IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF GEORGIA

SAVANNAH DIVISION


UNITED STATES OF AMERICA      *

v.                            * CASE NUMBER CR413-28

NAJAM AZMAT                    *

_____

Transcript of Detention Hearing held February 28, 2013 before The

Honorable G. R. SMITH, Magistrate  Judge Presiding.

_____



APPEARANCES:

For the Government                              DAVID BURNS, ESQ.

For the Defendant                          KARL I. KNOCHE, AUSA
                                   E. GREGORY GILLULY, JR., AUSA




*Proceedings electronically recorded; transcript produced from transcription o f electronic recording.*

-2-

1    [NOTE: Court is opened.]

2    CLERK: The Court calls the case United States of America

3    versus Najam Azmat, Criminal Case Number CR413-28.

4    MR. KNOCHE: Good morning, Your Honor.  Karl Knoche and

5    Greg Gilluly for the United States. We're here for a detention hearing this

6    morning.  The government is ready.

7    MR. BURNS: Good morning, Your Honor.  David Burns for Dr.

8    Najam Azmat and we are ready.

9    THE COURT: The government has presented an exhibit list.

10   Do you intend to call witnesses?

11   MR. KNOCHE: We intend to proffer, Your Honor.  And in this

12   matter – I know Your Honor has had an opportunity to review the

13   indictment.  There are 49 counts charged in this indictment alleging

14   violations of Title 21, offenses for which a maximum sentence of ten years

15   or more is prescribed under the Controlled Substances Act, and that being

16   the case, the Bail Reform Act does have a rebuttable presumption that there

17   are no conditions or combination of conditions which would reasonably

18   assure the appearance of the defendant as required, and the safety of the

19   community.

20   This is a burden-shifting device.  We call on the defendant to

21   rebut the presumption, and then the government will proffer its evidence if

22   the defendant is successful in doing so.  We propose proceeding in that

23   fashion.

24   THE COURT: You learned this from Mr. Gilluly, did you, when

25   he came to the district?

1    MR. KNOCHE: We've discussed it, yes.

2    THE COURT: I'd never seen that before until he arrived. I

3    expect to see more of it.  Mr. Burns?

4    MR. BURNS: Good morning, Your Honor.  In regards to my

5    client, we don't think there should be any issue as to whether he should be

6    granted a bond.  We think the only issue should be what amount.  He has –

7    do you want me to do it from the podium or –

8    THE COURT:  – I can hear you well.  Wherever you are more

9    comfortable, I don't have a preference.

10    MR. BURNS: I met with him last night.  Obviously this is an

11    appointment from late Tuesday afternoon, but, if I can just get to my notes

12    from last night.  I've had an opportunity to review Probation Officer Drew

13    Walker's recommendation this morning, and we certainly take issue with

14    that.  In it there are three reasons cited as assessment of non-appearance.

15    The first is the offense charged.  As Mr. Knoche previously

16    stated, there's a multiple count indictment, but the basis of it is a

17    conspiracy related to the distribution of Schedule II through IV substances,

18    and that is alleged from a time period of basically three weeks in February

19    of 2011, when Dr. Azmat was employed by, I think it's East Coast Health in

20    Garden City on Highway 80.

21    THE COURT: How long a period?

22    MR. BURNS: Three weeks.

23    MR. KNOCHE: That's approximately correct.

24    MR. BURNS: That was the total term of his employment at that

25    medical center.  One of the arguments we anticipate from the government

-4-

1    is that continuing threat, to continue the actions that the government has

2    alleged occurred back in 2011.

3              THE COURT: I think Congress presumed that that is so.

4              MR. BURNS: Certainly, and –

5              THE COURT:  – That people in the drug trade stay in the drug

6    trade.  Now, normally, in a normal situation, and I don't know what – I

7    have re-read the legislative history of the act, but the typical case we see, of

8    course, is a different type of distribution.  And that's street drugs.  But the

9    Court knows that these pill mills have sprung up across the land, and they

10   are the hot new area for people to get access to mind-altering drugs, and it's

11   a major sort of a sea change in the country.  You don't have to read very far

12   to come across articles about this.

13             MR. BURNS: Certainly we're not here to contest whether it's,

14   you know, a legitimate area for the government to prosecute.  But we are

15   here to argue that there's no reason for him to be denied.  His medical

16   license is suspended currently in Kentucky.  And it's my understanding

17   they actually had a hearing today regarding that. So as it stands now, he is

18   not in any position to prescribe any more drugs.  He doesn't have his DEA

19   license at the time, and apparently it's been suspended for the better part of

20   a year.  So the threat of any continuing activity in that regard is essentially

21   none.  He doesn't have the license to do it.

22             THE COURT: In other words, you're saying his threat was

23   posed by his ability as a physician – if the indictment is accepted, and the

24   probable cause finding has been made by the grand jury, that his threat was

25   that he would write prescriptions and allow people to get access to

1    prescription medications for an unlawful purpose.

2              MR. BURNS: That is the government's –

3              THE COURT:  – The loss of his medical license would deprive

4    him of that ability, and therefore eliminate the threat.

5              MR. BURNS: That is correct, Your Honor.  He has not practiced

6    in a year, and I believe that is reflected in the probation report.

7              The second is the lack of verifiable, legitimate employment.

8    Obviously, without his ability to prescribe medication, he cannot practice as

9    a medical doctor.  If and when that license is restored – and he is fighting

10   strenuously to have it restored, but if it is restored he at that point could

11   seek employment in his own field again.  But until that point, he's in no

12   position to practice.

