IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF GEORGIA

SAVANNAH DIVISION

UNITED STATES OF AMERICA   *

v.                       * CASE NUMBER CR413-28

SEAN MICHAEL CLARK,     *
ET. AL.

_____

Transcript of Motions and Evidentiary Hearing  held September 10, 2013

before The Honorable G. R. SMITH, Magistrate  Judge Presiding.

_____

*Proceedings electronically recorded; transcript produced from transcription o f electronic recording.*

-2-

APPEARANCES:

For Defendant Clark                        ROBERT PHILLIPS, III, ESQ.

For Defendant Lizama                       DAVID A. KETTEL, ESQ.
                                           JULIE M. WADE, ESQ.


For Defendant Azmat                        THOMAS A. WITHERS, ESQ.

For Defendant Morford                  ANNE PANNELL RODMAN, ESQ.

For the Government                         KARL I. KNOCHE, AUSA
                                           GREG GILLULY, AUSA



## I N D E X

PRELIMINARIES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5


COURT'S RULINGS ON MOTIONS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6


### Government's Presentation of Evidence

DOUG KAHN

    Direct Examination by Mr. Knoche  . . . . . . . . . . . . . . . . . . . . . . . . . .  36

    Cross-Examination by Mr. Kettel . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44

    Redirect Examination by Mr. Knoche  . . . . . . . . . . . . . . . . . . . . . . . .  56

### Defense Presentation of Evidence

BOBBY BANKS

    Direct Examination by Mr. Kettel . . . . . . . . . . . . . . . . . . . . . . . . . . 57


ANGEL COLEMAN

    Direct Examination by Mr. Kettel . . . . . . . . . . . . . . . . . . . . . . . . . . 60


COREY SCHAFF

    Direct Examination by Mr. Kettel . . . . . . . . . . . . . . . . . . . . . . . . . . 65

    Cross-Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . . 67


KEVIN SCOTT

    Direct Examination by Mr. Kettel . . . . . . . . . . . . . . . . . . . . . . . . . . 69

    Cross-Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . . 74


ADELAIDA LIZAMA

    Direct Examination by Mr. Kettel . . . . . . . . . . . . . . . . . . . . . . . . . . 76

    Cross-Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . . 83

    Redirect Examination by Mr. Kettel . . . . . . . . . . . . . . . . . . . . . . . . 91

    Recross-Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . 93


MEGAN GUMP

Direct Examination by Mr. Kettel . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

Cross-Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

Redirect Examination by Mr. Kettel . . . . . . . . . . . . . . . . . . . . . . . . . 113

CERTIFICATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

-5-

1    [NOTE: Court is opened.]

2    CLERK: The Court calls the case of United States of America

3    versus Sean Michael Clark, et. al., Criminal Case Number CR413-28.

4    MR. KNOCHE: Karl Knoche and Greg Gilluly for the

5    government, ready.

6    THE COURT: Good morning.

7    MR. GILLULY: Good morning, Judge.

8    MR. PHILLIPS: Your Honor, Bobby Phillips.  I'm here for Sean

9    Clark, and we're ready as well.

10    THE COURT: All right.

11    MR. WITHERS: Tom Withers for Dr. Najam Azmat.  We are

12    prepared to proceed.

13    MS. WADE: Julie Wade and David Kettel for Adel Lizama.

14    THE COURT: Good morning.

15    MS. RODMAN: Anne Rodman for Shelly Morford.

16    THE COURT: Good morning.  Well, we have a host of motions.

17    I think there's only one motion that will require the taking of evidence, and

18    that is Miss Lizama's motion to suppress statements that she made to law

19    enforcement agents at her residence.  And I understand from the Clerk

20    there is a request for argument on the remainder of the motions.

21    Mr. Phillips, you're at the top of the list here.  Do you wish to be

22    heard first?  And you're sitting there closest to me.

23    MR. PHILLIPS: Very well, Judge.  But I did want to present

24    some evidence on the motion to dismiss for selective prosecution.  I think

25    it's necessary.

1          THE COURT: Now, explain to me why that is necessary for me

2    to have an evidentiary hearing on that when you haven't –

3          MR. PHILLIPS: – Well, simply because I think I need to –

4          THE COURT:  – Well, wait a minute, let me finish.

5          MR. PHILLIPS: Oh, I'm sorry, I'm sorry, Judge.

6          THE COURT: Selective prosecution is – you know, it's a

7    rigorous standard to me.  What kind of impermissible standard do you

8    think the government – you don't even say in your brief what they did that

9    was improper.

10          MR. PHILLIPS: Disparity of financial status, Judge.  I mean,

11   our contention is that the forfeiture, their taking the $2,000,000 from the

12   mastermind of the alleged conspiracy, from the person who financed the

13   conspiracy, taking the $2,000,000 from him, and then enter into a plea

14   agreement in which the government agreed to forbear from any

15   prosecution of Lewis Trematerra, was discriminatory.

16          THE COURT: In other words, your theory is that the

17   government prosecutes the rich and the poor differently.

18          MR. PHILLIPS: Yes, sir, and I understand – I've researched

19   and I have not found a case on point.  I found some interesting cases in the

20   Eleventh Circuit, and selective prosecution is recognized as a possible – not

21   really a defense, but as, I guess it's for the motion to dismiss if you can

22   prove – and it's a high standard, I understand that.  And the only evidence

23   that I was going to present, I wanted to call Mr. Knoche to establish the

24   record about the fact that Mr. Nuvest was first prosecuted – well, suit was

25   filed against him, a couple lawsuits I believe.  They brought a criminal

-7-

1  information.  The criminal information proceeded.  They eventually

2  superseded that information to allege a forfeiture count of $2,000,000.

3  Then they entered into a plea agreement with Nuvest through his attorney,

4  Mr. Harry Donnie Dixon, in which the civil suits were dismissed.  The

5  government agreed not to prosecute any officers of Nuvest or the – or the –

6  they had another corporation, which was the managing corporation of East

7  Health Clinic; and also agreed not to prosecute Lewis Trematerra.  And the

8  reason I think some evidence is necessary, because there is testimony in the

9  grand jury transcripts, of which Mr. Knoche is aware, that establish that

10  Mr. Lewis Trematerra was the money behind the operation – the alleged

11  operation.  He was probably the mastermind of the whole process, and yet

12  he is allowed to walk away without any prosecution.

13         My client, according to the documents provided, had a seizure

14  of like $56,000 that he wound up forfeiting.  And my contention, my

15  argument that I would make to this Court, and eventually on appeal if an

16  appeal is necessary, is that $56,000 was not enough to satisfy the

17  government if they got $2,000,000 from Mr. Trematerra, and we believe

18  that that's discriminatory.

19         THE COURT: In other words, if he'd had more money to fork

20  over to the government, they wouldn't have prosecuted him.

21         MR. PHILLIPS: That's my theory, Judge.

22         THE COURT: In other words, what we've got here is, somebody

23  gets a sweetheart deal, you think –

24         MR. PHILLIPS: Yes, sir, no doubt about that.

25         THE COURT:  – from the government, and your client was not

1    offered a sweetheart deal, and that establishes selective prosecution.  I'm

2    unfamiliar with any case law to support that theory.  I do agree – the usual

3    standard and criteria you hear about in the cases is discrimination on the

4    basis of race, or perhaps religion.

5             MR. PHILLIPS: Yes, sir.

6             THE COURT: I've never seen a case based upon – there may be

7    some – based upon this particular theory of economic standing.  But let me

8    hear – even if that's the case, I think you would have to come forward to

9    show with affidavits and evidence that the government had some kind of

10   improper motive in its mind when it did this.

11            MR. PHILLIPS: Motive is going to be awfully hard to prove,

12   Judge.  I think it's going to be circumstantial and inferential because of the

13   fact that if you look at the grand jury testimony that I was going to address

14   through Mr. Knoche, it's clear that Mr. Trematerra was involved in this –

15   he ran pain clinics, he invested in pain clinics in Florida.  When Florida's

16   law changed and they decided to move to Georgia –

17            THE COURT:  – Well, I mean, can it just be that they don't have

18   the evidence on him?

19            MR. PHILLIPS: Judge, you know, I don't think that's the case.

20   I mean, I think that if – that's some of the questions that I was going to

21   address to Mr. Knoche this morning, to be honest.  But I believe they did

22   have enough evidence to charge Mr. Trematerra.  And I think that's partly

23   what we have to show, and I had prepared some questions to ask my good

24   friend and colleague.

25            THE COURT: Well, you know what the law is, you referenced it

1    in your brief.  It's not only a very high burden, it's one where there is a

2    presumption to overcome, a presumption that the government is not

3    engaging in prosecution based upon impermissible reasons.  And it's your

4    burden to come forward and show otherwise.  I guess you want to turn this

5    into a discovery session, perhaps –

6              MR. PHILLIPS: – No, sir, not really.  I mean, I – there are

7    some admissions, I believe, that Mr. Knoche will have to make if he's

8    allowed to testify, as to what kind of case that they had against Mr.

9    Trematerra.

10             THE COURT: Really?  Is that what the government's required

11   to do?

12             MR. PHILLIPS: Well, Judge, I think the government – it's

13   incumbent upon them when they investigate a case, and Mr. Knoche did

14   work with the investigators, before they file an accusation or an

15   information or seek an indictment, they have to make a preliminary

16   investigation to determine whether or not there's enough probable cause,

17   of course, and whether there's a possibility that they can get a conviction

18   beyond a reasonable doubt.  And I believe that before – and I believe that

19   that's part of the policy of the United States Attorney's office, that they have

20   to be convinced that they have enough evidence to get a conviction beyond

21   a reasonable doubt before they indict.

22             Now, in this case, they chose not to indict or not to bring an

23   information against Mr. Trematerra, they went against Nuvest and the

24   managing company, which is – I had it somewhere, Judge, I'm sorry – it's

25   got a number in it.  But Mr. Trematerra was president of both corporations.

1    Of 6221 Enterprises.  6221 Enterprises was a managing company for East

2    Health Clinic.  And East Health Clinic is the clinic that all of these

3    defendants were in some way associated with.  And it got set up through

4    Nuvest and that 6221 Enterprises, which was owned, operated and

5    financed by Lewis Trematerra.  So, you know, it's like they say, okay, well,

6    the head of the snake is good, we're going move it, we're going to come

7    down here and cut off a little bit of the tail.  And it just seems – you know,

8    why would the government prosecute all the minions and not the head, but

9    for the fact that there was a $2,000,000 pay off to the government.  And

10   that's all.

11           And I understand, Judge, it's a stretch, but ...

12           THE COURT: All right.  Well, Karl, have you been enlightened

13   about the theory behind the selective prosecution –

14           MR. KNOCHE:  – Well, I read the motion.  That's about the

15   enlightenment that I have.  I mean, the defendant contending that an

16   individual who's not indicted in this case is the kingpin or the motivating

17   force behind it doesn't make it so.  And even if it did, that would require the

18   government to have sufficient evidence to prosecute the case.  The

19   defendant has not shown that his client was singled out for race, religion or

20   any other arbitrary classification.  It's a two-prong test.  He's got to show

21   discriminary effect, and a discriminatory purpose.  He has all the grand

22   jury transcripts which took place that have been turned over in the

23   government's discovery, and he's made no showing that there was any such

24   motivation or purpose on the part of the government.  And the government

25   believes, having not made that showing, he's entitled to no evidentiary

-11-

1    hearing in this matter.

2                    THE COURT: He wants you to speak as to why Trematerra was

3    not prosecuted.

4                    MR. KNOCHE: The government – in this case we have

5    defendants who were cooperating with the government during the

6    investigation, who then withdrew from plea agreements.  Miss Lizama did

7    that; Mr. Daniel Wise, one of the defendants, did that; Miss Carreras did

8    that.  Building blocks that the government was working on towards a

9    possible indictment of the investor fell through.  And the government – you

10   know, its evidence will show only that Mr. Trematerra had a corporation,

11   Nuvest, which is the subject of CR413-47.  That company invested the seed

12   money, about $55,000, to opening the clinic here.  Individual never visited

13   the clinic, never set foot in the state of Georgia, to my knowledge, did not

14   have any say in the day-to-day management of the business.

15                   THE COURT: Has he been prosecuted in any other

16   jurisdiction?

17                   MR. KNOCHE: No.

18                   THE COURT: Has the government reached any type of formal

19   agreement with him –

20                   MR. KNOCHE: Yes.

21                   THE COURT:  – not to prosecute?

22                   MR. KNOCHE: Well, it was part of the Nuvest plea agreement.

23                   THE COURT: I haven't read that agreement but, specifically

24   upon payment of these monies he and other principals of some corporation

25   would not be prosecuted?

1    MR. KNOCHE: Yes, of the Nuvest Corporation.

2    THE COURT: And there's a $2,000,000 payment?

3    MR. KNOCHE: There's a $2,000,000 forfeiture, monies which

4  the government had seized during the course of the financial investigation.

5    THE COURT: Was any of the money seized returned?

6    MR. KNOCHE: Some of it was returned, yes. About a million

7  dollars was returned.

8    THE COURT: And who was the recipient of the returned funds?

9    MR. KNOCHE: It was returned to counsel for Nuvest, Mr.

10  Donnie Dixie.

11    THE COURT: What kind of evidence do you want apart from

12  what he just said?

13    MR. PHILLIPS: Well, that's about all I've got, Judge, at the

14  moment. But may I, for the record, tender my exhibits, which are simply

15  the documents related to the Nuvest. It's the original information which

16  I've provided – certified copies. It's the superseding information, it's the

17  plea agreement, it's a written resolution by Nuvest Corporation stating that

18  they've agreed to the plea agreement, it's the Court's consent order of

19  forfeiture, and it's the Court's sentencing order – I believe that's a

20  judgment in the criminal case. I'd just like to have these attached to the

21  record, so if at some point in time we have to go up on any issues that it'll

22  be there.

23    MR. KNOCHE: For the record, one last thing, just in case the

24  Court is wondering, the size of the forfeiture in comparison to the amount

25  of money which was invested, on a money laundering-based forfeiture

-13-

1   theory, any funds which are commingled with clean funds makes the entire

2   account dirty.  So when – you know, the government's theory was that the

3   money which was paid back to Nuvest on its investment, when that was

4   commingled with other accounts, that made those accounts forfeitable;

5   therefore, the size of the forfeiture got to the magnitude that it ended up at.

6        THE COURT: Well, it seems that even if there's some – even if

7   your theory of an economic difference between the rich head of this

8   organization and your client shows some type of discriminatory effect – in

9   other words, one person had a lot of money and the other one had much

10  less, and therefore there's some kind of effect here – you have to show a

11  discriminatory purpose.  Mr. Knoche just indicated what the government's

12  reasons were here.  There is a difference in evidence.  You know, they

13  struck a deal, but this is commonplace in case after case we see.  It's not

14  uncommon in drug cases and a lot of other kind of cases – I mean, street

15  drug cases, for the government to reach some kind of agreement with

16  higher ups and for only the people lower down to go to jail. I mean, we've

17  all seen instances like that.

18        So I can't see anything in your motion that gives me the

19  foundation for the belief of discriminatory purpose that would warrant an

20  evidentiary hearing on that.  And I think our rules would require you to

21  come forward with affidavits and a showing, particularly against the

22  rigorous standard that the Supreme Court has established.  You know the

23  *Armstrong* case, and the cases it cites, make this such a tremendous

24  burden for the defendant.  Just throwing allegations like this around are

25  not enough to get to an evidentiary hearing.  I don't think you've met the

-14-

1    standard that would warrant a hearing.

2            MR. PHILLIPS: May I tender my documents, though, Judge,

3    for the record.

4            THE COURT: What are the documents?

5            MR. PHILLIPS: Just – it's the Nuvest case, the original

6    information, the superseding information, the government's notice of plea

7    agreement, the Nuvest written resolution consenting to the entry of the

8    plea, consent order of forfeiture, and the judgment in the criminal case,

9    certified copies.

10           THE COURT: The government has no objection?

11           MR. KNOCHE: It's on PACER, Your Honor.

12           THE COURT: All right, have that tendered to the Clerk.  Do you

13   have other motions?  You're requesting a witness list from the government?

14           MR. PHILLIPS: We did want a witness list, Judge.  We also

15   would like, as part of that witness list that there are numerous – and the

16   reason we need a witness list as soon as possible, this has been declared a

17   complex case.  There are numerous transcripts of grand jury testimony

18   where two or three people at the time testified.  Other people have been

19   mentioned.  We've been provided about six or eight disks, and in order for

20   us to hone in for a defense, we need a witness list at the earliest possible

21   time.

22           Also would like information of all the – and I opted in on their

23   reveal the deal –

24           THE COURT: Yeah.

25           MR. PHILLIPS:  – that is very important in this case because

-15-

1    we have information that we believe that some of the people who will be

2    testifying for the government may have been arrested since all of this has

3    begun, and perhaps the government may have intervened to assist them in

4    those situations.  So we'd like to get up-to-date criminal histories, and we'd

5    like to get up-to-date plea agreements and disclosures from the

6    government.  Any type of disclosure, any type of correspondence the

7    government has given to prospective witnesses or to actual witnesses in

8    this case, we'd really like to get that as quickly as possible because we think

9    we're entitled to it.

