UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | INDICTMENT NUMBER: |
| ) | CR 4:13 – 028 |
| DR. NAJAM AZMAT, ) | |
| ) | |
| Defendant. ) | |

## DR. AZMAT'S EXPERT WITNESS DISCLOSURE

Comes Now, Dr. Najam Azmat, ("Dr. Azmat") one of the defendants herein, and pursuant to Fed. R. Crim. P . 16(b)(l)(C), hereby make the disclosures set forth below concerning the expert testimony he expects to offer at trial in this matter. Dr. Azmat reserves the right to modify and supplement these disclosures, including based upon the evidence at trial or upon further review of the sources and materials discussed here, or other source.

### I. DR. THOMAS SIMOPOULUS

Dr. Simopoulus received his Bachelor's degree from Brandeis University in Chemistry in 1991 and received his Masters in Chemistry that same year. Dr. Simopoulus received his Medical Degree from the University of Massachusetts Medical School in 1995. He then did his internship at the New England Medical Center in Boston in 1995-1996, and his residency at the New England Medical Center, Department of Anesthesiology from Brigham and Women's Hospital from Brigham and Women's Hospital, Harvard Medical School, Boston, Massachusetts from 1996-1999. Dr. Simopoulus then completed his Fellowship in Pain Management at Beth Israel Deaconess Medical Center, Harvard Medical School from 1999-2000.

Dr. Simopoulus is board certified by the American Board of Anesthesiology and is board certified by the American Board of Anesthesiology in Pain Medicine.

From 2000 to the present Dr. Simopoulus has been an instructor in Anaesthesia at Harvard Medical School and an Associate in Anesthesia at the Department of Anesthesia, Critical Care and Pain Medicine at Beth Israel Deaconess Medical Center, Boston, Massachusetts. A copy of Dr. Simopoulus' Curriculm Vitae is attached.

Dr. Simopoulus' opinions will be based upon his education, training, and experience, through which he is an expert in the evaluation of medical practitioner prescribing and overall medical care and is also an expert with respect to the difference between evaluating a physician whether a physician acted outside the usual course of professional practice such that he/she was no longer practicing medicine.  Dr. Simopoulus' conclusions will be based upon his education, training, and experience, and his review of medical records and medical record summaries, various items used by Dr. Azmat in their medical practice to include office forms and documentation, educational background, and other materials produced in discovery in this case. In addition, Dr. Simopoulus may rely upon the following clinical literature in rendering his opinions and reserves the right to supplement the same.

- Bajwa ZH, Simopoulos TT, Pal J, Kraemer JJ, Chopra P, Nagda JV, Najib U, Celestin J, Sial K, Ahmad B, Warfield C, Steinman TI, Wootton J., Low and therapeutic doses of antidepressants are associated with similar response in the context of multimodal treatment of pain, (Pain Physician Sept-Oct. 2009; 12(5):893-900).
- Warfield, CA, Principles & Practice of Pain Medicine (Second Edition (2004)).
- Warfield, CA, Manual of Pain Management (1991, 2002).
- Warfield, CA, Principles & Practice of Pain Medicine (First Edition (1993)).

Dr. Simopoulus has also relied upon the following in forming his opinions in this case: expert witness disclosures produced by the government; evidence relating to office forms,

2

procedures, documentation methods, among other materials available to the parties through the discovery process.

As an independent and further basis for his opinion, Dr. Simopoulus has reviewed the patient files of each of the patients in the indictment.

Dr. Simopoulus may elect to present some of his findings at trial through one or more summary exhibits. Dr. Simopoulus reserves the right to supplement his opinion as necessary to fully address the medical issues raised in this case. Dr. Simopoulus may review additional material prior to and during trial to further ensure his opinions remain accurate and complete. He reserves the right to supplement his disclosure as needed.  All of Dr. Simopoulus' opinions will be expressed to a reasonable degree of medical and professional certainty.

## A. OVERVIEW OF PAIN MANAGEMENT AND CHRONIC OPIOID THERAPY

Dr. Simopoulus is expected to provide an overview of pain management and chronic opioid therapy, including:

- explanation of what pain management and chronic opioid therapy are in general;
- the level of need for pain management nationwide, including the number of physicians specializing in pain management to provide care for those suffering from chronic pain;
- definitions and explanations of concepts and terms associated with pain management and opioid prescribing, including before and during the time frame referenced in the indictment and the evolution of that terminology, including as examples terms such as "dependence," "addiction" and "opioid tolerance";
- the relevance of those concepts and terms to the determination of whether a doctor has ceased practicing medicine at all;
- explanation of the various pain management practices provided;

- description of opioid pain medications, including their uses, side effects, and risks;

- the evolution of understanding among pain management doctors regarding how opioids metabolize and work in the body, and the resulting ability of doctors today to more accurately assess patients' needs for opioid treatment versus the past;

- indications of potential drug aberrant behavior; and

- explanations of various courses of action available to a medical professional when indications of potential drug aberrant behavior are present.

