UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | INDICTMENT NUMBER: |
| | ) | CR 4:13 – 028 |
| DR. NAJAM AZMAT, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RENEWED MOTION FOR JUDGMENT OF ACQUITTAL
OR, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL**

Comes Now, Dr. Najam Azmat, Defendant herein, by and through undersigned counsel, and respectfully renews his motions for a judgment of acquittal, pursuant Fed. R. Crim. P. 29. In the alternative, the Defendant moves this Court for a new trial, pursuant to Fed. R. Crim. P. 33. In support of this motion, the Defendant submits the following memorandum.

**I. DR. AZMAT IS ENTITLED TO A JUDGMENT OF ACQUITTAL**

To sustain a jury's verdict, the evidence presented by the government must pass a well-established test. The evidence must be sufficient to convince a reasonable, rational jury that the government has proven all the essential elements of the charged offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 317 (1979). While the government need not exclude every reasonable hypothesis of innocence, a verdict cannot stand where the evidence "is wholly consistent with an obvious and reasonable innocent interpretation, and where little more than conjecture supports the hypothesis of guilt." *United States v. Kelly*, 888 F.2d 732, 740 (11th Cir. 1989) (citations omitted). Jury verdicts cannot be sustained based on "speculation and conjecture." *Kelly*, 888 F.2d at 741. This principle is especially important in cases involving inherently complex regulatory scheme. *See, e.g., United States v. Whiteside*, 285 F.3d 1345 (11th Cir. 2002) (reversing Medicare fraud, conspiracy and false statement

convictions for insufficient evidence). Federal Rule of Criminal Procedure Rule 29 provides that at the close of the evidence and again after trial, upon motion by defendant, the court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."

After the government rested Dr. Azmat moved for judgment of acquittal pursuant to Fed.R.Crim.P. 29, on insufficiency of evidence as to all counts, that the government had indicted Dr. Azmat for unlawfully "dispensing," not distributing medication, that the money laundering conspiracy count failed since the specified unlawful activity alleged was the "dispensation" of controlled substances and the money laundering conspiracy charge failed under *Christo*. That motion was taken under advisement and denied at the conclusion of trial. Defendant hereby re-asserts the grounds stated in that motion and orally at trial and requests that the Court reconsider its ruling at trial denying it.

## II. ALTERNATIVELY, THE COURT SHOULD GRANT A NEW TRIAL

### A. New Trial For Collective Error

Sections II and VI of this memorandum summarize most of the significant errors relating to trial errors. As this Court has noted in granting a Motion for New Trial, Rule 33 of the Federal Rules of Criminal Procedure provides that, "[t]he court on motion of a defendant may grant a new trial to that defendant if required in the interests of justice." The decision whether to grant a new trial is within the sound discretion of the trial judge. *United States v. Shankman*, 13 F.Supp.2d 1358, 1362 (S.D. Ga. 1998), *aff'd* 181 F.3d 1264 (11th Cir. 1999) quoting *United States v. Champion*, 813 F.2d 1154, 1170 (11th Cir. 1987). Courts should exercise great caution when granting new trials and that motion should only be granted in exceptional cases. *Id*. In reviewing a motion for new trial based on the weight of the evidence, the court "need not view

the evidence in the light most favorable to the verdict," but rather, it may weigh the evidence and consider the credibility of the witnesses. *Id.*, quoting *United States v. Martinez*, 763 F.2d 1297, 1312 (11th Cir. 1987). The evidence must weigh heavily against the verdict such that a miscarriage of justice would occur to let the verdict stand. *Id*. As noted by the court in *Shankman*, a new trial may be granted where the credibility of the government's witnesses has been impeached and the government's evidence marked by uncertainties and discrepancies. *Id*. In *Shankman*, Judge Alaimo independently evaluated the evidence regarding defendant Pedrick and the credibility of the witnesses and was left with a reasonable doubt as to Pedrick's guilt, finding that the evidence weighed heavily against finding that Pedrick knew of any agreement, or had the specific intent to defraud. *Id*., at 1363.

