## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **CR 413-28** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **NAJAM AZMAT** | ) | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S RENEWED MOTION FOR JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL [DOC 324]

Now comes the United States of America, by and through Edward J. Tarver, United States Attorney for the Southern District of Georgia, and files the government's response to Najam Azmat's renewed motion for judgment of acquittal or, in the alternative, motion for new trial.

Azmat contends that he is entitled to a judgment of acquittal pursuant to Fed. R. Crim. P. 29 "on insufficiency of evidence as to all counts, that the government had indicted Dr. Azmat for unlawfully "dispensing," not distributing medication, that the money laundering conspiracy count failed since the specified unlawful activity alleged was the "dispensation" of controlled substances and the money laundering conspiracy charge failed under <u>Christo</u>." [Doc 324, p 2]. In the alternative, Azmat contends he is entitled to a new trial for a variety of reasons, including "collective error," <u>id</u>. at 2-4; insufficient evidence, <u>id</u>. at 4-11; improper admission of expert testimony, <u>id</u>. at 11-14; the court's rejection of proposed jury instructions, <u>id</u>. at 14-17; prosecutorial misconduct, <u>id</u>. at 17-20; and the erroneous admission of all East Health Center files, <u>id</u>. at. 20-21.

**1. Standard for Upholding Jury Verdict Against Motion for Judgment Of Acquittal**

All criminal convictions must be proven by "evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." Jackson v. Virginia, 443 U.S. 307, 316 (1979). In order to uphold a verdict against a motion for judgment of acquittal which challenges the sufficiency of the evidence, the Court must determine whether the evidence, when viewed in the light most favorable to the government and drawing all reasonable inferences in favor of the jury's verdict, was sufficient for a reasonable jury to find the defendant guilty of all essential elements of the offense charged beyond a reasonable doubt. United States v. Gamory, 635 F.3d 480, 497 (11th Cir. 2011). "A conviction must be upheld unless the jury could not have found the defendant guilty under any reasonable construction of the evidence." United States v. Chastain, 198 F.3d 1338, 1351 (11th Cir. 1999); see also United States v. Calderon, 127 F.3d 1314, 1324 (11th Cir. 1997) ("[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt").

**2. Standard for Granting New Trial Motion**

The court may vacate a judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33. Azmat suggests error throughout the trial, both individually and cumulatively, has deprived him of a fair trial. See United States v. Baker, 432 F.3d 1189, 1223, 1203 (11th Cir. 2005) (noting the court will reverse if the cumulative effect of errors is prejudicial). The cumulative error doctrine "provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." United States v. Munoz, 150 F.3d 401, 418 (5th Cir.1998).

### 3. The Evidence at Trial was Sufficient to Convict Azmat of All Counts

To convict a physician licensed to prescribe controlled substances under 21 U.S.C. § 841, "it [is] incumbent upon the government to prove that he dispensed controlled substances for other than legitimate medical purposes in the usual course of professional practice, and that he did so knowingly and intentionally." United States v. Ignasiak, 667 F.3d 1217, 1228 (11th Cir. 2012); see also United States v. Tobin, 676 F.3d 1264, 1282 (11th Cir. 2012).

The evidence showed that East Health Center opened on February 21, 2011, in Garden City, Georgia, and was closed on May 26, 2011 following the execution of a federal search warrant. East Health Center was opened in Garden City owing to a belief on the part of the organizers that the laws in Georgia were more hospitable to "pain clinics" following the enactment of statutes in Florida making it difficult for non-medical doctors to own such clinics. The clinic functioned solely as a place where patients received prescriptions for controlled substances. The organizers of the clinic were uniformly from south Florida and had no prior connection to the state of Georgia, let alone the Savannah area.

None of the organizers were medical doctors and none had any legitimate experience in the health care field. Several had prior experience working with "pill mill" operations in south Florida. In particular, Adelard LeFrancois had experience managing pill mills in Boca Raton, and elsewhere in Florida, and used the information that he gained there to inform various decisions regarding the operation of East Health Center. Sean Clark and Francis ("Frankie") Barbuscia had experience marketing pill mills and actively recruited customers from rival pill mills to come to East Health Center.

