## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **vs.** ) | |
| ) | |
| ) | No. CR413-028 |
| **NAJAM AZMAT,** ) | |
| ) | |
| Defendant. ) | |

### DEFENDANT NAJAM AZMAT'S SENTENCING MEMORANDUM REGARDING THE GUIDELINE FOR OXYCODONE

COMES NOW Defendant Najam Azmat and files this, Sentencing Memorandum Regarding the Guideline For Oxycodone and shows the Court the following:

### I. INTRODUCTION

As will be demonstrated below, the conversion ratio employed by the Sentencing Commission with regard to oxycodone is not based on empirical data and/or national experience, is arbitrary and capricious, does not exemplify the Commission's exercise of its characteristic institutional role, rests upon faulty assumptions and creates unfair sentencing disparities for similar conduct. As a result, this Court is free to vary from that guideline.

1

Also, as further detailed herein, because the drug quantity tables are tied to mandatory minimums that were not based on empirical data, or national experience, this Court may likewise vary from them.

District courts may impose sentences that vary from guideline ranges if they disagree with a particular Sentencing Commission policy. *Kimbrough v. United States*, 552 U.S. 85, 109-110 (2007); *United States v. Corner*, 598 F.3d 411 (7th Cir. 2010); *United States v. Merced*, 603 F.3d 203 (3d Cir. 2010); *United States v. Mitchell*, 624 F.3d 1023, 1030 (9th Cir. 2010); *United States v. Stone*, 575 F.3d 83, 89 (1st Cir. 2009), *United States v. Carr*, 557 F.3d 93, 106 (2nd Cir. 2009); *see United States v. Dossie*, 851 F.Supp. 2d 478 (E.D.N.Y. 2012) (sentencing a defendant in a drug trafficking case below the guidelines range where district court had underlying policy disagreement with the U.S.S.G. section 2D1.1 as a whole and holding that the district court's authority to vary is at its greatest where the offense guideline at issue is not the product of the Commission's empirical analysis and technical expertise).

In addressing the sentencing disparities in crack and powder cocaine, the Supreme Court acknowledged that the sentencing commission was established "to formulate and constantly revise national sentencing standards," and that, "in fulfilling this important institutional role," the Commission draws on a "capacity courts lack to base its determinations on empirical data and national experience,

guided by professional staff with appropriate expertise." *United States v. Diaz*, 2012 WL 322243, *3 (E.D.N.Y. Jan. 28, 2013) (quoting *Kimbrough*, 552 U.S. at 108-09). When an offense guideline is based on the Commission's analysis of empirical data and national experience, the advisory ranges it produces can fairly be said to "reflect a rough approximation of sentences that might achieve objectives of the [Sentencing Reform Act]." *Id*. In short, the courts should look more closely at sentences outside the applicable guidelines range where the Commission's assessment of a particular guideline imposed is supported by empirical data and national experience. However, where a variance is based on a policy disagreement with guidelines "not based on empirical data and national experience, and hence 'do not exemplify the Commission's exercise of its characteristic institutional role,'" appellate courts defer to the sentencing judge's reasonable policy disagreement with the guidelines. *Id*. (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007).

## II. ARGUMENT AND CITATION OF AUTHORITY

**A. The Guideline Conversion Ratio for Oxycodone Is Not Based on Empirical Data or National Experience, Is Arbitrary and Capricious, Does Not Exemplify the Commission's Exercise of Its Characteristic Institutional Role, and Creates Unfair Sentencing Disparities for Similar Conduct**

