1

1    THE UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF GEORGIA
2              SAVANNAH DIVISION

3

4    UNITED STATES OF AMERICA,        :
                                       :
5      v.                             :
                                       :   CASE NUMBER CR-4:13-28-04
6    NAJAM AZMAT,                      :
                                       :
7        Defendant.                    :
     _____

8

9

10

11

12

13            TRANSCRIPT OF SENTENCING HEARING
       BEFORE THE HONORABLE WILLIAM T. MOORE, JR.
14              United States Courthouse
                   125 Bull Street
15               Savannah, Georgia
                  August 6, 2014
16

17

18

19

20
     COURT REPORTER: Victoria L. Root, CCR
21                   United States Court Reporter
                     Post Office Box 10552
22                   Savannah, Georgia  31412

23

24
        *Proceedings recorded by mechanical stenography.*
25      *Transcript produced by computer-aided transcription.*

2

1                         A P P E A R A N C E S

2

3        FOR THE GOVERNMENT:

4                 KARL IRVING KNOCHE, Esquire
                  Assistant United States Attorney
5                 Post Office Box 8970
                  Savannah, Georgia  31412
6                 (912) 201-2573

7

8        FOR THE DEFENDANT:

9                 THOMAS A. WITHERS, Esquire
                  Gillen, Withers & Lake, LLC
10                8 East Liberty Street
                  Savannah, Georgia 31401
11                (912) 447-8400

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                            I N D E X

2

3                                                                Page

4    I.     PRELIMINARIES . . . . . . . . . . . . . . . .      4

5    II.    FINDINGS OF FACT AND CONCLUSIONS OF LAW . . . . .   20

6    III.   WITNESSES FOR THE DEFENDANT

7           1.  NABIL AZMAT
                Direct Examination by Mr. Withers . . . . .     22
8               Cross-Examination by Mr. Gilluly. . . . . .     28

9           2.  MUHAMMAD AKRAM
                Direct Examination by Mr. Withers . . . . .     31
10              Cross-Examination by Mr. Gilluly. . . . . .     34
                Redirect Examination by Mr. Withers . . . .    40
11
            3.  CHRISTOPHER L. RAY
12              Direct Examination by Mr. Withers . . . . .     43
                Cross-Examination by Mr. Gilluly. . . . . .     47
13
     IV.    ARGUMENT BY MR. KNOCHE AS TO SENTENCE . . . . . .   49
14
     V.     ARGUMENT BY MR. WITHERS IN MITIGATION OF
15             SENTENCE. . . . . . . . . . . . . . . . . . .    53

16   VI.    DEFENDANT'S STATEMENT TO THE COURT. . . . . . . .   58

17   VII.   PRONOUNCEMENT OF SENTENCE . . . . . . . . . . . .   86

18   VIII.  CERTIFICATE OF REPORTER . . . . . . . . . . . . .   95

19

20                             -oOo-

21

22                      GOVERNMENT'S EXHIBITS

23

24   NUMBER        IDENTIFICATION                          ADMITTED

25   S-1           Order of revocation from Kentucky          17

4

1          P R O C E E D I N G S

2          (Call to order at 2:59 p.m)

3          THE COURT:  Good afternoon.

4          MR. KNOCHE:  Good afternoon.

5          MR. WITHERS:  Good afternoon.

6          THE COURT:  Call the case, please, Ms. Bodaford.

7          COURT CLERK:  Yes, Your Honor.

8          The Court calls the case of *United States of America*

9    *v. Najam Azmat*, Case Number CR-4:13-28-4.

10          Representing the Government is Carl Knoche and Greg

11   Gilluly, Jr.  Representing the defendant is Thomas Withers.

12   This case is called for sentencing.

13          MR. KNOCHE:  Government is ready, Your Honor.

14          MR. WITHERS:  Ready for the Defense, Your Honor.

15          THE COURT:  Mr. Withers, if you and Mr. Azmat would

16   come to the lectern, please.

17          MR. WITHERS:  (Complied).

18          THE COURT:  Mr. Najam Azmat, you appeared before

19   this Court on January 13, 2014, accompanied by your attorney,

20   Mr. Thomas Withers, for a Rule 11 proceeding -- excuse me.

21   Take that back -- accompanied by your attorney, Mr. Thomas

22   Withers, for a jury trial.

23          On January 17, 2014, you were found guilty of Count 1

24   of a superseding indictment charging you with conspiracy in

25   violation of 21, United States Code, Section 846; Counts 2

5

through 13, Counts 15 through 17, Counts 19 through 25,
Count 27, Count 28, Counts 30 through 50 of a superseding
indictment charging you with unlawful distribution of
Schedule II controlled substances in violation of 21, United
States Code, Section 841(a)(1); Counts 14, 26, and 29 of the
superseding indictment charging you with unlawful dispensation
of Schedule IV controlled substances in violation of 21, United
States Code, Section 841(a)(1); Count 18 of the superseding
indictment charging you with unlawful distribution of
Schedule III controlled substances in violation of 21, United
States Code, Section 841(a)(1); and Count 52 of the superseding
indictment charging you with conspiracy to launder monetary
instruments in violation of 18, United States Code, Section
1956(h).

      Subsequent to the jury's verdict, the Court directed
the United States Probation Office to conduct a presentence
investigation and, upon completion, to file a report and to
furnish you and your counsel and counsel for the Government
with a copy of that report.

      I'll ask you at this time, Mr. Azmat:  Have you had
an opportunity to read and discuss the presentence report and
any addendum with your lawyer?

      THE DEFENDANT:  Yes, I have, Your Honor.

      THE COURT:  And do you or Mr. Withers now have any
objections to either the factual accuracy of the report or to

6

1    the probation officer's application of sentencing guidelines?

2              MR. WITHERS:   Your Honor, if I may --

3              THE COURT:   Yes, sir.

4              MR. WITHERS:   -- we do have objections that we have

5    filed and supplied to the probation office.   She has addressed

6    those objections.   I would want to be heard, really, on only

7    one of those objections.

8              THE COURT:   All right.   Let me ask you, before we

9    are heard on one of these objections, Mr. Withers:   The

10   addendum to the PSI, on Page 5, says that Dr. Azmat objects to

11   the conclusions that there are no factors which warrant a

12   departure, and it says "Paragraph 84."

13             The PSI which addresses that that I have is

14   Paragraph 86, assuming we're talking about the same thing.

15             MR. WITHERS:   That's correct, Your Honor.

16             THE COURT:   Okay.   So it's Paragraph 86 in the PSI

17   that we're dealing with today that you're objecting to there?

18             MR. WITHERS:   With respect to issues concerning

19   departure, yes, sir.

20             THE COURT:   Okay.   All right.   What else do you wish

21   to be heard --

22             MR. WITHERS:   Judge, there are two errors.   And I've

23   spoken with Ms. Jacobs and Mr. Knoche about it.   I think,

24   actually -- and neither of which are particularly impactful at

25   the end of the day, but I think that the record does need to be

1    corrected.

2              Count 1, the PSI lists that as a maximum term of

3    imprisonment of not more than 20 years.  I think, because

4    Count 1 was a general verdict and there's a Schedule IV

5    narcotic controlled substance, that the maximum term for

6    Count 1 would be 5 years.  And I just discovered that

7    yesterday.  I brought it to Ms. Jacobs' attention today.

8              THE COURT:  All right.

9              MR. WITHERS:  Additionally, Count 13 sets forth --

10   excuse me.  Not Count 13.  Paragraph 13 sets forth that

11   Dr. Azmat treated 17 patients per day.

12             Ms. Jacobs, I think, confirmed with Agent Sikes

13   yesterday that the total number of patients seen was 196 and

14   the total number of patients who came into the clinic were 246

15   during that 19-day period.

16             THE COURT:  So the total patients that he treated

17   were --

18             What do you contend?

19             MR. WITHERS:  I think it was 196.

20             THE COURT:  All right, sir.  Anything else?

21             MR. WITHERS:  No, Your Honor.

22             Then I would turn to the objections that we have

23   brought forth, and those deal with the issue of relevant

24   conduct.

25             THE COURT:  All right.  Before we get to the

8

1  objections, let me ask --

2          Mr. Knoche, you heard the -- Counsel's statement

3  regarding Count 1 as far as the maximum penalty and Count 13

4  regarding the number of patients of 196.

5          What is the Government's position there?

6          MR. KNOCHE:  Your Honor, we'll concede that Counsel

7  is correct as to Count 1, that that should be a 5-year maximum

8  because of the Schedule IV and because the -- there was not a

9  special finding by the jury concerning the Schedule II drug.

10         I'll take responsibility for not preparing a special

11 verdict form as to Count 1.  It will not affect the overall --

12         THE COURT:  Yeah.

13         MR. KNOCHE:  -- finding of the Court

14         THE COURT:  It doesn't affect the overall, but --

15         MR. KNOCHE:  But we concede that --

16         THE COURT:  But you agree with that?

17         MR. KNOCHE:  Yes.

18         THE COURT:  Okay.  Now, how about on the number of

19 patients in Count 13?

20         MR. KNOCHE:  I believe we agree there were 196

21 patients treated, and I believe that's what Mr. Withers just

22 proffered to the Court.  The total number of patients who

23 signed in to East Health Center during the time that Dr. Azmat

24 was employed there was 239.

25         THE COURT:  But 196 --

9

1          MR. KNOCHE:  Were actually seen and treated.

2          THE COURT:  Seen and treated?

3          MR. KNOCHE:  Yes, sir.

4          THE COURT:  Okay.  All right.  Then I'll ask the

5     probation officer, then, to amend the PSI and -- on Count 1

6     regarding the 5 years and also amend the PSI on Count 13 that

7     there were 196 patients that were seen and treated.

8          All right.  Now, go ahead, Mr. Withers.

9          MR. WITHERS:  Your Honor, my next objection addresses

10    the attributable conduct issue, which is set forth at Pages 2

11    and 3 of the addendum to the PSI.

12          First, I submitted a memorandum yesterday that sets

13    forth the *Chube*, C-h-u-b-e, case from the 6th Circuit,

14    Your Honor.  It dealt with a allegation -- or case of unlawful

15    prescribing by a physician.  I think that case is instructive.

16    And we would argue that there's no reliable evidence that

17    every prescription written by Dr. Azmat was for an unlawful or

18    improper purpose and, therefore, included within the

19    guidelines.

20          Dr. Kennedy, the Government's expert, reviewed

21    patient files for, I believe, 25 patients, Counts 2 through 50.

22          And if the Court recalls when Agent Sikes testified

23    the afternoon, I think, of the first day of trial, he

24    introduced into evidence Government Exhibit 26, which were a

25    handful of patient files that were strikingly inconsistent with

1   the Government's theory.

2           The *Chube* case that we think is instructive here, the

3   Court said where there are indications in patient files, for

4   instance, in that case, notes that indicated the doctor was

5   trying to wean patients off medications, number one, and that,

6   number two, there were prescriptions that supported that, that

7   that would cut against the argument by the Government in that

8   case and here that every prescription written was unlawful.

9           The 6th Circuit commented that the facts and

10  circumstances surrounding each of the prescriptions that render

11  it unlawful have to be reviewed, and it's not sufficient for

12  the Government to rest on the general proposition that every

13  prescription is without a legitimate medical need.

14          Secondly, Your Honor, I set forth in a sentencing

15  memorandum that I filed last week, because I wanted to make

16  certain it got to the Court early enough, that addressed the

17  issue of the problems with respect to the conversion tables

18  that deal with oxycodone.  And as set forth in those papers,

19  Judge, the Court can impose a variance where there is a policy

20  disagreement by the Court with the sentencing commission.  And

21  that's the *Kimbrough* case.

22          The case -- that *Kimbrough* case talks about empirical

23  data, national experience, and what have you that the

24  sentencing commission was supposed to take into consideration

25  in crafting the guidelines.

1          Originally, as we set forth, 1 gram of oxycodone was

2     equal to .5 grams of heroin.  The drug equivalency table had

3     1 gram of oxycodone equal to 500 grams of marihuana.  In 2003,

4     1 gram of oxycodone was increased remarkably -- or sharply to

5     6,700 grams of marihuana.  So that 1 gram of oxycodone equals

6     6,700 grams of marihuana.

7          Heroin, on the other hand, is equal to 1,000 grams of

8     marihuana.  So heroin is punished by the guidelines, under the

9     drug equivalency tables, far less than -- 6.7 times less than

10     the -- than oxycodone.

11          Interestingly, there were no public hearings; there

12     was no empirical data; and it wasn't based upon national

13     experience.  For instance, when the commission first was given

14     the task of establishing guidelines, one of the things that

15     they did was interview judges, practitioners, scientists for

16     the purpose of establishing kind of a national experience with

17     various drugs.  That didn't occur with respect to that 2003

18     amendment, 657, I think it is.

19          The close equivalent, as set forth in our papers,

20     for oxycodone would be morphine, and the guidelines, however,

21     didn't change with respect to morphine.  For the past

22     16 years -- or the previous 16 years, they've been treated

23     exactly the same.

24          With respect to the issue of heroin, Your Honor, I

25     think the Court, through its own experience, knows that heroin

1   is a Schedule I drug with no medical use; that heroin -- there

2   is an inherent danger with respect to heroin in terms of

3   violence, terrorism, international money laundering, and

4   drug trafficking violence that's not present with respect to

5   oxycodone.

6          So I think -- excuse me.  I think that the Court can,

7   therefore, comfortably conclude that the sentencing commission

8   was not basing Amendment 657 on empirical data or national

9   experience in terms of increasing that drug equivalency from

10  .5 grams equal -- up to 1 gram of oxycodone equals 6,700 grams

11  of marihuana.

12         That would conclude my remarks in that respect,

13  Your Honor.

14         THE COURT:  Let me state, Mr. Withers, that I have

15  read your sentencing memorandum regarding the guidelines

16  concerning oxycodone, and I've also read the sentencing

17  memorandum that you filed which dealt with issues outside of

18  that.  I've read both of those and all the attachments to that.

