IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF GEORGIA

SAVANNAH  DIVISION


UNITED STATES OF AMERICA     *

v.                            *   CASE NUMBER CR413-28

NAJAM AZMAT              *

---

Transcript of Evidence and Proceedings Adduced in the Jury Trial held

January 13-17, 2014 before The HONORABLE WILLIAM T. MOORE, JR.,

Judge Presiding, reported by Marie Cowart, Official Court Reporter.

---

VOLUME 1 - 1/13/2014

PP. 57 - 201

APPEARANCES:

For the Government                 KARL I. KNOCHE, AUSA
                                    GREGORY E. GILLULY, JR., AUSA

For the Defendant                  THOMAS A. WITHERS, ESQ.


*Proceedings recorded by shorthand with back-up recording; transcript produced from note reading in*

*conjunction with transcription of back−up recording.*

## I  N D E X

### VOLUME 1A - 1/13/2014

(*Voir Dire* and Jury Selection)

PP. 1 - 56

PRELIMINARIES AND INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . 13

JURY PANEL SEATED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*VOIR DIRE* EXAMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

      Juror Biographicals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

SILENT STRIKING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

JURY SEATED AND SWORN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

CERTIFICATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

### VOLUME 1 - 1/13/2014

PP. 57 - 201

PRELIMINARIES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

COURT'S RULINGS ON EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

OPENING STATEMENTS

    By Mr. Knoche  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

    By Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Government's Presentation of Evidence

MARY KAY ROSS

    Direct Examination by Mr. Knoche  . . . . . . . . . . . . . . . . . . . . . . . . 82

    Cross-Examination by Mr. Withers  . . . . . . . . . . . . . . . . . . . . . . . . 90

    Redirect Examination by Mr. Knoche  . . . . . . . . . . . . . . . . . . . . . . 93

    Recross Examination by Mr. Withers  . . . . . . . . . . . . . . . . . . . . . . 94

DAVID HATMAKER

    Direct Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . 95

    Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 103

    Redirect Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . 107

CHARLES SIKES

Direct Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . . 107

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 150

Redirect Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . 181

Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . 188

CHARGE CONFERENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

CERTIFICATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201

## VOLUME 2 - 1/14/2014

## PP. 202 - 456

PRELIMINARIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202

ADELARD LeFRANCOIS

Direct Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . 202

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . 251

Redirect Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . 277

Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . 284

FRANCIS J. BARBUSCIA

Direct Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . 286

Cross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 301

Redirect Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . 310

Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . .  311


NANCY BINION

Direct Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . .  312

Cross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . 329

Redirect Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . 333


PATRICIA ROHRER

Direct Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . 334

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . 344

Redirect Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . 350

Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . .  351


KONSTANTINO AFTHINOS

Direct Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . 352

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . 369

Redirect Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . 378

Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . 381

SEAN CLARK

Direct Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . . . 383

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . . 392

Redirect Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . 401

Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . 402


JOSEPH TRAVIS BRADLEY

Direct Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . . . 403

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . . 415

Redirect Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . 431


LATINA SIMPSON

Direct Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . . 434

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . . 445

Redirect Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . 452


CERTIFICATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 456

VOLUME 3 - 1/15/2014

PP. 457 - 734

PRELIMINARIES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 457

GERALD SMITH

    Direct Examination by Mr. Knoche  . . . . . . . . . . . . . . . . . . . . . . . . . . 457

    Cross-Examination by Mr. Withers  . . . . . . . . . . . . . . . . . . . . . . . . . . 469

JAMES GABLE

    Direct Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . . 480

    Cross-Examination by Mr. Withers  . . . . . . . . . . . . . . . . . . . . . . . . . . 488

    Redirect Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . 494

    Recross Examination by Mr. Withers  . . . . . . . . . . . . . . . . . . . . . . . . 496

BILL LETNER

    Direct Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . . 496

    Cross-Examination by Mr. Withers  . . . . . . . . . . . . . . . . . . . . . . . . . . 507

    Redirect Examination by Mr. Gilluly  . . . . . . . . . . . . . . . . . . . . . . . . 512

    Recross Examination by Mr. Withers  . . . . . . . . . . . . . . . . . . . . . . . 513

KIMBERLY LETNER

    Direct Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . . 516

    Cross-Examination by Mr. Withers  . . . . . . . . . . . . . . . . . . . . . . . . . . 524

Redirect Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . 534

Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 537


KEN GOSSETT

Direct Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . . 537

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . . 546

Redirect Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . 563

Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 567


DANIEL WISE

Direct Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . . 569

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . . 586

Redirect Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . 605

Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 608


MICHAEL PALMER

Direct Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . . 609


GENE SCOTT KENNEDY, M.D.

Direct Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . . 611

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . . 673

COURT'S INSTRUCTION TO COUNSEL . . . . . . . . . . . . . . . . . . . . . . . . . 726

COURT'S INSTRUCTION TO DR. KENNEDY . . . . . . . . . . . . . . . . . . . . . 728

COURT'S RULING ON APPROPRIATE STANDARD
    FOR GOOD-FAITH DEFENSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 728

CERTIFICATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 734

### VOLUME 4 - 1/16/2014

### PP. 735 - 932

PRELIMINARIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 735

GENE SCOTT KENNEDY, M.D.

    Continued Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . 735

    Redirect Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . 761

    Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . 775

COURT'S RULINGS ON EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . 777

GOVERNMENT RESTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 777

DEFENSE RULE 29 MOTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 778

RESPONSE OF GOVERNMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 780

COURT DEFERS RULING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 780

Defendant's Presentation of Evidence

THOMAS SIMOPOULOS, M.D.

    Direct Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . . . 783

    Cross-Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . . 859

    Redirect Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . 917

DEFENSE RESTS AND CLOSES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 918

COURT'S RULINGS ON EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 919

CHARGE CONFERENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 922

DEFENSE RENEWS RULE 29 MOTION . . . . . . . . . . . . . . . . . . . . . . . . . 930

DEFENDANT WAIVES RIGHT TO TESTIFY . . . . . . . . . . . . . . . . . . . . . . . 931

CERTIFICATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 932

<u>VOLUME 5 - 1/17/2014</u>

<u>PP. 933 - 987</u>

PRELIMINARIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 933

CLOSING ARGUMENTS

    By Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 933

    By Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 946

REBUTTAL ARGUMENT

    By Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 964

COURT'S RULING ON DEFENSE RULE 29 MOTION . . . . . . . . . . . . . . 973

DEFENSE EXCEPTIONS TO CHARGE . . . . . . . . . . . . . . . . . . . . . . . . . 975

JURY QUESTIONS 1 AND 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 976

RECEIPT OF VERDICT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 977

JURY POLLED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 980

POST-CONVICTION RIGHTS ADVISED . . . . . . . . . . . . . . . . . . . . . . . . . 980

JURY INSTRUCTED REGARDING FORFEITURE . . . . . . . . . . . . . . . . . . 982

DETENTION  HEARING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 982

COURT'S RULING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 986

CERTIFICATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 987

-57-

1          [NOTE: On 1/13/2014 following *voir dire* and jury selection,

2     the proceedings are continued outside of the presence of the jury as

3     follows:]

4                THE COURT: Mr. Knoche, how much time are you requesting

5     in your opening?

6                MR. KNOCHE: I can do the government's opening in 20

7     minutes, Your Honor.

8                THE COURT: Will you be doing it, or will Mr. Gilluly be doing

9     it?

10               MR. KNOCHE: I'll be doing the opening.

11               THE COURT: Okay.  Mr. Withers, how much time are you

12    requesting in your opening?

13               MR. WITHERS: 25 minutes, Your Honor.

14               THE COURT: So we're talking about 45 minutes or more for

15    opening.  I'm going to bring this jury back in in a minute, I'm going to give

16    them their preliminary jury instructions, and that usually takes 15 minutes

17    or so.  So rather than split up your openings, it's probably better to go

18    ahead and send the jury to lunch before you begin your openings, unless

19    y'all have some problem with that.

20               MR. WITHERS: No, that's fine, Your Honor.

21               MR. KNOCHE: No, Your Honor.

22               THE COURT: Now, I will tell you, you know, I've gotten various

23    estimates from you as to the length of this trial, and the last estimate I got

24    was about a week.  Now, if this case is not over with – if we don't finish this

25    case by Friday, you need to be prepared to be here on Saturday if necessary.

1   And also, Monday next is a holiday, and so you need to be prepared to be

2   here on that holiday if necessary.   So I just want to tell you so you can talk

3   to your witnesses or whatever if we don't get finished.

4           Now, before I bring this jury back in and give them their

5   preliminary instructions, are there any matters that I need to take up

6   before we get directly into the case after your opening, Mr. Knoche?

7           MR. KNOCHE: One mostly housekeeping issue, Your Honor.

8   In this case the government has two agents.  I would like leave of the Court

9   to have the government's second case agent, Mr. Kahn, who will not be with

10   us at table, I'd like for him to have permission to be present during the

11   proceedings.

12           THE COURT: Is he going to testify?

13           MR. KNOCHE: He's on our witness list.  At this point it's

14   unlikely, but if there's a need at the end of the case, I would like to have him

15   excused from the sequestration rule.

16           THE COURT: What do you say, Mr. Withers?

17           MR. WITHERS: Your Honor, if he is not going to testify, then I

18   have no objection to him being here.  If he is going to testify, then I would

19   ask that the rule apply to him as well.

20           THE COURT: Well, we're going to have the rule of

21   sequestration, Mr. Knoche, so I think you're faced with a situation of

22   making that decision as to whether or not you want him or whether you

23   don't want him here.

24           MR. KNOCHE: Yes, Your Honor.  We'll make that decision, and

25   if we elect to leave Agent Kahn as prospective witness, we'll have him stay

1     out of the courtroom.

2            THE COURT: All right, and the case will be reported under the

3     rule, and so you need to be aware of keeping your witnesses out of the

4     courtroom, and you need to be aware of keeping your witnesses out of the

5     courtroom, Mr. Withers.  And any witness – you know, their testimony will

6     be excluded if they are in the courtroom to hear the testimony of other

7     witnesses.

8            Anything else from the government, Mr. Knoche?

9            MR. KNOCHE: No, Your Honor.

10           THE COURT: Mr. Withers?

11           MR. WITHERS: Your Honor, I have one other matter I did

12    want to put on the record.  Mr. Bobby Phillips called me last Monday, I

13    think, and notified me that his client, Mr. Clark, had said that he had

14    actually come to see me two years ago.  And I did confirm that I actually did

15    meet with him.  I didn't discuss anything of substance, and I think that Mr.

16    Phillips agrees with that.  He didn't retain me.  It was a very short meeting,

17    apparently.  But I did want to put that on the record.  And Dr. Azmat, I've

18    discussed with him the issue that, you know, although I don't think there's

19    a conflict, that if there is, he would waive it.

20           THE COURT: You're saying that Dr. Azmat would waive the

21    conflict.

22           MR. WITHERS: Yes, Your Honor.

23           THE COURT: Is that what you're saying?

24           MR. WITHERS: Yes, Your Honor.

25           THE COURT: All right.  If you'll stand, Dr. Azmat.  You heard

-60-

1    your lawyer testify that several years ago that he probably met with Mr.

2    Clark, who may end up being a witness against you in this case.  That he

3    wasn't retained by Mr. Clark, he doesn't remember any in-depth

4    conversation with Mr. Clark, but if there is some sort of conflict because of

5    that, that you want to waive that conflict, which you have a right to do or

6    not do, Dr. Azmat.  What is your decision.

7         DR. AZMAT: Your Honor, I will gladly waive that right.

8         THE COURT: Thank you, you may have a seat.  Anything else

9    from you, Mr. Withers?

10        MR. WITHERS: No, sir.

11        THE COURT: There was a filing from the government on the

12   11th, a certificate of disclosure – ninth certificate of disclosure, and in that

13   filing were plea agreements of Wise and – I don't know how you pronounce

14   the other name.

15        MR. KNOCHE: Afthinos?

16        THE COURT: Yeah.  Now, do you have those plea agreements,

17   Ms. Bodaford, that I can review?

18        CLERK: Yes, Your Honor.

19        THE COURT: Do you have the originals?

20        CLERK: I don't have the originals, I have the ones we made the

21   ...

22        THE COURT: Okay, well, we've already dealt with those, then?

23        CLERK: Yes, sir, they've all been fixed.

24        THE COURT: What I propose to do now, counsel, is to bring

25   the jury back in to give them their preliminary jury instructions, to recess

1    for lunch, to give each of you no more than 25 minutes based upon what

2    you've stated to me for your opening statements, and then we would

3    immediately get right into the evidence with the first witness after that.

4            All right, bring the jury in, please.

5            [NOTE: The jury is seated in the jury box, and the proceedings

6    are continued in the presence of the jury with the Court's preliminary jury

7    instructions, which are not a part of this record.  The proceedings are then

8    continued as follows:]

9            THE COURT: Now, when we take our recess for lunch you're

10   going to be on your own.  Some of you may not be familiar with where we

11   are and this courthouse, but on both sides of the courthouse, and over here

12   behind the courthouse, and for a couple of blocks over here toward Bull

13   Street and up Bull Street, there are numerous places to get something to

14   eat.  You can get a full meal, you can get sandwiches, soup, hotdog,

15   hamburger, whatever you want.  And you'll be on your own during these

16   recesses.  Now, when you come back, as I've said, come back directly in the

17   jury room.

18           Now, according to my watch, which is probably pretty accurate,

19   I think it's about five minutes until noon.  So because this is your first day

20   and you're not familiar here, we're going to recess until 1:15.  So you'll be on

21   your own until 1:15.  Be back in the jury room ready to begin at 1:15.

22           Leave your notepads and your pencils, and they'll be here for

23   you when we get back from this recess.

24           So we will adjourn for your lunch recess at this time.

25           [NOTE: The jury is excused for luncheon recess.  The

-62-

1    proceedings are continued outside of the presence of the jury as follows:]

2         THE COURT: All right, counsel, I will see you after lunch, and

3    we will begin with your opening statements.  And as I've told you, at the

4    close of business today then we'll have a conference regarding the draft of

5    the charges that I sent to you.  So I will see you after our lunch recess.

6         [NOTE: A luncheon recess is taken, after which the proceedings

7    are continued in the presence of the jury as follows:]

8         THE COURT: Members of the jury, I hope you enjoyed your

9    lunch and appreciate you getting back on time, and we are ready to

10   proceed.  You may begin, Mr. Knoche.

11              OPENING STATEMENT BY

12   MR. KNOCHE:

13        May it please the Court, counsel.  Ladies and gentlemen, I was

14   introduced briefly at the outset of the case.  I'm Karl Knoche, is my name.

15   I'm an Assistant U.S. attorney.  My co-counsel seated to my immediate

16   right is Greg Gilluly, and to his right is our case agent, Diversion

17   Investigator Charles Sikes of the Drug Enforcement Administration.  A

18   fellow you haven't seen during jury selection sitting behind him is Mr. Dean

19   Athanasopoulos.  He's a litigation support technician for the U.S.

20   Attorney's office.  You'll hear us addressing him from time to time to show

21   – publish particular exhibits to you on the monitors which are in front of

22   you.  So that's Dean.

23        Ladies and gentlemen, let me outline for you a brief history of

24   the East Health Center, a clinic which seemingly sprung from nowhere in

25   Garden City, Georgia, on or about February the 21st of 2011.  That was the

1    first day it opened its doors to the public in an old strip mall on Highway 80

2    East in Garden City.  The clinic opened on February the 21st.  It was closed

3    on May the 26th of 2011, a scant three months later, when DEA agents, CNT

4    agents, and other investigators served a federal search warrant at the

5    premises and seized numerous records and materials from the clinic.

6    Never reopened after that.

7              Now, this was no ordinary medical clinic.  It did not open in

8    Garden City because of some perceived need, or gap, or void in the medical

9    community of Savannah.  In fact very few, if any, of the patients who visited

10   East Health Center during its short tenure were from Savannah.  The

11   majority of patients came from out of state, and not just over the border in

12   South Carolina, although there were some like that.  No, the patients

13   typically and routinely came from far away places like the Commonwealth

14   of Kentucky, a full 10, 11-hour drive from Savannah.  They came from all

15   over the state of Florida.  They came from Orlando, they came from

16   Jacksonville.  There were patients that came to see East Health Center

17   doctors who came from the state of Ohio and elsewhere.  The government's

18   evidence will make this clear to you as we progress through the case that

19   this was a clinic serving an out-of-town, out-of-state clientele.

20             And likewise with the patients, the persons who organized the

21   East Health Center, they also weren't from Savannah.  They were routinely

22   and typically from south Florida.  They came from Boca Raton, Palm

23   Beach, and those areas in south Florida.  Curiously, none of the organizers

24   of the clinic had any legitimate medical experience.  The patients who came

25   to East Health Center, they typically traveled, because they were traveling

1    such long distances, they traveled in groups.  They carpooled.  They would

2    come with their out-of-state plates, and they would park at the parking lot

3    at East Health Center, and they would be told by the people who worked at

4    the clinic, you know, park your car the other way so that the license plate

5    isn't so obvious.  They were told rules about smoking and loitering at the

6    clinic, so as to not draw the ire of neighboring businesses, or the attention

7    of law enforcement agents.

8    They almost without exception paid cash for their visits. $300

9    was the basic going rate to be seen by a physician at East Health Center.

10   East Health Center did not accept insurance.  It's not a place where you

11   could go and write a check.  There were some patients, very few, that paid

12   by credit card, and you will see evidence of that.

13   The clinic was a sparsely appointed office.  There was very little

14   medical equipment in the facility.  There was a scale that you could weigh

15   yourself.  There was a blood pressure cuff.  After a visit by an agent from

16   the CNT in the early days that the clinic was open, the members – the

17   organizers of the clinic went out and procured some things like medical

18   charts to show this is the human body, this is the musculature, this is the

19   respiratory system.

20   One thing will be very clear to you as we progress through this

21   case: the patients who came all these distances, and paid the cash, and

22   traveled in groups to be seen in this sparsely appointed clinic, they came for

23   one reason, and that reason was to obtain prescriptions for powerful

24   narcotic medications.  And the medicine of choice, the drug of choice for

25   the customers at East Health Center was oxycodone.  And you'll hear that

1  this oxycodone comes in two strengths or dosages, it's 30 milligrams and 15

2  milligrams, but this was the drug of choice.  This was the gold standard for

3  patients who came to the East Health Center.

4          Many of these patients were drug abusers.  Many were drug

5  addicted, and there were many who also diverted their drugs to third

6  parties, sold their drugs to other people.  These patients obtained the

7  prescriptions with only the most cursory of physical examinations.  The

8  physical exams that were conducted were not credible.  You will hear this

9  both from the patients who we expect to call and testify, and you will also

10  hear it from a pain management expert that the government will call and

11  tell you about his review and his opinions of the files that were seized from

12  East Health Center.

13          Patients would come and they would complain of pain.  A

14  typical complaint would be that patient's pain is a 9 or 10 on a scale of 1 to

15  10, with 10 being the highest.  Now, you would expect that a person with a

16  pain level of 9 or 10 would be on the phone and calling an ambulance and

17  going to an emergency room.  You'll see – from surveillance video which

18  was seized at the clinic, you'll see pictures of these patients standing in the

19  lobby, standing in line waiting to pay their money, sitting in chairs.  And I

20  will challenge you to, in your own minds, ask yourselves if it's credible to

21  believe that those persons have a pain level of 9 or 10.

22          Couple that with the medical files which were seized in which

23  the patients complain of many things often which aggravate or make their

24  symptoms worse.  One of them – which I think is very remarkable, and I

25  ask you to keep mental track of this – sitting or driving long distances

1    makes the back pain worse.  So you might ask yourself, why are these

2    patients driving all this distance to be seen at East Health Center.  Imagine

3    how many legitimate doctor offices these patients would pass during their

4    several-hundred-mile one-way journey to the East Health Center.

5         You would think that a person with a history of pain and a

6    person with a history of pain management treatments, that there would be

7    a good clinical record of this, that there would be records available from the

8    doctor who most recently treated the patient for whatever ailment they

9    complain of.  You would think that.  The presentation of these prior

10    medical records was not a prerequisite at East Health Center.  In fact the

11    agent will testify he's been through every one of the records of Dr. Azmat's

12    patients at East Health Center and did not find any evidence of prior

13    physicians' records being in the file.  The only thing that a patient was

14    expected to provide in addition to the fee, the $300, was an MRI which was

15    less than two years old.  That's it.  There were some instances where there

16    were pharmacy records in the file, but that was not the rule; it was not

17    required.  The only thing that was required was the MRI, the payment of

18    the money, and a complaint that, I have pain and I need these drugs.

19         Doctors did not make any attempt to contact prior physicians.

20    Not only do they not get the records, they didn't call the doctors on the

21    other end to see, is this your patient and have you been treating him with

22    this medication.  They were not questioned as to why they had traveled so

23    far to get these prescriptions, and it was no secret that they had traveled so

24    far, because when the patients were seen at East Health Center, the first

25    thing you do, like many of you have experienced when you visit your own

-67-

1    doctor, you fill out the paperwork.  And what's one thing that is on every

2    one of those files?  Name and address.  And all that paperwork goes back to

3    the doctor.  The doctor had to know, and we will present evidence that he

4    did know, that his patients were, the majority of them were from out of

5    state, and the vast majority came from long distances from Savannah,

6    Georgia, even if they were coming from within the state of Georgia.

7          There was no plan for treatment.  Some patients, some patients

8    had dangerously high blood pressure.  You'll hear from the patient whose

9    blood pressure at her initial visit with Dr. Azmat was 153/123.  That's an

10   example.  And there were others whose files you will be seeing during the

11   course of this trial.  Nothing, nothing was said about that blood pressure,

12   even though those patients were ostensibly at a high risk for a stroke.

13         I've talked about the patients.  I mentioned that the organizers

14   of this clinic were not from Savannah either.  The organizers came from

15   Palm Beach, they came from Boca Raton.  No legitimate medical

16   experience.  You will hear from several of these, the first of which we expect

17   will be an individual with a somewhat long, unusual name, Adelard

18   LeFrancois.  Mr. LeFrancois had no legitimate medical experience.  He did

19   have experience managing pill mills in south Florida.  And in particular, he

20   managed a pill mill in Boca Raton, Florida, and he learned about how the

21   business operated.  He learned what props were necessary to try to make

22   the business look legitimate.  He knew the dangers of seeing too many

23   patients at one time.  He knew the drill.  Ask if the MRI was less than two

24   years old.

25         He brought with him to Garden City, Georgia, this knowledge

1    which he obtained while running the pill mill in Boca Raton.  He knew the

2    form, the protocols, the marketing techniques.  This is what he brought.

3    He was the guy who knew how to make it go.  And he had office staff

4    members that worked with him that he brought, as well, to staff the office.

5    He brought a woman named Adel Lizama, and another woman, Candace

6    Carreras, who had worked with him at the Boca Raton pill mill.  He knew a

7    fellow named Sean Clark, who worked as a marketer and a security guard

8    for various south Florida clinics, and another fellow named Frankie

9    Barbuscia, who was a marketer.

10          You will hear from Mr. Barbuscia, you will hear from Mr. Clark,

11    you will hear from Mr. LeFrancois about their activities.  And I'd like you to

12    take away from Mr. LeFrancois' testimony why did he move his pill mill

13    clinic, a pill mill clinic, to Garden City, Georgia.  And it was for several

14    reasons.  Foremost was, the laws of the State of Florida had become far less

15    hospitable to pill mills, made it difficult to operate.  They put restrictions on

16    the number of days that a – for which a doctor could prescribe medicines.

