IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF GEORGIA

SAVANNAH  DIVISION


UNITED STATES OF AMERICA       *

v.                             *   CASE NUMBER CR413-28

NAJAM AZMAT                    *

---

Transcript of Evidence and Proceedings Adduced in the Jury Trial held

January 13-17, 2014 before The HONORABLE WILLIAM T. MOORE, JR.,

Judge Presiding, reported by Marie Cowart, Official Court Reporter.

---


VOLUME 2 - 1/14/2014

PP. 202 - 456

APPEARANCES:

For the Government                    KARL I. KNOCHE, AUSA
                          GREGORY E. GILLULY, JR., AUSA

For the Defendant                  THOMAS A. WITHERS, ESQ.


*Proceedings recorded by shorthand with back-up recording; transcript produced from note reading in*

*conjunction with transcription of back—up recording.*

# I  N D E X

## VOLUME 1A - 1/13/2014

### (*Voir Dire* and Jury Selection)

#### PP. 1 - 56

PRELIMINARIES AND INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . 13

JURY PANEL SEATED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*VOIR DIRE* EXAMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    Juror Biographicals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

SILENT STRIKING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

JURY SEATED AND SWORN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

CERTIFICATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

## VOLUME 1 - 1/13/2014

#### PP. 57 - 201

PRELIMINARIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

COURT'S RULINGS ON EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

OPENING STATEMENTS

    By Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

    By Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Government's Presentation of Evidence

MARY KAY ROSS

    Direct Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . 82

    Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 90

    Redirect Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . 93

    Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . 94

DAVID HATMAKER

    Direct Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . 95

    Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . 103

    Redirect Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . 107

CHARLES SIKES

Direct Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . . 107

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 150

Redirect Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . 181

Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . 188

CHARGE CONFERENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

CERTIFICATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201

## VOLUME 2 - 1/14/2014

## PP. 202 - 456

PRELIMINARIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202

ADELARD LeFRANCOIS

Direct Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . . 202

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 251

Redirect Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . 277

Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . 284

FRANCIS J. BARBUSCIA

Direct Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . 286

Cross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . . 301

Redirect Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . 310

Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . 311


NANCY BINION

Direct Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . 312

Cross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 329

Redirect Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . 333


PATRICIA ROHRER

Direct Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . 334

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 344

Redirect Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . 350

Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . 351


KONSTANTINO AFTHINOS

Direct Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . 352

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 369

Redirect Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . 378

Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . 381

SEAN CLARK

Direct Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . . . 383

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . . 392

Redirect Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . 401

Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . 402

JOSEPH TRAVIS BRADLEY

Direct Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . . . 403

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . . 415

Redirect Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . 431

LATINA SIMPSON

Direct Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . . 434

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . . 445

Redirect Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . 452

CERTIFICATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 456

<u>VOLUME 3 - 1/15/2014</u>

<u>PP. 457 - 734</u>

PRELIMINARIES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 457

GERALD SMITH

    Direct Examination by Mr. Knoche  . . . . . . . . . . . . . . . . . . . . . . . . . .  457

    Cross-Examination by Mr. Withers  . . . . . . . . . . . . . . . . . . . . . . . . . .  469

JAMES GABLE

    Direct Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . . . 480

    Cross-Examination by Mr. Withers  . . . . . . . . . . . . . . . . . . . . . . . . . .  488

    Redirect Examination by Mr. Gilluly  . . . . . . . . . . . . . . . . . . . . . . . .  494

    Recross Examination by Mr. Withers  . . . . . . . . . . . . . . . . . . . . . . . .  496

BILL LETNER

    Direct Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . . . 496

    Cross-Examination by Mr. Withers  . . . . . . . . . . . . . . . . . . . . . . . . . .  507

    Redirect Examination by Mr. Gilluly  . . . . . . . . . . . . . . . . . . . . . . . .  512

    Recross Examination by Mr. Withers  . . . . . . . . . . . . . . . . . . . . . . . .  513

KIMBERLY LETNER

    Direct Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . . . 516

    Cross-Examination by Mr. Withers  . . . . . . . . . . . . . . . . . . . . . . . . . . 524

Redirect Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . 534

Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 537


KEN GOSSETT

Direct Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . 537

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 546

Redirect Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . 563

Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 567


DANIEL WISE

Direct Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . 569

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 586

Redirect Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . 605

Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 608


MICHAEL PALMER

Direct Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . 609


GENE SCOTT KENNEDY, M.D.

Direct Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . 611

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 673

COURT'S INSTRUCTION TO COUNSEL . . . . . . . . . . . . . . . . . . . . . . . . . . 726

COURT'S INSTRUCTION TO DR. KENNEDY . . . . . . . . . . . . . . . . . . . . . 728

COURT'S RULING ON APPROPRIATE STANDARD
        FOR GOOD-FAITH DEFENSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 728

CERTIFICATE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 734

## VOLUME 4 - 1/16/2014

### PP. 735 - 932

PRELIMINARIES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 735

GENE SCOTT KENNEDY, M.D.

        Continued Cross-Examination by Mr. Withers  . . . . . . . . . . . . . . . 735

        Redirect Examination by Mr. Knoche  . . . . . . . . . . . . . . . . . . . . . 761

        Recross Examination by Mr. Withers  . . . . . . . . . . . . . . . . . . . . . 775

COURT'S RULINGS ON EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 777

GOVERNMENT RESTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 777

DEFENSE RULE 29 MOTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 778

RESPONSE OF GOVERNMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 780

COURT DEFERS RULING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 780

Defendant's Presentation of Evidence

THOMAS SIMOPOULOS, M.D.

     Direct Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . . . . 783

     Cross-Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . . 859

     Redirect Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . 917

DEFENSE RESTS AND CLOSES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 918

COURT'S RULINGS ON EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 919

CHARGE CONFERENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 922

DEFENSE RENEWS RULE 29 MOTION . . . . . . . . . . . . . . . . . . . . . . . . 930

DEFENDANT WAIVES RIGHT TO TESTIFY . . . . . . . . . . . . . . . . . . . . . . . 931

CERTIFICATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 932

VOLUME 5 - 1/17/2014

PP. 933 - 987

PRELIMINARIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 933

CLOSING ARGUMENTS

    By Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 933

    By Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 946

REBUTTAL ARGUMENT

    By Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 964

COURT'S RULING ON DEFENSE RULE 29 MOTION . . . . . . . . . . . . . . 973

DEFENSE EXCEPTIONS TO CHARGE . . . . . . . . . . . . . . . . . . . . . . . . . 975

JURY QUESTIONS 1 AND 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 976

RECEIPT OF VERDICT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 977

JURY POLLED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 980

POST-CONVICTION RIGHTS ADVISED . . . . . . . . . . . . . . . . . . . . . . . . . 980

JURY INSTRUCTED REGARDING FORFEITURE . . . . . . . . . . . . . . . . . . 982

DETENTION  HEARING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 982

COURT'S RULING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 986

CERTIFICATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 987

-202-

1       [NOTE: Court is opened on 1/14/2014.  The proceedings are

2   continued in the presence of the jury as follows:]

3       THE COURT: Good morning, ladies and gentlemen.  I

4   appreciate you being here on time on a wet, dreary morning.  I hope you

5   had a pleasant evening last night, and we're ready to proceed.

6       Mr. Knoche?

7       MR. KNOCHE: Mr. LeFrancois.

8     [Witness Sworn]

9       CLERK: You may be seated.  Please state your name and

10  occupation, and spell your first and last name for the record.

11      MR. LeFRANCOIS: Adelard LeFrancois.  A-D-E-L-A-R-D.  L-E-

12  F-R-A-N-C-O-I-S.  Employment, I work for a company called RGIS, which

13  is an inventory service company.  I'm a manager for RGIS.

14              A D E L A R D   L e F R A N C O I S

15       GOVERNMENT'S WITNESS, SWORN, TESTIFIED AS FOLLOWS

16                     DIRECT EXAMINATION BY

17  MR. KNOCHE:

18  Q    What city and state do you live in, Mr. LeFrancois?

19  A    Boynton Beach, Florida.

20  Q    And for those members of the jury who aren't familiar with Florida

21  geography, where is Boynton Beach?

22  A    In South Florida.

23  Q    Near what – what's the next biggest city?

24  A    Boca Raton and Ft. Lauderdale.  Just south of that.

25  Q    How long have you lived in Florida?

-203-

1    A    Twenty years.

2    Q    Didn't grow up there?

3    A    No, sir, I grew up in Philadelphia, Pennsylvania.

4    Q    What took you to South Florida?

5    A    I just after – I wanted just change, experience, different change.

6    Didn't want to deal with the cold weather anymore in Philadelphia, so I

7    moved down to South Florida and explored opportunities from South –

8    originally moved to Ft. Lauderdale, and then just moved around ever since.

9    Q    How old are you now?

10   A    Forty-four.

11   Q    All right, sir, and what have you done for a living since living in

12   Florida?

13   A    When I first came down I worked in a retail aspect. I worked at B.J.'s

14   Wholesale Club as a manager, and I worked in Albertson's grocery store as

15   a manager.  I worked in a mortgage business for a few years.  And then in

16   2009 I got involved with the pain management business in 2009.

17   Q    Tell the jury how you got involved with pain management.

18   A    One of my old associates I worked with at Blue Chip Mortgage

19   Company, he was a partner there, and him and I were friends.  And I'd left

20   the company because we had the crash in 2008 where the market – the

21   housing value just fell apart in Florida.  So I was – I actually ran into him

22   one time at a Miami Heat game, just by coincidence.  I haven't talked to

23   him for several months.  And he said that he was getting involved in a new

24   venture called pain management.  I never heard of it, didn't know anything

25   about it.  And he asked me if I was interested in running it because I have

-204-

1    good – I'm good with numbers and I'm very – I'm basically OCD.  I like

2    everything being neat and orderly.

3         So I talked to – we had a conversation, we had lunch.  And then I

4    asked him if I had to be licensed, if I had to be a doctor.  And he goes, no,

5    you don't have to be anything like that.  You just have to be good with

6    numbers and take care of the patients.  So I was like, okay.

7         So in the fall of 2009 I decided to go and work for him at the pain

8    management company called Palm Pain and Rejuvenation.

9    Q    Palm Beach Pain and Rejuvenation located ...

10   A    In Boca Raton, Florida on Federal Highway.

11   Q    And what were your duties there?

12   A    I was the office manager.  I was in charge of all the supplies, ordering

13   of the medications, the C-IIs, the controlled substances, and just making

14   sure that every – we were never out of medications, and that every – all the

15   patients were taken care of.

16   Q    When you say you had to ensure that you never ran out of medication,

17   may we assume that you gave medication to patients onsite?

18   A    Well, that site was an onsite dispensing location there, too, whereas

19   where the doctor would see the patient, she would write a script out for the

20   patient, and then the patient would wait in the waiting area, and then while

21   I would fill the script for the patient, and then give it to the patient.

22   Q    What kind of a patient base did Palm Beach Pain and Rejuvenation

23   cater to?  Was it local patients or out-of-town patients?

24   A    No, sir, mostly out of state.  Probably 90-to-95 percent of the patients

25   came from Kentucky, West Virginia, North Carolina, as far up as, we had

-205-

1    some patients from Maine come down, Ohio.  And they were all – mostly

2    out-of-state patients, yes, sir.

3    Q    And what kind of treatment did you provide to the patients at Palm

4    Beach Pain and Rejuvenation?

5    A    The doctor would administer their exam, just give them an initial

6    exam, and just prescribe patients based off his or her exam, and that was it.

7    There was – that was just the whole exam, 15 minutes, 20 minutes exam,

8    that's all.

9    Q    And what kind of drugs were prescribed and handed out at Palm

10    Beach Pain and Rejuvenation?

11    A    C-IIs, which is your oxycodone, 15 milligram, 30 milligram; your

12    Percocets; and then your lower other – C-IIIs, you get the Valium, you got

13    your Xanax, and you got your – and just non-controlled drugs like that, too,

14    but mostly it was the C-IIs, which is the oxy and the Percocets.

15    Q    Did patients who came to Palm Beach Pain and Rejuvenation, were

16    those the drugs they were requesting?

17    A    Yes, sir.

18    Q    What kind of examination took place?

19    A    Basic examination.  You know, when the patient first came in they had

20    to fill out their little questionnaire, basically what their background, where

21    they're from, where they live and all that stuff, too.  And then after that they

22    would go to the back and get their blood pressure taken, and then

23    administer a drug test.  And then once that would be done they go back into

24    the lobby until the doctor was ready to see him or her.  And once they did

25    that, the doctor would, you know, administer a basic exam as far as just

-206-

1    basic questions, how are you feeling today?  Everything okay today?

2         And I was never actually in the room with the patient.  It was just, you

3    know, the doctor would go in, see a patient, and come out 15 minutes later

4    and hand a chart with the scripts filled out to be filled.

5    Q    What kind of payment did you accept for the patient visit?

6    A    Cash, debit card and credit card.  We did not take insurance.

7    Q    Did not take insurance?

8    A    No, sir.

9    Q    What kind of medical equipment did you have at Palm Beach Pain and

10   Rejuvenation?

11   A    Basic.  We had the – the patient bed, we had.  We had charts on the

12   walls, and then we had the basic equipment, the little cotton balls, and ear

13   swabs, and that's pretty much the extent of it.  We didn't have anything else

14   – any other equipment besides that as far as X-ray machines or anything

15   like that.  Nothing like that.

16   Q    Did any sort of treatment take place at Palm Beach Pain and

17   Rejuvenation other than the dispensation of controlled substances?

18   A    No, sir.

19   Q    Patient was obviously required to bring the fee –

20   A    Yes, sir.

21   Q    – to be seen.  What else?

22   A    A fee, and they had to bring a photo ID, and they had to bring an MRI

23   within two years.  If it was over two years old, then we would request them

24   to go get another MRI at a local facility, which we had a good relationship

25   with, where they would go and get the MRI and have it back to us within 24

1    hours.  So obviously a lot of the patients come from out of state wouldn't

2    have to wait for 48 or 72 hours, we'd get their MRI back right away, and

3    then we would see the patient – or the doctor would see the patients.

4    Q     So would it be typical for a patient from the state of Kentucky, for

5    example, to appear at your clinic with an MRI from a Florida MRI clinic?

6    A     That's correct, yes, sir.

7    Q     And then were these patients – would they come back on a regular

8    basis?

9    A     Yes, sir.  They'd get their medications.  The cycle was 28 days.  It has

10   to be at least 28 days, and most of them like clockwork would come back on

11   the 28th, 29th, or 30th day to see the doctor again as a return patient.

12   Q     Who were some of the doctors that you knew to work at Palm Beach

13   Pain and Rejuvenation?

14   A     Dr. Pinsley, Sherri Pinsley.  Dr. Susan Hall.  Dr. Donald Blatz, they

15   were a few of the ones – Dr. Ameet.  I'm not sure of their first names.  Dr.

16   Attreeties.  Dr. Carter.  I'm not sure of the first names, but those are some

17   of the names that worked at Palm Beach Pain location itself.  (Names

18   spelled phonetically.)

19   Q     Were you the only such facility in South Florida?

20   A     No, sir.  As I said, when I first got hired, I went to go train, and the

21   place I trained at was called Margate Pain, which was owned at the time by

22   a man named Pasquale Gervasio.  And I trained there for two weeks

23   learning the ins and outs of the pain management place as far as ordering

24   of the medications, ordering of supplies, and everything – doing everything

25   to the computer called Abacus.  Abacus is the computer when you go and

1    get your medications filled and you have your prescription bottle, you have

2    the little stuff put on your prescriptions, your name, address and stuff, the

3    system is called Abacus, which does all that for you.

4         So I trained there for two weeks, and then I went to the Palm Beach

5    Pain location to open that one up.

6    Q    Do you also know – are you familiar with a doctor named Dr. Adla

7    Adi?

8    A    Yes, sir.

9    Q    And who is he?

10   A    He was a doctor that worked in the office up in Jacksonville or Orange

11   Park, Florida.  He worked for us.  He worked for the office up there, yes.

12   Q    And was that the same kind of practice?

13   A    Same kind of practice, yes, sir.

14   Q    Same type of patient profile, out of state, Florida MRIs?

15   A    Yes, sir.

16   Q    Return every 30 days?

17   A    Yes, sir.

18   Q    And Dr. Arnold Aaron?

19   A    Yes, sir.  He was one of the doctors.  He worked at different –

20   numerous locations for us.  Margate Pain, and he worked at Palm Beach

21   Pain specifically.  And he – yes, he worked for us, too.

22   Q    How many patients would typically come to your location, Palm Beach

23   Pain, on a daily basis?

24   A    Anywhere from 50 to 75 to 80.  I mean, the most we saw one day was

25   109 patients.  But for the most – I mean, at the time we had five locations in

-209-

1    general.  We had the Margate Pain location, we had Palm Beach pain,

2    which is in Boca Raton.  We had one in Boynton Beach, Florida.  We had

3    one in Palm Springs, which is Lake Worth, Florida, which is just about half-

4    an-hour north.  And we had one in Orlando.  And then we had one in

5    Jacksonville.  So all those locations.  Our location would see about 40-to-

6    60-to-70 patients a day, depending on the day.

7    Q    How were the doctors paid?

8    A    Cash.

9    Q    When?

10   A    Daily, every day at the end of the day cash.

11   Q    And what was a typical arrangement for the doctors at Palm Beach

12   that you're aware of.  How much did they get paid –

13   A    – Doctors got paid at Palm Beach location anywhere from fifteen-

14   hundred dollars, $2,000.  Dr. Pinsley received a little bit more because of

15   her experience, so we paid her roughly like twenty-five hundred dollars a

16   day when we were truly busy and seeing 45 and 50 and 60 a day.  But for

17   the most part the doctors had a flat rate of anywhere from fifteen-hundred

18   to $2,000 a day.

19   Q    Did your waiting room accommodate that many patients at a time?

20   A    No, sir.  The Palm Beach Pain location, the max the lobby could seat is

21   36.  And in a few instances we had the fire marshal come in and tell us we

22   had to clear the lobby or get shut down.  So to accommodate all those

23   patients, on the side we had some park benches put in so the patients could

24   sit outside there and smoke, and so that we could have accommodations

25   between the lobby and then the side benches so we would have no

1    problems with the fire marshal.

2    Q      And why did you have rules about smoking and number of people that

3    congregated?  Why did you do that?

4    A      Well, we wanted to see as many people as we possibly could, and try to

5    keep it unconspicuous so law enforcement would not, you know, notice that

6    we had a lobby full of patients.  When we put this  – when we put the

7    benches up, we also had like a landscaper put in like eight-foot tall trees

8    along the whole perimeter of the park bench, so you really could not see in

9    to see if people were sitting on the park benches or not.

10   Q      And presumably persons traveling from these states well north of

11   Florida like Kentucky, they would have out-of-state license plates.

12   A      Yes, sir.

13   Q      And did you have any instructions about where they could park?

14   A      Well, we had a parking lot adjacent to the building which we had, and

15   patients were parking there.  And another situation we solved was, we

16   bought some vans, and about two miles north of the location there was a

17   convenience store, which we made a deal with the convenience store clerk

18   where we could have all the patients park their cars in that parking lot, and

19   then we would shuttle them back and forth from the location to the

20   convenience store as so that we could keep the parking lot relatively light as

21   far as plates from out of state, because we did have a dry cleaner that was in

22   the same building as us, and we wanted to keep it so with as little cars as

23   possible in the parking lot to help avoid law enforcement or any type of

24   issues we felt we might have.

25   Q      What medical – kind of medical training did you have prior to working

-211-

1    at Palm Beach?

2    A    None, none, sir.

3    Q    And what kind of formal medical training did you undergo after

4    working at Palm Beach, or while you worked at Palm Beach?

5    A    No formal medical training at all.  Just knowing about dispensing of

6    the medications, and learning about how to order medications.  As far as

7    medical training, none, sir.

8    Q    What's your education level?

9    A    I have high school diploma and then I did some like college.  I took

10   some courses in mathematics and that's it.  I do not have a degree,

11   bachelor's degree.

12   Q    You had other people that worked at the office, obviously, besides you

13   and the doctor.

14   A    Yes, sir.

15   Q    Okay.  Did you know an Adel Lizama?

16   A    Yes, sir.  She worked as the receptionist.  She's the one who handled all

17   the intake.  If a patient came to the window, she would take care of

18   processing the paperwork, making sure the MRI was within two years old,

19   having them fill out the patient forms, and taking the cash payment, and

20   then getting them ready to see the doctor.

21   Q    What formal medical education or training did she have?

22   A    None, sir.

23   Q    Did you know a Candace Carreras?

24   A    Yes, sir.  She worked for us in the back room.  When a patient came to

25   the back, before they see the doctor, she is the one who administered the

-212-

1   blood pressure test, and asked about ten question that the doctor – excuse

2   me, that the – that Candace would ask the patient.  How are you feeling

3   today on a scale from 1 to 10?  Do you smoke?  Any problems?  Any

4   diseases?  Any drug problems?  And that's the questions she asked, and

5   then she would send them back to the lobby.

6   Q    What medical training or education did she have?

7   A    None, sir.

8   Q    Do you know a Sean Clark?

9   A    Yes, sir.

10  Q    Tell us how you know Mr. Clark, and what if anything he did at Palm

11  Beach or these other clinics you've described.

12  A    Sean Clark worked for us.  He did security for us in the lobby.

13  Sometimes if a patient was outside sitting on the side on the park bench

14  and they were smoking, we would call the patient's name out and they

15  wouldn't hear their name because obviously they were outside.  So he

16  would go out and bring the patient in, and he would handle security if

17  there's any problems with patients getting in confrontations with each

18  other.

19          And he also handled marketing for us.  He would go to local

20  pain clinics and put our advertisements on their windows to say, hey, come

21  see us next time.  And then he would also go to like the local hotels in the

22  morning, the lower-end motels like the Motel 8, Super 8, and put our

23  advertisements on the windows so the patients could come and see us in

24  the morning.  And he would specifically target out-of-state plates, people

25  coming from Kentucky and other states, and he would put the

-213-

1    advertisements so they would come and see us with the flyer.

2    Q    And what was the purpose of that to get the patients to come?

3    A    Just to get as many patients to come as possible.

4    Q    And did you have a name for that sort of activity?

5    A    The marketing team?

6    Q    Yeah.

7    A    That was our marketing team.  No, marketing team.

8    Q    Marketing, okay.  Was that what Mr. Clark was in charge of?

9    A    He was one – he was not in charge of that.  There was a gentleman

10   named Marco, and Ben, they were the ringleaders, or the so-called

11   ringleaders of the marketing team, and there was two sets of teams.  So

12   Marco and Ben would do one, and then Sean Clark would go out and do his

13   own marketing, too, on his own.

14   Q    And this marketing was always done against rival clinics.

15   A    Yes, sir.

16   Q    Did you know Francis Barbuscia?

17   A    Yes, sir.

18   Q    Who is Mr. Barbuscia?

19   A    Mr. Barbuscia was in the same capacity as Mr. Sean Clark.  He would

20   do marketing.  Him and Sean usually worked together as a tandem, and

21   they did marketing together at the local clinics and at local hotels.

22   Q    You said that Mr. Clark also was in charge of security in case scuffles

23   broke out between or amongst patients.  How often did that happen?

24   A    It happened frequently, because patients would come out, and one

25   patient would have their meds, and then patients would talk about their

-214-

1    meds, what they received, and some patients were unhappy with what they

2    received and someone else received, too, and then they would fight over

3    meds and – so instances like that.

4    Q    Did Mr. Clark or Mr. Barbuscia have any formal medical training to

5    your knowledge?

6    A    No, sir.

7    Q    You're not from Savannah.  Ever lived here?

8    A    No, sir.

9    Q    Do you recall back in the beginning of 2011 opening a clinic, a pain

10   management clinic in Garden City, Georgia?

11   A    Yes, sir.

12   Q    And tell the members of the jury how it came to be that you left your

13   employment at Palm Beach Pain and Rejuvenation and decided to open a

14   clinic in Garden City, Georgia.

15   A    While I was so employed with Palm Beach Pain and Rejuvenation, I

16   was always wanting to open up my own clinic, 'cause I knew all the ins and

17   outs of how to open up a clinic, from the groundwork from A-to-Z,

18   everything involved in opening up a clinic, the licensing, getting of the

19   doctor, getting of the patients, everything, I knew how to do that.  So I

20   talked to a friend of mine named Lewis Trematerra, who happened to be an

21   investor with Palm Beach Pain, and I told him I was looking to branch out

22   on my own.

23         And at the time the laws in Florida had changed where after October

24   1st of 2010 you cannot dispense for more than 72 hours unless you were

25   owned – unless you have insurance, you had insurance there, and we did

-215-

1    not obviously have insurance.  So patients are not going to come down from

2    Kentucky for 72 hours, drive all the way down from Kentucky or another

3    state to get meds for 72.  That was just – they were not going to do that.  So

4    we lost a lot of business that way.

5        So I decided to – I wanted to open up my own place, and Georgia, at

6    the time the laws in Georgia were the same as the laws in Florida at the

7    time, which were you didn't have to be doctor owned, and you could

8    dispense onsite.  So we said that Florida – Georgia was the perfect location.

9        And so we talked, and then I – Mr. Sean Clark went up to Georgia to

10   scout locations, anywhere, up in Atlanta, any other cities, and we decided

11   we were going to stay on the East Coast so it'd just be one straight drive up,

12   just had to drive up, I wouldn't have to fly, 'cause I did not like to fly.  So he

13   found some locations, and he chose the one in Garden City.  And –

14   Q    – If I may, you say that Georgia was the perfect location, and you've

15   described some of those reasons.  You said, you know, relative proximity to

16   Florida.  What were some of the other advantages of Georgia?

17   A    The laws in Florida – Georgia at the time were the same as what they

18   were in Florida before, whereas you didn't have to be doctor owned, you

19   could dispense for 28 days, and you could dispense onsite.  Those were the

20   main reasons why we decided on Georgia.

21   Q    All right.  So you – did you talk to some of your coworkers at Palm

22   Beach Pain and Rejuvenation and recruit them to come with you to run the

23   clinic?

24   A    Yes, sir.  I talked to Adel Lizama, and I talked to Candace Carreras,

25   and asked them if they were interested in coming and working for me,

-216-

1    because I had a good relationship with them, and they were comfortable

2    working with me, and they decided to come and work for me – work with

3    me at the office up in Georgia.

4    Q     And since none of you lived up here, I assuming arrangements had to

5    be made for living space?

6    A     Yes, sir.  The original plan was to have Adel, Candace and myself come

7    up and train, and get everybody – we had another team come up.  The

8    name was Dan Wise and a gentleman named Kostas and a lady named

9    Shelly, who were going to come up, and they were going to live here and

10   stay here and work in the clinic.  And we went up there, Candace, Adel and

11   myself, to train them and spend time with them to show them how

12   everything worked with the doctor, with the patients, with the files, and

13   then we were going to come back down to Florida and then monitor

14   everything from Florida.

15   Q     And so did you rent a house?

16   A     They rented a house, yes, sir.  I'm not sure exactly the location 'cause I

17   was never in the house, but they did rent a house, Dan Wise and Shelly and

18   Kostas, they rented a house, yes, sir.

19   Q     And did people who were from Florida and then involved in East

20   Health Center, did they stay at that house while working at East Health

21   Center?

22   A     Yes, sir.

23   Q     Did Sean Clark or Frankie Barbuscia come with you?

24   A     Yes, sir, they came up and they were – their job capacity was the same

25   as it was when they worked in Florida.  They did the marketing, and we

1   would target rival clinics.  And we even went to the location we had in

2   Jacksonville and they were instructed to put marketing – marketing on the

3   windows and the windshields of the clinic in Jacksonville.

4   Q    Were you successful in finding a location in Garden City to open your

5   office?

6   A    Yes, sir.  Mr. Clark found a location on U.S. Highway 80, 626 U.S.

7   Highway 80.  He found the location there.

8            MR. KNOCHE: Can we see Exhibit 28-3, please.

9   Q    Do you recognize 28-3 that's been admitted into evidence?

10  A    Yes, sir, that's the location for East Health Center.

11  Q    And who signed the lease for – or negotiated the lease and signed the

12  lease for East Health Center?

13  A    That was Mr. Clark, Sean Clark.

14  Q    Did you have a doctor who had agreed to work at your clinic when you

15  opened up?

16  A    Yes, sir.  We had a doctor.  While I was still in Florida, and we had

17  everything ready to go as far as the office goes, supplies, everything was set.

18  The only thing I needed to do was find myself a doctor now.  And I put

19  some ads in a local advertisement called Craigslist, and I had a response

20  from a Dr. Azmat.

21  Q    And if I may take a moment, you kept records of these things you're

22  describing, the lease, the Craigslist ad, and other materials related to your

23  management of East Health Center in Florida; did you not?

24  A    Yes, sir.

25  Q    Okay.  You had a separate office in Florida?

-218-

1    A    Yes, sir.  We had rented in a park in Boca Raton, yes, sir.

2    Q    And why did you keep that separate office?

3    A    Well, we wanted to maintain everything from one central facility.  I

4    had webcams installed so I could see all the location, all the activity going

5    on during the day.  So even though I was in Florida, I could see everything

6    that was going on during the day, from the lobby to the outside of the place,

7    make sure there was no problems.  So I could just basically monitor

8    everything, all the activity, during the day.

9    Q    I'm going to approach you and show you what's been marked as

10   Government's Exhibits 30-4 and 34 – excuse me, that's 30-4-2.

11              MR. KNOCHE: May I approach, Your Honor?

12              THE COURT: Yes.

13   Q    Would you look at those and tell us if you recognize 30-4 and 30-4-2.

14   A    Yes, sir, these were the ads that I placed in Craigslist looking for a

15   doctor for our location in East Health Center.

16              MR. KNOCHE: And can we –

17   Q    – Well, were those the ads that you ran?

18   A    Yes, sir.

19              MR. KNOCHE: Could you show us those, Dean?  Would you

20   highlight the text.

21   Q    [Reading]: New office in Savannah looking for experienced doctors.  Is

22   that your ad?

23   A    Yes, sir.

24   Q    Okay, and the date on that is January the 20th of 2011?

25   A    Yes, sir.

1       MR. KNOCHE: And could you just scroll down just a bit to

2   show us the text.  Okay.

3   Q    Is that the salary that you were intending to offer to whichever doctor

4   would agree to work at East Health Center?

5   A    Yes, sir.

6       MR. KNOCHE: And then the next ad, 30-4-2.

7   Q    At or about the same time?

8       MR. KNOCHE: Could you scroll down.

9   Q    That one says, salary negotiable?

10  A    Yes, sir.

11  Q    Location, Garden City?

12  A    Yes, sir.

13  Q    Did you actually do any weight loss or rejuvenation work at the clinic

14  once you opened it?

15  A    No, sir.

16  Q    Why would you have advertised for that?

17  A    Just to see if I can't get different variety of doctors to respond to the

18  ad.

19  Q    What did you expect any doctor who responded to this ad, what did

20  you expect them to do at that clinic?

21  A    Pain management.  Yes, sir.

22  Q    And was it to be the same business model as you've described for your

23  clinics that you worked at, particularly Palm Beach Pain and Rejuvenation

24  in Boca Raton, Florida?

25  A    My expectation was to be the exact same mantra as the one we had on

-220-

1    Boca Raton, pain management exclusive to clientele from out of state, and

2    that was same exact platform as the one we had in Florida, yes, sir.

3    Q      Now, you finally opened this East Health Center clinic on or about

4    February the 21st of 2011?

5    A      Yes, sir.

6    Q      Okay, and the clinic opens.  Where do your patients – how have you

7    recruited your patients?

8    A      Patients were recruited, basically we went to target different facilities

9    in the area that were pain management facilities already in existence, and

10    we went to the one location in Jacksonville which already had patients.

11    And then we bought some advertisements, some local – so we could put on

12    local – at the end of highways, as people are getting off exits and on exits.

13    We bought some local advertisements as well.

14    Q      Okay, and as you adopted the same business model, you were hoping

15    to attract the same patients, perform the same services.

16    A      Yes, sir.

17    Q      Were the activities which took place at the clinics you've described in

18    Florida, was that legitimate medical activity?

19    A      No, sir.

20    Q      And how about in Garden City, you expected it to be exactly the same.

21    A      Yes, sir.

22    Q      I'm going to approach and show you what's been marked Exhibit 35

23    for identification.  That's a big plaque.  Would you look at that, and then

24    hold it so the jury can see it.  What is it?

25    A      This is one of the forms of advertisement that we used that we put on

-221-

1   various exits when you got off different exits off of 95, and then different

2   roads on the street in Savannah, Garden City.  This is basically just telling

3   patients to call this number, and then we would give them the location of

4   the new location that we were opening up, and basically advertisement to

5   get patients to come in.

6   Q    And it says – let me recover that for you.

7   A    Thank you, sir.

8            MR. KNOCHE: Your Honor, I'd like to move 35 and 30-4 and

9   30-4-2 into evidence.

10           THE COURT: Admitted.

11  Q    It says in-house on it.  What does that – describe what that means –

12  A    – In-house was the intention of filling medications in-house, whereas

13  a doctor would write the prescription for the patient, and then we would fill

14  the medications, the oxycodone, the Percocets, the Valium, in-house.  And

15  that was the whole thing of doing in-house, which is the same model we

16  had in Florida.

17  Q    At the time that you came up to Garden City, were you aware that pill

18  mills in Florida were being shut down by law enforcement?

19  A    I was, yes, sir.

20  Q    Did you have personal knowledge of that?

21  A    I did have personal knowledge of that.  We had some locations – our

22  office in Boynton Beach was shut down.  And then we also had an instance

23  in Jacksonville where the office was shut down.  But they hired a couple of

24  attorneys, and they had a temporary restraining and got that reopened.

25  But it was shut down for a period of time.  But, yes.  And other facilities,

-222-

1    rival facilities that were not owned and operated by us were shut down, yes,

2    sir.

3    Q    And have you heard of American Pain Management?

4    A    Yes, sir.  That was the – that was – that was our model.  That was how

5    we modeled our business, after them.  We went in there one day and looked

6    at them, and we opened up the doors, and it was like 50, 60 people waiting

7    in the lobby, and that was why we modeled them, and that's why we put our

8    first location at Palm Beach Pain two blocks north of them just to rival them

9    and have patients come to see us.

10   Q    And after they were shut down, did you and your other conspirators in

11   this matter discuss lessons learned?  You know, what protective measures

12   could be taken to avoid a similar fate?

13   A    Well, we tried – I had meetings with Richard McMillan and Pasquale

14   Gervasio to try to keep us under the radar.  One of the things was opening

15   up another clinic, or more clinics so people could spread out and go to

16   different locations.  Another way of doing it was, like we said, doing the

17   marketing and purchasing of the vans to keep the law enforcement so if

18   they drove by they didn't see a parking lot filled with Kentucky and Ohio

19   and the West Virginia license plates.  So we did as many counter-measures

20   as possible to keep everything low key.  And that was – that was what we –

21   but by opening up as many clinics as we could, that was our biggest way of

22   detracting one facility from seeing 110 people a day, whereas we could filter

23   them to different locations.

24   Q    Did you think that number of patients was very conspicuous?

25   A    Yes.

-223-

Q     And did you at East Health Center take measures to – or try to limit

that.

A     When we first opened up I had a meeting with everybody, and I told

them my intention was not to see any more from 25 to 30 a day at the max,

not more a day, 'cause I wanted to keep a low profile in that new location.

Q     As you've described it at Palm Beach, would you require patients at

East Health Center to bring an MRI?

A     Yes, sir.

Q     And how old would he MRI have to be?

A     The MRI had to be within two years old.  And if it was older than two

years old they would have to go to a local facility and get another MRI.

Q     Did you have rules concerning parking?

A     We tried to encourage – we had the parking lot right in the front there,

which there was not many spots available, but we also tried to encourage

people to park on the sides if they could.  And next door there was a

restaurant called – it was a burger joint, and we would also – I talked to the

manager there and asked him if we could have patients park there, and he

was okay with that.  So we did that so we wouldn't alert law enforcement as

to how many cars we would have in a parking lot from out-of-state plates.

Q     And smoking rules?

A     Smoking was permitted on the side of the building and in the back of

the building only.

Q     Were a high percentage of your patients – was a high percentage

smokers?

A     Most of the patients were smokers, yes, sir.

-224-

1    Q      Did you ever desire to have a broader patient mix?  You know, patients

2    with different ailments seen at your clinic.

3    A      Well, that was my intention when I first opened up my first day there.

4    I was there, and we had a couple patients come in that were complaining of

5    – you know, they were coughing, cold.  One person was – they just were not

6    feeling well, and they wanted to go see the doctor, and the doctor refused to

7    see them.  And I was kind of wondering why, and he just basically said that,

8    I can't see them because of my malpractice insurance.  So I was like, okay.

9          So we turned them away, and then that was the end of that, seeing

10   regular patients who just have normal cough and cold or weren't feeling

11   well.

12   Q      It didn't happen?

13   A      No, sir.

14   Q      Would you have expected those patients to pay $300 to be seen at East

15   Health Center?

16   A      No, sir.

17   Q      A person with a cold?

18   A      No, sir, not $300, no, sir.

19   Q      So your office staff you've described.  You brought Adel, she worked at

20   East Health Center?

21   A      Yes, sir.  She worked there for the first few weeks with us.  She did the

22   training, and then we had Candace Carreras who did training, and then

23   myself.  And then our intention was to stay there for two weeks, come back

24   down to Florida where Dan would take over for what I was doing, Shelly –

25   Kostas would take over for what Candace was doing, and Shelly would take

-225-

1    over for what Adel was doing, as far as everybody knowing how to handle

2    the patients and handle everything as far as dealing with the patients,

3    dealing with the blood test, the drug test for the patients, and then finishing

4    up everything with the end-of-day reports.

