# IN THE UNITED STATES DISTRICT COURT FOR THE

## SOUTHERN DISTRICT OF GEORGIA

### SAVANNAH  DIVISION

UNITED STATES OF AMERICA          *

v.                                             *   CASE NUMBER CR413-28

NAJAM AZMAT                            *

---

Transcript of Evidence and Proceedings Adduced in the Jury Trial held

January 13-17, 2014 before The HONORABLE WILLIAM T. MOORE, JR.,

Judge Presiding, reported by Marie Cowart, Official Court Reporter.

---

<u>VOLUME 3 - 1/15/2014</u>

<u>PP. 457 - 734</u>

APPEARANCES:

For the Government                                      KARL I. KNOCHE, AUSA
                                                        GREGORY E. GILLULY, JR., AUSA

For the Defendant                                       THOMAS A. WITHERS, ESQ.

*Proceedings recorded by shorthand with back-up recording; transcript produced from note reading in*

*conjunction with transcription of back–up recording.*

# I  N D E X

## VOLUME 1A - 1/13/2014

### (*Voir Dire* and Jury Selection)

#### PP. 1 - 56

PRELIMINARIES AND INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

JURY PANEL SEATED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*VOIR DIRE* EXAMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    Juror Biographicals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

SILENT STRIKING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

JURY SEATED AND SWORN  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

CERTIFICATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

## VOLUME 1 - 1/13/2014

#### PP. 57 - 201

PRELIMINARIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

COURT'S RULINGS ON EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

OPENING STATEMENTS

    By Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

    By Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Government's Presentation of Evidence

MARY KAY ROSS

    Direct Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . . 82

    Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . . 90

    Redirect Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . 93

    Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . 94

DAVID HATMAKER

    Direct Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . 95

    Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 103

    Redirect Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . 107

CHARLES SIKES

-4-

Direct Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . . 107

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 150

Redirect Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . 181

Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . 188

CHARGE CONFERENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

CERTIFICATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201

## VOLUME 2 - 1/14/2014

## PP. 202 - 456

PRELIMINARIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202

ADELARD LeFRANCOIS

Direct Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . . 202

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 251

Redirect Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . 277

Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . 284

FRANCIS J. BARBUSCIA

Direct Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . 286

Cross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . . . 301

Redirect Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . 310

Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . 311

NANCY BINION

Direct Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . 312

Cross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 329

Redirect Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . 333

PATRICIA ROHRER

Direct Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . 334

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 344

Redirect Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . 350

Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . 351

KONSTANTINO AFTHINOS

Direct Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . 352

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 369

Redirect Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . 378

Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . 381

SEAN CLARK

Direct Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . . . . 383

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . . . 392

Redirect Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . 401

Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 402

JOSEPH TRAVIS BRADLEY

Direct Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . . . . 403

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . . . 415

Redirect Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . 431

LATINA SIMPSON

Direct Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . . . 434

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . . . 445

Redirect Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . 452

CERTIFICATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 456

<u>VOLUME 3 - 1/15/2014</u>

<u>PP. 457 - 734</u>

PRELIMINARIES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 457

GERALD SMITH

    Direct Examination by Mr. Knoche  . . . . . . . . . . . . . . . . . . . . . . . . . 457

    Cross-Examination by Mr. Withers  . . . . . . . . . . . . . . . . . . . . . . . . . 469

JAMES GABLE

    Direct Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . 480

    Cross-Examination by Mr. Withers  . . . . . . . . . . . . . . . . . . . . . . . . . 488

    Redirect Examination by Mr. Gilluly  . . . . . . . . . . . . . . . . . . . . . . . 494

    Recross Examination by Mr. Withers  . . . . . . . . . . . . . . . . . . . . . . . 496

BILL LETNER

    Direct Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . 496

    Cross-Examination by Mr. Withers  . . . . . . . . . . . . . . . . . . . . . . . . . 507

    Redirect Examination by Mr. Gilluly  . . . . . . . . . . . . . . . . . . . . . . . 512

    Recross Examination by Mr. Withers  . . . . . . . . . . . . . . . . . . . . . . . 513

KIMBERLY LETNER

    Direct Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . 516

    Cross-Examination by Mr. Withers  . . . . . . . . . . . . . . . . . . . . . . . . . 524

Redirect Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . 534

Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 537


KEN GOSSETT

Direct Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . 537

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 546

Redirect Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . 563

Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 567


DANIEL WISE

Direct Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . 569

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 586

Redirect Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . 605

Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 608


MICHAEL PALMER

Direct Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . 609


GENE SCOTT KENNEDY, M.D.

Direct Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . 611

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 673

COURT'S INSTRUCTION TO COUNSEL . . . . . . . . . . . . . . . . . . . . . . . . . . 726

COURT'S INSTRUCTION TO DR. KENNEDY . . . . . . . . . . . . . . . . . . . . . . 728

COURT'S RULING ON APPROPRIATE STANDARD
           FOR GOOD-FAITH DEFENSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 728

CERTIFICATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 734

<u>VOLUME 4 - 1/16/2014</u>

<u>PP. 735 - 932</u>

PRELIMINARIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 735

GENE SCOTT KENNEDY, M.D.

        Continued Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . 735

        Redirect Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . 761

        Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . 775

COURT'S RULINGS ON EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 777

GOVERNMENT RESTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 777

DEFENSE RULE 29 MOTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 778

RESPONSE OF GOVERNMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 780

COURT DEFERS RULING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 780

Defendant's Presentation of Evidence

THOMAS SIMOPOULOS, M.D.

     Direct Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . . . 783

     Cross-Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . 859

     Redirect Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . 917

DEFENSE RESTS AND CLOSES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 918

COURT'S RULINGS ON EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 919

CHARGE CONFERENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 922

DEFENSE RENEWS RULE 29 MOTION . . . . . . . . . . . . . . . . . . . . . . . . 930

DEFENDANT WAIVES RIGHT TO TESTIFY . . . . . . . . . . . . . . . . . . . . . . . 931

CERTIFICATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 932

<u>VOLUME 5 - 1/17/2014</u>

<u>PP. 933 - 987</u>

PRELIMINARIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 933

CLOSING ARGUMENTS

    By Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 933

    By Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 946

REBUTTAL ARGUMENT

    By Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 964

COURT'S RULING ON DEFENSE RULE 29 MOTION . . . . . . . . . . . . . . 973

DEFENSE EXCEPTIONS TO CHARGE . . . . . . . . . . . . . . . . . . . . . . . . . 975

JURY QUESTIONS 1 AND 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 976

RECEIPT OF VERDICT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 977

JURY POLLED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 980

POST-CONVICTION RIGHTS ADVISED . . . . . . . . . . . . . . . . . . . . . . . . 980

JURY INSTRUCTED REGARDING FORFEITURE . . . . . . . . . . . . . . . . . 982

DETENTION  HEARING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 982

COURT'S RULING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 986

CERTIFICATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 987

-457-

1       [NOTE: Court is opened on 1/15/2014.  The proceedings are

2   continued in the presence of the jury as follows:]

3       THE COURT: Good morning, ladies and gentlemen.  I trust that

4   you had a pleasant evening and appreciate everyone being here on time

5   again this morning and ready to go.

6       You may proceed, Mr. Knoche.

7       MR. KNOCHE: Gerald Smith.

8     [Witness Sworn]

9       CLERK: Please state your name, your occupation, and spell

10  your last name for the record.

11      MR. SMITH: Gerald Asher (phonetic) Smith, S-M-I-T-H.  I'm a

12  cement finisher in Brunswick, Georgia.

13                   G E R A L D   S M I T H

14   GOVERNMENT'S WITNESS, SWORN, TESTIFIED AS FOLLOWS

15                      DIRECT EXAMINATION BY

16  MR. KNOCHE:

17  Q    Mr. Smith, you say you live in Brunswick, Georgia?

18  A    Yes, sir.

19  Q    And can you tell the members of the jury about prior criminal history

20  that you have.  You've been convicted of felony offenses; is that correct?

21  A    I was convicted of one.  I received – or I bought something, a stolen

22  item, and I was just convicted of trafficking and attempt to manufacture

23  methamphetamine.

24  Q    And have you – and those were both felonies.  Have you been

25  sentenced for those offenses?

-458-

1    A    I was sentenced – yes, sir, I was sentenced to the receiving stolen

2    goods five years probation, and it was under the *nolo contendere* or

3    something act.  And I was sentenced to ten years probation on the

4    trafficking and – ten years probation, a fifteen-hundred dollar fine, six

5    months PDC, suspended, and completion of the halfway house where I'm

6    attending now.

7    Q    Do you work?

8    A    Do I work?

9    Q    Yeah.

10    A    Yes, sir.

11    Q    What do you do?

12    A    Cement finishing.  I work for a company.

13    Q    All right, sir.  How long have you done that?

14    A    All my life.

15    Q    And you said you were convicted of a drug offense, and that was a

16    manufacture of methamphetamine?

17    A    Yes, sir.

18    Q    Have you been yourself an abuser of illegal controlled substances?

19    A    Pretty much all my life.

20    Q    What substances have you abused?

21    A    Prescription pain pills, and methamphetamine, you pretty much name

22    it.

23    Q    How old are you now?

24    A    Thirty-two.

25    Q    And would you consider yourself – you're not using drugs now; are

-459-

1    you?

2    A    No, sir.

3    Q    Would you consider yourself a drug addict?

4    A    Yeah, I'm still a addict.  Always will be, but no longer use.  I'm in a

5    program now that's pretty good, it's a faith-based program.  Pretty much

6    got me turned around in the right direction.

7    Q    At one time you were addicted to oxycodone?

8    A    Yes, sir.

9    Q    And that is – is that pharmaceutical that you need a prescription to

10   get?

11   A    Yes, sir.

12   Q    Can you also buy that on the street?

13   A    Yes, sir.

14   Q    And Mr. Smith, at some – well, back in March of 2011, do you

15   remember coming to a doctor office in Garden City called East Health

16   Center?

17   A    Yes, sir.

18   Q    Okay, and how was it that you heard about East Health Center?

19   A    I was left a doctor off Dunn Avenue in Jacksonville, and somebody had

20   brought me a flyer to the store behind the doctor's office.  And the next day

21   or the day after, it wasn't long after that I went to him, went here to Garden

22   City.

23   Q    What kind of doctor office were you at in Jacksonville?

24   A    It's a pain management doctor.

25   Q    And was it – do you know what a pill mill is?

-460-

1    A    Yes, yes, sir, I guess.

2    Q    Was it that kind –

3    A    Yes.

4    Q    – of facility?

5    A    Pretty much.  Little quick stop.

6    Q    Quick stop?

7    A    Yeah, you go in and get it and go out.

8    Q    Okay.  What'd you have to show down in Jacksonville to get drugs?

9    A    MRI within two years old and – had to be no older than two years old,

10   and pretty much pass a drug screen.

11   Q    Had you been to other clinics besides that one in Jacksonville?

12   A    Yes, sir.

13   Q    And was that pretty much the drill at all the clinics that you sought

14   oxycodone from?

15   A    Pretty much.

16   Q    Have an MRI less than two years old?

17   A    Yes, sir.

18   Q    And what kind of complaint of pain did you know you had to make in

19   order to receive a prescription?

20   A    I think they give you a little schedule, you know, a little scale of 1 to 10,

21   pretty much put the highest scale they got.

22   Q    While at Jacksonville at this clinic, someone gave you a flyer or a

23   leaflet telling you about East Health Center?

24   A    Yes, sir. Let me phrase that, the store behind the clinic.  After we had

25   done left and got the prescription from there, we went to the store, stop and

-461-

1   get us something to drink before we hit the road, and he run up to the car.

2   He was kind'a chasing cars down giving people flyers.

3   Q    And you took one.

4   A    Yes, sir.

5   Q    Okay, and after that, was there a phone number you called, or did you

6   just go?

7   A    Pretty much show up, is what we did.  I mean you can call and make

8   an appointment, or you can go.

9   Q    And let me show you – this has been admitted into evidence as

10  Government's Exhibit 27-160.  Mr. Smith, can you read that?  You see that

11  on the screen in front of you?

12  A    Yes, sir.

13  Q    Is that your handwriting?

14  A    Yes, sir.

15  Q    So that Gerald Smith is you?

16  A    Yes, sir.

17  Q    Okay.  Can you read the date?

18  A    March 7, 2011.

19  Q    And looking at that, would you remember the date that you visited

20  East Health Center?

21  A    Pretty much.

22  Q    Would be that date.

23  A    Yeah.

24  Q    Okay, and look down, it says, How have your symptoms been without

25  medication.  You see where you circled a number?

1    A    A 10.

2    Q    What number did you circle?

3    A    You talking about on the scale?

4    Q    Yes.

5    A    A 5, and then a 10 and a 6.

6    Q    You say without your medication you're a 10?

7    A    Yes, sir.

8    Q    Okay, and 10 being the highest.

9    A    Yes, sir.

10   Q    Were you in fact ever a pain level of 10?

11   A    No, sir.

12   Q    And you indicated on this form that a number of things made your

13   symptoms worse: sitting, standing, bending, lifting, laying down.  Sounds

14   like just about everything.

15   A    Pretty much.

16   Q    Did you know to make those sorts of exaggerated complaints?

17   A    Kind of routine to make it at all of them.

18   Q    Let me show you another form here.  Still your handwriting, Mr.

19   Smith?

20   A    Yes, sir.

21   Q    Still the same exhibit.  You see the line where it says, On a scale of 1 to

22   10, what is your usual degree of pain.  And what'd you put?

23   A    Ten.

24   Q    Okay.  So you were consistent.

25   A    Yes, sir.

-463-

1    Q    Did you get seen by the doctor at East Health Center that day?

2    A    Yes, sir.

3    Q    Do you see that doctor here in court today?

4    A    Yes, sir.

5    Q    Can you identify him for the record?

6    A    Dr. Azmat.

7    Q    Okay, and what color tie is he wearing?

8    A    Red.

9              MR. KNOCHE: Ask that the record reflect that identification,

10   Your Honor.

11             THE COURT: So noted.

12   Q    Tell the members of the jury what kind of physical exam Dr. Azmat

13   performed on you on March the 7th, 2011?

14   A    I walked in and paid my money.  I waited about five or ten minutes.  I

15   walked to the back, took a drug screen, the first one.  And I went and sat in

16   a room and waited.  I think checked my reflexes and checked my heartbeat.

17   And I think he said one leg was longer than the other, something.  And

18   pretty much that was it.  I got my scripts and I left.

19   Q    Were you required to lift your legs or bend over?

20   A    Nah, I sit on a bed, or laid on a bed, I guess.  Probably measured my

21   leg.

22   Q    And you say your blood pressure was taken before you went back.

23   A    Yeah.

24   Q    That wasn't done by Dr. Azmat.

25   A    No, sir.

-464-

1    Q    If you look down where it says previous medication, do you see – that

2    is not your handwriting is it?

3    A    Where at?

4    Q    Toward the bottom of the page, it says previous – I'll slide it up a bit.

5    Now it's in the middle, previous medication.

6    A    No, sir.

7    Q    You don't see that line?

8    A    I see it, but that's not my handwriting.

9    Q    Okay.  That's not your handwriting, but did you tell Dr. Azmat that you

10   were getting 150 oxy 30s?

11   A    Yes, sir, I wrote it down.

12   Q    Okay, and 30 Valium 10s?  Is that correct?

13   A    Yes, sir.

14   Q    That's what you told him?

15   A    I had wrote down Xanax and everything on the – whatever I got from

16   the doctor before I wrote it down.

17   Q    And did you receive a prescription on that particular day?

18   A    Yes, sir.

19   Q    And I'm going to show you one more document.  Can you see the one

20   on the left?

21   A    Yes, sir.

22   Q    Okay. What was that?

23   A    150 30 milligram oxycodone.

24   Q    Okay, and then you got a prescription for 60 Percocet 10s on the right;

25   is that correct?

-465-

1    A    Yes, sir.

2    Q    Okay, and that prescription was dated March the 10th, 2011.  Did you

3    have to go back and pick it up?

4    A    No, sir, I think they post-dated it or something, where I had just come

5    from another doctor.

6    Q    Prior to getting that prescription, did Dr. Azmat ask you about your

7    family history?

8    A    (No audible response.)

9    Q    Did he ask you about family history?

10   A    I think he might have.

11   Q    I fibbed, I have one more document to show you.  See that where it

12   says family history?

13   A    Yes, sir.

14   Q    You wrote something about your father had a heart attack.

15   A    Yes, sir.

16   Q    And that was true?

17   A    Yes, sir.

18   Q    You have a mother?

19   A    Sir?

20   Q    You have a mother?  You didn't write anything.

21   A    No, huh-uh.

22   Q    How about siblings, any siblings?

23   A    Yes, sir, I have kids.

24   Q    Grandparents?

25   A    Yes, sir.

-466-

1    Q    Okay, and you wrote nothing.

2    A    No.

3    Q    Were you asked about that?

4    A    Can't really recall.  If I wrote that down, I'm sure I was asked but ...

5    Q    You wrote it down, but did Dr. Azmat ask you about any family

6    history?

7    A    I'm not sure.

8    Q    Did he ask you?

9    A    I really can't recall.

10   Q    During your examination.

11   A    Yes.

12   Q    Did he counsel you about the addictive qualities of the drugs you were

13   taking?

14   A    No, sir.

15   Q    Did he warn you – how did you get there?  You're not from Savannah;

16   right?

17   A    No, sir.

18   Q    You're from where?  Brunswick –

19   A    – Brunswick, yes, sir.

20   Q    Okay.  How did you happen to get to the clinic on March the 7th?

21   A    Me and my cousin and his girlfriend.

22   Q    What's your cousin's name?

23   A    Brian Smith.

24   Q    And what's his girlfriend's name?

25   A    Ann Underwood.

-467-

1    Q    And had they all been to the clinic before?

2    A    Yes, sir, we kind'a – we pretty much together on all of them.

3    Q    You go to these sorts of clinics together?

4    A    Yes.

5    Q    And who pays for the visits?

6    A    If we didn't have the money he'd pay for it, and we'd get different

7    sponsors to help you.  I guess is what you call it.

8    Q    And what do you understand a sponsor to be?  When you say sponsor,

9    what do you mean?

10    A    When I don't have the money, he does.

11    Q    He does what?

12    A    He pays for it.

13    Q    He pays for it.  And what's the sponsor get in exchange for paying for

14    the doctor's visit?

15    A    You give the pills back to him for what he give you at a lower price

16    than what they sell on the street.

17    Q    And how much do you – you know, as a drug addict and a user of

18    oxycodone, do you know what you would pay for a 30 milligram pill of

19    oxycodone on the street?

20    A    They go up as high as 30-or-40 bucks, then down to 10.

21    Q    About a dollar a milligram.

22    A    Pretty much.

23    Q    And on this particular occasion, March 7th, when you came with Brian

24    Smith, did Ann Underwood come also?  Do you remember?

25    A    Yes.

-468-

1    Q    Okay, and did you fill this prescription?

2    A    Yes, sir.  I couldn't fill it nowhere in Savannah.  Nobody would touch

3    it, so we had to call around and find out where we could fill them at.  I think

4    I ended up filling it at Whitaker's in Jesup.

5    Q    In Jesup?

6    A    Yes, sir.

7    Q    And from the medication that you received from that pharmacy in

8    Jesup, did you give some of that to Mr. Brian Smith, your cousin?

9    A    Yes.

10   Q    Is that correct?

11   A    Yes, sir, correct.

12   Q    Do you remember Dr. Azmat asking you about – or talking to you

13   about alternative treatments besides the drugs you were on?

14   A    No, sir.

15   Q    Did he discuss the MRI with you?

16   A    Not with me.

17   Q    He wouldn't have discussed it with anyone else probably –

18   A    – I mean, he didn't discuss it with me, you know.

19   Q    Did he remark about your very high pain rating of 10?

20   A    No, sir, he didn't really say too much to me.  It was that he looked at

21   the papers I filled out, and after that it was pretty much a done deal after he

22   checked my heartbeat and told me about my leg being longer than the

23   other, and that was it.

24            MR. KNOCHE: That's all I have for this witness, Your Honor.

25            THE COURT: Ms. Bodaford, do you have any Kleenex down

-469-

1    there?

2                CLERK: Yes, sir.

3                THE COURT: I want you to give one to this witness, and

4    whatever you've got in your mouth I want you to take it out and put it in

5    that Kleenex.

6                MR. SMITH: Oh, yes, sir.

7                THE COURT: All right, Mr. Withers, you may proceed.

8                          CROSS-EXAMINATION BY

9    MR. WITHERS:

10   Q    Mr. Smith, good morning.

11   A    Morning.

12   Q    My name is Tom Withers.  I represent Dr. Azmat.  I have a few

13   questions for you this morning.

14        How many times did you come up to East Health Center?

15   A    I actually seen the doctor once, but I been up there numerous times

16   through that month with different people.

17   Q    And how many times did you actually check in at the front desk?

18   A    One time that I paid.  I went there three months in a row, but I only

19   seen him once.  He was gone.

20   Q    Okay, and you just told this jury that Dr. Azmat post-dated the

21   prescription, because the prescription is dated March 10; right?

22   A    Yes, sir.

23   Q    And again, this is in the exhibit that the government just introduced.

24   And of course that prescription is dated 3/10; isn't it?

25   A    Yes, sir.

-470-

1   Q    But you saw Dr. Azmat on March 10; did you not?

2   A    I saw Dr. Azmat on the 7th.

3   Q    This is Government's Exhibit 29-1A-018.  What's the date on that

4   exhibit, sir?

5   A    It says the 10th.

6   Q    Yes, sir.  And then I want you to look right down there, Line Number

7   10.  See your name there?

8   A    Yes, sir, I sure do.

9   Q    Gerald Smith?

10  A    That's it.

11  Q    You signed in on the 10th; didn't you?

12  A    I guess I did.

13  Q    So Dr. Azmat didn't post-date that prescription; did he?

14  A    I know I went to the doctor in Jacksonville, and my 28 or 30 days

15  wasn't up, and I couldn't get them filled for another three days.  So I guess

16  that brought it down to the 28 day.

17  Q    And so that's why you came back on that day, the 10th.  And I'm going

18  to show you what is also in the government's exhibit that they've just

19  identified, 27-160, and somebody wrote at the bottom of that, Can come

20  back on 3/10; didn't they?

21  A    I guess they did.

22  Q    You know the importance of being truthful and accurate to this jury;

23  don't you?

24  A    Yeah.

25  Q    You want to make sure you treat this man fairly; don't you?

-471-

1    A    Yes, sir.

2    Q    And you want to make sure you tell the truth –

3    A    Yes, sir.

4    Q    – to this jury; don't you.  Now, you're a convicted felon; aren't you?

5    A    Sure am.

6    Q    You're a twice-convicted felon; aren't you?

7    A    Well, they covered one up, so I guess I'm convicted of one.

8    Q    You pled guilty to felony theft back in – in Glynn County back in 2006;

9    didn't you?

10    A    That's correct.

11    Q    And then you testified before the grand jury here in the Southern

12    District of Georgia in September of 2013; didn't you?

13    A    That's correct.

14    Q    And at that time you were being held in the Glynn County Detention

15    Center; right?

16    A    Correct.

17    Q    And you were being held on some serious charges; true?

18    A    That's correct.

19    Q    And those charges include – give me just one minute – trafficking in

20    methamphetamine and manufacturing methamphetamine.

21    A    That's correct.

22    Q    Tampering with evidence; correct?

23    A    That's correct.

24    Q    Trafficking in cocaine; correct?

25    A    Incorrect.

-472-

1    Q    Incorrect?

2    A    Incorrect.  I was not charged with trafficking of cocaine, I was charged

3    with trafficking of methamphetamine.

4    Q    And when you testified before the members of the grand jury, you

5    understood that the government prosecutors or the DEA agent would let

6    the Glynn County prosecutors know the nature and extent of your

7    cooperation; right?

8    A    Yes, sir.

9    Q    And it was your hope that the Glynn County authorities would

10   consider your cooperation favorably; correct?

11   A    Well, they did.  I've been sentenced.

12   Q    In fact they did consider that testimony favorably, as you just said;

13   right?

14   A    Yes.

15   Q    Trafficking in methamphetamine, do you recall what the maximum

16   penalty for that is in the state of Georgia?

17   A    Well, in the situation I was in they told me ten years.

18   Q    All right, and the tampering with evidence, do you recall what the

19   maximum sentence for that was?

20   A    No, sir, they never did tell me about that one.

21   Q    Were you also charged with manufacturing methamphetamine?

22   A    It falled under trafficking.  The manufacturing fell up under the

23   trafficking.

24   Q    And am I right in this, that the trafficking charge is a ten-year

25   mandatory minimum in the state of Georgia.

-473-

1    A    Yes, sir.

2    Q    So that if you get convicted of trafficking, you get out of prison after

3    serving ten years; correct?

4    A    I guess.

5    Q    But on October 30th of last year, the prosecutor down in Brunswick

6    dismissed all of the outstanding warrants against you for manufacturing

7    and trafficking; didn't he?

8    A    No, sir, they didn't.  I pled out to it, and they got me with intent to

9    manufacture methamphetamine.  Possession with intent to manufacture.

10   Q    Right, and so you ended up pleading – you were charged with

11   trafficking; right?  And you ended up pleading to a possession; correct?

12   A    Yes, sir.  I was charged with manufacturing, and it fell because they

13   had no bond setting for the manufacturing of methamphetamine, so it fell

14   under trafficking.

15   Q    Right, and so – manufacturing, by the way, means making

16   methamphetamine; right?

17   A    Yes, sir, it does.

18   Q    That's what you were doing; right?

19   A    Yes, sir, it was.

20   Q    Nobody's fault but your fault with respect to that; right?

21   A    Pretty much.

22   Q    And what happened is, you went from a trafficking or manufacturing,

23   however you'd like to consider it, to a simple possession with intent; right?

24   A    There's nothing simple about manufacturing methamphetamines.  I

25   was charged with possession with intent to manufacture.

-474-

1  Q     Let me just see if I can straighten this out.  You were charged with

2  trafficking, that's what the document says –

3         MR. KNOCHE:  – Your Honor, I've been forbearing, but I

4  object at this point.  This is impeaching on a collateral matter.  I mean the

5  impeachment is the fact that he's been convicted, he has the felony

6  conviction.

7         THE COURT: He's asking him about what he thought his

8  possible sentence could be and what his deal was that he got and the result

9  of that.  Go ahead, Mr. Withers.

10  Q     (By Mr. Withers) And sir, you were charged with a manufacturing or

11  trafficking; right?

12  A     Yes, sir.

13  Q     And it went down – all the way down to a possession with intent;

14  right?

15  A     Yes, sir.

16  Q     You went from facing a ten-year sentence in prison; right?

17  A     Yes, sir.

18  Q     To a probated sentence; correct?

19  A     I guess, if it's probated. I'm doing 12-to-18 months in a halfway house

20  right now.

21  Q     Okay.  So that is your sentence, is a halfway house.

22  A     Yes, sir.

23  Q     You have pretty much used every drug there is; haven't you?

24  A     I've – yes, sir, except for the cocaine and crack.  I've never really been

25  too big on that.

-475-

1    Q    You've never used cocaine?

2    A    I didn't say I never used it, I said I wasn't too big on that when I tried

3    it.

4    Q    Oh, okay.  My question, sir, dealt with use.  You've used marijuana;

5    haven't you?

6    A    Yes, sir.

7    Q    You've used cocaine; haven't you?

8    A    Tried it.

9    Q    You've used acid; haven't you?

10   A    Yes, sir.

11   Q    You've used ecstasy; haven't you?

12   A    Tried it.

13   Q    And you've used methamphetamine; haven't you?

14   A    Yes, sir.

15   Q    And you were getting the oxycodone for the purpose of selling it; were

16   you not?

17   A    No, sir.

18   Q    To use and sell?

19   A    Well, to use and sell, yes, sir.

20   Q    All right, and you did that for a fellow by the name of Altman several

21   times as well; didn't you?

22   A    Yes, sir, I did it for several people.

23   Q    And so over the period of time you've done that on dozens of

24   occasions; haven't you?

25   A    Yes, sir.

-476-

1 Q Admitted that to the government DEA when they talked to you.

2 A Yes, sir.

3 Q And you're not getting prosecuted for any of that; are you?

4 A No, sir.

5 Q By the way, you were actually making meth; right?

6 A I have before, but in the situation I was in, it was another fellow that

7 had come up there and got dropped off at my residence and had a bag full

8 of stuff, and he left running from the cops and left his bags right there, and

9 I kind'a had to take the blame for it.

10 Q Uh-huh, and you've dealt methamphetamine before; right?

11 A Yes, sir.

12 Q In fact, your friend who you would go to the clinics down in

13 Jacksonville, Mr. Altman, he's dealt methamphetamine before; right?

14 A Yes, sir.

15 Q In fact, you and Mr. Altman were getting methamphetamine directly

16 from a group of Mexicans; weren't you?

17 A Yes, sir, we have.

18 Q And the methamphetamine that you get from Mexico is different from

19 the methamphetamine that you manufacture at home; isn't it?

20 A I don't see nothing too different about it.

21 Q All right, and you would get up to 25 pounds of methamphetamine,

22 you and Mr. Altman.

23 A I never said I got it, I said I've seen it.

24    MR. KNOCHE: I object to this –

25    MR. SMITH:  – I thought I was in here for the doctor, not for

-477-

1    trafficking or manufacturing methamphetamines.

2              MR. WITHERS: Your Honor, this all goes to the amazing deal

3    that this fellow got, and it goes to his weight and credibility.

4              THE COURT: Go ahead, Mr. Withers.

5    Q    (By Mr. Withers) You've done 25-pound deals with Mr. Altman and

6    his –

7    A    – Seen it, I've seen it.

8    Q    Oh, so you've seen it.  You've been present when Mr. Altman is getting

9    it.

10   A    Yeah, I guess you can call it – I was there, yeah.  I sure was.

11   Q    How much does 25 pounds of methamphetamine cost?

12   A    A hundred dollars a gram, if you figure.

13   Q    I'm not good at math.  28 grams an ounce?

14   A    That much is twenty-eight hundred, I would believe.

15   Q    All right, and –

16   A    – 32 ounces in a pound; right?

17   Q    Tens of thousands of dollars.

18   A    Maybe more.

19   Q    And the street value of that methamphetamine that you've seen with

20   Mr. Altman and his source of supply, what's that?

21   A    It's a bunch.

22   Q    Hundreds of thousands of dollars is the answer; isn't it?

23   A    Yes, sir.

24   Q    Now, on one occasion you took a fellow to – and make sure I get these

25   names right.  You know a fellow by the name of –

-478-

1        THE COURT:  – Mr. Withers, there's a way to do this and a way

2    not to do it, and specific instances of conduct is not one of the ways to do it.

3        MR. WITHERS: Yes, Your Honor.

4    Q    Now, Mr. Smith, you said that Dr. Azmat did do a physical

5    examination; did he not?

6    A    Checked my reflexes and my heartbeat.  And told me my leg – one leg

7    was longer than the other.

8    Q    And when you met with Dr. Azmat, you told him that your pain was a

9    10 with medication, and a 7 without medication.  This is the government's

10   same exhibit for the record.

11   A    A 10 without meds –

12   Q    A 10, excuse me.

13   A    – and a 7 with medication.

14   Q    Right.  And you also told Dr. Azmat that you hurt your back lifting –

15   and I think that says heavy in 2007; right?

16   A    Yes, sir.

17   Q    And that was true; correct?

18   A    Yes, sir, I was lifting a log, and it kind'a shifted the weight of my back.

19   Q    The result of that was, you sustained a serious injury.

20   A    It tore something in my back pretty good.

21   Q    And although you're not a doctor, you understood that that injury that

22   you suffered was a serious injury to your back.

23   A    Yes, sir.

24   Q    And you understood also that because of that serious injury that you

25   found out that you could use that for the purpose of getting pain

-479-

1    medications; didn't you?

2    A    Yes, sir.

3    Q    And so when you went in and told Dr. Azmat that it's a 10 without

4    meds, and a 7 with meds, you were lying to Dr. Azmat; true?

5    A    I got meds, that's what mattered.

6    Q    When you took the medication, did it alleviate your pain?  Did it cause

7    your pain to go away?

8    A    Some, and then when you didn't have it, it hurt it worse.

9    Q    All right.  In fact, the East Health Center also got a copy of your MRI;

10    did they not?

11    A    Yes, sir, they did.

12    Q    And that shows that serious injury; correct?

13    A    Yes, sir.

14    Q    And when you actually left the East Health Center, Dr. Azmat

15    discontinued the Valium you were on; didn't he?  You didn't get a

16    prescription for Valium.

17    A    I thought I did.

18    Q    Well, let's look at that real quick.  Here's the prescriptions; right?

19    A    Yes, sir.

20    Q    You got oxycodone 30, 150 tablets; right?

21    A    Yes, sir.

22    Q    You got Percocet, 10/325, 60 tablets; correct?

23    A    Yes.

24    Q    And then you got Neurontin and Motrin; correct?

25    A    That's what it looks like.

-480-

1    Q    You didn't get any Valium; did you?

2    A    I may not have.  It's been some years ago and I ...

3    Q    You can't remember?

4    A    Yeah, I mean, I could remember.  I guess I can't remember that one.

5              MR. WITHERS: All right.  I think that's all the questions I have

6    for this witness, Your Honor.  Thank you.

7              THE COURT: Anything else of this witness, Mr. Knoche?

8              MR. KNOCHE: No, Your Honor.

9              THE COURT: Can the witness be excused?

10             MR. KNOCHE: Yes.

11             THE COURT: You're excused, sir, thank you.

12         [Witness Excused]

13             THE COURT: Call your next witness.

14             MR. GILLULY: Government calls James Gable.

15         [Witness Sworn]

16             CLERK: You may be seated.  Please state your name, your

17    occupation, and spell your last name for the record.

18             MR. GABLE: James Gable.  Landscaper.  G-A-B-L-E.

19                     J A M E S   G A B L E

20        GOVERNMENT'S WITNESS, SWORN, TESTIFIED AS FOLLOWS

21                     DIRECT EXAMINATION BY

22    MR. GILLULY:

23    Q    And Mr. Gable, how old are you, sir?

24    A    Forty years old.

25    Q    And where do you live now?

-481-

1    A    145 Jonesville on Hilton Head Island.

2    Q    Okay.  How long have you lived on Hilton Head Island?

3    A    Just recently moved there, actually.  Less than six months.

4    Q    Prior to living in Hilton Head, I date your attention back to around

5    March of 2011, do you remember where you were living at that time?

6    A    Yeah, in Bluffton, South Carolina.

7    Q    Okay, and did you come to learn of a place called East Health Center.

8    A    I did.

9    Q    Will you tell the ladies and gentlemen how you found out about East

10   Health Center.

11   A    It was through just an acquaintance in Savannah just letting me know

12   that a new clinic had opened up in I think Garden City.

13   Q    On or about March 1, 2011, were you addicted to oxycodone?

14   A    Yes.

15   Q    And were you addicted prior to March 1, 2011?

16   A    Yes.

17   Q    And what was your purpose of going to East Health Center?

18   A    Basically to get a prescription for oxycodone.

19   Q    Okay, and had you previously been going to other places commonly

20   known as pill mills?

21   A    That's correct.

22   Q    And will you please tell the ladies and gentlemen your observations of

23   East Health when you arrived.

24   A    It was – I would just consider it the typical –

25               MR. WITHERS:  – Objection, Your Honor.  Mr. – counsel

-482-

1     continues to elicit conclusions.  He can ask who, what, when, where, how,

2     what did you see, as opposed to the conclusion.  I object to that.

3              MR. GILLULY: And Judge I asked what his observations were.

4     I didn't ask him –

5              THE COURT:  – Well, but when he starts to give you an answer

6     that's not the answer (sic) you give him, you've got some obligation to get

7     him back on track, okay?  So he's objected.  So ask him the question again,

8     and tell him to answer your question.

9              MR. GILLULY: Yes, sir.

10    Q    (By Mr. Gilluly) When you arrived at East Health Center, will you

11    describe what you observed in the lobby of East Health Center.

12    A    As far as the decor or the people that were there?

13    Q    Both.

14    A    Okay.  The people there were – didn't really seem to be sick as far as

15    colds, or bleeding, or anything like that, or any visible injuries.  The decor

16    was not typical of a medical facility, which is usually light and bright, fairly

17    nice, comfortable.  That's the short version.

18    Q    Yes, sir.

19             MR. GILLULY: Dean, if you would put up 14-004.

20    Q    When you arrived did you fill out a questionnaire, and in fact is that

21    your handwriting on this document?

22    A    Yes, it is.

23             MR. GILLULY: And 14-005.

24    Q    In that questionnaire did you indicate that your pain was usually an 8

25    on a scale of 1 to 10?

1     A     That's correct.

2     Q     And let me ask you this: was your pain legitimately an 8?

3     A     Probably not.

4     Q     And why do you say probably not?

5     A     It's kind of common knowledge that when you go to a pill mill –

6              MR. WITHERS:  – Objection, Your Honor, about common –

7     what common knowledge –

8              THE COURT:  – Yes, sir.  He's not going to give general

9     opinions about things, Mr. Gilluly.  You can ask him, you know, what he

10    did, how he did it, why he did it, without giving general opinions about

11    what his opinion is about different doctors' offices and how they operate.

12    Q     (Mr. Gilluly) Mr. Gable, if you would, when I ask you – yeah, stay

13    away from generalities, and just talk about what you observed and why you

14    did what you did, please.

15    A     Okay.

16    Q     You listed an 8.  Why did you list an 8?

17    A     I listed an 8 to get the maximum amount of oxycodone.

18    Q     Okay.

19             MR. GILLULY: Will you scroll down, Dean, on 14-005.

20    Q     And did you list your previous medications?

21    A     I did.

22             MR. GILLULY: 14-006, in the middle, right about – a little

23    higher than that, please.  Yes.

24    Q     It has a question [reading]: Have you ever been treated for substance

25    abuse, dependency abuse, addiction or other?  If so, when.

-484-

1    Were you truthful in that answer?

2    A    Yes.

3    Q    But in fact were you addicted at the time?

4    A    Yes.

5    Q    Why didn't you note that you were addicted to OxyContin – or

6    oxycodone?

7    A    Because I didn't think they would maybe write the prescription.

8    Q    Okay, and prior to seeing the doctor, did you, in addition to filling out

9    that paperwork, also –

10    MR. GILLULY:   – if you'd go to 14-011, and if you'd highlight

11    the, I, James Gable.

12    Q    Did you also sign this document, and if you could please read that

13    paragraph.

14    A    [Reading]: I, James Gable, have read the above information or it has

15    been read to me, and all my questions regarding the treatment of pain with

16    opioids have been answered to my satisfaction.  I hereby give my consent to

17    participate in the opioid medication therapy and acknowledge receipt of

18    this document.

19    Q    When you signed that document, had you met the doctor yet?

20    A    No.

21    Q    In fact was this before you even saw the doctor?

22    A    Yes.

23    Q    And the doctor that you saw on that first visit, do you see him in the

24    courtroom today?

25    A    I do.

-485-

1    Q    And will you point to him and describe something he has on.

2    A    Yes, a red tie.

3              MR. GILLULY: Judge, if the record could reflect he's identified

4    Dr. Azmat.

5              THE COURT: So noted.

6              MR. GILLULY: Thank you.

7    Q    Mr. Gable, I'd like to –

8              MR. GILLULY:  – pull up 14-018, please.

9    Q    And does this appear to be the initial visit form that indicates your

10   weight and blood pressure, pulse, et cetera?

11   A    Yes.

12   Q    And was that taken by Dr. Azmat or someone else working at that

13   clinic?

14   A    Someone else working at the clinic.

15             MR. GILLULY: And if you could scroll down.

16   Q    It says pain scale 1 to 10, you indicated 9 with meds.  Were you

17   legitimately in a pain of 9?

18   A    No.

19   Q    And again, why did you claim to be in a pain of 9?

20   A    Because if I claimed to be in very low pain, then I wouldn't get very

21   much medication.

22   Q    Okay, and will you tell the ladies and gentlemen of the jury what kind

23   of examination Dr. Azmat did with you.

24   A    From what I recall, just talked to me about my pain situation, which is

25   a lower back pain, and that is basically about it.

-486-

1    Q    Did he do any – did he put his hands on you, as far as you remember?

2    A    No.

3    Q    Did he have you lift your legs or have you lay on the table?

4    A    No.

5    Q    Did he conduct any X-rays?

6    A    No.

7    Q    Did he talk to you about your blood pressure?

8    A    No.

9    Q    Did he talk to you about alternative forms of treatment other than

10   oxycodone products?

11   A    I don't recall.

12             MR. GILLULY: And in fact, if we could go back to 14-018.  The

13   top, please.

14   Q    In filling out this document, did the person who took your blood

15   pressure note an allergy?

16   A    Yes.

17   Q    Will you read it for the ladies and gentlemen what you're purportedly

18   to be allergic to.

19   A    It says OxyContin.

20   Q    Did Dr. Azmat talk to you about being allergic to OxyContin prior to

21   prescribing you OxyContin – or oxycodone?

22   A    No.

23   Q    Never brought up your allergy?

24   A    No.

25   Q    In fact you're not allergic to that; are you?

-487-

1    A    No.

2    Q    Did Dr. Azmat talk to you about physical therapy or referring you to a

3    specialist?

4    A    Not that I recall.

5    Q    Did he talk to you about the addiction propensities when dealing with

6    controlled substances?

7    A    Not that I recall.

8    Q    And did he in fact prescribe you controlled substances?

9    A    Yes.

10             MR. GILLULY: If you'd put up 14-022.

11   Q    Is that a copy of the prescriptions that Dr. Azmat prescribed you?

12   A    That is correct.

13   Q    When you were at the doctor's office, did you see any medical

14   equipment, sir?

15   A    Not that I recall.

16   Q    Did you see Dr. Azmat use any medical equipment during your

17   examination?

18   A    Maybe – maybe the – I don't know what it's called, the thing to – the

19   thing they tap on your knee to get a – you know ...

20   Q    Like a reflex hammer?

21   A    Yes, thank you.

22   Q    Okay, and did he talk to you about your reflexes after he hit you with

23   the hammer?

24   A    No.

25             MR. GILLULY: If I may have a second, Judge.

1    [Pause]

2        MR. GILLULY: That's all the questions I have at this time,

3    Judge.

4        THE COURT: Mr. Withers.

5                    CROSS-EXAMINATION BY

6    MR. WITHERS:

7    Q    Good morning, sir.

8    A    Good morning.

9    Q    I'm Tom Withers.  I represent Dr. Azmat.

10        Truth be told, you don't have a very good recollection with respect to

11    your visit to Dr. Azmat; do you.

12    A    I think I do.

13    Q    All right.  You are 40 years old; is that right?

14    A    Yes.

15    Q    You have a serious back problem; do you not?

16    A    I think so.

17    Q    You have had that serious back problem confirmed through other

18    physicians; haven't you?

19    A    Yes.

20    Q    And you continue to see physicians –

21    A    Yes.

22    Q    – with respect to your back problem; do you not?

23    A    Yes.

24    Q    And continue to receive medications because of that back problem; do

25    you not.

-489-

1    A    That's correct.

2    Q    And continue to receive pain medications because of that back

3    problem; do you –

4    A    – That's correct.

5    Q    And those pain medications help you with respect to your back

6    problem; do they not.

7    A    They do.

8    Q    And when you went to see Dr. Azmat, it was important for you to

9    maximize your pain so that you would get the maximum number of tablets,

10   I think you said; is that correct?

11   A    That's correct.

12           MR. WITHERS: Ms. Bodaford, can you turn on ...  Thank you.

13   Q    And the fact is that you have tried physical therapy and home

14   exercises in the past; correct?

15   A    The home exercises, correct.  The physical therapy, I did do it, but it

16   wasn't related to my back.

17   Q    Okay, and with respect to the issue of your degenerative disc disease,

18   I'm going to show you what's been marked as Government's Exhibit 14-

19   019.  Again, sir, the two of us aren't doctors, but you understand that you

20   have a degenerative spine disease; don't you?

21   A    Yes.

22   Q    And you understand that it is chronic –

23   A    Yes.

24   Q    – don't you?  That means it's not going to get better; doesn't it.

25   Regrettably.

-490-

1    A    I don't – I don't know.

2    Q    Okay.  That's fair enough.  When you went to see Dr. Azmat, in other

3    words, and you described your problem with respect to your back, you're

4    describing to Dr. Azmat the real problem; right?  It's a serious injury that

5    you had, a serious disc disease; true?

6    A    Could you ask me that again, please?

7    Q    I will.  When you told Dr. Azmat – you said y'all talked, he asked you

8    about what was wrong with you; right?

9    A    Correct.

10   Q    When you described what was wrong with you, that you had a disc

11   problem –

12   A    Uh-huh.

13   Q    – that was a real problem you were talking to him about; right?

14   A    That's correct.

15   Q    And the pain that you suffered, I think that you said that you

16   maximized your pain – and I'm going to show you what's been marked as

17   Government's Exhibit 14-018.  I think you said that you maximized your

18   pain as a 9 without meds and a 6 with meds; correct?

19   A    That's correct.

20   Q    Because you knew that for the purpose of your conversation with Dr.

21   Azmat the higher you told him the pain, the worse you told him the pain,

22   you thought the more medication you would receive; true?

23   A    That's correct.

24   Q    But when you're talking to him, sir, you're actually talking to him

25   about real pain; true?

-491-

1    A    Yes.

2    Q    Now, on this sheet here, when you were talking to Dr. Azmat, you told

3    him that the history of your injury was you had hurt your back doing some

4    kind of landscaping, I think; is that accurate?

5    A    Correct.

6    Q    So you told him the truth about how you hurt your back.

7    A    Correct.

8    Q    And Dr. Azmat records here [reading]: Pain is low going down left leg

9    – and I can't read, I think that means occasionally.

10        Was that in fact true?

11   A    Yes.

12   Q    You told him that you currently do landscaping.  Was that in fact true?

13   A    Yes.

14   Q    Now, you've talked about, sir, a little bit, the blood pressure was taken

15   before you saw Dr. Azmat; correct?

16   A    Correct.

17   Q    You did a urine drug screen; right?

18   A    Correct.

19   Q    That showed that you were on oxycodone; right?

20   A    Correct.

21   Q    You don't have an allergy to oxycodone; right?

22   A    No.

23   Q    And the fact that your urine drug screen for oxycodone, that was

24   exactly what you expected it to be; true?

25   A    Yes.  I would – yes, I would hope that it would be.

-492-

1    Q    Yes, sir.  And you had written on one of these earlier forms that you

2    were on both oxycodone and Valium; do you recall that?

3    A    (No audible response.)

4    Q    I can get it if – let me ask you this way: if that's what's reflected in the

5    record, you wouldn't dispute that.

6    A    Is it the record that I filled out when I initially –

7    Q    – Yes. sir.

8    A    Then, yeah, that would be correct.

9    Q    Okay, and do you recall telling the doctor that you were on oxycodone

10   30 milligrams, 210, I think.

11   A    Right.

12   Q    Was that accurate?

13   A    No.

14   Q    How many were you on?

15   A    150.

16   Q    So you told him inaccurately with respect to that.

17   A    Yes.

18   Q    In hopes that he would give you as many as 210, I trust.

19   A    Yes.

20   Q    And then it said, Valium 10 milligrams –

21   A    Yes.

22   Q    – 30 tablets; right?

23   A    Right.

24   Q    And Dr. Azmat did perform a physical examination; did he not?  He

25   examined you with your – he examined your chest and back with his

1    stethoscope; didn't he?

2    A    He did do that.

3    Q    He tested your reflexes; didn't he?

4    A    Yes.

5    Q    Do you remember him holding your hands and testing your strength

6    up and down?

7    A    I do not.

8    Q    Do you remember him asking you to turn and bend forward?  Do you

9    remember that?

10    A    I don't.

11    Q    It is fair to say, is it not, Mr. Gable, that over the years you have

12    learned what to say with respect to getting prescription medications.

13    A    Yes.

14    Q    And when – what Dr. Azmat prescribed for you was oxycodone 30,

15    150 tablets; correct?

16    A    Correct.

17    Q    Motrin, which is over-the-counter, but to get it in 800 milligrams I

18    think you have to have a prescription, 90 tablets; correct?

19    A    Correct.

20    Q    And he discontinued the Valium you were on; didn't he?

21    A    (No audible response.)

22    Q    If you don't remember –

23    A    – If it's not there, yeah, he must have.

24    Q    If you don't remember –

25    A    – I don't –

1  Q     – you can just say you don't remember.

2  A     I really don't remember if I didn't want it or he discontinued it or ...

3              MR. WITHERS: I think that's all the questions I have for this

4  witness.  Thank you, Your Honor.

5              THE COURT: Anything else of this witness?

6              MR. GILLULY: Judge, if I may ask just a couple ...

7                    REDIRECT EXAMINATION BY

8  MR. GILLULY:

9  Q     Sir, is this a copy of the MRI that was presented to Dr. Azmat?

10  A     Yes.

11  Q     It was performed in Florida?

12  A     Yes.

13  Q     Why Florida?

14  A     That was one of the first doctors I'd been to, is Dr. Zupkin (phonetic),

15  and he recommended them or sent me to them.

16  Q     Okay, and at this time when the doctor sent you there, I mean, were

17  you addicted?

18  A     Yeah.

19  Q     Were you going to the doctor for the pills for your addiction?

20  A     Yeah.

21  Q     The lawyer asked you about the fact that you're going to a physician

22  now and still getting treated by pain medicines.  And you are; is that right?

23  A     That's correct.

24  Q     The way the physician is treating you now, is it different than how Dr.

25  Azmat has done it?

-495-

1    A    It is.

2    Q    Can you tell the ladies and gentlemen the differences.

3    A    It really is like a – she's a real doctor.  Treats me for blood pressure

4    problems, other issues I've had since I've been going to her.  She, you

5    know, has tons of equipment, things like that.

6    Q    Are you doing any physical therapy?

7    A    No, just the stretches that I've always done.  No other physical

8    therapy.

9    Q    Has she counseled you about the addictive qualities of oxycodone?

10   A    She has, and actually she came up with something she was trying

11   where she varied the amount of the prescription.  She says that hopefully it

12   will help with not becoming too tolerant to a certain amount of pills.  So if

13   you lower to what – you know, 120 to 150, you know, it keeps you from

14   having 150 and then 150 not doing anything, and you have to go to 180, and

15   then, you know, after a while 180 doesn't do anything, then you have to go

16   to more, you know.  It stops that.

17   Q    Is there a treatment plan that is in place that is specific to you?

18   A    Yes.

19   Q    Was there a treatment plan ever discussed with Dr. Azmat?

20   A    No.

21   Q    And the lawyer asked you about whether you remember the doctor

22   having you bend over, and you said no.  Are you saying that he didn't have

23   you bend over?

24   A    Yeah, as far as I can remember, he did not have me bend over.

25   Q    And the lawyer asked you about whether you remembered the doctor

-496-

1  doing an examination on your hand strength.  Did he do an examination on

2  your hand strength?

3  A    Not that I recall.

4        MR. GILLULY: No more questions at this time, Judge.

5        MR. WITHERS: Very briefly, Your Honor.

6        THE COURT: Yes, sir.

7                    RECROSS-EXAMINATION BY

8  MR. WITHERS:

9  Q    Mr. Gable, with respect to your current medical treatment, you are

10  examined by the physician on a monthly basis, I trust?

11  A    Yes.

12  Q    And you receive oxycodone on a monthly basis, I trust.

13  A    That's correct.

14        MR. WITHERS: Thank you, sir.

15        THE COURT: Anything else of this witness?

16        MR. GILLULY: No, Your Honor.

17        THE COURT: Can the witness be excused?

18        MR. GILLULY: Yes, Your Honor.

19        THE COURT: All right, you're excused, sir.  You may come

20  down.

21      [Witness Excused]

22        THE COURT: Call your next witness, please.

23        MR. GILLULY: I'd like to call Billy Letner to the stand.

24      [Witness Sworn]

25        CLERK: You may be seated.  Please state your name and your

-497-

1    occupation, and spell your last name for the record.

2            MR. LETNER: Bill Letner.  L-E-T-N-E-R, and I'm a sheet metal

3    worker.

4                    B I L L   L E T N E R

5        GOVERNMENT'S WITNESS, SWORN, TESTIFIED AS FOLLOWS

6    _____ DIRECT EXAMINATION BY

7    MR. GILLULY:

8    Q    A sheet metal worker, sir?

9    A    Yeah.

10   Q    How long have you been in that field?

11   A    About 11 years.

12   Q    And what does that consist of?  What does –

13   A    – Doing duct work in commercial buildings.

14   Q    Okay.

15   A    And installing the air units.

16   Q    So are you up there literally on ladders and putting in duct work and –

17   A    – Yeah.

18   Q    Is it a physical activity?

19   A    Yeah.

20   Q    Yes, sir.  And where do you live?

21   A    In Davenport, Florida.

22   Q    And how far is Davenport, Florida from Savannah and Garden City?

23   A    About 312 miles.

24   Q    How many hours does it take to get here?

25   A    About five hours.

-498-

1    Q    Okay, and are you married, sir?

2    A    Yes, sir.

3    Q    And what is your wife's name?

4    A    Kimberly Letner.

5    Q    And do you have a son?

6    A    Yeah.

7    Q    And what is his name?

8    A    David Letner.

9    Q    Okay. I want to date your attention back to on or about February 21,

10   2011.  Did you, your wife, and your son come to the East Health Center in

11   Garden City?

12   A    Yes, sir.

13   Q    How did you learn about East Health Center?

14   A    Let's see.  A guy named Frankie met me down in South Florida around

15   Boca Raton, and he told me they were opening a clinic up here.

16   Q    Okay, and so did you decide, based on what Frankie told you, to come

17   up to the clinic here?

18   A    Yeah, he told me that they were going to open another clinic up here,

19   and he told me if I can round up some people to bring up to the clinic that

20   they would take care of me.

21   Q    Okay, and what did that mean to you, take care of you?  What was that

22   – what did that mean to you?

23   A    That they were going to give me more pills on my prescription.

24   Q    And in fact, Mr. Letner, when you were in Florida before you were

25   approached by this person named Frankie, I mean, were you at a pain

-499-

1    clinic?

2    A    Oh, yeah.

3    Q    Were you there because you were addicted –

4    A    Yeah.

5    Q    – to oxycodone?

6    A    Yes, sir.

7    Q    Okay, and when you went to East Health Center, did you go to East

8    Health Center because you were addicted to oxycodone?

9    A    Yeah.

10    Q    And when you went to East Health Center, did you see a doctor?

11    A    Yes, sir.

12    Q    And do you see that person in the courtroom today?

13    A    Yeah, the gentleman over there.

14    Q    And if you could describe something he has on, please.

15    A    The red tie.

16          MR. GILLULY: And, Judge, if the record could reflect he's

17    identified the defendant.

18          THE COURT: So noted.

19    Q    And when you got to East Health Center, did you have to fill out forms

20    and documents prior to seeing the doctor?

21    A    Yeah.

22    Q    And how did you pay when you went there?

23    A    With cash.

24    Q    Do you remember how much you paid?

25    A    I believe it was 200.  I'm not sure.

-500-

1    Q    Okay.  Don't guess.  Did your wife also go for the purpose of seeing the

2    doctor for pills?

3    A    Yes, sir.

4    Q    And did she have to pay also?

5    A    Yeah.

6    Q    And did your son – how old is your son?

7    A    Twenty-eight.

8    Q    And – he's 28 now?

9    A    Yeah.

10    Q    In 2011 he was either 26 or 27.  How old was he, 26?

11    A    That was –

12    Q    – Or younger?

13    A    No, I think he was 25.

14    Q    Okay, and was he going there for the purpose of getting pills?

15    A    Yeah.

16    Q    Did he have to pay?

17    A    Yes.

18    Q    Did all of you pay cash?

19    A    Yes.

20    Q    And when you got there I indicated – or started to ask you about

21    paperwork that was filled out.

22         MR. GILLULY: I'd like to put Number 3 up on the overhead,

23    please.

24    Q    Is that one of the sheets that you recognize that handwriting?

25    A    Yes.

-501-

1   Q    And you went there on about February 21, 2011?

2   A    Yeah.

3          MR. GILLULY: Okay, and 3-002.

4   Q    And Mr. Letner, you indicate pain in lower back and the degree of pain

5   a 9.  Why did you write that the degree of pain was a 9?

6   A    My back was hurting.  I'd had a logging accident several years prior to

7   that, so I had had some pretty bad back pain.

8   Q    Was it legitimately a 9?

9   A    Yeah – well, it could have been a little bit lower.

10  Q    I mean, I just want absolute honesty.

11  A    Yeah.

12  Q    I mean, embrace the truth.

13  A    Yeah, it could have been a little lower than a 9.

14  Q    In other words, you could have exaggerated a little?

15  A    Yeah.

16  Q    And why would you do that?

17  A    To get more pills.

18  Q    Okay, and you indicated lower on that page that you were already –

19  you had received oxycodone 30, 180s (sic) and oxycodone 15s, 90s (sic),

20  and that's at the bottom.  Is that what you were receiving previously?

21  A    Yeah.

22          MR. GILLULY: Page 3-003.

23  Q    There's a question about have you ever been treated for substance

24  dependency, abuse, addiction or other.  If so, when.  You didn't answer that

25  question; is that correct?

-502-

1    A    Yes.

2    Q    Did you tell anyone there that you were an addict?

3    A    No.

4    Q    And that you were there to support your addiction.

5    A    No.

6    Q    Why not?

7    A    I just didn't.

8    Q    Did you – why do you think – why would you not tell them you were

9    an addict?

10    A    Because then you wouldn't – they wouldn't give you no pills if you told

11    them you were an addict.

12    Q    Okay, and ultimately in this paperwork –

13            MR. GILLULY:  3-008.

14    Q    – there's a paragraph [reading]: I, Billy Letner – can you read that?

15    A    Yeah.

16    Q    Out loud.

17    A    Oh. [Reading]: I, Billy Letner, have read the above information or it

18    has been read to me and all my questions regarding the treatment and of

19    pain – I can't read too well.

20    Q    Okay.  Is it [reading]: – with opioids have been answered to my

21    satisfaction?

22    A    Yeah.

23    Q    [Reading]: I hereby give my consent to participate in the opioid

24    medication therapy.

25    A    Yeah.

-503-

1   Q   And below that is it your signature?

2   A   Yeah.

3   Q   And this document, was it filled out before you even saw a doctor?

4   A   Yes, sir.

5   Q   When you arrived at East Health Center, did you make any

6   observations about the parking lot?  About vehicles in the parking lot.

7   A   Yeah.

8   Q   Will you tell the jury about that?

9   A   There was cars from Ohio, Kentucky, Georgia, Florida.

10   Q   And when you went into the building into the lobby when you first

11   entered, did you observe other people there?

12   A   Yes, sir.

13   Q   And what did you observe of them?

14   A   Most of them were a lot younger people and ...

15   Q   Did any of them appear to be in excruciating pain?

16   A   No.  I mean, I didn't see nobody that seemed they were in excruciating

17   pain.  I seen several that were nodding out.

18   Q   That were nodding out?

19   A   Yeah.

20   Q   Like passing out?

21   A   Yeah, sort'a.  You could tell they were on the medication.

22   Q   Okay, and – okay.

23            MR. GILLULY: 3-011.

24   Q   This top portion, that's not your handwriting; is that correct?  Where it

25   talks about the patient name, date of birth, age, allergies?

-504-

1    A    Yeah, that's not mine.

2    Q    And is that done by the doctor – is that done by someone who was

3    doing triage before you saw the doctor?

4    A    I don't remember on that.

5    Q    Okay.  What was your blood pressure then?

6    A    I ...

7    Q    Pardon?

8    A    I don't know what it was.

9    Q    Do you see where it says BP?  If you can.  Does it say 153/89?

10   A    Oh, yeah, okay.

11   Q    And after filling this out and after paying your money, did you get back

12   there to actually see Dr. Azmat?

13   A    Yes.

14   Q    And will you tell the jury about what kind of examination Dr. Azmat

15   did with you?

16   A    Basically he talked to me.  I went over the prescription that I was

17   already getting.  He was reading off the page that I had filled out.

18   Q    Yes, sir.

19   A    And he basically just wrote my script.

20   Q    Okay.  Did he put his hands on you or do any kind of –

21   A    – No.

22   Q    Have you lay on a bed, lift your legs?

23   A    No.

24   Q    Any kind of physical examination at all?

25   A    No.

1   Q   Did he talk to you about the addictive qualities of oxycodone products?

2   A   No.

3   Q   Did he talk to you about any alternative forms of treatment?

4   A   No.

5   Q   Did he talk to you about maybe referring you out to a specialist?

6   A   No, sir.

7   Q   Did he talk to you about your blood pressure?

8   A   No.

9       MR. GILLULY: 3-012.

10  Q   And it appears you got your MRI from POM MRI.  Do you remember

11  if that was in Boca Raton or Plantation?

12  A   Boca Raton, I believe.

13  Q   How far is Boca Raton from where you live?

14  A   That's about a two-hour ride.

15  Q   Two hours?  How far is Boca Raton from Savannah, Georgia.

16  A   Wow, that would be a pretty good ride.  I would say at least seven,

17  eight hours.

18      MR. GILLULY: Dean, if you could put 3-014 up.

19  Q   And in fact, sir, did Dr. Azmat prescribe you oxycodone 30, 100 and –

20  it appears to be 80 quantity, and oxycodone 15, 60 quantity?

21  A   Yeah.

22  Q   And are these copies of the prescriptions that he gave you?

23  A   Yes, sir.

24  Q   And your son, who was 25 at the time, did he, too, see Dr. Azmat?

25  A   Yes, sir.

-506-

1    Q    And how long were you there when he went back to see the doctor?

2    A    How long were we there?

3    Q    Well, no.  Like were you in the lobby while your son was back there

4    with the doctor?

5    A    Yes.

6    Q    How long did that take?

7    A    Probably no more than five or ten minutes.

8    Q    Okay, and did your son get prescriptions as well?

9    A    Yes.

10   Q    Do you remember what he got prescribed?

11   A    No, I'm not sure.

12   Q    Was it oxycodone?

13   A    Yeah, yeah, he got oxycodone.  I don't know the amount.

14   Q    Okay, and your wife, were you there when she went back?

15   A    Yes.

16   Q    And did she, too, get prescriptions for oxycodone?

17   A    Yes, sir.

18   Q    And all three of you came on the same day from Florida?

19   A    Yes, sir.

20   Q    Did the doctor ask you any questions about the fact that your son and

21   your wife were there?

22   A    No.

23   Q    Did he ask you why you came all the way from Davenport, Florida,

24   which is south of Orlando?

25   A    No.

-507-

1    Q    Did he ask you why you got your MRI even two hours farther away

2    than that?

3    A    No.

4    Q    Did you have any trouble filling his prescriptions?

5    A    Yes.

6    Q    And in fact could you get them filled in this area?

7    A    No, not in this area.

8    Q    Did you have to go – what'd you do once you could not get your

9    prescriptions filled?

10   A    I went back to my house, and then I came back up again, I think a

11   couple days later or a day later, and went to some little small town east of

12   here – or west of here.

13   Q    How did you learn of that place as a place to go?

14   A    I went back to the clinic and told Frankie that I was having trouble

15   filling the script, and I believe he's the one that gave me a few pharmacies

16   that would probably fill them.

17   Q    Okay, and I don't believe I asked you, when you wife went back there

18   to see Dr. Azmat, do you remember how long her examination took?

19   A    No more than five or ten minutes.

20        MR. GILLULY: Judge, that's all the questions I have.

21        THE COURT: Mr. Withers.

22                        CROSS-EXAMINATION BY

23   MR. WITHERS:

24   Q    Good morning, Mr. Letner.

25   A    Morning.

-508-

1    Q    I'm Dr. Azmat's counsel, Tom Withers.

2          Now, as I understand it, you were approached by a fellow by the

3    name of Frankie somewhere down in Florida.

4    A    Yeah.

5    Q    And of course you didn't see Dr. Azmat down there –

6    A    No.

7    Q    – when Frankie was talking to you; right?

8    A    No, sir.

9    Q    And what Frankie had spoken to you about was that he was going to

10   be opening with others a clinic in the Savannah area; right?

11   A    Yes.

12   Q    And that he would be dispensing medications in-house; right?

13   A    Yes.

14   Q    And of course you found out that that was not true; correct?

15   A    Yeah.

16   Q    And that was important to you in terms of your prescriptions so that

17   you wouldn't have to go running around trying to fill the prescriptions;

18   correct?

19   A    Yeah.

20   Q    Now, you've been to clinics in Florida for a period of time; have you

21   not?

22   A    Yes, sir.

23   Q    And went to several clinics on dozens of occasions; true?

24   A    Yeah.

25   Q    And so you were seeing a variety of doctors down in both South and

1    North Florida; right?

2    A    Pretty much South Florida.

3    Q    Okay. You never went to a clinic in Jacksonville?

4    A    Yes, yeah, I did.

5    Q    All right, and you saw, though, Dr. Azmat on one occasion; true?

6    A    Yeah.

7    Q    And that was the first day that East Health Center opened; correct?

8    A    Yeah.

9    Q    And you checked in at – and this is Government's Exhibit 29-A1-150

10   on the 21st, and you're Number 12; correct?

11   A    Yeah.

12   Q    At 11:17; correct?

13   A    Yes, sir.

14   Q    And so there were not 15-to-20 people waiting in the waiting room, or

15   the entrance room; were there?

16   A    I didn't sit and count the people, but, I mean, there was several people

17   there.

18   Q    Now, like lots of folks, you don't have any health insurance; correct?

19   A    No.

20   Q    And did not have any health insurance in February of 2011; correct?

21   A    No.

22   Q    And when you got to East Health, someone took you back and took

23   your blood pressure; correct?

24   A    Yes, sir.

25   Q    You had to give a urine sample; correct?

-510-

1    A    Yes.

2    Q    And you – it is fair to say, I think you talked to us earlier about being

3    involved in a logging accident; right?

4    A    Yes, sir.

5    Q    And in fact that was a bad work-related accident; true?

6    A    Yeah.

7    Q    And when you saw Dr. Azmat, you told him about your work-related

8    accident; didn't you?

9    A    Yes, sir.

10        MR. WITHERS: This is 3-011.

11   Q    Sir, this is a copy of your initial visit form, and do you see under the

12   history of trauma – or if that reflects [reading]: Logging accident, Kentucky

13   – and it looks like it says six years ago, maybe; is that accurate?

14   A    From back then – would have roughly been then, yeah.

15   Q    Okay, all right.   So you were telling Dr. Azmat the truth when you told

16   him about how you were injured; is that right?

17   A    Yes, sir.

18   Q    All right, and I think you testified earlier that you did not tell the truth

19   when you wrote that without meds – or when you told him that without

20   meds your pain was a 9 and with meds that it was a 4, that you had in fact

21   exaggerated the level of your pain.

22   A    Yeah.

23   Q    But it is true, though, if I understand you correctly, that you were in,,

24   in fact, pain; correct?

25   A    Yeah, I was in pain.

-511-

1  Q   All right, and you had told Dr. Azmat as well that you were a sheet

2  rock – sheet rock –

3  A   – No, sheet metal.

4  Q   Sheet metal, excuse me, and did duct work as well.

5  A   Yeah.

6  Q   And do you recall telling Dr. Azmat about that logging accident in

7  Kentucky that you actually fell 15 feet?

8  A   Yeah, I fell off of a tree.

9  Q   And so you really did fall 15 feet.

10 A   Yeah.

11 Q   And you really did tell that to Dr. Azmat.

12 A   Yes.

13 Q   And you really did tell Dr. Azmat that your back was hurting since and

14 getting progressively worse.

15 A   Yeah.

16 Q   And you really did tell Dr. Azmat that you worked construction and it's

17 gotten to be hard to work.

18 A   Yeah.

19 Q   And you really did tell Dr. Azmat that it's hard for you to get out of bed

20 in the morning.

21 A   Yeah.

22 Q   And that you've got pain going down your right leg.

23 A   Yes.

24 Q   All that was true.

25 A   Yeah.

-512-

1    Q    And you told Dr. Azmat that you were on oxy 30 milligrams, 150

2    tablets.  That was true?

3    A    Yes.

4    Q    And that you had oxycodone 15 milligrams, 90 tablets.  That was true.

5    A    Yeah.

6    Q    And out of all of the doctors that you have been to see, the dozens and

7    dozens of occasions – and I want you to be honest, because Mr. Gilluly was

8    asking you these questions – do you have any distinct recollection of being

9    examined by Dr. Azmat or not.

10   A    No.

11           MR. WITHERS: I think that's all the questions I've got.  Thank

12   you.

13           THE COURT: Anything else, Mr. Gilluly?

14           MR. GILLULY: Yes, Your Honor.

15                  REDIRECT EXAMINATION BY

16   MR. GILLULY:

17   Q    Regarding the last question by the lawyer regarding a distinct

18   recollection of being examined, are you saying that Dr. Azmat did not

19   examine you, or are you saying you don't remember?

20   A    No, I – he didn't examine me.  He just talked to me.

21   Q    And you remember that?

22   A    Yeah.

23           MR. GILLULY: Putting up over on the Elmo equipment 29-1A-

24   050.

25   Q    That was a sign-in sheet that the defense lawyer talked about, and I

1    see your name there, Billy Letner, at 11:17.  And then below that, who is

2    that?  That's your wife; right?

3    A    Yes.

4    Q    And will you tell the ladies and gentlemen who Tammy Baker is?

5    A    That's my sister.

6    Q    And who Gary Baker is?

7    A    That's my brother-in-law.

8    Q    They're all from down in South Florida, too; right?

9    A    No, they're from Ohio.

10   Q    Oh, they're from Ohio.

11   A    Yeah.

12   Q    And do you know if they got oxys also?

13   A    Yes.

14   Q    From Dr. Azmat?

15   A    Yes.

16                MR. GILLULY: That's all the questions I have.

17                MR. WITHERS: Very brief follow-up, Your Honor.

18                THE COURT: Yes, sir.

19                      RECROSS-EXAMINATION BY

20   MR. WITHERS:

21   Q    Sir, do you know what the Bakers told Dr. Azmat?

22   A    No, sir, I don't.

23   Q    You know whether they lied to him about their level of pain?

24   A    I don't know that.

25   Q    Y'all didn't talk about that?

-514-

1    A    No.

2    Q    With respect to the issue of an examination by Dr. Azmat, did Dr.

3    Azmat listen to your chest and back with his stethoscope?  Do you recall

4    that?

5    A    I don't recall that.

6    Q    Did Dr. Azmat test your reflexes?  Do you recall that?

7    A    No, he didn't.

8            MR. WITHERS: I think that's all I've got.  Thank you, Your

9    Honor.

10           THE COURT: Anything else of this witness?

11           MR. GILLULY: Nothing else, and the witness can be excused,

12   Judge.

13           THE COURT: All right, sir, you're excused.

14        [Witness Excused]

15           THE COURT: Ladies and gentlemen, we'll take about a five

16   minute recess.

17           [NOTE: A brief recess is taken, after which the proceedings are

18   continued outside of the presence of the jury as follows:]

19           THE COURT: Let me see you over here a minute, counsel,

20   before we start back.

21           [NOTE: Side bar conference on the record.]

22           THE COURT: I meant to ask you this actually earlier, before we

23   started this trial, but, in the event of a conviction in this case, do counsel

24   want to go directly into the forfeiture question with this jury, or do you

25   want me to do what I've done in the past and bring the jury back – bring

-515-

1    the same jury back at a later time just to hear the question of whether there

2    should be a forfeiture or not?

3              MR. WITHERS: Let me chat with my client briefly about that, if

4    I could, Your Honor, and report back to you.

5              THE COURT: Because if we're going to do that, I'm going to

6    have to do some additional work that would deal just directly with the

7    forfeiture and what we would tell the jury about the forfeiture.

8              MR. WITHERS: My druthers would probably be to come back.

9              THE COURT: Well, that's usually what the government and the

10   defense lawyers both want to do –

11             MR. WITHERS: We'll go with that, then.

12             THE COURT:  – but I didn't ask you about that ahead of time.

13             MR. KNOCHE: And that would be some time – schedule that

14   for some future …

15             THE COURT: Yeah, so the agreement is that in the event of a

16   conviction, then I will tell this jury that they will have to come back at some

17   later date, and that I will notify them, for us to hear the question of the

18   forfeiture.

19             MR. KNOCHE: The government concurs.  Judge, while we're at

20   side bar, it might be useful, because I anticipate that there may be

21   something counsel wants to say about it.  The government intends to call

22   Special Agent Michael Palmer of the IRS to introduce an IRS record of lack

23   of income tax filing for year 2011.  And the government submits that that is

24   relevant, and we have cases to cite, at the very least on the money

25   laundering conspiracy count.

-516-

1    THE COURT: Sure, I agree with that.

2    MR. WITHERS: I would object, of course.

3    THE COURT: Your objection is noted ahead of time.

4    [NOTE: Side bar conference concluded.]

5    THE COURT: All right, bring the jury back in, please.

6    [NOTE: The jury is seated in the jury box, and the proceedings

7    are continued in the presence of the jury as follows:]

8    THE COURT: You may proceed Mr. Gilluly or Mr. Knoche.

9    MR. GILLULY: Thank you, Your Honor.  We call Kimberly

10   Letner.

11   [Witness Sworn]

12   CLERK: You may be seated.  Please state your name, your

13   occupation, and spell your last name for the record.

14   MS. LETNER: Kimberly Letner.  I'm a housekeeper, and L-E-T-

15   N-E-R.

16   K I M B E R L Y   L E T N E R

17   GOVERNMENT'S WITNESS, SWORN, TESTIFIED AS FOLLOWS

18   DIRECT EXAMINATION BY

19   MR. GILLULY:

20   Q    And Ms. Letner, do you live in Savannah, Georgia?

21   A    No.

22   Q    Where do you live?

23   A    Davenport, Florida.

24   Q    And how far is Davenport, Florida from Savannah, Georgia and

25   Garden City?

-517-

1    A    Probably – I'm not sure.  About 300.

2    Q    Three hundred minutes, miles ...

3    A    Oh, to get there?  Oh –

4    Q    – No, no, I mean, how many miles.  You say around 300 miles?

5    A    Yes.

6    Q    How long does it generally take by vehicle to get to Savannah?

7    A    About seven hours.

8    Q    Okay.  I'd like to date your attention to on or about February 21, 2011.

9    Did you have occasion to come to a medical facility called East Health

10   Center?

11   A    Yes, I did.

12   Q    And what was the purpose of you going to East Health Center?

13   A    Frankie approached my husband and told him to gather up people to

14   go there.  So I went with my husband.

15   Q    And what were you trying to get at East Health Center?

16   A    Oxycodone.

17   Q    Okay, and now, were you present when Frankie approached your

18   husband?

19   A    No, I was at home.

20   Q    Okay.  I'm just going to ask you today for you to tell the ladies and

21   gentlemen about what you know firsthand, what you experienced, and not

22   so much what other people told you; okay?

23   A    Okay.

24   Q    And on February 21, 2011, did you in fact see a doctor?

25   A    Yes, I did.

-518-

1    Q    Do you see that person in the courtroom today?

2    A    Yes, I do.

3    Q    Could you point to him, and describe something he has on.

4    A    A red tie.

5         MR. GILLULY: Judge, if the record could reflect she has

6    identified the defendant.

7         THE COURT: So noted.

8         MR. GILLULY: And I'd like to put Number 4 on the screen,

9    please.

10   Q    And is that in fact your handwriting on February 21, 2011?

11   A    Yes, sir.

12   Q    And Ms. Letner, when you came here, who-all did you come with?  Did

13   you come with your husband?

14   A    It was my husband and my son.

15   Q    Okay, and your son was 25 at the time?

16   A    Yes, he was.

17   Q    Okay, and what was – if you know, what was the purpose of your

18   husband and son coming to East Health Center?

19   A    My son went because he has two fingers amputated and had pain, and

20   was there to get the oxycodone, along with my husband.

21   Q    Both to get oxycodone?

22   A    Yes.

23        MR. GILLULY: Okay, and 4-002.

24   Q    And is this part of the questionnaire that you filled out prior to seeing

25   the doctor?

-519-

1    A    Yes, sir.

2    Q    And did you list your pain level 8 to 9?

3    A    Yes.

4    Q    You indicated that you had lower back pain.

5    A    Yes.

6    Q    And were you truly and 8 or 9 at that time?

7    A    No.

8    Q    And why did you exaggerate your symptoms?

9    A    Because then you get more oxycodone.

10        MR. GILLULY: Okay. I'd like to put up 4-003, please.

11   Q    It asks you about previous treatments that you've had for the problem

12   that you're presenting today, and you didn't fill that out; is that right?

13   A    Yes.

14   Q    It also asks you about whether you have a history of – or treatment for

15   substance abuse or addiction. You did not fill that out either; did you?

16   A    No.

17   Q    And you didn't fill out your family history; is that correct?

18   A    Yes.

19   Q    Did Dr. Azmat ever ask you about previous treatments that you may

20   have undergone?

21   A    No.

22   Q    Did Dr. Azmat ever ask you about whether you'd been treated for

23   substance abuse?

24   A    No.

25   Q    Did he ever ask you about whether you were addicted to oxycodone?

-520-

1    A    No.

2    Q    When you went to East Health Center, were you in fact addicted?

3    A    Yes, sir.

4    Q    And was your son?

5    A    Yes, sir.

6    Q    And was your husband?

7    A    Yes, sir.

8    Q    Did Dr. Azmat ever ask you about your family history?

9    A    No, sir.

10   Q    Did he ask you about your son and your husband?

11   A    No, sir.

12   Q    And in fact prior to seeing the doctor, one of the forms of many that

13   you were asked to fill out is 4-008, and part of that form indicates – can

14   you read well?  I don't want to put pressure on you by reading in front of a

15   roomful of people if you have trouble reading.

16   A    It says [reading]: Have you read the above information or is it has

17   been read to you and all my questions regarding to the treatment of pain

18   was – I don't know that word – have you been answered to my satisfaction

19   and hereby given my – something – to participate in the medical therapy of

20   acknowledge receipt of this document.

21   Q    And was all this paperwork – am I right, it's filled out prior to you

22   seeing the doctor?

23   A    Yes.

24   Q    Okay.  Did the doctor ever talk to you about a treatment plan?

25   A    No.

-521-

1    Q    Did he ever talk to you about opioid medication therapy?

2    A    No.

3    Q    Did he ever go over any questions about the information that you filled

4    out in this form?

5    A    No.

6    Q    Pardon?

7    A    No.

8         MR. GILLULY: 4-011.

9    Q    And this appears to be the initial visit form.  Prior to seeing the doctor,

10   was your height, weight, blood pressure and pulse taken by someone who

11   worked at the place?

12   A    Yes, sir.

13   Q    Okay.  Did Dr. Azmat measure you or test your blood pressure, talk to

14   about –

15   A    No.

16   Q    – any of that?

17   A    No, sir.

18   Q    And will you please tell the jury about the kind of examination Dr.

19   Azmat did with you.

20   A    He just come in and sat into like a school desk, wrote out my

21   prescription, and I was gone.

22   Q    How long do you think that examination took?

23   A    Probably about five minutes.

24   Q    Did he put his hands on you in any way?

25   A    No, sir.

-522-

1   Q   Did he lift your leg or have you lay down on a table?

2   A   No, sir.

3   Q   Did he talk to you about problems with your lower back complaint?

4   A   No, sir.

5   Q   Did he talk to you about the addictive qualities of oxycodone?

6   A   No, sir.

7   Q   Did he refer you to any specialists?

8   A   No, sir.

9           MR. GILLULY: If you'd put up 4-012.

10  Q   And you got your MRI, am I correct, in – was it Plantation or Boca

11  Raton, do you know?

12  A   Boca Raton.

13  Q   Which is about two hours from where you live?

14  A   Yes.

15  Q   Did he ask you why you got your MRI in Florida?

16  A   No.

17  Q   Did he ask you why you came all the way from below Orlando, Florida

18  to come up here –

19  A   – No, sir.

20          MR. GILLULY: 4-013.

21  Q   And in fact ultimately did the doctor prescribe you oxycodone 15, 60

22  and oxycodone 30, 60?

23  A   Yes, sir.

24  Q   And are those copies of the receipt?

25  A   (No audible response.)

-523-

1    Q    And do you know whether your son was also prescribed oxycodone?

2    A    Yes, sir.

3    Q    Do you know whether your husband was as well?

4    A    Yes, sir.

5    Q    Were you there when your son went back to see the doctor?

6    A    Yes, sir.

7    Q    And how long did that examination take?

8    A    About five minutes.

9    Q    What about your husband?

10    A    About five minutes.  But with my son – I mean, maybe I shouldn't say

11    this, but with my son, he failed the test, and I took his test to see the doctor.

12    Q    What do you mean by that?  Talk to me.

13    A    The urine test, the drug test that when you go back there.  Well, my

14    son went back there, and he had something in his urine, and then one of

15    the nurses come out and asked me to do it for my son.

16    Q    Okay, and speaking of that, you indicated on your forms that you were

17    taking Xanax; is that right?

18    A    Yes.

19    Q    And your drug screen showed negative for Xanax.

20             MR. GILLULY: And that would be 4-014.

21    A    (No audible response.)

22    Q    Were you taking Xanax?

23    A    Yes, sir.

24    Q    Any idea why it shows negative?

25    A    No, sir.

-524-

1    MR. GILLULY: That's all the questions I have, Judge, at this

2  time.

3    THE COURT: Mr. Withers.

4              <u>CROSS-EXAMINATION BY</u>

5  <u>MR. WITHERS</u>;

6  Q    Good morning, ma'am.

7  A    Good morning.

8  Q    I'm Tom Withers.  I represent Dr. Azmat.

9  A    Okay.

10  Q    What did you say your address was at the time you went to see Dr.

11  Azmat?

12  A    I lived in a resort in Davenport.

13  Q    And this is one of the exhibits the government was just showing you.

14  A    Yes.

15  Q    Is that what your address in fact was?

16  A    That was my address before I changed my driver's license.

17  Q    Okay.  So 401 West Seminole Boulevard, Sanford, Florida –

18  A    Yes.

19  Q    – that was an earlier address?

20  A    It was about a month.

21  Q    A month before this?

22  A    A month before I moved to Davenport.

23  Q    Oh, okay.  Your husband was Billy Letner – is Billy Letner?

24  A    Yes, sir.

25  Q    This is a document we just reviewed with him.  He shows an address

-525-

1      from Kissimmee, Florida.

2      A    It was a resort that he lived in.

3      Q    All right.  Was that the accurate address?

4      A    No, sir.

5      Q    Okay.  That's another earlier address, then?

6      A    Yes, sir.

7      Q    And your son, David, actually does put Davenport, Florida.

8      A    Yes, that's what was on his license.  We all lived right there at the

9      Tuscana, and were waiting to get our license changed 'cause we were

10     buying a house.

11     Q    Okay.  All of you had the same address at that point in time; correct?

12     A    Yeah, we lived in the resort.

13     Q    And all three of you put different addresses down as your address.

14     A    Because you have to put down what is on your license.

15     Q    Now, when you came to Savannah, fair to say you were coming up

16     here to get help for your back pain; true?

17     A    No, I was coming for the oxycodone.

18     Q    Do you recall coming to this courthouse in September of 2012 and

19     testifying before the grand jury?

20     A    Yes, sir.

21     Q    And when you testified before the grand jury, you took the same oath

22     then that you've taken today –

23     A    Yes.

24     Q    – true?

25     A    Yes.

-526-

1    Q    And do you recall the question being asked of you [reading]: Why were

2    you coming  – or going to East Health Center.

3              MR. WITHERS: This is Page 101, counsel, Lines 22- 25.

4    Q    And your answer was [reading]: I was going to go there to get help for

5    my back pain.

6    A    Yes.

7    Q    That was true then and it's true now –

8    A    Yes.

9    Q    – correct?  Now, you had been seeing a physician in Florida; correct?

10   A    Yes.

11   Q    And your husband told you about being able to come to Savannah and

12   get your prescriptions filled in-house; correct?

13   A    Yes.

14   Q    And that appealed either to you or to him; correct?

15   A    It was told to him.

16   Q    All right, and the doctors that you had been seeing in Florida had

17   prescribed you oxycodone; correct?

18   A    Yes.

19   Q    And fentanyl, if I'm pronouncing that correctly.

20   A    Yes.

21   Q    And you understand fentanyl is a powerful controlled substance?

22   A    (No audible response.)

23   Q    Yes, ma'am?

24   A    Yes.

25   Q    Thanks.  And the physician – or strike that.

-527-

1      With respect to when you sign in to the East Health Clinic – I think

2   you were just looking at this – and for the record it's 4-002 – you wrote on

3   the intake form that you had low back pain; correct?

4   A   Right.

5   Q   And that you'd been having that low back pain for 11 years.

6   A   Yes.

7   Q   That the usual degree of pain is 8 or a 9.

8   A   Yes.

9   Q   And that it radiates down your right hip to your leg.

10  A   Yes, it does.

11  Q   All right, and was all of that true in terms of it radiating down your hip

12  to your leg?

13  A   Yes.

14  Q   Now, the 8 or 9 pain level, I'm sorry, but did you say that that was true

15  or that was exaggerated?

16  A   It was exaggerated at that time.

17  Q   And then you wrote down that you were getting oxycodone 30

18  milligrams, 180; correct?

19  A   Yes, sir.

20  Q   Oxycodone 15 milligrams, 90; correct?

21  A   Yes, sir.

22  Q   And Xanax 2 milligrams, 60; correct?

23  A   Yes, sir.

24  Q   And is that what you told Dr. Azmat as well?

25  A   Yes.

-528-

1    Q    And that was in fact true?

2    A    Yes, it is.

3    Q    And you also talked to Dr. Azmat when you saw him about the fact

4    that you had joint and muscle pain in the morning; do you recall that?

5    A    Yes.

6    Q    And that was true?

7    A    Yes.

8    Q    And you said you did a urine drug screen that was positive for

9    oxycodone; correct?

10   A    Yes.

11   Q    But negative for benzodiazepine or Xanax.

12   A    Right.

13   Q    And we don't know why that negative.

14   A    Right.

15   Q    Okay.  You mentioned briefly, ma'am, about your son failing the urine

16   drug screen.

17   A    Yes, he did.

18   Q    But that somehow or another somebody messed with the urine drug

19   screen so that he passed.

20   A    Yes, sir.

21   Q    Dr. Azmat was not aware of that, I trust.

22   A    Right.

23   Q    He was not.

24   A    No, he wasn't.

25   Q    And you certainly didn't tell Dr. Azmat that.

-529-

1   A   No, I did not.

2   Q   Now, when you physically saw Dr. Azmat – one other question going

3   back to what you wrote, and I'm not trying to embarrass you, ma'am, I'm

4   really not.

5   A   That's fine.

6   Q   You wrote that you have anxiety and panic attacks, and was that true?

7   A   Yes, it is true.

8   Q   And I'm sorry for that.  And you understood that was the reason, then,

9   that you had been prescribed the Xanax.

10  A   Yes.

11  Q   So you had a legitimate need, in your view, at least, with respect to the

12  Xanax.

13  A   Right.

14  Q   Now, when you met with Dr. Azmat – and I don't know whether

15  you've seen this before or not – but having learned to read his handwriting,

16  it looks like it says here about the history of trauma [reading]:  MVA, motor

17  vehicle accident 11 years ago.

18  A   Yes, sir.

19  Q   And was that true, ma'am?

20  A   Yes.

21  Q   Then it says [reading]: Hurt back and – I'm not sure if that says

22  something about rotator cuff right here?  Tore your rotator cuff?

23  A   Yes.

24  Q   Did you tear your rotator cuff?

25  A   Yes, I did.

-530-

1   Q    Okay, and, again, that the pain goes down your right hip, I think.  And

2   all of that was true, ma'am?

3   A    Yes, sir.

4   Q    All right, and then, again you exaggerate your pain scale; correct?

5   A    Yes.

6   Q    So you're – if I'm hearing you correctly, is it fair to say that you're

7   doing that for the purpose of trying to deceive the doctor so that you can get

8   more medication; is that fair to say?

9   A    Yes.

10  Q    And then you wrote that – or he wrote that your pain without the

11  meds was a – or excuse me, with meds was a 4 to a 5; was that fair to say?

12  A    Yes.

13  Q    That's what you would have told him.

14  A    (No audible response.)

15  Q    Okay, and then he notes that your occupation is housekeeping and

16  cleaning.  Was that accurate?

17  A    Yes, sir.

18  Q    And do you recall any – do you recall whether Dr. Azmat tested your

19  reflexes?

20  A    No.

21  Q    You don't recall that, or it did not happen?

22  A    It did not happen.

23  Q    All right, and when you – you did tell Dr. Azmat the medications that

24  you were on and the tablets that you were receiving; did you not?

25  A    Uh-huh.

-531-

1    Q    That's a yes?

2    A    Yes, sorry.

3    Q    That's okay, I'm not trying to be difficult.  The previous medications of

4    30 milligrams, 180 tablets; correct?

5    A    Yes.

6    Q    And then oxycodone 15 milligrams, 90 tablets; correct?

7    A    Yes.

8    Q    And Xanax 2 milligrams, it looks like 60 tablets; do you see that?

9    A    Yes.

10    Q    And the – and you came away from your visit to Dr. Azmat with two

11    prescriptions as we've just seen –

12    A    Right.

13    Q    – on the screen a minute ago.  And those were oxycodone 30, 60;

14    correct?

15    A    Yes.

16    Q    And then oxycodone 15 milligrams, 60; correct?

17    A    Yes.

18    Q    So the – and I'm not good at math, but the oxycodone 30 went from

19    180 tablets, decreased by 120 down to 60; correct?

20    A    Yes.

21    Q    The oxycodone 15 milligrams went from 90 tablets decreased down to

22    60; correct?

23    A    Yes.

24    Q    And the Xanax was discontinued; correct?

25    A    Right.

-532-

1   Q     Counsel asked you about any treatment plan that Dr. Azmat would

2   have spoken with you about.  But do you see his note here where he says

3   [reading]: Wean off narcotics?  Let me leave that on there, I'm sorry.

4   A     Yes.

5   Q     Okay.  Do you know what that means, ma'am?

6   A     Yes.

7   Q     And so it would appear, then, from the record ,that Dr. Azmat was

8   trying to get you off of the rather significant dose that you were getting of

9   Xanax and OxyContin; correct?

10  A     Yes.

11  Q     If my math is correct, going back to the number of prescription

12  medications, the 180 plus 90 plus 60 would be 330 total, and you went

13  down to a total of 120.  So from 330 tablets per month –

14  A     Yes.

15  Q     – before seeing Dr. Azmat to 120 tablets a month after seeing Dr.

16  Azmat; correct?

17  A     Yes.

18  Q     So you were after the visit receiving roughly one-third of the

19  medication that you were receiving before the visit; true?

20  A     True.

21  Q     You mentioned your son, David Letner, and David traveled up and

22  traveled back with you; did he?

23  A     Yes, sir.

24  Q     And you said, I believe, that David has suffered a work-related

25  accident, or was it a –

-533-

1    A    – A birth.

2    Q    Okay, and he's missing a couple of fingers that are painful to him.

3    A    Yes.

4    Q    Does he still see someone with respect to that today?

5    A    No, David is off of it all.

6    Q    All right, and when David saw Dr. Azmat, did you understand that Dr.

7    Azmat significantly decreased his medication that he was on?

8    A    No, I did not.

9    Q    Do you know one way or another?

10   A    No.

11   Q    All right.  Was David at the time on – to your knowledge, and if you

12   don't know, just tell me.

13   A    Okay.

14   Q    On oxycodone 30 milligrams, 240 tablets?

15   A    Yes, he was.

16   Q    Are you aware that after seeing Dr. Azmat that his oxycodone 30

17   milligrams was reduced from 240 tablets down to 90?

18   A    Okay.  No, I did not know.

19   Q    Okay, all right.  Very good.

20        MR. WITHERS: I think that's all the questions I have.  Thank

21   you, ma'am.

22        MS. LETNER: Thank you.

23        THE COURT: Anything else of this witness, Mr. Gilluly?

24        MR. GILLULY: May I, Your Honor?

25        THE COURT: Yes, sir.

-534-

<u>REDIRECT EXAMINATION BY</u>

1

<u>MR. GILLULY</u>;

2

Q     Mr. Withers asked you about your previous grand jury testimony.  Do

3

you remember on Page 100 of the grand jury testimony the question being

4

asked to you [reading]: Ultimately, did you, your husband, and your son

5

travel from Florida to Garden City here in the Southern District of Georgia

6

to East Health Center for the purpose of getting oxycodone?

7

A     Yes, sir.

8

Q     And what was your answer?

9

A     Yes.

10

Q     Did Dr. Azmat ever talk to you about his goal to wean you off of

11

medication?

12

A     No, sir.

13

Q     Did he ever talk to you about addiction?

14

A     No, sir.

15

Q     Did he ever talk to you about going to see someone who actually has

16

training on addiction?

17

A     No, sir.

18

Q     And to be clear, when you went to see the doctor you went there

19

because you were addicted seeking pills.

20

A     Yes, sir.

21

Q     You had previous injuries; is that right?

22

A     Yes.

23

Q     And you were treated for those injuries?

24

A     Yes, sir.

25

-535-

1    Q   And then got –

2          MR. WITHERS:  – Objection to the leading, Your Honor.

3    Redirect doesn't give –

4          MR. GILLULY:  – I was leading, and I will not lead, Judge.  I

5    apologize, Mr. Withers.

6          THE COURT: All right, go ahead.

7    Q   (By Mr. Gilluly) Were you ultimately treated for your injuries back

8    when it happened?

9    A   Yes, sir.

10    Q   And were you taken off of controlled substances?

11    A   Yes, sir.

12    Q   Did you then later get hooked back on them?

13    A   Yes, sir.

14    Q   And are they powerful drugs?

15    A   Oh, yes.

16    Q   And is that why you went to East Health?

17    A   Yes, sir.

18    Q   The defense lawyer asked you some about your interactions with Dr.

19    Azmat.  And do you remember testifying before the grand jury, the

20    question being [reading]: Tell us about your interaction with the doctor –

21          MR. WITHERS:  – Excuse me, what page, counsel?

22          MR. GILLULY: I'm sorry, 103,

23    Q   And you saying [reading]: Well, he just came in and didn't even ask

24    me any questions.  He didn't check me to see if something was wrong with

25    me, he just wrote me a prescription –

-536-

1    THE COURT:  – Mr. Gilluly, the purpose of going over a prior

2    statement with her is whether or not she's given an inconsistent statement

3    or not, and there's nothing inconsistent about what she said.  She said, I got

4    no examination.

5    MR. GILLULY: And then Mr. –

6    THE COURT:  – No, sir, but all you're doing is going back

7    again, and she hasn't been impeached about that.  She hasn't given an

8    inconsistent statement about that.

9    MR. GILLULY: My argument – I'll move on, Judge.

10   THE COURT: No, sir, but you can't just go to a prior statement

11   and start reading from a prior statement unless the purpose of it is to

12   impeach her by a prior inconsistent statement.  And she did not give any

13   inconsistent statements.  She said, I got no examination.

14   MR. GILLULY: My position is the attorney then asked her

15   about specifics regarding things that were said from Dr. Azmat and to Dr.

16   Azmat, and I was going to go in to rehabilitate her regarding what was said

17   or what was not.  I was going to clarify that she gave a prior consistent

18   statement, Judge.

19   THE COURT: Well, are you talking about what she said to the

20   doctor?

21   MR. GILLULY: Yes, Your Honor, and what he said to her.

22   THE COURT: All right, I'm not sure about this, but let's – go

23   ahead.

24   MR. GILLULY: I'll keep it simple.

25   Q     (By Mr. Gilluly) Did you have a conversation with him?

-537-

1    A    No, sir.

2           MR. GILLULY: Nothing further, Judge.

3           MR. WITHERS: Very briefly, Your Honor.

4                  RECROSS-EXAMINATION BY

5    MR. WITHERS:

6    Q    Ma'am, you did tell the grand jury that you came up here for the

7    purpose of getting – for your back pain; true?

8    A    True.

9    Q    And you had no health insurance at the time; true?

10   A    True.

11   Q    And when you left seeing Dr. Azmat, you had a prescription for a third

12   of the medications that you'd had –

13           THE COURT:  – Those have all been asked and answered –

14   A    True.

15           THE COURT:  – Mr. Withers.

16           MR. WITHERS: Thank you.  Nothing further.  Thank you,

17   ma'am.

18           THE COURT: Anything else of this witness?

19           MR. GILLULY: No, Your Honor, and she may be excused.

20           THE COURT: All right, you may come down, ma'am.  You're

21   excused.

22       [Witness Excused]

23           THE COURT: Call your next witness, please.

24           MR. KNOCHE: Kenneth Gossett.

25       [Witness Sworn]

-538-

1    CLERK: You may be seated.  Please state your name, your

2    occupation, and spell your last name for the record.

3    DR. GOSSETT: My name is Ken Gossett, G-O-S-S-E-T-T.  And

4    I'm a family practice physician, and I'm currently working in the

5    landscaping business right now.

6    K E N   G O S S E T T

7    GOVERNMENT'S WITNESS, SWORN, TESTIFIED AS FOLLOWS

8    DIRECT EXAMINATION BY

9    MR. KNOCHE:

10   Q    Dr. Gossett; is that correct?

11   A    That's correct.

12   Q    All right, sir, and you were at one time back in 2011 employed at the

13   East Health Center in Garden City, Georgia; is that correct?

14   A    That's correct.

15   Q    And were the approximate dates of that employment March the 26th of

16   2011 through May the 26th of 2011?

17   A    That's correct.

18   Q    And prior to coming to East Health Center, where had you worked

19   immediately prior to that?

20   A    I'd worked in North Georgia in Blue Ridge at Fanning County

21   Emergency Room.

22   Q    Okay.  You're an emergency room doctor?

23   A    Yes, that's correct.

24   Q    All right, sir.  And how did you hear about the employment

25   opportunity at East Health Center?

-539-

1    A    I found out about the job online at a website called "Doc Café," and

2    they just posted a position available, and I filled out the information online.

3    Q    Did you speak to any of the owners or principals of East Health Center

4    and work out an agreement with them?

5    A    The only person I spoke to on the phone was a recruiter from Florida

6    by the name of Carol, and she just kind of told me the specifics of where the

7    location was and what we would do there.

8    Q    Did they tell you how much they would pay you?

9    A    She – if I remember correctly, I think she did say that they would start

10   out at fifteen-hundred dollars a day was the typical rate there.

11   Q    Okay, and did they tell you when you might be expected to be paid,

12   whether it be at the end of the day, at the end of the week, or the end of the

13   month?

14   A    It would be daily, a daily payment.

15   Q    And was that payment to be by cash or check?

16   A    It was cash.

17   Q    And did you accept the offer to go work there for fifteen-hundred

18   dollars a day?

19   A    I did.

20   Q    And was that in fact the case that you were paid daily the sum of

21   fifteen-hundred dollars cash?

22   A    That's correct.

23   Q    And what were your duties at East Health Center?

24   A    Well, my main job, I guess, was just to examine new patients, and

25   then, you know, prescribe, you know, pain medicine for them.

-540-

1    Q    Now, you were not the – you saw the records that East Health Center

2    kept; is that correct?

3    A    I did.

4    Q    And when a patient would be presented to you, did you have access to

5    the records of any prior visit that a patient might have made?

6    A    No, the only information we had was just current information the

7    patient provided about where they lived and the medications they were

8    taking.  But as far as other previous physicians or therapies or treatments,

9    we weren't aware of that.

10   Q    I guess you – I believe you misunderstood my question.  You saw the

11   other East – if there was another doctor at East Health Center, would you

12   have seen those records in the file?

13   A    Yes, yes.

14   Q    And I believe your answer was, but you didn't see records of

15   physicians from outside of East Health Center.

16   A    Correct.

17   Q    Describe for the members of the jury the appearance of East Health

18   Center.

19   A    Well, it was – it was a corner – a corner office in a strip mall, so you

20   could easily go by thinking it was maybe like a barber shop or, you know,

21   some kind of store.  You know, there was really no outside appearance that

22   would indicate it was a medical facility, so it would be easily missed.  I

23   guess that's the best way to describe it.  Kind of very plain, very subdued,

24   you know, really no indication of any kind of, you know, medical practice

25   inside.

1    Q    It did not appear to be that sort of facility.

2    A    Correct, that's correct.

3    Q    The patients who you saw at East Health Center, were they referred to

4    you by other physicians?

5    A    No, no.  They were just – I guess they had a word-of-mouth to come to

6    that facility, but there were no professional referrals that I was aware of.

7    Q    And were you –

8           THE COURT:  – Excuse me.  Maybe I missed it, Mr. Knoche,

9    but what was the time frame that he was there.

10           MR. KNOCHE: He's testified it was March 26 through May 26

11    of 2011.

12           THE COURT: March 26 –

13           MR. KNOCHE:  – I'm sorry, March 21 – March 21st, Your

14    Honor.

15           THE COURT: March 21 ...

16           MR. KNOCHE: 2011 through May 26th.

17           THE COURT: Through May 26th.  All right, thank you.

18    Q    (By Mr. Knoche) Were you the only physician working there at the

19    time you were employed there?

20    A    Yes.

21    Q    There weren't – you didn't have physician colleagues there.

22    A    No.

23    Q    It was not a very large premises?  Or was it?

24    A    No, very small.

25    Q    Were you aware of how patients paid for their visits?

-542-

1    A   It was my understanding they would pay in cash.

2    Q   Do you know how much they paid?

3    A   I think the initial visit was $250, and then each visit thereafter was

4    $300.

5    Q   Now, you say you had access to some of the other records from East

6    Health Center.  Did you see patients that had previously been seen by Dr.

7    Najam Azmat?

8    A   Yes.

9    Q   Do you recognize that name from the files?

10    A   Yes.

11    Q   And to your knowledge, was he the first physician employed at East

12    Health Center?

13    A   It's my understanding he was.

14    Q   What were patients who came there – did you notice a pattern, what

15    they were seeking?

16    A   Oh, yeah, all of them wanted oxycodone, was the primary drug that

17    they wanted.  Sometimes Xanax, but all of them wanted oxycodone.

18    Q   And as far as these patients paying cash, did you ever refuse to

19    prescribe oxycodone?

20    A   On a few occasions I couldn't – I couldn't justify them with their

21    complaints or any of their, you know, medical records that they would

22    receive it, and I wouldn't.  And then, when that would occur, I would tell

23    Dan, the office manager, then he would give them a refund.

24    Q   That's Dan Wise?

25    A   That's correct.

-543-

1    Q    And so if no prescription, money would be refunded.

2    A    That's correct.

3    Q    Were these patients paying for prescriptions?

4    A    That's correct.

5    Q    Were you able to notice from the records kept at East Health Center

6    whether the patients were from the local area or outside of the local area?

7    A    It seemed the majority were outside the area.

8    Q    Did you notice any mode, any particular states that patients came

9    from?

10   A    Florida, in particular.  We saw a lot of people from Florida, then most

11   of the Southeast area, including South Carolina, Tennessee, Kentucky, even

12   a few from Ohio.

13   Q    Did that strike you as odd?

14   A    It seemed very unusual to travel that distance to come to our clinic.

15   Q    Did it seem any more particularly odd that patients would travel that

16   distance while complaining of pain?

17   A    It seemed like it would be very difficult to travel very far with the type

18   of symptoms they were complaining of.

19   Q    Were you able to observe how patients arrived?  Did they come, you

20   know, by themselves, or in groups?

21   A    The majority of people I saw came three or four to a car.

22   Q    Now, are you a renowned pain management physician?

23   A    No.

24   Q    How did patients find you at East Health Center?

25   A    I guess word-of-mouth was the main mode that they would find.  I

-544-

1    know East Health Center had some aggressive marketers that would go to

2    these other clinics, particularly in Florida, and let them know that our clinic

3    was available, and if they weren't happy with the prescriptions they were

4    getting in Florida they could come up to Georgia and get prescriptions

5    there.

6    Q    And can you estimate for the jury what percentage of patients came

7    seeking oxycodone?

8    A    All of them.

9    Q    You saw their reported levels of pain; did you not?

10   A    I did.

11   Q    And how did you verify these complaints?

12   A    Well, that was very difficult, because you'd have to take their word for

13   it. So there's really – there was no attempt on my part to contact a

14   physician they had seen before to verify their, you know, injuries.

15   Q    Okay.  So you never called prior physicians?

16   A    No.

17   Q    And if you would, I'm not sure that the court reporter heard your

18   answer.  That was no?

19   A    No, that's correct.

20   Q    So did you ask for the patients to bring records from their earlier –

21   their prior physicians?

22   A    I don't think there was attempts made to get prior records, no.

23   Q    What were the patients required to bring, besides their payment, to

24   see you?

25   A    They were required to have some radiologic exam of their injury,

-545-

1    either a CT scan or an MRI, and a few of them provided a drug history.

2    Q    Did you notice any unusual security measures at the clinic?

3    A    There were a lot of cameras all throughout.

4    Q    Cameras?

5    A    Yes.

6    Q    Did the clinic have rules about smoking, loitering, parking cars, that
7    sort of thing?

8    A    I think the main emphasis was keeping people from gathering in front
9    of the facility, and even to the side of the facility.  They were encouraged to
10   go behind the facility if they were going to smoke or gather.

11   Q    And why did you have those measures?

12   A    Dan didn't want a lot of attention brought to a lot of people in front of
13   the clinic.

14   Q    Did patients have difficulty filling prescriptions written from East
15   Health Center?

16   A    Yes.  We would get phone calls, particularly the first week, inquiring
17   about the facility, and inquiring about me, and just trying to figure if we –
18   you know, what we were doing there.

19   Q    Dr. Gossett, you have pleaded guilty, is that not true, to a conspiracy
20   offense involving your illegitimate dispensation of controlled substances at
21   East Health Center?

22   A    That is correct.

23   Q    And that conspiracy carries a maximum five-year penalty?

24   A    That's correct.

25   Q    And you had a lawyer negotiate that agreement?

-546-

1    A    That's correct.

2    Q    And did he tell you that the penalties you may have faced, you know,

3    but for that agreement, might have been much more severe?

4    A    Yes.

5    Q    And did he tell you that each count of dispensation would have been

6    well in excess of five years that you'd receive?

7    A    That's correct.

8    Q    And you are – now, you've been called as a witness by the government.

9    Is it – have you been sentenced?

10   A    No, sir.

11   Q    And you pled guilty in front of this Court, this Judge; is that right?

12   A    Yes, sir.

13   Q    And are you hoping that at the appropriate time the fact of your

14   cooperation might be brought to the Court, and that you might receive a

15   sentence less than five years.

16   A    I'm hoping for that.  I have no guarantee, but I'm hoping for that.

17   Q    And that was my final question: have any promises been made to you?

18   A    No, sir.

19              MR. KNOCHE: Pass the witness.

20              THE COURT: Mr. Withers.

21                        CROSS-EXAMINATION BY

22   MR. WITHERS:

23   Q    Good morning.

24   A    Morning.

25   Q    Dr. Gossett, I'm Tom Withers.  I represent Dr. Azmat.  You've never

-547-

1    met Dr. Azmat; have you?

2    A    That's correct.

3    Q    And have never seen him before today; is that accurate?

4    A    That's correct.

5    Q    Now, you started work at the clinic on March 21st; is that what your

6    testimony was?

7    A    Correct.

8    Q    That was a Monday?

9    A    I'm not sure exactly which day that was.

10   Q    Okay, and how long prior to that had you been in negotiation with

11   Carol from South Florida about taking over the East Health Center's

12   medical duties?

13   A    Not more than a couple weeks.

14   Q    You, of course, knew at the time that you arrived that the clinic had

15   been open for a few weeks.

16   A    Yes.

17   Q    And you knew, of course, that there had been an earlier physician at

18   the clinic.

19   A    Yes.

20   Q    And you understood that that earlier physician had been terminated;

21   correct?

22   A    Correct.

23   Q    And it was explained to you that one of the issues with respect to that

24   termination was, the doctor wasn't doing what the patients wanted; true?

25   A    I was explained by Dan that there were problems with his DEA, that

-548-

1    was the reason he was terminated.

2    Q    And you knew that when you began work there that it was a pain

3    clinic; true?

4    A    Yeah.  I don't know if the words pain clinic were used but, yes.

5    Q    I don't mean to quibble, but you understood that the facility was one

6    for pain management; is that fair to say?

7    A    Yes, yes.

8    Q    Now, there are all types of different doctors' offices; right?

9    A    Sure.

10   Q    And a doctor's office that is treating pain medically doesn't have to

11   have a physical therapy facility; right?

12   A    I guess that's true, yes.

13   Q    I mean, in other words, you're not going to have an X-ray machine at a

14   general practitioner's office; right?

15   A    For the most part, right.

16   Q    I mean, you know, if you go to see – I don't mean to call you country,

17   but, you know, Fanning County is way up in the northern part of the state,

18   less populous area; right?

19   A    Right.

20   Q    A GP in Fanning County isn't going to have an X-ray machine;

21   correct?

22   A    Probably not.

23   Q    Not going to have an MRI machine; right?

24   A    Right.

25   Q    So, you know, each doctors' office, each medical facility is going to

-549-

1    have different types of equipment depending on the patients that they are

2    seeing.  That's fair to say; isn't it?

3    A    That's correct.

4    Q    You knew after the first few days that the patients were coming in

5    were coming in with complaints of pain; correct?

6    A    Yes.

7    Q    And did anyone at the facility – Dan, anyone else – tell you that Dr.

8    Azmat had not been prescribing heavily enough?  Did you come to learn

9    that when you were working there?

10   A    No.

11   Q    Did Dan ever discuss with you what medications you would be

12   prescribing?

13   A    No, he just showed me the charts that showed this is typically what the

14   patients would receive.

15   Q    All right, and showing you the charts, was he showing you the charts

16   in terms of the types of medications?

17   A    Well, it would be listed what each patient had received the month

18   before, and the medicines they had been on before they came to East

19   Health Center.

20   Q    All right, and you were seeing both new patients and return patients?

21   A    Correct.

22   Q    Did Dan ever tell you what his expectations were of you with respect to

23   what the dosage level you were going to be prescribing?

24   A    No.

25   Q    Did you have any prior experience with respect to the issue of pain

-550-

1    management?

2    A    No.

3    Q    Did you have any prior experience with respect to treating patients

4    with chronic pain?

5    A    No.

6    Q    Did anyone at the clinic complain to you that Dr. Azmat had not been

7    good for business, or words to that effect?

8    A    Not that I'm aware of.

9    Q    Did any of the patients that you saw complain to you that Dr. Azmat

10   had routinely discontinued their prescription for Valium?

11   A    Not that I'm aware of.

12   Q    Did you – in looking at the charts of the earlier patients that had been

13   seen by Dr. Azmat, did you notice that Dr. Azmat had routinely

14   discontinued Valium?

15   A    Maybe on two or three cases.  It would be hard to recall without

16   reviewing the charts.

17   Q    Okay, and that's fine, and I know it's been a year and a half, or almost

18   two years now, since you would have seen the charts; is that right?

19   A    Almost three years.

20   Q    Okay, and do you recall seeing that Dr. Azmat would routinely

21   discontinue Xanax?

22   A    I don't recall.

23   Q    Do you recall that Dr. Azmat would routinely reduce the dosage of the

24   patients that he saw?

25   A    No, I don't recall.

-551-

1    Q    Now, do you recall that there were occasions, Dr. Gossett, where a

2    patient would have been discontinued from Xanax by Dr. Azmat where you

3    added it back in?

4    A    That's possible.  I wouldn't recall without reviewing the charts, but

5    that's a possibility.

6    Q    All right.  You understand, do you not, Doctor, that the combination of

7    oxycodone and Xanax can be a dangerous combination for patients; true?

8    A    That's correct.

9    Q    And if a patient – or excuse me, if Dr. Azmat is discontinuing the

10   Xanax, then that is taking that patient out of that dangerous situation;

11   true?

12   A    With that combination, true.

13   Q    And that would make – that would be the same for Valium.  If the

14   patient is taking the drug combination – have you ever heard the term

15   cocktail?

16   A    Sure.

17   Q    And what does cocktail – a drug cocktail mean, sir?

18   A    Just a combination of medicines.

19   Q    All right, and so what you would see on occasion would be a drug

20   cocktail of oxycodone, Xanax and Soma for instance; correct?

21   A    Correct.

22   Q    That's a dangerous combination; correct?

23   A    It can be, sure.

24   Q    And if the physician seeing that is taking that patient off of that Xanax

25   and Soma combination, and leaving only the oxycodone, then that's doing

-552-

1    something positive for the patient.  That's fair to say; isn't it?

2    A    It's reducing the dosage, yes.

3    Q    Similar, Dr. Gossett, did you notice that on occasion Dr. Azmat

4    reduced by a third – or reduced to a third the number of prescriptions that

5    a patient was on?

6    A    I couldn't recall the number of the medicines without reviewing the

7    charts.

8    Q    Okay.

9              MR. WITHERS: If I could have just one minute.

10   Q    Did you meet Al LeFrancois?

11   A    On one occasion.

12   Q    Okay.  Who was your day-to-day manager?  Who was the person that

13   you reported to?

14   A    Dan was the office manager.

15   Q    All right, and the occasion that you met Al, did Al tell you what to do

16   or how to do it?

17   A    No.

18   Q    I'm going to show you one patient – this is Government's Exhibit 4-00

19   – or excuse me, 011.  Doctor, do you see that this patient was on – under

20   the previous medications – 30 oxycodone, 180 tablets?

21   A    Yes.

22   Q    And oxycodone 50, 90 tablets?

23   A    Yes.

24   Q    And Xanax 60 – 2 milligrams, 60 tablets.  Do you see that sir?

25   A    I do.

-553-

1    Q    And do you see that Dr. Azmat reduced that patient from 180 tablets

2    of 30 milligrams down to 60?  Do you see that?

3    A    I do.

4    Q    That's a reduction to – to a third, by a third, I'm confusing myself right

5    now.  A lot; right?

6    A    By a third, yes.

7    Q    And that the oxycodone 90 has been reduced from – excuse me,

8    oxycodone 15 has been reduced from 90 down to 60; you see that?

9    A    I do.

10   Q    And that the Xanax 2 milligrams, 60 tablets, has gone to discontinue

11   the Xanax; do you see that?

12   A    I do.

13   Q    Be fair to say that with this patient that Dr. Azmat has reduced those

14   medications by a significant manner; correct?

15   A    Correct.

16   Q    That's fair to say; isn't it?

17   A    In this chart, yes.

18   Q    And do you see where it says wean off medications?  Down at the very

19   last ...

20   A    Yes.

21   Q    Doctor, if someone is on up to 270 oxycodone on a monthly basis, it

22   would be appropriate to try and wean that patient off that medication if her

23   objective symptoms didn't bear out her complaint of pain; correct?

24   A    Correct.

25   Q    In other words, you wouldn't want to completely discontinue the

-554-

1    oxycodone, given the numbers of oxycodones she's taking on a monthly

2    basis; would you?

3    A    Correct.

4    Q    That would be dangerous for the patient; wouldn't it?

5    A    Correct.

6    Q    Doctor, did any of the patients that were coming to you tell you that

7    they were drug addicts?

8    A    No.  No, sir.

9    Q    Did any of them tell you they were selling the drugs that you were

10   issuing prescriptions for?

11   A    No one told me that, no.

12   Q    Would you have prescribed medications to a patient if that patient told

13   you that they were diverting the medication?

14   A    No.

15   Q    Do you agree with me that you saw patients who showed signs of

16   significant – or excuse me, had MRIs that confirmed significant injury?

17   A    Will you repeat the question?

18   Q    Yes, I'm sorry, that was a bad question.

19        Did you see patients who had MRIs that confirmed serious injury?

20   A    We did, you know, see patients with MRIs, but it was difficult to

21   confirm an injury.

22   Q    Okay.  A physician doesn't base whether he or she is going to prescribe

23   oxycodone only on the basis of an MRI; right?

24   A    Correct.

25   Q    I mean, an MRI would be an objective measure to confirm whether the

-555-

1    report of injury is confirmed objectively; correct?

2    A    Correct.

3              MR. WITHERS: If I could have just one moment, Your Honor.

4         [Pause]

5              MR. WITHERS: I had it up here all along.  I apologize, sir.

6    Q    Let me show you an MRI that we reviewed earlier today.  Of course,

7    this would be an MRI that would be consistent with the type of MRI you're

8    used to seeing with respect to a report; is that accurate?

9    A    There would be many diagnostic interpretations of an MRI.  This

10   would be one of them.

11   Q    Okay.  Asked another way: a physician who is not trained in radiology

12   doesn't actually read the MRI.  What you do is read the MRI report; is that

13   accurate?

14   A    That's correct.  We don't have the films available to go over there.

15   Q    Right, and do you see this finding here, the second-to-the-bottom

16   paragraph about a six o'clock [reading]: Annular tear measuring 9

17   millimeters with a central and right and left disc protrusion; you see that?

18   A    Yes, sir.

19   Q    That's a – to put it in layman's terms – a significant physical injury; is

20   it not?

21   A    It appears to be the result of one, yes.

22   Q    Maybe I asked a bad question again.  That MRI would show a

23   significant injury to someone; right?

24   A    Correct.

25   Q    Now, East Health Clinic was closed down on May 26th of 2011; correct?

-556-

1   A   That's my understanding.

2   Q   Were you there that day?

3   A   No.

4   Q   You were interviewed that day; were you not?

5   A   Right.  I never made to the office.

6   Q   Did the DEA ask you to surrender your license to prescribe after that?

7   A   Yes.

8   Q   And you did so.

9   A   I did.

10  Q   You did not have a license to dispense; correct?

11  A   Correct.

12  Q   And you did not dispense out of that facility; correct?

13  A   Correct.

14  Q   You are licensed to practice medicine in how many states?

15  A   Georgia and Alabama.

16  Q   Did you surrender your Georgia license?

17  A   No.

18  Q   So you said here today that you are engaged in the landscaping

19  business, but you continued to practice medicine after the entry of your

20  guilty plea; did you not?

21  A   I did.

22  Q   All right.  So you came in here before this Court – and I believe it was

23  October of 2012 – and entered a guilty plea; is that accurate?

24  A   Correct.

25  Q   It looks like the date of your plea, or at least the date of the

-557-

1    information filing, I don't have a copy of your plea agreement dated, was

2    October 31 of 2012; correct?

3    A    That sounds correct.

4    Q    You continued to practice in the state of Alabama after you entered

5    your plea of guilty before this Judge; didn't you?

6    A    I did.

7    Q    And in fact you continued that practice until just a few months ago;

8    didn't you?

9    A    I did.

10   Q    Okay.  So you want to make certain that the jury has a fair and

11   accurate portrayal with respect to you and your testimony; right?

12   A    Yes.

13   Q    True?  But the fact is that you came into this courtroom and entered a

14   plea.  The government didn't ask you to surrender your license to practice

15   medicine; did they?

16   A    Only my DEA.

17   Q    Only your DEA.  So you pled guilty to a charge that dealt with your

18   practice of medicine; right?

19   A    The prescription of drugs.

20   Q    It's the practice of medicine; isn't it?

21   A    Well, specifically the drugs.

22   Q    Were you practicing medicine when you were prescribing, sir?

23   A    Sure.

24   Q    And part of that plea agreement – part of this charging document talks

25   about the fact that you're a licensed physician; does it not?

-558-

1    A    Yes.

2    Q    You came into this court, pled guilty to having seen patients and

3    illegally treated those patients, and illegally prescribed medication, and

4    then went right back to practicing medicine; didn't you?

5    A    Without prescribing narcotics, yes.

6    Q    And continue that until just a few months ago before you come down

7    here to testify; right?

8    A    That's correct.

9    Q    Now, you still have your license over in Alabama; right?

10   A    Correct.

11   Q    You've been reprimanded, however, by the State of Alabama; right?

12   A    That's correct.

13   Q    The Medical Board in Alabama, one can find out online, has

14   reprimanded you for lying about your continuing education credits; right?

15   A    That's correct.

16   Q    So what you did in the state of Alabama after you entered your guilty

17   plea here, you falsified your continuing education credits over there; right?

18   A    Well, not exactly.

19   Q    Do I have the time line wrong?

20   A    Yeah.  They took discipline action on me because I didn't have my

21   education requirements in in time – in a certain time.

22   Q    Well, let me ask you this, and I'm reading from the stipulation you

23   entered.  You entered a stipulation with the Alabama State Board of

24   Medical Examiners; did you not?

25   A    Uh-huh, yes.

-559-

1   Q    Your wife is a lawyer; correct?

2   A    No.

3   Q    That's a different Gossett who is your lawyer on this?

4   A    No, she – no, I didn't really have a lawyer for that.

5   Q    All right. [Reading]: It's admitted by Dr. Gossett that on or about

6   December 20, 2012 you submitted or caused to be submitted a license

7   renewal application for the year of 2013 where you represented you had 25

8   credits when you didn't; correct?

9   A    That's correct.

10  Q    So you came in here, you entered a guilty plea in October.  You went

11  back and your falsified your renewal application for your license in the state

12  of Alabama; right?

13  A    No, no.  The only thing that they were upset with me is I didn't have

14  my educational requirements in on time.  That was what they were upset

15  with me about.  It wasn't a falsification of records.

16           MR. WITHERS: If I could have just one moment, Your Honor.

17           THE COURT: Yes, sir.

18       [Pause]

19  Q    (By Mr. Withers) Sir, this is a copy of the consent order reprimanding

20  you; is it not?

21  A    It looks like, yes.

22  Q    And the second paragraph says that on or about December 20th you

23  submitted or caused to be submitted an Alabama Medical License Renewal

24  Application for the year of 2013 on which the certification was made that

25  the annual minimum continuing medical education requirement of 25

-560-

1    credits had been met or would be met by December 31, 2012.

2         And the license had supporting documents if audited – licensee,

3    excuse me.  That's what it says; true?

4    A    Correct.

5    Q    In the next paragraph you admit that in fact the required number of

6    continuing medical education credits necessary for the renewal of the 2013

7    license had not been obtained, and/or that the supporting documentation

8    had not been produced.  Specifically, Dr. Gossett obtained no valid credits;

9    correct?

10   A    That's correct.

11   Q    And as a result of that a consent order was entered reprimanding you

12   based upon that conduct, and entering that reprimand as against your

13   license to practice; correct?

14   A    Correct.

15   Q    But as you sit here today, your license in Alabama to practice medicine

16   is still intact; right?

17   A    Yeah.

18   Q    Or did you surrender that?

19   A    I didn't renew it after the end of the year.

20   Q    All right.  Your Georgia license is still intact?

21   A    Yes.

22   Q    You have to renew your Georgia license; do you not?

23   A    Yes.

24   Q    And you do that online now?

25   A    You can, yes.

-561-

1    Q    All right.  Do you – and of course this information is obtainable online

2    as well.  Do you recall informing the Georgia Medical Board that you have

3    not been convicted of any felony, irrespective of pendency or availability of

4    an appeal, or pled guilty or *nolo* to a felony.  That's what you told to the

5    Georgia Medical Board; right?

6    A    Maybe that's before that I pled.

7    Q    I'm sorry?

8    A    I said that was probably before I pled.

9    Q    When did you renew your license?

10    A    They're renewed every two years.

11    Q    Did you ever inform the Georgia Medical Board that you had come

12    into court and entered a guilty plea?

13    A    No.

14    Q    You are required by their rules to do so; aren't you?

15    A    Which they require the next time I renew.

16    Q    No, no.  When you enter a guilty plea to a felony, the Georgia Medical

17    Board requires that that physician self-report; isn't that true?

18    A    I'm not aware of that.

19    Q    Now, the folks that you do have an agreement with is the United States

20    Attorney's office; right?

21    A    Well, I don't know if I'd call it an agreement.

22    Q    Sir, one will be marked, but you have a plea agreement that you have

23    signed in this case; right?

24    A    Correct.

25    Q    That plea agreement is an agreement; correct?

-562-

1    A    Correct.

2    Q    That plea agreement provides that –

3         MR. WITHERS:  – and for the record that's 34-4.

4    Q    That plea agreement provides, sir, does it not, that you are to

5    cooperate with the government; right?

6    A    Well, I guess to answer truthfully.

7    Q    And – right, and the ones that determine whether or not you get a

8    motion to reward you for your cooperation is the government.  That's what

9    it provides; correct?

10   A    Well, I guess that depends on Judge Moore.

11   Q    Uh-huh.  I'm going to read you Page 2 [reading]: It is a condition

12   precedent to the government's filing of a 5K motion that the defendant be

13   completely truthful with the government, and that it is a matter committed

14   to the sole discretion of the United States Attorney as to whether that's

15   occurred or not; right?

16   A    Okay.

17   Q    Yes?

18   A    Yes.

19   Q    And you went from facing dozens of years in prison to a cap of five

20   years in prison; correct?

21   A    That's correct.

22        MR. WITHERS: If I could have just a minute, Your Honor.

23        [NOTE: Mr. Withers confers with defendant off the record.]

24   Q    (By Mr. Withers) Sir, when did you renew your Georgia license?

25   A    I can't remember.  It's been over two years.

-563-

1    Q    You don't recall renewing your license in March of 2013?

2    A    Not my Georgia license.

3    Q    If that's reflected on the Composite State Board of Medical Examiner's

4    website that would be inaccurate?

5    A    I thought it was '12.  2012 I think was the last time that I renewed.

6    Q    I'm sorry, I couldn't hear you.

7    A    I thought it was 2012 the last time I renewed.

8           MR. WITHERS: Your Honor, I would mark as Defendant's 13

9    the stipulation and consent order.  We move that into evidence.

10          THE COURT: Any objection, counsel?

11          MR. KNOCHE: No objection, Your Honor.

12          THE COURT: All right, admitted without objection.

13          MR. WITHERS: Thank you, Your Honor.

14          THE COURT: Anything else of this witness, Mr. Knoche?

15          MR. KNOCHE: Yes, Your Honor.  May I approach the witness,

16   Your Honor?

17          THE COURT: Yes, sir.

18                       REDIRECT EXAMINATION BY

19   MR. KNOCHE:

20   Q    I'm showing you what's been marked as 34-4.  That is a redacted

21   version of your plea agreement.  Do you recognize that?

22   A    Yes, sir.

23   Q    That agreement contains all the promises that have been made to you

24   pursuant to your plea agreement before this Court?

25   A    That's correct.

-564-

1    MR. KNOCHE: I'm going to tender that agreement, Your

2  Honor.

3  Q    And that does state your obligations as well; is that correct?

4  A    Yes, sir.

5    THE COURT: It's admitted.

6  Q    And one of those obligations is to testify truthfully.

7  A    Correct.

8  Q    Without a medical – or excuse me, with a medical license you can still

9  practice medicine; isn't that correct.

10  A    Correct.

11  Q    So your medical licenses are not issued by the DEA.

12  A    Correct.

13  Q    They're issued by whatever state you're licensed in –

14  A    That's correct.

15  Q    – the State of Georgia, the State of Alabama, that's a state agency; is

16  that correct?

17  A    Correct.

18  Q    But without a DEA registration, can you prescribe narcotic

19  medications?

20  A    No.

21  Q    You cannot do that?

22  A    Correct.

23    MR. KNOCHE: I would like, Dean, to pull up 4-11.  Scroll down,

24  please.  Stop.

25  Q    That information – you're familiar with this chart from East – you

-565-

1   know, these are the types of charts that you saw at East Health Center?

2   A    That's correct.

3   Q    The previous medication, that would be what the patient reports to the

4   doctor; is that correct?

5   A    That's correct.

6   Q    Now, if there were nothing in the record – or the medical chart to

7   substantiate that, you'd just be going on what the patient says; is that

8   correct?

9   A    That's correct.

10  Q    And so you wouldn't know if in fact the patient was actually getting

11  180 oxy 30s; would you?

12  A    That's correct.

13          MR. WITHERS: Objection, Your Honor.  Redirect does not

14  mean the government gets to lead.  I object to the leading.

15          THE COURT: Redirect doesn't mean that he gets to lead, I

16  agree with that.  He does have a right to go back over the charts that you

17  did.  But just don't lead the witness.

18          MR. KNOCHE: I'm sorry if I was leading, Your Honor.

19  Q    (By Mr. Knoche) So how would you know other than the word of the

20  patient?

21  A    Yeah, you wouldn't.

22  Q    Now, if a patient came with a complaint of a significant injury of some

23  kind, would you expect that there might be a significant clinical record of

24  that injury?

25  A    You would think.  Probably several records.

-566-

1  Q    And without that record, you would be once again relying on, what?

2  A    Just the patient's word.

3  Q    Okay.  Now, in the MRI which counsel showed you a moment ago

4  showing a significant annular tear, okay, I want to ask you about that.  Let

5  me back up for a moment.  Did you notice that many of your patients were

6  from out of state?

7  A    Correct, yes.

8  Q    And that those same patients, did you notice, that they had MRIs from

9  third states?

10  A    That's correct.

11  Q    Would you expect that that significant annular tear could be obtained

12  on an MRI in that patient's home state?

13  A    True.

14  Q    Can you account for a reason why a person from Kentucky with a

15  significant annular tear would have to go all the way to South Florida to

16  have an MRI?

17  A    I can't.

18  Q    Does that strike you as irregular?

19  A    Yes.

20  Q    Did you routinely observe that at East Health Center?

21  A    Yes.

22  Q    Was it apparent to you while at East Health Center that many of your

23  patients were drug abusers?

24  A    It seemed that they acquired a lot of pain medicine, yes.

25         MR. KNOCHE: That's all I have, Your Honor.

-567-

1    THE COURT: Anything else, Mr. Withers?

2    MR. WITHERS: Yes, sir, briefly with respect to that issue with

3    respect to his licensure.

4    <u>RECROSS-EXAMINATION BY</u>

5    <u>MR. WITHERS:</u>

6    Q    Sir, the fact is that you didn't report to the State of Alabama your

7    surrender of your DEA –

8    MR. KNOCHE:  – Beyond the scope.

9    MR. WITHERS: It is not.  He asked him about practicing

10    medicine –

11    THE COURT:  – He asked him whether he could prescribe, not

12    whether he could practice.  He asked him – he said because of the DEA

13    license you can't prescribe.  He didn't ask him anything about practicing,

14    other than prescribing.

15    MR. WITHERS: And that's what I want to focus on, is the issue

16    of what and when he reported to the State of Alabama about prescribing.

17    THE COURT: Well, limit it to that.

18    Q    (By Mr. Withers) Isn't it true that you did not surrender your authority

19    to dispense, administer, or prescribe pursuant to your Alabama license

20    until August 11, 2013?

21    A    That's correct.

22    MR. WITHERS: And, Your Honor, I have a voluntary surrender

23    of the controlled substances certificate.

24    Q    That's your signature at the bottom of that certificate; is it not, sir?

25    A    It is.

-568-

1    Q    Executed on August 11, 2013; correct, sir?

2    A    That is.

3    Q    And that language that I just read is there in the second full

4    paragraph; is it not, sir?

5    A    Yes.

6                    MR. WITHERS: Your Honor, I would tender that as 261.

7                    THE COURT: All right, admitted.  Anything else of this

8    witness?

9                    MR. KNOCHE: No, Your Honor.

10                   THE COURT: Can the witness be excused?

11                   MR. KNOCHE: Yes, sir.

12                   THE COURT: You're excused, sir, thank you.

13         [Witness Excused]

14                   THE COURT: Members of the jury, it's almost noon.  We're

15   going to take a little longer lunch recess today, so we'll take our lunch

16   recess until 1:15.

17                   And I remind you what I've always reminded you and continue

18   to remind you of, don't discuss this case with anyone.  Don't discuss it

19   among yourselves.  Leave your notepads and pencils here.  When you come

20   back into the courthouse, please come directly into the jury room and

21   remain in the jury room until we begin.  And we'll begin at 1:15, and you're

22   excused until that time.

23                   [NOTE: The jury is excused for luncheon recess.  The

24   proceedings are continued outside of the presence of the jury as follows:]

25                   THE COURT: Counsel, we've given to you what we have

-569-

1    designated as a second draft of the proposed charges, and after we adjourn

2    court this afternoon, whatever time that is, I'm going to want to discuss

3    those with you before you get out of here.

4          So I'll see you at 1:15.

5          [NOTE: Whereupon a luncheon recess is taken, after which the

6    proceedings are continued in the presence of the jury as follows:]

7          THE COURT: Ladies and gentlemen, I hope you enjoyed your

8    lunch.  I appreciate you all being back on time.  And you may proceed, Mr.

9    Knoche.

10          MR. KNOCHE: Dan Wise.

11       [Witness Sworn]

12          CLERK: You may be seated.  Please state your name, your

13    occupation, and spell your last name for the record.

14          MR. WISE: Daniel Wise, W-I-S-E.  Occupation is marketing.

15                    D A N I E L   W I S E

16       GOVERNMENT'S WITNESS, SWORN, TESTIFIED AS FOLLOWS

17                    DIRECT EXAMINATION BY

18    MR. KNOCHE:

19    Q    Mr. Wise, where do you live?

20    A    West Palm Beach, Florida.

21    Q    All right, sir, and when you say marketing, what are you doing right

22    now?

23    A    I work for a sales and marketing company.

24    Q    You were originally, until just last week, a defendant in this case

25    pending trial; is that right?

-570-

1    A    Yes, sir.

2    Q    And you have now entered a plea of guilty; is that correct?

3    A    Correct.

4    Q    To a charge of conspiracy to dispense controlled substances without a

5    legitimate medical purpose?

6    A    Yes, sir.

7    Q    And I believe money laundering-related offenses?

8    A    Correct.

9    Q    But that was a one-count plea, and did you understand that now your

10   maximum penalty that you're facing is five years?

11   A    I do.

12   Q    Okay, and but for that plea, if you had gone to trial and been convicted

13   of the offenses you're charged with in the indictment that this jury is

14   hearing, that your penalties could have been much greater.

15   A    I understand, yes.

16   Q    And that is a – the offense you pled to is felony offense, correct,

17   because it carries a penalty of more than a year –

18   A    Yes.

19   Q    – it's a five-year offense.  That is not your – or was not your first felony

20   conviction.

21   A    No, it was not.

22   Q    Can you tell the jury about other felony convictions that you have.

23   A    In 1997 I had a felony conviction of grand theft of a dwelling.  And

24   then just recently involved with this in 2000 – well, 2013 the case was

25   finalized, but it was a probation case for possession of a controlled

-571-

1    substance.

2    Q    And was that a felony as well?

3    A    I believe so, yes.

4    Q    All right, sir.  Mr. Wise, how old are you now?

5    A    Thirty-five.

6    Q    And how long you lived – you say you live in West Palm now?

7    A    Yes.

8    Q    How long have you lived in West Palm?  Is that your hometown –

9    A    – Majority of my life.

10   Q    Most of your life?

11   A    Yes.

12   Q    Have you ever lived in the Savannah area?

13   A    I lived in Pooler, Georgia for a few months.

14   Q    For a few months, okay, and tell us how it was that you came to reside

15   for that brief interval in Pooler, Georgia.

16   A    While working in Boca Raton, Florida for a gentleman by the name of

17   Sean Clark and Adelard LeFrancois for a telemarketing company, they told

18   me that they were opening an office in Savannah – or, I'm sorry, Garden

19   City, Georgia doing pain medicine, or pain clinic, and asked if I'd be

20   interested in coming up and working there as their office manager, just to

21   kind of keep everybody doing what they were supposed to be doing on a

22   day-to-day basis.  So that's how I came about to move up to Pooler.

23   Q    And it's a big move –

24   A    Yeah.

25   Q    – distance-wise, or fairly significant.  What did they offer you in

-572-

1    exchange for your agreement?

2    A    Originally they offered me a salary of $10,000 a month, and paying for

3    my expenses to live, plus my – you know, that's all.  It was just a $10,000 a

4    month salary and my expenses paid.

5    Q    And what were your duties to be?

6    A    Kind of oversee day-to-day operations.  When patients came in just

7    kind of really just make sure everybody was doing what they were supposed

8    to be doing, make sure patients weren't loitering outside.  Basic stuff.  It

9    wasn't like an actual detail put into place.

10   Q    Did you know that it would be a nominal pain management clinic?

11   A    I did.

12   Q    Okay.  A doctor's office?

13   A    Yes.

14   Q    And what kind of patients were you led to believe would be coming to

15   the facility?

16   A    Patients that were seeking pain medication from different areas, from

17   different states.  They wanted to do it in Georgia versus Florida because

18   Florida passed a law where you can't dispense inside the same – if it's a

19   pain clinic they can't also dispense, they'd have to open a separate

20   dispensary.  So they planned to be able to have the prescriptions written

21   and filled in-house, or dispense in-house as well.  They never got that far,

22   but that was the intent.

23   Q    Was Georgia considered to be more hospitable to such a facility?

24   A    Yeah, they picked Savannah, Georgia specifically because of where –

25   or, I'm sorry, Garden City, Georgia specifically because it was located near

-573-

1    I-95, and majority of the patients were driving from the north going to the

2    south, so they thought it would be easier to immediately have traffic

3    without doing a lot of marketing, being if people just knew they were there,

4    they would stop.

5    Q    Do you have any experience of – prior to East Health Center, did you

6    ever work in the medical field?

7    A    Never, no.

8    Q    Any training?

9    A    Zero.

10   Q    Okay.  Had you ever worked for any of the pill mills or a pill mill that's

11   been described –

12   A    No.

13   Q    – earlier, okay.  So this was your first time.

14   A    Correct.

15   Q    Okay, and you said that you're catering to a particular clientele?

16   A    Yes.

17   Q    And how did you identify this clientele?

18   A    Well, originally it was tough, but later on it became very clear that the

19   clientele they were looking for were just basically people that were coming

20   in, and the only thing they needed to show was an MRI.  And they had us

21   going just to different pain clinics, like in Jacksonville where they're

22   actually south of Garden City for the fact that these people were going to be

23   passing us, so they had us go to other pain clinics and let the clients – or

24   the patients know that if they want to come here instead it's closer.  We

25   were told to specifically say that the doctor writes heavy, and that they'll get

-574-

1    what they're looking for, that they just come down to Garden City on their

2    next visit.  We were told to give them discounts on their visit.  Instead of

3    the normal fee, I think they originally started at like 200 or $250, I don't

4    remember the exact amount.

5         But it was just made to sound very easy for the patient to come in and

6    get what they were looking for.

7    Q    And when you say "they" wanted you to do that, who was directing this

8    marketing activity?

9    A    Sean Clark, and I don't remember Frank's last name, Frank, and Adel

10   – or I'm sorry, Al LeFrancois – Adelard LeFrancois and Sean Clark.

11   Q    So they told you to market the clinic?

12   A    Yes.

13   Q    Did you actually participate in that?

14   A    I did.

15   Q    Okay, and where were you – how did you find your target locations to

16   hand out these cards or flyers that you've described?

17   A    They would tell us where to go specifically.  Most of the time it was

18   spent in Jacksonville.  They would have us sit literally outside of another

19   pain clinic and say, when you see patients pull up or when you say patients

20   leave – you know, in some cases they would tell us just to, you know, drive

21   up to them at a red light, or if they stopped for, you know, a burger, get out

22   and talk to them and ask if they saw the doctor, and if not if they want to go

23   up to see our doctor instead.  If they're not happy with the prescriptions

24   they're getting here, our doctor is going to write heavier amount of

25   prescriptions.

-575-

1          We would just – they told us look for license plates that were out of

2     state.  Drive around the local hotels like in the area, like motels, and look

3     for out-of-state patients – or out-of-state cars and put cards on the

4     windows.  Just a lot of day-to-day stuff like that.

5     Q     You indicated that Sean Clark was involved in that activity?

6     A     Yes.

7     Q     And Frank, you couldn't remember his last name.

8     A     Yeah, I cannot remember Frank's –

9     Q     – Can you describe him?

10    A     About 6 foot 3, maybe 6 foot 2.  He looks African-American, but he's

11    actually Italian.  Everybody just called him Frankie, Frankie B.

12    Q     Okay.  Did he have a fairly distinct accent?

13    A     Yeah, very, just kind of sounded like a New Yorker.

14    Q     Did you have friends from South Florida that you encouraged to come

15    with you to work at East Health Center and live in this house that you've

16    described in Pooler, Georgia?

17    A     Yes, I did.

18    Q     And who were they?

19    A     My girlfriend, Shelley, and my best friend, Konstantine Afthinos.

20    Q     And what were their duties to be?

21    A     Shelley was receptionist, and Konstantine did triage.  He would take

22    their blood pressure, urine test, and he would just – he would take that

23    information and make copies of it, and he would turn it in with the patient

24    report to Dr. Azmat, or the doctor onsite.

25    Q     Did either Shelley or Konstantine have any medical training?

-576-

1    A    Zero.

2    Q    They're about your age?

3    A    Yes, we're all relatively the same age, early 30s.

4    Q    Do you remember the address of this house in Pooler?

5    A    I do not.

6    Q    Okay.  When you arrived at East Health Center, did you have a doctor

7    onboard already?

8    A    Yes.

9    Q    When you started working inside the clinic?

10   A    Prior to me working there, there was already a doctor there.  And when

11   I started working there was the same doctor.

12   Q    All right, and your duties were day-to-day management?

13   A    Yes.

14   Q    Were you in any way responsible for handling cash?

15   A    I was.

16   Q    Okay.  What else did you do?

17   A    After the doctor would see patients, he would give us the prescriptions.

18   We would make copies of them, put a photocopy in the client's folder, give

19   the prescriptions to the client.  Just making sure there wasn't chaos in the

20   lobby, and making sure people weren't loitering out front, try to keep them

21   in the back smoking cigarettes.  We would specifically tell people to back in

22   their vehicles so the license plates were not exposed.  And I didn't know

23   why at the time, but later on came to find out, I guess, pain clinics were on

24   the radar, and the way they were finding them was out-of-state license

25   plates.  So we were told to have them park in backwards so it didn't appear

-577-

1   to have out-of-state cars that were in the parking lot.

2   Q    You would tell that to the customers that came to East Health Center?

3   A    Tell it to the customers, and we also would tell it to the security guard

4   that we have onsite.

5   Q    And when a patient arrived at East Health Center, did you ever notice

6   whether they typically came alone or came in groups?

7   A    There were several occasions where we would see the same person

8   show up, but they weren't there to see the doctor.  They would just drive in

9   with anywhere from three or four people to sometimes seven or eight

10   people would get out of one car, and they would all come in with their – you

11   know, their cash and whatever, and they would be there to see the doctor.

12   Q    Have you ever heard the term "sponsor" used?

13   A    Yes.

14   Q    Tell the jury what you understand that to mean.

15   A    What I understand sponsor to be is a person that drives the patients to

16   the pain clinic.  He pays for their – pays for them to go there, he pays for

17   their visit to see the doctor, he pays for their cost if they need to get a new

18   MRI, and in return for that I believe that the patient would give the sponsor

19   a portion of the medicine that was received.  And I don't know what the

20   exact portion was, but we were told around 50 percent.

21   Q    That was an arrangement that you had nothing to do with, the patients

22   made those arrangements –

23   A    – That was between the patient and the person that brought the

24   patient, the so-called sponsor.

25   Q    Did you see the same so-called sponsors show up again and again at

-578-

1    the clinic?

2    A    Yes, there was one gentleman in particular that stuck out, and I believe

3    his name was Leroy.  He would come there quite often, maybe two times a

4    week, sometimes more.  Then he might not show up for a week, and then

5    he would be back there two or three times again.

6    Q    And you indicated that you did have issues with patients arriving with

7    out-of-state license plates.

8    A    Correct.

9    Q    Do you recognize Najam Azmat?

10   A    I do.

11   Q    Okay.  Could you describe him for the record?

12   A    His appearance?

13   Q    Yeah, describe him so that the record will reflect that you've identified

14   him.  What color tie is he wearing.

15   A    He's wearing a red tie.

16                MR. KNOCHE: May I have the record reflect that identification.

17                THE COURT: So noted.

18   Q    Was Dr. Azmat the physician employed by East Health Center when

19   you started working inside the clinic as the manager?

20   A    Yes, he was.

21   Q    And did you have occasion to get to know Dr. Azmat?

22   A    I wouldn't say got to know him but, I mean, day-to-day, just talking

23   office talk, yes.

24   Q    How – who paid him?

25   A    Well, the – you mean ...

-579-

1    Q    Yeah, who paid him?  I mean …

2    A    East Health Center.  I'm the one that handed him the cash.

3    Q    Where'd you get the cash with which you paid him?

4    A    From the daily take of whatever came in that day.

5                    MR. KNOCHE: Could we see 29-2A-23, please.  Excuse me,

6    check that, 29-5A-1.

7    Q    Did you have a surveillance camera, surveillance system?

8    A    Yes, we did.

9    Q    Okay, and why did you have surveillance cameras?

10   A    They put surveillance in, they said it was for – just for security

11   purposes because there was cash onsite, and potentially there was

12   supposed to be medication onsite as well.  Just to prevent people from

13   wanting to break in.

14                   MR. KNOCHE: And 29-5A-8.

15   Q    Do you recognize yourself there?

16   A    I do.

17   Q    Okay, and you saw the other picture a moment ago.

18   A    Yes.

19   Q    What are you doing?

20   A    There it looks like I was doing maybe the daily count.

21   Q    Okay.  Is that counting cash?

22   A    Yes.

23   Q    Okay, and you did that at the end of each and every business day?

24   A    Correct.

25   Q    Okay, and from those proceeds did you pay Dr. Azmat?

-580-

1    A    Yes.

2            MR. KNOCHE: Could we see 29-2A-23.  I'm sorry, 29-2A-23.

3    Sorry, 29-2-23. There we go.  Could you highlight some of that top half of

4    the page.

5    Q    That document has been admitted.  It says daily cash audit report.  Do

6    you recognize that form?

7    A    Yes, I do.

8    Q    Okay, and was that the form that you were perhaps filling out in the

9    photo you saw a moment ago?

10   A    That could have been the form I was filling out, yes.

11   Q    Okay, and it indicates the number of new patients.  What's a new

12   patient?

13   A    New patient is somebody that has not previously been to East Health

14   Center.

15   Q    And it indicates previous-day patients.

16   A    I'm sorry –

17   Q    – Why would you have previous-day patients?

18   A    Previous-day patients, the most common reason for a previous-day

19   patient would be, for example, if you went there to see the doctor today and

20   you did not have a valid MRI, we would send you out for an MRI.  Normally

21   you would get it same day and come back.  Depending on what time you

22   came back, you may not get to see the doctor that day, but you've already

23   paid for your visit, so you'd come back the following day, and we would just

24   mark it down so it would line up with the cash that was received for that

25   day.

-581-

MR. KNOCHE: Okay.  If you could show us the lower half of the form.

Q    See where it says cash from office visits?

A    Yes.

Q    Okay.  Eighteen hundred, what does that mean?

A    That would be eighteen hundred divided by the six patients that were there that day.  The typical payment was, I believe, 250.

Q    In that instance, if it's eighteen hundred divided by six new patients, that would be 300.

A    Right.

Q    But the amount varied; did it?

A    No, it was – like I said, this was a while ago so my numbers may be a little bit off.  250 may have been for the first visit only or for a discount; 300 actually I think was the normal fee that they would pay for a new patient.

MR. KNOCHE: And scroll down a bit more, Dean.

Q    Okay.  In this particular instance it shows doctor pay of $524; is that correct?

A    Yes.

Q    Would that have been paid in cash?

A    That would have been paid in cash.  I'm not sure why it would have been that low unless there was a check included with it.

MR. KNOCHE: I'd like to have you recall 29-2A-21, please.

Q    You recognize that form?

A    I do.

-582-

1    Q    Okay.  What's the date?

2    A    March 9, 2011.

3    Q    And it says how many new patients that day?

4    A    Yes, 13.

5    Q    Okay, and cash from office visits, that would have been cash – or

6    would it have been cash paid by the new patients?

7    A    Yes.

8    Q    So once again 300 times 13 would be thirty-nine hundred?

9    A    Yep.

10         MR. KNOCHE: And scroll down, Dean.

11   Q    And that day does it show the doctor being paid?

12   A    Yes.

13   Q    Okay.  How much?

14   A    $2,000.

15   Q    And that would have been cash?

16   A    Cash.

17   Q    Okay, and then at the very bottom, once you've deducted all of your

18   expenses you have your net deposit.

19   A    Thirteen-forty, correct.

20   Q    And where would that money go?

21   A    That would go into the bank.

22         MR. KNOCHE: And finally, 29-2A-23, please.

23   Q    March the 8th?

24   A    Yes.

25   Q    Okay.  Reflects the same information; right?

-583-

1   A   Correct.

2   Q   And once again shows Dr. Azmat, paid him $2,000 cash.

3   A   Yes.

4   Q   And that was your typical arrangement with him?

5   A   Yes, it was.

6   Q   Did you ever pay him by other means?

7   A   Once in a while if they did not have the funds in cash he was paid with

8   a check.

9   Q   Did Dr. Azmat know that the patients who came to East Health Center

10   were paying cash?

11   A   I believe so, yes.

12   Q   And why do you believe that?

13   A   I couldn't give you an exact reason why.  It was just kind of – I mean,

14   everybody paid with cash.  The doctor knew we didn't take insurance.

15   Never specifically spoke about whether it was check or cash.

16   Q   He knew he was paid in cash; did he not?

17   A   Yes.

18   Q   Is that what he preferred?

19   A   Yes.

20   Q   Did Dr Azmat know about how you had recruited so many people to

21   come here at your clinic?

22   A   Yes.  We didn't have in-depth conversations about it.  It was more of,

23   when we would go out and do marketing we would, you know, say – 'cause

24   there were some times when I first went and started working out of the

25   East Health Center when I was also temporarily doing part-time marketing.

-584-

1   So I was in and out of the office, and I would let everybody know that I'm

2   going to market other pain clinics, you know, to bring in patients.  So that it

3   was something that was very candidly and openly talked about within the

4   office.

5   Q    Did pharmacies ever call back in to East Health Center when they

6   received a prescription from a patient of Dr. Azmat's and –

7   A    Yes.

8   Q    – tell you – question it?

9   A    Quite often.

10   Q    Or not fill it?

11   A    Both.

12   Q    Did patients call and complain?

13   A    All the time.

14   Q    Did patients ever complain to you that they were not satisfied with the

15   amount of drugs they were prescribed?

16   A    Yes, that happened quite often as well.

17   Q    Did you discuss that with Dr. Azmat?

18   A    Yes.

19   Q    And what would he tell you?

20   A    I would get a call from either Sean or Al and was told to go tell Dr.

21   Azmat that he needs to increase what he's writing 'cause the patients are all

22   calling complaining.  And Dr. Azmat would get frustrated and explain that

23   it was his license on the line, that he wasn't going to do what they wanted

24   him to do, and he would increase the patients' prescription on their next

25   visit.  He wanted to show that they weren't starting off at a high amount.

-585-

1    He wanted to show that they were getting less than what they were getting

2    at a previous clinic.

3    Q    Would you thereafter pass that information to the patient?

4    A    Yes, we would tell the patient that on the next visit your amount,

5    whatever you're prescribed, will increase.

6    Q    Did that seem to placate them?

7    A    I mean, they didn't have a choice, so I would say it just kind of – you

8    know, yes.

9    Q    Was Dr. Azmat aware of the sponsor issue, patients coming with

10   groups of individuals –

11                   MR. WITHERS:  – Object to asking the question as a

12   conclusion, Your Honor.  If he knows the facts –

13                   THE COURT:  – Ask him if he knows.  Don't ask him for a

14   conclusion. Ask him if he knows.

15                   MR. KNOCHE: I didn't say did he know.

16   Q    (By Mr. Knoche) Did he know that?

17   A    Yes.

18   Q    How do you know that?

19   A    There was a couple of occasions when the gentleman's name I

20   mentioned before, Leroy, would come into the office, and I had made a

21   statement in front of Dr. Azmat that he brings patients.  And Dr. Azmat

22   said that he doesn't want that person inside the facility, he wants him to

23   stay out in the parking lot.

24   Q    And would you then tell that individual to go out in the parking lot?

25   A    Yep.

-586-

1   Q   And was this an individual that was not –

2   A   – Was not seeing the doctor.

3   Q   Not –

4   A   – I don't believe he ever saw the doctor.

5       MR. KNOCHE: If I may have a moment.

6       [NOTE: Mr. Knoche and Mr. Gilluly confer off the record.]

7       MR. KNOCHE: Pass the witness, Your Honor.

8                   CROSS-EXAMINATION BY

9   MR. WITHERS:

10  Q   Good afternoon, sir.  My name is Tom Withers.

11  A   Good afternoon.

12  Q   I represent Dr. Azmat.  Now, if I understand correctly, you are a three-

13  time convicted felon.

14  A   Correct.

15  Q   A conviction out of Gwinnett County, Georgia last year; correct?

16  A   Correct.

17  Q   Possession of controlled substance; correct?

18  A   Correct.

19  Q   You received a probated sentence for that; correct?

20  A   Correct.

21  Q   That arose out of an arrest up in the Atlanta area on 5/26/11; correct?

22  A   Yes.

23  Q   And you pled guilty to that possession of controlled substance charge

24  last year; correct?

25  A   Correct.

1    Q    And then I believe you testified there had been another conviction,

2    and was that from Florida in 1997?

3    A    Yes.

4    Q    And what was that for, sir?

5    A    Grand theft of a dwelling.

6    Q    Grand theft of a dwelling, and you pled guilty to that charge; did you

7    not?

8    A    Yes.

9    Q    And your sentence for that was?

10   A    Ten months in county.

11   Q    And so you have been to prison before?

12   A    Not prison.  I've been to county.

13   Q    County jail, excuse me.

14   A    Yes.

15   Q    Not a pleasant place; correct?

16   A    Not at all.

17   Q    And you pled guilty last week; is that what I heard you say?

18   A    Correct.

19   Q    Here in this courtroom.

20   A    Yes, I did.

21   Q    You were originally charged in this indictment here that we're about

22   today; correct?

23   A    Correct.

24   Q    Charged in all 52 counts; were you not?

25   A    Yes, I was.

-588-

1    Q    Charged in Count 1 with conspiracy; correct?

2    A    Yep.

3    Q    That was a drug conspiracy; right?

4    A    I believe so.

5    Q    You understood, sir, that that penalty for that charge was a maximum

6    penalty of 20 years.  You understood that; correct?

7    A    Yes.

8    Q    And then you were charged in 49 counts of unlawful dispensation of

9    controlled substances, Counts 2 through 50; correct?

10   A    Yes.

11   Q    And those penalties varied from 5-to-20 years, depending on the

12   controlled substance; correct?

13   A    Correct.

14   Q    And then you were charged in Count 51 of that indictment; correct?

15   A    (No audible response.)

16   Q    That was a distribution of a controlled substance by you to an

17   undercover agent as I understand it.

18   A    Yes.

19   Q    And you did not enter a guilty plea to that charge; correct?

20   A    I don't know.  I don't think so.

21   Q    Okay, all right.  You understood that that distribution charge carried a

22   maximum term of imprisonment of 20 years as well; true?

23   A    Okay.

24   Q    And then, finally, you had a conspiracy to launder proceeds, what is

25   often referred to as money laundering, and that was Count 52 of that

-589-

1    indictment –

2    A    Correct.

3    Q    – do you recall that.  And that's a 20-year offense as well –

4    A    Yes.

5    Q    – do you recall that.  So that you understood, then, that the potential

6    sentence that you were facing was extremely lengthy; fair to say.

7    A    Yes.

8    Q    And what you ended up entering a plea to, however, was a one single

9    count that was not contained in the indictment; correct?

10   A    Correct.

11   Q    So you had the indictment of 52 counts; right?  And all 52 of those

12   counts are being dismissed; correct?

13   A    Yep.

14   Q    And you pled guilty to a single count; correct?

15   A    Correct.

16   Q    That's a count on a five-year conspiracy; true?

17   A    Yes.

18   Q    So you understand as you sit here today that the maximum term you

19   face as a three-time convicted felon is five years; correct?

20   A    Yes.

21   Q    And you have entered into a plea agreement with the government as a

22   result of negotiations with your attorney and counsel for the government;

23   correct?

24   A    Yes, sir.

25   Q    In that plea agreement the government makes certain promises to

-590-

1    you; does it not?

2    A    I don't know if they're promises.

3    Q    Well, let me ask it this way, and I think I'm repeating myself, and if I

4    am I apologize.  But you understand that as a result of your plea to the

5    separate charge, that entire indictment is going away; right?

6    A    Correct.

7    Q    And you understand that the one who decides whether you'll be

8    rewarded for your cooperation by a motion is the government.  You

9    understand that as well; do you not?

10   A    Correct.

11   Q    Now, you knew several of these folks in South Florida; correct?

12   A    Yes, I did.

13   Q    I think you talked about your girlfriend Shelly.

14   A    Yep.

15   Q    Your friend Konstantinos Afthinos.

16   A    Correct.

17   Q    You knew Al LeFrancois.

18   A    Yes.

19   Q    You knew Sean Clark.

20   A    Yes.

21   Q    So you were kind of the connection between the group of, you know,

22   Al and Sean and Mr. Afthinos and –

23   A    Shelly.

24   Q    – Shelly; correct?

25   A    Yes.

-591-

1    Q    And all of y'all – or strike that.

2         Had you ever been to any of the places of employment, places of

3    work, of Mr. LeFrancois when you were in South Florida?

4    A    When you say places of work, are you referring to pain clinics or –

5    Q    – Palm Beach Pain and Rejuvenation –

6    A    No.

7    Q    – Clinic, Margate Pain and Rejuvenation Clinic.

8    A    No.

9    Q    All right.  You understood from Al that he was the brains, I guess,

10   behind opening up a pain clinic here in the Savannah area –

11   A    – Savannah, yes.

12   Q    All right, and the result of which is, all of y'all, six or seven of y'all,

13   eventually moved up here; right?

14   A    Correct.

15   Q    Dr. Azmat didn't know any of those folks down in South Florida; did

16   he?

17   A    I do not know.

18   Q    All right.  Well, you never saw him talking to Al; did you?

19   A    Dr. Azmat was already at the clinic working in Georgia before I was

20   there.  I did not hang out with Al outside of where I worked in Boca, so I

21   don't know anything about their personal connection, or I don't know how

22   he was hired or how that came about.

23   Q    All right.  Did you ever see Dr. Azmat in Florida talking to Mr.

24   Konstantinos Afthinos?

25   A    No.

-592-

1   Q   Shelly Morford?

2   A   No.

3   Q   Mr. LeFrancois?

4   A   No.

5   Q   Anybody else?

6   A   No.

7   Q   And y'all went from South Florida up to Jacksonville area for a period

8   of week where you did what was called marketing; right?

9   A   Correct.

10   Q   Dr. Azmat wasn't out marketing; was he?

11   A   No, he was not.

12   Q   That was you, Frankie, Sean and Konstantinos; correct?

13   A   Yes.

14   Q   Now, you were first interviewed by the DEA agents back in June of

15   2011; do you recall that?

16   A   I do.

17   Q   Two DEA agents were present; correct?

18   A   Yes.

19   Q   Two Chatham County narcotics agents present; correct?

20   A   (No audible response.)

21   Q   If you don't recall you can say –

22   A   – I do not recall the amount of people.

23   Q   And you eventually started cooperating with the government back in

24   July of 2011, I believe; is that correct?

25   A   Yes, correct.

-593-

1    Q    And you went before the grand jury in October of 2011; correct?

2    A    Correct.

3    Q    And by that time you had met with government prosecutors on several

4    occasions; is that accurate?

5    A    Yes, it is.

6    Q    And in those meetings you told them about your knowledge of the East

7    Health Center; did you not?

8    A    I did.

9    Q    And in those meetings you told them you knew about who was doing

10   what; correct?

11   A    Yes.

12   Q    Now, in those meetings you never once mentioned this allegation that

13   Dr. Azmat was aware of sponsors; did you?

14   A    It was not asked of me, correct.

15   Q    So that issue with respect – and you'd met with them on a number of

16   occasions; right?

17   A    Correct.

18   Q    Several different days; right?

19   A    Right.

20   Q    Several hours of interviews; right?

21   A    Correct.

22   Q    And not once did you mention that Dr. Azmat knows about a sponsor;

23   did you?

24   A    Their interviews were not being questioned to me about Dr. Azmat.  It

25   was more of how the marketing, and Al and Sean at that time.  I really don't

1    remember any questions asked of me about Dr. Azmat at that point in time.

2    Q    All right.  By the way, when you went to Jacksonville, it was your

3    impression at that point in time that it was going to be a primary care or

4    urgent care clinic; is that accurate?

5    A    Correct.

6    Q    And – but you were doing this kind of remarkable thing that I think

7    you called gorilla marketing; correct?

8    A    Correct.

9    Q    And that's where y'all would run up to people and hand out cards to

10   them and that sort of thing; right?

11   A    Yes.

12   Q    Now, you never discussed gorilla marketing with Dr. Azmat; did you?

13   A    No.

14   Q    And in fact in all of these hours and hours and hours of conversation

15   that you had with the government prosecutors and investigators over the

16   period of years, you've never once told them that, Dr. Azmat knew about

17   our marketing efforts; have you?

18   A    I don't believe that to be true.  I believe we had discussed it.  I don't

19   know if it was during the grand jury, but I do remember having private

20   conversations where those topics were touched on.  That wasn't the reason

21   for the conversations, but we did have those discussions.

22   Q    With respect to the marketing, you said that you did two weeks of

23   gorilla marketing down in Jacksonville; right?

24   A    Yes, but *Gorilla Marketing* is actually a book.  That's where the term

25   gorilla marketing came from.  It wasn't a term made up.

-595-

1    Q    Oh, okay, all right.

2    A    So just – 'cause you keep referring to gorilla marketing.

3    Q    All right.  I'm sorry, I actually took that term out of your grand jury

4    testimony.

5    A    Right.

6    Q    So let's just call it marketing.  You did two weeks of marketing down in

7    the Jacksonville area.

8    A    Yes.

9    Q    And you said that on occasion you would, as you're leaving, say, I'm

10    going to go marketing, and that Dr. Azmat would hear that; right?

11    A    Correct.

12    Q    Now, the fact is that Dr. Azmat is back – he's not out working out in

13    front in the lobby area; correct?

14    A    Correct.

15    Q    He's back seeing patients; right?

16    A    For the most part, yes.

17    Q    He's not counting money where you were counting money; was he?

18    A    No, he was not.

19    Q    That was something that he never did.  He never sat and counted

20    money with you and Shelly or anybody else; right?

21    A    He never counted it with us.  He was in the room on occasions while

22    we were counting the money, yes.

23    Q    He knew that you received cash.  Not his job or responsibility to count

24    the cash.

25    A    Correct.

-596-

1   Q    That's what Al would hold you accountable for, or Sean would hold

2   you accountable for; right?

3   A    Yes, sir.

4   Q    And when you folks moved up here, you all rented a house out in

5   Pooler; right?

6   A    Correct.

7   Q    All lived in the house in Pooler; correct?

8   A    Correct.

9   Q    And I believe you said that you didn't start up in Savannah the first

10  day that the clinic opened; right?

11  A    Correct.

12  Q    You came several days later?

13  A    I think it was a couple of weeks later –

14  Q    All right.

15  A    – maybe a week or two.

16  Q    So if the clinic opened on February 21, then you and Dr. Azmat would

17  have had a two-week time frame that would have overlapped –

18  A    Roughly.

19  Q    – if you came up two weeks later; fair to say?

20  A    Sure.

21  Q    All right.  Now, during that period of two weeks, it is fair to say that

22  you never went to lunch with Dr. Azmat; right?

23  A    No.

24  Q    Dr. Azmat would sit in his office and eat lunch alone; right?

25  A    Sometimes.

-597-

1    Q    You never – well, he never went to lunch with anybody else there; did

2    he?

3    A    We never went to lunch.  We all ate lunch in the office, and there were

4    occasions where we had lunch – I'd have lunch in his office with him so ...

5    Q    You never went out for afternoon or evening activity with Dr. Azmat.

6    A    No, we did not.

7    Q    You and Dr. Azmat were not friends or companions; were you?

8    A    We were not.

9    Q    You didn't go out to dinner with Dr. Azmat.

10   A    Correct.

11   Q    Dr. Azmat didn't go over to your place at Pooler; right?

12   A    No, he didn't.

13   Q    Dr. Azmat would work and either go home or go to the hotel; correct?

14   A    Correct.

15   Q    In your dealings with Dr. Azmat, he was always polite to you; wasn't

16   he?

17   A    Yes.

18   Q    He was always professional to you; wasn't he?

19   A    Yes.

20   Q    When you saw him interacting with other office members, he was

21   always polite to them; wasn't he?

22   A    I believe so.

23   Q    He was always professional to them; wasn't he?

24   A    Yes.

25   Q    And when you saw him interacting with patients, he was always polite

-598-

1    and professional to those patients; wasn't he?

2    A    Yes, he was.

3    Q    Now, I believe that you also have testified earlier that you went to

4    Florida one week and then learned that Dr. Azmat got fired; correct?

5    A    I don't remember the time frame, if I was there or in Florida.  If I said

6    that in my grand jury statement, then I'm sure that's where I was.

7    Q    Okay.  If your grand jury statement reflects that – the question was

8    [reading]: So Dr. Azmat then, did you terminate him or what?

9    And the answer, Page 42, Line 8 [reading]: Answer.  I don't know

10   what they did.  I went to Florida for a few days the week that they let him

11   go.

12   A    Okay.

13   Q    Is that fair?

14   A    Yeah, I wasn't in charge of hiring or firing.

15   Q    Okay.  So that the week that Dr. Azmat got fired, you were gone for

16   several days; correct?

17   A    Okay.

18   Q    And so, again, if you didn't come for two weeks, and then you leave for

19   several days that last week, that means you were actually working there at

20   the East Health Center for about a week and a half when Dr. Azmat was

21   there; true?

22   A    I believe it to be longer than that, and I also believe that the time that I

23   was not there and he was let go was over a weekend when nobody would

24   have been there.  I believe he was either let go Friday or on a Monday

25   morning when – I would go to Florida every weekend.  I'd go there Friday

-599-

1    after work and I'd come back Sunday.  So I think I was in Florida when it

2    actually happened.  I don't know if it was in person or over the phone, but I

3    wasn't away, so to speak, when we were supposed to be at work.

4    Q    All right.   But your testimony – and your grand jury testimony was in

5    October of 2011.

6    A    Okay.

7    Q    All right?  In October of 2011 your memory of the events surrounding

8    February and March of 2011 was much clearer; is that fair to say?

9    A    Sure.

10   Q    And your testimony at that point in time was that you went to Florida

11   for a couple of days that week, and you learned he gets fired; correct?

12   A    Correct.

13   Q    Now, you also know this, do you not, that every patient that left East

14   Health Center wasn't completely happy with what they were being

15   prescribed; right?

16   A    Correct.

17   Q    So that a patient might come in and have a prescription for 240 pills

18   for a month, and be cut down by the doctor – Dr. Azmat – to 90 pills for the

19   month.  That's fair; isn't it?

20   A    Okay.

21   Q    Is that fair or not?  Don't –

22   A    – I don't remember the amounts.  If you have something for me to

23   review I could …

24   Q    Do you recall testifying before the grand jury –

25                MR. WITHERS: And I'm at Page 47, Line 1.

-600-

Q    – [reading]: But maybe one month they were written 240 of

something, and then they saw our doctor, he would cut them down to 90.

A    Yes, that sounds like something I would have said.

Q    And the patient didn't like that.

A    Correct.

Q    And in fact, if a patient came in being prescribed 240 prescriptions a

month, but left with a prescription for 90, that would be an unhappy

patient; correct?

A    More than likely, yes.

Q    And I'm showing you what has been marked as Government's Exhibit

5-012.  This is from 2/21, a patient by the name of David Letner, and it's

amazing that you mentioned that 240 and 90 because, voilà, here we have

oxycodone 30 milligrams, 240; correct?

A    Okay.

Q    And then he obtained a prescription for oxycodone 30, 90 milligrams

(sic); correct?

A    Correct.

Q    And the fact is, sir, is it not, that Dr. Azmat was routinely – routinely –

reducing the number of tablets that patients were getting.

A    That is correct.

Q    And Dr. Azmat was routinely discontinuing the Xanax that patients

were getting.

A    That I do not know.

Q    Okay.  Did your friends from South Florida ever tell about the cocktail

of prescriptions that certain patients liked to get of oxycodone, Xanax,

-601-

1    Soma?  Did you find that out when you were in this East Health Center

2    business?

3    A    I don't remember them saying a specific pill that they were used to

4    getting.

5    Q    And there were a lot of unhappy patients, then, coming out of East

6    Health Center; correct?

7    A    Yes.

8    Q    And on occasion those patients would get mad, and they'd get mad at

9    you; correct?

10   A    Correct.

11   Q    Now –

12   A    – Well, okay.  They weren't mad at me, they were mad because I

13   couldn't do anything about the doctor writing a higher a prescription.

14   Q    Exactly.  And when you had the confrontation – or not a

15   confrontation, I don't think you described it as a confrontation.  But the

16   patients were complaining to you, and so you spoke with Dr. Azmat.

17   A    Yes.

18   Q    And if the patient that recalls that particular conversation was a fellow

19   by the name of Smith that testified earlier, and if that was June 10th, does

20   that seem to be about the period of time that you would have had that

21   conversation with – excuse me, March 10th, does that seem to be about the

22   right time?

23   A    It could have been.  I ...

24   Q    Okay.  That's fair to say.  But what happened is that Dr. Azmat told

25   you that it was him that was the doctor, and he was going to do what he

-602-

1    thought he should do.  That's fair to say; isn't it?

2    A    Yes, and he would – with that same statement, though, he said he

3    would increase their dosage on their next visit.

4    Q    Now, that happens on June 10th (sic), and did you say words to Dr.

5    Azmat to the –

6              MR. KNOCHE: – March 10th.

7    Q    I keep saying June.  I'm just tired, I'm sorry.

8    A    That's okay.

9    Q    March 10th.  Did you say words to the effect to Dr. Azmat, you gotta get

10   on the team?

11   A    I don't remember.

12   Q    If you don't remember just – that's fine.

13   A    Yeah, I don't remember saying that.

14   Q    I'm going to show you from the very next day, March 11, when Dr.

15   Azmat sees a patient by the name of Sherry Fields who went from

16   oxycodone, 210 tablets to oxycodone 150, I believe that says.  Do you see

17   that?

18   A    Yes.

19   Q    Oxycodone 15 milligrams, 120 tablets down to 60.  Cuts that in half;

20   correct?

21   A    Yes.

22   Q    She reported being on Xanax 2 milligrams, 60 tablets, and Dr. Azmat

23   discontinued the Xanax.  Do you see that?

24   A    I do.

25   Q    And do you – and I'm going to show you –

-603-

1    MR. WITHERS:  – That was, for the record, 23-015 of the

2    government's exhibits.

3    Q    And I'm showing you, sir, what's been marked as Exhibit 23-018 of the

4    government's exhibits.  Do you see under the oxycodone 30 milligram

5    tablet where Dr. Azmat writes on there, all or none?

6    A    Yes.

7    Q    Do you know what that means, sir?

8    A    Yes, I do.

9    Q    And what does that mean?

10   A    That means the pharmacy has to fill all of those prescriptions.  They

11   cannot just get the oxycodone.

12   Q    Did that make the patients unhappy as well?

13   A    I don't know if it made them unhappy.  I think sometimes they

14   couldn't afford it.  That was their biggest complaint, was, they couldn't

15   afford all of the prescriptions.

16   Q    And did you – do you recall telling Mr. Afthinos that Dr. Azmat was

17   being a disaster in his treatment of the patients?

18   A    I don't recall the conversation.

19   Q    Do you recall telling Mr. Afthinos that Dr. Azmat was spending too

20   much time with the patients?

21   A    I don't recall the conversation.

22   Q    Now, your testimony is that Dr. Azmat said, oh, well, I'm going to

23   increase it some time later; correct?

24   A    Correct.

25   Q    But what was occurring in fact is that every one of these patients was

-604-

1    coming in getting a lesser dosage than they had previously been on; is that

2    fair to say?

3    A    Fair to say, yes, sir.

4    Q    And that other medications were being discontinued; fair to say?

5    A    Fair to say.

6    Q    So on the crucial first visit to the East Health Clinic, that patient is

7    going home unhappy because he or she has gotten a lot less medication

8    than they wanted to obtain; is that fair to say?

9    A    That's fair to say, yes, sir.

10   Q    And so it's your testimony that what Dr. Azmat said is, oh, well, after I

11   make every one of these people unhappy, I'm going to increase their dosage

12   if and when they happen to come back?

13   A    On the situations where the people had complained, yes.

14   Q    This story about – this statement about Dr. Azmat increasing the

15   dosage units later, you didn't tell that to the grand jury; did you?

16   A    I do not remember.

17   Q    In your multiple meetings with the government back in 2011, you

18   didn't tell that to the government agents then; did you?

19   A    I – I thought that I did.  It seems like something that we would have

20   discussed.  But I do not remember.  This has been going on for a few years

21   now.

22   Q    By the way, you mentioned that Dr. Azmat, he's back in the back

23   working; right?

24   A    Yes.

25   Q    Back in the patient rooms working; correct?

-605-

1    A    Correct.

2    Q    He's not out in the lobby meeting and greeting patients when they're

3    coming in; correct?

4    A    No, correct.

5    Q    That didn't happen; did it?

6    A    No.

7    Q    He's not out walking around in the parking lot; is he?

8    A    No, he's not.

9    Q    And as I understand it, when you first got there you had these rules

10   about backing in, and you didn't come to understand that that was an issue

11   until several days or weeks later; correct?

12   A    Correct.

13        MR. WITHERS: If I could have just one moment, Your Honor.

14        [NOTE: Mr. Withers confers with defendant off the record.]

15        MR. WITHERS: Thank you, sir.

16        THE COURT: Anything else of this witness, counsel?

17        MR. KNOCHE: Briefly, Your Honor.

18                    REDIRECT EXAMINATION BY

19   MR. KNOCHE:

20   Q    Mr. Wise, I'm going to show what's 34-6, approaching you.  You

21   recognize that as a redacted plea agreement of yours?

22   A    Yes, I do.

23   Q    Okay, and that has all the promises made by the United States to you

24   in this prosecution?

25   A    Yes, it does.

-606-

1   Q     Okay, and you're hoping, as you testified earlier, that you get some

2   break for cooperating; right?

3   A     Correct, I do.

4   Q     Does that plea agreement require you by the terms of this agreement

5   to tell the truth?

6   A     Yes, it does.

7                     MR. KNOCHE: Show us 29-5A-4.

8   Q     From your surveillance camera at East Health Center?

9   A     Yes.

10  Q     Was that a typical scene prior to opening your doors each day?

11  A     Yes, it was.

12  Q     Okay, and that is the front door?

13  A     Yes.

14  Q     Okay.  What door did Dr. Azmat come in?

15  A     The front door.

16  Q     So would he have seen those patients –

17  A     Yes.

18  Q     – congregating.  You were shown the patient file of a David Letner just

19  a moment ago.  I'm going to show you that, if I may, Government Exhibit 5.

20  I'm passing you 5.  Do you see any prior physician records in Government

21  Exhibit 5, Mr. Wise?  If you'd thumb through that for just a moment.  And

22  if you do, just let us know when you see them.

23        [Pause]

24  A     I do not see any.

25  Q     Was that part of the protocol at East Health Center that a patient

-607-

1    would bring prior physician records?

2    A    No, that was not required.

3              MR. KNOCHE: So call up for the screen, Dean, 5-012 again.

4    Scroll down a bit.

5    Q    So those numbers, the previous medication, 240 oxy 30 and – I can't

6    even read it, it might be 180 oxy 15, how did you verify that?

7    A    Most occasions we did not have any way of verifying that.

8    Q    Did you ever verify it?

9    A    On occasion, yes, only if the patient actually brought in their

10   prescription history, which didn't happen very often.

11   Q    Did you see a prescription history in that file?

12   A    I do not.

13   Q    And you just looked through it; right?

14   A    There's no –

15   Q    – So Dr. Azmat is relying solely on whatever the patient tells him; is

16   that right?

17   A    It is, correct.

18   Q    Okay, and was that typical of most patients?

19   A    Yes.

20   Q    And you didn't at first remember what David Letner was prescribed on

21   February the 21st, but do you remember what his mom and dad got without

22   looking at the file?

23   A    No.

24   Q    Do you remember that same day, Latina Simpson, her father-in-law,

25   and her husband got that same day?

-608-

1    A    No.

2              MR. KNOCHE: That's all I have, Your Honor.  I'd like to tender

3    his plea agreement.

4              THE COURT: Admitted.  Anything else of this witness, Mr.

5    Withers?

6              MR. WITHERS: Very briefly, Your Honor.

7                          RECROSS-EXAMINATION BY

8    MR. WITHERS:

9    Q    Sir, I'm going to show you what's been marked as Government Exhibit

10   29-1A-043.  You recognize that document; do you not?

11   A    Yes.

12   Q    That's the kind of daily recording of the patient name and the amount

13   paid; correct?

14   A    Yes.

15   Q    So on that date seven patients were seen; correct?

16   A    According to this, correct.

17   Q    Then moving to the first of March, Exhibit 21-1A-036, it appears to be

18   a Tuesday, nine patients were seen; correct?

19   A    Correct.

20   Q    So during Dr. Azmat's time there was not some huge crowd waiting

21   out front; was there?

22   A    Every morning the patients were waiting out front for the doors to

23   open.

24   Q    Well, those days there, seven patients, nine patients.

25   A    There's several days where there wasn't necessarily just the patients,

-609-

1    there was people that were driving up with the patients, there was the

2    sponsors that were waiting to be seen that I didn't have their money yet.  I

3    mean, I could speculate all day on how many patients were out in the

4    parking lot.  It was day-by-day, but there was – averagely each day there

5    was several patients standing outside.

6    Q     What was the average number of patients seen during Dr. Azmat's

7    three-and-a-half weeks that he worked?

8    A     I do not know.

9            MR. WITHERS: All right, thank you.

10           THE COURT: Anything else of this witness?

11           MR. KNOCHE: No, Your Honor.

12           THE COURT: Can he be excused?

13           MR. KNOCHE: Yes, Your Honor.

14           THE COURT: All right, you're excused, sir, thank you.

15       [Witness Excused]

16           THE COURT: Call your next witness, please.

17           MR. WISE: Do I leave this here, Your Honor?

18           MR. KNOCHE: Let me recover that.  Michael Palmer.

19       [Witness Sworn]

20           CLERK: You may be seated.  Please state your name and your

21   occupation, and spell your last name for the record.

22           MR. PALMER: Michael Palmer, IRS Special Agent.  Last name

23   is spelled P-A-L-M-E-R.

24               M I C H A E L   P A L M E R

25       GOVERNMENT'S WITNESS, SWORN, TESTIFIED AS FOLLOWS

-610-

<u>DIRECT EXAMINATION BY</u>

<u>MR. KNOCHE</u>:

Q     And briefly for the jury, Agent Palmer, what does an IRS Special Agent do?

A     We investigate allegations of tax violations, as well as money laundering violations.

Q     And do you from time to time have the occasion to conduct record searches, your agency, for income tax information?

A     Yes, I do.

Q     And would that include Form 1040 U.S. Individual Income Tax Return information?

A     Yes.

Q     And during the course of this investigation did you cause a search to be done of the income tax record of Najam Azmat for calendar year ending December 31, 2011?

A     Yes, I did.

Q     To your knowledge, was 2011 the year that Dr. Azmat received cash and check income from East Health Center?

A     Yes.

          MR. KNOCHE: May I approach the witness, Your Honor?

          THE COURT: Yes, sir.

Q     And I'll show you what's been marked Government Exhibit 32. And what is Government Exhibit 32?

A     It is a Certification of Lack of Record, is what it's titled.

Q     And in IRS parlance, what does a lack of record mean?  That the

-611-

1    individual did or did not file an income tax return?

2    A     It means that the individual did not file an – excuse me, income tax

3    return for the tax year 2011.

4                     MR. KNOCHE: That's all I have of the witness.

5                     THE COURT: Any questions of this witness?

6                     MR. WITHERS: No, Your Honor.

7                     THE COURT: All right, you may come down, Agent Palmer,

8    thank you.

9          [Witness Excused]

10                    MR. KNOCHE: Yes, and I tender Exhibit 32, Your Honor, if I

11   haven't done that.

12                    THE COURT: Admitted.

13                    MR. KNOCHE: At this point we're going to – if I may call my

14   next witness, Dr. Gene Kennedy.

15         [Witness Sworn]

16                    CLERK: You may be seated.  Please state your name and your

17   occupation, and spell your last name for the record.

18                    DR. KENNEDY: Gene Scott Kennedy, M.D.  K-E-N-N-E-D-Y.  I

19   am a physician from St. Simons Island, Georgia.

20                    G E N E   S C O T T   K E N N E D Y,  M. D.

21         GOVERNMENT'S WITNESS, SWORN, TESTIFIED AS FOLLOWS

22                           DIRECT EXAMINATION BY

23   MR. KNOCHE:

24   Q     And Dr. Kennedy, let me just admonish you for a moment.  The

25   reporter has to hear everything that's said, and there is a live microphone

-612-

1    in front of you, and so if you would be sure to speak loudly enough so that

2    the court reporter can get a good record.

3    A    Yes, sir.

4    Q    Dr. Kennedy, what is your occupation?

5    A    I have a medical pain management clinic on St. Simons Island,

6    Georgia.

7    Q    And what kind of – you say it's a pain management clinic.  What kind

8    of patients do you see there?

9    A    The majority of my patients are referred to me from neurosurgeons,

10   orthopedic surgeons, other people in the community who have patients

11   that are going to require long-term medical management.

12   Q    Do you have a Georgia medical license?

13   A    I do.

14   Q    And do you have a registration from the Drug Enforcement

15   Administration which allows you to write prescriptions for controlled

16   substances?

17   A    I do.

18   Q    What is your educational background?

19   A    I have a bachelor's degree from Louisiana State University; a Doctor of

20   Medicine Degree from New York Medical College.  My residency was in

21   family medicine in Wheeling, West Virginia, and I have a diplomate status

22   from The American Board of Pain Management.

23   Q    How long have you been licensed to practice medicine in Georgia?

24   A    Since 2001, I believe.

25   Q    And your practice on St. Simons Island, your pain management

-613-

1   practice, how long have you specialized in pain management?

2   A    Since 2000 – the very beginning of 2005.

3   Q    And describe pain management clinic.  You may prescribe controlled

4   substances; is that correct?

5   A    That is correct.

6   Q    What other things do you do to manage pain?

7   A    When patients are referred to me, I evaluate them, and based on their

8   complaint and what seems to be the appropriate prescribed treatment, they

9   may get physical therapy, they may be referred onwards, they may be

10  managed without scheduled medications, they may receive scheduled

11  medications.

12  Q    You mentioned that you have a credential from The American Academy

13  of Pain Management.  When did you obtain that?

14  A    That goes back, if I recall, to 2008.

15  Q    And tell the members of the jury, what training, if any, are you required

16  to undergo to get that credential?

17  A    The American Academy of Pain Management credentialing process is

18  something that essentially any physician can obtain, and it requires two

19  years of previous experience in handling pain management patients.  It

20  requires three credentialing letters from physicians in the community, three

21  letters of recommendation, and 100 hours of continuing medical education,

22  of which 50 currently have to be in pain management.

23  Q    And has the State of Georgia ever sought out your medical expertise?

24  A    Yes, sir.

25  Q    And can you describe that for the jury, please.

-614-

1    A    In the past we've been contacted by The Georgia Medical State Board to

2    act as a peer reviewer for The Georgia State Medical State Medical Board.

3    Q    And the members of the jury may not know what a peer reviewer is, so

4    why don't you describe that process?

5    A    A peer reviewer is someone who reviews medical charts for the medical

6    board to render an opinion on whether or not an action needs to be taken

7    against a physician in the state of Georgia.

8    Q    And the files that you are peer reviewing, does that specifically deal with

9    charts wherein narcotics have been prescribed?

10   A    So far, yes, sir.

11   Q    And how often has the state board sought your expertise of that area?

12   A    I don't know the exact number of times, and I think I had not reviewed

13   charts for the medical board in perhaps a year or two; but prior to that, there

14   were a fairly good number.

15   Q    And have other –

16   A    – I would say at least half a dozen times.

17   Q    Have other government agencies sought your expertise?  For example,

18   the Glynn County DA's office?

19   A    Yes, sir.

20   Q    GBI?

21   A    Yes, sir.

22   Q    The DEA?

23   A    Yes, sir.

24   Q    And U.S. Department of Justice.

25   A    And the FBI, yes, sir.

-615-

1    Q    And the FBI.  Have you ever testified as an expert witness?

2    A    This is my third time.

3    Q    Third time in federal court?

4    A    Yes, sir.

5    Q    And you previously testified in this courtroom, I believe.

6    A    It was in this building.  I don't remember if it was this courtroom.

7    Q    And in the U.S. District Courthouse in Brunswick, Georgia?

8    A    Yes, sir.

9    Q    And this is your third time?

10   A    Yes, sir.

11   Q    Have you ever testified before any federal administrative board

12   regarding DEA registration – registrants, I should say?

13   A    Yes, sir, on an occasion in Beaufort, South Carolina.

14   Q    Have you been paid for your work as a medical expert?

15   A    Yes, sir.

16   Q    And are you familiar with what a controlled substance is?

17   A    Yes, I am.

18   Q    And would you describe for the jury, just give them a brief outline of the

19   various control schedules.

20   A    The scheduling of medications goes back, I believe it's listed in the

21   Nixon administration with the passage of the Controlled Substances Act

22   where medications were put in various schedules.  They're called, Schedule I,

23   I through V, depending on their addictive quality or their abuse potential and

24   whether or not they have a legitimate medical use.

25          So a Schedule I drug would be a drug such as LSD or peyote where it

-616-

1    has a high abuse potential and no recognized medical treatment purpose.

2          A Schedule II medication would be a medication that has a high abuse

3    potential but has medical indications.  And then it goes down from there.

4    Q    Give us some examples of Schedule II controlled substances.

5    A    A Schedule II controlled substance would be oxycodone or morphine.

6    Q    And other common drugs which might be included in Schedule IIs that

7    you're familiar with that you might prescribe in your practice.

8    A    By and large, those would be Schedule II opioid drugs.

9    Q    Is Percocet such a drug?

10   A    It is.

11   Q    Oxycodone?

12   A    Yes.

13   Q    OxyContin?

14   A    Yes, sir.

15   Q    And Schedule III?

16   A    Schedule III are medications that have a medical purpose, have a

17   legitimate medical purpose, and a somewhat lower abuse potential.

18   Q    But still a significant potential for abuse?

19   A    Yes, sir.

20   Q    Schedule IVs, give –

21   A    – And it goes down from there.  Lorcet or hydrocodone preparations –

22   Q    Would be Schedule IIIs.

23   A    – as they're sold in the U.S., hydrocodone preparations would be

24   Schedule III.

25          Schedule IV medications would be benzodiazepines and those kind of

-617-

1    medications.

2         Schedule V would be kids' cough syrup.

3    Q    And when we say benzodiazepine, what are some of the names that the

4    jury may have heard for a drug which is a benzodiazepine?

5    A    Valium, Ativan, Xanax.

6    Q    As a pain management physician, you prescribe controlled substances

7    such as oxycodone or hydrocodone when you deem it appropriate?

8    A    I do.

9    Q    And it is not your view that people should be denied such pain

10   medications.

11   A    No, sir.

12   Q    Are you familiar with the standards and the guidelines of The Georgia

13   Composite State Medical Board concerning the prescription of controlled

14   substances for the treatment of pain?

15   A    Yes.

16   Q    In fact, have you presented some public comment on these guidelines at

17   meetings of The Georgia Composite Medical Board?

18   A    I did.

19   Q    Was that back in 2011?

20   A    Yes.

21   Q    Are you familiar with national policies such as those in the Federation

22   of State Medical Boards model policy?

23   A    Yes.

24   Q    Are the standards similar?

25   A    Yes, they –

-618-

1    Q    – The Georgia and the federal standards?

2    A    They are.

3    Q    And are you familiar with standard reference materials as they relate to

4    the practice of medicine, and in particular pain management?

5    A    There are a lot of references that relate to the practice of medicine and

6    in pain management.  I am familiar with some.

7    Q    And do some of those materials include The Physician's Desk

8    Reference?

9    A    Yes, sir.

10   Q    The Merck Manual?

11   A    Yes.

12   Q    Various textbooks on pain and pain management?

13   A    Yes.

14   Q    And do you consider those standards in your own practice?

15   A    Yes.

16   Q    And do you consider those standards when you have been called upon

17   in the past to render expert opinions on the prescribing practices of other

18   physicians?

19   A    Yes.

20            MR. KNOCHE:  With that foundation, I would like to tender Dr.

21   Kennedy as an expert witness in the field of pain management.

22            THE COURT: Any *voir dire*?

23            MR. WITHERS: If I could, I would, with – subject to my previous

24   motion that we filed, would renew that, and I understand the Court's ruling.

25   With respect to the issue of *voir dire*, I think that Mr. Knoche has established

-619-

1    the minimum criteria necessary under Rule 702, and I would like to reserve

2    other issues regarding the weight and credibility of that, including his

3    training and experience, with the Court's permission.

4    　　　　　THE COURT:  But you do not wish to voir dire the witness now

5    on the tender of Mr. – or offer of Mr. Knoche that this witness be admitted as

6    an expert to testify in the field of pain management.

7    　　　　　MR. WITHERS: I do not, Your Honor, and I'll reserve all those

8    other questions with respect to weight and credibility.

9    　　　　　THE COURT: All right, he's admitted, Mr. Knoche.

10   Q    (By Mr. Knoche)  Dr. Kennedy, we've talked about some of the reference

11   materials and standards used to determine if controlled substances are

12   appropriate to be prescribed.  Is the medical history of the patient relevant?

13   A    Yes, of course.

14   Q    And why is that?

15   A    It's impossible to render a diagnosis, certainly on a chronic patient,

16   without a medical history.

17   Q    And how is a medical history usually taken from a patient?

18   A    Most offices will have a patient history intake form, and the physician,

19   having reviewed that, will discuss any issues that are on there with the

20   patient and, additionally, their treatment records from other physicians'

21   offices.

22   Q    And is it your practice to – an accepted practice to request records from

23   other physicians when determining if it's appropriate to prescribe controlled

24   substances?

25   A    Yes, sir.

-620-

1   Q    And tell us about the importance of a physical exam.

2   A    A physical exam is the second part, or another major part of what helps

3   a physician render a diagnosis and decide on a treatment.

4   Q    Have you heard of treatment plans?

5   A    Yes, sir.

6   Q    And what is – it seems obvious. What is a treatment plan?  What does it

7   – what is it's purpose?

8   A    A treatment plan is what the physician and the patient agree on as a

9   course that they are going to proceed with to hopefully help improve their

10  life.

11  Q    When creating that treatment plan, is it appropriate in all cases to

12  include – consider the use of non-controlled drugs?

13  A    Is it appropriate in all cases –

14  Q    – Is to consider the use of non-controlled drugs?

15  A    Yes, sir.

16  Q    Is it appropriate to consider referrals to specialists?

17  A    Yes.

18  Q    What type of specialist might one in chronic pain expect to be referred

19  to from time to time?

20  A    In a practice that is handling a lot of patients who have chronic pain

21  issues, I would expect that there would be referrals for physical therapy,

22  occupational therapy, perhaps interventional pain management,

23  orthopedics, neurology, neurosurgery.  All are possibilities.

24  Q    And if a referral is made, should that be indicated in the patient's chart?

25  A    Yes, sir.

-621-

Q    And is the treatment plan something which is written?

A    A treatment plan should be noted at the bottom of the encounter note. That's usually the last entry on the encounter note, is the physician's plan.

Q    To state the objectives of the plan.

A    Yes.

Q    And what would – in your practice as an example, what would be an objective of the pain management treatment plan?

A    In pain management, especially when you're talking about controlled medications, the plan of treatment has to be based on anticipated outcomes and what it is that you're hoping your patient is going to be able to achieve, how they're going to be able to benefit from taking scheduled medications.

Q    You've talked about obtaining prior physician records, and Dr. Kennedy, in the case of individuals with chronic pain issues and, for example, which are resulting from a motor vehicle accident, would you expect that there would be such records?

A    Yes, sir.

Q    And would you guess that the older the injury, the longer the clinical file would be?

A    Yes, sir.

Q    And how about the patient's prescription records?  What should we expect?

A    Those have not always been available in all states and, in fact, only fairly recently have been available in the state of Georgia.  But some states have had prescription monitoring programs over the last number of years, and those can be important because they can tell how frequently patients are

-622-

1   getting their pain medications filled, where they're getting them filled, who is

2   prescribing them, that sort of thing.

3   Q     And what are ways that a pain management doctor, or any doctor,

4   might go about documenting and reviewing the patient's prescription

5   record?  Where might it come from?

6   A     Of a great deal of importance would be to have the previous physician's

7   treatment records.

8   Q     And sometimes pharmacy records?

9   A     Yes, sir.

10   Q     Should that prescription record be reviewed and discussed with the

11   patient before prescribing a controlled drug?

12   A     Should it be reviewed and discussed with the patient?

13   Q     Yes, the prescription record.

14   A     Well, in my opinion, it should be reviewed.  I don't know about

15   necessarily discussed, but it should be reviewed.

16   Q     Do the standards require that the physician discuss the risks and

17   benefits of the use of controlled substances with the patient?

18   A     Yes.

19   Q     And does that include explaining the risks and benefits of the drug

20   which is being considered for prescription?

21   A     Yes.

22   Q     When embarking on what appears to be the long-term use of an

23   addictive substance such as a Schedule II drug, is it appropriate to – or wise

24   to hold family conferences?

25   A     It can be useful.

-623-

1    Q    Is it appropriate to explain the differences between dependence,

2    tolerance, and addiction?

3    A    That also can be important.

4    Q    What are the differences?

5    A    Dependence is a physiologic state that begins to occur after a patient has

6    been on a scheduled medication, on an opiate medication for a long time.

7    And it is indicated that one of the things that demonstrate dependence is

8    when a patient has also developed tolerance, where they require more of any

9    given agent to achieve the same effect.  So that's chemical dependence and

10    tolerance.  And was there –

11    Q    – Addiction.

12    A    And addiction is where someone has chemical dependency that they

13    pursue despite obvious adverse effects to themselves.

14    Q    How importance is it to maintain regular monitoring of the patient who

15    is on controlled substances?

16    A    In my opinion, it's important.

17    Q    Should follow-up examinations be conducted?

18    A    Yes, sir.

19    Q    And record keeping, discuss record keeping standards.

20    A    Well, as far as the standards are concerned, certainly physicians are

21    required to document what it is that they're prescribing, how much of what it

22    is that they're prescribing, as well as why they are prescribing it.

23    Q    And record keeping requirements, I'm assuming, are important.

24    A    They are.

25    Q    Dr. Kennedy, in this case you have reviewed 25 patient files which are

-624-

1    the subject of the indictment that the jury is hearing.  I would like to discuss

2    with you each of those patient files and ask you your opinion about the

3    medical legitimacy of the prescriptions which were alleged.  So you may have

4    some records with you if you need to refer to them.

5         Jim Brooks would be the first patient I'd like to discuss with you.  What

6    did you determine from the evaluation of the file of Jim Brooks, which is

7    Government Exhibit Number 1?

8    A    In my opinion, it was not legitimate medical management.

9    Q    And would you state the basis for your opinion, sir?

10   A    This patient on presentation – this is a summary of all the information

11   that's in the chart – but on presentation the patient had a rated pain level of

12   9.  Physical examination notwithstanding, he had a urine toxicology screen

13   that was entirely negative despite being prescribed – I'm sorry, sir.

14   Q    Keep your voice up.  I think counsel's having a hard time.

15   A    Where should I be speaking?

16   Q    Let me come and maybe I can . .. I think the microphone is somewhat

17   obstructed.  I know it is a narrow area –

18   A    – Oh, I'm sorry.  I had my book over it.

19   Q    And, I'm sorry.  This patient you determined to be  63 year old from

20   Kentucky?

21   A    Yes, that's correct.

22   Q    And was there an MRI in the file?

23   A    There was.

24   Q    How old was it?

25   A    The MRI was from 2009.

-625-

1    Q    And in your opinion, did that reveal findings which, of themselves,

2    supported the prescription of narcotic medication?

3    A    No.

4    Q    And describe for the members of the jury the physical examination

5    which is contained in the notes in Exhibit 1?  And I'm speaking specifically of

6    February the 21st of 2011.

7    A    Initially, the patient – essentially the physical exam noted no neurologic

8    findings, and lumbar flexion, forward bending, 45 degrees, and tender low

9    back.  Otherwise normal.

10   Q    And when you we talk about – since we may hear that term from time to

11   time – lumbar flexion, is that if I were to bend from the waist?

12   A    Yes, sir.

13   Q    Okay, and if I were to make my chest parallel to the ground, that would

14   be –

15   A    90 degrees.

16   Q    – 90 degrees?  What's considered a good range of motion?

17   A    60 and above.

18   Q    60 and above, all right.  This individual you indicated was negative for

19   controlled substances; is that right? Negative urine drug screen –

20   A    – On the urine drug screen, yes, sir.

21   Q    And what, if any, indication would that be to you as a pain management

22   expert?

23   A    If the physician is coming – if the patient is coming from another

24   physician who has prescribed scheduled medications, they should be present

25   in the urine toxicology screen.

-626-

1    Q    And would that lend some suggestion that the patient is

2    misrepresenting his using of the drug?

3    A    Possibly.

4    Q    Were there any other physician, doctor records in that file other than

5    the ones from East Health Center?

6    A    There were no previous medical records.

7    Q    Other than the MRI.

8    A    That's correct.

9    Q    Now, this patient was from Kentucky; is that right?

10   A    Yes, it is.

11   Q    Now, Kentucky has some big cities in it?

12   A    Yes.

13   Q    Like Lexington, Kentucky?

14   A    Yes, sir.

15   Q    This patient from Kentucky presented in Georgia for narcotic pain

16   management.  Is that unusual?

17   A    It is.

18   Q    And why?

19   A    Well, one of the things that pain management physicians, physicians

20   who are prescribing a lot of scheduled medications look for, something that

21   raises an index of suspicion with them, is if patients are coming from a long

22   distance to obtain prescriptions.

23   Q    Now, the MRI itself, where was that from?

24   A    The MRI was from Florida.

25   Q    And does that in any way contribute to your opinion that this was not

-627-

1   legitimately –

2   A   Yes, sir, it does.

3   Q   – prescribed?

4   A   Yes, sir.

5   Q   This patient received how many pills, a prescription for how many

6   controlled substance pills?

7   A   On the initial appointment, the patient was prescribed 240 scheduled

8   pills.

9   Q   And in your experience and your opinion, is that a lot?

10  A   It is.

11  Q   That was 180 oxy 30 milligram?  Can you see it in your notes?

12  A   Yes.

13  Q   And 60 oxy 15s –

14  A   – 60 15 milligrams.

15  Q   In your opinion, Dr. Kennedy, what is a large number of – in your

16  practice, a large number of controlled substance pills for a patient to take per

17  day?

18  A   Well, it can vary.  It can vary.  And a patient can take as low as one pill a

19  day up to many.  But based on the history and the physical examination that

20  I'm looking at in this chart, in my opinion, eight high dosage oxycodone pills

21  per day is a very high dosage of this medication.

22          MR. KNOCHE: Can we see Exhibit 1-16 briefly.

23  Q   And are those the prescription forms that you see in the file which

24  you've just indicated was 180 oxy 30s, and 60 oxy 15s.

25  A   Yes, sir.

-628-

1    Q    Now, let's go to the next patient, George Hunter, Government Exhibit 2.

2    Did you have an opportunity to look at this file?

3    A    I did.

4    Q    And did the file document this is a 35-year-old patient from Kentucky?

5    A    Yes.

6    Q    And how many years had this patient complained of pain?

7    A    He reported of a pain complaint going back ten years.

8    Q    And the pain level was described as a 9; was it not?

9    A    Nine out of 10.

10   Q    And how credible is that?

11   A    Well, it depends.  It's possible that that can be a credible pain

12   complaint, and it's also possible that it might not be a credible pain

13   complaint.  But if a patient reports a pain level of 9, I would expect him to be

14   fairly distressed.

15   Q    Would you expect such a patient with a pain level of 9 to be traveling to

16   Georgia to seek narcotic pain management?

17   A    I would think that would be unlikely.

18   Q    There is a – is there an indication of the patient's blood pressure?  This

19   is George Hunter.

20   A    Yes, sir.

21   Q    And what was the blood pressure?

22   A    His initial blood pressure was 158/106.

23   Q    And is that a high or a low blood pressure reading?

24   A    Diastolic of 106 is high enough that it should alarm a physician.

25   Q    Was there anything in the file which indicates that that was addressed?

-629-

1    A    No, sir.

2    Q    Was there any treatment plan?

3    A    No, sir.

4    Q    The lumbar flexion is indicated as 60 degrees.  You would say that was

5    normal?

6    A    I – well, there is some variation on that, but for a patient who has a pain

7    complaint of 9 from a ten-year-old back injury, I would consider that to be

8    pretty good.

9              MR. KNOCHE: If we may see Government 2-013.

10   Q    This patient was prescribed controlled substances by Dr. Azmat; is that

11   correct?

12   A    Yes, sir.

13   Q    Can you read that for the jury?

14   A    180 oxycodone 30 milligram pills, and 60 oxycodone 15.

15   Q    That's 240.

16   A    Yes, it is.

17   Q    How many pills a day would that be over the course of a month?

18   A    Eight pills per day.

19   Q    In your opinion, was that legitimate?

20   A    No, sir.

21   Q    Was there a legitimate medical reason shown in the file?

22   A    No, sir, it was not.

23   Q    This individual also was quite a large person; is that right?

24   A    6' 8", 340 pounds.

25   Q    And neurologic exam was normal?

-630-

1    A    Yes.

2    Q    And were there any other physician records in the file, or evidence that

3    some attempt was made to contact a previous physician?

4    A    No, sir.

5    Q    Let's turn to Government Exhibit 3, which is Billy Letner.  Do you have

6    that file, and have you had a chance to review it?

7    A    Yes.

8    Q    What were your findings upon review of Billy Letner's file?

9    A    It was not medically legitimate.

10   Q    And why?

11   A    The physical examination and the obtained  history did not rise to the

12   level of the narcotics that were prescribed.

13   Q    Was there any indication of a request for records of prior physicians?

14   A    No, sir.

15   Q    Was there any other contributing medical history provided?

16   Q    No, sir.

17   A    Was there a plan of treatment?

18   Q    No, sir.

19   Q    This patient is one who had a ten-year complaint secondary to a fall as

20   you indicated earlier.  Would you expect that there would be a significant

21   record?

22   A    Yes.

23   Q    And this patient was from where?

24   A    He was from Florida.

25   Q    And specifically, from Kissimmee, Florida?  That would be in the file?

-631-

1    A    I know the MRI was from Plantation, Florida.  His address ...

2    Q    Is that – as you've indicated with our first two witnesses, or excuse me,

3    our first two exhibits – suspicious, that a patient from that area would be

4    coming to Georgia for narcotics treatment?

5    A    Having a patient come from a great distance and crossing state lines,

6    travel a great distance would raise a red flag and an elevated level of

7    suspicion for me.

8            MR. KNOCHE: 3-014.

9    Q    Did Mr. Billy Letner receive narcotics prescriptions as shown by the

10   file?

11   A    Yes, sir.

12   Q    For 180 oxy 30s?

13   A    Yes, sir.

14   Q    And 60 oxy 15s?

15   A    That's correct.

16   Q    In your opinion was that medically legitimate?

17   A    It was not.

18   Q    Let's go to Kim Letner.  Did you review this file?  It's –

19   A    I did.

20   Q    – Government Exhibit 4.

21   A    I did.

22   Q    And this individual has the same last name as the other patient, David

23   Letner; is that right?

24   A    Yes.

25   Q    And how old is Ms. Letner?

-632-

1    A    46.

2    Q    And she was presenting with what kind of a complaint?

3    A    Back pain.

4    Q    And secondary to what?

5    A    And auto accident-related injury.

6    Q    What did she report her usual level of pain as?

7    A    Eight to 9.

8    Q    And was there an MRI in the chart?

9    A    There was.

10   Q    And was that MRI from South Florida, as well?

11   A    It was Plantation, Florida.

12   Q    Were there any other previous medical records in the file?

13   A    No, sir.

14   Q    What was your opinion of the prescription of controlled substances to

15   her, if any?

16   A    It was not medically legitimate.

17            MR. KNOCHE: Show us 4-013.

18   Q    What did Ms. Kimberly – excuse me, Kimberly Letner receive?

19   A    That prescription, what I'm looking at, is for 60 oxy – 15 milligram

20   oxycodone pills.

21   Q    And why, in your opinion was that this not for a legitimate medical

22   purpose?

23   A    The physical exam and medical records and the MRI did not support

24   prescription of any narcotics, narcotics at this level, in my opinion.

25   Q    Is there anything unusual about family members traveling together

1    from Florida to a south Georgia pill mill to seek drugs?

2    A    Yes, sir.

3    Q    And why is that?

4    A    That would raise a red flag for me if family members were both traveling

5    together long distances with essentially identical or very similar complaints

6    for essentially identical narcotic medications.

7    Q    Let's turn to David Letner.  Did you review this file?  That's Exhibit

8    Number. 5.

9    A    Yes, sir.

10    Q    And what were your findings, Dr. Kennedy?

11    A    Treatment is not medically legitimate.

12    Q    And tell us why.

13    A    This patient was a 25 year old who presented with a usual pain level of

14    9.  He had an MRI from Delray Beach, Florida that was, in my opinion,

15    unimpressive.  Initial physical examination reported a pain level of 10 in this

16    25-year-old guy.  He was prescribed oxycodone in several different strengths,

17    and his physical examination was essentially identical to both his mother

18    and his father's, whose also were identical, more or less.

19    Q    Did this individual in his – he reported to the doctor that he was taking

20    480 pills per month; is that right?

21    A    That was what was written in the intake documentation.

22    Q    How impressive is that?

23    A    In my opinion, that's extremely impressive.  If a 25 year old were to

24    come in my office and report a pain level of 9, and state that his previous

25    physician had been prescribing 480 scheduled pills per month, or 16

-634-

1    scheduled pills per day, and this patient was coming to me from another

2    state, it would raise a very, very, very high index of suspicion.

3    Q    Dr. Kennedy, in your opinion, when, if ever, is it appropriate for a pain

4    management doctor to prescribe narcotics to drug addicts?

5    A    That potentially can occur.  If you have someone who is addicted to

6    medication, a heroin addict for example, and they have a horrible accident,

7    they're involved in a motor vehicle accident, or something happens to them,

8    just because they're addicted to medication doesn't mean that they are not

9    allowed to have adequate pain relief.  It's just that that has to be verified and

10   appropriate.

11   Q    You described earlier the distinction between a person who is addicted,

12   right, versus a person who is dependent, okay.

13   A    Yes.

14   Q    And remind the jury of that distinction.

15   A    Addiction is where someone has a chemical dependency where they

16   utilize a medication despite it being bad for them, despite the adverse

17   consequences that causes in their life.

18   Q    Would some of the adverse consequences be the expense of pursuing

19   the drugs to sustain that, the drug addiction?

20   A    Certainly.

21   Q    Are you aware in your professional experience that controlled

22   substances like oxycodone are frequently diverted to the street?

23   A    Yes, sir.

24   Q    Is that something that the practitioner who is writing the prescription

25   needs to consider before writing such a prescription?

-635-

1    A    Yes, sir.

2    Q    Would an individual like Mr. David Letner claiming such a high number

3    of pills per day, over 12, 13 pills a day, would that indicate the potential for

4    that sort of diversion?

5    A    In my opinion, yes, sir.

6    Q    Let's go to Latina Simpson, please. Did you have a chance to review

7    Latina Simpson's file?

8    A    I did.

9    Q    And what were your findings, Dr. Kennedy?

10   A    In my opinion the treatment was not legitimate.

11   Q    Where was this patient from?

12   A    This patient was from Kentucky.

13   Q    And would it, again, seem odd to you that a patient would come all the

14   way from Kentucky to Garden City for  pain management treatment?

15   A    Again, particularly with an MRI report from South Florida.

16   Q    Would your finding be compounded if you knew that she came with her

17   husband and father-in-law in the same trip?

18   A    Definitely.

19   Q    Did you know that Jim Brooks was the father-in-law of Ms. Simpson,

20   who is Exhibit Number 1?

21   A    Not until today.

22   Q    They have different last names.  Why, in your opinion, other than her

23   being from Kentucky with a MRI from Florida, is this prescription not issued

24   for a legitimate medical purpose?

25   A    In my opinion, the lack of medical records, the combination of the MRI

-636-

1    report and the physical examination note, which was essentially nonexistent,

2    did not at all rise to the level of the medication she received.

3    Q    And this patient, did she not complain of a pain secondary to an

4    unspecified accident at age 19?

5    A    Yes.

6    Q    Would you expect there would be a significant clinical record of her

7    injury and therapy that she's undergone in those many years, 20 years?

8    A    Yes, sir.

9              MR. KNOCHE: May we see 6-018?

10   Q    Are those the prescription forms that you saw in the file, Dr. Kennedy?

11   A    Yes.

12   Q    150 oxy 30s; is that right?

13   A    Yes.

14   Q    And 30 Xanax 1s?

15   A    Yes.

16             MR. KNOCHE: Scroll up.

17   Q    30 oxycodone 15s.

18   A    Yes.

19   Q    Are there some dangers involved with the prescription of oxycodone

20   and Xanax in tandem?

21   A    Potentially, yes.

22   Q    And what is that potential?

23   A    The greatest one is respiratory depression, which either of these drugs

24   can cause, but if you take them together, combined, particularly with alcohol,

25   it can cause respiratory depression and you potentially can overdose and die.

-637-

1    MR. KNOCHE: Pull up 6-013.

2    Q    Is that the initial – the exam form from Ms. Simpson –

3    A    Yes.

4    Q    – that was in that file?

5    A    Yes.

6    MR. KNOCHE: Scroll so we can see that, Dean.

7    Q    Describe, in your opinion, the thoroughness of the examination which

8    was conducted by Dr. Azmat for Ms. Simpson.

9    A    Well, as you can see from looking at everything that comes after the

10   physical examination heading, the examination itself is extremely cryptic,

11   meaning it's difficult to interpret.  The lumbar – where it says MS spine,

12   which is the back examination, it says flexion of 75 degrees, which is in the

13   normal range.  So essentially what we're looking – and extremities, F-R-O-

14   M, that means full range of motion.

15    So what we're looking at is a physical examination which essentially is

16   extremely poorly documented; and what is documented is normal.

17   Q    And there is no diagnosis; is that correct?

18   A    That's correct.

19   Q    And no treatment?

20   A    That's correct.

21   Q    And as you perused all of these files and examined them, did you notice

22   that chronic lower back pain was the most frequent diagnosis given?

23   A    Yes, sir.

24   Q    James Lockwood, please.  You have that file, or you've reviewed that

25   file, Dr. Kennedy?

-638-

1    A    Yes, sir.

2    Q    What were your findings with Mr. Lockwood?

3    A    In my opinion, the prescriptions were not legitimate.

4    Q    And tell us, you know, when you reviewed the file, did you determine

5    where Mr. Lockwood was from?

6    A    He was from Kentucky.

7    Q    And how old?

8    A    Forty-two.

9    Q    And what kind of complaint did he present with?

10   A    He had a six-year complaint job related back pain.

11   Q    And his usual pain level was recorded at 7 to 8?

12   A    Yes, sir.

13   Q    And this individual, did you notice in his file that he had a state ID card

14   as opposed to a driver's license?

15   A    I did.

16   Q    And what, as a practitioner of pain management medicine, what red

17   flags are raised by the state ID card?

18   A    Well, this is a matter of some importance.  If you have particularly a

19   young patient who does not have a driver's license, and they have a state-

20   issued ID card, then the question of whether or not this patient potentially

21   had been involved in DUI before is very important.  When you add that to

22   the fact that it's a patient from Kentucky with a state-issued ID card

23   presenting with an MRI from Plantation, Florida to south Georgia for

24   narcotics management, there just is a very, very increasing number of red

25   flags that are going up.

-639-

1   Q    And this individual like − as I believe you just indicated is from

2   Kentucky; right?

3   A    Yes, sir.

4   Q    And the MRI was from Florida?

5   A    Yes, sir.

6           MR. WITHERS: Objection to leading, Your Honor.  I've tried to

7   be ...

8           THE COURT: Yes, sir, he's already asked and answered those

9   questions.  I don't know why you need to ask him the same thing over again.

10   I understood, and I think the jury understood what he said.

11           MR. KNOCHE: Yes, Your Honor. 7-009, please.

12   Q    (By Mr. Knoche) Dr. Kennedy, did you find a form like this in each of

13   the patient files that you reviewed?

14   A    To the best of my recollection, yes, sir.

15   Q    Can you read where it says, I, James Lockwood?

16   A    [Reading:] I, James R. Lockwood, have read the above information or it

17   has been read to me, and all my questions regarding the treatment of pain

18   with opioids have been answered to my satisfaction.  I hereby give my

19   consent to participate in the opioid medication therapy and acknowledge

20   receipt of this document.

21   Q    Hypothetically, if that document were filled out before seeing the doctor,

22   would that presuppose that narcotics will be prescribed?

23   A    Opioids, yes, sir.

24   Q    Does, in your opinion, the form suggest that?

25   A    It does.

-640-

1    Q    If this is the patient's first visit, would you expect that the doctor would

2    examine the patient before obtaining the patient's consent to receiving

3    opioids?

4    A    Certainly, the patient's case would be discussed with the patient before

5    considering that.

6    Q    And what would that suggest as to the standard of care being employed?

7    A    The implication is that there is an assumption being made that patients

8    will be prescribed opioid medications before they're seen in the clinic.

9    Q    And in fact –

10          MR. KNOCHE: 7-017, please.

11   Q    – this patient was prescribed drugs; right?

12   A    Yes, sir.

13   Q    And you see on there the patient was prescribed 150 oxy 30s?

14   A    Yes, sir.

15   Q    60 oxy 15s?

16   A    Yes, sir.

17   Q    For a total of 210 pills.

18   A    Oxycodone pills.

19   Q    And that would be seven per day; is that right?

20   A    Yes.

21   Q    And your opinion was that that was not legitimate.

22   A    No.

23   Q    Carlie Cole.  If you would, Dr. Kennedy, describe briefly what the file

24   reflected upon your examination.  You did make some indication of the

25   patient's age, what state, how old the complaint.  Would you tell the jury

-641-

1    about that?

2    A    Forty-nine year old from Kentucky being treated for back pain, six-year

3    complaint of pain dating from a motor vehicle accident which she rated as 8

4    in severity without medications and zero in severity with medications.

5    Q    Did the chart contain an MRI?

6    A    It did.

7    Q    Did it have any other medical charts in the file?

8    A    There were no previous treatment records.

9    Q    And this Kentucky patient, where was her MRI from?

10   A    Delray Beach, Florida.

11   Q    In your opinion, was the exam which was documented in the file

12   supportive of prescribing narcotics?

13   A    No, sir.

14   Q    And why not?

15   A    What is reported was lumbar flexion of 75 degrees, which is normal, and

16   lateral flexion of 20 degrees, which is arguably normal, and no tenderness on

17   palpation.  The examination was essentially normal.

18   Q    How about the pain level 8 without meds and the zero with meds?

19   A    That is not credible.

20   Q    Is it suspicious?

21   A    It's very suspicious to me.

22   Q    Why is that?

23   A    A patient who is 49 years – whose pain is severe enough that they are

24   going to all this trouble to be seen is not going to have pain that goes to zero

25   by being treated with anything.

-642-

1    MR. KNOCHE: And 8-014.

2    Q    The patient was in fact given prescriptions; is that right?

3    A    Yes, sir.

4    Q    Is that 150 oxy 30s?  Is that what you read?

5    A    Yes.

6    Q    And 60 hydrocodone 10/325.

7    A    Yes.

8    Q    We have not seen, I don't believe, prescriptions for hydrocodone since

9    you've been on the stand.  What is the significance of the hydrocodone

10    10/325?

11    A    Hydrocodone is a opiate medication similar to oxycodone.  It is a

12    Schedule III and not a Schedule II medication, meaning that it is less

13    stringently scheduled.  And the reason is because it is always prepared with

14    Tylenol, acetaminophen, or Ibuprofen which is Advil, and that's why it says

15    10/325.  So the 10 milligrams is the hydrocodone; the 325 is Tylenol.

16    Q    And I believe you've given your opinion about that.  Not legitimate?

17    A    Not in my opinion.

18    Q    Paul Cole.  Did you review that file, Dr. Kennedy?

19    A    I did.

20    Q    Did you note that Paul Cole provided the same address as Carlie Cole,

21    31 Baker Drive, Jackson, Kentucky?

22    A    I did not note that at the time, but once the charts were all put together,

23    I noted that they came together.

24    Q    Would that suggest that they might be husband and wife?

25    A    Yes, sir.

-643-

1    Q    Tell us what you found upon reviewing Paul Cole's file?

2    A    Fifty year old being treated from back pain reportedly from accidents

3    dating to the 1980s.  Stated that his pain level was a 9 out of 10.

4    Q    Were there previous medical records in the chart besides the MRI and

5    other office documents from East Health Center?

6    A    No, sir.

7    Q    And this individual was from Kentucky.  Suspicious again; correct?

8    A    Yes, sir.

9    Q    How about the pain level of 9?

10   A    Again, that would be something that would raise my eyebrows and a

11   level of suspicion, unless the patient was extremely distressed.

12                    MR. KNOCHE: Exhibit 9-014.

13   Q    Those are the prescription documents which were in the file signed by

14   Dr. Azmat?

15   A    Yes, sir.

16   Q    150 oxy 30s?

17   A    Yes, sir.

18   Q    90 oxy 15s?

19   A    Yes, sir.

20                    MR. KNOCHE: Can you scroll down, Dean?

21   Q    And 90 Motrin 800.

22   A    Yes.

23   Q    Have you ever heard the terminology fill all or none?

24   A    Yes.

25   Q    Tell us the significance of fill all or none.

-644-

1    A    Physicians will on occasion, to insure that their patients are taking their

2    medications as prescribed – specifically all of their medications as prescribed

3    – will put on the prescription form fill all or none.  So if the patient was to

4    say that they just wanted to fill the oxycodone prescriptions, the pharmacist

5    would be in a position to insist that they fill all of their prescriptions or get

6    none of them filled.

7    Q    Is it a – in your experience with reviewing illegitimate medical

8    prescriptions, is it common for a doctor to prescribe a Motrin or other over-

9    the-counter drug along with the controlled substances?

10   A    In the case of prescriptions that are not medically legitimate, in my

11   experience, if a patient, if a physician is writing prescriptions for fill all or

12   none, it will usually be for a inexpensive muscle relaxant or an inexpensive

13   nonsteroid medication.

14   Q    Are those costly drugs, the Motrin, the ...

15   A    In medication such as Flexeril, a muscle relaxant, they are quite

16   inexpensive.

17   Q    Does it provide any real deterrent to the person who really wants just

18   the oxycodone to fill the prescription for the Motrin with that?

19   A    No, sir.

20   Q    Exhibit 10 will be Tyrice Harris.  Take a moment and tell us what you

21   found upon review of the file of Tyrice Harris.

22   A    Thirty-year-old patient from Florida who presented with a usual pain

23   level of 10 out of 10, had a Florida state ID card, had a history of low back

24   pain which dated back to a motor vehicle accident in 2006.

25   Q    Was there any prior medical history or, excuse me, records from

-645-

1    previous treating physicians incident to that motor vehicle accident in 2006?

2    A    No, sir.

3    Q    And I hate to be redundant, but a pain level of 10, that's 10 on a scale of

4    1 to 10, being the highest.

5    A    Yes, sir.

6    Q    Have you ever seen patients with pain levels of 10?

7    A    I have.

8    Q    Presenting at your office?

9    A    I may have over the course of the years had one or two people who

10   presented with a pain level of 10.  Ten is a pain level that is as bad as can be

11   imagined, and if somebody has a pain level of 10, I would expect them to be

12   screaming.

13   Q    Would you expect them to be in an ambulance going to the emergency

14   room?

15   A    Pain level of – potentially.  Pain level of 10 is a very severe, very

16   alarming level of pain, assuming that somebody understands the pain scale.

17   Q    Would you assume that person would commute from Jacksonville,

18   Florida to the Savannah area to wait in line to see a doctor to get a

19   prescription, to fill a prescription, in order to alleviate that pain level of 10?

20   A    No, sir.

21   Q    There might be more expeditious routes?

22   A    You would think so.

23        MR. KNOCHE:  Show us the prescription record, which was –

24   Q    – well, first, the drug screen in this case, did you make some note

25   whether the drug screen was positive or negative?

-646-

1    A    It was negative.

2              MR. KNOCHE: 10-14 – 10-014.

3    Q    Those are the prescription records in that file?

4    A    Yes, sir.

5    Q    150 oxy 30s?  30 oxy 15s; is that correct?

6    A    That's correct.

7    Q    In your opinion, was that – the issuance of that prescription done for a

8    legitimate medical reason?

9    A    It was not.

10   Q    It was not?

11   A    It was not medically legitimate.

12   Q    In the MRI file, did you notice that the MRI report indicated no

13   referring doctor?

14   A    I did.

15   Q    Describe if that, in your opinion, is an unusual circumstance.

16   A    In the entirety of my career, both doing family practice and medical

17   pain management, I cannot recall a single episode of seeing an MRI from a

18   self-referred patient.

19   Q    Did you notice –

20   A    – It's possible, but it would be very, very unusual.

21   Q    Did you notice that a number of the MRIs in the files that you reviewed

22   came from the same facility or cluster of facilities in South Florida?

23   A    Yes, sir.

24   Q    Advanced MRI.  I think POM MRI was another?

25   A    I don't recall the names specifically, but that sounds correct.

-647-

1    Q    Dannelle Perry.  Tell us if you reviewed this file, what are your findings

2    as far as the biographical circumstances of the patient.

3    A    This patient was another one with a Florida state ID card, 45 year old

4    being treated for low back pain of one-year duration, rated as 10 on a 10

5    scale.

6    Q    Ten out of 10?

7    A    Yes, sir.

8    Q    And the complaint was from – incident to what sort of event?

9    A    Fell from a tree.

10   Q    Like the last patient, did you notice the drug screen?  The urine screen

11   was negative?

12   A    Yes.

13   Q    Suggesting that the patient was not using oxycodone?

14           MR. WITHERS: Your Honor, I object to leading.

15   Q    Does it suggest that the patient was not using oxycodone?

16   A    It suggests the patient was not using oxycodone.

17   Q    And is that a red flag as far as potential diversion of the drugs that are

18   prescribed?

19   A    It can be.

20   Q    I believe you indicated Florida ID as opposed to a driver's license for

21   this patient?

22   A    That's correct.

23           MR. KNOCHE: 11-14, please.

24   Q    Yet the patient did receive prescriptions for controlled substances;

25   correct?

-648-

1    A    That's correct.

2    Q    Shown on the screen, 150 oxy 30s, 30 oxy 15s.

3    A    Yes, sir.

4    Q    Is there something peculiar, it seems many of these patients that you're

5    describing we're seeing prescriptions for 150 oxy 30s.  Did that seem to be

6    mode during your review?

7    A    It was common.

8    Q    And have you – if you would, opine whether or not the issuance of those

9    prescriptions to Mr. Dannelle Perry of Jacksonville, Florida were medically

10    legitimate?

11    A    In my opinion it was not.

12    Q    Brian Smith.  What are his biographical circumstances?

13    A    This patient had a Georgia state ID card, 43 years old, presented with a

14    pain level of 10, with a greater than 20-year pain complaint from job and

15    accident-related circumstances.

16    Q    May we assume there was an MRI in the file?

17    A    There was.

18    Q    Were there any other medical – previous medical records in the chart?

19    A    No, sir.

20    Q    Did you notice the urine screen in this case?

21    A    Yes.

22    Q    Was there anything significant about the urine screen?

23    A    The urine drug screen which was photographed and scanned into the

24    chart, there is a statement that it was positive for meth.

25    Q    And what could meth be?

-649-

1    A    I am assuming in a parlance of my office on the urine drug screens that

2    we use, it would be for methamphetamine.  Potentially, if the abbreviations

3    are different, it could be for methadone.  But whether it's for methadone or

4    methamphetamine, it is an alarming finding.

5    Q    Was it remarked upon in the medical records made by Dr. Azmat?

6    A    No, sir.

7    Q    Did the individual receive a prescription?

8    A    Yes.

9                MR. KNOCHE: Can we see 12-26, please?

10    Q    Is that from the file –

11    A    Yes, sir.

12    Q     – that you reviewed, okay.  And there was a prescription for 150 oxy

13    30s, 15 Xanax 1 milligram?  Is that correct?

14    A    Yes.

15    Q    And I believe also Flexeril and Motrin were also prescribed; is that

16    right?

17    A    That's correct.

18    Q    In your opinion, was the issuance of that prescription medically

19    legitimate?

20    A    No, sir.

21    Q    And why not?

22    A    I would be very alarmed to prescribe 165 scheduled agents to a patient

23    who had an abnormal urine drug screen.

24    Q    And how about the physical findings?  Do you have an opinion as to

25    whether they supported the prescription of –

-650-

1    A    – The physical examination did not rise to the level, in my opinion, of

2    requiring scheduled medications.

3    Q    And this patient was from Georgia, not from Kentucky, not from

4    Florida, but from Brunswick; is that correct?

5    A    Georgia I know, Brunswick I can tell you in a moment.  Yes, yes,

6    Brunswick.

7    Q    He was not a patient of yours.

8    A    No, sir.

9    Q    St. Simons is in the Brunswick area; correct?

10   A    It's across the causeway.

11   Q    Can we go to Joseph Bradley's file?  You reviewed that, Mr. Kennedy?

12            THE COURT: Mr. Knoche, let me give the jury a five-minute

13   recess before we begin with this file.

14        [NOTE: A brief recess was taken, after which the proceeding was

15   continued in the presence of the jury as follows:]

16            THE COURT: All right, you may proceed, Mr. Knoche.

17            MR. KNOCHE: Yes, your Honor.

18   Q    (By Mr. Knoche)  Dr. Kennedy, we're moving to Joseph Bradley,

19   Middleburg, Florida.  What were your findings as to this patient?

20   A    This patient was a 26 year old presenting with a Florida state ID card,

21   reporting that his pain was 9 out of 10.  The chart contained, in his case,

22   pharmacy printout which indicated that he had five previous prescribers of

23   scheduled medications.

24   Q    There was an MRI, as well?

25   A    Yes, sir.

-651-

1    Q    But no other – besides those, the MRI and the pharmacy reports,

2    nothing else.

3    A    No, sir.

4    Q    Other than what he reported?

5    A    (No audible response.)

6              MR. KNOCHE: Dean, 15-013.

7    Q    He did receive prescriptions; correct?  150 oxy 30s, 60 oxy 15s.  And

8    what was below those?

9              MR. KNOCHE:  Dean?

10   Q    30 Xanax, 1milligram; is that correct?

11   A    That's correct.

12   Q    And the Motrin; correct?

13   A    Yes, sir.

14   Q    Do you have an opinion whether that was – those prescriptions were

15   given in a legitimate – for a legitimate medical reason?

16   A    Yes, sir.  In my opinion, it was not medically legitimate.

17   Q    And tell the jury why you have that opinion.

18   A    Well, again, this is a 26 year old from Florida with a pain complaint of 9,

19   presenting with out-of-state MRIs with no previous medical records, five

20   previous treating physicians, none of whom were contacted, and he was

21   prescribed this level of scheduled medications.  In my opinion it's not

22   medically legitimate.

23   Q    And this is another patient who received Xanax; correct?

24   A    Yes, sir.

25   Q    And you've described that that can be problematical when prescribed in

-652-

1    combination with oxycodone?

2    A    Potentially, yes, sir.

3    Q    And what is the potential?

4    A    The potential is respiratory – the potential, the worse potential probably

5    is respiratory depression and death that can occur if somebody has an

6    overdosage.

7    Q    James Gable is our next.  You reviewed this file; is that correct?

8    A    I did.

9    Q    What did you learn from reviewing the office records from East Health

10   Center about Mr. James Gable?

11   A    This patient was a 37 year old from South Carolina, again with MRI

12   from Florida, presenting in Georgia with a 15-year pain complaint related to

13   heavy lifting at work, and reporting his pain level as 9 in severity.

14   Q    Were there any other medical records other than the MRI in the file?

15   A    No, sir.

16   Q    Did you notice in this file, Dr. Kennedy that the patient also indicated

17   that he had an allergy to OxyContin?

18   A    Yes, sir.

19   Q    Other than that allergy being noted, was there any other indication of

20   what, if any, counseling took place about that allergy?

21   A    No, sir.

22        MR. KNOCHE:  Prescription document which I'd like to publish

23   is 14 – excuse me, 14-22.

24   Q    You see that prescription for 150 oxy 30s?

25   A    Yes, sir.

-653-

1    MR. KNOCHE: Is there anything else with that, Dean?

2    Q    Do you have an opinion whether that was given for a legitimate medical

3    reason?

4    A    In my opinion it was not medically legitimate.

5    Q    And defend your opinion, Dr. Kennedy.  Why not?

6    A    Well, again, this is a fairly young patient, 37 years old, with a 15-year

7    pain complaint, which would have dated to him being 22 years old.  I would

8    expect there to be an extensive medical record.  With him showing up from

9    South Carolina with an MRI report from yet another state, showing up in

10   Georgia, there are more and more red flags that go up.

11   Q    I'd like you to explain as best you can to the jury neurologic findings of

12   nonfocal.  What does that mean?

13   A    To me, in terms of the examinations I'm looking at, if somebody says a

14   nonfocal neurologic exam, it indicates that they did a neurologic exam but

15   there wasn't anything specific.

16   Q    And what is a grossly intact neurologic exam?

17   A    Well, grossly intact neurologic exam implies to me less of an exam and

18   perhaps just observational, with not noting anything that's wrong on

19   observation.

20   Q    How is that conducted, to make that conclusion as grossly intact?  Can

21   you watch me walk into the room and make that opinion?

22   A    Yes, sir.

23   Q    Is that all there is to it?

24   A    Well, you would hope not, but that could be an accurate statement.

25   Q    All right, sir.  And you've indicated that that was not legitimately –

-654-

1   A    Not in my opinion.

2   Q    – issued.

3        Let's go to Gary Evans.  Tell the jury what you learned about Gary

4   Evans from looking at that file, his age, where he's from.

5   A    Patient was a 60 year old from Kentucky who presented with back and

6   knee pain related to a job injury in 1999.  Stated on presentation that his

7   pain level was 10 in severity without medications, and 3 in severity with his

8   medications.

9              MR. KNOCHE: Exhibit 15-23.

10  Q    Was prescribed those medicines; is that correct?  From the file, 150 oxy

11  30s, 30 oxy 15s?

12  A    Yes, sir.

13  Q    And I believe there was a noncontrolled drug at the bottom of that

14  chart, Motrin?

15  A    Yes, sir.

16  Q    Was that, in your opinion, medically legitimate?

17  A    No, sir.

18  Q    And why not?

19  A    Well, again, for the reasons that I have stated, we have a patient who is

20  coming from one state to Georgia, essentially for narcotic management, who

21  is reporting their pain level as being 10 without their medications, 3 with

22  their medications, with what amounts to a noncredible physical examination

23  and no previous medical records.

24  Q    The MRI here showed a chronic anterior tear of the medial collateral

25  ligament.  Was there any indication that the patient's knee was examined?

-655-

1   A   No.

2   Q   No other records in the file?

3   A   No.

4   Q   How about a treatment plan?

5   A   No treatment plan.

6   Q   Chris Conkel.  And Dr. Kennedy, this is from Government Exhibit 16.

7   Tell us about Chris Conkel, what you learned of him from your examination

8   of the East Health Center medical file.

9   A   This patient was a 49 year old from Florida who, again, presented with a

10  Florida identification card and not a driver's license, who reported an eight-

11  year history of low back pain secondary to a motor vehicle accident.

12          MR. KNOCHE: 16-020

13  Q   Mr. Conkel was prescribed 150 oxy 30s, is that right, by Dr. Azmat, and

14  Motrin?

15  A   Yes, sir.

16  Q   In your opinion, was that done for a legitimate medical reason?

17  A   No, sir.

18  Q   And why not, in your opinion?

19  A   Again, for the reasons that I noted with the problems of credibility of

20  physical examination, the patient's identification, the fact that he was seen

21  for several follow-up visits where no physical examination whatsoever was

22  even documented.

23  Q   The MRI in this case indicated a – I believe a broad-based posterior disc

24  herniation.  Was that – is a finding like that as you read on that MRI

25  sufficient to justify the prescription which this patient received?

-656-

1  A    On its own?  In my opinion, no.

2  Q    Why not?

3  A    Even if there was – because the finding here is – the finding here is

4  something that is potentially significant.  In itself,  my opinion, it needs to be

5  combined with an adequate physical examination and followup in order to

6  establish that it's significant.

7  Q    Patient's blood pressure was 150/96.  Is that a problem, in your

8  opinion?

9  A    Well, it's not normal.  In my opinion I'd like to think that I would have a

10  word with the patient about his blood pressure.

11  Q    Is there any indication that a word was had with the patient?

12  A    No, sir.

13  Q    One last question before I move off the MRI:  is it – would you like to

14  see some numeric value assigned to the size of the bulge shown on the MRI?

15  I mean, does it say anything about the size of the bulge?

16  A    Characteristically, MRI studies, if they're reporting a disc herniation or

17  they were reporting a disc bulge, it'll have a numeric value that says it bulges

18  so many millimeters in a certain direction.

19  Q    Joshua Merryman, please.  This is Exhibit 17.  Tell us about what you've

20  learned about Mr. Merryman.

21  A    This patient was a 27 year old who presented with a Florida state ID

22  card, stating that his usual pain level was 9.  Patient had an eight-year pain

23  complaint secondary to a fal injury at work dating to when he was 21 years

24  old.

25  Q    What kind of patient history was in the file other than MRI?

-657-

1    A    There was no history.  There were no previous medical records.

2    Q    And the MRI was from Florida?

3    A    Yes, sir.

4    Q    As was the patient?

5    A    Yes, sir.

6              MR. KNOCHE: 17-020.

7    Q    You see those prescriptions in the file?  You see the prescription from

8    Dr. Azmat for 150 oxy 30s and 60 Percocet 10/325s?

9    A    Yes.

10             MR. KNOCHE: Anything else, Dean, on that?

11   A    Naprosyn and Flexeril.

12   Q    What are those drugs?

13   A    Naprosyn is a nonsteroidal anti-inflammatory medication sold over the

14   counter as Aleve, and Flexeril, which is a muscle relaxer.

15   Q    In your opinion, was that prescription for 150 oxy 30s and 60 Percocet

16   10s given for a legitimate medical reason?

17   A    No, sir.

18   Q    Why not?

19   A    As stated, when a very young patient from out of state with extremely

20   high pain levels reported, no previous medical records, and physical

21   examination which was not supported.

22   Q    Did the examination noted by Dr. Azmat in that file indicate the patient

23   had a full range of motion of extremities?

24   A    Yes.

25   Q    And this patient was another one diagnosed with chronic low back pain;

-658-

1    is that correct?

2    A    Yes, sir.

3    Q    Does that seem to be the diagnosis, that most of these patient files

4    you've reviewed had that same diagnosis?

5    A    That or similar wording is recurrent.

6    Q    How about the long-term goal of medical management as a goal of

7    treatment?  What do think of that?

8    A    Medical management is not a long-term goal.  The prescribing of

9    narcotics is supposed to be based on improving somebody's function.  And if

10   somebody tells you, for example, that they can't go to the park with their kids

11   and you consider prescribing narcotic medications, if they're able to go to the

12   park with their kids, then you know that they're benefitting from it.  And that

13   kind of a functional goal is a treatment goal.  Medical management in and of

14   itself is not a treatment goal.  In my opinion.

15   Q    Patricia Rohrer, please.  Exhibit 18.

16   A    Yes.

17   Q    Tell us about Ms. Rohrer.  What did you learn about her?

18   A    This patient is a 55 year old from Kentucky, again with an MRI from

19   Plantation, Florida.  Presented with a pain level report of 9.  Initially was

20   found to have a blood pressure of 119 over – or, I'm sorry, of 196/116, which

21   was not addressed in the medical record.  And in my opinion, the treatment

22   was not medically legitimate.

23   Q    196/116, for us laypersons, how dangerous is that?

24   A    Malignant hypertension, to my recollection, is something that is

25   diagnosed when somebody has a diastolic blood pressure,  the lower

-659-

1    number, of 120 or above.  So – and a person could reasonably be hospitalized

2    for that.  So if somebody presents with blood pressure of 116, it's possible it

3    could be managed appropriately in the office, but I would expect to see some

4    kind of mention, at least in passing, in the medical record.

5                    MR. KNOCHE: 18-014.

6    Q    Patient did receive prescriptions for controlled substances.  I see 60 oxy

7    15s.

8                    MR. KNOCHE: You can scroll down, Dean.

9    Q    Plus the Flexeril.  150 oxy 30s; is that correct?

10   A    Yes, sir.

11   Q    And you've opined that that was not medically legitimate.  Would you

12   further defend your opinion for the jury, please.

13   A    This patient on the initial appointment was prescribed a total of 210

14   scheduled pills, or seven scheduled pills per day, and it was not – it was not

15   supported by records or physical examination.

16   Q    She complained of neck pain; is that right?  Chronic neck pain?

17   A    That is correct.

18   Q    Was the cervical exam – that's the examination of the neck – was that in

19   your opinion a credible examination?

20   A    No.

21   Q    Why not?

22   A    The only notation is decreased range of motion, flexion-extension,

23   lateral flexion rotation, no C-spine tenderness, restricted left lumbar

24   rotation.  Examination was otherwise normal.  There were no positive

25   neurologic findings and the remainder of the physical examination was

-660-

1    certainly not exhaustive.

2    Q    In your experience, Dr. Kennedy, would you expect that a patient like

3    Patricia Rohrer might cope adequately with over-the-counter pain medicines

4    and heat pad?

5    A    That would depend on my feeling about the patient after doing the

6    physical examination.  It's impossible to say without examining the patient.

7    But potentially.

8    Q    Would you try that first?

9    A    Possibly.  I would like to think so.

10   Q    Jessica Rogers.  Tell us about her, Dr. Kennedy.

11   A    This patient was a 26 year old from Kentucky with a four-year pain

12   complaint that she reported was work related and was level of 8 in severity,

13   the usual pain level of 8.

14   Q    Unusual for such a young patient from Kentucky?

15   A    Yes, sir.

16   Q    And in particular, from such a patient seeking narcotic treatment in

17   Savannah, Georgia?

18   A    A pain level of 8 in a 26-year-old patient is certainly something to be

19   noticed.

20            MR. KNOCHE: Show us 19-20, please?

21   Q    Those prescription records you see noted in the file?

22   A    Yes, sir.

23   Q    60 oxy 15s?  That looks like Ibuprofen.  Is that what it looks like to you,

24   Dr. Kennedy?

25   A    Yes.

-661-

1        MR. KNOCHE: And scroll down.

2    Q    And 150 oxy 30s?

3    A    Yes, sir.

4    Q    In your opinion, was that prescription medically legitimate?

5    A    No, sir.

6    Q    And can you defend your opinion, please?

7    A    MRI didn't document findings that alone supported narcotic

8    management.  Nothing else in the chart, no patient history. 26 year old from

9    South Carolina presenting for narcotic management in Georgia.

10   Q    From Kentucky, I believe you said.

11   A    What did I say?  I'm sorry.

12   Q    I think you just said South Carolina.

13   A    Forgive me, Kentucky.

14   Q    Twenty-six year old from Kentucky, MRI from West Palm Beach; right?

15   A    From Florida, and pain level of 8, and physical examination was

16   inadequate.  No medical history to contribute.

17   Q    No other records in the file other than the MRI?

18   A    That's correct.

19   Q    Let's go to Troy Roark, Government Exhibit 20.  Tell us about Mr.

20   Roark.

21   A    Mr. Roark was a patient that was 62 years old from Kentucky that was

22   being treated for back pain.  He reportedly had a history of three previous

23   back surgeries and a spinal cord stimulator implantation.  He reported his –

24   or his pain level was reported as 9.  And on his initial physical examination, a

25   surgical scar was noted, and a blood pressure of 203/105 was also recorded

-662-

1    in the chart but not addressed in the notes.

2              MR. KNOCHE: 20-015, please.

3    Q    Mr. Roark received prescription for 150 oxy 30s; is that right?

4    A    Yes, sir.

5    Q    60 Lorcet 10/500s?

6    A    Yes, sir.

7              MR. KNOCHE:  And anything else you got?  Yeah.

8    Q    Naprosyn, that's the Advil; is that right?

9    A    That's sold over the counter as Aleve.

10   Q    Aleve, I'm sorry.  In your opinion, were those prescriptions, the

11   oxycodone prescriptions, issued for a legitimate medical reason?

12   A    In my opinion, no.

13   Q    And why do you have that opinion?

14   A    Sixty-two year old from – well, from out of state presenting for narcotic

15   management in Georgia.  Physical on examination initially revealed only

16   nonfocal neurologic finding.  And in my opinion, the straight leg raise exam

17   portion of that was not credible.

18   Q    Describe that some more.  Why is that straight leg raise exam not

19   credible?

20   A    Well, this is a 62-year-old patient who reportedly has had three previous

21   lumbar surgeries, and a spinal cord stimulator implantation, which is an

22   interventional technique for severe pain.  What's written down is that the

23   straight leg raising test was 90 degrees on the left, which is essentially

24   perpendicular, which would be very unexpected in my opinion.

25   Q    Unexpectedly good?

-663-

1    A    Yes.  Far more than what I would expect.  And 60 degrees on right.

2    Q    Did you note in the file that the physician reported his history as, fell off

3    wall and busted it?

4    A    Yes, sir.

5    Q    What kind of a diagnosis is that?

6    A    Sir, I can't say.  Unless he was quoting the patient directly, and

7    sometimes patients will say things that don't make a great deal of sense, but

8    all on it's own that doesn't make sense.

9    Q    And you've indicated he was markedly hypertensive; right?

10   A    Yes, sir.

11   Q    And was that noted or commented upon in the file?

12   A    It was not.

13   Q    Barry Hinkle.

14   A    Yes, sir.

15   Q    Tell us about – this is Exhibit 21.  What about Mr. Hinkle?

16   A    This patient was a 22 year old from Kentucky who presented with a

17   Kentucky state ID card and not a driver's license or other ID.  22 year old

18   who reported his pain level as 9.  He had an MRI from Florida.  Stated that

19   his pain complaint was five years in duration secondary to a motor vehicle

20   accident.

21   Q    Were there any other records in the file other than the MRI and the

22   office documents from East Health Center?

23   A    No, sir.

24   Q    There was a copy of a pharmacy printout, I believe; is that right?  That

25   was the only other ...

-664-

1    A    Yes, yes.

2          MR. KNOCHE: 21-020.

3    Q    Prescription for 150 oxy 30s, Flexeril.  You've described Flexeril.

4          MR. KNOCHE: And scroll down.

5    Q    90 Motrins?

6    A    Yes, sir.

7    Q    In your opinion, was that prescription for this Kentucky patient of 150

8    oxy 30 milligrams medically legitimate?

9    A    In my opinion, no, sir.

10   Q    Why not?

11   A    Well, again, because this is a 22 year old from Kentucky presenting for

12   narcotic management in Georgia based on MRIs from Florida.  In reviewing

13   the chart, at one point on presentation he reported that his usual pain level

14   was 9, which alone raises an index of suspicion.  And in totality, combined

15   with the physical examination, which was not adequately supported, my

16   opinion is that it is not medically legitimate.

17   Q    Dr. Kennedy, again this was a 22-year-old patient; right?

18   A    Yes, sir.

19   Q    22 years old from Florida.  Anything in that MRI report which

20   supported the prescriptions that were given?

21   A    No.  No, sir.

22   Q    Jason Jarvis.  Tell us about Jason Jarvis, please.

23   A    This patient was a 30 year old from Ohio, who presented with an MRI

24   from Plantation, Florida, reportedly having a six-year pain complaint

25   secondary to a motor vehicle accident in 2005, and a fall injury in 2009.

-665-

1    Reported that his usual pain level was 9.

2    Q    And any other prior physician records in the file other than the MRI?

3    A    No, sir.

4    Q    And the MRI was from Plantation, Florida?

5    A    That's correct.

6         MR. KNOCHE: 22-017.

7    Q    And you noted those prescriptions in the file, Dr. Kennedy?

8    A    Yes, sir.

9    Q    150 oxy 30s?

10   A    Yes, sir.

11   Q    The Naprosyn.

12        MR. KNOCHE: And scroll down, Dean.

13   Q    60 oxy 15s?

14   A    Yes.

15   Q    And the – is that – I won't pronounce it correctly – Neurontin?

16   A    Neurontin.

17   Q    What kind of drug is that?

18   A    Neurontin is an antiseizure medication that falls in that category of

19   drugs that are called neuroleptic medications, and sometimes they can be

20   used to treat painful conditions.

21   Q    In your opinion, were those prescriptions for oxycodone, two of them,

22   were they issued for a legitimate medical purpose?

23   A    No, sir.

24   Q    And why do you have that opinion?

25   A    Well, again, this is a young – a 30-year-old patient with a six-year pain

-666-

1    complaint who is from Ohio with an MRI from Florida, presenting in Georgia

2    for narcotic medical management.  This patient – with the pharmacy

3    printout that was in the chart, there were two previous recorded treating

4    physicians, but there is no indication that either of them were contacted.  In

5    my opinion it was not medically legitimate.

6    Q    Was any treatment planning indicated?

7    A    No, sir.

8    Q    Any indication of return appointments or anything like that in any of

9    these files that you recall?

10   A    Some of the patients had return appointments.

11   Q    Sherry Fields.  Dr. Kennedy, tell us what you learned about reviewing

12   Sherry Fields' file, as far as the basic information, her age, what state is she

13   from.

14   A    This was a 37-year-old patient from Kentucky who, again, presented

15   with a state-issued ID card.  She reported her presenting pain level as 9 out

16   of 10 in severity, and again, her pain complaint was 11 years in duration.

17   Q    What other – well, excuse me, was there an MRI in the file?

18   A    Yes.

19   Q    Where was the MRI from?

20   A    The MRI was from Florida.

21   Q    So what did this –

22        MR. KNOCHE: – if you could, for just a moment, show us

23   Exhibit 23-18.

24   Q    She received those prescriptions, Dr. Kennedy?  Did you see those in

25   the file?

-667-

1    A    Yes.

2    Q    150 oxy 30s; is that right?

3    A    Yes.

4    Q    60 oxy 15s?

5    A    Yes.

6              MR. KNOCHE: And scroll down.

7    Q    The Motrin and the – I don't even know what the other drug is.  What is

8    that, Dr. Kennedy?

9    A    Elavil.

10   Q    Were those prescriptions for oxycodone, the 150 30s and the 60 15s,

11   medically legitimate?

12   A    Not in my opinion.

13   Q    In your opinion, and why is that?

14   A    Patient from Kentucky with MRI report from Florida, with no previous

15   medical records, and a reported pain severity of 9, with nothing else in the

16   chart that supported the prescriptions that were prescribed, and the physical

17   examination not being supported either, in my opinion, is not medically

18   legitimate.

19   Q    This patient was – the diagnosis of Dr. Azmat indicated chronic low

20   back pain.  Reconcile that with the physical exam, Dr. Kennedy, showing a

21   lumbar flexion of 90 degrees and straight leg raising of 90 degrees.

22   A    Essentially, that means that the patient with his complaint of back pain

23   that was 9 in – a level of 9 in severity could bend perpendicular to the floor at

24   the waist, and from lying – from a lying-on-her-back position could have her

25   leg raised perpendicular as well.  That does not at all support the history or

-668-

1    the medications that were prescribed.

2    Q    Nancy Binion.  This is Exhibit 24.  Tell us about Ms. Binion.

3    A    This patient was a – forgive me.  This patient was a 41 year old from

4    Kentucky with an MRI, again, from Florida who presented with a complaint

5    of three years' duration of low back pain without any known precipitating

6    incident or episode.

7    Q    What does she indicate was her usual pain level?

8    A    She on presentation reported that her usual pain level was 10.

9    Q    And did you notice previous doctor records in the file?

10   A    There were no previous medical records in the chart.

11   Q    How about the patient's blood pressure?  What did you ...

12   A    Patient's blood pressure in this case was – on presentation, 155/123

13   with a pulse of 106.

14   Q    And in your opinion as a medical doctor, how remarkable was that?

15   A    I would have been extremely alarmed and, if nothing else – if nothing

16   else, the blood pressure should be rechecked if it's at that level, just to be

17   sure that a reading this high is not an error.

18   Q    Is there any indication that it was rechecked?

19   A    No, sir.

20         MR. KNOCHE: 24-021, please.

21   Q    Did you note in the records of Exhibit 24 that Ms. Binion was

22   prescribed 120 oxy 30s?  Is that correct?

23   A    Yes.

24   Q    90 oxy 15s?

25   A    That's correct.

-669-

1          MR. KNOCHE: Dean, scroll down if there is anything else.

2     Q     The over-the-counter medicines?

3     A     It's a prescription strength nonsteroid medication, the Naprosyn, and

4     the Neurontin.

5     Q     Any – what kind of medications are prescribed for high blood pressure?

6     A     Anti-hypertensive medications.  There's a whole –

7     Q     – What are some that the jury may have heard of?

8     A     Commonly?  Well,  there are a whole bunch of classes of medications,

9     including beta blockers is one class.  Other medications are called ACE

10    inhibitors or ARB inhibitors or vasodilators.  There are a whole gamut of

11    anti-hypertensive medications.

12    Q     Was there any indication in the file that such medicine was prescribed

13    for Ms. Binion with her malignant hypertension?

14    A     No, sir.

15    Q     In your opinion, were those prescriptions for the oxycodone, the two of

16    them, were they for legitimate medical reason?

17    A     No, sir.

18    Q     And I'd like you to elaborate on how you reached that opinion.

19    A     Well, this is a 41-year-old patient from Kentucky, MRI as previously

20    from Florida, and is presenting in Georgia for narcotic management with a

21    malignant hypertension that was unaddressed.  Her physical examination

22    revealed that she was 268 pounds, with a straight leg raising of 75 degrees

23    bilaterally, which is potentially true, but it's not supportive of prescribing

24    narcotic medications in my opinion.  Based on all of the things together, my

25    opinion is, it's not legitimate medical management.

-670-

1    Q    You may not know, but hypothetically, if you knew that she came with

2    her husband on the same date to the same clinic seeking the same drugs,

3    would that punctuate your opinion?

4    A    Definitely.

5    Q    And by that I mean, add an exclamation mark to it.

6    A    I would have a definite increased level of concern.

7    Q    And John Koenig, Exhibit 25.

8    A    Yes, sir.

9    Q    Tell the jury about his medical file, the biographical and other data

10   about Mr. John Koenig from South Carolina.

11   A    Patient was a 33 year old, South Carolina, presenting with a South

12   Carolina state ID card, reporting that his pain level was 10 without his

13   prescribed medications and 4 – I'm sorry, pain level of 10 without his

14   prescribed medications and 4 with his medications.  Reportedly had an

15   eight-year pain complaint secondary to a motor vehicle accident.

16   Q     Were there clinical records in the file from that motor vehicle accident?

17   A    No, sir.

18   Q     Would you expect that they would be available if requested or

19   demanded of the patient?

20   A    With an eight-year pain history, I would expect that some previous

21   treatment records would be available.

22   Q    There was a pharmacy record indicating that Mr. Koenig, the 33 year

23   old from South Carolina, had two prior physicians?

24   A    Yes, sir.

25   Q    Any indication in the record of attempts to contact those physicians?

-671-

1    A    No.

2              MR. KNOCHE: 25-19.

3    Q    Are those the prescriptions that you noted from Mr. Koenig's file?

4    A    Yes, sir.

5    Q    And were those prescriptions for 150 oxy 30 milligram; correct?

6    A    Yes.

7    Q    And 60 Percocet 10/325s, and Naprosyn; is that right?

8    A    Yes.

9    Q    In your opinion, were those prescriptions for oxycodone issued for a

10   legitimate medical purpose?

11   A    No, sir.

12   Q    Why not, Dr. Kennedy?

13   A    This patient was young at 33 with an eight-year reported pain

14   complaint, reporting a pain level of 10, presenting from South Carolina with

15   no previous treatment records.  MRI, again, obtained out of state.  Physical

16   examination was not contributory and was not entirely credible.  And based

17   on the totality of all of these things, my opinion is it's not medically

18   legitimate.

19   Q    Do you agree that pain is a subjective thing?

20   A    Yes, sir.

21   Q    And so what might be a high level of pain for one person may be lower

22   for another?

23   A    Yes, sir.

24   Q    But as a physician, do you agree that it's necessary to verify a patient's

25   self-reported levels of pain?

-672-

1    A    Yes.  And let me say that I think that it can be appropriate to give

2    patients pain medication on an initial visit without having extensive records,

3    but not at the levels that I'm seeing here and not without a required – not

4    without a requirement that the patient produce some kind of medical records

5    that support the history that we're talking about.

6    Q    But you would agree that verification is essential.

7    A    Yes, sir.

8    Q    And is that need to verify accentuated by the biographical data that

9    you've recited about these patients concerning the distances that they

10   traveled?

11   A    In my opinion it makes it an even larger matter of concern.

12   Q    And when they've traveled from state "A" to state "B" with MRI from

13   state "C", does that just compound your concerns?

14   A    Yes, sir.

15   Q    Now, we've been through a lot of records here, 25 patient records, Dr.

16   Kennedy.  In your opinion, were any of the prescriptions that you've

17   reviewed in these 25 patient files – and I'm talking the prescriptions for the

18   controlled substances – issued for a legitimate medical purpose or in the

19   usual course of professional practice?

20   A    In my opinion, no.

21              [NOTE: Mr. Knoche confers with Mr. Gilluly.]

22   Q    And is that – would that opinion be under guidelines and standards of

23   the State of Georgia?

24   A    I'm not exactly sure —

25   Q    — Would those guidelines, whether we're looking at this from a national

-673-

1     or a state standard, would your opinion be the same?

2     A     Yes, sir.

3                MR. KNOCHE: Pass the witness, Your Honor.

4                THE COURT: Mr. Withers.

5                         CROSS-EXAMINATION BY

6     MR. WITHERS:

7     Q     Dr. Kennedy, good afternoon.

8     A     Afternoon.

9     Q     My name is Tom Withers.  I represent Dr. Azmat in this matter.

10           Tell us what a board certification is, please, sir.

11    A     A board certification in the U.S. means that something – it is a

12    certification that is awarded by a entity that is approved by the ACGME,

13    which is the overall governing body for medical boards – for medical

14    specialties, if I'm not mistaken.

15    Q     Right.  The board of medical specialties; fair to say?

16    A     Yes, sir.

17    Q     And you are not board certified in pain management; correct?

18    A     That is correct.

19    Q     And tell us what board eligible means, please.

20    A     Board eligible would be someone who has, for example, done a

21    residency, but has not sat for the examination, but they have met the

22    requirements to sit for the examination to become board eligible.

23    Q     You are not board eligible in pain management; are you?

24    A     There is not – in pain medicine, there is not an American board of pain

25    management –

-674-

1    Q    – In medicine – excuse me.  You are not board eligible in pain

2    medicine; are you?

3    A    That's correct.

4    Q    Now, The American College of Pain Medicine, I think, came into being in

5    1991, I think, having pain medicine and pain management as a specialty;

6    does that seem right?

7    A    Well, with pain medicine specifically.  Pain management is something

8    aside.

9    Q    And what that entity does is, it provides specialty training for pain

10   medicine; correct?

11   A    The board?

12   Q    The board makes certain that there are – that you have special training

13   in pain medicine;  correct?

14   A    Yes, sir.

15   Q    And that you have special testing in pain medicine; right?

16   A    Yes, sir.

17   Q    And that you have – it provides for the credentialing of pain medicine

18   specialists; correct?

19   A    Yes, sir.

20   Q    And if – it's a – fair to say is a doctor-based organization to ensure a

21   high quality of training and experience for those folks who practice pain

22   medicine; is that true.

23   A    For those who practice pain medicine, yes.

24   Q    And the physicians who are board certified – and you're board certified

25   in family practice, as I understand it, from your direct testimony.

-675-

1    A    That's correct.

2    Q    The physicians who are board certified meet tough requirements;

3    correct?

4    A    That's true.

5    Q    And you did not do a residency in pain medicine; did you?

6    A    There is no residency in pain medicine.

7    Q    It's a residency in anesthesiology; correct?

8    A    Yes, sir, that's correct.

9    Q    You did not do a residency in anesthesiology; did you?

10   A    That's correct.

11   Q    Didn't do a fellowship in pain medicine; did you?

12   A    That's correct.

13   Q    And when I say that you're not board eligible, that means basically that

14   you cannot take that board for being board certified or obtaining that board

15   certification for pain medicine; true?

16   A    That is correct.

17   Q    So as far as The American Academy is concerned, you are not

18   adequately trained to take the exam to be board certified; that's true, isn't it?

19   A    You are bringing two different organizations.  According to The

20   American Academy or the American Board?

21   Q    American Board.

22   A    The American Board, no, sir.

23   Q    There are board certified physicians in Savannah are there not, in pain

24   medicine?

25   A    Yes, sir.

-676-

1    Q    I think there's board certified physicians in the Brunswick area in pain

2    medicine.

3    A    There are.

4    Q    University – or excuse me, Emory University has board certified

5    physicians in pain medicine.

6    A    I would presume.

7    Q    As does The Medical College of Georgia.

8    A    Certainly.

9    Q    And so you are not listed in The American Board's directory of

10   specialists in pain medicine; correct?

11   A    That's correct.

12   Q    You would agree that a board certified physician in pain medicine is

13   more well trained than you in pain medicine; that's true, isn't it?

14   A    In pain medicine?  Yes, sir.

15   Q    Now, you have never published any peer reviewed articles; have you?

16   A    That's correct.

17   Q    You have never published any peer reviewed articles in pain

18   management; have you?

19   A    That's correct.

20   Q    You haven't published any peer reviewed articles in the use of opioids in

21   the management of chronic pain; have you?

22   A    That's correct.

23   Q    You've never published any peer reviewed articles regarding the

24   standards of care for the management of chronic pain; have you?

25   A    No, sir.

-677-

1   Q   Tell me, Doctor, what hospitals do you have privileges at?

2   A   I no longer admit.

3   Q   And so that means that if a patient comes to you and has an acute

4   problem, you can't see that patient in the hospital.

5   A   No, they're sent to a hospitalist who is on call for me.

6   Q   I asked a poor question.  You can't admit a patient.  If that patient

7   comes to you and they got a problem, they need to be, go into the hospital ...

8   A   Essentially, they're sent to the hospitalist, who admit them.

9   Q   You can't treat a patient in the hospital; right?

10   A   No, sir, I don't have privileges.

11   Q   You couldn't see a patient in the hospital for any reason; right?

12   A   That's true.

13   Q   And if I went to the hospital administrator down at, what is it called,

14   Southeast Georgia Regional Medical Center and wanted to have you treat a

15   patient there for pain medicine, you couldn't do it; right?

16   A   Not as an inpatient.

17   Q   Is there – could you treat a patient in Savannah in the hospital setting?

18   A   No, sir.  Well, I –

19   Q   – There's not a hospital in the country that you could treat a patient in;

20   is there?

21   A   I no longer carry privileges.

22   Q   In fact, on The Georgia Composite Board's website, sir, you list yourself

23   as a solo practitioner with a full range practice; correct?

24   A   Yes.

25   Q   The only thing that you say on The Georgia Board's website is that you

-678-

1    don't do obstetrics; correct?

2    A    Yes, sir.

3    Q    That doesn't say a word on your Georgia Board credentialing about

4    anything related to pain management; does it?

5    A    No, sir, that was submitted when I was doing family practice.

6    Q    You have never taught in a medical school; have you, sir?

7    A    No.

8    Q    You have never taught medical residents.

9    A    In my previous practice I had residents rotate through.

10   Q    Yeah, bad question.  That's right.  That would've been when you were

11   doing family practice –

12   A    Yes.

13   Q    – up in Wheeling.

14   A    In Ohio.

15   Q    You have never taught residents in the field of pain medicine; true?

16   A    That's true.

17   Q    Haven't taught fellows in the field of pain medicine; true?

18   A    That's true.

19   Q    Now, you agree with me, do you not, Dr. Kennedy, that when you

20   undertake to testify in a court of law, whether it's a civil or criminal case, that

21   that's an important matter as an expert witness; correct?

22   A    Yes, sir.

23   Q    And you agree that before testifying you should be fully informed of the

24   facts regarding the matter in which you're testifying.

25   A    Yes, sir.

1    Q    And that you should be familiar with the medical records; correct?

2    A    Yes.

3    Q    And that you have a solemn obligation to be fair, no matter who is

4    paying your bill; that's true, isn't it?

5    A    Definitely.

6    Q    And it's fair to say, is it not, that a physician who testifies regarding

7    medical standards should have clinical experience about the subject matter

8    of that testimony?  That's fair to say; is it not?

9    A    Yes, sir.

10   Q    And in this case, you have no knowledge regarding the facts of this

11   matter other than what you – the papers that you have reviewed; is that

12   accurate?

13   A    I'm not exactly certain how to answer your question.  Can you ...

14   Q    Well, your testimony in this matter is based upon your review.

15   A    Yes, sir.

16   Q    And that's the review of the patient charts that we've just been through,

17   the 25.

18   A    Yes.

19   Q    And if I were to open a patient chart, then, there would be a factual

20   basis for each and every opinion that you've expressed in this matter;

21   correct?

22   A    Yes.

23   Q    By the way, pain medicine, sir, can be a difficult business; can't it?

24   A    Yes.

25   Q    And that's because you've been fooled by patients; haven't you?

-680-

1    A    I have.

2    Q    And you've been fooled on more than one occasion; right?

3    A    I have.

4    Q    And in fact, you've discovered, in fact, later in your treatment of a

5    patient that that particular patient, or patients, have lied to you or deceived

6    you; that's fair to say, isn't it?

7    A    Yes, sir, it is.

8    Q    And that, sir, is something that pain management specialists deal with;

9    isn't it?

10   A    No, we're talking about pain –

11   Q    – Pain medicine.

12   A    Well –

13   Q    You got me there.

14   A    – I'm doing pain management.  Your questions –

15   Q    Yes, sir.

16   A    – have been about pain medicine, but the answer in either case would

17   be yes.

18   Q    All right.  In other words, it can be a problem patient population; right?

19   A    Yes, sir, it can.

20   Q    And in treating uninsured patients who have addiction problems, you

21   would agree with me that that can be a particularly problematic patient

22   population, as well; would you not?

23   A    Yes.

24   Q    And that's been discussed, has it not, in the professional literature for

25   dozens of years; correct?

-681-

1    A    The treatment of –

2    Q    – The difficult treatment of uninsured folks who may have addiction or

3    dependence problems.

4    A    With pain –

5    Q    – Yes, sir.

6    A    With pain problems?  Yes, sir.

7    Q    And it's fair to say that in your experience, in your professional

8    expertise, that the under treatment of pain in the U.S. is a significant

9    problem.

10   A    It is.

11   Q    And it's also fair to say, is it not, that pain hurts folks more than just

12   physically; true?

13   A    Definitely.

14   Q    And pain can cause depression; correct?

15   A    Yes.

16   Q    Pain can impact productivity; correct?

17   A    Yes.

18   Q    Pain can impact how someone participates in society; true?

19   A    True.

20   Q    And you would also agree, would you not, Dr. Kennedy, that a

21   physician, treating someone with chronic pain, whenever possible, should

22   err on the side of trying to treat that patient; that's fair to say, isn't it?

23   A    In my opinion, yes.

24   Q    And you would agree that even if someone is addicted to prescription

25   medications, that sometimes people in that patient population are suffering

-682-

1   from pain and need prescription pain medication.

2   A    Yes, sir.

3   Q    And you would also agree that just because folks have these problems

4   with dependence, addiction, what-have-you, that that doesn't mean you

5   shouldn't treat them; right?

6   A    Agreed.

7   Q    And that you shouldn't prescribe them medication; right?

8   A    Agreed.

9   Q    In other words, those people are entitled to be treated; correct?

10  A    Certainly.

11  Q    And you would agree, would you not, Dr. Kennedy, that folks with old

12  injuries, even years-old injuries, can sometimes have those injuries cause

13  them pain in the present day?

14  A    Certainly.

15  Q    And so it can be hard for the treating physician, hard for the treating

16  physician to deal with the patient who may be presenting with problems that

17  occurred years in the past.

18  A    The question is it can be difficult for a physician to deal with pain

19  problems for an injury in the distant past?

20  Q    Yes, sir.

21  A    Yes, sir.

22  Q    Now, some folks with drug dependence – and by the way, when you look

23  at a file here, these 25 files that we just reviewed, you can't tell me from

24  looking at that hard piece of paper that that particular patient is an addict;

25  can you?

-683-

1   A    No, sir.

2   Q    You can't tell me whether that person is a dependent person; can you?

3   A    Categorically, no, but equivocally, yes.  It would raise my suspicions,

4   some of them.

5   Q    Other than raising than your suspicion, you cannot tell.

6   A    No, sir.

7   Q    And by the way, some folks who are drug dependent, whether we get

8   into the category of addict or not, some folks who are drug dependent can be

9   shrewd; correct?

10  A    Yes, sir.

11  Q    They can be good deceivers; correct?

12  A    That's true.

13  Q    One of the things that makes the job difficult; right?

14  A    Yes, sir.

15  Q    They can be good liars; correct?

16  A    Yes.

17  Q    And simply because you, as the treating physician, could get fooled by a

18  patient, that doesn't mean that you've somehow practiced bad medicine;

19  does it?

20  A    Not necessarily, no.

21  Q    And that doesn't mean that you've committed a crime; does it?

22  A    Not necessarily, no.

23  Q    And when a patient is able to get drugs from a doctor under false

24  pretenses, that doesn't mean that the doctor has operated outside the scope

25  of a legitimate practice; does it?

-684-

1   A    Can you say that again?

2   Q    I'll try and do it in two parts.  Just because the patient got prescription

3   medications under false pretenses doesn't mean the doctor was abandoning

4   the practice of medicine; right?

5   A    That's true.

6   Q    Dr. Kennedy, you have testified as an expert witness for the government

7   in three separate trials, if I'm accurate, in the last three years;  is that

8   accurate?

9   A    That sounds right.

10  Q    And you are now being paid by the Department of Justice for the work

11  you've been doing for them.  I believe you testified to that.

12  A    Yes, sir.

13  Q    In 2013, is it fair to say that your biggest payor, your biggest single

14  payor, was the Department of Justice and the DEA?

15  A    From my entire income?

16  Q    Yes.

17  A    No, sir.

18  Q    In 2012 and 2013, the United States Attorney's Office paid you

19  $21,150?

20  A    Yes.

21  Q    Does that sound accurate?

22  A    It very well could be.

23  Q    And last month you submitted a bill – you testified for the government

24  in a trial last month down in Brunswick; didn't you?

25  A    I did, yes, sir.

-685-

1    Q    You submitted a bill for that testimony for $5,500?

2    A    That's correct.

3    Q    You haven't gotten paid, as I understand, from government counsel.

4    A    Not yet.

5    Q    But you have submitted that bill.

6    A    Yes, sir.

7    Q    And the DEA has paid you $32,800 for helping them; right?

8    A    That probably is correct.

9    Q    So as I – if I'm doing my math right, for the years 2012, 2013, with

10   respect to the Department of Justice at $21,500, and then $5,500 for last

11   month, and then $32,880 from the DEA, that's $59,530 in the last two

12   years; does that seem accurate?

13   A    Yes, it could very well be.

14   Q    Now, you talked to us for a minute, Doctor, about being, I think you

15   say, Diplomate of the American Academy of Pain Management; right?

16   A    Yes, sir.

17   Q    That's a far cry, is it not, from being board certified by the American

18   Board.

19   A    Yes, sir.

20   Q    And by the way, just out of curiosity, in your board certification for

21   your family practice, you did three years of specialty training; did you not?

22   A    Yes.

23   Q    And then you had to sit for the specialty board; correct?

24   A    Yes.

25   Q    That's a day-long process for family medicine?

-686-

1  A    Yes.

2  Q    And then you get – did you go through oral exams as well?

3  A    No.

4  Q    And then you have to maintain that certification after that, which can

5  be an enormous effort just to do that – maintain that certification; can't it?

6  A    Yes.

7  Q    Now, have you maintained your board certification in the family

8  practice boards?

9  A    Yes.

10  Q    Have you reviewed the expert witness guidelines of The American – let

11  me get the right thing here – The American Board for Family Practice?

12  A    In the distant past.

13  Q    Are you aware that The American Boards for Family Practice require

14  that before a physician testifies as an expert witness, that they should be

15  fully trained in the medical specialty or area of practice about which he or

16  she is testifying.

17  A    Yes, sir.

18  Q    So from your own organization, it says you have to be fully trained in

19  order to testify; correct?

20  A    For family practice?

21  Q    That's the family practice code of ethics or standards; right?

22  A    Right.

23  Q    And you would admit to me, would you not, that you are not fully

24  trained in pain medicine; true?

25  A    In pain medicine.

-687-

1    Q    And the AMA, The American Medical Association, has similar

2    standard, does it not, its code of ethics?

3    A    Yes.

4    Q    And that code of ethics for The American Medical Association says

5    that before you testify, you should be fully trained in that area of specialty

6    that you're testifying in; right?

7    A    Yes.

8    Q    Have you ever had your – you talked about doing peer reviews with

9    respect to The Georgia Medical Board, and I'll talk more about that with

10   you in a minute.  Have you ever submitted your testimony for the purpose

11   of having it peer reviewed by any organization?

12   A    Have I submitted testimony for peer review?

13   Q    Yes.

14   A    No, sir.

15   Q    Now, you testified earlier about the requirements to be credentialed as

16   a member of The American Academy of Pain Management; correct?

17   A    Yes.

18   Q    And in fact, what that says is that you have to have practiced with

19   someone for a two-year period of time; correct?

20   A    I don't know that it specifically states that you have to have practiced

21   with someone.

22   Q    You might be right about that, and so I'll move on.  But what you do

23   have to do is, you have to pay an application fee of $350; correct?

24   A    That's true.

25   Q    And after you pay that application fee of $350, then you – in order to

-688-

1    be a diplomat, then you take an online test; correct?

2    A    I did not take an online test.  That could be their current standard, but

3    at the time it was, it had to be at a specific location.

4    Q    Okay.  And so you did take a test; right?

5    A    Yes.

6    Q    Was that a two-hour test?

7    A    Give or take.

8    Q    And it was a pass-fail.

9    A    Yes.

10   Q    And after you take that test and, you know, pass-fail, then voilá, you're

11   now a diplomat in The American Academy of Pain Management; right?

12   A    Yes, sir.

13   Q    And I believe that you said that one of the things you have to do, is

14   that you have to be a practicing physician; right?

15   A    Yes.

16   Q    So every physician can do that test.

17   A    That's true.

18   Q    And that specialty, that certification is not recognized by The

19   American Board of Medical Specialties; is it?

20   A    No, that's true.

21   Q    That body, The American Academy of Pain Management, is not

22   regulated by anyone in the medical profession in terms of the American

23   Boards; correct?

24   A    The American Academy is not regulated by The American Board?

25   Q    Right.

-689-

1    A    Not to my knowledge.

2    Q    And so it allows physicians with no special training to claim special

3    training; right?

4    A    I don't know that I would agree with that.

5    Q    Let me ask it a different way.  It allows physicians with no specialty

6    training to claim an area of specialization; that's true, isn't it?

7    A    I don't know that I would agree with that either.

8    Q    Now, once you become a member of The American Academy, you

9    receive documents, do you not, from The American Academy?

10    A    Receive documents?

11    Q    Yes.

12    A    Yes, sir.

13    Q    They send you several periodicals –

14    A    Yes.

15    Q    – a year; correct?

16    A    Yes.

17    Q    And you would agree with the statements from that organization that

18    pain is a silent epidemic in the United States.

19    A    Not so silent in my practice, but that would be the opinion of the

20    organization, I do not doubt.

21    Q    And you would agree with the statement of your organization, The

22    American Academy of Pain Management, that an estimated 50 million

23    Americans live in chronic pain caused by disease, disorder, or accident.

24    A    True.

25    Q    And you would agree that one can – that your organization maintains

-690-

1   that one can conclude that chronic pain and its under treatment represents

2   a major problem confronting us.

3   A   I would agree that the organization would conclude that?

4   Q   No, sir, your organization concludes that pain and its under treatment

5   represents a major problem.

6   A   Yes, sir.

7   Q   And that untreated pain has a significant impact on the sufferer; right?

8   A   Yes, sir.

9   Q   And on the family of the sufferer; right?

10   A   Yes, sir.

11   Q   And on the community as a whole; right?

12   A   Yes, sir.

13   Q   We talked about, Doctor, the significant things one has to do to

14   maintain your certification, board certification.  That can be, again, an

15   enormous task for a individual physician to do that.  But to maintain your

16   diplomat status, what you have to do is maintain a license to practice;

17   correct?

18   A   That's correct.

19   Q   Do a hundred hours of CME, which is continuing medical education,

20   within a four-year period.

21   A   Yes, sir.

22   Q   Not very onerous; right?

23   A   It's not.

24   Q   And promise to practice within The American Academy code of ethics

25   and patients' bill of rights; right?

-691-

1     A    Yes, sir.

2     Q    Just briefly, Doctor, oxycodone is a legal drug in the United States,

3   legal controlled substance; correct?

4     A    Yes.

5     Q    And the recommended dosage unit for oxycodone is what?

6     A    To my knowledge there is no specific recommended dosage unit for

7   that medication.

8     Q    Right.  So there's nothing in terms of the literature – and Mr. Knoche,

9   counsel for the government, mentioned a few things – but there's nothing

10   in terms of the literature that tells the individual physician, this is the

11   recommended dosage.

12     A    That's correct.

13     Q    And so what that means is that the unit dosage is up to the clinical

14   judgment of the physician; correct?

15     A    Yes, sir.

16     Q    Now, so with respect to the dosage unit, there were some questions

17   about that.  You have no general quarrel with the dosage unit, because

18   there's not a standard that governs the dosage unit; is that fair to say?

19     A    That would depend on the situation under discussion.

20     Q    Exactly.  And of the 25 patient chart reviews you did, the charts

21   showed that each of those 25 patients was already on oxycodone; correct?

22     A    To the best of my recollection, yes.

23     Q    So that Dr. Azmat did not initiate narcotic pain management; correct?

24     A    Not necessarily.

25     Q    And it is also true, is it not, that Dr. Azmat reduced the number of

-692-

1    medication, the amount of medication, in each and every patient; did he

2    not?

3    A    No, sir, not necessarily.

4    Q    Are you familiar with ones where he did not?

5    A    There are no previous medical records to establish what they had been

6    prescribed, so it's impossible to say whether a dosage was kept the same,

7    decreased, or increased.

8    Q    Well, you saw the pharmacy records, right, so let's just look at the ones

9    with the pharmacy records, previous pharmacy records.  That gives you a

10   baseline; right?

11   A    Yes, sir.

12   Q    With respect to the ones that – do you know how many records there

13   are with pharmacy, previous pharmacy –

14   A    – Not off the top of my head, no.

15   Q    Okay.  Several?  I can't remember either.

16   A    A few.

17   Q    With respect to those ones with pharmacy records in them, he

18   decreased the medication in each of those; did he not?

19   A    Would not surprise me, sir.

20   Q    Also true that on some of those, he decreased the medication by more

21   than 50 percent; true?

22   A    I cannot quote a specific instance but, again, that would not surprise

23   me.

24   Q    Is it true, Dr. Kennedy, that he decreased – excuse me, that he

25   discontinued the Valium for each patient that was on the combination of

-693-

1  oxycodone and Valium?

2  A    I do not recall that specifically, but I don't recall any prescriptions for

3  Valium, so that could be the case.

4  Q    You would agree with me that the combination of Valium and

5  oxycodone can be problematic; right?

6  A    Yes, sir.

7  Q    And the reason, I think you said, is because they're both central

8  nervous system depressants; right?

9  A    That's correct.

10  Q    And so the combination of those can make it dangerous for the

11  patient; right?

12  A    Yes.

13  Q    So that when Dr. Azmat is eliminating the Valium, then he's making it

14  safer for the patient; right?

15  A    You could make that argument.

16  Q    Well, it's either true or not.  Do you agree with me that that's a fair

17  statement?

18  A    It depends on what's being done with other medications at the time.

19  As a general statement, yes, sir, that's true.

20  Q    Okay, and it's also true, is it not, Doctor, that the combination of

21  Xanax and oxycodone presents that same CNS depressant, central nervous

22  system depressant, effect in combination that becomes dangerous; right?

23  A    Yes.

24  Q    And so did you notice that Dr. Azmat discontinued the Xanax for

25  almost each and every patient that was on Xanax?

-694-

1    A    There were Xanax prescriptions in the chart also.  I mean, there were

2    also patients for whom Xanax was continued, and I don't remember

3    specifically about initiated.  But, again, if Xanax was discontinued, that

4    would not surprise me.

5    Q    It would be – if there is a combination, if a patient was on, Dr.

6    Kennedy, a combination of oxycodone and Xanax, and if Dr. Azmat

7    discontinued that Xanax, that would be a positive thing for the patient;

8    right?

9    A    Generally speaking, yes.

10   Q    Do you recall that Dr. Azmat – if you don't, it's fine, I know you've

11   reviewed a lot – wrote Xanax for only three patients?

12   A    I don't recall, but that number doesn't sound incorrect to me.

13   Q    And do you recall that on each of those three, he reduced the

14   milligrams from 2 milligrams to 1 milligram?  Did you notice that?

15   A    I noticed that the dosage was decreased on some Xanax prescriptions,

16   yes, sir.

17   Q    Now, you know what a drug detoxification is; don't you?

18   A    Yes.

19   Q    That can be a dangerous situation for a patient; can it not?

20   A    It can.

21   Q    In which case, sometimes the patients are hospitalized as result of

22   drug detoxification.

23   A    You talking about drug withdrawal?

24   Q    Yes, sir.

25   A    Yes.

-695-

1   Q    So why don't you – tell us what drug withdrawal is so that we have that

2   term defined for us.

3   A    In patients who are addicted or chemically dependent who have

4   developed a level of tolerance, if the medication is then abruptly withdrawn

5   from them and is not tapered, they have a setup for physiologic condition

6   where they would go through what's called an abstinence syndrome

7   because of the lack of medication.

8   Q    And that can be bad for the patient.

9   A    It can.

10  Q    Can result in the hospitalization of the patient.

11  A    It can.

12  Q    In some cases it can result in the death of a patient.

13  A    It can.

14  Q    In terms of the specifics, did you notice that – I think the number is 22

15  of the 25 patients – Dr. Azmat either reduced or discontinued the either

16  Xanax or Valium?  Does that sound right to you?

17  A    Can you re-say the question, please?

18  Q    In 22 of the 25 patients, Dr. Azmat either reduced or discontinued

19  either Xanax or Valium.

20  A    In 22 out of 25?

21  Q    Yes, sir.

22  A    Okay.

23  Q    Did you notice that?

24  A    Not off the – not put in those terms, no, sir.

25  Q    Now, you mentioned something during your direct examination about

1    it would be impossible to tell that without seeing the patient.  Do you recall

2    that phrase that you used that on?  If you don't, it's all right.

3    A    Well, I recall the statement, but the context is ...

4    Q    Okay, and it's getting late in the day.  But what you were referring to

5    when you were talking about seeing the patient is what in medicine is called

6    a clinical examination; right?

7    A    Clinical examination is comprised of the history and the physical

8    examination, and the actual patient encounter.

9    Q    Yes.

10    A    I'm not certain how to answer your question.

11    Q    Well, let me just see if I can move on and get to it.  You've been

12    treating patients in the pain medicine setting since 2005; correct?

13    A    Pain management.

14    Q    Pain management?

15    A    Yes.

16    Q    And you would agree with me that in assessing a patient, you use your

17    clinical judgment in assessing that patient; correct?

18    A    Yes, sir.

19    Q    In other words, you wouldn't treat a patient without seeing that

20    patient, would you?

21    A    No.

22    Q    If I called you up and said, doc, this is my problem, you're going to say

23    come to my office; right?

24    A    The exception could be if you were on call for another physician, and

25    you had been called about somebody that you didn't know.  In that case, it

-697-

1    may be possible to treat somebody that you had not seen.

2    Q    In your practice, you make it a practice to make sure you see your

3    patients.  That's especially important for you; right?

4    A    Yes, sir.

5    Q    And in your American Academy of Pain Management, when you took

6    their test, they had a number of questions that dealt with patient

7    assessment; right?

8    A    Yes.

9    Q    In fact, out of the 120 questions that are now on there, I think 40 of

10   those questions – yeah, 40 of those questions deal with pain assessment, or

11   of patient assessment, excuse me.

12   A    Wouldn't surprise me.

13   Q    And what we're talking about in that patient assessment is what I was

14   asking about just a few minutes ago; and that is, the clinical examination;

15   right?

16   A    Can you rephrase that, sir?

17   Q    What we're talking about when you're making the patient assessment,

18   is the clinical examination; true?

19   A    Okay, yes.

20   Q    That's true; isn't it?

21   A    Well, I just want to be sure that you and I are using the same terms

22   when you say clinical assessment.

23   Q    Actually, I'm talking about a clinical examination.  You know, when

24   you're physically looking at the patient; right?

25   A    Okay.

-698-

1   Q   When you're physically talking to the patient; correct?

2   A   Okay.  Yes, sir.

3   Q   Is that fair to say that's the clinical examination?

4   A   The clinical examination, in my view, is the whole encounter where

5   you have the medical records, the patient history, the physical examination.

6   Q   Right.  And that is, that clinical examination, that is indispensable to

7   your practice of medicine; isn't it?

8   A   Yes.

9   Q   That hands-on, eyes-on a patient, indispensable; fair to say?

10  A   Yes.

11  Q   And you would agree with me that Dr. Azmat had that available to

12  him; right?

13  A   Had what available to him?

14  Q   He had the availability to lay eyes on, lay hands on the patient.

15  A   As far as I know, yes, sir.

16  Q   And with respect to those 25 patient reviews that you've done, you did

17  not; did you?

18  A   No, sir.

19  Q   Now, there have been several patients who have testified here.  Have

20  you examined any of those patients?

21  A   No, sir.

22  Q   Did you ask to examine any of those patients?

23  A   No, sir.

24  Q   Did you see any of those patients today while you were here?

25  A   No, sir, not that I know of.

-699-

1   Q   You would grant me, would you not, Dr. Kennedy, that there is value

2   to the physician in just seeing the patient; that's fair to say.

3   A   Yes.

4   Q   And you would grant me that you want to lay eyes and hands on a

5   patient in your treatment of a patient; true?

6   A   True.

7   Q   And when you testify as an expert witness, you don't have the benefit

8   of having examined that patient; do you?

9   A   That's correct.

10   Q   Now, you started reviewing these documents here apparently in late

11   2011, early 2012.

12   A   That sounds right.

13   Q   Did you ever ask anyone with the government, let me examine at least

14   one of these patients?  Did you ever make that request?

15   A   No, sir.

16   Q   Did you ever tell the government about the importance of the clinical

17   examination in the physician's eyes?

18   A   Did I tell the government the importance of the physical examination?

19   Q   Yes.

20   A   Yes, sir.

21   Q   Did you tell – strike that.  It's fair to say that the physical examination

22   is conducted so that the treating physician can, in conjunction with the

23   history and physical, can come to a conclusion about what that patient's

24   problem was?

25   A   Yes.

-700-

1   Q     And by the way, you talked earlier about – I think that Mr. Knoche

2   asked you some questions about what the patient had said.  What the

3   patient tells you is a history; correct?  When we're talking about taking a

4   history and physical, you sit down with a patient and say, you know, Mr.

5   Withers, tell me what's going on, why are you here today; right?

6   A     That's the historical part, yes.

7   Q     And if I tell you, well, I was involved in a motor vehicle accident in

8   2009 and my neck has been hurting since, it's your testimony that unless

9   the doctor obtains my medical records from my treating physician from

10  that accident, that that doctor has abandoned the practice of medicine.

11  A     That was not my testimony.

12  Q     Okay.  So the standard does not require, whether you were talking

13  about the standard of care, the standard of Georgia, generally, the standard

14  nationally, the standard does not require the treating physician to get every

15  prior pain – or excuse, treatment record.

16  A     No, sir.

17  Q     It does not?

18  A     No, sir.

19  Q     If I come limping into your office because I've had problems with my

20  foot and it's causing me pain throughout the day, you don't tell me, do you,

21  Dr. Kennedy, you know, I don't believe you, Mr. Withers.  I want to see the

22  medical records from your surgeon; do you?

23  A     Mr. Withers, you wouldn't – I see patients by referral only, so your

24  medical records have to be in my possession first.

25  Q     Right, so you're not going to see me until you have my medical record;

-701-

1    right?

2    A    Yes, sir.

3    Q    But that practice of Dr. Gene Kennedy from St. Simons does not

4    establish what the standard is, either in the state of Georgia or nationally;

5    right?

6    A    That's true.  That is true.

7    Q    Now, medical records can be incomplete; can they not?

8    A    Yes.

9    Q    Doctors can make mistakes, can they not?

10    A    Most definitely.

11    Q    And we looked at one, I think it was Latina Simpson, where there

12    wasn't a diagnosis written in, wasn't treatment – anything regarding a

13    treatment plan written in.  There is a difference between incomplete

14    medical records and no medical records; is there not?

15    A    Yes.

16    Q    And in fact, you've testified about that in other cases.  A doctor has

17    had no medical records following an encounter with a patient; right?

18    A    That's true.

19    Q    That's bad.

20    A    That's very bad.

21    Q    And you also know, do you, Dr. Kennedy, that – let me turn back to

22    that Latina Simpson thing.  We all make mistakes, right?  And you wouldn't

23    say just because there is a diagnosis omitted on that one patient chart, that

24    that means that Dr. Azmat has abandoned the practice of medicine.

25    A    Certainly not.

1    Q    And you know, do you not, that every physician keeps his or her

2    records differently; correct?

3    A    That's true.

4    Q    In fact, nowadays, an awful lot of doctors have electronic medical

5    records, EMR; right?

6    A    That's true.

7    Q    And so what you see now is a lot of doctors just kind of punching

8    things into a computer and it brings up template after template; right?

9    A    Yes, sir.

10   Q    Hard as a reviewing physician to really determine what was happening

11   with that patient.

12   A    That is correct.

13   Q    And you also know, do you not, Doctor – and I don't mean this to

14   suggest that Dr. Azmat is an old man – but you also know that some of the

15   doctors with a little gray hair and missing a little hair don't keep medical

16   records like some of the younger physicians.

17   A    That's true.

18   Q    That's fair to say, isn't it?

19   A    That's true.

20   Q    In other words – in fact I think, you know,  you mentioned about The

21   Georgia Composite Board, The Composite Board has written a lot about

22   that over the years because of some of the older doctors aren't the best

23   record keepers; right?

24   A    That's a fact.

25   Q    And you would also agree with me, you're aware that The American

-703-

1    Medical Association's position and their code of ethics is that the medical

2    records are the property of the physician, although they must be shared

3    with the patient; correct?

4    A    Yes.

5    Q    And so what that means is, the medical record is there for – and I

6    think this is what the code of ethics says – primarily for that doctor's own

7    use.  That's fair to say, isn't it?

8    A    I would agree.

9    Q    And it's also fair to say, I just talked about The Georgia Composite

10   Board a minute ago, that that board is sympathetic to doctors who haven't

11   done as good a job as they should've done with respect to record keeping

12   over the years; true?

13   A    I can't speak for the board.

14   Q    Okay.  One of the factors that you have talked about in each of the 25

15   patients is the lack of prior records.

16   A    Yes.

17   Q    Correct?  Did you ever ask the government, you know, we got plenty of

18   time here, let's get some of those prior records, let's see what they look like?

19   Did you ever make that request?

20   A    No, sir.

21   Q    Now, Dr. Kennedy, one of the continuing challenges with respect to

22   pain medicine and pain management, is that there is no pain meter to

23   determine the amount of pain someone is feeling; right?

24   A    I agree.

25   Q    And in fact, it is strictly subjective; true?

-704-

A    It's mostly subjective.  I think that people who have experienced hands can objectively tell when somebody is experiencing pain.  But by and large, what you're saying is true.

Q    From the patient's communication to the physician, the physician has to rely on what the patient says; that's a fair statement, is it not?

A    Not exclusively, but essentially.

Q    You would agree with me, wouldn't you, Doctor, that when a patient walks into a doctor's office seeking pain medication, that the first thing a doctor should do is listen to the report of pain and the description from the patient.

A    Yes.

Q    And likewise, you would agree with me that sometimes pain correlates to a physical study, such as an MRI; right?

A    Yes.

Q    In other words, you can have a – to put it more simply, you can have a MRI with positive findings.  That means it looks bad to the physician; right?

A    Yes.

Q    But that patient isn't really complaining of pain; right?

A    That's true.

Q    You can have a client come in, a patient come in and that patient can have a normal MRI but have a terrible back; right?

A    That's true.

Q    By the way, speaking of back, Counsel was asking you about, well, golly, we're seeing a pattern.  Most of the complaints are about low back

-705-

1    pain.  Your organization recognizes that the primary complaint of chronic

2    pain deals with the low back; right?

3    A    Yes, sir.

4    Q    So it's not surprising to you as a physician that you're seeing the

5    complaints of pain with respect to low back pain; right?

6    A    I would not expect to see that as an almost exclusive thing, but I would

7    expect to see a fairly large number, perhaps even a preponderance, of low

8    back pain.  To my knowledge, there was one chart that was neck pain, and

9    the remainder of the patients were low back pain, if I remember correctly.

10   Q    By the way, you dispense medication from your office; do you not?

11   A    I do.

12   Q    You did not find that medications were dispensed from East Health

13   Center; did you?

14   A    No, sir.

15   Q    Dr. Azmat was writing prescriptions, not dispensing; correct?

16   A    That's correct.

17   Q    Now, you believe that the use of urine toxicology screens is appropriate

18   in the pain management world; correct?

19   A    Yes.

20   Q    Now, to be fair, even though there are urine toxicology screens used

21   here at East Health Center, that's not a requirement by any means in terms

22   of either a civil standard of care or otherwise; correct?

23   A    The laws have changed over the last couple of years, and The Georgia

24   State Medical Board has recently – their guidelines do include urine

25   toxicology screening in patients who are receiving narcotics medications;

1    but at the time that we're talking about, that was not in effect.

2    Q    Turning back briefly to the issue of medical records, even though you

3    talked about that on virtually all 25 occasions, there is no professional

4    requirement that a doctor obtain medical records before treating a patient;

5    is there?

6    A    No.

7    Q    And the standard of care, even in a civil standard where you're talking

8    about whether a doctor has done something negligent or not, doesn't

9    require even that that physician obtain prior medical records; does it?

10   A    Not required, no, sir.

11   Q    Now, Doctor, you wrote 25 patient reviews in this case.  Have you had

12   those – have you looked at those while you've been up on the stand?

13   A    Yes, sir, I referenced them.

14   Q    Now, in those patient reviews, you did not cite a single standard; did

15   you?

16   A    I don't remember exactly the particular template, but I believe that the

17   Georgia Code is referenced in these.

18   Q    I'll let you see if you can find that, but I don't want to take up the jury's

19   time with doing that right now.

20   A    Okay.

21   Q    When you're talking about the Georgia Code, are you're talking about

22   the Georgia regulations that are announced, I guess for want of a better

23   word, by The Composite Board.

24   A    I don't know if the question –

25   Q    – When you were referring to the Georgia Code, what were you

-707-

1    referring to?

2    A    The Medical Board regulations, not rules.

3    Q    There you go, and when we're talking about medical board, just so the

4    jury knows, we're talking about The Composite Board of Medical

5    Examiners for the State of Georgia.

6    A    Yes, sir.

7    Q    And Dr. Kennedy, you know here in this case, we are not talking about

8    what a doctor – in terms of whether there is a prescription issued for a

9    legitimate medical purpose, we're not talking about a standard of care here;

10   are we?  Standard of care is a term in a civil case; is that fair to say?

11   A    I'm thinking how best to answer your question here –

12   Q    – Well, let me ask it –

13   A    – Ultimately, in my opinion, it is a standard of care issue, but not

14   specifically as I think you are referring to in terms of a medical malpractice

15   kind of standard of care.

16   Q    Have you ever testified in a medical negligence case before?

17   A    No, sir, I have not.

18   Q    In your testimony in 2012 in this courthouse, you didn't cite a single

19   textbook or treatise when you were talking about your opinion; were you?

20   Did you?

21   A    Sir, I don't recall which case specifically you're talking about, but I

22   don't recall being asked.

23   Q    Okay.  Sir, do you have your expert worksheet in front of you there?

24   A    I have the ones that I have completed.  Are you meaning a blank one?

25   Q    No, sir.

-708-

1    MR. WITHERS: May I approach and retrieve that, Your Honor?

2    THE COURT: Yes, sir.

3    WITNESS: Thank you, sir.

4    Q    Just trying to streamline things here, sir.

5    MR. WITHERS: Ms. Bodaford, can you turn this on for me.

6    Q    I'm going to show you – sir, this is your expert worksheet for Dr.

7    Gossett – or excuse me, your expert worksheet for a patient by the name of

8    Nancy Binion; is it not?

9    A    Yes, sir.

10   Q    And you write up there at the top Dr. Gossett; do you not?

11   A    Yes, sir.

12   Q    And in fact, what you are referring to here with respect to Ms. Binion

13   is Dr. Azmat; correct?

14   A    The – yes, yes.

15   Q    All right.  In other words, when you're talking about the initial –

16   excuse me, the encounter documentation of – from 3/14/2011 and you go

17   on, that encounter is – deals with Dr. Azmat; correct?

18   A    As far as I recall, yes, sir.

19   Q    And the MRI for Ms. Binion had significant findings; did it not?  I'll

20   just –

21   A    – Just a moment, sir.  I've got a lot of papers up here.

22   Q    That's okay, Doctor, I know.  Let me go ahead and pop this up here to

23   move things along if I could.  Is that a copy of your report, sir?

24   A    Yes, sir, looks like it.

25   Q    You read the second sentence down, the MRI finding of severe left-

-709-

1    sided L5-S1 neural foraminal stenosis is significant; correct?

2    A    Yes, sir.

3    Q    And could rise to the level of initiating narcotic management; correct?

4    A    Yes.

5    Q    But previous treatment records are absent; correct?

6    A    Right.

7    Q    So that would be a significant finding; would it not?

8    A    Potentially so.

9    Q    On an MRI.  The physical exam indicates straight leg raising 75

10    degrees bilateral, and bilateral ankle swelling. Now, for Ms. Binion, I think

11    this is the one you were mentioning earlier that just doesn't seem to match

12    up with the MRI, not consistent with the MRI.  Is that what your –

13    A    – That was not my testimony, sir.

14    Q    All right.  And what you write here is, well, in explaining your opinion,

15    sir, is it the attending physician inappropriately initially prescribed a

16    Schedule II opiate and Valium in the absence of a credible physical

17    examination or previous treatment documentation; correct?

18    A    Yes, sir.

19    Q    Now, I will tell you, sir, I have spent a while with your records.  Every

20    one of these records that you – reports that you prepared says that the lack

21    of prior treatment documentation informs your opinion about whether Dr.

22    Azmat had ceased practicing medicine, ceased treating the patient.

23    A    That's part of it.

24    Q    Now, let's look at what you wrote was, the attending physician

25    inappropriately initially prescribed a Schedule II opiate and Valium.  Let's

-710-

1    look at what happened here.  What does that say right there, sir?

2    A    Dc Valium.

3    Q    So you remember when I asked you that question earlier about that I

4    would find a factual basis for every opinion you expressed in your reports.

5    Your report in that sense is in error; is it not?

6    A    You may have found one, yes, sir.  If I could have a moment to look at

7    the chart here.  Okay , sir?

8    Q    Yes, sir.

9    A    My understanding is that this patient was seen by two physicians.

10   Q    Right, you wrote a separate report for the other physician, though;

11   didn't you?

12   A    They just give me the charts packaged individually, so chances are it

13   would just be one report on the individual case review.  And there is a

14   prescription for Valium dated 5/23/11 that I'm looking at.

15   Q    Your report – and I don't mean to quibble – but your report talks

16   about what was initially prescribed; doesn't it?

17   A    Yes.

18   Q    It says initially prescribed a Schedule II opiate; correct?

19   A    Yes.

20   Q    And Valium; correct?

21   A    Yes.

22   Q    That's inaccurate; isn't it?

23   A    That is inaccurate.

24            MR. WITHERS: Your Honor, we have these marked, the report

25   for Ms. Binion marked as Defendant's 1 and Defendant's 2 and tender those

-711-

1    and move those into evidence.

2    Q    Going on through that file, sir, the physician-patient agreement that

3    explains a number of the issues with respect to opioid treatment, that's a

4    good thing; isn't it?

5    A    Yes.

6    Q    The MRI, physician evaluating that, that's a good thing; isn't it?

7    A    Yes.

8    Q    The urine drug screen, that's a good thing; isn't it?

9    A    If it's appropriately – if it's dealt with appropriately.  In general terms,

10   yes, it's a good thing.

11   Q    Now, with respect to Mr. Bradley, you talked about him earlier.  The

12   MRI for Mr. Bradley likewise shows a serious issue; does it not?

13   A    Just a moment, sir.  Which patient number are we?

14   Q    I'm sorry?

15   A    I'm trying to find the chart that you're referring to, Mr. Bradley.

16   Q    I tell you what I'm going to do, sir.

17   A    Got it.

18   Q    Okay?

19   A    Yeah.

20   Q    I'm going to put this down here.  We've all seen it earlier.  Are you

21   looking at that MRI on the screen?

22   A    Yes.

23   Q    It says disc degeneration with diffuse loss of disc signal, does it not,

24   there in the third or fourth full paragraph from the bottom?  You with me?

25   A    No.  I'll get there.

-712-

1    Q    Disc degeneration –

2    A    Okay.

3    Q    – with diffuse loss of disc signal.

4    A    Uh-huh.

5    Q    You see that?

6    A    Yes.

7    Q    Yes, sir?

8    A    Yes.

9    Q    It goes on, does it not, central disc herniation.

10   A    Yes.

11   Q    Correct?  Broadbase posterior and extruded central disc herniation.

12   A    Yes.

13   Q    With slight ventral thecal sac impingement.

14   A    Yes.

15   Q    And it talks about an annular tear as well right here.  You with me?

16   A    Yes.

17   Q    All of that amounts to a – what you would agree is an objective finding

18        of a significant injury.

19   A    Not necessarily.

20   Q    Well, you know, I noticed when Mr. Knoche was asking you questions,

21        you would always say, does the MRI support the initiation of narcotic pain

22        management.  A physician is never going to just an MRI and say, boom,

23        that patient needs to get oxycodone; is he?  You're never going to do that.

24        You're going to rely on your clinical judgment; right?

25   A    You would hope so.

-713-

1    Q    So the statement that you repeatedly make in your reports about, it

2    alone doesn't support the initiation of narcotic pain management, it's never

3    going to alone support the initiation of narcotic pain management.

4    A    No, sir, that's not true.

5    Q    Oh, it will?

6    A    Potentially, yes, sir.

7    Q    Okay.  I don't mean to quibble, but as a general rule, that's a fair

8    statement; isn't it?  You might be able to find some exception to that rule.

9    A    Will you restate the rule?

10   Q    Yeah.  What you say repeatedly, every one of these reports, is, the

11   initiation of narcotic pain management is not supported by the MRI alone.

12   You recall that phraseology?

13   A    Yes, sir.

14   Q    You mentioned template.  Do you use a template when you write these

15   reports?

16   A    Yes, sir.

17   Q    Because they seem awfully familiar with respect to recurring language;

18   right?

19   A    They're looking at the same thing, so, yes, sir, it's the same template.

20   Q    And you would agree that a physician is not going to look at – as a

21   general matter, is not going to look at an MRI and that alone in terms of

22   assessing whether the patient should be prescribed medication.

23   A    Well, sir, it potentially could be the case if the patient, for example,

24   had a history of surgery on their spine or that sort of thing.  On its own, that

25   would support the initiation of medications.

-714-

1    Q    And by the way, you talk about the initiation of narcotic pain

2    management.  We know, by the way, that Dr. Azmat didn't initiate narcotic

3    pain management for these patients; right?

4    A    No, sir.

5    Q    Excuse me?

6    A    No, we don't.  We don't have any previous medical records.

7    Q    No, no, we do have positive urinalysis, right, for oxycodone.  So that

8    patient's on oxycodone when he or she comes in the office.

9    A    Yes, sir, but my point is, some of those were negative as well.

10   Q    How many did you see were negative, two?

11   A    I don't recall the exact number, sir, but it was not addressed.

12   Q    And with respect to the pharmacy records, that confirmed that the

13   patient was on narcotic pain management.

14   A    Yes, sir, it does.

15   Q    And in those instances, you still wrote, did not support the initiation of

16   narcotic pain management; right?

17   A    I would have to see specifically which –

18   Q    And we'll see.

19   A    – case you're referring to.

20   Q    By the way, on this particular case, that is, Joseph Bradley, on your

21   report, you wrote that Dr. Azmat's diagnosis is below minimum standards;

22   do you recall that?  And I'm just going to put it up here.  It's Defendant's

23   Exhibit 9.  You see that, diagnosis?  You with me at the top of the page, sir?

24   A    Right.

25   Q    And you check or put an "X" below minimum standards; correct?

-715-

1    A    Yes.

2    Q    And let's look at the diagnosis here.  Chronic low back pain, multi-

3    level; right?

4    A    Yes.

5    Q    Do you see that on your screen?

6    A    Yes.

7    Q    Do you see where Dr. Azmat has also written radiculopathy, if I'm

8    pronouncing that right?

9    A    Yes.

10   Q    As well as – is that ...

11   A    Facet arthropathy.

12   Q    Facet arthropathy, thank you very much.  And isn't that, what he has

13   put as the diagnosis, consistent with what we see in the MRI report?

14   A    Yes, it is.

15   Q    Fair to say that this Mr. Bradley fellow that we just looked at has a

16   serious disc disease; does he not?

17   A    No, sir.  Not necessarily.

18   Q    Well, sir, do you agree with what the MRI report – or let me ask it a

19   different way.  Do you have a reason to disagree with the findings in the

20   MRI?

21   A    Potentially.  I think that the MRI could be called into question in this

22   case because there are no numerical values assigned to anything that is

23   herniated or bulging or anything else.  It just uses general terms to

24   describe.

25   Q    You understand when you say the word "potentially," we're sitting in

-716-

1    here in a criminal case; don't you?

2    A    Yes.

3    Q    And with Mr. Bradley – this is Defendant's Exhibit Number 11 – Mr.

4    Bradley was positive for benzodiazepine when he came in; was he not?

5    A    Yes.

6    Q    And the history that he gave was Xanax, that looks like 30 milligrams;

7    right?

8    A    Right.  30 pills.

9    Q    I'm sorry, Xanax 2 milligrams, 30 pills.  Do you read that the same

10    way I do?

11    A    Yes.

12    Q    And Dr. Azmat reduced that to Xanax 1 milligram, 30 pills; correct?

13    A    Yes.

14    Q    That would be, in the treatment of a patient, a good thing to reduce

15    that Xanax; correct?

16    A    Yes.

17    Q    Now, I notice, by the way, Doctor, that you pick and choose what you

18    wish to use against Dr. Azmat to your purpose, and I'm showing you –

19         THE COURT:  – Is that a statement or a question, Mr. Withers?

20         MR. WITHERS: I'm sorry, Your Honor, I apologize.

21    Q    I'm showing you, sir –

22         THE COURT: – No, sir, just – is that a statement or is that a

23    question, Mr. Withers?

24         MR. WITHERS: Well, it is a question.

25    Q    In fact you do pick and choose what –

-717-

1       THE COURT:  – Well, then, let's make it in the form of a

2   question.

3       MR. WITHERS: I'll do it.

4   Q    (By Mr. Withers) You do choose – pick and choose what you wish to

5   credit in Dr. Azmat's physical examination; do you not?

6   A    I try to look at consistently the same things in each chart that I

7   reviewed.

8   Q    All right.  Let's look at Jim Brooks.  And I'm looking, sir, at your

9   report.  And you talked this some when you were being questioned by Mr.

10  Knoche.  Your report – this is marked for purpose of identification as

11  Defendant's Exhibit 16.  You note neurologic exam was normal; correct?

12  A    In my review.

13  Q    Yes, sir, it's up on the screen in front of you.

14  A    Oh, okay.  Yes.

15  Q    And so you are crediting or believing what Dr. Azmat has written with

16  respect to the neurologic exam; correct?

17  A    No, sir.  I am simply noting that that's what is in the chart.

18  Q    And there again, as the previous treatment records are completely

19  absent and no indication that a physician was contacted or records were

20  requested; right?

21  A    Yes.

22  Q    And when you're explaining your opinion down at the bottom of that

23  page, again you talk about the absence of supporting previous treatment

24  documentation; correct?

25  A    Yes.

-718-

1    Q     And there's that language again.  The findings from the provided MRI

2    reports do not rise to the level of initial narcotic management; correct?

3    A     Yes.

4    Q     Now, going back to the – what you write about the overall summary

5    here where I've got the little star out here.  The initial physical examination

6    revealed only nonfocal neurologic findings; correct?

7    A     Yes.

8    Q     Is it fair to say – and that's Defendant's 17 marked for identification –

9    fair to say, then, that you are crediting what Dr. Azmat wrote when he said

10   nonfocal neurologic findings?

11   A     No, sir, I am simply reporting it.

12   Q     And by the way, when you're talking about neurologic function, a

13   normal neurologic function doesn't mean that the patient should not be

14   prescribed opioids; right?

15   A     True.

16   Q     And with respects to Mr. Brooks, sir, Mr. Brooks reported oxycodone

17   210 tablets; correct?  30, 210; correct

18   A     It's –

19   Q     – Right here?

20   A     Yes, that's the presumption that we make, is that that's what was

21   stated.  All we have is what's written on the form.

22   Q     That would be – what is written on the form would be what the patient

23   reported to the physician; correct?

24   A     There is no way of knowing, but that is the presumption that I would

25   make.

-719-

1    Q    Well, let me ask you this: see where it says tree logger?

2    A    Yes.

3    Q    Your presumption would be that the fellow told Dr. Azmat that he's a

4    tree logger?

5    A    Yes, sir.

6    Q    And the oxy 30 milligram, 210 tablets was reduced to 180; correct?

7    A    Yes.

8    Q    The oxy 15 milligram, 90 tablets was reduced to 60; correct?

9    A    Yes.

10   Q    And the Xanax 35 tablets was discontinued; correct?

11   A    Yes.

12   Q    And if – and you have previously written in these reports and

13   previously testified about the dangerous combination of oxycodone and

14   Xanax, and eliminating the Xanax for that patient would be a good thing;

15   correct?

16   A    Generally, yes, sir.  But I would note that the numbers that were

17   circled on that physical examination form are not reflected in the

18   medications that are listed or what the patient reported on presentation.

19   That's why I said that that's what we presume, is that's what the patient

20   told the physician while they were in the room and he circled it in there.

21   Q    Right. Well, I mean, again it's one thing when you have a doctor who's

22   not writing anything down in a patient record, but here we've got a patient

23   record; correct?

24   A    We have a patient record.

25   Q    And you're certainly not going to suggest, are you, that Dr. Azmat

-720-

1   ceased practicing medicine because you suspect that the patient wasn't

2   telling him that.  I mean, that's not your testimony; is it?

3   A    No, sir.

4   Q    Let me show you what's been marked for identification as the overall

5   summary for the patient Carlie Cole.  It's marked as Defendant's Exhibit

6   Number 21.  You note again, initial physical examination revealed only

7   grossly intact neurologic findings; correct?  It's up on your screen, sir.

8   A    Yes, sir.

9   Q    And you talk about the six-year history of pain subsequent to a MVA,

10  that would be a motor vehicle accident; correct?

11  A    Yes, sir.

12  Q    So clinical documentation should've been available; correct?

13  A    Yes.

14  Q    That no records were requested; right?

15  A    Yes.

16  Q    But we know that that's not a standard by which you would adjudge

17  this case; correct?

18  A    That is not what I have testified to, I don't believe.

19  Q    And you write that phrase, the MRI reports do not document findings

20  that alone support narcotic management, and there is nothing else in the

21  chart that supports the patient – the reported patient history; correct?

22  A    Yes.

23  Q    And you have written that there is nothing in the chart that supports

24  the reported pain history, but what this patient has reported to Dr. Azmat

25  in her history – and this is a history of trauma; correct?  You with me?

-721-

1    A    Yes.

2    Q    Up on your screen?  – '07 fell off four wheeler, broke back; right?

3    A    Right.

4    Q    Now, that is a fairly significant injury; is it not?

5    A    We don't know what we're talking about.

6    Q    Well, the patient has reported that she broke her back in a four

7    wheeler accident; right?

8    A    Broke your back can be a pretty broad statement.

9    Q    Well, let me ask you this, Doctor: that's what the patient has reported

10   to Dr. Azmat; correct?

11   A    Correct.

12   Q    Do you have any evidence that's contrary to what's written there that,

13   you know, Carlie Cole didn't break her back in a motor vehicle, or a four

14   wheeler accident in 2007?

15   A    Sir, there is no documentation that states that.

16   Q    All right, and the four wheeler accident where she broke her back

17   would certainly be supportive of having pain in 2011; right?

18   A    If those records were present, yes.

19   Q    Well let me ask you this, Doctor: do you say – and now I'm getting

20   confused.   But do you say to your patient when the patient says, I broke my

21   back in a four wheeler accident, is it your testimony that the standard

22   required is for the doctor to say, prove it to me?

23   A    No, sir, I never said that.

24   Q    Okay.  So what you would assume, then, is what that patient tells the

25   doctor is true; right?

-722-

1   A    Not necessarily.

2   Q    All right.  Well ...  There is nothing in the patient record that supports

3   that, I believe that was what you just testified to.

4   A    Yes.

5   Q    I'm going to  show you what's been marked as Defendant's 25.  Says

6   disc bulging at all levels; correct?

7   A    Yes.

8   Q    Most severe at L2-3; correct?

9   A    Yes.

10  Q    Spinal stenosis at L4-5; correct?

11  A    L4-L5.

12  Q    What's spinal stenosis?

13  A    That would be a narrowing of the spinal canal.

14  Q    Neural encroachment as detailed above, and this would be Defense 24.

15  It's previously been identified in the government's case. There is marked

16  impingement upon the bilateral lateral recesses; do you see that?

17  A    Yes.

18  Q    What is neural impingement, Doctor?

19  A    Neural impingement in the sense that we're discussing is where

20  something is squeezing on a nerve root.

21  Q    Neural, or nerve impingement to put it another way; right?

22  A    Yes.

23  Q    Is painful.

24  A    Can be.

25  Q    Can be.  As a general matter, you would expect neural impingement,

-723-

1    nerve impingement to be painful; right?

2    A    Sir, as you said earlier, you can have a horrible MRI with no

3    symptoms, or you can have a normal MRI with horrible symptoms.  As a

4    general thing, yes, sir.

5    Q    This patient, by the way, was positive for benzodiazepine?

6    A    Positive for oxycodone, benzodiazepines, and opiates –

7    Q    – Let me show you what's been marked as Defense Exhibit 27.  Do you

8    see that on your screen, sir?

9    A    Yes.

10   Q    That shows positive for benzodiazepine; does it not?

11   A    Yes.

12   Q    And look what happens with this patient.  By the way, in your report

13   you wrote that the diagnosis of Dr. Azmat was substandard; didn't you?

14   A    Sir?

15   Q    In your report, sir, you wrote that the diagnosis of Dr. Azmat was

16   substandard; did you not?

17   A    Yes.

18   Q    That diagnosis that he has written here, spinal stenosis, neural

19   foraminal, I think that says nerve impingement, L4-5, that's consistent with

20   the reflections – the findings on the MRI, isn't it?

21   A    That's essentially exactly what's on the MRI.

22   Q    So you would disagree, then, with the MRI as well.

23   A    Potentially, because there a no numerical values.

24   Q    And this is a patient who reported oxycodone 150.  That was

25   continued; correct?

-724-

1    A    Not necessarily, sir.  That's not what is written in the patient-

2    completed previous medication part.  That's what's handwritten on this

3    form.  So, again, that's a presumption that we're making.

4    Q    Well, are you going to presume that when Dr. Azmat was writing that

5    down that he was lying?  Is that part of your opinion in this case?

6    A    No, sir, that's not my statement.  There is a page that has a recorded

7    place for patients to write their previously prescribed medications.

8    Q    Right.  And they don't always complete it to the terms of the number

9    of tablets; do they?

10   A    Not always, no, sir.

11   Q    The lorazepam 2 milligrams, 30; right?

12   A    Yes.

13   Q    Tell the jury what Dr. Azmat did here, please, sir.

14   A    It says, discontinue lorazepam, but it should be noted that on the chart

15   the patient wrote that she previously had been prescribed Xanax.

16   Q    And she was positive for benzodiazepines; right?

17   A    Yes, sir.

18   Q    Is Xanax a benzodiazepine?

19   A    It is.

20   Q    Yes?

21   A    It is.

22   Q    Okay. So whether the patient wrote – what was it that you said the

23   patient wrote?  I'm sorry.

24   A    Xanax.

25   Q    Xanax, we know that the benzodiazepine was discontinued; correct?

1    A    Yes.

2    Q    That would be a good thing; wouldn't it, Dr. Kennedy?

3    A    Yes.

4              THE COURT: Are we going to another patient now, Mr.

5    Withers?

6              MR. WITHERS: I am, Your Honor.

7              THE COURT: I'm going to send this jury home.  Members of

8    the jury, I don't know how much longer this examination is going on.  I'll

9    discuss it with the lawyers after you leave here tonight, but I'm going to

10   send you home for the evening now.  I remind you the same precautionary

11   instructions that I have given you every day; and that is, don't discuss this

12   case with anyone.  Don't even discuss it among yourselves.  Don't discuss it

13   with any family member, friend.  Don't try to find out anything on your own

14   about this case.  Don't look up anything in any encyclopedias, dictionaries,

15   websites, smart phones, iPhones, computers.  I don't need to go through all

16   the different media, but you understand what I'm saying.  But if you do any

17   of that, it would be a serious violation of your oath, and you would be in

18   contempt of this Court's order if you do that.

19             So go home again.  Try to enjoy your evening.  Try to relax.

20   Come back in the morning, and we will begin in the morning at 9:30

21   instead of nine o'clock.  So keep that in mind, we will begin at 9:30.  Again

22   there will be some refreshments for you when you get here.  And with those

23   instructions, please leave your note pads and your pencils in your chairs,

24   and they will be given to you in the morning.

25             [NOTE: The jury is dismissed for the day.  The proceedings are

-726-

1    continued outside of the presence of the jury as follows:]

2              THE COURT: Dr. Kennedy, I need to talk to you before you

3    leave here, but I also need to talk to the lawyers, so I want you to step out in

4    the hall, please.  Do not discuss your testimony with anyone.  Don't talk

5    with anyone while you're out there about anything to do with this case, and

6    I'll see you back in here in a few minutes.

7              [NOTE: Dr. Kennedy leaves the courtroom.]

8              THE COURT:  All right, have a seat, Counsel.  Mr. Withers, the

9    government examination of this witness on direct examination lasted two

10   hours and five minutes.  You have at this time had this witness on cross-

11   examination uninterrupted since 4:30 this afternoon, which means about

12   an hour a half.  What is your estimate on when you're going to finish up

13   with this witness, Mr. Withers?

14             MR. WITHERS: I would say an hour and 15 minutes to an hour

15   and a half, Your Honor.

16             THE COURT: More?

17             MR. WITHERS: Yes, sir.

18             THE COURT: Not going to happen.  He's an expert witness, and

19   I'm going to give you a thorough right to examine him.  The government

20   had him up, like I said, for two hours and five minutes.  You've had him for

21   an hour and a half, so you're going to have to give me a better estimate than

22   that, and I'm going to hold you to it.

23             MR. WITHERS: Your Honor, part of the difficulty with respect

24   to cross-examining this witness is that there are 25 separate charts to go

25   through.  He has given opinions with respect to each of those charts, and

-727-

1    there are things that he has said that are, I think, factually in error.  And I

2    think to provide a constitutionally effective defense for Dr. Azmat that I

3    need to review those charts.

4                    THE COURT: There's a lot of repetition here.  I'm going to give

5    you one hour.  So tonight prepare to use that one hour to your advantage,

6    Mr. Withers.  Do you follow me?

7                    MR. WITHERS: I do, Your Honor.

8                    THE COURT: Okay.  The government, I am assuming, is going

9    to want to rehabilitate this witness in some way, but I will tell you in

10   advance that we're not going to rehash his direct examination, Mr. Knoche.

11   It's not going to be another redirect examination.  Do you understand and

12   fully appreciate what I'm saying?

13                   MR. KNOCHE: Yes, sir.

14                   THE COURT: Because if you attempt – if the government

15   attempts to just rehash all over again what he's already testified to, then I'm

16   going to stop you.

17                   MR. KNOCHE: I understand, Your Honor.

18                   THE COURT: How many more witnesses does the government

19   intend to call?

20                   MR. KNOCHE: Anticipate only one more, Your Honor.

21                   THE COURT: Okay.  All right, there is a matter of law that I

22   want to talk to you about, and I want to put on the record with counsel so

23   that you will understand.

24                   Before this case started, my law clerks and I discussed whether

25   we're talking about a national standard or whether we're talking about a

-728-

1     regional or state standard.  But before we get into that, bring Dr. Kennedy

2     back in here.  I forgot we still have him.

3                     [NOTE: Dr. Kennedy returns to the courtroom.]

4                     COURT SECURITY OFFICER: Would you like him on the

5     witness stand, Your Honor?

6                     THE COURT: No.  This is his records.  Come up here and get

7     your records, Doctor.

8                     [NOTE: Dr. Kennedy retrieves his records from the witness

9     stand.]

10                    THE COURT: All right, Doctor, we've had to break during your

11    testimony, and we'll start with you being back on the witness stand in the

12    morning at 9:30.  In the meantime, do not discuss your testimony with

13    anyone.  Don't discuss it with any lawyer for the government.  Don't discuss

14    it with any lawyer for the defendant.  Don't discuss it with any agent or

15    anyone.  Don't discuss it with anyone means just don't discuss it at all with

16    any person.

17                    DR. KENNEDY: Yes, sir.

18                    THE COURT: So you're excused at this time, and we'll begin so

19    you need to get here a little before 9:30 in the morning.

20                    DR. KENNEDY: Thank you, sir.

21                    THE COURT: Thank you.

22                    [NOTE: Dr. Kennedy is excused and leaves the courtroom.  The

23    proceedings are continued as follows:]

24                    THE COURT: Now, with the question of the standard, the

25    government, and particularly you, Mr. Gilluly, have pushed the argument

-729-

1    that the appropriate standard is a national standard, and there's no

2    Eleventh Circuit case expressly recognizing the applicability of a national

3    standard, and I'll cover more of that later.  But the government's argument

4    that it's a national standard is inappropriate and – or is appropriate, may

5    have merit based on the Eleventh Circuit's interpretation that the national

6    language does not articulate a national standard, and the government's

7    reliance on the appropriateness of a national standard is misplaced.  It's

8    just simply wrong.

9            I've had my clerks work on a memorandum that better

10   expresses the problem in this case.  And I'm going to try to summarize it as

11   best I can and use the memorandum.

12           The notion that the applicable standard of care for good-faith

13   defenses starts with the Supreme Court's opinion in *Gonzalez v. Oregon* –

14   and that's a 2006 opinion.  In *Gonzalez*, the Court interpreted the Control

15   Substances Act as failing to abrogate the individual states' authority to

16   regulate the dispensing of controlled substances.  Relying on this

17   interpretation, the Eleventh Circuit stated in dicta – and that was in a case

18   called *U.S. v. Tobin*:

19           [t]o the extent that the [jury] instruction speaks to "standards

20           of [professional] practice generally recognized and accepted in

21           the United States," and thus suggests that the CSA imposes

22           national standards of professional practice, it is inconsistent

23           with the Supreme Court's observation that unless Congress

24           specifies otherwise, the CSA does not establish national

25           standards.

-730-

1    *Tobin,* therefore, can easily be interpreted to establish an

2    applicable standard of care based upon regional or state professional

3    practices.

4        Less than a year after *Tobin,* the Eleventh Circuit revisited the

5    issue.  And in *United States v. Joseph*, which is a 2013 Eleventh Circuit case

6    at 709 F.3d, the defendants relied on *Gonzalez* and *Tobin* in arguing that

7    the district court incorrectly charged the jury by instructing it to evaluate

8    the defendants' conduct against a national standard – or a national

9    standard of practice.  And that's at 1094 in *Joseph*.  Rejecting the

10   defendants' argument, the Eleventh Circuit stated that

11       [t]he district court committed no error when it instructed the

12       jury to consider whether the defendants acted "in accordance

13       with a standard of medical practice generally recognized and

14       accepted in the United States."  This instruction did not suggest

15       that the jury must evaluate the conduct of the defendants

16       against a single national standard of practice.  The instruction

17       instead required the prosecution to prove that the actions of the

18       defendants were inconsistent with <u>any</u> accepted standard of

19       professional practice.

20       Now, the Eleventh Circuit downplayed the applicability of

21   *Gonzalez* and described the panel's dicta in *Tobin* as speculation.  In

22   *Joseph*, which is the 2013 opinion, the court's reasoning in *Joseph* appears

23   to be that the instruction "in accordance with a standard of medical practice

24   generally recognized and accepted in the United States" does not articulate

25   a national standard of practice.  Rather, this instruction simply requires the

1    government to prove that a defendant's conduct was "inconsistent with any

2    accepted standard of professional practice." Now, in an unpublished case,

3    the Eleventh Circuit recognized that it had approved the instruction at issue

4    in *Joseph*, and that's a case called *United States v. Bourlier*, if that's the

5    correct pronunciation – B-O-U-R-L-I-E-R – and that's an Eleventh Circuit

6    2013 unpublished opinion at 518. And it states that "The district court also

7    instructed the jury that a prescription is lawful if it was written 'in

8    accordance with the standards ... generally recognized and accepted in the

9    United States.' This court approved this precise instruction in *Joseph*."

10   That's what the court said.

11           It is difficult to reconcile the Eleventh Circuit's endorsement of

12   the national standard language with the language of *Gonzalez* and *Tobin*

13   stating that the applicable standard is not a national one. As stated above,

14   the Eleventh Circuit sidesteps this problem by reasoning that defining it as

15   "a standard of medical practice generally recognized and accepted in the

16   United States" does not articulate a national standard. Implicit in this

17   reasoning is that the proper standard is not a national standard, but

18   something else. Given this anachronism, there are competing arguments

19   with respect to the appropriate standard that should be included in the jury

20   charge.

21           On the one hand, it appears that the Eleventh Circuit has

22   approved the use of the national language. In both *Joseph* and *Bourlier*,

23   the Court refused to find any error in the use of an instruction defining the

24   standard as "a standard of medical practice generally recognized and

25   accepted in the United States." Indeed, in *Bourlier* – again, I'm not sure of

-732-

1   that pronunciation – the Court recognized that this precise instruction was

2   approved by the Eleventh Circuit in *Joseph*.  Therefore, it is likely that the

3   use of this language is unlikely to be found as error on appeal.

4             On the other hand, it seems that the use of language instructing

5   the jury that they are to compare the defendant's conduct with a regional

6   standard comports with the recognized belief that the appropriate standard

7   is not a national standard.  While *Joseph* and *Bourlier* state that there is no

8   error in using the national language, they do not prohibit an instruction

9   using regional language.  At no point does the Eleventh Circuit expressly

10   recognize that the appropriate standard is a national standard.  Rather, the

11   Eleventh Circuit simply defines the national language as not articulating a

12   national standard.  If the appropriate standard is a regional one, then it

13   would seem that it is more appropriate to define it in regional terms.  And

14   in the suggested charges in this case, the Court has stated the standard is

15   the standard of the State of Georgia, and you've received those in the

16   second draft.  Morever, the use of this language, which has been requested

17   by defendant, would not create an appealable issue.

18             Now, I think that that memorandum of law is correct, and I

19   think that that memorandum states the correct position of the Eleventh

20   Circuit today.  But if – and the second draft of the charges uses a regional

21   standard, or a state standard, and not a national standard.

22             Does any counsel now have any objection to that standard being

23   placed in the jury charge?

24             MR. GILLULY: No, Your Honor.

25             THE COURT: Mr. Knoche?  I mean, excuse me, Mr. Withers?

-733-

1     MR. WITHERS: Your Honor, my only concern would be a

2 practical one, and that is that my expert would be prepared to testify that

3 the practices that he has evaluated are legitimate.  I wasn't going to have

4 him address a particular standard here or there, although he can talk about

5 the Georgia standards as well.

6     THE COURT: I'm talking about the charge and the appropriate

7 charge.  You, Mr. Withers, you know, requested the regional standard or

8 the state standard.

9     MR. WITHERS: I'm with you, Your Honor.  No objections.

10     THE COURT: All right, anything else before we begin at 9:30 in

11 the morning?

12     MR. KNOCHE: Not from the government, Your Honor.

13     MR. WITHERS: No, sir.

14     [NOTE: Whereupon the proceedings are adjourned.]

-734-

STATE OF GEORGIA

CHATHAM COUNTY.

CERTIFICATE OF REPORTER

I, Marie Cowart, do hereby certify that the above and foregoing pages of typewritten material is a true, correct and complete transcript of the evidence and proceedings adduced in the Jury Trial stated in the captioned matter, this being Volume 3 of Volumes 1A, and 1 through 5.

This 18th day of September, 2014.

/s/ *Marie Cowart*

Marie Cowart, CCR B-237
United States Court Reporter
Southern District of Georgia
Savannah Division

P. O. Box 9572
Savannah, GA 31412
(912) 650- 4066