13             Moreover, numerous defendants coming before this Court with

14   no employment, presently or, you know, in years past, and that's not an

15   issue for whether they should be granted bond or not.

16             THE COURT: Well, I think the government's argument would

17   be a lack of legitimate employment means, in a person who wants to live,

18   he might resort to the illegitimate-type of employment that he's been

19   engaged in.  So if he has no means of support, that's certainly a factor to be

20   considered under the Bail Reform Act.

21             MR. BURNS: I think it's a bit of a stretch, though, to speculate

22   that anybody without a job would resort to illegal means to make money,

23   though.

24             THE COURT: Well, that may be so, but he's in a little different

25   situation than the average person who loses their job, and there's a

1    probable cause finding that he's been engaged for quite some time – there

2    is a prior history the government will offer here about activities in

3    Kentucky; is that correct?

4            MR. KNOCHE: Correct, Your Honor.  Activities which actually

5    took place after the events alleged in our indictment.

6            MR. BURNS: The third reason cited is, ties to a foreign country.

7            THE COURT: Yes.

8            MR. BURNS: While Dr. Azmat was born in Pakistan, he has

9    been a U.S. citizen since the '80s.  All of his medical practice, his medical

10   training, his education has been in this country.  He has four children in

11   this country.  Now, I think he may have gone to medical school before he

12   came here, but his residencies were in the United States, Washington, D.C.,

13   as well as a couple of other places we talked about last night.  Surgical

14   training in Washington, D.C., New York and Ohio.  And his ties to a foreign

15   country, obviously it is a legitimate issue for discussion on a bail hearing.

16   Is there a flight risk that he would leave the country?  In order to do that,

17   he's going to need a passport.  Due to child support obligations out of New

18   Jersey, when he went to renew his passport, New Jersey put a hold on it.

19   So presently he does not have a valid passport to leave the country, even if

20   he wished to.  And this is a concern for the Court, because he is trying to

21   clear up the child support arrearage.

22           If during the pendency of this case, for whatever reason, he

23   does have his passport renewed, he would be more than willing to

24   surrender that pending the outcome of this case.

25           So we think the issues cited by probation are not legitimate

-7-

1   reasons to deny him bond in this case.  He's 55 years old.  He's never faced

2   a criminal charge before.  I know the government is going to point to issues

3   with his license and practice over the last five or six years, but the fact of

4   the matter is, this is the first time he's ever been arrested in his life.  He's 55

5   years old.  He's a doctor, he's a U.S. citizen, he doesn't have the ability to

6   travel.  And with all those reasons, we think he is absolutely appropriate for

7   a bond.

8           The government is going to have what we anticipate is a large

9   volume of discovery.  In my experience, this is going to slow down the

10  process somewhat, as obviously the government has all this time to build

11  up the case before they file it, but then it's handed off to the defense to

12  analyze.  And, you know, a lot of times we're given 10, 20-day windows to

13  do that in, which may not be appropriate in this case, and I may be asking

14  for additional time.  And in light of that, we think that's another reason that

15  we think bond should granted.

16          Moreover, the government first approached Dr. Azmat about

17  this in September of 2012.  There were negotiations between his attorney at

18  that time and the government as to pleading to one count of conspiracy.

19  He declined the offer.  He knew that this was coming.  There was no

20  attempt at flight.  When they came to find him, he was at his home.  His

21  home is in Waycross, Georgia, within the Southern District, and they own

22  the home.  They've been there since 2005.  Another indication that he's not

23  a flight risk, ties to the community.

24          And with all that in mind, we do feel it's highly appropriate that

25  he be granted bond in a reasonable amount.

1    MR. KNOCHE: Your Honor, without conceding that the

2    presumption has been rebutted, the government does have some

3    information that we would like to proffer to the Court.

4    Your Honor, initially, in response to counsel's argument, I

5    would urge the Court – and I'm sure the Court just from common sense

6    and experience appreciates that regulatory means of inhibiting and

7    preventing criminal behavior, it's an imperfect means at best. Whether it's

8    a background check for the purchase of a weapon, or whether it's the

9    requirement of a DEA registration and medical license, things fall through

10   the cracks all the time.  And to rely on the fact that he does not currently

11   have a medical license as a bar to him engaging in similar types of behavior

12   in the future, I think should be looked at with some skepticism.

13   Going to the indictment itself, Your Honor, there is probable

14   cause to believe the allegations in that indictment.  I would proffer to the

15   Court, as counsel pointed out a moment ago, Dr. Azmat worked at East

16   Health Center in Garden city for a fairly short time, approximately

17   February the 21st through March the 15th of 2011.  Your Honor, this is a

18   clinic which was established in Garden City, not by any local doctors, not by

19   any local businessmen, not by any local community activists, the persons

20   who established this clinic were, without exception, from south Florida –

21   Ft. Lauderdale, Boca Raton area.  They had experience in pill mills down in

22   Florida which had been shut down, and Florida had passed certain laws

23   making it more difficult for these clinics to operate.  So these conspirators

24   decided to move to Georgia where the laws were not as onerous for the

25   operation of these clinics, and where the clinic would be located closer to

1    the customer base – and I'll say customer base and not patient base.

2    Mostly persons coming from states like Kentucky, Ohio, Tennessee,

3    traveling hundreds of miles on a monthly basis for the privilege of paying a

4    $250 or $300 cash fee at East Health Center, seeing Dr. Azmat, or whoever

5    else was in the employ of East Health Center, and receiving prescriptions

6    for powerful narcotic medications - 30 mg oxycodone, 50 mg oxycodone.

7    These were prescribed for these customers almost and virtually without

8    exception.