10                  THE COURT: Do you really oppose a motion to reveal the deal?

11                  MR. KNOCHE: No, I – you know, typically the government files

12   a *Brady-Giglio* disclosure ten days before trial.  The government would be

13   willing to make that available 30 days before trial.  But let me say, the

14   government has provided extensive discovery.  As far as witnesses go, well,

15   look at the discovery.  You have the grand jury transcripts of every witness

16   that the government called before the grand jury in this matter.  So, you

17   know, you can draw the conclusions you would from those disclosures.

18                  THE COURT: In many districts defense counsel would not be

19   getting the grand jury transcripts, I'm aware of that.

20                  MR. KNOCHE: And investigative reports of the DEA, the CNT,

21   the GBI, those are –

22                  THE COURT:  – Also the type of material that in many districts

23   would never be turned over.  And, you know, the Eleventh Circuit has said

24   that that type of material is usually beyond the realm of discovery provided

25   under Rule 16.  So the government has done again more than is required

-16-

1    strictly by the rules.

2    MR. KNOCHE: And patient files of the individual patients who

3    formed the basis of the substantive 841 counts have been disclosed to the

4    defendants.

5    THE COURT: You don't intend to call as a witness every single

6    person who visited this clinic.

7    MR. KNOCHE: No, Your Honor, that would – no.

8    THE COURT: But all of the names of everyone interviewed by –

9    nor have you interviewed all of those people, I would assume.

10   MR. KNOCHE: No.

11   THE COURT: But everyone who has been interviewed by the

12   government – by the agents –

13   MR. KNOCHE:  – Those reports have been made available.

14   THE COURT: Yeah.  Now, the motion for a witness list is

15   DENIED.  The motion to reveal the deal, the government has agreed to

16   produce all *Giglio* material 30 days prior to trial –

17   MR. KNOCHE: 30 days.

18   THE COURT:  – and the Court will – I think that certainly gives

19   the defense enough time, and more time than you usually get in a case.

20   And so I will GRANT the defendant's motion for that kind of information,

21   but accept the government's representation that 30 days is – and find is

22   adequate.  So it doesn't have to be revealed at this point.  I don't think

23   there's a trial date in this case yet.

24   MR. KNOCHE: No trial date, Your Honor.

25   THE COURT: Tom?

-17-

1  MR. WITHERS: Judge, I have only one issue that I have

2 noticed up.  This is a issue familiar to the Court on my view of *Brady*, that

3 that is a continuing obligation of the government.  And so we filed a

4 detailed *Brady* request.  The government indicates that – and they have

5 provided voluminous discovery, Your Honor.  I just want to make sure that

6 the Court does not moot that motion, because I think it's a continuing

7 obligation.

8  THE COURT: Well, I'll GRANT the motion for *Brady*

9 disclosure.  It's a governmental obligation even if you had not filed the

10 motion.  You are obligated to produce it.  Do you believe there's any *Brady*

11 material currently in your files that has not been turned over?

12  MR. KNOCHE: No, as far as exculpatory information, no.

13 There is, you know, criminal histories of witnesses, that has not been

14 explicitly disclosed, although a lot of that is, you know, indicated in the

15 grand jury testimony of those individuals, that they have prior convictions.

16 But the actual criminal histories of prospective witnesses have not been

17 provided.

18  THE COURT: All right, I'll GRANT the *Brady* motion, with the

19 stipulation that the government is to make the *Giglio* disclosures of

20 impeachment information 30 days prior to trial.

21  MR. WITHERS: Thank you, Your Honor.  And Your Honor just

22 inquired about the trial date.  We did file a Rule 16 motion for expert

23 witness disclosure, and I know – I would anticipate the government is

24 going to provide a detailed expert witness disclosure.  I'm just curious when

25 that would be provided.

1    MR. KNOCHE: Yes, and we filed one, too, in our discovery

2  motion.  So I believe that the reports of our expert witnesses have been

3  disclosed; the identity of the experts has not been disclosed.  But we

4  understand we have an obligation, as does the defense, to comply with the

5  notice obligations concerning expert witnesses that will be called.

6    THE COURT: When do you plan to reveal the identity of your

7  expert witnesses?

8    MR. KNOCHE: Your Honor, I would say we won't do that until

9  we have a trial date.

10    THE COURT: All right, well, then upon receiving a trial date

11  within –

12    MR. KNOCHE:  – I would think shortly thereafter.

13    THE COURT: That seems to be reasonable.

14    MR. WITHERS: I'll accept that. Thank you, Your Honor

15    MR. KNOCHE: And, Your Honor, we would like the defendant

16  to be subject to those same ...

17    THE COURT: Well, Tom knows his obligations.  The

18  government has made a request for reciprocal discovery, and if they're

19  requesting that type of data under Rule 16 from you, then they have an

20  obligation also to reveal their reciprocal discovery.

21    MR. WITHERS: That's all I have, Your Honor.

22    THE COURT: All right, thank you.  Julie, you want to proceed

23  with the evidentiary portion of your motions first?  And I understand the

24  motions before the Court have been whittled down to the motion for early

25  disclosure of criminal histories, which I've pretty well addressed here; a

-19-

1    motion to strike surplusage; motion to suppress the grand jury statements,

2    none of which require evidentiary hearing; and then, finally, the motion to

3    suppress statements made at her residence, which will require an

4    evidentiary hearing.  How do you want to go?

5              MS. WADE: Well, I first want to make sure Ms. Rodman

6    doesn't have any motions, because ours is going to be rather prolonged.

7              THE COURT: I don't think you do; do you, Anne?

8              MS. RODMAN: No, Judge.  I actually did file a notice yesterday

9    that our motions have been resolved.  But I did want to quickly address, I

10   did file a motion to travel on behalf of Ms. Morford a couple weeks ago.

11   She –

12             THE COURT:  – We haven't granted that yet?

13             MS. RODMAN: No.

14             THE COURT: You filed it four weeks ago?

15             MS. RODMAN: No, about two weeks ago.

16             THE COURT: Where did it go?

17             [NOTE: Off the record discussion.]

18             THE COURT: I don't even have a probation officer here to say

19   anything.  The Clerk is whispering to me that the issue might not even be

20   with me; it might be at this stage of the case with the district judge.  I don't

21   know.  I typically – if there's no objection from the government or the

22   probation officer, I 99 percent of the time will grant those without any

23   changes from what the parties are proposing.  Does the government oppose

24   this?

25             MR. KNOCHE: Would counsel be so kind as to remind me

-20-

1    where she wanted to travel?

2           MS. RODMAN: Yakima, Washington at the end of this month.

3           MR. KNOCHE: She has family there?

4           MS. RODMAN: Yes, she has her grandmother and some other

5    family members that she'd like to see.

6           THE COURT: I granted that. I signed it yesterday.

7           MS. RODMAN: Oh, all right, thank you, Judge.

8           THE COURT: I think I handwrote in there that your client was

9    to provide an itinerary.  That's the change from your language in the

10   proposed order.

11          MS. RODMAN: Okay.  I'll let her know.  Thank you, Judge.

12          MS. WADE: And, Your Honor, with respect to our motions, we

13   still would like a ruling on the other motions, the *Brady* motions.  The

14   papers for those speak for themselves.  We would like argument on the

15   other three, and then evidentiary hearing on –

16          THE COURT:  – Let's rule on it right now.  The motion for

17   *Brady* material is GRANTED in exact parallel with the other motions; and

18   that is, the government will produce any exculpatory material immediately.

19   I'm sure that's your intent.  Do you have anything –

20          MR. KNOCHE:  – If we had exculpatory information, we have

21   no desire to hold it.

22          THE COURT: *Giglio* material 30 days prior to trial.  Motion to

23   disclose other crimes, motions for additional discovery, motion for

24   disclosure under 12.3, what is that?

25          MS. WADE: I don't even have it with me.  It's one of those

-21-

1    standard ones that the rules require.

2    THE COURT: Then the standard orders are issued.  The

3    government's obligation to make its discovery disclosure is bound by Rule

4    16.  It has exceeded the Rule 16 obligations in this case by a large measure,

5    and has disclosed – I don't think there's any evidentiary part of your file

6    you have not turned over in this case.

7    MR. KNOCHE: No.

8    THE COURT: They have the entirety of what you're looking at.

9    MR. KNOCHE: Yes, or it's available for inspection.  It's been

10   made available.

11   THE COURT: All right.  So those motions are granted.  The only

12   – I mean, the government is in compliance with its discovery obligations as

13   represented by Mr. Knoche here.

14   MS. WADE: Thank you, Your Honor.  With respect to the early

15   disclosure of criminal histories, I know you said that's mostly been

16   resolved. Can I address that issue briefly?

17   THE COURT: Yes, if there's something you need to, sure.

18   MS. WADE: Yes.  In this case, and the way it sort of evolved

19   was, a lot of the key players – the primary doctor, the primary organizer or

20   the primary financier – all pled to informations prior to indictment.  And so

21   when we received the discovery post-indictment, we did receive the

22   criminal histories of the current defendants, which we understand there

23   was no obligation to provide, but we did not receive the criminal histories

24   of those people that pled to an information, and are really the key to the

25   conspiracy here, and key to the operation.  And so we have requested those

1    criminal histories.  There are references throughout the grand jury

2    testimony of prior criminal histories.  And this isn't just simple

3    impeachment for us, but this really goes to the heart of the defense.  What

4    this organization was, was a bunch of thugs who found pretty young women

5    with crystal clean records to sort of be in certain roles.  And so the criminal

6    histories are important because they go to our defense; and not just the fact

7    that they have criminal histories, but we'd like to actually see what they are,

8    and may go talk to some of those people involved in those crimes to see if

9    there's a pattern of conduct here.

10          These files are sitting in Mr. Knoche's evidentiary file.  They're

11   with probation.  The PSIs have been done for these individuals, so they're

12   with the judge.  They're with everyone in the courthouse except for the

13   defendant, and it really goes to the heart of –

14          THE COURT:  – It's probably on the internet, too, right?

15          MS. WADE: Well, we have what these people – some of them

16   were up in New England for a while, in Florida, so it's not like we can just

17   check the Chatham County database and pull up their arrest records.

18          THE COURT: But there are paid-for services.  I've been shown

19   what is available out there.  And it's amazing what – you may have to pay

20   for it, but it's amazing what is out there in the public.

21          MS. WADE: You're right, and the first thing we all do when we

22   get a client is Google that person.  But the burden – I mean, so my client

23   now has to pay to conduct a comprehensive nationwide search for criminal

24   histories of six or seven people, when they're sitting in the file, and there's

25   no harm here to disclosing it because there's no ongoing investigation.  All

-23-

1   these people are under pretrial release.  So it's not like there's a reason to

2   keep – and in some instances I can envision a case where you would want

3   that information protected until the eve of trial or until 30 days, but those

4   factors here are simply not present.  So there's no harm, there's no reason

5   not to disclose it, and it's more than just impeachment evidence for us here.

6   And so we would ask that for those people that have pled to informations

7   that the criminal histories of those individuals be disclosed.  And had they

8   been indicted as sort of the normal course of cases, we would have received

9   that in discovery.  It's only because they pled prior – and I don't think they

10  pled prior to avoid disclosing their criminal histories, it's just the way the

11  case played out.

12          THE COURT: Will these individuals be witnesses for the

13  government in this trial?

14          MS. WADE: Almost certainly, yes.

15          MR. KNOCHE: And I'll just state, they know the identity of the

16  individuals.  Counsel said they would like to go talk to them.  They can

17  certainly contact them if they wish.

18          MS. WADE: I'm sorry, I meant like victims of a crime – you

19  know, if there's a pattern of this and we need to go investigate a prior crime

20  to see what it was.  I don't know what is –

21          THE COURT:  – Okay.  Well, I mean, it might be useful to

22  them.  When do you intend to reveal that information?

23          MR. KNOCHE: Well, 30 days before the trial.

24          THE COURT: I think that's sufficient.  I won't order any earlier

25  disclosure of these witnesses' criminal history than 30 days prior to trial.

-24-

1          MS. WADE: Okay.  Thank you.  So, of course, it's up to the

2  Court how we want to run – there are two other motions that we were just

3  going to just offer simply argument on, and we can proceed like that.

4          THE COURT: Well, so the motion for early disclosure is

5  GRANTED, but the 30-day period is deemed adequate.

6          You have a motion to strike surplusage.  You don't like the term

7  "pill mill" being in the indictment in this case.

8          MS. WADE: I don't, I don't –

9          THE COURT:  – Now, the Eleventh Circuit has said it's okay for

10  the government to use the term "pill mill" in the course of the trial itself.

11          MS. WADE: Well, I don't think it's that clear.  In the cases that

12  the government cited, for example, the *Hazelwood* case, in that case there

13  was evidence – there was conversation amongst the conspirators of the

14  term "pill mill."  So they themselves were using it, so it was a term that was

15  very relevant to that case.

16          In the *Schneider* case that the government cited, it wasn't even

17  a case on West Law or Lexus, you had to really dig into PACER to find it,

18  the defendants had moved to strike it in their brief, but didn't really argue it

19  in their legal section, and then the Court doesn't really rule on it one way or

20  the other.  The Court does later on rule that under 403 the jury can't hear

21  the term at all.  So the *Schneider* case very much supports the

22  inflammatory nature of this term.  It's not in the U.S. Code, it's not in the

23  regs, it's not in the legal dictionary, it's not in a medical dictionary.  It's in

24  the Urban Dictionary because it's an inherently slang term, and there's no

25  reason the government needs to have that in their indictment to prove their

1    case.  It's not an element of the crime.  They have to –

2              THE COURT:  – You view it differently as "stash house?"

3              MS. WADE: I don't have a stash house in this case so –

4              THE COURT:  – I know that.  Courts have left that in

5    indictments before as a shortcut way of describing – we all know what a

6    stash house is and that being in an indictment.  Some people have moved to

7    strike it; some courts have said no.

8              MS. WADE: And crack house, I know is the same.

9              THE COURT: Crack house, yeah.

10             MS. WADE: Baby daddy is probably a term that would not

11   survive in an indictment.  So there are slang terms that are allowed and

12   some slang terms that are not allowed.  And Courts may use those slang

13   terms when they're writing their written opinions.  So, you know, Mr.

14   Knoche cited some cases that have used that term in their written opinions,

15   but that doesn't mean that the jury got to hear that term, or that it was in

16   the indictment.

17             THE COURT: Journalists would use that in the first paragraph

18   of any article about this case, don't you think?

19             MS. WADE: Sure, it'd be in the headlines, pill mill indicted.

20   And I think even – and I didn't bring the press release for some of the

21   arrests and stuff, but I think even when this was reported locally it was the

22   term "pill mill."  It has a meaning, it has a very negative meaning, and we

23   sort of assume people know what it is.  Here, this was a health clinic, it was

24   registered as a health clinic.  There were doctors working there, and to sort

25   of allow the indictment to say this very inflammatory word sort of assumes

1    that –

2              THE COURT:  – Well, the indictment's allegations are

3    inflammatory even without the word.  I mean, the fact that the government

4    charges, you know, something that is inflammatory is not enough to strike

5    the indictment.  The allegation is that this clinic was being run for no

6    legitimate medical purpose, drugs were being dispensed in each instance as

7    a criminal act without any purpose whatsoever than to give drug addicts

8    their meds.

9              MS. WADE: And the indictment can make all of those

10   allegations, but the term "pill mill" we think carries – and the Eleventh

11   Circuit has set the standard of inflammatory and prejudicial, and the

12   *Schneider* case that looked at this issue that the government cited –

13             THE COURT:  – Yeah, inflammatory and prejudicial.  I'm just

14   trying to see how this carries that much prejudice, to use that term.

15             MS. WADE: Because it is the term that the newspaper used,

16   that the journalists use, that the Urban Dictionary uses to sort of taint these

17   allegations as inherently evil and wrong.  And the government can talk

18   about dispensing illegal drugs and, you know, that people were coming in

19   for drugs.  They can talk about all that, but when they define it as a pill mill

20   –

21             THE COURT:  – If it were a securities case, the government

22   might use "boiler room" in the indictment.  The paper might use that, too.

23             MS. WADE: You know, and again I think it's this particular

24   term that is inflammatory and prejudicial.  I do think it meets the

25   standards because people come in, they've read about it, they've seen a

1    "Dateline" story on it, and it's that term – it's not necessary to be in the

2    indictment, and it is inflammatory and it is prejudicial because people

3    understand it to mean something awful, and it sort of – when you say it as

4    pill mill, I think it sort of assumes that everyone who's being charged with

5    it knew that, used that term.  Like I said, this was not a case where that

6    term was used, as far as I know from our review of the evidence.

7            MR. KNOCHE: Well, Your Honor, we will rely, of course, on

8    our written response, but just as an exclamation point, the case from the

9    Northern District of Florida, *Caroni*, it says, the Court finds nothing

10   inappropriate or unduly prejudicial about the phrase "pill mill."  It cites

11   *U.S. v. Hazelwood*, one of the other cases that the government relied on in

12   its response.  The use of the phrase "pill mill" is not much different than

13   other words, like drug organization, drug house or stash house.