B. **EXISTENCE AND APPLICABILITY OF GUIDELINES RELATED TO THE TREATMENT OF CHRONIC NON-CANCER PAIN**

Dr. Simopoulus is expected to testify about the existence, or absence, and development of any guidelines or standards relating to the treatment of chronic non-cancer pain. He is expected to testify that during the relevant time period, although some general guidelines existed that could apply to the treatment of pain management there was no accepted standard of care for how to treat chronic non-cancer pain. Dr. Simopoulus is also expected to explain what generally accepted practices are. He is further expected to testify that no requirements or obligations relating to the practice of pain management existed in 2011 to the assessment of whether a medical professional was acting in the usual professional practice. In particular, he is expected to testify about the extent to which best practices existed, the substance of any existing guidelines, or best practices, and generally accepted practices of medical professionals related to:

- how to respond to a patient's potential drug aberrant behavior;

- how to determine whether to prescribe controlled substances to a chronic non- cancer pain patient;

- how to evaluate patient risk potential as they relate to the use of controlled medications to treat pain;

- the use of risk evaluation systems for determining which patients were best suited to safely use and handle opioid medications;

- the use of template language to document patient exams and treatment;

- the use of clinical drug testing;

- how to respond to drug tests that appear to identify potentially drug aberrant patient behavior;

- the use of a treatment agreement;

- the use of a treatment plan;

- informed consent;

- scheduling for periodic review of patients; and

- the use of particular methods to evaluate patient risk for drug aberrant behavior.

### i. Federation of State Medical Boards Policies

Dr. Simopoulus is expected to testify about the applicability and use of guidelines of the Federation of State Medical Boards ("FSMB") for pain management medical practices, in particular during the relevant time period. He is also expected to testify about the substance of FSMB policies that address the treatment of chronic non-cancer pain.

He is expected to testify that he is familiar with the FSMB and its role nationwide in providing general guidance to member state medical boards on various guidelines associated with the provision of medical care. Among other FSMB materials, he is familiar with the FSMB's 1998 and 2004 Model Policy for the Use of Controlled Medications for the Treatment of Pain ("Model Policy").

Dr. Simopoulus is also expected to testify about the process by which the FSMB periodically convenes representatives of state medical boards, together with experts in specific subject areas, to study and develop recommendations on issues pertinent to medical regulation. Dr. Simopoulus is further expected to testify that FSMB policy statements on the use of controlled substances for the treatment of pain are not intended to and do not (1) set any standard of care, (2) establish any absolute course of care for the specific challenges that arise in patient care, or (3) identify best practices in the area of pain management. Instead, policy statements merely provide general guidance and suggestions to encourage some level of consistency in medical practice, while recognizing the physician's discretion in medical-decision-making.

Above all, policy documents and statements on the use of controlled substances for the treatment of pain are not intended to set any standard of care or to identify best practices in the area of pain management.

He is further expected to testify the guidelines referenced above do not (1) set any standard of care, establish any absolute course of care for the specific challenges that arise in patient care, or (2) identify best practices in the area of pain management.

### ii. Labels and/or FDA Warnings

Dr. Simopoulus is expected to address the concept of the Food & Drug Administration's ("FDA") labeling of drugs and the physician's discretion to prescribe off-label, and discuss the general meaning of a drug label, how physicians use it, the role of the drug label in educating patients about the drug prescribed for them and the role of the patient to take responsibility to talk with their physicians about drug side effects and other aspects of drug use.

He is expected to testify that FDA drug labeling does not establish any standard of care related to the treatment of chronic pain or for opioid prescribing. He is further expected to testify

that FDA drug labeling also does not establish any requirements or obligations on physicians or other medical professionals regarding how controlled substances must be prescribed.

## C. **REVIEW OF DR .AZMAT'S PRACTICES**

Dr. Simopoulus is expected to testify that based upon the indicia of a usual professional practice described below, during the time period of the charged conduct Dr. Azmat were practicing within the usual course of professional practice and operating a legitimate medical practice offering treatment for patients with chronic pain conditions. He is also expected to testify that with respect to each of the patients in the indictment, Dr. Azmat prescribed controlled substances for legitimate medical purposes in the usual course of professional practice and the medical professional-patient relationship.