Individually, but especially collectively, the errors set forth mandate a new trial.  Even if multiple trial errors, viewed individually, would each be considered harmless, a new trial is mandated if the cumulative effect of the errors served to deprive a defendant of a fair trial. See, e.g., *United States v. Baker*, 432 F.3d 1189, 1223, 1229-31 (11th Cir. 2005) (reversing convictions of two defendants under "cumulative error doctrine");  *United States v. Hands*, 184 F.3d 1322, 1334 (11th Cir. 1999) (reversal required by effect of  inflammatory, irrelevant evidence of spousal abuse and prosecutorial misconduct); *United States v. Marshall*, 173 F.3d 1312, 1318 (11th Cir. 1999) (combined evidentiary errors harmful even though one witness's testimony, if believed, would have sustained conviction); *United States v. Sepulveda*, 15 F.3d 1161 (1st Cir. 1993) (cumulative effect of several incidents of prosecutorial misconduct requires reversal when combined with inadmissible hearsay challenging defendant's credibility).  This standard was well defined by the court in *United States v. Sarracino*, 340 F.3d  1148, 1169 (10th Cir. 2003):

> A cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless. Unless an aggregate harmless-ness determination can be made, collective error will mandate reversal, just as surely as will individual error that cannot be considered harmless. The harmlessness of cumulative error is determined by conducting the same inquiry as for individual error–courts look to see whether the defendant's substantial rights were affected.

See also *Baker*, 432 F.3d at 1223; *United States v. Pearson*, 746 F.2d 787, 796 (11th Cir.1984);

*United States v. Sanchez*, 176 F.3d 1214, 1218 (9th Cir. 1999).

## III. <u>THE INSUFFICIENT EVIDENCE</u>

### A.  <u>The Evidence was Insufficient - Conspiracy</u>

To prove a Section 846 conspiracy, the government must show (1) an agreement between two or more people to commit a crime; (2) defendant's knowledge of that agreement; and (3) his voluntary joinder in the agreement. *United States v. Monroe*, 866 F.2d 1357, 1365 (11th Cir. 1989). Where a government's case is predicated largely, if not solely, on circumstantial evidence, reasonable inferences, and not mere speculation, must support the jury's verdict. *United States v. Perez-Tosta*, 36 F.3d 1552, 1556 (11th Cir. 1994). Association with a co-conspirator or presence at the scene of the crime is insufficient to prove participation in a conspiracy. *United Sates v. Brazel*, 102 F.3d 1120, 1131 (11th Cir. 1997). If there is insufficient proof that the defendant conspired with anybody, then a conspiracy conviction will not be sustained. *United States v. Parker*, 839 F.2d 1473, 1478 (11th Cir. 1998).

There was no evidence that Dr. Azmat voluntarily joined a conspiracy to unlawfully distribute controlled substances under 21 U.S.C. Section 846. The testimony was just the opposite.[1] On his first day of work, Al LeFrancois decided that Dr. Azmat had to go and that he

---

[1] Dr. Azmat is in the process of requesting the transcript from the trial. Upon receipt of those transcripts, he reserves the right to supplement this Motion to include specific references to the

was going to be fired. Additionally, Mr. Wise testified that patients were unhappy with Dr. Azmat and that he was a disaster for the goals of East Health Center. Even accepting the evidence in the light most favorable to the government it is clear that Dr. Azmat was an outlier among a group of conspirators that he had no prior relationship with and that his actions were contrary, not consistent with, the goals of the conspirators from South Florida.

Dr. Azmat is entitled to acquittal on Count One.

**B. The Dispensation Charges – Counts 2 Through 50**

The question for resolution for the jury on Counts 2 through 50 was whether under 21 U.S.C. § 841(a)(1) Dr. Azmat  ceased being a doctor, even a poor or negligent doctor, and "intentionally … distributed controlled  substances for no legitimate medical purpose and outside the usual course of professional practice." *See Gonzales v.  Oregon*, 546 U.S. 243, 270 (2006). In *United States v. Joseph*, 709 F.3d 1082, 1102-1104 (11th Cir. 2013), the Eleventh Circuit just one year ago, in affirming the conviction of the defendant-physician, noted the following indicia that the physician was a drug dealer: 1) he had prescribed an inordinately large quantity of controlled substances, 2) prescriptions were issued to one patient for delivery to others, 3) no physical examinations were conducted, 4) prescriptions were pre-signed and 4) prescriptions were issued to patients never seen by a physician. See also, *United States v. Elder*, 682 F.3d 1065, 1072 (8th Cir. 2012) (upholding conviction of physician-defendant where he did not maintain any patient files and rarely saw patients himself, yet prescribed medication to 544 patients in a five month period); *United States v. Bartee*, 479 F.2d 484, 485–87 (10th Cir. 1973) (finding there was sufficient evidence to support conviction under 21 U.S.C. § 841(a)(1) where

---

transcript, as well as additional basis for a judgment of acquittal and/or new trial based on specific citations to the transcript. Any effort in this motion to refer to statements made at trial are not direct quotations.