While none of the organizers of East Health Center had any medical experience, they were able to tend to the day-to-day operations of a pill mill, including renting office space,

recruiting patients, hiring workers, purchasing supplies, and paying bills, and keeping records. They could not, however, write prescriptions for controlled substances, and therefore needed to recruit a licensed medical doctor for this duty. LeFrancois hired Azmat following an unsuccessful attempt to recruit a local physician to work at the clinic. (This physician immediately called a CNT agent after meeting with LeFrancois and Clark, thus launching the investigation.) Azmat had called LeFrancois in response to a craigslist ad offering $2,000 per day for a doctor to work at an office specializing in "Pain Management, weight loss and rejuvenation." [Govt. Ex. 30] Azmat and LeFrancois came to an agreement by telephone and Azmat began work on February 21, 2011, the first day the clinic was open. The only expectation was that he would prescribe controlled substances to East Health Center patients.

      Very few patients seen by Azmat at East Health Center lived in the Savannah area. Most traveled many hundreds of miles to be seen there. Over sixty percent of the patients seen by Azmat were from out-of-state, with Kentucky, Ohio, and Florida being the most common points of origin. [Govt. Ex. 31-1] Patients frequently traveled in groups and sometimes family members would come together and receive prescriptions which were nearly identical. Patients typically paid $300 for their brief visits with Azmat. East Health Center did not accept insurance or checks so most patients paid cash. A very few paid with credit cards. Of the eight patients who testified at trial, all came with the expectation of receiving a prescription for a month's worth of oxycodone, and sometimes other drugs, such as Xanax. The testimony of these patients showed that in order to get a prescription from Azmat, nothing more was required than to show up, pay the fee, fill out some paperwork, present an MRI that was less than 2 years old, and orally provide a history of pain. According to these patients, only a cursory, if any, physical examination was conducted by Azmat. There were no referrals for other treatments and there

was no treatment plan. The eight patient witnesses who testified indicated that they were addicted to oxycodone at the time they received their prescriptions from Azmat. Several testified that they had overcome those addictions after East Health Center was closed (e.g., witnesses Rhorer, Bradley, and Simpson).

There was substantial evidence of other red flags indicating the unlawful nature of East Health Center. The office had little, if any, medical equipment. Most patients received a diagnosis of "chronic lower back pain." Patients were not required to furnish prior medical records other than a less than two-year old MRI report. No attempts were ever made by Azmat or other staff to obtain prior records or to contact prior physicians. The MRIs were also remarkable. A large percentage of patients presented MRIs from a cluster of MRI facilities in south Florida. [Govt. Ex. 31-3] Remarkably, a large number of patients from Kentucky, and elsewhere, had MRIs from south Florida. Patients were not referred for treatment or other therapy. Patients traveled hundreds of miles by automobile despite complaints of extraordinary levels of pain. The patients who testified at trial indicated that Azmat never questioned why they traveled so far to get these prescriptions. The patient files showed there were no individualized treatment plans. The "treatment plans" explaining that the patient would receive opioid therapy were always signed prior to the patient seeing the physician.

The numerous patient files that were admitted showed that most patients described their pain levels as a "9" or "10" on a scale of 1-10. [See generally Govt. Exs. 1 through 27-191] Photographic evidence was presented to the jury showing patients sitting and standing in the waiting room which belied the notion that they were in extreme pain. [Govt. Exs. 29-5a-3 through 29-5a-5] Some patients had dangerously high blood pressure. They did not receive counseling, referrals or warnings.

Azmat worked at East Health Center from February 21, 2011 to March 18, 2011. During that short time, he saw and wrote prescriptions for 196 patients. [Govt. Ex. 31-8] Ninety-six percent of these patients received prescriptions for oxycodone. [Govt. Ex. 31-6] Diversion Investigator Charles Sikes testified that he interviewed Azmat at Azmat's home on September 19, 2012. According to Sikes, Azmat admitted he knew that the patients were addicts, knew they came from other pill mill clinics, knew they paid in cash, and knew they came from far away.

Finally, the evidence showed that Azmat filed no tax return showing his income from East Health Center, lending proof to his knowledge that the activity was unlawful.

There was sufficient evidence to support Azmat's convictions. Eleventh Circuit precedent establishes that "conduct where an inordinately large quantity of controlled substances was prescribed, ... large numbers of prescriptions were issued, ... no physical examination was given,.... [and] that [the physician] knew or should have known that his patients were misusing their prescriptions" suggests that a defendant distributed a prescription without a legitimate medical purpose and outside the usual course of professional practice. United States v. Joseph, 709 F.3d 1082, 1104 (11th Cir. 2013). As shown above, there was ample evidence that Azmat engaged in this type of conduct. In addition, the government's medical expert, Dr. Gene Kennedy reviewed the patient files of the patients who were the subject of the substantive counts of indictment and testified that the files showed that the physical exams were not credible and did not support the initial prescription of narcotics. In the opinion of Dr. Kennedy, each of the prescriptions underlying counts 2 through 50 were issued for no legitimate medical purpose. Even Azmat's expert, Dr. Thomas Simopolous, conceded on cross-examination that it was odd that patients would travel hundreds of miles to East Health Center when there likely must have been physicians closer to the patients' homes. Simopolous agreed that he would have questioned

6

the patients about this long distance travel, the MRIs (some of which showed the report being written before the examination was conducted), and the high blood pressures presented by some patients.