### 1. The Guidelines History Related to Oxycodone

The original version of the Sentencing Guidelines which the Commission sent to Congress on May 13, 1987 set oxycodone as directly equivalent to heroin for sentencing purposes. At the time, the equivalency tables used heroin as the conversion baseline instead of marihuana, but the ratio between marihuana and heroin was the same as it is today (1 gm heroin = 1 kg marihuana). "To determine these finer distinctions, the Commission consulted numerous experts and practitioners, including authorities at the Drug Enforcement Administration, chemists, attorneys, probation officers, and members of the Organized Crime Drug Enforcement Task Forces, who also advocate the necessity of these distinctions." 52 Fed. Reg. 18046, 18064. The original drug equivalency table submitted to Congress established that "1 gm of Oxycodone = 1 gm of Heroin," and "1 gm of Morphine = 0.5 gm of Heroin". *Id*. However, in October of 1987 the Commission altered these Guidelines with a series of "technical and conforming amendments" before they became effective. Among these amendments was a reduction in the oxycodone equivalency to match the morphine ratio. Therefore, effective November 1, 1987, 1 gram of oxycodone was equivalent to 0.5 grams of heroin. 52 Fed. Reg. 44674,

4

44694. The Commission explained that they used the sentences provided in, and derived from 21 U.S.C. 841(b)(1) as a primary basis for the guideline sentences. They noted, however, that because the statute "provides direction only for the more common controlled substances, i.e., heroin...The Drug Equivalency Tables...provide conversion factors for other substances, which the Drug Quantity Table refers to as 'equivalents' of these drugs." *Id*.

Although the Commission articulated no specific rational for this specific change, the November revisions were preceded with the following statement: "Since May 1, 1987, the Commission has conducted extensive clinical testing of the guidelines. Those sessions produced useful suggestions for clarifying and reorganizing the commentary."

This "extensive clinical testing" along with the "consult[ation with] numerous experts and practitioners" upon which they relied in formulating the equivalency ratios supported a reduction in the oxycodone equivalency. In light of the stark similarity between oxycodone and morphine and the relative danger of heroin, the affirmative reduction in oxycodone's equivalency ratio makes sense. This basic ratio stayed in place (although the method of baseline equivalency changed from heroin to marihuana) until it was refashioned in 2003.

Effective November 1, 2003, Amendment 657 to the Federal Sentencing Guidelines changed the drug equivalency conversion from "1 gm of oxycodone =

500 gm of marihuana" to "1 gm of oxycodone (actual) = 6700 gm of marihuana." Oxycodone (actual) was defined as "the weight of the controlled substance, itself, contained in the pill, capsule, or mixture." The Commission explained that the amendment addressed proportionality issues: "(1) because of the formulations of the different medicines; and (2) because different amounts of oxycodone are found in pills of identical weight."

The Commission's "solution" was to drastically increase oxycodone's equivalency ratio. It explained that "this equivalency keeps penalties for offenses involving 10 mg OxyContin pills identical to levels that existed prior to the amendment, substantially increases penalties for all other doses of OxyContin, and decreases somewhat the penalties for offenses involving Percoset." In the published minutes of the Commission's vote on this amendment, the Commissioners focused almost exclusively on the proportionality issue and ignored the drastically heightened equivalency ratio. *See* Minutes of the March 26, 2003 U.S.S.C. Public Meeting (http://www.ussc.gov/amendment-process/public-hearings-and-meetings/20030325-26/minutes-march-26-2003 ) (hereafter "March 26 Meeting"). The only reference to the increased Oxycodone penalties was an offhand remark by Chair Murphy that "members of Congress would be particularly interested in this amendment because the illicit drug market for oxycodone has grown." *Id*.

6

The Commission held no public hearing, reported absolutely *no* empirical data, and conducted absolutely *no* scientific studies, as to why the amendment wildly increased the drug equivalency for oxycodone.

Other than this comment from Chair Murphy - that it was a belief held by members of the Congress, there was no actual evidence offered to suggest that greatly increasing the penalty for oxycodone to 13 times greater than morphine was justified.

### 2. The Amended Oxycodone Equivalency Tables are Unreasonable and Arbitrary

There are several flaws with Amendment 657 and the current oxycodone sentencing policy. First, the equivalencies for morphine and codeine, drugs which are nearly identical to oxycodone, were not changed. Like oxycodone, morphine and codeine are Schedule II opioid analgesics with very similar chemical structure and clinical use. *See* AMDG, Interagency Guideline on Opioid Dosing for Chronic Non-Cancer Pain, 2010 Update, p. 4, available at:

http://www.agencymeddirectors.wa.gov/Files/OpioidGdline.pdf.