19         In all respect, I cannot comfortably conclude that

20  the sentencing commission has made some error with the

21  guidelines as to oxycodone.  Judge Gleeson, who wrote the

22  opinion that you relied on most heavily, I know.  I have a lot

23  of respect for him.  I think he's a fine judge.  There are

24  other judges that I have a lot of respect for, but I don't

25  always agree with them.  They don't always agree with me.

1              You point out that at the time of the amendment -- I

2    believe you -- 16 years ago, that Judge Murphy was the chairman

3    of the sentencing commission.  I know Judge Murphy.  I worked

4    closely with Judge Murphy when I was on the Criminal Law

5    Committee of the Judicial Conference of the United States.

6    Later, Judge Hinojosa came after Judge Murphy had served many

7    years.  He saw no need to change it, and the guideline has not

8    been changed.

9              I know from experience that those people on the

10   sentencing commission take very seriously their duties in

11   studying what guidelines should be and when amendments should

12   be made and when changes should be made.  I know that there is

13   a large staff in the AO's office and assigned to the sentencing

14   commission that works through these issues.  They have

15   hearings.  I've testified at some of their hearings.

16             So while I appreciate your argument, I cannot

17   comfortably conclude that your argument is correct.

18             But what does the Government wish to say, Mr. Knoche?

19             MR. KNOCHE:  Your Honor, we wish to rely on the

20   black letter law of the guidelines that 1 gram of oxycodone

21   is equivalent to 6,700 grams of marihuana.  I think, if the

22   Court follows that, the sentence would be what would be as

23   conceived by the sentencing commission.

24             THE COURT:  Well, as you know, I'm not bound by that.

25             MR. KNOCHE:  No, sir.

14

1          THE COURT:  As Mr. Withers points out, you know, if

2     a Court has serious disagreements with the findings of the

3     sentencing commission and the guidelines, then the Court has it

4     within its purview to disagree and to depart from that or to

5     vary from that.

6          So -- but as I've said, I can't, as Mr. Withers said,

7     comfortably conclude that the guidelines are wrong in this case

8     and that the sentencing commission is wrong in this case.

9          MR. KNOCHE:  That would be the Government's view as

10    well, your Honor.

11         THE COURT:  All right.  What else, Mr. Withers?

12         MR. WITHERS:  Your Honor, that's all with respect to

13    objections, both factually and to the application or relying on

14    what I've written otherwise.

15         THE COURT:  Does the probation officer wish to say

16    anything regarding any of these objections?

17         PROBATION OFFICER JACOBS:  Your Honor, I would like

18    to note that the statutory fine as to Count 1 will be reduced

19    from $1 million to $250,000.  And the term of supervised

20    release would also be affected.  That would change from at

21    least 3 years' supervised release to at least 1 year of

22    supervised release.

23         THE COURT:  So the fine is going to change to what?

24         PROBATION OFFICER JACOBS:  $250,000.

25         THE COURT:  All right.  Let's back -- the supervised

1    release would then be what?

2              PROBATION OFFICER JACOBS:  It would be reduced to at

3    least 1 year of supervised release.

4              THE COURT:  Now, the PSI we're dealing with today

5    says the fine is 20,000 to 47,000,000?

6              PROBATION OFFICER JACOBS:  Yes, sir.

7              THE COURT:  Okay.  And that would be changed to?

8              PROBATION OFFICER JACOBS:  $20,000 to 46,000 -- I

9    mean, 46,250,000.

10             THE COURT:  46,250-?

11             PROBATION OFFICER JACOBS:  Yes, Your Honor.

12             THE COURT:  All right.  Anything else?

13             And the fine is -- stays the same?

14             PROBATION OFFICER JACOBS:  The term of supervised

15   release stays the same as to all of this.  It's still at least

16   3 years' supervised release.  But the fine range is reduced

17   to --

18             THE COURT:  Okay.

19             PROBATION OFFICER JACOBS:  -- from 20,000 --

20             THE COURT:  From 20,000 to what we said?

21             PROBATION OFFICER JACOBS:  Yes, sir.

22             THE COURT:  Okay.  Do you have any comment about

23   that, Mr. Withers?

24             MR. WITHERS:  No, I don't, Your Honor.

25             One thing I did neglect, Your Honor, is we had raised

1   a 2D1.1 two-point reduction issue.  And Counsel presented me

2   with and we signed an agreement allowing that, if I could hand

3   that up, please.

4          I've reviewed that with Dr. Azmat.  I believe he

5   understands it, and he signed it.

6          THE COURT:  All right.  Let me ask you a question,

7   Dr. Azmat.  This sentencing agreement says that you have signed

8   and your counsel and counsel for the Government have signed,

9   which requests a two-level -- a lower two-level reduction from

10  the current guidelines.  And it states that you agree on the

11  record that you will not seek any further reduction under 18 --

12  under Title 18, United States Code, Section 3582(c) in the

13  event that the anticipated two-level reduction is, in fact,

14  adopted and made retroactive by the sentencing commission.

15         Is that your agreement, Dr. Azmat?

16         THE DEFENDANT:  Yes.  I've had an opportunity to

17  discuss it with Counsel.  And upon advice of Counsel, I did

18  sign that.

19         THE COURT:  All right.  Anything else regarding

20  objections, Mr. Withers?

21         MR. WITHERS:  No, Your Honor.

22         THE COURT:  Does the Government wish to make any

23  response regarding the objections, Mr. Knoche?

24         MR. KNOCHE:  Two things, Your Honor.  I would like

25  to tender an exhibit which is directly relevant to Exhibit --

1    to Paragraph 40 of the presentence report.  This would be the

2    order of revocation from Kentucky.  And it is largely in

3    rebuttal to the sentencing memoranda that Counsel submitted on

4    behalf of Dr. Azmat with a number of character witnesses

5    attesting to the quality of doctor and the character of the

6    doctor.

7           There are a number of findings from the Commonwealth

8    of Kentucky Board of Medical Licensure which I believe are

9    directly -- directly contradict that, and I would like the

10   Court to --

11          THE COURT:  What is that exhibit number?

12          MR. KNOCHE:  S-1, Your Honor.

13          THE COURT:  All right.  That's --

14          MR. KNOCHE:  I've marked it as S-1.

15          THE COURT:  It's admitted.

16          MR. KNOCHE:  And, Your Honor, as far as the relevant

17   conduct in the case, the Government does not rely on just the

18   general proposition that every prescription written by

19   Dr. Azmat was done for a -- outside the ordinary course of

20   medical practice and for a legitimate medical purpose.  The

21   Government relies on the evidence which the Court heard over

22   the course of 5 days of trial in this matter.

23          We heard from the organizers of the clinic.  They

24   testified clearly as to why this facility was located in

25   Savannah, Georgia -- or Garden City, why they opened up.  It

1   was strictly a money-making proposition, and it had come here

2   because of changes in the Florida law which made Florida less

3   hospitable to pill mills in South Florida.

4          And the organizers had experience with pill mills,

5   and they knew how to operate them, and they knew they were

6   money-making operations.  That's why they came here.  They did

7   not come here to provide legitimate medical treatment; only to

8   make money.

9          Your Honor, I'd ask you to keep in mind the

10  background and training of those people that you heard from,

11  the reasons why they chose Garden City, the manner in which

12  they recruited patients to come to the Garden City clinic;

13  going to rival pill mills, handing out flyers, directly

14  soliciting patients to come to Savannah where they could get

15  the drugs that they wanted from the doctor, whether it was

16  Dr. Azmat or others, working at the clinic.  They recruited

17  their doctor from a craigslist ad.  They paid the doctor in

18  cash at the end of every day.

19         Your Honor will remember the testimony concerning the

20  rules and regulations of the clinic:  Don't congregate.  Don't

21  smoke out back.  Watch how you park your car.  Back it in so

22  the license plates aren't so familiar.

23         You'll remember the testimony that the patients at

24  this clinic, from day one, came from all over the Southeast,

25  from Florida, from Kentucky.

1          Some of these witnesses testified very poignantly to

2     the amount of money they spent in pursuit of drugs to fuel

3     their drug addiction, Patricia Rohrer in particular.  I believe

4     she testified she went through over $35,000 of her savings

5     nest egg to fuel her oxycodone prescription -- her addiction.

6     Excuse me.  Keep in mind that many of these customers were

7     selling their drugs to other people, and there was testimony to

8     that.

9          A legitimate patient came to this clinic on day one

10     complaining of flu-like symptoms and was turned away by

11     Dr. Azmat, was not treated.  The only patients who were treated

12     were those seeking opioids.

13          The medical files themselves, they were very sparsely

14     populated with any medical information.  The only thing that

15     was required was an MRI less than 2 years old.  These MRIs came

16     from all over, Your Honor.  You'll remember they came from

17     Kentucky.  They came from Florida.  They were -- they came

18     from the same cluster of MRI facilities.  Some of them had

19     inconsistent dates and times of -- that the actual scans were

20     conducted.

21          The patients signed a consent to opioid therapy when

22     they signed in to East Health Center before the doctor would

23     even see them.  It was a forgone conclusion that the patients

24     at East Health Center would get narcotics prescribed to them,

25     and that's the reason they came and paid $300 cash per visit to

1    do so.   There was no insurance taken at the clinic.   Dr. Azmat

2    was typically paid in cash at the end of the business day,

3    $2,000 a day.

4         Your Honor, we think that -- when you consider all

5    those circumstances in their totality, that the Court should

6    find in favor of the probation officer's recommendation as to

7    relevant conduct, and that's the Government's request.

8         THE COURT:   The Court adopts the factual statements

9    contained in the presentence investigation report, to which

10   there are no objections as to the controverted factual

11   statements in Paragraphs 10, 13, 15, 16, 40, 61, and 62.   The

12   Court adopts the position of the probation officer stated in

13   the addendum.

14        Now, questions of guideline application have arisen

15   with respect to the conclusions contained in Paragraphs 13 and

16   17 dealing with drug quantity; Paragraphs 24 and 30 with the

17   base offense level; Paragraphs 26 and 35, the adjusted offense

18   level; Paragraph 36, the adjusted offense level for Group 1

19   and Group 2; Paragraph 39, the total offense level; and

20   Paragraph 71, the advisory guideline range.

21        After considering the objections raised in this case

22   and after considering all of the testimony during the trial and

23   the numerous exhibits that were admitted and reviewed by the

24   Court, the Court concurs with the findings in the presentence

25   report, including the addendum, with the exception of

1  Paragraph 86 -- or Paragraph, looks like, 8 of the addendum,

2  which refers to Paragraph 84, which addresses Paragraph 86,

3  which says that the probation officer concludes that there are

4  no factors which would warrant a departure in this case.

5           And the Court is of the opinion that it's up to the

6  Court to decide whether there are factors that warrant

7  departure or not, and I will make that decision.  But since

8  there was an objection to that, I do not concur with the --

9  with that finding, and I say that that's up to the Court to

10  make that determination.

11           The Court then determines that the applicable

12  advisory guidelines are a Total Offense Level 36, a Criminal

13  History Category I, 188 to 235 months of imprisonment, 1 year

14  of supervised release -- at least 1 year of supervised release,

15  a 20,000 to a $46,250,000 fine, no restitution, and a

16  $5,100 special assessment.

17           Now, Mr. Withers, do you wish to make any statement

18  or present any information in mitigation of sentence?

19           MR. WITHERS:  Yes, I do, Your Honor.  I have several

20  character witnesses.  I would like the Court to hear from just

21  a few, actually.

22           THE COURT:  Yes, sir.

23           MR. WITHERS:  And if I could, Your Honor, with

24  respect to the -- if I could ask for clarification with respect

25  to the consent agreement that we just passed up regarding the

22

1   additional two levels, is the Court then not going to accept

2   that, or is that included in . . .

3        THE COURT:   That's going to be included in my

4   sentence.

5        MR. WITHERS:   Okay.  All right.  I'm sorry.

6        Your Honor, I would ask Nabil Azmat to come forward,

7   please.

8        COURT CLERK:   Please remain standing.   Raise your

9   right hand to be sworn.

10                  (Witness sworn)

11        COURT CLERK:   You may be seated.

12        THE WITNESS:   Thank you.

13        COURT CLERK:   Please state your name, your occupation

14   and spell your first and last name for the record.

15        THE WITNESS:   Sure.  My full name is Nabil Azmat,

16   spelled N-a-b-i-l, last name A-z-m-a-t.  I'm in the IT field,

17   system engineer.

18                  NABIL AZMAT,

19   having been first duly sworn or affirmed, was examined and

20   testified as follows:

21                  DIRECT EXAMINATION

22   BY MR. WITHERS:

23   Q.   I'm sorry.  What's the nature of your employment, sir?

24   A.   I'm a system engineer with a company -- IT consulting

25   company.

23

Q.     And where do you work?

A.     I work for the company called Diebold.

Q.     And where is that?

A.     It's all over.  It's a multinational company.  I travel --
this is a company that takes care of all the banking and
financial industry's infrastructure.  I'm an engineer for that
company.

Q.     And as I understand it, Mr. Azmat, you've recently
transitioned into that job; is that right?

A.     That is correct.

Q.     And before that, what kind of work were you engaged in?

A.     I've been in IT consulting with an IT consulting company
right before this, and I was working as an IT consulting system
engineer once again.

Q.     And just for the Court's reference, you testified here,
I guess it was, a little over a year ago at the detention
hearing?

A.     That is correct.

Q.     And, sir, where are you living?

A.     I'm in Atlanta --

Q.     And how long --

A.     -- specifically Lawrenceville.  My address is 1075
Chandler Ridge Drive.  It still stays the same.

Q.     And how long have you been living up in the Atlanta area?

A.     I would say since 1998.

24

Q.    Now, your older brother is the defendant, Dr. Najam Azmat?

A.    That is correct.

Q.    You have children?

A.    I have four children.

Q.    Their ages, please, sir.

A.    The oldest is a daughter.  She's 9 -- 10 years old.  And there's a 9-year-old daughter and a son which is 5 years old and a 1-year-old son.