17    It was two or three days.  There were new rules which required that the

18    owner of a pain management facility be a licensed medical doctor.

19          These things made it very much more difficult to operate.  So

20    Georgia is a state which did not have all those safeguards.  And also, it had

21    the added benefit of being far closer to the customer base.  Imagine if you

22    are a patient from Lexington, Kentucky, it is far more convenient to drive to

23    Garden City, Georgia than to drive from Lexington, Kentucky all the way

24    down to Boca Raton, Florida.  Saves that particular patient hundreds of

25    miles one way.

1          Dan Wise was another individual that joined the East Health

2    Center when it was opened.  He was the onsite manager of East Health

3    Center.  Mr. Wise is a tenth-grade dropout, and just prior to becoming the

4    office manager his most recent job was doing credit repair.  He had a friend

5    called Kostas, Konstantinos was his name, Afthinos.  He was a friend of

6    Dan.  He also worked doing credit repair.

7          So while none of these individuals, none of these organizers had

8    the ability to prescribe medicines, they could do what you would expect are

9    the things that are necessary to run a business.  They could find a facility

10    and sign a lease for it.  They could purchase supplies.  They could collect

11    money.  They could open bank accounts.  They could pay the help.  They

12    could do all these things, but they couldn't do the indispensable thing – the

13    reason for these clinics to exist – they could not write prescriptions for

14    controlled substances.

15          And for that you need a licensed medical doctor.  And the

16    person that opened the doors at East Health Center, the first – and there

17    were more than one, but the first doctor in the door was Dr. Najam Azmat.

18    And you will ask, well, how did he hear about East Health Center, you

19    know.  How did he know?  He answered a Craigslist ad.  A Craigslist ad run

20    by Mr. LeFrancois, and Mr. LeFrancois talked to Dr. Azmat on the phone

21    one day in response to that Craigslist ad and said, $2,000 a day, and we'll

22    pay you at the end of every day.  And you can understand the temptation.

23    And Dr. Azmat fully succumbed, and from day one was seeing the out-of-

24    state patients and writing prescriptions for controlled substances.

25          And when I say he was writing prescriptions, I'm not talking he

1 was writing a prescription for a pill or two, or that he was writing a

2 prescription for two or three days' worth of pills.  From day one, he's

3 writing prescriptions for hundreds, hundreds of oxycodone tablets,

4 oxycodone 30s, oxycodone 15s, and also some other controlled substances

5 like Xanax.

6    Dr. Azmat only worked at East Health Center from February

7 the 21st through March the 18th of 2011.  During that short time, he saw and

8 wrote prescriptions for 196 patients.  Ninety-six percent of these patients

9 received prescriptions for oxycodone in similar to the quantities which I've

10 just described to you.

11    As the Judge explained during jury selection, Counts 2 through

12 50 charge actual instances of dispensation, or writing prescriptions for

13 controlled substances.  The amounts which are alleged in Counts 2 through

14 50 are illustrative of the sorts of prescriptions that Dr. Azmat wrote for

15 each of his patients.

16    Now, while Dr. Azmat was the first doctor hired at East Health

17 Center, he was not the first doctor recruited.  And you will hear, I believe

18 our first witness will be a Dr. Mary Kay Ross, who is a Savannah physician,

19 and she will tell you that she also was made aware of this Craigslist ad and

20 this opening for a physician.  And the advertised amount of money, of

21 course, she was interested, too.  So she and her husband met with Mr.

22 LeFrancois and Sean Clark, who was the security guard and marketer guy

23 down in Boca Raton.  They met them for lunch at the Toucan Restaurant in

24 Savannah, and they were told that, your patient base will already be

25 established.  Patients will be coming from out of town, and you'll be writing

-71-

1    the prescriptions.  The patients will know what they're supposed to get.

2    And she was invited to go visit the clinic, and she did.  And when she visited

3    the clinic, saw that, you know, it was this rundown strip mill – or strip mall

4    – pill mill in a strip mall.  And there was no equipment, and there were no

5    supplies, and she will tell you that Mr. LeFrancois and Mr. Clark both

6    appeared to be New Jersey wise-guy types, heavy accents, gold chains, did

7    not by any stretch appear to belong in a medical setting.

8         And so Dr. Ross, when she left that meeting, first thing she did

9    was, she got on the phone and she called a friend of hers at CNT.  That

10   launched this investigation.  That's what brings the DEA and the GBI, and

11   it's a short turn from there, just a few months, warrant is obtained, place is

12   searched, medical files are recovered, along with other records from the

13   clinic.  You'll see these records, a lot of them.  You'll see the photographs.

14   You'll see the business records which talk about the money which was

15   turned over at East Health Center.

16        And I must mention again, you know, that this facility pops up

17   seemingly out of nowhere overnight.  How does one expect the word to get

18   out to the customer base that we're open for business now?  You know, in

19   startup businesses, that's a hard thing for any startup business, bringing

20   customers in the door.  Well, they had an answer for that.  And that answer

21   was, again, it was learned from the experience running the South Florida

22   pill mills.

23        And they had a technique which they called marketing, and I'm

24   not sure if marketing is a good description for it.  But what would happen

25   is, Mr. Clark, Mr. Barbuscia, Mr. Wise, Mr. Afthinos, they would travel to

1    rival pill mill clinics in the state of Florida, which, you know, at the time

2    was the capital of pill mills.  You go to a rival clinic down there, and you

3    would look for the out-of-state license plates.  You would look for the

4    patients, you know, congregating at the facilities, and you would put

5    leaflets in their hand.  You would say, we have a new pain facility that we're

6    opening in the Savannah area.  We have a doctor that will write what you

7    want.  Come on up.  It's closer to home.  And they did this over a period of

8    several weeks and very successfully, between that and the word-of-mouth

9    in the addict community, before long, almost from day one, there was a

10   ready-made client base at East Health Center.

11            Dr. Azmat is the only defendant on trial.  He's charged with the

12   conspiracy count, the charge that he conspired with Al LeFrancois, with

13   Adel Lizama, with Candace Carreras, with Frankie Barbuscia, with Sean

14   Clark, and others not named in the indictment.  He conspired to dispense

15   controlled substances without a legitimate medical purpose, not in the

16   usual course of a professional medical practice.  That's Count 1.

17            LeFrancois, Clark, Wise, they'll testify they have already

18   pleaded guilty to offenses related to East Health Center, and they'll tell you

19   that, and you can consider that when you assess their credibility and

20   whether you believe them.  But you'll hear from them.

21            Count 52 is a money laundering count.  The money which

22   passed through East Health Center came from the patients paying their

23   $300 to obtain –

24            THE COURT:  – Mr. Knoche, use the lectern.

25            MR. KNOCHE: Yes, sir.

1        THE COURT: I've been very patient.  Go ahead.

2        MR. KNOCHE: Thank you, Your Honor.

3        The money which was used to pay the bills, to pay the credit

4   cards, to pay the help, all these proceeds came from the patients coming to

5   the window, paying their $300.  That's the source of the money laundering

6   count, that everyone who worked there, including Dr. Azmat, knew that

7   was the source, that that source of proceeds was from an unlawful activity,

8   the prescription of – the unlawful prescription of controlled substances.

9        Things were done at East Health Center to make it look

10  legitimate.  It was not.  Everything done there, and you will get this

11  impression we trust early in the case, it was a prop, it was a sham. it was a

12  show.  It was a pill mill masquerading as a doctor's office.

13       This case is not about mistakes, not mistakes that the

14  organizers made.  It's not about mistakes or misjudgments that Dr. Azmat

15  made.  It's about choices.  This case is about choices that were made.  And

16  this is about choices to write prescriptions for people who had no business

17  receiving them.  It's about choices Dr. Azmat made.  He decided who he

18  would associate with.  He decided who he would write prescriptions for.

19  He decided to be the missing gear in the machinery that was East Health

20  Center.  Without him, or others like him, this facility doesn't go.

21       At the end of the case I'll have the opportunity to address you

22  again.  We're going to ask you to return a verdict that speaks the truth, that

23  Najam Azmat conspired with others to dispense controlled substances

24  outside the usual course of professional practice; that he actually dispensed

25  controlled substances; and, that he laundered money as charged.  We'll ask

1   you to return that verdict which we submit will be a verdict which speaks

2   the truth.

3               THE COURT: Thank you, Mr. Knoche.  Mr. Withers?

4               MR. WITHERS: Thank you, Your Honor.

5                           OPENING STATEMENT BY

6   MR. WITHERS:

7               May it please the Court, counsel, ladies and gentlemen, again,

8   my name is Tom Withers.  It's my privilege to represent Dr. Azmat.  During

9   the course of this case, you're going to see this young lady over here with

10  me that we haven't introduced yet.  That's Robin Jenkins.  She is my office

11  assistant.  She keeps my office running, and she keeps me organized here in

12  the courtroom.

13              Now, what is this case about?  It's simple, and the question for

14  you, ladies and gentlemen, is whether during the three-and-a-half-week

15  period that Dr. Azmat worked at the East Health Clinic, whether he was

16  working there acting as a doctor or a drug dealer.  It is that stark.  The

17  question for you, was he acting as a doctor or a drug dealer.  It's not about

18  whether he was a good doctor, bad doctor, negligent doctor.  And the

19  answer to that question, you will see through the evidence, is that Dr.

20  Azmat was acting as a physician, exercising his clinical judgment during the

21  short period of time that he worked there.  And at the conclusion of this

22  case, we're going to ask that you return a verdict of not guilty on all of the

23  charges.

24              Now, this is Dr. Azmat's wife, Sameena.  They've been married

25  18 years.  You will hear he has three children, the oldest of which has

-75-

1    physical disabilities.  They live and work in the Waycross area.  In the

2    winter of 2011, he was doing various locum tenens jobs, and that means

3    transitional jobs here and there, and he did answer that ad in the Craigslist.

4    And you will hear that he spoke with the owner of the clinic on the phone,

5    this Al LeFrancois that Mr. Knoche has spoken about.

6    He was offered – he was interviewed on the phone and offered

7    the job, and he accepted.  Now, unlike Dr. Ross, who Mr. Knoche has

8    referred to, Dr. Azmat's first day at the East Health Center was February

9    21st.  He did not go to the East Health Center.  He did not know these folks

10   that Mr. Knoche has talked about were the ones who came up from south

11   Florida.

12   And as you listen to this case you're going to hear some very,

13   very important facts, which can be stubborn things; and that is, that Dr.

14   Azmat never saw a single patient more than once.  Never.  You will hear

15   that Dr. Azmat never increased the medication for a patient.  Never.  You

16   will hear that Dr. Azmat routinely discontinued – these folks would come in

17   and they would be on a, what is  – you will hear called by Drug

18   Enforcement officers, a cocktail of prescriptions.  They would be on

19   oxycodone; Soma, a muscle relaxer; Xanax, an antidepressant.  And you

20   will hear that Dr. Azmat routinely discontinued the patient's Valium when

21   they were on Valium, the patient's Xanax when they were on Xanax.  And

22   you will hear the reason that he did that, and even the government's

23   experts will acknowledge that that combination of the depressants called

24   CNS depressants – central nervous systems depressants – like Xanax, that

25   that combination of Xanax and oxycodone is dangerous.  And so what did

1   Dr. Azmat do?  He exercised his clinical judgment, and he took them off of

2   the Xanax.

3            Now, you've heard about these folks, Mr. LeFrancios, Mr. Wise,

4   Mr. Clark, others.  They were down in – living and working down in south

5   Florida.  Dr. Azmat didn't know them.  They called – he responded to the

6   ad, he spoke to one of them, Mr. LeFrancois.  But when you listen to this

7   evidence from these various folks, you'll see that Dr. Azmat was an

8   outsider.  They all came up here and rented a house together out in Pooler.

9   Dr. Azmat didn't go out for drinks with them in the afternoon after work.

10  He didn't drink.  He didn't go to dinner with these folks when they would

11  go out for dinner together.  They all lived in the same house out in Pooler.

12  He's never been to that house, never went to that house.  He would eat

13  lunch at his desk in his office and then go home.  And after three-and-a-half

14  weeks of being there, he's terminated.  They said, you don't need to come

15  back.

16           Now, one of the things that Judge Moore has already spoken to

17  you about is witness credibility, and that's something we do every day.  See

18  somebody on the street, start talking to them, and we're evaluating that

19  person.  We may not do it consciously, but we all do it.  And as Judge

20  Moore has already told you, the kind of standards you use are common

21  sense things.  You know, does that person appear to be telling the truth?

22  Does he have a reason to lie?  Does he have a good memory?

23           And you're going to hear that these south Florida folks, many of

24  them were indicted in the same indictment, had over 50 counts dismissed

25  in this indictment, and they pled guilty to a separate charge where, where

-77-

1    they were facing dozens of years, they now face a maximum of five.

2            Now, Judge Moore will tell you at the end of the case when he's

3    talking to you that that's the type of witness you have to examine that

4    testimony more closely.

5            And one thing I want you to watch is the indictment that Mr.

6    Knoche has spoken about charges – and as the Court has already told you,

7    it's just a piece of paper.  It sets forth what the accusations are.  But it

8    charges Dr. Azmat with 14 separate counts that first day, February 21, 2011,

9    when he didn't know anybody in that facility, his first time there.  First time

10   he'd ever seen a patient there, first time he'd ever seen Mr. LeFrancois.

11   And that's where your common sense comes in.  Did this man, who knows

12   no one, start engaging in a conspiracy with folks he's never met before?

13           Now, the government's going to put up, as they said, certain

14   patients.  One group of patients Mr. Knoche has described as folks that are

15   addicts or abusers, people coming to get their medication, that sort of

16   thing.  And what those witnesses are going to tell you is that they had to lie

17   to Dr. Azmat, they had to deceive Dr. Azmat about their pain, their injury.

18   They didn't walk in and tell Dr. Azmat, hey, I'm here to get some

19   oxycodone.  They didn't use some secret street language for the purpose of,

20   you know, hit me up with oxys.  They'd come in, tell him about a legitimate

21   injury in almost all cases and pain that they were going through.

22           Now, the second group Mr. Knoche is talking about are folks

23   that are drug dealers who would come in and divert the medication, I think

24   he said.  And again, you're going to see that those people had to deceive Dr.

25   Azmat for the purpose of getting that type of medication, give him a history

1    of pain, told him how they were hurt.  And you'll hear that in the pain

2    management setting, in any setting, there isn't a pain meter that we can

3    attach someone to.  There isn't a scientific test that tells a physician, or

4    anyone in the medical community, what our level of pain is, how much pain

5    we're in.  The gold standard, you will hear, is the question from the doctor

6    to patient: on a scale of 1 to 10, how much pain are you in?  That's the gold

7    standard.  And that's what happened here.

8              Now as Mr. Knoche mentioned, like at most doctors' offices, the

9    patient –

10             Ms. Bodaford, can you switch on the overhead?

11             – the patient would come in and would fill out a form.  And

12   then that patient would be seen later by Dr. Azmat, but they would fill out

13   the basic history form like most physicians' offices.  They would fill out a

14   pain management agreement.  And one of those things that it would say

15   would be, I will not share my medication with others.  They would do what

16   is called the urine drug screen, a urinalysis for the purpose of insuring two

17   things: one, they're not taking illicit drugs; and two, if they're telling the

18   doctor they're on oxycodone, it confirms that they were on oxycodone.

19   They would have to get a source-verified MRI; that is, from the facility that

20   took the MRI, would be faxed up to the East Health Center.  And on many

21   occasions, the pharmacy reports.  And then the history and physical would

22   be conducted by Dr. Azmat.

23             This is either male or female, I can't recall, Carlie Cole from

24   Kentucky, who comes in and gives Dr. Azmat a history – and, regrettably,

25   I've become good at reading his handwriting – but this is Dr. Azmat's note

1    here that you see in front of you of his examination of the patient.  History

2    of trauma, right here, where he – the patient relates, '07 fell off a four-

3    wheeler, hurt back, back hurting and is getting worse.  Fell down stairs and

4    broke tailbone in '08, low back pain, and then relates to Dr. Azmat what the

5    history of medication is right there.  And then you'll see this part here –

6    and these records are going to be in evidence – you'll see that part there,

7    and Dr. Azmat – this part through here is called the physical exam where

8    Dr. Azmat is seeing the patient, putting hands on the patient, conducting

9    what is called a clinical examination of the patient.

10               Again, the handwriting isn't pretty, but you'll see here where

11   the MS spine right here, I think that says, lumbar flexion 75 percent.  That's

12   bending up and down.  Lateral flexion, that's going back and forth, 20

13   percent, and no tenderness.  And then the diagnosis – and this is an

14   individual with a traumatic injury as confirmed by the MRI.  But you'll see,

15   most importantly, this word right here which says, that actually reads,

16   nerve or neural impingement, which means that the nerve is being

17   impinged, the nerve is being touched, which causes excruciating pain.  And

18   then this – under the treatment, you will see that Dr. Azmat continued this

19   patient on the oxycodone 30 milligram tablets, continued the patient on the

20   oxy – excuse me, the hydrocodone, which is right here.  It went from 90 up

21   here down to 60 here, and that he discontinued the lorazepam.  I think the

22   lorazepam is the clinical name for the Xanax.  So that is a good illustration

23   of Dr. Azmat exercising his clinical judgment.

24               Now you'll hear also that when someone is on –

25               You can turn that off, please, ma'am.

1   — when someone is on long-term dosages of oxycodone they become – and

2   there's a variety of terms that you're going to become familiar with –

3   dependent is one of them, but you can't just cut the oxycodone off like that.

4   You have to wean the patient.  You have to cut it back slowly, or else it'll

5   cause illness, sickness, as a result of the discontinuation of that.

6          Now, one of the things that's going to be important in your

7   consideration of this case is whether the physician can trust what the

8   patient says, physician-patient trust.  When the patient comes in and says

9   my back is hurting and it goes down through my leg, called radiating pain,

10  the doctor doesn't say, prove it to me.  The doctor has to accept what that

11  patient says based upon the history and physical.

12         Now, Mr. Knoche mentioned one thing about the government's

13  experts, Dr. Kennedy, and what he says is required for the practice of

14  medicine.  Remember, this isn't a question about, you know, is this a civil

15  case where somebody's done wrong.  It's a question about whether Dr.

16  Azmat was practicing any medicine.  But Dr. Kennedy, the government's

17  expert, is a family practice physician who describes himself as a pain

18  specialist.  He was working up in rural Ohio, came down to rural Georgia

19  up in Claxon 15 years ago, practiced up there for a few years, and in 2005

20  he comes – he moves to St. Simons, and he becomes a pain management

21  specialist.

22         Now, I want you to watch this testimony closely.  Watch Dr.

23  Kennedy's testimony closely, because what he does is, he takes an online

24  examination, test, two hours, 120 questions, 20 don't count.  And he passes

25  and gets a nice certificate that says he now is a diplomat in pain

1    management.  I can't remember the exact name of the place, it's The

2    American Society of Pain Management, I think.  He wasn't trained in pain

3    management.  He didn't go to school for pain management.  He's not what

4    is called board certified by the American College that certifies physicians.

5    He's not board eligible.  But he is the expert who is making tens of

6    thousands of dollars reviewing cases for the DEA and testifying in court.

7            Now, back to the indictment briefly.  You're going to hear some

8    words and terms in here.  And one of the things that I want you to

9    concentrate on is Dr. Azmat is charged with dispensing medication, Counts

10   2 through 50 say the word dispense, unlawfully dispense.  But you're going

11   to hear that to dispense medication, you have to have a separate DEA

12   license, which Dr. Azmat never had.  He had a license to prescribe, not to

13   dispense.  But you're going to see in the indictment, it actually describes –

14   sets forth the definition of dispense, which doesn't apply to any of those

15   Counts 2 through 50.

16           Now, as Judge Moore told you, we don't have a duty to do

17   anything in a criminal case.  But you're going to hear from a doctor who is a

18   leader in the world of pain management.  His name is Dr. Tom Simopoulos

19   from Massachusetts.  He went to the University of Massachusetts Medical

20   School, did his residency at a famous hospital in Boston called Brigham and

21   Women's Hospital through Harvard Medical School, did his fellowship,

22   additional training, an entire another year in pain management at Beth

23   Israel Deaconess Medical Center in Boston.  He's board certified in two

24   things.  That means he's taken – had special training for years, and taken

25   days' long tests to be board certified.  He's board certified in both

1    anesthesiology and pain management.  He teaches, he lectures, he's a

2    specialist.  This is his livelihood, this is his calling.

3              And he's going to come in here and he's going to tell you that

4    Dr. Azmat was engaged in the usual course of professional practice.  He's

5    reviewed the same charts that the government's experts have reviewed, and

6    he's going to walk through these doors and tell you about the world of pain

7    management.  And he'll review with you why, in his professional opinion,

8    Dr. Azmat was issuing prescriptions in the legitimate practice of medicine

9    and not as a drug dealer.

10             And at the end of this case, we're going to ask that you return a

11   verdict on each and every count of not guilty.  Thank you.

12             THE COURT: Thank you, Mr. Withers.  You may call your first

13   witness, Mr. Knoche.

14             MR. KNOCHE: Yes, Your Honor.  The government calls Dr.

15   Mary Kay Ross.

16        [Witness Sworn]

17             CLERK: Please state your name and your occupation and spell

18   your last name for the record.

19             DR. ROSS: My name is Mary Kay Ross, and I'm a physician.

20   My last name is R-O-S-S.

21                        M A R Y   K A Y   R O S S

22        GOVERNMENT'S WITNESS, SWORN, TESTIFIED AS FOLLOWS

23                        DIRECT EXAMINATION BY

24   MR. KNOCHE:

25   Q    Dr. Ross, do you practice medicine right now?

1    A    Yes, I do.

2    Q    In Savannah, Georgia?

3    A    Yes.

4    Q    And what kind of medicine do you practice?

5    A    Functional medicine.

6    Q    Tell the jury what that is.

7    A    It's like integrative medicine.  It's basically preventative internal

8    medicine.

9    Q    And what other history or experience have you had as a practicing

10   medical doctor?

11   A    I'm board certified in emergency medicine.

12   Q    Does that mean you worked in an emergency room?

13   A    Yes.

14   Q    And where was that?

15   A    At Memorial Hospital for seven years.

16   Q    And you have a Georgia Medical License and Registration?

17   A    I do.

18   Q    I'd like to call your attention back to an event in February of 2011.  Do

19   you recall ever having a conversation with an individual about a medical

20   clinic opening in Garden City, Georgia?

21   A    I do.

22   Q    What had you learned about the facility which caused you to speak to

23   this individual?

24   A    I was working in the emergency room at Memorial.  I was one of the

25   partners, and I actually had opened a private practice.  And I was in the

-84-

1     process of leaving the emergency room, and I had been considering doing

2     some *locum tenens* work, and a friend of mine, another physician in the

3     group, had seen an ad for a part-time job at a clinic that was opening up in

4     Savannah, and he sent me the information.  The job was offering $2,000 a

5     day to work in a pain management clinic.  They also were offering aesthetic

6     medicine, which was something that I was interested in.

7     Q     And you made contact with someone about that?

8     A     I did.  I made a phone call and spoke with the gentlemen that

9     responded, and we actually met for lunch.