5    Q    Your Craigslist ad –

6    A    Yes, sir.

7    Q    – in response to that, do you remember talking to a Dr. Mary Kay

8    Ross?

9    A    Yes, sir.  Dr. Ross responded to the ad, and she was interested in the

10   position, and I actually met with her with Sean Clark at a local restaurant in

11   Savannah to discuss the location, what we were going to be doing, what we

12   were going to be specializing in, and I wanted her to come and see the

13   location to see if she was interested.  So we had lunch, and then after lunch

14   we came to see the facility.  And after that she responded to me a couple

15   days saying that she was not going to able to take the position.

16   Q    Did you discuss pay with her?

17   A    Pay was not – pay was discussed at the time.  I told her I would do

18   fifteen-hundred dollars a day with her, but it never came to fruition after

19   that.  And she was with her husband at the time, too.

20   Q    Did you have any discussion with her where you told her what kind of

21   patients she would be seeing?

22   A    Yes, sir.  I told her we would specialize in – we would do pain

23   management, and basically I had experience in the business in Florida, and

24   that I was looking to do the same thing here in Georgia.  And it was just

25   basically pain management clientele, and she was – she understood that.

-226-

1    Q    Did you tell her what she was expected to prescribe?

2    A    Yes, sir.  I told her that we were going be prescribing mostly the

3    oxycodone, the Percocets, and various other C-III drugs, the Valium, the

4    Xanax, and stuff like that.

5    Q    All right.  She didn't accept the job; is that correct?

6    A    She did not, no, sir.

7    Q    So you know the defendant here who's on trial, Najam Azmat?

8    A    Yes, sir.

9    Q    Do you see him in the courtroom?

10   A    I do, yes, sir.

11   Q    Would you point him out and describe him for the record?

12   A    Dr. Azmat over there.  He was the doctor who responded to my ad, and

13   he's the one who took the position for us at East Health Center.

14   Q    Tell the members of the jury about your first contact with Dr. Azmat.

15   A    My first contact was – live contact was the Monday, the 21st, which we

16   opened up.  Prior to that our contacts were via email or through – we had

17   – you know, he responded to the Craigslist ad.  But we talked via email,

18   because I was still in Florida looking for a doctor for the location, and he

19   responded to the ad.  And then Monday the 21st was the first day that Dr.

20   Azmat and I had introduced each other – to each other.

21   Q    Your first contact with him was by telephone?

22   A    Telephone and email, yes, sir.

23   Q    And during your telephone conversation – well, did you offer him the

24   salary that was advertised in the Craigslist ad?

25   A    I did, yes, sir.

-227-

1    Q    Okay, and how much was that?

2    A    $2,000 a day.

3    Q    And did you tell him how that would be paid to him?

4    A    I told him that it would be paid cash daily at the end of the day.

5    Q    And was that what your practice turned out to be?

6    A    Yes, sir.

7    Q    He accepted the position?

8    A    Yes, sir.

9    Q    Was he the physician at East Health Center on day one, February 21st

10   of 2011?

11   A    Yes, sir, he was.

12   Q    And any other doctors working at the clinic at that time?

13   A    No, sir, he was the only doctor at the clinic at that time.

14   Q    And you described a – I believe from day one a patient came to the

15   clinic with cold or flu symptoms wanting to see the doctor.  Is he the one

16   that refused to see that patient?

17   A    That is correct, yes, sir.

18   Q    Now, you had several forms that were filled out by patients at East

19   Health Center; is that correct?

20   A    That's correct, sir.

21         MR. KNOCHE: And if I may, Dean, could you call up Exhibit 1-

22   002.  And if you'd highlight – well …

23   Q    What was the template for the creation of that form?  I mean, did you

24   make this up just when you started East Health Center?

25   A    The templates for all the forms were created from all our offices in

1    Florida.  I took all the templates from there and just changed the name

2    from the Palm Beach Pain location to the East Health Center location.  But

3    everything else stayed the same as far as the name, date, and phone

4    number, and we just took all the templates from there and converted to

5    East Health Center.

6    Q    So – and that information on the top of that sheet, that's information

7    supplied by and written by the patient?

8    A    That's correct, yes, sir.

9             MR. KNOCHE: Could we scroll down to the bottom of that

10   exhibit.

11   Q    See the italicized portion that says, In order to be seen by our

12   physician.  That was language that you incorporated or borrowed from the

13   Palm Beach clinics?

14   A    That's correct, yes, sir.

15   Q    And further on down at the very bottom in bold.  Could you read that

16   for the jury?

17   A    [Reading]: There will be no refunds given once we've begun our work

18   up.  Example: should we find out you are doctor shopping and we had

19   already begun investigating, we will not refund your office visit.

20   Q    Are you familiar with the term "doctor shopping" based on your

21   history with pill mills?

22   A    Yes, sir.

23   Q    What's doctor shopping?

24   A    Doctor shopping is where a patient would go to Clinic A on a Monday,

25   and they would get their meds and get everything filled for them, too.  Then

1    they would go to another clinic that same day or the next day and try to get

2    more meds without being – without being detected by the clinic prior to

3    that so the doctor would not know that the patient was at another clinic

4    that same day or the day after or day before, and they would try to get the

5    same meds again.  So one patient got 180 of the oxys and 90 of the

6    Percocets, they would go to another clinic, and that's doctor shopping, and

7    go to another clinic and try to get the same medications again, the same

8    prescription again, and try to do that as many times as they can.

9    Q    Mr. LeFrancois, these forms that we're going over here, these were

10   specifically tailored for your pill mill; right?

11   A    That's correct, yes, sir.

12   Q    Were they tailored for the cold and flu patient?

13   A    No, sir.

14           MR. KNOCHE: Could we scroll up to 1-005.  And I would like

15   you to highlight the bottom-third of the page if you could, Dean.  Starting

16   where, All visits, if you could bring that up for the jury.

17   Q    Could you read that for the jury?

18   A    Yes, sir. [reading]:   All visits will be paid for in advance to seeing the

19   physician.  There will be no refunds in the event that you do not receive any

20   medication from the physician.  You are paying for a physician's time to

21   check your medical records, ask you questions, and give you a basic

22   checkup, which will be blood pressure and injury which is located.  You are

23   not paying for the medication.  It is up to the physician and your medical

24   records showing your chronic pain injury of which medications the

25   physician feel will work better for you on your current medications.

-230-

1    Q    This was – East Health Center, was it opened as a for-profit business?

2    A    Yes, sir.  Purely profit.

3    Q    And from your experience in Palm Beach and other clinics, is it a

4    profitable business?

5    A    Yes, sir.  The patient comes in and they pay 250 or $300 for their

6    patient, and then if you're dispensing in-house, an average dispensing costs

7    anywhere from 3-to-$500, the average patient is paying $800 per visit per

8    person, and you're seeing 40 people a day, that's $32,000 that day.  That's

9    cash.  And you multiply that times four and five offices, and you can see you

10   can make a lot of money very fast.

11   Q    And did any treatment take place at East Health Center other than the

12   writing of prescriptions by Dr. Azmat and other doctors?

13   A    No, sir.

14   Q    What equipment did you have at East Health Center?

15   A    Basic equipment, same as we had in the offices in Boca, which we had

16   the office bed, then we had posters on the wall, posters throughout the

17   building as far as, you know, different laws.  And then we had the basic

18   equipment in the rooms as far as tongue depressors, the doctor had his

19   stethoscope, and that was basically it.

20   Q    Did you have a scale?

21   A    We had a scale.  We had one scale that was done to administer the –

22   when the patient would go back and get their blood work done, blood test.

23   So we had a arm pressure monitor, and then we had the scale, and that was

24   it.

25   Q    Scale, blood pressure monitor, you said there were some posters on

-231-

1    the wall?

2    A    Posters on the wall.

3    Q    Who suggested the posters?

4    A    I did.  I did, yes.

5    Q    Do you remember being visited by a CNT, a Counter Narcotics agent

6    from Chatham-Savannah Counter Narcotics Team during the first two days

7    that you were open?

8    A    Yes, sir.

9    Q    Okay, and did that individual suggest to you, or ask you why you didn't

10   have any equipment in the office?

11   A    He did, and my explanation was that it was our first day of opening,

12   and he was not happy with that – not happy about the answer.  So he told

13   me of all the things that we were required to have, the basic minimum

14   requirements we had to have and he would be back the next day.  So that

15   same day Adel and I went shopping to local businesses, medical supply

16   companies, and purchased everything that was required of him to have in

17   our offices by end of that day, business day.

18   Q    So based on his visit and comments, you went and bought some cotton

19   balls?

20   A    Cotton balls, the swabs, Band-aids, first aid kits, just the basic

21   requirements that he required for us.

22   Q    Band-aids for what, patients that came in with boo-boos?

23   A    Yes, sir.

24   Q    I mean, you keep those in your medicine cabinet at home –

25   A    Yes, sir –

-232-

1    Q    – do you not?

2    A    – but that was a requirement for us.  And then we had the gauze pads

3    and stuff like that.

4    Q    Was that equipment just a prop?

5    A    Yes, sir.

6    Q    Were they ever used?

7    A    No, sir.

8    Q    No patients coming in with boo-boos.

9    A    No, sir.

10   Q    And the charts that you had on the wall showing, what?

11   A    They have the appearance of a doctor's room.  You have the chart with

12   the gentleman – with the muscle chart.  Then basically, that's pretty much

13   the extent of our charts.

14            MR. KNOCHE: Before we move on to some other exhibits, since

15   we're talking about patient files, 1-008.  Okay.  If you could scroll down to

16   the middle portion, Dean, malpractice insurance.

17   Q    Can you read that?

18   A    [Reading]: Under Georgia law physicians are generally required to

19   carry medical malpractice insurance or otherwise demonstrate financial

20   responsibility to cover potential claims for medical malpractice.

21   Q    Okay, and did you have medical malpractice?

22   A    We did not.  No, sir.

23   Q    And that would account for the bold print [reading]: Your doctor has

24   decided not to carry?

25   A    Yes, sir.

-233-

1    Q    Did the patients who traveled from Kentucky and Ohio, hundreds of

2    miles, paid $300, did they seem to care that you didn't have medical –

3    A    They did not care, no.

4    Q    – malpractice insurance?

5    A    They did not care, no, sir.

6              MR. KNOCHE: If we could, Dean, go to 28-4, please.

7    Q    Do you recognize that photograph?

8    A    Yes, sir, that's the lobby of the location on 626 U.S. Highway 80 at the

9    East Health Center.

10   Q    And is that the way the lobby – I know the faces of the individuals

11   sitting may have changed, but is that the way it looked?

12   A    Yes, sir.

13   Q    Were those signs on the wall from day one?

14   A    Yes, sir, those signs were on the walls from day one.  We put all those

15   signs up prior to our opening up, yes, sir.

16             MR. KNOCHE: Could we see 28-5.  Could you zero-in on the

17   sign in the middle-right of the picture, the big sign.

18   Q    Do you recognize that sign?

19   A    Yes, sir, I put that sign up myself.

20   Q    What was your template for that sign?

21   A    We ordered those signs from a local company in Ft. Lauderdale that

22   did the same signs for our locations in Florida, same company did that

23   kind.  I called them and said, I'm opening up a clinic in Georgia and I need

24   you to make all the signs for us like you did in Florida.  And the gentleman

25   made all the signs, and we brought them up when we came up to hang

-234-

1    everything and put all the supplies away, and we hung that sign up.

2    Q    As we look at the picture, it looks like there are pills and whatnot as

3    the background of the picture.

4    A    Yes, sir.

5    Q    Why would that background have been chosen?

6    A    I do not know, sir.  That was just the signs – I told him make the exact

7    same signs and exact same program that he did for all the offices in Florida.

8    Q    Is this a sign that's geared specifically to pill mills?

9    A    Yes, sir.

10   A    It's not a picture of children running and picking –

11              MR. WITHERS:  – Objection to leading, Your Honor.

12              THE COURT: Yes.  Don't lead the witness, Mr. Knoche.  Don't

13   suggest an answer to him.

14   Q    (By Mr. Knoche) Bullet Number 2, could you read that?

15   A    [Reading]: I understand this office does not prescribe oxycodone –

16   OxyContin.

17   Q    And are you familiar with what OxyContin is?

18   A    Yes, sir, oxycodone.  It's a controlled substance, C-II.

19   Q    Oxycodone is a controlled substance.  What's OxyContin?

20   A    Another name.  Another name for it.

21   Q    What's the active ingredient?

22   A    It's a C-II.  I'm not sure of the active ingredient.  I just know that it's a

23   powerful narcotic, a C-II.  I'm not sure of the active ingredient side of it.

24   Q    Oxycodone was in fact – or was it in fact prescribed at East Health

25   Center?

-235-

1    A   Yes, sir, it was.

2           MR. KNOCHE: 28-6.

3    Q   Can you read that sign?

4    A   [Reading:] 24-hour camera surveillance.  And the other one is

5    [reading]: You must smoke in the back of the building near the ashtray.  If

6    anyone is caught disregarding butts on the ground floor you'll be charged a

7    five-dollar fee, no exceptions.

8    Q   Have you ever seen signs like that at your regular doctor's office?

9    A   No, sir.

10    Q   Why all the no smoking and camera surveillance warnings?

11    A   Well, the no smoking was to prevent a large cluster of people smoking

12    at the same time to alert if law enforcement were to drive by and see that.

13    And to try to keep all the butts – keep the place as clean as possible.  And

14    the 24-hour camera surveillance was just to deter anybody from if they

15    wanted to potential theft of anything, if they thought anything was on the

16    property, so we wanted to let them know that we had security cameras

17    going at all times.

18           MR. KNOCHE: And 28-8.  Make it 28-9.

19    Q   Can you read that sign?

20    A   [Reading:] No recounts or refunds after handling meds or signing.  By

21    handling or signing you are agreeing that your pill count is accurate.

22    Before handling medications please ask our dispensing technician to

23    recount your pills in front of you.  Thank you, management.

24    Q   Is it fair to say from those signs that the business was about the

25    money?

-236-

1    A    Yes, sir.

2    Q    Where did you – were you able to monitor the activities at East Health

3    Center from a remote location?

4    A    Yes, sir.  We had rented an office in Mizner Park, which is in Boca

5    Raton, Florida.  Adel, Candace and I were there every day and I had

6    cameras installed that allowed me access to monitor the location at all

7    times, 24 hours a day, seven days a week, to see the patient activity, to see

8    the hallway, the outside of the location and the side of the building, just to

9    monitor the activity throughout the day.

10            MR. KNOCHE: 29-5A-1.

11   Q    Do you recognize the premises?

12   A    Yes, sir, that's the back room with – where the safe and all of the vials

13   for the medications, and the computer and an employee named Dan Wise

14   counting the money at the end of the day.

15   Q    Is that the way the facility looked throughout its relatively short

16   history?

17   A    Yes, sir.

18            MR. KNOCHE: And 29-5A-10.

19   Q    Do you recognize that?

20   A    That's the lobby, the front lobby of the East Health Center with the

21   patients coming in, and the window over to the right is where the patient

22   intake forms where they would talk to the receptionist to fill out all the

23   medical forms for the patients.

24   Q    Were any of the – during your – during the time that East Health

25   Center was open, was that a fairly typical view of the way the patients

-237-

1    looked?

2    A    Yes, sir.

3    Q    Did any patients ever have to be removed by ambulance, or taken to

4    the hospital because of their extreme pain levels?

5    A    Not to my knowledge, sir.

6         MR. KNOCHE: Dean, if you would highlight the woman in the

7    middle.

8    Q    I know you probably don't know her, but does she appear to you to be

9    in a high degree of pain?

10   A    She does not, no, sir.  She's just standing around waiting.

11        MR. KNOCHE: May I approach the witness, Your Honor?

12        THE COURT: Yes, sir.

13   Q    Mr. LeFrancois, I'm showing you a couple of exhibits that you'll need

14   to remove from those binders.

15   A    Yes, sir.

16   Q    Actually I have one other that I'm going to hand you as well.  And do

17   watch the microphone.

18   A    Yes, sir.

19   Q    Let's start with 30-1, the notebook labeled, cash audit and end-of-day

20   reports.  It's in the notebook.

21   A    Yes, sir.

22   Q    The black notebook.  Do you recognize that?

23   A    I do, yes, sir.  This is the patient log, basically how many patients we

24   saw that day, how much they paid.  This is the patient log, how much – this

25   is the patient's name, how much they paid that day, and how they paid, via

-238-

1    credit card, cash, and then says the number at the bottom as far as how

2    much we took in for that day.  And then with the person's – and then over

3    here would be, this is a return patient that's in our – saying that was a

4    return patient.  And then this is the initials of the person who took the – did

5    all the information on this template here.  And then here at the bottom as

6    far as how many patients we had, with the new, previous, returns, and total

7    seen for the day.

8    Q    And how did you get that information all the way down to your office

9    in Florida, which was located, where?  The office in Florida?

10   A    The Florida?  The location in Florida was in Boca Raton, Florida.  We

11   had it e-faxed to us every day at the end of the day.  When they did all the

12   patient – they did all the forms, they would e-fax us all the information at

13   the end of the day.

14   Q    And those same documents which you've just identified were also

15   maintained onsite at East Health Center?

16   A    Yes, sir.

17   Q    So if we compared that with the records from East Health Center they

18   would be –

19   A    That's correct, yes, sir.

20   Q    – they would match up.

21   A    Yes, sir.

22   Q    And you did that cash audit and end-of-day report every day.

23   A    Yes, sir, we did it every day.

24   Q    And you kept track of the money you took in?

25   A    Yes, sir.  We kept track of the money we took in.  I instructed all the

-239-

1    staff that if they wanted to go get lunch, obviously they couldn't leave the

2    building, to have lunch sent to them, and they would have receipts for the

3    lunch.  Receipts for the lunch, all the receipts for the lunch would be right

4    there.  And if they had any expenses where if somebody had to come in for

5    electrical work or something broke, that all the contracting work would get

6    done, they would have receipts for everything.  There's more receipts here

7    for everything like that.  And there's all the receipts for the day, and that

8    would include the tally for the end of the day, too, so they would have a

9    total of how much it was, minus the doctor's fee, minus the fees for the day,

10   which was, you know, lunch and any other expenses. And that number at

11   the bottom had to match the deposit which they were depositing in the

12   bank at the end of the day.

13   Q    Is the doctor's pay indicated on those charts?  How much the doctor

14   was paid.

15   A    On these here, this is just patient intake.  This is just – not in these

16   here.  This is just basically all the patient information as far as how much

17   they paid and all that stuff.  It's not on any of these here.

18   Q    Let me show you 29-3 for a moment. I'm just going to hand this to you

19   for a moment.  It's been previously admitted into evidence.

20   A    Yes, sir.

21   Q    Could you look on that form.  Does that show the doctor's pay he

22   received each day?  That's for March the 18th.

23           MR. KNOCHE: Could you pull up – I'm getting confused.  Your

24   Honor, may I approach the witness and show him ...

25           THE COURT: Yes, sir.

-240-

1    Q    For example –

2    A    Yes, sir.

3    Q    – open it to March the 9th, 2011.  Can you look at the bottom of the

4    page?

5    A    Yes, sir.  This is ...

6            MR. WITHERS: What exhibit is that, Mr. Knoche?

7            MR. KNOCHE: 29-2.

8            MR. WITHERS: Thank you.

9    Q    Do you see where it indicates the doctor's pay?

10   A    Yes, sir.  This is a daily cash audit report.  All the information from

11   over here was transposed in this one.  So this basically tells you how many

12   new patients we saw that, how many total patients came in, opening

13   amount, which is our opening – we had like an opening drawer of a

14   hundred dollars – and this is the total of how much we did for the day, was

15   thirty-nine hundred dollars.  Lunch was $60.  Doctor pay was $2,000, and

16   then we had a little $500 deposit we had to do for the Houston house, and

17   that was the deposit right there of thirteen hundred and forty dollars.  But

18   right there is indicated by the doctor pay of $2,000.

19   Q    And so you kept good records of all your expenses at East Health

20   Center; correct?

21   A    I did, yes, sir.

22   Q    So the basic accounting trick was, money taken in, less expenses, and

23   describe some of the expenses.  You had a lease.

24   A    We had the lease of the building.  We had the Georgia Power and Light

25   where they paid for the Georgia Power and Light monthly.  We had to pay

-241-

1    for the cable.  We had cable TV installed for the patients, Comcast.  And

2    then the salaries for the employees, the doctor's salary, and daily lunch,

3    and that was pretty much the extent of our expenses, unless we had

4    something break in the office that we had to fix, something like that.

5    Q    And the balance at the end of the day was your profit.

6    A    That's correct, yes, sir.

7    Q    Let me recover that so ...

8    A    Thank you, sir.

9    Q    And you kept records of bank accounts?

10   A    Yes, sir.

11   Q    Do you have 30-3 up there?

12   A    Yes, sir.

13   Q    Take a look at 30-3 and tell us what that is.

14   A    This is just a local bank that we did business with, SunTrust, and this

15   is basically just all the deposits here, and then we had the writing in the

16   front, opening balance, how much we had for opening balance, and then

17   how much as far as doctor's pay, doctor's pay, doctor's pay, doctor's pay.

18   And all these are just bank statements from the East Health Center location

19   with the daily business activity for that location right there, East Health

20   Center.

21   Q    And those are records that you maintained in the course of your East

22   Health Center business; is that correct?

23   A    That's correct, yes, sir.

24   Q    And the SunTrust Bank account, you opened that, when?  At the

25   beginning or the end of the ...

-242-

1   A    We opened that prior to our opening up the East Health Center.

2   Q    And you deposited funds into that account?

3   A    Yes, sir, we deposited funds in that account on a daily basis up until

4   the day when we received a letter from them, basically on February 16th,

5   basically saying that they were not able to provide –

6   Q    – They closed the account?

7   A    They closed the account.

8   Q    The office help, you've described Ms. Lizama and Ms. Carreras.  Do

9   you know Dan Wise?

10  A    Yes, sir.  Dan Wise was employed and worked in the same capacity as I

11  was.  He was going to be the office manager at that location.  He was going

12  to handle all the – if there was any patient complaints, patient issues, and

13  he would handle all the paper at end of the day as far as making sure that

14  everything balanced at the end of the day.

15  Q    At the end of the day, you had significant cash proceeds?

16  A    I'm sorry, sir?

17  Q    You had significant cash proceeds –

18  A    Yes, sir.

19  Q    – at the end of every day, okay.  And what would be done with those at

20  the end of the day?

21  A    They were deposited into the bank every day, and then he would have

22  the deposit, and then he would send me a copy of the deposit slip via e-fax,

23  too, so I'd know how much he deposited every day.

24  Q    And all those deposits would have come from patients –

25  A    – East Health Center.

-243-

1    Q    From patients paying?

2    A    East Health Center.  Patients pay, yes, sir.

3    Q    After SunTrust closed the account, did you open a – you mentioned I

4    think those BB&T Bank records as well?

5    A    We opened up account with BB&T for the East Health Center, and we

6    did the same business we were doing with SunTrust, making the deposits

7    on a daily basis.

8    Q    You paid your help that worked at the facility?

9    A    Yes, sir, we paid our help weekly pay.  Every week we'd pay them, yes,

10   sir.

11   Q    Would that include Sean Clark?

12   A    Sean Clark, that would include Frankie Barbuscia, that would include

13   Kostas, Adel, Candace, myself and Dan Wise.

14   Q    And you had agreed upon amounts that you paid each of those folks?

15   A    Yes, sir.  We agreed upon, it was $500 for the staff. $500 for Adel,

16   $450 for Candace, a thousand dollars for myself, a thousand dollars for

17   Dan – excuse me, a thousand dollars for Sean, and I believe it was 750 for

18   Frankie.

19   Q    And you paid your doctors?

20   A    Yes, sir, that was cash –

21   Q    – Dr. Azmat in particular?

22   A    That was cash every day, $2,000.

23   Q    And the source of that cash was, what?

24   A    From the proceeds from the patients paying for their visits.

25   Q    You have Exhibit 30-2?

1    A    Yes, sir.

2    Q    Take a look at 30-2.

3    A    This is the lease that Sean Clark signed on January 10th of 2011.

4    Q    Is that the lease for the premises which came to be known as East

5    Health Center?

6    A    That is, yes, sir.  626 U.S. Highway 80.

7    Q    And did you – from the proceeds of East Health Center, did you pay

8    the lease payments?

9    A    Yes, sir, we made the lease payments off the profits from the East

10   Health Center, and the fee was twelve-hundred dollars a month.

11   Q    And last exhibit I think that you have up there is 30-5.

12   A    Yes, sir.  These would be – yes, sir, 30-5.  This is the State of Georgia's

13   certificate of organization to form East Health Center into an LLC.  So we

14   formed the company into an LLC.

15   Q    And who did you have as the incorporator?  Are there names of

16   individuals?

17   A    Registered agent was Adel Lizama.

18   Q    Same Adel Lizama that you've just described as being one of the

19   employees you brought with you to East Health Center?

20   A    Yes, sir.

21   Q    And each of those records are the records that you kept at Mizner

22   Park?

23   A    That's correct, yes, sir.

24   Q    In the same condition?

25   A    Yes, sir.

-245-

1   Q     Business records that you kept in the ordinary course of your

2   business?

3   A     All the records, yes, sir, everything.

4             MR. KNOCHE: Your Honor, I'd like to tender 30-1, 30 – 30-1 is

5   the notebook labeled cash audit and end-of-day reports; 30-2, the lease;

6   30-3, the folder with bank records; 30-4 we've already tendered, the

7   Craigslist ads; and 30-5, the certified copy of articles of the incorporation.

8   A     Yes, sir.

9             MR. KNOCHE: Move those into evidence, Your Honor.

10            THE COURT: Admitted.

11  Q     (By Mr. Knoche) After – you were open from February the 21st to May

12  the 26th?

13  A     That's correct, yes, sir.

14  Q     Dr. Azmat didn't work there the whole time?

15  A     No, sir, he did.

16  Q     Okay, and did he leave on his own, or did you terminate him?

17  A     I let him go, yes, sir.

18  Q     And why did you let him go?

19  A     We were – after the first day, we started receiving calls from

20  pharmacies, and the pharmacies – at the time we weren't dispensing in-

21  house –

22            THE COURT:  – Don't ask him what pharmacists told him, Mr.

23  Knoche.

24            MR. KNOCHE: I'm sorry, Your Honor.

25            THE COURT: Don't ask him what pharmacists told him.  That's

1    hearsay and you know it, so let's don't get into that.

2    Q    Did you terminate him based on complaints of patients?

3    A    Yes, sir.

4         [NOTE: Mr. Knoche confers with Mr. Gilluly off the record.]

5    Q    (By Mr. Knoche) Prior to Dr. Azmat beginning his employment at East

6    Health Center, did you have the same sort of conversation with him as you

7    had with Dr. Ross?

8    A    Our conversation – well, our conversation was via telephone because I

9    didn't meet him until the 21st when we opened up, and our conversation

10   was that I was looking for a doctor for pain management.  He said he had

11   vast experience in a pain management facility, he had multiple DEA

12   licenses, and he said that, I'd be able to take care of everything for you, so

13   that sounded like the perfect fit for us.

14   Q    Did you discuss with him your expectations, what you expected of

15   him?

16   A    Yes, sir.  Our conversation basically was that we're looking – you

17   know, we're going to see patients from out of state, and they're looking for,

18   you know, pain management, specifically clientele pain management, and

19   he was okay with that.

20   Q    And when you say pain management, you're discussing a particular

21   subset of pain management; is that correct?

22   A    Yes, sir, basically it was catering the same thing as I did – I mentioned

23   to him my experience in Florida with the pill mills and working in that

24   capacity, so it was the same type of operation.

25   Q    And as you described with – or as Dr. Ross described, did you – you

1  told him it would be oxycodone.

2  A   Yes, sir.

3  Q   And what would his role be?  Dr. Azmat's role.

4  A   He was the primary physician there.  He would be the only one on

5  staff, and he would take care of all the patients for us.

6  Q   He didn't live in the Savannah area; did he?

7  A   Not to my knowledge, no, sir.

8  Q   Do you know, did he commute back and forth from his home, or did

9  he stay at a motel?

10  A   I believe he drove every day.  I'm not sure exactly that, but I know that

11  he was there every day, and I don't remember getting an expense report for

12  a hotel room, so I believe he drove every day.

13  Q   Did the business carry on after Azmat?  Did you find another doctor?

14  A   Yes, sir.  There was a local service that I inquired about in Florida that

15  does consulting work, and they hire doctors for locations – all type of

16  locations.  And I met with the lady named Carol Biggs who owns a company

17  called Concord Consulting in Hialeah, which is basically in Miami, Florida,

18  and I told her what – I had an office in Georgia, and I was looking for a

19  doctor for the location, and she found a Dr. Gossett for me.

20  Q   Mr. LeFrancois, you were investigated as part of this case as well; were

21  you not?

22  A   I was, yes, sir.

23  Q   And in fact you are pending sentencing by this Court; is that correct?

24  A   I am, yes, sir.

25  Q   Did you – do you recall entering a plea of guilty to a conspiracy count?

-248-

1    A    I do, yes, sir.

2    Q    Okay, and if I may –

3         MR. KNOCHE: May I approach the witness?

4    Q    – and show you 34-5.

5         THE COURT: Yes, sir, let me see you over here, Mr. Knoche.

6         [NOTE: Side bar conference on the record.]

7         THE COURT: Your witness's credibility has not been attacked

8    in the opening statement by Mr. Withers.  There's been no attack on his

9    credibility at this time, so if you intend to attempt to introduce his plea

10   agreement in your case-in-chief, I'm not going to permit that.  I'm not

11   going to permit you to bolster your client's testimony by his plea agreement

12   unless and until his credibility is first attacked.

13        MR. KNOCHE: Your Honor, my intention actually is to show

14   this impeaching material – I don't need to tender the plea agreement, but I

15   do want the jury to know that he has pleaded guilty, that he is a convicted

16   felon, and that he has other felony convictions, because I'm guessing Mr.

17   Withers will go into that.

18        THE COURT: I'm not saying you can't ask him questions, but

19   I'm saying, don't tender the plea agreement.

20        MR. KNOCHE: Yes, sir.

21        THE COURT: Don't offer the plea agreement, all right?

22        MR. KNOCHE: Yes.

23        THE COURT: Not only with this witness, or any other witnesses

24   whose credibility has not been attacked by the defendant.

25        MR. KNOCHE: Your Honor, and just so that I'm clear, but I can

-249-

1    ask him about his prior convictions and the fact that he's pending

2    sentencing.

3              THE COURT: Yes, sir, you may do that.

4              [NOTE: Side bar conference concluded.]

5    Q    (By Mr. Knoche) Mr. LeFrancois, as I asked you, you're pending

6    sentencing by this court for a felony conviction now; is that right?

7    A    That's correct, sir.

8    Q    And that was a conspiracy count related to activities of your

9    management of East Health Center; is that right?

10   A    Yes, sir.

11   Q    And that conspiracy, was it to – one of the objects of that conspiracy to

12   dispense controlled substances without legitimate medical purpose?

13   A    Yes, sir.

14   Q    And to engage in money laundering transactions?

15   A    Yes, sir.

16   Q    And do you know what you've been told is the penalty for what you're

17   facing from this Court?

18   A    A maximum of five years, sir.

19   Q    And are you aware that if convicted of the charges of the type which

20   are before this jury in this trial, you would have faced much more time?

21   A    That is correct, yes, sir.

22   Q    Perhaps up to 20 years or more.

23   A    Twenty years, yes, sir.

24   Q    And so you received a significant benefit by virtue of pleading guilty to

25   that –

-250-

1   A   I did, yes, sir.

2   Q   – five-year conspiracy count.

3   A   Yes, sir.

4   Q   And you've been in trouble other places as well, have you not?

5   A   For the offices in Florida.  I was arrested for the offices in – when I

6   was originally arrested in May of 2000 – May 26th of 2011, it was for the

7   offices in Florida, and I was arrested for those locations.

8   Q   And what was the offense that you were arrested for?

9   A   The fraudulent signature of the 222s, which is the form the doctors use

10   to order the medications from, and I was signing doctors' names on those.

11   Instead of the doctor signing themselves, I would sign it and then send it in

12   to the manufacturers to get the medications.

13   Q   And is that because those facilities in Florida were dispensing –

14   A   – That's correct, yes, sir.

15   Q   You ordered the medicine –

16   A   – I ordered the medicine, yes.

17   Q   You forged the doctor's name on the DEA forms.

18   A   That's correct, yes, sir.

19   Q   And have you been sentenced for those offenses?

20   A   No, sir, I have not.

21   Q   That was an offense brought by the State of Florida?

22   A   That's correct, yes, sir.

23   Q   And do you have any other felony convictions other than those two

24   that we've just described.

25   A   Well, everything was tied in with the – I think there was four with the

-251-

1    Florida.  It was all about the – in reference to pedigree paperwork and

2    maintaining the 222s.  It was all in conjunction with all that.  Yes, sir, that's

3    it.

4                    [NOTE: Mr. Knoche confers with Mr. Gilluly off the record.]

5                    MR. KNOCHE: Pass the witness, Your Honor.

6                    THE COURT: Ladies and gentlemen, we'll take a five-minute

7    recess.  Do not discuss your testimony with anyone during this recess.

8                    MR. LeFRANCOIS: Yes, Your Honor.

9                    [NOTE: A brief recess is taken, after which the proceedings are

10   continued in the presence of the jury as follows:]

11                   THE COURT: All right, Mr. Withers.

12                   MR. WITHERS: Thank you, Your Honor.

13                            <u>CROSS-EXAMINATION BY</u>

14   <u>MR. WITHERS</u>;

15   Q    Good morning, Mr. LeFrancois. My name is Tom Withers.

16   A    Good morning, sir.

17   Q    I represent Dr. Azmat.

18   A    Yes, sir.

19   Q    Now, if I understand your earlier testimony correctly, you are a twice-

20   convicted felon; is that accurate?

21   A    Yes.

22   Q    You have entered a guilty plea in the state of Florida; is that accurate?

23   A    Yes, sir.

24   Q    Was that in Palm Beach County?

25   A    That is correct, sir.

-252-

1    Q    And you were arrested in Palm Beach on the same day as the search

2    here at East Health Center if I recall correctly.

3    A    That is correct, sir.

4    Q    That's May 26, 2011.

5    A    Yes, sir.

6    Q    Bad day for you.

7    A    Yes, sir.

8    Q    And that arrest, however, was completely unrelated to the search here;

9    correct?

10   A    That is correct, sir.

11   Q    And you have been charged in the state of Florida with one count of

12   trafficking in contraband prescription drugs; correct?

13   A    Yes, sir.

14   Q    That is an offense that carries a 30-year sentence; correct?

15   A    That's correct, sir.

16   Q    You have been charged with one count of receipt of prescription drugs

17   from an unauthorized person in Palm Beach County as well; correct?

18   A    Yes, sir.

19   Q    You face 15 years on that single count; correct?

20   A    Yes, sir.

21   Q    You face one count of failure to maintain  pedigree of prescription

22   medications; correct?

23   A    Yes, sir?

24   Q    Again, that's in Palm Beach, and you face five years on that offense;

25   correct?

-253-

1    A   Yes, sir.

2    Q   And just so that we kind of frame that for the members of the jury,

3    when we talk about pedigree of medication, that's following it from the

4    manufacturer to the end user; correct?

5    A   That's all part of the 222 forms, yes, sir.

6    Q   All right, and so that maintains the integrity – it's intended to

7    maintain the integrity of that –

8    A   – It's a three-part form.  One part stays at the office, one part goes to

9    the manufacture of the medications, and one part goes to the DEA, so

10    everything is compliant with that, yes, sir.

11    Q   Okay.  And finally, you face one count of possession with intent to sell

12    contraband prescription drugs down in Palm Beach County; correct?

13    A   Yes, sir.

14    Q   That's a 15-year offense; is that accurate?

15    A   Yes, sir.

16    Q   If my math is correct – and you can correct me if I'm wrong – I believe

17    that means that you face 65 years of imprisonment if convicted on those

18    four counts in Palm Beach County; correct?

19    A   Yes, sir.

20    Q   You pled guilty, however, in Florida; correct?

21    A   I did, yes, sir.

22    Q   And that was some time ago; right?

23    A   That's correct, sir.

24    Q   And you have been pending sentence for well over a year on Palm

25    Beach County; correct?

-254-

1    A    Yes, sir.

2    Q    And what has happened is, your sentencing there has been delayed

3    until after your testimony here; true?

4    A    Correct.

5    Q    In fact you were scheduled, were you not, to be sentenced one week

6    ago yesterday, last Monday, you were scheduled to be sentenced in Palm

7    Beach County; correct?

8    A    Yes, sir.

9    Q    And it just happens that that sentencing was delayed last week so that

10   you could complete your testimony here before sentencing there; correct?

11   A    Correct.

12   Q    Now, you've been cooperating with the Southern District of Georgia

13   and authorities in Florida since February of 2012; correct?

14   A    Yes.

15   Q    You were interviewed by two DEA agents and two GBI agents, I

16   believe, down in Florida in February of 2012; correct?

17   A    Correct.

18   Q    And that took place at the Palm Beach County State Attorney's office;

19   correct?

20   A    Yes, sir.

21   Q    And then later in 2012 you came to Savannah and you entered a guilty

22   plea, as we've heard you describe it; correct?

23   A    Yes, sir.

24   Q    And that was in August of 2012, a year and some five months ago;

25   correct?

-255-

1    A    Correct.

2    Q    And you entered a plea here to a single count of conspiracy, as we

3    heard you testify; correct?

4    A    That's correct.

5    Q    And so you understand, by the way, that in Palm Beach County you

6    have a deal with the prosecutors there; do you not?

7    A    Yes, sir.

8    Q    And that deal is going to call for an extremely lenient sentence for you;

9    is it not?

10   A    I believe so.  My attorney is going to advise me on that one, too.

11   Q    I'm sorry?

12   A    My attorney down there –

13   Q    – No, don't tell me what your attorney has told you.  But you

14   understand, though, or you hope for a sentence of probation to arise out of

15   those charges in Palm Beach County; do you not?