9          Your Honor, during the short time that Dr. Azmat worked at the

10   clinic, the DEA has looked at the prescriptions written, Dr. Azmat

11   prescribed approximately 636,000 mg of oxycodone.  Now, that number

12   pulled out of the air does not necessarily speak to us right off, but I did

13   some math and looked at the guidelines.  That would equate to 636 grams

14   of oxy, or the equivalent, converting under the published sentencing

15   guidelines, to 4,200 kilograms of marijuana, an offense level of 34.  So

16   that's a very large amount of drug, even under the fairly generous, if I will

17   say, marijuana sentencing guideline standards.

18          Your Honor, the many characteristics of the pain clinic are set

19   forth in Paragraph 36 of the indictment.  I'd like to review several of them.

20          It's alleged, first of all, that none of the employees of the clinic,

21   with the exception of the medical doctor – and in this case we're focusing

22   on Dr. Azmat – had no medical background, training or education.  These

23   were people, some of whom call from call centers where their main

24   employment history was, you know, cold calling people, like maybe you get

25   phone calls, or others in the courtroom get phone calls at their dinner hour

1   seeking to repair your bad credit, those sorts of things.  That was the types

2   of persons that worked at the clinic.  They had a number of requirements to

3   be seen by a doctor.  Number one requirement, and the main purpose of

4   the conspiracy was to separate patient from cash, and, as I've indicated, a

5   cash payment was required in the amount of $250 to as high as $350.  No

6   insurance was taken at this clinic.  There was no Medicare, no Medicaid.

7   This was a cash business.  And the doctors who worked there were typically

8   paid in cash at the end of the day.  There were some exceptions to that.

9   Sometimes checks were written, but for the most part doctors were paid

10   from the cash proceeds taken in by the business.

11          Your Honor, the clinic was characterized by inadequate

12   verification of the patients' medical complaints, a cursory medical

13   examination, if any, by the attending physician, inadequate patient medical

14   histories.  The doctors did not require patients to bring their prior medical

15   records.  Perhaps a pharmacy record showing that they had obtained

16   controlled substances in the past, but that would be it.  An MRI report,

17   which the patient would bring by himself or herself to the clinic.  The clinic

18   did not go to the MRI facilities to request these reports, so obviously the

19   potential for fraud in connection with those MRI reports was very large.

20          There was little, if any, dialogue with patients regarding

21   treatment options, no discussion of risk and benefits of such treatments.

22   Patients were not referred to other specialists for physical therapy, or for

23   orthopedic work, or neurological exams.  It didn't happen.  The sole reason

24   patients came to the clinic was to receive prescriptions for oxycodone and

25   often typically Xanax, a Schedule IV controlled substance.

-11-

1    Your Honor, so this went on for some time.  Dr. Azmat left the

2    employ of the clinic on March 15th of 2011.  He ultimately ended up in

3    Lexington, Kentucky after his tenure at East Health Center.  And, curiously,

4    there it did not take long for the authorities to find out that significant pill

5    mill operation is at play in Kentucky.  And Your Honor, I have as an exhibit,

6    which I will tender in a moment as Government Exhibit Number 3, it's an

7    emergency order of suspension from the Commonwealth Kentucky Board

8    of Medical Licensure dated February the 16th of 2012.  This dealt with his

9    activities at that health clinic, again, occurring in the later stages of 2011.

10   The findings which I'm about to summarize for you from the Board's order

11   and findings of fact are very similar to the facts which I've just proffered

12   concerning the operation at East Health Center.

13   Among those findings, they found that Dr. Azmat's medical

14   specialty was vascular surgery – and we'll talk about that some more in a

15   moment – but they found that Azmat has no training in the specialty of

16   pain management medicine or primary care.  The Board appointed an

17   inspector to review Dr. Azmat's practices at this Lexington clinic, identified

18   the following concerns:

19   One, that Azmat typically prescribed oxycodone 15 mg or 30 mg

20   medications in similar doses and quantities for the majority of patients.  In

21   other words, a patient appeared, a patient typically got the same

22   prescription cocktail, if you'll call it, as every other patient who showed up

23   at the clinic.

24   The practice was characterized by young patients on high doses

25   of narcotics, narcotic analgesic medications.

1    It was characterized by patients traveling long distances to

2 obtain medications.  Looking through the substantive counts of our

3 indictment, you'll see we put the city and state of origin for particular

4 patients for whom substantive counts were alleged, and almost without fail

5 they're from Kentucky, from Florida – not from Savannah, not from

6 Garden City, not from Chatham County, not from the Southern District of

7 Georgia - coming from long distances for the privilege of being treated by

8 Dr. Azmat, who has no training in the specialty of pain management.  And,

9 you know, I'm just guessing, Your Honor, and I would proffer that a patient

10 coming from Lexington, Kentucky, as some of those identified in the

11 substantive counts, must have passed a number of other legitimate pain

12 clinics prior to getting to East Health Center.  They came here for one

13 reason, and that was because they knew they could score these drugs.

14    Prospective patients, the inspector found and the Board found,

15 were instructed to bring a copy of an MRI report – that's what we did here

16 at East Health Center – a printout from their previous pharmacy showing

17 what medications had been prescribed.  The Board found that these

18 practices lacked the credibility necessary to make real medical decisions.

19    Azmat's practice in Kentucky did not accept any health

20 insurance, same as our practice.  A significant number of his patients were

21 unemployed, and yet were able to pay hundreds of dollars each month for

22 expensive office visits and medications.  The majority of the patients, the

23 Board concluded, would have to be diverting their drugs to be able to afford

24 the cost of this travel, doctor's fees, and cost of acquiring the prescriptions

25 from a pharmacy.