14           THE COURT: You're talking about the Eleventh Circuit saying

15   it?

16           MR. KNOCHE: That was from the Northern District of Florida.

17           THE COURT: Oh, yeah, that was the first case in your list of –

18           MR. KNOCHE:  – That was *Caroni*, right, and they cite

19   *Hazelwood*, which I believe is out of the Sixth Circuit, Your Honor.

20           MS. WADE: In *Hazelwood* there was evidence that the

21   defendants were using that term.  So in my mind that is a distinction

22   because that is a term that was used by the organization.

23           THE COURT: Well, I agree, you know.  That does – that's an

24   important distinction.  You don't have any instance where the defendants

25   were using the term "pill mill" in this case?

-28-

1    MR. KNOCHE: Your Honor, I can't categorically say yes or no

2    to that.  It is so, I'll say, inherent in the whole operation of these cases, not

3    only here, but elsewhere, that it's a term which everyone understands.  I

4    believe even the defendants have used that – or the patients have used that

5    in their recitation of what happened at the clinic.

6    THE COURT: In trying to assess a prejudicial effect, I'm trying

7    to see if that word were stricken from the indictment how much better off

8    your client would be when the jury is presented with the indictment.  And it

9    just doesn't seem that pill mill launches this into another level, other than

10    the straightforward allegations, the non-use-of-the-vernacular passages of

11    the indictment.  They don't seem to – this doesn't to catapult into another

12    level of prejudice.

13    But, you know, the district judge may have a different view of

14    that.

15    MS. WADE: I mean, I agree, it's a very close call.  I think it is –

16    I mean, we would say its prejudicial, particularly when you line it up with

17    our defense and the facts around our client.

18    THE COURT: And I think there's only six instances in the

19    indictment where you use –

20    MR. KNOCHE:  – Six that I counted.

21    THE COURT: And the indictment is pretty lengthy here.

22    MR. KNOCHE: Yes.  So I counted one, two, three, four, five, six

23    paragraphs that use ...

24    THE COURT: And you define the term "pill mill."

25    MR. KNOCHE: We did define it as meaning a nominal pain

1    management facility which dispenses outside the usual course of

2    professional practice et. cetera.

3             THE COURT: What would you have them use in these

4    paragraphs?

5             MS. WADE: A nominal pain management facility.  I mean,

6    that's – you know, the inflammatory word, they want give a definition, just

7    use the definition.  Again, it's not a legal term, it's not in the code, it's not

8    essential to their case, and for our defense –

9             THE COURT:  – Well, there's nothing that says an indictment

10   has to be couched in the language of the code.

11            MS. WADE: Oh, sure, absolutely, absolutely.

12            THE COURT: Well, I'm going to DENY the motion.  I'll think

13   about it.  I guess the parties have done pretty thorough research in this

14   area, the use of the word "pill mill."  It wouldn't take long to find all the

15   cases.

16            MR. KNOCHE: I believe – we've tried to find the –

17            THE COURT:  – As you point out, many courts in talking about

18   the case will use the term "pill mill" in their opinion.  I think you list a lot of

19   –

20            MR. KNOCHE:  That is true.

21            THE COURT:  – circuit court opinions, yeah.  But they might

22   also use a lot of other terms that they wouldn't want a prosecutor to use at

23   trial.

24            MR. KNOCHE: Yes.  I think in *Hazelwood* they did use the

25   term in the indictment itself.

-30-

1          THE COURT: Yeah, but she says that the defendants in the case

2    were themselves referring to their operation as a pill mill.  You know, like

3    in a motion to strike an alias, if the alias is really, you know, a word that

4    most people would find suggestive of somebody's bad character, but it is a

5    word that many of your witnesses only knew that individual, thought that

6    that was their name, they knew them by nothing other than their alias,

7    routinely courts allow it to come it.

8          MR. KNOCHE: Let's say – you know, and even if the

9    defendants did not use the term so much, patients that have been

10   interviewed by the agents I believe have use the term.  Patients of the

11   facility.

12         THE COURT: I'll DENY the motion.  I'll think about it some

13   more.

14         MS. WADE: Okay, thank you, Your Honor.  The other

15   outstanding motion that we'd like to present argument but no evidence is

16   for the motion to suppress the statements to the grand jury.  In this case,

17   it's kind of surprising, a lot of – about half of the defendants in this case

18   testified before the grand jury, which is fairly unusual.  In this case we've

19   submitted a fair amount of emails from Miss Lizama's lawyer talking about,

20   you're going to get arrested if you don't cooperate, the mafia is after you,

21   they're watching you, the FBI will protect you.  Miss Lizama's lawyer was

22   Karen Dove Barr, who the Court is very familiar with.  She also didn't make

23   this stuff up.  It was coming from agents, the mafia references, that we're

24   going to arrest you, those types of statements.

25         MR. KNOCHE: Well, I have to object that it's obvious that the

1    agents said any such thing.

2    MS. WADE: That's fine – I mean, that's fair enough.  I don't

3    think Ms. Barr was creating this in a way to sort of get her client to testify.

4    But we've submitted the emails showing Ms. Barr's language that is

5    coercive, and it is threatening, and it does seem to offer protection –

6    THE COURT:  – I didn't read anything from Ms. Barr's emails –

7    I've read the motion and what you put in there.  I didn't read anything that

8    suggested that Ms. Barr was threatening her client.

9    MS. WADE: Exactly.  She's conveying things like, some of these

10   dangerous people are watching you.  The government will issue an arrest

11   warrant.  The government wants to help protect you.  You need to

12   cooperate with the FBI, the FBI will protect you.  It was DEA, but ...  So

13   there are statements in there, and it's not her saying – threatening her

14   directly, it's sort of conveying these messages.  She never spoke with her

15   parents about her testimony, and in federal court, for example, when we go

16   through a Rule 11 hearing a client is always asked – or the defendant is

17   always asked if he's consulted with their family.  There was only brief

18   discussion about the testimony in the car.  Miss Lizama signed a proffer

19   agreement, but later did not recall it.  She did not understand what a 5K

20   was.  The proffer agreement has, I would say, no consideration.  The

21   government has said that the consideration was their actual meeting, but

22   she was compelled under subpoena to come.

23   And so even though – and I acknowledge, in the grand jury they

24   did the checklist of, you're a target, and all of those questionings, but I

25   don't think that necessarily insulates the testimony and the waiver of the

-32-

1    Fifth Amendment when you look at the full context of what Miss Lizama

2    was being advised and what she understood at the time.

3            THE COURT: Well, I'll have to confess, I've never seen a

4    motion like this.  I'll have to, you know, tip my hat to your creativity, but

5    you're asserting a violation of the Fifth Amendment right against self-

6    incrimination, that somehow she was mis-advised – but not by the

7    government, by her own lawyer.  And that she entered into a waiver not –

8    to come before the grand jury when she had counsel, and when the

9    government was telling her and apprising her of all of her rights, but that it

10   was really ineffective assistance of counsel, seems to be the foundation of

11   this motion.  I've always thought that the exclusionary rule is meant to

12   deter misconduct by government officials, not by a defendant's own

13   attorney.  I'm unaware of any case where the exclusionary rule has ever

14   been applied in this context.  No such case is cited in the brief, nor in the –

15   I can't remember if you filed a reply to the government's –

16           MS. WADE:  – No, Your Honor, we did not.

17           THE COURT: I just don't see how – you're wanting me to

18   exclude this under some theory that I can't find any basis for under the law.

19           MS. WADE: Well, let me – two responses to that.  The first is,

20   these references to the mafia, and the FBI will protect you, and the

21   government's going to issue arrest warrant, and if you continue to

22   cooperate the government is going to protect you, we feel that Ms. Barr was

23   simply the messenger of the government's message in that case.

24           And secondly, I think there is – and I don't do a lot of 2255

25   work, but you resolve those ineffective issues only which cannot be dealt

1    with at the trial.  And so if there's an opportunity –

2              THE COURT:  – It'd be a rare case where you could determine

3    ineffective assistance of counsel.  I mean, it can be done.

4              MS. WADE: But we have raised it for that reason.  I mean, if it

5    can be addressed now, we think the emails support it.

6              THE COURT: Yeah, but you know what the other component to

7    ineffective assistance counsel is?  Not only a failure to live up to certain

8    standards of the profession, deficient performance, but also prejudice.  No

9    way the Court can make a prejudicial finding at this point.  Your client

10   might not even be convicted in this case.

11             MS. WADE: Well, and I guess we could delay ruling on it, you

12   know, until trial, until the issue comes up, whether the grand jury comes in.

13   We would prefer a ruling –

14             THE COURT:  – Well, no, you would have to delay it until after

15   the jury finds her guilty.

16             MS. WADE: Well, I think –

17             THE COURT: And then they would have heard the evidence.

18             MS. WADE:  – when you're considering whether it comes in, it

19   could be raised then.  I also think it goes back to – and we'll hear more

20   evidence of this – about Miss Lizama's first encounter with the government

21   and the interrogation at her house, and that by the time she got to the

22   grand jury she had been promised things by the government, she had been

23   assured they would take care of her, and she really had no option but to

24   testify.

25             THE COURT: Yeah, well, it's not uncommon for defendants to

1   misgauge the risks in speaking versus not speaking, and different attorneys

2   have different attitudes about that.  For all I know Ms. Barr was correct in

3   her statements that, you know, the best thing for her client at that time was

4   to do exactly as she advised.  I don't know the whole background

5   surrounding this.  This is not the day for me to probe into all of that.  You're

6   not asking for an evidentiary hearing, in any event.  But I think on the basis

7   of this paper here I can't find any legal authority that would warrant the

8   exclusion of these statements because Ms. Barr *may* have been misadvising

9   her client, or mis-perceiving whether her client should cooperate with the

10  government or not.  This is a college-educated woman.  There was much

11  delay between the time she was questioned in her house and her entering

12  into a proffer agreement, a one-sided agreement, but there are probably

13  plenty of attorneys in this room for the defense this morning who have

14  signed similar proffer agreements offered by the government.  And you

15  may be one of them.

16          So I just can't see any legal basis for applying the exclusionary

17  rule in this context.  That will be my recommendation to the district judge.

18  You can make an argument to the district judge that I'm wrong.

19          MS. WADE: Thank you.  And I would request, Your Honor, if

20  it's appropriate, in that report and recommendation if you would

21  acknowledge that we did not waive the issue with respect to 2255 down the

22  road.

23          THE COURT: We can't waive that unless she enters into a plea

24  agreement and gives up her 2255 rights.

25          MS. WADE: Well, sometimes if it's addressed at the trial part

-35-

1    it's not allowed to be part of the 2255.  So I just want to make sure we don't

2    run into that.

3                    THE COURT: Yeah, it's not being addressed.

4                    MS. WADE: Okay.

5                    THE COURT: In other words, the issue of counsel's – Ms.

6    Dove's – Ms. Barr's performance is not being addressed by the Court

7    specifically.  I don't see any reason to get into that.

8                    MS. WADE: Thank you, I just wanted to clarify.

9                    THE COURT: That would be a side issue.  All right, I guess the

10   only thing left is the taking of evidence of on the motion to suppress

11   statements.  Let me take a very short recess before we get into that.

12                   [NOTE: A brief recess is taken, after which the proceedings are

13   continued as follows:]

14                   THE COURT: How many witnesses will we have?

15                   MR. KNOCHE: The government for it's presentation anticipates

16   calling only witness in its direct case.  We may call rebuttal witnesses.

17                   THE COURT: All right.

18                   MR. KNOCHE: Our first witness is Agent Kahn, Doug Kahn of

19   the DEA.

20                   THE COURT: And for the defense, how many witnesses do we

21   have?

22                   MR. KETTEL: Seven witnesses, Your Honor, but that would

23   include the cross of Agent Kahn.

24                   THE COURT: How many of these are percipient witnesses who

25   were there at the scene?

-36-

1    MR. KETTEL: They all were, Your Honor.

2    THE COURT: You're calling all of the agents as well as your

3    client?

4    MR. KETTEL: Yes, and just to let the Court know, I intend to

5    spend most of my time with Special Agent Kahn; very short, just one or two

6    questions of Bobby Banks, Angela Coleman, Corey Schaff and Kevin Scott.

7    Megan Gump was the roommate of Adel Lizama, who was there.

8    THE COURT: Okay.  Yeah, I read that.

9    MR. KETTEL: And then, Miss Lizama.

10    THE COURT: Okay.

11    MR. KNOCHE: Your Honor, counsel did ask that the witnesses

12    be sequestered, so I'd ask all the government agents to step outside.

13    THE COURT: All right.

14    MS. WADE: And Miss Gump is outside as well, Your Honor.

15    THE COURT: Okay.  Call your first witness.

16    Government's Presentation of Evidence

17    MR. KNOCHE: Agent Kahn.

18    CLERK: Please take the stand and be seated.  State your name

19    and your occupation for the record, and please spell the last name.

20    MR. KAHN: My name is Douglas Kahn.  I'm a special agent

21    with the Drug Enforcement Administration, and it's K-A-H-N.

22    D O U G L A S   K A H N

23    GOVERNMENT'S WITNESS, SWORN, TESTIFIED AS FOLLOWS

24    DIRECT EXAMINATION BY

25    MR. KNOCHE:

-37-

1    Q    Agent Kahn, you are one of the government's lead investigators on this

2    case, U.S. v. Sean Clark, et al.?

3    A    Yes, sir.

4    Q    And were you so involved in your investigation back on June the 15th

5    of 2011?

6    A    Yes, sir.

7    Q    And did you have occasion to travel to south Florida to make contact

8    with one of the defendants here, Miss Adelaida Lizama?

9    A    Yes, sir.

10   Q    And was that in Boca Raton?

11   A    Yes, sir.

12   Q    And do you remember, was the address 20881 Ramita Trail?

13   A    Yes, it was.

14   Q    Okay, and did you go to that residence by yourself on June the 15th,

15   2011?

16   A    No, sir.

17   Q    Who was with you?

18   A    It was GBI Special Agent Bobby Banks; it was CNT Agent Angela

19   Coleman; her supervisor, Corey Schaff; and Miami TFO, Task Force Officer

20   Kevin Scott.

21   Q    Were each of those individuals somehow involved in the investigation

22   of what we'll call the East Health Center case?

23   A    Yes, sir.

24   Q    Agent Banks is with GBI?

25   A    Correct.

1    Q    Coleman and Schaff are with who?

2    A    CNT.

3    Q    And Task Force Agent Scott?

4    A    Was a Miami – DEA Miami task force officer.

5    Q    Do you remember what time of day it was that you arrived at Miss

6    Lizama's residence?

7    A    It was after lunch, between approximately one and three o'clock.

8    Q    Okay, and what was the purpose of you going to that residence?

9    A    We went to that residence to interview Miss Lizama.

10   Q    About your investigation?

11   A    Correct.

12   Q    How did you arrive at her residence?

13   A    By vehicle.

14   Q    Were those marked police cars?

15   A    No, sir.

16   Q    They're unmarked cars?

17   A    Correct.

18              THE COURT: How many cars?

19              WITNESS: We had two cars, sir.

20   Q    (By Mr. Knoche) What sort of attire were the investigators wearing?

21   A    All of us were in plainclothes.

22   Q    Were you – did your clothing identify you as police officers?

23   A    No, sir.

24   Q    Did you all arrive at the residence at the same time?

25   A    Yes, sir.

-39-

1    Q    And tell the Court what happened when you arrived at the Ramita

2    Trail.

3    A    When we arrived at the residence, sir, we went to the front door, and I

4    knocked on the front door.  Miss Lizama came and she answered the door.

5    I told her who we were, and that we wanted to talk to her.  Miss Lizama

6    then invited us inside the residence.  She had a fairly large living room,

7    living area, so we all sat in there.

8    Q    Let me interrupt you just for a moment.  When she answered the door,

9    did it appear that she had been up and about her daily affairs for the day?

10   A    Yes, sir.

11   Q    She was clothed?

12   A    Yes.

13   Q    Okay.  Did she seem alert?

14   A    She did.

15   Q    Did she seem impaired in any way, either, you know, mentally or from

16   sleep deficiency or intoxication?

17   A    No, sir.

18   Q    Did she seem to understand your questions and statements to her?

19   A    Yes, sir.

20   Q    And she invited you in the house?

21   A    She did.

22   Q    Okay.  Were any of the agents displaying weapons when you arrived at

23   the house?

24   A    No, sir.

25   Q    All right, so she invited you in, and I believe you said you went to the

1    living room?

2    A    We did, yes, sir.

3    Q    And tell me what happened in the living room.

4    A    We all sat down, and I explained to Miss Lizama that she was not

5    under arrest, she did not have to speak to us if she did not want to.  I

6    explained to Miss Lizama that it was a consensual and voluntary interview.

7    She stated that she understood, and agreed to answer questions.  I then –

8    Q    – Well, did you ask her questions?

9    A    I did.

10   Q    Okay, and did she at any time during the course of your interview

11   indicate that she wished to terminate the interview?