He is further expected to testify that based on the indications described below Dr. Azmat made best efforts to comply with the usual course of professional practice for a pain management practice.

Dr. Simopoulus is expected to explain that he arrived at these conclusions by applying his training and experience, including those standards announced in some federal criminal case law and  as an expert witness in similar cases to assess whether Dr. Azmat satisfied certain objective indications described below.

In addition, he is expected to testify that although FSMB Policy Guides, FDA Labels, and other guides do not represent standards of care in pain management or establish any requirements for medical practitioners his review of the materials provided and in consideration of the indicia of a usual professional practice described below Dr. Azmat acted consistently with the general guidelines described in those sources.

Given the absence of any applicable requirements in the guidelines, or other medical sources for assessing whether a medical professional was acting in the usual professional practice rather than as a drug dealer, Dr. Simopoulus is expected to testify that he drew those objective indications about whether a medical professional was acting in the usual professional practice rather than as a drug dealer from his training and experience and incorporating the guidelines into that training and experience to assess whether a physician prescribed controlled substances as a drug dealer.

Dr. Simopoulus is expected to testify that the indications that a medical professional was acting in the usual professional practice:

- maintenance of patient records;
- examining patients before prescribing controlled substances;
- conducting physical exams;
- taking medical histories of patients before prescribing controlled substances;
- not prescribing controlled substances when the medical professional knows that a patient is not using controlled substances for a therapeutic or medical purpose;
- not instructing patients to fill prescriptions at a variety of pharmacies; and
- not using street slang to refer to controlled substances.

Dr. Simopoulus is also expected to testify that based on his training and experience there are other indications that a medical professional is operating a legitimate medical practice and prescribing controlled substances in the usual professional practice. Those indications include:

- use of a documentation system;
- use of patient encounter logs;
- efforts to evaluate patient risk for drug aberrant behavior;

- implementation of clinical drug testing;

- responses to potential drug aberrant behavior;

- responding to instances of patient reports of lost or stolen medication;

- creation and use of a treatment plan;

- provision of informed consent; and

- use of a treatment agreement.

Dr. Simopoulus is expected to testify that all of these indications demonstrate that Dr. Azmat operated a legitimate medical practice and prescribed controlled substances in the usual professional practice in the course of the medical professional-patient relationship. Dr. Simopoulus is further expected to testify about the manner in which each of these indications is present in the medical practices of Dr. Azmat.

a.  Patient Records

Dr. Simopoulus is expected to testify that Dr. Azmat created medical records for his patients and maintained them throughout the course of the practitioner-patient relationship according to or exceeding the generally accepted practices during the time period of the charged conduct, to the extent such generally accepted practices existed. These medical records include evidence of patient history, physical examination, treatment plans, informed consent, the use of treatment agreements with most of their patients, drug testing at the point of care and using diagnostic testing, such as MRIs, that represent that Dr. Azmat was prescribing in the usual course of professional practice.

### i. Patient Medical and Pain History

Dr. Simopoulus is expected to testify that Dr. Azmat's records reveal reasonable efforts to obtain patient history through a variety of means, to include discussions with the patient, and review of diagnostic tests such as MRIs.

### ii. Physical Examination

Dr. Azmat is expected to testify that Dr. Azmat performed initial physical examinations according to or exceeding the generally accepted practices for frontline practitioners, to the extent such generally accepted practices existed.

Importantly, because Dr. Azmat never treated any of the patients in question a second time, Dr. Azmat's only interaction was at the initial visit and his treatment met the generally accepted practice.

### iii. Prescribing for a Therapeutic Purpose

Dr. Simopoulus is expected to testify that Dr. Azmat prescribed controlled substances according to or exceeding the generally accepted practices during the time period of the charged conduct. He is also expected to testify that he did not identify any instance in which Dr. Azmat prescribed controlled substances when it was actually known that the patient was not using the controlled substances for therapeutic or medical purposes. Dr. Simopoulus is further expected to testify that there was no evidence that Dr. Azmat recommended that patients go to multiple pharmacies to fill prescriptions or that he used street slang to refer to controlled substances. He is further expected to testify that this conduct met or exceeded the generally accepted medical practices, to the extent they existed during the time period of the charged conduct.