defendant-doctor told patient to go to "different drugstores each time [the patient filled a prescription]" because of pressure from the Federal Bureau of Narcotics and Dangerous Drugs, used slang terms for controlled substances, and that defendant-doctor never performed a physical examination); *United States v. Singh*, 390 F.3d 168 (2d Cir. 2004) (defendant-physician convicted where he developed scheme for nurses to see patients without the doctor, and defendant-physician signed prescriptions without even knowing identity of patients); *United States v. Rosen*, 582 F.2d 1032, 1036 (5th Cir. 1978) (setting out list of factors for determining validity of conviction under 21 U.S.C. § 841, including that a physician warned patients to fill prescriptions at different drug stores and used street slang to refer to pain medications). These condemned behaviors include where the defendant physician:

- did not maintain patient records;

- issued inordinately large quantities of controlled substances;

- issued prescriptions to a patient known to be delivering the drugs to others;

- never conducted physical examinations;

- instructed patients to fill prescriptions at different drug stores; and

- used street slang to refer to controlled substances.

It is this set of objective condemned behaviors that may support a jury verdict that a medical professional is dealing drugs rather than practicing medicine. However, applying the *Rosen* factors to this case demonstrates that the evidence was insufficient to support the jury verdict.

The evidence at trial was that Dr. Azmat maintained detailed medical records of the physician-patient encounter, except for one patient (Latina Simpson), where he failed to note the diagnosis and treatment.

Rather than issuing inordinately large quantities of controlled substances, or a prescription drug cocktail that Dr. Kennedy testified was often present in pill mills, Dr. Azmat routinely eliminated the drug cocktail and reduced the medications the patient was on.

There was no evidence that Dr. Azmat issued prescriptions to a patient known to be delivering the drugs to someone else. In fact, each of the patients who testified admitted to exaggerating their symptoms for the purpose of deceiving Dr. Azmat.

There was no evidence that Dr. Azmat ever instructed a patient where to fill prescriptions, or that he used street slang in distributing controlled substances.

Viewing the evidence in the light most favorable to the government demonstrated that Dr. Azmat was usually paid cash by East Health Center, that a substantial number of the patients at the clinic were from out of state, and that five patients testified that little or no physical examination was performed. However, those facts alone do not justify a conviction.

In short, this case is a far cry from the evidence that has been presented for the purpose of sustaining a verdict of guilty.

## C. Counts Based Solely on Patient Records

The Indictment is based principally on the allegation that Dr. Azmat's treatment of a specific number of his patients so far exceeded the "standard of care" that he was no longer acting in his professional capacity as a physician but as a "drug pusher." Yet, for most of the counts, the government has chosen to base its case solely only an examination of Dr. Azmat's medical records. According to the government, because Dr. Azmat's medical records do not contain enough information to "justify" the prescriptions issued, it is permissible for a jury to convict him as being a criminal. In fact, the government has not even attempted to show, one way or the other, whether the patients identified in the Indictment had

injuries, illnesses or conditions that, within the wide range of discretion accorded physicians, might justify the use of controlled substances.  For these patients, the government has relied entirely on the theory that Dr. Azmat's records alone failed to justify the prescriptions.

The government's evidence is patently insufficient under *United States v. Tran Trong Cuong*, 18 F.3d 1132 (4th Cir. 1994). In that case, a doctor was convicted of 127 counts.  The court affirmed the convictions were the patients ***did*** testify but reversed the convictions where they did not.  The government presented seven patients who stated that they faked symptoms and Dr. Tran's examinations were perfunctory.  They further testified that Dr. Tran made statements to them, such as reminding them that they could get pain medications.  Dr. Tran also advised them to fill the prescriptions at different pharmacies so as not to arouse suspicion.  For these counts, the Fourth Circuit found that the evidence was sufficient.  However, for counts in which the government relied, as here, solely on the medical records, the Fourth Circuit reversed the convictions for insufficient evidence.  The Fourth Circuit correctly perceived the logical flaw in this method of proving such serious charges:

> The present case is a classic example of "overkill" by the prosecution.  It obtained an indictment containing 136 counts, of which 80 counts were supported only by copies of the prescriptions and by Dr. MacIntosh's testimony together with his summary of the office charts of 20 patients, who did not testify.  ***Such tactics invite a jury to find guilt by association <u>or as a result of a pattern</u>***, and to conclude that if the physician violated the Controlled Substance Act in those counts supported by the testimony of patient-witnesses as to their personal contact and conversations with the defendant, then the defendant must be guilty of the remaining counts.

*Tran*, 18 F.3d at 1142 (emphasis added) (reversing for insufficient evidence).