The money laundering conspiracy verdict was supported by evidence that Azmat knowingly received proceeds of the specified unlawful activity in exchange for writing prescriptions for the other conspirators. Each day he was paid from proceeds generated by the operation of the unlawful pill mill and that this was done with the intent of promoting the carrying on of the unlawful activity.

Viewing the record in the light most favorable to the government and drawing all reasonable inferences in favor of the jury's verdict, the evidence was sufficient for a reasonable jury to find the Azmat guilty of all essential elements of the offenses charged beyond a reasonable doubt. See Jackson, 443 U.S. at 319 (requiring convictions to be upheld if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"). Accordingly, Azmat's renewed motion for acquittal and his motion for new trial should be denied.

### 4. There was no Requirement for Patients to Testify About Each Substantive Count

Azmat's argument that the evidence is insufficient because the government failed to call as a witness every patient whose records served as a basis for a count in the indictment is not supported by law. Azmat argues that of the 25 patients identified in the indictment, "only 7 of them were called to testify. [Doc 324 at 9] He also complains that the government's expert witness did not physically examine any of the patients, and that medical records alone do not justify conviction. [Id.]

There is no legal requirement that each count must be proven by direct evidence such as patient testimony, as opposed to circumstantial evidence. (In fact, the statute provides for conviction where death results, and thus no direct patient testimony would be possible.) Here, the government presented the direct testimony of seven patients who were identified in the indictment, one patient who was not (Gerald Smith), and circumstantial evidence regarding the remaining counts. Importantly, the medical records and prescriptions of every patient identified in the indictment and representing a separate count of the indictment were admitted into evidence and reviewed by Dr. Kennedy, the government's medical expert. At trial, Dr. Kennedy rendered an opinion as to each count that Azmat had acted outside the ordinary course of professional practice and for no legitimate medical purpose. As previously summarized above, the evidence showed that Azmat conducted only cursory physical examinations of the patients, ignored signs of drug-seeking behavior, and conducted no examinations which might have shown that a patient's complaint about his or her level of pain was a pretext. Azmat completely failed to obtain prior medical records of his patients and he uniformly prescribed medication with little, if any, supporting documentation in the medical record of the patient. The evidence was sufficient to support the verdicts.

In support of his argument, Azmat relies heavily on United States v. Tran Trong Cuong, 18 F.3d 1132 (4th Cir. 1994) (holding expert testimony regarding a pattern of conduct based on a summary of patient files could not sustain convictions). Contrary to Azmat's argument, this case does not stand for the proposition that patients must testify to support each charge. In Tran Trong Cuong, the court reversed convictions on 80 out of 127 counts where the patients neither testified nor were presented to the jury through the physician's medical records. 18 F.3d at 1141. Those counts had been supported solely by evidence of prescriptions and a summary report of patient

files. The expert witness in that case did not discuss by name the patients who did not testify nor did he comment on their treatment or lack of treatment or their prescriptions that were in evidence. Instead, the expert stated only that he had identified a pattern of prescribing that he did not think was justified. Id. Significantly, the medical expert admitted that some of the medical charts did not provide sufficient information from which to conclude that the prescriptions were actually improper. Despite this, the information was included in a summary and formed the basis of separate counts. Id. The Fourth Circuit reversed 80 of the 127 convictions stating, "[a] defendant is entitled to individual consideration of every count in an indictment by the jury and evidence sufficient to convict on each count beyond a reasonable doubt." Id. at 1142. Such evidence is more often than not circumstantial. See generally United States v. Martinez, 588 F.3d 301, 314 (6th Cir. 2009) (noting in a health care fraud case where the government "did not offer individualized patient testimony" that "circumstantial evidence alone can sustain a guilty verdict" where expert testimony is "sufficiently specific to the patient, date, and services in the indictment"), cert. denied, 131 S. Ct. 990 (2011); United States v. Brown, 553 F.3d 768, 780 (5th Cir. 2008) (upholding a verdict convicting pharmacists of distributing drugs other than for a legitimate medical purpose and noting that "our standard of review does not change if the evidence that sustains the conviction is circumstantial rather than direct."). Here, contrary to Azmat's assertion, the government did not rely on mere summaries or an impermissible presumption that Azmat must be guilty on all counts due to a pattern that evolved from the testimony of a few witnesses. Instead, the record at trial included the patient medical files of all patients seen by Azmat at East Health Center and prescriptions supporting every count in the indictment. Unlike the trial in United States v. Tran Trong Cuong, 18 F.3d 1132 (4ᵗʰ Cir.1994), Dr. Kennedy specifically discussed the medical file of each patient charged in the indictment,

including those who did not testify, commented on the prescriptions they received, and made individual assessments about their treatment. Id. at 1141. From this, a rational juror could find Azmat guilty beyond a reasonable doubt as to each count presented.