Morphine in particular is a close equivalent to oxycodone for pharmaceutical and pain management purposes. Both oxycodone and morphine are "selective µ-opioid receptor agonists," which means that oxycodone has a similar potency for dependence and addiction as morphine. *See* Trescot, Datta, Lee, Hansen, *Opioid Pharmacology*, Pain Physician, Vol. 11, Issue 2S, March 2008, pp. 133-153. While

7

morphine and oxycodone utilize the same mechanism of action as other opioids, oxycodone has a shorter plasma half-life than an equivalent dose of morphine (it does not last as long). *See* A. O. Gallego, "Oxycodone: A Pharmacological and Clinical Review," Clinical and Translational Oncology, Vol. 9, No. 5, May 2007.

Oxycodone was initially developed to retain the analgesic effects of morphine and heroin with less dependence. To some extent, this was achieved, as studies found that both the strength and length of oxycodone's analgesic effects are less than that of heroin or morphine. *See* OxyContin Addiction Addressed by Tablet Redesign, Drug Addiction Treatment, found at:

http://www.drugaddictiontreatment.com/types-of-addiction/prescription-drug-addiction/oxycontin-addiction-addressed-by-tablet-redesign/ ; Eija Kalso, Oxycodone, Journal of Pain and Symptom Management, Vol. 29, No. 5S, May 2005, § 47 - S56.

The drugs are so similar that disparate treatment is not warranted. Scientific studies have placed oxycodone and morphine at the equi-analgesic ratio of anywhere between 1:1 and 2:1 depending on timing of the dosing. *See United States, ex rel. Mark Radcliffe v. Purdue Pharma L.P.*, 582 F.Supp.2d 766, 769 (W.D.Va. Oct. 14, 2008) (citing Agency for Health Care Policy & Research, Public Health Serv., U.S. Dept. of Health & Human Servs., Clinical Practice Guideline: Acute Pain Management: Operative or Medical Procedures and Trauma, app. C2 (Feb.1992);

United States Pharmacopeia-Dispensing Information 2238 tbl. 2 (16th ed 1996); Robert G. Twycross, Opioids, in Textbook of Pain 943, 953 tbl. 49.7 (Patrick D. Wall & Ronald Mezack, eds.3d ed. 1994)). The similarity of these drugs is borne out by physician opioid conversion tables, which show that oxycodone and morphine have a similar medical equivalency gram for gram. *See* Interagency Guideline on Opioid Dosing for Chronic Non-Cancer Pain, p. 1 7.

Studies of the clinical application of both oxycodone and morphine have shown little clinical distinction but indicate that morphine could have more serious side effects and be less safe. A study published by the Department of Anesthesia Intensive Care Medicine and Pain Therapy at La Sapienza University in Rome Italy looked at over 15 different clinical studies dealing with the clinical use of oxycodone and other analgesic medicines specifically noted the similarities between morphine and oxycodone as well as the greater risk associated with morphine. *See* F. Coluzzi, C. Mattia, Oxycodone: Pharmacological Profile and Clinical Data in Chronic Pain Management, Minerva Anestesiol, Vol.71:451-60 (2005); *see also* Gallego, *supra*, (Both studies finding that side effects such as nausea and hallucinations are more prevalent with morphine than oxycodone).

Secondly, the Commission's decision to set one gram oxycodone (actual) as equivalent to 6700 grams marihuana is not reasonable. The Commission provided no evidence that oxycodone, as compared to morphine is more dangerous when

9

diverted from clinical use to abuse. Lacking such findings, it is fair for this Court to question the appropriateness of this discrepancy in the equivalency ratios, since no other opiate equivalencies were changed by Amendment 657 and oxycodone was altered so it is now sentenced 13 times higher than morphine which it had been equal to for purposes of offense level calculation for the previous 16 years!