Q.    And you're married as well?

A.    Yes.

Q.    And your mother, Dr. Azmat's mother, lives where?

A.    She lives with me.

Q.    Is she present in court today?

A.    She is.

Q.    And has she recently had some health difficulties?

A.    She did, yes.

Q.    And what -- if you can, just give us a general nature of her health issues, please, sir.

A.    Sure.  She has -- she's a heart patient, and she has multiple problems going on.  She can barely walk a few steps. She has to be carried.  She has other problems like diabetes, and she sees a -- has some other chronic diseases.  She's going through those a little more severely for the past few months.

Q.    In the past, has Najam been active with respect to your mother's health and wellness?

A.   He has always been.  My mother always likes to call him before or after the appointment.  Obviously, being a family member, she trusts him more than anybody else, and he has been actively involved in every way.

Q.   And when did you come to the U.S.?

A.   I came in 1991.

Q.   And you came at Najam's assistance, request, help?

A.   Absolutely.  He did help me a lot getting settled in this country.  He helped me with education.  I was living with him. He helped me with anything and everything that a big brother would do.

Q.   '91 would have been the same year that he was naturalized?

A.   Yes, I believe so.

Q.   And when you moved here, where were y'all living?

A.   We were in New York.

Q.   And you actually lived with him?

A.   In the same house, yes.

Q.   Okay.  Did he help you with financial support?

A.   He helped me with everything, which includes financial support for sure, yes.

Q.   And did you go to college originally up in the New York area?

A.   I did, yes.

Q.   And, ultimately, where did you end up graduating from?

A.   Georgia State University in Atlanta.

1    Q.    And did Najam help you with respect to that transition as

2    a -- someone coming to the U.S. and gaining a foothold here in

3    the United States?

4    A.    Absolutely.  At every step, he was always there.  He was

5    always there for me.  And anything and everything that I

6    needed, he provided me.

7    Q.    Have y'all maintained a close family relationship over the

8    years?

9    A.    Absolutely, very close.

10   Q.    Have you been to his house and he to yours?

11   A.    All the time, I would say.

12   Q.    And his wife and sister-in-law and mother-in-law, they're

13   here in court as well?

14   A.    They are.

15   Q.    And as I -- you know his children well?

16   A.    Absolutely.

17   Q.    And have you observed Dr. Azmat, Najam, interact with his

18   family and his wife?

19   A.    Certainly, all the time.  Obviously, I learned a lot from

20   him, I mean, as a good father.  I learned a lot of skills,

21   a lot of love that he provides to his children.  He's been a

22   guiding force for me.  I've noticed him all the time with

23   family members.

24   Q.    And has Sameena, his wife, recently had to move from

25   Waycross to -- up to Atlanta?

1    A.    She did, yes.

2    Q.    And that was occasioned by Dr. Azmat's incarceration?

3    A.    That is correct.  The family has moved to Atlanta.   There

4    are family members over there.   There are more resources,

5    obviously.   The family is always close.   Now, the situation --

6    for the sake of the situation, they have moved, yes.

7    Q.    And I trust that issues and responsibilities that have

8    formerly been shouldered by Najam are coming to rest on other

9    family members?

10   A.    That is correct, yes.  We are there, and we are taking --

11   going to be taking much extra responsibility now.

12   Q.    Now, Najam and Sameena have a 17-year-old by the name of

13   Nausher?

14   A.    That's correct, yes.

15   Q.    And he is a special needs child?

16   A.    He is.

17   Q.    And have you seen Najam, Dr. Azmat, interact with his

18   special needs child?

19   A.    Yeah.   He has picked up the biggest responsibility, always

20   watching him.   He does take care of him, his medicine, what he

21   eats, what he does; always been interacting with him, taking

22   care of him in every possible way.

23   Q.    Has he been the primary caretaker with respect to Nausher

24   as he's grown up over the years?

25   A.    That is correct, yes.

1   Q.    What kind of father has Najam been to his three children?

2   A.    I would say he is an example for me and I'm pretty sure

3   for everybody else who gets to know him.  I've seen him

4   interacting with his children.  And, I mean, I would say I've

5   learned from him a lot.  He's an example.  He loves his kids.

6   The kids love him back.  As far as all the kids' needs, he

7   makes sure he knows his kids well, what they need, and does

8   fulfill in every possible way.

9   Q.    And in summary, Mr. Azmat, can you comment on the nature

10  and character of Najam Azmat.

11  A.    He's been a role model for me forever, always.  I've

12  looked upon him for advice anytime I need it.  In any difficult

13  time, I've always talked to him.  He's always discussed things

14  with me, given me the best advice.  Obviously, my father passed

15  away a few years ago, so he took upon a bigger role.  And I'd

16  say I'm lucky to be his younger brother.

17              MR. WITHERS:   Thank you, sir.  No further questions.

18              THE WITNESS:   Yes, sir.

19              MR. WITHERS:   Wait just a second.

20              THE COURT:   Any questions?

21              MR. GILLULY:   Yes, Your Honor.

22                          CROSS-EXAMINATION

23  BY MR. GILLULY:

24  Q.    Mr. Azmat, was your brother married before his present

25  wife?

1    A.    That is correct.

2    Q.    And he has children by another woman; is that correct?

3    A.    Correct.  He has one son, not children.

4    Q.    And you're familiar -- do you know that son's name?

5    A.    Yes.

6    Q.    What is his name?

7    A.    Numair.

8    Q.    And you're familiar that Dr. Azmat did not support that

9    son very well?

10   A.    For his financial difficulties, he might have.  But in his

11   heart, he has always made sure that his responsibilities are

12   fulfilled towards him.

13   Q.    But he was ordered to pay child support, and he didn't pay

14   child support; is that correct?

15   A.    Once again, I would say as far as financial difficulties,

16   it might have been the case.  I'm not absolutely familiar with

17   all of the financial transactions or what all of his

18   responsibilities were, but I know he's always wanted to fulfill

19   everything that he wanted to fulfill for him.

20   Q.    Are you aware that he lost his medical license for a

21   period of time for failure to pay child support for his son?

22   A.    I am familiar.

23   Q.    You are?

24   A.    (Nodded head).

25   Q.    And did you ever go to the East Health clinic?

30

1    A.   I did not.

2            MR. GILLULY:  Nothing further, Judge.

3            MR. WITHERS:  I have no further questions for this

4    witness.

5            THE COURT:  All right.  You can come down, sir.

6    Thank you.

7            THE WITNESS:  Thank you, sir.

8            MR. WITHERS:  Dr. Akram.

9            COURT CLERK:  Please remain standing.  Raise your

10   right hand to be sworn.

11                        (Witness sworn)

12           COURT CLERK:  You may be seated.

13           Please state your name, your occupation and spell

14   your first and last name.

15           THE WITNESS:  My name is Muhammad Akram,

16   M-u-h-a-m-m-a-d.  Last name is Akram, A-k-r-a-m.  And I'm a

17   physician, and I'm working for the last 15 years in Waycross,

18   Georgia.

19           COURT CLERK:  Thank you.

20                       MUHAMMAD AKRAM,

21   having been first duly sworn or affirmed, was examined and

22   testified as follows:

23                      DIRECT EXAMINATION

24   BY MR. WITHERS:

25   Q.   Dr. Akram, what kind of medicine do you practice?

1    A.    I'm board certified with internal medicine, but I do

2    outpatient clinic working for Mayo Clinic Health System.

3    Q.    And that's the Mayo branch in Waycross?

4    A.    In Waycross, yes, sir.

5    Q.    And, Dr. Akram, did you come to know Dr. Najam Azmat when

6    he moved to Waycross in 2005?

7    A.    Yeah.   End of 2004, I heard about him, but I met him

8    personally in 2005 when he came through the door.

9    Q.    Did you interact with him both with respect to your

10   profession and with respect to him personally as well?

11   A.    Yes.

12   Q.    And tell me a little bit about -- or tell the Court a

13   little bit about what you've witnessed with your -- with

14   respect to your observation of Dr. Azmat both personally and

15   professionally.

16   A.    He's -- personally, I feel that he is very well-qualified

17   surgeon.   He was the -- you know, part of the trauma team of

18   our hospital.   He practiced general medicine, vascular medicine

19   along with it.   And he was well -- I sent so many patients to

20   him.   He took care of them.   And I'm very thankful to him at

21   that time when he was working there.

22   Q.    And did you grow to know Dr. Azmat as a person as well?

23   A.    Yes, exactly.

24   Q.    And tell the Court a little bit about how you came to know

25   him personally.

1   A.    Yeah.   He's from the same country that I came from.   We

2   are from Pakistan.   And I met him and became very close to him.

3   Since I met him -- we have very small community.   We are, like,

4   four or five Muslim families there.   And we get together, and

5   we do Jumu'ah prayer.   And he always there for the prayer.   And

6   that's cooperation with us, you know, meeting each other.   So

7   we've become very close friends because there's no other people

8   there.   So we talk about back-home things, everything.   So

9   personally, we are very -- we've become very close.

10  Q.    And did you observe him interact both with respect to his

11  family, children, and the community generally?

12  A.    Yeah.   He's a wonderful father because -- I know because

13  one of his sons, he has special needs.   He has ADD/HD, and,

14  you know, he has some issues.   But he's always there, you know.

15  Sometimes that kind of behavior becomes very hard on the

16  parents when they're interacting with other families sitting

17  together.   But he is very patient with him, always trying to do

18  things right, everything for him.

19        I know about her -- his daughter because she's younger

20  than my children.   And he participated in all the academic quiz

21  bowls in school.   He goes there.   All -- whenever there's a

22  gathering at the school, he's always there.   So I call him a

23  very, very dedicated father.

24  Q.    You've also seen him interact in terms with interacting

25  and supporting his children in the school --

1    A.    Yes.

2    Q.    -- place as well?

3    A.    Exactly.  Always.

4    Q.    And you're aware that, last August, Dr. Azmat suffered a

5    heart attack --

6    A.    Yes.

7    Q.    -- and was treated in --

8    A.    He was admitted to our hospital.  Then he moved -- then

9    was sent to the Mayo Clinic in Jacksonville.  So he has

10   angioplasty -- four-vessel angioplasty.

11   Q.    Thank you.  And if you would, can you comment to the Court

12   on the nature and character of the man that you've grown to

13   know the last 10 years in Dr. Najam Azmat, please.

14   A.    I feel he's a wonderful person.  It's very unfortunate

15   that I'm here and talking about him.  Probably, he done a bad

16   misjudgment in his life.  But he's always -- a person who

17   always talk about the right thing, what's the right thing to

18   do, what is the best thing to do, how to take care of patients,

19   how to take care of the other -- you know, assistance to the

20   other families or anything.  But he's a good human being.  In

21   my personal opinion, he's in a bad situation because of his bad

22   judgment, whatever he made, but he's a good person.

23              MR. WITHERS:  Thank you, sir.  No further questions.

24              THE COURT:  Questions, Counsel?

25              MR. GILLULY:  Yes, Your Honor.

34

1          May I proceed, Judge?

2          THE COURT:   Yes.

3          MR. GILLULY:   Thank you.

4                    CROSS-EXAMINATION

5    BY MR. GILLULY:

6    Q.    Dr. Akram, you did not know Dr. Azmat prior to 2004 when

7    he moved to Waycross?

8    A.    No.

9    Q.    You never met his other family or his other son?

10   A.    No.

11   Q.    Okay.  And with regard to your relationship, did y'all

12   work in the same office in Waycross?

13   A.    His office was next to my office, but I never worked in

14   the same office --

15   Q.    Yes, sir.

16   A.    -- because I have internal medicine practice.  He has a

17   general surgery and vascular surgery.

18   Q.    Yes, sir.  And you indicated in a letter that you wrote to

19   the Court that he was a good surgeon, and I believe you said he

20   could be useful to many patients in the future.

21   A.    I hope so.

22   Q.    Did you ever follow his practice when he did work in

23   Waycross?  I mean, did you ever hear anything about his

24   practice?

25   A.    His practice was fine.  And there was -- one incident

1    happened, some complication with a surgery, and that patient

2    was sent to Jacksonville.  So that's the one mishap he has

3    there.

4    Q.    There's -- okay.  And I was going to ask:  In fact, you

5    would -- are you familiar that he's had restrictions placed on

6    his privileges at multiple hospitals?

7    A.    No.  I have no idea.

8    Q.    Are you aware that he's had several lawsuits filed against

9    him for malpractice?

10    A.    I have no idea.

11    Q.    Okay.  Are you aware that -- you obviously probably aren't

12    aware that in '96 he worked as a surgeon in Kentucky.

13          Did you know that?

14    A.    No.

15    Q.    Or that a hospital, Hardin Memorial Hospital, restricted

16    his privileges due to his competency issues as a surgeon?

17    A.    He never told me anything, and I have no idea.

18    Q.    And when you're -- when you have a medical license, there

19    are certain duties that -- you have to update the medical

20    board.

21          For instance, if you lose your privileges at a hospital,

22    you have to notify them; right?

23    A.    Exactly.

24    Q.    And it's a violation of board rules and medical procedure

25    not to consistently update when there are issues?

1    A.    Definitely.

2    Q.    Okay.  Are you aware that Dr. Azmat never notified the

3    medical board that he had lost privileges at the Hardin

4    Memorial Hospital?

5    A.    I have no idea.

6    Q.    In August of 2002, are you aware that Dr. Azmat moved to

7    Madisonville, Kentucky, where he worked until October two years

8    later?

9    A.    Only thing I know is that he moved from Kentucky.  I

10   never found out what city he was there because he talk about

11   Louisville most of the time.  So I don't know where the

12   medicine in Kentucky is.  I've never been there.

13   Q.    So you don't know about the person who died in a

14   malpractice suit and the doctor was sued and actually had to

15   pay some money for that?