10    Q     How many individuals did you meet with for lunch?

11    A     Two.

12    Q     And where did that take place?

13    A     At Toucan.

14    Q     And that's a restaurant –

15    A     – in Savannah, on Stephenson.

16    Q     Stephenson, okay.

17              MR. KNOCHE: May I approach the witness, Your Honor?

18              THE COURT: Yes, sir.

19    Q     I'm showing you what's been previously been marked as

20    Government's Exhibits 28-1 and 28-2.  Dr. Ross, will you take a look at

21    those for a moment, and tell the jury if you recognize those individuals.

22    A     I do.  Actually, it's Sean Clark and Al LeFrancois, the gentlemen that I

23    met.

24    Q     Do you remember, the fellow on top, is that Mr. LeFrancois?

25    A     Yes.

1    Q    And beneath that, Mr. Clark?

2    A    Yes.

3    Q    And is that the way those gentlemen looked –

4    A    Yes.

5    Q    – back in February 2011?

6    A    Yes.

7              MR. KNOCHE: Have permission to publish that to the jury,

8    Your Honor?

9              THE COURT: Yes, sir.

10             MR. KNOCHE: If you'd publish 28-1 and 28-2, please?

11   Q    Tell the members of the jury about your lunch.

12   A    Well –

13   Q    – Did you discuss the prospective job?

14   A    Yes, I did.  We had lunch at Toucan, and actually both of the

15   gentlemen that I met with did not seem to be particularly medical in

16   background, although they owned the pain clinic.  And they discussed that

17   we would be dispensing pain medication from the office, and that the

18   patients were already lined up and prepared to come.  Most of them were

19   from out of state.  And I inquired about things like malpractice, and they

20   said we didn't need any, that none of their doctors ever had any

21   malpractice.  And that if I wanted to do Botox or aesthetic medicine, that I

22   could pretty much do whatever I wanted to do.  It was whatever – however

23   I wanted to operate.

24   Q    Did these individuals – you indicated did not appear like they were –

25   belonged to the medical community.  How was that?

1    A    Actually, they didn't have any real medical background, although they

2    were very versed in pain medications, and that they explained to me that

3    the patients would need to have MRIs, and that they would bring their stuff

4    with them.  Everything was ready to go.  And they had, I guess, northern

5    accents.  They sounded like they were from New Jersey, or New York, or

6    something like that.

7    Q    How were they dressed?

8    A    Oh, gosh.  Casual, just in slacks and a shirt.

9    Q    Did they tell you what amounts of drugs that you would be prescribing

10   for the patients at East Health Center?

11   A    They did.  They were in very, very large amounts, somewhere in the

12   neighborhood of 150-to-190 pills at a time.

13   Q    Now, you've worked in an emergency room.

14   A    Correct.

15   Q    Are you familiar with persons coming to the emergency room seeking

16   –

17   A    Yes.

18   Q    – narcotics?

19   A    Absolutely.

20   Q    That make you sensitive to it?

21   A    Very sensitive to it, yeah.

22   Q    Did they offer you the opportunity to go and inspect the clinic?

23   A    Yes, they did.

24   Q    And did you avail yourself of that opportunity?

25   A    I did.

-87-

1    Q    And tell us about your visit – and if I may approach you again, I

2    intended to hand 28-3 when I was up here.  Look at 28-3.

3    A    Okay.

4    Q    What's that?

5    A    That's the clinic, and it was a clinic in Garden City that had a little

6    waiting room, a front desk, and right behind the front desk in a little room

7    there was a safe where they would dispense medications from.  And then

8    further down a hall, there was a scale, blood pressure cuff.  I think there

9    was probably a bathroom.  That's it.

10    Q    28-3 that I've shown you, is that the way the clinic looked in early

11    February when you visited?  Do you recognize that?

12    A    I don't know that it said insurance exams when I went in there.

13    Q    I think it's the one on the far right, the building.

14    A    Right, but I can't really read the signage there, to be honest with you.

15    Q    All right, and did you observe any other medical equipment at the –

16    A    No.

17    Q    – facility?

18    A    And when I inquired about labs and things, they said that there was a

19    lab next door that you could send patients to.

20    Q    And were you told that the – whether or not the patients knew what

21    medicines they would be prescribed?

22    A    They did know.

23    Q    And based on your experience as an ER doctor and your current

24    practice, did the amounts that you were expected to prescribe, did that

25    startle you in any way?

1    A    Absolutely.  In the emergency room, we are very sensitive to pain –

2    drug seekers, basically.  And we dispense usually around 20 pills and that's

3    it.  So writing for anywhere from 150 to 190 sounded like a large number to

4    me and something I would not be comfortable with.

5    Q    Did it strike you unusual after they told you that patients would be

6    coming from out of state?

7    A    Yes, it did.

8    Q    And why is that?

9    A    Well, I just didn't think that that would be a prudent way to seek

10   medical care for a pain problem.

11   Q    What would you expect instead?

12   A    There are pain management specialists that are board certified in pain

13   management.

14

15   Q    That wasn't you?

16   A    No.

17   Q    And how about those clinics, would you expect them to be closer to

18   home for the patients?

19   A    Absolutely.

20   Q    They're not a rarity, are they?

21   A    No, we have some good pain management doctors in Savannah.

22   Q    So after your meeting ended, did you make contact with any member

23   of law enforcement about your experience?

24   A    I absolutely did.  I actually contacted them before I went into the

25   clinic.  And –

1    Q    – Between lunch and the clinic?

2    A    Yes.

3    Q    All right.

4    A    Yeah, I actually wasn't going to go into the clinic until I spoke with a

5    law enforcement agent that suggested I go and look and see what else there

6    was going on.

7    Q    Do you remember who that agent was?

8    A    Yes, Agent Coleman.

9    Q    And who does she work for?

10   A    She is with the narcotics department.

11   Q    Savannah-Chatham –

12   A    Savannah-Chatham, yeah.

13   Q    – Counter Narcotics?

14   A    Yeah.

15   Q    Describe for the members of the jury what, if anything, about the

16   clinic, based on your experience, appeared legitimate.

17   A    What appeared legitimate?

18   Q    Yeah, what, if anything.

19   A    I mean, it was an office.  It had a front desk and a waiting room.  It

20   really didn't have a lot of medical supplies of any sort.  And so it was not in

21   my opinion an adequate medical office.

22   Q    And did you couple that with your observation of the individuals that

23   were soliciting your employment?

24   A    Absolutely.

25   Q    And their description of the type of patients you'd be seeing?

1    A    Absolutely.

2    Q    So what did you conclude?

3    A    I felt like it was probably something that Savannah really didn't need

4    to have in our city.  I felt like it was dangerous, and –

5              MR. WITHERS:  – Objection to the conclusions, Your Honor.

6              THE COURT: Sustained.

7              MR. KNOCHE: May I recover the exhibits, Your Honor?

8              THE COURT: Yes.

9              MR. KNOCHE: If you'd answer counsel's questions, please.

10             DR. ROSS: Yes, sir.

11             MR. WITHERS: You're finished?

12             THE COURT: Mr. Withers.

13                    <u>CROSS-EXAMINATION BY</u>

14   <u>MR. WITHERS</u>:

15   Q    Dr. Ross, good afternoon.  My name is Tom Withers.  I represent Dr.

16   Azmat.

17             Now, you do not know Dr. Azmat.

18   A    No, I do not.

19   Q    You did not see Dr. Azmat when you met with Mr. LeFrancois and Mr.

20   Clark.

21   A    No.

22   Q    You did not see Dr. Azmat at the East Health Center on, did you say

23   February 1st of 2011?

24   A    I know it was February 2011.

25   Q    Okay, and you worked at the time in the emergency room.

-91-

1    A    In emergency medicine, and I had a private practice.

2    Q    Okay.  Now, the purpose of prescribing pain meds in the emergency

3    setting is to give that patient enough so that they can be stabilized and sent

4    to their primary care physician or specialist; is that fair to say?

5    A    That's correct.

6    Q    Now, you mentioned that Mr. LeFrancois and Mr. Clark told you that

7    it was their intention to dispense medication.

8    A    Correct.

9    Q    And there is a difference between prescribing and dispensing; is there

10   not?

11   A    Correct.

12   Q    In order to prescribe, you have to have a DEA license or registration,

13   I'm not sure which one it's called.  Is it a license or registration?

14   A    I believe it's a license.

15   Q    Okay, and to dispense, that usually happens at pharmacies, hospitals

16   perhaps, other facilities that are, again, licensed or registered for the

17   purpose of dispensing the medication; correct?

18   A    Correct.

19   Q    So that when you dispense the – when you prescribe the medication,

20   you're actually giving someone a paper prescription; correct?

21   A    Correct.

22   Q    But when you're dispensing the medication, you are giving them the

23   prescription in a bottle with the instructions on it; that's correct, is it not?

24   A    That's correct.

25   Q    And what they wanted to do, when they were speaking to you, is

1    dispense; correct?

2    A    Correct.

3    Q    Now, you mentioned that there are many board certified pain

4    management specialists in Savannah; correct?

5    A    I believe so.

6    Q    And for the purpose of board certification, you have to have specialty

7    training; correct?

8    A    Correct.

9    Q    Can be years long; right?

10   A    Yes.

11   Q    And then you have to take a board issued by the American Boards, I

12   believe.

13   A    The specialty board.

14   Q    The specialty board.  And so – and that can be a day's long event for

15   that specialty board; correct?

16   A    Correct.

17   Q    Intensive study; true?

18   A    (No audible response.)

19   Q    That's a yes?

20        MR. KNOCHE: Beyond the scope, Your Honor.

21        MR. WITHERS: It is not.  He asked about pain management,

22   and she was talking about pain management.

23        THE COURT: Objection's overruled.  Go ahead, Mr. Withers.

24   Q    (By Mr. Withers) And that pain management – or excuse me, that

25   board certification can be a day's long process; correct?

-93-

1     A     I'm assuming so.  I am not board certified in pain management.

2     Q     For ER medicine, was it an entire day of examination?

3     A     Yes, sir.

4     Q     Not an easy thing?

5     A     No.

6              MR. WITHERS: I think that's all I've got, thank you.

7              THE COURT: Anything else of this witness, Mr. Knoche?

8                    REDIRECT EXAMINATION BY

9     MR. KNOCHE:

10     Q     Dr. Ross, the issuance of a prescription is also considered

11     dispensation; is it not?

12     A     Pardon?

13     Q     The issuance of the prescription itself is dispensation, as well as

14     getting the pills in a bottle; isn't that correct?

15     A     I would think so.

16              MR. WITHERS: Well, I object and move to strike unless he

17     establishes that foundation, because she just testified differently, Your

18     Honor.

19              MR. KNOCHE: I ask the Court to instruct the jury at the

20     appropriate time on that standard.

21              THE COURT: Well, you're asking the question, and then you

22     solicited an answer, and now you're telling me to instruct the jury at the

23     appropriate time.  Ask the question and see if it requires an answer, if she

24     can answer it.

25     Q     Can you answer that question?

1    A    Are you asking me whether or not dispensing a medication is the same

2    as writing a prescription –

3    Q    – If issuing the prescription is, you know, is dispensing the

4    medication.

5    A    And I believe what he was asking me earlier was, he was trying to

6    decipher the difference between the two.  I believe either way, you're

7    issuing the medication; correct?

8             MR.  WITHERS: If I can briefly follow up on that, Your Honor?

9             THE COURT: Yes, sir, go ahead.

10                    RECROSS-EXAMINATION BY

11    MR. WITHERS:

12    Q    If I'm a physician and I do not have a license to dispense, I cannot

13    dispense; correct?

14    A    You shouldn't, correct.

15    Q    That would be bad.

16    A    Right.

17             MR. WITHERS: Thank you.

18             THE COURT: Anything else of this witness:

19             MR. KNOCHE: If I could tender 28-1 and 2, Your Honor.

20             THE COURT: Admitted.  Can the witness be excused?

21             MR. KNOCHE: Yes, Your Honor.

22             THE COURT: All right, you're excused, ma'am.  Thank you.

23             DR. ROSS: Your Honor, would it be okay if I sat and watched

24    the rest, please?

25             THE COURT: Yes, ma'am.

1       [Witness Excused]

2               MR. GILLULY: Call Dr. David Hatmaker.

3       [Witness Sworn]

4               CLERK: Please state your name and your occupation and spell

5       your last name for the record.

6               DR. HATMAKER: David Hatmaker, M.D.  That's H-A-T-M-A-

7       K-E-R.

8                   D A V I D   H A T M A K E R, M. D.

9       GOVERNMENT'S WITNESS, SWORN, TESTIFIED AS FOLLOWS

10                      DIRECT EXAMINATION BY

11      MR. GILLULY:

12      Q     Dr. Hatmaker, if you could, it's kind of hard to hear in this courtroom

13      sometimes.  Would you keep your voice up, please?

14      A     Yes, sir.

15      Q     Dr. Hatmaker, are you employed, sir?

16      A     Yes, sir.

17      Q     And where are you employed?

18      A     I'm working as the emergency department medical director at

19      Meadows Regional Medical Center in Vidalia, Georgia.

20      Q     How long have you been employed there, sir?

21      A     I work with the contract management group called Schumacher, and I

22      started there in February of 2013.

23      Q     And what is your current assignment there?

24      A     Medical director, Emergency Department.

25      Q     And as a medical director in the emergency department, are you in

-96-

1 fact a physician?

2 A Yes, sir, I am.

3 Q How long have you been a physician?

4 A I graduated medical school 1980.  Completed my residency in the

5 United States Navy in 1984.  I've been practicing since 1984.

6 Q And the kinds of medical practice that you've engaged in since the

7 Navy, can you tell the ladies and gentlemen about that?

8 A I've worked in emergency departments full time since 1987 in Georgia,

9 Athens, Georgia, primarily.  I worked in facilities seeing patients of 10,000

10 volume a year, up to 40,000 patients per year.

11 Q In fact, as an emergency room doctor, can you just tell your primary

12 responsibilities, sir?

13 A We take patients of all stripes, of all ages, and of all particular

14 illnesses, and see them through their evaluation management, either

15 discharge or admitted to the hospital.  Trauma, medical, pediatric,

16 obstetrics, the gamut of patients.

17 Q And are you certified by the Board in pain management?

18 A No, sir, I'm not.

19 Q And you're not a Diplomat in pain management; is that correct?

20 A No, sir, I'm not.

21 Q I'd like to date your attention back to early 2011.  Did you have

22 occasion to visit a place called East Health Center in Garden City, Georgia?

23 A Yes, sir, I did.

24 Q And how did that come about?

25 A I responded to a physician recruitment ad from a *locum tenens* group,

1    Altiva (phonetic).  They described it as a wellness clinic with some pain

2    management, weight-loss type clinics, and they said it was in Garden City,

3    Georgia.

4    Q    And let me ask you, what is *locum tenens*?

5    A    It's part time.  I was not looking for a full-time basis. Clinics, facilities,

6    hospitals, emergency departments, sometimes need physicians for a short-

7    term basis.

8    Q    So it's a fancy word, *locum tenens*, is for part-time?

9    A    Right, travelers, and it's got various names.

10   Q    And prior to visiting East Health, did you have any conversations with

11   anyone from East Health?

12   A    Yes, Mr. Al LeFrancois.  We did some telephone texting and email

13   communications.

14   Q    And did you ultimately go to East Health in Garden City?

15   A    Yes, sir, I did.

16   Q    And upon arriving at that facility, could you tell the ladies and

17   gentlemen what your initial thoughts were?

18   A    It did not meet my expectations.  I was expecting to see a rather high-

19   end type facility in a fairly nice neighborhood.  Turns out the facility was

20   rather on a lower scale in a, I wouldn't say unsavory, but a less-than-

21   attractive community.  It was not what I expected.  I thought it might be

22   just a business office that they were doing recruiting, or the scheduling, or

23   that kind of operation.  Turns out that was the clinic, however.

24   Q    Okay, and in fact did you meet with anyone at that clinic?

25   A    Mr. LeFrancois –

-98-

1    Q    – Is that the same person you talked to on the telephone?

2    A    Same person.  There were two female receptionists, clerical-type

3    people, and one physician there.

4    Q    All right, well, with regard to Mr. Francois (sic), do you think you'd be

5    able to recognize him?

6    A    Yes, sir.

7                    MR. GILLULY: If we could put 28-1 on the screen, please?

8    Q    And is that Mr. Francois (sic)?

9    A    Yes, sir.

10   Q    And what did this person who's on the screen, what did he tell you

11   about the office?

12   A    That it was primarily a pain management office, medical patients.

13   Described the amount of the clinical hours, 8 to 5, no weekends, no nights,

14   no on-call responsibilities.  He gave me a salary figure.

15   Q    Okay.  Did he talk to you about whether or not the clinic accepted

16   insurance?

17   A    No insurance.  Cash, credit card basis.

18   Q    And did he talk to you about any goals of expanding that clinic

19   anywhere else?

20   A    I think they anticipated up to three clinics in the general vicinity.

21   Q    And did he talk to you about your need for medical malpractice

22   insurance?

23   A    I asked about it, and he said it was not a particular need there because

24   patients tended not to sue the clinicians.

25   Q    Okay, and did he explain what kind of pain management practice he

1     wanted you to perform at East Health Center?

2     A     Evaluation of the patients, looking at their clinical information, maybe

3     their imaging reporting; and primarily it's treatment with narcotics.

4     Q     Pardon me?

5     A     Treatment with narcotics primarily.

6     Q     Did he tell you what kind of narcotics or quantities that he wanted you

7     to distribute or dispense?

8     A     We talked about Roxicodone.  We didn't talk about specific numbers,

9     or pills, or numbers of dispensing, but that was the gist of the operation, I

10     think.

11     Q     The gist of the operation was dispensing Roxicodones?

12     A     Yes, sir.

13     Q     Okay, and with regard to the salary, did he explain how much he

14     would pay you?

15     A     It was about $2,000 a day, cash.

16     Q     And did he explain how much this clinic was making a week?

17     A     His estimate to me was clearing about 7,000 a week with the clinic,

18     after expenses, including my expenses.

19     Q     Okay, and in fact when you were there, I mean, the clinic was already

20     open; is that right?

21     A     Yes, it was.

22     Q     You indicated you met two women who appeared to be doing desk

23     work?

24     A     Yes, sir.

25     Q     Did you see any nurses?

-100-

1   A   I did not.

2   Q   Did you see any medical equipment?

3   A   Other than basic equipment like benches, doctor's chairs, and that sort

4   of thing.

5   Q   Any X-ray equipment?

6   A   No, sir.

7   Q   Any kind of machines where you can look up on and read an X-ray?

8   A   No, sir.

9   Q   Any MRI equipment?

10  A   No, sir.

11  Q   And with regard to patients, did you ask how the clinic got patients?

12  Did they advertise?

13  A   I asked about advertising.  They said they did not advertise, that it was

14  more of a word-of-mouth.  They wanted to keep it a kind of a low profile,

15  under-the-radar sort of picture.

16  Q   You mean Mr. Al told you they were keeping a low profile?

17  A   Yes, sir.

18  Q   What did that mean to you?

19  A   Didn't make sense.  Most people who have well-established clinics

20  need to advertise for patients, and he didn't see the need for that so ...

21  Q   No need for that and trying to keep it below the radar?

22  A   Yes, sir.

23  Q   Did he discuss with you anything about a DEA registration number?

24  A   He had a suggestion that I actually have my DEA registration moved to

25  the clinic at that address, and that way they could actually bring narcotics

1    to the clinic and dispense directly from the clinic.

2    Q    Yes, sir, and with regard to your meeting with Al, you went on a tour.

3    You said you didn't see any nurses, but you did see a physician; is that

4    right?

5    A    Yes, sir.

6    Q    That physician that you saw when you went on the tour of the clinic

7    with Mr. LeFrancois, do you see him in the courtroom today?

8    A    Yes, sir.

9    Q    And could you please point to him, describe something he has on?

10   A    At the defendant's table there.

11   Q    If you could point to him –

12   A    – With the green tie and the suit, yes sir.

13   Q    And did you meet that individual?

14   A    I did, yes, sir.

15           MR. KNOCHE: Judge, if the record could reflect he's identified

16   the defendant, Mr. Azmat.

17           THE COURT: So noted.

18           MR. KNOCHE: Thank you.

19   Q    And when you met with him, what was he doing?

20   A    He was in one of the exam rooms at the time .  I was with him when he

21   evaluated one of their clients at the clinic.

22   Q    And by evaluation, tell the ladies and gentlemen what kind of exam he

23   appeared to be doing.

24   A    Did basic neurologic musculoskeletal exam, motor functioning, ability

25   to ambulate, reflexes, a fairly cursory exam, but designed to – pretty

1    focused on the musculoskeletal system.

2    Q    And is cursory exam?  What does that mean?

3    A    Not very detailed.

4    Q    While he's doing this, I mean, is the door open, and is he talking to

5    you while he's treating a patient?

6    A    Yes, sir.  Kind of like I was there as a visiting student, visiting clinical

7    physician –

8    Q    – And did you see what this patient was prescribed, if anything?

9    A    I did see some of the prescriptions that were written.  They were

10   narcotic prescriptions, I think four.

11   Q    Four narcotic prescriptions?

12   A    Four different prescriptions, yes.

13   Q    And do you have any idea which narcotics; do you remember?

14   A    Oxycodone, Roxicodone were the substance that I saw, yes, sir.

15   Q    Did you have any conversations with Dr. Azmat regarding patients and

16   where they may have come from?

17   A    We did, and he related that some of them came from out of state, even,

18   to this area for that purpose.

19   Q    And after going on a tour, after talking with Dr. Azmat, after talking to

20   Mr. LeFrancois, what did you do?

21   A    Well, I thanked them for the interview and for the opportunity, headed

22   back to Athens, my home.  And something didn't feel right, so I actually

23   called the recruiter back to suggest to him that he take this particular

24   opportunity off of his recruiting list.  I didn't think other physicians should

25   come there.

1       In addition, I called a friend of mine at the DEA in the Athens,

2  Georgia area to suggest that they might look into this particular clinic.

3  Q     And why did you do that?

4  A     As an emergency physician, I see the adverse affects of narcotic abuse,

5  and sales and overdose on a regular basis, and sometimes they come from

6  clinics which I presume are like this one, and I'd like to see if these type

7  operations could be closed, and I thought Joe should look at that.

8  Q     Did it appear to be a legitimate medical clinic?

9  A     It did not.

10      MR. GILLULY: Nothing further, Judge.

11      THE COURT: Mr. Withers?

12      MR. WITHERS: Thank you, Your Honor.

13                   CROSS-EXAMINATION BY

14  MR. WITHERS:

15  Q     Dr. Hatmaker, my name is Tom Withers.  I represent Dr. Azmat.

16  A     Afternoon.

17  Q     I have just a few questions for you, sir.

18      Now, you spoke with Al LeFrancois about what his expectations of

19  you would be; correct?

20  A     Yes, sir.

21  Q     Mr. LeFrancois didn't tell you what you would be doing as a physician;

22  did he?

23  A     Could you rephrase the question?

24  Q     Well, he didn't tell you, you're going to prescribe oxycodone 30

25  milligrams per patient.

1    A    That's correct, he did not.

2    Q    He did not.

3    A    He did not.

4    Q    Okay, and when you spoke with Dr. Azmat, you actually physically sat

5    through an examination of a patient with him; correct?

6    A    Yes, sir, I did.

7            MR. WITHERS: Ms. Bodaford, if you could turn on the Elmo.

8    Q    Now, in your experience, you know there are what are called focal or

9    nonfocal examinations –

10   A    Yes, sir.

11   Q    – is that fair to say?  A focal examination would be for a specific

12   purpose; correct?