16   A    I do hope for that, yes.

17   Q    All right.  Now, under the plea agreement that you have here with the

18   government, you face a maximum term of imprisonment of five years;

19   correct?

20   A    Yes, sir.

21   Q    Sixty months; correct?

22   A    Correct, sir.

23   Q    So what you have gone from – and you understand, by the way, if you

24   had been charged here, you would be facing dozens and dozens of years of

25   imprisonment; correct?

-256-

1    A    Correct.

2    Q    And you understand that in the federal system that's real time.  You

3    know that as well; correct?

4    A    Correct.

5    Q    And so you understand that there's no parole, for instance, in the

6    federal system; do you not?

7    A    I was not aware of that.  I've never been –

8    Q    – Okay.  Well, let me ask it this way, then: you understand that if you

9    get a minimum mandatory 10-year sentence, you serve that minimum

10   mandatory 10-year sentence in federal court; true?

11   A    Okay, thank you, sir.

12   Q    So went from facing dozens of years imprisonment here, 65 years of

13   imprisonment down there, to what you hope is going to be less than five

14   years; true?

15   A    Correct.

16   Q    Now, you were engaged in this what you've said is pill mill activity

17   down in Florida for some period of time; correct?

18   A    Correct.

19   Q    And when did you start that?  Was it 2010?

20   A    No, 2009.  November 30th of 2009, that last day of November.

21   Q    And one thing I neglected to mention, sir.  Even though you pled guilty

22   in August of 2012, you have not been sentenced yet –

23   A    No, sir.

24   Q    – in this court.  So you understand that you're going to have your day

25   of judgment in this court after your testimony; correct?

-257-

1    A    I do, yes, sir.

2    Q    And you know and you hope that the government is going file a

3    motion to reduce your sentence based upon your cooperation –

4    A    Correct, sir.

5    Q    – true.  And you understand that whether you get a reduction in your

6    sentence is up to the government to file that motion; correct?

7    A    Correct, sir.

8    Q    Fair to say, is it not, sir, that you were involved in a lot of criminal

9    activity in South Florida.

10   A    I was involved with the pain management – the pill mills, so, yes, sir.

11   Q    All aspects of it.

12   A    I was involved in all aspects of it.  I knew all of it.

13   Q    And you committed crimes in a lot of places, in Boca Raton, Palm

14   Beach; right?

15   A    Yes, sir.

16   Q    Jacksonville?

17   A    I was not involved – I was – I was – my main facility was the Boca

18   Raton office.

19   Q    Okay.

20   A    That was my main facility.  I had never visited that one in Jacksonville

21   or the one in Orlando.  I never visited those locations, sir.

22   Q    And the conspiracy charge that you pled guilty to here charges you

23   from the 2009 to the May 26, 2011 time frame.

24   A    That's correct.

25   Q    And you were involved in the Margate Pain and Rejuvenation Center

-258-

1  before the Palm Beach Pain and Rejuvenation –

2  A   – That's where I did my training at, sir.

3  Q   By the way, you did not know Dr. Najam Azmat in 2009; true?

4  A   That's correct.

5  Q   You didn't know him in 2010; did you?

6  A   No, sir.

7  Q   Dr. Azmat was not in Jacksonville doing what you've described as the

8  marketing with these other folks; correct?

9  A   No, sir.

10  Q   And you would agree with me – just on a couple of points – you would

11  agree with me, would you not, with respect to the expenses that you went

12  over earlier that you kept track of those expenses pretty closely; correct?

13  A   Pretty closely, yes, sir.

14  Q   Mr. Knoche asked you about it was a for-profit business; right?

15  A   Yes, sir.

16  Q   And that's what you kept up with was the money; right?

17  A   Yes, sir.

18  Q   In fact you had that security system installed so that you could make

19  sure you could watch what was happening up here; correct?

20  A   Correct, sir.

21  Q   So you're sitting down there in your office in South Florida watching

22  what's going on in the office up here; right?

23  A   Yes, sir.

24  Q   And one of the things, it's fair to say, that you wanted to make sure is

25  that nobody skimmed any money from you; right?

-259-

1    A    That's correct.

2    Q    You know a little bit about skimming money; don't you?

3    A    Yes, sir.

4    Q    And that's because you've skimmed money from your employers in the

5    past; right?

6    A    Correct.

7    Q    You did that in the South Florida area?

8    A    Yes.

9    Q    And how much money did you skim?  Tell the jury about that.

10   A    I have no idea how much total amount was.

11   Q    A lot?

12   A    (No audible response.)

13   Q    Well, let's define that.  You were skimming money for a lengthy period

14   of time from your employer; weren't you?

15   A    Yes.

16   Q    True?

17   A    True.

18   Q    And we're talking about, it's a cash-based business; right?

19   A    Yes.

20   Q    And so what's the big deal putting a little bit of cash in my pocket.

21   That's what you did; right?

22   A    Correct.

23   Q    You've never been prosecuted for that; have you?

24   A    No.

25   Q    You told the prosecution about that; didn't you?

-260-

1    A    Yes, I did.

2    Q    You told other people about that; didn't you?

3    A    Yes, I did.

4    Q    You stole tens of thousands of dollars; didn't you?

5    A    Yes.

6    Q    Would it be over a hundred?

7    A    No, sir.

8    Q    Going back to the money – going back to the money, you know from

9    keeping up with the money – see if we can agree on this – that you never

10    paid Dr. Azmat for his travel from Waycross to East Health Center; right?

11    A    No, sir.

12    Q    You know that that's right; correct?  You didn't do it.

13    A    Correct.

14    Q    You know that you didn't ever pay for any overnight stays of Dr.

15    Azmat; correct?

16    A    Not to my knowledge, no, sir.

17    Q    And that's something that you would be knowledgeable about; true?

18    A    For the most part, yes, sir.  I was only there for the first two weeks, but

19    after that, no.  But when I was there, for my time I was there, no, I didn't

20    pay for any overnight expenses or anything like that.  Just gave him cash

21    every day.

22    Q    Never paid his expenses; that's true?

23    A    Correct.

24    Q    Now, you said you got your training at the Margate Pain Management

25    Clinic, and is that in Palm Beach as well?

-261-

1   A    That's in Broward County, which is just south of Palm Beach County.

2   Q    All right.  That's where you got your training; right?

3   A    Correct.

4   Q    You would actually fill prescriptions at that clinic; true?

5   A    I did, yes, sir.

6   Q    And that clinic would actually dispense medication to the ultimate

7   patient; right?

8   A    Correct.

9   Q    That's what you ultimately hoped that you'd be able to scheme up here

10   in Savannah area; right?

11   A    Yes, sir.

12   Q    And when I'm talking about – and by the way, you know what the

13   issue of dispensing is; don't you?

14   A    (No audible response.)

15   Q    Let me ask – that's a bad question.  You know that when you dispense,

16   you package the medication up and give it –

17          MR. KNOCHE:  – Your Honor, I object, and I'd like a side bar

18   on this issue.

19          [NOTE: Side bar conference on the record.]

20          MR. KNOCHE: Your Honor, I believe it's inappropriate for

21   counsel to go into legal issues upon which the Court will instruct the jury at

22   the close of evidence.  We had this discussion yesterday during the charge

23   conference, what is the legal definition of dispensing.  The government's

24   objection is that –

25          THE COURT:  – Why did Mr. Gilluly ask his witness, said,

1    you're a lawyer, aren't you?  What do you understand that dispense means?

2    What do you understand this means, and he answered it.  I mean, what is

3    the difference in Mr. Gilluly asking the witness that question, or Mr.

4    Withers asking the witness that question.

5            MR. KNOCHE: I think the issue – I don't object to counsel

6    asking if he understands that dispensing is giving the – you know, that they

7    were not giving the medicine to patients at East Health Center, that they

8    were just giving prescriptions.  I think the jury, you know, should know

9    that.  But as far as –

10           THE COURT:  – Well, I'm going to charge the jury the exact

11   language as to what it is, and I'll tell you what it is.  The charge is going to

12   say [reading:] As it is used in these instructions, dispensing a controlled

13   substance or causing a controlled substance to be dispensed includes

14   issuing a prescription for a controlled substance.

15           That's what they're going to get told at the end of this trial.

16           MR. KNOCHE: Thank you, Your Honor.

17           THE COURT: So you still have a problem with Mr. Withers'

18   examination?

19           MR. WITHERS: He actually testified that they dispensed down

20   there, and he actually –

21           MR. KNOCHE:  – Judge, just so counsel and the Court are

22   aware, I don't object to that distinction, that they were giving the medicine

23   out.  I think that is absolutely what occurred.

24           THE COURT: All right, go ahead.

25           [NOTE: Side bar conference concluded.]

1          THE COURT: All right, Mr. Withers.

2     Q     (By Mr. Withers) Sir, I was asking you about what y'all did down at

3     Margate.

4     A     Yes, sir.

5     Q     Am I pronouncing that right?

6     A     Margate Pain, yes, sir.

7     Q     Margate you dispensed the controlled substances; did you not?

8     A     Correct.

9     Q     That means giving it to the patient in its pill container; correct?

10    A     Yes, sir.

11    Q     And you never – you wanted to do that here at East Health Center;

12    right?

13    A     I did, yes, sir.

14    Q     And in fact we saw some pictures of pill containers; correct?

15    A     Yes, sir, I ordered those, yes, sir.

16    Q     But the patients here at East Health Center was never – excuse me,

17    strike that.

18          The facility here at East Health Center was never set up to dispense.

19    A     That's correct.

20    Q     But you continued after Dr. Azmat left trying to get East Health Center

21    set up to dispense; did you not?

22    A     We did, yes, sir.

23    Q     Now, you have previously stated to Mr. Barbuscia – am I pronouncing

24    that right?

25    A     I believe so.

-264-

1    Q     – that Dr. Azmat was a disaster; correct?

2    A     Correct.

3    Q     You have told Mr. Barbuscia that he didn't want to give anybody

4    anything that they were usually on; correct?

5    A     I believe so, yes, sir.

6    Q     Words to that effect; is that fair?

7    A     Correct.

8    Q     In other words, you were complaining to – can I call him Frankie?  Is

9    that what you call him, Frankie?

10   A     I call him Frankie, yes.

11   Q     You were complaining to Frankie that Dr. Azmat was not giving folks

12   what they wanted; correct?

13   A     On occasion, yes, sir.

14   Q     You told him that he's no good; correct?

15   A     Yes.

16   Q     That he's not writing heavy; correct?

17   A     I don't remember that part.

18   Q     Do you recall telling Frankie that you wanted to replace Dr. Azmat

19   with someone who would write more freely.

20   A     I don't recall that.

21   Q     Now, through your experience down in Florida, you came to know

22   what was required by Florida law; correct?

23   A     Yes, sir.

24   Q     With respect to a pain management clinic; right?

25   A     Yes, sir.

1     Q     So that Florida had specific requirements for pain management clinics

2     only; correct?

3     A     Correct.

4     Q     And those requirements were that you had to have an MRI within two

5     years of the date of the visit; right?

6     A     Correct.

7     Q     That every patient had to get a urine drug screen; correct?

8     A     Correct.

9     Q     And that every patient had to have a patient history done as well;

10     correct?

11     A     Yes, sir.

12     Q     And you knew that if a patient was prescribed oxycodone but didn't

13     have oxycodone in their system, then in Florida that patient couldn't be

14     seen by a doctor.

15     A     That's correct.

16     Q     Those requirements in Florida you brought up here to Savannah;

17     correct?

18     A     Correct.

19     Q     And so what happened was that there were oftentimes patients that

20     would come in that would not be seen by Dr. Azmat; correct?

21     A     I would assume so, yes, sir.

22     Q     Well, you were getting the daily log of the patients and reviewing that

23     as well; right?

24     A     I was from my office in Boca, yes, sir.

25     Q     And you were here – did you say two weeks?

-266-

1    A    Two weeks, yes, sir.  The first two weeks.

2    Q    In Florida y'all had a file called a discharged patients file; correct?

3    A    Correct.

4    Q    And so, to be clear, those were patients in Florida who would not get

5    seen by the physician; right?

6    A    Yes, sir.

7    Q    And the same occurred here at East Health Center where if the patient

8    failed a urine drug screen, that patient was not seen by the physician; right?

9    A    Correct.

10   Q    If the patient had a forged MRI, the patient would not be seen by Dr.

11   Azmat; correct?

12   A    Correct.

13   Q    If the patient was doctor shopping, the patient would not be seen by

14   Dr. Azmat –

15   A    Correct.

16   Q    – correct?

17   A    Correct.

18   Q    And here you maintained, did you not, that discharged patient file;

19   correct?

20   A    Correct.

21   Q    Now, one of the things that you talked about with Mr. Knoche was the

22   DEA Form 222.  When you worked at the Margate Clinic you learned what

23   that form was; right?

24   A    Yes, sir.

25   Q    And I think you described it just a minute ago in terms of it being in

1    triplicate and whatnot.

2    A    It's a triplicate form, and it's – you order it to order your medications,

3    your C-II substances.  And like I said, it comes in three parts, yes, sir.

4    Q    All right, and that is what is provided to the manufacturer, the

5    distributor of the controlled substance, and to the DEA?

6    A    Yes, sir, and then one copy to be kept at the office.

7    Q    Right.  And those Form 222s are to be signed by physicians; correct?

8    A    That's correct.

9    Q    And you would forge the signatures of physicians on those forms;

10    correct?

11    A    On occasion, yes.

12    Q    And you've ordered in forging those forms tens of thousands of

13    controlled substances; right?

14    A    Yes.

15    Q    Hundreds of thousands of dollars of controlled substances; right?

16    A    Yes, sir.

17    Q    So you were the one down in South Florida who was forging the

18    prescription – or excuse me, the Form 222 for hundreds of thousands of

19    dollars of oxycodone to come into your rejuvenation clinic; right?

20    A    For some 222 forms, yes.

21    Q    And do you recall that on one occasion you received over 750,000 pills

22    on just one occasion from a manufacturer, NuCare.

23    A    NuCare, yes, sir.

24    Q    750,000 pills on just one occasion; right?

25    A    I'm not sure if it was just from NuCare, but the beginning of the month

-268-

1   we would get our shipments in.  We would get shipments in from various

2   manufacturers.

3   Q    Now, you would see down in South Florida hundreds of patients in a

4   particular day.

5   A    Not at one location, but at the other locations –

6   Q    Okay.

7   A    – but combined, yes.  Combined.

8   Q    I thought you said at one location y'all saw 109 patients.

9   A    That was one day we saw 109, but for the most part it was, you know,

10   50, 60, 70, in that range.

11   Q    And you mentioned the folks that were the investors in your venture

12   moving up here to Georgia.

13   A    Yes, sir.

14   Q    That was you and who?

15   A    A gentleman named Lewis Trematerra.

16   Q    And Mr. Trematerra, was he an investor in those clinics in South

17   Florida as well?

18   A    He was, yes, sir.

19   Q    And you assisted him with opening clinics, and I think you testified

20   Boynton Beach, Palm Beach, Orlando.

21   A    It was his money.  He just asked me if I was – what I thought about the

22   places, if it was good investment, and I said, yeah, they're all doing well.

23   Q    And you opened each one of those offices; did you not?

24   A    I opened up the office in Boynton, and I opened up the office in Palm

25   Springs, which is –

-269-

1    Q    – Set up – I'm sorry, I didn't mean to interrupt you, sir.

2    A    No, sir.  I opened up – I set up the offices as far as supplies, ordering

3    all the medications, getting all the licensing for – I helped with the Palm

4    Beach Pain location, and then I opened up the one in Boynton Beach, and

5    then I opened up the one in Palm Springs.

6    Q    And you were making fifteen-hundred dollars a week.

7    A    Correct.

8    Q    You'd get a bonus of 3-to-$5,000 at the end of each month; right?

9    A    Yes, sir.

10   Q    And after the Florida law changed, you decided that you would open a

11   pharmacy; right?

12   A    Correct, sir.

13   Q    And that was called Country Value Pharmacy?

14   A    Country Value Pharmacy, yes.

15   Q    All right, and you had Ms. Candace Carreras working with County

16   Value; right?

17   A    Yes, sir.

18   Q    Ms. Lizama working at Country Value; right?

19   A    Yes, sir.

20   Q    Mr. Clark working at Country Value; right?

21   A    He never worked directly inside there.  He run security for us, but he

22   never worked directly in the office.

23   Q    Okay, but he was working security for Country Value.

24   A    Yes, sir.

25   Q    Never been prosecuted for anything related to that pharmacy; have

-270-

1    you?

2    A    No, sir.

3    Q    Now, as I understand it, when the facility in Jacksonville was closed,

4    you and Mr. Trematerra decided that y'all would come up here; right?

5    A    That was one of the reasons.

6    Q    And one of the things that you wanted to do was take care of primary

7    care patients; right?

8    A    Pain management patients.

9    Q    No, one of the things that you wanted to expand into was primary care

10   patients.

11   A    That was an idea that Lewis Trematerra and I had, yes.

12   Q    Okay, and one of the things that you wanted to do was take Blue

13   Cross-Blue Shield; correct?

14   A    I was looking to become a member of Blue Cross-Blue Shield, yes, sir.

15   Q    But you found out that – I think you testified that Dr. Azmat told you

16   that he could not treat primary care patients; correct?

17   A    I don't remember that.  I don't remember – I'm sure I did.  I don't

18   remember if I did say that or not.

19   Q    Do you recall Dr. Azmat telling you that he did not have malpractice

20   for primary care?

21   A    Yeah, after I saw his first two patients and he told me that.

22   Q    Okay.  Fair to say that when he told you that he could not see primary

23   care, you were shocked; right?

24   A    I was very shocked, yes, sir.

25   Q    You were livid with him; correct?

1      A     I was upset.

2      Q     You had something of a confrontation with Dr. Azmat that day;

3  correct?

4      A     I'm not sure it was a confrontation.  We had a – we had a – I was mad,

5  but I don't know if we had a confrontation.

6      Q     In fact you had never met Dr. Azmat until that morning; right?

7      A     Until that Monday, yes, sir.

8      Q     Had a – I think you testified a couple of phone calls and you

9  exchanged a couple of emails.

10      A     That's correct.

11      Q     In fact, your first email with him was at the beginning of February;

12  correct?

13      A     Okay.

14      Q     And he sent you his Georgia license and his DEA Registration;

15  correct?

16      A     Correct, sir.

17      Q     And after that first confrontation you had with – or where you were

18  livid, put it in your – shocked, put it in your words, on his first day of work,

19  you decided that was the beginning of the end for you with respect to Dr.

20  Azmat; correct?

21      A     Among other things, yes.

22      Q     And you started immediately searching for a replacement; did you

23  not?

24      A     I inquired about, yes, trying to find somebody else.

25      Q     By the way, you had said that you told Dr. Azmat that you were just

-272-

1    going to be pain management.  That's not true; is it?

2    A    I don't remember.  I don't recall.

3    Q    Well, do you recall sending him an email that you were going to be

4    both pain management and weight loss.

5    A    That was our – one of our original goals, was to be multifaceted, more

6    than just pain management.

7    Q    Okay.  Is it fair to say, then, that you told Dr. Azmat that you were

8    going to be both pain management and weight loss?  Is that fair to say?

9    A    Fair to say.

10   Q    Now, Dr. Azmat didn't know Adel; correct?

11   A    Correct.

12   Q    He didn't know Candace; correct?

13   A    Correct.

14   Q    He didn't know Frankie; correct?

15   A    Correct.

16   Q    He didn't know Mr. Afthinos, if I'm pronouncing that correctly; right?

17   A    Yes, sir.

18   Q    Y'all all knew one another in some fashion or another down in South

19   Florida; right?

20   A    We did, yes.

21   Q    Y'all had all worked together in some fashion or another down in

22   South Florida; correct?

23   A    Mr. Afthinos didn't work with us.  That was his first venture into

24   coming up with us.  He was friends with Mr. Dan Wise.  But Candace, Adel,

25   Frankie and myself all worked together, yes.

5

Case 4:13-cr-00028-WTM-GRS   Document 386   Filed 09/18/14   Page 84 of 267

-273-

1    Q    Okay.  Mr. Afthinos did know Dan Wise and Dan's girlfriend, Shelly

2    Morford.

3    A    Correct.

4    Q    You told us about having a meal with Dr. Ross where you went out and

5    discuss what y'all were going to do and what your intentions were; right?

6    A    Yes, sir.

7    Q    You never had such a discussion with Dr. Azmat; did you?

8    A    No, sir, 'cause I was back up in Florida at the time – down in Florida,

9    excuse me.  Down in Florida.

10   Q    The two weeks that you spent here, you didn't have – go out after work

11   for drinks with Dr. Azmat; did you?

12   A    No, sir.

13   Q    The two weeks that you spent here, he didn't come over to the house

14   that y'all had rented out in Pooler; did he?

15   A    No, sir.

16   Q    But what he did do during that period of time was, he saw patients;

17   correct?

18   A    Correct.

19   Q    And he stayed in his office; correct?

20   A    Correct.

21   Q    He was something of an outsider amongst you folks from South

22   Florida; true?

23   A    True.

24   Q    You would see on your little security camera that Dr. Azmat would eat

25   lunch at his desk alone; right?

-274-

1    A    I couldn't see into the rooms, but he did eat – you know, the two weeks

2    I was there he did – he ate from his office, yes.

3    Q    Okay.  Now, what you had set up here with respect to East Health

4    Center was an ownership plan where this Mr. Trematerra had a 60 percent

5    ownership; correct?

6    A    Correct.

7    Q    You had a 22 percent ownership; correct?

8    A    Correct.

9    Q    Ms. Lizama had a 5 percent ownership; correct?

10    A    Correct.

11    Q    Mr. Clark had a 16-to-18 percent ownership; correct?

12    A    Correct.

13    Q    Dr. Azmat didn't have any ownership interest; correct?

14    A    Did not.

15    Q    And you never offered him any ownership interest –

16    A    Not that I recall –

17    Q    – correct?

18    A    – no, sir.

19    Q    You've looked at the series of records that you had in front of you a

20    minute ago, and I'm not going to belabor this by pulling those records out,

21    but if the record reflects that on March 1 y'all saw nine patients, you would

22    agree with that.

23    A    I would agree with that.

24    Q    On March 8th that y'all saw 12 patients, you would agree with that.

25    A    Yes, sir.

-275-

1    Q    But then after Dr. Azmat left, the patient count went way up; didn't it?

2    A    I would – I don't know.  I would have to see that.

3    Q    If you don't know –

4    A    I don't know.

5    Q    – just tell me you don't know.

6    A    I don't know.

7    Q    Do you recall seeing as many patients as 31 patients on March 25,

8    2011?

9    A    Yes, sir.

10              MR. WITHERS: May I approach, Your Honor?

11              THE COURT: Yes, sir.

12   Q    Sir, I'm handing you what's been marked as Exhibit 171.  This is an

13   email string dated March 1 of 2011; correct?

14   A    Correct.

15   Q    Do you recall dealing with a business consultant by the name of Gary

16   Holden where you were trying to arrange for another physician to come in?

17   A    Yes, sir.

18   Q    If you look at the bottom of the second page, you write to Mr. Holden

19   [reading]: How long would it take to get a FT physician in here; correct?

20   A    Correct.

21   Q    So within a period of a few days it would be fair to say that you were

22   looking for someone to replace Dr. Azmat; correct?

23   A    Correct.

24   Q    And do you recall dealing with a fellow by the name of Dr. Hutchins

25   for the purpose of trying to get him onboard the following day – or excuse

-276-

1    me, two days later, Thursday, March 3, 2011.

2    A    I believe so, yes, sir.

3    Q    And I believe you testified earlier that ultimately you ended up

4    discharging Dr. Azmat; correct?

5    A    Correct.

6    Q    And do you recall the date that you terminated him?

7    A    I believe it was the 18th of March.  That's what I'm going to say, I think

8    it was that Friday.

9    Q    When Dr. Azmat was at the clinic, fair to say that the patients were

10   unhappy with Dr. Azmat; correct?

11   A    Fair to say, yes.

12   Q    When Dr. Azmat was at the clinic, it's fair to say that the patients were

13   dissatisfied their drugs were being cut; correct?

14   A    Among other things, yes, sir.

15   Q    Fair to say that patients were unhappy that Dr. Azmat was routinely

16   discontinuing Xanax; correct?

17   A    I don't recall that.

18   Q    And when you spoke with Dr. Azmat on the phone, you never told him

19   that this is what he had to prescribe.

20   A    Had to, no.

21   Q    You never told him that, you're only prescribing oxycodone; correct?

22   A    No, sir.

23   Q    And I believe you actually testified earlier – or strike that.

24        The fact is that you didn't see it as your place to tell the doctor what to

25   do; true?

1   A   True.

2   MR. WITHERS: May I approach, Your Honor?

3   THE COURT: Yes, sir.

4   Q   Sir, I'm handing you an email from you to Mr. Hutchins dated March

5   3, 2011; correct?

6   A   Yes, sir.

7   Q   And in that email you're inquiring about Dr. Hutchins being able to

8   come to work at East Health Center; correct?

9   A   Yes, sir.

10   MR. WITHERS: If I could have just one moment, Your Honor.

11   [NOTE: Mr. Withers confers with defendant off the record.]

12   MR. WITHERS: No further questions, Your Honor, thank you.

13   I would tender those two exhibits

14   CLERK: What was the number of the second one?

15   MR. WITHERS: 178, I believe.

16   THE COURT: So you're tendering 171 and 178?

17   MR. WITHERS: Yes, Your Honor.

18   THE COURT: All right, those are admitted.  Redirect?

19   MR. KNOCHE: Yes, sir.

20                    REDIRECT EXAMINATION BY

21   MR. KNOCHE:

22   Q   Mr. LeFrancois, as you indicated on your – on cross-examination,

23   you're facing charges in Florida which are independent of any charges

24   you're facing here in the Southern District of Georgia; is that correct?

25   A   That's correct, yes, sir.

-278-

1    Q    And the U.S. Attorney's office is not prosecuting you down in – the

2    U.S. Attorney's office for the Southern District of Georgia is not prosecuting

3    you for what you did in Florida; is that correct?

4    A    No, sir.

5    Q    Is it your hope that the extent of your cooperation will be made known

6    to those authorities which are prosecuting you?

7    A    It is, yes, sir.

8    Q    And have you been made any promises in that regard?

9    A    No promises have been made, no, sir.

10          MR. KNOCHE: And, Your Honor, may I show the witness's plea

11   agreement at this time?

12          THE COURT: Are you talking about his?

13          MR. KNOCHE: His plea agreement.

14          THE COURT: All right, let me see counsel over here.

15          [NOTE: Side bar conference on the record.]

16          THE COURT: In anticipation of the problem that we usually

17   have regarding plea agreements, I have pulled, prior to this trial beginning,

18   the plea agreement of this witness, and also the plea agreements of Daniel

19   Wise, Shelly Morford, Candace Carreras, Sean Clark, Lizama, Gossett, and I

20   don't know how you pronounce this other guy –

21          MR. KNOCHE: Afthinos.

22          THE COURT:  – Afthinos and Barbuscia.  Now, those were the

23   people who were on a list of maybe testifying in this case, and I have done

24   what the law requires me to do as far as policing these plea agreements,

25   and I have excised out of the plea agreement – for example, I have excised

-279-

1    out of this witness's agreement what he pled guilty to, which says that he

2    conspired with these people.  And I have also taken out of these agreements

3    any statements where the government agreed in the agreements that a

4    certain defendant was less culpable than some other defendant in the case.

5         So I'm going to have my – I'm going to give these agreements to

6    you, Mr. Knoche, and I'll have copies made for Mr. Withers, and any plea

7    agreements that the witnesses are questioned about, or that would be

8    offered in this case, must be the agreements that I have exercised the duty

9    to police that eliminates any possible voucher for the conviction.  In other

10   words, this agreement – this witness's agreement should not go into

11   evidence where he says, I conspired with so-and-so, okay?  As far as what

12   he pled guilty to individually, that's a different situation.  And so you need

13   to use those plea agreements.  If Mr. Withers intends to use them, then he

14   needs to use those plea agreements also.

15        So the only thing that has been taken out of there is what they

16   pled to if it says, I pled to a conspiracy that would involve this defendant,

17   and any statement where the government says they are less culpable than

18   any other defendant in this case.

19        But I think at this point in time with this witness – I don't know

20   about the other witnesses – but with this witness, Mr. Withers has

21   challenged him as to whether he's got any special deals, and whether he's

22   looking for his sentence to be reduced, and those types of things.  So the

23   government would be entitled to introduce the agreement, but only with

24   those matters taken out of the agreement that I have taken out that would

25   constitute some special vouching for the witness, or that would indicate

-280-

1    that he had committed some crime together with the defendant who is on

2    trial.

3                     MR. KNOCHE: Yes, sir, I understand the Court's instructions.

4                     MR. WITHERS: Yes, Your Honor.

5                     MR. KNOCHE: I need to remove the exhibit tag and confer with

6    Mr. Gilluly for just 30 seconds or so at my table.

7                     THE COURT: Sure, sure.

8                     Do we have extra copies of those, Mr. Lake?  Or I need to run

9    them off for ...

10                    LAW CLERK: I can run them off.

11                    THE COURT: After you tag them, we'll run them off so that

12   each one of you will have a copy of those agreements.

13                    [NOTE: Side bar conference concluded.]

14                    THE COURT: All right, Mr. Knoche, you may continued.

15                    MR. KNOCHE: Just a moment, Your Honor.

16                    [NOTE: Mr. Knoche and Mr. Gilluly confer off the record.]

17   Q     (By Mr. Knoche) Mr. LeFrancois, I'm going to approach you and show

18   you what's been marked Government Exhibit 34-5.  As I was asking you a

19   moment ago, you've described your plea, and you are hoping to get some

20   further benefit from the Court at sentencing as a result of your cooperation;

21   is that correct?

22   A     That's correct, sir.

23   Q     And your obligations under the plea agreement are set forth in that

24   plea agreement; is that correct?

25   A     They are, yes, sir.

1    Q    And what you're required to do.

2    A    Yes, sir.

3    Q    And are you required to testify truthfully?

4    A    Yes, sir.

5    Q    And is that committed to the discretion of the United States Attorney's

6    office?

7    A    Yes, sir.

8    Q    And you understand that if the government were to ask the Court for a

9    sentence less than the five years which you're facing, that would be

10   completely committed to the discretion of this Court.

11   A    Yes, sir.

12   Q    Mr. LeFrancois, previously admitted into evidence – and I'll hold it up

13   from here – was Exhibit 35.

14   A    Yes, sir.

15   Q    That was your marketing sign; right?

16   A    That was a marketing sign, yes, sir.

17   Q    And by the face of the sign you were marketing pain management.

18   A    Correct.

19   Q    And you sent your marketers, Mr. Barbuscia, Mr. Clark, Mr. Wise, Mr.

20   Afthinos, whoever did the marketing for East Health Center, they were

21   marketing pain management; is that correct?

22   A    That's correct.

23   Q    They were going to pain management, or what you have described as

24   pill mill facilities in Florida?

25   A    Yes, sir.

-282-

1    Q    Did you have a sign –

2              MR. WITHERS:  – Objection, Your Honor.  Mr. Knoche is

3    leading wildly.

4              THE COURT: Yes, just ask him the questions, Mr. Knoche and

5    let him answer.

6    Q    (By Mr. Knoche) Did you have a similar sign that said primary care

7    management?

8    A    No, sir.

9    Q    Did you ever market primary care doctors' offices?

10   A    No, sir.

11   Q    To try to take their patients.

12   A    No, sir.

13   Q    And you indicated to counsel that you were chagrined, if you will, that

14   Dr. Azmat wouldn't or couldn't see primary care patients –

15   A    I was –

16   Q    – is that right?

17   A    – yes, sir.

18   Q    But that wasn't – was that the reason that you were hiring him, was to

19   do primary care?

20   A    No, sir.

21   Q    In your experience, do you have any experience with how lucrative a

22   business primary care could be for someone like you?

23   A    I do not have any experience in that.

24   Q    You have no experience in the medical community –

25   A    – No experience.

1    Q     And likewise, weight management, do you have any experience in

2    that?

3    A     No experience.

4    Q     Do you have any knowledge of patients coming from Kentucky and

5    Ohio to be seen at weight management clinics in South Florida?

6    A     No, sir.

7    Q     Was it your expectation that that was a moneymaker for your clinic?

8    A     No, sir.

9    Q     So why would you couple or think of coupling weight management or

10   primary care with your pill mill operation?

11   A     To have the appearance that we were seeing – doing a multitude of

12   things.

13   Q     And that appearance was, you knew from day – after Dr. Azmat –

14         MR. WITHERS: – Objection, leading, Your Honor.

15   Q     Did you know that that wouldn't work?

16   A     I did know.

17   Q     Were your patients unhappy?  Did they ever express unhappiness with

18   Dr. Azmat?

19   A     They did, yes, sir.

20   Q     And why were they unhappy?

21   A     They were unable to get their prescriptions filled.

22   Q     And did that inform your decision one way or the other about his

23   continued employment at East Health Center?

24   A     That was the main reason for me looking for another doctor.

25         MR. KNOCHE: That's all the questions the government has.

-284-

1          MR. WITHERS: Just briefly, Your Honor.

2          THE COURT: Yes, sir.

3                    RECROSS-EXAMINATION BY

4     MR. WITHERS:

5     Q     You said just now the reason that you let him go was because the

6     patients were unhappy they were unable to get their prescriptions filled.

7     A     Yeah, prescriptions weren't able to get filled, the pharmacy would not

8     fill them.

9     Q     Not really true; is it?

10    A     Yes, it is true.

11    Q     Do you recall — well, let me ask you this: isn't it true that that first day,

12    the first time Dr. Azmat didn't see a primary care patient, that was the

13    beginning of the end for you —

14    A     That was upsetting to me.

15    Q     — isn't that true?

16    A     I was very upset, but that was — you know, that was one of the things

17    that I kept in my memory banks, along with then I started getting calls

18    from pharmacies saying they're not going to fill —

19          MR. WITHERS:  — Objection to what he's told, Your Honor,

20    with respect to hearsay.

21          THE COURT: Yes, sir, don't testify about what someone else

22    told you.

23          MR. LeFRANCOIS: Yes, Your Honor.

24    Q     And isn't it true that that first day was the beginning of the end for you

25    —

-285-

1    A    Yes, sir.

2    Q    – with Dr. Azmat.

3    A    Yes, I was upset that day, yes, sir.

4    Q    And that first day you began to find a replacement doctor – you

5    searched to find a replacement doctor for Dr. Azmat.

6    A    I'm not sure it was the first day.

7              MR. WITHERS: May I approach, Your Honor?

8    A    It might have been the first day.

9              THE COURT: Yes, sir.

10             MR. WITHERS: Counsel, Page 160, grand jury testimony.

11   Q    You recall testifying here in Savannah before the grand jury.

12   A    Yes, sir, I do.

13             MR. WITHERS: Your Honor, that's actually my only copy.  May

14   I remain here for just one minute?

15             THE COURT: Yes, sir.

16   Q    You were sworn to tell the truth.

17   A    Yes, sir.

18   Q    And you did tell the truth.

19   A    Yes, sir.

20   Q    And of course that was almost three years – or excuse me, your

21   testimony was two years ago almost; right?

22   A    Correct, yes, sir.

23   Q    And what you said was [reading]: So that was the beginning of the end

24   for me, and that was in my search to find a replacement doctor; correct?

25   A    Correct.

-286-

1    Q    So you began your search to replace Dr. Azmat the first day; true?

2    A    True.

3    Q    And you – it was the beginning of the end of you with respect to Dr.

4    Azmat; true?

5    A    That was one of the factors, yes, sir.

6              MR. WITHERS: No further questions.

7              THE COURT: Anything else of this witness, Mr. Knoche?

8              MR. KNOCHE: No, Your Honor, he may be excused.

9              THE COURT: Can the witness be excused?

10             MR. KNOCHE: Yes, from the government's perspective.

11             THE COURT: All right, you may come down, sir.

12        [Witness Excused]

13             THE COURT: Call your next witness, please.

14             MR. GILLULY: We call Frankie Barbuscia.

15        [Witness Sworn]

16             CLERK: You may be seated.  Please state your name, your

17    occupation, and spell your last name for the record.

18             MR. BARBUSCIA: Francis J. Barbuscia.  Occupation, elevator

19    mechanic.  Last name spelled B-A-R-B-U-S-C-I-A.

20             F R A N C I S   J.   B A R B U S C I A

21        GOVERNMENT'S WITNESS, SWORN, TESTIFIED AS FOLLOWS

22                    DIRECT EXAMINATION BY

23    MR. GILLULY:

24    Q    Mr. Barbuscia, it's kind of hard to hear in this courtroom.  If you

25    would, if you'll just keep your voice up so everyone in the jury and even in

-287-

1    the back of the courtroom can hear you; okay?

2    A    Sure.

3    Q    Pardon?

4    A    Yes, sir.

5    Q    All right, and then some of the questions I ask, if you would just, you

6    know, you respond, because they are being taken down, the questions and

7    answers, by the court reporter.

8    A    Yes, sir.

9    Q    Do you also go by Frankie Barbuscia?

10   A    Yes, sir.

11   Q    And Frankie B?

12   A    Yes, sir.

13   Q    And you have quite an accent.  Where are you from?

14   A    Brooklyn, New York.

15   Q    And how old are you, sir?

16   A    Right now, 37.

17   Q    And are you working now?

18   A    Yes, sir.

19   Q    And what is it you do?

20   A    I'm in the elevator union.  I modernize elevators.

21   Q    Okay.  I don't know if it's my ears, but I'm having a little bit of

22   difficulty, maybe it's your deep voice.  If you'll just speak a little more into

23   the microphone and a little louder, okay?

24   A    Sure.  It's really low.

25   Q    Yeah, it is, but I'd appreciate it.

-288-

1    A    I'm in the elevator trade.  I do modernization, rip out old elevators,

2    install new ones for the Union, Local 71.