1    Oh, and by the way, I didn't mention, there were no local

2    pharmacies in the Savannah area that would fill Dr. Azmat's prescriptions.

3    So when a patient traveled here and obtained a prescription, that was just

4    the beginning of the odyssey. Then the next trip was, find a pharmacy,

5    often hundreds of miles away, to fill the prescription. And staff at the East

6    Health Center, that was one of their duties, was to make sure we had a list

7    of pharmacies that were willing to accept these prescriptions written by Dr.

8    Azmat. You wouldn't go to CVS and fill these prescriptions.

9    The Board in Kentucky concluded that the cash fee which was

10   charged in Lexington was $250, concluded that that's approximately three

11   times the standard fee that a doctor would charge for such an office visit. A

12   cash-only pain management clinic, the Board concluded, is a red flag that

13   the facility is not legitimate.

14   Just a few more things from Kentucky, Your Honor. I'm going

15   to tender the Board's finding. They concluded that Azmat ignored

16   pertinent information for developing a treatment plan. He placed all

17   patients on the same high dose opioid medications, regardless of the

18   severity of diagnosis or potential risk associated with the medications.

19   They reviewed 21 patient files, all 21 reviewed received high-dose opioid

20   medication, and these were prescribed on the very first visit to the clinic.

21   Azmat did not make any attempt to diagnose source of pain, there were no

22   referrals for physical therapy. His automatic ordering of MRI studies did

23   not correlate to any physical examination or a written treatment plan. All

24   21 patient files reviewed came from out of state – the patients came from

25   out-of-state pill mills located in Florida, Ohio and Georgia.

-14-

1    And they concluded, and I think the Court should give great

2    weight to this, [reading]: There's probable cause to believe that Azmat's

3    practice constitutes a danger to the health, welfare and safety of his

4    patients and the general public.

5    There is probable cause to believe that he has committed

6    certain violations in the recent past, and probable cause to believe he will

7    commit similar violations in the near future.

8    THE COURT: How long did he work at the Kentucky facility

9    you've just mentioned?

10    MR. KNOCHE: I believe it was approximately four months,

11    Your Honor.  If I may for just a moment ...  According to Dr. Azmat, who

12    was interviewed, and I'm going to proffer from a statement he made, from

13    approximately May of 2011 through February of 2012.  The order of

14    suspension was dated February the 16th of 2012.

15    THE COURT: Is it, to your knowledge, common for any state's

16    medical examiners board to take such prompt and immediate action upon

17    learning of – how did it come to fruition that quickly?

18    MR. KNOCHE: Referring to my preparatory comments about

19    regulatory mechanisms being often less than we would hope, I would say

20    that was quick action.

21    THE COURT: That's remarkably quick.  I'm most impressed

22    with Kentucky.

23    MR. KNOCHE: And then called it an emergency order, so they

24    did recognize the severity of ...

25    THE COURT: How that information came to the medical

1    authorities of Kentucky, you're not at this time aware.

2            MR. KNOCHE: Well, Your Honor, I will say that from our

3    experience here at East Health Center what happens is, these clinics can be

4    spotted.  You know, if you'll allow me the license to say, you can see these

5    things from a hundred miles away, I mean, because they have the indicia:

6    people lining up early in the morning, out-of-state license plates,

7    congregating and waiting, you know, loitering at the premises where the

8    facility is located.  Typically it will be a neighboring tenant, you know, a

9    neighboring business who will say, hey, there's a problem here.  This

10   medical clinic just opened up and the place is overrun with what appear to

11   be drug-seeking people, and I use the word "pill-billy" because I've heard

12   other people use it.  People from out of state who are obviously and

13   apparently addicted to drugs.

14           THE COURT: And this emergency order in Kentucky revoked

15   the license to practice in that state?

16           MR. KNOCHE: In Kentucky.

17           THE COURT: In Kentucky.

18           MR. KNOCHE: Yes, sir.

19           THE COURT: Has there ever been a similar order out of

20   Georgia?

21           MR. KNOCHE: Not pertaining to his prescribing practices.

22   Your Honor, Exhibit 1, which I'll tender in a moment – and I believe Your

23   Honor has a copy of the government's exhibit list –

24           THE COURT: I have the list, yeah.

25           MR. KNOCHE: – is a letter of suspension from the Georgia

-16-

1    Composite State Board of Medical Examiners from September 23, 2008.

2    That was for a failure to pay child support.  And I believe that suspension

3    was fairly short lived, that his license was restored within a week or two of

4    that order.

5            THE COURT: You have mentioned that the indictment says –

6    and there's probable cause to support, obviously, the indictment or we

7    wouldn't have an indictment – that these various things you've ticked off

8    here regarding a lack of medical examination, there's a failure to really

9    focus in on any legitimate medical complaints that would warrant the

10   dispensing of these types of drugs, and that this really being the hallmark of

11   the classic pill mill, that the grand jury has found that to be so.  You did not

12   mention what led the government to bring this indictment, what the

13   strength of the evidence is supporting these type of allegations.