12   A    No, sir.

13   Q    Did you make any promises or representations to her about what

14   might happen to her as a result of your investigation or her talking to you?

15   A    No, as a matter of fact, I told her, sir, that I couldn't make any

16   promises, I couldn't make any representations about what may end up

17   happening to her.

18   Q    Could you determine, or did you ask her if she was represented by

19   counsel?

20   A    I did.

21   Q    And what was her response?

22   A    She said she was not represented by counsel.

23   Q    Did she request counsel?

24   A    No.

25   Q    Did you consider her at any time to be in custody?

1    A    No, sir.

2    Q    And as a result of you not deeming her in custody, did you give her or

3    advise her of her rights under the *Miranda* decision –

4    A    I did not.

5    Q    – *Miranda v. Arizona*?

6    A    No, sir.

7    Q    Approximately how long did the interview last?

8    A    I'd say it lasted approximately an hour.  Maybe a little bit more.

9    Q    And did she ever request for you to stop talking to her during the

10   course of the interview?

11   A    No.

12   Q    Was there anyone else in the residence?

13   A    (No response.)

14   Q    Was there anyone else there?

15   A    No, sir.

16   Q    Did anyone arrive during the course of your interview?

17   A    Yes, sir.

18   Q    Tell the Court about that.

19   A    During the interview, it was to the middle to the end of the interview,

20   Miss Lizama's roommate arrived at the residence.  She came in, and Miss

21   Lizama got up and greeted her.  The roommate said she was only going to

22   be a minute, she had to get something, and she went back to the back

23   bedroom where she – I take it that's where her bedroom was.

24   Q    And was Miss Lizama allowed to go speak to her roommate privately?

25   A    She was allowed to, yes.

1    Q    Did they speak?

2    A    They did.

3              THE COURT: In your presence, or out of your presence?

4              WITNESS: In our presence.

5    Q    (By Mr. Knoche) Describe for the Court Miss Lizama's demeanor

6    during the interview.  Did she remain composed throughout?

7    A    She was relatively calm.  I mean, obviously she was a bit miffed about

8    law enforcement being at her house.  I think it was at one point during the

9    interview when she recognized and she acknowledged that East Health

10   Center and Total Health Group, which is another pill mill that we shut

11   down, that they were illegitimate businesses, at that point she broke down

12   crying.  So really, that, and at the end of the interview she was a tad bit

13   upset.

14             THE COURT: You said a second ago, maybe I misheard you,

15   she was a bit miffed about law enforcement being present?

16             WITNESS: Not – you know, surprised.  Surprised, perhaps a

17   little concerned.

18   Q    (By Mr. Knoche) Which, in your experience, was understandable with

19   five law enforcement officers.

20   A    Correct.

21   Q    Was she allowed to use the restroom while your interview was taking

22   place?

23   A    She was.

24   Q    And did she –

25             THE COURT:  – Well, did she do that?

1          WITNESS: No, sir.  But we weren't going to restrict her from

2     doing anything.

3          THE COURT: Well, did you tell her she was free to do that?

4          WITNESS: No.  I think – it was –

5          THE COURT:  – Well, she wasn't allowed – she would not have

6     been prohibited –

7          WITNESS: Correct.

8          THE COURT:  – is what you mean.

9          WITNESS: That's right.

10    Q    (By Mr. Knoche) Did she have any pets in the house?

11    A    Yes, there was.  There was – if I recall correctly, a small dog.

12    Q    Was she allowed – or did she request to allow the dog to be walked?

13    A    She – I took the dog out and she, I think, allowed the dog to basically

14    wander around.  But if I remember correctly, she did let the dog out.

15    Q    And during the course of your interview, she did make certain

16    statements and admissions to you; is that correct?

17    A    She did.

18    Q    Okay.  When the interview ended, was she arrested after the

19    interview?

20    A    No, sir.

21    Q    Okay, and what happened when you had completed your questioning

22    of her?

23    A    After we were finished, we left the residence, and Miss Lizama

24    remained at the residence.

25    Q    Did you part on friendly terms?

1    A    We did.

2    Q    And thereafter, in fact, you had additional contact with Miss Lizama

3    after June 15th.

4    A    Correct.

5    Q    On more than one occasion.

6    A    Correct.

7    Q    And were those contacts all friendly as well?

8    A    Very cordial.

9         MR. KETTEL: Objection, relevance.

10        THE COURT: Yeah, I guess it's consistent with the

11   government's argument that she voluntarily did this because she continued

12   to have contact.  I guess it has some degree of relevance to a claim that she

13   was coerced into making these statements.  So I'll allow the testimony.

14   A    All of our contact, sir, was very cordial and very professional.

15        MR. KNOCHE: If I may have a moment.

16   Q    Was any form of restraint ever used during your encounter – your

17   contact with Miss Lizama on June the 15th?

18   A    No, sir.

19   Q    Was she handcuffed?

20   A    No, sir.

21   Q    Was she ever told she could not leave?

22   A    No, sir.

23        MR. KNOCHE: That's all I have, Your Honor.

24                  CROSS-EXAMINATION BY

25   MR. KETTEL:

1    Q    Agent Kahn, you started with DEA in 1990; is that correct?

2    A    Correct.

3    Q    And you were originally assigned to the Washington, D.C. office?

4    A    Correct.

5    Q    And then in approximately 1997, you were reassigned to the Savannah

6    office?

7    A    Correct.

8    Q    And then two years later, in 1999, you were relocated to the Beaufort,

9    South Carolina office?

10   A    Correct.

11   Q    What kind of training did you receive between 1990 and 1999

12   regarding interrogation techniques?

13   A    I've had periodic training throughout the course of my career, and to

14   give you specific information would be very difficult without having my

15   training log in front of me.

16   Q    Do you keep your training logs in your office?

17   A    You know, we're not required to keep a training log.  I, however, keep

18   a list of my training, and I keep my certifications.  I keep that for my

19   personal records.

20   Q    So we would be able access if we wanted to serve you with a subpoena

21   before trial to get those documents?

22          MR. KNOCHE: Your Honor, I object to the relevance of this,

23   Your Honor.  The question is, was it a custodial interview.  This isn't a

24   retrial of Agent Kahn's history with the DEA.

25          THE COURT: I can't imagine any subpoena gaining

1    information that would be admissible at the trial of this case, but you may

2    try.

3    Q    (By Mr. Kettel) Agent Kahn, were you in charge of this investigation?

4    A    I was a co-case agent in this investigation.

5    Q    And who was your other co ...

6    A    There was Charles Sikes and there was Bobby Banks.

7    Q    And –

8    A    – And Angela Coleman.

9    Q    And what was done specifically to prepare for the interrogation of

10   Miss Lizama on June 16th of 2011?

11   A    As with any person we interview, we try to obtain or establish the

12   correct address where the person is.  Then at that point we basically travel

13   to that residence, and then we interview the person.

14   Q    Prior to June 16th of 2011, had you had an opportunity to talk to Al

15   LaFrancois?

16   A    You know, I'm not sure, sir, exactly what date or time that we

17   interviewed him.  I don't have that in front of me.

18            THE COURT: You're talking about the sequence of whether you

19   interviewed her first and him second?

20            WITNESS: I can't recall.  I need to look in my dates on my

21   reports, sir.  There were so many interviews that we conducted.

22   Q    (By Mr. Kettel) Do you know if you had an opportunity to speak with

23   Dr. Pensley (phonetic) before you interrogated Miss Lizama.

24            MR. KNOCHE: Objecting to the relevance.  This is a motion to

25   suppress statements on June the 15th.  Whether the witness had

1    interviewed Dr. Pensley or any other witness, in the government's mind, is

2    not relevant to the decision that the Court will have to make concerning

3    this interrogation.

4              THE COURT: I'm struggling on that, but I'm going to give

5    counsel some latitude as to what preparation was made in advance of

6    approaching this woman's house.  But, please, let's get back to the point.

7    Q    (By Mr. Kettel) Agent Kahn, do you have in front of you a copy of the

8    report of investigation – of the interrogation on June 16th of 2011:

9    A    It was June 15th.  Yes, sir, I do have that.

10             MR. KNOCHE: I believe there was a mistake, counsel, on the –

11   I believe the date was the 15th, but the report indicates the 16th.

12             WITNESS: Correct.

13   Q    And just for the record –

14             THE COURT: – That's Exhibit M?

15             MR. KETTEL: Exhibit M, yes, Your Honor.

16   Q    Did you consider yourself the note taker on the day of the

17   interrogation?

18   A    Yes, I took notes.

19   Q    Now, it's my understanding that some of the other law enforcement

20   were also taking notes.  Do you know if that's correct?

21   A    I can't recall if they were taking notes or not, sir.

22   Q    Did you keep your notes from that day?

23   A    I did.

24   Q    Why did you have five officers come to the meeting at Miss Lizama's

25   house on the 15th of June?

1   A    Well, in this case, Special Agent Bobby Banks with the GBI was the

2   GBI representative; Angela Coleman was the CNT representative.  She was

3   intimately involved with the investigation.  Her supervisor came with her.

4   Kevin Scott was the Miami task force officer who was assigned to help us

5   out, who had a case relevant or correlating with this investigation, so Mr.

6   Scott joined us as well.

7   Q    But why did you feel the need to have five law enforcement numbers

8   there that day?

9   A    You know, there's no set number of agents that are allowed to sit in an

10   interview.  In this case, that happened to be the folks that were with me

11   that accompanied me to the interview.  And, you know, that happened to be

12   the number that day, and that's the folks that were there.

13   Q    You testified earlier that Ms. Lizama invited you into the house.  What

14   do you mean by that?

15   A    Well, we asked her if we could interview her.  I did ask her if there was

16   a place that we could sit down, and she said, yeah, and essentially that was

17   her invitation for us to come in and sit in her little living area.

18   Q    Did she ever use the words, "please come in," something like that?

19   A   I can't recall.

20   Q    Who began the questioning of Miss Lizama?

21   A   I did.

22   Q    And if you can, could you estimate percentage of how many of the

23   questions came from you, and how many of the questions came from the

24   other members of law enforcement.

25   A    I could tell you probably a majority of the questions came from me.  I

1    also recall that other officers that were present, they may have had some

2    clarifications questions or had some questions that they wanted to ask that

3    they also asked.

4    Q    I'd like to refer you to Paragraph 4 of your report.

5    A    Yes, sir.

6    Q    Do you see that?

7    A    I do.

8    Q    Now, there's a discussion of DEA Form 222.  Do you recall Adel

9    Lizama's exact words about what she said with respect to the DEA Form

10   222s?

11   A    Sir, if you don't mind if I have a second, can I read that?

12   Q    Sure.

13        [Pause]

14        THE COURT: Are you talking about the Bates Stamp Page 145,

15   Paragraph 4?

16        MR. KETTEL: Yes, Your Honor.

17   A    You know, I think this paragraph gives a good representation about the

18   discussion that we had. The exact words, I couldn't – there's no way I could

19   tell you the exact wording of what was said, but this paragraph has a very

20   good representation of the discussion that took place.

21   Q    Did you get the impression that Miss Lizama even understood what a

22   DEA Form 222 was?

23   A    Yes.

24   Q    And what are you basing that on?

25   A    From our conversation.

1    Q    And specifically what about that conversation made you think she

2    understood what that form was?

3    A    Well, the fact that she stated she filled out about 50 DEA-222s made

4    me very confident that she was aware of what that form was.

5    Q    After you prepared a draft of your report, did you circulate it to any of

6    the other members of law enforcement that were present to make sure it

7    was accurate?

8    A    You know, I can't recall if I did or not.  I mean, there are occasions

9    where I ask somebody to read my reports for accuracy, but in this instance

10   specifically, I can't recall if I did or not.

11   Q    Now, your report was actually – it was signed just a few days later, on

12   June 21st of 2001 (sic).  Did you consider that to be a quick turnaround for a

13   report?

14   A    Actually the report – my date of completion was June 23, 2011, and if

15   you look at the bottom in Box 12.  So your question is, is that quick

16   turnaround?  I would say so.  I'm usually very prompt at getting reports

17   done, and it really varies with the workload that I have.  But for the most

18   part I sit down and try to get reports done as soon as I can.

19   Q    I'd like to direct your attention to Paragraph 18 of the report, which is

20   Bates Number 150.

21            THE COURT: Now, really, getting into what was said during the

22   course of the interview is interesting only to the extent that it bears upon

23   the issues you've raised in your motion.  It might be useful in preparation

24   for trial to know what Mr. Kahn is going to say at the trial of the case.  But if

25   it doesn't bear on whether she was, you know, in custody or somehow

1    coerced into speaking, I don't really think we're using our time productively

2    here.

3              MR. KETTEL: I understand, Your Honor.  I only have a few

4    more questions about the report, and this particular – I think, in particular

5    actually goes to the issues of whether she believed she was in custody.

6              THE COURT: Okay.

7    Q    (By Mr. Kettel) Agent Kahn, who was asking the questions that are

8    covered in Paragraph 18?

9    A    I was asking the questions.

10   Q    And you testified earlier that Miss Lizama began to cry, I think you

11   said when she realized that the East Health Clinic was not a legitimate

12   business; is that correct?

13   A    Correct.

14   Q    Now, isn't it true, even when you read your own words in Paragraph

15   18, that she initially said that she believed both that clinic and a prior clinic

16   that she worked at were legitimate, and it was only after you and maybe

17   some other law enforcements convinced her that they weren't that she got

18   very upset and started to cry?

19   A    You know, my opinion of what transpired during this conversation was

20   that Miss Lizama was trying to make it appear that she was innocent, and

21   that she had no knowledge about any illegal activities.  But when the reality

22   that law enforcement explained to her, hey, these are the illegitimate things

23   happening at this clinic, as I explained that to her, I think she realized law

24   enforcement was fully aware that the pill mill she worked at, East Health

25   Center, and she was involved with Total Health Group, were pill mills.  And

1    at that point I think she realized that law enforcement was fully aware that

2    she was involved with illegal activities, and in my opinion that's when she

3    started crying.

4    Q    Or she realized after law enforcement provided her with more

5    information that – it was at that moment that she realized the businesses

6    might not have been legitimate.

7    A    I think you need to ask Miss Lizama what she thought.

8    Q    Even after Miss Lizama started to cry, the interrogation continued for

9    some time; did it not?

10   A    It did.  We actually got her some tissues and – a box of tissues, and

11   allowed her to compose herself.  And the interview continued.

12   Q    Is that in the report anywhere, that you gave her a box of tissues?

13   A    No, sir, but I remember that specifically.

14   Q    Is there any mention in the report that her roommate came into the

15   house that day?

16   A    No, sir.

17   Q    Did you ever tell Miss Lizama she could take a break?

18   A    I don't know.  I think when the roommate came in we made it very

19   clear to Miss Lizama that the roommate – you know, and I can't recall the

20   specific words, but there was nothing said to imply that she could not talk

21   to her roommate.  As a matter of fact, she got up and went and gave her

22   roommate a big hug and a kiss.  There was no restrictions on Miss Lizama

23   at all.

24   Q    Okay, but the fact that her roommate walked into the house that day

25   isn't even in the report; correct?

1      A     It's not in the report, correct.

2      Q     And the fact that she got up and gave her a hug and a kiss is not in the

3      report.

4      A     Correct.

5      Q     Why did you not include them in the report?

6      A     If it was something relevant to the investigation, I felt like the

7      information in my report are things that are relevant to the investigation.  I

8      didn't think that Miss Lizama getting up and giving her roommate a kiss is

9      something that I needed to document in my report.

10     Q     Did anyone offer Miss Lizama a drink of water?

11     A     I don't recall.

12     Q     Did anyone tell Miss Lizama she could take a break and have

13     something to eat?

14     A     I don't recall specifically.  I can tell you, sir, that there was no

15     restrictions on Miss Lizama from doing whatever she needed to do.  No one

16     told her she couldn't do anything.  As a matter of fact, I think we made it

17     implied through our conversation, you know, that she could get up and take

18     care of her – you know, talk to her roommate or do whatever.  And that's

19     exactly what she did.

20     Q     How would you imply that to a 24-year-old girl who's never

21     encountered law enforcement, that she can do those things?

22     A     You know, I can't remember the specific conversation, but it was

23     something to where – you know, I can't remember if she asked or not, but I

24     know that none of us in the room said, no, you can't go talk to your

25     roommate, sit down.  It was the exact opposite.

1    Q    During the interrogation of Miss Lizama, did she receive any telephone

2    calls or text messages?

3    A    I can't recall.

4    Q    Do you recall that you or someone else actually told her to ignore the

5    texts that came in?

6    A    I don't recall.  I don't remember any of that.

7    Q    Didn't someone tell Miss Lizama's roommate to go to her room and

8    close her door?

9    A    I don't think so.  Not that I recall.

10   Q    Agent Kahn, in 2005 you were transferred from the Beaufort, South

11   Carolina office to the Atlanta Field Division; is that correct?

12   A    That's correct.

13   Q    And wasn't that because the U.S. Attorney's office in Charleston,

14   specifically AUSA Robert Bickerton, complained of integrity problems in

15   your investigative work for DEA –

16          MR. KNOCHE:  – I'm objecting, Your Honor.  Objecting to the

17   relevance.