### iv. Efforts to Evaluate Patient Risk for Drug Aberrant Behavior

Dr. Simopoulus is expected to testify that he found evidence of patient risk evaluation in Dr. Azmat's medical practice and patient files according to or exceeding the generally accepted practices during the time period of the charged conduct. Dr. Simopoulus is expected to testify specifically about Dr. Azmat's efforts to incorporate a history and physical, accompanied by objective usage of MRIs and urine drug screens supports his opinion that Dr. Azmat acted within the usual course of professional practice when prescribing controlled medications. He is further expected to testify that this conduct met or exceeded the generally accepted medical practices during the time period of the charged conduct.

### v. Clinical Drug Testing

Dr. Simopoulus is expected to testify that during the relevant period in this case, drug testing was not a generally accepted medical practice in connection with chronic pain management. He is expected to testify that clinical drug testing was in fact a relatively new concept in pain management and that there was no consensus on the utility of drug testing during the period of the indictment. He is further expected to testify that Dr. Azmat's use of clinical drug testing exceeded the generally accepted practices to the extent they existed during the time period of the charged conduct.

### vi. Responses to Potential Drug Aberrant Behavior

Dr. Simopoulus is expected to testify that another indication of whether a practitioner is acting within the usual course of professional practice when prescribing controlled substances is to determine whether the physician is dose escalating; however, in each occasion, Dr. Azmat either reduced the medications in question or eliminated them, which is what he did in the majority of patients presenting with a history of benzodiapam usage. Thus Dr. Simopoulus is

11

expected to testify that rather than being a drug dealer, Dr. Azmat 's actions in this regard constitute conduct within the usual course of professional practice according to or exceeding the generally accepted practices to the extent they existed during the time period of the charged conduct.

### vii. Responding to Instances of Patient Reports of Lost or Stolen Medication

Dr. Simopoulus encountered no instances of patient reports of lost or stolen medication during his review of the charts, which would be an indication of drug aberrant behavior.

### viii. Creation and Use of a Treatment Plan

Based on his evaluation of the patient files, Dr. Simopoulus is expected to testify Dr. Azmat created and used a treatment plan with each of his patients. He is expected to testify that this conduct is within the usual course of professional practice and according to or exceeding the generally accepted practices, to the extent they existed, during the time period of the charged conduct.

### ix. Provision Informed Consent

Dr. Simopoulus is expected to testify to the meaning of informed consent in the context of providing medical care and discuss 'how this process applies in the management of chronic pain, as well as how the approach to informed consent has changed over time. Based on his review of the medical charts Dr. Simopoulus is expected to testify that the evidence he reviewed demonstrates Dr. Azmat efforts to conduct informed consent met or exceeded the generally accepted medical practices, to the extent they existed during the time period of the charged conduct.

**x. Use of a Treatment Agreement**

Dr. Simopoulus is expected to testify about what a Treatment Agreement is and the purpose that it may serve, including to guard against drug aberrant behavior by asking the patient to commit to not seeking controlled substances from other sources. Dr. Simopoulus is expected to testify that this conduct is within the usual course of professional practice and according to or exceeding the generally accepted practices, to the extent they existed, during the time period of the charged conduct.

**xi. Responses to Potential Drug Aberrant Behavior**

Dr. Simopoulus is expected to testify about the challenges presented to medical practitioners regarding the potential of drug aberrant behavior present to practitioners and those challenges were not present in the patients who presented to Dr. Azmat. He is further expected to testify that this conduct is within the usual course of professional practice and according to or exceeding the generally accepted practices, to the extent they existed, during the time period of the charged conduct.

This 2nd day of December, 2013.

/s/ Thomas A. Withers, Esq.
Thomas A. Withers, Esq.
Georgia Bar Number: 772250
Attorney for Dr. Najam Azmat

Gillen, Withers & Lake, LLC
8 East Liberty Street
Savannah, Georgia 31401
Telephone: (912) 447-8400
E-Mail: Twithers@gwllawfirm.com

CERTIFICATE OF SERVICE

The undersigned certifies that I have on this day served all the parties in this case in accordance with the notice of electronic filing ("NEF") which was generated as a result of electronic filing in this court.

This 2nd day of December, 2013.

/s/ Thomas A. Withers, Esq.
Thomas A. Withers, Esq.
Georgia Bar Number: 772250
Attorney for Dr. Najam Azmat

Gillen, Withers & Lake, LLC
8 East Liberty Street
Savannah, Georgia 31401
Telephone:  (912) 447-8400
E-Mail: Twithers@gwllawfirm.com