The Fourth Circuit was also critical of the government's failure to have its expert examine the patients at issue to determine whether there were medical reasons that might justify the treatment.  *Id.* at 1141-42.  At trial herein, Dr. Kennedy testified that he had never

examined a single patient and that he had never requested to examine a single patient. A doctor-defendant, the Fourth Circuit emphasized, was "entitled to individual consideration of every count in an indictment by the jury and evidence sufficient to convict on each count beyond a reasonable doubt." *Id.* at 1142.

Conversely, in virtually every case where a federal circuit court has affirmed a doctor's conviction, the government's evidence included testimony directly from the patients. *See, e.g., United States v. Chube*, 538 F.3d 693 (7th Cir. 2008) (jury heard from 15 patients); *United States v. Wexler*, 522 F.3d 194 (2d Cir. 2008) (patients testified that they were addicts and received prescriptions that were not medically necessary); *United States v. Bek*, 493 F.3d 790 (7th Cir. 2007) (patients testified, some with visible scars from heroin abuse); *United States v. McIver*, 470 F.3d 550 (4th Cir. 2006) (expansive summary of the evidence introduced for each patient and, in upholding the convictions for sufficient evidence, the court specifically referred to the patient testimony); *United States v. Hurwitz*, 459 F.3d 463 (4th Cir. 2006) (noting that some of Dr. Hurwitz's patients testified); *United States v. Feingold*, 454 F.3d 1001 (9th Cir. 2006) (numerous patients testified for the government, some testifying that the doctor kept prescribing to them even though he knew they were drug addicts); *United States v. Katz*, 445 F.3d 1023 (8th Cir. 2006) (summarizing testimony from all 15 patients who testified for the government and expressly distinguishing *Tran* on this basis).

In this case only 7 of the 25 patients testified: Billy Letner (Counts 6 & 7), Kimberly Letner (Counts 8 & 9), Latina Simpson (Counts 12, 13, & 14), Joseph Bradley (Counts 27, 28 & 29), James Gable (Count 30), Patricia Rhorer (Counts 36 & 37) and Nancy Binion (Counts 47 & 48).

Therefore, Dr. Azmat is entitled to a verdict of acquittal on each count of the indictment were the patient did not testify and where the evidence presented relied only on the medical records presented.

**D.** **The Government Failed to Establish a Threshold Standard Under Georgia Law and How Dr. Azmat Violated that Standard**

As Dr. Azmat pointed out in his *Daubert* Motion, the apparent distinction in the law between a doctor's malpractice, even gross malpractice, and criminal conduct is a matter of degree. When the physician's conduct (1) departs ***to a sufficient degree*** from (2) the ***standard of care*** against which the physician's conduct is measured, the law permits the inference that the physician is no longer "acting as a physician" (and, hence, immunized) but rather the physician is acting as nothing more than a "drug pusher." *See United States v. Moore*, 423 U.S. 122, 138 (1975); *United States v. Wexler*, 522 F.3d 194, 206 (2d Cir. 2008); *Tran Trong Cuong*, 18 F.3d at 1137; *United States v. Vamos*, 797 F.2d 1146, 1152 (2d Cir. 1986).

Dr. Azmat is entitled to a judgment of acquittal because the government never established the appropriate standards of care and never defined, through expert testimony or otherwise, the range of discretion permitted within that standard, when a violation of that standard is merely a form of civil "malpractice" and when the departure from the (undefined) standard is sufficiently egregious to cross the (undefined) civil-criminal boundary line. As the court correctly recognized in *United States v. Feingold*, 454 F.3d 1001, 1007 (9th Cir. 2006), "only after assessing the standards to which medical professions generally hold themselves is it possible to evaluate whether a practitioner's conduct has deviated so far from the 'usual course of professional practice' that his actions become criminal." *See also United States v. McIver*, 470 F.3d 550, 559-62 (4th Cir. 2006) (recognizing that "it is ***the extent and severity of departures*** from the professional norms that underpin a jury's finding of criminal

violations") (emphasis added).  This Court ultimately instructed that the jury that the standard by which to measure Dr. Azmat's care was a State of Georgia standard and the government failed to establish what those standards were and how they were violated.

**E. Distribution v. Dispensation**

Dr. Azmat incorporates by reference as if fully set forth herein his entire Motion for Acquittal regarding the government having indicted Dr. Azmat for "dispensing" controlled substances, but having proven only that he prescribed controlled substances. Doc # 307, pp. 4-13.