**5. Azmat was Correctly Charged with Dispensing and a Prescription Alone is a Sufficient Basis to Charge Dispensation**

Azmat argues that Azmat was indicted for "dispensing" controlled substances, but the government only proved that he "prescribed" controlled substances. [Doc 324 at 11] In United States v. Thompson, 624 F.2d 740 (5th Cir. 1980), a defendant physician was charged with "dispensing" outside the usual course of professional practice. As is the case with Azmat, the defendant argued that he should have been charged with "distributing," not dispensing, controlled substances outside the usual course because the term "dispense" only applies to a "lawful order of a practitioner." Id. at 741-42. As such, the defendant argued, only an unregistered physician could be charged with unlawfully dispensing controlled substances. Id. at 742. The Fifth Circuit held that the defendant physician was properly charged with "dispensing" controlled substances outside the usual course of professional practice. Id.

A doctor may be charged with dispensing controlled substances outside the course of professional practice even though the "patient" never took possession of the drugs, United States v. Tighe, 551 F.2d 18, 21 (3rd Cir. 1977), or the prescription was never filled, United States v. Stump, 735 F.2d 273, 276 (7th Cir. 1984). The mere issuance of a prescription for a controlled substance outside the course of professional practice and for no legitimate medical purpose satisfies all of the elements of 21 U.S.C. § 841(a)(1). United States v. Flowers, 818 F.2d 464, 467 (6th Cir. 1987) (a person can violate 841(a)(1) by writing prescriptions for controlled substances outside the usual course of professional practice, even though the prescriptions are never filled); Tighe, 551 F.2d at 20 (a prescription for a controlled substance "cannot be regarded as less than the constructive or attempted transfer of the substance itself, since a

prescription is the written representation of the drug and enables its possessor to claim physical custody and control over the drug prescribed).

The Court correctly charged the jury that "dispensing a controlled substance or causing a controlled substance to be dispensed includes issuing a prescription for a controlled substance. [Doc 319 at 11] There was no error.

### 6. The Government Established an Appropriate Standard for Evaluating Azmat's Conduct

Azmat's argument that the government failed to establish an applicable threshold standard of medical care by which the jury could measure his conduct is baseless. The government presented expert medical testimony regarding acceptable medical standards and whether Dr. Azmat's conduct was outside its bounds. Dr. Gene Kennedy testified about the standards published by the Georgia Composite State Board of Medical Examiners and also about national policies such as those found in the Federation of State Medical Boards Model Policy. Dr. Kennedy indicated that those standards, and ones found in standard reference materials such as the Merck Manual and Physicians' Desk Reference, are to be considered and applied whenever a physician makes a decision to prescribe controlled substances such as oxycodone. The government recalls Dr. Kennedy testified that, among other things contained in the Georgia Medical Board standards, a medical history and physical examination must be obtained, evaluated, and documented in the medical record, including records from other physicians. A treatment plan should be created, including the consideration of appropriate non-controlled drugs, and referrals to appropriate specialists. The physician should make a determination that the exclusive use of non-controlled drugs is not appropriate. The physician should review the patient's prescription records and discuss the patient's chemical history before prescribing a controlled drug. The physician should discuss risks and benefits of the use of controlled

substances with the patient and record that this was done. The physician should monitor the patient for the underlying condition and for side effects of medication. Finally, the physician should establish treatment objectives.

In short, the government presented ample evidence of "a generally accepted standard of medical practice," to guide the jury's consideration of whether that standard was violated by Azmat. See United States v. Merrill, 513 F.3rd 1293, 1306 (11th Cir 2008). The court specifically instructed that the jury was required to find that Azmat issued each prescription with knowledge that it was being issued not for a legitimate medical purpose in the usual course of professional medical practice.