If the Commission made the changes contained in Amendment 657 because it had evidence that opioid analgesics were more dangerous than previously believed, they should have altered the equivalency for a number of other drugs. This did not occur because no such evidence was presented in support of Amendment 657.

An examination of the Commission materials associated with Amendment 657 reveals that there was no explanation given for why oxycodone was treated differently than morphine or codeine.  Therefore, the Commission's decision to single out oxycodone when setting the new equivalency table has no reasonable basis. Accordingly, this Court may disregard that Amendment and the drug equivalency table.

### 3. The Oxycodone Guidelines Result in Sentencing Ranges that Overstate the Seriousness of the Offense

Amendment 657 has the effect of penalizing oxycodone up to 6.7 times more severely that heroin and up to 13.4 times more severely than morphine. The treatment reflects an unsound judgment as to the relative danger of oxycodone abuse compared to these other substances. In a press release dated March 27, 2003, the

Commission stated that they had voted to "increase substantially the penalties for oxycodone trafficking...hop[ing] that this enhanced penalty [would] help deter any further increase in the abuse of this drug and serve to punish appropriately those criminals engaged in its illegal trafficking." The Commission, however, did not conduct a study or otherwise engage in appropriate fact finding to conclude that the new oxycodone guidelines were rationally proportional to the harm caused. Because the resulting guideline is not based on "empirical data and national experience," it "does not exemplify the Commission's exercise of its characteristic institutional role," and it is not an abuse of discretion to conclude that it yields a sentence that is greater than necessary even in a "mine-run case." *Kimbrough*, 128 U.S. at 575.

This unreasonableness is particularly acute when the oxycodone guideline is compared to the heroin guideline. This Court can draw on its own experience that oxycodone is much less dangerous to use, and oxycodone trafficking is much less violent and destructive than heroin trafficking. Heroin is a Schedule I drug with no approved medical use. The National Institute on Drug Abuse (NIDA) has reported that Heroin is the most abused and the most rapidly acting of the opiates. *See* NIDA Research Report, Heroin: Abuse and Addiction, Revised 2005, available at http://www.ehd.org/health_heroin_6.php. Moreover, in 2004, the year after the oxycodone amendment took effect, there were 215,000 heroin related visits to hospital emergency room, compared to 51,000 for oxycodone. *See* Drug Abuse

11

Warning Network, 2004 Selected Tables of National Estimates of Drug-Related Emergency Department Visits,

http://www.samhsa.gov/data/2k9/DAWN/ED2004/2004EDTables.pdf.

The drug equivalency table in 2D1.1 sets one gram of heroin equivalent to 1,000 grams of marihuana. This proportion is 6.7 times **less** than the current oxycodone equivalency, a proportion that becomes even more pronounced when taking dose equivalency into account since heroin doses are smaller than oxycodone doses.

Heroin is associated with dangerous drug traffickers who funnel money to violent foreign cartels which the DEA have linked to global terrorism. In Congressional testimony, the DEA stated that the opium and heroin industry in Afghanistan has provided hundreds of millions of dollars to the Taliban and other terrorist organizations, money which fuels armed conflicts, insurgencies, and terrorism against innocent people. *See* March 3, 2010 Statement of Anthony P. Placido, Assistant Administrator for Intelligence, United States Drug Enforcement Administration, Before the House Oversight and Government Reform Subcommittee on National Security and Foreign Affairs; Karen P. Tandy, DEA Administrator, Testimony before the House Committee on International Relations, February 12, 2004.

Oxycodone on the other hand, is a pharmaceutically produced controlled substance, which doesn't carry the same level of drug trafficking violence or association with terrorism. Since the illicit use and distribution of oxycodone doesn't impact public safety as dramatically as heroin, it shouldn't be penalized more severely at sentencing.

Indeed, it should not be penalized more severely than the most analogous Schedule II opioid analgesic: morphine. The fact that the Commission did not conduct a sentencing impact study prior to passing Amendment 657 is particularly troubling. When acting in their "institutional role," it should be the Commission's goal to fashion sentences which are based on "empirical data and national experience." *Kimbrough*, 128 U.S. at 575.