16   A.    No.

17   Q.    In Waycross, Georgia, he was in private practice as a

18   general and vascular surgeon; is that correct?

19   A.    Uh-huh.

20   Q.    Is that yes?

21   A.    Yes, sir.

22   Q.    At the Satilla Regional Medical Center?

23   A.    Satilla Regional Medical Center, right.

24   Q.    Yes, sir.  And you realize, in January of 2006, there was

25   a complication during a surgery that actually resulted in the

1    death of a patient?

2    A.    Correct.  That's the one.

3    Q.    And he was sued for malpractice?

4    A.    He was.

5    Q.    Are you aware --

6    A.    He was, yes.

7    Q.    And it settled for 950- -- or over $900,000?

8    A.    I don't know the amount, but I think it settled somewhere.

9    I have no idea exactly.

10   Q.    And are you aware, in 2007, Dr. Azmat lost his malpractice

11   insurance and moved to another location?

12   A.    I had no idea he lost his malpractice insurance.

13   Q.    Or that he failed to notify the board when he went to a

14   new location to practice medicine?

15   A.    I have no idea.

16   Q.    Or that in 2008 his medical license was suspended in

17   Georgia for failure to pay child support?

18   A.    I have no idea.

19   Q.    And he didn't tell the board about his suspension.

20         Did you know that?

21   A.    I have no idea.

22   Q.    Or that -- let me ask you this, Doctor.

23         At Mayo Clinic, you're not paid in cash.  Is that fair to

24   say?

25   A.    Yeah.  We get the checks.

1    Q.    And you pay taxes; right?

2    A.    Yeah.   That's --

3    Q.    Are you aware that Dr. Azmat worked at East Health and he

4    was paid in cash and never even filed taxes?

5    A.    I have no idea.

6    Q.    Okay.   In August of 2010, he returned to Kentucky and

7    worked at a clinic that was owned by a nonphysician and that

8    every person he saw received prescriptions for controlled

9    substances.

10          Did you know that?

11   A.    I have no idea.

12   Q.    And that that clinic was shut down only after a few days?

13   A.    I have no idea.   Whatever I heard about that clinic when

14   all these things happened here -- so then I found out from

15   other people, but I never -- I didn't know that before then.

16   Q.    Did you know that Dr. Azmat failed to notify the board

17   that he was even practicing medicine in Lebanon, Kentucky?

18   A.    I have no idea.

19   Q.    Or in fall of 2010, that Dr. Azmat worked at the --

20   Commonwealth Quality Medical Management in Prestonsburg,

21   Kentucky, did you know that?

22   A.    No, sir.

23   Q.    And that he failed to notify the board that he was working

24   there?

25   A.    I have no idea.

1    Q.    Or that in April and -- or in May of 2011, he worked for

2    the Lexington Algiatry office in Lexington, Kentucky --

3    A.    No.

4    Q.    -- which was --

5    A.    I have no idea.

6    Q.    -- ultimately shut down for being a pill mill?

7    A.    I have no idea.

8    Q.    Did you know that Dr. --

9    A.    Now, this --

10    Q.    Pardon?

11    A.    This that I heard -- when all this thing happened, I read

12    it on the newspaper here in Waycross, but I don't know that.

13    Q.    So did you know that, after this whole East Health pill

14    mill case, he then moved to another pill mill that was shut

15    down and he ultimately lost his medical license in Kentucky for

16    basically the same kind of stuff he was doing here?

17    A.    Well, I have no idea what happened there.

18    Q.    If you knew all that, would that change your opinion of

19    whether he's a good doctor?

20    A.    That thing is not acceptable in medical profession.

21    That's, you know . . .

22    Q.    Wouldn't be very useful to future patients?

23    A.    Oh, yes, definitely.

24         MR. GILLULY:   Nothing further, Judge.

25         MR. WITHERS:   If I could follow up briefly,

1    Your Honor.

2              THE COURT:   Yes, sir.

3                         REDIRECT EXAMINATION

4    BY MR. WITHERS:

5    Q.    Dr. Akram, let's talk about -- for a brief moment about

6    what you did know and did observe.

7          Did you see Dr. Azmat in the physician-patient setting?

8    A.    Yes.  Couple of times, yes.

9    Q.    Was he deferential and professional --

10   A.    He is always --

11   Q.    -- in the physician-patient setting?

12   A.    He is always professional.  I sent so many of my patients

13   to him, so I found him pretty . . .

14   Q.    You were comfortable enough with your personal

15   observations --

16   A.    Yes.

17   Q.    -- that you directed patients to him?

18   A.    Yeah, because he was a faculty in our staff.  So he's the

19   vascular surgeon.  He's a general surgeon.  That's what we

20   always look for, you know, in the hospital.

21   Q.    Did he seem to be honest in dealing with his patients?

22   A.    Yes.

23   Q.    Did he seem to be caring in --

24   A.    Yes.

25   Q.    -- dealing with his patients?

1      Did he seem to be a -- and you saw him with respect to the

2  community, that is --

3  A.    Yes.

4  Q.    -- Dr. Azmat --

5  A.    Yes, sir.

6  Q.    -- interacting with --

7  A.    Yes, sir.

8  Q.    -- the folks at the school?

9  A.    Uh-huh, yeah.

10 Q.    Did he seem to be caring with respect to his interactions

11 with the folks in the school system?

12 A.    Yeah.  He's a very caring person.  No doubt about it.

13 Q.    Did he seem to be caring with respect to his interaction

14 with his children in the --

15 A.    Yes.

16 Q.    -- school system?

17 A.    He was very wonderful and very caring.

18 Q.    Did you see him interacting in the religious setting, that

19 is --

20 A.    Yes.

21 Q.    -- the --

22 A.    Very good, yeah.

23 Q.    -- small community of Muslims in the Waycross --

24 A.    Uh-huh, yes.

25 Q.    -- community?

1    A.    He always participated, and he is very dedicated.

2    Q.    Were -- and were you comfortable that he was a sincere,

3    caring person --

4    A.    Yes.

5    Q.    -- when you were interacting with him on the religious

6    front?

7    A.    Yes, definitely.

8    Q.    And did you see him as a family member --

9    A.    Yes.

10   Q.    -- as a father?

11   A.    Yes.  He's a good father.

12            MR. WITHERS:   Thank you.

13            Nothing further, Your Honor.

14            THE COURT:   All right.   You may come down, Doctor.

15   Thank you.

16            THE WITNESS:   Thank you.

17            MR. WITHERS:   Mr. Chris Ray.

18                  (Witness sworn)

19            COURT CLERK:   Please state your name, your occupation

20   and spell your last name for the record.

21            THE WITNESS:   My name is Christopher Ray.   I am an

22   attorney at law.   And my name is spelled C-h-r-i-s-t-o-p-h-e-r,

23   middle initial L, last name R-a-y.

24            COURT CLERK:   Thank you.

25                  (No omissions)

1          CHRISTOPHER L. RAY,

2    having been first duly sworn or affirmed, was examined and

3    testified as follows:

4                         DIRECT EXAMINATION

5    BY MR. WITHERS:

6    Q.    Mr. Ray, can you give us a brief sketch of your

7    educational background, please.

8    A.    Yes, sir.  I have a bachelor's degree in military and

9    diplomatic history from Princeton University.  I have a law

10   degree, or J.D., from the Fordham University School of Law.  I

11   have been practicing law for 20 years.  I'm a partner in the

12   Savannah, Georgia, law firm of Oliver Maner, LLP.

13         I'm a member in good standing of the State Bar of Georgia

14   as well as the State Bar of New York.  I'm admitted to practice

15   in all federal and state courts in the state of Georgia as well

16   as the United States Court of Appeals for the Armed Forces and

17   the Supreme Court of the United States.

18   Q.    And, Mr. Ray, the nature of your practice over the last

19   20 years, what has that been?

20   A.    The -- I am a trial lawyer, and the bulk of my litigation

21   practice over the last 15 years has been in the area of medical

22   malpractice defense and medical licensure work.  Prior to that

23   time, I was a captain in the United States Army JAG Corps where

24   I was principally a criminal prosecutor.

25   Q.    And you received an honorable discharge from the United

1    States Army?

2    A.    Yes, sir, I did.

3    Q.    And when was that?

4    A.    In 1999.

5    Q.    And, Mr. Ray, with respect to your professional practice,

6    did you have occasion to get to know and represent Dr. Najam

7    Azmat?

8    A.    Yes, Mr. Withers, I did.  About 7 or 8 years ago, I

9    first met Dr. Azmat and his wife, Sameena, in connection with

10   representing him in a civil matter.

11   Q.    How many matters, ultimately, did you come to represent

12   him in?

13   A.    I believe seven or eight cases over the years I've had

14   occasion to represent Dr. Azmat.

15   Q.    You understand, by the way, that Dr. Azmat -- and based

16   upon your former job as a prosecutor with JAG, you understand

17   that he stands as having been convicted of serious felonies

18   today?

19   A.    Yes, sir, I do understand that.

20   Q.    And your -- I want to talk for a few minutes, Mr. Ray,

21   about your getting to know Dr. Azmat over that period of time

22   that you were representing him.

23        Did you get to know him both personally and

24   professionally?

25   A.    Yes, sir, I did.  I got to know him both personally and

1    professionally and quite extensively in both spheres.

2    Q.    And tell me about what you observed with respect to his

3    personal interactions and dealings with him.

4    A.    Mr. Withers, we obviously -- when you represent a client,

5    and especially represent a client in a complex matter, you

6    develop a deep relationship with that client, which I'm sure is

7    no surprise to you.

8          And so I communicated with Dr. Azmat over a number of

9    years on a routine, regular basis, a weekly basis, sometimes a

10   daily basis, phone calls, e-mails, meetings in person, meetings

11   at my office, meetings in his home, court proceedings.

12         So I would say, over that period of time, one of the key

13   character traits that I observed about Dr. Azmat is that I

14   think he has a very strongly developed sense of personal honor.

15   He was always, in all of his dealings with me, punctual,

16   responsive, attentive, interested, involved.  I could not have

17   asked more from him as a client.

18         I came to learn that he is descended from a long line of

19   military men in Pakistan, and I think that infuses a lot of

20   his, sort of, personal sense of bearing.  So that's -- I would

21   say the first thing that I would observe is one of personal

22   honor.

23   Q.    And in your interactions with him when you would go to his

24   house, would you see his interactions with his family as well?

25   A.    Yes, sir, I would.  That was certainly more limited.  But

1    I did get to meet Sameena on multiple occasions.  I have met

2    his children once or twice.  I met Nausher, the oldest, who is

3    a special needs child.

4         Dr. Azmat, in the rare occasions I saw him with his

5    family, was, to my eye, a doting father, a loving husband,

6    involved strongly in that family.  But I can also add that

7    talking about his family out of their presence was a fairly

8    common bit of small talk for us.  We would talk about his

9    children and what they were up to.

10        And it was readily obvious and apparent to me that he

11   was strongly interested in his children's well-being, their

12   education.  I know that he was very involved in some school

13   board-type matters in Ware County because he had concerns about

14   the quality of education available for his children.

15        So, again, as it was observed by me, he struck me as a

16   model husband and parent to that family.

17   Q.   And out of the years-long relationship and the dozens

18   and dozens of hours that you spent with him personally and

19   professionally, would you tell the Court -- or provide the

20   Court with the insight with respect to what you observed

21   concerning the nature and character of Dr. Najam Azmat.

22   A.   I guess, at its heart, even knowing everything that has

23   transpired here, even understanding the context in which this

24   testimony is being given, in my dealings with him, I found him

25   to be a genuinely personable, real, interested human being, a

1    man with a strong sense of his faith.

2         We would have extensive -- I find Islam interesting.   We'd

3    have extensive conversations about his observance of the Muslim

4    month of Ramadan and what that involved and the personal

5    fasting.

6         I found him acutely interested in the welfare of his

7    family, and I found him to be an involved, interested American

8    citizen.   I think he was proud of his citizenship as an

9    American.   We had a long conversation one night about what it

10   was like to move here as an adult and try and learn American

11   football.   But he made a conscious decision he was going to

12   learn American football because that was part of the

13   integration.   And that's the kind of guy he is.

14             MR. WITHERS:   Thank you, sir.   No further questions.

15             THE COURT:   Questions, Counsel?

16             MR. GILLULY:   Yes, Your Honor.

17                          CROSS-EXAMINATION

18   BY MR. GILLULY:

19   Q.   Mr. Ray, you said that you met Mr. Azmat -- or Dr. Azmat

20   because you had represented him in seven or eight cases?

21   A.   That's correct.

22   Q.   And the seven or eight cases were medical malpractice

23   cases --

24   A.   They were.

25   Q.   -- where he was the defendant?

48

A.     He was a codefendant in most of them, not a sole
defendant.

Q.     Yes, sir.  In fact, was he paying you or the insurance
company paying you?

A.     He had, as most physicians do, professional liability
insurance which provided for my fee.

Q.     Okay.  And you've known him for some time over the course
of this.

    How many times did Dr. Azmat contact you to express
concerns about East Health Center, the place where he was
working?

A.     That's not a matter that I ever discussed with Dr. Azmat.

Q.     You discussed family; you discussed professional practice
with him, his religion; but not once did he say, "There's
something sketchy going on over here"?  He never talked to you
about any concerns about potential addicts receiving highly
addictive controlled substances day in and day out?

A.     No, sir.  As I said, that's not a subject I ever discussed
with him.

        MR. GILLULY:  Okay.  That's all the questions, Judge.

        THE COURT:  Any more for this witness, Mr. Withers?

        MR. WITHERS:  No, Your Honor.

        THE COURT:  All right.  You're accused, Mr. Ray.
Thank you.

        THE WITNESS:  Thank you, Your Honor.

1          MR. WITHERS:  Your Honor, I believe that completes my

2    character witnesses.  Dr. Azmat would like to make a statement

3    in allocution.

4          THE COURT:  Yes, sir.  I'll give him an opportunity

5    to do that.