13   A    Yes, sir.

14   Q    Now, if you would, if you would look under physical examination right

15   here [indicating], does that seem to be consistent with the type of

16   examination that Dr. Azmat was doing with the patient that you saw?

17   A    It's tough to read all of the wording, but, yes, sir, I agree –

18   Q    – I'll tell you what, if – let's look just over here on the left-hand side

19   where it says, can you read that, neck?

20   A    Yes, sir.

21   Q    And then – and that says, I think, supple, nontender?

22   A    I think so, yes, sir.

23   Q    And what does that mean to you as a physician?

24   A    That the neck had a fairly decent range of motion.  There's no palpable

25   tenderness upon palpation of the neck.

-105-

1    Q    And that's the type of examination you saw, in part, Dr. Azmat

2    conducting; correct?

3    A    Yes, sir.

4    Q    And then the part, you see that R-R-R?

5    A    Yes, sir.

6    Q    And I can't recall the abbreviation for that, but did you see Dr. Azmat

7    using a stethoscope for the purpose of checking the chest and back?

8    A    Yes, sir.

9    Q    And then underneath there, we've got chest, and you've already said

10   that you saw that examination as well; correct?

11   A    Yes, sir.

12   Q    And then the abdomen, did you see him doing – and I believe that says

13   soft, nontender, I think – but you saw him conducting that examination of

14   the patient that you were in the room on.

15   A    I don't recall that particular portion, no, sir.

16   Q    Okay, and then you see the neuro; do you not?

17   A    I do, yes, sir.

18   Q    And that says, grossly intact, I think?

19   A    Yes, sir.

20   Q    And again, that's consistent with what you saw Dr. Azmat doing.

21   A    Yes, sir.

22   Q    And then underneath that it says, MS spine.  What does MS mean to

23   your knowledge?

24   A    Musculoskeletal.

25   Q    Okay, and then there are, I think it says lumbar flexion 75 degrees,

-106-

1    lateral flexion 20 degrees.  Is that consistent with the type of examination

2    you saw Dr. Azmat doing as well?

3    A    Yes, sir.

4    Q    Now, did Dr. Azmat discuss with you some of his practices in seeing

5    patients.

6    A    (No audible response.)

7    Q    Let me ask it another way –

8    A    A little more specific, I'm sorry.

9    Q    – that was not a very good question, I'm sorry.

10        Did he tell you that he was reducing medication for those that were

11   on oxycodone and Roxicodone?

12   A    Not that I recall, no.

13   Q    Do you recall him talking to you about the fact that he was

14   discontinuing Xanax, if the patient happened to come in on a combination

15   of oxycodone and Xanax?

16   A    Sorry, I don't recall that.

17   Q    And when you were there – do you recall the date that you were there,

18   or approximate date that you were there?

19   A    I don't recall the dates, except that it was early in the year.

20   Q    Okay.  The East Health Center was not dispensing medication at that

21   point in time; was it?

22   A    I don't think so, no, sir.

23   Q    It was not set up to dispense medication; was it?

24   A    I don't think so, no, sir.

25        MR. WITHERS: I think that's all I've got.  Thank you.

1      THE COURT: Anything else of this witness?

2      MR. GILLULY: Yes, Your Honor.

3                    REDIRECT EXAMINATION BY

4  MR. GILLULY:

5  Q      Dr. Hatmaker, you actually are a lawyer also; aren't you?

6  A      Yes, sir.

7  Q      And are you familiar with the Code of Federal Regulations regarding

8  the definition of dispensation?

9  A      Yes, sir.

10  Q      Does that include writing a prescription?

11  A      Yes, sir.

12      MR. GILLULY: Nothing further, Judge.

13      THE COURT: Can the witness be excused?

14      MR. GILLULY: Yes, Your Honor.

15      THE COURT: You may come, sir.  You're excused.

16  [Witness Excused]

17      MR. KNOCHE:  Investigator Sikes, please.

18  [Witness Sworn]

19      CLERK: Please state your name and your occupation and spell

20  your last name for the record.

21      MR. SIKES: Charles Sikes, diversion investigator, Drug

22  Enforcement Administration, S-I-K-E-S.

23                    C H A R L E S   S I K E S

24      GOVERNMENT'S WITNESS, SWORN, TESTIFIED AS FOLLOWS

25                    DIRECT EXAMINATION BY

1    MR. KNOCHE:

2    Q    Mr. Sikes, how long have you been employed by DEA?

3    A    Since October 2010.

4    Q    And will you describe for the members of the jury, what is the general

5    mission of the Drug Enforcement Administration?

6    A    To enforce the controlled substance laws of the United States.

7    Q    And you described yourself as a diversion investigator?

8    A    That's correct.

9    Q    And I believe that Agent Kahn was here during jury selection.  He is a

10   special agent?

11   A    That's correct.

12   Q    And what's the difference?

13   A    Diversion investigators do regulatory and criminal investigations

14   involving DEA registrants.  That's an individual that has a registration to

15   dispense, administer, or prescribe controlled substances.  Special agents

16   conduct primarily criminal investigations involving illicit drugs, street

17   drugs that you would typically think of, heroin, that type of thing.  But they

18   also do investigations involving pharmaceutical controlled substances like

19   diversion investigators.

20   Q    And you indicated that you enforce or investigate potential violations

21   of the Controlled Substances Act?

22   A    That's correct.

23   Q    Are you familiar with the various schedules of the Controlled

24   Substances Act?

25   A    Yes, I am.  There's five different schedules of drugs.  Schedule I is

1   heroin, street drugs that you would typically see that don't have any

2   medical use.

3       II through V are schedules for drugs that have an acceptable medical

4   use.  Schedule II is highly addictive drugs.  Schedule III is highly addictive,

5   but it's a little less than II, and then IV is a little less than III.

6   Q    Okay.  You said as an example of Schedule I would be heroin.

7   A    Right.

8   Q    No legitimate medical use?

9   A    Well, as an example of Schedule II would be like oxycodone.  Schedule

10  III, hydrocodone.  Schedule IV, Xanax or alprazolam.

11  Q    Okay, and in the – okay.  How do you go about investigating potential

12  violations or enforcing the law as it pertains to controlled substances?

13  A    Most of the time it's through a complaint.  We'll receive a complaint

14  from a citizen, or another physician, pharmacist, and we'll interview the

15  complainant to gather additional information about their complaint.  We'll

16  conduct surveillance, gather prescription records, subpoena financial

17  records, and do search warrants, that type of thing.

18  Q    And you were involved with the investigation of East Health Center,

19  Dr. Azmat, and others that worked at East Health Center; is that correct?

20  A    That's correct.

21  Q    Will you tell the members of the jury, how did your investigation

22  begin?

23  A    We received a complaint from Dr. Ross, who was just up here.

24  Q    And did she tell you about the meeting with Mr. LeFrancois and Mr.

25  Clark?

-110-

1    A    Right.  Dr. Ross contacted Angela Coleman from CNT, and CNT

2    contacted our office, the Drug Enforcement Administration, also the

3    Georgia Bureau of Investigation.  And we got together and started initiating

4    the investigation.

5    Q    And what sort of things did you do in your investigation of East Health

6    Center?

7    A    We conducted surveillance.  We went out to the clinic, observed out-

8    of-state tags parked in front of it.  An agent from CNT, Ron Tyran, went out

9    and conducted an inspection of the facility.  We also spoke with local

10   pharmacists to find out what type of medications were being prescribed

11   from the clinic.  We got prescription profiles.  We saw that the majority of

12   the prescriptions were for oxycodone.  We also conducted trash pulls and

13   found that some of the patient files had been thrown away.

14   Q    Did you, during the course of your investigation, learn what was the

15   medium of exchange at the business?  Was it a cash business?  Was it a

16   credit card business?

17   A    Yes, East Health Center was primarily a cash business, but also it did

18   accept some credit card payments.

19   Q    And did you determine where the owners of the clinic were from?

20   A    Yes, they were from South Florida.

21   Q    And you indicated that you discovered through your surveillance and

22   the pharmacy searches that many of the patients came from out of state?

23   A    That's correct.

24   Q    And traveled long distances?

25   A    Yes, that's correct.

1    Q    What else did you learn about some of these patients?

2    A    That they traveled long distances, that they were receiving primarily

3    oxycodone prescriptions, that they traveled in groups.  Through our

4    surveillance we saw groups of patients arriving together at the clinic.

5    Q    And based on your pharmacy profiling of the prescriptions written at

6    East Health Center, did you determine what were the predominant drugs

7    which were being prescribed?

8    A    Primarily oxycodone 30 milligram; oxycodone 15 milligram; Percocet

9    10, which is also an oxycodone product; Flexeril; Motrin; and other things.

10   Q    Motrin is an over-the-counter drug?

11   A    Yeah, Motrin is over-the-counter drug, but it was primarily controlled

12   substances.

13   Q    And you said the clinic was visited during the course of the

14   investigation?

15   A    Yes, it was.

16   Q    By law enforcement?

17   A    That's correct.

18   Q    And what was determined as far as the status of medical equipment

19   and other supplies at the facility?

20   A    When the clinic was first opened, Ron Tyran, a CNT agent, went out to

21   East Health Center and determined there was no medical equipment, other

22   than a scale and maybe a blood pressure cuff.  And he made a subsequent

23   visit.  He went back and told them, look, that, you have applied for a license

24   as a medical facility, we expect to see medical equipment in here.  And we

25   learned that they went out and purchased Band-Aids, and gauze, and

1    cotton balls, that type of thing, to give the appearance of a medical facility.

2    Q    Eventually did your investigation lead to the issuance of a search

3    warrant by this court?

4    A    Yes, it did.

5    Q    And did you participate or supervise the execution of that search

6    warrant at East Health Center?

7    A    Yes, I did.

8    Q    Tell the members of the jury, what was the date that you served the

9    warrant?

10   A    That was May 26, 2011.

11   Q    And how did you go about executing the warrant?

12   A    We met with the receptionist for the clinic, Shelly Morford, and told

13   her we had a search warrant for the clinic.  She allowed us to go in, opened

14   the door of the clinic.  We then allowed all the patients to come in like a

15   normal day.  And then all the law enforcement officers that were going to

16   be serving the warrant followed the patients in, and we conducted

17   interviews of the patients and began searching the facility.

18   Q    And as you searched the facility, did you seize items that you felt were

19   of evidentiary value?

20   A    Yes, we did.

21   Q    Did you seize all the patient folders that were at East Health Center?

22   A    Yes, we did.

23   Q    Did you take pictures?

24   A    Yes.

25   Q    Did you seize business records?

-113-

1    A    Yes, we did.

2    Q    And did you seize the surveillance camera system that was present?

3    A    Yes, we did.

4              MR. KNOCHE: If I may have the 28 exhibits.  May I approach

5    the witness, Your Honor?

6              THE COURT: Yes, sir.

7    Q    I'm showing you a series of photographs, Agent Sikes, and ...

8              MR. KNOCHE: Is control back with Mr. Athanasopoulos?

9    Thank you.  Could we have exhibit –  starting with 28-1.

10    A    This is Adelard LeFrancois.

11              MR. KNOCHE:   And 28-2?

12    A    Sean Clark.  This is a picture of the East Health Center.  You can see all

13    the way to the far right where it says 626 at the top.  It's a little bit blurry.

14    Q    Each of these photographs that I'm going through with you, is that the

15    way the clinic appeared on May the 26th, 2011?

16    A    That's correct.

17    Q    And accurately portrays the way it looked?

18    A    Yes, it does.

19    Q    What number are we at?

20    A    That's 28-3.

21    Q    That is the exterior of East Health Center?

22    A    That's correct.

23    Q    Okay, and that is located – I keep saying Garden City.  Do you have an

24    address for the facility?

25    A    Yes, 626 Highway 80, Garden City, Georgia.

-114-

1    Q    There's a sign that says Coastal Exams.  Where in relation to –

2    A    – Right, that's – it's next door to Coastal Exams.  You can see kind of

3    an orange, peach, I believe, on the front.

4    Q    So it's to the extreme right of the building.  It's the last building on –

5    the last space on the right.

6    A    That's correct.

7                 MR. KNOCHE:  28-4, please?

8    A    This is a picture of the inside of East Health Center.  It's the reception

9    window, and this is some of the signage that was around the front window.

10                 MR. WITHERS: Judge, I object.  We're talking about here, with

11    respect to this witness, May 26, 2011.  I think the question is whether this

12    was the appearance of the facility when Dr. Azmat worked there, not two

13    months later.  And unless that foundation is laid, I object to these –

14                 THE COURT:  – Well, he's saying that this is the way it

15    appeared on May 26, 2011, and I'll let him testify about that.  You can

16    cross-examine him about whether he knows how it appears when your

17    client was there or not.  Go ahead.

18    Q    (By Mr. Knoche) And you say that both those signs were posted on the

19    walls of the waiting room?

20    A    That's correct.

21    Q    And we may have some closer views of those.  How about 28-5?

22    A    This is another view of the reception area.  This is kind of a waiting

23    room.  It was an L-shape, kind of went this way and then straight back.

24    There's some more signage that was on the wall.

25    Q    What kind of chairs were the patients sitting in?

1    A    There was a combination of chairs.  They were primarily folding

2    chairs, but there were also a few metal chairs that had a small cushion on

3    them.

4    Q    And were those individuals that we're looking at, were they patients

5    that day?

6    A    They were primarily patients.  There is one officer in the picture, but

7    the rest are patients that showed up the day of the search warrant.

8    Q    Which one is the officer?

9    A    The one standing in the black shirt.

10   Q    You see the sign in the very middle of 28-5?

11   A    Yes, I do.

12          MR. KNOCHE:  Show us 28-5A.

13   A    This is a close-up of the sign that was there.

14          MR. KNOCHE: Can you highlight any of the text on that?

15   Q    What does the second bullet point read?

16   A    [Reading:] I understand that this office does not prescribe OxyContin.

17   Q    In fact, did you determine that oxycodone, the active ingredient, was

18   routinely prescribed?

19   A    Well, oxycodone is a generic of OxyContin.  We found that it was

20   prescribed on a regular basis.

21   Q    28-6?

22   A    These were some of the signs above the reception area, 24-hour

23   camera surveillance, and then instructions about smoking.

24   Q    28-7?

25   A    This is additional signage that was in the front office, no recounts or

1    refunds after handling meds.

2    Q    No refunds?

3    A    Also the same signs  we've seen before.

4    Q    And 28-8?

5    A    This a picture of the same sign.

6    Q    28-9?

7    A    This is also a close-up picture of the same sign.

8    Q    And the sign says, no recounts or refunds after handling meds or

9    signing?

10   A    Right.

11   Q    28-10?

12   A    This is a 24-hour surveillance sign in another part of the office.

13   Q    And that's a different 24-hour surveillance sign?  Is that correct?

14   A    Yes, it is.

15   Q    28-11?

16   A    This is another 24-hour surveillance sign that was on the back door.

17   Q    28-12?

18   A    This is a picture of some more 24-hour camera surveillance signs

19   along with one of the surveillance cameras.

20   Q    And that's the surveillance camera at the top of the picture?

21   A    Yes, it is.

22   Q    28-13?

23   A    28-13, this is a picture of the hallway.  You can see the camera down at

24   the end of the hall and the two surveillance signs.

25   Q    Is that the back door at the very rear of the picture?

-117-

1    A    Yes, it is.

2    Q    Okay, that we saw a moment ago.  And those rooms off the corridor,

3    what were they?

4    A    Those are patient exam rooms and also an office.

5    Q    28-18?

6             MR. GILLULY: 28-14.

7    Q    I'm sorry, 28-14.

8    A    This is a picture that shows another one of the surveillance cameras on

9    the ceiling.

10   Q    28-15?

11   A    28-15, this is a picture of two more surveillance cameras, one inside

12   the clinic, and one just to the right of it is outside the clinic.

13   Q    28-16?

14   A    This is a picture of another outside surveillance camera.

15   Q    It shows the – also the storefront, East Health?

16   A    The storefront, and you can see the name, East Health.

17   Q    28-17?

18   A    This is a picture of another surveillance camera along with the front of

19   East Health.

20   Q    28-18?

21   A    This is a surveillance system that they had that recorded the images

22   from their surveillance cameras.  They kept them on a DVR that was

23   recorded.

24   Q    Did you eventually seize that –

25   A    – Yes, we did.  We seized the DVR system.

-118-

1    Q    That system shown in 28-18, okay.  28-19?

2    A    This was a diagram for the office.

3    Q    Was that posted on the wall?

4    A    Yes, it was.

5    Q    Does that diagram accurately depict the way East Health Center was

6    actually laid out?

7    A    Yes, it does.

8    Q    28-20?

9    A    This is a picture of an exam room.

10   Q    What was in those exam rooms?

11   A    There was a patient bed, a stool, and a plastic drawer – a plastic bin

12   with drawers that had some cotton balls, Band-Aids, gauze, that type of

13   thing.

14   Q    What other – or what medical equipment did you observe while you

15   were executing your  warrant inside of East Health Center?

16   A    We saw a blood pressure cuff, and a scale, and some Band-Aids.

17   Q    Any X-ray machines?

18   A    No.

19   Q    Treadmills?

20   A    No.

21   Q    Exercise equipment?

22   A    No, sir.

23   Q    28-21?

24   A    This is also another view of the exam room, or the next exam room.

25   Q    28-22?

-119-

1    A    This is another view of the exam room.

2    Q    And these pictures, that was what was in the exam room when you

3    served your warrant.

4    A    That's correct.

5    Q    The bed, the pictures.

6    A    Right.

7    Q    28-23?

8    A    This is another picture of the exam room.

9    Q    What was in the – see the plastic cart in the middle left-hand part?

10    A    That was Band-Aids and some basic first-aid equipment, such as

11    gauze, cotton balls, and like Q-tips.

12    Q    28-24?

13    A    These are some of the patient file – these are the patient files that were

14    seized in this filing cabinet.

15    Q    And did you take all the files?

16    A    Yes, we did.

17    Q    Did all the files you seized pertain to Dr. Azmat patients.

18    A    No, they didn't.

19    Q    There were other doctors who worked there after him?

20    A    That's correct.

21    Q    28-25?

22    A    This was kind of a kitchen area or supply room.

23    Q    Do you recognize the fellow on the – taped to the refrigerator door

24    there?

25    A    Yeah, this is a picture of Konstantinos Afthinos, went by Kostas.  He

-120-

1    was an employee of East Health Center.

2    Q    28-26?

3    A    This was a supply closet at East Health Center.

4    Q    Was that toward the rear of the building?

5    A    Yes, it was.

6    Q    28-27?

7    A    This is a picture of their bathroom.

8    Q    Did you learn patients were asked to give urine samples when they

9    were seen at East Health Center?

10   A    Yes.

11   Q    28-28?

12   A    This is a sink that was toward the rear of the building with a few

13   cleaning supplies.

14   Q    28-29?

15   A    This is a picture of their scale, and also just some miscellaneous items

16   that were in the clinic.

17   Q    That looks like bottled water?

18   A    Bottles of water and some tissue, a telephone.

19   Q    28-30?

20   A    This was the room behind the reception area, and this was a safe, and

21   then next to it were empty pill bottles with the lids.  And then also on top of

22   the safe were some of their daily forms that they filled out, end-of-day

23   reports, things they used to keep track of the cash.  Above that in these

24   boxes on the top were the boxes that the empty pill bottles came in.

25   Q    Did you seize those records which are located on top of the safe?

1    A    Yes, we did seize those.

2    Q    28-31?

3    A    This is a close-up of the safe and the pill bottles inside the drawers.

4    Q    28-32?

5    A    This is the inside of the safe, the prescription pads that were in the top.

6    Down from that were some additional prescription pads.  That was a

7    binder, a black binder, that had their checkbook in it and check stubs.  And

8    then there were some – I'm not sure what that is at the bottom.

9    Q    28-33, a different view, I believe of the safe?

10   A    Right, a different view of inside of the safe.

11   Q    28-34?

12   A    This is a picture of the front reception area.  This was a safe that was

13   kept underneath the reception desk to put cash in.

14   Q    And we saw earlier a picture of the window, which was the front

15   window.  This is from the inside –

16   A    – This is behind the window.

17   Q    28-35?

18   A    These are the boxes that the pill bottles came in, and I believe the fax

19   machine or printer.

20   Q    28-36?

21   A    This is a close-up of one of the boxes showing that they were pill

22   bottles or vials, and that they came with caps.

23   Q    And I think our last photograph right now is 28-37.

24   A    This is inside one of the boxes that pill bottles came in.

25   Q    Tell the jury what we're looking at.

1    A    This was – these are the pill bottles inside the box.

2            MR. KNOCHE: Your Honor, I have a number of additional

3    exhibits, but for housekeeping I would like to move all those 28-series

4    exhibits into evidence at this time, 28-1 through 28-37.

5            THE COURT: All right, they're admitted.

6            MR. KNOCHE: Permission to approach, Your Honor?

7            THE COURT: Yes, sir.

8    Q    Agent, I'll recover the – I'm now giving you what is  marked as

9    Government Exhibit 29-5, and if you can tell the members of the jury,

10   what's 29-5?

11   A    This is the DVR system that the cameras were plugged into or

12   recorded onto.

13   Q    That you showed us the picture of in 28-series a while ago?

14   A    Right.

15   Q    And did you have the occasion to have an examination done of the

16   hard drive of that device to determine if it contained any video surveillance

17   which was recorded by the cameras we looked at?

18   A    Yes, we did.

19   Q    Okay, and were you able to recover any images from the hard drive of

20   that device?

21   A    Yes, we were.

22   Q    And did you cause still shots to be made of various segments of that

23   video?

24   A    Yes, I did.

25   Q    And just to be clear, were you able to determine how many days that

-123-

1    surveillance camera would record?

2    A    Yes, that surveillance – the DVR was capable of holding 30-day

3    memory of video footage.  And when we analyzed the hard drive on the

4    DVR, we found that it had surveillance footage from April 28 until May

5    25th.

6                    MR. KNOCHE: Your Honor I'd like to move 29-5 into evidence.

7                    THE COURT: Admitted.

8    Q    Now, you said you took still shots.  You have a series of photographs

9    29-5A-1 through 29-5A2.  I believe it's in the – let me get that for you.  Keep

10   your voice up, please.  Okay, 29-5A-1.

11                   MR. KNOCHE: Dean, if you'd get 29-5A-1 up for us.

12   Q    This is from the surveillance video; is that correct?

13   A    Right.  This is a photo of Dan Wise, the manager, counting the cash at

14   the end of the day.

15   Q    You recognize Dan Wise?

16   A    Yes, I do.

17   Q    He was an employee of the clinic?

18   A    That's correct.

19                   MR. KNOCHE: Could you give us a close-up of the cash.

20   Q    29-5A-2?

21   A    This is a picture of the front reception area and waiting room.  And

22   also on the front next to the reception window is a guy named Antwan who

23   was a security guard for the clinic.

24   Q    29-5A-3?

25   A    This is another picture of the front waiting room with people signing in

-124-

1    at the clinic.

2    Q    29-5A-4?

3    A    This is a picture of the front door of the clinic and people congregating

4    or waiting outside for the clinic to open.

5    Q    And 29-5A-5?

6    A    This is a picture of the same group that was waiting outside going into

7    the clinic once the clinic was open.