3              MR. GILLULY: One second.  Ma'am?

4              REPORTER: I need him to speak up.

5    Q    Again, the court reporter is having a difficult time hearing.  Even if you

6    have to exaggerate your voice, if you could just speak louder.

7    A    Okay.  No problem.

8    Q    It's so deep it's hard to hear sometimes.

9    A    Okay.

10   Q    Into the microphone loud.

11   A    Okay.

12   Q    All right.  You said that you were in the elevator business; right?

13   A    Yes, sir.

14   Q    You help repair elevators?

15   A    Actually I uninstall old ones and reinstall new ones.

16   Q    Okay.  And where do you live?

17   A    Right now, 513 Southwest, Ft. Lauderdale.

18   Q    Okay.  You live in South Florida; right?

19   A    Yeah.

20   Q    How long have you lived in Florida?

21   A    Since 2005, April 2005.

22   Q    And before living in Florida where did you live?

23   A    Brooklyn, New York.

24   Q    And what brought you from Brooklyn down to Florida?

25   A    I just wanted to get out of Brooklyn.  It's nothing but trouble.

-289-

1    Q    You were getting in some trouble in New York?

2    A    Yeah, it was a bad neighborhood.

3    Q    Okay, and in fact while you were in New York you got arrested and

4    convicted for an attempted armed robbery; is that right?

5    A    Yes, sir.

6    Q    Ended up getting about five years around the year 2000?

7    A    Yes, sir.

8    Q    And that was a felony; right?

9    A    Yes, sir.

10   Q    And in fact you've also been convicted out of this courtroom; is that

11   correct?

12   A    Yes, sir.

13   Q    And you pled guilty to a conspiracy charge, and you're awaiting

14   sentencing; is that right?

15   A    Yes, sir.

16   Q    Okay, and you're represented by a lawyer; is that correct?

17   A    Yes, sir.

18   Q    And you entered into a plea agreement with the United States?

19   A    Yes, sir.

20   Q    And agreed to cooperate; is that right?

21   A    Yes, sir.

22   Q    Okay.  I'd like to date your attention back to around 2010.  Did you get

23   involved into the pain management marketing business?

24   A    Yes, sir.

25   Q    And can you tell the ladies and gentlemen, prior to doing this what

-290-

1   were you doing?

2   A   Prior?

3   Q   Yeah.  Prior to being a marketer what did you do?

4   A   I was an elevator guy.

5   Q   Okay.  Did you have any training in marketing prior to working for the

6   pain management?

7   A   Absolutely not.

8   Q   Okay, and how'd you get involved in marketing for pain management

9   clinics?

10  A   When the economy took a dip, the union laid everybody off.  So I was

11  desperate to find work.  I knew a friend that was marketing for some pain

12  clinics in Florida.  He asked me if I wanted to give it a try, it paid well.  I

13  said, no problem.  I jumped onboard.

14  Q   Okay, and was that in Florida?

15  A   Yes, sir.

16  Q   And can you tell the ladies and gentlemen, who did you work for in

17  Florida?

18  A   Pat McMillan – I mean, Richey McMillan – Rich McMillan and Patrick

19  Gervasio, couple other guys.

20  Q   Okay, and did they train you?

21  A   They didn't train me.  The guy who was in charge of me was Marco

22  Blanco.  He trained me.

23  Q   Marco Blanco trained you.

24  A   Basically.

25  Q   And what kind of stuff – what'd Marco train you on, how to market for

-291-

1    pain clinics?

2    A    How to counter-market other pain clinics.

3    Q    And what does that mean, sir?

4    A    Basically try to take patients from one clinic and transfer them over to

5    another.

6    Q    Okay, and did you market for clinics in Florida – multiple clinics?

7    A    Yes, sir.

8    Q    And in fact in addition to counter-marketing, did you ever go to hotels

9    and put flyers on cars?

10   A    Yes, sir.

11   Q    And what kind of cars in particular were you looking for when you

12   were marketing?

13   A    Well, we were taught that cars with out-of-state plates, cars that

14   looked all beat up, those type of cars.

15   Q    Okay, and when you were doing this counter-marketing, were you

16   looking for a particular kind of person to market to?

17   A    I noticed after a couple of weeks of marketing for these guys, I noticed

18   half the patients looked like zombies.

19   Q    Okay.  They had a particular look to them?

20   A    Yeah, they looked like they were drug addicts.

21   Q    And what would you do when you'd go up to them?

22   A    I would hand them a flyer, and whatever was the – what we were told

23   to – the punch line, or whatever you want to call it, the incentive of the

24   week, we were told to, you know, tell that patient that incentive.

25   Q    Okay, and –

1    A    – And try to sway them to go to the new clinic.

2    Q    Okay, and what kind of incentives – would they rotate what the

3    incentive was sometimes?

4    A    Yes, sir.

5    Q    Tell the ladies and gentlemen some of the incentives that you would

6    tell potential customers to get them to go to new pain clinics.

7    A    This particular doctor writes really heavy, he's really good.  If you

8    bring five patients, two are free.  Bring three patients, one free, all types of

9    different – free taxi service, all different types of stuff.  Every week it was

10   something new.

11   Q    Did you ever actually go inside other pain clinics to market?

12   A    Marco had me attempt to try to counter-market a particular clinic in

13   Jacksonville, Florida.  He had me go into a lobby twice.  One time I went

14   into the lobby, sat down and handed out a few flyers to patients that were

15   waiting to see a doctor.  The second time I attempted to do it, I got chased

16   out by a security guard, so I told him I didn't want to do that anymore, and

17   I didn't.

18   Q    So you actually went in, acted like a patient, handed out flyers?

19   A    Sat in the lobby area and was counter-marketing.

20   Q    These clinics that you went to, were they legitimate doctors' offices?

21   A    I mean, they looked like pill mills.  They looked like raggedy little

22   clinics.

23   Q    Did you ever see kids there?

24   A    I seen kids waiting in the cars.

25   Q    Okay, and did you ever – you mentioned security.  I mean, were there

-293-

1    security at these pill mills?

2    A    Oh, yeah.

3    Q    And you ever had any troubles with security?

4    A    They chased me a few times for parking in the parking lot, or parking

5    across the street.  After a while they knew we were counter-marketing.

6    Q    Okay, and in fact did you later market for a clinic named East Health

7    Center before it opened?

8    A    Yes, sir.

9    Q    Who did you – how did this come about, you working for East Health

10   Center?

11   A    Well, a couple of guys that worked for Pat and Richey had broke off

12   and wanted to start their own clinic in Georgia.

13              MR. GILLULY: Okay, and in fact, Dean, if you could put 28-1

14   up.

15   Q    Do you recognize this guy?

16   A    Yes, sir.

17   Q    Is that one of the guys that broke away from Pat and Richey?

18   A    Yes, sir.

19   Q    Do you know his name?

20   A    Alfred LeFrance

21   Q    Is that one of the guys you worked with at East Health?

22   A    Yes, sir.

23              MR. GILLULY: And if you could put 28-2 up.

24   Q    This guy look familiar?

25   A    Yes.

-294-

1   Q   Who is that?

2   A   Sean Clark.

3   Q   He is another guy who broke away from the Florida clinic?

4   A   Yes, sir.

5   Q   Did he work with you in marketing for East Health Center?

6   A   Yes, sir.

7   Q   Did y'all market for East Health Center prior to East Health Center

8   being opened?

9   A   Yes.

10   Q   And, again, what kind of techniques did you employ to market for East

11   Health Center?

12   A   Well, it definitely wasn't as aggressive as Marco's nature, but we

13   definitely counter-marketed the same way.  We would intercept patients

14   going into other clinics, or intercept them as they left, you know.

15   Q   Did you ever intercept patients at gas stations?

16   A   Of course.

17   Q   And, again, what kind of person were you looking for?

18   A   Same thing, out-of-state plates, raggedy cars.  They just – you could

19   tell they didn't belong in the area.

20   Q   And did they appear to be – you said the word zombies.  Were you

21   looking for same kind of person?

22   A   Yes, the same look, and it's easy to map them out, yeah.

23   Q   Okay, and these people, did they look like addicts?

24   A   Yes, sir, most of them.

25   Q   All right, and –

-295-

1    A    – Good percentage.

2    Q    Pardon me?

3    A    A good percentage.

4    Q    And did you ever see people in vehicles coming in groups?

5    A    Yes, sir.

6    Q    And were those kinds of people that you would try to market?

7    A    Of course, the more the better.  I mean, what we were basically told as

8    marketing guys is, the more patients we bring in, you know, the longer we

9    could keep our job.

10    Q    Okay, and how were you paid?

11    A    By check or cash.

12    Q    Okay, and –

13    A    – Mainly check.

14    Q    Pardon me?

15    A    Mainly check.

16    Q    Weekly or –

17    A    – Weekly.

18    Q    Okay, and when you went to go market, were you wearing a suit?  Or

19    how did you dress?

20    A    I'd just dress in whatever.  It doesn't matter.  Something comfortable.

21    Q    All right. What about Sean?

22    A    Seemed like he'd wear whatever he wanted, too.

23    Q    Including like, what, casual clothes or ...

24    A    Casual clothes.  You know, sometimes – when I was still working for

25    Marco for Pat and Richey down in Florida, sometimes I'd dress up to look

-296-

1    like a raggedy patient just so I can blend into the parking lot and wouldn't

2    get harassed by the security guards.

3    Q     Okay, and when you were marketing for East Health Center, for Al,

4    and – you said you wore casual clothes?

5    A     Casual clothes.  I did more intercepting when patients left the clinics

6    than push – try to – I didn't want no altercations with security guards no

7    more.  They were very heavily armed security guards.

8    Q     Did you ever have a confrontation with a security guard who was

9    armed?

10   A     Yes.

11   Q     Tell us about that.

12   A     I got chased by a red Monte Carlo, security guard.  He had like three

13   guns on him.  He chased me out of the parking lot and –

14          THE COURT:  – Mr. Gilluly, this is all a very interesting story,

15   but what does it have to do with the charges against the defendant in this

16   case?

17          MR. GILLULY: Well, Judge, in this conspiracy it's outlined –

18          THE COURT:  – Well, you've already covered a lot of this many

19   times, and I'm going to ask you to just …

20          MR. GILLULY: Move forward?

21          THE COURT: He's been asked at least three or four times what

22   kind of clothes he wore, so let's just move it on along, Mr. Gilluly.

23          MR. GILLULY: Yes, Your Honor.

24   Q     (By Mr. Gilluly) When you were marketing, what kind of vehicle were

25   you driving?

-297-

1    A    Rented cars.

2    Q    Okay, and I'd like to –

3         MR. GILLULY:  – Dean, if you could put up Exhibit 35.

4    Actually it's not in the computer.

5    Q    I'm handing you what's been previously marked Exhibit 35 into

6    evidence.  This sign look familiar?

7    A    Yes, sir.

8    Q    And is this one of the signs that you and others used to market for East

9    Health Center?

10   A    Yes, sir.

11   Q    And it says in-house here.  What does that mean?

12   A    Well, I think they wanted to go in-house with, like prescribe

13   medication onsite, but they never got around to it.

14   Q    When you were marketing, were you ever telling people that, hey, we

15   dispense in-house?

16   A    I was told to tell people here and there that they were gonna dispense

17   in-house eventually, but they never got around to it.

18   Q    Okay.  And the flyers that you indicated you passed out, what was

19   written on those flyers?

20   A    The flyers were different with different incentives.  Same address,

21   same, you know, but in the back or the front they'd have different

22   incentives, two for one, this and that, so many patients show up at the same

23   time, same group, discount for this, discount for that.

24   Q    Okay, and you're from Florida, you're doing some marketing.  Did

25   there come a time when you actually moved to Savannah, Georgia?

-298-

1    A    I stayed up in Savannah in a rented house for a couple of weeks,

2    correct.

3    Q    Who did you stay in the house with?

4    A    The personnel that worked in the Savannah office.

5    Q    And some of the names?

6    A    Dan Wise, Shelly, Kostas, Sean stayed there a few weeks.  That's about

7    it.

8    Q    Who paid the bills for the house?

9    A    It was East Health Center paid for it.

10   Q    And these people that lived in that house, and these people that you

11   worked with, were any of them from Savannah?

12   A    No.

13   Q    Okay.  Did East Health ever market by running television ads, as far as

14   you know?

15   A    No.

16   Q    Radio ads?

17   A    No.

18   Q    Did you continue to market after East Health Center opened?

19   A    Yes, for about – yes.

20   Q    And did you observe where patients were coming from?

21   A    Yes.

22   Q    And ...

23   A    All over the country.

24          MR. GILLULY: And I'd like you to put 28-3 up, please.

25   Q    And does that photograph look familiar, sir?

-299-

1    A    Yes, that's East Health Center.

2    Q    Okay, and is East Health Center on the right of that strip mall

3    building?

4    A    Yeah, it's on the right on the very corner right there.

5    Q    Okay.  Now, when you were marketing, did you ever go into East

6    Health Center?

7    A    Several times to pick up flyers and stuff like that, yeah.

8    Q    Did you ever see people that you had marketed to inside the clinic?

9    A    That I marketed to in the street inside the clinic?

10    Q    Yes, sir.

11    A    Several times.

12    Q    Okay.  Did you ever observe the lobby and people in the lobby?

13    A    Yeah, but briefly.  Never really specifically, but in and out.

14    Q    In and out, you didn't work primarily in the office.

15    A    Never.

16    Q    Okay, and do you know if the clinic accepted medical insurance?

17    A    Not that I – I don't think they did.

18    Q    Did you ever meet a doctor who worked there when you were there?

19    A    I said hi and bye to a doctor, yeah, several times.

20    Q    And at the beginning when it opened up, what did you know – what

21    was his – what did you call him?

22    A    Dr. Hazmat.

23    Q    Okay, and is that what you knew him as, Dr. Hazmat?

24    A    Yeah, that's what I knew him as.

25    Q    Do you see him in the courtroom today?

-300-

1    A    Yes, I do.

2    Q    If you could point to him, describe something he has on.

3    A    He's right there wearing the gray suit with the glasses.

4         MR. GILLULY: Judge, if the record could reflect he's identified

5    the defendant.

6         THE COURT: So noted.

7         MR. GILLULY: Thank you.

8    Q    Based on conversations with your clients, did you ever hear

9    complaints from customers that they weren't able to get their Azmat

10   prescriptions filled?

11   A    Yes.

12   Q    Did you express these complaints to the bosses?

13   A    Yes.

14   Q    As far as pharmacies, were you ever involved in helping patients find

15   pharmacies where they could get their Azmat prescriptions filled?

16   A    What I was told was to find out if patients were complaining, or if

17   patients said that they found pharmacies that would fill their prescriptions

18   to notify the office so the office could have a list of places where they could

19   go.  Initially patients were not getting their prescriptions filled.

20   Q    So the office created a list of pharmacies that would?

21   A    Yes, sir.

22   Q    In your observations, was East Health Center a legitimate medical

23   clinic?

24        MR. WITHERS: Objection to that conclusion, Your Honor.

25        MR. GILLULY: Judge, lay opinion under 701.

-301-

1      MR. WITHERS: Not a proper ...

2      MR. GILLULY: Pardon?

3      THE COURT: No, sir, that's not a proper question.  Go ahead.

4      MR. GILLULY: That's all the questions I have, Judge.  I pass

5 the witness.

6         <u>CROSS-EXAMINATION BY</u>

7 <u>MR. WITHERS:</u>

8 Q  Sir, good afternoon.  My name is Tom Withers.  We haven't met

9 before.  I represent Dr. Azmat.

10   Now, when you on the very infrequent occasions spoke to Dr. Azmat,

11 he was kind to you; wasn't he?

12 A  Yes, sir.

13 Q  He was polite; correct?

14 A  Yes, sir.

15 Q  He was professional; true?

16 A  Yes, sir.

17 Q  When – and by the way, sir, you are a twice-convicted felon; are you

18 not?

19 A  Yes, sir.

20 Q  And your first conviction, I believe you testified to, was in the state of

21 New York; correct?

22 A  Yes, sir.

23 Q  Kings County, New York; right?

24 A  Yep.

25 Q  Pardon me?

-302-

1     A    Yes, sir.

2     Q    You were arrested for and pled guilty to attempted armed robbery of a

3  drug dealer; correct?

4     A    Correct.

5     Q    You served almost five years in one of the New York state

6  penitentiaries for that crime; true?

7     A    Yes, sir.

8     Q    You used a gun in that offense; did you not?

9     A    Yes, sir.

10    Q    Later served time for a parole violation of several months; correct?

11    A    Yes, sir.

12    Q    Now, you also were charged here in the Southern District of Georgia;

13  correct?

14    A    Yes, sir.

15    Q    You began cooperating back in November of 2011; does that seem

16  about right to you?

17    A    (No audible response.)

18    Q    If the record reflects that you wouldn't dispute –

19    A    – I started cooperating when I was approached by the DEA.

20    Q    Okay.  In fact you were interviewed by two DEA agents; were you not?

21    A    Yes, sir.

22    Q    And ultimately testified here in front of the grand jury in the Southern

23  District of Georgia, did you not, as part of your cooperation.

24    A    Yes, sir.

25    Q    And you understood, did you not, that you were facing dozens of years

-303-

1    in prison if you are prosecuted and convicted here in the Southern District

2    of Georgia; didn't you.

3    A    Yes, sir.

4    Q    Prison's not a nice place; is it?

5    A    Been there before, it's not nice.

6    Q    And the result of which is, you entered into a plea agreement with the

7    government; true?

8    A    Yes, sir, if that's what it's called.

9    Q    All right, and you understand as part of that plea agreement that your

10   time that you face now is capped at five years; you understand that?

11   A    Yes, sir.

12   Q    You pled guilty to the offense of conspiracy; correct?

13   A    Yes, sir.

14   Q    And that conspiracy goes all the way back to your time in Florida;

15   true?

16   A    Yes, sir.

17   Q    And you knew – or excuse me, you started working, I think you

18   mentioned a Mr. McMillan and a Mr. Gervasio; true?

19   A    Yes, sir.

20   Q    Those are the folks that you were working with in the pain clinics

21   down in Florida; correct?

22   A    Yes, sir.

23   Q    You also met a number of other folks down there; did you not?

24   A    Yes, sir.

25   Q    Mr. LeFrancois?

-304-

1    A    Yes, sir.

2    Q    Mr. Clark?

3    A    Yes, sir.

4    Q    Now, Dr. Azmat was not down in Florida with y'all doing your thing in

5    Florida; was he?

6    A    No, sir, not that I know of.

7    Q    And you've described running around, this kind of crazy scenario in

8    these parking lots and whatnot in Jacksonville and elsewhere.  Dr. Azmat's

9    not doing that; was he?

10    A    No, sir.

11    Q    And you told me I believe that you only saw Dr. Azmat on a couple of

12    occasions; is that right?

13    A    Yes, sir.

14    Q    Did you ever see him inside of the facility when he was actually seeing

15    a patient?

16    A    Did I ever see him inside East Health Center?

17    Q    Yes, sir.

18    A    I've seen him inside East Health Center several times.

19    Q    Seeing a patient.

20    A    Not actually seeing a patient, just walking through the hallway as I'd

21    walk to the back.

22    Q    Now, Dr. Azmat, he wasn't familiar with these folks in South Florida;

23    right?

24            MR. GILLULY: Judge, I would object to speculation.

25            MR. WITHERS: Well, I'll fix that.

-305-

1    THE COURT: Ask him if he knows.

2    Q    (By Mr. Withers) Did you ever see Dr. Azmat in the company of Mr.

3    LeFrancois in South Florida?

4    A    No.

5    Q    To your knowledge –

6    A    To my knowledge.

7    Q    – Dr. Azmat didn't know Mr. LeFrancois; did he?

8    A    Well, I know he knew him when he worked for East Health Center.

9    Q    Bad question, I'm sorry.  Dr. Azmat didn't know Mr. LeFrancois in

10   South Florida; did he?

11   A    I don't know.  I know they had an initial interview, I think when they

12   said they were going to find a doctor for East Health Center before it

13   opened, and I assumed it would probably be Azmat since he was the first

14   doctor that was hired –

15   MR. WITHERS:  – I object to it as speculation, Your Honor.

16   THE COURT: Well, ask him the question so he doesn't

17   speculate.

18   MR. WITHERS: I'm doing the best I can.

19   THE COURT: Well, you're just talking about South Florida.

20   Say, before a such-and-such a date in Savannah, you know.  Why don't you

21   ...

22   Q    (By Mr. Withers) Before the creation of the idea of East Health Center

23   in early 2011, Dr. Azmat's not down in South Florida with you folks; was

24   he?

25   A    No, not that I know of.

-306-

1    Q   And it was you folks in South Florida that hatched the scheme for East

2    Health Center up here in Savannah.  That's true; isn't it?

3    A   I was hired when a team was put together to make East Health Center,

4    yes.

5    Q   By the way, when you went – when you were up here you didn't go

6    into the office very much; did you?

7    A   No, sir.

8    Q   You weren't internally involved in what was going on in the office;

9    were you?

10    A   No, sir.

11    Q   I believe you said you were hired by Mr. LeFrancois?

12    A   And Sean Clark.

13    Q   And you knew that Mr. LeFrancois had lost his job because he'd been

14    stealing from Mr. Gervasio and Mr. McMillan; right?

15    A   Yes, sir.

16    Q   Been skimming cash; right?

17    A   Yes, sir.

18    Q   And he told you, Mr. LeFrancois, that you were going to be given an

19    ownership interest in East Health Center; didn't he?

20    A   Yes, he did.

21    Q   That wasn't true; was it?

22    A   Not how it turned out.

23    Q   All right.  You understand Lew to be the primary investor; right?

24    A   Yes, yes, sir.

25    Q   Al was given an ownership interest to your knowledge?

-307-

1    A    Yes, sir.

2    Q    Adel was going to be given an ownership interest; right?

3    A    Yes, sir.

4    Q    Candace was going to be given an ownership interest; right?

5    A    Yes, sir.

6    Q    Mr. Clark was going to be given an ownership interest; right?

7    A    Yes, sir.

8    Q    You actually saw the paper with the percentages on it; right?

9    A    I took a glance at it, yes.  I couldn't verify everything on it, but I took a

10   glance at it.

11   Q    And Dr. Azmat wasn't on that piece of paper; was he?

12   A    I did not see his name on that paper.

13   Q    Now, let's deal with Dr. Azmat.  You actually believed his name was

14   Hazmat; is that right?

15   A    Yes, sir.

16   Q    In other words, y'all weren't standing around calling him Hazmat in

17   some derogatory fashion, you just misunderstood what his name was; is

18   that fair to say?

19   A    Well, basically my ears are a little shut down, so I've only frequented

20   the office a few times, and when I heard his name for the first time, it

21   sounded like Hazmat.

22   Q    Okay.

23   A    And where I'm from, if it sounds appealing, that's usually what we call

24   you from now on.

25   Q    Now, fair to say that Dr. Azmat was a disaster for East Health Center;

-308-

1    right?

2    A    Me being the marketing person that has to secure the clientele, to my

3    standpoint, yes.

4    Q    He didn't want to give anybody anything that they were usually on;

5    correct?

6    A    I wouldn't say that would be correct.  I would say that nobody could

7    get their prescriptions filled with him.

8    MR. WITHERS: May I approach, Your Honor?

9    THE COURT: Yes, sir.

10    MR. WITHERS: And again, Your Honor, if I could have the

11    Court's permission to examine the witness from –

12    THE COURT:  – This is the last witness we're going to do that

13    with, Mr. Withers.  If you're going to question them about any of this,

14    you're going to have to get your own copy.

15    MR. WITHERS: Yes, sir.

16    Q    (By Mr. Withers) You testified in front of the grand jury in November

17    of 2011; correct?

18    A    Yes, sir.

19    Q    Sworn to tell the truth; right?

20    A    Yes, sir.

21    Q    And the question was [reading]: Why do you say that Dr. Hazmat was

22    a disaster?

23    And your answer was [reading]: He was just from what everybody

24    complained about he didn't want to give anybody anything that they were

25    usually on; correct?

-309-

1    A    I guess so.  That's a long time ago.  Or get their prescriptions filled.

2    Q    And the fact is that patients were complaining and not showing back

3    up; right?

4    A    Yes, sir.

5    Q    And Al was telling you the doctor's horrible; correct?

6    A    Yes, sir.

7    Q    Al told you he's not writing heavy; correct?

8    A    I don't quite remember that.

9              MR. WITHERS: May I approach, Your Honor?

10             THE COURT: Yes, sir.

11             MR. WITHERS: Counsel, Page 60, Lines 1 and 2.

12   Q    You with me there at the top of the page, sir?

13   A    Yes, sir.  Yes, yes.

14   Q    What you said when you testified before the grand jury was [reading]:

15   They weren't getting enough drugs; correct?

16   A    Yes, now I remember now.

17   Q    You said [reading]: Al was basically like, the doctor's horrible; correct?

18   A    Yes.

19   Q    [Reading]: He's not writing heavy; correct?

20   A    Yes.

21   Q    [Reading]: He's not good; correct?

22   A    Correct.  I'm sorry, my memory's a little jogged.  It's been many years.

23   Can't remember every word.

24   Q    And so Al wanted to replace him with a doctor who would write more

25   heavily; correct?

-310-

1    A    To my understanding, yes.  He definitely wanted – Al definitely

2    wanted a replacement.

3              MR. WITHERS: I think that's all the questions I have for this

4    witness.  Thank you, Your Honor.

5              THE COURT: Anything else of this witness, Mr. Gilluly?

6              MR. GILLULY: May I have one second?

7         [Pause]

8              MR. GILLULY: May I proceed, Judge?

9              THE COURT: Yes, sir.

10                    REDIRECT EXAMINATION BY

11    MR. GILLULY:

12    Q    Mr. Barbuscia, prior to this whole East Health Center venture, you

13    didn't know Dr. Hazmat?

14    A    No, never –

15    Q    – Do you have any – have you had any contact with him since

16    everyone's respective arrest?

17    A    No, sir.

18    Q    Okay, and the defense lawyer talked to you about your plea agreement.

19    You are hoping to get a reduction by testifying; is that correct?

20    A    Yes, sir.

21              MR. GILLULY: May I approach, Judge?

22              THE COURT: Yes, sir.

23    Q    I'm handing you what's been – I've handed you a document that's

24    been previously marked 34-2.  Is that a copy of your plea agreement?

25    A    Yes, sir.

-311-

1    Q    And let me ask you this: Have anyone on the government  – have we

2    told you what to say?

3    A    No, sir.

4    Q    In fact have we promised you anything?

5    A    No, sir.

6    Q    And is that outlined in the plea agreement, that there are no promises?

7    A    Yes, sir.

8    Q    And that you've got to tell the truth.

9    A    Yes, sir.

10   Q    And are you doing that?

11   A    Yes, sir.

12            MR. GILLULY: Nothing further, Judge.

13            MR. WITHERS: Very briefly, Your Honor?

14            THE COURT: Yes, sir.

15                      RECROSS-EXAMINATION BY

16   MR. WITHERS:

17   Q    Sir, when did you plead guilty?

18   A    A while back.

19   Q    August 2012?

20   A    Maybe.  It was a while ago.

21   Q    You've been waiting to be sentenced this entire time; right?

22   A    Yes, sir.

23   Q    And the government filed – are you aware that the government filed a

24   motion in February of 2013 to delay your sentencing until after your

25   cooperation was complete?

-312-

1    A    I have no idea of that.

2    Q    You understand that the government is the one who makes the

3    decision whether to file a motion to reward you for your cooperation.  You

4    understand that they hold that key; do you not?

5    A    Yeah, but I was never informed of that.

6              MR. WITHERS: Thank you, no further questions.

7              THE COURT: Anything else of this witness?

8              MR. GILLULY: No, Judge, if I could, I formally move, I

9    formally move his plea agreement, 34-1, into evidence.  And that's all I

10   have.

11             THE COURT: Is that one we talked about earlier?

12             MR. GILLULY: Yes, sir.

13             THE COURT: Okay, that's admitted.  Can this witness be

14   excused?

15             MR. GILLULY: Yes, Your Honor.

16             THE COURT: All right, sir, you may come down.

17             MR. WITHERS: May I retrieve that ...

18             THE COURT: Yes, sir.

19        [Witness Excused]

20             THE COURT: Ladies and gentlemen, it's about five minutes

21   until noon.  I'm going to give you your recess now, and we'll be in recess

22   until one o'clock today.  And I again remind you of what I have told you

23   before: don't discuss this case with anyone, don't even talk about it among

24   yourselves.  Leave your notepads and pencils here during the recess.  When

25   you come back to this courthouse, please come directly back to the jury

-313-

1    room, and we will begin at one o'clock.

2    [NOTE: The jurors are excused for luncheon recess.  The

3    proceedings are continued outside of the presence of the jury as follows:]

4    THE COURT: All right, counsel, since I'm going to assume from

5    this point on with a lot of these witnesses that they may be asked about

6    prior statements, I will remind you of Rule 613, which was amended in the

7    Federal Rules some time ago that states [reading]: In examining a witness

8    concerning a prior statement made by the witness, whether written or not,

9    that the statement need not – need not – be shown nor its contents

10   disclosed to the witness at that time.  But on request, the same shall be

11   shown or disclosed to opposing counsel.

12   And I would suggest to you that you're using an antiquated

13   procedure.  And if you want to ask this witness about a prior statement,

14   either one of you, say: Do you remember giving a statement to the grand

15   jury?  Do you remember being placed under oath?  You said so and so.  And

16   if the witness denies the statement that's in the grand jury report then you

17   can – if he asks to see it, you can show it to him and then confirm it with

18   him.  But it's not necessary to keep coming up here and showing the

19   statement, whatever it is, to the witness before you ask the witnesses the

20   questions.

21   All right, we'll be in recess until one o'clock.

22   [NOTE: Whereupon a luncheon recess is taken, after which the

23   proceedings are continued in the presence of the jury as follows:]

24   THE COURT: Call your next witness, please, Mr. Knoche.

25   MR. KNOCHE: Nancy Binion.

-314-

1    [Witness Sworn]

2           CLERK: You may be seated.  Please state your name, your

3    occupation, and spell your last name.

4           MS. BINION: Nancy Binion.

5                    N A N C Y   B I N I O N

6    ___ GOVERNMENT'S WITNESS, SWORN, TESTIFIED AS FOLLOWS

7    _____ DIRECT EXAMINATION BY

8    MR. KNOCHE:

9    Q     Ms. Binion, before I ask you any questions, you're not feeling real

10   great today; is that right?

11   A     No.

12   Q     Ms. Binion, where are you from?

13   A     Morehead, Kentucky.

14   Q     And tell the members of the jury, where is Morehead, Kentucky?

15   A     It is 70 miles from Lexington, Kentucky, Keeneland? Everybody knows

16   it's a big horse state.

17   Q     It's in kind of the eastern part of the state?

18   A     Yeah.

19   Q     Okay, and you live – you have a home you live in.  Could you describe

20   your home for the members of the jury?

21   A     I live in a trailer, a two-bedroom trailer, with my mother and my

22   husband.

23   Q     And that's fairly remote and difficult to get to?

24   A     Yes.

25   Q     And how far a drive is it to Lexington?

-315-

1   A   Seventy-one miles.

2   Q   Is that the nearest big city?

3   A   Yeah.  Yes, I'm sorry.

4   Q   All right.  Ms. Binion, were you ever a patient at East Health Center?

5   A   Yes, sir.

6   Q   Do you recognize the doctor you saw there on your first visit?

7   A   Oh, yes.

8   Q   Could you describe him for the record, please.

9   A   Sitting right over there with a grey suit on, and a tie with blue and grey

10  in it.

11              MR. KNOCHE: Could we see Government Exhibit 24-003.

12  Q   Ms. Binion, do you recognize your handwriting on that document?

13  A   Yes, sir.

14  Q   And you see the date in the left-hand corner there near the top?

15  A   February 9, 2011.

16  Q   Is that a form you filled out the first time you saw – or when you saw

17  Dr. Azmat at East Health Center?

18  A   No.  That was the first time I went to East Health Center.  They were so

19  full they had me come back two, maybe three days later.

20  Q   Do you remember how you got there?

21  A   Yes.

22  Q   How'd you get there?

23  A   David Henderson.

24  Q   Okay, and what did David Henderson do?

25  A   (No audible response.)

-316-

1    Q    Did he drive you there?

2    A    Yes.

3    Q    Okay, and why would you – are you related to David Henderson?

4    A    No.

5    Q    Okay.  Are you married?

6    A    Yes.

7    Q    What's your husband's name?

8    A    Brian.

9    Q    Brian, same last name, Binion?

10   A    Yes.

11   Q    Okay, and so who is Dave Henderson that he would drive you to

12   Garden City, Georgia to be seen at East Health Center?

13   A    I was gullible.  I had never been out of the state of Kentucky.  He said,

14   let me take you to a doctor and you will make money.  He took me to the

15   doctor, I made no money.  I got hurt instead.

16   Q    What were you – how would you make money from going to a doctor?

17   A    The way I understood it, he was gonna pay me for my time.

18   Q    And did he –

19           THE COURT:  – I don't know what she means, he was going to

20   pay me for my time.

21   A    David Henderson was going to pay me for my time to travel here.

22   Q    Okay, and he was going to pay you in money?

23   A    Yes.

24   Q    Okay, and what was in it for him?

25   A    The medicine, I guess.

-317-

1   Q    Was that in fact – did you on any of your trips with David Henderson

2   get medicine?

3   A    Yes.

4   Q    And what'd you do with it?

5   A    I never seen the medicine.

6   Q    Do you know who got it?

7   A    He went in the pharmacy, he paid for it, and he got it.

8   Q    When did you – when did Dave Henderson start driving you to

9   doctors' offices?

10  A    I'm not for sure when it was.

11  Q    Was it before March the 9th of 2011?

12  A    Yes, I believe it was.

13  Q    Okay, and were those clinics that you went to in Georgia?

14  A    No.

15  Q    Where were they?

16  A    I think there was one in Florida.

17  Q    And how long a drive from Morehead, Kentucky down to these clinics

18  in Florida you were going to?

19  A    Eighteen, 19 hours.

20  Q    Okay, and would you stop at a motel on your way down?

21  A    No, sir.

22  Q    And what would happen when you'd go to the clinics?

23  A    He would give me the money.  I would go in, sign in, see the doctor for

24  two minutes.  Hi, bye, go back out in the waiting room, wait on the

25  prescriptions, and leave.

-318-

1        MR. KNOCHE: Could we have 24-019.

2    Q    Do you recognize this MRI document with your name on it?

3    A    Yes.

4    Q    Premier Medical Imaging.  What kind of facility was that?

5    A    That is where I went to have the MRI done.

6    Q    And there are two addresses there, Delray Beach, Florida and Coral

7    Springs.  Do you remember which one you went to?

8    A    No, I don't.  I don't know where I was at.

9    Q    Okay, and why did you go to get that MRI?

10   A    Because the doctor that I was seeing sent me – wrote a script that

11   morning – well, soon as I seen him, and to go have the MRI done and then

12   come back to his office.

13   Q    Was that Dr. Arnold Aaron?

14   A    I think so.

15   Q    See the name on the document that's in front of you there, referred

16   by?

17   A    Yes.

18   Q    Okay, and what kind of facility did Arnold Aaron work at?

19   A    Well, it was an MRI place, but ...

20   Q    In other words, the doctor who referred you for the MRI, that told you

21   to get it.

22   A    Yes.

23   Q    What kind of facility was that?  Maybe you don't understand –

24   A    Hole in the wall.

25   Q    – maybe you don't understand my –

-319-

1   A   – No, I understand it –

2   Q   – you don't understand my question.

3   A   – I'm just trying to think of a polite way to say it.

4   Q   Well, say it as politely as you can.

5   A   It was not a place that I would take my children, my mother –

6           MR. WITHERS:  – Objection to this, Your Honor.  She can give

7   a physical description but not the editorial –

8           THE COURT:  – Yes, don't ask her to give an opinion of that

9   sort, Mr. Knoche.

10   Q   (By Mr. Knoche) Was it a facility like East Health Center?

11   A   Yes.

12   Q   Okay, and in what ways?

13   A   It was not like any doctor's office I had ever seen.

14   Q   For what reason did people go to the clinic?

15   A   Pills.

16   Q   And what kind of pills?

17   A   Oxycodone 30, oxycodone 15, and Valium.

18   Q   And at that clinic in Florida that you went to, did you see persons from

19   out of state?

20   A   Yes.

21   Q   From Kentucky?

22   A   The license plate from out of state, so I assume that's where they were

23   from.

24   Q   Okay, and why did you stop going – how did you go from this clinic in

25   South Florida to East Health Center?

-320-

1    A    We were in Florida out in the parking lot waiting on the clinic to open.

2    There was a gentleman was passing out cards for the West Health Center in

3    Georgia, and they said that we would get what we were getting there if we

4    come here.

5    Q    You'd get the same prescriptions?

6    A    Yes.

7    Q    And why was that attractive to you to switch clinics from South Florida

8    to East Health Center?

9    A    It wasn't to me, it was to David.  I don't know what his train of thought

10   was.

11   Q    Was it closer?

12   A    It was to the doctor, yeah.

13   Q    Closer to Morehead, Kentucky.

14   A    Yes.

15   Q    Dave Henderson – David Henderson, did he bring you by yourself or

16   were there other people that were traveling with you?

17   A    My husband was with me.

18   Q    Okay, and would your husband see the doctor in South Florida with

19   you?

20   A    Yes.

21   Q    Or on the same trip?

22   A    Yes.

23   Q    Okay, and how about at East Health Center?

24   A    Yes.

25   Q    And was his arrangement with Mr. Henderson the same thing?

-321-

1 A As far as I know.

2 Q Does your husband – his name is Brian?

3 A Yes.

4 Q Does he use oxycodone?

5 A No.

6 Q You said that on your first trip, March the 9th, you saw the document,

7 you paid your money, didn't see Dr. Azmat.