14           MR. KNOCHE: Your Honor, I will represent to the Court that

15   during the course of this investigation, which began in the U.S. Attorney's

16   office in approximately May of 2011, it led to the issuance of a search

17   warrant by this Court on May the 26th.  The search of the East Health

18   Center premises, by which time a different doctor, Dr. Kenneth Gossett,

19   was working there, the seizure of approximately 900 medical files, the

20   evaluation of those files, and then the calling of approximately 32 witnesses

21   before the grand jury over the course of the last year and a half.  In

22   addition, as far as strength of case goes, this Court, all in front of Judge

23   Moore, has already received guilty pleas from four defendants pursuant to

24   informations; one a manager and organizer of the clinic named Adelard

25   LeFrancois, an individual named Constantinos Afthinos, who was a worker

-17-

1    in the clinic, a fellow named Frankie Barbuscia, who was what we call a

2    marketer for the clinic.  And let me explain the marketing procedures for

3    these clinics.  It involves individuals who are able to withstand scrutiny and

4    a little bit of the rough and tumble of the street.  They go to rival pain

5    clinics and they put leaflets in the hands of persons who are obvious to the

6    marketer's perspective pill mill patients, clients if you will, and that leaflet

7    will say, hey, we have opened this new clinic in Garden City, Georgia.

8    Come on up, it's closer, and if you present this on your first visit we'll give

9    you a little discount on the fee.  That was their marketing, was spotting

10   drug addicts at other pill mills and encouraging them to bring their

11   business here.

12              Also, for strength of the case, one of the physicians who

13   succeeded Dr. Azmat, Dr. Kenneth Gossett, he has pleaded guilty to a Title

14   18, U.S. Code 371 conspiracy alleging also – it was a multi-object

15   conspiracy, but among them alleging that he dispensed controlled

16   substances, the same type that are set forth in this indictment, without

17   legitimate medical purpose, outside the ordinary course of professional

18   practice.

19              THE COURT: I don't want to get you too far off track, but I am

20   interested in your response to defendant's assertion that, well, without a

21   medical license his ability to do this type of thing has come to an end.  And

22   that's his – you know, regardless of the strength of the government's case

23   and what he's done in the past, his ability to repeat that type of activity is

24   really eliminated.

25              MR. KNOCHE: Well, I think what concerned me a great deal,

-18-

1    the government, was counsel's representation that Dr. Azmat is strenuously

2    and vigorously attempting to have his medical license reinstated.  He is not

3    remorseful, not repentant, does not recognize what is apparent to others

4    who have looked at this pill mill and others similar to it that this behavior is

5    obviously and blatantly and dangerously illegal.  And he wishes to be

6    reinstated to that status.

7                    THE COURT: Well, if he's barred by Kentucky from practicing

8    medicine there, but you are unaware of his currently being barred in

9    Georgia; is that correct?

10                    MR. KNOCHE: I'm unaware of that, and I would – I am not

11   aware –

12                    MR. BURNS:  – Can I clarify that issue, Your Honor?  His

13   Georgia license has not been suspended, but his DEA license to write

14   prescriptions has.  So even though – they can't really practice, license, one

15   without the other.  So he's not in any position to practice without a DEA

16   license.

17                    MR. KNOCHE: However, a physician can work under someone

18   else's DEA's registration.  So that is not barred.

19                    Oftentimes a street drug dealer will appear before the Court and

20   will promise not to engage in the behavior again, and this Court has a lot of

21   experience with that condition being ineffective.  With a medical doctor –

22                    THE COURT:  – I'm also experienced with it being effective.

23                    MR. KNOCHE: Sometimes, and the government –

24                    THE COURT:  – You know, over the history of all these years, it

25   depends on what is at stake in that person's life.  I have found that certain

-19-

1    collateral has a powerful influence on some of these individuals.  Of course,

2    I've heard no proffer here about any real collateral, and no individual is

3    coming forward that would satisfy – I haven't heard of anyone to satisfy the

4    Court, if they pledge their assets that would cause Dr. Azmat to be very

5    careful in his conduct.

6            MR. KNOCHE: Well, and again, there is a question in a similar

7    vein, the defendant, according to the pretrial services report, is still

8    $60,000 in arrears in child support payments.  He's applied here for –

9            THE COURT:  – He wants to catch up so he can get his passport

10   renewed.

11           MR. KNOCHE: And how he will do that is hard to fathom.  He's

12   without significant means, otherwise he would not have applied for and

13   had been granted court-appointed counsel.  He still has significant ties to

14   abroad, regardless of his passport status.  We don't have his passport, but

15   apparently he traveled to the U.K., I believe the report indicates in 2011.

16           THE COURT: Well, I note – I see that, and I note in the

17   information disclosed to the probation officer that during a period of

18   however long it lasted in 2011 to 2012 he was earning $30,000 per month

19   in nine months during that period.  That doesn't – that's a considerable

20   sum of money to not any of it be around anymore.  So I have some

21   reservations about really whether he even qualifies for court-appointed

22   counsel, but he's made the showing and he's sworn that he has nothing,

23   and they've accepted his assertions, and I have as well.  But utter lack of

24   any money or resources to travel or to escape the Court's jurisdiction, I'm

25   not sure that I'm utterly convinced of that.

1        MR. KNOCHE: That he lacks the resources.

2        THE COURT: Yeah, that he lacks the resources.

3        MR. KNOCHE: Yes, sir.  The government would join in that

4    finding.

5        THE COURT: You know what the physicians at this East Pain

6    Clinic were being paid?  Was it at the end of every week, end of every day,

7    or how?

8        MR. KNOCHE: It's alleged in the indictment, and it's

9    particularly as far as Dr. Azmat, it's in the money laundering portion, and I

10   will read.  I believe it was on Page 19 of the indictment [reading]: Between

11   March the 1st 2011 and March the 18th of 2011, the conspirators made daily

12   salary payments by cash, check or credit card to Najam Azmat in amounts

13   ranging between approximately 1 and $2,000.  We've taken that off of

14   records that we seized during the course of the investigation.