18          THE COURT: Yeah, I don't think – we're getting pretty far

19   afield here as to what happened in this particular case.

20          MR. KETTEL: May I ask a follow-up question, Your Honor?

21          THE COURT: Is it about any problems that he had with some

22   other agent over in South Carolina that caused him – you want to ask him if

23   he's ever been disciplined for misconduct as an agent?

24          MR. KETTEL: How about this ...

25   Q    (By Mr. Kettel) Agent Kahn, have you ever been disciplined for making

-55-

1    material misrepresentations in various investigative reports?

2    A    No.

3    Q    Has anyone every made any inquiry into you making material

4    misrepresentation in various investigative reports?

5    A    I have had allegations, as most people that do this job.  You know, I

6    have had allegations made against me.  However, no allegation has been

7    founded.

8    Q    But that was the reason you were transferred to the Beaufort, South

9    Carolina office; is that not correct?

10    A    (No audible response.)

11    Q    Transferred from the Beaufort, South Carolina office.

12    A    (No audible response.)

13            MR. KNOCHE: Objection.

14            THE COURT: Sustained.

15    Q    Agent Kahn, during the interrogation of Miss Lizama, did you ever

16    show her any documents?

17    A    I did not show her any documents?

18    Q    Did any of the other officers present do that?

19    A    I don't recall anyone showing her any documents, no, sir.

20    Q    Did you or any of the other officers present ever show her any

21    photographs?

22    A    I can't recall if we did or not.  I want to say we did not, but I'm not a

23    hundred percent sure.

24    Q    Couldn't the length of the interrogation actually been closer to two

25    hours rather than a little more than an hour?

1    A   I believe it was a little bit more than an hour from what I recall.

2    Q   And you didn't record the interview; did you?

3    A   No.

4    Q   Do you ever record interviews?

5    A   No, sir.

6    Q   Why not?

7    A   We're not required to.  It's not in our DEA policy, and it's not a habit

8    that I normally do.

9    Q   Did you ever ask Adel Lizama to write anything out for you after you

10    interrogated her?

11    A   No, sir.

12    Q   Why not?

13    A   That's not the normal way that we do interviews.

14           MR. KETTEL: May I have a moment, Your Honor?

15           THE COURT: Yes.

16      [Pause]

17    Q   (By Mr. Kettel) Agent Kahn, when you first met Miss Lizama and you

18    explained to her that this was a voluntary interview, it was consensual, did

19    you ever explain to her what you meant by that?

20    A   I think that the wording I used had its own definitions, and I think that

21    it was very clear to Miss Lizama what I was saying.

22    Q   And why do you say it was clear to her?

23    A   Because she didn't ask any questions about it.  I didn't say it in a way

24    that made it confusing.  I made it very plain in a clear, concise statement.

25           MR. KETTEL: Thank you.

-57-

1           REDIRECT EXAMINATION BY

2     MR. KNOCHE:

3     Q    You told her she wasn't under arrest?

4     A    Correct.

5     Q    You told her she didn't have to speak?

6     A    Correct.

7     Q    She seemed to understand that?

8     A    Correct.

9     Q    Counsel refers to this interrogation, but tell the Court what was the

10    demeanor of the parties.  Was it question/answer, or was it conversational,

11    give/take?  How would you characterize it?

12    A    I characterize it very similar to the conversation we're having now, very

13    low-key.  There was no type of voice being raised or confrontation.  It was

14    very casual and very non-confrontational.

15              MR. KNOCHE: That's all I have.

16              MR. KETTEL: Nothing further.

17              THE COURT: All right, thank you.  You may step down.

18         [Witness Excused]

19              MR. KNOCHE: Nothing else from the government on this

20    motion, Your Honor.

21              THE COURT: All right.  Your first witness?

22              MR. KETTEL: Yes, Your Honor, defense calls Bobby Banks.

23              Defense Presentation of Evidence

24         [Witness Sworn]

25              CLERK: Sir, please be seated.  State your name and your

-58-

1    occupation for the record.

2              MR. BANKS: My name is Bobby Banks.  I'm a special agent for

3    the Georgia Bureau of Investigation.

4                        B O B B Y   B A N K S

5         DEFENSE WITNESS, SWORN, TESTIFIED AS FOLLOWS

6                        DIRECT EXAMINATION BY

7    MR. KETTEL:

8    Q    Good morning, Agent Banks.

9    A    Good morning.

10   Q    Agent Banks, which office are you assigned to, Atlanta or Savannah?

11   A    The Savannah Regional Drug Enforcement Office.

12   Q    And when did you first start working with Special Agent Kahn?

13   A    2010-2011.

14   Q    And could you describe your role in this investigation, please.

15   A    Co-investigative agent with Agent Kahn.

16   Q    And how many of these cases relating to nominal pain clinics have you

17   investigated before?

18   A    Prior to this one, or including this one?  Two or three.

19   Q    And did you and Agent Kahn have a plan before you showed up in Miss

20   Lizama's house in June of 2016 (sic) as to how the interview would go?

21   A    I don't know if there was a design plan.  We talked about things that we

22   would like to ask her, but I don't know if there was a plan.

23   Q    Did you ever talk about the need for having five members of law

24   enforcement show up at her home that day?

25   A    No.

1    Q   Do you know why five officers had to show up that day?

2    A   I don't know if was necessary they had to show up.  That's just how

3    many of us were there.

4    Q   After – Special Agent Kahn testified when you were outside that he

5    prepared the draft of the DEA-6 report.  Did he ever show you a copy of

6    that before it was put in final?

7    A   I don't recall.

8    Q   Do you recall Miss Lizama's roommate arriving that day?

9    A   I do.

10    Q   Do you recall that someone sent her to her room and told her to close

11    her door?

12    A   I don't recall that.  I know that she went to her room.  I don't recall

13    someone told her not to go to her room.

14    Q   Have you ever talked to Al LaFrancois?

15    A   I have.

16    Q   And did you speak to him prior to June 15th of 2011?

17    A   I don't recall.

18    Q   Do you recall that at one point during the interrogation of Miss Lizama

19    that she began to cry?

20    A   Yes.

21    Q   And what happened after she cried?

22    A   Eventually she stopped crying.  I don't know what you're getting at.

23    Q   Did the interrogation cease for a while after she started crying?

24    A   Well, we didn't talk to her while she was crying.  The conversation

25    continued after she cried.

1   Q    Did anyone do anything to console her?

2   A    As far as what?

3   Q    As far as in an attempt to calm her down and stop crying?

4   A    I mean, it wasn't like hysterical crying.  It was just, you know – it was

5   sort of lightly crying.  We didn't go hug her or pat her on the back or wipe

6   her tears or anything.

7   Q    Did anyone hug her?

8   A    I believe her roommate did.

9   Q    Do you remember anyone ever telling Miss Lizama that she could take

10   a break and get a glass of water?

11   A    I don't recall anyone saying that.  I also don't recall anyone saying she

12   couldn't.

13              MR. KETTEL: Thank you.

14              MR. KNOCHE: No questions.

15              THE COURT: Thank you, Agent Banks.  You may step down.

16       [Witness Excused]

17              THE COURT: Is the witness excused?

18              MR. KETTEL: Yes, sir.

19              THE COURT: All right, you're free to go.

20              MR. KNOCHE: May the witness remain in the courtroom?

21              THE COURT: Yes.

22              MR. KETTEL: The defense calls Angela Coleman.

23       [Witness Sworn]

24              CLERK: Please be seated.  State your name and your

25   occupation for the record, please.

1    MS. COLEMAN: DEA Task Force Agent Angela Coleman.

2    A N G E L A   C O L E M A N

3    DEFENSE WITNESS, SWORN, TESTIFIED AS FOLLOWS

4    DIRECT EXAMINATION BY

5    MR. KETTEL:

6    Q    Good morning, Miss Coleman.

7    A    Good morning.

8    Q    You say you're DEA task force.  You're a member of a different agency;

9    is that correct?

10   A    Correct.  I'm actually a member of Savannah-Chatham Police assigned

11   to CNT, the Chatham Narcotics Team.

12   Q    How long have you been involved in this investigation?

13   A    From the beginning.

14   Q    But you were only involved in the investigation of the East Clinic in

15   Garden City?

16   A    Yes, the East Health Clinic.

17   Q    East Health Clinic.  So you had nothing to do with the investigation of

18   anything in Florida; correct?

19   A    I was on the trip going to Florida, but as far as the actual investigations

20   in Florida, no, not into those clinics there.

21   Q    So your only role that took place within the state of Florida was when

22   you went to interview Adel Lizama on June 15th of 2011; is that correct?

23   A    That trip there where we did interviews, yes.

24   Q    And did anyone ever tell you why they wanted you to go?

25   A    Because the people involved were – that were being interviewed were

-62-

1    involved in the clinic here in Garden City.

2    Q    Did you know that there were going to be five members of law

3    enforcement for that interview?

4    A    Yes, I did.

5    Q    Do you think that was a lot of officers to go just to visit a single person?

6    A    No, I do not.

7    Q    Why not?

8    A    Because in that situation it was a DEA agent, a local DEA agent there

9    that was helping us to get around to find the different locations, myself, my

10   supervisor, and a GBI agent that was also involved in the investigation.

11   Q    Did you ask any questions of Miss Lizama that day?

12   A    I spoke with Miss Lizama at the time, but I don't recall asking her any

13   specific questions.

14   Q    What did you talk about when you spoke to her?

15   A    We were all sitting in the living room area – I think that's what you

16   would call it – on the sofas speaking with her in reference to East Health

17   and the case involved in Garden City.

18   Q    And what did you actually talk about with her about East Health?

19   A    I don't remember asking her any specific questions myself.

20   Q    Do you remember, though, she had a dog there that day?

21   A    Yes, she did.

22   Q    Do you remember playing with the dog?

23   A    Yes.  I commented on how cute the dog was.

24   Q    Do you remember that at one point during the interrogation Miss

25   Lizama began to cry?

-63-

1    A    Yes, she did cry.

2    Q    And what happened after she started to cry?

3    A    It was at the end of the interview speaking with her that she began to

4    cry in reference to all of the situation in general with East Health Center.

5    And it was shortly after that that the interview was concluded.

6    Q    All right, so a few more questions were asked after she started to cry; is

7    that correct?

8    A    I don't recall exactly what questions were asked.

9    Q    Did Special Agent Kahn ever show you a copy of his draft report that he

10   prepared that day?

11   A    I may have seen his report.  I don't remember seeing his report at this

12   point.  I don't remember reading his report.  I have my report that I wrote

13   in reference to it.

14   Q    And do you still have a copy of your report?

15   A    I do.

16   Q    Did you ever – I know you don't recall specifically, but do you think

17   generally you might have given some input to Special Agent Kahn's report

18   before it was put in final?

19   A    I don't specifically remember, so I can't answer that.

20   Q    After Miss Lizama started to cry, did anyone do anything to console

21   her?

22   A    I don't recall specifically giving – saying anything to console her.

23   Q    And whose car did you arrive in?

24   A    I believe Agent – Sergeant Schaff and myself were in his vehicle, and

25   then the other agents were in another vehicle in front of us.  We were

-64-

1    following them.

2    Q    And where were the two cars parked?

3    A    In front of the residence.  I don't remember exactly where in front of

4    the residence.  I know we were just pulled up in front of the residence.

5    Q    And they were actually blocking in the car that Miss Lizama owned?

6    A    They may have parked in the driveway behind her.  I couldn't tell you

7    for sure if her vehicle was in front of – blocked in or not.  It wasn't

8    intentionally blocked in.

9            MR. KETTEL: Thank you.

10           MR. KNOCHE: No questions, Your Honor.

11           THE COURT: Thank you, you're excused. Free to stay or leave

12   the courtroom.

13      [Witness Excused]

14           MR. KETTEL: Defense calls Agent Schaff, Your Honor.

15           MR. KNOCHE: Your Honor, I wonder if we might have a

16   proffer from counsel.  It seems at this point the witnesses are repetitive and

17   redundant.

18           THE COURT: Well, I don't know if he knows unless he's spoken

19   with them what they're going to say.  Do you have a response to Mr.

20   Knoche?  Do you want to make a proffer about what he's going to say, or do

21   you know?

22           MR. KETTEL: Your Honor, my response is, just as with the last

23   witness, it'll be very brief.  There are only a couple of issues I'd like to touch

24   upon.

25           THE COURT: All right, I'll permit it.  Go ahead.

1        [Witness Sworn]

2                CLERK: Please be seated.  State your name and your

3        occupation for the record.

4                MR. SCHAFF: Corey Schaff.  I'm a sergeant with Savannah-

5        Chatham Metro Police.

6                CLERK: Spell first and the last.

7                MR. SCHAFF: C-O-R-E-Y  S-C-H-A-F-F.

8                        C O R E Y   S C H A F F

9            DEFENSE WITNESS, SWORN, TESTIFIED AS FOLLOWS

10                       DIRECT EXAMINATION BY

11       MR. KETTEL:

12       Q    Good morning.

13       A    Morning.

14       Q    You said sergeant?

15       A    Yes.

16       Q    Sergeant Schaff, when did you first get involved in this investigation?

17       A    I was assigned to the Counter Narcotics Team supervising the

18       diversion unit.  Probably a couple of weeks after Agent Coleman and Agent

19       Thran (phonetic) had brought to my attention a clinic being opened in

20       Garden City.

21       Q    And at one point part of the investigative team asked you to travel to

22       Boca Raton, Florida; is that correct?

23       A    Yes.

24       Q    And that was to interview Adel Lizama?

25       A    The – my supervisor, the captain over at the narcotics team, made me

1     aware of the trip down there, and asked for me to attend.

2     Q     Did anyone ever tell you why they needed you to go to Miss Lizama's

3     home?

4     A     Just as the supervisor and representative for the Counter Narcotics

5     Team, that's pretty much it.

6     Q     Did you play any particular role when you got to her home that day?

7     A     As far as what?  What would you ...

8     Q     Securing the house.

9     A     I was present and, again, representing CNT's interests and, you know,

10    more or less making decisions on behalf of CNT.  But as far as conducting

11    interviews or anything like that, I was just more in attendance than

12    participant.

13    Q     And what do you mean by representing their interests?

14    A     On the trip overall.  If there was a financial issue with CNT agents or

15    whatever.  I was not the primary investigator or anything like that so ...

16    Q     How long do you remember the interview of Miss Lizama taking place?

17    A     I would probably say around an hour, maybe a little more.

18    Q     Do you recall Miss Lizama's roommate showing up during the

19    interview?

20    A     I recall a female arriving at the house and entering the house.  I think

21    she went to like a back bedroom or something, and then I don't – she may

22    have left or may have stayed in the back bedroom, I'm not sure.

23    Q     And she went to her back bedroom because she was told to go to her

24    back bedroom; correct?

25    A     I don't believe so.

1    Q    Did – one of the vehicles that arrived at her house that day, were you

2    driving the vehicle?

3    A    I believe so.

4    Q    And where did you park your car?

5    A    I think in front of the house?

6    Q    Blocking Adel Lizama's car?

7    A    No.

8              THE COURT: You say in front, you mean in the driveway or on

9    the street?

10             WITNESS: No, on the street, sir.

11   Q    (By Mr. Kettel) And what was your vehicle?  What kind of vehicle was

12   it?

13   A    I believe I was driving a Tahoe.

14   Q    Was it a black Tahoe?

15   A    No, it was tan.

16             THE COURT: That's what you drove from Savannah to Boca

17   Raton?

18             WITNESS: Yes, sir, I believe so.

19             MR. KETTEL: Thank you.

20             MR. GILLULY: May I ask a few questions?

21             THE COURT: Yeah.

22                          <u>CROSS-EXAMINATION BY</u>

23   <u>MR. GILLULY:</u>

24   Q    Sergeant, the question about the roommate, you observed the female

25   enter after the interview had already started; is that correct?

1    A    Correct.

2    Q    Did the female have any problem entering into the house?

3    A    No.

4    Q    You didn't see anyone pat down the female?

5    A    Oh, no.

6    Q    In fact, you didn't see anyone tell the female, you need to go in the back

7    room?

8    A    No, sir.

9    Q    Did the female and Miss Lizama have a conversation that you

10   witnessed?

11   A    With her roommate –

12   Q    – Each other.

13   A    I believe they did converse, but I'm not sure.

14   Q    No agent ever told them they weren't allowed to talk to each other;

15   correct?

16   A    No.

17   Q    The tone of the conversation between agents and Miss Lizama was

18   conversational; is that correct?

19   A    Yes.

20   Q    Y'all treated her fairly?

21   A    Oh, yes.

22   Q    No one put her in handcuffs?

23   A    No.

24   Q    No one told her she was not free to leave?

25   A    No.

1    Q    In fact, the roommate was free to come and go as well; is that correct?

2    A    Yes, sir.

3                 MR. GILLULY: Nothing else, Judge.

4                 MR. KETTEL: Nothing further, Your Honor.

5                 THE COURT: All right.  Thank you, Agent Schaff.  You're

6    excused, and you're free to leave or stay at your preference.