**F. Failure to Prove Count 52**

Dr. Azmat incorporates by references as if fully set forth herein, his entire Motion for Acquittal regarding the failure to prove Dr. Azmat violated the law concerning Count 52 – the money laundering conspiracy. Specifically, the government's proof failed because the specified unlawful activity relied on the unlawful "dispensation" of controlled substances and it failed under the authority of *Christo* as fully set out in that Motion. Doc # 307, pp. 13-16.

## IV. IMPROPER ADMISSION OF EXPERT TESTIMONY

Although the government's amended papers on the Daubert issue filed just before trial, waxed extensively regarding the parameters of Dr. Kennedy's expert testimony, at trial, there was no such proof. *See* Doc # 297. The admissibility of the Government's proffered expert opinions under *Daubert* are analyzed within the framework of what the Government had to prove in this case – that Dr. Azmat was a drug dealer.

As this Court has noted, in *North American Specialty Co., v. Wells*, 2013 WL 4482455, *2 (S.D. Ga., August 19, 2013), the Eleventh Circuit and courts within the Eleventh Circuit have excluded expert testimony where it is simply a reiteration or recasting of a parties'

11

contentions. *See Cook ex rel. Estate of Tessier*, 402 F.3d at 1111 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert."); *Frazier*, 387 F.3d at 1262–63 ("[E]xpert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments."); *Mich. Millers Mut. Ins. Corp. v. Benfield*, 140 F.3d 915, 921 (11th Cir.1998).

Dr. Kennedy's opinions were inadmissible under *Daubert* as an expert may not offer an opinion based only on his own say-so. *See McGovern ex rel. McGovern v. Brigham & Women's Hosp.*, 584 F.Supp.F.Supp.2d 418, 423-24 (D. Mass. 2008) ("Expert testimony is the product of reliable principles and methods if the theory employed by the expert to explain the meaning of her observations is shown to be valid and was derived through the so-called scientific method.") (internal quotations omitted). Such opinions are not reliable, because they are neither testable nor based upon any objective standard. *Daubert*, 509 U.S. at 591. In that regard, experience is not a proxy for reliability.

## A. Opinions About the Quality of Medical Care Based Only on an Expert's Say-So Or Personal Views Were Inadmissible

Courts across the country regularly exclude expert opinions about medical care where, as here, the opinions are based upon nothing but the expert's *ipse dixit* because such opinions are unreliable. *See, e.g., Adams v. Lab. Corp. of Am.*, 2012 WL 370262, at *14–15 (N.D. Ga. Feb. 3, 2012) (excluding expert testimony regarding the appropriate standard of care, because expert's opinion was unreliable where she agreed with objective benchmarks for evaluating care but did not apply them); *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F.Supp.F.Supp.2d 334, 354 (S.D.N.Y. 2005) (excluding expert opinion "which appears to be based on no scientific support other than his own personal experience" that defendant-physician's failure to respond to

discharge of synovial fluid following operation fell below the standard of care); *Algarin v. New York City Dep't of Corr.*, 460 F.Supp.2d 469, 477 (S.D.N.Y. 2006) (excluding as unreliable expert opinion that assessments resulting in psychiatric commitment "were not performed in conformity with the standards of the medical profession," because the expert was not relying on any objective standards but only how he thought the assessment should have been conducted). "An anecdotal account of one expert's experience, however extensive or impressive the numbers it encompasses, does not by itself equate to a methodology, let alone one generally accepted by the relevant professional community." *Berk*, 380 F.Supp.F.Supp.2d at 354. *Accord*, *Clarke v. Schofield*, 632 F.Supp.2d 1350 (M.D. Ga. 2009) (excluding emergency room physician's opinion regarding cause and location of deep vein thrombosis).

In *McGovern ex rel. McGovern v. Brigham & Women's Hosp.*, for example, the Court excluded the testimony of plaintiff's expert regarding the appropriate standard of care in a medical malpractice case, because there were no indicia of reliability that the opinion was anything other than the expert's own say-so. 584 F.Supp.F.Supp.2d at 424-25 (D. Mass. 2008) Of course, an expert may testify "solely on the basis of experience," but "he must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Brown*, 402 F.Supp.2d at 308-09. The plaintiff's expert in *McGovern* could not pass that rigorous test for demonstrating reliability when offering an opinion based only on one's experience and knowledge.

As the Supreme Court of the United States explained, nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is only the *ipse dixit* of the expert. *See General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997). As the

Eleventh Circuit explained, "If admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong." *Frazier*, 387 F.3d at 1261.