### 7. Expert Testimony was Properly Admitted.

There was nothing improper about the government's expert testimony. The government's medical expert, Dr. Kennedy, testified that Dr. Azmat's conduct was neither for a legitimate purpose nor in the usual course of practice. The jury was free to rely on this testimony. Experts are permitted to testify regarding, and to disagree about, whether a defendant's conduct was within or outside of applicable medical standards. See generally United States v. Moore, 423 U.S. 122 (1975); United States v. Katz, 445 F.3d 1023, 1032 (8th Cir. 2006) (stating experts are prohibited from offering opinion on a defendant's mental state not from providing opinions that link standards of care to the existence of a legitimate medical purpose). In this case, Dr. Kennedy was not permitted to testify regarding the ultimate issues of the defendant's intent or knowledge, or guilt or innocence of the crimes charged. See also United States v. McIver, 470 F.3d 550, 561-62 & n.14 (4th Cir. 2006) (noting whether the defendant acted outside the bounds of professional practice is a question of fact for the jury on which expert testimony is appropriate). Instead, Dr.

Kennedy properly set forth the applicable standards by which appropriate medical care is determined and offered his opinion that Azmat's conduct exceeded that medical standard.

### 8. The Court Properly Instructed the Jury.

Azmat argues that the Court erred by refusing to give certain instructions he proposed. He claims his proposed instructions were derived from Georgia law that either directly set standards of care of provided Georgia physicians with specific rights with respect to treating patients in Georgia with controlled substances. [Doc 324 at 14-17]

"A district court's refusal to give a requested instruction is reversible error if (1) the requested instruction was a correct statement of the law, (2) its subject matter was not substantially covered by other instructions, and (3) its subject matter dealt with an issue in the trial court that was so important that failure to give it seriously impaired the defendant's ability to defend himself." United States v. Carrasco, 381 F.3d 1237, 1242 (11th Cir.2004).

The district court's refusal to give the requested instructions requested by Azmat was not an abuse of discretion. The subject matter of several of the rejected instructions was substantially covered by other instructions. The instruction given by the Court advised the jury that the government must prove beyond a reasonable doubt "[t]hat the defendant dispensed a controlled substance, knowingly and intentionally, outside the usual course of professional practice for a medical doctor and without legitimate medical purpose." [Doc 319 (Jury Instruction) at 11]

The Court further instructed that good faith was a defense to the charges in Counts 2 through 50 of the indictment and that the government must prove that the defendant dispensed a controlled substance "other than in good fail in the usual course of professional practice." "Good faith . . . means good intentions and the honest exercise of good professional judgment as to a patient's medical needs. Good faith connotes an observance of conduct in accordant with what

the physician should reasonably believe to be proper medical practice.." [Doc 319 at 17] Thus, the jury was able to consider these standards in determining, for example, whether Azmat had prescribed the controlled substances in good faith, which the jury was instructed was a complete defense to the unlawful dispersal counts. See Joseph, 709 F.3d at 1097 (highlighting the fact that "[e]xperts for both the prosecution and the defense testified about the accepted standard of medical practice"). The instruction given by the Court did not in any way convey to the jury that breaching a civil standard of care alone could result in conviction, but in fact advised them otherwise. See generally, United States v. Smith, 573 F.3d 639, 649 (8th Cir. 2009). Determining what conduct lies beyond the bounds of professional medical practice and whether the Defendant knowingly engaged in that conduct was a task for the jury. See United States v. Johnson, 322 Fed. Appx. 660, 667 (11th Cir. 2009) (unpublished) (indicating that criminal knowledge and intent are issues for the jury).

Azmat has not shown that the Court's refusal to give the requested instructions "seriously impaired [his] ability to defend himself." Carrasco, 381 F.3d at 1242. The Court's instructions relating to the standard of care that have been specifically approved by the Eleventh Circuit. See e.g. United States v. Williams, 445 F.3d 1302, 1307-08 (11th Cir.2006).(an instruction explaining that the government must prove the doctor dispensed controlled substances "outside the usual course of professional practice ... properly state[d] the standard by which a [doctor's] conduct must be judged.").

Even though the court rejected some of Azmat's proposed instructions regarding particular standards of medical care, Azmat presented evidence regarding what he considered to be the appropriate standard. The court's instruction on the standard of care left the determination to the jury, stating in part, "[t]he defendant may not be convicted if he merely made an honest

effort to treat his patients in accordance with a standard of medical practice generally recognized and accepted in the state of Georgia." [Doc. 319 at 17]

**9. There was no Prosecutorial Misconduct**

The government did not engage in prosecutorial misconduct by asking Azmat's medical expert whether he knew that the defendant went to medical school in Pakistan. The question was not improper; and even if it was, it did not prejudicially affect the rights of the defendant. The question did not undermine the fairness of the trial or contribute to a miscarriage of justice. In the case at hand, national origin was not an issue. The issue in the case is whether the defendant, a physician, unlawfully prescribed controlled substances outside the course of professional practice and for no legitimate medical reason. The government has shown throughout this response that the evidence against Azmat was more than sufficient.