Compare the fact that the Commission didn't consult any empirical data when revising the oxycodone guidelines with the study that accompanied the study concerning public perceptions of sentencing guidelines for heroin. That study found that for heroin, "the distribution of survey preferences was centered around the guideline range; roughly equal proportions (between 45% and 47%) of survey respondents indicated punishment preferences either above or below the range." U.S.S.C., Just Punishment: Public Perceptions and the Federal Sentencing Guidelines, 1993-1994. These results imply that from a "national" perspective, the American people believe heroin sentences are roughly appropriate. This in spite of

the fact that heroin causes the most opioid related deaths, fuels violence and feeds funding for international terrorists. It would strain credulity to believe that "empirical data and national experience" demand a harsher penalty for a significantly less abused, less habit forming, slower acting, and less socially destructive opiate like oxycodone.

Similarly, the Commission recently surveyed district judges, and asked them if the guideline ranges were generally appropriate for several types of offenses. For oxycodone, 29 percent of the judges who responded viewed the guidelines as "too high." U.S.S.C. Results of Survey of United States District Judges: January 2010 through March 2010, Table 8. Approximately the same number (32%) found the heroin guideline too high, notwithstanding how much lower it is than oxycodone. *Id*.

In conclusion, statistical data, even from the Commission itself confirm that the Sentencing Commission was not exercising sound, reasoned sentencing judgment when it enhanced oxycodone penalties. Further, a comprehensive look at the development of oxycodone and other similar opioid substances show that the guidelines create sentencing disparities that are unwarranted and unjust under careful comparative analysis of these substances and the offenses concerning the use and abuse of these substances. The Commission's explanation for Amendment 657 dealt exclusively with their attempt to address a drug problem. They did not offer a

justification for the severe increase in penalties for moderate and high dose oxycodone pills. The oxycodone guideline does not deserve judicial deference in following Congress's directive that sentences be sufficient, but not greater than necessary to satisfy the goals of sentencing.

**B. The Drug Tables Are Not Based Upon Empirical Data, or National Experience and are Unreasonable and Arbitrary**

In *U.S. v. Diaz*, 2013 WL 322243 (E.D.N.Y. 2013), Judge Gleeson in a detailed opinion noted how the historic rise in the incarceration rate of non-violent drug offenders has not simply been due to the mandatory minimum sentencing laws, but also been due in part to the Sentencing Commission's abdication of its own responsibilities.

Judge Gleeson points to a pivotal moment in sentencing policy which has thus far generated too little public attention. When the Sentencing Commission was established in 1984 to promote uniformity in sentencing, it was directed by law to craft new Guidelines by examining past sentences imposed for various federal offenses – the collective wisdom and experience of judging. But while the Commission was crafting its initial set of Sentencing Guidelines, Congress passed a new crime law in 1986, creating new mandatory minimums for certain drug offenses – the Anti-Drug Abuse Act of 1986. *Diaz*, at *1-2.

These mandatory minimum sentences were, as Congress itself noted, aimed at high-level dealers, but as Judge Gleeson notes, the Sentencing Commission then

15

made a policy decision to throw past experience out the window, and tailor its new drug Guidelines instead so that they mirrored Congress' arbitrarily-chosen 1986 minimum penalties (including the 100-to-1 crack-to-powder cocaine ratio now widely recognized as irrational). Decades of past drug sentences were then simply ignored, and the 1986 Act's numbers were substituted and used instead. But these new minimums were meant to apply only to high-level dealers – not to also bend upward the sentencing ranges imposed on players with quantities below these stated, threshold amounts. *Diaz*, at \*4-6.