6          Does the Government wish to present any information

7    as to the appropriate sentence?

8          MR. KNOCHE:  Only argument at the appropriate time,

9    Your Honor.  We've tendered the one exhibit and --

10          THE COURT:  Okay.  Well, this is your time.

11          MR. KNOCHE:  To argue the case, Your Honor?

12          THE COURT:  Yes, sir.

13          MR. KNOCHE:  All right.  Your Honor, once again,

14   Your Honor is very familiar with the facts of the case, having

15   tried this matter back in January, having presided over a

16   number of changes of plea and sentencing hearings over the past

17   couple of years.

18          Did Dr. Azmat really does stand alone and apart from

19   his codefendants in the matter.  All of his codefendants

20   eventually -- some sooner, some later, but all eventually

21   accepted plea offers from the Government; cooperated with the

22   Government; testified at grand jury; testified at trial; came

23   before your court and expressed their contrition, their sorrow

24   for the -- their roles in the offense and the harm which they

25   had done to others both in their own families, members of the

50

1   community, and, in particular, the patients who were treated

2   at East Health Center, said treatment consisting solely of the

3   prescription of controlled substances.

4       Dr. Azmat stands alone.  He has expressed no

5   contrition for his role in East Health Center.  I believe that

6   the record is quite obvious that his sole motivation in coming

7   to East Health Center was the money that he would be paid at

8   the end of each day.  He was not interested in providing

9   medical services.  He was not a healer.  He really was a dealer

10  and should be viewed as such.

11      He's a big family man.  We've heard testimony about

12  that.  Had a total disregard for the health and welfare of his

13  own patients.  Had a total disregard for the health and welfare

14  of the families of his patients.

15      We heard from a number of witnesses at trial -- the

16  Letners come to mind.  Latina Simpson comes to mind -- who came

17  and visited East Health Center in groups, often with family

18  members, all to receive controlled substances from Dr. Azmat.

19  He had no regard for those people.

20      In fact, he had so little regard for his patients or

21  for the illegal activity which he engaged in during his entire

22  tenure, albeit just several weeks, at East Health Center, when

23  he left East Health Center, he moved to Lexington, Kentucky,

24  as shown in Paragraph 40 of the presentence report, engaged in

25  the exact same activity, activity which, as with East Health

1   Center, was so open, notorious, and obvious that that clinic

2   was shut down.   Took a little longer there than it took here.

3   The clinic lasted 3 months here.   I believe it lasted 7 or

4   8 months up in Kentucky.   But, nonetheless, the same M.O.

5   Search warrants were served; records were seized; and, once

6   again, Dr. Azmat was outed as the pill mill doctor, which he so

7   obviously is.

8           We're distressed to hear of the plight of Dr. Azmat's

9   family, as I'm sure the Court is sympathetic to them.   They

10  are -- I guess could be viewed as victims of his medical

11  practice just as his patients were.   But Dr. Azmat is the one

12  who stood in the best position, who knew the needs of his poor

13  son and of his poor wife and disregarded that in order to

14  follow this very disreputable, dangerous, illegal line of work,

15  which he followed and persisted in for a considerable period of

16  time.   Greed was the motivation, and he was paid for what he

17  did.

18          Your Honor, Counsel raised the issue of disparity

19  compared to the other -- sentencing disparity is an issue for

20  the Court to consider when compared to the other defendants.

21          The 11th Circuit has held that, ordinarily, a

22  sentence within the guideline range is reasonable.   And

23  particularly with regard to disparity, the 11th Circuit, in a

24  case -- published case of *United States v. Glover*, indicated a

25  defendant who cooperates with the Government and enters a plea

agreement is not similarly situated to a defendant who does not

cooperate and proceeds to trial.  Further, there is no

unwarranted disparity when a cooperating defendant receives a

substantially shorter sentence than a defendant who does not

cooperate.

Well, once again, Dr. Azmat has not cooperated.
He's -- if he's expressed any contrition, it is shallow and
superficial.  He is sorry for the predicament he's in, but,
Your Honor, he's done great harm.  He's violated his
Hippocratic Oath on multiple occasions over multiple years;
first, do no harm.  Dr. Azmat has done nothing but harm.

And this is the day, Your Honor, that the Government
asks that he receive the just reward, the due punishment that
he deserves for his misconduct.

Your Honor, the guideline range at an Offense
Level 36, Category I is 188 to 235 months.  If the Court were
to grant a downward variance of two levels, his range would be
151 to 188 months.

Your Honor, the Government asks the Court to impose
a sentence of 188 months as a strong message to others about
the -- what happens when they engage the law in such a flagrant
manner as Dr. Azmat did and to serve as a deterrent to others
and to deter Dr. Azmat specifically from engaging in this
activity in the future.

THE COURT:  Thank you, Mr. Knoche.

53

1        Before I call on Mr. Azmat, Mr. Withers, is there

2   anything else that you wish to say, as his counsel, in

3   mitigation of sentence?

4        MR. WITHERS:  Yes, Your Honor.

5        We filed our papers with respect to the sentencing

6   memo yesterday and framed, in part, by -- where Dr. Azmat came

7   from because I think it gives insight into who he is.

8        Mr. Ray mentioned about Dr. Azmat's upbringing in a

9   career military family.  As we set forth, his ancestors were

10  originally in the British Indian Army, later to be the Pakistan

11  Army.  His father retired as a army officer and moved to --

12  along with the rest of his family, ultimately to Georgia to be

13  with Najam and his family.  His mother still lives with Nabil,

14  his brother, up in Atlanta.

15       He helped bring his brother here, helped put his

16  brother through college, helped get his brother on a fin- --

17  not only a financial footing but, in a personal sense, a

18  footing in a new country.

19       Dr. Azmat attended college and medical school in

20  Pakistan but received exceptional training when he came to the

21  U.S.: a surgical residency in Washington, D.C.; a residency at

22  Brookdale Hospital in New York; a vascular surgery fellowship

23  in Ohio; and, ultimately, a endovascular fellowship at the

24  Cleveland Clinic.

25       He and Sameena, his wife here, have been married

1    since 1995.   As the Court has heard, they have three children:

2    Nausher, the special needs child, 17; Neesha, a daughter, age

3    15; and Jansher, a son, age 10.   When they moved to Waycross in

4    2005, Sameena's mother came and lived with them.   And I think

5    that demonstrates, Your Honor, that this is a man and a family

6    who is committed to family and community.

7         At the detention hearing in May of last year, this

8    Court heard several witnesses, including Dr. Darlene Tanner

9    from the Waycross school district who talked about Dr. Azmat's

10   care for their special needs son, Nausher.   And until January

11   of this year, that responsibility was shouldered on a daily

12   basis by Dr. Azmat.

13        And, Your Honor, a man's reputation, it's been said,

14   for good character is the shadow he casts amongst the everyday

15   lives of others.   And the letters that have been submitted by

16   Dr. Azmat's family, friends, folks in the community demonstrate

17   that he's a man that was active in his children's schools;

18   active in his children's lives; that he was a loving, doting

19   father, as Mr. Ray says; that, as Dr. Tanner writes, he's a

20   loving and supporting father who encourages his children, a

21   man committed to his faith, family, and community.

22        And I think Dr. Akram talked, as did Mr. Ray, about a

23   man of deep religious commitment.   And Dr. Irfan in Waycross,

24   who we submitted a letter on behalf of, talked about the caring

25   nature of Dr. Azmat to his family and community, demonstrated a

1    commitment to his children that was inspirational.

2            And his 15-year-old daughter wrote the Court about

3    Dr. Azmat never missing an awards ceremony, Dr. Azmat being her

4    role model and a caring, loving father.

5            And there are -- no doubt, a lot of people come

6    before the Court who have literally found religion just before

7    sentencing, and this Court hears a lot of that.   But

8    Dr. Azmat's dedication to his family, his community did not

9    begin when his legal services -- his legal troubles first

10   surfaced.   But those letters that the Court has received, the

11   testimony that the Court has heard demonstrate a man whose

12   life's work is of a good, caring person.

13           Your Honor, with respect to the issue of sentencing

14   disparities, there are two sides of that coin.   One is that the

15   Sentencing Reform Act is supposed to provide proportionality

16   among different offenses.

17           And we've set forth in our papers that, for instance,

18   in this case, Dr. Azmat's guideline range of 188 to 235 is only

19   two points lower and at the lower end of the applicable

20   guideline range for someone who commits a bank robbery of over

21   $5 million where a firearm is discharged.

22           So, A, the proposed sentence by the guidelines

23   doesn't fit within that proportionality issue of different

24   offenses; and, B, it doesn't fit with respect to the other side

25   of that coin, and that is sentences meted out in this case that

1   have ranged from 52 months' imprisonment down to 13 months.

2              Even though the 11th Circuit recognizes that those

3   who enter pleas and who are rewarded with a 5K certainly are

4   dissimilar in a certain respect, they are not dissimilar when

5   we're talking about the exact same case and someone who simply

6   exercises the constitutional right to a jury trial.

7              And I would suggest that it's this Court that stands

8   as the bulwark to ensure that a defendant can exercise that

9   right to a trial without being -- having fear of being

10  sentenced three times more severely than those who enter a

11  plea.  And so we ask that the Court sentence Dr. Azmat within

12  the range of the sentences previously imposed in this case.

13             With respect to what Mr. Knoche mentioned about

14  deterrence, the Court knows through its experience -- and our

15  papers set out the proof of this -- that someone, A, that is

16  Dr. Azmat's age, B, that is in Dr. Azmat's health, C, that is

17  in Dr. Azmat's marital and family situation is not likely to

18  reoffend.  I think that the Court can rest upon that, that --

19  that fact that Dr. Azmat's circumstances mean that he is not a

20  likelihood to reoffend.

21             Also, I think the Court can consider the fact that

22  the loss of Dr. Azmat's future livelihood as a medical

23  practitioner -- because, in all likelihood, he will never

24  practice medicine again -- is a factor that the Court can

25  consider in imposing sentence.  And we've cited to the

1    11th Circuit authority with respect to that.

2            Finally, Your Honor, with respect to the issue of

3    family responsibilities and loss of caretaking support, we've

4    cited to the appropriate guideline, 5H1.6, that the Court can

5    take that issue into consideration in fashioning a sentence.

6            And that -- based upon all of the factors that are

7    present in this case, Your Honor, we ask that you vary greatly

8    from the sentence sought by not only the probation officer but

9    by the Government as well.

10           Those factors that we have set forth I think

11   establish that Dr. Azmat's case is outside of the heartland

12   contemplated by the guidelines and justifies substantial

13   variance or departure.

14           And in that respect, Your Honor, we leave to this

15   Court's judgment Dr. Azmat's fate with respect to the

16   appropriate sentence in that respect.

17           THE COURT:  Thank you, Mr. Withers.  If you'll have

18   your client come back to the lectern, please.

19           MR. WITHERS:  (Complied).

20           THE COURT:  Mr. Azmat, the law provides that you have

21   a right to make any personal statement to the Court before the

22   imposition of sentence.

23           Is there any personal statement that you wish to

24   make or any additional information that you wish the Court to

25   consider in mitigation of sentence?

58

1          THE DEFENDANT:  Yes, I do, Your Honor.

2          THE COURT:  Yes, sir.

3          THE DEFENDANT:  May I proceed?

4          THE COURT:  Yes, sir.

5          THE DEFENDANT:  Thank you very much.

6          May it please the Court --

7                    (Off-the-record)

8          THE COURT:  All right.  Go ahead, sir.

9          THE DEFENDANT:  The jury has rendered its verdict.

10   That is why we are here today.  The American system of justice

11   is jury-based.  The system is at least as old as the Bill of

12   Rights.  The system has withstood the test of times, which is a

13   testament to its survival and longevity.

14          It is a perfect system?  Perhaps not -- is it a

15   perfect system?  Perhaps not, but it is certainly the best

16   system that we have.  Many folks have found justice that they

17   deserve by the decisions rendered by the jury.  At the same

18   time, not everyone has been satisfied by jury-rendered

19   decisions; some out of anger, but some justifiably so.

20          It would not be incorrect for me to state that from

21   time to time the jury has rendered a decision in error.  Many

22   a criminal charged with actually committing crimes such as a

23   murder has walked free from the courthouse based upon the

24   decision made in error by the jury.  At the same time, many an

25   innocent has suffered the misery of incarceration by an unjust

59

1    verdict handed to them by the jury.

2         There are perhaps quite a few reasons as to why a

3    decision by the jury is made in error.  Most of such reasons

4    fall into the following categories:

5         Number one, the technical aspects of the case and

6    arguments for and against may be too complicated for a jury

7    made up of common folks with limited technical knowledge of the

8    subject matter being contested.

9         The medical aspects of my case fall in just such a

10   category.

11        Number two, misleading information fed to the jury

12   by the Prosecution leaving the jury thoroughly confused and

13   misdirected.

14        This has also been the case, for example, the

15   craigslist and talking about excess doses of drugs, both of

16   which I will address in some detail in a minute.

17        Number three, emotional pitch and theatrics by the

18   Prosecution which deviate from the facts of the matter but

19   ingrain upon the minds of the jurors as gospel.

20        This, too, happened -- and I will explain in

21   detail -- when they call it a pill mill.

22        Number four, jury bias.  This could be based upon

23   color, gender, ethnicity.

24        And yes, the word "Pakistan" was raised by the

25   Prosecution.

60

1       Number five, pretrial publicity either specific to

2   the case or general to the broad category of what I was accused

3   of.

4       Pill mill is an example that I'll talk about.

5       Number six, internal issues amongst jurors or

6   collectively affecting the jurors such as peer pressure, lack

7   of interest in the case, such as a juror -- a juror would

8   likely side with the majority to, what they say, get it over

9   with; for example, on the Friday afternoon, no interest in

10  prolonging the arguments and to go home for the weekend.

11      In  my case, the jury deliberated for around 2 hours

12  on a 52-count indictment.