8    Q    Who's the fellow opening the door that we see –

9    A    – Fellow opening the door, that's Konstantinos Afthinos.

10   Q    Is he the same fellow whose picture was on the refrigerator?

11   A    Yes, it is.

12   Q    29-5A-6?

13   A    This is a picture in the safe room in front of the safe with two of the

14   clinic employees counting the cash at the end of the day.  Shelly Morford is

15   counting the cash, and Konstantinos Afthinos is there collecting the

16   garbage from the room.

17   Q    29-5A-8?  I'm sorry, 7.

18   A    This is a picture of Konstantinos completing the daily, the end-of-the-

19   day sheets along with the cash that was collected from the day.

20   Q    The cash is on the floor?

21   A    That's correct.

22   Q    Now 5A-8.

23   A    This is a picture of Daniel Wise and Shelly Morford counting cash at

24   the end of the day.

25   Q    5A-9?

-125-

1  A   This is a picture of some of the clinic employees.  At the top you'll see

2  Daniel Wise and Antwan, and at the front of the picture, or bottom of the

3  picture, you'll see Shelly Morford and Konstantinos Afthinos.

4  Q   And 5A-10.  29-5A-10.

5  A   This is another picture of the front waiting room, and there are some

6  patients in the front that I can identify.  Standing up in the blue shirt is

7  Nancy Binion, and seated next to her is her husband Bryan Binion.

8          MR. KNOCHE:  See the woman in the middle of the photo,

9  Dean?  Would you highlight her please?

10  Q   So the woman standing is Nancy Binion?

11  A   That's correct.

12  Q   Was she a patient of Dr. Azmat's?

13  A   Yes, she was.

14  Q   Now, this video surveillance, it was a 30-day loop, so it must go back

15  to late April and through May; is that right?

16  A   Right, from end of April through end of May.

17  Q   After the time of Dr. Azmat's employment.

18  A   That's correct.

19  Q   Did you determine that patients who saw Dr. Azmat continued to

20  come to the clinic after he left?

21  A   Yes.

22  Q   And Nancy Binion was one of them?

23  A   That's correct.

24  Q   Do each of those photographic stills accurately represent what was

25  removed from the hard drive, 29-5?

-126-

1    A    Yes, they do.

2              MR. KNOCHE: I'd like to offer those into evidence, Your

3    Honor, 29-5A-1 through 29-5A-10.

4              THE COURT: All right, admitted.

5              MR. KNOCHE: May I approach, Your Honor?

6              THE COURT: Yes, sir.

7    Q    And if you would, Mr. Sikes, please be careful of the microphone.

8    A    Okay.

9    Q    29-1.  29-1A.  You recognize any of those exhibits?

10   A    Yes, I do.

11   Q    And what is 29-1?

12   A    This is a binder that had the patients' sign-in sheets, and also a sheet

13   that totaled up all the patients that were there and what they paid for their

14   visit.

15   Q    And how are those documents in 29-1 organized?

16   A    They're in descending order.  It starts on May 25, and it goes all the

17   way back to when the clinic opened on February 21st.

18   Q    Is that exhibit in the same condition it was in on the day that you

19   seized it?

20   A    Yes, it is.

21   Q    And you reorganized it?

22   A    No, I haven't.

23   Q    Okay, and 29-1A, what is that?

24   A    These are the daily sheets and summary sheets on the top from the

25   period that Dr. Azmat worked at the clinic.

1    MR. KNOCHE: And I'd like to tender 29-1 and 29-1A, Your

2  Honor, and I'd like to publish some excerpts of 29-1A to the jury at this

3  time.

4  Q    And if you would, Agent Sikes, if you would look through the –

5    MR. KNOCHE:  – Yes, I tendered that into evidence, Your

6  Honor.  Did not hear if it was admitted.

7    THE COURT: Which one?

8    MR. KNOCHE: 29-1 and 1A that the agent  ...

9    THE COURT: All right, they're admitted.

10  Q    Pick a date, if you would, Agent Sikes, from 29-1A and give us the

11  number from what Mr. Dean published.

12  A    2/21/2011.

13  Q    Is there a Bates number at the bottom of the page?

14  A    Oh, a Bates number, not on this –  no, there's not.

15    MR. KNOCHE: Excuse me a moment, Your Honor.

16    [NOTE: Mr. Knoche confers with technical person off the record.]

17  Q    What date ...

18  A    February 21, 2011.

19  Q    And what's the significance of February 21st?

20  A    This is the first day that Dr. Azmat worked for East Health Center.

21    MR. KNOCHE: If you would, Dean, if you'd call up 29-1A-50

22  and 51.

23  Q    What is this document we're looking at ?

24  A    This is a patient sign-in sheet from the first day that Dr. Azmat worked

25  there and the first day the clinic opened.

1    Q    And were sign-in sheets such as that kept for every day that Dr. Azmat

2    worked at the clinic?

3    A    Yes, they were.

4    Q    So if one were to peruse 29-1A, you would see the days that he worked

5    there and the patients that he saw; is that correct?

6    A    That's correct.

7    Q    So it has their name, and what's next, time that they checked in?

8    A    Right.  Time that they checked in and then their phone number.  You

9    can see the area codes from where their phone numbers are.

10   Q    And were you able to locate during your search of East Health Center

11   medical files which related or pertained to each of those signed-in patients?

12   A    Yes, I was.

13           MR. KNOCHE: Can we take a look at 29-1A-51?

14   Q    Apparently  it's a two-page exhibit; is that right?

15   A    That's correct.

16   Q    Now, where was the sign-in log kept at East Health Center?

17   A    It was kept in the office.  I believe it was on top of the safe.

18           MR. KNOCHE: Show us 20 – 49 for convenience sake.

19   Q    What's 49?

20   A    This is a summary of those two sign-in sheets.

21   Q    And do those names correspond to the sign-in sheet?

22   A    Yes, they do.

23   Q    Michael Brooks, I believe, was the first name on the sign-in sheet?

24   A    Right, and it's also the first name on the summary.

25   Q    And then we have a second column, amount paid.

-129-

1    A    Right.

2    Q    And a running total?

3    A    Yes.

4    Q    Let's look at – if you would, pick us out one more.  Let me suggest

5    February 25.

6    A    Okay.

7              THE COURT: Mr. Knoche, I'm not certain about the summary.

8    You've testified about the sign-in sheets, so when they came in they signed

9    in.  What is the summary?  Where did it come from?

10             MR. KNOCHE: This is a record that was seized from the clinic,

11   Your Honor.

12             THE COURT: Well, that's what I'm trying to ask you, okay.  He

13   just said it was the summary, and that's all he said –

14   Q    – Would you explain –

15             THE COURT: – He said here are sign-in sheets, and he said

16   what they were.  And then you said what is this, and he says this is a

17   summary.

18   A    Right, I'm sorry, Your Honor.  This is another sheet that was prepared

19   at the clinic, and it takes the same information that was on the sign-on

20   sheets and puts it onto one page in a neater format that you can read it.

21             THE COURT: All right, thank you.

22   Q    (By Mr. Knoche) And it totals the ...

23   A    Totals the amount collected for that day, the date, and it gives the

24   names of the patients that were there.

25   Q    And that is – those documents are – there's one for each day.

-130-

1    A    Right, that's correct.

2    Q    All right, 29-2, I'm going to bring to you.  If I may recover those from

3    you.  29-2, what is it?

4    A    These are daily cash audit reports that were seized from the clinic, and

5    it gives the number of patients that were there, if anybody received a

6    refund, how much money they had at the start of the day, how much cash

7    they received, and it also lists their expenses, what they paid for lunch, how

8    much the doctor was paid, if they purchased any office supplies, or any

9    other expenses during that day.  They kept it on a sheet, and because it was

10   cash, they wanted to account for cash that they took in.  And also they kept

11   copies of receipts of anything they purchased during the day.

12   Q    And what is 29-2A?

13   A    29-2A are the same cash audit report sheets, but it's for the period that

14   Dr. Azmat worked at the clinic.

15   Q    February 21st  through –

16   A    – February 21st  through March 18th.

17   Q    And is that exhibit – those exhibits, are they in the same condition

18   that they were when you seized them?

19   A    Yes, they are.

20   Q    And 29-2A is a copy of certain documents from 29-2 –

21   A    – Right, it's a copy of what's in here, but for the days of his

22   employment.

23              MR. KNOCHE: Your Honor, I move 29-2 and 2A into evidence,

24   Your Honor.

25              THE COURT: Admitted.

-131-

1      MR. KNOCHE: All right, if we could have, Dean, 29-2A-50.

2    Q    Is this document representative of these daily cash audit reports which

3    are contained throughout Exhibit 29-2?

4    A    Yes, they are.

5    Q    Is there one of these for each day that Dr. Azmat worked at the clinic?

6    A    Yes, there is.

7    Q    And what information is contained in this particular exhibit, 29-2A.

8    A    It has the number of patients that signed in, the amount of cash they

9    had at the beginning of the day, cash that they received from the office that

10   day, patients coming in.  It also included expenses, you see where they paid

11   for their lunch, the doctor's pay, and they also paid $25 to Comcast.

12   Q    29-3 I'm going to show you.  29-3 and 29-4, I'll give those to you at

13   once, and recovering 29-2 and 2A.

14       THE COURT: All right, before we begin that, Mr. Knoche, let

15   me give this jury a break.  We've been here a couple of hours since lunch.

16   We're going to have about a ten-minute recess, ladies and gentlemen.

17       I remind you, Mr. Sikes, do not discuss your testimony with

18   anyone during this recess.  We'll take about ten minutes.

19       [NOTE: A brief recess is taken, after which the proceedings are

20   continued in the presence of the jury as follows:]

21       THE COURT: You may continue, Mr. Knoche.

22   Q    (By Mr. Knoche)  Agent Sikes, before the break, I handed you what

23   had been marked Government's Exhibits 29-3 and 29-4.  Do you still have

24   those?

25   A    Yes, I do.

-132-

1    Q    29-3, what is it?

2    A    This is a checkbook with the check stubs that were filled out.

3    Q    And that was – was that the same checkbook binder that we saw in the

4    one picture in Exhibit 28?

5    A    Yes, this was inside the safe at East Health Center.

6    Q    And 29-4.

7    A    29-4.  This is a copy of credit card receipts where they accepted credit

8    card payments.

9    Q    And can you tell the jury, look at a day, February 21st for example, are

10   there any credit card receipts?  Can you tell?

11   A    No, the first credit card receipt was for February 24th.   There was one.

12   Q    There was one?  And was it a low volume?  Low volume for credit card

13   transactions –

14   A    – Yes, yeah,  a low volume of credit card receipts, mainly two a day,

15   maybe three.

16   Q    And those were from patients?

17   A    Yes, patients' payments.

18   Q    Each of those exhibits in the same condition –

19   A    – Yes, the same.

20            MR. KNOCHE: Your Honor, I would tender 29-3 and 4.

21            THE COURT: Admitted.

22   Q    And Mr. Sikes, we're up to Exhibits 1 through 25 now.  They are – the

23   next several exhibits are arrayed in a box in front of the jury.  Have you had

24   a chance prior to your testimony here today to inspect what's in each one of

25   those boxes, and are you prepared to answer some questions about them?

-133-

1   A   Yes, I am.

2   Q   Exhibits 1 through 25, what are those?

3   A   Exhibits 1 through 25 are patient charts that were seized from East

4   Health Center that were patients of Dr. Azmat, and I believe they are also

5   the charged counts in the indictment.

6   Q   Okay. So does each of 1 through 25 pertain to one of the counts – one

7   or more of the counts alleged in Counts 2 through 50 of the superseding

8   indictment?

9   A   Yes, that's correct.

10   Q   And those include the files of Jim Brooks, George Hunter, Billy Letner,

11   et cetera, people who are named in those –

12   A   That's correct.

13   Q   – the subject of those counts. And are those – each of those exhibits, 1

14   through 25, those medical records, in the same condition that they were

15   when you seized them on May the 26th of 2011?

16   A   Yes, they are.

17   Q   And then there are more patient files labeled 26-1 through 26-23. Are

18   those also patient files of Dr. Azmat patients?

19   A   Yes, they are.

20   Q   And in the same condition that they were when you seized them?

21   A   Yes, they are.

22   Q   And finally, Exhibits 27-1 through 27-191, more patient records?

23   A   Yes, that's correct.

24   Q   And have you made sure that those are Dr. Azmat patient files?

25   A   Yes, I have.

1   Q     And are they in the same condition that they were when you seized

2   them on May the 26th?

3   A     Yes, they are.

4   Q     Were those the files, some of which we saw in the pictures that we saw

5   on the day that you executed the search warrant?

6   A     Right, they were.  There was a metal filing cabinet, and most of them

7   were in there.  And there was also some additional shelving in the office

8   that they came out of.

9           MR. KNOCHE: Your Honor, with that foundation, I would like

10  to tender into evidence each of those exhibits, and it is many pages of

11  exhibits, but it's 1 through – starting on exhibit list Page 1, 1 through

12  Exhibit 27-191.

13          THE COURT: Admitted.

14  Q     Agent Sikes, after you seized those exhibits, those patient records, did

15  you have the occasion to look at each and every one of them?

16  A     Yes, I have.

17  Q     And from each of those records – and I believe it's in the

18  neighborhood of 240 records?

19  A     I believe it was 238, around 240.

20  Q     All right, and from each of those records, were you able to determine

21  patient name?

22  A     Yes.

23  Q     What other information were you able to extract from the patient

24  files?

25  A     The patient's address, their date of birth, where they received their

-135-

1    MRI, prescriptions that they were issued, the date of their visit, a copy of

2    their driver's license, that type of thing.

3    Q    Were you able to determine whether the patients were or were not

4    prescribed controlled substances?

5    A    Yes.

6    Q    Okay, and how did you do that?

7    A    I went through each of the patient files and looked at the prescriptions

8    that were in the files for the day, and determined if they were prescribed

9    controlled substances or not.

10   Q    And were you able to extract that data and keep a tally of it?

11   A    Yes, I was.

12        [NOTE: Mr. Knoche confers with Mr. Gilluly off the record.]

13        MR. KNOCHE: Your Honor, I am sorry.  It may take me a

14   moment to locate these.

15        THE COURT: Yes, sir.

16        [NOTE: Mr. Knoche confers with Mr. Gilluly off the record.]

17   Q    (By Mr. Knoche) Agent Sikes, I'm approaching you and I am showing

18   you what's been previously marked for identification as Exhibits 31-8

19   through 31-11.  I'm going to hand these to you and go through each one

20   individually.

21   A    Okay.

22   Q    Do you recognize those exhibits?

23   A    Yes, I do.

24   Q    I'd like you to start with 31-8.  What is 31-8?

25   A    This is a spreadsheet listing all the patients that came to East Health

1    Center during the time Dr. Azmat was there.

2    Q    What information does 31-8 summarize?

3    A    It lists the patient name, their address, city, state that they were from,

4    zip code, date of birth, the MRI facility that they got their MRI from, what

5    state the MRI facility was in, and whether or not they were prescribed

6    medication.

7            MR. WITHERS: Your Honor, if I might interpose an objection.

8    I object to the summary witness testimony without a foundation with

9    respect to any of the patients.  I mean, we're talking about specific patients

10   and specific patient records.  This is, I would submit to you, the other side

11   of that *Elisor* point where the defense can't offer a specific record for a

12   particular date to show that Dr. Azmat was in compliance with legitimate

13   medical need. And so–

14           THE COURT:  – As I understand what Mr. Knoche's attempting

15   to do now – and you correct me if I'm wrong – is he is attempting to have

16   this witness identify a summary under 1004, I guess it is, of voluminous

17   documents that the witness says that he prepared from the documents that

18   were seized in search.  Now, I'm assuming that's what's going on here.  But

19   that's all I know about what Mr. Knoche – he hasn't addressed the Court

20   and said, you know, I want to use this witness as a summary witness, I want

21   to do that, and then we can get into it and we can discuss it.  So I'm not sure

22   where we are, Mr. Withers.

23           MR. KNOCHE: May I reply, Your Honor?  It is indeed being

24   offered as a summary under Federal Rule of Evidence 1006.

25           THE COURT: Well, have you showed the summary prior to this

-137-

1    case today to Mr. Withers, and has Mr. Withers had an opportunity to

2    examine the summary and review the summary before trial today?

3                MR. KNOCHE: Each and every record which is –

4                THE COURT:  – No, sir, just answer.  I didn't say each and –

5                MR. KNOCHE: Yes, yes.

6                THE COURT:  – every record.  Have you shown the summary

7    exhibit – the summary exhibit – have you shown that summary exhibit to

8    Mr. Withers prior to this trial beginning, and has Mr. Withers had an

9    opportunity to examine the summary exhibit that this witness is being

10   questioned about?

11               MR. KNOCHE: Yes.

12               THE COURT: Okay.  What do you say, Mr. Withers?

13               MR. WITHERS: Well, I received the exhibits on Friday, Your

14   Honor.  You know, again, in an earlier case, Your Honor, dealing with a

15   similar situation, the defense was attempting to show a – you know,

16   particular patient on a particular day, and the government moved in limine

17   to prevent that.

18               THE COURT: Well, that's another case.  That's not my case.

19   That's not this case.

20               MR. WITHERS: Well, it was before Your Honor, and a motion

21   in limine was granted to preclude defense counsel from going into anything

22   outside of those particular counts in the indictment.  Here, we've got 50

23   particular counts of the indictment where we can address what happened

24   with a particular patient on a particular date, not –

25               THE COURT:  – Well, does this summary include – well, you

-138-

1    need to tell me, does this summary – I haven't seen the summary, I don't

2    know what the summary is.  Does this summary include patients and

3    events that took place outside of what your client's being charged with in

4    the indictment?

5              MR. WITHERS: Well, it's outside of the counts, Your Honor.

6    There are 50 counts, and this is a summary, not of those 50 counts, but of

7    every patient that Dr. Azmat saw for the three-and-a-half weeks that he was

8    there.

9              THE COURT: What do you say, Mr. Knoche?

10             MR. KNOCHE: Your Honor, there is a conspiracy count

11   charged in Count 1, which – and these charts deal with the patients that Dr.

12   Azmat saw during his time during the conspiracy that he worked at East

13   Health Center.

14             THE COURT: But not all of them are included in the counts?

15             MR. KNOCHE: Not every – we did not make a count for every

16   patient file.  We did not do that.

17             THE COURT: Okay.  But these summaries that he's going to

18   testify about, I assume he's going to say he prepared this summary from the

19   records that he seized; is that correct?

20             MR. KNOCHE: Yes, Your Honor, he's going to testify that he

21   prepared those summaries from those exhibits which have just been

22   received into evidence, which we submit are voluminous.

23             THE COURT: All right, the objection's overruled, Mr. Withers.

24   But y'all could help me out if you alert me as to what you're doing here, you

25   know.  It would help an awful lot.  Go ahead.

1      MR. KNOCHE: I'm sorry, Your Honor.

2   Q    (By Mr. Knoche) 31-8, you were describing what it showed, and you

3   were describing the methodology by which you compiled that chart?

4   A    Right.  This is a spreadsheet that I made based on reviewing each of

5   the patient files.  And from those files I took out the patient's name, their

6   street address, the city and state and zip code where they were from, their

7   date of birth, where they received their MRI, the name of the MRI facility

8   and the state; and also if they were prescribed medication.

9   Q    And just for clarity's sake, that summary chart pertains only to

10  patients seen by Dr. Azmat between March the 21st of 2011 and March the

11  18th of 2011.

12  A    That's correct.

13  Q    31-9?

14      THE COURT: You said March 21st to March 18th.

15      MR. KNOCHE: March 18th, Your Honor – February 21 to March

16  18.

17      THE COURT: So you're talking about February, not March.  I

18  understood you to say March 21 to March 18.

19      MR. KNOCHE: I misspoke, Your Honor.  I'm sorry.

20      THE COURT: So what are we talking about?

21      MR. KNOCHE: February 21 to March 18.

22      THE COURT: All right.

23  A    That's correct.

24  Q    Okay.

25  A    31-9, this is a list of all the prescriptions that were issued by Dr. Azmat

1    during his employment at East Health Center.

2    Q    And does it show the –

3    A    – It shows the patient's name, their street address, the city and state

4    that they're from, the date that they visited the clinic, the drug that they

5    were prescribed, the milligrams of the drug, the quantity, and whether or

6    not it was a controlled substance by the schedule.

7    Q    31-10?

8    A    31-10, this is a list of the patients by visit date.  And it lists the patient's

9    name, the date they visited the clinic, their address, city, state and zip code.

10   Q    31-11?

11   A    31-11, this is a chart summarizing the charged counts.  It lists the

12   patient's name, their street address, city, state, zip code, their date of birth,

13   and where they received their MRI.  And it also has additional pages that

14   lists each of the prescriptions that the patients received that were in the

15   charged counts.

16   Q    And from each of those summary data charts, did you later on create a

17   summary of graphic charts?

18   A    Yes, I did.

19            MR. KNOCHE: Your Honor, before getting to the graphic

20   charts, I would like to move into evidence, based on the foundation which

21   has been shown, Government Exhibits 31-8 through 31-11.

22            MR. WITHERS: I would have the same objection, Your Honor.

23            THE COURT: All right, objection's overruled and the records

24   are admitted, or the summary is admitted.

25   Q    You prepared graphic charts, then?

-141-

1   A   Yes, I did.

2   Q   And I have a series of charts to show you.

3            MR. KNOCHE: May I hold this so that the jury may see it, Your

4   Honor?

5            THE COURT: Yes, sir.

6            MR. KNOCHE: And Mr. Athanasopoulos, I believe you have

7   these on Sanction, so if you would publish 31-1, please.

8   Q   Agent Sikes, you see 31-1?

9   A   Yes, I do.

10  Q   Okay, and tell us what 31-1 is graphing.

11  A   This is a graph or chart showing the different states that the patients

12  came from to visit Dr. Azmat at East Health Center, and then the

13  percentage of patients from those states.

14  Q   And those are all his patients, the 238 or so that you described.

15  A   These are the patients that received medication from Dr. Azmat.

16  Q   Okay.  That actually received medication.  How many patients is that?

17  A   196.

18  Q   And by way of illustration, the blue field to the upper left of the chart

19  says 24 percent.  That is coded to a particular state?

20  A   That is Kentucky patients.

21  Q   And so what is the jury to gather from that chart –

22  A   – Looking at the light blue section on the left of the chart, it's showing

23  that 24 percent of the patients that Dr. Azmat prescribed medication to

24  traveled from Kentucky to East Health Center.

25  Q   And then moving clockwise from there, you come to a lighter pink

1    color?

2    A    Right, that's West Virginia.

3    Q    And then there are two 1 percent ...

4    A    That's patients from the state of Virginia and Connecticut.

5    Q    Then the large blue field that says 18 percent?

6    A    Florida patients.

7    Q    And then down into the red field.

8    A    This is Georgia patients.

9    Q    36 percent from Georgia?

10   A    Right.

11   Q    The 3 percent, the light green?

12   A    They're South Carolina patients, North Carolina, followed by

13   Tennessee and Ohio.

14   Q    And Ohio?

15   Q    31-2. Now this also says patients by states.  Distinguish it from the

16   first chart.

17   A    Right, these are the patients that are in the charged counts, and it's a

18   chart showing the percentage of patients from the states listed. Florida, 32

19   percent; Georgia, 4 percent; 52 percent of the patients were from Kentucky;

20   4 percent from Ohio; and 8 percent from South Carolina.  These are just the

21   charged counts.