8 A Right.

9 Q And how come?

10 A They were busy, too full, and had us come back.

11 Q So what'd you do?  Did you go home?

12 A Went home and turned around and come back.

13 Q Okay.  From Savannah or Garden City to Morehead, Kentucky, how

14 many hour drive is that?

15 A Too long.

16 Q So on March 9th, that same day you drove all the way back to

17 Morehead?

18 A Yes.

19 Q Okay, and you came back on a – a few days later?

20 A Yes.

21   MR. KNOCHE: Can we see Exhibit 24-18, please.

22 Q See the date at the top of the form?

23 A Yes.

24 Q That's about five days after your first trip down?

25 A Yes.

-322-

1    Q    And were you seen by Dr. Azmat on that date?

2    A    Yes.

3    Q    Did you tell him that – the form indicates that without medication

4    your pain level is a 10 –

5    A    No.

6    Q    – is that right?  Did you tell him that?

7    A    No.

8    Q    How'd that information get entered; do you know?

9    A    Nope.

10   Q    Did you tell him how much medication you were getting?

11   A    Nope.  They had my pharmacy report from Florida.

12   Q    Did you get a prescription from Dr. Azmat on that day?

13   A    Yes.

14              MR. KNOCHE: 24-021, please.

15   Q    See that prescription?

16   A    Yes.

17   Q    Can you interpret that or read it for the grand jury (sic) –

18   A    – Oxycodone 30, 120.

19   Q    And that's 120 pills?

20   A    Yes.

21   Q    Okay, and how long was that supposed to last you?

22   A     A month.

23   Q    So that'd be four a day?

24   A    (No audible response.)

25   Q    Okay, and then I believe there's another prescription oxy 30s?

-323-

1    A    No, oxy 15.

2    Q    Oxy 15s, excuse me.

3    A    Ninety.

4    Q    Ninety.

5    A    Three times a day.

6    Q    And after you got those prescriptions, did Mr. Henderson get those

7    filled?  Were they filled?

8    A    Yes.

9    Q    Did you get any of the medicine?

10   A    No.

11        MR. KNOCHE: Let's go back to 24-18, please.  Near the top of

12   that, the third, fourth line down, can you highlight the BP, the blood

13   pressure.

14   Q    Can you read what that says?

15   A    Yes.

16   Q    What's it say?

17   A    155/123.

18   Q    Do you typically have very high blood pressure?

19   A    Yes.

20   Q    Okay.  What, if anything, did Dr. Azmat tell you or ask you about your

21   high blood pressure?

22   A    Nothing.

23   Q    What, if anything, did he tell you about the effects of the drugs you

24   were to be taking that were prescribed?

25   A    Nothing.

-324-

1    Q    What warnings, if any, did he give you about mixing drugs and

2    alcohol?

3    A    Nothing.

4    Q    What, if any, warnings about driving a car while under the influence of

5    these drugs?

6    A    Nothing.

7    Q    Describe the physical examination he conducted.

8    A    I seen this gentleman for the total of two minutes.  In that time I was

9    fine when I went in.  I was crying when I come out.  He put his fingers in

10   my spine, that it bruised my spine.  I have never in my life been to a doctor

11   that would inflict pain.

12   Q    Did he talk to you about your medical history?

13   A    No.

14   Q    Did he ask you for prior medical records other than what you had

15   turned in at the window?

16   A    No.

17   Q    Okay, and at the window you had your MRI; correct?

18   A    Yes.

19   Q    Okay, and perhaps a pharmacy report?

20   A    Yes.

21   Q    Did he recommend any alternative therapies for you?

22   A    No.

23   Q    Did he recommend physical therapy?

24   A    No.

25   Q    Did he discuss your MRI with you?

-325-

1    A    No.

2    Q    Did he discuss your pain rating with you?

3    A    No.

4    Q    Did he ask you why you had driven from Morehead, Kentucky to be

5    seen by him at East Health Center in Garden City?

6    A    No.

7    Q    Did he make any remarks about why you from Kentucky had an MRI

8    from South Florida?

9    A    No.

10         MR. KNOCHE: Can we see 24-004.

11   Q    Is that your handwriting still?

12   A    Yes.

13   Q    Okay, and see where it – about the fifth line down it says, on a scale of

14   1 to 10, what is your usual degree of pain?

15   A    Yes.

16   Q    Okay, and what does it say?

17   A    Ten.

18   Q    Okay, and is that what you wrote down?

19   A    Yes.

20         MR. KNOCHE: Can we see Exhibit 25A-10.  25A-10.  My

21   mistake, I believe.  29-5A-10.

22   Q    Do you recognize yourself in that photograph?

23   A    Yes.

24   Q    Does that look to be the waiting room at East Health Center?

25   A    Yes.

-326-

1    Q    Are you the individual standing up in the middle of the photograph?

2    A    Yes.

3              MR. KNOCHE: Could you highlight Ms. Binion in that.

4    Q    Is that you?

5    A    Yes.

6    Q    Now, that was in May.

7              MR. KNOCHE: If we could have Exhibit 24, the first page.  24.

8    Q    On that date in May you indicate your pain level as 10?

9    A    Uh-huh.

10   Q    Same as on the first day you went, March 9th?

11   A    Yes.

12             MR. KNOCHE: Go back to 25-A – excuse me.  29-5A-10.

13   Q    Do you appear to be at a pain level 10 on a scale of 1 to 10?

14   A    No.

15             MR. WITHERS: Objection to the conclusion, Your Honor.

16   Q    You're standing.

17   A    I'm standing.

18   Q    You're waiting?

19             MR. WITHERS: Objection to the leading, Your Honor

20             THE COURT: Yes, sir, just ask her what she's doing there.

21   Q    What are you doing?

22   A    I am waiting on my prescriptions.

23   Q    And are those other people in the waiting there with you, are those

24   also patients to your knowledge?

25   A    To my knowledge, yes.

1   Q     What kind of people did you observe in the waiting room at East

2   Health Center?

3   A     Well, body odor, addicts, falling out of chairs.

4   Q     Similar to your observations about the Florida clinics you had visited,

5   did you observe that people were from out of state?

6   A     Yes.

7   Q     You were diagnosed with lower back pain –

8   A     Yes.

9   Q     – by Dr. Azmat.  Now, the first day that you went there, were you on a

10  cane?

11  A     Yes.

12  Q     And what was that for?

13  A     My left knee.

14  Q     Your knee.  Had something happened to your knee?

15  A     I was hurt at work.  I hurt my left knee.  Since then I have had surgery.

16  Q     So there was no cane visible in the photograph.

17  A     No.

18  Q     By that time you were not using it?

19  A     No.

20  Q     Did you – did Dr. Azmat ask you about your knee?

21  A     No.

22  Q     Did you in fact have chronic lower back pain?

23  A     Yes, but not to the extent of – pain level of 10.

24  Q     How do you treat that lower back pain or that knee pain?

25  A     Heating pad, Aleve, Advil, Tylenol.

-328-

1        MR. KNOCHE: 24-27, please.

2    Q    You tested positive for oxycodone; okay?

3    A    Yes.

4    Q    And you just said that you treat your back pain with Aleve and other

5    over-the-counter drugs.  How do you account for the positive drug test?

6    A    When you go to these clinics you have to pass a drug test – well, fail a

7    drug test.  I would take a little piece of a 15 in order to pass the drug test for

8    them so it would be in my system.

9    Q    And you knew that was expected.

10   A    Yes.

11   Q    Did you know that ...

12        [NOTE: Witness coughing.]

13   Q    I know you don't feel well.  Take your time, Ms. Binion.  That was

14   known by you that you needed to fail the test.

15   A    Yes.

16        [NOTE: Witness coughing.]

17        MS. BINION: I'm so sorry.

18   Q    And you knew that you had to have an MRI.

19   A    Yes.

20   Q    And you wrote a 10 for your pain as your usual level.

21        [NOTE: Witness coughing.]

22   Q    This is my last question and we'll let you go – we'll let counsel ask you

23   some questions.

24        So why write a 10?

25   A    That's what I was told to write.

-329-

1    [NOTE: Witness coughing.]

2    MS. BINION: I'm sorry, Your Honor.

3    THE COURT: That's okay.

4    MR. KNOCHE: Pass the witness, Your Honor.

5    THE COURT: Mr. Withers.

6                        CROSS-EXAMINATION BY

7    MR. WITHERS:

8    Q    Good afternoon, ma'am.

9    A    Afternoon.

10   Q    My name is Tom Withers.  I represent Dr. Azmat.  I'm sorry you feel

11   bad.  I will not be unkind to you, but I do have a few questions.

12        Now, when you came down here from Morehead, Kentucky with this

13   fellow by the name of Henderson, I believe you said?

14   A    Uh-huh, yes.

15   Q    And Mr. Henderson is the one who gave you the money to pay for your

16   visit.

17   A    Yes.

18   Q    And you understood that you needed to cheat on your urine drug

19   screen; is that what you told us?

20   A    Yes, the first one, you have to have nothing in your system.  After the

21   first visit, you have to have oxy in your system.

22   Q    Okay, and your first visit – sorry about that – your first visit was on

23   3/14 the time that you saw Dr. Azmat; yes?

24   A    Yes.

25   Q    So on that visit you would not have oxy in your system, as you've said.

-330-

1    A    No.

2         MR. WITHERS: Jennifer, can you pull this up, please, ma'am.

3    Q    And I'm going to show you what's been marked as Government's

4    Exhibit 24-02 – 6, sorry.  And, ma'am, that is a urine drug screen that

5    shows you positive on 3/14 for benzodiazepine; right?

6    A    Yes.

7    Q    You had benzodiazepine in your system on 3/14; did you not?

8    A    It says I did.

9    Q    And let's look at the urine drug screen – this is Government's Exhibit

10   24-027.  That shows on your first visit, 3/14, positive for oxycodone; does it

11   not?

12   A    Yes, and I know exactly why now.

13   Q    So the first time that you visited, your urine drug screen was in fact

14   positive.

15   A    Yes.

16   Q    Now, you told us just a minute ago that you did not tell Dr. Azmat that

17   your pain was a level of 10.  You told us that; right?

18   A    Yes, I guess.

19   Q    All right, and I'm going to show you what's been marked as

20   Government's Exhibit 24-004, we just looked at that a minute ago, and

21   what you wrote, however, was that your – on a scale of 1 to 10 your usual

22   pain is 10.  That's what you wrote.

23   A    That's what I wrote.

24   Q    And just above that, ma'am, it says, describe your main complaint or

25   problem.  And you wrote, extreme pain in lower back; did you not.

-331-

1    A    Yes.

2    Q    Now, you've told us that you came down here with Mr. Henderson and

3    your husband, and that the purpose was so that Mr. Henderson could use

4    your drugs; is that right?

5    A    No.  I said I was promised to be able to be paid for my time, and that

6    he would be getting the medication.

7    Q    Okay, and so what you were going to do, then, is, you were going to go

8    in and lie to the doctor; right?

9    A    Yeah.

10   Q    And get medication as a result of those lies; right?

11   A    Yes.

12   Q    And then come out and give the medication to Mr. Henderson; right?

13   A    Yes.

14   Q    And when in fact you saw Dr. Azmat, one of the things that he did, he

15   discontinued the Valium that you were on; did he not?

16   A    I don't remember.

17   Q    Okay.  I'm going to show you what's been marked as 24-021.  These

18   were the prescriptions we were just looking at.  You see those two

19   prescriptions?

20   A    Yes.

21   Q    Oxycodone 30 and Oxycodone 15; right?  No Valium there.

22   A    No.

23   Q    And then you got Naproxen, 500 milligrams, and Neurontin; correct?

24   A    Yes.

25   Q    And there's a notation that I've highlighted that says, all or none;

-332-

1    correct?

2    A    Yes.

3    Q    Now, Mr. Knoche asked you about your knee pain and whatnot.

4    A    Yes.

5    Q    You didn't go in and tell Dr. Azmat a story about your knee pain; did

6    you?

7    A    No.

8    Q    Because you had been coached by Mr. Henderson what to say –

9    A    Yes.

10    Q    – correct?

11    A    Yes.

12    Q    You had done it before; correct?

13    A    One time before, yes.

14    Q    And you did it on this occasion with Dr. Azmat –

15    A    Yes.

16    Q    – correct?  And you did it later, as well, at the same clinic; did you not?

17    A    No.

18    Q    Mr. Henderson – you – Mr. Knoche –

19    A    – Mr. Henderson took me – the first time he ever took me to a clinic

20    he told me what to say.

21    Q    You came to East Health Center – strike that.

22         The only time you saw Dr. Azmat was on March 14th of 2011.  That's

23    true; isn't it?

24    A    Yes.

25    Q    You came to East Health Center on two other occasions; did you not?

-333-

1 A Yes.

2 Q On each of those two occasions you lied to the physician as well; did

3 you not?

4 A Yes.

5 Q Have you been to other clinics since then?

6 A No.

7 Q You had been to clinics before then; had you not?

8 A No.

9 Q You'd not been to clinics before then?

10 A The one in Florida, that was it.

11 Q And you got the prescriptions filled from that occasion in Florida as

12 well; right?

13 A Yes, in Ocala.

14   MR. WITHERS: I think that's all I have, thank you.

15   THE COURT: Anything else of this witness?

16       REDIRECT EXAMINATION BY

17 MR. KNOCHE:

18 Q Ms. Binion, did – as to the forms that you filled out before you saw the

19 doctor, were they ever reviewed by Dr. Azmat?

20 A No, sir, they wasn't.

21 Q And you've described briefly the physical exam.  Did he put you on the

22 table and do anything with you?

23 A No, sir.

24   MR. KNOCHE: That's all I have.

25   THE COURT: Anything else of this witness?

-334-

1          MR. KNOCHE: No, Your Honor.

2          THE COURT: Mr. Withers?

3          MR. WITHERS: Your Honor, I think that's all I've got for this

4    witness.

5          THE COURT: Can the witness be excused?

6          MR. KNOCHE: Yes, Your Honor.

7          THE COURT: All right, you're excused, ma'am.  Thank you.

8        [Witness Excused]

9          THE COURT: Call your next witness, Mr. Withers (sic).

10         MR. KNOCHE: Patricia Rohrer.  Yeah, Rohrer.

11       [Witness Sworn]

12         CLERK: You may be seated.  Please state your name for the

13   record.

14         MS. ROHRER: Patricia Rohrer.

15                P A T R I C I A   R O H R E R

16     GOVERNMENT'S WITNESS, SWORN, TESTIFIED AS FOLLOWS

17                 DIRECT EXAMINATION BY

18   MR. KNOCHE:

19   Q    Ms. Rohrer, where do you live?

20   A    Lexington, Kentucky.

21   Q    And what do you do for a living?

22   A    I don't do anything now.  I'm disabled, signed up on disability.

23   Q    What have you done?

24   A    I worked in food service most of my life, house cleaning, factories.

25   Q    Are you married?

-335-

1   A   Yes.

2   Q   If I can call your attention to – well, let me ask you this first: have you

3   ever used oxycodone?

4   A   Yes.

5   Q   When did you start using oxycodone?

6   A   Probably 2010 or '11, somewhere around there.

7   Q   And how was it that you came to use this medicine?

8   A   I started going to pain clinics in Florida.

9   Q   You live in Lexington?

10  A   Yes.

11  Q   That's a pretty big city?

12  A   Yeah.

13  Q   Plenty of – well, The University of Kentucky is in Lexington; right?

14  A   (No audible response.)

15  Q   And medical center, doctors' offices –

16          MR. WITHERS: – Objection, Your Honor.

17          THE COURT: Yes, sir.  Don't lead her, Mr. Knoche.  Just ask

18  her – you know, you can ask her a simple question, are there any pain

19  clinics where you live, you know.  Let her answer.

20  Q   (By Mr. Knoche) To your knowledge are there?

21  A   There is pain clinics, but they don't give anything like that in

22  Lexington.

23  Q   So knowing that they would not do that for you, how did you find pain

24  clinics in Florida that would?

25  A   Through friends, billboards.

-336-

1    Q    What would you – tell us about the billboards which enticed you to

2    travel to Florida to start using oxycodone.

3    A    They would just say, need help with pain, give numbers.  You call and

4    talk to them, and they would tell you you could walk in or make an

5    appointment.

6    Q    To walk in?

7    A     (No audible response.)

8    Q     Okay.  Tell you what you needed to bring?

9    A    No, not until you called them.

10   Q    Okay. Well, when you called them.

11   A    Yeah.

12   Q    And would that be, what?

13   A    An MRI within two years old.  That was about it.

14   Q    And was this in south Florida or Jacksonville; do you know?

15   A    South – I went to as far as Miami.

16   Q    And how did you travel?

17   A    Car.

18   Q    With anyone?

19   A    A friend of mine, we'd go together.

20   Q    Long trip.

21   A    Yes.

22   Q    Was this –

23   A    – Two or three days, sometimes a week.

24   Q    And you – right now you don't work.  Were you working when you

25   started doing oxycodone?

-337-

1    A   Yes.

2    Q   Making a lot of money?

3    A   No.

4    Q   Is it expensive to drive from Lexington to –

5    A   It is.

6    Q   – south Florida.

7    A   But my husband drawed  a retirement out where he was at work.  We

8    probably ran through as much as $36,000 going to pain clinics.

9    Q   Over the course of what period of time?

10    A   Four or five yeas.

11    Q   And do you still go to pain clinics?

12    A   No.

13    Q   And why not?

14    A   Can't afford it.  Actually, I hope I'm never on them again.

15    Q   Are you using any oxycodone now?

16    A   No.

17    Q   Are you coping with your pain okay?

18    A   I deal with it the best I can.

19    Q   How do you – do you take over-the-counter drugs?

20    A   Yeah, and I'm waiting to get – I have a regular doctor in the town

21    where I live at now, and I'm waiting to get into one of the pain clinics in

22    Lexington, but it's something that they do with therapy along with the

23    medication and stuff.

24             MR. KNOCHE: Can we see Exhibit 18, please?

25    Q   Is that your handwriting, Ms. Rohrer?

-338-

1    A    Yes.

2    Q    And can you read the date for the jury?

3    A    3/8/11.

4    Q    Would that have been when you visited East Health Center?

5    A    Yes.

6    Q    You remember the doctor you saw there?

7    A    Yes.

8    Q    All right.  Do you see him in the courtroom here?

9    A    Yes.

10   Q    Could you describe him for the record?

11   A    He's sitting there with the blue tie.

12        MR. KNOCHE: I'd ask the record to reflect the identification,

13   Your Honor.

14        THE COURT: So noted.

15   Q    That paperwork that you filled out, Ms. Rohrer, that we were looking at

16   a moment ago, was that filled out before or after you saw the doctor?

17   A    Before.

18   Q    Doctor ever discuss any of those forms with you?

19   A    No.

20        MR. KNOCHE: 18-002.

21   Q    See where it says what your usual level of pain was?

22   A    Yes.

23   Q    What's it say?

24   A    Seven to nine.

25   Q    Is that your usual level of pain?

-339-

1    A    That's what I felt it was.  I realize that 7 to a 9, or a 10, that I should be

2    in tears.  I'm in pain now, but I would rate it probably a 6.  And I – at the

3    time I felt that's what it was, was a 7 to 9.

4    Q    But today you indicate you're dealing with it with over-the-counter

5    meds.

6    A    Advil, heat pad, but I'm constantly in pain.  The oxys did help the pain,

7    and I guess that's why I kept seeking them.

8    Q    Were you addicted?

9    A    Yes, I was.

10   Q    And if you did not take oxycodone, would you have withdrawal

11   symptoms?

12   A    Yes, but I didn't run out.  I made sure I wasn't out.

13   Q    Well, you're off it now, did you withdraw?

14   A    Yes.

15   Q    And describe that process.

16   A    The worse withdrawal was the depression.  I even thought about taking

17   my life at once – one time.  A lot of sick stomach, couldn't eat, didn't want

18   to be around anybody, didn't want to talk to anybody.  Stayed in bed.  It

19   was a terrible feeling.  Don't want to do it again.

20   Q    Do you intend to go through it again?

21   A    I hope not.  I pray for it every day, that I never do.

22              MR. KNOCHE: Let's see 18-11.

23   Q    See what your blood pressure was on the day that you saw Dr. Azmat?

24   A    Yes.

25   Q    What's it say?

-340-

1    A    196/116.

2    Q    Are you being treated for high blood pressure?

3    A    I am now.

4    Q    Is it under better control?

5    A    Yes.

6    Q    Did Dr. Azmat discuss that with you?

7    A    No.

8    Q    Describe the physical examination that Dr. Azmat gave?

9    A    He took a strength test with my hands, had me squeeze his hands,

10   because I don't have a lot of strength in my left arm due to my neck.  He felt

11   of my neck, my back.  He looked down my throat, in my ears.  That was

12   about it.

13   Q    Did he examine you on the table?

14   A    No.

15   Q    Did he make you bend over?

16   A    No.

17   Q    Lift your legs?

18   A    No.

19   Q    In the middle of 18-11, previous medication; see that?

20   A    Uh-huh.  It's a little hard  – hard to read –

21   A    Yes, I see it.

22   Q    – but can you see 180 oxy 30 ...

23   A    Yes.

24   Q    That's not your handwriting, is it?

25   A    No.

-341-

1   Q   Is that what the doctor wrote?

2   A   Yes.

3   Q   Is that what you told him?

4   A   That's what I was getting before I came there.

5   Q   And you did receive a prescription from Dr. Azmat; correct?

6   A   Yes.

7           MR. KNOCHE: 18-14.

8   Q   And in the lower right, you received a prescription for 150 oxy 30s?

9   A   I'm seeing Flexeril and oxycodone 15.

10          MR. KNOCHE: There we go, lower right.

11  A   Okay.

12  Q   Okay.  See that?

13  A   Yes.  150.

14  Q   Dated March the 8th?

15  A   Yes.

16  Q   And then –

17          MR. KNOCHE: – if you'd scroll up, Dean.

18  Q   Sixty 15s?

19  A   Yes.

20          MR. KNOCHE: 18-12.

21  Q   You know what that document is?

22  A   MRI.

23  Q   Is that you, Patricia Rohrer?

24  A   Yes.

25  Q   And where did you get that MRI done?

-342-

1    A    I think Boca Raton.

2    Q    Are there MRI facilities in Lexington, Kentucky?

3    A    Yes, but they're a lot more expensive than these are.  In Lexington it

4    costs close to a thousand dollars for MRI.

5    Q    Well, how much did it cost you to get this done?

6    A    350, I think.  It was either 250 or 350.

7    Q    Did you get it done the same day?  I mean, did you get the report the

8    same day you were examined?

9    A    Yes.

10   Q    Pretty good service?

11   A    Yes.  It was pretty quick.

12   Q    Pretty quick?

13   A    Yeah.

14   Q    You remember what Dr. Azmat counseled you about the effects of the

15   drugs he was prescribing to you?

16   A    There was no counseling.

17   Q    Did he ever talk about your drug addiction?

18   A    No.

19   Q    Warn you about driving while under the influence of pills?

20   A    No.

21   Q    Did he talk about your medical history?

22   A    No.

23   Q    Did you give him prior physician records?

24   A    No.

25   Q    Did he try to call your doctor, your previous physicians, to your

-343-

1    knowledge?

2    A    Not to my knowledge.

3    Q    Refer you to physical therapy?

4    A    No.

5    Q    Discuss any alternative treatments?

6    A    No.

7    Q    Discuss your MRI?

8    A    No.

9    Q    Did he discuss your pain rating with you –

10   A    – He did ask about the MRI, how I got hurt.

11   Q    How you got hurt?

12   A    I did explain that to him.

13   Q    Did he discuss the findings in the MRI with you?

14   A    No, other than that it was just a neck injury.

15   Q    You've already said he didn't mention the blood pressure?

16   A    No.

17   Q    Did he say anything about your weight?

18   A    No.

19   Q    Did he ask you why you drove so far to see him?

20   A    No.

21   Q    Did he ask you why you, from Kentucky, had an MRI from south

22   Florida?

23   A    No.

24              MR. KNOCHE: That's all I have, Your Honor.

25              THE COURT: Mr. Withers?

-344-

1          <u>CROSS-EXAMINATION BY</u>

2     <u>MR. WITHERS</u>:

3     Q     Ms. Rohrer, good afternoon.

4     A     Afternoon.

5     Q     I'm Tom Withers.  I represent Dr. Azmat.

6              I'm sorry you're still in pain, but if I understand what you're telling

7     us, you continue to be hurting in your neck; is that accurate?

8     A     Yes.

9     Q     Now, Mr. Knoche was just looking at a document, and for record, I'll

10    turn back to it.  It's document 18-011.  You see that on the screen, ma'am?

11    A     Yes.

12    Q     It says, can't turn neck; right?

13    A     Right.

14    Q     And it may be hard for you to read, I've gotten use to it, but I think it

15    says, hurt neck, factory, ten years ago.

16    A     Right.

17    Q     Was that true?  Did you hurt your neck –

18    A     Yes.

19    Q     – in a factory ten years ago?

20    A     Yes.

21    Q     So Dr. Azmat would have taken what's called a history – that is, how

22    you were injured; correct?

23    A     Right.  I was injured in a car wreck right after that, but I don't see that

24    on here.

25    Q     Okay, and it also says from neck, and I think that says mid-back right

-345-

1    there, and down left arm and shoulder.

2    A    Right.

3    Q    Was that true?

4    A    Yes.

5    Q    And you see where it says oxy 30, 180 right there?

6    A    Yes.

7    Q    That was true as well, was it not?

8    A    Yes.

9    Q    And right next to that, ma'am, I think it says oxy 15, and I think that

10   says 84, although it's hard to read.

11   A    Yes.

12   Q    And then Xanax right next to that; correct?

13   A    Yes.

14   Q    And there were a couple of others, Flexeril, and I'm not sure that I can

15   read that other one.  And then if we look down here, the oxycodone 30

16   milligram tablets were reduced from 180 down to 150.

17   A    Yes.

18   Q    The oxy 15 milligram tablets were reduced from 84 tablets down to 60;

19   correct?

20   A    Yes.

21   Q    And then the Xanax was discontinued; was it not?

22   A    Yes.

23   Q    So that when you went into see Dr. Azmat, you came out with fewer

24   oxycodone; correct?

25   A    Yes.

-346-

1   Q   And no Xanax, true?

2   A   Correct.

3   Q   Now, you've described withdrawal for us.  Did you – ma'am, did

4   anybody attempt to wean you off the oxycodone –

5   A   No.

6   Q   – any healthcare professional?

7   A   No.

8   Q   You did that yourself.

9   A   Yes.

10   Q   I know that had to be hard.

11   A   Yes, it was.

12   Q   Now, when you first went to the East Health Clinic –

13            MR. WITHERS: And this is Government Exhibit 29-1A-023.

14   Q   – it was on the morning of March 8, 2011; right?

15   A   Yes.

16   Q   It looks like, ma'am, you checked in at 10:35.

17   A   Yes.

18   Q   And the – you're position Number 8 that day.  That's your signature

19   there?

20   A   Yes.

21   Q   And a total of 12 patients –

22   A   Yes.

23   Q   – in the clinic that day.

24   A   Well, when I was there, I guess.

25   Q   Throughout the day.  Now, in other words, when you went in there

-347-

1    weren't 15 or 20 people waiting in the waiting room at that clinic; were

2    there?

3    A    There was probably 10 or 12 by the time I left, but I wasn't there very

4    long.

5    Q    Okay, and this information that's recorded here, that Dr. Azmat has

6    recorded on this form, with respect to your hurt neck, all of that was true;

7    correct?

8    A    Yes.

9    Q    With respect to the pain scale here, a 9 without meds, and a 6 with

10   meds, that was true; wasn't it?

11   A    I felt like was, yes.

12   Q    The prescription medications that you were on, all of that was true as

13   well; correct?

14   A    Yes.

15   Q    And so it's fair to say, then, that you went to the East Health Clinic

16   because you in fact were in pain; were you not?

17   A    Yes.

18   Q    And you told Dr. Azmat the truth; did you not?

19   A    Yes.

20   Q    And when you saw him, you spent about 10 or 15 minutes with him;

21   didn't you?

22   A    Probably about ten.

23   Q    And I think you've described he listened to your chest and back; true?

24   A    No.

25   Q    He didn't?

-348-

1    A    No.  He looked at my throat and my ears, examined the strength of my

2    hands, and felt of my neck and back, but he didn't listen to it.

3    Q    All right.  Do you recall when you testified in front of the grand jury?

4    A    Yes.

5    Q    You came down here, were sworn to tell the truth; correct?

6    A    Yes.

7    Q    And that was on September 11, 2012; correct?

8    A    Yes.

9    Q    And do you recall the question being asked to you, did he check your

10   heart rate; and your answer was, he didn't – well, yes, he listened to my

11   heart –

12   A    – They checked my heart rate when they do pre-op.

13   Q    And your answer –

14   A    – I probably got confused there, but that's what they do, is the pre-op.

15   Q    All right, and he did a strength test with your hands as well; did he not?

16   A    Yes.

17   Q    And of your arms as well; did he not?

18   A    Yes.

19   Q    And he checked the rotation of your neck; didn't he?

20   A    Yes.

21   Q    And he physically examined your neck – that is, put hands on your

22   neck; did he not?

23   A    Yes.

24   Q    Listened to your chest and lungs; didn't he?

25   A    No, they did that in pre-op.

-349-

1    Q   You recall telling the grand jury, he felt of my neck and my back, and

2    he listened to my lungs?  Do you recall telling the grand jury that?

3    A   I probably just got confused on it, because they listen to lungs and

4    heart in pre-op.

5    Q   And he pushed on your shoulders.

6    A   Yes.

7    Q   And you had an MRI with you; correct?

8    A   Yes.

9    Q   And I know neither you nor I is a doctor, but you understand that MRI

10   showed serious problems with respect to your neck; didn't it?

11   A   Yes.

12   Q   You did a urine drug screen; correct?

13   A   Yes.

14   Q   And two of the medications that Dr. Azmat gave you were Motrin and

15   Flexeril; do you recall that?

16   A   Yes.

17   Q   And you got those filled as well; did you not?

18   A   Yes.  The Motrin made me sick at my stomach so I couldn't take it, but

19   I did use the Flexeril.

20   Q   And when you saw Dr. Azmat, ma'am, you told him the truth; is that

21   correct?

22   A   Yes.

23   Q   And what you put down was accurate with respect to everything you

24   did and said with respect to Dr. Azmat –

25   A   – Yes, that's what I got at the pain clinic prior years.

-350-

1    Q    And the medications that he prescribed helped your pain; didn't it?

2    A    Yes.

3    Q    Thank you, ma'am.

4                        REDIRECT EXAMINATION BY

5    MR. KNOCHE:

6    Q    The name of the person you traveled with was ...

7    A    Tammy Ray.

8    Q    Tammy Ray, and did you notice her name on that form which counsel

9    showed you a moment ago?

10   A    Yes.

11   Q    Signed in with you at the same time?

12   A    Yes.

13   Q    Showing the same area code as you're from?

14   A    Yes.

15   Q    Kentucky area code.  Is that a Kentucky area code?

16   A    Yes, Lexington.

17   Q    Now, when counsel asked you, or suggested that Dr. Azmat cut down

18   the medicines you were taking, that's the first and only time you saw him;

19   wasn't it?

20   A    Yes.

21   Q    He didn't cut down anything that he had prescribed.

22   A    No.

23   Q    Okay.  You said you were taking 180 —

24   A    Right.

25   Q    — of oxy 30s?  And he gave you what, 150?

-351-

1    A    150, and I wasn't happy about it because he cut it.

2    Q    So that counts as a cut?

3    A    (No audible response.)

4    Q    Have you done anything to your neck, you know, surgery-wise,

5    therapy-wise, since you stopped taking oxy?

6    A    No, because they can't guarantee that it'll fix my neck.  No, I'm not

7    going to be cut on for that.

8    Q    So you're the same Patricia Rohrer physically, albeit two years older

9    today than you were –

10   A    Yes.

11   Q    — when you saw Dr. Azmat.  And can you cope with this on ...

12   A    I do.

13   Q    Are you on – do you have any medical insurance?

14   A    No.

15   Q    Were you asked for insurance when you checked in –

16   A    No.

17   Q    – the East Health Center?  How did you pay?

18   A    Cash.

19         MR. WITHERS: Very brief followup, Your Honor?

20         THE COURT: Yes.

21                    RECROSS-EXAMINATION BY

22   MR. WITHERS:

23   Q    Fact is that when Dr. Azmat decreased your medication, you weren't

24   happy with that; right?

25   A    No.

-352-

1    Q    And you still today hurt; right ?

2    A    Yes.

3    Q    And still today waiting to get into a pain clinic in your home state.

4    A    Yes.

5             MR. WITHERS: Thank you, ma'am.

6             THE COURT: Anything else of this witness?

7             MR. KNOCHE: No, Your Honor. She may be excused –

8             THE COURT: – May the witness be excused? All right, you're

9    excused, ma'am.  Thank you.

10        [Witness Excused]

11            THE COURT: Call your next witness.

12            MR. GILLULY: Judge, we'd like to call Konstantinos Afthinos.

13        [Witness Sworn]

14            CLERK: You may be seated.  Please state your name, your

15   occupation, and spell your first and last name for the record.

16            MR. AFTHINOS:   My name is Konstantinos Eugene Afthinos.

17   Last name A-F as in Frank T-H-I-N-O-S.  My occupation is a food server.

18            K O N S T A N T I N O S   A F T H I N O S

19       GOVERNMENT'S WITNESS, SWORN, TESTIFIED AS FOLLOWS

20                      DIRECT EXAMINATION BY

21   MR. GILLULY:

22   Q    And Mr. Afthinos, if you'll just speak up.  Sometimes it's hard for me

23   to hear.

24   A    Yes, sir.

25   Q    And Mr. Afthinos, where do you live, sir?

-353-

1    A    I live in Lake Worth, Florida.

2    Q    And where – is that middle, northern, or southern Florida?

3    A    South Florida.

4    Q    Okay.  How long have you lived in Florida?

5    A    Twelve years.

6    Q    What brought you down there?

7    A    College, place to stay with the folks.

8    Q    And did you attend college?

9    A    I did, a few.

10   Q    And did you graduate?

11   A    No.

12   Q    Okay.  Mr. Afthinos, you are in fact – you stand before the Court now,

13   you've been convicted of a federal crime.

14   A    Yeah.

15   Q    You were convicted of a misprision charge related to unlawful

16   distribution of controlled substances and money laundering; is that right?

17   A    Yes.

18   Q    And you're awaiting sentencing?

19   A    I am.

20   Q    And as part of your plea agreement you've agreed to testify and

21   cooperate with the United States Government; is that right?

22   A    I have, yes.

23   Q    Okay, and you are represented by counsel; is that right?

24   A    Yeah.

25   Q    Okay.  I would like to date your attention back to in or about 2011.  Did

-354-

1      you get a job at East Health Center in Garden City, Georgia?

2      A    Yes, I did.

3      Q    And how did you learn of East Health Center?

4      A    I was working for my friend Dan, and business wasn't going so good,

5      and they approached Dan about a job at a clinic.  And he told me about it,

6      and I was like, well, we're not going to be working, can I come with you?

7      And he said, I'll ask if I can find you work with us and you can come with

8      us.

9      Q    Okay, and is this Dan Wise?

10     A    Dan Wise, yeah.

11     Q    Okay.  A friend of yours?

12     A    A friend of mine.

13     Q    What kind of business were you and Dan in prior to East Health

14     Center?

15     A    When I met Dan we were doing debt consolidation.  That moved to

16     credit repair.  And from credit repair it moved into helping people get into

17     the HART program, the Home Affordable Remodification Program.

18     Q    Okay.  Through Dan did you ultimately meet somebody by the name of

19     Sean Clark?

20     A    I did.

21     Q    Did you meet Al LeFrancois?

22     A    Yes, I did.

23     Q    Did you meet Frankie Barbuscia?

24     A    Yeah, Frankie B, yeah.

25     Q    And at that time were all of you living in Florida?

-355-

1    A    Yes.

2    Q    Did there come a time when you learned of an intent to open a medical

3    office in Savannah, Georgia?

4    A    Yeah.

5    Q    And who do you learn – did you learn that through, Dan?

6    A    From Dan, from that conversation, yeah.

7    Q    And to your knowledge, did Dan have any previous medical

8    experience?

9    A    No.

10   Q    Did Sean have any previous medical experience?

11   A    Not that I know of.

12   Q    What about Shelly?

13   A    No.

14   Q    Did you have any –

15   A    No.

16   Q    – previous medical experience.

17   A    No.

18   Q    Okay, and did you know who was financing the opening of the clinic in

19   Georgia?

20   A    Lew, Sean –

21   Q    Lew...

22   A    – Al.

23   Q    Pardon?

24   A    Lew, Sean, Al.

25   Q    Okay, and when you were approached, what was your job supposed to

-356-

1    be at East Health Center?

2    A    They wanted me to be a security guard.

3    Q    A security guard, and how much do you weigh?

4    A    130.

5    Q    And how tall are you?

6    A    5'6".

7    Q    So they wanted you to be a security guard at a doctor's office?

8    A    Yeah, but it wasn't for how you think – of how you think of muscle.  It

9    was just, tell people where to sit, tell people where to stand, tell people

10   where they can and can't smoke, don't have people loitering outside the

11   business.

12   Q    Okay.  Do you have any training in security?

13   A    No.

14   Q    All right, and do you know whether or not Al had any medical

15   training?

16   A    I know that he operated a clinic in Boca, but don't know –

17   Q    – Did you ever go to that clinic?

18   A    I did.  We took a trip there.

19   Q    And do you know what kind of clinic it was?

20   A    Yeah, it was a pill mill.

21   Q    Pardon me?

22   A    It was a pill mill.

23   Q    Okay, and by pill mill, what do you mean?

24   A    I mean they dispensed narcotics to people that didn't need them.

25   Q    Okay, and prior to East Health opening, did you engage in marketing?

-357-

1    A    I did.

2    Q    And if you could just tell the ladies and gentlemen what kind of

3    marketing you did.