15       THE COURT: Similar system here as was in place in Kentucky.

16       MR. KNOCHE: Yes, sir, it's a – the motivation for engaging in

17   this type of practice, if one is so inclined to abuse the power granted by

18   their licensing states and the United States Government, it's a lucrative

19   opportunity to make money.  And this is something which Dr. Azmat has

20   not violated once, twice, we've alleged numerous occasions in the course of

21   this conspiracy.  And then – obviously then numerous more occasions in

22   Kentucky, which led them from a starting base of zero to suspend his

23   license within a matter of months, and make these very damning findings

24   concerning his –

25       THE COURT:  – In your experience, and in this case particular,

-21-

1  are most of these pain clinics operating with one physician on staff or

2  multiple physicians?

3         MR. KNOCHE: I would say in the past I would have said one,

4  Your Honor, but I think our experience with several of these investigations

5  which are ongoing now, and some of which have been indicted, it is

6  multiple physicians, not necessarily working at the same time, but working

7  successively.  A physician will have a tenure for a few months, and then be

8  replaced by another.

9         THE COURT: Of course, regardless of the presumption, the

10  government's burden on danger to the community is clear and convincing

11  evidence, that not only has he done dangerous things in the past, but he

12  will continue to endanger the community.  Flight risk, of course, is a lower

13  threshold.

14         MR. KNOCHE: Yes, it is.

15         THE COURT: And the absence of a passport has not prevented

16  others from leaving the country.

17         MR. KNOCHE: Your Honor, the exhibits, I'd like to just review

18  them briefly with Your Honor.

19         As I said, Exhibit 1 is the letter of suspension from the Georgia

20  Board in 2008 for the child support arrearage.

21         I have marked as Government Exhibit 2, this is an article from

22  the *Florida Times Union* and the headline of this article is "Waycross

23  Hospital Pays $840,000 in Lawsuit Over Unqualified Physician," and this

24  involved a wrongful death stemming from an endovascular procedure that

25  Dr. Azmat performed at the Satilla Regional Medical Center some time, I

1    believe it was in 2005 or 6.

2                    THE COURT: What does this show me?

3                    MR. KNOCHE: Pardon me?

4                    THE COURT: What does this establish for purposes of

5    detention?

6                    MR. KNOCHE: Well, as far as dangerousness, I mean, if he had

7    – whether he's acting as a pill mill or as a vascular surgeon, he is a hazard

8    and a menace to patients –

9                    THE COURT:  – You think any settlement that a hospital enters

10   into shows wrongdoing on the part of the physician or hospital?

11                   MR. BURNS: Judge, we would object to the introduction of any

12   news articles.  They are hearsay within hearsay.  The article –

13                   THE COURT:  – Well, hearsay is admissible at a proceeding like

14   this –

15                   MR. BURNS: Sure, we understand that but ...

16                   THE COURT:  – but I don't give too much weight to the fact

17   that some hospital entered into a settlement.  It doesn't prove wrongdoing.

18   And hospitals settle all the time because they live in fear that – well, of

19   runaway juries.

20                   MR. BURNS: Certainly.

21                   THE COURT: That bad results mean big verdicts regardless of

22   fault.  So I know this.

23                   MR. BURNS: And what we would point to here is, that this is a

24   newspaper person's brief analysis of legal documents, of which the U.S.

25   government was a party.  If they wanted to provide the settlement, they

-23-

1    could.

2            THE COURT: I think I was convinced with your argument

3    before you made it.

4            MR. BURNS: All right, thank you.

5            MR. KNOCHE: Your Honor, I have Exhibit 3, is the emergency

6    order of suspension.  It's a lengthy document, and I have summarized it to

7    some length, but I would like to tender that.

8                4 is – I'm sure counsel will have the same objection – is another

9    newspaper article from Kentucky summarizing, if you will, the emergency

10   order of suspension.  It may aid the Court in parsing through this order.

11           THE COURT: In other words, it does reflect the suspension up

12   there got the attention of the press.

13           MR. KNOCHE: It did that.  Your Honor, Exhibit 6 – these are

14   copies of medical files which were seized from the East Health Center, and I

15   will tender these as proof of the strength of the government's case.  But

16   attached to them is what was called an expert worksheet for each of the

17   patients.  And some of the patients also saw Dr. Gossett or other physicians

18   at East Health Center, but an expert looked at these and concluded that

19   these prescriptions were written without legitimate medical purpose, in

20   fairly strong terms.

21           THE COURT: And is the expert's summary of that attached?

22           MR. KNOCHE: Yes, it is, Your Honor.  It's attached to each file.

23   There are a number of them.

24               And finally, Your Honor, I would tender what I've marked as

25   Government's Exhibit 5, which is a summary of an interview conducted of

-24-

1   Dr. Azmat by Diversion Investigator Charles Sikes of the Drug Enforcement

2   Administration.  Just confirms, you know, the fact that he did work there

3   during the time period alleged, that he did prescribe the medications that

4   we've been talking about, that he did recognize that patients came from

5   long distances to see him.  I would tender it as corroboration of that

6   proffer.

7           So I would tender those six exhibits.  I've given copies to

8   counsel.  If I may have just a moment, Your Honor. [Pause]  That would be

9   the government's presentation.

10          THE COURT: Well, does the defendant have any other evidence

11  that you would like to offer?

12          MR. BURNS: We're not seeking to introduce any evidence,

13  Your Honor.  If I could just point a couple of things out in response to the

14  government's arguments there.  One thing is that this is an issue of the care

15  of the doctor, that's what this about, was this care proper.  And that's

16  ultimately going to be for the jury to decide.  Whether these were – you

17  know, he clearly had the license –

18          THE COURT:  – Well, it's true, but if somebody is charged with

19  handling cocaine, transferring that, that's ultimately a decision for the fact

20  finder, and that is the jury.