7         [Witness Excused]

8                 MR. KETTEL: Your Honor, defense calls Kevin Scott, please.

9         [Witness Sworn]

10                CLERK:  Please be seated.  State your name and your

11   occupation for the record, please.

12                MR. SCOTT: My name is Kevin Scott, S-C-O-T-T.  I'm

13   employed by the city of Coconut Creek as a detective, and I'm assigned to a

14   DEA group out of Miami.

15                    K E V I N   S C O T T

16          DEFENSE WITNESS, SWORN, TESTIFIED AS FOLLOWS

17                       DIRECT EXAMINATION BY

18   MR. KETTEL:

19   Q    Good morning, Detective Scott.

20                THE COURT: Where is the city of Coconut Creek?

21                WITNESS: It's in Broward County.  It's a little north of Miami,

22   sir.

23                THE COURT: All right.

24   Q    Detective Scott, when did you first get involved with this investigation?

25   A    Can you clarify which investigation?

1    Q    Were you involved at all of the investigation of Palm Beach ...

2    A    Pain and Rejuvenation?  Yes, sir.

3    Q    And when did you get involved with that?

4    A    In 2010.

5    Q    Is that the reason why in 2011 you were asked to accompany four other

6    members of law enforcement to interview Adel Lizama?

7    A    Yes, sir.

8    Q    And what was specifically your role that day when you went to

9    interview Miss Lizama?

10    A    I had been contacted by Agent Kahn and asked to help locate Miss

11    Lizama.  I, subsequent to that day, contacted them and told them that, you

12    know, she was at that location, or had been staying at that location.  They

13    came into town.  I basically as – I guess an envoy for the department – you

14    know, assistance, since my local knowledge, assisted taking them there that

15    day.

16    Q    Were you one of the people that drove to Miss Lizama's house that

17    day?

18    A    I did drive my own vehicle that day.

19    Q    And what vehicle was that?

20    A    I don't remember exactly.  I normally drive an unmarked Enterprise

21    rental vehicle.  So it would have been an unmarked Suburban, or

22    something like that.  It would have been just an average rental car.

23    Q    And where did you park your car?

24    A    I'm just taking a moment trying to remember.  I believe – and maybe

25    you can correct me.  I don't remember which direction the front of the

-71-

1    house faces, but if you're standing looking at the front of the house, I

2    believe I parked on the street to the right of the house.

3    Q    You didn't park in the driveway?

4    A    I may have later on.  I don't have – my recollection is approaching the

5    house from the right side.  So I don't specifically remember where I parked

6    that day, but I do remember approaching when I first approached the

7    house from the right.

8    Q    Why would you have moved your car later on?

9    A    I may have gone for a notebook.  I remember moving the vehicle once

10   during the course of being there.

11   Q    And you went to get your notebook because you were taking notes?

12   What was the reason for that?

13   A    And, again, I remember going to the car.  I don't know whether it was

14   to drop equipment that I had or to get something, but I remember moving

15   the car in the street.

16   Q    What kind of equipment did you bring with you that day?

17   A    I would have – again, it's been a couple of years.  I may have had a vest

18   on that I took to the car and dropped.

19   Q    Is it normal for you to wear a vest when you're going to interview a

20   witness?

21   A    Yes, sir.  Generally I work plainclothes.  Usually I don't even carry a

22   gun.  So a lot of times I'll use a vest, you know, if we're going up to knock at

23   someone's house, and I get –

24           THE COURT:  – You're talking about a protective vest of some

25   kind?

1    WITNESS: Yes, sir, that would – and I'm not even certain that I

2    had it on that day.  You know, I mean, it's been a couple of years.  I'm

3    trying to be as honest and forthright with you as I can.

4    THE COURT: When you do wear such a vest, is it exposed and

5    obvious to anyone you encounter that you have it on?

6    WITNESS: It's just – it's a black vest with a nylon cover, and it

7    would say police on the front.  That's typically what I use.

8    THE COURT: And why would you have taken it out and put it in

9    the car?

10    WITNESS: Because it was no longer needed.  I believe what

11    happened is, when they made contact with her and were invited in the

12    house, I realized it was, you know, an interview.  It wasn't – you know,

13    there was no confrontational-type of issues.

14    THE COURT: In other words, you weren't in danger.

15    WITNESS: No, sir.

16    THE COURT: Okay.

17    Q    (By Mr. Kettel) But starting out you weren't sure whether you'd be in

18    danger.

19    A    Yes, sir.  I mean, you never know who you're going to approach or who

20    you're going to contact, or who would be in the house.

21    Q    Now, since you were basically the local person who helped find the

22    house, was part of your responsibility to, you know, do some – to get some

23    intel to make sure that the house was secure and safe?

24    A    No, sir, I did not do that.  I was asked to locate her, and I think the only

25    information I was able to relay to them was that the vehicle – I did not have

1    any recollection of actually seeing Miss Lizama there.  I believe what I

2    relayed to them was that the vehicle that she was last known to be driving

3    was there, which was a black Jeep.  And I believe that's what I relayed to

4    them.

5    Q    And did everyone arrive at approximately the same time at her home?

6    A    I believe so, yes, sir.

7    Q    And when you first arrived at her home, what's the next thing you-all

8    did?

9    A    I remember Agent Kahn and – going to the front door and knocking on

10    the door.  Agent Kahn identified himself, asked to speak with her, and was

11    basically invited into the house.  They were invited in, sat down at the, you

12    know, living room.  There was a couch, maybe an end table, and another

13    couple of chairs facing the couch.  And we all sat on the couch.

14    Q    Before Agent Kahn knocked on the door, did anyone do anything to

15    secure the house to make sure it was safe for Agent Kahn to approach the

16    front door?

17    A    No, sir.  I mean, I don't remember anyone going – if you're asking

18    specifically if we surrounded the house, I do not believe that that took

19    place.

20            MR. KETTEL: May I have a moment, Your Honor?

21            THE COURT: Yes.

22      [Pause]

23            MR. KETTEL: Nothing further, thank you.

24            MR. GILLULY: May I?

25            THE COURT: Yes.

1          MR. GILLULY: Thank you.

2                    <u>CROSS-EXAMINATION BY</u>

3    <u>MR. GILLULY:</u>

4    Q    Detective Scott, you were not the primary agent in this interview of

5    Adel Lizama; correct?

6    A    That is correct.

7    Q    And Doug Kahn was the primary agent who did most of the

8    questioning; correct?

9    A    Yes, sir.

10   Q    And Miss Lizama was cooperative; is that right?

11   A    Yes, sir.

12   Q    There were no voices raised throughout the entire interview?

13   A    No, sir.

14   Q    She was cooperative, and it was of a conversational tone; is that

15   correct?

16   A    Yes, sir.

17   Q    Regarding the vehicles, you don't remember specifically where they

18   were parked, but is it fair to say that you had no intention of blocking her

19   and keeping her restrained in the home?

20   A    That is correct.

21   Q    And she was not restrained; was she?

22   A    No, sir.

23   Q    In fact, she was advised that she was not in custody.  In fact, she was

24   never patted down, nor were handcuffs placed on her; is that correct?

25   A    That is correct.

-75-

1   Q   Officers, or detectives and agents did not have any blue lights flashing.

2   A   No, sir.

3   Q   Never pulled out any flashlight, shine it in her face?

4   A   No, sir.

5   Q   Didn't have your gun shown, if you even had a gun on; correct?

6   A   That is correct.

7   Q   And she was cooperative.

8   A   Yes, sir.

9   Q   And the room itself was a relatively large living room at a place where

10   she lived; correct?

11   A   That is correct, sir.

12   Q   And at any point during the interview did she tell you, I don't want to

13   answer any more questions?

14   A   No, sir.

15   Q   Did you ever hear her say, I want to leave?

16   A   No, sir.

17   Q   Did you ever hear her say, I don't feel comfortable, I'd like a lawyer?

18   A   No, sir.

19   Q   Did she express anything but cooperation during this interview?

20   A   No, sir.

21         MR. GILLULY: That's all I have, Judge.

22         MR. KETTEL: Nothing further, Your Honor.

23         THE COURT: All right.  Thank you, Agent Scott.  You may step

24   down.

25      [Witness Excused]

-76-

1        MR. KETTEL: Your Honor, the defense calls Adel Lizama.

2        [Witness Sworn]

3        CLERK: Please be seated.  State your full name for the record.

4    Please spell your first and the last name.

5        MS. LIZAMA: Adelaida, A-D-E-L-A-I-D-A, Lizama, L-I-Z-A-M-

6    A.

7                    A D E L A I D A   L I Z A M A

8            DEFENDANT, SWORN, TESTIFIED AS FOLLOWS

9                        DIRECT EXAMINATION BY

10   MR. KETTEL:

11   Q    Good morning.

12   A    Morning.

13   Q    Ms. Lizama, are you currently employed?

14   A    Yes.

15   Q    And where do you work?

16   A    Carr Workplaces.  I'm a client services associate.

17   Q    And how long have you worked there?

18   A    Since February of this year.

19   Q    So I'm going to jump right into June 15th of 2011.  Do you recall that

20   date?

21   A    Yes.

22   Q    And what's the first thing that made you realize that law enforcement

23   was at your house?

24   A    My dog was alarmed by the loud pound on the door, and the scuffling

25   of many people showing up to the door.

1  Q    So you actually heard the scuffling?

2  A    Yes.

3  Q    Do you have a doorbell at your house?

4  A    Yes, I do.

5  Q    Did anyone ring the doorbell?

6  A    No.

7  Q    And when I refer to your house, it's actually not your house; is it?

8  A    It's my parents' house.

9  Q    Do you know who it was that pounded on your door?

10 A    No.

11 Q    And what happened after you heard the pounding on the door?

12 A    I immediately felt a sense of fear.  I was home alone, and I looked

13 through the peephole and I saw what seemed to be a group of people.  It's a

14 very small doorway, and I opened the door.

15 Q    And who was the first person you saw?

16 A    I cannot recall, there was so many people.

17 Q    When you looked through the peephole, were you able to see any

18 vehicles in front of your house?

19 A    Yes.

20 Q    How many vehicles did you see?

21 A    Two.

22      MR. KETTEL: May I approach, Your Honor?

23      THE COURT: Yes.

24 Q    Miss Lizama, I've placed in front of you what's been marked as Exhibit

25 K.

1    MR. KETTEL: Your Honor, it's also already attached to our

2    motion.

3    THE COURT: As Exhibit K?

4    MR. KETTEL: As Exhibit K.

5    Q    Miss Lizama, what does Exhibit K reflect?

6    A    That is my driveway and the two vehicles that I saw.

7    Q    And there's one car in the driveway that's facing out rather than facing

8    in to the driveway.  Whose car is that?

9    A    That was my Jeep at the time.

10   Q    And is that what you saw on June 15th of 2011?

11   A    Yes.

12   MR. KETTEL: May I approach again, Your Honor?

13   THE COURT: Yes.

14   Q    Just to move things a little more quickly, I've placed in front of you

15   Exhibits O and P, which were not – I don't believe attached to the motion,

16   but they're marked now for today's purposes as O and P.  Could you tell me

17   what those pictures reflect?

18   A    My car being blocked in with nowhere to go.

19   Q    And so you went to the front door, and what happened next?

20   A    When I opened the door, I saw a number of faces in front of me.  I

21   immediately felt bombarded and a sense of fear.  They identified that they

22   were there to interview me.

23   Q    And did they ever enter the house?

24   A    Yes, they did.

25   Q    How was it that they entered the house?

1   A     They said they wanted to ask me some questions.  I agreed to answer

2   questions and they entered.

3   Q     And we've heard some testimony earlier that you then all went into the

4   living room; is that correct?

5   A     Yes.

6   Q     And where were you seated in the living room?

7   A     With my back facing the door, next to Bobby Banks.

8          MR. KETTEL: May I approach, Your Honor?

9          THE COURT: Yes.

10  Q     I've handed you what's marked as Exhibit S, and what does Exhibit S

11  depict?

12  A     That is my living room.

13  Q     Now, I can see from the photograph that there's some Halloween

14  decorations, so I'm assuming this photograph was not taken on or about

15  June 15th of 2011 –

16         THE COURT:  – That's Exhibit L in the brief?  Same picture?

17         MR. KETTEL: Yes, it is.  I apologize, Your Honor.

18         THE COURT: Can we call it Exhibit L?

19         MR. KETTEL: Yes.  My mistake.

20         THE COURT: All right.

21  Q     As I was saying, I'm assuming that this photograph was not taken on

22  or about June 15th.

23  A     No, it was not.

24  Q     But does the arrangement of the furniture in that photograph depict

25  the way the furniture was arranged in –

1    A   Yes, it does.

2    Q   – June of 2011.  And you have a pen, by any chance?

3    A   No.

4             MR. KETTEL: May I approach, Your Honor?

5             THE COURT: Yes.

6    Q   Could you please mark on Exhibit L where you were seated during the

7 interrogation.  And maybe if you put "A.L." as your initials, or something

8 like that.  And where were the other officers standing or seated on that day?

9    A   They were surrounding me on the other couches.

10   Q   And was your dog also there?

11   A   Yes.

12   Q   Where was your dog?

13   A   On the lap of Agent Coleman.

14   Q   You heard testimony earlier that you were allowed – or someone let

15 your dog out.  Did that happen?

16   A   I never got up at any point of the interview.

17   Q   Did you ever feel like you had any choice but to let the officers into

18 your house that day?

19   A   No.

20   Q   Did anyone ever tell you you were free to leave that day?

21   A   No.

22   Q   Did anyone ever tell you that you could ask them to leave your house?

23   A   No.

24   Q   The report that I think you reviewed and we've talked about today, in

25 it Special Agent Kahn indicates that he considered the interview to be

1    consensual and voluntary.  What does that mean to you?  Does it mean

2    anything to you?

3    A    No.  That I allowed them to ask me questions, but that's all that I

4    know.

5    Q    So now that you're all seated in the living room, officers are

6    surrounding you, what happened next?

7    A    They began to ask me a numerous amount of questions.  They all kept

8    going, one after another.

9    Q    Did they ever talk over each other?

10   A    Yes.

11   Q    Did anyone ever tell you you had a right to remain silent?

12   A    No.

13   Q    And they did tell you, though, that you weren't under arrest; correct?

14   A    Yes.

15   Q    But just once.

16   A    Uh-huh.

17   Q    What was the tone of the interrogation?

18   A    They seemed, you know, I guess, angry in a sense of trying to get down

19   to the bottom of what they were interrogating me about.

20   Q    And when you would answer a question, would they then repeat what

21   they thought you said so they could write it down?

22   A    Some questions, yes.

23   Q    Did it appear to you that they were writing everything down

24   accurately?

25   A    No.

1    Q    And did you tell them that?

2    A    Yes.

3    Q    Did you ever try to correct them?

4    A    Yes.

5    Q    And what happened when you tried to do that?

6    A    They moved on with another question.

7    Q    How long did the interrogation last?

8    A    At least two hours.

9    Q    And were you allowed to take any breaks?

10    A    I did not.

11    Q    Were you allowed to have a drink of water?

12    A    No.

13    Q    Were you allowed to eat any food?

14    A    No.

15    Q    Were you allowed to make or receive any telephone calls?

16    A    No.

17    Q    Did you ever receive any text messages during the interrogation?

18    A    Yes, I did.

19    Q    And what happened when you did?

20    A    They asked me who it was.  I told them Al LaFrancois (phonetic), and

21    they asked me what it read.

22    Q    And did you tell them?

23    A    Yes.

24    Q    At one point your roommate arrived at your home; is that correct?

25    A    Yes.

1    Q    What happened when she arrived?

2    A    They silenced me, told me to tell that they were here for an

3    investigation to a hit and run.

4    Q    So they told you to lie?

5    A    Uh-huh.

6    Q    And then what happened?

7    A    We all went silent.  She walked into the house, and she went towards

8    her room.  They asked her to close the door behind her.

9    Q    At any point during your meeting with the officers, did you ever

10   believe that you were free to leave?

11   A    No.

12   Q    And even if you somehow figured out that you could run outside on

13   your front lawn, where would you have gone?

14   A    Nowhere.  My car was blocked in, and I had a bunch of strangers in my

15   house.

16              MR. KETTEL: Thank you.

17                         CROSS-EXAMINATION BY

18   MR. KNOCHE:

19   Q    Miss Lizama, you are well educated; is that correct?

20   A    I went to Florida Atlantic University, yes.

21   Q    That's an accredited school, four-year college?

22   A    Yes.

23   Q    You have a four-year degree?

24   A    On a full scholarship for basketball.

25   Q    On a full scholarship, and what was – what is your degree in?

1    A    Health administration.

2    Q    Health administration?

3    A    Yes.

4    Q    And what are some of the subjects you studied to get a degree in

5    health administration?  Or what are the core subjects that you studied?