The recent case of *United States v. Zolot*, __ F.Supp.2d __, 2013 WL 4832705 (D. Mass. Sept. 13, 2013) is instructive. In *Zolot*, the court noted in ruling on the *Daubert* motions of both parties, that, while experts may testify on the basis of experience, if they are relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. *Id.* at *11, (citing Fed.R.Evid. 702, Advisory Committee's Note). The government relied heavily on *Zolot* in crafting its Daubert responses, however, at trial, the government's proof failed to include any of the standards they contended undergirded his opinions.

In finding that the government's experts should be excluded the court found that the experts had failed to "sufficiently articulate the standard of care they are applying to assess the defendants' conduct . . . " *Id.*, at 14. The district court stated that the expert had to "specifically cite the written standard they are relying on or provide testimony as to the accepted standard in the field." *Id*.

Dr. Kennedy testified without offering what information informed his opinions that Dr. Azmat violated standards, or what those standards were. At the end of the day, Dr. Kennedy's opinions were the classic *ipse dixit* that should have been excluded.

## V. <u>THE COURT'S REJECTION OF PROPOSED JURY INSTRUCTIONS</u>

Under the law of this Circuit, a defendant has the right to theory of defense instructions even apart from instructions on elements of the offense. The failure to issue such

instructions has consistently been found to be reversible error in this Circuit. *See, e.g., United States v. Ruiz*, 59 F.3d 1151 (11th Cir. 1995); *United States v. Morris*, 20 F.3d 1111 (11th Cir. 1994); *United States v. Banks*, 942 F.2d 1576, 1580 (11th Cir. 1991); *United States v. Hedges*, 912 F.2d 1397, 1405-06 (11th Cir. 1990). Indeed, as these and other Eleventh Circuit cases illustrate, perhaps the most frequent ground for reversal in this Circuit is the refusal of district courts to issue theory of defense instructions. *See also United States v. Vicaria*, 12 F.3d 195, 199 (11th Cir. 1994); *United States v. Opdahl*, 930 F.2d 1530, 1533 (11th Cir. 1991), *United States v. Orr*, 825 F.2d 1537 (11th Cir. 1987); *United States v. Lively*, 803 F.2d 1124, 1125-26 (11th Cir. 1986); *United States v. Gold*, 743 F.2d 800, 819 (11th Cir. 1984), *cert. denied*, 469 U.S. 1217 (1985). This is so, because a defendant is entitled to such an instruction so long as there is "any foundation" in the evidence to support it. *United States v. Ruiz*, 59 F.3d 1151 (11th Cir. 1995); *United States v. Middleton*, 690 F.2d 820, 826 (11th Cir. 1982), *cert. denied*, 103 S.Ct. 1497 (1983); *Strauss v. United States*, 376 F.2d 416 (5th Cir. 1967); *Perez v. United States*, 297 F.2d 12, 13-14 (5th Cir. 1961). *Accord United States v. Pedroza*, 750 F.2d 187, 204-05 (2d Cir. 1984) (defendant entitled to theory of defense instruction "'for which there is any foundation in the evidence, no matter how weak or incredible that evidence may be'") (citations omitted). Moreover, in deciding whether such a foundation exists, the Court is obliged to view the evidence in the light most favorable ***to the accused***. *Middleton,* 690 F.2d at 826; *United States v. Lewis*, 592 F.2d 1282, 1286 (5th Cir. 1979).

A district court has the discretion to refuse a proposed defense instruction only in the limited instances where:

(1)     The proposed instruction is not "substantially" correct;
(2)     There is some instruction that ***is*** in fact given which adequately and substantially addresses the same issue; or
(3)     The proposed instruction deals with an unimportant aspect of the trial

and, therefore, the failure to give it does not seriously impair the defendant's ability to defend himself against the charge.

*United States v. Ruiz*, 59 F.3d 1151 (11th Cir. 1995); *Opdahl*, 930 F.2d at 1533, *quoting with approval Lively*, 803 F.2d at 1125-26.

In this case, the Court rejected numerous instructions proposed by the defendant that accurately defined the law and were critical to his defense.

As Dr. Azmat pointed out in his Daubert motion, the apparent distinction in the law between a doctor's malpractice, even gross malpractice, and criminal conduct is a matter of degree. Accordingly, Dr. Azmat submitted a series of instructions derived from Georgia law that either directly set standards of care or provided Georgia physicians with specific rights with respect to treating patients in Georgia with controlled substances. These Proposed Instructions included:

No. 21 (Standard of Care – Uncertainty in the Law)

No. 22 (Difference Between Civil Malpractice and Criminal Conduct)

No. 23 (Reasonable Physicians May Disagree)

No. 24 (Honest Information)

No. 25 (Physician's Duty to Relieve Pain)

In *United States v. Feingold*, 454 F.3d 1001, 1010 (9th Cir. 2006), the Court held that an instruction is improper if it allows a jury to convict a licensed practitioner under § 841(a) solely on a finding that he has committed malpractice, intentional or otherwise. Rather, the district court must ensure that the benchmark for criminal liability is the higher showing that the practitioner intentionally has distributed controlled substances for no legitimate medical purpose and outside the usual course of professional practice.