Allegations of prosecutorial misconduct are subject to a "two part test." United States v. Obregan, 893 F.2d 1307, 1310 (11th Cir. 1990). The Court must first determine whether the prosecutor's comments were improper; and second whether the comments prejudicially affected the substantial rights of the defendant. United States v. Castro, 89 F.3d 1443 (11th Cir. 1996). In determining whether improper statements by a prosecutor at trial merit reversing a conviction some of the factors considered by the court are: the degree to which the challenged remarks have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury; the strength of the competent proof to establish the guilty of the accused. Davis v. Zant, 36 F.3d 1538 (11th Cir. 1994). These factors apply to improper statements made in argument and other improper remarks made by a prosecutor during the course of the trial. Walker v. Davis, 840 F.2d 834 (11th Cir. 1988). "A defendant's substantial rights are prejudicially affected when a reasonable probability

arises that, but for the remarks, the outcome of the trial would have been different." United States v. Eckhardt, 466 F.3d 938, 947 (11th Cir. 2006). A prosecutor's statement will justify the reversal of a conviction if it undermined "the fairness of the trial and contributed to a miscarriage of justice." United States v. Sawyer, 799 F.2d 1494 at 1507 (11th Cir. 1986). In determining whether to reverse a conviction based on improper statements, the Court must review the claim against the entire record. See United States v. Young, 470 U.S. 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163 n. 14, (1982)). "[E]ach case necessarily turns on its own facts." United States v. Socony–Vacuum Oil Co., 310 U.S. 150 (1940).

The government did not make an improper comment when it asked the defense expert whether he knew where Azmat attended medical school.[1] As outlined in the facts above, the issue in this case was whether Azmat, a medical doctor, prescribed controlled substances for a legitimate reason in the usual course of professional practice. In this case, the majority of the Azmat's patients, each of whom received prescriptions for controlled substances, traveled from long distances to see the defendant. They traveled from Florida, South Carolina, Tennessee, Kentucky, and elsewhere. The United States presented expert testimony from a Georgia physician, Dr. Gene Kennedy. Dr. Kennedy opined that the defendant did not practice within the standards of professional practice; and he prescribed highly addictive controlled substances without legitimate medical need. On cross-examination, the defense questioned the expert about his schooling, his training, his lack of board certification; and his experience. The defense repeatedly attacked Dr. Kennedy asserting his lack of qualifications to judge Dr. Azmat's practice. The defense called an expert witness, Dr. Thomas Simopolous, a Harvard Medical School professor, who testified that Azmat practiced within the bounds of law. The defense

---

[1] The United States submits that the question by the government was not a statement or a comment. This Court, on more than one occasion, instructed the jury that questions asked by the lawyers are not evidence; the answers are.

16

lawyer highlighted Dr. Simopolous's education, schooling, board certification and experience. On cross-examination, the government asked the defendant's expert a number of relevant questions. The expert agreed that every state had physicians who practiced pain management. The expert agreed that most doctors who practice pain management are not board certified. The expert agreed that one "index of suspicion" that a patient may be shopping for pills is whether the patient traveled long distances to seek prescriptions for controlled substances. The government asked the expert whether he knew about the defendant prior to this case. The government asked whether he knew where the defendant went to medical school, to which he replied he did not remember. Without objection, the government then asked whether he knew whether the defendant went to a medical school in Pakistan, to which the expert replied that he believed so. The government asked the expert whether he knew if the defendant was board certified in pain management; to which the expert testified he was not. While the expert testified that he learned of the Hippocratic Oath to do no harm at his medical school, he was not aware of the courses taught at the defendant's school.

The government's question was not improper. The purpose of the questions was to demonstrate to the jury that people traveled hundreds of miles to see the defendant, not because he was some expert, board certified doctor, who attended a prestigious medical school, but because he would write prescriptions for controlled substances. The defendant was not board certified and attended a medical school outside of the United States. The expert did not know what courses were taught at the medical school. **Not once** did the government ask anything about the defendant's race, or national origin. Asking about the defendant's schooling and professional training was just as relevant as it was when the defense lawyer asked the government's witness about his training, or the defendant's expert witness about his training. Medical training is a

relevant issue in a trial when a doctor is on trial for practicing outside the bounds of his medical profession. Medical training is a relevant issue in a trial when a doctor is arguing good faith. Because the questions were relevant and not improper; the defendant's motion for a new trial should be denied.