In 2004 the Commission's fifteen-year report to Congress had these words for the original Commission's failure to discuss why it extended the "quantity-based" approach of the ADAA across the entire spectrum of drug trafficking sentences: "The drug trafficking guideline ... had the effect of increasing prison terms far above what had been typical in past practice, and in many cases above the level required by the literal terms of the mandatory minimum statutes." *See* U.S. SENTENCING COMM'N, FIFTEEN YEARS OF GUIDELINES SENTENCING: AN ASSESSMENT OF HOW WELL THE FEDERAL CRIMINAL JUSTICE SYSTEM IS ACHIEVING THE GOALS OF SENTENCING REFORM 49 (2004) [hereinafter FIFTEEN YEAR REPORT ] . That Report also noted that "In addition to linking the drug amounts in the statutes to guideline ranges at the five-and ten-year levels, the Drug Quantity Table extends

the quantity-based approach across 17 different levels falling below, between, and above the two amounts specified in the [ADAA]." *Id.*

What resulted, as Judge Gleeson explains, is a drug sentencing scheme that unduly skews sentences across the board based on attributed quantity amounts rather than the defendant's role in the offense, financial interest, or other meaningful factor. *Diaz*, at *6-8. . Minor players received guideline sentences not tied to actual culpability, but with a myopic view toward a sentence driven almost exclusively by drug quantity. *Diaz*, at *12. And for over t w o d e c a d e s our federal prisons have filled with low- or mid-level drug offenders – the type easily replaced on the streets, with crime rates largely unaffected.

This nation's judges have been telling the Commission to de-link the drug trafficking offense guideline from those harsh mandatory minimums and to reduce the sentencing ranges. *Id.* at *9. In order to appreciate that the quantity driven sentences are out of whack, courts have begun to look at what other judges are doing with the guidelines. Those decisions in oxycodone cases are illustrative for purposes of demonstrating how far out of whack the guidelines are. In 2013 the Sentencing Commission's own Quick Facts shows that only about thirty percent of oxycodone offenses are within the guidelines! Importantly, the rate of non-government sponsored, below guideline sentences was 31.1% in 2012 and 28.6% in 2013 with an average reduction in 2013 of 46.5%! See 2012 Quick Facts

attached as Exhibit A and the 2013 Quick Facts attached as Exhibit B.

Judge Gleeson's *Diaz* opinion is an extraordinarily well-researched opinion, from a former federal prosecutor, dissecting how our system has strayed from the rational, and come to be so different from what it once was. He calls for moving from our present sentencing scheme, largely based on attributed drug quantity, to one based far more on a defendant's role- in-the-offense and criminal history, with Guideline quantity attributions immediately reduced by one-third, so that federal drug sentencing can return to its historical norms.

As Judge Gleeson poignantly argues, without a rational, normative based sentencing system, the unnecessarily punitive drug guidelines have real human costs: "children grow up, loved ones drift away; employment opportunities fade; parents die." *Id.*, at 18.

Since the drug quantity guidelines were not based upon empirical data, or national experience, this Court is authorized to vary from that guideline.

### III. CONCLUSION

WHEREFORE, based upon all of the reasons and citations set forth herein, Dr. Azmat respectfully submits that the sentence set forth in the Pre-Sentence Report is greater than necessary, and that this Court is authorized to vary from the proposed guideline.

Respectfully submitted, this 30th day of July, 2014.

                                           s/ Thomas A. Withers, Esq._____
                                           Thomas A. Withers, Esq.
                                           Georgia Bar Number: 772250
                                           Attorney for Dr. Najam Azmat

GILLEN, WITHERS & LAKE, LLC
8 East Liberty Street
Savannah, Georgia 31401
Telephone: (912) 447-8400
Facsimile:   (912) 629-6347
E-Mail: Twithers@gwllawfirm.com

## **CERTIFICATE OF SERVICE**

This is to certify that I have on this day served all parties in this case in accordance with the notice of electronic filing ("NEF") that was generated as a result of electronic filing in this Court.

This the 30th day of July, 2014.

s/ Thomas A. Withers, Esq._____
Thomas A. Withers, Esq.
Georgia Bar Number: 772250
Attorney for Dr. Najam Azmat

GILLEN, WITHERS & LAKE, LLC
8 East Liberty Street
Savannah, Georgia 31401
Telephone: (912) 447-8400
Facsimile:   (912) 629-6347
E-Mail: Twithers@gwllawfirm.com