13      I will now review each of these categories that I

14  just mentioned to show just how exactly they applied to my case

15  and affected the outcome.  I will state the facts and back them

16  up with evidence.  My purpose is to show exactly how the jury

17  rendered an unjust verdict in my case.

18      While this is a very emotional day for me, I will

19  refrain from such expression as -- inasmuch as I'm able to;

20  however, I can assure the Court that I will not allow any such

21  distraction to make me deviate from the facts.

22      Number one, the technical aspects that perhaps

23  escaped the jury.  The first and foremost was the conspiracy

24  charge, which was the -- Count 1 of the indictment.  It charged

25  me for conspiring with the codefendants to dispense large

1    quantities of narcotic medications to the patients.

2         This is a very important charge because there was

3    no involve- -- because if there was no involvement in such a

4    conspiracy by the defendant, then his practice was

5    legitimate -- was a legitimate medical practice and, as such,

6    could not be charged with the subsequent 51 counts.  The whole

7    indictment falls apart in this situation.

8         Let me go over some factual basis of error that the

9    jury perhaps, in their technical basis, was unable to

10   appreciate.

11        THE COURT:  Let me stop you a minute, Dr. Azmat.

12        Mr. Withers, this is not an appeal of his sentence.

13   Now, he has a right to state to me anything that he wishes me

14   to hear in mitigation of his sentence.  You know, we tried this

15   case for many days.  We should not be required to listen to a

16   long dissertation from Dr. Azmat regarding an appeal of the

17   facts and the verdict in this case.

18        Now, I'm prepared to listen to him, and I will listen

19   to him, but, as his counsel, you might want to discuss this

20   with him.  I don't know if you knew before this hearing today

21   that we were going to rehash the whole trial or not,

22   Mr. Withers, but that's not the purpose of giving a defendant a

23   right to allocute for himself as to mitigation of sentence.

24        MR. WITHERS:  Could I have a moment?

25        THE COURT:  Yes, sir.

1                    (Defense Counsel and Defendant conferred.)

2            THE COURT:  All right, Doctor.  Go ahead.

3            THE DEFENDANT:  Number one, the definition of

4    conspiracy.  Sometime in the middle of the deliberation, the

5    jury asked the Court to provide it with a definition of

6    conspiracy.  Just imagine.  The jury heard the evidence never

7    knowing what the meaning of the centerpiece of the Government's

8    case was.  The burden of proof was on the Government.  It had

9    to prove beyond a reasonable doubt that I was involved in the

10   conspiracy with the rest of the individuals at the clinic.

11           How could the Government prove without a reasonable

12   doubt that I conspired with the others when it failed to

13   explain to the jury the very meaning of conspiracy?

14           Looking at it another way, how could the jury

15   conclude that they had heard evidence of conspiracy beyond a

16   reasonable doubt when they did not have an understanding of the

17   charge while the evidence was being presented?

18           This, in fact, leads one to conclude beyond a

19   reasonable doubt that the verdict rendered by the jury on the

20   conspiracy charge was not evidence-based.

21           I would now like to look at some facts of the

22   evidence related to the conspiracy charge.  Sean Clark,

23   Dan Wise, Frankie Barbuscia, Konstantino Afthinos, all

24   owners/employees of the clinic, were present -- were presented

25   to the jury as Government witnesses.  They were all

1   codefendants in the case but not on trial because each entered

2   a plea bargain.  I was offered the same bargain but turned it

3   down because I believed then, as I believe now, that I am and

4   still am innocent.

5           Each and every one of the individuals that I named

6   testified at trial that they did not know me, never met me,

7   never spoke to me, never saw me before I started working at the

8   clinic, so there was no evidence of conspiracy based on this

9   factor.

10           The only individual that I spoke with before starting

11   to work at the clinic was LeFrancois and exchanged a couple of

12   e-mails, all of which, of course, denied having any

13   conversation with me about the purpose of the clinic or what

14   the expectations were.

15           The Government did not present any evidence that I

16   conspired with the individuals or met with any one of them

17   before starting work at the clinic, not one bit of

18   information -- of evidence that any conspiracy took place

19   between me or anybody associated with the clinic.  LeFrancois'

20   testimony was also to this effect.

21           Now, let us review the evidence after I started

22   work at the clinic.  Testimony at trial by LeFrancois, the

23   owner/manager of the clinic, was unambiguous when he stated

24   that, on the very first day when the clinic opened, he started

25   searching for a new physician for the clinic.  There is

1    evidence of his corresponding with a physician by e-mail for

2    this purpose on the very first day of my work at the clinic.

3            LeFrancois also testified that the reason he started

4    searching for my replacement was because the patients were not

5    happy with the kind and quantities of medications that I was

6    prescribing on my very first day at work.

7            This testimony flies in the face of a conspiracy that

8    I was involved in with the individuals of the clinic.  Sadly,

9    the jury ignored these facts and evidence while rendering a

10   guilty verdict of conspiring with these individuals.

11           On the other hand, there's evidence that I was not

12   involved in conspiracy with the clinic individuals.  Next,

13   please consider what Dan Wise testified.  He was the clinic

14   manager after LeFrancois.  His testimony -- in his testimony,

15   he admitted that he had an angry exchange with me because the

16   patients were not happy with my prescribing narcotics.

17           He even admitted to saying to me, "Get on with the

18   program," and called LeFrancois to report to him that I was a

19   disaster for the clinic.  The account was corroborated by

20   Konstantinos Afthinos in his grand jury testimony.

21           While this testimony and evidence is beyond a

22   reasonable doubt that I was not a part of the conspiracy,

23   sadly, the jury ignored these facts and rendered a guilty

24   verdict.

25           Let me check another fact.  I worked for 19 days at

the clinic out of which I spent two half days in a doctor's office and one half day taking care of a traffic ticket in Dublin.  I'm pretty sure I also took another half day off for some personal reasons.  So I worked a total of approximately 17 or 17 and a half days.

LeFrancois testified that he fired me, saying I was bad for the business.  This raises the question:  How could I be a conspirator with them and be bad for the business at the same time?  This fact went unregistered with the jury.

Now, let me review the evidence the Government provided to show that I was involved in the conspiracy with the others.

To start with, the Government called the clinic a pill mill and did not provide a definition of it.  At least -- at best, it's a slang.  No manufacturing of pills or medicines were taking place at the clinic if you look at it in the literal sense.

The Government could have called it an illegitimate pain clinic.  It did not do so because what appears in the -- the Government's purpose was to inflame the emotions of the jury.  As I mentioned at the top of my statement, such emotional blackmail is used by litigators, and the purpose is to sway the jury away from the facts.

Now, I will review some facts.  Craigslist.  To start with, the Government has repeatedly harped the tune by

1    repeatedly telling the jury that an ad in craigslist for a

2    physician's job was a red flag.  Just because a physician's

3    job for a pain clinic is listed in craigslist, does it make it

4    illegitimate?  They even mentioned it today.  They told the

5    jury that -- something to the effect that there was no real

6    physician's job listed in craigslist.  This certainly is no

7    evidence beyond a reasonable doubt.

8           Did I break any state or federal law by responding

9    to a job placed in craigslist?  I'll -- let me present some

10   evidence to that effect.

11          Your Honor, here are some of the listings in

12   craigslist that are current at this time:  Family practice

13   physician, Bogalusa, Louisiana; ER physician, Southern Georgia;

14   executive director/administrator, hospice, (unintelligible);

15   primary-care physician, part-time, Albany, Georgia; ER

16   physician needed, Hazelhurst, Georgia; primary care physician,

17   full-time, Albany, Georgia; ER physician, Swainsboro, Georgia;

18   primary care, Athens; cardiothoracic surgeon physician's

19   assistant.  These are some of the examples of ads that are

20   current in craigslist at this time.

21          It is not illegitimate, but the way it was presented

22   to the jury felt like I had done something wrong just by

23   responding to an ad in craigslist.

24          And, plus, the craigslist ad did not say it was for a

25   pill mill.  Had it been for a pill mill, I would not have been

1     standing here today.   The jury was misled.

2          Then it says patients came to the clinic from faraway

3     places.   While it may be true that some patients traveled from

4     faraway places to be seen at the clinic, the Government did not

5     prevent -- present any evidence that I had knowledge of their

6     home addresses.   The standard of beyond a reasonable doubt was

7     not met in this instance either.

8          Is it against the law for a physician to see patients

9     from another clinic?   Again, this is just a circumstantial

10    evidence at best.   I'll address it in a minute.

11         A number of patients from the same town or more --

12    or one or more from a family and carpooling, that, again, was

13    mentioned today.   How does any of this prove that there was an

14    illegal activity going on in the clinic?

15         Did the Government prove beyond a reasonable doubt

16    that such practice was illegal or illegitimate?   No.

17         Did the Government prove beyond a reasonable doubt

18    that I was even aware of patients carpooling or belonging to

19    the same town?   No.

20         The Government did not even show how many such

21    examples existed.   This, again, was a circumstantial evidence.

22         In fact, in my surgical practice, I operated on

23    multiple family members.   I even had a couple of families with

24    three generations as my patients.   There's nothing wrong and

25    unusual about family members using the same physicians.   In

1    fact, what would be unusual is if each family member consulted

2    a different physician for a similar problem.  That would be

3    unusual.

4             MRI was required.  This was another factor that was

5    talked about a lot.  When somebody has back pain, a diagnosis

6    of back problem can be suspected on history and physical

7    examination.  The actual confirmation of diagnosis of a spinal

8    problem is dependent on an imaging study, meaning to visualize

9    the image, or picture, of the spine.  This is best accomplished

10   by an MRI.

11            This is not unique to pain clinics.  Other

12   specialties have similar requirements.  For example, orthopedic

13   doctors require you to have x-rays before you can consult them.

14   This requirement is time efficient for the physicians and cost

15   efficient for the patient because it eliminates the need for a

16   second visit since the exam and confirmation of diagnosis and

17   treatment can be carried out in one sitting.  Where and how the

18   patients get their MRI is neither the concern nor the

19   responsibility of the physician.

20            If the Government felt that the MRIs were

21   illegitimately obtained, then it should have gone after the

22   patients or the facility that performed the MRI.

23            Let me share a personal example.  A few years ago,

24   our son Nausher, that we've talked about, required an MRI.  We

25   had no health insurance coverage, so we shopped around and

1   found a facility in Atlanta which was most cost efficient for

2   us and where the test was performed.

3           This MRI report was reviewed by his neurologist in

4   Louisville, Kentucky; Detroit Children's Hospital; and

5   Children's Hospital -- the Boston Children's Hospital in

6   Massachusetts.  None of them had any concerns or questions as

7   to why a patient from Waycross had an MRI in Atlanta and was

8   being seen in Louisville, Detroit, or Boston.  Why was this any

9   different?

10          All MRI reports are primary-source verified, meaning

11  the facilities where they were performed directly faxed the

12  reports to the clinic, and an employee at the clinic signed and

13  dated the reports to verify that this was obtained directly

14  from the source and not a copy that the patient brought with

15  them.  So saying that the MRIs were illegitimate, again, flies

16  in the face of evidence.

17          There are two patient charts here that have a sticky

18  note attached to them where it said, "Get MRI directly faxed,"

19  even though it was a verbal thing.  This is on David Letner.

20  There's a James Lockwood, again, a sticky note on it by

21  somebody at the clinic saying, "Try to get the MRI directly

22  faxed.  I know RDC is difficult."

23          And here is what actually took place.  Whoever saw

24  the -- received the MRI fax at the clinic signed and dated it

25  to verify that it was directly faxed and not the copy that a

1   patient had brought.

2          With the evidence that I have just presented -- let

3   me give you another example, Your Honor, of an MRI brought to

4   my attention by an employee where they could not verify the

5   primary source because of an answering machine that was there.

6          Upon reviewing the report, while I did not exactly

7   recall what the actual issue was, but I picked up an error in

8   the report.  So after an Internet search, I managed to locate

9   the radiologist who was on staff at the medical center at

10  Charleston, South Carolina.

11         I called him, and he informed me that he never read

12  MRIs outside the medical center.  I faxed the report to him,

13  and he confirmed it to be fraudulent and assured me that he

14  would report it to the authorities.  The following day, he even

15  called me back to say that he visited the place and there was

16  no such place that did the MRI.

17         This would be on my phone record, my conversation

18  with him, because I've never ever in my life made any

19  conversation with anybody in Charleston, South Carolina.  I was

20  the one who was conscientious enough to make sure that those

21  reports were authentic.

22         The Government did not present any evidence beyond a

23  reasonable doubt that the MRIs were illegitimate.  The burden

24  of proof was on them.  If I was a part of a conspiracy, would I

25  take the effort to find the radiologist and ask if he had

1    actually read the MRI?  Certainly not.

2           This was, in part, because the Government, without a

3    factual basis, accused me of running a pill mill.  And how

4    could a jury not convict somebody running a pill mill?

5           I'd now like to set the record straight on the

6    question of pill mill, which has been mentioned repeatedly and

7    even today.  When I responded to the ad in craigslist, it did

8    not say that it was a pill mill.  When I started working at the

9    clinic, nobody discussed, directed, or even otherwise mentioned

10   to me what their expectations of me were or to run a pill mill.

11   Nobody told me what medications to write and what quantities to

12   write.  I had no reason to suspect that it was a pill mill.

13   I've already presented evidence to this effect.

14          Since I was there on the first day the clinic was

15   open, there was no way for me to figure out that it was a pill

16   mill before I started working there.  There was no expectation

17   of me how to run it.  There's no evidence to this effect.  The

18   Government did not present any evidence to that effect.

19          As an employee of the clinic, I was never a part of

20   any decisions that were made to open the clinic, select the

21   site of the clinic, set up the clinic, administer the clinic,

22   set the policies for the clinic, or do any hiring or firing of

23   the employees.