22   Q    And those are the patients for the charged Counts 2 through 50 of the

23   indictment.

24   A    Right, that's correct.

25   Q    31-3?

-143-

1  A    These are MRIs by state and it's showing patients that were seen at

2  East Health Center, where they received their MRIs.  58 percent received

3  their MRIs in the state of Florida; 31 percent got their MRIs in the state of

4  Georgia; 8 percent had Kentucky MRIs; 1 percent South Carolina; 1 percent

5  Tennessee; and the remaining 1 percent was all other states.

6  Q    31-4.

7  A    This chart is MRIs by state for the charged counts, 2 through 50.  And

8  it's showing that 72 percent of the patients went to Florida to get an MRI; 4

9  percent got their MRI in Georgia; 16 percent, Kentucky; 4 percent, South

10  Carolina; and then 4 percent of the patients didn't have MRIs.

11  Q    And that pertains to the charged counts.

12  A    That's correct.

13  Q    31-5.

14  A    This is a chart showing patients by age group.  The first one to the

15  right where it's 43 percent, those are patients between 21 and 35 years old.

16  Then the red section where it says 31, these are patients that were 36 to 45

17  years old.  The green with 18 percent is patients that are 46 to 55.  The 7

18  percent is 56 to 65; and only 1 percent of the patients were over the age of

19  65.

20  Q    Exhibit 31-6.

21  A    This is a chart showing oxycodone prescriptions issued by Dr. Azmat.

22  The blue section are the patients that received oxycodone.  The 4 percent

23  red section is patients that did not receive oxycodone.

24  Q    And that was for patients who received prescriptions?

25  A    Right.

-144-

1  Q    And that would have been the 196.

2  A    196 patients.

3  Q    And finally for the graphic charts 31-7.

4  A    This is a map of the East Coast of the United States.  And in each of the

5  states that are highlighted in pink or light red there, it's showing number of

6  patients per state.  At the top you have Connecticut, there were 2 patients

7  that came down; 14 from Ohio; 48 from Kentucky; 5 from West Virginia; 2

8  from Virginia; 7 from Tennessee; 5 from North Carolina; 6 from South

9  Carolina.  There were 71 from Georgia, and 36 from Florida.

10          MR. KNOCHE: Your Honor, I tender those summary graphic

11  charts 31-1 through 31-7 into evidence based on foundation shown.

12          THE COURT: Admitted.

13      [NOTE: Mr. Knoche confers with Mr. Gilluly off the record.]

14  Q    (By Mr. Knoche) Did you cause some search to be done of the medical

15  records of the State of Georgia, the Composite Board of Medical Examiners,

16  to determine if Najam Azmat had a valid Georgia Medical License during

17  the time he worked for the East Health Center?

18  A    Yes, I did.

19  Q    And likewise, did you also conduct a search of DEA records to see if

20  Dr. Azmat was a registered physician during the time that he worked at

21  East Health Center?

22  A    Yes, I did.

23  Q    You did not know of Dr. Azmat prior to your investigation here?

24  A    No, I didn't.

25  Q    Did you have occasion on or about September the 19th of 2012 to

-145-

1    interview Dr. Azmat in Waycross, Georgia?

2    A    Yes, I did.

3    Q    He was not in custody at the time; was he?

4    A    No, he wasn't.

5    Q    So when you interviewed him, did you advise him of his *Miranda*

6    rights?

7    A    No, I didn't, but I asked him – I told him that he was free to go any

8    time, he didn't have to talk with us.

9    Q    If he's not in custody, are you required to do that?

10   A    No, I'm not.

11   Q    And where did you interview him in Waycross?

12   A    We interviewed him in his front yard at his residence.

13   Q    Did you tell him why you were there to see him?

14   A    Yes, we told him we wanted to talk to him about his employment at

15   East Health Center.

16   Q    And did he agree to answer your questions?

17   A    Yes, he did.

18   Q    Did he seem to understand who you were?

19   A    Yes, he did.

20   Q    And why you were there?

21   A    Yes.

22   Q    And you explained that to him, I trust?

23   A    Yes, we did.

24   Q    Did you ask Dr. Azmat how it was that he came to work at East Health

25   Center?

-146-

1    A    Yes, I did.

2    Q    And what did he tell you?

3    A    He told me that he spoke with an individual by the name of Al, Adelard

4    LeFrancois, concerning the position.

5    Q    And what offer or representations did he say Mr. LeFrancois made to

6    him about his prospective employment?

7    A    That he'd be working as a pain management physician.

8    Q    Did you ask him about other members of the East Health Center staff?

9    A    Yes, I did.  We asked him if he was familiar with any other employees

10   at the clinic.

11   Q    And was he?

12   A    Yes.

13   Q    And did he know Dan Wise?

14   A    Yes, he did.

15   Q    What did he say about Mr. Wise?

16   A    He said that Dan Wise was trained by Adelard LeFrancois to be the

17   manager of East Health Center.

18   Q    Did he know a woman named Adel Lizama?

19   A    Yes, he did.

20   Q    What did he tell you about her?

21   A    He said she worked at the clinic.

22   Q    Did he say what her role was?

23   A    I don't recall.

24   Q    Did he know an individual named Kostas?

25   A    Yes, he did.

1    Q      What did he say about Kostas?

2    A      Said that Kostas took blood pressure of patients that came into the

3    clinic.

4    Q      Shelly, did he know Shelly?

5    A      He remembered that there was an employee there by the name of

6    Shelly, but he couldn't describe her or what her position was at the clinic.

7    Q      Did he ever – did he tell you whether he ever met Sean Clark?

8    A      Yes, he said that Sean Clark was one of the organizers of the clinic, and

9    that he'd come into the clinic a few times.

10   Q      Did he describe to you the location of East Health Center?

11   A      Yes, he said that it was located in Garden City, Georgia in a strip mall

12   with dark tinted windows.

13   Q      And what kind of a clinic did he say it was?

14   A      A pill mill or pain management clinic.

15   Q      And did he say that they did any primary care?

16   A      No, he said in fact primary care patients were refused.  If a patient

17   came in with a cold, flu, they wanted a physical, they were refused.

18   Q      Did he acknowledge that he knew that numerous of the patients were

19   from out of state?

20   A      Yes, he did.

21   Q      Did he use a term to describe the patients?  Did he call them patients?

22   A      No, actually, he called patients customers, which I found unusual.  He

23   constantly referred to them as customers.

24   Q      Did he indicate whether he recognized that these individuals had been

25   to other pain management clinics?

1 A Yes, in fact said most of the patients that he saw were from other pain

2 management clinics.

3 Q And what did he say about their status as far as use of drugs?

4 A He said that most patients coming to the clinic were previously

5 prescribed oxycodone and were addicted to it.

6 Q Did he tell you what the patients were required to show in order to be

7 seen or receive a prescription?

8 A Yes, said that patients were required to present an MRI prior to being

9 seen by him.

10 Q Did he tell you whether or not they were required to provide other

11 medical records?

12 A He said that the clinic did not require patients to bring their previous

13 medical records from their other doctors, just the MRI.

14 Q Did he make any observations about the age of the patients that came

15 there?

16 A He said that the clinic had a requirement of a minimum age, and he

17 couldn't recall if it was 21 or 25, but the clinic set up a minimum age of

18 patients that were allowed to come to the clinic.

19 Q How long did he say he spent with patients?

20 A He said he spent an average of, I believe, 30-to-40 minutes with a

21 patient.

22 Q And how were they treated for their symptoms?

23 A He said that all patients were required – or all patients were given

24 narcotic medication such as oxycodone.

25 Q What other treatments were they provided by Dr. Azmat, if any?

-149-

1    A    There were no other alternative forms of treatment.  All patients were

2    treated with narcotics.

3    Q    Did he refer customers to other specialists?

4    A    Dr. Azmat stated that he referred patients to other specialists, but he

5    did not document it in the charts.

6    Q    When you say "document," it wouldn't  have been written down

7    anywhere in the charts?

8    A    There was no evidence in the charts that I found where he referred

9    patients out.

10   Q    Did he say whether he had privileges at any local hospital in

11   Savannah?

12   A    He said he did not have privileges at any local hospitals.

13   Q    Did he tell you that during the – that he had been visited while at the

14   clinic by an agent of the Savannah-Chatham Counter Narcotics Team?

15   A    Yes, I believe he said a Savannah-Chatham police officer came to the

16   clinic, questioned him and Adelard LeFrancois about the lack of medical

17   equipment in the clinic.

18   Q    And what did Dr. Azmat say was his response to that visit?

19   A    He said that about a week later he contacted the officer and said, what

20   kind of medical equipment would we need to bring the clinic in compliance.

21   Q    Did Dr. Azmat – was he aware of the forms of payment which were

22   tendered by customers or patients at East Health Center?

23   A    Dr. Azmat said that the clinic only accepted cash, and they didn't

24   accept any other forms of treatment such as private insurance, Medicaid,

25   Medicare, anything like that.

-150-

1    Q    Did you verify that that was the case, that no insurance was accepted?

2    A    Yes, I did.

3    Q    And how did he say he was paid?

4    A    Dr. Azmat stated that he was paid by check at the end of each week.

5    Q    You've examined the records which have previously been admitted.

6    Do they bear that out?

7    A    No, the records I found is that Dr. Azmat was paid cash at the end of

8    each day, with a few exceptions.  I think he did receive three or four checks

9    at the end of the day for those days.

10        [NOTE: Mr. Knoche confers with Mr. Gilluly off the record.]

11    Q    (By Mr. Knoche) The East Health Center in Garden City, you obviously

12    visited there because you've testified about your search warrant.

13    A    Right, that's correct.

14    Q    That is in the Southern District of Georgia; is it not?

15    A    Yes, it is.

16        MR. KNOCHE: Pass the witness, Your Honor.

17        THE COURT: Questions, Mr. Withers?

18        MR. WITHERS: Yes, thank you very much, Judge.

19                    CROSS-EXAMINATION BY

20    MR. WITHERS:

21    Q    Agent Sikes, good afternoon.

22    A    Good afternoon.

23    Q    Let's start where you ended off there.  Are you referring to your notes

24    as you're testifying here?

25    A    No, I don't have any notes up here other than the exhibits that were

-151-

1    handed to me.

2    Q    Okay.  Now, when you interviewed Dr. Azmat, let's start where you left

3    off there, that was September 19, 2012; right?

4    A    I believe that was the date.

5    Q    And you spoke to him down at his residence in Waycross; correct?

6    A    Correct.

7    Q    When you spoke with him, Dr. Azmat was polite to you; wasn't he?

8    A    Yes, he was.

9    Q    He was courteous with you; was he not?

10    A    Yes, he was.

11    Q    When you spoke with him, he showed proper respect for you as a

12    federal agent or federal agents.

13    A    Yes, he did.

14    Q    All right, and now you drove – your DEA station is here in Savannah;

15    correct?

16    A    Right, that's correct.

17    Q    And as well as Agent Kahn who was with you; is that correct?

18    A    That's correct.

19    Q    And you and Agent Kahn drove from Savannah to Waycross for the

20    purpose of interviewing Dr. Azmat; correct?

21    A    That's correct.

22    Q    And at that point in time, that's about a year and six months maybe?

23    I'm not good at math, four months from the date of the search; correct?

24    A    Yes.

25    Q    Approximately.  And so you knew at that point in time that Dr. Azmat

-152-

1   was a part of your investigation; fair to say?

2   A    Yes.

3   Q    And the DEA has recording equipment; does it not?

4   A    Yes, we do.

5   Q    And that's something that y'all do fairly frequently when you're going

6   to do like an undercover activity or something like that; true?

7   A    Right, we use a recording for undercover activity.

8   Q    All right, and, of course, you know how to record an interview; do you

9   not?

10  A    I do, but it's not part of our policy to record interviews.

11  Q    And Agent Kahn, of course, is a – he's got a little more years under his

12  belt than you do maybe?

13  A    Yes, he does.

14  Q    And he is a criminal investigator, where I guess you're a drug

15  diversion investigator; do I have that right?

16  A    That's correct.

17  Q    So Agent Kahn might be more used to recording folks than you would

18  be; is that fair to say?

19  A    Not interviews, just 'cause it's not our policy to record interviews.

20  Q    Okay, and when you're talking about a policy, so the Drug

21  Enforcement Administration has a policy that if you're going to go

22  interview someone who may one day end up in a court of law, that your

23  policy is to not record that interview; correct?

24  A    That's correct.

25  Q    And the policy of the DEA, then, is that one agent is going to be a note

1    taker, and one is going to be an interviewer; correct?

2    A    That's correct.

3    Q    And then when you come back from that interview, what you do is

4    transcribe the notes that you have been taking at the point of the interview;

5    correct?

6    A    Right, we use our notes as an aid to prepare the reports.

7    Q    All right, and so you're not taking – were you the one taking notes or

8    the one doing the questioning?

9    A    Taking notes.

10   Q    And you're not taking verbatim notes at the time you're sitting there in

11   an interview; are you?

12   A    It's a mix.  If there is a quote, I'll do that verbatim, but most of it is

13   summary.

14   Q    And I'm looking at your five-or-six page report here, and I don't see –

15   there may be one or two small quotes, but most of it is a summary of what

16   you say was said; correct?

17   A    That's correct.

18   Q    And in fact the interview occurred on September 12, 2012, and the

19   dictation didn't occur until September 25 of 2012; isn't that true?

20   A    I don't know if that's correct or not.

21         MR. WITHERS: May I approach, Your Honor.

22         THE COURT: Yes, sir.

23   Q    Sir, I'm going to hand you –

24         MR. WITHERS:  – and just for counsels' reference, it's Bates

25   Stamp Number 855.

-154-

1    Q    You recognize this, do you not, sir?

2    A    Yes, I do.

3    Q    And if you could tell us what the date down in the right – bottom

4    right-hand corner of that is.

5    A    September 25.

6    Q    Okay.  Is that the date of the transcription, sir?

7    A    No, it's not.

8    Q    What is that date reflected?

9    A    Up at the top where it says, date prepared 9/20, that's the date it was

10    prepared.  9/25 is the date that any revisions or corrections were made and

11    sent back to a supervisor.

12            MR. WITHERS: May I retrieve that exhibit, Your Honor?

13            THE COURT: Yes, sir.

14    Q    In fact, as a law enforcement officer, you are permitted to do what is

15    called surreptitious or secret recordings; are you not?

16    A    Yes.

17    Q    So that you have these little microcassette recorders and can record

18    someone without them knowing it; right?

19    A    Yes, that's correct.

20    Q    Didn't do that with Dr. Azmat.

21    A    Right.

22    Q    Didn't ask Dr. Azmat if you could record him.

23    A    No, we didn't.

24    Q    Now when you interviewed Dr. Azmat, he did not recall Adel's last

25    name; did he?

-155-

1    A    I don't think so.

2    Q    When you – and he knew the triage person as Kostas but didn't

3    remember that last name.

4    A    That's correct.

5    Q    He didn't remember the name of Ms. Carreras; correct?

6    A    That's correct.

7    Q    And he told you that this was a pain management clinic; did he not?

8    A    Yes, he did.

9    Q    And you talked about him telling you about the Savannah Police

10    Officer coming by the clinic.

11    A    Right.

12    Q    And you know that in fact occurred; do you not?

13    A    Yes, it did.

14    Q    That's Agent Tyran; correct?

15    A    Yes.

16    Q    Who came the second day that the clinic was open; correct?

17    A    It may have been the first or second day, I'm not sure about that.

18    Q    Either one, first or second day of the clinic being open; correct?

19    A    Yes.

20    Q    Yes?

21    A    Yes.

22    Q    And Agent Tyran walked through the facility; correct?

23    A    Yes, he did.

24    Q    And of course, you know Agent Tyran; do you not?

25    A    Yes, I do.

-156-

1    Q    Work with him, or worked with him at that time.

2    A    Yes, I've worked with him in the past.

3    Q    And he also told you about speaking with Agent Tyran on the phone

4    the following week; did he not?

5    A    Yes, he did.

6    Q    And one of the things that Agent Tyran had talked with Al about was

7    the lack of equipment; correct?

8    A    Al and Dr. Azmat.

9    Q    But when Dr. Azmat called Agent Tyran, what he had asked was what

10   the clinic would need to bring it into compliance; correct?

11   A    Yes, he did.

12   Q    And he didn't talk about specific furniture when Dr. Azmat was talking

13   to Agent Tyran, they were talking medications; correct?

14   A    I'm not sure about that.

15   Q    Have you listened to that audiotape?

16   A    We tried to listen to it.  It's not very understandable.  It's hard to

17   understand.

18   Q    You don't recall whether medications were discussed in that tape or

19   not.

20   A    I don't recall.

21   Q    Agent Tyran, you also knew, visited pharmacies at that point in time;

22   that is, the last week of February; correct?

23   A    Yes, Agent Tyran did visit pharmacies.

24   Q    And you as well?

25   A    I didn't visit pharmacies, but I did obtain prescription profiles through

-157-

1    a subpoena.

2    Q    Okay, and when you spoke with Dr. Azmat, what he told you at the

3    conclusion of that interview was that what he did at East Health Clinic was

4    the legitimate practice of medicine; did he not?

5    A    He said that he thought what he did was legitimate.

6    Q    He's talking with you about the issue of the practice of medicine; was

7    he not?  That's what y'all were there for.

8    A    Yes, that's correct.

9    Q    Now, you've given us some nice-looking summary charts.  Tell me,

10   how many patients did Dr. Azmat reduce the number of tablets of

11   oxycodone for.

12   A    I'm not aware of any.

13   Q    You're not aware of him ever reducing an oxycodone prescription.

14   A    No.

15   Q    Are you aware of him ever discontinuing a patient's Xanax?

16   A    I saw notes in the chart that say, DC Xanax, but I don't know what they

17   were previously prescribed.

18   Q    Okay.  Well, let's look at it this way: did you look at the 25 patients that

19   are in the indictment?  Did you look at those records a little closer?

20   A    Yes, I believe so.

21   Q    I mean, that would be fair; right?

22   A    [No audible response.]

23   Q    Yes?

24   A    Yes.

25   Q    With respect to those patients, on how many occasions did Dr. Azmat

1    decrease or delete, discontinue the Xanax?

2    A    I don't know.

3    Q    On how many of those patients did Dr. Azmat decrease or discontinue

4    the Valium?

5    A    I don't know.

6    Q    How many patients did Dr. Azmat see more than once?

7    A    None.

8    Q    Now, you were telling us about some of the exhibits that were seized,

9    and y'all have them put into the notebooks in reverse date order; right?

10   A    Which notebooks are you referring to?

11   Q    Well, let me see if I can be more specific.  With respect to the patient

12   charts, and I'm talking about the sign-in sheets.

13   A    Okay.

14   Q    Those are in reverse date order; correct?

15   A    Yes, that's correct.

16   Q    And it shows, I think it's Tuesday, the 22nd, they saw ten patients;

17   correct?

18   A    I don't know.

19           [NOTE: Mr. Withers and Mr. Knoche confer off the record.]

20           MR. WITHERS: Your Honor, Mr. Knoche said that I can call

21   upon his assistant to pull up an exhibit.  May I do that?

22           THE COURT: Yes, sir.

23           MR. WITHERS: Sir, if you could pull up 29-1A-048.  048.

24   Q    And it looks like actually there were 11, excuse me, 11 total patients,

25   but one is stricken through; correct?

-159-

1    A    That's correct.

2    Q    So a total of ten patients that day; yes?

3    A    There are 11 patients.

4    Q    Okay. I mean, it looks –  well, there are 11 patients on the new patient

5    log; true?

6    A    Right.

7    Q    And one of those patients is stricken through; true.

8    A    Okay.

9    Q    And if you turn to the next page, sir –

10           MR. WITHERS: That would be, sir, 29-1A-047.

11   Q    – that page shows –

12           MR. WITHERS: – It will be 29-1A-047.

13   Q    And that shows ten patients; correct?

14   A    Okay.  Ten patients.

15   Q    That would confirm  my count on the 22nd of ten patients; correct?

16   A    Correct.

17           MR. WITHERS: Your Honor, if I can just do this the more

18   conventional way of approaching the witness, please?

19           THE COURT: Yes, sir.

20   Q    I'm going to show you what's been marked as 29-1A-045.

21   A    Okay.

22   Q    And 046.  Do you recognize those?

23   A    Yes, I do.

24   Q    And that shows that –

25           THE COURT:  – Don't examine him from there, Mr. Withers.  If

-160-

1    you want to show him a document, show it to him.  Examine him from the

2    lectern.

3    Q    And what does that tell us how many patients were seen on that

4    Wednesday of the first week?

5    A    There were one patient on 2/23.

6    Q    Okay, and so the total number of patients that were seen by Dr. Azmat,

7    you added that up; did you not?

8    A    Can you repeat your question?

9    Q    Yes.  You added up the total number of patients seen by Dr. Azmat;

10   did you not?

11   A    Yes, I did.

12   Q    And that number was, what?

13   A    238.

14   Q    All right, and then, the total number of patients – or excuse me, the

15   total number of patients that were signed in was 238; is that right?

16   A    I believe that's correct.

17   Q    And the total number of patients that were seen was 196.

18   A    196 patients received medication.

19   Q    Okay.  So that means there is a difference of, if my math is correct, 46

20   patients; correct?

21   A    I believe there were 42 patients.

22   Q    Pardon me?

23   A    I believe it was 41 or 42 patients.

24   Q    Okay, and that's patients not seen?

25   A    Patients not prescribed medication.  Some of these patients, there

-161-

1    were no notes that they were seen.

2    Q    Okay.  So, well,  let's look at it this way, then.  You've told us in one of

3    your charts that 4 percent were not prescribed medication; correct?

4    A    Four percent of the 196 patients prescribed medication did not receive

5    oxycodone.

6    Q    Okay.  But we have 41, 42 patients, then, that there is no record of

7    them receiving any medication; correct?

8    A    Right, that's correct.

9    Q    And I believe –

10                    MR. WITHERS: – And, sir, can I get you to pull up 31-8?

11   Q    This is the summary exhibit that you prepared that shows which

12   patients received medication, which patients didn't receive medication;

13   correct?

14   A    That's correct.

15   Q    Okay, and so if you just look over here on the right-hand side, for

16   instance, the first two were not prescribed medication; correct?

17   A    That's correct.

18   Q    And if I go through that list, then, I'm going to – 42 – and I'm not very

19   good at math – but if 42 patients were not prescribed medication out of a

20   total of 238 seen, then what's that percentage going to be, about 15, 18, 20

21   percent?

22   A    Yeah, something like that.

23   Q    Around in that area?

24   A    Yeah.

25   Q    Somebody can check my math.  Now, out of the 96 percent of patients

1      –

2                MR. WITHERS: – You can pull that down, thank you.

3      Q      Out of the 96 percent of patients that you said were prescribed

4      oxycodone, how many of those patients came in with oxycodone in their

5      system?

6      A      A good number of them, I don't know exactly how many.

7      Q      Going to be a substantial amount; true?

8      A      True.

9      Q      In other words, it would be rare for Dr. Azmat to have started

10     someone on oxycodone; that's fair to say, isn't it?

11     A      There were some patients that tested negative for oxy that still

12     received it.  I don't know how many of each.

13     Q      Now, the surveillance that you were talking about, do you recall when

14     that was started?

15     A      I believe it was in February or March.

16     Q      All right, and I'm speaking about the video surveillance.

17     A      Oh, video surveillance from inside the clinic started on April 28.

18     Q      I'm sorry, I asked a bad question.  Do you recall when the folks at East

19     Health Center started doing the – put in the video surveillance?

20     A      I believe it was prior to the clinic opening.  We had receipts from the

21     security company.