4    A    We went up to Jacksonville to a couple of the pill mills that were really

5    successful.  We're talking 200 people line up around the block.  And we had

6    our business cards.  And we would wait for these people that were going to

7    see the doctor to go to a 7-11, and we would approach them, come to our

8    office, come see our doctor, our doctor will take really good care of you.  If

9    they would leave, we would follow them in our car, and we would stop them

10   at a red light, and we would have them roll down their windows, and we'd

11   pass our business cards to them and tell them come to our place instead.

12   Q    Okay, and you're talking about marketing, we, who are some of the

13   people you marketed with?

14   A    There was me, Dan, Frankie and Sean.

15   Q    Okay, and what kind of people were you looking for?  You said – I

16   mean was it – did they fit a particular profile?

17   A    Anyone walking out of the clinic.  We didn't care.

18   Q    Did you ever see people walking out of the clinic and getting into

19   vehicles in groups?

20   A    Oh, sure, yeah.

21   Q    Are those the kind of people you would approach?

22   A    Oh, yeah.  We also – we went to hotels really early in the morning, like

23   4:00 a.m., and we would go to these kind of banged up hotels, and we

24   would look for out-of-state license plates, and we would put our business

25   cards on the windshields.

-358-

Q    Okay, and did you have occasion to meet a female named Adel and
Candace?

A    Yeah.

Q    And were they from Florida also?

A    Yeah.

Q    And did they start working at East Health Center?

A    Yes.

Q    And what was their job at East Health Center?

A    Just to come up and train us on front desk, and how to take drug tests
and urine tests and all that.

Q    Okay.  So after doing some marketing – or, you did some marketing
before East Health opened; is that correct?

A    Yeah, before it opened.

Q    And there was a point where your job switched from marketer to
actually working inside the clinic; is that right?

A    Yeah.

Q    And who trained you?

A    Candace.

Q    And to your knowledge does Candace have any medical training?

A    No.

Q    What about Adel?

A    Not that I know of.

Q    Pardon me?

A    No, not that I know of.

Q    Okay, and when you came up here to Garden City, Georgia, where

-359-

1    were you living?

2    A    At first we rented this house in Savannah until me and Dan and Shelly

3    could find a place of our own.

4    Q    Do you know who was paying the bills for this house?

5    A    Al, Lew, I'm not sure.  I know Al took care of all the finances and stuff.

6    Q    Okay, and what was your job going to be besides marketer at East

7    Health?

8    A    Whatever they needed me for.  They trained me in front desk, they

9    trained me in triage, taking blood pressure, doing urine samples.

10    Q    Okay, and what is triage?

11    A    It's where you interview the client, take their blood pressure, do their

12    drug test, prep them for the doctor.

13    Q    Okay, and the person who trained you in how to do triage, did this

14    person have any medical knowledge?

15    A    No.

16    Q    Okay, and was one of your duties to give patients forms to fill out?

17    A    Yes.

18    Q    Okay, and you've seen the forms, obviously.

19    A    Yeah.

20            MR. GILLULY: Dean, if you'd put 1-002 on the screen.

21    Q    Is this one of the forms of information that would be your duty to give,

22    or someone who's working at the front desk to give a prospective customer?

23    A    Yes.

24    Q    Let me ask you this: before the people got this form, did they have to

25    pay any money?

-360-

1    A    Yeah.

2    Q    How did they pay?

3    A    $300 up front, credit card, cash.

4    Q    And did you ever observe people traveling in groups to the doctor's

5    office?

6    A    Ninety percent of our clients.

7    Q    Ninety percent of your clients?  And they paid cash, and how would

8    this piece of paper – would you literally just hand them a stack of papers to

9    fill out?

10   A    Yep.

11   Q    Pardon me?

12   A    Yes.

13             MR. GILLULY: Okay, and in fact, if you'll put 1-003.

14   Q    Is that, again, something that the patient fills out?

15   A    Yeah.

16             MR. GILLULY: 1-004.

17   Q    Another patient-filled-out document?

18   A    Yes.

19             MR. GILLULY: 1-005.

20   Q    Same?

21   A    That's it.

22   Q    Pardon me?

23   A    Yes, that's one –

24   Q    – Okay, and there's also a doctor-patient center agreement.  Is that

25   likewise filled out prior to the patient seeing the doctor?

-361-

1    A    Yeah.  If it's in the packet it has to be filled out and ...

2              MR. GILLULY: Okay, let me put it up there, 1-006.

3    A    Oh, yeah –

4    Q    – That's it –

5    A    – all the initials.

6    Q    That's part of the packet?

7    A    Yeah.  We would go and make sure every one was initialed before we

8    gave it to the doctor.

9    Q    Did it take patients long to fill this out, or they just ...

10   A    No, they breeze right through it.

11   Q    Breeze right through it, and was there a medical professional going

12   over and explaining any of the – what the documents mean?

13   A    No.

14   Q    In fact was there even conversations, or was it a one-sided thing, you

15   hand the papers, they fill it out, they give it back.

16   A    Yes.

17   Q    Pardon?

18   A    Yes.

19             MR. GILLULY: Okay, and 1-007.

20   Q    Again, standard form that's filled out by the patient without the doctor

21   present?

22   A    Yes.

23   Q    I mean, it's talking about safeguarding medications and prescriptions

24   before people have ever even met with the doctor; is that right?

25   A    Yeah.  Honestly, I've never – I never actually read the packets.  I just

-362-

1    made sure it was all filled out.

2              MR. GILLULY: 1-008.

3    Q    Another standard piece of paper given.

4    A    Yeah.

5    Q    And that talks about some medical malpractice.

6              MR. GILLULY: Will you scroll down, Dean.  Keep going.  1-009.

7    Q    Another document that's just passed out and signed before seeing a

8    doctor?

9    A    Uh-huh.

10   Q    Pardon?

11   A    Yes, yes.

12             MR. GILLULY: Dean, if you could go, I, Jim Brooks, and

13   highlight that paragraph.

14   Q    If you could read that out loud.

15   A    [Reading]: I, Jim Brooks, have read the above information or it has

16   been read to me and all my questions regarding the treatment of pain with

17   opiates have been answered to my satisfaction.  I hereby give my consent to

18   participate in the opioid medical therapy and acknowledge receipt of this

19   document.

20   Q    And all these documents are filled out before the patients ever even

21   met the doctor?

22   A    Yeah.

23             MR. WITHERS: Objection to counsel leading again, Your

24   Honor.

25             THE COURT: Yes, sir.  You've asked that question at least three

-363-

1   times, and he's said every time the forms were filled out before you go to

2   the doctor.

3            MR. GILLULY: Yes, sir, I'll move on.

4            THE COURT: Just like when I go to the doctor's office and they

5   give me the forms and I sign them before I have to go back to see the

6   doctor.  I mean – so you don't need to ask him that five times.

7            MR. GILLULY: Yes, sir.

8   Q    (By Mr. Gilluly) Does this document appear to predetermine that

9   patients would be placed on opioids before they even see a doctor?

10            MR. WITHERS: Objection to that conclusion, Your Honor.  The

11   document –

12            MR. GILLULY:  – Speaks for itself.

13            MR. WITHERS: Excuse me.  Objection to the conclusion.  The

14   document speaks for itself, that's right.  He does not have to summarize

15   what the document says.

16            THE COURT: Yes, sir, you don't need to summarize the

17   document.  The document will be in evidence, the jury can look at it, and

18   the jury can decide about it.

19            MR. GILLULY: Yes, Your Honor.

20   Q    (By Mr. Gilluly) Again, you said you've never even really read these

21   documents.  Did you ever have to explain these documents to any patients?

22   A    They never asked me any questions about them.

23   Q    Okay, and one of your jobs as triage is to talk about blood pressure.

24   Are you familiar with what a good blood pressure is?

25   A    Generally.  I couldn't give you numbers off the top of my head.

-364-

1   Q    Okay.  Have you ever been trained by medical personnel on blood

2   pressure dangers?

3   A    No.

4   Q    Did you perform urine tests?

5   A    Yes.

6   Q    Why?

7   A    To make sure that hard drugs weren't in a patient's system before

8   seeing a doctor.

9   Q    And by hard drugs, what are you talking about?

10  A    Cocaine, methadone.  Anything – if they had anything in their

11  symptoms (sic) , they had to make sure that if you do have something like

12  methadone in your system, do you have a prescription for it.

13  Q    If people tested positive for something like marijuana, were they able

14  to see the doctor?

15  A    Yeah.

16  Q    What about people who claimed to be taking oxycodone but it's not in

17  their system?

18  A    We would – what we do with those people is, we would put them in a

19  file, and they were said, there's drugs in your system, hey, I'm not to say if

20  you had cocaine today or not.  We're going to keep your file, you can test –

21  come back and test one more time.  If you fail again, that's it.  But you have

22  one more chance to come in here with clean urine specimen, and then you

23  can see the doctor.

24  Q    And when you first started, who was the doctor?

25  A    Dr. Azmat.

-365-

1    Q    Do you see him in the courtroom today?

2    A    Yes.

3    Q    Could you point to him and describe something he has on?

4    A    He's the man wearing the watch with his hand up.

5    Q    Wearing the what?

6    A    Wearing the watch with his hand up.

7             MR. GILLULY: Okay, Judge, if the record could reflect he's

8    identified the defendant.

9             THE COURT: So noted.

10   Q    And what kind of prescriptions did Dr. Azmat prescribe?

11   A    It was oxycodone, Percocets, and everything else.  It had Ibuprofen on

12   it, as I remember.

13   Q    Okay, and how do you know that?

14   A    I handed out the scripts.

15   Q    Okay.  Will you please describe kind of how it works.  Just walk it

16   through.  A patient walks into the center.  Give us the steps that must be

17   taken before the patient walks out.

18   A    To get the script?

19   Q    Sure.

20   A    What we would do, the patient would come in, he would give us – fill

21   out the paperwork, and they'd have to give us some kind of diagnosis.  99

22   percent  of the time it was an MRI, if not a hundred.  And then what we

23   would do is, to make sure it was a real MRI, we would call wherever they

24   got this MRI and have a direct fax.  And then we would look at both of

25   them, make sure, you know, they both matched.  Then they were – once

-366-

1    they passed that, then they gave us the money, $300.  We made sure all the

2    bills were real, put them in a safe, unless they had a credit card, we'd just

3    charge the credit card.  They then went back to triage, I do a urine

4    specimen on them, and as long as they were clean, then we put the report

5    into – on the door.  Dr. Azmat would see him.  Dr. Azmat would bring the

6    prescription back.  We would do a photocopy, and then I would call out to

7    the person, and I would tell them exactly what pills they were getting, how

8    many pills they were getting, and confirm they're them, and then hand

9    them the script.

10   Q    Okay.  So you were the one who would hand the scripts that Dr. Azmat

11   prescribed.

12   A    Yes.

13   Q    Did you ever see Dr. Azmat do anything but write prescriptions for

14   patients?

15   A    No.

16   Q    Did you ever see Dr. Azmat treat people who had colds or other

17   illnesses?

18   A    No.

19   Q    Did you ever see him turn people away who were sick?

20   A    One person came in, just wanted a Z-pack, said he had a cold, and we

21   asked Dr. Azmat, and Dr. Azmat said I don't want to see him for one reason

22   or another.

23   Q    Did the office have any real medical equipment?

24   A    Not at first.

25   Q    Did it have any X-ray machines?

-367-

1    A    No.

2    Q    Anything that could be used to read an X-ray?

3    A    Nothing like that.  We were – there was nothing but a bed in a room.

4    And then when the agents came, said, get this, this and that or we'll shut

5    you down, Al ran out to some medical supply shop, got everything that was

6    on that list, and then we filled each room.

7    Q    And why was that done?

8    A    We were told we were getting shut down.

9    Q    Okay.  I mean, like for instance, were there cotton balls –

10   A    Yeah.

11   Q    – and other medical supplies put – were they ever used?

12   A    No.

13   Q    And why were they there?

14   A    Because the guys told us, put these things in the rooms.

15   Q    And in fact –

16        MR. GILLULY:  – I'd like to go to 29-5A-2, please.

17   Q    When Dr. Azmat was working there, does this picture indicate similar

18   conditions as when he was there?

19   A    Yep, that was every day at the office.

20   Q    Every day at the office.

21   A    Uh-huh.

22   Q    The individual in the blue shirt in the middle of that photograph, who

23   was that?

24   A    That was our security guard.

25   Q    Do you know how Dr. Azmat was paid?

-368-

1    A    Cash.

2    Q    And do you know where the money came from?

3    A    From the patients.  Every day we would count out – from whatever

4    money we made we'd count out $2,000, wrap it up in a piece of paper, and

5    hand it to Dr. Azmat.

6    Q    Were there any rules related to where people could hang out?

7    A    Yeah, that's what he was there for.  I mean, no one was scared of a

8    fight breaking out or anything, but if there was, he was there.

9    Q    By he, you mean the security guard?

10   A    Yeah, security guard.  And he would tell people, you know, what they

11   wanted me to do at the beginning, you can sit here, you can stand there, if

12   you want to smoke you can go over there, no loitering in the front.  That

13   was his job.

14   Q    Did you ever see kids there?

15   A    Yeah, true.

16   Q    And what were they – who were they with?

17   A    Their parents.

18   Q    And what did parents and other people who attended East Health

19   Center look like?

20   A    Every-day normal folks.  I can't say I'd seen anybody sick and I –

21   again, I don't have any medical expertise, but from what I learned about

22   these drugs and what was being prescribed, and I would ask them at triage,

23   what's your pain, 1 out of 10, and they'd say 10.  And it's like, how did you

24   drive from Oklahoma if your pain's a 10 –

25              MR. WITHERS:  – Objection to the editorial, Your Honor.

-369-

1    THE COURT: Yes, sir, just ask him to answer the question, Mr.

2    Gilluly.

3    MR. GILLULY: Certainly.

4    Q    Did you make any observations on whether the people were going

5    there to get treated for pain, or to get pills?

6    A    Yeah, they were there for pills –

7    MR. WITHERS:  – Objection to the conclusion, Your Honor.

8    THE COURT: He can't give a medical opinion, Mr. Gilluly.

9    MR. GILLULY: And I'm asking about his observations, Judge.

10   THE COURT: Well, you asked about his observations, but

11   you're asking him – and he's a layperson – to give a medical opinion about

12   why somebody had gone to see a doctor.  Now, if they told him, that's one

13   thing.  But he is a lay witness, he's not trained in medicine.  You've been

14   through all that with about how he has no training in medicine, so don't ask

15   him to give a medical opinion.

16   MR. GILLULY: Yes, Your Honor.

17   Q    (By Mr. Gilluly) Without giving a medical opinion, describe your

18   observations to the jury.

19   A    I can't think of anything new to say.  These people seemed fine and

20   healthy, and they came to see a doctor.  That's my observation.

21   MR. GILLULY: Thank you.  Nothing further.

22   THE COURT: Mr. Withers.

23   CROSS-EXAMINATION BY

24   MR. WITHERS:

25   Q    Good afternoon.

-370-

1    A    Good afternoon.

2    Q    You are here from South Florida?

3    A    Yeah.

4    Q    I'm Tom Withers.  I represent Dr. Azmat.  I have a few questions for

5    you.

6         You were interviewed by federal agents the first time in June of 2011;

7    were you not?

8    A    Yeah.

9    Q    And during that interview, you told them that the first few weeks that

10   East Health Center was open that they saw about five or six patients a day;

11   didn't you.

12   A    Yeah.

13   Q    And you told them that you believed that East Health Center was a

14   legitimate business; true?

15   A    Yeah.

16   Q    And then you appeared in this court in November of 2012 and you

17   entered a felony plea to what's called a misprision of a felony; correct?

18   A    Yes.

19   Q    And you pled guilty to that; correct?

20   A    I did.

21   Q    And so as you sit here today, you are a convicted felon; true?

22   A    I am a convicted felon.

23   Q    And the – your sentencing in that over one year and two months'

24   period of time has not taken place; has it.

25   A    No.

-371-

Q    And that's because the government has requested that the sentencing be delayed until after you appear here to testify; correct?

A    That's true.

Q    At the end of the day – and you are cooperating with the government; right?

A    Yes.

Q    And at the end of the day, it's fair to say that you hope you will be rewarded for your cooperation; true?

A    That's part of it.

Q    In fact you testified before the grand jury in October of 2012; right?

A    Yeah.

Q    That was some weeks before you actually entered your guilty plea –

A    Yes.

Q    – correct?

A    Yes.

Q    And you are friends with Dan Wise; correct?

A    I was.

Q    You were, good point.  And you knew his girlfriend, Shelly Morford; correct?

A    Shelly, yeah.

Q    Y'all came up here together from South Florida; right?

A    Yes.

Q    You knew some of the other folks, like Mr. LeFrancois and Sean Clark as well; right?

A    Yeah.

-372-

1    Q    Yes?

2    A    Yes, uh-huh.

3    Q    And part of that group – or strike that.

4         Dr. Azmat was not part of that group in South Florida; was he?

5    A    No.

6    Q    And you've described for the members of the jury you and four other

7    folks running around putting cards on cars –

8    A    Yeah.

9    Q    – in Jacksonville; right?

10   A    Uh-huh.

11   Q    Yes.

12   A    Yes.

13   Q    And Dr. Azmat wasn't part of that group; was he?

14   A    No.

15   Q    You've described running around in Jacksonville tracking people

16   down as they came out of some facility down there and you handing them a

17   card; right?

18   A    Yes.

19   Q    Dr. Azmat wasn't part of that group; was he?

20   A    No, not at all.

21   Q    Now, you and Dan developed a business relationship with Sean Clark;

22   right?

23   A    Yes.

24   Q    And it was one or the other, and I can't recall what your testimony

25   was, that approached you with the idea of coming to Savannah to open a

1  healthcare business; correct?

2  A    Yes.

3  Q    And you went with Dan to a doctor's office in Boca Raton; correct?

4  A    Yeah.

5  Q    And I think you've described it was kind of an odd sort of doctor's

6  office; right?

7  A    Yeah.  We peeped in the door, and all you saw was two metal chairs,

8  and that was the doctor's office, and that struck me as odd.

9  Q    And when y'all came up here after talking about this down in South

10  Florida and then doing the advertising in Jacksonville, you ultimately

11  moved up here, what, in January of 2011?

12  A    Yeah.

13  Q    And it was kind of the whole gang that moved up here.  You, Mr. Clark,

14  Mr. LeFrancois, Adel Lizama, and Candace Carreras; do I have that right?

15  A    Yes.

16  Q    And did you say you lived downtown first?

17  A    Yeah, for a couple weeks.

18  Q    And then you moved out to the Pooler area; right?

19  A    Yes.

20  Q    So it was all of you folks living in one house in Pooler; correct?

21  A    Yeah, uh-huh.

22  Q    I'm sorry, but you do have to say yes or no for the record.

23  A    Yes, uh-huh, sorry.

24  Q    Dr. Azmat never lived at that place in Pooler; did he?

25  A    No.

-374-

1    Q    Dr. Azmat never came to that place in Pooler; did he?

2    A    No.

3    Q    Now, you never met Dr. Azmat until you saw him walk in the door, or

4    saw him on the first day of business, February 21, 2011; true?

5    A    True.

6    Q    You never had a conversation with Dr. Azmat prior to February 21,

7    2011; true?

8    A    No.

9    Q    And Dr. Azmat was always polite with you in his dealings with you;

10   was he not?

11   A    Oh, it was depending on the day, but a business was a business, some

12   days are better than others.

13   Q    He was professional with you in his interactions in the business

14   setting; is that fair to say?

15   A    Yes.

16   Q    And y'all saw folks of all ages at that facility; correct?

17   A    Yeah.

18   Q    You saw folks of all backgrounds; correct?

19   A    Yes.

20   Q    You saw folks dressed all kinds of way; didn't you?

21   A    Yeah, sure.

22   Q    And let's talk for a minute about the urine drug screens, because you

23   testified earlier that people that tested positive for marijuana would still be

24   seen by the –

25   A    Yeah.

-375-

1    Q   – doctor.  You testified to that; didn't you.

2    A   Yeah.

3    Q   But in fact what would happen is, Dr. Azmat didn't like to see a patient

4 with a positive urine screen for marijuana; would he?

5    A   He didn't personally like, or I was told by one of the people that

6 worked there if you saw a marijuana test, we personally, we don't like to see

7 people with harder drugs than that, but if you see some with a marijuana

8 test, switch out the test for another test.  And I would do that.

9    Q   And you're not running back telling Dr. Azmat you just switched out a

10 positive urinalysis for marijuana for a negative urinalysis for marijuana;

11 were you?

12    A   Of course not.

13    Q   Pardon me?

14    A   Of course not.

15    Q   And so that when you told the jury just a minute ago that the patient

16 would still be seen even though he had a positive urinalysis, that was

17 because of what you did; right?

18    A   Of my manipulation, yes.

19    Q   Exactly right.  It was not anything that Dr. Azmat did to manipulate

20 that urine drug screen; was it?

21    A   No.

22    Q   Fair to say, then, with respect to those patients, you were working to

23 deceive Dr. Azmat.  That's true; isn't it?

24    A   It's a hard question.

25    Q   If you have difficulty with that question, I will make it easier.  It's fair

-376-

1      to say that you were falsifying the urine drug screens; true?

2      A    I falsified urine drug screens when it came to marijuana.

3      Q    All right, and you didn't tell Dr. Azmat that you had falsified the urine

4      drug screens.  That's true; is it not?

5      A    No – yes, that's true.

6      Q    And there would be patients discharged every day, in your words, for

7      being positive for meth, or positive for cocaine in the urine drug screen –

8      A    If they came back ...

9      Q    – do you recall that.

10     A    If they came back and also tested positive for a second time, or if we

11     found out that they were doctor shopping, we would put them in a

12     discharge file.

13     Q    Okay, and so the office – or maybe it was you – maintained what's

14     called a discharged files file; right?

15     A    Yes.

16     Q    Discharged patients file, I'm sorry ...

17     A    Yeah, uh-huh.

18     Q    All right.  So that there were actually patients who did not get seen by

19     Dr. Azmat; true?

20     A    Yeah, if they were risky patients, we wouldn't let them be seen.

21     Q    And with respect to the MRIs, you would, I think you said, request

22     those direct fax from whatever office that MRI originated from.

23     A    Was taken, yeah, uh-huh.  Yes.

24     Q    Let me ask you another way: you got the MRIs directly from whatever

25     facility made the MRI; right?

-377-

1    A    Yes, uh-huh.

2    Q    And you would get those faxed the same day the patient was there.

3    A    Yeah, before they got seen.

4    Q    Before the patient was seen by the doctor.

5    A    By the doctor, yeah.

6    Q    And you talked to a lot of patients who would tell you that they were in

7    pain; correct?

8    A    Sure, yeah.

9    Q    And you had been told by your friends that you came up here with that

10   you were going to keep this within the confines of the law; right?

11   A    Yeah, whatever that was.

12   Q    You never thought it was going to come to this –

13   A    No.

14   Q    – that's fair to say.

15   A    I thought at the worst case scenario they'd shut us down.  I never

16   thought I'd be standing here before you or be in this kind of trouble, no.

17   Q    And the fact is, Dr. Azmat didn't last very long at that facility; did he?

18   A    Yeah.  No one would fill his scripts.

19   Q    All right, and there was an issue as well with respect to the patients

20   being dissatisfied with Dr. Azmat for other reasons; right?

21   A    Uh-huh.

22   Q    Yes?

23   A    Yeah.

24   Q    And you recall in fact Dan being upset with Dr. Azmat because he was

25   taking too long with the patients; right?

-378-

1    A    Yeah.

2    Q    And what he was complaining about was that Dr. Azmat wasn't writing

3    enough prescriptions; correct?

4    A    Yeah.  They had a talk about that, yeah.

5    Q    All right, and he told Dr. Azmat, step it up; correct?

6    A    I don't know if those were his words, but something to that effect, yes.

7    Q    Something to that effect.  And that's because Dr. Azmat was spending

8    15-to-20 minutes per patient; true?

9    A    Yeah, and we want to get these turned over.

10            MR. WITHERS: That's all I have, thank you.

11            THE COURT: Any other questions of this witness?

12            MR. GILLULY: Yes, Your Honor.

13                    REDIRECT EXAMINATION BY

14   MR. GILLULY:

15   Q    Mr. Afthinos, you indicated that was part of why you are testifying

16   today, in the hopes of getting a better deal.  What's the other part?

17   A    Coming to terms with what I've done.  Coming to terms with the

18   position I'm in.  Knowing what I was a part of, what I was pushing.

19   Understanding these pills, what they do.  I have never thought of myself as

20   being this kind of person, and I took a job opportunity that I knew wasn't

21   right, but I wanted a job.  And so if I were sentenced back in February, I'd

22   probably be out by now.  It's not just to cooperate and make things easier in

23   my life, it's just trying to set it straight.

24   Q    Did we ever tell you what to say?

25   A    Never.

-379-

1    Q    Did anyone –agents, anyone tell you what to say when you get into this

2    courtroom?

3    A    No.

4    Q    Pardon?

5    A    No.

6    Q    The defense lawyer asked you about discharged files.  Were you one of

7    the people who actually did the discharging?

8    A    Once or twice, sure.

9    Q    Was most of the discharging done before the people made it to the

10    doctor?

11    A    If we found out they were doctor shopping.  No, it would be – most of

12    them, they were repeat customers, and we found something about them

13    that made us scared or – so we would make up a discharge report and tell

14    them not to come back.

15    Q    By we, you mean you and people at the front.

16    A    Yeah, you know, I wasn't ...

17    Q    Did you ever request the underlying medical files from the doctors

18    who referred patients to get MRIs?

19    A    One more time.  I didn't understand that.

20    Q    Did you ever get previous medical history from the actual doctors who

21    purportedly treated these patients?

22    A    Not direct from doctors.  I don't know where that came from but ...

23    Q    You just got the MRIs.

24    A    Yeah

25    Q    That patients would bring –

-380-

1    MR. WITHERS:  – Objection to the leading.  Just because it's

2    redirect doesn't mean it's open season for leading.

3    THE COURT: Objection sustained.

4    MR. GILLULY: I won't lead, Judge.

5    Q    (By Mr. Gilluly) He asked you about a conversation with Dan and Dr.

6    Azmat about stepping it up.  You weren't present – were you present for

7    that conversation?

8    A    No, Dan told me about it.

9    Q    And did Dr. Azmat continue to work there after that conversation?

10   A    Yes.

11   Q    We talked about patients who were using marijuana, and that was

12   covered on cross-examination.  I'd like to put up what's been previously

13   marked as 27-55.  I'm going to put on the Elmo an initial visit form.  Do you

14   see the date there?

15   A    3/6 yeah.

16   Q    On the top?

17   A    February 21st.

18   Q    Pardon?

19   A    Yes, February 21, 2011.

20   Q    Okay, and that was when – was that when Dr. Azmat was working

21   there?

22   A    Yes.

23   Q    I don't know if you can read it, but at the bottom there can you read

24   the treatment of what was prescribed.  If you can read it, and if you can't

25   it's no big deal

-381-

1    A    I see oxy 30, 90.  DC oxy 15.  DC Xanax, and something 300, 90.

2    Q    Okay.

3    A    Motrin 300.

4    Q    And I will place a copy of a prescription.  Can you see the prescription

5    that was signed by Dr. Azmat on February 21, 2011.  On the left, what does

6    that say?

7    A    Oxycodone 30, 90.

8    Q    Do you see a drug test, and if you would please read that as well.

9    Positive what?

10   A    Yeah, there's that first one's positive.

11   Q    For what?

12   A    You got to forgive me.  I forget how to read these things.  It's been

13   years.

14   Q    Do you know what THC is?

15   A    Yeah, it's marijuana.

16           MR. GILLULY: That's all the questions I have, Judge.

17           MR. WITHERS: Just very briefly, Your Honor.

18                     RECROSS-EXAMINATION BY

19   MR. WITHERS:

20   Q    Mr. Afthinos – I'm sorry if I didn't say that right.

21   A    It's fine, it's great.

22   Q    Also present in the records were pharmacy records on occasions;

23   correct?

24   A    Yeah.

25   Q    And so that y'all would call to the pharmacy and have the pharmacy

-382-

1    records faxed directly back; correct?

2    A    Yeah, uh-huh.

3    Q    So that Dr. Azmat could confirm what that previous pharmacy

4    prescription had been; true?

5    A    Yeah, uh-huh.

6    Q    Now, counsel has asked you questions with respect to the issue of your

7    cooperation.  You understand that the one who holds the key to whether

8    you get a motion to reward you for your cooperation is the government;

9    correct?

10   A    Yes.

11   Q    And that the government and only the government can reward you for

12   that cooperation.  You understand that.

13   A    Yes.

14   Q    Now, counsel has asked you about this file for Mr. Combs right here.

15   There came a time where Dr. Azmat discovered that not all of the urinalyses

16   were making their way to the files; correct?

17   A    I don't recall.  I've never –

18   Q    – Didn't Dr. Azmat have a conversation with you and others in the

19   office to make certain that the UDS, the urine drug screens, made their way

20   into the files?

21   A    We were very detailed about taking care of all this, and there was – I

22   can't recall a time that we never had a drug test come in under Dr. Azmat's

23   file or any doctor we had.  We were very – we didn't want to get shut down

24   and we tried to keep this as detailed as we could with the drug screens and

25   all that.

-383-

1     MR. WITHERS: Thank you.

2     THE COURT: Anything else of this witness?

3     MR. GILLULY: No, Your Honor.

4     THE COURT: Can the witness be excused?

5     MR. GILLULY: Yes, Your Honor.

6     THE COURT: You can come down, sir.

7     [Witness Excused]

8     THE COURT: Let's take a five-minute recess, please.

9     [NOTE: A brief recess is taken, after which the proceedings are

10    continued outside of the presence of the jury as follows:]

11    THE COURT: I remind you that we're going to need to adjourn

12    about 4:30.  I don't know what your plans are for your witnesses.

13    Bring the jury in, please.

14    [NOTE: The jury is seated in the jury box, and the proceedings

15    are continued as follows:]

16    THE COURT: You may proceed, Mr. Knoche or Mr. Gilluly.

17    MR. GILLULY: Thank you, Your Honor.  We'd like to call Sean

18    Clark.

19    [Witness Sworn]

20    CLERK: You may be seated.  Please state your name, your

21    occupation, and spell your last name for the record.

22    MR. CLARK: My name's Sean Clark, C-L-A-R-K.  And I

23    currently work for the Lawyer Referral Network in Florida.

24    S E A N   C L A R K

25    GOVERNMENT'S WITNESS, SWORN, TESTIFIED AS FOLLOWS

-384-

DIRECT EXAMINATION BY

MR. GILLULY:

Q    And Mr. Clark, how old are you, sir?

A    Thirty-four.

Q    And where – you said the Lawyer Referral Network in Florida.  Do you live in Florida?

A    Yes.

Q    And where in Florida do you live?

A    Deerfield Beach.

Q    And is that middle, northern or southern?

A    South Florida.

Q    And you've got an accent.  Prior to coming to Florida, where are you from?

A    From Long Island, New York.

Q    And what brought you down to Florida?

A    I had some substance abuse issues, and I came down to Florida to go to a halfway house in '08.

Q    Okay, and you stand before the Court and the jury today convicted. You've pled guilty to a conspiracy charge related to the distribution of controlled substances and money laundering, and you're awaiting sentencing; is that correct?

A    Yes.

Q    And you're represented by counsel –

A    Yeah, Mr. Phillips is here.

Q    – whose actually in the courtroom.

-385-

1    A    Yeah.

2    Q    And as part of your guilty plea, you agreed to cooperate with the

3    United States; is that right?

4    A    Yeah.

5    Q    Mr. Clark, I'd like to talk to you about your involvement in pain

6    management facilities, and specifically, East Health Center in Savannah,

7    Georgia.

8         First, let me ask you, do you have any medical training at all?

9    A    No.

10    Q    And prior to your involvement with East Health Center, did you work

11    with people in Florida in the pain management field?

12    A    Yes.

13    Q    And how did you get involved?

14    A    Well, I came down in June of '08, and a few months after I was down

15    here I started working for a friend of mine's brother at – we did debt

16    settlement.  I did that for about year, and some of the laws were changing,

17    and the place was about to close.  And one of his partners had opened a

18    pain management clinic in Boca Raton.  So it was the same guy I worked for

19    for a while, and I needed a job 'cause I was closing, and I went to work for

20    him.

21    Q    Do you know the name?

22    A    I think it was Palm Beach Pain and Rejuvenation at first, and then they

23    had changed names after – you know, a year or two later, but I think that's

24    what the name was.

25    Q    Who were you working with there?

-386-

1    A    Richard McMillan.

2    Q    Okay, and did there come a time through working with Rich McMillan

3    where you met Al LeFrancois?

4    A    Yeah, Al was the office manager in Boca Raton.

5          MR. GILLULY: Okay, if you could put 28-1 on the screen,

6    please.

7    Q    The individual on the screen, who is that?

8    A    Yeah, that's Adelard LeFrancois, Al.

9    Q    And did you participate in marketing with others for pain

10   management clinics in Florida?

11   A    Yes.

12   Q    Who was your target audience?

13   A    Well, in South Florida at the time there was a lot of pill mills, and

14   people were coming down from Tennessee, Kentucky, Ohio, as far away as

15   Maine.  And there was a lot of – a lot, a lot of people that came down.  So

16   our target audience was people that were coming from out of state to go to

17   these clinics.

18   Q    Okay, and just describe some of the marketing techniques you

19   employed.

20   A    Most of them, you know, traveling so far, they would stay in a hotel the

21   night before.  So we had a list of a couple of dozen hotels that were like $40

22   a night.  We would go there, and we would put flyers on all the windows.

23   And then during business hours, when they came, we would go to other

24   clinics and MRI places and hand out cards, and direct them to the clinics

25   that I worked for.

-387-

1    Q    And did there come a time when you and Al LeFrancois and others

2    decided to open your own pain clinic in Garden City, Georgia?

3    A    Yeah, I wasn't involved in the initial conversation to open it, but very

4    shortly thereafter, before it opened, I was approached by Lewis and Al, and,

5    yes.

6    Q    And that's Lewis Trematerra?

7    A    Yes.

8    Q    And who selected Savannah area for the pill – pain management

9    place?

10   A    I'm not sure.  I found the actual office that we leased.  I don't know

11   who actually made the selection, but in a conversation I had with them they

12   asked me to come up here into Chatham County and look for a location.

13   Q    In fact you found the place that ultimately became East Health Center;

14   is that right?

15   A    Yeah, and Frankie met with a Realtor, and we looked at several

16   buildings.  We would take pictures of them and send them back to them.

17   And when we found the office on Route 80, I eventually – you know, once I

18   got their approval, I signed a lease for it.

19   Q    Okay, and why – I mean, why did you pick that location?

20   A    Well, most of the people that were coming to Florida, you know, they

21   were traveling from north of here, you know, Tennessee, Kentucky, West

22   Virginia.  So I think that it was close to a main road, and it was a lot less of a

23   distance from where a lot of the people were coming from.

24   Q    Okay, and you said you signed a lease.

25          MR. GILLULY: If you will put, Dean, 32-5 on the overhead,

-388-

1    please.  And zoom in a little bit.

2    Q     And is that the front page of the lease that you signed that started East

3    Health?

4    A     Yeah, I think so.

5    Q     And in fact ...

6           MR. GILLULY: If you could go to 30-2-002, Dean.

7    Q     Are those your initials on some of the paragraphs?

8    A     Yeah.

9           MR. GILLULY: And 30-2-011.

10   A     Yeah, that looks right.

11   Q     Okay.  In fact is that your signature?

12   A     Yeah, that's my signature.

13   Q     And where was the money coming to finance this operation?

14   A     Well, they set up a corporate account, and Lewis Trematerra funded it.

15   I think the first deposit was $29,000.  I actually put the money up for the

16   lease, and he paid me as soon as I got – I think I wrote a check for the lease,

17   and then I was reimbursed.

18   Q     Yes, sir.  And did you open any bank accounts to get the business

19   going?

20   A     Yeah, I was a managing member on the corporation, because Lewis

21   didn't want to be on the bank accounts, and I don't know if he trusted Al as

22   much, so for the purpose of, you know, being accountable to him as to the

23   money that was spent, I was on the bank account.  I wasn't the owner of the

24   company, but I was – I don't know if there's a first and second position.

25   Adel was the owner, and I was just the signer on the account.

-389-

1    Q     And what is Adel's last name?

2    A     Lizama.

3    Q     And did Adel Lizama, or Lew, or Al, or any of the others who were

4    involved in the ownership of the clinic, have any medical training or

5    experience, other than working at pill mills in Florida?

6    A     No, other than that, not to my knowledge.  I know Lew invested into

7    the – you know, the clinics in Florida, and they opened quite a few of them.

8    They had about seven of them before they were closed down by the

9    authorities.  But I know Adel worked there.  I don't know – I know she had

10   a college education.  I don't know if she did anything in the medical field in

11   school, but as far as I know, the only experience she had was working at the

12   clinic in Florida.

13   Q     And did you assist in East Health with setting up surveillance cameras

14   in the facility?

15   A     Yeah, yeah, I was pretty much up in Georgia before the clinic opened,

16   and basically I got a checklist from Al as to what we were supposed to do.

17   He basically – him and the girls, Candace and Adel, were in Florida, and

18   they would make all the arrangements with the different vendors, whether

19   it was security, the locksmith, Office Depot when they ordered the stuff

20   online, and I would usually go and meet the delivery and, you know, put it

21   away.  And I was involved in setting the office up before it opened.

22   Q     And with regard to the office, can you tell the ladies and gentlemen

23   when you opened it what kind of medical equipment you guys had in there.

24   A     I don't know, a couple of tables.  I don't really remember.  It wasn't a –

25   I mean, we didn't get X-ray machines and stuff like that.  There really

-390-

1    wasn't too much medical equipment.  I didn't order it.  I got the deliveries,

2    and I don't think I put it away.  But, you know, as far as I remember, it was

3    more office stuff.