21          MR. BURNS: There is no legitimate cocaine anymore.

22          THE COURT: Well, a legitimate medical need would be a

23  defense, just like I didn't distribute the cocaine would be, or it was for

24  personal use rather than distribution would be a defense.  But the strength

25  of the evidence as to whether a crime has been committed must be

-25-

1    considered by the Court at the same time that the presumption of

2    innocence is still attached to the defendant.  So the Bail Reform Act puts

3    the Court in the unique position of assessing the merits of the government's

4    case early on on probable cause, hearsay-type showings.  And it's

5    problematical, but that's historically what courts have done, and the

6    Supreme Court has upheld the constitutionality of these procedures.

7            MR. BURNS: And we'd also point out, while the government

8    has had an opportunity to have its experts examine these and say what

9    their position is, we have not had an opportunity for our experts to examine

10   them and say what the doctor's position is.

11           THE COURT: Absolutely, yeah, that's still – of course, the very

12   nature of this, what kind of medical doctor would operate a clinic where the

13   patients travel for hundreds of miles to receive pills which are readily

14   available in the community where they live?  It's a red flag, was what Mr.

15   Knoche said Kentucky found.  It's a red flag all right.  In fact, it can't be

16   explained away.

17           MR. BURNS: And I think something that's important to know is

18   that all this knowledge may not be the doctor's.  The doctor is going to look

19   at the patient.  You know, the doctor –

20           THE COURT:  – Mr. Knoche said that his statement was that he

21   did know the patients were traveling that far to get these pills.  He

22   confessed that during an interview.

23           MR. BURNS: Okay, I can't speak to that evidence.

24           THE COURT: That's what you just said.

25           MR. KNOCHE: Yes, sir, that is reflected in the summary.

1    MR. BURNS: What's not reflected is what percentage of the

2    patients were local.  What percentage of the patients had seen other doctors

3    before going there.  That's obviously all issues for trial.  We aren't here to

4    try this –

5    THE COURT:  – Well, now, the indictment lists patients and

6    gives where they live.

7    MR. BURNS: But I think it's selective.  I don't think –

8    THE COURT:  – I don't know about how many, that the

9    number were distributed doesn't add up in the indictment.  So there were

10    local people he was seeing as well for these same purposes.

11    MR. KNOCHE: I believe at the very – it may have shed some

12    light on it, Paragraph 38 of the indictment says that [reading]: During the

13    period of the conspiracy – not all of which Dr. Azmat was at the clinic, but

14    it says [reading]:  – prescriptions were written for more than 480 patients

15    who lived outside the state of Georgia, including more than 130 from

16    Kentucky, more than 50 from North Carolina, more than 30 from South

17    Carolina, and more than 80 from Florida.

18    MR. BURNS: But what it doesn't list is how many were from

19    Georgia.

20    THE COURT: Well, it's wrong to dispense medications for an

21    illicit purpose, regardless of the person's residence.

22    MR. BURNS: And something else we would point out was that

23    he was there for four weeks, Judge.  I can tell you, I was originally hired by

24    an attorney when I moved to Savannah.  I didn't know anything about him,

25    I wasn't from here.  I worked for him for several months, realized that he

-27-

1    wasn't practicing properly, and I quit.  And I don't know why he's being

2    imputed with the conspiracy when he withdraw almost immediately, if he

3    conspired with anybody to begin with, but ...

4           THE COURT: I know the government's response, he withdrew

5    to go to Florida and continue the business – I mean to Kentucky.

6           MR. KNOCHE: Yeah, there was no withdrawal.  And the

7    practice wasn't something you walk into, this was something that he was

8    the primary, and without him it didn't happen.  So he knew what the

9    practice was because he's the onsite physician.

10          MR. BURNS: Another thing we would point to is, the

11   government talked about the patients being unemployed.  We don't think

12   that would be unusual at a pain management clinic.  A lot of people are

13   going to get injured on the job or in car accidents, and actually they get

14   worker's comp payments, they're getting personal injury settlement

15   payments, so we don't think that proves one thing or the other.

16          And that's basically it, Judge.  We'll obviously have our

17   opportunity to defend the case on the merits.  This morning's not the time.

18   We think bond is entirely appropriate.  If the Court is concerned about the

19   doctor having his license reinstated, he would certainly stipulate as a

20   condition of his bond that he will not practice while the case is ongoing.

21          THE COURT: If I set – you say reasonable bond, I guess you're

22   talking about the financial conditions that might be imposed by the Court.

23          MR. BURNS: That's correct.

24          THE COURT: What could he meet?  I mean, if I set any figure

25   that is commonly thrown around in drug cases, what could he meet?

-28-

1   What's the source of any funds he would use to post it?

2          MR. BURNS: Well, he's like any of my other clients, the families

3   are generally willing to help out.

4          THE COURT: But I don't see them here, and I don't see

5   anybody with substantial resources.  I've heard nothing from the defendant

6   that suggests that anyone in his family has the type of money that would

7   interest the Court as real security, that would ruin them if he were released

8   and violated.  Do you wish to comment on that?