6         MR. KETTEL: Objection, Your Honor, relevance.

7         THE COURT: I'll allow it.

8    A    The classes that I had to take, and I don't recall specifically –

9    Q    – Can you tell the Court any of your classes that you took?

10   A    All the introductory courses, and anything substantial for –

11   Q    – Chemistry?

12   A    No.

13   Q    Math?

14   A    I took a math course as a freshman.

15   Q    English?

16   A    Yes.

17   Q    Okay.  What are some other classes you studied?

18   A    Any health administration classes.

19   Q    Okay.  All those classes, I'm assuming, were at Florida Atlantic

20   conducted in English?

21   A    Yes.

22   Q    And you do speak fluent English?

23   A    Yes.

24   Q    Is English your first language?

25   A    Spanish actually was my first language.

1    Q    Okay.  How long have you been speaking English.

2    A    Since I was four.

3    Q    Okay, and so when you went through all your grammar school and

4    middle school and high school, was that all at English-speaking schools?

5    A    Yes.

6    Q    Okay, and Florida Atlantic as well; right?

7    A    Yes.

8    Q    With your education, you know what consensual means; do you not?

9    A    Yes.

10    Q    What's it mean?

11    A    I allow it.

12    Q    Okay.  Or you consent; would you agree with that?

13    A    I would agree that I allow something.

14    Q    Okay.  Voluntary, what does voluntary mean to you?

15    A    Similar, that I volunteer to do something.

16    Q    Okay.  That you're not forced.

17    A    No.

18    Q    Would you agree that would be implied within the term voluntary, that

19    you were not forced?

20    A    In regards to what?

21    Q    Well, in regards to the English meaning of the word voluntary.

22    A    I believe it would depend on the subject matter.

23    Q    You stated a moment ago to counsel, and I wrote down in quotes, I

24    agreed to answer questions.

25    A    Yes.

1    Q    You agreed, okay.  And you agreed to answer those questions inside

2    your house, your living room.

3    A    Yes.

4    Q    You indicated that your first indication that there were people at your

5    front door was you heard a scuffling; is that right?

6    A    Yes.

7    Q    Does that mean that you heard fighting, shouting, pushing, that sort of

8    thing?

9    A    No, I heard –

10   Q    Is that what you mean by scuffle?

11   A    – all the footsteps.

12   Q    You heard footsteps, okay.  In other words, the footsteps that five

13   people – you know, the sounds that five people arriving talking might be

14   making.

15   A    Yes.

16   Q    But there was no arguing, no pushing, no fighting, that sort of thing.

17   That's not what you meant; was it?

18   A    I did not see anything outside at that point.

19   Q    You said you had a sense of fear; is that right?

20   A    Yes.

21   Q    So you called the police?  You called the police?

22   A    No.

23   Q    Okay.  In fact, you must have been relieved to learn that in fact those

24   were the police.

25   A    No.

1 Q No.  Did you learn that they were the police?

2 A I knew they were some type of law enforcement.

3 Q Well, okay, let's not quibble.  Law enforcement/police would be the

4 same thing; is that correct?

5 A I imagine so.

6 Q Law enforcement are police?

7 A Yes.

8 Q Okay.  So learning that it was law enforcement, and not just five

9 strange people scuffling at your front door, must put your mind at ease to

10 some extent.

11 A No.

12 Q No?  These pictures in the driveway, who took those pictures?

13 A My roommate.

14 Q Your roommate, that's Miss Gump?

15 A Yes.

16 Q Did you tell her to take those?

17 A No.

18 Q How did you learn that she had, then?

19 A I learned afterwards, when the agents left.

20 Q Now, after the agents arrived at your front door, they didn't make a

21 forced entry into your residence; did they?

22 A No.

23 Q They knocked on the door, or as you said, they pounded on the door?

24 A Yes, it was a very loud pounding.

25 Q A loud knocking on the door, but they didn't force their way in?

1    A    No.

2    Q    Okay.  In fact, you opened the door to them; right?

3    A    Yes.

4    Q    And you invited them into your house?

5    A    I did not invite them into my house.

6    Q    Now, what time of day was this?  It was afternoon; wasn't it?

7    A    Yes.

8    Q    You were up and about?  You were dressed?

9    A    I was dressed in workout clothes.

10    Q    Okay.  Had you had breakfast?

11    A    I don't recall.

12    Q    Is it your habit?

13    A    Occasionally.

14    Q    Okay.  Had you had lunch?

15    A    I don't recall.

16    Q    Okay.  Were you intoxicated?

17    A    No.

18    Q    How long do you think you'd been up that day?

19    A    I don't recall.

20    Q    No idea?

21    A    No.

22    Q    Ten minutes before they arrived?

23    A    No.

24    Q    An hour before they arrived?

25    A    I don't recall.

-89-

1    Q    You were never handcuffed; were you?

2    A    No.

3    Q    You were never made to lie down.

4    A    No.

5    Q    No?  You weren't restrained physically by the agents; were you?

6    A    No.

7    Q    They didn't put hands on you; did they?

8    A    No.

9    Q    Your roommate was allowed to enter the residence.

10   A    It was her home.

11   Q    Sure, and no one tried to stop her from coming in.

12   A    No.

13   Q    You were allowed to speak to her.

14   A    I did not speak to her.

15   Q    You were allowed to have some contact with her.

16   A    We only made eye contact.

17   Q    Did you not give her a kiss?

18   A    No.

19   Q    Okay.  Your roommate was never arrested; was she?

20   A    No.

21   Q    After the agents had finished their interview with you, you weren't

22   arrested; were you?

23   A    No.

24   Q    Okay.  The agents weren't displaying firearms; were they?

25   A    No.

1    Q    Okay.  The agents were all in plainclothes?

2    A    They all matched.

3    Q    You never told the agents –

4            THE COURT:  – Say again, their clothes all matched?

5            WITNESS: Yes, they were all wearing –

6            THE COURT:  What do you mean by that?

7            WITNESS:  – the same collar T-shirts, the same black under-

8    collar T-shirts and khaki pants with boots.

9            THE COURT: Black T-shirts and khaki pants?

10           WITNESS: Yes.

11           THE COURT: How about the female agent?

12           WITNESS: Same.

13   Q    (By Mr. Knoche) You never told the agents that you wanted to leave.

14   A    I didn't know that I could leave my residence with people in my home.

15   Q    You never said you wanted a lawyer.

16   A    I did not have a lawyer.

17   Q    You never said you didn't want to answer their questions.

18   A    Not –

19   Q    – In fact, you were quite cooperative with the agents; is that correct?

20   You answered the questions they asked you.

21   A    I believed that was my only option.

22           THE COURT: Did you ever ask them to leave your residence?

23           WITNESS: No.  I didn't know I could.

24   Q    (By Mr. Knoche) You never attempted to deny the agents entry into

25   your residence; did you?

1   A   I didn't know I could.

2   Q   You never told them you were afraid of them; did you?

3   A   No.

4   Q   Because you knew they were the police.

5   A   Yes.

6   　　　　　MR. KNOCHE: That's all I have, Your Honor.

7   　　　　　REDIRECT EXAMINATION BY

8   MR. KETTEL:

9   Q   On June 15th of 2001 (sic), you knew that Al LaFrancois had been

10   arrested a few weeks before; hadn't he?

11   A   Yes.

12   Q   And what did that mean to you on June 15th?  What significance did

13   that have to you?

14   A   When I heard a number of agents approach my door, I thought that

15   they were coming to arrest me.

16   Q   Now, you testified a few moments ago that you didn't have any contact

17   with your roommate when she came in; is that correct?

18   A   That is correct.

19   Q   There was no hug?

20   A   No.

21   Q   No kiss?

22   A   No.

23   Q   Did anyone ever offer you any Kleenex when you started to cry?

24   A   No.

25   Q   The photographs that you have in front of you which are marked K, O

1    and P, do they reflect that you could have gotten in your car and left if you

2    wanted to?

3    A    No.

4    Q    Why not?

5    A    My car was completely blocked in.

6            MR. KETTEL: Thank you.

7            MR. KNOCHE: Your Honor, I have one more question.

8            THE COURT: Let me just see if he's through, first.

9            MR. KNOCHE: I'm so sorry.

10           MR. KETTEL: I'm sorry, Your Honor, I just have a few

11   questions.

12   Q    (By Mr. Kettel) When the police and agents left your home, did they

13   leave any business cards?

14   A    No.

15   Q    Did they tell you their names?

16   A    They – I think Bobby and Doug left a ripped-up piece of paper with a

17   telephone number.

18   Q    Did they ever ask you if you had any money in your home?

19   A    Yes.

20   Q    What did they ask you?

21   A    They asked if I had money stashed in my home.

22   Q    And what'd you tell them?

23   A    No.

24   Q    Do you recall if when your roommate arrived whether your front door

25   was locked or unlocked?

1    A    It was locked.

2    Q    And after the officers and agents left your house that day, did they give

3    you any instructions on whether you could or could not talk to anyone?

4    A    They told me I could not talk to anyone.

5         MR. KETTEL: Thank you.

6                    RECROSS-EXAMINATION BY

7    MR. KNOCHE:

8    Q    Miss Lizama, excuse me, I neglected to ask, did you or your roommate

9    have a recording device which made any audio recording of the interview

10   on June the 15th?

11   A    No.

12        MR. KNOCHE: That's all I have.

13        THE COURT: Thank you, Miss Lizama, you may step down.

14      [Witness Excused]

15        MS. WADE: Your Honor, the photographs that are attached as

16   exhibits are black and white.  We now have color ones, and so we'd like to

17   tender those in.

18        THE COURT: Well, I have a color copy in the brief.

19        MS. WADE: Oh, you do?  Oh, well, that's good to know.  Okay.

20   Well, very good.  We have a couple of –

21        THE COURT:  – I think there were some photographs – where

22   are they?  Still ...

23        MR. KETTEL: Right here.

24        MS. WADE: I thought when we scanned them in they became

25   black and white, so now I've learned something about PACER.

1    MR. KETTEL: Your Honor, the –

2    THE COURT:  – There were some exhibits referenced that are

3    not part of your attachments to your brief.

4    MS. WADE: Yes.  We've just submitted some additional

5    photographs.

6    THE COURT: Are you moving for their admission?

7    MR. KETTEL: Yes, Your Honor.

8    THE COURT: Any objection?

9    MR. KNOCHE: No, Your Honor.

10   THE COURT: Any further testimony?

11   MR. KETTEL: We have one last witness, Your Honor.

12   THE COURT: Oh, you do?

13   MR. KETTEL: That's Megan Gump.

14   [Witness Sworn]

15   CLERK: Please be seated.  State your name and your

16   occupation for the record, please.

17   MS. GUMP: Megan Gump.  I'm a student, as well as I work in

18   marketing.

19   CLERK: Spell first and last name.

20   MS. GUMP: M-E-G-A-N  G-U-M-P.

21   THE COURT: Proceed.

22   M E G A N   G U M P

23   DEFENSE WITNESS, SWORN, TESTIFIED AS FOLLOWS

24   DIRECT EXAMINATION BY

25   MR. KETTEL:

-95-

1    Q   Miss Gump, where do you currently live?

2    A   South Beach Miami, Miami Beach, Florida.

3    Q   And have you ever lived with Adel Lizama?

4    A   Yes, sir.

5    Q   And when did you first start living with Adel Lizama?

6    A   February of 2011.

7    Q   Would you consider yourself close friends with Miss Lizama?

8    A   Yes.

9    Q   Do you recall a date in June, June 15th of 2011, when you returned to

10   your house?

11   A   Yes, sir.

12   Q   And tell me what happened from the time you got to the front door

13   until you left the house later that day.

14   A   Well, basically I just pulled up to my house, and there were two

15   Suburban vehicles parked in front of my house, particularly in front of

16   Adel's car in our driveway.  And then I parked my car in the front of our

17   house, and I went to our front door, unlocked our house, and went inside.

18   Q   Let me just stop you there –

19   A   Sorry.

20   Q   – I apologize, my fault.

21          MR. KETTEL: May I approach, Your Honor?

22          THE COURT: Yes.

23   Q   I'm handing you what have been previously marked as Exhibits K, O

24   and P.  Have you ever seen those exhibits before?

25   A   Yes, sir.

1      Q     And what are they?

2      A     They're the pictures that I took the day that I got to my house.

3      Q     And why did you take them?

4      A     Well, particularly because I pulled up and saw P, and I guess I was

5      shocked, and a little concerned as to who it was and why they were parked

6      the way they were.  So then I took the other two pictures just because of the

7      fact of, once again, particularly especially the car that's in the street, how he

8      was parked.  It wasn't by any means how a normal person would park, so I

9      guess I was a little shocked and confused.  So I just really took them to, I

10     guess, maybe later show Adel as to like – because I'm guessing she hadn't

11     seen that.

12     Q     Did you know who owned the cars?

13     A     No, sir.

14     Q     Did you have any suspicions?

15     A     Well, I suspected that it was obviously someone there to see Adel

16     because we were the only people who lived there, along with our roommate.

17     And I might have had a little suspicion that it was either someone there to,

18     you know, hurt Adel or to be there for some reason.  And then I also had

19     suspicion that it could have been cop cars, just because of the fact that they

20     were two alike Suburban cars.

21     Q     So now you approached the front door.  Was the door locked?

22     A     Yes, sir.  I did have to use my key to unlock it.

23     Q     And what happened when you stepped inside?

24     A     I opened the door, and I saw Adel and five other agents in our living

25     room.  All of them were seated except for one, who was approaching me at

-97-

1    the door.

2    Q    Did that agent introduce himself?

3    A    He didn't introduce himself, but he – basically I opened the door and I

4    saw Adel.  We made eye contact, and I basically just was kind of like

5    shocked and, you know, was just kind of like, hello? like to the room.  And

6    then the agent was like, you know, hi, we're here to speak with Adel, we just

7    needed to ask her a couple of questions.  I'm going to need you to go in your

8    room.  That's pretty much just what he said to me.

9    Q    And did you do that?

10   A    Yes.  I mean, he actually was kind of just like, I need you to go to your

11   room, you know.  Is there a door on your bedroom?  And I was like, yeah,

12   you know, of course there's a door.  And he's like, well, okay, well, I'm going

13   to need you to go to your room and I need you to shut your door.  And at

14   the time I was just really confused.  I had just gotten off of work.  I also was

15   there like on a very limited amount of time.   I was there to just briefly

16   change, get some food, and then head back out to another event I had to go

17   to.  So when he asked me to like go in my room and, you know, shut my

18   door, I was definitely like a little worried about okay, well, you know,

19   there's things I need to do.  And I was also concerned for Adel, like who are

20   these, you know, men, and why are they asking me to go in my room and

21   shut my door away from like whatever was happening.

22   Q    Before you went into your room and shut your door, did you have an

23   opportunity to talk to Adel?

24   A    No.  It was very – very quick.  Like he was right at the door like, you

25   know, pretty demanding as to the fact that I needed to go to my room and

1    shut my door, because obviously he didn't want me to hear anything that

2    they were saying.  He didn't want me to make any prior contact with Adel,

3    you know.  It was a very brief moment from like me walking in and him

4    basically telling me to go to my room.

5    Q    So you didn't give Adel a hug?

6    A    No, no.  Adel was seated on the couch.

7    Q    And what was the expression on Adel's face when you saw her?

8    A    Well, right when I walked into the room, I immediately like looked at

9    Adel and we made eye contact.  She looked like she'd been crying.  She was

10   obviously very upset.  She looked like she was worried.  She looked like she

11   felt very intimidated, threatened, you know, nervous.  So I was concerned

12   for my roommate.  I was very curious as to what was happening in my

13   house.  I was obviously unaware of, you know, anything going on when I

14   arrived.  Adel looked like she was pretty much caught by surprise about this

15   whole situation as well.

16        So I remember briefly just, you know, kind of like, are you okay?  You

17   know, like looking at her, and she just kind of like nodded at me.  And then

18   I, you know, went to my room, and the officer basically like followed me

19   there, and then shut the glass door that separates our living room and our

20   bedrooms behind me actually.

21        And then I went to my room and, you know, I shut my door, and just

22   kind of went along with things I had to do in that area of the house.

23   Q    How long did you stay in the house before you left to go back to work?

24   A    Maybe about 20, 30 minutes.

25   Q    And were the agents and other law enforcement still in the house when

1    you left?

2    A    No.  I had gone to my room, and I had changed and went to the

3    bathroom and did the things that I had to do there, and then I actually like

4    was on a time constraint.  So I came out of my bedroom, opened up the

5    glass door.  They were still there.  As soon as I approached that room, they

6    immediately stopped talking.  I went to the kitchen.  I kind of did what I

7    had to do there just because I knew I had to get out of the house.  And they

8    were kind of whispering, some voices, I didn't really hear what was going

9    on.

10        And then I'm pretty sure I made my way back to the bedroom just to

11   kind of give them privacy, and by the time I came out they were gone.

12   Because I remember specifically leaving, and when I left with my car, their

13   cars weren't there anymore.

14   Q    And before you left, did you have a chance to talk to Adel about what

15   happened?

16   A    Very briefly.  Not a whole lot.  She basically just – you know, I asked if

17   she was okay, and kind of did that thing.  And then she basically just told

18   that they were there to ask questions about Al, and that was pretty much it.