There are cases in which the evidence arguably supports, and the Defendant may rely

upon, some specific theory of defense other than the traditional defenses covered by Special Instructions 13.1 through 17. In such cases, upon appropriate request, theory of defense instructions relating to material factual issues arising from the evidence must be given. *United States v. Conroy*, 589 F.2d1258, 1273 (5th Cir. 1979); *United States v. Lewis*, 592 F.2d1282 (5th Cir. 1979); *United States v. Sirang*, 70 F.3d 588 (11th Cir. 1995) (A defendant is entitled to a specific instruction on his theory of defense, not an abstract or general one). It is error to not give a requested instruction if the requested instruction's subject matter: is a correct statement of the law; is not covered by a separate pattern instruction; and goes to an important issue in the case. *See United States v. Woddard*, 531 F.3d 1352, 1364 (11th Cir. 2008).

Here, it was a theory of Dr. Azmat's defense that being a negligent physician, or even grossly negligent physician did not equate with being a drug dealer. Dr. Azmat was entitled to have the jury charged consistent with the instructions submitted.

## VI. PROSECUTORIAL MISCONDUCT REQUIRES A NEW TRIAL

During questioning of the defense expert, Dr. Tom Simopolous, government counsel asked Dr. Simopolous if he knew where Dr. Azmat obtained his medical education. Dr. Simopolous replied that he did not recall. The import of this question is that this was not a case regarding whether Dr. Azmat had negligently performed some procedure and whether his training was sufficient, but whether he had intentionally engaged in drug dealing. Not satisfied with Dr. Simopolous' answer, government counsel then specifically stated "Pakistan" asking if that refreshed the expert's opinion. Counsel for Dr. Azmat moved for a mistrial, which was denied. No curative instructions were given.

Allegations of prosecutorial misconduct are subject to a "two-part test." *United States v. Obregon,* 893 F.2d 1307, 1310 (11th Cir.1990). Whether the challenged comments were

17

improper and if so, whether they prejudicially affected the substantial rights of the defendant. *United States v. Castro,* 89 F.3d 1443, 1450 (11th Cir.1996) (citing *Obregon,* 893 F.2d at 1310). "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different." *United States v. Eckhardt,* 466 F.3d 938, 947 (11th Cir.2006).

There was no proper purpose in questioning Dr. Simopolous regarding Dr. Azmat's medical training. Again, his training and experience were not at issue in the case. The question for the jury was whether Dr. Azmat crossed the line from being a physician to drug dealer. Whether he was educated in the U.S. or Pakistan was of no event to that inquiry for the jury. Rather, the remark was intended to comment upon Dr. Azmat's national origin and engender prejudice against him. As the United States Supreme Court has held, "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943). "Undeniably, prosecutorial remarks kindling racial or ethnic predilections 'can violently affect a juror's impartiality.'" *United States v. Doe*, 903 F.2d 16, 28 (D.C.Cir. 1990) (quoting *Haynes v. McKendrick*, 481 F.2d 152, 156-159 (2d Cir. 1973); citing *Berger v. United States*, 295 U.S. 78, 88 (1935)). The prosecution's eliciting of alleged evidence regarding Dr. Azmat's Pakistani national origin and training was intentionally calculated to kindle prejudice against him and create a prohibited propensity inference that Dr. Azmat allegedly violated the law as a result of his background and training.

In a close case, where Dr. Azmat was presenting the testimony of a Harvard trained expert, the comment regarding Dr. Azmat's national origin made a difference. The injection of such improper and prejudicial testimony constitutes reversible error and provides ground for the

ordering of a new trial. *See United States v. Herrera*, 531 F.2d 788 (5th Cir. 1976) (reversing the defendant's convictions for importing and possessing cocaine with intent to distribute, holding that the prosecutor's arguments as to "[w]hether any juror, or the prosecutor, or any other American, would be afforded similar protections in defendant's home country or some other foreign country had nothing to do with this case," and were "egregiously inappropriate"). The testimony concerning Dr. Azmat's national origin was entirely irrelevant to the charges and served no purpose other than to goad the jury to convict Dr. Azmat because he was of Pakistani origin. Grant of a new trial is therefore supported by *United States v. Rodriguez Cortes*, in which the Court of Appeals for the First Circuit reversed the convictions of one of the defendants for conspiracy to import and distribute cocaine based upon the fact that the prosecution had introduced the defendant's Colombia identification at trial, holding that the introduction of the evidence was "obvious harmful error" and:

> [C]ould be taken as an appeal to the jurors to find the defendant guilty by reason of his national origin, inviting them to believe that if a person is born in Colombia, then he must be involved in drug trafficking. This form of reasoning is precisely the type of prejudice that Federal Rule of Evidence 403 is intended to guard against…
>
> The admission of the card as an exhibit made it more likely that whatever preconceived notions the jury might have had about Colombians and drug trafficking would infect the deliberative process.

949 F.2d 532, 541, 42 (1st Cir. 1991); *see also United States v. Doe*, 903 F.2d at 20 (reversing the convictions for drug and firearms charges of the defendants, several of whom were Jamaican, where the prosecution made arguments and introduced expert testimony concerning alleged "Jamaican gang activity," holding that the statements constituted prejudicial and harmful error: "These statements hardly described for the jury the *modus operandi* of drug dealers, Jamaican or otherwise, nor could they have provided legitimate assistance to the jurors in determining whether appellants committed the offenses charged. [Fn.]. Instead, they focused on

monopolization of the local drug market by dealers tracing their ancestry to Jamaica, and strongly suggested that appellants were guilty because two of them are Jamaican) (internal footnote omitted); *see also United States v. Vue*, 13 F.3d 1206, 1213 (8th Cir. 1994) (reversing the convictions of the defendants, who were of Hmong descent, for opium smuggling, based upon the admission at trial of certain testimony related to the likelihood of the involvement in opium smuggling of persons of Hmong descent).

Based upon the egregious testimony regarding Dr. Azmat's ethnicity intentionally elicited by the prosecution in this case, a new trial should follow.

## VII. ERRONEOUS ADMISSION OF ALL EAST HEALTH FILES

The government introduced into evidence, over objection, all of the files at East Health Center for patients seen by Dr. Azmat. The introduction of this evidence was substantially outweighed by the risk of unfair prejudice.

In *United States v. Jones,* 570 F.2d 765 (8th Cir.1978), a physician was prosecuted for distributing Quaalude without legitimate medical purpose and outside the usual course of medical practice. The court held that it was prejudicial error to have introduced evidence relating to 478 prescriptions written by the defendant for Schedule II drugs, which prescriptions were not covered by the indictment, when there was no evidence concerning the doctor-patient relationship existing with respect to these prescriptions.

Citing the Supreme Court's seminal case, *United States v. Moore*, 423 U.S. 122, 138 (1975), the Eight Circuit held that, "Absent any evidence bearing upon Dr. Jones' treatment of the patients in question, issuance of the prescriptions without more does not show that Dr. Jones acted unprofessionally in issuing these prescriptions." *United States v. Jones*, 570 F.2d 765, 768 (8th Cir. 1978).

Similarly here, there was no evidence related to the other 200 patients that formed the basis for the admission of all of the EHC files and as pointed out by *Tran* the admission of such evidence not cabined by any evidence regarding the physician patient relationship runs the risk of guilt by association. The admission of that evidence was unfairly prejudical.

## VIII. CONCLUSION

Based upon all of the reasons and authorities set forth above, Dr. Azmat respectfully requests that this Court grant his Motion for Acquittal or, alternatively, grant his Motion for New Trial.

This the 31st day of January, 2014.

/s/ **Thomas A. Withers, Esq.**
Thomas A. Withers, Esq.
Georgia Bar Number: 772250
Attorney for Dr. Najam Azmat

Gillen, Withers & Lake, LLC
8 East Liberty Street
Savannah, Georgia 31401
Telephone: (912) 447-8400
E-Mail: Twithers@gwllawfirm.com

## CERTIFICATE OF SERVICE

The undersigned certifies that I have on this day served all the parties in this case in accordance with the notice of electronic filing ("NEF") which was generated as a result of electronic filing in this court.

This 31st day of January, 2014.

/s/ Thomas A. Withers, Esq.
Thomas A. Withers, Esq.
Georgia Bar Number: 772250
Attorney for Dr. Najam Azmat

Gillen, Withers & Lake, LLC
8 East Liberty Street
Savannah, Georgia 31401
Telephone:  (912) 447-8400
E-Mail: Twithers@gwllawfirm.com