In his motion for new trial, the defendant asserts that the government elicited evidence "regarding Dr. Azmat's Pakistani national origin.[2]" [Doc. 324 at 18] This is simply not true. The government did not ask any questions or make any assertions regarding national origin. The relevant question about schooling was not "calculated to kindle prejudice against him;" nor did it result in prejudice. This case differs from the cases cited in the defendant's brief. Not one of the cases cited by the defendant, United States v. Herrera, 531 F.2d 788 (5th Cir. 1976), United States v. Rodriguez Cortes, 949 F.2d 532 (1st Cir. 1991), United States v. Doe, 903 F.2d 16 (D.C. Cir. 1990), or  United States v. Vue, 13 F.3d 1206 (8th Cir. 1994), dealt with a prosecutor asking a witness about the educational background of a physician.

In Herrera, the government in closing argument compared the Honduran legal system with the United States legal system and argued that the defendant, a Honduran, was fortunate to have the protections afforded in the United States. This opinion statement by the prosecutor was not relevant to the facts of the case. The Fifth Circuit reversed the case, based not on this one statement, but on a series of inappropriate statements, including repeated instances of vouching. Herrera, 531 F.2d 788 (5th Cir. 1976). In the case at hand, the question was relevant, probative and isolated.

In Rodriguez Cortez, the government introduced an identification card that identified the defendant as a Columbian, under the theory that the card made it more likely that the defendant

---

[2] While the government disputes that it ever elicited any testimony regarding Azmat's national origin, the government fails to see anything improper about asking the defense expert if he knew where Azmat was educated.

18

was a member of a conspiracy involving other Columbians, because a "Columbian is more likely to trust another Columbian." The First Circuit reversed the case in part because the card's admission was more prejudicial than probative. The First Circuit noted that the district court made improper assumptions, factually, and racially. The district court essentially found that the defendant was more likely a member of the conspiracy because of his national origin. In closing, the prosecutor argued in closing: "This man, this young man has ties with Columbia, from there you can reasonably infer why Libardo Sierra [a co-conspirator] was calling him." The First Circuit reversed on a FRE 403 basis and reasoned that "[i]n this context, this could be taken as an appeal to the jurors to find the defendant guilty by reason of his national origin, inviting them to believe that if a person is born in Colombia, then he must be involved in drug trafficking." Rodriguez Cortes, 949 F.2d 532 at 541 (1st Cir. 1991). The First Circuit, however, specifically held that the prosecutor's comments **did not constitute misconduct.** Id. at 543. In the case at hand, unlike the situation in Rodriguez Cortez, the government did not mention national origin, but simply questioned the expert regarding the educational background of the defendant.

   In Doe, the D.C. Circuit Court of Appeals reversed drug trafficking convictions based on the introduction of expert testimony and improper closing arguments regarding the *modus operandi* of Jamaican drug takeovers. The district court did not conduct a proper balancing inquiry under 403 of the Federal Rules of Evidence. The government introduced expert testimony that Jamaicans were taking over the drug trade in D.C. In closing argument, the government improperly argued "[a]nd what is happening in Washington D.C. is that Jamaicans are coming in, they're taking over the retail sale of crack in Washington D.C.. It's a lucrative trade. The money, the crack, the cocaine that's coming into the city is being taken over by people just like this- just like this. . . ." Doe, 903 F.2d 16 (1st Cir. 1991). The Court found that these

statements were a "blatant attempt to have the jury punish appellant[s] for the emotional headlines that were current at the time, and as an impermissible appeal to the jury to consider the fact that because people just like this- just like this are taking over the cocaine business… the [appellants] are guilty because they share the same nationality as those whom [the expert] described in such negative terms." Id. at 22, 23. In reversing the case, the Circuit Court also noted that the evidence was "hardly overwhelming." Id. at 23. In the case at hand, there was no racial animus. There were no hasty generalizations. The government simply tested the knowledge of the defendant's expert of the defendant and his training by asking the expert where the defendant went to medical school and what courses were taught at the school.

Much as in Doe, Vue, is also off point. In Vue, the Eighth Circuit Court appeals reversed a drug dealer's conviction because the district court improperly allowed expert testimony that persons of Hmong descent are more likely to smuggle opium. The Eighth Circuit reversed and held that the admission of testimony tying the ethnic descent of a defendant to the ethnic characteristics of drug dealers in a specific geographic area or a specific type of drug was improper. Vue, 13 F.3d 1206 at 1213, 1214. In the case at hand, the government did not elicit testimony about the defendant's ethnicity, nor did the government elicit testimony regarding characteristics of drug dealers in a specific geographic area.