24          I was not a part of any decisions regarding setting

25   of an amount the clinic charged the patients, whether the

1  patient -- whether the clinic accepted cash or insurance

2  assignments from patients.  I had no import or anything to do

3  with the forms that were placed in the patient's chart or the

4  language included in the forms placed in the clinic, how the

5  employees were paid, or how I was paid.  I did not have any

6  incentives or bonuses for seeing a certain number of patients

7  per day, as is common with some pain clinics.

8        The Government did not present one bit of evidence

9  contrary to what I have stated.  Why?  Because no such evidence

10  exists, none whatsoever, except claims.  And yet the Government

11  is presenting the case implied as if I was responsible for some

12  of the things I mentioned, like cash payment by the patients

13  and language in the forms, to name a couple, amongst others.

14        The Government craftily confused the jury by implying

15  as if I was responsible for such clinic policies just because I

16  worked there.  The fact is that the clinic and myself were two

17  separate entities.

18        To clarify this with an example, the physicians

19  and hospitals across the United States have exactly the same

20  relationship where the hospitals set the policies and

21  procedures, fee schedules, patient forms, et cetera.

22  Physicians do not set the policies, et cetera, for the

23  hospitals and, as such, are not responsible for their contents.

24        The fact is that the hospitals are found liable if

25  the physicians do not follow their policies and procedures.

1   The reverse is not true.  Physicians are not liable for the

2   hospital's policies.  Exact similar policy and arrangements is

3   also in place for all freestanding medical facilities like

4   urgent care centers, outpatient surgery centers, rehab centers,

5   nursing homes, et cetera, et cetera, and clinics.

6         Physicians and medical facilities, be they hospitals

7   or clinics or other medical facilities like I mentioned, are

8   two separate entities, and each is responsible for its own

9   actions.

10         We see complaints filed in civil suits -- civil

11   courts and indictments handed dutily (phonetic) to each

12   separately.  The hospital gets sued for -- or indicted

13   separately from the physicians.

14         In my situation, it appears that the Government

15   reinvented the wheel by holding me responsible for the actions

16   and policies of the clinic.  If the Government had issues with

17   the clinic policies, they should have indicted the clinic as a

18   separate entity, but it did not and instead held me responsible

19   for the policies of the clinic.

20         Sadly, the jury did not appreciate this fact as well.

21   The Government just did not have the evidence against me in the

22   matter, so they used the evidence that the clinic was

23   responsible for and confused the jury.

24         I have full faith and confidence that what the jury

25   missed will be corrected by the Court and exonerate me of these

74

1    misplaced charges.

2              On the subject of conspiracy, another fact needs

3    attention.   The person who actually initiated and bankrolled

4    the project of East Health, Mr. Trematerra, paid the Government

5    $2 million to escape indictment.   What is interesting in this

6    is the Government called it a settlement.   When the Government

7    accepts money, they give it a legal name of settlement.

8              No matter what twist the Government gives it or what

9    excuse the Government makes to justify it, nothing can change

10   the fact that the Government, under the pretext of settlement,

11   accepted what, in the eyes of many fair-minded persons -- of

12   any fair-minded person, would be called a bribe to let

13   Mr. Trematerra escape an indictment.

14             This raises a question.   Why did the Government not

15   offer a similar settlement to the other defendants?

16             Reminds me of a famous quote in George Orwell's book

17   that I read about 35 years ago titled *Animal Farm* in which the

18   animals take over the farm under the pretext of equal justice

19   and equal rights for all animals.   The pigs run the farm under

20   the slogan "All animals are equal."   This soon changes to "All

21   animals are equal.   Some are more equal than others."   This was

22   done to justify the special privileges the pigs were enjoying

23   over the other animals.

24             My purpose of bringing up this issue is to show that,

25   in the eyes of our government, the justice department is saying

that some are more equal than others.  There is -- where is the equal justice by the justice department?  Apparently, the justice department does not subscribe to the "Justice is blind" slogan either.

The main conspirator is enjoying the sunny beaches of South Florida, having paid his way out of jail, while the Government indicted an innocent physician instead and charged him with conspiracy while the main conspirator paid his way out of it.

Now, I would like to say a few words on physician compensation -- that, again, was brought up today -- and how physicians get paid in -- for their services in this country.

Those that own their own practices bill the insurances for the services and also take cash, yes, cash from patients that lack insurance coverage.  Employed physicians get paychecks like -- just like any other employee in private or government sector.

Then there's a third category which are considered contract employees, and their compensation is either on a daily basis or at an hourly rate.  Their checks do not have their taxes taken out of them.  There's a fourth category that get cash only for their services.

The third and fourth category are quite similar in that the checks can be cashed with similar results.  Both categories are responsible for paying their own taxes.  And

1    yes, I paid all the taxes, contrary to what the Government has

2    asserted.

3              When I worked as a local (unintelligible), my

4    compensation was at a negotiated daily rate not too dissimilar

5    from what the clinic has paid me here.  I was also paid an

6    hourly rate.  This includes working at a government and a VA

7    facility.  No taxes were deducted.

8              Let me share some examples of cash-only clinics to

9    put things in the right perspective.  When I practiced in

10   Elizabethtown, Kentucky, three physicians that I know of

11   structured their primary care clinics to cash only.  They did

12   not accept any insurance assignments, and all patients paid

13   cash to them in order to be seen by the physician.  They

14   included Dr. Sam Pike, Dr. Hall, and Dr. Green.  Their full

15   name escapes my memory.  I'm sorry.

16             Is it illegal for them to accept cash as a

17   compensation?  Certainly not.  Then why would cash compensation

18   to me any -- be any different?  Was it illegal to be paid by

19   check or case?  No.  Then why did the Government make this an

20   issue?

21             Another personal example.  My wife and I took our

22   son Nausher to be evaluated by Dr. Stanley Greenspan, who is

23   a world-renown -- was a world-renown authority in his field.

24   Dr. Greenspan, unfortunately, passed away a few years ago.

25   Apart from his faculty position at the George Washington

University Hospital in Washington, D.C., Dr. Greenspan had a private clinic at his residence where he evaluated patients on a cash-only basis.  We paid him $1,200 for a consultation lasting around an hour.

Was it illegal for Dr. Greenspan to accept cash? Certainly not.  So why would cash compensation for me be any different?  What is good for the goose is also good for the gander, as they say.

If a question arises that the clinic was an illegal or an illegitimate entity, then why did the Government not indict the clinic to prove it?  The Government called the clinic a pill mill yet it did not indict it as an entity.  I'll address this in a minute.

A quick word about my compensation at the clinic. I was paid $2,000 a day, and it has been made an issue by the Government.  Sometimes I was paid by cash, and there is evidence that they even paid me by check.  Physician compensations vary, and $2,000 per day is not out of the ordinary.

I had earlier alluded to Dr. Greenspan's fee of $1,200 for around an hour of compensation.  I was myself paid more than that while working at the emergency department at Appling Health Care Center in Baxley, Georgia.  My contract with Satilla Regional Medical Center in Waycross when I first moved was far above this as well.  I bet Dr. Kennedy, the

1     Government's expert witness, makes more than that in his daily

2     practice.

3              The question is:  Why did the Government bring up

4     this compensation to the attention of the jury without a

5     comparative analysis?  The answer is nothing other than to make

6     an issue out of a nonissue, the purpose being to mislead the

7     jury into believing that something unusual or bad was going on

8     at the clinic.

9              On the other hand, if the Government felt what the

10    clinic did in this respect was illegal or inappropriate, why

11    did the clinic -- why didn't it not indict the clinic for its

12    wrongdoing instead of holding me responsible for the actions of

13    the clinic?

14             This was not a -- this was a clinic policy.  I did

15    not demand cash.  I would have just as well been satisfied if I

16    was paid by payroll check.

17             Did the Government present any evidence to the jury

18    to suggest that I demanded any cash compensation?  No, because

19    none existed.  Yet it is using it against me as if I did

20    something illegal or wrong.

21             The next issue that I'd like to address is an

22    extremely important one regarding what we call the pill mill,

23    which has been repeatedly mentioned by the Government.

24             The following elements have to be present,

25    Your Honor, in order for a pain clinic to be labeled a pill

1    mill.  There are seven that I've listed.

2         Number 1, physicians prescribe large quantities of

3    so-called drug cocktail, which I'll explain in a moment;

4    Number 2, minimal or no physical exam is carried out;  Number 3,

5    meaningless urine drug screen;  Number 4, MRIs are not verified;

6    Number 5, quantities of medications are increased over a period

7    of time;  Number 6, physicians receive bonuses and incentives

8    for seeing at least a certain number of patients per day;

9    patients -- Number 7, patients driving long distances because

10   any -- for any of the above or all of the above.

11        And, now, I'll go through each of these seven

12   elements as they pertain to East Health Center and my role in

13   each.

14        The issue of prescribing large quantities of

15   narcotics.  In order to understand this fact, the Government

16   never defined to the jury what a large quantity of narcotic

17   was.  Neither did the Government expert.  Neither one of them

18   informed the jury what was a normal quantity or dose of

19   narcotics.

20        How could the Government charge me with prescribing

21   and dispensing -- I'll go over dispensing in a minute -- large

22   quantities of narcotics when it failed to define what

23   constitutes normal --

24        THE COURT:  Mr. Withers, I'm going to stop you, and

25   I'm going to stop your client again.  Now, this is not an

1    appeal of the jury verdict in this case.  This is not a motion

2    for a new trial, which has been denied in this case.

3           This is an opportunity for the defendant to tell the

4    Court anything about mitigation of sentence, why you should

5    give me a certain sentence, Judge, why you should sentence me

6    within the guidelines or out of the guidelines or why you

7    should depart or vary from your sentence in my personal case.

8           Now, this is not -- the purpose of giving him the

9    right to state in mitigation of sentence anything that he

10   wishes to state before the Court announces its sentence is

11   being abused here.

12          Now, Mr. Azmat needs to tell me in mitigation of

13   sentence, not arguing appeal in this case.  And I don't know

14   whether he listens to me or whether he listens to you,

15   Mr. Withers, but you're counsel, and you're an officer of this

16   Court, and you cannot stand moot.

17                MR. WITHERS:  I'll speak with him again, Your Honor.

18                THE COURT:  Yes, sir.  You have a duty to do that.

19                MR. WITHERS:  Of course, Your Honor.

20                THE COURT:  Everybody remain seated.

21                      (A brief recess was taken from 4:56 p.m. to

22                      4:59 p.m.)

23                THE COURT:  Are we ready to continue, Mr. Withers?

24                MR. WITHERS:  Yes, sir.

25                THE COURT:  All right, sir.

1            All right.  Mr. Azmat, you may continue.

2            THE DEFENDANT:  Your Honor, I'd just like to wind

3    this up with my closing remarks.

4            Your Honor, patients with chronic pain problems fall

5    into two categories, those that seek medication for diversion

6    and those that are in real need for help for their pain.  It is

7    not always easy for physicians to make a distinction between

8    the two.  Conscientious physicians try to do their best to help

9    the patients in need while discouraging the drug-seeking ones.

10            Evidence that I presented or I could not clearly

11    demonstrates that I was making a conscientious effort to help

12    those in need by reducing the narcotic medications across the

13    board on each and every patient from 10 to 30 percent on the

14    low end and, for the -- most patients, 50 to 60 percent or more

15    by not prescribing benzodiazepines with the narcotics except

16    to wean those patients off -- and that happened in 22 out of

17    the 25 patients reviewed by Dr. Kennedy -- by not prescribing

18    the so-called drug cocktail -- I never did prescribe that --

19    by enforcing strict urine drug screens, and by not prescribing

20    narcotics to those that failed the urine drug screen, by

21    enforcing primary-source verification of MRIs, et cetera,

22    et cetera.

23            Evidence was also clear that ones seeking medication

24    without need were not only unhappy and defended -- demanded

25    (unintelligible), but I also told them not to come back, and

1    many did not come back to the clinic.

2          Nothing made me change my efforts to continue with

3    rational treatment of patients with need.  I have made -- I

4    made a good-faith effort, and I had good intentions.   My

5    conscience is crystal clear.  Deep inside, I'm extremely hurt

6    because my good intentions were misread, ignored, misconstrued,

7    and my name maligned, and I've been vilified.

8          I'm deeply hurt because, in spite of my steadfastness

9    in resisting the pressures of change, what I believe was right,

10   I find myself convicted by crimes that -- of crimes that I did

11   not commit.  I'm absolutely sure and without any doubt that

12   I'm cleared in the -- in God's eyes, and I endure the pain and

13   suffering in spite of my good-faith efforts that I clearly

14   demonstrated.  And, unfortunately, I could not present the

15   evidence with medical literature that I had here.

16         My practice was a legitimate medical practice.   I

17   stand in front of God with a clear conscience of innocence.

18   I'm extremely remorseful and sorry that neither the jury nor

19   the Government recognized my good intentions.  I wish I could

20   open my heart and show how much I've cared for all my patients

21   throughout my career and, yes, including the patients that I

22   saw at East Health.  My profession has always been very

23   important to me, and I've always taken the pride in doing the

24   right thing for my patients, including the ones at East Health.

25         Can any fair-minded person argue that reducing

1    narcotics drastically in most, discontinuing Xanax except to

2    wean them off because it could not be abruptly stopped, and

3    never prescribing drug cocktail, not prescribing narcotics to

4    those that failed the urine drug screens for illicit drugs,

5    et cetera, et cetera, was a legitimate and good medical

6    practice?  Sadly, unfortunately, the Government thought

7    otherwise.

8            Your Honor, with my arguments and evidence to support

9    them, I do not deserve to be incarcerated.  I have clearly

10   shown that the Government misread -- misled the jury with

11   less than accurate and unsupported information amounting to a

12   misconduct.  I've demonstrated to the Court that the Government

13   expert failed to define the standard and arbitrarily accused me

14   of inappropriate narcotic prescription.

15           Such an accusation is contrary to the medical

16   standard and clearly states that the expert testimony should

17   be based on sound scientific basis.  Neither the Government nor

18   the expert defined what the level -- normal standard was for

19   narcotic prescription.  In other words, his testimony should

20   not be based on personal views and experiences.  There was

21   bias in his testimony and written reports, which are totally

22   ignored the fact -- which totally ignored the fact that I

23   reduced the narcotic medications.