22     Q      All right, and was part of the reason for that surveillance so that Mr.

23     LeFrancois, or whomever was back in Florida, could watch what was going

24     on up in Georgia?

25     A      That may have been one of the reasons.

-163-

1    Q    Well, if you don't know, you can tell me –

2    A    – I don't know.

3    Q    Okay.  The 29-5 series of the photos that you introduced earlier and

4    talked about, Dr. Azmat's not in any of those photos; is he?

5    A    The surveillance photos?

6    Q    The photos that were taken on May 26, 2011.

7    A    No, he's not.

8    Q    In the photographs of the cash, there are no photographs of Dr. Azmat

9    with cash; right?  He's not back there counting the cash.

10    A    That's correct.

11    Q    And that wasn't what he did at East Health Clinic; did he?

12    A    No.

13    Q    In other words, he's not handling any of the monies that are coming in

14    other than being paid; fair?

15    A    That's correct.

16    Q    Now, out of the 196 patients that were prescribed medication, how

17    many total patients did you interview?

18    A    I would say close to –  maybe close to 50, I would guess.

19    Q    That you interviewed?

20    A    That either I interviewed or the other case agents.

21    Q    How many total patients that you interviewed said that they were

22    turned away from East Health Center?

23    A    How many patients?

24    Q    Yes.

25    A    None that we interviewed.

-164-

1      MR. WITHERS: If I could have just one minute, Your Honor.

2      THE COURT: Yes.

3      [NOTE: Mr. Withers confers with defendant off the record.]

4    Q    Did you prepare the 26-series as well?

5    A    Which exhibits are those?

6    Q    Well, these are just assorted patients.  I ...

7    A    Yes, I did.

8    Q    You prepared that?

9    A    Yes.

10   Q    Okay, and in preparing that, did you notice that there were patients

11   who came in that were negative for oxycodone who did not receive

12   oxycodone?

13   A    That's possible.

14   Q    And did you testify that there were absolutely no medical records in

15   any of the charts?

16   A    When we reviewed the charts we found MRIs and a few prescription

17   profiles.  There may have been one patient that had a hospital discharge.

18   Q    Andrew Shaffer, that's 26-11.  Do you recall Mr. Shaffer?

19   A    Yes.

20   Q    Do you recall that there were records from respectable medical of Mr.

21   Shaffer in his file?

22   A    I don't recall.

23      MR. WITHERS: May I approach the witness, Your Honor?

24      THE COURT: Yes, sir.

25   Q    If you could identify what exhibit number that is, sir?

-165-

1    A    This is 26-11.

2    Q    All right, and are there medical records for Mr. Shaffer from

3    respectable medical?

4    A    Yes, there are four pages of medical records.

5    Q    If you would look at 26-8.  Do you see Dr. Azmat's note on that

6    patient?

7    A    Yes.

8    Q    Do you see where Mr. Craig came in complaining of having had past

9    leg surgery at the top of the complaint?

10    A    I see a note that says leg.  I – it may say surgery, I'm not sure.

11    Q    All right, and do you see meds, what it says there?

12    A    Yes.

13    Q    Read that for the jury.

14    A    [Reading:] Oxy 30, number 90, oxy 15, number 60, Xanax 2, number

15    30.

16    Q    All right, and I want you to look at the urine drug screen.  You know

17    that that was part of the patient file; correct?

18    A    Right, positive THC, positive benzos.

19    Q    Well, you're looking at – that's actually the wrong date.  We're on

20    March 3rd.

21    A    Oh, okay.  March 3rd, negative for benzos.

22    Q    All right, and so for that patient that was negative, what was the

23    prescription written by Dr. Azmat?  Back at Dr. Azmat's note.  Look at his

24    note, please.

25    A    Oh, okay.  His note says Motrin 800.

-166-

Q    So that patient was negative – urine drug screen of negative, and he

went away with a Motrin; correct?

A    That's correct.

Q    Look at 26-6, if you would, please.  Do you see Dr.  Azmat's note?

A    Yes.

Q    That patient, what did that patient tell Dr. Azmat he was taking in

terms of oxycodone 30 milligrams?

A    90 oxy 30s.

Q    And tell the jury, if you would, please, what that patient received by

way of medication by Dr. Azmat?

A    It appears the patient received Zydone, which is a hydrocodone

product, 60 count; and Xanax 15 – 1 milligram Xanax, 15 tablets; and I

believe 90 Motrin.

Q    All right, and what about the oxycodone 30, 90 tablets?

A    He did not receive the oxycodone.

Q    Previously you just testified to this jury that you weren't aware of any

patients being discontinued oxycodone; right?

A    Right.  There's not any record other than Dr. Azmat's notes saying that

they were prescribed those medications.  There's not any prescription

profiles – well, there is a prescription profile that shows he did not receive

it.

Q    I'm sorry?

A    He did not receive oxy 30.

Q    All right, and so Dr. Azmat discontinued that patient's oxycodone;

true?

1    A   Yes, he did.

2    Q   And read the jury what the note says down there next to the note of

3  Xanax.  You see the words, "to wean off?"

4    A   Yes, [reading]: Wean off Xanax 1 milligram.

5    Q   All right, as a drug diversion agent, you know what wean means; do

6  you not?

7    A   Yes, I do.

8    Q   And tell the jury what that means.

9    A   Means to decrease the dosage.

10    Q   Turn to patient 26-9, if you would, please.  Joe Sadler?  Do you see

11  that patient?

12    A   Yes.

13    Q   And that patient was not seen; correct?

14    A   Right.

15    Q   Because his pharmacy record didn't check out; correct?

16    A   There's a note that says [reading]: Why was patient not seen by doctor.

17  It doesn't – there's no notes.

18    Q   I'm sorry?

19    A   There's no notes why the patient wasn't seen.

20    Q   Turn to 26-3 if you would, please.  You see Dr. Azmat's note?

21    A   (No audible response.)

22    Q   Are you with me?

23    A   Yes, which note are you referring to?

24    Q   Dr. Azmat's note of this physical examination.  You there?

25    A   Yes.

-168-

1    Q    That patient reported that he was on 180 oxycodone 30; correct?

2    A    Yes.

3    Q    And Dr. Azmat reduced that to 90; did he not?

4    A    Yes, he did.

5    Q    That patient was on 90 oxycodone 15 milligrams; correct?

6    A    That's correct.

7    Q    Dr. Azmat reduced that to 60 tablets; correct?

8    A    Correct.

9    Q    That patient reported that he was on Xanax 2 milligrams of 60;

10   correct?

11   A    Correct.

12   Q    Dr. Azmat discontinued that Xanax; did he not?

13   A    Yes, he did.

14   Q    Turn to 26-5, if you would, please, sir.  Do you see that patient, Bruce

15   Kennedy?

16   A    Yes.

17   Q    Do you see the notation – did you see that Dr. Azmat actually saw that

18   patient?

19   A    Yes, it looks like he did.

20   Q    All right, and issued prescriptions; correct?

21   A    Yes, he did.

22   Q    And you see the notation at the front of that chart, sir, that says

23   [reading]: Physician needs to call pharmacy to destroy prescriptions?

24   A    Yes, I do see that.

25   Q    And then there is a quote, unquote, destroyed under that?

-169-

1   A   I don't see one under that.

2   Q   I'll come back to that.

3       MR. WITHERS: Well, if I could approach, Your Honor.

4       THE COURT: Yes, sir.

5   Q   I actually said under that; didn't I?

6   A   Yes, you did.

7   Q   And you said you didn't see one under that; didn't you?

8   A   That's correct.

9   Q   Where is the word "destroyed" written in big, dark letters?

10  A   Above the note there it says, destroy.

11  Q   Okay, my mistake.  Turn to 26-7, sir.  You with me?

12  A   Yes, I am.

13  Q   That's patient Kristin Phillips; correct?

14  A   Yes, it is.

15  Q   All right.  Turn to Dr. Azmat's note, if you would, please, sir.

16  A   Okay.

17  Q   You there?

18  A   Yes, I am.

19  Q   That patient reports being on oxycodone 30, 160; right?

20  A   That's right.

21  Q   And so the jury knows specifically what we're talking about is 30

22  milligrams of oxycodone; correct?

23  A   That's correct.

24  Q   160 tablets; correct?

25  A   That's correct.

1    Q    Tell the jury what Dr. Azmat did with respect to that oxycodone.

2    A    It looks like he discontinued oxy 30.

3    Q    All right.  The patient reported being on 60 milligram – excuse me,

4    hydrocodone 10 milligrams, 60 tablets; correct?

5    A    That's correct.

6    Q    Dr. Azmat increased the hydrocodone to 90; correct?

7    A    Yes, that's correct.

8    Q    And the patient reported being on Valium 10 milligrams, 30 tablets;

9    right?

10   A    That's correct.

11   Q    And Dr. Azmat decreased – or excuse me, discontinued that patient's

12   Valium; correct?

13   A    That's correct.

14   Q    And then gave the patient a Motrin 800 milligrams, 90 tablets;

15   correct?

16   A    Yes, that's correct.

17   Q    800 milligrams, by the way, is not available in Motrin over-the-

18   counter; you have to have a prescription for that for ...

19   A    Yes, I believe that's correct.

20   Q    Go to 26-10, William Sadler.

21   A    Okay.

22   Q    Mr. Sadler was – gave a history of oxycodone 30 milligrams, 90;

23   correct?

24   A    That's correct.

25   Q    Soma, 60 tablets; correct?

-171-

1    A    That's correct.

2    Q    Xanax 1 milligram, 60 tablets; correct?

3    A    Yes, that's correct.

4    Q    All right, and if you look down at the bottom of the page where Dr.

5    Azmat notes his prescriptions.

6    A    Okay.

7    Q    The oxycodone 30, 90 is continued; correct.

8    A    That's correct.

9    Q    The Soma is discontinued; correct?

10    A    That's correct.

11    Q    We haven't heard, but Soma is a muscle relaxant; true?

12    A    Yes, that's correct.

13    Q    And then he discontinued the Xanax; correct?

14    A    That's correct.

15    Q    I want you to find Dr. Cole's – look under the prescriptions there, and

16    go to Dr. Gossett's, and then Dr. Cole's prescriptions.

17        So when that – and just to finish that up, there's a Norco, I think,

18    that's mentioned as a prescription by –

19    A    – Right, a hydrocodone product was added.

20    Q    Okay, and then with respect to Dr. Cole, do you see that?

21    A    Yes, I do.

22    Q    All right, Dr. Cole had that patient on – just run through those

23    prescriptions with me.  I can't read my writing.

24    A    There was oxycodone 15 milligram, 120; Xanax 2 milligram, 30;

25    Motrin 800 milligram, 90; Soma, 30 tablets; oxycodone 30, 45 tablets.

-172-

1    Q    Okay.  So she had added, if I'm accurate here, the oxycodone 15;

2    correct?

3    A    That's correct.

4    Q    She had added the Soma back in; correct?  It had been discontinued.

5    A    Yes, that's correct.

6    Q    And she had added in the Xanax that had been discontinued.

7    A    That's correct.

8    Q    Turn to Jeff Smith, and I apologize for jumping around, but it's 26-12,

9    please.  Do you see Dr. Azmat's notes, sir?

10   A    Yes, I do.

11   Q    That patient is Jeff Smith?

12   A    Yes, it is.

13   Q    What's the date that he was seen by Dr. Azmat?

14   A    March 3rd.

15   Q    I'm sorry?

16   A    March 3rd.

17   Q    Third?

18   A    Yes.

19   Q    That patient was on oxycodone 30 milligrams, 180 tablets; correct?

20   A    Yes, I believe so.

21   Q    Oxycodone 15, 60 tablets; correct?

22   A    Correct.

23   Q    Norco 10, 90 tablets; correct?

24   A    That's correct.

25   Q    Xanax 2 milligrams, 90 tablets; correct?

-173-

1    A    That's correct.

2    Q    And by the way, as a diversion investigator, when you see this

3    combination of drugs here, the Xanax combined with the oxycodone, you

4    understand that that can be a dangerous combination; do you not?

5    A    Yes, I do.

6    Q    All right, and so Dr. Azmat, when he saw this patient, he reduced the

7    oxy 30, 180, 30 tablets down to 150; correct?

8    A    Correct.

9    Q    He took the oxy 15 milligrams, 60 tablets, discontinued that; right?

10   A    Yes, he did.

11   Q    The Norco 90 discontinue – excuse me, went down to 60; correct?

12   A    That's correct.

13   Q    The Xanax 2 milligrams, 90 tablets, tell the jury what Dr. Azmat did

14   with that.

15   A    Discontinued Xanax.

16   Q    Okay.  So he's taking a patient with a report of a dangerous

17   combination; correct?

18   A    Correct.

19   Q    And he's discontinuing one of those that causes that dangerous

20   combination; correct?

21   A    That's correct.

22   Q    I'm sorry?

23   A    That's correct.

24   Q    And read to the jury, if you would, please, sir, what Dr. Azmat's note

25   says about weaning off narcotics.

1    A    Says [reading:] Will continue to wean off, will continue to wean –

2    something – narcotics.

3    Q    It looks like two down arrows maybe.

4    A    Yes.

5    Q    Okay, and again, if you would turn to 26-13.  Phillip Smith, a Georgia

6    patient; correct?

7    A    Let me see.  Yes.

8    Q    What date was Mr. Smith seen by Dr. Azmat?

9    A    Looks like March 6, 2011.

10   Q    By the way, as a diversion investigator – as a diversion investigator –

11   you have learned through your investigations that what drug dealers like to

12   do is, they like to make their clients happy; right?

13   A    That's correct.

14   Q    I mean, in other words, a drug dealer that is saying, I'm not going to

15   sell to you, that's not going to go well for that drug dealer; is it?

16   A    No.

17   Q    Now, let's look at Mr. Smith.  Mr. Smith had oxy 30 milligrams, 120

18   tablets; right?

19   A    That's right.

20   Q    And tell the jury what Dr. Azmat did with Mr. Smith and his 30

21   milligrams of oxycodone, 120 tablets.

22   A    Discontinued.

23   Q    Look at the Soma, 60 tablets.  Do you see that?

24   A    Yes, I do.

25   Q    And I asked you earlier about Xanax, combination of Xanax and

-175-

1    oxycodone being troublesome from a health perspective.  When you throw

2    in Soma, that makes it even more problematic for that person who's taking

3    that combination of drugs; correct?

4    A    That's correct.

5    Q    And so tell the jury what Dr. Azmat did with the Soma.

6    A    I believe he discontinued it.

7    Q    And the Xanax 1 milligram, 30 tablets, what did Dr. Azmat do with

8    that Xanax?

9    A    Discontinued it.

10   Q    26-14, Eric Thomas.  Mr. Thomas came in with – on oxycodone 30

11   milligrams, 180 tablets; correct?

12   A    That's correct.

13   Q    Dr. Azmat reduced that to 150; correct?

14   A    That's correct.

15   Q    Mr. Thomas came in on Xanax 2 milligrams, 90 tablets; correct?

16   A    That's correct.

17   Q    And there again, Agent, is that troublesome combination of Xanax and

18   oxycodone.  Tell the jury what Dr. Azmat did with that combination.

19   A    I believe he discontinued the Xanax.

20   Q    Now, you've got Michael Thomas as 26-15; correct?

21   A    That's correct.

22   Q    Turn to the medical note that you have in the file there, sir, 26-15.  You

23   see that medical note?

24   A    Yes.

25   Q    Do you see the note that's dated 3/18 of '11?

1    A    Yes, I do.

2    Q    Who signed that note?

3    A    There's no one signed the one for 3/18, but where it's dated 3/21, that

4    was signed by Dr. Gossett.

5    Q    Okay.  That patient does not have any interaction with Dr. Azmat; did

6    he?

7    A    There's no notes that Dr. Azmat saw him.

8    Q    Okay.  So that patient was seen by Drs. Gossett and Cole; correct?

9    A    Correct.

10   Q    He was not seen by Dr. Azmat; correct?

11   A    That's correct.  There's no note saying he was.

12   Q    Turn to 26-16, Troy Vosaturo.  Do you see Dr. Azmat's note?

13   A    Yes, I do.

14   Q    That patient was on oxycodone 30, 180 tablets; correct?

15   A    That's correct.

16   Q    Dr. Azmat reduced that to 150 tablets; correct?

17   A    That's correct.

18   Q    He was on oxycodone 15 milligrams, 90 tablets; correct?

19   A    That's correct.

20   Q    That patient's prescription was reduced to 60 tablets of oxycodone 15;

21   correct?

22   A    That's correct.

23   Q    And Dr. Azmat again discontinued the Xanax that patient was on;

24   correct?

25   A    That's correct.

-177-

1    Q    And discontinued the Soma that that patient was on; correct?

2    A    That's correct.

3    Q    Leslie Willis, 26-17.  That was March 4, 2011?

4    A    Yes, it was.

5    Q    And is that a patient by the last name of Willis; correct?

6    A    Can you repeat your question?

7    Q    The patient's last name was Willis?

8    A    Yes, it is.

9    Q    The patient was not seen by Dr. Azmat; correct?

10   A    That's correct.

11   Q    26-18, Edward Wilson.  Do you have that note?

12   A    Yes, I do.

13   Q    What's the date of it?

14   A    March 15, 2011.

15   Q    That patient was on oxycodone 30 milligrams, 180 tablets; correct?

16   A    That's correct.

17   Q    Dr. Azmat reduced that to 120; true?

18   A    That's correct.

19   Q    Dr. Azmat – or that patient was on oxycodone 15 milligrams, 90

20   tablets; correct?

21   A    That's correct.

22   Q    Dr. Azmat discontinued that; didn't he?

23   A    That's correct.

24   Q    That patient was on Xanax 2 milligrams, 90 tablets; correct?

25   A    That's correct.

-178-

1    Q    That Xanax was discontinued; correct?

2    A    That's correct.

3    Q    The next exhibit is curious to me, 26-19, Wesley Wren, W-R-E-N.  Can

4    you find a doctor's note?

5    A    (No audible response.)

6    Q    There's no doctor's note for Dr. Azmat on this patient, is there?

7    A    No, there's not.

8    Q    26-20, Hatfield, I believe is that patient's name?

9    A    Right, that's correct.

10   Q    This patient was on no previous medications; correct?

11   A    That's correct.

12   Q    And her urine drug screen was negative; correct?

13   A    Yes, that's correct.

14   Q    What does she report as her mechanism of an injury?  Put another

15   way, more simple way, what caused her hurting?

16   A    I can't read the notes.

17   Q    That's okay, that's all right.  There is a description in there as to the

18   history for her pain; correct?

19   A     That's correct.

20   Q    It's hard to read.  I got better at it.  What Dr. Azmat did with that

21   patient is put her on Percocet; correct?

22   A    That's correct.

23   Q    All right.  So this is a patient with no previous medications, and she

24   gets Percocet and naproxen; correct?

25   A    That's correct.

-179-

1    Q    And naproxen is a – is that a non-steroidal anti-inflammatory?

2    A    Yes, that's correct.

3    Q    Michael Linton, 26-21?  This patient was actually on – reported being

4    disabled on social security; correct?

5    A    Yes, that's correct.

6    Q    All right, and did Dr. Azmat see that patient?

7    A    Yes, he did.

8    Q    And maintained those prescriptions, if my notes are accurate.

9    A    No, actually he gave him oxycodone and Percocet that he wasn't

10    previously on.

11    Q    Okay, all right, and then –

12             MR. WITHERS: Just a couple more, Your Honor.

13    Q    – Wilson Lopez, the next one, 26-22?  See Dr. Azmat's note?

14    A    Yes.

15    Q    That patient was on 30 milligrams of oxycodone, 150 tablets; right?

16    A    That's correct.

17    Q    Reduced to 120; correct?

18    A    That's correct.

19    Q    Hydrocodone 10 milligrams, 60 tablets?

20    A    That's correct.

21    Q    That was continued; correct?

22    A    Yes.

23    Q    And then the Valium 10 milligrams, 20 tablets was discontinued;

24    correct?

25    A    That's correct.

-180-

1   Q   Stevie Spell, 26-23.  That's a Georgia patient; correct?

2   A   (No audible response.)

3   Q   I'm sorry, I don't think we got that.

4   A   Yes, this is a Georgia patient.

5   Q   And what's the date of that treatment?

6   A   I believe it's 2/24/2011.

7   Q   That patient was on oxycodone 30 milligrams, 180 tablets; correct?

8   A   That's correct.

9   Q   And that was reduced by Dr. Azmat to 150 tablets; correct?

10  A   That's correct.

11  Q   Lorcet 10 milligrams, 90 tablets; correct?

12  A   That's correct.

13  Q   I don't think we've heard Lorcet before.  What's Lorcet?

14  A   Lorcet is a hydrocodone product.

15  Q   And hydrocodone is ...

16  A   It's a controlled substance, Schedule III.  That is hydrocodone with

17  acetaminophen, Tylenol.

18  Q   And that was 90 tablets, 10 milligrams, 90 tablets reduced to 60;

19  correct?

20  A   That's correct.

21  Q   The Soma, 90 tablets, discontinued; right?

22  A   That's correct.

23  Q   The Xanax, 60 tablets, discontinued; correct?

24  A   That's correct.

25  Q   So again we're going from the troublesome combination of oxycodone,

1    Soma and Xanax to – excuse me, oxycodone, Lorcet, Soma and Xanax to

2    oxycodone and Lorcet, with both of those being reduced; correct?

3    A    That's correct.

4                 MR. WITHERS: If I can have just a minute, Your Honor.

5           [NOTE: Mr. Withers confers with defendant off the record.]

6                 MR. WITHERS: I think that's all I have, Your Honor.  Thank

7    you.

8                 THE COURT: Any redirect, Mr. Knoche?

9                 MR. KNOCHE: Yes, sir.

10                      <u>REDIRECT EXAMINATION BY</u>

11   <u>MR. KNOCHE</u>:

12   Q    Agent Sikes, every patient that Dr. Azmat would have seen at East

13   Health Center would've been a new patient.

14   A    That's correct.

15   Q    He was the physician there when the door opened.

16   A    That's correct.

17   Q    And so if a patient walked in the door, they had not –

18                 MR. WITHERS:  – Objection to leading, Your Honor.

19                 THE COURT: Yeah, don't lead the witness.

20   Q    Is there any way that he would have  seen them before at that clinic?

21   A    No, these are all new patients to Dr. Azmat.  He was the first physician

22   to work at the clinic.

23   Q    And when counsel asked – or points out Dr. Azmat reducing

24   prescriptions, that is – from the record, is that based on what the patient is

25   telling the doctor?

-182-

1    A    Yes, that's correct.  This is notes that the doctor would've taken from

2    what the patient told him, not from previous medical records.

3    Q    So if the patient exaggerated the amount of drugs that would be given,

4    and the doctor prescribed for less than that exaggerated amount, that's not

5    cutting; is it?

6              MR. WITHERS: Objection –

7    A    That's correct.

8              MR. WITHERS:  – to the leading question, Your Honor.

9              THE COURT: Yes, sir.  Mr. Knoche, ask the questions and let

10    him give you the answers without leading him into the answer, please.

11    Q    Would that be an example of cutting?

12    A    No.

13    Q    You've reviewed all those 200 – was it 238 files?

14    A    Yes, I have.

15    Q    And you've previously testified that 196 of those patients received

16    prescriptions from Dr. Azmat; is that correct?