4    Q      And was the intent with opening East Health was the intent to operate

5    it as a pill mill?

6    A      Yeah.  I mean, I rationalized it when we were getting going in my head.

7    But the clinics in Florida, it was the same type of clinic that Lew and Al had

8    ran in Florida and I worked for for a little bit.  I only worked in Florida for

9    about two or three months, and then I found something else to do.   But

10   that was – you know, I think that was their agenda.  And, you know, I

11   wasn't involved in patient care, and I wasn't involved in picking out a

12   doctor and how they were going to be treated, but to the best of my

13   knowledge they were going to be run the same way.

14   Q      Okay, and did you ever have occasion to see the customers who would

15   show up at East Health?

16   A      Yeah.

17   Q      And did they look similar to the people that you were marketing from

18   other pain clinics?

19   A      Yeah, they were all people that had traveled from out of state, and, you

20   know –

21   Q      – And after the clinic opened – let me ask you this: did the clinic ever

22   accept any kind of medical insurance?

23   A      No, it was talked about before it got going.  And I don't know if it was

24   because of incompetence on the office staff, or it was just because they had

25   enough people coming where they really didn't need to.  Because it filled up

1  quick, and we started seeing 20, 30 people a day right away.  And it was

2  talked about, and then after it opened I never really heard it mentioned

3  again.

4  Q    Yes, sir.

5  A    And it was only – it was cash, or some people – I think we had a

6  merchant account where they took debit cards, but mostly cash.

7  Q    Okay, and the doctor who worked there the first time, do you know

8  who that was?

9  A    Yeah, it was Dr. Azmat.

10  Q    Do you see him in the courtroom?

11  A    Yes.

12  Q    Could you point him out and describe something he has on?

13  A    Gentleman at the other table with the glasses on.

14       MR. GILLULY: Judge, if the record could reflect he's identified

15  the defendant.

16       THE COURT: So noted.

17       MR. GILLULY: Thank you.

18  Q    With regard to Dr. Azmat, do you know whether or not, or if he did, if

19  he prescribed controlled substances to people who came to East Health

20  Center?

21  A    Well, I'm pretty sure that's why he got the job, yeah.

22  Q    Okay, and are you aware whether or not there were ever any

23  difficulties filling prescriptions?

24  A    Yeah, there was a lot of difficulties.  He wrote a lot of prescriptions,

25  and a lot of the pharmacies wouldn't fill them.  I don't know what happened

1    but, yeah, we had a lot of difficulty with patients getting them filled.

2    Q    Do you know how Dr. Azmat was paid?

3    A    Well, I didn't at first, for the first, like week or two, but then I found

4    out he was getting $2,000 a day.  And I thought that was a little bit high,

5    but that's what he was paid.

6    Q    Yes, sir.

7    A    And I remember having a few conversations with him and, you know,

8    trying to work it out him a little less over the phone.  And, you know, that's

9    what he said his fee was.

10    Q    Two thousand a day?

11    A    Yeah.

12        MR. GILLULY: If I may have a second, Judge.

13        [NOTE: Mr. Gilluly and Mr. Knoche confer off the record.]

14        MR. GILLULY: That's all the questions I have at this time.

15        THE COURT: Mr. Withers.

16                    CROSS-EXAMINATION BY

17    MR. WITHERS:

18    Q    Mr. Clark, good afternoon.  I'm Tom Withers.  I represent Dr. Azmat.

19    I have just a few questions for you, sir.

20        You've described for us that you knew Richard McMillan and Mr.

21    Trematerra down in South Florida; right?

22    A    Yes.

23    Q    And you said they owned what I think you said were pill mills in South

24    Florida; right?

25    A    Yeah, about seven of them.

-393-

1      Q    And Al LeFrancois worked at those pill mills; correct?

2      A    Yes.

3      Q    And did you say that you worked there for a period of time?

4      A    Yeah, briefly.

5      Q    All right, and you – so you knew Mr. LeFrancois; right?

6      A    Yes.

7      Q    You knew Frankie Barbuscia?  Am I pronouncing that right?

8      A    Yeah.

9      Q    You knew Adel Lizama?

10     A    Yeah.

11     Q    You knew Candace Carreras.

12     A    Yes.

13     Q    And you said that what Al and Lew had come up with was that Al and

14    Lew were the moving force to open the East Health Clinic?

15     A    Yeah, as far as I know, yes.

16     Q    I mean, that's what you understood.

17     A    Yeah, yeah.

18     Q    All right, and I believe you also knew Dan Wise as well; correct?

19     A    Yes.

20     Q    Mr. Afthinos, if I'm pronouncing that correct.

21     A    Yeah, I believe so.

22     Q    And so there was a core group of you, then, from South Florida who

23    moved up here in January-February 2011; right?

24     A    Yeah.  I mean, when you're talking about the relationship and that I

25    know everybody, Candace and Adel, maybe I was in the same room with

-394-

1    them a few times.  Al, I had a conversations with.  I knew Lew very well,

2    and I got to know Dan a little bit.  I worked with him for about two or three

3    months.  But it wasn't like we had a long relationship together.  These are

4    not people I knew intimately.

5    Q    Okay.  Thank you for clarifying that.  You did not know Dr. Azmat

6    during that period of time you were living down in Florida; right?

7    A    No.

8    Q    You didn't see him down there with Lew and Al; right?

9    A    No.

10   Q    In fact the first time you ever laid eyes on Dr. Azmat was here in

11   Garden City, Georgia in February of 2011; correct?

12   A    That's not the first time I ever heard his name, but the first time I ever

13   met him was in Garden City.

14   Q    Right.  The first time you met Dr. Azmat was when both of you were

15   working at the East Health Clinic; true?

16   A    Yes.

17   Q    Now – and it was you, Frankie, Mr. Afthinos and Dan Wise who were

18   doing the marketing that you've described for us down in Jacksonville?

19   A    For about two weeks together we did.  And then the next two weeks it

20   was me and Frankie, and that was about all the –

21   Q    And Dr. ...

22   A    – marketing.

23   Q    I'm sorry, I didn't mean to interrupt you, sir.  Dr. Azmat was not

24   amongst that group that was doing that activity in Jacksonville; was he?

25   A    No, he wasn't marketing.

-395-

1    Q    All right, and Dr. Azmat – fair to say, you didn't have any significant

2    interactions with Dr. Azmat here in Garden City; did you?

3    A    We had a few conversations that were short.  I think I might have

4    spent two or three hours with him.  That was probably a lot.

5    Q    But you did spend plenty of time with the others that worked there;

6    right?

7    A    More than with Dr. Azmat, yeah.

8    Q    Well, I mean, we're – you never went to lunch with Dr. Azmat; did

9    you?

10   A    No, I don't think so.

11   Q    You never went to dinner with Dr. Azmat; did you?

12   A    No.

13   Q    You never went to have drinks with Dr. Azmat; did you?

14   A    Nope.

15   Q    Never watched football with Dr. Azmat; did you?

16   A    Nothing social.

17   Q    He didn't come over to your house in Pooler where all of y'all were

18   living; did he?

19   A    Well, I didn't really live there.  I stayed there a few nights, but I wasn't

20   living there.

21   Q    Okay.  When you stayed in Pooler, you never saw Dr. Azmat over at

22   the house in Pooler; did you?

23   A    Nothing social.

24   Q    Did you ever see him interacting with patients?  Folks in the office?

25   A    Patients or staff?

-396-

1    Q    Let's look at it both ways.  You ever see him interacting with other staff

2    in the office?

3    A    Well, I've only spent a few hours in the office, and when I did it wasn't

4    just me and him alone.  So, yeah, there was other people around.

5    Q    Okay.  So when you saw Dr. Azmat in the office setting, though, sir,

6    Dr. Azmat was always polite and professional with folks in the office

7    setting; wasn't he?  Isn't that fair to say?

8    A    Yeah, I don't remember him being particularly rude.

9    Q    Now, you were telling us about all these things that – activities that

10   you did.  Dr. Azmat didn't sign any papers on behalf of East Health Center;

11   did he?

12   A    As far as what?

13   Q    Well, you signed the lease agreement; right?

14   A    Yes.

15   Q    Dr. Azmat didn't sign the lease agreement; did he?

16   A    No.

17   Q    You opened the bank accounts; right?

18   A    Yeah, as far as I know –

19   Q    – Dr. Azmat – I'm sorry, I didn't mean to interrupt, sir.

20   A    No, as far as I know, he only signed the patient files for the patients

21   that he saw. I ...

22   Q    Were you finished?  I'm sorry.

23   A    Yeah, that's it.

24   Q    Dr. Azmat didn't open the bank accounts; did he?

25   A    No.  He didn't get a check from one, either.

-397-

Q     Dr. Azmat didn't have signature authority over the bank accounts; did he?

A     No.

Q     And it was you that selected the office location?

A     Well, I don't know if selected – I found it, and then once Lew and Al told me that they wanted to proceed with it, you know, once they saw it, then I signed the lease.  I didn't really do anything without their permission.  It was his money that was spent.

Q     And was it in fact – well, I'll strike that.

       Sir, you've described staying in Pooler for only a few nights; right?

A     Well, before the clinic opened I stayed in Savannah for a couple of weeks while I met the deliveries and the different vendors.  But while the clinic was actually operational, yeah, probably only a few nights after it was opened.

Q     All right, and then what happened?  Where did you go after that?

A     Al had found another office in Norcross, I believe.  And so basically I moved over to Kennesaw at Al and Lew's direction to do the same thing that we did here in Savannah to – you know, to meet the different vendors and open and set up the office.

Q     So what I'm driving at is, your interaction with Dr. Azmat was pretty limited; isn't that fair to say?

A     It was – we did talk a few times, but it was limited.

Q     I mean, you were only in that facility for a few days; right?  After it was opened?

A     Yep.

-398-

1    Q     Now, you were originally charged in this indictment along with Dr.

2    Azmat; right?

3    A     Yes.

4    Q     You were charged – and that indictment was changed, or superseded,

5    in August of last year; you remember that.

6    A     Yes.

7    Q     And you were charged in 51 of the 52 counts of the indictment; right?

8    A     If you say so.  Probably.  I don't remember how many counts there

9    were, I just remember five counts on the front page that I read.  I thought

10   they were all one, but ...

11   Q     You were charged in a lot of counts; is that a fair statement?

12   A     Yeah, I thought it was five.  I didn't know 52 but, okay.

13   Q     Do you recall that you were charged in a drug conspiracy count that

14   carries a 20-year maximum sentence; do you recall that?

15   A     Yes.

16   Q     Do you recall that you were charged in several counts of unlawfully

17   distributing or dispensing controlled substances; do you recall that?

18   A     Yes.

19   Q     And do you recall that each of those offenses carried a maximum

20   sentence of 20 years; do you recall that?

21   A     Yes.

22   Q     And do you recall that you were charged in a money laundering

23   conspiracy charge?

24   A     Yes.

25   Q     And that money laundering conspiracy charge carries a maximum

210-

-399-

1    sentence of 20 years; do you recall that?

2    A    Yep.

3    Q    And so adding those up, lots of years; right?

4    A    Yes.

5    Q    But what you entered a plea to is entirely separate; correct?

6    A    I mean, yeah, I didn't plead to any of the counts I was charged with.

7    Q    Right.  So the indictment against you, you pled to none of those counts

8    in the indictment; true?

9    A    Yeah, I pleaded not guilty, and then the government came back with

10   an offer that I accepted and I pled guilty to.

11   Q    And the maximum penalty under your plea agreement with the

12   government, your agreement with the government, is now five years; you

13   understand that.

14   A    Yes.

15   Q    And government's made a number of promises to you in that plea

16   agreement; hadn't they?

17   A    As far as ...

18   Q    Well, you understand that by pleading guilty to that single count that's

19   not in the indictment, that indictment is going to be dismissed.

20   A    Yes.

21   Q    You understand that.

22   A    Yeah.

23   Q    All right.  And it is your understanding as well that through your

24   cooperation – or strike that.

25        You are cooperating with the government, obviously; right?

-400-

1    A    Yeah, and I asked if my testimony – if the Doctor was innocent or

2    guilty if it would have any bearing on any deal I was given, and they said

3    no. So whether he – you know, I have no motives to tell anything but the

4    truth.

5    Q    And you understand that it is the government and only the

6    government that can file a motion to reward you for your cooperation.  You

7    understand that as well; don't you?

8    A    Actually Special Agent Kahn told me that's not how it works.  He said

9    that the Judge would hear my testimony –

10            MR. WITHERS:  – Your Honor, I object to the hearsay.

11   A    Well, he's with the government – he did tell me that, and he's a

12   government employee, so, yeah, he's the only one I got an answer from,

13   and he said that the Judge would hear my testimony and as long as he

14   thought it was honest, that that's what it'd be weighed on.

15   Q    Do you recall your plea agreement in this case, sir?

16   A    You know, I don't know the specifics.  I kind of just remembered the

17   number of years I was pleading to and ...

18   Q    And what you know from that is, you went from facing dozens and

19   dozens of years to a cap of five years; right?

20   A    (No audible response.)

21   Q    Fair to say; right?

22   A    Yeah.

23            MR. WITHERS: Thank you.  No further questions, Your Honor.

24            THE COURT: Anything else of this witness?

25            MR. GILLULY: Yes, Your Honor.

-401-

REDIRECT EXAMINATION BY

MR. GILLULY:

Q     At any point have we told you what to say, sir?

A     No.

Q     Has anyone promised you anything in exchange for your testimony?

A     No, quite the opposite.  I actually never got an answer from anybody, except for Agent Kahn, who told me that as long as you tell the truth it doesn't matter, you know, what happens, that that would be taken into account.

Q     In fact ...

        MR. GILLULY: May I approach, Judge?

        THE COURT: Yes, sir.

Q     I'm going to hand you – I've handed you a document that's previously marked Government's Exhibit 34-3.  Does that appear to be a copy of your plea agreement?

A     Yeah, I believe it is.

        MR. GILLULY: Judge, I'd like to move it into evidence.

        THE COURT: Admitted.

        MR. GILLULY: May I approach again?

        THE COURT: Yes, sir.

Q     Would you read Paragraph 2 for the jury?

A     [Reading]: The defendant fully understands and agrees that whether or not sentencing court decides to depart downward or reduce his sentence, as well as the extent of any such downward departure or reduction, is completely within the sentencing court's discretion.

-402-

1    MR. GILLULY: No further questions, Judge.

2    MR. WITHERS: Just one question in followup, please, Your

3    Honor.

4    THE COURT: Yes, sir.

5                      RECROSS-EXAMINATION BY

6    MR. WITHERS:

7    Q    Page 2 of that same exhibit, sir.  Can you read that highlighted portion

8    right there?

9    A    [Reading]: The determination of whether the defendant has provided

10   substantial assistance or has been truthful with the United States

11   Attorney's Office or the United States Probation Office is a matter

12   committed to the sole discretion of the United States Attorney's Office.

13   MR. WITHERS: Thank you.  No further questions, Your Honor.

14   THE COURT: Can this witness be excused?

15   MR. GILLULY: Yes, Your Honor.

16   THE COURT: All right, you're excused, sir.

17   [Witness Excused]

18   THE COURT: Call your next witness, please.

19   MR. KNOCHE: Latina Simpson.  They're bringing her, Judge.

20   [Pause]

21   MR. KNOCHE: Let's go with Joseph Bradley, and we'll wait for

22   Ms. Simpson.

23   MR. GILLULY: Call Joseph Bradley.

24   [Witness Sworn]

25   CLERK: You may be seated.  Please state your name and your

-403-

1    occupation, and please spell your last name for the record.

2            MR. BRADLEY: I'm Joseph Travis Bradley.  My last name is

3    Bradley, B-R-A-D-L-E-Y.  My occupation is construction worker.

4                    J O S E P H   T R A V I S   B R A D L E Y

5            GOVERNMENT'S WITNESS, SWORN, TESTIFIED AS FOLLOWS

6                        DIRECT EXAMINATION BY

7    MR. GILLULY:

8    Q    Your occupation is what?  I'm sorry.

9    A    I'm a construction worker.

10   Q    Okay. Thank you, sir.  If you would, just speak up a little bit.

11        Mr. Bradley, where do you live, sir?

12   A    Jacksonville.  Actually, Middleburg right outside Jacksonville.

13   Q    Right outside Jacksonville, Florida?

14   A    Yes, sir.

15   Q    How long have you lived in Florida?

16   A    All my life.

17   Q    I want to date your attention – let me ask you this:  I want to date your

18   attention back to 2003.  Did you get injured and you start taking

19   OxyContin?

20   A    Yes, sir.  Actually, it was oxycodone – or Percocet.

21   Q    Okay, and how long have you – how long were you on it?

22   A    Up until about three years ago.

23   Q    2008, did you start – I was going to ask you if you started taking oxys

24   again and started going to Florida pain clinics?

25   A    Yes, sir.

-404-

1    Q     Okay, and tell us – I guess, tell me, with regard to these Florida pain

2    clinics, do you remember some of the names of the ones you would

3    frequent?

4    A     VIP, I believe I went to North Florida Pain, and there was also a clinic

5    on Atlantic Boulevard that I went to that got shut down.  I can't really

6    remember the name of it.

7    Q     Now, these clinics that you went to in Florida , were you going for the

8    purpose of getting pills because you were addicted?

9    A     At that point, yes, sir.

10   Q     Okay. So you were going for the pills rather than for legitimate

11   medical treatment?

12   A     It started off as legitimate medical treatment.  I do have injuries in my

13   back, but it eventually got to the point where I was just strung out on the

14   pills.

15   Q     Okay, and in fact in about February of 2011, did you learn about the

16   East Health Center?

17   A     Yes, sir.

18   Q     How did you learn about it?

19   A     I met Frankie outside of a clinic I was going to.

20   Q     This person named Frankie, anything particular about him?

21   A     From up north, from New York, Jersey, something like that.  I'm not

22   sure.  He had the accent.

23   Q     And what was Frankie telling you about East Health Center?

24   A     Basically that I should come to his clinic, you know, they'll give me

25   pretty much whatever I want, you know, max I can get.  Didn't care that I

-405-

1    had been to a clinic that month or anything like that, just to come up and,

2    you know, work things out with them basically.

3    Q    Okay.  Were there any conversations – in fact did he give you

4    anything, like a card or anything in that regard?

5    A    Yes, sir, he gave me a card that day.

6    Q    And when Frankie approached you, was he with other people?

7    A    Yes, sir.  He was in the – they were at a gas station right next to the

8    clinic, and I think there was about four people in the vehicle.

9    Q    Okay.  How many people were with you?

10   A    I was there with my buddy that day.  But he wasn't – you know, I'd

11   walked next door to go to the bathroom.  We were waiting to see the doctor.

12   But when I met Frankie, I was by myself.

13   Q    So you and your buddy, were y'all both at that –

14   A    – Yes, sir.

15   Q    Was it a legitimate office or a pill mill?

16   A    I would say a pill mill because it actually got shut down.  It was on the

17   news.  The doctor wasn't even a doctor or something like that.  You know, it

18   was all over the news for a while.

19   Q    Okay, and it's in Florida.  So you and your buddy were there to get

20   what kind of drugs?

21   A    Oxycodone.

22   Q    And you ran into Frankie, you learned about East Health Center.  Did

23   Frankie have any conversations with you about any benefits about you

24   coming to East Health Center?

25   A    That day, no.  Later on, yes.

-406-

1   Q    Okay.  Well, what about later on?  Tell us about that.

2   A    Later on he had mentioned basically that, you know, if I bring people

3   and all that, that, you know, he'd give me discounts.  Basically I'd come for

4   free and, you know, wouldn't have to wait when I get up there and stuff like

5   that.

6   Q    In the initial conversations, was there any mention whether or not they

7   actually were going to be dispensing pills onsite or just dispensing

8   prescriptions?

9   A    They would be.  At first they were just doing prescriptions.  They were

10  going to open up, I guess, an actual attached pharmacy to where I could

11  come and get my prescriptions and, you know, filled and everything the

12  same time.

13  Q    On or about March 1, 2011, did you in fact go to East Health?

14  A    Yes, sir.

15  Q    Did you go with other people?

16  A    No, I went by myself.

17  Q    Okay.  How long did it take you to get there?

18  A    About three hours, I think.

19           MR. GILLULY: And, Dean, if you could pull up 13.

20  Q    This right here, is this your handwriting, sir?

21  A    Yes, sir.

22  Q    And in fact the date March 1, 2011?

23  A    Yes, sir.

24           MR. GILLULY: 13-002.

25  Q    Did you fill this out yourself?

-407-

1    A    Yes, sir.

2    Q    In fact there is a question, what is your problem from.  You didn't

3    answer that question; is that right?

4    A    Where is it at?

5    Q    Top.

6    A    Oh, yeah, no.

7    Q    Didn't describe your complaint?

8    A    No.

9    Q    Didn't describe the pain?

10   A    No.

11          MR. GILLULY: Okay, and if you could go down a little bit, just

12   scroll down.

13   Q    You listed for medications that you indicate you'd been previously

14   prescribed.  You name them as Roxicodone, a particular brand of –

15   A    – At first, whenever the big pill scene hit like north Florida, for some

16   reason all prescriptions said Roxicodone.  And then after a year or so, it all

17   started stating it as oxycodone.  So I'm not sure what the difference is, but I

18   know it's the same drug.

19          MR. GILLULY: Okay.  13-003.

20   Q    Again, your own handwriting?

21   A    Yes, sir.

22   Q    Please indicate which treatments you had had.  You didn't write

23   anything down there; is that right?

24   A    No.

25          MR. GILLULY: Okay. 13-004.

-408-

1  Q     Indication of symptoms that you indicated you were experiencing; is

2  that right?

3  A     Yes, sir.

4          MR. GILLULY: 13-005.

5  Q     A doctor-patient center agreement that you signed?

6  A     Yes, sir.

7          MR. GILLULY:  Continued on 13-006.  And continued on 13-

8  007.  13-008.  If you could highlight, Dean, where it says, I, Joseph Travis.

9  Q     Sir, can you read that?

10 A     [Reading:] I, Joseph Bradley, have read the above –

11 Q     – No, start over.

12 A     [Reading:] I, Joseph Travis – excuse me – have read the above

13 information or it has been read to me, and all my questions regarding

14 treatment of pain with opioids have been answered to my satisfaction.  I

15 hereby give my consent to participate in opioid medication therapy and

16 acknowledge receipt of this document.

17 Q     With regard to all these papers, were these filled out before you ever

18 met the doctor?

19 A     Yes, sir.

20 Q     Did the doctor ever go over these documents with you?

21 A     No.

22 Q     Did anyone go over these documents with you?

23 A     No.

24         MR. GILLULY: 13-009 is a consent form.

25 Q     And in fact they require you to give a driver's license of some kind, if

-409-

1    you remember.

2    A    Yes, sir.

3         MR. GILLULY: 13-010.

4    Q    And it's hard to read, but that appears to be an identification card; is

5    that correct?

6    A    Yes, sir.

7    Q    And that day –

8         MR. GILLULY: – If you would put 13-011.

9    Q    That day you actually did get to see a doctor; is that correct?

10   A    Yes, sir.

11   Q    Before seeing that doctor had you already filled out this paperwork?

12   A    Yes, sir.

13   Q    And did you have to make any payments to the clinic to see this

14   doctor?

15   A    I think I paid like $300.

16   Q    How much?

17   A    300, I think is what it was.

18   Q    Was it cash?

19   A    Yes, sir.

20   Q    Were you working at the time?

21   A    No, sir.

22   Q    And were you addicted for drugs at the time?

23   A    Yes, sir.

24   Q    At the height of your addiction, tell the ladies and gentlemen how

25   much oxys you were taking.

-410-

1    A    Whenever it was readily available, probably between 30-to-50 30

2    milligram pills a day.

3    Q    How were you taking them?  30-to-50 a day?

4    A    Yes, sir.

5    Q    How would you, how would you –

6    A    – Intravenous.

7    Q    Pardon?

8    A    Intravenous.

9    Q    You'd shoot them up?

10    A    Yes, sir.

11    Q    And were you addicted at the time you saw Dr. Azmat?

12    A    Yes, sir.

13    Q    Can you tell the ladies and gentlemen of the jury what kind of

14    examination Dr. Azmat gave you?

15    A    When I seen the doctor, I was probably in there for five, maybe ten

16    minutes tops.  He put his hands on my back for a second or two, hit my

17    knee with the little thing, and listened to my heart.  That was about it.

18    Q    As far as your blood pressure and your pulse, was that done by the

19    doctor, or was that done before you went back to the doctor?

20    A    That was done before I went in to the doctor.

21    Q    Did the doctor ever have you lay down on a table and lift your legs or

22    anything like that?

23    A    No, sir.

24    Q    Did he ever have you bend, touch your toes?

25    A    No, sir.

1   Q    Did he ever request any of your prior medical records from
2   physicians?
3   A    I had an MRI and prescription history.  That was it.
4   Q    How did you know to bring that?
5   A    You know, any clinic you go to are going to want that, at least.
6   Q    What kind of clinic?
7   A    Any pain management clinic.
8   Q    Okay.  Did there appear to be any legitimate medical equipment – or
9   any medical equipment at –
10  A    – It was empty when I got there.  There was several rooms, but, I
11  mean, everything was pretty much empty.
12  Q    Did the doctor try to conduct an X-ray?
13  A    No, sir.
14  Q    During this examination with the doctor, did he talk to you about any
15  of the addictive qualities of oxycodone?
16  A    Not that I can remember.
17  Q    Did he ask you whether or not you were addicted?
18  A    No, sir.
19  Q    Did he talk to you about any alternative forms of treatment regarding
20  oxycodone?
21  A    I think he may have mentioned something but, I mean, didn't really
22  talk to me about it.  I think he maybe mentioned, you know, therapy or
23  something like that.
24  Q    Did he refer you to any specialists?
25  A    No, sir.

-412-

1    Q    And did he ultimately prescribe you any medications?

2    A    Yes, sir.

3    Q    And do you remember who handed you the prescriptions for the

4    medications?

5    A    (No audible response.)

6    Q    Was it the doctor, or do you remember?

7    A    I think that I got them at the desk up front –

8    Q    – So after you –

9    A    – after I was done.

10   Q    Pardon me?

11   A    I think I picked them up at the desk up front when I was done.

12            MR. GILLULY: If you would put 13-013 up.

13   Q    Can you read and tell the jury what you got from Dr. Azmat based on

14   that examination?

15   A    I got 150 of 30 milligram oxycodone; 60 15 milligram oxycodones; and

16   Motrin 800 milligram, 90; and Xanax 1 milligram, 30.

17   Q    With regard to Xanax, did Dr. Azmat talk to you about any issues

18   regarding anxiety during the examination?

19   A    I told him they were for my anxiety.  We didn't really discuss anything

20   about it, you know, besides that.

21   Q    Did he refer you to any kind of a counselor or a psychiatrist or –

22   A    – No, sir.

23   Q    Pardon?

24   A    No, sir.

25   Q    And with these prescriptions, did you have any difficulty getting them

-413-

1    filled?

2    A    I never got them filled.

3    Q    Did you try?

4    A    Yes, sir.

5    Q    And explain to the jury how you tried to get them filled?

6    A    I was at the clinic that day, and basically the receptionist and several

7    other employees that work in there helped me locate a pharmacy that

8    would fill it.  And nobody in the general area would fill it because of the fact

9    of who the doctor was.  There was some kind of issue –

10   Q    – That's all we need to say.  And, sir, with regard to – let me – you pay

11   $300, you come from Florida, and you – were you going to pay cash for

12   these prescriptions?

13   A    Yes, sir.

14   Q    How much does it cost to get, for instance, 150 30 milligram

15   OxyContin?

16   A    I couldn't tell you today, but back then it was probably about $650 for

17   just the 30 milligram.

18   Q    And you had to pay for an MRI.

19   A    Yes, sir.

20   Q    How much did that cost?

21   A    $300, I think, is what it cost then.

22   Q    And you obviously had a pretty bad habit.  How would you support

23   your habit?

24   A    Basically between me going to the doctor, actually taking friends, you

25   know, them helping me out, and stuff like that.

-414-

1    Q    Did you ever sell them?

2    A    No, sir.

3    Q    Did you ever buy them from people on the streets?

4    A    Yes, sir.

5    Q    What's the going rate for an oxy 30 back then?

6    A    Back then, probably $20 a piece.

7    Q    $20 a pill?

8    A    Yes, sir.

9    Q    Now, when you came up here from Florida, did you drive here?

10   A    Yes, sir.

11   Q    Did the doctor ever warn you about driving a car taking these drugs?

12   A    No, sir.

13   Q    You noted on the intake form your pain rating – well, actually you

14   didn't.  Didn't even note a pain rating.  Did the doctor talk to you about

15   your pain rating?

16   A    No, sir.

17   Q    Did he ever talk to you about the dangers of combining Xanax with

18   OxyContin?

19   A    Yes, sir.  Actually, he didn't even want to prescribe me the Xanax, but

20   he did because I was already on it.

21   Q    Did he ask you why you traveled so far to see him?

22   A    No, sir.

23   Q    Did he talk to you about combining Xanax with things like alcohol, or

24   combining OxyContin with things like alcohol?

25   A    No, sir.

-415-

1    Q    After you having difficulty getting your prescriptions filled, I believe

2    you said, it was – you were refunded or something?

3    A    Yes, sir, they refunded my money.

4    Q    Who did the refunding?

5    A    I believe it was Dan.

6    Q    And did anyone ever approach you about trying to find physicians – or

7    pharmacies who actually would fill Dr. Azmat's prescriptions?

8    A    Yes, sir.

9    Q    Tell the ladies and gentlemen about that.

10   A    Whenever I was going to leave, when they refunded my money, I was

11   going to a clinic that I guess they were in competition with in Orange Park,

12   and they told me that basically they were going to give me my money back,

13   but whenever I go back, they would want me to go to the clinic and get an

14   approved pharmacy list so they could get their prescriptions filled by these

15   certain pharmacies.  And they actually offered to pay me for it, and they

16   did.

17   Q    How much?

18   A    I think it was a hundred dollars that they gave.

19             MR. GILLULY: Judge, that's all the questions I have at this

20   time.

21             THE COURT: Mr. Withers.

22                        CROSS-EXAMINATION BY

23   MR. WITHERS:

24   Q    Good afternoon, Mr. Bradley.

25   A    How do you do?

-416-

1    Q    My name is Tom Withers.  I represent Dr. Azmat.

2         You met Dr. Azmat on one occasion; correct?

3    A    Yes, sir.

4    Q    That was March 1, 2011.

5    A    Yes, sir.

6    Q    You're a convicted felon.

7    A    Yes, sir.

8    Q    Convicted in 2005 of felony possession of LSD.

9    A    Yes, sir.

10   Q    You served time for that; correct?

11   A    Yes, sir.

12   Q    And ultimately were adjudged guilty of that.  Despite the fact that your

13   plea was in '05, you were ultimately adjudged guilty of that in 2008;

14   correct?

15   A    Yes, sir.

16   Q    Now, you were charged and pled guilty with two other offenses as well;

17   were you not?

18   A    I'm sure.

19   Q    Burglary of a dwelling.

20   A    Yes, sir.

21   Q    Does that ring a bell?

22   A    Yes, sir.

23   Q    And where was that?

24   A    Jacksonville, Middleburg area, I think.

25   Q    And you served time for that as well; correct?

-417-

1    A    Yes, sir.  Yes, sir.

2    Q    So twice-convicted felon; right?

3    A    Yes, sir.

4    Q    Now, and Mr. Bradley, you really did injure your back; didn't you?

5    A    Yes, sir.

6    Q    And tell us about that injury.

7    A    It was work related.  I was framing houses, and what had happened is,

8    we were setting a header over a garage for, you know – well, it was a header

9    over a garage, and we didn't have a crane to lift it.  And it was pretty heavy,

10   it was probably about eighteen-hundred pounds, something along there.

11   And I used my shoulder to actually pivot, you know, and everybody lifted

12   one end, and I sat and pivoted it, and they went to the other end to lift it

13   and it – you know, my back just got really messed up from that.

14   Q    And as a result of that serious injury, you were prescribed Percocet,

15   and, I think you told us, became dependent on it.

16   A    Yes, sir.

17   Q    And you've suffered from withdrawal from oxycodone before; have

18   you not?

19   A    Yes, sir.

20   Q    Extremely unpleasant thing.

21   A    Yes, it is, very.

22   Q    I think you described it previously as really bad.

23   A    Yes, really bad.

24   Q    You'd have night sweats; right?

25   A    Yes, sir.

-418-

1    Q    You couldn't sleep for days; correct?

2    A    No, sir.

3    Q    Would mess up your digestive system; correct?

4    A    Yes, sir.

5    Q    You have bought oxycodone off the street; correct?

6    A    Yes, sir.

7    Q    And when you saw Dr. Azmat in March of 2011, you didn't tell him

8    that you had bought oxycodone off the street; did you?

9    A    No, sir.

10   Q    You didn't tell him in March of 2011 that you were a twice-convicted

11   felon; did you?

12   A    No, sir.

13   Q    And I believe that you've testified previously that you've been to about

14   a dozen or so pain clinics; correct?

15   A    Yes, sir.

16   Q    And didn't tell Dr. Azmat that you had been to a dozen or so pain

17   clinics either; did you?

18   A    He had my prescription history.  Other than that, no, it was not

19   discussed.

20   Q    All right, and we'll talk about that prescription history in just a second.

21   But with respect to that, they did obtain from your pharmacy or pharmacies

22   a prescription history; correct?

23   A    Yes, sir.

24   Q    And some of those clinics you had been to in the Jacksonville area you

25   had been to over and over again; right?

-419-

1    A    Yes, sir.

2    Q    And so over the years you have visited pain clinics dozens and dozens

3    of occasions; correct?

4    A    Yes, sir.

5    Q    Now, you have testified that you were actually going to the doctor and

6    obtaining the prescription from the doctor at these pain clinics down in

7    Jacksonville; right?

8    A    What do you mean by obtaining?

9    Q    Well, you were getting prescriptions from doctors in the Jacksonville

10   area for oxycodone; right?

11   A    Not the actual pills, but the prescriptions, yes, sir.

12   Q    All right, and then, I think you testified that in February of 2011 you

13   were approached by some folks, one of whom was named Frankie; right?

14   A    Yes, sir.

15   Q    And Frankie told you about the clinic up in Savannah; right?

16   A    Yes, sir.

17   Q    You didn't see Dr. Azmat down in Jacksonville; did you?

18   A    No, sir.

19   Q    Didn't speak with Dr. Azmat at that clinic down in Jacksonville; did

20   you?

21   A    No, sir.

22   Q    But what Frankie had told you was that some of the folks in the

23   Jacksonville clinic were breaking off to form a clinic up in the Savannah

24   area.

25   A    Yes, sir.

-420-

1    Q    Now, you would occasionally sponsor people to go see pain clinics;

2    wouldn't you?

3    A    Yes, I have.

4    Q    And so what that means, for the jury's understanding, is that you'd get

5    other people to go to clinics; right?

6    A    So I can have the medication.

7    Q    I'm sorry?

8    A    So I could have their medication.

9    Q    Right.  And then you would get, in some fashion or another, either

10   their medication or a discount for bringing a certain number of people to

11   clinic.

12   A    That's so I wouldn't have to pay basically the street prices, yes.

13   Q    Now, you never had that conversation with Dr. Azmat about you doing

14   that.

15   A    Oh, no, sir.

16   Q    You've never been prosecuted for the fact that you were, you know,

17   piling up people and taking them to a pain clinic down in Jacksonville; have

18   you?

19   A    I think piling them up is probably the wrong word, but I didn't –

20   wasn't aware that was illegal.

21   Q    Okay.  You never got prosecuted for sponsoring people –

22   A    No, sir.

23   Q    – to go to a pain clinic.  Now, the day that you went to East Health

24   Center –

25        MR. WITHERS:  – Ms. Bodaford, is this on?

-421-

1        CLERK: It is.

2    Q    I'm going to show you what's been marked as Government's Exhibit

3    29-1A-037.  That's your signature on line 8; is it not?

4    A    Yes, sir.

5    Q    And on that day, that total of nine patients went to the clinic; right?

6    A    Yes, sir.

7    Q    Wasn't crowded when you went in that day, then; was it?

8    A    I think one or two people in the lobby.

9    Q    In fact in terms of your view of a pain management clinic, didn't seem

10   to be doing too well; right?

11   A    No, sir.

12   Q    Now, you didn't see Dr. Azmat out front meeting and greeting

13   patients; correct?

14   A    No, sir.

15   Q    You never saw him until he came into your examination room; right?

16   A    Yes, sir.

17   Q    And you went to East Health Center, or East Health Clinic on that one

18   occasion; right?

19   A    Yes, sir.

20   Q    And you never went back; right?

21   A    No, sir.

22   Q    The East Health Clinic also obtained your MRI from A1 Imaging down

23   in Jacksonville; did they not?

24   A    Yes, sir.  I believe I brought it with me.

25   Q    I'm going to show you what's been marked as Government's Exhibit

-422-

1    13-012.  Do you recognize that as your MRI from A1 Imaging of Mandarin?

2    A    Yes, sir.

3    Q    See in the top right-hand section where it says direct fax?

4    A    Okay.  Yes, sir.

5    Q    Now, I'm not a doctor and neither are you, but you understand that

6    that MRI shows that you have legitimate problems.

7    A    Yeah, oh, yes, sir.

8    Q    And you understand that because of those problems, it's allowed you

9    to go into various doctor's offices and get what you want.

10    A    Yes, sir.

11    Q    And if I can read, that MRI says right here, L5-S1, disc degeneration

12    with diffuse loss of disc signal; does it not?

13    A    Yes, sir.

14    Q    And it talks about the migration of disc material within your spine;

15    does it not?

16    A    Yes, sir.

17    Q    And it talks about, as well, ventral thecal sac impingement.  Do you

18    understand that that means nerve impingement?