9          MR. BURNS: We would just ask for a low bond, Judge.  And we

10  think the flight risk just doesn't exist.  We think the reasons cited don't

11  apply.  He's not leaving the country.  Anybody with enough will can do what

12  they want, but the fact of the matter is, if that were his intent, he would

13  have been long gone after federal agents showed up, and federal attorneys

14  were trying to get him to plead guilty to a case. If his intent were to flee, it

15  would have been at that time, not just to sit and wait for them to come get

16  him and then have to go through this process and then flee.  And we're not

17  talking about somebody that's unintelligent here.  If his intent was to flee,

18  there's no evidence that he ever intended to flee or took any substantial

19  step towards that.

20         THE COURT: Well, I can't eliminate the possibility that he was

21  hoping against hope that his statements to the agent would deflect

22  attention from him, or that he – it would be some time coming, or that it

23  would never arrive.  The indictment and arrest focuses the mind.

24         Congress has made the presumption that those in the drug

25  trade are flight risks and dangers to the community.  Mr. Knoche invokes

-29-

1  the presumption.  It stays in the case, even in the face of contrary evidence.

2  The contrary evidence here is that he's lost his medical license, that he has

3  no passport, so that he can't practice medicine, and he won't try to get it

4  back – you've represented he won't try to get his license back, therefore, he

5  can't do what he has been doing, or will not do it.  And that he can't leave

6  the jurisdiction or the country because he can't leave the United States and

7  travel abroad without a passport.  So that is offered to counter the

8  presumption.  But, you know, when I see a person that's traveled as

9  frequently as he has, who was born in Pakistan, who has sisters in England,

10  he has – he's in arrearage – despite a good income, he's in arrearage for a

11  large amount on child support, there's a good sum of money that he was

12  earning, and he concedes that, that now he's destitute, such that he only

13  secures counsel by appointment by the Court and on the public's bill.  He

14  doesn't have any employment that he could go to that I'm aware of.  These

15  ties to a foreign country in a case like this, where he has an incentive to get

16  out of the country, or to flee the jurisdiction, facing the kind of sentence he

17  now is – I don't know what he was aware of earlier, but Mr. Knoche has

18  made it very plain, if he is found to have distributed drugs in the fashion

19  that the grand jury has charged him with – and the government's evidence

20  is strong here, there may be defenses, but I have to look at it and make an

21  assessment about strength of the evidence, it's a strong case against this

22  defendant.  He knows – if he doesn't know, I can tell him, at a level 30, the

23  kind of sentence with no possibility of parole would be most lengthy.  He's

24  not a young man. It would be the balance of his life if he's convicted in this

25  case.  It could be.

-30-

1        That is a powerful incentive to avoid justice, to escape the

2   consequences of his actions.  I think he has the means through family help

3   or otherwise to flee the country.  In the fact of this evidence, there is no

4   specific – just family can get together, and if I pluck a figure out of the air,

5   they can come forward and try to meet it.  Well, I don't think that's what

6   the Bail Reform Act contemplates.  I think it's, you come forward with

7   specific family help and finances, and who these people are, and what his

8   ties to them are, and what the amount of money that they can put up that

9   might reasonably assure the Court that he is not going to flee, that he's not

10  going to engage in these activities again.

11        I'm not as persuaded by the government's danger to the

12  community argument as I am by the risk of flight.  I've seen other drug

13  cases where the operation has been so dismantled and interrupted by the

14  government, that certain defendants in the case I don't think could re-

15  establish their ties in the drug world as easily, and some can.  But when the

16  government brings through a careful investigation all its evidence to light

17  in a detention hearing, or highlights its evidence, that the defendant really

18  can't get back out and join the conspiracy he was in because all the

19  conspirators are in jail, that influences my decision sometimes.

20        I think here, without a medical license his utility to the pain mill

21  people who are managing and setting these things up is reduced and

22  diminished significantly.  And it's true, he could work under another

23  physician, and he could see them and run them through the mill, and

24  others could write the prescriptions.  They could rubber stamp them, for

25  that matter, and they probably do.

-31-

1       So I don't discount it altogether, but could the Court do things

2   that would diminish that?  Yes, we could probably put him on electronic

3   monitoring, under careful supervision, prohibit him from working at any

4   type of facility that's not approved by the Court, and do things of that

5   nature.  We would restrict his travel, and strict curfew, and that might

6   satisfy me on his danger to the community.  But risk of flight, I'm left with

7   the strong impression that he has every incentive to flee.  There's a

8   presumption created by Congress that he will.  I don't think that's been

9   sufficiently rebutted, and I am – with no firm statement by the defendant

10  that there are loved ones who have money that he would not want to hurt if

11  they posted it, and that it's a sufficiently large sum of assets or large

12  amount of assets that the Court thinks would cause him to reconsider, I

13  think the government has made out the case for detention.  It's not the

14  strongest case I've ever seen.  And I guess in most of these pill mill cases

15  when a person is local – if they're foreign to the district and they're caught

16  here, then I think most of them probably wind up going into custody.

17  Someone like him who has lived in the district for a long time, it's a little

18  different situation.

19      But I'm persuaded by the government's evidence here,

20  particularly in view of the lack of any showing by the defendant about who

21  would post money, what amount it would be, what resources they have, and

22  what his ties to those people are.  So I'll order pretrial detention in this

23  case.

24      [NOTE: Whereupon the proceedings are concluded.]

STATE OF GEORGIA

CHATHAM COUNTY.

CERTIFICATE OF REPORTER

I, Marie Cowart, do hereby certify that the above and foregoing pages of typewritten material is a true, correct and complete transcript produced from the electronic sound recording of the proceedings in the above-entitled matter.

This 9th day of April, 2013.

/s/ *Marie Cowart*

Marie Cowart, CCR B-237
United States Court Reporter
Southern District of Georgia
Savannah Division

P. O. Box 9572
Savannah, GA 31412
(912) 650- 4066