19   Q    She didn't tell you anything more?

20   A    No.

21           MR. KETTEL: May I have a moment, Your Honor?

22       [Pause]

23           MR. KETTEL: Nothing further, thank you.

24                    CROSS-EXAMINATION BY

25   MR. GILLULY:

1    Q   Is it Miss Gump?

2    A   Yes.

3    Q   I'm sorry, I missed – it is G-U-M-P?

4    A   G-U-M-P, like Forrest.

5    Q   Okay, thank you.  Would you like a tissue for your bubble gum?

6    A   Oh, I'm sorry, if it's bothering you, then, yeah.

7    Q   I just – I see you chewing it, and if you want to keep chewing it, I

8    certainly don't have a problem –

9    A   I don't mind taking it out.

10    Q   – but if you'd like a tissue I can get you one.  Huh?

11    A   I said, I don't mind taking it out.

12    Q   Well, I mean, if you feel comfortable, that's fine.

13        Ms. Gump, what's your date of birth?

14    A   8/8/88.

15    Q   Okay, and how long have you known Miss Lizama?

16    A   I started living with her in February, and I had known her for about, I

17    would guesstimate, six months before that or so.

18    Q   Okay.  So you knew her – started living with her in February of 2011,

19    and prior to that you'd known her six months.  And is it fair to say y'all are

20    pretty close friends?

21    A   Yes.  I mean, we're pretty close.

22    Q   Okay, and in fact you're close enough to where you live in the same

23    home with her; is that correct?

24    A   Yes, sir.

25    Q   Do y'all still live together?

-101-

1    A    No, sir.

2    Q    And let me ask you this before I forget: before you came in here today,

3    who told you about this hearing today?

4    A    Miss Julie called me.

5    Q    Okay, and she called you and asked you some questions.  I mean,

6    you've been interviewed by the lawyers; is that right?

7    A    I spoke with Julie once on the phone.

8    Q    Okay, and did she ask you about what you observed that day, June 15,

9    2011?

10   A    Yes, sir.

11   Q    And you gave a statement to her?

12   A    Yes, sir, I spoke with her.

13             MR. GILLULY: If I could have the *Jencks* material, Judge.

14             THE COURT: When you say gave a statement, do you mean –

15             WITNESS:  – Oh, no, I didn't give a statement.  She just

16   basically called me to kind of inform me –

17             THE COURT:  – You didn't submit anything in writing –

18             WITNESS: No, sir.

19             THE COURT:  – to Ms. Wade?

20             WITNESS: No. She just called me to basically ask the

21   information I'm pretty much saying right here right now.

22             MR. GILLULY: Okay.

23   Q    (By Mr. Gilluly) And essentially, by friends, I mean, are you and Miss

24   Lizama in any kind – y'all are close enough where you hug each other; is

25   that fair to say?

1    A   I hug all of the people I care about in my life so, yeah.

2    Q   Anything romantic – and I don't mean to be offensive – but anything

3    romantic, kiss on the check, anything like that?

4    A   No, sir, nothing romantic.

5    Q   Okay.  With regard to Adel Lizama, on June 15, 2011, you were gone

6    when the agents arrived; correct?

7    A   I was not at the house when they arrived, no.

8    Q   Okay, and where were you prior to that?

9    A   I was at work.

10    Q   And where do you work?

11    A   I worked for a company called Mix One Beverages.  I was the

12    marketing manager so I was doing an event.

13    Q   Were you doing the event that morning?

14    A   Yes ,sir.

15    Q   Okay, and so you don't really know what took place at the door,

16    obviously, before you got there?

17    A   No.

18    Q   You don't know who locked the door; correct?

19    A   Correct.

20    Q   And you don't even know the content of the conversation between the

21    agents and Miss Lizama; correct?

22    A   Not specifically, no.

23    Q   No.  In fact –

24    THE COURT:  – Do you normally keep your house door locked?

25    WITNESS: Yes, sir.  It was three girls in the house so the three

-103-

1    of us were pretty good about locking our doors –

2    THE COURT:  – But you weren't surprised to find you had to

3    use your key to enter the residence?

4    WITNESS: No, it was pretty normal.

5    THE COURT: Okay.

6    Q    (By Mr. Gilluly) Who's the other roommate?

7    A    Alyssa.

8    Q    Do you know her last name?

9    A    Arbuckle.

10   Q    Is she still roommates with you?

11   A    No, sir.

12   Q    And when you arrived, like I said, you don't know who locked the door;

13   correct?

14   A    Correct.

15   Q    And did you take the photographs – you took the photographs of the

16   vehicles.  Was that in one sitting in your car – while you were sitting in your

17   car?

18   A    I believe this one was in my car, and these two were clearly out of my

19   car because you can see my car there.

20   Q    Okay, and that was all prior to you going inside?

21   A    Yes, sir.

22   Q    And you said that you did that because you were concerned of who may

23   be in there; right?

24   A    Correct.

25   Q    And why were you concerned?

1    A    Well, because the black car is blocking Adel's car in the driveway, and

2    the gold car is parked sideways in the middle of the street, blocking the

3    other entrance to where another two parking spots would be for our

4    driveway.  So it clearly looks like whoever these people were didn't want

5    Adel getting in her car and leaving or having any opportunity to leave.  And

6    also looks like they didn't want anybody pulling into our driveway to park

7    and possibly come in the house.

8    Q    And when you were concerned, you said you were concerned that she

9    may be getting hurt; is that correct?

10   A    No, I was just concerned of who might be at our house that would park

11   like that that would, you know, be there in the first place.  It was –

12   Q    – Okay.  Did – and so you took –

13          THE COURT:  – Are these all the photographs you took that

14   day?

15          WITNESS: These three, yes.

16          THE COURT: You didn't take any more of those vehicles?

17          WITNESS: No, sir.

18          THE COURT: Did you try to get an image – I guess the answer

19   is no because you don't have the tag numbers of the vehicles captured in

20   your photographs; is that right?

21          WITNESS: No, they don't have license plates on the front so ...

22          THE COURT: Yeah.  Well, a word to the wise, the next time you

23   have concerns about vehicles in front of your house, you make sure you get

24   the tag numbers down.  Did you send these photographs – text them or

25   email them – to anyone before you entered the house?

1        WITNESS: No, sir.

2        THE COURT: Also, if you have concerns like that, send them to

3    someone.  Because if there were bad people in the house, they could take

4    your phone and nobody would ever have the evidence, you see?

5        WITNESS: Yeah.

6        THE COURT: If you have those concerns in the future, I would

7    give some advice to do a little better job of recording and disseminating the

8    information before you expose yourself to unknown people.

9        Proceed.

10        MR. GILLULY: Thank you.

11   Q    (By Mr. Gilluly) You didn't call the police; correct?

12   A    No, I mean, I thought these were police so ...

13   Q    Okay, okay, and why did you think that, based on the vehicle or based

14   on conversations you had had with Miss Lizama?

15   A    Mostly based on the vehicles, only because of the fact that they looked

16   like they could be undercover cop cars.

17   Q    You say mostly, what about the other part.

18   A    Well, I mean, two matching Suburbans just kind of, I guess, fits the

19   description that I have in my head, as well as the fact that I didn't know a

20   lot about what was going on, but I had known a little bit about what was

21   going on, and I knew that people might be interested in asking Adel

22   questions so ...

23   Q    Okay, and how did you know a little bit about what was going on?

24   A    Well, I was Adel's roommate, so we lived together.  I knew that she had

25   a job, and I had heard her mention Al's name.  I knew that she, you know,

1    was excited about her job.  She graduated college, and I guess found a job

2    that, you know, she was working in the healthcare industry, which was I

3    think something that she wanted to do.  You know, she would come home,

4    she was excited about her job, she was excited about I guess having

5    responsibility.  It seemed like she had an important position.

6    Q     And do you remember what job this is?  Is this Total Medical Express,

7    or Palm Beach Pain and Rejuvenation –

8              MR. KETTEL:  – Objection, Your Honor, relevance and

9    hearsay.

10    A     Yeah, I don't know –

11              THE COURT:  – Well, it wouldn't be hearsay if she remembers

12    what the job was.

13    A     I actually – I don't know the specific details.  I just lived with Adel.  But

14    I don't know any specific details about like the name of the office.  I don't

15    know what the position was that she held.  I don't know the duties that she

16    did.  I don't know any of that information.

17    Q     It's fair to say you've kind of got your own life.  Y'all live together, but

18    you do your thing so you don't know everything that's going on in Adel's

19    life; correct?

20    A     I mean, of course.

21    Q     Yeah, of course.  And you don't even know what the interview was

22    about when the agents were there; is that right?

23    A     Like I said, the only thing Adel told was that it was to ask questions

24    about Al.

25    Q     And she told you that she answered questions; is that right?

-107-

1    A    That, I don't know.

2    Q    You don't know if she told you that?

3    A    I mean, she told me that they were there to ask questions about Al.  I

4    don't know –

5    Q    – And she never told you she was forced to answer any questions; did

6    she?

7    A    That, I don't know.  That's ...

8    Q    You don't know whether she told you that?

9    A    She never told me she – she never told me anything other than they

10   were there to ask questions about Al.  I never asked her any other questions

11   about it.

12   Q    But she never told you she was coerced through an interrogation to

13   answer questions; correct?

14   A    I know that she definitely felt threatened and intimidated –

15   Q    – Is that a yes or a no, and then you can explain.  Did she ever tell you

16   she was interrogated to such a means where she felt compelled to tell

17   officers something?

18   A    I think that emotionally, being her friend I got that message from her,

19   but ...

20   Q    She never told you?

21   A    She never said those specific words.

22   Q    She never told you she was treated unfairly either; did she?

23   A    She never might have verbally said that, but there was definitely some

24   heartfelt and mistreated emotions coming from the officers that were at the

25   house.

1    Q   But you didn't observe what the officers were saying, correct, because

2    the conversations were in a whispered voice; is that right?

3    A   Correct.

4    Q   In fact, you indicated that you were ordered to go to your room; is that

5    correct?

6    A   Uh-huh.

7    Q   The reality is, you were coming home to change clothes to leave;

8    correct?

9    A   Correct.

10   Q   Your clothes were in your room.

11   A   (No audible response.)

12   Q   Yes?

13   A   Yeah, but I had other things that I was going to do around the house

14   besides go to my room like a five year old and sit there.

15   Q   But you did.  I mean, your purpose in stopping by the home was to

16   change before you left; right?

17   A   That was one of my things, yes.

18   Q   And you did do that.

19   A   I did do that.

20   Q   You weren't locked in your room; were you?

21   A   The door was shut behind me when I entered my room.

22   Q   And then you opened the door and you left because you said you then

23   went into the kitchen; correct?

24   A   Correct.

25   Q   And then you were able to leave; correct?

-109-

1    A    Correct.

2    Q    At no point did you see them handcuff Miss Lizama; right?

3    A    Correct.

4    Q    And in fact you did have a conversation with her after the agents left.

5    A    Very briefly.

6    Q    Yes, a brief conversation.  But since then you've – I mean, you're

7    friends, you live with her.  After that day, y'all have talked about what

8    happened that day; correct?

9    A    Very minimally.

10   Q    And she's never told you that they withheld food from her; has she?

11   A    I know that they wouldn't let her get off the couch or move from the

12   position that she was in.

13            THE COURT: Well, how do you know that?

14            WITNESS: Because when I was there they had her on the

15   couch, and I actually, you know, tried to approach her and talk to her, and

16   they basically like shut me down and shoved me away from her.  They

17   didn't want me talking to her.  They didn't want Adel like getting up and

18   saying hi to me or anything like that.

19            THE COURT: Who shoved you?

20            WITNESS: No one shoved me.   I mean like, you know, they

21   basically just demanded that I not talk to Adel, not go over to say hi to her,

22   not anything.

23   Q    (By Mr. Gilluly) Who demanded that?

24   A    One of the gentlemen that were there.

25   Q    Which one?  Look around.

1  A   I'm not sure, but I believe that it was either the agent with the short

2  black hair or the bald one.

3  Q   Okay, and so it could either be a baldheaded person or someone with

4  black hair that shoved you.

5  A   No one shoved me physically –

6  Q   – Or forced you away from having a conversation with your friend who

7  you've known some time who you live with; correct?

8  A   They demanded me to go to my room, yes.

9  Q   It's either a baldheaded guy or a guy –

10 A   – The guy that stood up –

11 Q   – who has a full head of black hair.

12 A   The guy that stood up at the door I'm pretty sure was the guy with

13 black hair.

14 Q   Okay, and you felt that you were being treated unfairly in your home;

15 correct?

16 A   Correct.

17 Q   And when did you call DEA to complain?  Or when did you call the

18 police department to complain about you being treated unfairly in your

19 own home?

20        MR. KETTEL: Objection, relevance.

21        THE COURT: No, I'll allow it.

22 Q   Will you tell the Court when?

23 A   I never made a phone call to complain.

24 Q   When did you contact the media to say, hey, there was an unlawful

25 interrogation in my home and I was treated unfairly?  When did you tell the

-111-

1  media that?

2  A    You know, I totally should have done that, but I was not educated on

3  the fact that I should have.  So I never did.

4  Q    So you never did.  With regard to the pictures you mentioned, that was

5  before you went into the home; correct?

6  A    Correct.

7  Q    Now, did you take – you said you took the picture from outside of your

8  car, and then you took some pictures from inside of your car; is that

9  correct?

10  A    This one's from in, those two from out.

11  Q    And did you move your car at any point?

12  A    No, sir, I just parked it where you can see it in picture O, and I left it

13  there until I left.

14  Q    Okay, and so you moved your car after taking some pictures, and then

15  you parked your car; is that right?

16  A    No.  I pulled up to my house and took this first picture from my car,

17  and then I parked my car and got out and took these two pictures.

18  Q    Okay, okay, and with regard to Adel, you indicated that you made eye

19  contact; correct?

20  A    Yes, sir.

21  Q    During that eye contact, did she attempt to talk to you?

22  A    Not really.

23  Q    Okay.  During that eye contact, did she tell you these agents were

24  treating her unfairly?

25  A    Not verbally but, I mean, I was definitely very concerned about her

-112-

1    from the emotion I was reading from her.  Like I said, it looked like she had

2    been crying.  She looked like she was very scared, you know, intimidated,

3    worried, nervous, probably felt very anxious about why they were there.

4    Q    But she didn't express any of that verbally to you; did she?

5    A    Not verbally, no.

6    Q    Okay –

7                THE COURT:  – And you gained all this information about her

8    inner feelings from how long an observation of her?  Just making eye

9    contact?

10               WITNESS: Well, I mean, I made eye contact, and then I kind of

11   was just like, hello? And then the agent, you know, briefly spoke with me

12   for a moment.  So I was in the room –

13               THE COURT:  – Well, I'm talking about, you have testified

14   earlier on direct examination, and now on cross-examination, that you

15   made a lot of inferences about her emotional state, and that was from

16   making eye contact with her and seeing her face.

17               WITNESS: Correct.

18               THE COURT: Briefly.

19               WITNESS: (No audible response.)

20               THE COURT: All right.

21               WITNESS: Yeah, but, I mean, I was definitely concerned.  So,

22   you know, I asked her –

23               THE COURT:  – I'm not questioning that.  I'm just trying to get

24   a clear understanding of how you came to this impression, and how long

25   you had to observe her before you drew these inferences.

1    Q    (By Mr. Gilluly) Did you know any of these agents prior to that day?

2    A    No, sir.

3         MR. GILLULY: That's all I have, Judge.

4                    REDIRECT EXAMINATION BY

5    MR. KETTEL:

6    Q    Miss Gump, when you came out of the bedroom to go into the kitchen,

7    I believe, to try to make something to eat, what happened?

8    A    I just walked out of the bedroom, opened up the glass door and walked

9    past the five agents and Adel sitting on the couches.  And I went to the

10   kitchen where it's – you know, there's a wall so I couldn't see anything.

11   And like I said, as soon as I walked out of my bedroom, they just kind of

12   like immediately stopped talking.  And then once I was in the kitchen, I just

13   maybe heard some brief, you know, voices, not anything – no words or

14   sentences were made out.  So it was very brief.

15        MR. KETTEL: Thank you.

16        MR. GILLULY: That's all the questions I have, Judge.

17        THE COURT: Thank you very much.  You may step down.

18      [Witness Excused]

19        THE COURT: Any other evidence?

20        MR. KETTEL: No, Your Honor.

21        MR. KNOCHE: No rebuttal.

22        THE COURT: All right, thank you.

23        [NOTE: Whereupon the proceedings are concluded.]

STATE OF GEORGIA

CHATHAM COUNTY.


CERTIFICATE OF REPORTER


I, Marie Cowart, do hereby certify that the above and foregoing pages of typewritten material is a true, correct and complete transcript produced from the electronic sound recording of the proceedings in the above-entitled matter.

This 23rd day of September, 2013.


/s/ *Marie Cowart*

Marie Cowart, CCR B-237
United States Court Reporter
Southern District of Georgia
Savannah Division


P. O. Box 9572
Savannah, GA 31412
(912) 650- 4066