Because there was no government misconduct, and the evidence was overwhelming, this Court should deny the defendant's motion for a new trial.

### 10. The Court did not Abuse its Discretion by Admitting all of Azmat's Patient Files

The admission of all of Azmat's patient files from East Health Center was proper because the files were relevant and the probative value of the files was not substantially outweighed by a danger of unfair prejudice. Federal Rule of Evidence 401 states that evidence is relevant if: (a) it

has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. Fed. R. Evid. 402 states that relevant evidence is admissible unless any of the following provides otherwise; the United States Constitution; a federal statute; these rules; or other rules prescribed by the Supreme Court. Fed. R. Evid. 403 states, *inter alia*, that the court may exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice.

In the case at hand, the defendant was charged in Count One of a 23 page indictment with conspiring to unlawfully dispense controlled substances not for a legitimate medical purpose and not in the usual course of professional practice from as early as 2009 through December 2011. (See, Doc. 156, Superseding Indictment 413-028). Paragraph 38 of the indictment alleges "that between on or about February 21, 2011 and up to and including May 26, 2011, members of the conspiracy prescribed and caused to be prescribed more than 4 million milligrams of oxycodone. During this same time period, prescriptions were written for more than 480 'patients' who lived outside the state of Georgia, including more than 130 from Kentucky; more than 50 from North Carolina; more than 30 from South Carolina; and more than 80 from Florida." (See, Doc. 156, Paragraph 38, Superseding Indictment).

The Court did not abuse its discretion by admitting the defendant's patient files. The files were of customers the defendant saw during the time period outlined in the indictment and were relevant to proving the conspiracy charged in count one of the indictment.[3]

While the defendant alleges prejudice, he fails to outline how the defendant was unfairly prejudiced. The cases cited by the defendant are off point. In <u>United States v. Jones</u>, 570, F.2d 765 (8th Cir. 1978), the appellate court reversed and remanded a conviction for a physician who

---

[3] The United States does not recall the defendant objecting to the admission of the Azmat files. Regardless, the United States submits the Court did not commit error by allowing their admission.

was convicted of one count of unlawfully distributing Quaalude prescriptions to an undercover officer. In <u>Jones</u>, the defendant was charged with two violations of Title 21, United States Code, Section 841(a)(1), regarding two prescriptions written to undercover officers on two separate days. The district court, via Fed. R. Evid. 404(b), allowed the introduction of 478 non-charged prescriptions. These prescriptions were introduced on the government's theory that the defendant knew about Quaaludes because he had previously prescribed them 478 other times. The government did not introduce any proof that the 478 prescriptions were issued improperly. However, the government called police officers who testified that some of the 478 prescriptions were issued to people the officers thought were drug addicts, inferring that the prescriptions were unlawful. Most of the trial focused on the 478 prescriptions. The Court of Appeals reversed and remanded the case. The Court held that the district court erred in admitting the 478 prescriptions via a 404(b) other act theory because there was no evidence that the doctor acted unprofessionally in issuing the prescriptions. The Court held that that probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury. <u>Id</u>. at 769.

The case at hand differs significantly from <u>Jones</u>. In the case at hand, the defendant was charged with a conspiracy to dispense and distribute controlled substances, not two substantive counts. The conspiracy lasted a significant time and alleged the unlawful distribution of millions of milligrams of oxycodone, while in <u>Jones</u>, the substantive counts alleged only two dates. In the case at hand, the government introduced the files to prove the conspiracy and to prove overt acts outlined in the indictment. In <u>Jones</u>, the government introduced the prescriptions under 404(b). In the case at hand, the United States contended that all of the prescriptions by the defendant were unlawful and all of the patient files were relevant to prove this allegation.

Because Azmat's patient files were relevant to proving the elements of Count One of the Indictment, this Court did not abuse its discretion by allowing the admission as evidence. Because there was no error, this Court should deny the defendant's motion for a new trial.

Respectfully submitted,

*/s Karl I. Knoche*

Karl I. Knoche
Assistant United States Attorney
Georgia Bar No. 426624


*/s E. Greg Gilluly, Jr.*

E. Greg Gilluly, Jr.
Assistant United States Attorney
Tennessee Bar No. 019397

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that I have on this day served all the parties in this case in accordance

with the notice of electronic filing ("NEF") which was generated as a result of electronic filing in

this Court.

This 14th day of February, 2014.

Respectfully submitted,

*/s Karl I. Knoche*

Karl I. Knoche
Assistant United States Attorney
Georgia Bar No. 426624

Post Office Box 8970
Savannah, Georgia 31412
(912) 652-4422