24           Your Honor, it is entirely at the discretion of the

25   Court to intervene at this late hour to serve justice that the

1    defendant was denied by the jury verdict due, in major part, to

2    a result of misinformation and other tactics by the Government

3    which deviated not only from the facts of the case but also

4    from the evidence gathered by the Government itself, the proof

5    of which I could not fully present today, not to mention this

6    misconduct by the Government in mentioning the Pakistan

7    location of my medical school, leaving to -- the jury to draw

8    its own conclusion.

9            Can the Court assure me with 100 percent certainty

10   that such misconduct by the Government had absolutely no effect

11   in the minds of the jurors?

12           The jury took around 2 hours to deliberate a 52-count

13   indictment is testament to some alternate factors influencing

14   their minds because the evidence was just not there to convict

15   me.  I should be the beneficiary of such a doubt given the fact

16   that the Government provided enough reasons to prejudice the

17   minds of the jurors.

18           THE COURT:  Anything else, sir?

19           THE DEFENDANT:  Finally, I offer my unconditional

20   apology to the Court for any inadvertent misspoken words.  My

21   respect for the Court has always remained unwaivered.

22           I'm extremely remorseful for all the happenings that

23   happened.  I had no bad intentions, like I said, and I've

24   always been a good person at heart and taken care of my

25   patients.  I wish I had more time or was allowed to present

1   some of the other things that I could not.

2           I thank my friends, supporters, and family for their

3   presence and, above all, the Court for allowing me to speak and

4   for listening to me.

5           Thank you and God bless the Court and may the hand

6   of God direct the Court to a just intervention.   Thank you,

7   Your Honor.

8           THE COURT:   Thank you, sir.

9           I have listened to the defendant and the defendant's

10  counsel.   I have also listened to counsel for the Government.

11  I've reviewed the presentence investigation report.   I've also

12  considered the factors set forth at 18, United States Code,

13  Section 3553(a).   I have reviewed the sentencing memorandum

14  filed by Defendant's counsel, and I have reviewed the

15  memorandum regarding the guideline range for oxycodone also

16  filed by Defendant's counsel.

17          I have listened to the testimony today of the

18  defendant's brother, Mr. Nabil Azmat; to his friend and fellow

19  physician, Dr. Akram, if that's the correct pronunciation; and

20  to Mr. Chris Ray, who's a local attorney who has represented

21  and known Dr. Azmat for many years.   I've also considered a

22  letter that I received some time ago from Dr. Azmat's

23  15-year-old daughter, a very compelling letter from a daughter

24  that obviously loves her father.

25          Pursuant to the Sentencing Reform Act of 1984, it is

1    the judgment of the Court that the defendant, Najam Azmat, is

2    hereby committed to the custody of Bureau of Prisons to be

3    imprisoned for a term of 133 months.  And this term of

4    imprisonment is comprised as follows:

5           A term of 133 months as to Count 1, the conspiracy

6    count; a term of 133 months as to each of Counts 2 through 13,

7    15 through 17, 19 through 25, 27, 28, and 30 through 50 --

8    those are the counts involving Schedule II controlled

9    substances -- a term of 60 months as to each of Counts 14, 26,

10   and 29, the counts involving Schedule IV controlled substances;

11   a term of 120 months as to Count 18, the count involving

12   Schedule III controlled substances; and a term of 133 months as

13   to Count 52, the conspiracy to commit money laundering.

14          Each of the terms of imprisonment imposed as to

15   Counts 1 through 50 and 52 are to be served concurrently with

16   one another for a total term of 133 months of imprisonment.

17          The Court has conducted a downward variance from the

18   advisory guideline range pursuant to the factors identified in

19   18, United States Code, Section 3553(a).

20          The Court, in imposing a sentence below the advisory

21   guideline range, has considered the Government's motion

22   regarding the proposed guideline amendment, which includes a

23   two-level reduction in the base offense level for drug-related

24   offenses.  That two-level reduction would yield a total offense

25   level of 34 with a criminal history category of I, and the

1  advisory guideline range in the instant matter under the

2  proposed amendment would be 151 to 188 months.

3       And the defendant has agreed not to seek a further

4  reduction in sentence pursuant to 18, United States Code,

5  Section 3582(c)(2) [sic] should the sentencing commission adopt

6  the proposed amendments and make those amendments retroactive.

7       This Court has also conducted a downward variance

8  from the advisory guideline range pursuant to the factors

9  set forth in 18, United States Code, Section 1820 --

10 Section 3553(a), particularly the history and characteristics

11 of the defendant.

12      As set forth in the presentence investigation report,

13 Mr. Azmat is 57 years old.  He suffered a heart attack

14 approximately 1 year ago.  He underwent surgery and had five

15 coronary stents inserted in response to that heart attack.

16 He has been diagnosed with coronary artery disease, received

17 several medications for this condition.  The defendant is also

18 restricted to a special diet in association with his heart

19 disease.

20      The defendant was also diagnosed with glaucoma

21 approximately 5 years ago.  As a result of this condition, he

22 is suffering from gradually reduced vision in his right eye and

23 requires several additional medications.  The defendant also

24 suffers from arthritis in both shoulders and has previously

25 undergone surgery for a torn meniscus of his right knee.

1           The totality of the defendant's physical health

2   problems leads this Court to conclude that the imposed sentence

3   is sufficient but not greater than necessary to comply with the

4   purposes of sentencing prescribed at 18, United States Code,

5   Section 3553(a), specifically the need of the sentence imposed

6   to provide the defendant with the -- with needed medical care

7   in the most efficient manner.

8           The Court has determined that the imposed sentence

9   adequately reflects the seriousness of the offense behavior,

10  that it promotes respect for the law and provides just

11  punishment for the offense.  Likewise, the imposed sentence

12  sufficiently affords deterrence from any future criminal

13  conduct on the part of the defendant and sufficiently protects

14  the public from further crimes of this defendant.

15          After considering the factors set forth at United

16  States Sentencing Guidelines, Section 5E1.2(d), the Court has

17  determined that the defendant does not have the ability to pay

18  a fine.

19          It is further ordered that Defendant shall pay the

20  United States a special assessment of $100 as to each count for

21  a total of $5,100, which shall be due immediately.

22          Pursuant to 21, United States Code, Section 862, the

23  defendant shall be ineligible for certain federal benefits for

24  a period of 5 years.

25          Upon release from imprisonment, the defendant shall

1  be placed on supervised release for a term of 1 year, and this
2  supervised release is composed of 1 year of supervised release
3  as to each of Counts 1 through 50 and Count 52, all to be
4  served concurrently.

5      While on supervised release, the defendant shall
6  comply with the standard conditions of supervision adopted by
7  this Court and the mandatory conditions required by 18, United
8  States Code, Section 3583, which will not include -- or which
9  will include, but not be limited to, urine testing, a
10  prohibition against possession of any firearm or other
11  dangerous weapon and a prohibition against a violation of any
12  local, state, or federal law.

13      Further, the defendant shall cooperate in the
14  collection of a DNA sample as directed by the probation officer
15  pursuant to 18, United States Code, Section 3583.

16      The defendant shall participate in a program of
17  testing for drug and alcohol abuse; and, further, the defendant
18  shall not tamper with any testing procedure.

19      The defendant shall submit his person, property,
20  house, residence, office, papers, vehicles, computers as
21  defined in 18, United States Code, Section 1030(e)(1) or other
22  electronic communications or data storage devices or media to a
23  search conducted by a United States probation officer at a
24  reasonable time, in a reasonable manner based upon reasonable
25  suspicion of contraband or a violation of a condition of

1   release, and a failure to submit to such a search may be
2   grounds for revocation.  The defendant shall warn any other
3   residents that the premises may be subject to searches pursuant
4   to this condition.
5           The defendant shall not be employed as a physician or
6   otherwise dispense controlled substances during the term of
7   supervision.
8           The probation officer is directed to provide the
9   defendant with a written statement which sets forth all the
10  conditions to which the term of supervised release is subject.
11          It is further ordered that Defendant is remanded to
12  the custody of the United States Marshal.
13          Mr. Azmat, you're now advised it is your right to
14  appeal from this sentence within 14 days of this date.  A
15  failure to appeal within the 14-day period shall be a waiver of
16  your right of appeal, and the Government may file an appeal of
17  this sentence.
18          You're also advised that you're entitled to
19  assistance of counsel in taking an appeal.  And if unable to
20  afford a lawyer, one will be provided for you.  And if you so
21  request, the clerk of clerk will prepare and file a notice of
22  appeal on your behalf.
23          In the event of an appeal, it'll be the obligation
24  and responsibility of your counsel to continue his
25  representation on appeal unless and until relieved by order of

1    the United States Court of Appeals.

2              Mr. Azmat, as you know, I was the trial judge that

3    tried this case and heard the evidence in this case.  There's

4    no jury error in this case, and you unfortunately deceive

5    yourself when you take the position that there was jury error.

6              You have been sentenced today for what you did in

7    this case, not what happened in Kentucky, not what happened in

8    anywhere else, not what happened in any other civil actions

9    that might have been brought for you, but only for what you did

10   and what your conduct was in this case.

11             You have people that believe in you.  Your friend

12   testified that, in his opinion, you are a good physician.  This

13   Court has proved in this case that in no event should you be

14   allowed to practice medicine again.  You have dishonored your

15   profession by your conduct in this case.  You have dishonored

16   yourself.

17             The family is the one who always suffers.  There's

18   always a wife or children or other family members left behind.

19   But you chose the path that you took in this case.

20             And no reasonable person, based upon the evidence

21   presented in this case and what happened in this case, could

22   come to any conclusion but the fact that you are guilty as you

23   were found guilty by the jury in this case.

24             To many people, apparently, because -- I remember the

25   testimony at your bond hearing, and I remember the people from

1   the board of education and other people who came and testified

2   as to your interest in the community and in your family.  And

3   to many people, you have, apparently, a Jekyll-and-Hyde

4   personality.  Many people see you one way, and this verdict of

5   this jury and the testimony in this case found you another way.

6          Over 20 years ago, there was a movie that was made,

7   had Marlon Brando as the star in the movie.  And at one point

8   in the movie, Marlon Brando said to one of the other people,

9   "You may be a one-eyed jack, but I've seen the other side of

10   your face."  And what you did in this case and what you did

11   involving these patients showed the other side of your face.

12          Sentence has now been pronounced.  Other than any

13   objections previously stated for the record, do you have any

14   objections to the Court's findings of facts, conclusions of

15   law, or manner in which the sentence was pronounced?

16          Any from the defendant, Mr. Withers?

17          MR. WITHERS:  Your Honor, I would just adopt those

18   previously stated.

19          THE COURT:  Any from the Government, Mr. Knoche?

20          MR. KNOCHE:  Briefly, two things, Your Honor.

21          THE COURT:  Yes, sir.

22          MR. KNOCHE:  As to Count 1, I believe the total

23   sentence should be 60 months because of the findings the Court

24   made at the beginning of the hearing.  It would not affect the

25   total sentence of imprisonment.  But as to Count 1, the

1  Government asks that you amend that pronouncement to 60 months

2  concurrent.

3        THE COURT:  Let me see what I said.  I said

4  133 months as to Count 1, and that was an error.  It should

5  be --

6        MR. KNOCHE:  60, Your Honor.

7        THE COURT:  -- 60 months as to Count 1, the

8  conspiracy count.

9        MR. KNOCHE:  Yes, sir.  And --

10        THE COURT:  And I correct that.

11        MR. KNOCHE:  Your Honor -- and one other thing.  As

12  to all of the Schedule II substantive counts -- and I can

13  rattle them off for Your Honor.  But the term of supervised

14  release would be at least 3 years, not 1 year.

15        So the Government requests that the Court modify the

16  term of supervised release as to -- to those Schedule II counts

17  to be at least 3 years of supervised release.  Or 3 years would

18  be the Government's request.

19        THE COURT:  What does the probation office say?

20        PROBATION OFFICER JACOBS:  That's correct,

21  Your Honor.  The advisory term of supervised release remains at

22  least 3 years.

23        THE COURT:  Okay.  So on those counts, it remains at

24  3 years.

25        All right.  I will correct the sentencing statement

94

1    then by saying that the term of supervised release shall be

2    3 years.

3              MR. KNOCHE:  And that's all from the Government,

4    Your Honor.

5              THE COURT:  Anything else, Mr. Withers?

6              MR. WITHERS:  Your Honor, I would ask for a day or so

7    to submit to the probation officer a requested designation.

8              THE COURT:  All right, sir.  Whatever designated

9    institution you want me to recommend, if you'll let the

10   probation officer know, I'll make that recommendation in the

11   final judgment and commitment in this case.

12             MR. WITHERS:  Thank you, Your Honor.

13             THE COURT:  All right.  We'll be in recess.

14             THE MARSHAL:  All rise.

15                  (Proceedings concluded at 5:23 p.m.)

16

17

18

19

20

21

22

23

24

25

95

1                    C E R T I F I C A T E

2

3        I, Victoria L. Root, Certified Court Reporter, in and for

4    the United States District Court for the Southern District of

5    Georgia, do hereby certify that, pursuant to Section 753,

6    Title 28, United States Code, the foregoing is a true, correct,

7    and complete transcript of the stenographically reported

8    proceedings held in the above-entitled matter and that the

9    transcript page format is in conformance with the regulations

10   of the Judicial Conference of the United States.

11       WITNESS MY HAND AND SEAL this 3rd day of September, 2014.

12

13

14

15

16

17

18                         */s/  Victoria L. Root*
                           VICTORIA L. ROOT, CCR B-1691
19                         United States Court Reporter
                           Southern District of Georgia
20                         Savannah Division

21

22

23   Post Office Box 10552
     Savannah, Georgia  31412
24   (912) 650-4066

25