17    A    Yes, that's correct.

18    Q    And would you remind the jury what percentage of those received

19    prescriptions for oxycodone?

20    A    96 percent.

21    Q    Now, did you make some record of the, is it 38 patients, that did not

22    receive prescriptions?

23    A    Right, there were 42 patients that didn't receive medication from Dr.

24    Azmat.  20 of them there's no notes in the file that show that he actually

25    saw the patient.  Nine of the patients were referred out for MRIs or MRI

-183-

1   requested for those nine patients.  Four of them tested positive for illicit

2   drugs, such as cocaine, marijuana, meth, and were asked to come back

3   three days later.  Some of those patients overlapped with the next

4   physician.  There were also two patients that tested positive for prescription

5   drugs that they weren't previously prescribed.  And so those patients were

6   asked to come back.  And there were a few other miscellaneous examples.

7   One patient had an infection in her ankle and was asked to go get an X-ray

8   or CT scan of her ankle.  And those are why the patients were prescribed

9   medication.

10   Q    So in essence, they didn't see the doctor.

11   A    That's correct.

12   Q    Counsel has reviewed a number of files with you.  I'd like you to turn

13   to 26-7, Kristin Lee Philips, as an example.

14            MR. KNOCHE: May we have just a moment, Your Honor?

15        [NOTE: Mr. Knoche and Mr. Withers confer off the record.]

16            MR. KNOCHE: We need to borrow an exhibit.

17            CLERK: Which one?

18            MR. KNOCHE: 26.

19            MR. WITHERS: Your Honor, could I retrieve – I'm sorry.

20            MR. KNOCHE: Pull up, Dean, 26-7-009.

21   Q    Kristin Lee Philips?

22   A    Yes, that's correct.

23   Q    From that form that she filled out, where is she from?

24   A    She's from Sophia, North Carolina.

25   Q    Do you have any idea where Sophia, North Carolina is?

-184-

1    A    No, I don't.

2    Q    Can you show us 26-7-012?

3    A    This is a copy of Ms. Phillips' driver's license from North Carolina.

4    Q    No.  26-7-012?  That's not a driver's license, that's an MRI?

5    A    Oh, 012.  Yes, this is a copy of her MRI.

6    Q    Can you see that on the screen?

7    A    Yes, I can.

8    Q    And where was that MRI done?

9    A    This was completed at Advanced Diagnostic MRI in Jacksonville,

10   Florida.

11   Q    So Ms. Sophia (sic) from North Carolina has an MRI record from

12   Florida?

13   A    That's correct.

14   Q    And who was the referring physician for that MRI?

15   A    There was not a referring physician listed on the MRI.

16   Q    And what conclusion would you draw from that?

17   A    That she obtained an MRI by herself without a referral.

18   Q    Walked in?

19   A    Yeah, walked into the clinic, or the MRI facility.

20   Q    26-7-014.

21   A    These are copies of prescriptions that she was taking –

22   Q    – Okay.  My question is, based on that evidence, she got a prescription

23   for what?

24   A    For hydrocodone 10 milligram/500, 90 count; and also a Motrin 800

25   milligram, 90.

-185-

1    Q   Counsel asked you about 26-21.

2                MR. KNOCHE:  So if you would pull up 26-21-002.   We  have

3    that?

4    Q    Okay, what's the name of that patient?

5    A    Michael Linton.

6    Q    And where does Mr. Linton claim to be from?

7    A    Middleton, Ohio.

8    Q    Have any idea where Middleton, Ohio is, other than somewhere in ...

9    A    I don't know.

10                MR. KNOCHE: And 26-21-015.

11   Q    Okay.  What's that?

12   A    This is an MRI report from Advanced Diagnostic MRI in Jacksonville,

13   Florida.

14   Q    Was that the same location that the last patient we talked about got an

15   MRI, Kristin Phillips?

16   A    Yes, that's correct.

17   Q    Same one.

18   A    That's correct.

19   Q    Did you see a lot of MRIs from Advanced MRI –

20   A    Yes, I did.

21   Q    – in these files?

22   A    Yes, I did.

23   Q    Who was the referring on that?

24   A    There's no referring physician listed.

25                MR. KNOCHE: And 26-21-017?

-186-

1    Q    What was that patient prescribed based on that evidence or

2    presentation?

3    A    60 oxycodone 15 milligram tablets; 60 Percocet 10 milligram tablets;

4    as well as 90 Motrin 800 milligram tablets.

5    Q    26-22, Wilson Lopez.  Mr. Lopez is from where?

6    A    Rincon, Georgia.

7    Q    And show us 26-22 –

8            THE COURT: – You have any idea where Rincon, Georgia is?

9            MR. SIKES: Yes, sir.

10           MR. KNOCHE: We all know where Rincon is.

11   Q    26-22-012.  Where did this patient from Rincon get the MRI done?

12   A    Advanced Diagnostic MRI in Jacksonville, Florida.

13   Q    Is that the same one as the last two patients that we talked about, Ms.

14   Phillips and Mr. Linton?

15   A    Yes, it's the same place.

16   Q    That's in Jacksonville, Florida?

17   A    That's correct.

18   Q    There are MRI facilities in or near Rincon, Georgia; is that correct?

19   A    Yes, there are.

20   Q    And based on that, 26-22-014, what happened?

21   A    Patient was issued prescription for Neurontin 30 milligram, 63 tablets;

22   120 oxycodone 30 milligram tablets; 60 hydrocodone 10/500 tablets; and

23   90 Motrin 800 milligram tablets.

24   Q    And the last one, 26-23-004, counsel asked you about Stevie Spell.

25   A    From Alma, Georgia.

-187-

1    Q    From Alma?  Okay.  And 26-23-019, where did Mr. Spell from Alma,

2    Georgia get his MRI?

3    A    Advanced Diagnostic MRI in Jacksonville, Florida.

4    Q    Same one as all the other facilities.

5    A    That's correct.

6    Q    Who is the referring physician?

7    A    There's not one listed.

8    Q    And based on that showing –

9        MR. KNOCHE: See 26-23-023

10    Q    – what kind of luck did Mr. Spell have?

11    A    Received 150 oxycodone 30 milligram tablets; 90 Motrin 800

12    milligram tablets; and 60 Lorcet 10/500 tablets.

13        MR. KNOCHE:  Now, go back for a moment to 26-7-012.

14    Q    This is the MRI of Ms. Kristin Phillips from Advanced MRI.

15    A    That's correct.

16    Q    What was the date of that exam and time?

17    A    November 10, 2010.

18    Q    What time?

19    A    11:22.

20        MR. KNOCHE:   And go now to 26-7-013.

21    Q    What time did the doctor review that exam that took place at 11:22?

22    A    On the same date at 11:07 prior to the exam taking place.

23    Q    So the doctor read the exam before it was conducted.

24    A    That's right.

25        MR. KNOCHE: That's all I have.

-188-

<u>RECROSS-EXAMINATION BY</u>

<u>MR. WITHERS</u>:

Q    You understand the importance of being thorough and fair; correct?

A    Correct.

Q    Yes?

A    Yes.

Q    Mr. Knoche was asking you questions regarding Kristin Phillips just now.  Look at page 26-7-015.

MR. WITHERS:  Could we bring that one up?  And if you could, sir, highlight the bottom of that page.

Q    Do you see where we have in the record a prescription for – make sure we get this – 2/11/11; correct?

A    That's correct.

Q    Oxycodone; correct?

A    Correct.

Q    30 milligrams, 160; correct?

A    That's correct.

Q    Hydrocodone; correct?

A    That's correct.

Q    60; correct?

A    Say that again?

Q    60.

A    60 hydrocodone.

Q    Diazepam, which I think is Xanax, if memory serves me?

A    It's not Xanax, but it's similar to it.

-189-

1    Q    Okay.  30 tablets; correct?

2    A    That's correct.

3    Q    So, tell me, does this confirm, or does this act as confirmation of

4    what's reflected in the record?

5    A    This was in the record.

6    Q    Right.  I mean, so we have a source-verified document from the

7    pharmacy; correct?

8    A    That's correct.

9    Q    All right, and let's go back here to another one that Mr. Knoche just

10   spoke about – and I'm sorry, Ms. Spell, Stevie Spell.

11              MR. WITHERS: That's way back in the 26-23-024, please, sir.

12   Q    What is that, sir?

13   A    It's a drug screen.

14   Q    And the date of that?

15   A    2/24.

16   Q    What does it show?

17   A    Positive opiates.

18              MR. WITHERS: Next page which would be 26-23-025

19   Q    And what does that show?

20   A    Positive opiate – oxy.

21   Q    That would be consistent with what that patient was reporting;

22   correct?

23   A    Right, they received it two weeks prior.

24   Q    Pardon me?

25   A    Yes, that they had received controlled substances two weeks prior.

-190-

1    Q    Okay.

2              MR. WITHERS: And then finally, 26-22-015.

3    Q    This is Wilson Lopez that counsel was just asking you about.

4              MR. WITHERS:  The bottom of that page, please, sir.  Right

5    there.

6    Q    This shows that Mr. Lopez –

7              MR. WITHERS: If you would scroll up just a little bit?  There

8    we go, thank you.

9    Q    – was receiving oxycodone, the prescription date of 2/14; correct?

10   A    That's correct.

11   Q    The diazepam prescription date 2/14; correct?

12   A    That's correct.

13   Q    And the hydrocodone prescription date, same date, 2/14; correct?

14   A    That's correct.

15             MR. WITHERS: Thank you.

16             THE COURT: Anything else of this witness, counsel?

17             MR. KNOCHE: No, Your Honor.

18             MR. WITHERS: No, Your Honor.

19             THE COURT: Can the witness come down?

20             MR. KNOCHE: Yes, sir.

21             THE COURT: All right, you can come down, sir.  Thank you.

22         [Witness Excused]

23             THE COURT: Members of the jury, it is now ten after 5:00.  I

24   know you've had a long day today.  After you leave here there are matters

25   that the Court needs to take up with the lawyers before we begin court

-191-

1    again tomorrow, so I'm going to send you home for the evening.

2              Leave your notepads and pencils in your chair, and we will give

3    them back to you when you come in in the morning.

4              I want to give you some cautionary instructions before you

5    leave, and these instructions are vital to your jury service, and they're vital

6    to the oath that you took, and they're vital to the administration of justice.

7              Do not discuss this case with anyone.  Don't go home tonight

8    and discuss it with your husband, or your wife, or your neighbor, or your

9    friend, or your child.  It would be highly improper and it would be a

10   violation of your oath to do that.

11             I've been around trials a long time, and I know human nature.

12   If you go home and your wife says, Well, what happened in court today?

13   And you say, Well, the Judge said this, and the lawyer said this, and some

14   witness said this.  And then they say, Well, it sounds like to me so and so,

15   and so and so.  And they don't know the first thing about this case.  They

16   haven't heard the Court, they haven't heard the lawyers, they haven't heard

17   any of the witnesses.  And it would be highly improper for you to engage in

18   any such conversation with anyone in your family, or neighbor, or

19   coworker, or friend.

20             We need to keep this case pure.  You heard some witnesses

21   asked today did they understand certain words.  Well, I think you

22   understand the word pure, don't you?  That means, uncontaminated, clean,

23   and that's the way this trial needs to be until it's over with.  Justice

24   demands that this trial be that way until it is over with.

25             So abide by your instructions.  Don't discuss this case with

1    anyone, don't discuss it among yourselves.  Don't go home and look in a

2    dictionary, or a medical journal about drugs or definitions or anything.

3    Don't get on your iPhone, your computer, your Blackberry, don't be

4    Googling things, don't be looking up things on Wikipedia.  Do not try to

5    find out anything at all about the issues in this case.  If you do that, it will

6    be a violation of your oath as a juror.  If you do that and I find out about it, I

7    will hold you in contempt of court, and that will not be good for you.  If you

8    do that and we find out about it, it will cause a mistrial in this case, and

9    we'll have to start all over again, and you will be in serious trouble.

10          Now, when this case is over with, but only after it's over with,

11   only after I have accepted some kind of verdict in this case, then you can

12   discuss this case with anyone that you want to discuss it with.  But you

13   don't have to ever discuss this case with anyone.

14          Now, I don't know how I can be any more clear about that or

15   how serious I am about that.

16          Now, when you come in in the morning, give yourself plenty of

17   time to be here on time.  We're going to start promptly at nine o'clock.

18   And, you know, you've got to look out – if you live where I live, you've got to

19   look out for drawbridges, and you've got to look out for trains, and you've

20   got to look out for school buses and other things that delay you.  So give

21   yourself plenty of time to get here and be in the jury room by nine o'clock

22   so we can start promptly at nine o'clock.  And when you get here, there will

23   be some refreshments for you back in the jury room when you arrive.

24          So try to get here early so you can relax, and go home tonight

25   and relax.  Don't think about this case when you go home.  Go home and

-193-

1    enjoy your evening.  Go see your friends, or stay home and stay warm and

2    have dinner, watch television.  You know, just try to do the normal things

3    that you would do when you go home in the evening.

4              Now, with those instructions you're excused as this time, and

5    we will begin promptly at nine o'clock in the morning.  Thank you.

6              [NOTE: The jury is excused for the day.  The proceedings are

7    continued outside of the presence of the jury as follows:]

8              THE COURT: Counsel, one thing I want to tell you, because of a

9    scheduling matter that I have, we're going to need to stop about 4:30

10   tomorrow.  I don't know where we'll be at 4:30, but you can plan your

11   agenda that we'll probably stop around 4:30 tomorrow.  But after that, we

12   could go on into the evening.

13             Now, let's talk about the draft of the jury charges that we sent

14   you before this case started.  And as you know, you have two drafts, and

15   one is where the defendant testifies, and one is where the defendant does

16   not testify, and we don't need to go into whether the defendant will or will

17   not testify, but we can work off of that draft.

18             So for these discussions we'll work off the draft where the

19   defendant does not testify, and we know as experienced lawyers that it may

20   be – that the charge will be modified whether the defendant testifies or

21   doesn't testify.

22             So let's start with you, Mr. Knoche, and you tell me, do you have

23   any questions or reservations about the draft charges that you received

24   earlier.

25             MR. KNOCHE: Your Honor, I'm going to have Mr. Gilluly

-194-

1   address that.

2           MR. GILLULY: Yes, Judge.  We did have a couple of –

3           THE COURT:  – And refer me to a page and a paragraph,

4   please.

5           MR. GILLULY: Yes, Your Honor, if I may have a second.

6   Judge, with regard to Page 12 of the proposed instructions, in the bottom,

7   [reading]: Counts 2 through 50 of the indictment refer to prescriptions

8   written by the defendant for a particular individual or dispensation by the

9   defendant on a given date.

10          We're requesting that Your Honor define and include language

11   that was previously used by this Court in *United States v. Ly* and used by

12   the Court in this district, *Cleveland Enmon,* where it states [reading]: As

13   used in these instructions, dispensing a controlled substance, or causing a

14   controlled substance to be dispensed, includes issuing a prescription for a

15   controlled substance.

16          We would just like that added.  We don't have that – it's not in

17   the instructions, Judge, and we're asking ...

18          THE COURT: All right, I'll make a note of that, but you're

19   talking about the bottom of Page 12.

20          MR. GILLULY: Yes, Your Honor.  Further, with regard to – may

21   I proceed, Judge?

22          THE COURT: Yes, sir.

23          MR. GILLULY: Thank you, sir.  Judge, with regard to Page 19 of

24   the proposed instruction, it talks about – I believe it's the fourth paragraph

25   down, [reading]: In order to sustain its burden of proof – that's the

-195-

1    beginning of the paragraph.

2         THE COURT: Yes, sir, I follow you.

3         MR. GILLULY: Yes, Your Honor.  We are asking that the

4    standard – it talks about the standard generally recognized and accepted in

5    the state of Georgia, I would request that it be the United States, which was

6    consistent, again, with the way it was instructed in *Ly* and *Enmon*, Judge.  I

7    think it's a national standard rather than a local standard.  I just wanted to

8    be careful in that regard as well.

9         THE COURT: All right, I have a note of that.

10        MR. GILLULY: Thank you, sir.  And if I could have one more

11   second, Judge, I apologize.

12        THE COURT: Yes, sir.

13        [NOTE: Mr. Gilluly and Mr. Knoche confer off the record.]

14        MR. GILLULY: Judge, on Page 12 of the proposed instructions,

15   the first paragraph under the first heading where it says, Offense

16   Instruction 98: Possession with Intent to Distribute.  It says [reading]:

17   Counts 2 through 50 charge defendant with dispensing –

18        THE COURT:  – Wait a minute, now.  You're talking about Page

19   12?

20        MR. GILLULY: Yes, Your Honor, I'm sorry.

21        THE COURT: And you're talking about at the top?

22        MR. GILLULY: It's the middle where – it's in the middle

23   paragraph, Judge, where the paragraph beings with, Counts 2 through 50.

24        THE COURT: Okay.

25        MR. GILLULY: In that paragraph it indicates that – and I'll

-196-

1    read it [reading]: Counts 2 through 50 charge defendant with dispensing a

2    controlled substance, or causing a controlled substance to be dispensed,

3    outside the usual course of professional practice for a medical doctor and

4    without legitimate purpose.

5         And then you quote – or it states, Title 21, that last paragraph

6    says [reading]: Makes it a federal crime or offense for a medical doctor,

7    licensed and registered in the State of Georgia and by the United States, to

8    knowingly and intentionally dispense controlled substances outside the

9    usual courses of professional practice.

10        And instead of "and," I am requesting "or," because it's an

11   alternative means of committing the offense.  Or without legitimate

12   purpose related to the practice of medicine.  And again, my – I refer the

13   Court back to the original Dr. Ly instructions where it was an "or"

14   instruction given by this Court, and of course affirmed by the Eleventh

15   Circuit.  And Judge, I believe that same instruction was also given in

16   *Enmon* recently.

17        THE COURT: Okay, I've made a note of that.

18        MR. GILLULY: Thank you, sir.  That's all I have, Your Honor.

19        THE COURT: All right, Mr. Withers, do you have any

20   comments about the draft charges?

21        MR. WITHERS: Your Honor, with respect to – staying on that

22   same page, at the bottom of Page 12 when it talks about Counts 2 through

23   50 of the indictment, there is the language, quote  [reading]: Refer to a

24   prescription or prescriptions written by the defendant for a particular date

25   or individual.

1        The indictment alleges dispensation and not prescription.  And

2   so I would ask that you eliminate that language that starts with "refer" and

3   ends with "or."

4        MR. GILLULY: We have a position if Your Honor would like to

5   hear it at the appropriate time, Judge.

6        THE COURT: All right, I've made a note of that, Mr. Withers,

7   and Mr. Gilluly, you indicated that you wanted to comment regarding that.

8        MR. GILLULY: I don't even know if it's necessary, Judge.  I

9   think it is appropriate.  It was the way it was instructed in *Ly*.  That

10  paragraph was – that's how Your Honor instructed it in *Ly*, and it was

11  appropriate then.  And again, it's been deemed appropriate in other

12  Eleventh Circuit cases, Judge.

13        MR. WITHERS: Your Honor, if I could comment on that issue

14  about Dr. Ly.  Document 1, Page 1 of Dr. Ly's indictment charged him with

15  both distributing and dispensing; the distributing being the prescription,

16  the dispensing being the actual packaging of the controlled substance.  And

17  if you look at the government's indictment, Page 4, Paragraph 11,

18  Paragraph 12, the statutory law is laid out clearly [reading]: The term

19  "dispense" means to deliver a controlled substance to an ultimate user or

20  research subject by, or pursuant to, the lawful order of a practitioner,

21  including the prescribing and administering of a controlled substance, and

22  the packaging, labeling and compounding necessary to prepare the

23  substance for such delivery.

24        The term distribute – Paragraph 12 of the government's own

25  indictment, citing 21 U.S.C. § 802(11) [reading]: The term "distribute"

1    means to deliver (other than by administering or dispensing) a controlled

2    substance or a listed chemical.

3          So the *Ly* case is of no help to the government here, because in

4    that case the government's proof was that he was prescribing and

5    dispensing directly out of his facility.  That's not what the evidence is or

6    proof is here.  Dr. Azmat didn't have a license – a registration to dispense.

7          And so I think that with respect to the Counts 2 through 50, I

8    would respectfully ask the Court to insert the term as defined by the

9    government in its own indictment what the term dispense means, and I

10   think that should be inserted at the bottom of – or at the end of that

11   Offense Instruction 98.

12         THE COURT: All right, sir.

13         MR. WITHERS: And, Your Honor, if I can just do this the old

14   state court way and tell you that I would ask that our theory of defense

15   instruction, which is proposed Instruction 20, be included.  And the

16   defendant's proposed Instruction 21.  That deals with the difference

17   between standard of care and what's going on with respect to a criminal

18   case.  And similarly, 22 is the difference between a civil malpractice and

19   criminal case.  I would respectfully ask that those be included.

20         MR. GILLULY: We would oppose those, Judge.  And I do have

21   other cases to cite in support of our dispense argument if Your Honor

22   would like to hear them.  Otherwise, I'll submit it.

23         THE COURT: So what your objection is, as I understand it, is

24   the Court's excluding that request for charge; is that correct?

25         MR. WITHERS: Yes, Your Honor.

-199-

1         THE COURT: And you're referring to your request ...

2         MR. WITHERS: 20, 21 and 22, Your Honor.

3         THE COURT: All right.  Yes, Mr. Gilluly?

4         MR. GILLULY: Well, Judge, again, I would say it's a national

5 standard, and he's citing a state standard.  We would object as to that.

6 Additionally, Instruction 21, we would object to that instruction, and we

7 would object to Instruction 22 as well, Judge.  I think they would result in

8 confusion of the issues to the jury.  It's confusing when you read it.  You've

9 already – you instruct the jury on the burden of proof, that it's not a civil

10 case.  You will define beyond a reasonable doubt, you will define –

11         THE COURT:  – Well, you can infer by the fact that I left those

12 requests out of the charges that I might agree you, Mr. Gilluly, but I'm

13 giving y'all an opportunity to state whatever you want to state here, and Mr.

14 Withers to state whatever his objections are.

15         MR. GILLULY: Thank you, sir.

16         THE COURT: All right, anything else?

17         MR. GILLULY: No, Your Honor.

18         THE COURT: Anything else, Mr. Withers?

19         MR. WITHERS: No, sir.

20         THE COURT: All right, gentlemen, we are going to recess now

21 for the evening, and we will begin promptly at nine o'clock in the morning

22 with your first witness, Mr. Knoche.

23         Are there any other matters that either counsel wants to discuss

24 with the Court before we come back in the morning?

25         MR. KNOCHE: Nothing from the government.

1          MR. WITHERS: Nothing from the defense, Your Honor.

2          [NOTE: Whereupon the proceedings are adjourned.]

STATE OF GEORGIA

CHATHAM COUNTY.

CERTIFICATE OF REPORTER

I, Marie Cowart, do hereby certify that the above and foregoing pages of typewritten material is a true, correct and complete transcript of the evidence and proceedings adduced in the Jury Trial stated in the captioned matter, this being Volume 1 of Volumes 1A, and 1 through 5.

This 18th day of September,  2014.

/s/ *Marie Cowart*

Marie Cowart, CCR B-237
United States Court Reporter
Southern District of Georgia
Savannah Division

P. O. Box 9572
Savannah, GA 31412
(912) 650- 4066