19    A    Yes, it's been explained to me before.

20    Q    Now, when you were at – oh, wait, in the East Health Clinic when they

21    obtained your pharmacy records, those records showed that you were

22    getting both oxycodone and Xanax; did they not?

23    A    Yes, sir.

24    Q    I'm going to show you what's been marked as Government's Exhibit

25    13-014.  And this is a history from Florida, and it shows the oxycodone up

-423-

1    here; correct?

2    A    Yes, sir.

3    Q    And the alprazolam, if I'm pronouncing that correctly, and the

4    oxycodone; right?

5    A    Yes, sir.

6    Q    So when you came to the facility, you were actually on Xanax; right?

7    A    Yes, sir.

8    Q    And that fact that you were on Xanax was confirmed by the urinalysis

9    that was done there at East Health Clinic –

10    A    Yes, sir.

11    Q    – do you recall that.  Now, the combination of drugs of oxycodone and

12    Xanax, you started that when you were in Florida; right?

13    A    Yes, sir.

14    Q    And I believe you told us that you actually had a discussion with Dr.

15    Azmat about that combination of drugs; right?

16    A    Yes, sir.

17    Q    Dr. Azmat didn't want to write you a prescription for Xanax; did he?

18    A    Yes, sir.

19    Q    He did not.

20    A    He did not.

21    Q    And did he explain to you that the reason for that is because of the

22    danger of those two drugs in combination?

23    A    Yes, sir.

24    Q    So when Dr. Azmat was treating you, you had been on Xanax 2

25    milligrams; right?

-424-

1   A   Yes, sir.

2           MR. WITHERS:  And this is Government's Exhibit 13-013.

3   Q   What Dr. Azmat did is, he reduced it to Xanax 1 milligram; correct?

4   A   Yes, sir.

5   Q   And he wrote you a prescription for Motrin 800 milligrams, as well;

6   true?

7   A   Yes, sir.

8   Q   And if we look up here, Mr. Bradley, under the oxycodone 30 on that

9   prescription, you see those words where it says, all or none?

10  A   Yes, sir.

11  Q   And you understood that to mean, did you not, that you had to fill

12  either all of those or none of those?

13  A   Actually, I wasn't even aware that was on there, to be honest with you.

14  Q   Okay.  The combination of that oxycodone and Xanax, I believe you

15  described that as a combination of – or a cocktail prescribed by pill mills;

16  correct?

17  A   Usually, yes.

18  Q   And when you filled out the paperwork at East Health Center, you

19  indicated that you were on both of those drugs, oxycodone and Xanax;

20  correct?

21  A   Yes, sir.

22  Q   And the reality was that you were on occasion selling some of your

23  drugs.

24  A   No, sir.

25  Q   Not true?

-425-

1    A    No, I never sold my drugs.

2    Q    You remember when you came up here to testify before the grand

3    jury?

4    A    Vaguely.

5    Q    That was in September of 2012?

6    A    I do remember coming.  I don't remember the exact date.

7    Q    And do you recall the question being asked to you [reading:] Question,

8    the reality was you weren't taking the Xanax.  You were selling them or

9    trading them; am I right?  And your answer was [reading]: Something

10   along those lines.

11   A    I might've said that.

12   Q    But it's your testimony today that you were not –

13   A    – I've never sold my pills.

14   Q    Now, when you were examined by Dr. Azmat, you see the note where

15   it says history of trauma here?

16   A    I see it, yes, sir.

17   Q    And do you see where he has written [reading]: Hurt back – I think

18   that says four years ago – lifting heavy in construction framing.

19   A    Lifting construction framing, yes, sir.

20   Q    Okay.  Is that in fact what happened, what you just described for us

21   there?

22   A    Yes, sir.

23   Q    And you described that same thing for Dr. Azmat.

24   A    Yes, sir.

25   Q    And so you were telling Dr. Azmat the truth when you were telling him

-426-

1      about your mechanism of injury or how you were injured; right?

2      A      Yes, sir.

3      Q      And then it goes on right here, [reading:] Constant pain, getting

4      worse.  Did you tell Dr. Azmat that?

5      A      Yes, sir.

6      Q      And it continues to read [reading:] Pain low back and goes between

7      shoulder blade and – I think that says goes to buttocks.

8      A      Yes, sir.

9      Q      And did you tell Dr. Azmat that?

10     A      Yes, sir.

11     Q      And were you being truthful when you told Dr. Azmat that?

12     A      Yes, sir.

13     Q      And you told him that it was a pain scale of 9 without medications;

14     right?

15     A      Yes, sir.

16     Q      And a 2 – excuse me, a 7 with medication; correct?

17     A      Yes, sir.

18     Q      And then if we go on down, you described to him that you were

19     unemployed –

20     A      – Yes, sir.

21     Q      Was that true?

22     A      Yes, sir.

23     Q      And that you were on oxycodone 30 milligrams, 150 tablets; correct?

24     A      Yes, sir.

25     Q      Oxycodone 15 milligrams, 60 tablets; correct?

-427-

1    A    Yes, sir.

2    Q    And I think that says Xanax 2, 30 tablets; correct?

3    A    Yes, sir.

4    Q    And I don't know if you can read all of what is written there, but Dr.

5    Azmat did in fact do an examination with you; did he not?

6    A    A short one, yes, sir, like I described.

7    Q    All right, and do you recall Dr. Azmat, when he was examining you,

8    that he detected a heart murmur?

9    A    Yes, sir.

10   Q    And it says right here under heart, if I'm reading that correctly, it says

11   [reading]: Patient has heart – patient asked to consult cardiologist; correct?

12   A    I can't read that but –

13   Q    – Okay, well –

14   A    – I mean, what are you asking about that?

15   Q    I'm sorry.

16   A    Did he say – tell me to consult a cardiologist?  Is that what you're

17   asking?

18   Q    Yeah, did –

19   A    – Yes, he did.

20   Q    Okay.  So Dr. Azmat detected your heart murmur.

21   A    Yes, sir.

22   Q    And he told you to consult a cardiologist.

23   A    Yes, sir.

24   Q    By the way, after you got your prescriptions from Dr. Azmat and he

25   had decreased your Xanax, that made you unhappy; did it not?

-428-

1    A    I wasn't too worried about the Xanax, to be honest with you.

2    Q    All right, well you were unhappy, were you not, that you had come all

3    the way up here from Jacksonville and ended up getting less medication

4    than you had gotten in Florida?

5    A    Yes, sir.

6    Q    Now, you actually complained about Dr. Azmat that day; did you not?

7    A    There was probably a discussion about it, yes, sir.

8    Q    Do you remember complaining to somebody out front, or in the front

9    office about Dr. Azmat?

10   A    Yes, sir, it was Dan.

11   Q    And you could actually hear the discussion between Dan and Dr.

12   Azmat?

13   A    Yes, sir.

14   Q    It wasn't a discussion right in front of you, but it was a discussion

15   behind the door where you could hear what was going on.

16   A    I can't remember if they were in front of the door or behind the door,

17   but I do remember the discussion.  Actually, I think they were on the far

18   side of the waiting room, is what it was.

19   Q    Okay.  But you – not in your presence –

20   A    I can't remember exactly.

21   Q    – but you could hear.

22   A    Yes, sir.

23   Q    All right, and you had complained to Dan because you had gotten

24   fewer medications; right?

25   A    Basically the same thing, what I wanted for basically what I could've

-429-

1    stayed in Jacksonville to get.

2    Q    Okay, and you recall Dan telling Dr. Azmat he needed to get onboard –

3    A    Yes, sir.

4    Q    – or words to that effect.

5    A    Yes, sir.

6    Q    And Dr. Azmat replied to him that he was going to treat the patient, or

7    words to that effect.

8    A    No, I don't remember that.

9    Q    You don't recall what Dr. Azmat's response was.

10   A    I recall – actually, I remember it better now that you've brought it up.

11   It was in front of the door, and I do remember the discussion, and him

12   telling him that he does need to get onboard.  And basically, Dr. Azmat was

13   kind of not really wanting to do it, but at the same time, I guess, you know,

14   whenever Dan came back to talk to me, he told me I would get what I

15   wanted next time.

16   Q    And did you hear Dr. Azmat's response as opposed to what you

17   thought happened?  Do you recall –

18   A    – No, I really don't remember his response.

19   Q    All right.  Now, the issue with respect to your discussion about, with

20   Dan and the people afterwards, where you're talking to them about being

21   unhappy, and they end up giving you a refund, none of that takes place in

22   front of Dr. Azmat.

23   A    No, sir.

24   Q    The folks that gave you a refund didn't do that in front of Dr. Azmat.

25   A    No, sir.

-430-

1    Q    Now, we've already talked about Dr. Azmat listening to your heart and

2    telling you that you need to consult with a cardiologist, but do you recall

3    him putting his hand on your neck –

4    A    No, sir.

5    Q    – and checking your neck?  Did he ask you to turn your neck side to

6    side like that (indicating)?

7    A    No, sir.

8    Q    You mentioned that the exam took five, ten minutes at the max.

9    Describe for the members of the jury what that consisted of.

10   A    Basically when I went in there, it was a small discussion.  Like I said,

11   he checked my knee with the little thing.  He checked my heart and felt of

12   my back.

13   Q    Did he ask you to turn side to side?

14   A    No, sir.

15   Q    Do you recall him asking you to walk heel-to-toe?

16   A    No, sir.

17   Q    And finally, Mr. Bradley, the issue of you selling a pharmacy list, that

18   occurred between you and Frankie; right?

19   A    Yes, sir.

20   Q    So – and was that the same day?

21   A    No, it was probably like a week later.

22   Q    Okay.  So your discussions with respect to East Health Center started

23   with Frankie; correct?

24   A    Yes, sir.

25   Q    And they ended with Frankie; correct?

-431-

1    A    Yes, sir.

2    Q    And they ended with you selling a pharmacy list to Frankie for $200;

3    correct?

4    A    I think it was a hundred dollars he gave me just to give him the list.

5    Q    All right, and you never saw Dr. Azmat after March 1, 2011; correct?

6    A    No, sir, I never went back.

7         MR. WITHERS: That's all I've got, thank you.

8         THE COURT: May this witness be excused?

9         MR. GILLULY: May I ask a couple of questions, Judge?

10        THE COURT: All right, sir.

11        MR. GILLULY: May I use the Elmo?

12                    REDIRECT EXAMINATION BY

13   MR. GILLULY:

14   Q    Is this the prescription history that you gave to the office before you

15   saw Dr. Azmat?

16   A    I'm not sure that's all of it but, yes, I'm sure this is part of it.

17   Q    And did Dr. Azmat or anyone in the office ever request the medical

18   records from these two doctors, Dr. Robert Green or Adla Adi?

19   A    No, sir.

20   Q    Do you know what happened to Robert Green and Adla Adi?

21        MR. WITHERS: Objection.  Objection, it's completely

22   irrelevant, Your Honor.  Rule 403 –

23        MR. GILLULY:  – We can sidebar, Judge, if you'd like.

24        THE COURT: Okay.

25        [NOTE: Side bar conference on the record.]

-432-

1      THE COURT: All right, sir.

2      MR. WITHERS: Judge, he wants to ask this witness, do you

3   know what happened to Dr. Aldean (sic) – I can't remember the other

4   doctor's name – I think for the purpose of eliciting testimony that they

5   were prosecuted, and completely irrelevant, Your Honor.  And –

6      THE COURT:  – But what does it make – in this case, in the

7   trial in this case against Dr. Azmat, what is the relevance of what happened

8   to some other doctor that is not in this case?

9      MR. GILLULY: I think Mr. Withers throughout, and through

10  this witness, has been, you know, putting the patient records saying, well,

11  you were prescribed this by other doctors, with the argument that –

12     THE COURT:  – Well, that's true, that's what the record shows.

13     MR. GILLULY: Sure, and those doctors were shut down also.  I

14  mean, just because they were receiving prescriptions from these doctors

15  doesn't mean –

16     THE COURT:  – No, sir, no, sir.  The prejudice of that far

17  outweighs the probative value of it, and it's not relevant as to – what some

18  other doctor did, is not – he says that he came in and he brought him a

19  record that showed that he already had these drugs and he was getting

20  these drugs.  Now, we're not going to try some other doctor on whether he

21  gave them for a legitimate medical purpose or not.  At that time he may

22  have given them to this witness for a legitimate medical purpose.  The fact

23  that he was later prosecuted, the fact that he later lost his license, we're not

24  going to try that in this case.

25     MR. KNOCHE: Your Honor, if I may, just to supplement what

-433-

1    Mr. Gilluly says, but it seems counsel is offering that prior prescription

2    record as a basis or a –

3               THE COURT:  – The government has gone into the prior

4    prescription record.  The government has asked them about prior

5    prescription records, and he is asking about prior prescription records.

6    And I've made my ruling, and that's it.

7               [NOTE: Side bar conference concluded.]

8               THE COURT: All right, sir.

9               MR. GILLULY: Thank you, may I proceed.

10   Q    (By Mr. Gilluly)  After presenting this pharmacy prescription record to

11   East Health Center, again, no one requested follow-up records from these

12   physicians.

13   A    No, sir.

14   Q    Dr. Azmat did prescribe – did he prescribe you Xanax on the visit?

15   A    Yes, sir.

16   Q    Did he ever refer you to an addiction specialist?

17   A    No, sir.

18   Q    You indicated that you have been to 12 – in response to the defense

19   lawyer's questions, at least 12 pain clinics prior to East Health Center.

20   A    Roughly, about that, yes, sir.

21   Q    Yes, sir.  Were they similar?

22   A    Yes, sir.

23               MR. GILLULY: Nothing else, Your Honor.

24               THE COURT: Anything else of this witness?

25               MR. WITHERS: No, Your Honor.

-434-

1          THE COURT: Can the witness be excused?

2          MR. GILLULY: Yes, Your Honor.

3          THE COURT: All right, you're excused, sir.

4      [Witness Excused]

5          THE COURT: Call your next witness, please.

6          MR. KNOCHE: Latina Simpson.

7      [Witness Sworn]

8          CLERK: You may be seated.  Please state your name and your

9      occupation, and spell your name for the record.

10         MS. SIMPSON: Latina Simpson, S-I-M-P-S-O-N.  Unemployed

11     at the time, at the moment.

12                  L A T I N A   S I M P S O N

13         GOVERNMENT'S WITNESS, SWORN, TESTIFIED AS FOLLOWS

14                      DIRECT EXAMINATION BY

15     MR. KNOCHE:

16     Q     Ms. Simpson, I'm having just a wee bit of trouble hearing you, so if

17     you would keep your voice up.  There is a live microphone in front of you, if

18     you could kind of direct your answers to the mic.

19         Ms. Simpson, I hate to ask a lady their age, but would you tell the jury

20     how old you are?

21     A     Forty-four.

22     Q     And you live in Kentucky?

23     A     Uh-huh, yes.

24     Q     Frenchburg?

25     A     Yes.

-435-

1    Q    Tell the members of the jury where Frenchburg, Kentucky is.

2    A    Next to Lexington, Kentucky.

3    Q    How far from Lexington?

4    A    Six hundred-and-some miles from here.

5    Q    And how did you get here for this trial, did you fly or drive?

6    A    My husband drove.  We drove.

7    Q    And how long a drive is that?

8    A    Eleven hours.

9    Q    About eleven hours?  Ms. Simpson, back in 2011, did you have

10   occasion to come to a office known as East Health Center in Garden City,

11   Georgia?

12   A    Yes.

13   Q    How did you hear about East Health Center?

14   A    My husband at the time, which is my ex-husband now, he'd heard

15   about it.

16   Q    And what was your husband's name at that time?

17   A    Michael Brooks.

18   Q    And did he come with you to the East Health Center?

19   A    Yes.

20   Q    And any other family members that came with you?

21   A    My father-in-law.

22   Q    And what is your father-in-law's name?

23   A    Jim Brooks.

24   Q    Your former father-in-law.

25   A    Yes.

-436-

1    Q    Jim Brooks?

2    A    Yes.

3    Q    And did those gentlemen also live in Frenchburg, Kentucky back in –

4    A    Yes.

5    Q    – 2011?  Had you been using oxycodone prior to coming to East

6    Health Center?

7    A    Yes.

8    Q    And where were you going to obtain your prescriptions?

9    A    Florida.

10   Q    Do you remember where in Florida?

11   A    Not right off, no.  I can't think.  It was – where I got my MRI was Palm

12   something.

13   Q    We'll come back to that.

14   A    Okay.

15   Q    But had you been using oxycodone for some time?

16   A    Probably a year or two.  I guess maybe around two years.

17   Q    And how much oxycodone were you using?

18   A    From Florida?

19   Q    Yeah, before coming to East Health Center.

20   A    There they was giving – yeah, about 240, 30 milligrams.

21   Q    Per month?

22   A    Yes.

23   Q    About eight a day?

24   A    Yes.

25   Q    Were you addicted to the drug?

-437-

1    A    Yes.

2    Q    And how did it come to be that a person from Frenchburg, Kentucky

3    would be getting oxycodone way down in South Florida?

4    A    Well, at the time, it's something that my husband came up with.  He

5    wanted to go down, and my father-in-law and I went along with it.  And I

6    never took it before, never seen it before.  And I did have back trouble at

7    the time.  Got the MRI and stuff like that, and I didn't know they was

8    addictive like they was.

9    Q    So your husband and father-in-law got you addicted –

10    A    Right.

11    Q    – to oxycodone.

12    A    Right.

13    Q    How long did you do that?  I mean, it's a much longer drive from

14    Frenchburg to South Florida than it is to Garden City; is that right?

15    A    Yes, it is.

16    Q    And you'd do that every month?

17    A    Yes.

18    Q    And how much would this activity cost you?

19    A    Truthfully, I can't tell you  exact dollar.  My husband at the time, you

20    know, he done the driving, and he'd pay for the gas and pay for the, you

21    know, doctor.

22    Q    Would you stay in motels?

23    A    Yes.

24    Q    Would you – how would you pay for the doctor's visits, cash?

25    A    Cash.

-438-

1    Q    And how would you pay for the drugs that you received?

2    A    Cash.

3    Q    Are you a wealthy person?

4    A    I run a restaurant for 15 years, and I sold it, and then I had money left

5    to live off of for a while when I sold it.  And he was a self-employed logger,

6    so ...

7    Q    Costing you a lot of money every month?

8    A    Yes, yes.

9            MR. KNOCHE: Could we see Exhibit 6-002.

10    Q    That's you, Ms. Simpson?

11    A    Yes.

12    Q    You recognize your handwriting?

13    A    (No audible response.)

14    Q    Is that your handwriting?

15    A    Yes, yes.

16    Q    And what's the date in the top left of the form?

17    A    February 21, 2011.

18    Q    And would that have been paperwork that you filled upon your first

19    presentment at East Health Center?

20    A    Yes.

21            MR. KNOCHE: And page – excuse me, Exhibit 6-003.  Can you

22    zoom in on the usual degree of pain?

23    Q    What did you write down on that?

24    A    Eight-to-ten.

25    Q    Ten being the highest?

-439-

1    A    Yes.

2    Q    Were you in any pain level of 8-to-10 when you went to East Health

3    Center on February the 21st of 2011?

4    A    No.  That was – 10 would be unbearable.

5    Q    With 10 you'd be screaming.

6    A    Yes.

7    Q    Why did you put down that your pain level was 8-to-10?

8    A    Well, at the time I think I was told to put that.  People kind of talks

9    around where you're sitting.

10    Q    Did you see other people in the waiting room at East Health Center?

11    A    Yes.

12    Q    Did any of them appear to be in pain levels of 8-to-10?

13    A    No.

14    Q    What were they doing in the waiting room?  What did you observe?

15    A    Just like me, sitting and waiting for office call.

16    Q    Did you talk to any of the other patients?

17    A    No.  Just who I was with.

18    Q    Just your husband and father-in-law –

19    A    Yes.

20    Q    – who came down with you.  Do you remember the doctor you saw,

21    name of the doctor on that first visit?

22    A    I don't the name, no.  I do remember his face but not the name.

23    Q    You remember his name?

24    A    I can't –

25    Q    – I couldn't understand you.

-440-

1   A   No. I couldn't remember the name.  It was foreign like –

2   Q   – It was foreign?  Do you recognize –

3   A   – or different.

4   Q   Do you see him in the courtroom here today?

5   A   Yes.

6   Q   Could you describe him for the record? .

7   A   Describe him?

8   Q   Describe him.  What's he wearing?  Where is he seated?

9   A   There, gray suit, dark complected, dark hair.

10  Q   Did that doctor that you just described, did he conduct any

11  examination of you when you saw him on February 21st?

12  A   I can't tell you yes or no.  I remember being asked questions, but I

13  cannot tell you that, be honest.

14          MR. KNOCHE: Can you show us Exhibit 6-013?

15  Q   Do you see that's the same date, February 21, 2011?

16  A   Yes.

17  Q   That's still you, right?  Latina Simpson?

18  A   Yes.

19  Q   That's your date of birth that's listed?

20  A   Yes.

21          MR. KNOCHE: Could you scroll down to the physical exam

22  portion of the document?

23  Q   What was your diagnosis on that day?

24  A   I don't remember.

25  Q   Okay. What's written  there?

-441-

1    A    I can't read that..

2              MR. KNOCHE: Well, could you zoom out a little bit, Dean, so

3    she can read the line that says diagnosis, please.

4    Q    Is anything written there?

5    A    No.

6    Q    Can you read the line that says treatment?

7    A    Nothing.  Nothing there.

8              MR. KNOCHE: 6-014.

9    Q    See that document that says POM MRI?

10   A    Yes.

11   Q    Is that an MRI than that you brought with you from Frenchburg to

12   East Health Center?

13   A    Yes.

14   Q    Is that something you knew you were required to bring?

15   A    Yes.

16   Q    And how did you know you were required to bring an MRI form like

17   this to East Health Center?

18   A    Because when I was in Florida they requested MRI so ...

19   Q    That was – you understood that to be standard?

20   A    Yes.

21   Q    The doctor who examined you, whom you've identified, did he ask you

22   why a young woman from Frenchburg, Kentucky had an MRI from

23   Plantation or Boca Raton, Florida?

24   A    If he did, I can't – don't recall.

25              MR. KNOCHE: 6-018.

-442-

1    Q    Do you recognize those prescriptions you received, starting with the

2    one on the far right?  Can you read that?

3    A    I can read it, yes.

4    Q    What were you prescribed?

5    A    Oxycodone, 150 –

6    Q    – How many?

7    A    150.

8    Q    And that 30, do you know what that means?

9    A    30 milligram.

10          MR. KNOCHE:  And then go to the oxy 15 prescription, Dean,

11    beneath that.

12    Q    You recognize that?

13    A    30 of them, 15 milligram.

14    Q    What's the name of the doctor on the prescription pad?  Very top.  Can

15    you read it?

16    A    I see it, but – Najam Azmat?  I don't ...

17    Q    Is that the doctor who wrote the prescription?

18    A    That's what it says, I ...

19          MR. KNOCHE:  And finally, in the top left of 6-018, can you

20    zoom in on that, Dean?

21    Q    What's that a prescription for?

22    A    30 Xanax's, 1 milligram.

23    Q    Did the doctor who wrote you that prescription explain to you the

24    dangers of taking oxycodone and Xanax together?

25    A    If he did, I don't remember that neither.  I can't –

-443-

1    Q    – Did he counsel you on the effects of these drugs you were taking?

2    A    No, not as I recall.

3    Q    Did he ask you whether you were addicted to these drugs?

4    A    Not as I – no.

5    Q    Did he tell you the addiction potential of these drugs?

6    A    Not as I recall, no.

7    Q    Did he warn you about the harms of mixing oxycodone, Xanax, and

8    alcohol?

9    A    Not as I recall, no.

10    Q    Did he ask you why you came all the way from Frenchburg to see him

11    at East Health Center?

12    A    No.

13    Q    Did he ask for prior physician records, other than the MRI?

14    A    I cannot tell you that.  I have been to a doctor who has, so I can't tell

15    you if it was him or another one honestly.

16    Q    Did you take any to him?

17    A    Huh?

18    Q    Did you take any?

19    A    Not as I recall.

20    Q    Did he suggest any alternative forms of treatment other than taking

21    drugs?

22    A    No, not as I know of.

23    Q    Did he tell you what was wrong with you?

24    A    I can't recall.

25    Q    Ask any questions about the MRI?

-444-

1    A    I can't recall that neither.

2    Q    Did he ask you about your pain rating?  You said you were 8-to-10 was

3    your usual pain level.

4    A    He could have.  I mean, you know, I don't know if he did or not.

5    Q    Did he ask you why you weren't screaming?

6    A    No.

7    Q    Were you screaming?

8    A    No.

9    Q    The drugs that you were prescribed, Ms. Simpson, did you get that

10   prescription filled?

11   A    Yes.

12   Q    Did you take them all yourself?

13   A    Yes.  To be honest, what I didn't take got stolen because of the ...

14   Q    That was in 2011, this activity.  Are you still taking oxycodone?

15   A    No.

16   Q    And tell the jury when you stopped taking it?

17   A    It's probably been a year ago.  I went through divorce and moved in

18   with my parents, and I never took them no more.

19   Q    And are you coping with any pain issues you had without taking

20   oxycodone?

21   A    I take Aleve or Advil for anything I need.

22   Q    Does that seem to suffice for you?

23   A    Mostly, yeah.

24   Q    Is it difficult when you first stop taking oxycodone?

25   A    Yes, it was.

-445-

1   Q   And what was difficult about it?

2   A   It was like a bad flu.  You ached all over.  You was nauseated.  You

3   broke out in sweats.  And if I knowed that I never –  I would never started

4   taking it in the first place.  That's the reason I traveled so far to get it

5   somewheres else, because you didn't want that pain.  You didn't want to

6   have to suffer when you could go get the pill to take it away.

7   Q   Have you ever heard of the term "pill pain"?

8   A   Yes.

9   Q   What do you understand the term "pill pain" to mean?

10  A   What do I understand it to be?

11  Q   Yeah.

12  A   When somebody's complaining about pain to me that isn't legitimate, I

13  call it pill pain.  You know, it takes a pill to get it away.  It's not real pain.

14  Q   Have you ever heard anyone suggest that it's caused by the withdrawal

15  symptoms if you don't take the pills?

16  A   Yes.

17  Q   Would you agree with that?

18  A   Yes.

19              MR. KNOCHE: That's all I have.

20              THE COURT: Mr. Withers.

21                      CROSS-EXAMINATION BY

22  MR. WITHERS:

23  Q   Ma'am, good afternoon.

24  A   Hello.

25  Q   I'm Tom Withers.  I represent Dr. Azmat.

1    You recall when you came down here right at a year ago and testified

2    before the grand jury just downstairs in this courthouse?

3    A    Yes.

4    Q    You were sworn to tell the truth; right?

5    A    Yes.

6    Q    You took the same oath then that you took now; right?

7    A    Yes.

8    Q    And in front of the grand jury, you were asked the question [reading]:

9    What was the reason you came to Savannah?  And your answer was

10   [reading]:  I came to a pain clinic for help for my back; correct?

11   A    Yes.

12   Q    That's what you testified to then; correct?

13   A    Seems like, yes.

14   Q    Now – and that was true then; right?

15   A    Yes.

16   Q    You had been seeing a doctor up in Kentucky; had you not?

17   A    For my back?

18   Q    Yes, ma'am.

19   A    No.

20   Q    You don't recall seeing Dr. Rachel Short –

21   A    Yes, yes.

22   Q    – in Kentucky?

23   A    Yes.

24   Q    And you had been seeing her, and then, for whatever reason, she quit

25   the clinic that you had been going to –

-447-

1    A   Right.

2    Q   – correct?

3    A   Yes.

4    Q   And Dr. Short was prescribing pain medication to you; wasn't she?

5    A   Yes.

6    Q   And she was prescribing you what you called nerve medication;

7    correct?

8    A   Yes.

9    Q   And she was prescribing you Paxil for depression; correct?

10    A   Yes.

11    Q   She started you out on Lortabs; correct?

12    A   Yes.

13    Q   And Percocet; correct?

14    A   Yes.

15    Q   And ultimately ended up prescribing you Xanax as well; correct?

16    A   Yes.

17    Q   And when Dr. Short left that clinic up in Kentucky, no one else there

18    would prescribe you pain medication; true?

19    A   I really didn't go back to nobody else besides her.

20    Q   And when you and Mr. Brooks –

21          MR. WITHERS: This is Government's Exhibit 29-A1-050.

22    Q   – came to Savannah, it was the first day that it was open; do you recall

23    that?  The clinic was open.

24    A   If I sit and think about it, I remember them putting stickers on the

25    windows or the doors.

-448-

1    Q    Yes, ma'am.  That made you think it was just opening.

2    A    Yes.

3    Q    And it looks like you're patient number three that day; right?

4    A    Yes.

5    Q    And the result of which is, there wasn't a crowd in the waiting room;

6    right?

7    A    They was several people there.  It wasn't a big waiting room.

8    Q    Now, you filled out the paperwork when you got there; didn't you?

9    A    Yes.

10    Q    And on that paperwork – I'm going to show you, ma'am, what you

11    just looked at a minute ago, Government's Exhibit 6-003 – you put your

12    description as lower back, leg pain; correct?

13    A    Yes.

14    Q    And then you filled out down at the bottom of that page the

15    medications that you were on; correct?

16    A    Yes.

17    Q    I'm sorry?

18    A    Yes.

19    Q    And by the way, it was true that you had lower back pain; correct?

20    A    Yes, it is.

21    Q    And it was true that you were on these medications that you wrote

22    down here; correct?

23    A    From another state, yes.

24    Q    And when you described your pain that we just looked at a minute ago

25    when Mr. Knoche was asking you questions – I'll go ahead and pull it in –

-449-

1    what's your usual degree of pain, 8-to-10, is it your testimony that what you

2    wrote there was true or not?

3    A    If I sit and think about the level of pain, what 8 and 10 is, no, it wasn't a

4    8 or 10.

5    Q    All right.  Did you intentionally put that down wrong?

6    A    Like I said, we was talking, my husband and father-in-law, and we just

7    put the same thing,, you know.  Didn't really know at the time.

8    Q    And the medications that you wrote down there for the Xanax and the

9    oxycodone and the hydrocodone, you in fact were on those medications at

10   that point in time; were you not?

11   A    Yes.

12   Q    And you – when you got to the East Health Center, they obtained one

13   of your MRIs; correct?

14   A    Yes.

15   Q    You had to do a urine drug test; correct?

16   A    I remember doing a test.

17   Q    And do you recall that your urinalysis was positive for oxycodone?

18   A    I don't know.  I don't know if they told me yes or no.

19   Q    Okay.  But that's what you would expect, given the fact that you had

20   been taking oxycodone.

21   A    Most usually, yeah, then they tell you it's in your system.

22   Q    And after you filled out the paperwork, Dr. Azmat examined you; did

23   he not?

24   A    I cannot recall.  I didn't –

25   Q    – And that's fine, ma'am.  And I'm not trying to get you to say

-450-

1   anything other than what you truthfully recall.   But I want to look here, it

2   looks like something by car '08, and then MVA '08 and '010.  Were you

3   involved in a –

4   A   Car wreck.

5   Q   – car wreck?

6   A   Yes.

7   Q   And were you involved, in fact, in two car wrecks, one in '08 and one

8   in 2010?

9   A   Three exactly.

10   Q   Three?

11   A   Yes.

12   Q   One of those was a significant injury; was it not?

13   A   One was head-on, one was from behind, and one was side.

14   Q   Were all three of them car wrecks?  In other words, not a motorcycle

15   or –

16   A   – No.

17   Q   They were –

18   A   – All cars.

19   Q   All right, and as a result – and, in fact, if I look here, it's got car '08,

20   MVA '08, and then 2010, so it looks like you did describe to Dr. Azmat the

21   three car wrecks, although you can't recall having done so.

22   A   Right.

23   Q   The occupation here, it looks like it says owns restaurant?

24   A   Yes.

25   Q   Was that true at that time?

-451-

1    A    Yes.

2    Q    And then under the medication here, it looks previous medication,

3    oxycodone 30, 240 is – was that true, to your recollection?

4    A    Before I seen him, yes.

5    Q    And then 15 milligram oxycodone, 110; correct?

6    A    Yes.

7    Q    And then Xanax 2 milligrams, 60, it looks like; correct?

8    A    60 or 50, I don't remember, one or the other.

9    Q    Okay, and if I add those up correctly, 240, 110, and if it's 50, that

10   would be an even 400 tablets that you were on at that point in time.

11   A    Yes.

12   Q    And Dr. Azmat, with respect to the prescriptions that he gave you, he

13   reduced the Xanax from 2 milligrams to 1 milligram.  You see that?

14   A    Yes.

15   Q    And he reduced the number from 50 or 60 down to 30; right?

16   A    Yes.

17   Q    He reduced the oxycodone 30 from 240 tablets down to 150.

18   A    Yes.

19   Q    That's a sizeable drop; wasn't it?

20   A    Yes.

21   Q    Then the oxycodone 15, he reduced from 110 down to 30; correct?

22   A    Yes.

23   Q    That's another sizeable drop; correct?

24   A    Yes.

25   Q    So when you left, having been seen by Dr. Azmat, your prescriptions

-452-

1    had been cut just about in half; correct?

2    A    Yes.

3    Q    And those – let's be clear, when you were seeing him, when you were

4    describing to him your injury, you were talking about a real injury; right?

5    A    Yes.

6    Q    With real pain; right?

7    A    Yes.

8    Q    And the medication that he provided you provided real relief to you at

9    the time as well; didn't it?

10   A    Yes, it helped.

11            MR. WITHERS: That's all the questions I've got.  Thank you,

12   ma'am.

13            THE COURT: Mr. Knoche?

14                    REDIRECT EXAMINATION BY

15   MR. KNOCHE:

16   Q    What proof did Dr. Azmat ask of you that you had those motor vehicle

17   accidents?

18   A    I don't recall.

19   Q    He just asked you.  Did he do anything other than ask you?

20   A    I can't say.  I don't know.

21   Q    Those accidents, according to your chart, took place as early as 2008,

22   three years earlier; is that right?

23   A    If I remember correctly, I couldn't understand him.

24   Q    But there must have been some clinical record of your accident if you

25   sought medical help for it back in 2008 after you had the accident.

-453-

1    A    I pulled all my records from where I've been to the hospitals from

2    where I'm from, but I don't know if I turned them in to him.

3    Q    If they're not in the file, would that be indicative that they're not

4    there?

5    A    They would be that thick (indicating) if they was.

6    Q    He didn't ask you for them; did he?

7    A    Not as I recall.

8    Q    He took your word, whatever you said.

9    A    Yes.

10    Q    Is that correct?

11    A    (No audible response.)

12    Q    You have to answer yes or no.

13    A    Yes.

14    Q    Do you know what your husband was prescribed?

15    A    I think about the same.

16    Q    150 – 150 oxycodone.

17    A    Yeah.

18    Q    How about the father-in-law, 150?

19    A    Same, far as I can remember.

20    Q    Everybody got 150.

21    A    Far as I can remember, yes.

22              MR. KNOCHE: That's all I have, Your Honor.

23              THE COURT: Anything else of this witness?

24              MR. WITHERS: No, Your Honor.

25              THE COURT: Can the witness be excused?

-454-

1        MR. KNOCHE: Yes, sir.

2        THE COURT: All right, you're excused, ma'am.

3     [Witness Excused]

4        THE COURT: Members of the jury, I hate to disappoint you,

5     but we're going to have to quit at 4:30 today.  I don't want y'all to stand up

6     and clap, now, I just want you to realize that sometimes we've got some

7     other things we have to do.  But I know you've been attentive.  I've taken a

8     good look at you today.  And I'm going to send you home for the evening

9     with the same reminders that I give you, and that is: it would be a violation

10    of your oath to discuss anything about this case at all with anyone, no

11    family member, no friend, no relative.  Don't even discuss it among

12    yourselves.  Do go home and try to look up anything about this case in any

13    books, or online, or any smartphones or that sort of stuff that I've already

14    cautioned you about.  Don't communicate with anyone about this case.

15    When I say don't talk about it, I don't mean – you know, you can

16    communicate now by  smartphones and computers and all that kind of

17    stuff, and don't do any of that.

18        Forget about this case when you go home tonight.  Try to enjoy

19    your evening, do what you normally do.  We'll begin in the morning at nine

20    o'clock.  You were all on time this morning, and I appreciate it, because we

21    can't start until everybody gets here.  And again there will be some

22    refreshments for you when you get here in the morning.  Leave your

23    notepads and pencils here, and we'll begin in the morning promptly at nine

24    o'clock.

25        And so with those instructions, you're excused at this time.

-455-

1    Thank you very much.

2            THE COURT: The jury is excused for the day.  The proceedings

3    are continued outside of the presence of the jury as follows:]

4            THE COURT: Counsel, we'll begin in the morning at nine

5    o'clock.  Is there anything we need to talk about before we leave here this

6    afternoon?

7            MR. KNOCHE: Not from the government, Your Honor.

8            MR. WITHERS: Not from the defense, Your Honor.

9            THE COURT: And I neglected to tell you yesterday, but I hope

10   you know that we're going to lock this courtroom up when you leave here,

11   so it's not necessary for you to take anything out.  You can leave it all here.

12   If you want to leave it here, that's up to you.

13            Y'all have a good evening, and I'll see you tomorrow.

14            [NOTE: Whereupon the proceedings are adjourned.]

-456-

STATE OF GEORGIA

CHATHAM COUNTY.

CERTIFICATE OF REPORTER

I, Marie Cowart, do hereby certify that the above and foregoing pages of typewritten material is a true, correct and complete transcript of the evidence and proceedings adduced in the Jury Trial stated in the captioned matter, this being Volume 2 of Volumes 1A, and 1 through 5.

This 18th day of September, 2014.

/s/ *Marie Cowart*

Marie Cowart, CCR B-237
United States Court Reporter
Southern District of Georgia
Savannah Division

P. O. Box 9572
Savannah, GA 31412
(912) 650- 4066