# IN THE UNITED STATES DISTRICT COURT FOR THE

## SOUTHERN DISTRICT OF GEORGIA

### SAVANNAH  DIVISION

UNITED STATES OF AMERICA　　*

v.　　　　　　　　　　　　　　*　CASE NUMBER CR413-28

NAJAM AZMAT　　　　　　　*

---

Transcript of Evidence and Proceedings Adduced in the Jury Trial held

January 13-17, 2014 before The HONORABLE WILLIAM T. MOORE, JR.,

Judge Presiding, reported by Marie Cowart, Official Court Reporter.

---

VOLUME 4 - 1/16/2014

PP. 735 - 932

APPEARANCES:

For the Government　　　　　　　　　　　KARL I. KNOCHE, AUSA
　　　　　　　　　　　　　　　　GREGORY E. GILLULY, JR., AUSA

For the Defendant　　　　　　　　　　　THOMAS A. WITHERS, ESQ.

*Proceedings recorded by shorthand with back-up recording; transcript produced from note reading in*

*conjunction with transcription of back−up recording.*

-735-

1     [NOTE: Court is opened on 1/16/2014.  The proceedings are

2     continued in the presence of the jury as follows:]

3          THE COURT: Good morning, ladies and gentlemen.  I

4     appreciate you all being here on time this morning.  I hope you enjoyed

5     your extra half-hour of sleep.  We're ready to proceed.

6          THE COURT: Call your witness, please.

7          MR. WITHERS: Dr. Kennedy.

8          G E N E   S C O T T   K E N N E D Y,  M. D.

9          GOVERNMENT'S WITNESS, PREVIOUSLY SWORN,

10          TESTIFIED FURTHER AS FOLLOWS

11          CROSS-EXAMINATION CONTINUED BY

12     MR. WITHERS:

13     Q    Dr. Kennedy, good morning.

14     A    Morning, sir.

15     Q    I want to talk to you for a minute about the patient George Hunter,

16     and I'm going to be displaying these documents for you so that we can try

17     and move them along a little quicker, okay?

18     A    Yes, sir.

19     Q    Before I do that, you will agree with me, will you not, Dr. Kennedy,

20     that Dr. Azmat never saw any patient more than once; that's true, isn't it?

21     A    I believe there were a number of charts where there were return visits.

22     Q    There were return visits, but those return visits were never to Dr.

23     Azmat.  If you don't know that, you can say you don't know.

24     A    No, I don't – I can't confirm that without going through and reading

25     each review.

-736-

1    Q    George Hunter, patient.  I'm going to be displaying this for you.  This

2    is a patient who had prior back surgery.  Do you recall that?  And I'm

3    showing you what's been marked as Defense Exhibit 78.  Do you see the

4    history of surgery, microdisectomy in '02 and '04?  Do you recall that?

5    A    Yes, sir.

6    Q    And in fact, we know from the MRI report that he had nerve damage,

7    as well; correct?  And I'm going to show you what's been marked as

8    Defendant's Exhibit 79, where the MRI notes left neural foraminal

9    narrowing with disc material contacting the left S1 nerve root; correct?

10   A    Yes, sir.

11   Q    So you have in this one a contact with the nerve; correct?

12   A    Yes.

13   Q    And this is a radiology report from Morehead, Kentucky; correct?

14   A    Yes, sir.

15   Q    Now, Dr. Azmat, when he saw this patient, discontinued the Xanax;

16   did he not?

17   A    Yes.

18   Q    And you write in your report at Page 3, and this is Defendant's 76, sir,

19   that there is nothing else in the chart that supports the reported pain

20   history; correct?

21   A    Beyond the MRI.

22   Q    I want you to read right here [reading]: The history of trauma is

23   steamroller accident '02; correct?

24   A    Yes, sir.

25   Q    That would certainly support, in conjunction with the

1    microdisectomies in the '02 and '04, complaints of pain in 2011; correct?

2    A    In my opinion, not necessarily, not if it's not supported by other

3    documentation.

4    Q    And that other documentation, sir, what would that be?

5    A    Previous medical records.

6    Q    Now, turn to Billy Letner, and, again, I'm going to show you what's

7    your report, Defendant's Exhibit 79.  You write in there, Page 3 [reading]:

8    There is nothing else in the chart that supports the reported pain history;

9    did you not?

10   A    Yes, sir.

11   Q    But Mr. Letner reported a logging accident, Kentucky, fell 15 feet; did

12   he not?

13   A    Yes, sir.

14   Q    That would support – certainly support the complaint of pain; would it

15   not?

16   A    Not necessarily.

17   Q    And, sir, when you say not necessarily, again, this isn't a question

18   about whether something's possible or not.  You understand that.

19   A    Yes.

20   Q    Is there anything else that you would require other than the statement

21   of the patient, from Mr. Letner, that he fell out of a tree in a logging

22   accident?

23   A    I'm sorry, can you repeat that?

24   Q    Well, you've said – you told this jury that there was a complete

25   abandonment of a physician-patient relationship between Mr. Letner and

-738-

1    Dr. Azmat; correct?

2    A    Sir, no, sir, at no point did I testify to that.

3    Q    Well, you said that Dr. Azmat wasn't practicing legitimate medicine

4    when he treated Mr. Letner.

5    A    Yes, sir.

6    Q    Is there anything else that you would require from Dr. Azmat other

7    than that report of the logging accident where he fell 15 feet?

8    A    Sir, anything that supported the previous medical history would be

9    helpful.

10   Q    Helpful.

11   A    Yes, sir.

12   Q    Kim Letner.  Do you recall Ms. Letner?  You review your notes last

13   night?  And I'm going to show them to you so that you don't have to review

14   them now.  Did you review those last night?

15   A    I did not.

16   Q    Now, you provided one, and only one, report to the government, and

17   I'm going to mark this – this is marked as government's – excuse me,

18   Defense Exhibit 13, and that's the report on Kim Letner; is it not?

19   A    Yes.

20   Q    Your report for Kim Letner is dated March 19, 2013; is it not?

21   A    Yes.

22   Q    It was done over a year later than your other reports; was it not?

23   A    That wouldn't surprise me.  It's possible.

24   Q    And were you aware that your report on Kim Letner was prepared

25   after the indictment was returned in this case?

-739-

1    A    No, sir, I'm not aware of that.

2    Q    Now, Ms. Letner, when she reported to Dr. Azmat, reported 30

3    oxycodone – 30 milligrams oxycodone, 180 tablets; correct?

4    A    That's not – that's what's written here, but I don't – without referring

5    to the patient notes I can't tell you that's what the patient indicated on the

6    office forms that they fill out listing their medications.

7    Q    And I'm assuming that you, then, don't credit what Dr. Azmat has

8    taken here as the history of trauma.

9    A    (No audible response.)

10   Q    Do you believe what's written on the history of trauma or not?

11   A    In this particular instance, or for all of the charts?

12   Q    Well let's do it both ways.  In this particular instance.

13   A    Possibly.

14   Q    All right, possibly.  For all of the charts?

15   A    Possibly.

16   Q    Very good.  And then we've got a report of oxycodone – let me ask you

17   this way: Dr. Azmat has recorded that the patient told him that she was on

18   oxycodone 15 milligrams, 90 tablets; correct?

19   A    That's what's written there.

20   Q    And he also reflects that she told him she was on Xanax 2 milligram,

21   60, it looks eight tablets, or maybe it's a 60 tablets; correct?

22   A    That's what is written there.

23   Q    And Dr. Azmat reduced the 180 tablets down to 60; correct?

24   A    Yes.

25   Q    He reduced the 90 tablets down to 60 tablets; correct?

-740-

1    A    Yes.

2    Q    And he discontinued the Xanax; correct?

3    A    Yes.

4    Q    And he notes down here at the bottom, wean off narcotics; right?

5    A    Yes.

6    Q    And when you wean someone off narcotics, that means you are going

7    to gradually reduce the number and amount of narcotics that person is on;

8    correct?

9    A    That's true.

10   Q    And that's so that you prevent the physical problems that you

11   described in terms of the detoxification.

12   A    Yes, sir.

13   Q    And you would agree with me, would you not, that the number of

14   prescriptions before and after seeing Dr. Azmat is reduced to a third.

15   A    Yes.

16   Q    Weaning a patient off of narcotics is a legitimate medical goal; is it

17   not?

18   A    It is.

19   Q    I'm going to talk to you a minute about David Letner.  Similarly – and

20   this is Defense Exhibit 104 –  David Letner, that report was prepared

21   March 19, 2013.

22   A    Yes.

23   Q    And when David Letner saw Dr. Azmat, David Letner, according to the

24   note, was on oxycodone 30 milligram, 240 pills; correct?

25   A    Yes.

-741-

1    Q    And oxycodone 15, 180 tablets; correct?

2    A    Yes.

3    Q    And is this the patient you said that that's just too remarkable, that

4    one patient can't tolerate that much oxycodone?

5    A    Sir, I never said that.

6    Q    Okay, and Dr. Azmat reduced the oxycodone 30 milligrams down to

7    90 tablets; correct?

8    A    Yes.

9    Q    And the oxycodone 15 milligrams down to 30 tablets; correct?

10   A    Yes.

11   Q    If my math is right, Mr. Letner, David Letner, was receiving 240

12   oxycodone tablets before he saw Dr. Azmat, and 120 after he saw Dr.

13   Azmat; correct?

14   A    No, sir.  There is nothing in the record to support that this patient was

15   getting those medications previously.

16   Q    Other than what's reflected in the record.

17   A    Other than what the patient reported and wrote down.

18   Q    Latina Simpson.  On the next patient – and I want to be fair with the

19   jury, this is where Dr. Azmat neglected to note a diagnosis and treatment.

20   It's not filled in; is it?  It's up on the screen, sir.

21   A    It is not.

22   Q    That would be a mistake; correct?

23   A    It would be a mistake.

24   Q    Mistakes can happen; correct?

25   A    They can.

-742-

1    Q    I'm going to show you the copy of your report on this particular

2    patient.  Your report actually reflects Dr. Gossett; correct?

3    A    It does.

4    Q    And you were doing that for Dr. Azmat; correct?

5    A    Well, the reports come packaged to me for different physicians, and

6    sometimes there is more than one physician who is treating a patient.  So I

7    head it however it is that it is packaged by the organization that is sending

8    it to me.

9    Q    All right.  So you wouldn't acknowledge that that would be a mistake

10   on your behalf.

11   A    I'm uncertain without going through and reviewing every patient visit.

12   Q    And with respect to Ms. Simpson, Ms. Simpson reported to Dr. Azmat

13   that she was on 240 30 milligram tablets; correct?

14   A    Yes.

15   Q    110 15 milligram tablets; correct?

16   A    That's what's written.

17   Q    And 2 milligram Xanax, 60 tablets; correct?

18   A    Yes, sir.

19   Q    And although it's not noted, you reviewed earlier a copy of the chart –

20   and this is Government's Exhibit 6-018 – that showed Dr. Azmat's

21   prescriptions.  The Xanax was reduced 1 milligram; correct?

22   A    Yes.

23   Q    The oxycodone 30 milligram was reduced from 250 – excuse me, 240

24   to 150; correct?

25   A    Yes.

-743-

1    Q    And the oxycodone 15 milligram was reduced from 110 down to 30;

2    correct?

3    A    Yes.

4    Q    So that's a patient, again, who came in, was reporting to Dr. Azmat

5    total prescription tablets of 200 – excuse me, 410, if my math is accurate,

6    and she left with roughly half of that, 210; correct?

7    A    Sir, that was, again a patient with an unsupported narcotics history of,

8    as you point out, over 400 pills per month that was issued in a reduced

9    number.

10   Q    And again, on your report concerning Dr. Azmat for the patient James

11   Lockwood – that's going to be Defense Exhibit 121 – do you see where

12   you've reported Dr. Azmat's name?

13   A    Yes, sir.

14   Q    And you see where you've reported the patient's name, James

15   Lockwood; correct?

16   A    Yes.

17   Q    But on the second page of that, you say [reading]: Pn the follow-up

18   encounter, a physical examination was not performed, Xanax was added

19   without explanation, and the patient was again prescribed 210 oxycodone

20   pills.

21        That's what you write; correct?

22   A    Yes, sir.

23   Q    But that is all written about someone other than Dr. Azmat; do you

24   recall that?

25   A    Not specifically in this instance, no.

-744-

1    Q    If the record reflects that Dr. Azmat saw this patient only on the one

2    occasion that's reflected as the initial visit, you wouldn't dispute that.

3    A    No.

4    Q    And in fact, the follow-up visits that you mention, you mention the

5    follow-up visit on 3/25/2011.  Are you aware that Dr. Azmat was no longer

6    employed at East Health Center on that day?

7    A    No.

8    Q    Were you aware that Dr. Azmat had been terminated on or about

9    March 18, 2011?

10   A    No, sir.

11   Q    Patient Paul Cole.  You write for Mr. Cole – this is Defense Exhibit 29

12   – Page 2 of your report, I believe, the findings of the provided MRI report,

13   while potentially significant, do not alone rise to the level of initial narcotic

14   management; correct?

15   A    Yes, sir.

16   Q    There is an MRI in the file; is there not?  And I'll show that to you as

17   Defense Exhibit 31.  You see that MRI?

18   A    Yes.

19   Q    That shows mild bulging disc at L3-4; correct?

20   A    Yes.

21   Q    This is an MRI from Hazard, Kentucky; correct?

22   A    Yes.

23   Q    And then Page 2 of that MRI shows anterior spondylisthesis of L5 on

24   S1 with central disc protrusion; correct?

25   A    Yes.

-745-

1    Q    And bilateral SI joint sclerosis; correct?

2    A    Yes.

3    Q    You would agree with me that those indicate that this patient has

4    serious back problems.

5    A    No, sir, not at all.

6    Q    This MRI does not indicate that?

7    A    No.

8    Q    And why is that, Dr. Kennedy?

9    A    Well, these findings, if you go back to the body of the report, again,

10    there is no measurement of the size of any disc herniation. It speaks only in

11    general terms and, in my opinion, the MRI report alone doesn't rise to the

12    level of prescribing narcotics.

13    Q    So for every MRI report you think there must be a numerical

14    evaluation with respect to the disc herniation?

15    A    If they're reporting a disc herniation that is extensive enough to be

16    symptomatic, I would expect to see a measurement of how far the disc is

17    protruding.

18    Q    And this patient reported a history to Dr. Azmat of MVA times 2, that

19    would be motor vehicle times – motor vehicle accident times two; correct?

20    A    Yes.

21    Q    And it looks like four wheeler wreck '07; correct?

22    A    Yes.

23    Q    And the patient also reported to Dr. Azmat that he was on oxycodone

24    30 milligrams, 180 tablets; correct?

25    A    Yes.

-746-

1    Q    It's up on the screen in front of you, sir.

2    A    It is.

3    Q    And diazepam 10 milligrams, 30 tablets; correct?

4    A    Again, that's what's written here but is not put down on the list of

5    medications that the patient was taking.

6    Q    All right, and what Dr. Azmat did is discontinue the diazepam;

7    correct?

8    A    On presentation the patient did not report that he was taking

9    diazepam.  He reported that he was taking Xanax, which is not indicated

10    anywhere on this note.

11    Q    Xanax and diazepam are both benzodiazepines; right?

12    A    That's true.

13    Q    Is diazepam – you would expect that a patient would be saying Xanax

14    as opposed to the pharmacological name of diazepam; would you not?

15    A    Xanax and diazepam are different things.

16    Q    Well, they're both treated for – they're both used for the same thing;

17    are they not?

18    A    Yes.

19    Q    Both in the same class of drugs; are they not?

20    A    They are.

21    Q    Now, you prepared a report on each and every one of these patients;

22    did you not?

23    A    Yes, sir.

24    Q    I'm going to show you what's been marked as Defense Exhibit 133,

25    and there is a phrase that you use frequently about initiating narcotic

-747-

1    management.  You see that?

2    A    Yes, sir.

3    Q    And in fact, this patient is a patient who had a – and this is

4    Government's Exhibit 11-0115 – who had a prior pharmacy record; correct?

5    A    Yes.

6    Q    That prior pharmacy record would indicate that Dr. Azmat is not

7    initiating narcotic management; correct?

8    A    No, sir.  The patient was previously taking this, but initiating narcotic

9    management pertains to the individual physician involved.

10   Q    So when you write initiating narcotic management, you mean for Dr.

11   Azmat.

12   A    Yes, sir.

13   Q    Now, patient Brian Smith arrived at East Health Center on 2/24, and

14   this is the Government's Exhibit 12-030.  You testified about this yesterday,

15   and that says positive meth; correct?

16   A    Yes, sir.

17   Q    I believe that you talked about you didn't know whether that was

18   methadone or methamphetamine, but it nevertheless reflects a positive;

19   correct?

20   A    That's true.

21   Q    And did you note in the file that in fact Mr. Smith was turned away on

22   the 24th and returned on the 28th where he was in fact negative for meth on

23   that day; were you aware of that?

24   A    Sir, I would need to see those two side by side to be sure that we are

25   talking about the same thing.

-748-

1   Q   I don't know if I can do side by side, but I'm going to try.  You see

2   Brian Smith?  Well, I'll do it this way, sir.  See Brian Smith 2/24/11 –

3   A   I do.

4   Q   – positive meth?

5   A   I do.

6   Q   You see Brian Smith 2/28/11, negative?

7   A   Yes.

8   Q   And in fact, and I'm not going to belabor this with the particular

9   numbers, but on this particular patient, Dr. Azmat decreased – or excuse

10  me, discontinued the Soma; correct?

11  A   Yes, sir.

12  Q   And reduced the number of Xanax from Xanax 2 milligram, 60 tablets

13  down to 1 milligram, 15 tablets; correct?

14  A   That's true.

15  Q   And also in the file was a return visit that you note of Mr. Brian Smith;

16  correct?  But that return visit was not Dr. Azmat's, it was someone else's.

17  And I just want to show you this for illustration.  This is a doctor by the

18  name of Dr. Gossett, and we've seen his name on your files where you've

19  compared the two, or combined the two; correct?

20  A   Yes.

21  Q   And what Dr. Gossett notes on the return visit of Mr. Smith on the 28th

22  of March is, chronic low back pain, and the assessment.  And then – excuse

23  me, in the doctor note, the assessment, chronic low back pain, feels Xanax

24  and Soma were very helpful.  Will add Xanax – Soma, Xanax and

25  oxycodone, and he goes through and describes the 30 to 90; correct?

-749-

1    A    Yes, sir.

2    Q    That's not how it's supposed to work; is it?  The patient's not supposed

3    to come in and say, you know, golly, I think that the Soma and the Xanax is

4    good for me, so go ahead and add that in for me; would you?

5    A    That would be very suspicious.  Then again, on initial presentation

6    where those medications were decreased, the Roxicodone went from 120 –

7    the 30 milligram Roxicodone went from 120 to 150.

8    Q    Are you referring, sir, to Dr. Azmat increasing from 120 to 150 for Mr.

9    Smith?

10   A    Yes.  If I'm not mistaken it says, decrease to 150.

11   Q    I don't want to belabor it, but oxycodone 30, it looks like that's 160;

12   does it not?

13   A    Yes, where the patient writes down on the intake form, where the

14   patient writes down himself, he had written down 120.

15   Q    But what Dr. Azmat has taken in terms of the history is 160; is it not?

16   A    Yes, sir, and because there is a difference between what the patient has

17   actually written down and what is written down and circled on that form,

18   that calls into question in my mind occasionally when reviewing what has

19   been done with the medications, because those numbers do not always

20   match.

21   Q    What did you tell me he had written down for his number, sir?

22   A    He had written down Roxicodone 30, 120, takes it four times a day.

23   Q    Where is that?  What page are you looking at, sir?

24   A    On the very first page of the chart.

25   Q    I'm going to show you the second page where the patient lists his

-750-

1    medications.  It says oxycodone 30 milligram; correct?

2    A    Yes, sir.

3    Q    It says Xanax 2 milligram; correct?

4    A    Yes.

5    Q    It says Soma, I think that's 350, I'm not positive, and Motrin; correct?

6    A    Yes.

7    Q    That's what the patient was writing down.

8    A    That page is not dated, sir.

9    Q    Sir, it's very important for you to be accurate here in front of this jury;

10   isn't it?

11   A    I agree completely.

12   Q    But what you're looking at is a date of May 23rd.

13   A    Yes.

14   Q    Aren't you?

15   A    Yes.

16   Q    Well, we're talking about a visit to Dr. Azmat on February 24.  Dr.

17   Azmat had left the building by May 23.

18   A    Yes, sir, you are correct.  Forgive me, that was an error on my part.

19   Q    Gary Evans.  You had an MRI of the lumbar spine from Corbin,

20   Kentucky; correct?  I'm going to show you what's been marked as Defense

21   Exhibit 43.  You see that, sir?

22   A    Gary Evans?

23   Q    Yes, Gary Evans, yes, sir.

24   A    Yes.

25   Q    This showed broadbase bulging discs; correct?

-751-

1    A    Yes.

2    Q    And this is a fellow, by the way, who was, by history, disabled on social

3    security; correct?

4    A    Yes, sir.

5    Q    And Dr. Azmat discontinued that fellow's Xanax; didn't he?

6    A    That's – yes, sir, that's what's written.

7    Q    That would be a good thing; right?

8    A    Yes, sir.

9    Q    James Gable.  I show you what's been marked as Defense Exhibit 57,

10   your report for Mr. Gable.  Again, you wrote this report for Dr. Azmat;

11   correct?

12   A    Yes.

13   Q    Patient named James Gable; correct?

14   A    Yes.

15   Q    And you write at the very bottom of the last little paragraph [reading]:

16   On the initial encounter the patient was prescribed a total of 150 scheduled

17   pills; correct?

18   A    Yes.

19   Q    And there was no documented support for prescribing Valium;

20   correct?

21   A    Yes, sir.

22   Q    I'm going to show you Dr. Azmat's report.  This has previously been

23   identified as Government's Exhibit 14-018.  Dr. Azmat didn't prescribe

24   Valium; did he?

25   A    (No audible response.)

1   Q     And if you dispute it I'll show you the prescription.  There's the

2   prescription, Defense Exhibit 61, prescription for Motrin 800 milligrams;

3   right?

4   A     Yes.

5   Q     And prescription for oxycodone 30 milligrams, 150 tablets; correct?

6   A     Yes.

7   Q     Dr. Azmat didn't write a prescription for Valium; did he?

8   A     No.  Again, these are packaged with sometimes the patients being seen

9   by multiple physicians.

10  Q     I'll represent to you that no other physician's name other than Dr.

11  Azmat appears on your report.  You don't dispute that; do you?

12  A     No, sir.

13  Q     Talk to you briefly about Chris Conkel.  The patient reports a history –

14  and this is Defense Exhibit 36 – a history of MVA, and I think that is, years

15  ago, back pain times eight years; correct?

16  A     Yes.

17  Q     Reported his occupation as a painter.  He gives a description of how

18  both feet tend to get numb.  That's a fair description of sciatica; isn't it?

19  A     I would – well, yes, fair enough.

20  Q     All right.  Radiating pain going down your legs can make your feet

21  numb sometimes.

22  A     Pain radiating down his legs.

23  Q     He reports to Dr. Azmat that he's on oxycodone 30, 180; Xanax 2

24  milligrams, 30; Percocet 10, 120; correct?

25  A     That's what's written.

-753-

1    Q    And Dr. Azmat decreased the oxycodone and discontinued the Xanax;

2    correct?

3    A    Yes, sir.

4    Q    And also gave the patient a prescription for Motrin. Now, you had

5    earlier testified about the Motrin.  That 800 milligram prescription of

6    Motrin actually requires a prescription; does it not?

7    A    It does.

8    Q    Even though I think on occasion you said naproxen was just Aleve,

9    naproxen written in 500 milligram tablets requires a prescription as well;

10    correct?

11    A    It does.

12    Q    Now, Josh Merryman.  This is your report on Dr. Azmat; correct?

13    A    Yes.

14    Q    And this is Defense Exhibit 126, Page 2, you write [reading]: There

15    was no document in support for prescribing Soma; correct?

16    A    Yes.

17    Q    Same issue with respect to that one, because Dr. Azmat never

18    prescribed anybody Soma; did he?

19    A    (No audible response.)

20    Q    I'm going to show you what's previously been marked as

21    Government's Exhibit 17-016.  There is no reflection of a prescription for

22    Soma; is there?

23    A    Again, Soma was prescribed on 4/12.  This patient was seen by

24    multiple physicians.

25    Q    Jessica Rogers.  You report Dr. Azmat – Defense Exhibit 262; correct?

-754-

1    A    Yes.

2    Q    Page 2 of that.  You report, you write [reading]: The attending

3    physician inappropriately provided several prescriptions for a Schedule II

4    opiate and Xanax in the absence of credible supporting physical

5    examination or previous documentation; correct?

6    A    Yes.

7    Q    Jessica Rogers.  The Government's Exhibit Number19-016, Dr. Azmat

8    writes dc Xanax; correct?

9    A    Yes.  Again, this patient was seen by multiple physicians.

10   Q    No, sir.  You write [reading]: The attending physician inappropriately

11   prescribed several prescriptions for a Schedule II opiate and Xanax; right?

12   You say physician.  You don't say physicians.

13   A    But the patient was seen by multiple physicians.  The patient that was

14   attending – the physician that was attending the patient on that day wrote

15   that, in my opinion, without support.

16   Q    That doesn't have anything to do with Dr. Azmat; does it?  That Xanax.

17   A    This was the second physician.

18   Q    Patricia Rohrer.  Let me show you what's been marked as Defense

19   Exhibit 140.  I don't know if you can read that.  It says there is a broadbase

20   posterior disc herniation and touching the ventral surface of the spinal

21   cord; correct?

22   A    Yes, sir.

23   Q    But in your opinion, you didn't think that that supported alone the

24   prescription of medication; correct?

25   A    Correct.

-755-

1    Q    And you also write, do you not [reading]: There is nothing else in the

2    chart that supports the reported pain history; correct?

3    A    Yes.

4    Q    So in your professional view a herniated disc touching the spinal cord

5    at two different levels is not serious enough to have the patient report pain;

6    true?

7    A    Sir, I never testified to that.

8    Q    Well, you said –

9    A    That's not true.

10   Q    – nothing else in the record that would support the complaint of pain.

11   A    That, I did say.

12   Q    Barry Hinkle, and I won't belabor the point, but it has the same issue

13   as your other reports, talking about no support for prescribing Xanax.

14   That's Defense Exhibit 69; right?

15   A    Yes, sir.

16   Q    But when Dr. Azmat, Defense Exhibit 72, saw this patient, in fact he

17   discontinued the Xanax; correct?

18   A    He did, and again, this was a patient that was seen by multiple

19   physicians in the clinic.

20   Q    And you also write in this report [reading]: There is nothing else in the

21   chart that supports the reported pain history; correct?

22   A    Yes, sir.

23   Q    But what Mr. Hinkle reported in terms of the history that he gave to

24   Dr. Azmat was MVA, motor vehicle accident, three or four years ago; right?

25   A    Yes.

-756-

1   Q     And then, if you read on down [reading]: Then got run over by a car

2   while walking; doesn't he?

3   A     Yes.

4   Q     That would hurt; wouldn't it?

5   A     Yes, sir.

6   Q     That would cause you pain; wouldn't it?

7   A     It could.

8   Q     That pain could last for years; couldn't it?

9   A     Yes, sir.

10  Q     Mr. Troy Roark.  This is the fellow that had three back surgeries; do

11  you recall that?

12  A     Troy Roark.

13  Q     Let me show you what's been marked as Defense Exhibit 144,

14  previously identified and in evidence as a government's exhibit.  Mr.

15  Knoche asked you about the report that, he busted it; right?

16  A     Yes, sir.

17  Q     But there is a history of three surgeries; is there not?

18  A     Yes, sir.

19  Q     And there is also reflected in Dr. Azmat's note that this fellow – and

20  I'm pointing to it on the screen there –

21  A     Yes.

22  Q     – has the nerve stimulator inserted into him; right?

23  A     Yes.

24  Q     Three surgeries, a nerve stimulator, and the MRI, Defense Exhibit 146,

25  shows fairly extensive arthritic changes; correct?

-757-

1    A    Yes.

2    Q    And despite that, you write there is nothing else in the chart that

3    supports the reported pain history; don't you?

4    A    Yes, sir.

5    Q    We've got a history of three surgeries, we've got a nerve stimulator,

6    which the doctor notes on physical examination; right?

7    A    Yes, sir.

8    Q    So you know a physical examination occurred; right?

9    A    Yes.

10   Q    The doctor also notes, does he not, that there is – [reading]: Back has

11   healed, long scar from surgery; right?

12   A    Yes.

13   Q    So you've got a lengthy history confirmed on physical of prior

14   surgeries; do you not?

15   A    Yes.

16   Q    Now, by the way, another patient with nerve impingement, Jason

17   Jarvis.  I show you what's been marked as Defense Exhibit 85, at the

18   bottom of the page, you see where it says [reading]: At L4-5 with

19   impingement of the L4 nerve roots.

20   A    Yes.

21   Q    And again, you write, Dr. Kennedy [reading]: There is nothing else in

22   the chart that supports the reported pain history; correct?

23   A    Yes, sir.

24   Q    But what this fellow reported to Dr. Azmat was a 2005 motor vehicle

25   accident; correct?

-758-

1    A    Yes, sir.

2    Q    A 2009 he fell off a JLG lift and hurt back; right?

3    A    Yes, sir.

4    Q    And Dr. Azmat discontinued the Xanax the patient was on; correct?

5    A    Yes, sir.

6    Q    Discontinued the Soma the patient was on; correct?

7    A    Yes.

8    Q    And you know that that Soma, Xanax, oxycodone is a favored

9    prescription of folks who have dependence issues and whatnot; right?

10   A    It's a favorite cocktail.

11   Q    And that's what Dr. Azmat is eliminating.

12        Then, with respect to Sherry Fields, you write that Dr. Azmat put this

13   patient's safety at risk, and that's a phrase we see frequently when you're

14   writing; correct?

15   A    Yes, sir.

16   Q    Defense Exhibit 49, there at the very bottom [reading]: And may

17   represent a significant danger to the patient's safety; correct?

18   A    Yes, sir.

19   Q    And on four separate occasions here you write about the, you know,

20   lack of historical documentation, clinical documentation should've been

21   available, no prior records were requested; right?

22   A    Yes.

23   Q    But we know the issue of prior records is not a standard of care; right?

24   You don't have to get them.

25   A    No, sir, I never said that.

-759-

1    Q    You never said that?

2    A    No, sir, I have never testified that not having medical records is not a

3    standard-of-care issue.

4    Q    Well, let's just briefly explore that.  Is it your testimony that you have

5    to have prior medical records or not?

6    A    If we're talking about an acute situation, where somebody is acutely

7    injured, then certainly not.  If we're talking about embarking on a course of

8    narcotic management, I would say that obtaining previous medical records

9    is a standard-of-care issue.

10   Q    Okay.  So it's your testimony now that you do have to have medical

11   records.

12   A    Sir, I've not changed my testimony.  That is my testimony, yes, sir.

13   Q    And again, I'm not going to run through the chart for this person in

14   detail, but we know with respect to Ms. Fields, and this is Defense Exhibit

15   53, that Dr. Azmat discontinued the Xanax; correct?

16   A    Yes.

17   Q    And then last one, John Koenig.  There are two MRIs in this file; are

18   there not?

19   A    (No audible response.)

20   Q    I'll show them to you.  First one's marked as Defense Exhibit 255.

21   This is the fellow from up around the Charleston area.  You see that?

22   A    Yes.

23   Q    Dated October 23, 2008, and the history given of severe low back

24   pain.

25   A    Yes.

-760-

1    Q    As a result –  post-MVA; correct?

2    A    Yes.

3    Q    You know that means motor vehicle –

4    A    Yes.

5    Q    – accident.  There's a repeat MRI from 2009; right?

6    A    Yes.

7    Q    Low back pain, MVA; correct?

8    A    Yes.

9    Q    Shows a tiny central annular tear; correct?

10   A    Yes.

11   Q    I believe you talked about that with Mr. Knoche.  What you're seeing

12   in those two MRIs is a progression of problems from the first; correct?

13   A    Sir, I have to review them side by side, the reports, in order to agree or

14   disagree with that.

15   Q    Now, this was a patient who actually reported to Dr. Azmat two motor

16   vehicle accidents; didn't he?

17   A    Yes.

18   Q    2009 motor vehicle accident, 2008 motor vehicle accident; correct?

19   A    Yes.

20   Q    Both of those motor vehicle accidents are reflected in the MRI report;

21   correct?

22   A    They are reported.

23   Q    And although it's not reflected in Dr. Azmat's treatment record, this is

24   a patient who did not receive Xanax – or the discontinuation of the Xanax

25   is not reflected, but the patient had reported being on Xanax 2 milligrams,

1    30 tablets, I think, or 20.  And although it doesn't say down here that it was

2    discontinued, he did not get – he was not written a prescription for Xanax;

3    true?

4    A    That's correct.

5    Q    You just said that it was a requirement that you – that the physician

6    has to obtain prior medical records.

7    A    Sir, that's not what I said.  I said it is a standard-of-care issue, and that

8    is one of a number of requirements.

9    Q    You recall testifying before this court back in May of 2012.  You recall

10   that; don't you?

11   A    Yes, sir.

12   Q    Sworn to tell the truth in that case; were you not?

13   A    Yes, sir.

14   Q    And that was May of 2012.  The question was asked of you [reading]:

15   Accurate to say that in the time frame 2004 to 2005, in fact up until today,

16   a doctor has no – there is no professional requirement that a doctor obtain

17   medical records before treating a patient.

18        Your answer, sir, read that for the jury.

19   A    That's true.

20            MR. WITHERS: No further questions.

21            THE COURT: Mr. Knoche?

22                    REDIRECT EXAMINATION BY

23   MR. KNOCHE:

24   Q    Dr. Kennedy, I believe you've explained your answer, but why don't

25   you tell the jury how that's true, and reconcile that with what you've

1    testified about this morning about getting records.

2    A    Well, again, if somebody is presenting with an acute problem, and

3    you're going to be treating them for this problem, and this is not something

4    that's going to be lasting going down the road, then it may be appropriate

5    to treat a patient without getting full medical records.  And that happens all

6    the time.

7        But if what we're referring to is initiating or continuing a course of

8    high-dose opiate medications, that's something that is addressed in

9    numerous, numerous standard-of-care articles, including the most recent

10   one by The Federation of State Medical Boards, that says that having a

11   complete picture of the patient, including their previous medical records, is

12   a standard-of-care issue.

13   Q    And that high-dosage treatment with opioid medication would be the

14   five-to-seven-plus oxycodone pills that we're seeing Dr. Azmat prescribe on

15   a regular basis; is that correct?

16   A    Yes, sir.

17   Q    In a person with acute pain, having suffered a recent injury of some

18   sort, you would as a physician likely be able to observe the effects of that

19   pain on the patient.

20   A    Yes, sir.

21   Q    As opposed to a person walking in complaining of a pain level of 10,

22   and having just driven all the way from Kentucky to see you.

23   A    I agree, yes.

24   Q    Would that cause you some questions as a practitioner?

25   A    It would.

1    Q    And counsel's asked you about whether patients will try to fool you,

2    and what was your answer to that?

3    A    Yes, they will.

4    Q    And in particular, will individuals who are addicted to opioid

5    medicines attempt to fool you?

6    A    To get their prescriptions, yes, sir.

7    Q    In order to get their prescriptions.

8    A    Yes, sir.

9    Q    And is that why it's important to verify their complaints?

10   A    Yes, sir.

11   Q    And is that why it's important to get the prior records?

12   A    It is.

13   Q    And is it important to make your decision on the totality of those

14   circumstances?

15   A    Yes, sir.

16   Q    And would that include the patient's oral history provided to the

17   physician?

18   A    It would.

19   Q    It would include MRIs.

20   A    It would.

21   Q    It would physical examination.

22   A    Yes, sir.

23   Q    And it would include the prior physician records.

24   A    Yes, sir.

25   Q    And it would include –

-764-

1        MR. WITHERS:  – Objection, Your Honor, to the leading.  He

2    can ask him what it would include.

3        THE COURT: Yes.  Just rephrase the questions, Mr. Knoche.

4    Q    And would it also include biographical data?

5    A    It would.

6    Q    Would you consider the home of the patient?  Would you consider

7    how far they've traveled?

8    A    I would.

9    Q    And would you consider where they got their MRIs?

10   A    Yes, sir.

11   Q    And all those things would you consider in totality before making your

12   decision to initiate narcotic treatment?

13   A    Yes, sir, I'd like to think so.

14   Q    Would you consider one other thing, how the patient is paying for the

15   visit?

16   A    Well, to a much lesser degree but, yes, I suppose that would come into

17   it.

18   Q    Do many of your patients pay in cash?

19   A    Maybe a few.

20   Q    A few?

21   A    A few.

22   Q    What percentage?

23   A    A low percentage.  I would guess 10 percent or less.

24   Q    And you are – just to distinguish, there was some confusion between

25   the fields of pain management and pain medicine when counsel questioned

1   you.  You're not claiming to be practicing pain medicine; is that correct?

2   A     No, sir, that's a board certification that is something that an individual

3   can get after doing a one-year fellowship after completing a residency in

4   anesthesia, neurology, neurosurgery, and a number of other medical

5   specialties.  The training that they receive specifically is – well, in addition

6   to medications, is also for doing interventional techniques, like implanting

7   morphine pumps, and spinal cord stimulators, and those kind of things.

8   Q     And you don't do that.

9   A     No, sir.

10  Q     But are you fully trained in pain management?

11  A     I am trained in pain management.

12  Q     And you are a Diplomate of The American Academy of –

13        MR. WITHERS:  – Objection, Your Honor.  He's just rehashing

14  what he went over on direct.

15        THE COURT: This is already in the record, Mr. Knoche.

16  Q     (By Mr. Knoche) The reports that you were given, that you've reviewed

17  today, those reports were presented to you by The Drug Enforcement

18  Administration; is that correct?

19  A     Yes, sir.

20  Q     And counsel pointed out that there were three files, I believe, of the 25

21  patient files that I reviewed with you that had the name Gossett at the top

22  of them; is that correct?

23  A     That sounds correct.

24  Q     Now, the opinions which you gave on direct examination about

25  whether patients legitimately received the medications as alleged in the

-766-

1    indictment, was that based on Dr. Gossett's prescribing or Dr. Azmat's

2    prescribing?

3    A    That would depend on how the review was packaged when it was sent

4    to me.

5    Q    Right.

6    A    Because typically the organizations will say, this is a review on a

7    specific physician when the patient will have seen multiple physicians.  So

8    instead of doing a review on each individual physician that treated the

9    patient, a review is done based on who it was that the chart was sent under.

10   And it covers the entire care of the patient.

11   Q    From your review of the chart you noticed that during the short

12   history of East Health Center were there more than one physician

13   employed there?

14   A    I believe there were two.

15   Q    Well, there was Azmat; is that correct?

16   A    Yes.

17   Q    And Kenneth Gossett.

18   A    And Dr. Gossett.

19   Q    But my question specifically, sir, was, the opinions which I elicited

20   from you were about no legitimate medical purpose for those 25 files on the

21   first visit, that was based on Azmat's prescriptions.

22   A    Yes, sir.

23   Q    Not on Gossett's prescriptions.

24   A    No, sir.

25   Q    Now, you opined, did you not, that Gossett also prescribed prescription

-767-

1    medication without legitimate medical purpose.

2    A    He did.

3    Q    Now, just, I don't want to belabor it, Dr. Kennedy, but there's just a few

4    files that I'd like to review concerning the notion of Dr. Azmat weaning

5    patients on Xanax.

6              MR. KNOCHE: And Dean, I'll need you to help me, starting

7    with Jim Brooks, 1-013.

8    Q    You see where the patient, Dr. Kennedy, reported receiving Xanax 2

9    milligram, 35?  See where Mr. – where Dean is highlighting?  It's on the

10   screen in front of you.

11   A    Yes.

12             MR. KNOCHE: And would you show Dr. Kennedy the drug

13   screen, 1-019.

14   Q    And how did you interpret that, Dr. Kennedy?  That drug screen.

15   A    It's completely negative.

16   Q    So if a patient, who you've indicated could fool you, says they're taking

17   Xanax, tests negative for Xanax, would you conclude that they're actually

18   taking Xanax?

19   A    It would be difficult to conclude that they were taking Xanax.  It's

20   possible to have a false negative, but I would want to hear what the patient

21   has to say.

22   Q    But from the evidence gathered in your clinic upon your patient visit,

23   there's nothing to substantiate it.

24   A    Screen's negative.

25   Q    So in your opinion, would that be weaning?

-768-

1    A    Not if they were not already taking it.

2    Q    And this patient, Brooks –

3              MR. KNOCHE: 1-016.

4    Q    – despite that negative screen, Dr. Kennedy, you see where that

5    patient was prescribed 180 oxy 30s?

6    A    Yes, sir.

7    Q    Again, is that evidence of weaning?

8    A    No.

9    Q    You indicated in response to counsel's questions that in your opinion

10   some of these prescriptions placed the patients' safety at risk; is that

11   correct?

12   A    Yes.

13   Q    But you didn't have a chance to explain why in your opinion the

14   patient's safety is at risk.

15   A    Well, as an example, that patient that we were just discussing,

16   assuming that the urine toxicology screen is correct, and the patient is

17   negative for any prescribed agents, and gets an equivalent – I think I

18   calculated in Mr. Brooks' case, it works out to about 630 Percocet per

19   month, which would be a total of 16½ Percocet a day, it would certainly put

20   somebody at risk.

21   Q    And in what other ways?  Does it cause impairment issues?

22   A    Well, that's another risk.  The possibility of theft, and diversion, and

23   all sorts of other things are there.

24             MR. KNOCHE: George Hunter, Dean.  If you could put up 2-

25   011.  Yeah, that's fine.

-769-

1    Q    This patient also claimed to be receiving Xanax; is that correct?

2    A    Yes.

3    Q    Okay.  Claimed that.

4              MR. KNOCHE: And then can you show us 2-015.

5    Q    And that's a urine screen?

6    A    It is.

7    Q    What's your conclusion based on looking at that record?

8    A    That is negative.

9    Q    So if the – if Dr. Azmat did not give a prescription for Xanax on this

10   patient's visit on February 21, that wouldn't be evidence of weaning; would

11   it?

12   A    No, sir.

13             MR. KNOCHE: Kim Letner, please.  4-011.

14   Q    Patient Kim Letner claimed to be receiving 60 Xanax 2s per month.

15   A    That's what's written.

16             MR. KNOCHE: 4-014.

17   Q    What's that drug screen indicating?

18   A    That shows that it's negative for all.

19   Q    So if Ms. Letner received a prescription only for oxycodone and not

20   Xanax, that's not any indication of weaning from Xanax.

21   A    By itself, no, sir.

22   Q    Other than what the patient reported; is that correct?

23   A    In my opinion it's not.

24   Q    And you've indicated patients will fool you.

25   A    Yes, sir.

-770-

1        MR. KNOCHE: David Letner, 5-0-20.

2    Q    Positive for oxy; correct?

3    A    Yes, sir.

4        MR. KNOCHE: And 5-0-21.

5    A    Is that a 5 or a 2?

6        MR. KNOCHE: That's it.

7    Q    Can you interpret that screen?

8    A    Positive for opiates.  Well,  and one assumes negative for everything

9    else.

10    Q    Is it somewhat ambiguous?

11    A    No, it says it's positive for opiates.

12    Q    So if that individual did not  – claimed to get Xanax, but did not, that

13    would not be evidence of weaning.

14    A    No, sir.

15    Q    And tell the jury again why you do these urine screenings?

16    A    Well, it's important to know if the patient is taking things that are not

17    prescribed to them, and if they're not taking things that are prescribed to

18    them.  If a patient reports that they have been receiving 400 pills a month,

19    480 pills a month from a previous treating physician for a scheduled

20    medication, and their drug screen is negative for the medications that

21    comprise those prescriptions, that's an evident – it makes it evident that

22    the doctor should be concerned.

23    Q    Is it all part of the verification process?

24    A    Yes, sir.

25    Q    And should we see a pattern, Dr. Kennedy, would you expect – I mean,

-771-

1    physicians should be looking at the screenings; right?

2                    MR. WITHERS: Objection to counsel leading the witness, Your

3    Honor.

4                    THE COURT: Yes, sir.  Don't lead the witness, Mr. Knoche.

5                    MR. KNOCHE: I'm sorry, Your Honor.

6    Q     (By Mr. Knoche) Should the physician be looking at the screenings?

7    A     Yes, sir.

8    Q     And, Dr. Kennedy, in your opinion, if the screen is inconsistent with

9    the report, the physician should note that; correct?

10   A     Yes, sir.

11                   MR. KNOCHE: Latina Simpson, 6-013.

12   Q     Patient reported, you see 60 Xanax 2s?

13   A     Yes.

14                   MR. KNOCHE: 6-020, Dean.

15   Q     That screen is – that's a negative screen for Xanax, at the very least?

16   A     It's negative for benzodiazepine – it's negative for everything.

17                   MR. KNOCHE: And 6-018.  Highlight the Xanax prescription.

18   Q     Patient received a prescription for 30 Xanax 1 milligram.

19   A     Yes.

20   Q     Despite the negative screen; is that correct?

21   A     Yes.

22   Q     Is that evidence of weaning?

23   A     No, sir.

24                   MR. KNOCHE: James Lockwood, 7-014.

25   Q     Patient claims 60 Xanax 2s per month; is that right?

1   A   That's what's written.

2       MR. KNOCHE: 7-019.

3   Q   Dr. Kennedy, can you interpret the drug screen?

4   A   What you're showing me is negative for everything.

5   Q   So if the patient did not receive a prescription for Xanax, that would

6   not be evidence of weaning.

7   A   In my opinion, no.

8       MR. KNOCHE: Tyrice Harris, 10-011.

9   Q   Now, this patient claims 180 oxy 30s, 90 oxy 15s, and 60 Xanax 2s; do

10  you see that?

11  A   Yes, I do.

12  Q   And you agree that's what it says?

13  A   That's what it says.

14      MR. KNOCHE: 10-015.

15  Q   Could you interpret the drug screen?

16  A   Again, this is, what you're showing me is completely negative.

17      MR. KNOCHE: And 10-014.

18  Q   Patient received a prescription from Dr. Azmat for 150 oxy 30s and 30

19  oxy 15s; is that correct?

20  A   Yes, sir.

21  Q   In spite of the negative screen for everything.

22  A   Yes.

23  Q   Would that be evidence of weaning?

24  A   In my opinion, no.  But be it said, that's in the absence of any medical

25  records.  If there – it potentially could be, but there are no medical records

-773-

1    to support it, so with the negative urine drug screen, in my opinion, no.

2    Q    Well, would you agree that the drug screen is inconsistent with the

3    patient's report to the doctor?

4    A    Yes, sir.

5    Q    More proof of a  patient's misleading the doctor.  They do that.

6    A    Yes, sir, they do.

7    Q    And apparently that was the case with Mr. Harris's report of his drug

8    use; do you agree?

9    A    Potentially.  All we have is the negative urine drug screen and the

10   patient's history, but it does not – it certainly doesn't indicate that anything

11   is being weaned, in my view.

12        MR. KNOCHE: Dannelle Perry, 11-011.

13   Q    It's a little scribbly.  Can you see what the patient reported to Dr.

14   Azmat?  Can you read it for the jury –

15   A    For ...

16   Q     – the previous medication.

17   A    What's written is oxy 30, 180; oxy 15, 60; and Xanax 2 milligram, 60.

18        MR. KNOCHE: 11-016.

19   Q    Can you interpret the drug screen?

20   A    What you're showing me is completely negative.

21        MR. KNOCHE: 11-014.

22   Q    You see Dr. Azmat prescribed 150 oxy 30s and 30 oxy 15s.

23   A    Yes, sir.

24   Q    Not indicative of weaning.

25   A    No, sir.

-774-

1        MR. KNOCHE: And finally, 12 – a few exhibits.  Last patient.

2    12-018.

3    Q    Patient claims 60 Xanax 2s; is that correct?

4    A    Yes.

5        MR. KNOCHE: 12-030.

6    Q    This is our patient with the positive for meth?

7    A    Yes.

8        MR. KNOCHE: 12-028.

9    Q    A later date, negative.  Negative screen.  Would you agree with that?

10   A    There are no notations on this, and the photographic quality can be

11   very poor; and in order for a test to be negative, all you have to do is be able

12   to see a little tiny line there.  And so without it being a fairly clear

13   photograph, but based on what we're looking at, yes.

14       MR. KNOCHE: 12-026.

15   Q    Dr. Kennedy, four days after that positive meth test – would you agree

16   with me, 2/28 is four days after 2/24 – got a prescription for 150 oxy 30s;

17   correct?

18   A    Yes, sir.

19   Q    And 15 Xanax 1 milligram.

20   A    Yes, sir.

21   Q    No evidence of weaning based on the screens.

22   A    No.

23   Q    Patient was not discharged because of that positive test for a street

24   drug; would you agree?

25   A    There is nothing in the chart about that.

-775-

1    Q    And the individual got the scripts that you see in front of you.

2    A    The scripts are there.

3              MR. KNOCHE: That's all I have, Your Honor.

4              MR. WITHERS: Just very briefly, Your Honor.

5              THE COURT: Yes, sir.

6                        RECROSS-EXAMINATION BY

7    MR. WITHERS:

8    Q    Dr. Kennedy, you don't have an X-ray machine in your office?

9    A    No, sir.

10   Q    You don't have an MRI in your office?

11   A    No, sir.

12   Q    You don't do injection therapy.

13             MR. KNOCHE: Your Honor, this is beyond the scope of

14   redirect.

15             MR. WITHERS: Well, he asked him about the difference

16   between pain management and pain medicine, Your Honor.  That's what

17   this goes to.

18   A    I will occasionally do injections in my office.

19   Q    (By Mr. Withers) So that is part of pain medicine, then; right?

20   A    Doing injections?

21   Q    Yes.

22   A    Is part of pain medicine?

23   Q    Yes.

24   A    Certainly.

25   Q    And on each of those individuals that Mr. Knoche asked you about

-776-

1   whose urine drug screen – and I'm not going to go back through it, but

2   we've got urine through one of them, urine drug screen – Kim Letner, that's

3   negative for benzos; correct?

4   A    Yes.

5   Q    And she had reported a – to Dr. Azmat that she was on Xanax;

6   correct?

7   A    Yes.

8   Q    But with respect to – since Dr. Azmat discontinued the Xanax, or

9   didn't prescribe the Xanax, that would indicate to you that he had reviewed

10  the urine drug screen; wouldn't it?

11  A    Can you repeat that again, sir?

12  Q    Yeah.  You have a patient saying, I'm on Xanax; right?

13  A    Right.

14  Q    You have a negative urine drug screen; right?

15  A    Yes.

16  Q    And you have Dr. Azmat not writing a prescription for Xanax; right?

17  A    Correct.

18  Q    That would indicate to you that Dr. Azmat had reviewed the urine drug

19  screen; correct?

20  A    It could.

21          MR. WITHERS: Thank you, that's all I have, Your Honor.

22          THE COURT: Anything else of this witness?

23          MR. KNOCHE: Not from this witness, Your Honor.

24          THE COURT: Can the witness be excused?

25          MR. KNOCHE: Yes, sir.

-777-

1          THE COURT: All right, you're excused, Doctor, thank you.

2      [Witness excused]

3          THE COURT: We'll take a five-minute recess.

4          [NOTE: A brief recess is taken, after which the proceedings are

5      continued outside of the presence of the jury as follows:]

6          THE COURT: All right, I understand counsel wants to address

7      the Court before I bring the jury back in?

8          MR. KNOCHE: Yes, sir.  First, I wanted to tender 34-1 and 34-5

9      the Clerk did not have as tendered and admitted.  These were the plea

10     agreements of Afthinos and LeFrancois.

11         THE COURT: Those are admitted.

12         MR. KNOCHE: And just for the sake of the record, I have

13     conferred with Ms. Bodaford, and I believe we agree that all exhibits have

14     been admitted, but for the sake of the record, I'll like to re-move all the

15     government's exhibits at this time, just ...

16         THE COURT: You mean the ones that I've already ruled on –

17         MR. KNOCHE: Yes, sir.

18         THE COURT:  – or you think that I've already ruled on.

19         MR. KNOCHE: That's correct.

20         THE COURT: Okay.  Those are admitted for purposes of the

21     record.

22         MR. KNOCHE: With that, the government intends to announce

23     rest.

24         THE COURT: Okay, the government rests.  Are you ready to

25     proceed, Mr. Withers?

1     MR. WITHERS: Judge, I do have a motion for verdict of

2   acquittal that I can make orally.  I can file one during the lunch break.

3     THE COURT: You can make it now, and if you want to file one

4   later, I'll leave it open.  But you can go ahead and make it now.

5     MR. WITHERS: Judge, I want to move for a verdict of acquittal

6   on general grounds of insufficiency of evidence on each of Counts 1 through

7   52 – 51 doesn't apply to Dr. Azmat.  And specifically, with respect to the

8   Counts 2 through 50, I would move for directed verdict on the charging

9   language in the indictment as dispensation of controlled substance.  And I

10  believe, Your Honor – or it is our position that there is a distinction

11  between the dispensation and distribution in 21 U.S.C. 841.  And that's

12  what I'm addressing, those particular counts.   And specifically, 21 U.S.C.

13  841 provides that it shall be unlawful for any person knowingly to

14  distribute or dispense.  Title 21 defines – at 21 U.S.C. 802(10) defines

15  dispense as [reading]: To deliver a controlled substance by or pursuant to a

16  lawful order of practitioner, including the prescribing and administering –

17  and this is the important part, I think, Your Honor – and the packaging,

18  labeling or compounding necessary to prepare the substance for delivery.

19  Distribute means, basically, anything else.  To quote the statute, the term

20  distribute means [reading]: To deliver (other than by administering or

21  dispensing) a controlled substance.

22      The government has proven in its case-in-chief that Dr. Azmat

23  prescribed controlled substances.  They have not proven that he dispensed

24  controlled substances beyond a reasonable doubt, or there was a wholesale

25  lack of proof on that issue.  Again, the statute describes – or defines

-779-

1   dispense as the delivery by a lawful order and the packaging, labeling or

2   compounding.  And there were several witnesses who testified that East

3   Health Center never dispensed.

4            And so – and the indictment actually, at Paragraph 11 of the

5   superseding indictment, defines dispense.  And I think, you know, in

6   general parlance we think of the physician writing the prescription and the

7   pharmacist dispensing the prescription.  And here Dr. Azmat – neither Dr.

8   Azmat nor East Health Center ever dispensed.  And so we would ask for the

9   grant of our motion for verdict of acquittal with respect to Counts 2 through

10  50.

11           Interestingly, with respect to Count 1, the government does

12  charge that in the conjunctive.  They have charged distribute and dispense

13  in Count 1, so that argument does not apply to Count 1.

14           Count 52, because it relies on the activities specified in Counts 2

15  through 50, likewise – and that being the unlawful dispensation, because

16  the unlawful dispensation is the specified unlawful activity, we would

17  submit that Count 52 therefore fails – that's the money laundering count.

18           And, finally, Your Honor, with respect to the money laundering

19  count, the law – and I don't have the cite in my head, but it's the *Christo*

20  case, and in *Christo* the Eleventh Circuit held that the money laundering

21  activity has to be separate and apart from the underlying specified unlawful

22  activity.  And so under the authority of *Christo* we would move for a

23  directed verdict on Count 52 as well.

24           THE COURT: Thank you, Mr. Withers.  Do you want to

25  respond, Mr. Knoche?

-780-

1        MR. KNOCHE: Briefly, Your Honor.  The Court will instruct the

2   jury that dispensation includes issuing a prescription for a controlled

3   substance.  That's what doctors like Dr. Azmat do.  To accept counsel's

4   argument would fly in the face of physician prosecutions all over the

5   country which have taken place for many years.

6        So, Your Honor, we believe that the government has proven

7   each of the elements as alleged in Counts 1 and – Counts 1 through 52.  So

8   we do ask the Court to deny defense motions.

9        THE COURT: Well, the motion involves more than just that

10  question, so the Court will withhold at this time its ruling on the motion,

11  and I'll allow counsel to be heard, both counsel for the defendant and

12  counsel for the government to be heard later before the Court makes a

13  definitive ruling on the motion, and we'll proceed on with the trial at this

14  time.

15       MR. WITHERS: Your Honor, our first witness is going to be Dr.

16  Simopoulos.  He has not yet arrived, and I'm wondering if we could

17  perhaps take an early lunch today.

18       THE COURT: When is he supposed to arrive?

19       MR. WITHERS: He was supposed to be getting into town at

20  10:30.

21       THE COURT: He's supposed to land at 10:30, is that what

22  you're saying?

23       MR. WITHERS: Yes, sir, Your Honor.

24       THE COURT: He's not coming in by Marine helicopter or

25  anything like that, is he?

1    MR. WITHERS: I wish I had that authority.

2    THE COURT: So he's supposed to land at the Savannah

3 International Airport at 10:30.

4    MR. WITHERS: Yes, sir, Your Honor.

5    THE COURT: Under the best of circumstances, when do you

6 think he will be here?  Have you arranged to have someone pick him up at

7 the airport and drive him here, Mr. Withers?

8    MR. WITHERS: I just instructed him to get a cab, Your Honor,

9 and have him delivered to the courthouse.

10    THE COURT: So, again, under the best of circumstances, when

11 do you suspect that he would be here and be ready to proceed?

12    MR. WITHERS: Your Honor, I would think within half-an-

13 hour.

14    THE COURT: After he arrives here.

15    MR. WITHERS: I would think so.  Actually I mean a half-an-

16 hour from now.  I haven't checked his flight.

17    THE COURT: Okay.  I assume that you were surprised by the

18 government not calling it's other expert that it had listed, and therefore you

19 told this doctor to be here at a later time, and so I'll grant your request to

20 take an early lunch.  I'll bring this jury in – I'm going to tell them that the

21 reason we're having to do this is because this witness is coming in from out

22 of town and has not arrived.  I'm going to tell them that the government has

23 rested its case, that the government has no further evidence at this time,

24 and that we're going forward with your case, and because the witness has

25 not arrived that we'll take an early lunch.  I guess until about – it's about

1    ten after 11:00 now, so I guess we'll take an early lunch until about 12:15,

2    and that'll give everybody time to get here.

3              Any objection to that, Mr. Knoche?

4              MR. KNOCHE: No, Your Honor.

5              THE COURT: Mr. Withers?

6              MR. WITHERS: Thank you, Your Honor.

7              THE COURT: All right, bring the jury in, please.

8              [NOTE: The jury is seated in the jury box and the proceedings

9    are continued as follows:]

10             THE COURT: Members of the jury, I want to tell you where we

11   are in this case now.  While we took this recess, the government rested its

12   case, and that means that at this time in the case that the government has

13   no further witnesses to call, unless they should call some witnesses in what

14   we call rebuttal later on.  So the case now goes to the defendant.  And the

15   defendant's witness that the defendant has summonsed here to testify is a

16   doctor from out of state who is flying in here this morning and is not ready

17   to go at this time.

18             So we're going to take an early lunch in order to give the

19   witness time to get here and get to the courtroom.  So we're going to

20   adjourn for lunch until 12:15.  So we're going to take an early lunch today,

21   and we will start again at 12:15.

22             So leave your notepads and pencils in your chair, and we will

23   proceed with the testimony in this case at 12:15.  And, again, I remind you,

24   don't discuss this case.  Don't start making any decision or making up your

25   mind until all of the evidence is in and until you've heard my instructions

-783-

1    on the law.  So we'll take our recess now for lunch until 12:15.

2                    [NOTE: Whereupon a luncheon recess is taken, after which the

3    proceedings are continued in the presence of the jury as follows:]

4                    THE COURT: You may proceed, Mr. Withers.

5                    MR. WITHERS: Dr. Tom Simopoulos.

6         [Witness Sworn]

7                    CLERK: You may be seated.  Please state your name, your

8    occupation, and spell your last name for the record.

9                    DR. SIMOPOULOS: My name is Thomas Simopoulos.  My last

10    name is spelled S-I-M-O-P-U-L-O-S.  And I'm a physician.

11                T H O M A S   S I M O P O U L O S ,   M. D.

12         DEFENDANT'S WITNESS, SWORN, TESTIFIED AS FOLLOWS

13                            DIRECT EXAMINATION BY

14    MR. WITHERS:

15    Q    And I'm going to call you Dr. Simopoulos, if that's okay.

16         Dr. Simopoulos, where are you from?

17    A    I'm from Boston, Massachusetts.

18    Q    Just flew in a few minutes ago?

19    A    That is correct.

20    Q    I've placed a cup of water up there on the stand if you need it.

21    A    Thank you.

22    Q    Where are you employed, sir?

23    A    At Beth Israel Deaconess Medical Center.

24    Q    And where is that?

25    A    It's in Boston, Massachusetts.

-784-

1    Q    And what kind of a hospital is Beth Israel Deaconess Hospital?

2    A    It's what we call a tertiary care medical center.  It's a large medical

3    center for referrals of complex cases.

4    Q    And how long have you been employed there?

5    A    My 14th year this summer.

6    Q    And what do you do?

7    A    I'm a pain management physician.

8    Q    Dr. Simopoulos, if you could keep your voice up just a little bit, please,

9    sir.

10   A    Sorry.

11   Q    Tell the members of the jury where you went to undergraduate school.

12   A    I went to undergraduate at Brandeis University.  It's just outside of

13   Boston.

14   Q    And when did you graduate?

15   A    1991.

16   Q    And what was your course of study?

17   A    I was a biochemistry major and master degree combined program.

18   Q    And so the same year you got both your undergrad and master's?

19   A    That is correct.

20   Q    And it was in what?

21   A    It was in biochemistry.

22   Q    And then after you obtained your master's in biochemistry, what did

23   you do?

24   A    I then attended the University of Massachusetts Medical School.

25   Q    And where is that?

-785-

1    A    That's in Worcester, Massachusetts.  It's about an hour outside of

2    Boston.

3    Q    And you graduated from medical school?

4    A    That is correct.

5    Q    And when was that?

6    A    1995.

7    Q    And then what did you do?

8    A    Then I did a internship in internal medicine for a year, and then I did a

9    residency in anesthesiology at Brigham and Women's Hospital in Boston.

10   Q    And we've heard a little bit about a residency.  Tell the members of the

11   jury what a residency program is.

12   A    A residency program is a program that trains you after medical school

13   in a particular subspecialty of medicine.

14   Q    And what did you do your residency in?

15   A    That was in anesthesiology.

16   Q    And then after you – did you – after your course of study with respect

17   to the residency, what did you do?

18   A    After I completed the residency I became interested in pain

19   management, and I did a pain management fellowship at the hospital I'm

20   employed at, Beth Israel Deaconess Medical Center.

21   Q    Okay, and you're going to have to speak up just a little bit.  The court

22   reporter is having a difficult time hearing here in front of you.

23        And with respect to your residency, was that affiliated with a

24   particular university?

25   A    Yes.  Both the hospitals are affiliated with Harvard Medical School.

-786-

1    Q    And so how does that work when you're doing your residency with

2    respect to the medical school?

3    A    The medical school sends their students to train at these particular

4    hospitals and get their pre-graduate education there.  Then they can opt to

5    stay there as graduates, or move to other hospitals if they find those of

6    interest.

7    Q    All right, and you did your fellowship where?

8    A    At Beth Israel Deaconess Medical Center.

9    Q    Where you are right now.

10    A    Where I stayed, yeah.  I stayed on staff afterwards.

11    Q    Okay, and in terms of that fellowship program, we've heard that word.

12    Tell us what that means.

13    A    You spend an extra year of training learning to treat patients with

14    chronic pain conditions.

15    Q    And, you know, on a day-to-day basis, then, what does that training

16    consist of?

17    A    Well, it involves understanding these patients, how to evaluate them,

18    what their long-term course will be, what medications to use on these

19    patients that would be beneficial; and we also do nerve blocks, as well as

20    nerve stimulation-type therapies.  All of these therapies are quite

21    frequently used in combination, obviously, for patients who have very

22    difficult pain problems.

23    Q    And with respect to the study of pain management, is that a recent

24    discipline within medicine?

25    A    That is correct.  I mean, pain medicine is a very, very young specialty

-787-

1    that only recently has had enough attention, as recently as the '90s where

2    we brought it into attention.  And that's because notoriously pain has just

3    been one of those things that is very difficult to make objective and to treat.

4    So conveniently, we swept it under the rug for many years.

5    Q    And then once you completed your fellowship, when was that?

6    A    The fellowship I completed in the year 2000.

7    Q    And then what did – did you sit for your boards?

8    A    That is correct.  I sat for both my anesthesiology boards, and as well

9    also my pain management boards by the American Board of

10   Anesthesiology.

11   Q    Okay, and what is the American Board?

12   A    The American Boards are those boards on a national level that

13   recognize that you've completed training and have taken exams, and are

14   appropriately trained for a particular subspecialty.  It could be cardiology,

15   it could be internal medicine, surgery.  Everybody goes through the

16   American Boards to become board certified in their specialty.

17   Q    By the way, Dr. Simopoulos, our first meeting was today.  You didn't

18   know me, in other words.

19   A    That is correct.

20   Q    Dr. Azmat, you ever met or seen Dr. Azmat before right now?

21   A    This is the first time.

22   Q    And when you sat for the boards, how long was that process?  Exam-

23   wise.

24   A    The boards?  The anesthesiology boards consist of a written

25   component and are followed by an oral component about a year later.  And

-788-

1       the oral component basically consists of people asking you questions, case

2       scenarios, to ensure that you provide safe anesthetic care.  Once you pass

3       those exams, then you can sit for the pain management board

4       examinations.  Once you then pass those written examinations, now you're

5       board certified in both specialties.

6       Q     All right, and the exam to get board certified, the written exam in

7       anesthesiology, how long is that exam?

8       A     These exams typically run about three or four hours.

9       Q     And your oral exam, how long is that exam?

10      A     That's the morning, basically.  You go to a – they have a little different

11      staging, but in those days we'd stage it at a hotel.  You show up at a hotel.  A

12      couple of doctors – you're then brought in a room, and a couple of doctors

13      bombard you with case scenarios and questions.  If they determine that

14      you're safe and you save the patient, then you go to the next room and they

15      do the same thing to you there.  If you save the patient there, then you're

16      board certified.  If the patient doesn't survive, nor do you.

17      Q     And then with respect to pain management, how long is that board

18      process?  The written part.

19      A     Pain management became a subspecialty board in 1993, believe it or

20      not.  And so I took it in its seventh year, and it consists of primarily a

21      written examination only at this point in time.

22      Q     All right, and are you required to maintain those boards, or have you

23      maintained that board certification?

24      A     They expire every ten years.  So every ten years I sit for re-

25      certification.  I just re-certified in 2009 and 2010, respectively, for each

-789-

1    board.

2    Q    And what's that re-certification process like?

3    A    You know, three-hour exam in the morning.  Sit in front of a

4    computer.  You go to a test center.  You sit in front of a computer, and you

5    answer questions one after the next with different case scenarios.  Could be

6    a 16 year old next to you taking the PSATs for instance.  So just so you know

7    the setup.

8    Q    And have you maintained those certifications up through today's date?

9    A    Yes.  Up in that neck of the woods they won't keep you on staff if you

10   don't.

11   Q    And then, Dr. Simopoulos, do you have any academic appointments?

12   A    Yes, I do.  I'm assistant professor at the medical school, and so both

13   students and trainees in the subspecialty of anesthesiology, as well as pain

14   medicine, rotate through our clinic.

15   Q    And the medical school that you referred to, what medical school is

16   that?

17   A    Harvard Medical School, so primarily Harvard medical students rotate

18   through our pain center.

19   Q    And when you're talking about rotate, what does that mean?

20   A    They come in and they essentially spend time in the pain center

21   learning how to evaluate, treat patients, and the basics of what we offer

22   patients in chronic pain.

23   Q    And Dr. Simopoulos, are you licensed to practice medicine?

24   A    Yes.

25   Q    Where?

-790-

1    A    In Massachusetts only.

2    Q    When?

3    A    Boy, that's dating back to when I graduated in 1995.

4    Q    And you have any hospital admitting privileges?

5    A    Yes, I have admitting privileges at Beth Israel Deaconess Medical

6    Center.

7    Q    And that means that you can do what?

8    A    Well, that means that I can treat – evaluate and treat patients at the

9    medical center.

10    Q    And do you have any hospital appointments, sir?

11    A    Yes.  I direct primarily the interventional pain program for the

12    hospital.  That means I'm responsible for bringing in new technologies and

13    evaluating them that come to the forefront in pain management.

14    Q    And do you have any administrative duties at the hospital?

15    A    Yes.  I also sit on a committee for introducing – in general evaluating

16    new procedures and policies, how we're going to integrate them into the

17    hospital and make them safe, and streamline them so that everybody's on

18    the same page when we're doing something new for a patient.

19    Q    And, Doctor, are you a member of any professional societies?

20    A    Yes.  The major professional society that I'm in is The American

21    Society of Interventional Pain Physicians.  I'm also a member of The

22    American Academy of Pain Medicine and American Society of

23    Anesthesiologists, and The American Society of Neuromodulation, which

24    has to do a lot with implantable devices and therapies for chronic pain.

25    Q    And, Doctor, what about in terms of teaching.  Do you maintain active

-791-

1    teaching status at the hospital?

2    A    Yes.  Each year we have seven fellows that rotate through with us that

3    have to learn – that want to learn the specialty and spends a whole year

4    with us subspecializing in pain management.

5    Q    And have you been active in their instruction?

6    A    Yes.

7    Q    And have you ever been invited to speak on any continuing medical

8    education panels?

9    A    Yes.  We have a yearly pain management update course we do, which

10   is called The Principles and Practice of Pain Medicine, that I've been

11   involved with since I started there as staff.  So this will be my 14th year

12   doing a CME course.  And I've done CME courses on a national level.  But

13   that's the main one that I can say is just sponsored by our institution that

14   we do in Boston yearly.

15   Q    And Doctor, in your professional practice, are you familiar with the

16   management of chronic pain through the prescription of opioid

17   medications?

18   A    Yes, I am.

19   Q    And have you also published periodicals, books, that sort of thing?

20   A    Yes, yes.  I have often authored articles, chapters, books, editorials on

21   pain management.

22   Q    Is that something that you're expected to do in your professional

23   capacity?

24   A    Yes.  Obviously you have to keep abreast and keep updated, and so all

25   of this is necessary for my ongoing teaching for new doctors, as well as

1    keeping myself up to date. It offers me to periodically review what's new

2    and publish on it, as well as provide my own experiences and my own

3    studies that we do within the institution.

4            MR. WITHERS: And, Your Honor, at this point I would tender

5    Dr. Simopoulos as an expert in pain management and pain medicine.

6            THE COURT: Any *voir dire*?

7            MR. GILLULY: No, Judge, we don't object to that.

8            THE COURT: All right, he's admitted as an expert in pain

9    management and pain medicine.

10   Q    Dr. Simopoulos, have you ever testified in a criminal case before?

11   A    I have not.

12   Q    Have you ever testified in a courtroom before?

13   A    Yes, I have.

14   Q    And those were in the civil arena?

15   A    Yes.

16   Q    Now, earlier last year you were contacted by me and asked to review

17   materials in this case; were you not?

18   A    Yes, I was.

19   Q    And sitting in front of you is a black notebook with tabbed materials.

20   And are those the materials that you were provided for review, sir?

21   A    I can't sift through all of them, it's pretty thick, but they seem to be the

22   records.

23   Q    You were provided the medical records of Dr. Azmat's treatment of 25

24   patients from East Health Center.

25   A    That is correct.

-793-

Q    All right.  Now, Doctor, when a patient comes in to see a physician,
what's – with the chronic pain, what's the goal of the physician?

A    The physician is to evaluate, come to an understanding of the degree
of pain that the patient's experiencing in terms of pain intensity and their
decline in function; that is, what they can no longer do because of pain.
And then their sleep-life interference.  It may interfere with relationships
that they've had because they're just suffering so much.

       And then once you put that history together, obviously obtain their
past medical history, medications they've tried, those have been successful,
those that have not been successful, perhaps procedures, interventions.
They may have had surgeries that they've tried to control their pain.

       Once a thorough history is obtained, you then provide into their
psychiatric history.  Has it negatively affected them, caused them
depression, anxiety.  Has that been adequately treated.

       After that we move into the clinical examination, and therefore we
evaluate, typically, usually the standard physical exam, often involving,
again, looking at each body part they complain of, the degree of motion,
any kind of pain that we can elicit on examination.  Any kind of – often
pain is mediated through nerves, and you might find some issues with the
nervous system, or some damage to the nervous system that's going to
manifest as weakness.  It may manifest as numbness.  So this is typical
standard evaluation.

Q    And, Doctor, in terms of the – that evaluation that you're talking
about, as the physician, what ultimately do you want to do?  What's the goal
with respect to that patient?

-794-

1    A    The goal is to provide compassionate care.  For the most part you're

2    inclined, you're altruistic by nature, you want to believe your patient, you

3    want to provide compassionate care for your patient, and you want to see

4    them improve.  You want to see what you're going to do to hopefully

5    improve their life.  It makes them feel good, you feel good about yourself.

6    You go home and you have a good feeling about what you're doing.

7    Q    And what drew you to this area of medicine?

8    A    Precisely what I just said.  I think that would ...

9    Q    And is pain a serious problem in our society today?

10   A    It's a ubiquitous problem that we're seeing more and more.  People are

11   living longer.  They're also getting a lot of treatments that may predispose

12   them to pain.  So for instance, they survive a cancer these days that years

13   ago they just would have died.  Now either the treatment or the cancer has

14   left them with some chronic pain, just to give you an example of some of

15   the things that we're up against now.  Once you have success in something,

16   it breeds other problems that you might not have foreseen.

17   Q    And, Doctor, what are the different types of pain with respect to

18   chronic care pain – or chronic pain, excuse me.

19   A    Absolutely.  I mean, pain can come, in general, in three buckets.  It can

20   be, number one, what we call a somatic pain; that is, you have arthritis or

21   some joint on you that's been damaged, either by age, by trauma.  So the

22   body's reacting to this joint or problems with this joint normally.  It's

23   feeding pain every day to you that this joint's a problem.  Sometimes we

24   can replace that joint.  We can do supplementation injections to that joint,

25   and sometimes we can't, in which case we may be left with medications that

-795-

1    we can manage it.  We may be left with severing the nerves that provide

2    enervation to that joint as a palliation-type therapy.  So that's somatic.  So

3    the nervous system is behaving the right way, but there's a problem with

4    the body that we just can't fix.  It's stuck that way.

5         The second pain problem that you can bump into is, the nervous

6    system is now misbehaving.  There's nothing wrong with that structure, but

7    the nervous system misbehaves so, so-called nerve-related pain.  You may

8    think of it in terms of nerve injury pain.  The classic example is shingles.

9    Somebody is very, very pleasant, having a good time, all of a sudden they

10   get this nasty rash.  The rash resolves, but they're left with this nasty pain

11   that sort of just persists for a lifetime.  Now the nervous system is not

12   behaving the right way.  It's been damaged, and it continuously sets off

13   pain signals, much like if you tore a electrical circuit out of the wall and you

14   see the wire just firing abnormally.  That's what we have so so-called

15   patients will describe a lot of electrical, or burning, or stabbing, jabbing-

16   type pain.  Very difficult, very distressing to patients.  Difficult, ruthless to

17   treat.  Very difficult for us as docs to treat, especially if it invades the spinal

18   cord or the brain.  Those are extraordinarily difficult to treat.

19        If we then move on to another type of pain, we can look at a visceral;

20   that is, some organ has chronic pain.  So if somebody has chronic pain, for

21   instance, related to ulcerative disease, it could be ulcers in the stomach,

22   ulcerative colitis, something that erodes some organ or intestines, those

23   can result in chronic visceral, we label it, visceral being internal organ-type

24   pain.

25   Q    And Dr. Simopoulos, have you ever heard of the phrase that pain is the

1    fifth vital sign?

2    A     Absolutely.  Early in my career The Joint Organization for Hospitals

3    on Accreditation, or so-called The JCHO, mandated that pain be put forth

4    as a fifth vital sign.  And it was really just to get us to sort to ask patients,

5    are you having pain?  Are you suffering?  To sort of get us to evaluate

6    patients' pain and try to address it to the best that we could.  Obviously it's

7    not a vital sign as something you can measure, it's what a patients reports.

8    But I guess to just be sympathetic more to patients' conditions.

9    Q     And, Dr. Simopoulos, when a patient presents – and you mentioned a

10   little bit about this earlier when you mentioned the history – but when a

11   patient presents to a doctor complaining of chronic pain, how does the

12   physician go about determining whether that patient is in fact in pain?

13   A     Well, the first step is gathering a history.  The first thing is, you have to

14   – the patient's level and degree of pain is what they say it is.  That's

15   unfortunately the tools we have.  We come in, you state the degree of

16   suffering, we listen, we listen for other cues – in other words, what else has

17   it done to your life?  Has it interfered with work, decreased your hours,

18   interfered with sleep.  Often patients will look exhausted, tired from

19   everything they've been through.  It really wears on them.  You can see it.

20   And then in the rest of their history they're sort of – they often, not

21   uncommonly, will develop a lot of anxiety around, a lot of depression

22   concerning their pain.  So it's biologic.  Pain is subjective.  It is an

23   emotional as well as a sensory experience.  So patients have a lot of

24   emotional reaction to it, as well as they sense it all the time.  So it's the

25   feeling of where the pain is.

-797-

1    Q    And you mentioned something about pain is what the patient says it

2    is.  Is that the gold standard in terms of measuring pain?

3    A    It is.  That is the gold standard for measuring a patient's pain intensity.

4    I have no other way.  No instrument has been provided to me to be able to

5    hook it up to a patient and say, oh, wow, your pain is really high, or, well,

6    you're really not telling the truth, your pain is very low.  We don't have such

7    an instrument.

8    Q    And when you see a patient with chronic pain, I take it in your setting

9    there are a variety of options.  If you can speak to that, if you would, sir.

10   A    That is correct.  I mean, by the time most patients have seen me,

11   sometimes I'm pleasured enough to be able to start with medications of my

12   choice, but most of the time medications have already been tried.  Or many

13   times patients have tried many of them and they're not working well.  So

14   they're often referred for either additional work with the medications, or

15   procedurally-based pain management.

16   Q    And, Dr. Simopoulos, do different physicians have different comfort

17   levels with how much medication one might prescribe?

18   A    Absolutely.  You have to understand with these medications that

19   they're not well studied for these problems because, after all, the specialty

20   is very young.  There is no consensus on starting doses for these

21   medications.  Lots of what physicians tend to do is based on their

22   knowledge, prior experience, and impression of the patient's condition.

23   They put this all together to come up with what they will prescribe you.

24   Q    And are patients sometimes reluctant to take pain medication?

25   A    Yes.

-798-

1   Q    And in that respect, in dealing with patients, can pain management be

2   a challenging profession?

3   A    Oh, yes.  It's – there's not a dull moment.  You can just say that.  It is

4   very challenging to control pain, because pain is integrated into what keeps

5   you alive.  It is so integrated into the brain stem.  It is an inherent property

6   that is very, very difficult to eradicate from a patient.

7   Q    And can the population of pain patients be difficult to treat?

8   A    The population themselves can be very difficult, that's exactly right,

9   both because of the nature of pain, and often because many patients may

10  have coexisting psychological disease that makes them much more

11  vulnerable to the emotional component of pain, and really catalyze their

12  deterioration in that fashion.

13  Q    And Doctor, what's the range of options that a physician has with

14  respect to the prescription of pain medicine?

15  A    Well, if you could just clarify that.

16  Q    Well, would it range from starting with Tylenol?

17  A    Oh, yes.  I mean, by the time patients see me they often have tried

18  Tylenol, over-the-counter anti-inflammatories; that is Motrins, naproxens,

19  these types of medications.  They may have gone to their primary care

20  doctor, already received a prescription-type of anti-inflammatory.  They

21  may then after that have already, in my case often, gone to a potent opioid

22  pain killer.

23  Q    And, Doctor, are those opioids – describe what an opioid is, first.

24  We've heard that term several times.

25  A    Sure, absolutely.  Many, many years ago opiates are referred to the

-799-

1    naturally-occurring substance, such as morphine.  Morphine is a naturally-

2    occurring substance, particularly popularized by the Chinese, actually,

3    many, many years ago.  And what happened with morphine is, is that

4    chemists got a hold of it, particularly many Germans prior to World War II,

5    and modified these chemically.  And so a chemically-modified morphine is

6    an opioid, and they come in a variety of types.  And so for instance,

7    common types that you'll hear about, oxycodone, hydrocodone.  These are

8    opioids.  They've been altered by chemists from their morphine base.

9    Q     And are there opioids that are stronger than oxycodone?

10   A     Yes, there are.  If you – you can eventually increase any opioid to

11   match the other one, but if you go milligram-for-milligram there are.  So

12   for instance, fentanyl, you may have heard, is a very powerful opioid that's

13   stronger than that of oxycodone.

14   Q     And I was asking you a minute ago, Doctor, about the practice of your

15   profession being challenging.  Have you ever had patients come in and try

16   and fool you for the purpose of obtaining pain medication?

17   A     Yes.  Unfortunately that is not at all uncommon.  And to be honest, the

18   people that are pretty forth – the people that are not going to fool you are

19   going to be pretty obvious.  But there are people come in that have very

20   genuine problems.  I mean, they've got the cane, they've got weakness on

21   examination, they've had multiple surgeries, they had MRIs, they still have

22   problems.  Given all of this, despite all of this, they can have – they can

23   develop problems with these medications.  Doctors can develop problems

24   on these medications.

25   Q     And Dr. Simopoulos, let's talk about dosing of medication for a

-800-

1   minute.  You mentioned this briefly.  For a fellow my size, 6'4", 215, is there

2   – could you look at me and say, ah, you know, Mr. Withers, you're going to

3   need a dose of "X" milligrams, or how does that work?

4   A     Unfortunately I can't.  You can find yourself – you can say, well, Mr.

5   Withers is a tall man, and he's a good-size man, I should probably give him

6   an upper dose.  I could give him a higher dose.  His wife could call me then.

7   He could be sleepy, he could be throwing up, it could be the wrong

8   medication altogether.  I have no formula to exactly pick what that is.  I also

9   don't know how quickly his body's going to clear or process the medication

10  and eliminate it from his body.  We know today that – and it's certainly

11  becoming more common, and it's going to be, is to be able to genetically

12  test patients and figure out who can clear these medications rapidly and

13  may therefore need a higher dose.  At present, the majority of places in the

14  country don't know.  It's, we just start with a dose based on our

15  impressions and experience, and we provide it to the patients.  They call us

16  if there's a problem, or if it's not enough, or I'll see you back sooner if

17  there's an issue.

18  Q     And you touched on this, but what are the factors that affect that

19  dosage that a physician might prescribe to a particular patient?

20  A     Well, if they've – obviously if they have tried a number of medications

21  in the past, or if they've been on opioids and developed some degree of

22  tolerance – and what we mean by tolerance is, is the body gets used to it,

23  and you need a slightly higher dose to achieve the same response you did at

24  a lower dose, say, six months ago, because the body adapts.  That's a factor.

25  Obviously size, obviously the degree to which a patient clears the

-801-

1   medication from their bodies.  Their degree of pain, their degree of activity.

2   So if I have a lot of pain and I try to be active, my pain's going to become

3   even greater, that's going to dictate it.  So it's very different if you're a

4   laborer working very hard, lot of physical labor, you may need a higher

5   dose of pain killer than, for instance, if you have the same problem and

6   you're working at an office.  So –

7   Q    – And – I'm sorry, I didn't mean to interrupt you.

8   A    So I was just going to say, function has a lot to do with what a patient

9   needs for medication.  Lots of my patients will say, well, I'm going to go to

10  work, I'm going to suffer.  And no matter how you prescribe the pain

11  medication, doc, I'm going to take it more in the evening, because when I'm

12  done with my day, I'm in a lot of pain, and I can't even sleep because the

13  pain's making me – so they'll vary it according to their day, right.  Not

14  every day is the same, not every day do we do the same activity.  So pain's

15  dynamic within the day.

16  Q    What's the best way for a physician to make that determination over

17  time with respect to what dosage works for a particular patient?

18  A    Well, I think it's – you've got to follow the patient over time.  It's going

19  to take time to figure that out.  You're going to see the patient back, usually

20  sometimes if they're in a lot of pain it's challenging, you'll see them every

21  two weeks.  Most commonly we see them monthly.  We reassess, assess

22  their function, assess how they're doing, assess their pain level, assess their

23  sleep.  Maybe they'll have a spouse or a loved one with them, we'll ask

24  them, well, how are they doing?  Are they thrashing less in bed?  Are they

25  up less in their recliner?  Less bags under the eyes?  We're looking for cues

-802-

1    that we're making a difference in their quality of life.

2    Q    And Doctor, you mentioned something about tolerance.  Give me an

3    example of what tolerance – how that plays out in this chronic pain

4    management.

5    A    Absolutely.  Tolerance is – I alluded to a little earlier – is when you

6    receive a certain milligram, say 5 milligrams of a particular medication.

7    Particularly in this case we're talking about potent opioids.  And then some

8    time goes by, and you don't get the same effect, the same pain-relieving

9    effect as you did six months ago.  So in order to restore that relieving effect,

10   we'll have to increase the dose.  Tolerance sets in much more commonly the

11   younger we are, the more tolerant we become, because the nervous system

12   is much more adaptable the younger we are.  So a newborn will adapt far

13   greater to opioids than myself, and a 90 year old will adapt far less to

14   opioids than myself.  So the younger you are, and the more chronic pain

15   you have, and the more you try to do, the more likely your dose will – you'll

16   require a higher dose.

17   Q    What about tolerance as a function of time.  In other words, if I started

18   oxycodone January 1 of 2013 and I were still taking oxycodone today, how

19   would that tolerance – how would that long-term effect – have an effect on

20   tolerance?

21   A    Well, the longer you're exposed, the more likely you'll develop

22   tolerance. It's an interesting phenomenon, tolerance.  You can see it come

23   on pretty progressively, or a patient can be stable for a while on that

24   medication, and then all of a sudden a year later suddenly they come to the

25   office and they said, well, it's not working anymore.  And so it's – then

-803-

1   you've got to reassess, is it that they've gotten worse.  Well, if they haven't

2   gotten worse, anything you can determine objectively, it might be that

3   tolerance has set in.  You increase the dose, the patient's happy again, it

4   probably was tolerance.  But again, we can't measure anything at a cellular

5   level or within the body to say, oh, yes, this person has all those phenomena

6   that are consistent with tolerance in any objective manner.

7   Q     And, Doctor, I want to talk to you about some terms we have heard

8   and that are in the literature.  What is addiction?  Just define that for us,

9   please.

10  A     Sure.  Addiction you'll hear very, very commonly.  When a person is

11  addicted to a certain medication, in this case opioid medication, their whole

12  life is now going to revolve around acquiring that medication, using –

13  having a lot of compulsive behaviors to get that medication because they're

14  taking to all the time in a non-prescribed fashion.  Their functionality

15  deteriorates significantly.  They may go to multiple doctors to try to get the

16  medications, they may steal, they may break into a pharmacy, there's all

17  kinds of very aberrant behaviors that are far off scale, that a patient is just

18  spiraling out of control.  They'll call the office frequently to – because

19  they're out of medication.  They may go to emergency rooms to get

20  medications.  They may then, if they don't get enough medication, they may

21  exhibit elements of withdrawal, which is – withdrawals they start to –

22  almost you can think of withdrawal as a flu-like syndrome.  They'll get a lot

23  of abdominal pain.  They may get fevers, they may have sweating, their

24  blood pressure goes up, their heart rate goes up.  It's, again, not a

25  withdrawal that will – that is known to be dangerous to the patients, but it

-804-

1    is exceedingly uncomfortable.  If you ever had the flu, it is just like that.

2    It'll put you in bed.

3    Q    And, Doctor, what about the term dependence.  What is that, and how

4    does it differ from addiction?

5    A    Sure.  Well, addiction, obviously a patient is in state in which their life

6    revolves around that medication and their whole quality of life is

7    deteriorating.  Everybody can see that they're using the medication

8    aberrantly.  Everything's not going well.

9         With dependence, it's a very, very common issue that if all of us were

10   to be on opioids for chronic pain, for instance, our bodies have this natural

11   adaptation to it, and what happens is, is that the body get used to seeing it.

12   If we suddenly stop it, we, too, will go into withdrawals.  Even though we're

13   not displaying any addictive behavior, we'll still go into withdrawal because

14   we've been exposed to that medication.

15   Q    And, Doctor, one final term in that respect. What about pseudo-

16   addiction.  What is that?

17   A    Pseudo addiction was coined back in the '90s, and it came out of

18   patients that were – actually had sickle cell disease.  Now, sickle cell disease

19   is this blood problem with the red blood cells that really kind of all stick

20   together, and stick together in blood vessels and don't allow good profusion

21   or good blood flow into vessels, so patients get a lot of pain.  And

22   regrettably, a lot of these patients would initially be denied pain

23   medication, or very little thereof.  So they'd come in and say – even though

24   they've gotten, say, a little bit of Tylenol with codeine, they come in and say,

25   I really need more, I'm still in some pain.  And the docs would initially say,

-805-

1    well, maybe they're getting addicted.  But what their docs found is, if they

2    just increase their dose just a little bit, all of that behavior just suddenly

3    went away, and the patients just were with a smile, their functionality

4    improved, and they actually did a lot better.

5    Q     And Doctor, how do those terms, addiction, dependence, pseudo-

6    addiction, how do they play into your view of the records of Dr. Azmat from

7    the East Health Center?

8    A     Sure.  When I look at the records, and you look at the prescribing

9    patterns, and you're looking at this case, you're looking for, how are opioids

10   being prescribed, what affect is it having on the patients.  Is it being

11   prescribed in a manner to help with pain based on an assessment, or are

12   these medications being prescribed to drive an addiction.  If they're being

13   prescribed to drive an addiction, and a physician is no longer trying to help

14   but actually trying to, quote, move into a drug dealer, we're going to expect

15   that patients are going to become very dysfunctional.  They're going to call

16   the clinic a lot, they're going to go to ER visits, they're going to be on

17   escalating doses.  So the dose pattern is just going to go up.

18          And so this lack of function, that spiraling out of functional control

19   for this patient is what we're going to look for as evidence in the medical

20   records.  We're going to look for a pattern that just continuously shows that

21   we're going in the wrong direction.

22          The physician may also have to supplement with certain other

23   medications, so sometimes methadone is used to treat withdrawals from

24   these folks because they're spiraling so much out of control.  They may be

25   then referred to soboxone treatments, which is another way to treat opioid

-806-

1    addiction.  Or they may have a clonidine patch prescribed to them to

2    dampen down the high blood pressures, the high heart rates.

3         So we're looking for those elements in the charts, and we're trying to

4    find evidence for this type of prescription pattern driving this result in

5    these patients.

6    Q    And did you find any evidence in the East Health Records that you

7    reviewed of addictive behavior?

8    A    I did not.  In this brief treatment and glimpse that we have that Dr.

9    Azmat was at the medical treatment facility here, we did not see that

10   happen.

11   Q    And on each occasion that Dr. Azmat saw a patient, what was the total

12   number of occasions that he saw each patient?

13   A    The vast majority of patients were seen once.  There was one

14   encounter, he evaluated the patient, he did his exam.  Based on his

15   experience, his knowledge, and his impression, he formulated a treatment

16   plan.

17   Q    And Doctor, I want to take a few minutes and review some of the

18   terms that we've heard here in the courtroom, and I want to try and get you

19   to frame those for us.  But evidence-based medical standards would be

20   what?

21   A    Evidence-based medicine is a reasonably new term.  For many years

22   the way we learned, and certainly the way I formed impressions in medical

23   school was, is you go to the grand masters who had been practicing

24   medicine and they teach you the tricks, and you're just like – you know, it's

25   almost like you go to a Shaolin Temple and they're going to teach you all

-807-

1    the tricks of martial arts.  You're going to get the same thing here.

2         The truth is, is by the '90s we started to recognize that we needed to

3    have more science in what we do.  And the way we evaluated sciences, we'd

4    take a group of patients that have a similar disease problem, and a group

5    that also has a similar disease problem, we expose one group to a treatment

6    and the other group not, and we see how they do in the long run.

7         Pain medicine being a reasonably new field, pain being very

8    subjective, and it was very difficult for us to get a grip on how to evaluate

9    patients numerically with pain, we lagged behind in evaluating scientific

10   trials of medicals.  And in particular opioids, if we look, despite us having

11   about a 20-year experience of prescribing these medications in chronic

12   pain, we only have studies that go to about six months, and very few at that.

13   So from an evidence-based scientific perspective, we have not well

14   evaluated how patients do on these medications in the long run.

15        So it leaves practicing physicians and patients kind of with very little

16   science to go on.  Patients are suffering.  If you're going to wait for that

17   science, you're not going to see treatment.  Most patients will – will end up

18   passing away by the time we have the science to help them.

19   Q    And so with respect to evidence-based science standards, are there

20   many or any in the pain management world?

21   A    With respect to medications we lack – we are lacking strongly in

22   evidence-based medicine.

23   Q    And Doctor, what about what are called standards on treatment –

24   excuse me, guidelines in treatment of patients.

25   A    Well, what we've done in the absence of science is, is that doctors who

-808-

1    are experienced, belonging in certain societies, we'll review the little

2    medical science we have and try to come up with certain recommendations

3    for physicians.  And if we read those recommendations we'll often say, well,

4    we strongly recommend this, but we don't have any evidence for what

5    recommend.  And clearly in these guidelines we don't have all the scenarios

6    that physicians may face.  So it's lacking a lot of clinical applicability in the

7    circumstances that physicians may find themselves.

8         And finally, they're guidelines.  They don't guarantee any kind of

9    treatment outcome.  So even if I follow these to a "T," I can't guarantee an

10   outcome for a patient.

11   Q    Is a guideline an absolute in terms of the practice of medicine?

12   A    No, they're just that. They're just guidelines because they lack any

13   scientific validity, in which case then we can say, well, the science says you

14   should be doing "X."  We don't have that level of recommendation.

15   Q    And what about the term consensus statement; what does that mean

16   in the medical world.

17   A    Well, when we quite don't know what we're really doing scientifically –

18   again, a group of experts from maybe a variety of medical backgrounds

19   kind of get together.  So, for instance, I approach this from anesthesiology,

20   there are also neurologists who approach this field, and also rehabilitation

21   doctors who approach this field.  We'll kind of get together and we'll kind

22   say, well, here's what we all kind of agree, that we ought to kind of be using

23   these types of guidelines to help us frame our practices to kind of start to

24   look a little similar so that's nobody so much of an outlier and everybody

25   has a frame of reference.  Again, they're not specific.  They're not going to

-809-

1    tell me, well, if the patient comes in with sickle cell disease, you give them

2    this medication and you will get this outcome.

3        So, for instance, a good strong guideline in cardiologists' evaluate is,

4    is that when you get acute heart attack, people pop an aspirin.  Very well

5    established, very good science, done across the country.  We don't have

6    such science yet.  We're lagging behind.  We've had a harder time.

7    Obviously the heart has a lot more objective ways to evaluate it with

8    ultrasound and X-ray imaging that we haven't had in pain.

9    Q    And Doctor, with respect to the guidelines, you've reviewed The

10   Georgia Composite Board of Medical Examiners' guidelines with respect to

11   chronic pain management.

12   A    Yes, I have.

13   Q    And did that inform your opinions with respect to this case here?

14   A    Yes, it did.

15   Q    And we've heard, by the way, the term standards and standards of

16   care.  What does that mean in the medical world?

17   A    Standard of care, we often discuss that more in a civil case.  That is, a

18   doctor didn't follow a certain standard that led to, often, negligence.  So a

19   patient called me, they were having a hard time breathing after what I did

20   to them, and I didn't call them back.  Or I didn't – I neglected them, and

21   then some bad outcome then occurs.  So they incurred some type of injury

22   as a result of that. So it's often a – then I go to what we call a civil case

23   because I neglected the patient and something bad happened to them.  So

24   we would be here on a civil basis.

25   Q    And Doctor, I want to talk with you for a few minutes about The

-810-

1    Georgia Composite Board's guidelines for the use of controlled substances.

2        Step 1 in that guideline speaks of a medical history and physical exam

3    that needs to be obtained.  You've talked about history.  Tell us how you as

4    a physician take a medical history.

5    A    Well, medical history is what patient and you – first thing you – I just

6    leave it open initially for them, and let them tell me what's paining them,

7    how much, where.  Often they'll tell you a lot about what they've tried.  A lot

8    of times what we do today is, in addictions we often give a patient a

9    questionnaire ahead of time.  So when they're in the waiting room waiting

10   for us, they've filled out a lot of this, and we can review it and then just

11   simply ask even more questions to arrive at what's troubling them, and

12   what's worked, what hasn't worked.

13   Q    And Doctor, did you find that Dr. Azmat was taking a suitable medical

14   history in the records that you reviewed?

15   A    Yes.

16   Q    And with respect to the physical exam, tell us about that very briefly,

17   please, sir.

18   A    Yes.  There's been no specifics.  So just going back to these guidelines,

19   they say taking an adequate history.  So what you'll read, I don't care which

20   – I've heard a lot of guidelines from a lot of societies, including The

21   Georgia, they all say take a history.  They don't put very good point specifics

22   of what this history should entail, that you should have this, that you

23   should have this, that you should always do this, and if you don't have this,

24   you won't be able to – this bad thing will happen.  They don't have anything

25   like that, they leave that open.

-811-

1    And the same thing they do with the physical exam, they say an

2    adequate physical examination.  Well, that's kind of left up, again, to

3    interpretation by the physician based on when they see the patient, or

4    based on their own experience.  So they don't, again, put any point specific.

5    So they won't say, well, if a patient comes in with a back pain problem, you

6    should do this exam, this exam, and this examination of them.

7    Q    And Doctor, did you find in the medical records that you reviewed that

8    Dr. Azmat performed a sufficient physical examination?

9    A    He did.  The key pointer is, is that in the examination you'll often read

10   that he didn't find anything neurologically wrong with the patient, which is

11   important.  If he did find something neurologically wrong with the patient,

12   immediately he'd have to obviously consider referring that patient out to an

13   additional specialist to see if that could be treated if it wasn't addressed

14   before.  Just remember, we're just going to treat the pain as a therapy.

15   We're not going to be treating any other serious medical problems that may

16   be coexisting.

17   Q    And what about the Step 2 of The Georgia Composite Board would be

18   a creation of a treatment plan.  Did you find a sufficient treatment plan of

19   Dr. Azmat in the records?

20   A    Yes.  He began initially – obviously he saw most of these patients just

21   once.  These patients came in, they were having pain, he started a medical

22   treatment.  Usually it was just based on one single medication as a core

23   medication, oxycodone, that he was familiar with.  And that was the plan.

24   We don't have any further data to say, well, they came back and they

25   weren't stabilized, weren't doing better, what would have been the next

-812-

1    thing.  We have nothing further but the just one initial treatment, which is

2    what usually occurs when patients are in a lot of pain.  They come in, it's

3    very common that when I look at charts from the internist, from other

4    specialities, when I look at their initial plan that I can see in a computer at

5    our hospital, I can say, okay, when they came in they presented.  This is

6    what they did, they stabilized – tried to stabilize the patient initially on

7    some painkillers if they were having a lot of pain.  So it's very common

8    approach to an initial visit.

9    Q    And what about a review of the patients' prescription history.  Did you

10   find that would be another step in The Georgia Board?

11   A    Yes, he took a history of what the patient was on prior to initiating his

12   therapies.

13   Q    And why is that important, to obtain that history of prior prescription

14   history?

15   A    Well, you want to know what has worked for the patient, what

16   milligram dose.  It'll let you arrive at stabilizing this patient's pain and

17   treating them quicker.  And also avoiding medications the patient may have

18   had difficulties with in the past.

19   Q    Now, Doctor, there's no reflection in the record.  And for instance –

20         MR. WITHERS:  – Ms. Bodaford, if you could just turn one of

21   those on.

22   Q    I'm just going to look at one record, and this is previously in evidence

23   as a government's exhibit.  But there's no reflection in this record, Dr.

24   Simopoulos, that Dr. Azmat sat down and discussed the risks and benefits

25   of opioid therapy with that patient.  But did you see something in the

-813-

1    record that that actually had taken place.

2    A      That is standard.  Most patients will have a standard form called an

3    opioid agreement.  In an opioid agreement it lists the risks and benefits of

4    chronic opioid therapy.  Because to be very honest, whether you're on a

5    anti-inflammatory, Ibuprofen, or you're on a potent opioid, you're yearly

6    risks aren't that much different.  In other words, a Motrin stands the

7    chance of winding up in the hospital chronically because of gastrointestinal

8    bleed, and oftentimes death as well with it.  A hundred-thousand GI scopes

9    a year from – and so don't think just because something's over the counter

10   it's not without consequences.

11        Similarly, opioids come with high risks, and patient needs to know

12   those risks because they may then back out.  So line-per-line is detailed the

13   risks of this type of therapy.  And so the patient's encouraged, of course, to

14   read and initial the risks of this therapy. Then they have to then initial their

15   obligations that they have to do in order to keep themselves safe with this

16   therapy in the long run.

17        And I can tell you that this is reasonably well done.  We don't have

18   initials on each of these steps.  I have each of these steps, but I don't have

19   initials on each of these steps, which I thought was kind of – at least got the

20   patient to at least look at what they're doing, try to get the patients to at

21   least look at each line.

22        You know, once again, we do a lot of risky things, and I will say – I

23   will attest to the fact that you go and you purchase something that's

24   potentially dangerous to you, like a power tool, a chainsaw, a circular saw, a

25   miter saw, I don't think there's any of the manufacturers sits there and

-814-

1    reads you line-per-line and has you dot on the line that this will amputate

2    your finger, cut your hand off, and you'll need to have to those sewn back

3    on potentially, if they can be.

4        So it is really above and beyond when you're involved in something

5    risky that I think is done.  Same thing is true for a stepladder or a high

6    ladder.  You don't get any of this.  This was actually, at least in some form,

7    documented and done, and the patient is encouraged to read the risks/

8    benefits of this therapy.

9        Certainly by doing so they may have some questions, and it is nice

10   that some things may be clear and some things might not be, so then the

11   things that aren't can then be discussed with Dr. Azmat during the rest of

12   the visit.

13   Q    And Doctor, the next Georgia Board guideline is keeping detailed

14   records of the type, dosage and amount of the drug prescribed.  And was

15   that done here?

16   A    Yes.  You can see the dosages and amount dispensed per month

17   consistently.

18   Q    And then Step 9 would be maintaining adequate records.  In your

19   opinion did Dr. Azmat maintain adequate records?

20   A    Yes.  We can see what he's done with each patient.  We have a clear-cut

21   plan.  You know exactly what the patient received.  You know what he chose

22   not to prescribe.

23   Q    And so did Dr. Azmat meet what the Composite Board suggests with

24   respect to that?

25   A    Yes.

-815-

1   Q    And then, Doctor, I want to talk with you a little bit about – well,

2   before I get to that.  So in your judgment, in your opinion, Doctor, did Dr.

3   Azmat meet the guidelines put out by the Composite Board in Georgia?

4   A    Yes, he did.  And once again, I'll agree with, the guidelines are a

5   framework.  They're not anything that sort of guarantees an outcome from

6   Dr. Azmat.  They give him a framework of which to prescribe – evaluate

7   chronic pain patients and prescribe medications to treat their pain.  And he

8   did fit into that framework.

9   Q    And Doctor, what's the difference between meeting that guideline and

10  someone who has become a drug dealer in your view?

11  A    I think what we look for with drug dealer is, you're going to not

12  adequately evaluate any of the patients, or very cursorily do so.   And then

13  you just simply prescribe in even higher doses if they ask.  You'd want to

14  give them very high doses, and then have the patients back weekly.  And

15  you could just hang prescriptions on the door, patients can come by and

16  just pick up their prescription, you don't even meet them face-to-face, and

17  you just keep increasing their doses on a weekly basis.

18  Q    And what is dose escalation, Doctor?

19  A    It's when the milligrams per capsule just go up, or the number of pills

20  go up, or both.

21  Q    And is that what – how would that factor into your opinion here?  Did

22  you see any dose escalation?

23  A    No.  In fact, based on the histories, most of the medications were

24  started off lower, and that's the reasonable thing to do, especially if patients

25  had some break in their care.  And the tolerance rapidly can swing the other

-816-

1    way, in other words, your tolerance goes down, so it's good to start off

2    lower first and then see where you're going to end up.  And that's

3    encouraged, and that was done here.

4    Q    And did you find a variation in the prescriptions that were

5    administered as well?  Variations of amount, dosage and types.

6    A    Well, there were what we call adjuvants in some patients that he

7    though appropriate.  So some patients, they might have had inflammation.

8    In those patients he prescribed Ibuprofen or anti-inflammatory of that

9    type.  Some patients may have nerve pain.  He added what we call

10   Neurontin, or gabapentin, that's geared at nerve pain.  Its use stems from

11   that of shingles pain where a patient, as we know, has a lot of nerve pain.

12   So sometimes patients with back pain can have some nerve-related pain

13   down their leg, so-called sciatica.  So that was done in certain patients that

14   he felt needed it.

15        And the other thing he did was, he eliminated in a lot of these folks

16   the Xanax, because you want to – Xanax is this alprazolam.  It's a

17   medication which is used for anxiety.  And I think it's reasonable when you

18   get started to start with one medication, or one or two medications, and

19   just see.  If you get better control of the pain, will the anxiety kind of die

20   down a bit, and you don't really need another medication.

21        So I think it was a reasonable approach to first start low and go slow.

22   We don't know about the go slow yet because we don't have any followup,

23   but I think starting lower is prudent.

24   Q    Why is the issue of followup – in other words, more than one visit –

25   why is that an important issue in your analysis of this case, Doctor?

-817-

1    A    Well, in uncovering a lot of – in getting to know patients and really

2    what they're all about, you really need to have a long-term relationship with

3    the patient.  You really need to follow them, especially the patients with

4    chronic pain.  And reason is, is once again, pain is subjective.  There's no

5    measurement.  It's not a cholesterol, it's not something I can just measure,

6    here's your number, here are your medications, this is your outcome.  I

7    have nothing like that.  I really have to get to know how pain influences

8    their lives, what their level of other psychiatric co-morbidities are.  And the

9    only way you really get to know a patient is to follow them over time.

10        Then even after some time you follow patients in doing well on these

11   medications, or any kind of other therapy you do, patients can develop

12   psychiatric co-morbidities, they can deteriorate on you at any time.  So

13   that's the other reason why followup is so important, because we always

14   need to keep an eye out on these patients, because they are vulnerable to

15   other psychological problems.

16   Q    You –

17   A    – We just have – go ahead.

18   Q    Excuse me, I'm sorry, Doctor, you go ahead now.

19   A    Well, it's just a good relationship between depression and anxiety,

20   chronic pain.  It's a chicken and the egg phenomenon sometimes.  We don't

21   know which one comes first.  We know they both have a heavy intersection

22   with one another, they relate to the same places in the brain.  So patients

23   require careful followup and ongoing care.

24   Q    Doctor, of course we know that in all 25 of those patient charts you

25   reviewed there was prescriptions for OxyContin – or oxycodone –

-818-

1    A    Oxycodone, right.

2    Q    – excuse me.  Was that troubling to you?

3    A    Well, oxycodone is the most – just so we put it on the record,

4    oxycodone is amongst the most commonly prescribed opioid medication up

5    front when patients have severe pain.  It's because in large cases if we look

6    across the board it, doesn't matter whether you're surgical background,

7    primary care, cardiologist, gynecologist, this is a medication that most

8    doctors are familiar with most, they have the most experience.  So if I were

9    a patient I would want that doctor to prescribe what they're most familiar

10   with and not be trying something they're not so familiar with on me if

11   they're going to try to treat me.  So it doesn't surprise me.  It's not at all

12   surprising.  It's very common that this is the most common medication

13   that's used.

14   Q    And Doctor, we noticed in the records a lot of notations of chronic low

15   back pain.  Did that surprise you or bother you in formulating your

16   opinions here?

17   A    No.  Chronic low back pain is the most common reasons that patients

18   present in pain management centers.

19   Q    And I believe the highest dosage that we saw was 180 30 milligram

20   tablets, and 60 – excuse me, 60 15 milligram tablets.  Is that an excessive

21   dose?

22   A    Well, that's a great question.  Since there's not a great consensus in

23   terms of what's the dose, I preface most on what the patient's doing with

24   the dose than the dose itself.  Because, as you heard earlier, the dose is

25   predicated on the degree of tolerance, the degree of pain, the degree of

-819-

1    function that the patient has on that medication that may provoke them

2    having higher levels of pain.  So I can't necessarily base that the dose is

3    what's going to throw me off.  What I really am looking for is, what's the

4    trend of that dose, where is it going over time.  And where is the patient

5    going over time.  Is the patient improving with that dose, is the patient

6    deteriorating with that dose.

7            So that's – it's more importantly what's going on with the medication

8    than the actual number.

9    Q     And you mentioned a trend.  Did you notice any trends in Dr. Azmat's

10   prescription practices?

11   A     Yes.  He cautiously always began lower than what the patients'

12   reported history was of the dose.  And that's rightly so.  I mean, until you

13   can – you need to form an impression yourself, and it's good to just start a

14   little lower because, as I said, some patients may have not been treated for

15   a while and their tolerance may have decreased.  So that for safety purposes

16   I think is reasonable.  And he also stopped the Xanax in most patients, and

17   I think that's a good approach as well.

18   Q     And you saw the usage of urine drug screens.  And is that consistent

19   with good pain management?

20   A     Yes.  Urine drug screens are a fascinating test.  And I'll tell you why it's

21   a fascinating test.  It is a test that I am recommended to do, but yet no

22   society tells me exactly what to do with it.  And I know that's going to leave

23   you there and you're going to say, what is he ...  If you look at the

24   recommendations available to Dr. Azmat in 2009 they'll say, well, we

25   strongly recommend urine drug toxicology, and in particular it was mostly

-820-

1   for patients that may be at high risk for potential development of addiction.

2   So they may have had a substance abuse disorder, fell from a ladder, and

3   now have broken their back and have chronic pain.

4       So that might be an example where you might find yourself in the

5   scenario of the recommended urine toxicology screen.  Granted he checked

6   consistently in all of these patients for the most part that I could see to see

7   if they were A) taking their medication, or B) taking something else that

8   they did not disclose to him, because sometimes patients just don't disclose

9   to you everything they do, unfortunately.

10       And that's my most difficult issue when I'm treating with patients, is

11   when they're not truthful with me.  That is the hardest part, because in

12   order for me to believe in your pain I have to believe you.  If you're doing

13   things to deceive me, how can I trust you.  And then if I can't trust you, how

14   can I believe you're going to be safe on your medications I'm prescribing

15   and use them as I've directed.  It's a complex interaction that you need to

16   figure out over time.

17   Q    And, Doctor, you have pointed to something that has been troubling in

18   this case; and that is, what the patient tells the physician and whether the

19   physician can believe that.

20       I'm just going to show you what's previously been in evidence, and

21   the jury has seen it, but it's Brian Smith, his initial visit form with Dr.

22   Azmat.  Do you see the history of trauma there?  Right here?

23   A    Yeah, progressive back pain, pain, numbness is both legs –

24   Q    – Actually I'm –

25   A    – Lifting –

-821-

1   Q   – just above that.

2   A   – lifting a heavy beam, yeah.  Yes.  '04.

3   Q   '04, lifting heavy beams I think.

4   A   Correct.

5   Q   Now, when a physician is given a history of that, is the physician

6   obligated to go get any prior medical records with respect to the original

7   source of injury?

8   A   No.  I can quite honestly tell you most of the patients that come to our

9   center, we don't have a complete composite of their prior medical history.

10  And a lot of that has to do in part with the way the health system is.  It's a

11  very fragmented healthcare system we have.  Patients go from one facility

12  to the next to the next.  So – and we also – our computers don't link up.  It's

13  as if you're trying to book a flight but you have to take your baggage from

14  flight to flight because they don't talk to one another.  That's the problem

15  with our records, they don't automatically travel with the patient.

16  Q   And I'm going to show you another one, again in evidence, Billy Letner

17  discussed extensively.  Logging accident, Kentucky, six years ago, fell 15

18  feet.  Is the treating physician obligated to say to the patient, I'm not

19  treating you, I'm not prescribing you any controlled substances until I have

20  proof of what you're telling me.

21  A   You're not going to find that.  That's – I've never had a police report of

22  their motor vehicle accident, a photograph that they fell, or some – or the

23  medical records where they were hospitalized in many cases, particularly

24  when it dates back many years like that.  And I can tell you, we've honestly

25  progressed to more advanced therapies than medications, and we don't

1    have the details of the patients' initial injuries.

2    Q    So the standard, whether judged by a guideline or anything else that

3    you have told us about, does not require the physician to run get those prior

4    medical records.

5    A    You're correct.  Traditionally we have relied on our patients' history as

6    the gold standard for treatment.  They're the ones that we presume to be

7    suffering, they're the ones in need of our help.

8    Q    And when the patient – and I'm going to show you another one that

9    we have talked about, Carlie Cole.  When the patient reports to the

10    physician that the patient is on oxycodone 30 150 milligram tablets,

11    hydrocodone 10, and then lorazepam, is the physician obligated to tell the

12    patient, you know what, I'm not treating you until you prove to me that

13    you're actually on those medications.

14    A    There's no standard for that. You're basically kind of left to your own

15    judgment at that point in time.  You can on initial visit elect to treat that

16    patient with chronic opioids, and the guidelines will say that.  You can

17    decide that that's what you think is most appropriate, and you can decide

18    your doses that you would like to use on that patient.

19    Q    Now, do all – you talked about the usage of a physical exam.  Do all

20    physicians do the same physical exam?

21    A    I tend to think not.  You wouldn't expect that.

22    Q    And are there different ways for different physicians to adequately

23    conduct a physical?

24    A    Could you rephrase that a little bit?

25    Q    I'll try.

-823-

1   A    Yes.

2   Q    Do different doctors do different physicals that still meet standards,

3   guidelines, what-have-you.

4   A    Well, the guidelines don't really specify any details about physical

5   exams, that you should do test "X" or test "B" on your examination.  So it's

6   left up to the physician.

7   Q    And we have heard some terms here, Doctor, like range of motion.

8   What does that mean?

9   A    Well, that means the degree to which a patient can bend over, pick

10  something up, extend their back backwards as far as they can, move side-

11  to-side for instance, rotate their back.  These are the ranges of motion and

12  how well they can do that and how much that approaches being a normal

13  range.

14  Q    And Doctor, I'm going to show you another document that's

15  previously been admitted into evidence.  When you read – by the way, is

16  this a sufficient – in your professional opinion, is this a sufficient history

17  and physical that you see documented here by Dr. Azmat?

18  A    Yes.

19  Q    And when you read the – where it says, neck supple, no C-spine

20  tenderness, what does that mean?

21  A    The neck is nice and soft.  It's not rigid, and there's no tenderness that

22  the patient complains about when you feel over the musculature of the

23  neck.

24  Q    And then I'm going to jump down here to MS spine.  It looks like that's

25  lumbar flexion decreased 45 degrees.  Tell us what that mean.

-824-

1    A    That means that the degree to which the patient can bend forward is

2    restricted to about 45 degrees.  I mean, you kind of just eyeball that as the

3    patient does it in front of you.  You don't have any measuring instruments.

4    It's just a gross eyeball, that looks to be about 45 degrees.  So you have

5    some idea of how much variability, how crude this is.

6    Q    And I think this indicates tenderness LS.  What does that mean?

7    A    Tenderness over probably the lumbar spine.  LS is typically lumber

8    spine.  It's tenderness over their low back, that's what it's telling you.  So

9    when I feel over the low back and push to some degree – and again, the

10    degree to which patients – the degree to which doctors will push on the

11    musculature of the low back when they're feeling you will vary from

12    examiner to examiner.  So I could go in there and push a littler harder than

13    the medical student, for instance, and find tenderness and the medical

14    student never did.  Because it's again – we're taught to do this in medical

15    school.  There's no measuring tool to calibrate how much pressure to exert

16    because we don't have anything that we measure this with.  It's been taught

17    like this for years and years, and it hasn't changed that I've seen.

18    Q    And Doctor, did you see occasions where there were pharmacy profiles

19    in the medical records?

20    A    Yes.

21    Q    And what are those, and how are they used?

22    A    Well, pharmacy profiles are used – that's a great question.  It's when

23    you – and I presume with profiles you're referring to the prescription

24    monitoring.

25    Q    Yes, sir.

-825-

1    A    Yes.  Prescription monitoring programs are a recent outcry of

2    physicians to get this established in the country.  It began by the society I

3    told you earlier about  – and I mentioned a lot of them – but The American

4    Society of Interventional Pain Physicians became very frustrated with our

5    inabilities to monitor where patients go with opioids.  And for the first time

6    back in 2005-2006 we nationally pushed through a law for the first time in

7    physician history that the country should set up electronic prescription

8    monitoring programs, so that no matter where you go in the states we can

9    monitor where you've picked up opioids.  So if you go this doctor and

10   deceive this one, and you're successful in deceiving multiple doctors, we

11   can track you through pharmacies.

12        Despite that, it's taken many years because of funding, right?  You

13   can pass the law but it needs to be funded, and I can tell you we've just

14   recently set this up in Massachusetts.  I get very frustrated when I talk

15   about Massachusetts because you would think that the minute I get my

16   license I should get access to this program, but like many things in

17   government you have to hunt them down.

18        That said, they don't talk to one another state-to-state.  They didn't

19   set these up to link it between states.  So I can't – unless I have a license in

20   multiple states, I can't monitor what goes on to the state next to me.

21        So you can see there's some limitations with these particular

22   monitoring programs.  They're in their infancy in many states.  Some states

23   haven't set them up, but can be – have the potential to be useful.

24   Q    And Doctor, in the – I have sent you some patient files that dealt with

25   discharged patients; do you recall that?

1    A    Yes.

2    Q    And what did that – what conclusions did you draw with respect to the

3    discharged patients?  And those records are in evidence.

4    A    Well, once again, the patients that were discharged would be those

5    patients that have the potential or have had behaviors that just don't prove

6    to be safe on opioid therapy.  They may have other motives for seeking

7    them.  They could be addicted.  They could like to just abuse them, or they

8    could like to sell them.  These are very difficult entities as doctors for us to

9    diagnose where we're not detectives, after all, and we weren't taught to be,

10   so I don't have any formal training in detective work.  But you kind of end

11   up in this pathway in this business, unfortunately, because there haven't

12   been the appropriate safety guidelines for these patients.  Like the

13   prescription monitoring programs are in their infancy, the urine toxicology

14   screenings, all these ideas are coming out.

15        But again, looking back to Dr. Azmat back in '11, there's still – even

16   then, we knew less then than we know today.  Every month that goes by we

17   learn a little more, we add a little more to these things.  Because this is just

18   such a new area in terms of monitoring these patients and selecting these

19   patients.  I can't tell you how new it is.

20   Q    And Doctor, what conclusion did you draw from reviewing the records

21   based on Dr. Azmat's discontinuing the Valium for a variety of patients?

22   A    Well, I think that – as I said, I think that, earlier I think, number one,

23   is that you start with your treatment plan, you see how that goes.  If you can

24   improve the patient's pain with your medications, the anxiety may improve.

25   If that anxiety doesn't improve, they may have then elected to refer these

-827-

1    patients to a psychiatrist for more long-term antidepressant-type

2    medications.  So – and the other thing is, is that if – is that you – you just

3    want to see how – you want a limited interaction of alprazolam with

4    oxycodone.  In recent years, past two-to-three years, you're starting to see

5    more in the literature, well, we don't recommend this combination as

6    commonly together.  It can be, but certain societal groups are starting to

7    say not to use them.

8         So he kind of jumped on that pretty quickly, I thought, and it was

9    good.  Because you don't know which patients may have problems with

10   these medications long term and they can interact.  In other words, both

11   are downers.  You take them both together, it can make a patient very

12   sleepy.  And in high doses, of course, obviously lead to problems with

13   breathing and cease people's ability to breathe.

14   Q    And that combination of oxycodone and Xanax, then, would be – that

15   combination could lead to problems with respect to certain patients.

16   A    Correct.  And when you – and, you know, you've got to get to know

17   these patients.  So you start with one medication and you just follow them.

18   You see – and you get to know their behaviors, you get to know how they're

19   doing, you get to see if there are any extra phone calls, going to emergency

20   rooms looking for dose escalations.  You get to – you've got to get to know

21   your patients.  And I think that you start believing them, and then over

22   time you reevaluate, reevaluate and say, ah-ha, you're going pretty well on

23   this, or I don't think you're doing well on this, we'll have to taper this off

24   and try something else, or I think it's time for me to refer you elsewhere,

25   this is just not – or I just can't treat you.  All of these are potential issues

-828-

1    that will just take time to evaluate and determine.

2    Q    And Doctor, did you see in the records that there were several

3    instances, most instances, of nonprescription drugs, like Motrin 500

4    milligrams, naproxen – or Motrin 800 milligrams, naproxen 500

5    milligrams.  Did you see that in the records?

6    A    Yes.  There were patients that were treated with a combination of

7    medications.  So a safe and reasonable combination is to combine an anti-

8    inflammatory with a potent opioid medication, see if you can help the

9    patient further, or with a nerve pain medication like gabapentin, or

10   Neurontin.  And that was done in some instances where Dr. Azmat felt that

11   that would be valuable.

12   Q    And did you see the MRI studies in the documents as well?

13   A    Yes.

14   Q    How are those used in pain management?

15   A    That is a great question.  So magnetic resonance imaging is probably

16   the most explosive and fancy modality that we've had in the past 20 years

17   to looking at patients' spines.  And we thought, well, we'll finally kind of

18   solve this back dilemma.

19        The problem was, is by the mid-'90s we recognized that patients can

20   have a lot of MRI findings – in other words, deterioration in their discs and

21   their joints in the back, and have absolutely no pain.  And conversely,

22   patients can have some modest findings and have a lot of pain.  So we can't

23   use MRI to measure pain for patients because there's just not a consistent

24   correlation.

25        That said, we can use MRIs to exclude other rare problems that

-829-

1    patients may have, advanced degenerative disease of their backs, to make

2    sure their nerves aren't going to be compressed, or they're going to have

3    some instability that may lead to problems with nerve injury in the long

4    run.  So that it does have merit in terms of making sure that patients have a

5    benign – what we call a benign, not going to maim the patient or lead to

6    something, devastating condition, and that you can potentially treat these

7    patients conservatively.  Opioid medications may be that conservative

8    choice.

9    Q    And Doctor, with respect to the prescription medications that you saw

10   in the charts, were those consistent with legitimate medical practice?

11   A    Yes.  As we said, oxycodone is a very commonly prescribed

12   medication.  It's reasonably well accepted from patients.  The side effects

13   for opioids tend to be on the more modest side compared to morphine in

14   terms of the sedating, nausea, constipation.  You see more of those with

15   morphine than you do with oxycodone.  There's also a degree of physician

16   familiarity with the medication.  All of these have resulted in oxycodone

17   being a more common medication that is prescribed.

18   Q    And Doctor, you're being paid for your time that you spent reviewing

19   these files, as well as paid to be here – your time here today; are you not?

20   A    Yes, I am.

21   Q    And going back to the – to your reports.  You touched on this briefly;

22   and that is, the issue of trust between the doctor and a patient.  Is a

23   physician supposed to trust a patient?

24   A    Yes.  That's what we're taught in medical school.  You're taught to

25   believe, trust the patient and exert compassion.

-830-

1    Q    And if a patient comes in to you and says, golly, my back hurts, and it's

2    going down into my leg, do you tell that patient, no, it doesn't, and I'm not

3    going to treat you until I see your records?

4    A    No.  The common course of clinical action is to treat the patient.

5    Q    You mentioned withdrawal earlier, and I want to talk about weaning

6    patients.  Did you see efforts by Dr. Azmat to wean certain patients off the

7    medications?

8    A    Yes, certain patients were decreased significantly from their original

9    doses.

10   Q    And weaning means what?  How does that work in the medical world?

11   A    It's a gradual decline in opioid medication so that you eventually get a

12   patient off of them without precipitating withdrawal symptoms.

13   Remember, withdrawal symptoms are extremely uncomfortable, extremely

14   distressing.  They make a patient very sick.  So we want to taper those down

15   in a gradual fashion so that the body readjusts itself and we don't get that

16   nasty withdrawal syndrome.

17   Q    And Doctor, one of things that you said early on was clinical judgment.

18   Tell us what clinical judgment is.

19   A    Well, clinical judgment is most of what we do.  Because, especially in

20   this field where there's a lot of subjectivity – in other words, there's not a

21   test or measurement that you can do with a lot of things, and you're left to

22   sort of use your experience, your knowledge and your impression of the

23   patient to then judge what would be a reasonable option for a patient in

24   their best interest.

25        So with regards to opioids you use a judgment and you say, well,

-831-

1    based on everything I've evaluated, I'm willing to give oxycodone a trial in

2    this patient and see if it improves their lives.

3    Q    And Doctor, in your review of the records of Dr. Azmat, do you have

4    an opinion about whether he was exercising clinical judgment, and

5    exercising it appropriately.

6    A    Well, he had to have been.  Each time he definitely worked the patients

7    down on their medications, tried to just figure out what would be the least

8    dose that he could find, at least in his judgment, that may work for you –

9    for a particular patient.  He also added some additional types of

10   medications to see if he can help other components of their pain.  And

11   finally, he eliminated in many cases the Xanax component.  Because if you

12   can control the patient's pain, maybe their anxiety, maybe their sleep, will

13   improve, and you don't need additional medication that can interact with

14   oxycodone in some patients.

15        Again, it's not a hundred percent.  I mean, you could be, well, that

16   Xanax was actually beneficial in some patients, and you may find that that's

17   the case later on.  But at least initially, when you're trying to form an

18   impression on what you're doing, if you put a lot of ingredients in the

19   formula you're doing, it's hard to know what's actually working and what

20   isn't.

21        So I think he tried to do that with these patients.

22   Q    And Doctor, I am going to show you the initial visit form of each of the

23   patients.  I'm not going to belabor the point.  I just want your opinion with

24   respect to each of these.

25        You've reviewed the patient record – the entire patient record of Jim

-832-

1    Brooks, who saw Dr. Azmat on February 21, 2011; did you not?

2    A    Yes.

3    Q    Based upon your review of that entire chart, did you form an opinion

4    about whether Dr. Azmat's prescription of the controlled substance was

5    with a legitimate medical purpose?

6    A    Yes.

7    Q    And what's that opinion?

8    A    Well, it has a legitimate medical purpose.  If we look, there's a previous

9    injury in a good-size person who is obviously doing an occupation that is

10   physical, and you can concede that they may be suffering from doing so

11   chronically, because they've got wear and tear of their spine.  And they get

12   good benefit.  As you can see, the pain intensity when they use the

13   medications will drop significantly.  And so there's a reasonable

14   measurement.  He's again putting to the doses that he – his experience

15   suggests would be beneficial.

16         And we all have our thresholds on this.  This is – the dosage that you

17   finally see with the patients, and the starting ,and the cuts, and all this, are

18   all part of more of the art than any kind of formula.  There's no formula per

19   se, when a patient's of certain body weight, size, injury, duration of pain,

20   MRI findings, that you add all these up and you come up with *the dose*.

21   Okay?  This is kind of – I leave it to the art of what we do.

22   Q    And was – based on your review of this particular chart, did you form

23   an opinion about whether Dr. Azmat prescribed those medications

24   consistent with the usual course of his professional practice – or the usual

25   course of professional practice?

-833-

1    A    Yes, it was – to me it – you synthesize –

2             MR. GILLULY:  – Judge, I think that was just asked, and now

3    he's starting to explain it again.  I would object to just keep asking the same

4    question.

5             MR. WITHERS: No, actually the first question –

6             THE COURT:  – He asked it a little different.  Go ahead.

7    A    You synthesize the history, then the physical exam, the MRI findings,

8    the patient's occupation, their function, their improvement in pain, and

9    then you proceed to treat.  And that's – that's what Dr. Azmat did.

10   Q    And Doctor, again – and I'm going to try and run through these

11   quickly – George Hunter seen by Dr. Azmat on 2/21/2011.  In your opinion

12   did Dr. Azmat treat that patient with a legitimate medical purpose and

13   prescribe the medication with legitimate medical purpose?

14   A    Now, this patient, I just want to point out, is a very big treatment

15   challenge in the pain management world.  It's a very large patient who's

16   over six feet tall, 340 pounds, has had prior back surgery.  Once a patient

17   has prior back surgery, they become an extreme treatment challenge when

18   you put this picture together.  So very difficult to treat.  He's documenting

19   reasonable benefit from medications.  There's not many good treatment

20   options for this patients other than medications.  I would say in the long

21   term he will be medication dependent.  Was operating heaving equipment,

22   as we can see here, so there is a mechanical wear-and-tear basis for his

23   pain.  So we move down, yes, I would say this is a patient who – this is a

24   reasonable option.

25             You can see he's also added on Neurontin, or gabapentin, to further

-834-

1    augment the effects of the opioid painkillers by working through a different

2    molecular mechanism. And so this is – this is trying to attack a difficult

3    problem and a challenging patient.

4    Q     And were the medications, in your opinion, Dr. Simopoulos,

5    prescribed in the usual course of professional practice?

6    A     Yes.

7    Q     Just with respect to George Hunter, since this was an issue earlier,

8    where the MRI talks about disc protrusion, and someone that the medical

9    center had underlined the neural foraminal narrowing with disc material

10   contacting the left S1 nerve root, what does that mean in terms of just

11   telling us kind of basically, breaking that down for us.

12   A     Sure.  If you look at the MRI report, there was a lot of writing.  I mean,

13   and I look at that, I mean, that's the first thing that strikes you.  35 years

14   old, he's got a lot of descriptions for a lot of these discs, just indicating that

15   there's a lot of advanced degeneration in somebody so young.

16         Finally, to get to your point, L5-S1 with the discoid material.  The disc

17   is a shock absorber in the back, and what basically all the writing describes

18   is that the shock absorbers are wearing down.  At the L5-S1 it's worn down

19   so much that it's sticking out towards the nerves that come out of the spine

20   and go into his legs, so they have the potential to shoot pain down the legs.

21   And hence you see the application of gabapentin or Neurontin by Dr.

22   Azmat, to try to calm down this nerve pain potentially in his legs that can

23   occur, particularly if he were to resume work.  You can see he was out of

24   work, but you can imagine a good-size man like this with bad shock

25   absorbers lifting up something heavy.  He's heavy, the object's heavy.  My

-835-

1    God, you're going to have – you have the potential for a good deal of back

2    pain here, just looking at the whole picture.

3    Q     Billy Letner, Dr. Simopoulos, same questions. Based upon your

4    review, did Dr. Azmat's prescriptions of controlled substances to Mr.

5    Letner – were those done with a legitimate purpose in your opinion, sir?

6    A     Yes. You can see again, in an accident five years ago in this patient.

7    Fell, and you can see that the impact, at least that's documented here, of

8    the medications' improvement of his pain intensity and, potentially,

9    therefore, his quality of life. You can see that he's involved in repetitive

10   work and heavy activity.

11          The other thing that you would notice is that many patients, who are

12   involved have their own businesses, or work in construction, or do these

13   heavy manual type of labor, often don't carry health insurance. It's just not

14   an affordable option. I just know from a personal basis of that situation.

15   And you can see that it's a, maintain sort of some degree of function. He's

16   prescribed medications, probably uses mostly – I wouldn't doubt in most of

17   these folks they use more towards the evening after a very hard day's work

18   to alleviate their condition. And he documents quite nicely the effects of

19   the pain medication on pain intensity.

20   Q     And based upon your review, Dr. Simopoulos, were those medications

21   consistent with the usual course of professional practice?

22   A     Yes.

23   Q     And then next, Doctor, Kimberly Letner. And based upon your review

24   of the medical record, was Dr. Azmat's prescription of controlled

25   substances within a legitimate – with a legitimate medical purpose?

-836-

A    Again, a person who had a prior injury, fall, whiplash blow to the head, shoulders.  And you can see subsequently developed chronic low back pain, is involved in physical activity again in terms of cleaning.  Has a, again, a good – reasonable reduction.  If we look at, again, ability of opioids to reduce pain intensity, you'll find they vary from patients, depending upon what's causing their pain.  They'll have a better effect in patients who have more degenerative disc disease than if they have nerve pain.  And there can be modest to, in this case, moderate degree of reduction in pain intensity.  Some patients only get a very modest effect.  In this case we got a better effect.  It's uncommon that it's going to take the pain score in the majority of cases and drop it to zero.  You just don't see that in a lot of these patients who have this degree of pain and disc degeneration.

Q    And were those prescription medications consistent with the usual course of professional practice?

A    Yes.

Q    With respect to Mr. David Letner – and again this is in evidence – based upon your review of that chart and the complete file that you reviewed, were Dr. Azmat's prescriptions of the controlled substances within the legitimate medical purpose?

A    Again, you have a very young patient – yes.  Again, you have a younger patient here that you can see here, 25.  Again, very heavyset individual who's had injury and accidents.  Again, when you're very heavyset you're much more prone to have disc degenerative problems.  It's, again, supporting a heavier structure, so you're – you know, as the old saying says, the bigger you are, the harder you fall.  And, you know, supporting

-837-

1    structure will have to endure that.  So the shock absorbers are going to take

2    a big hit here in this individual.  You can see here the report of pain being,

3    again, moderately alleviated.

4           We don't expect the pain score to go zero.  We expect the pain – pain

5    is in general reduced by about 30-to-50 percent reduction in these

6    numbers you'll see in the majority of patients.  Some will be even more

7    modest than that.  They'll often say it takes the edge off, but sometimes

8    that's the best we can honestly do.  I honestly can't do any better than that

9    in some folks, and sometimes that's the only option some people have

10   based on their co-existing medical conditions.

11          So you can see he reduced down in getting his own start here.  The

12   prescriptions were up at 240 prior.  He started more conservatively here,

13   got the MRI directly faxed, started low and see how the patient does.

14   Q    And were those controlled substances prescribed within the usual

15   course of professional practice?

16   A    Yes.

17   Q    And then, Ms. Simpson.  And to be fair to the members of the jury,

18   this is one where we don't have the diagnosis and treatment reported.

19   Mistakes can happen.

20              MR. GILLULY: Judge, if that's a question …

21              THE COURT: Ask a question, Mr. Withers, don't give a

22   statement, please.

23   Q    (By Mr. Withers) Based upon your review of Ms. Simpson's record, do

24   you have – were Dr. Azmat's prescriptions of controlled substance with a

25   legitimate medical purpose?

-838-

1    A    Well, we don't see the treatment plan here, and that's hard to …

2    Q    Actually I can show you –

3    A    – Unless we have –

4         MR. GILLULY:  – Judge, I would object.  He was trying to

5    answer the question when Mr. Withers interrupted him to move on.

6         THE COURT: All right, let him answer the question, Mr.

7    Withers.

8         MR. WITHERS: I apologize.  Go ahead, sir.

9    A    Well, as you can see, the treatment plan isn't listed there.  We'd have

10   to look at the actual scripts that he submitted to the pharmacy.

11   Q    I'll come back to the pharmacy record on that one.  Next we have

12   James Lockwood, and I'm going to show you what's – going back to Ms.

13   Simpson, the prescriptions.  We have Xanax 1 milligram 30, oxycodone 150

14   – oxycodone 30 milligram 150, and oxycodone 15, 30.  In your opinion,

15   were those medications administered with legitimate medical purpose?

16   A    Based on the history and the exam and the MRI, we can say yes.  We

17   just don't have – it would be nice if we did have on the record his

18   impression, because after all it's nice to have the physician who saw the

19   patient face-to-face to tell us the final impression, and only then you can

20   get – but you have a lot of the elements to tell you that this patient is, again,

21   somebody who has back pain issues that seem to respond to opioids, that

22   seems to have no neurologic issues.  We didn't see their MRI but, once

23   again, could be treated with opioid therapy and let's see if they improve and

24   stay functional.

25   Q    And, again, based upon your review of that entire record, is that

-839-

1    consistent with the usual course of professional practice, sir?

2    A    Yes.

3    Q    Next we have James Lockwood.  Looking at the entire medical record

4    for Mr. Lockwood as you have, and just displaying this for the jury, based

5    upon your review, was Dr. Azmat's prescription of the controlled

6    substances for Mr. Lockwood with a legitimate medical purpose?

7    A    Yes.  And here's a patient where you're going up here looking at,

8    they're alert, they don't have a significant – he has right here the minimal

9    psychiatric history you need.  He has their medical purpose here in the

10   history, what trauma they've had, their results with medication, what

11   makes them worse.  You can see here they've got a higher blood pressure,

12   so you're saying, well, if I can treat this pain and the patient can remain

13   more active, maybe with more physical activity, it might help them with

14   their blood pressure, but they probably should also be seen by their

15   internist for that.  But, you know, as a pain doc you see a lot of increased

16   blood pressures in these folks, and you often try to help their pain to help

17   the rest of their medical issues by allowing them to be more functional, and

18   of course, walk, function, and hopefully help with that – help with that

19   condition as well.

20        So down here we see he starts up again lower than what the patient

21   has and see if we can get a base – see if less will do more for us in terms of

22   opioids.  He added in gabapentin, or Neurontin, here, and dc'd the Xanax.

23   He felt that would be more helpful in this patient.  He also added in an anti-

24   inflammatory, Naprosyn, there at 500 milligrams to further – so we're

25   attacking his pain problem through a variety of channels.  We're not just

-840-

1    doing – in this case, he felt that this patient would benefit from other, what

2    we call adjuvants, or additives.

3    Q     And were those prescription medications within the usual course of

4    professional practice?

5    A     Yes, all of them.  All of these medications are very standard basics for

6    what we use to treat chronic low back pain.

7    Q     And Carlie Cole, talk about that very briefly, sir.  Based upon your

8    review of those charts and records, in your opinion did Dr. Azmat issue

9    those medications – controlled substances with a legitimate medical

10   purpose?

11   A     Yes.  Again, you're documenting a history of a trauma and back issues

12   that developed that have become chronic that have a high pain intensity.

13   You've documented that the medications can be beneficial.  You've

14   obtained their previous medical treatments.  You've done your

15   examination, you've reviewed the MRI, and it's kind of a little summarized

16   here down here under the diagnosis part.  You pull all these together and

17   you decide how you're going to treat this patient if the – and, again, he

18   started – as consistently with his own impression of what the amount of

19   tablets the patient should have.

20        So he eliminated the benzodiazepine and the lorazepam here, added

21   in Naprosyn, an anti-inflammatory, thought that would be better, and

22   reduced her hydrocodone as well.

23        So, again, starting the patient lower than they usually were to see if

24   less is more.

25   Q     And in your professional opinion, sir, were those medications,

1    controlled substances, issued within the course of the usual professional

2    practice?

3    A     Yes.  They're not trying to – and we can see that the trend each time,

4    they're lower, they're less, they're with adjuvants, they're not trying to

5    encourage more, that we're going to give you more and more, and that's a

6    good thing.  It's showing me that we're trying to address the medical

7    problem, not trying to dispense medications for other purposes other than

8    a medical purpose.

9    Q     And Paul Cole, sir.  In your review of the chart and looking at his

10   record here, was Dr. Azmat's prescription of the controlled substance with

11   a legitimate medical purpose?

12   A     This, again, here, too, it's outlined here again.  Similar kind of

13   accidents, as you'll see, similar prior history that hurts.  You can see here

14   we've got more of a modest benefit from opioids, and you can see that at

15   times.  Those are the patients who are more on the moderate side of

16   reduction.  This is what we usually see.  Well, it keeps me out of severe

17   pain, doc, it just takes the edge off, and that's the best that we've been able

18   to do.  And that's not at all uncommon in what we see at times with certain

19   patients with chronic low back pain.

20          So, then, again, examination is done.  We determine that there's a

21   herniated disc here based on MRI that may account for the patient's

22   symptoms. Again, it's hard just to perfectly corroborate MRI to explain

23   everybody's pain and level of pain.  Certainly we cannot.  We've eliminated

24   the benzodiazepine. We've added an anti-inflammatory because we know

25   that opioids have only up here reduced things from 9 to 7, maybe if we add

-842-

1    an anti-inflammatory maybe we can do a little better with this, and that's

2    what he's done here.

3    Q    And in your opinion, were those prescription medications done within

4    the course of usual professional practice?

5    A    Yes.  We can also see an amount of pills being distributed to the

6    patients that is within his – within his framework of the initial treatments

7    of patients.  There's always some consistency, as you can see, with the

8    numbers prescribed, with the trends.  It's always showing the same – the

9    same pattern.

10   Q    And Tyrice Harris, Dr. Simopoulos.  Based upon your review of that

11   entire chart, and in your professional opinion, was Dr. Azmat's prescription

12   of the controlled substances with a legitimate medical purpose?

13   A    Yes.  Once again, similar kind of thing.  An accident usually is what

14   kindles these problems.  You can see a motor vehicle accident – that's MVA

15   here – beginning in '06.  And then what happens in time is, is that you

16   injure the discs, they – they really – shock absorbers don't get a lot of blood

17   supply in our backs.  They just kind of wear down over time, and the

18   problem just becomes progressively worse.  And so many times patients

19   aren't good candidates for other options, and in this case opioids may be

20   their only option.  Again, a modest reduction in pain, as you can see here,

21   so he's added on here an anti-inflammatory.  We've eliminated the Xanax,

22   because maybe if we get some better pain control we're not really – it might

23   help with the anxiety.  So we can see that trend again here in his

24   formulation of a plan – a treatment plan for this patient.

25   Q    And in your opinion, were those prescription medications done within

-843-

1    the course of the usual professional practice?

2    A    Yes.

3    Q    And with respect to Dannelle Perry, in your opinion, Dr. Simopoulos,

4    did Dr. Azmat prescribe those medications with a legitimate medical

5    purpose?

6    A    Yes.  Once again, in the spirit of the rest of the patients, there's always

7    some initial – many times an initial injury.  You can see falling off a tree.

8    Sometimes patients can just degenerate discs just spontaneously without

9    necessarily an injury, but often in these scenarios you find this to be the

10   case, especially in younger folks.  You can see pain again alleviated to a

11   degree.  It would take them out of severe pain and bring them down to the

12   cusps of moderate pain while on their medications.  Any physical activity

13   usually would expect to exacerbate this, and no doubt – particularly like

14   driving.   Driving is a very common complaint that you'll see with patients

15   with degenerative back pain.  They're just stuck there sitting, you know,

16   and it's kind of what sets a lot of my patients – a long plane ride, a long car

17   drive, so not at all unexpected.

18        And you move down here, looking at doses.  There, of course, as

19   always, titrated down to a reasonable, let's find out what the minimum

20   amount is that he can get away with, especially when you add in an anti-

21   inflammatory maybe we can do better, and you can see the naproxen added

22   in here.

23        So standard approach and standard theme that we've seen in the

24   treatment of these patients.

25   Q    And is that consistent with the usual professional practice?

-844-

1   A    Yes.  Once you see the patient, they've come in, their complaints, you

2   assess their medical treatment, that's what you can do as their doctor, to

3   see how much you can help them.  Once you do stabilize their pain and this

4   is as good as it's going to get, then you can decide if anything else could be

5   beneficial.  It could be physical therapy, it could be referred for injections,

6   it could be surgery, but this is a standard initial approach that we're seeing.

7   Q    And for Brian Smith, based upon your review of that record, in your

8   opinion was Dr. Azmat's prescription of the controlled substances with a

9   legitimate medical purpose?

10  A    Yes.  Once again, fitting in with the common theme, another lift injury

11  here of a heavy beam in somebody who's involved in construction and a lot

12  of physical labor.  You can see here a pain reduction that goes from 10 in

13  intensity to – 10 down to 6.  Again, a moderate change in their pain but

14  nonetheless, for them could be significant.  He eliminates the Xanax, adds

15  in anti-inflammatories, reduces down the opioid medication, all to try to

16  come down with a diverse way to attack the pain from different problems

17  and eliminate the dependence for any type of benzodiazepine.

18  Q    And Doctor, as a specialist in the field, are you troubled by the pain

19  scale of 10 being reported by a patient?

20  A    Well, patients – you know, that's just the question.  When you look at

21  these pain scales, and you know, as I've lived with them for many years,

22  you say to yourself, well, what is the patient really reporting?  This is kind

23  of a standard thing that we have in our center.  Are they reporting to me is

24  that their worst pain that they ever experienced?  Is that their pain that

25  they experienced after they lifted something?  Is that the pain that they had

-845-

yesterday?  Is that on average their pain?  You just don't know, and that's

kind of the limitations of what we have.  So the next generation of what

we'll be looking for is, we've got the smart phone now, so, you know, you

could really have patients just tell you daily how they're doing and get a

much better idea than this pain scale.  But this has been the standard

reporting, so the 10 is not at all without expectation, that patients

frequently will say, I'm going to tell the doc my worst pain, because if I tell

him, you know, I'm just having a 5 today, well, he may not believe me, or he

may not treat me.  And patients form impressions of what you may be

thinking as well, just as we try to of them.

     So that's not uncommon that you see that for those – for all those

reasons that I just discussed.

Q     And in your opinion, Dr. Simopoulos, was Dr. Azmat's prescription of

the controlled substances in the usual course of professional practice for

that patient?

A     Yes.

Q     And with respect to Mr. Joseph Bradley, based upon your review of

that chart, in your opinion was Dr. Azmat's prescription of the controlled

substances for a legitimate medical purpose?

A     Very similar to the rest of them.  Patients with low back pain, again,

some inciting event, lift, twist.  And you can see here a little bit more of a

modest reduction here from the opioids, from 9 to 7.  But you just don't

know exactly what that means.  I ask the patients, so about 9 to 7?  And if

they say to me, well, you know, actually that's quite a bit for me.  You know,

what people's 9s and people's 7s exactly mean is a little different from me

-846-

1    to you to the next person.  You may never get past a 7 unless somebody cuts

2    your arm off, but some other patients, you know, a 7 might be simple as a

3    suture, going in to suture a laceration on their head.  You know, we all vary

4    on this scale and what we report based on our prior experiences, based on

5    our emotionality around pain, based on how stoic, based on how our

6    mothers told us to not report pain to their doctor, to do whatever you want.

7    It's culturally variable, it's societally variable, it's experience variable.  So

8    this may be very meaningful to this individual, is what I'm saying, even

9    when you see this modest change.

10    Q    And were the prescriptions of those medications within the course of

11    the usual professional practice, Doctor?

12    A    Yes.

13    Q    And with respect to Mr. Gable, based upon your review of the record

14    of Mr. Gable, did you form an opinion as to whether Dr. Azmat's

15    prescription of those medications was within the legitimate medical

16    practice?

17    A    Again, a person involved landscaping, doing repetitive heavy work, not

18    at all uncommon that you can have back pain, especially down the leg.  I've

19    got one in my own practice just now I just treated, because in the winter

20    they plow snow up in our neck of the woods.  So, you know, once again,

21    states what's been helpful in the past.  Dr. Azmat goes to the frame of

22    reference that he's used to treating more with oxys 30 at a standard – you

23    can see a standard that he has set for patients.  And, you know, rather than

24    relying on Valium – and Valium's a great muscle relaxer, but the problem

25    with Valium is, it's – again, can cause serious withdrawals.  If you have a

-847-

1   benzodiazepine that you're using that's long acting like Valium, patients

2   can withdraw.  And the withdrawal to Valium or benzodiazepines is as

3   significant as that of alcohol, which means that patients can have a seizure

4   where they convulse, they fall to the floor, they may hit their head, they

5   may bleed into their head, they may break bones.  So that's why the

6   withdrawal from these benzodiazepines is more concerning than that of

7   opioids, because with opioids you get the flu, you don't fall and get a

8   seizure.  So that's the inherent difference.  So that's why he cut that out.

9        Now, if I were trying to not prescribe for legitimate medical purpose,

10   I would of course escalate these because then I can – as my patient uses all

11   their opioids up and they get all agitated and all this, well, they can pop a

12   benzodiazepine and just kind of calm down and not call me.  You see what

13   I'm saying?  So I would go the other way if I weren't going to go legitimate.

14   Q    And Doctor, in your opinion was Dr. Azmat's prescription of those

15   medications in the usual course of professional practice?

16   A    Yes.

17   Q    Gary Evans, Dr. Simopoulos.  Same two questions, sir.  Was Dr.

18   Azmat's prescription of the medications here for a legitimate medical

19   purpose?

20   A    Here is a person who clearly had lifting-twisting injuries in the past,

21   more disc degeneration, and ended up disabled on pain medication that

22   obviously does a good job.  So the – it'd be interesting once you get to know

23   this patient and you treat them, can they actually go back to work.  So

24   there's that potential here, and I'd certainly treat – if I had this change, and

25   then I could approach the patient and say, well now that we've clearly got

-848-

1    some control of your pain, would you – you know, could we get you back

2    into a vocational program to get you back to work.  So I think there's some

3    good potential here.  He also eliminated the Xanax, added in the Motrin, as

4    you can see, common sort of pattern that he's trying to control pain and see

5    if we can get patients back vocationally here.

6         So I do see a legitimate purpose when I'm looking at this.

7    Q    And –

8    A    – And the potential for returning to work.

9    Q    Excuse me, I'm sorry, go ahead.

10   A    You'd like to think potentially you could restore this person to more

11   meaningful life, be it work or activities of daily living, because you can see

12   good impact of the medication on the pain intensity.

13   Q    And were those medications within the course of the usual

14   professional practice, sir?

15   A    Yes.

16   Q    Mr. Conkel.  This record is in evidence.  Based upon your review of

17   this record, were the prescriptions issue for a legitimate medical purpose?

18   A    So you can see here a patient who is in their 40s who years ago ended

19   up with a motor vehicle accident.  Again, these things can trigger

20   degenerative processes that over time just can get worse.  You don't have as

21   much here a change in the pain scale here.  You can see that meds have a

22   very modest effect.  On the other hand, working, maybe even that changes

23   it enough, I'd have to explore it a little more over time.  Painter, repetitive

24   work, up and down ladders, probably, painting, bending, all kinds of

25   things.  So I think that we'd have to look for an adjuvant, right, because

-849-

1   clearly opioids aren't going to do enough.  So we can see here, we don't

2   need the Xanax here, what we really need is, is to add an anti-

3   inflammatory.  Maybe some Motrin would help, and we can see that added

4   in the plan here.

5   Q     And in your opinion, Doctor, were those medications prescribed in the

6   usual course of professional practice.

7   A     Once again, you assess the history.  It's suggestive that the patient has

8   pain and legitimate reasons for pain, and you treat in a reasonable fashion,

9   as was done.

10  Q     With respect to Mr. Joshua Merryman, based upon your review of the

11  record, Doctor, in your opinion did Dr. Azmat issue those prescriptions for

12  a legitimate medical purpose?

13  A     Right.  So here, fell to the floor.  Again, another injury that over time

14  just leads to degeneration over time of the back.  In a good deal of patients

15  you can see we have a good effect on the pain score on the medications.  It

16  reduced from a 9 to a 4, which is significant.  Lots of activities make his

17  pain worse, as you'd expect.  Most of – anything too prolonged in these

18  patients leads to pain.  Again somebody who's a painter, doing repetitive

19  activity, reviews the MRI, included the degenerative findings, and proceeds

20  to treat with a combination of pain medications and anti-inflammatories,

21  and in this case felt that the patient had some muscle spasms, so added in

22  Flexeril.  And so used a combination of medications to try to get control

23  and maintain function over time.

24  Q     And in your opinion, Doctor, were those medications issued within the

25  course of the usual professional practice?

-850-

1    A    Again, seem to be goal directed, and goal directed to maintain the

2    patient's function.

3    Q    Jessica Rogers, Dr. Simopoulos.  Based upon your review of that

4    record, in your opinion did Dr. Azmat issue those prescriptions with a

5    legitimate medical purpose?

6    A    Yes.  Here, Jessica is a young individual who is very heavyset at 5'5"

7    and over 200 pounds, and fell.  And you can imagine, it's kind of that, the-

8    bigger-they-are-the-harder-they-fall sort of scenario that you can see in

9    young folks at times.  And you can see some reasonable effect here from

10   opioids in terms of her treatment.  Still functioning.  Has interestingly

11   enough on MRI – and you can see this sometimes in young folks, and these

12   are always the challenging people to treat because you really – unless they

13   have some neurologic issue, you really don't want to operate on them, and

14   injections are many times not that useful.  Medications are frequently

15   where these patients end up long term, and so you can see here an attempt

16   to manage this pain that's reasonable.  It's gone from a high pain intensity

17   to a moderate pain intensity.  So, again, a goal-directed treatment in

18   patients that we don't have great solutions for in the long run,

19   unfortunately, when they end up with this condition.

20   Q    And Doctor, were those medications issued within the course of the

21   usual professional practice?

22   A    Yes, they were.

23   Q    And with respect to Mr. Troy Roark, in your review of that record, did

24   Dr. Azmat issue those prescriptions with a legitimate medical purpose.

25   A    Here's a person who had a fall, who's had three prior surgeries as he's

1    listed there, clearly has struggled with back pain quite a bit, and you can

2    see a modest effect on the back here with the regimen that he had.  We

3    move down, and you've got in the back, long scar in the back.  You've got

4    variety of degenerative findings by now on MRI because part of it's been

5    he's had spinal surgeries trying to help the problem, s a patient who's

6    struggled long term.  So what he does in this case is, is, well, probably

7    chronically you've got arthritis now that you're more senior, adding in an

8    anti-inflammatory such as Naprosyn, in combination with opioids, because

9    clearly Valium here and just opioids really aren't doing that much for the

10   pain.  So we're trying to rethink this problem through, eliminate the

11   dependence on Valium.  As I said, it can be an actor that can in the long

12   term result in significant withdrawal syndrome.  So I think this is

13   reasonable.  I also think that getting rid of Valium in somebody who's

14   crossing into their 60s is a good idea, because as we get older Valium is

15   something that makes you forget, that slows you down.  It can breed a

16   significant withdrawal syndrome, especially when you're older and you fall

17   at this age, you're more likely to get a bleed in the head.

18        So I think that it was all with good reason and good thought.

19   Q    Just very briefly, how many surgeries did Mr. Roark report?

20   A    Well, like we said, over time he's had quite a few.  So this is a person

21   who suffered for three surgeries that we can see here, starting from the

22   '80s.  So this is somebody who's going to have a hard time, and they end up

23   on what we call the "failed back;" in other words, they don't have long-term

24   relief from their back surgeries, they still have back pain that persists

25   despite back surgery.  We label that "failed back."  Those patients are

-852-

1   notoriously, as I alluded to earlier, the most difficult to treat.  They're the

2   ones that we're going to see the least impact from the medications on the

3   whole.  And you see that here.  There's nothing that we don't expect here.

4   We expect modest change.

5          But, once again, if it's he's trying to adjust their medication to see if

6   we can do better on that pain intensity, it might end up being that's all we

7   can do.  We won't know unless we had long-term followup.

8   Q    And were those surgeries that are reported up here confirmed on

9   physical examination?

10  A    Yeah, he – he was able to say here that there was a well-healed scar on

11  the back here from surgery that you document as standard.

12  Q    And the nerve stimulation – or stimulator, excuse me, what is that, Dr.

13  Simopoulos?

14  A    Well, nerve stimulation, which is – typically these are these wires that

15  are very specialized.  They're made out of platinum and iridium.  They've

16  come a long way in technology.  They are a number one weapon against

17  patients who have persistent pain after back surgery.  And what they do is,

18  they create electrical impulses to the spinal cord, and then the spinal cord is

19  activated.  Certain nerves are activated in the body to harness our own

20  body's chemicals to dampen down pain signals in the back and legs.  This

21  works primarily if the patient's pain is nerve-related pain, or nerve injury-

22  related pain, such as long-term sciatica.  Not everybody responds to this

23  therapy.  This therapy is far from perfect.  The best we can help patients,

24  about 70 percent of patients we can help to a degree, which leaves a big

25  chunk of patients that don't.  If we consider that 300,000 Americans

-853-

1    undergo back surgery a year, and if we consider that 40 percent of them

2    have chronic persistent pain after it, that leaves a lot of patients.  And if we

3    can only help about 40-to-70 percent of them adequately stimulation,

4    depending upon which study you review, that leaves a lot of patients that

5    we cannot help with nerve stimulation.

6         So this patient's tried that and it clearly didn't work.  So this is going

7    to be a patient that will be very difficult to treat.  We've reviewed the

8    patients thoroughly over long term.  The ability of comprehensive medical

9    management to really make a dent in this pain is not really well

10   documented.  But it is the only thing that many patients end up on because

11   it makes a small difference in their lives.

12   Q    And Dr. Simopoulos, in your professional opinion, with the history

13   that's given here, the three surgeries, the confirmatory long scar, and the

14   nerve stimulator that's inserted into the patient, would that account for the

15   complaints of pain for this patient?

16   A    Yeah, I mean – yes.  Once again, I mean, patients who – this patient

17   has tried over the years to combat their pain.  They've undergone three

18   back surgeries.  It's – as back surgeries are done more and more, each one

19   is met with less and less success.  The way to think of back surgery – and

20   this is a very common theme in the country.  I don't want you to think that

21   this is something extraordinary here.  It's very common for patients to have

22   multiple surgeries.  It's kind of like movie series, right?  The first movie was

23   better than the last one that you saw in the series of three or four.  That's

24   how back surgery is.  We get less return.  In fact, in many countries across

25   the world they don't perform extra surgeries because the cost isn't there.

-854-

1    But here, because we're not so cost conscientious in the country, and I'm

2    sure you know that, many patients will still try for that next surgery to try

3    to cure their pain problem and eliminate it.

4         So it's unlikely to happen, and we can see that here.  And we can see

5    that as patients undergo more surgeries, the amount of pain medication

6    goes up, up, up, up.  Very common.  It's as common as the cold around the

7    country.

8    Q     And Dr. Simopoulos, based on your review of that chart, were those

9    prescriptions in the usual course of professional practice?

10   A     Absolutely.

11   Q     And turning to Mr. Barry Hinkle, Dr. Simopoulos.  Based upon your

12   review of the file for Mr. Hinkle, were those prescriptions for controlled

13   substances for a legitimate medical purpose?

14   A     I really like what was done here.  I mean, this was a 22-year-old

15   patient who, again, had an injury.  He's gone – had developed back pain.

16   And so you really want to document this carefully and start as low as you

17   can, add some adjuvants – in other words, extra medications to help you

18   decrease the opioid dependence.  Because my concern is, is that if a patient

19   is young, a tolerance can set in, so you really want to attack this problem in

20   a variety of ways.  So what you can see here is, is that Ibuprofen has been

21   added into the mixture, Flexeril, which is a muscle relaxer, has been added

22   in here.  The Xanax that the patient said he was on before is eliminated,

23   and I think that's the reasonable thing to do.  And I think once we can

24   establish this treatment plan, get this patient stable, and this is a patient

25   that we can consider rehabilitation and encourage to do so in the long run.

-855-

1    Q      And were those medications issued within the usual course or

2    professional practice, Doctor?

3    A      Yes.

4    Q      And with respect to Jason Jarvis, based upon your review of the

5    record, were the prescription medications issued by Dr. Azmat for a

6    legitimate medical need – or excuse me, with a legitimate medical purpose.

7    A      Yes, and we can see, again, a similar – similar kind of – similar kind of

8    stories in many of these.  This is a guy, low back pain patient with radiation

9    down to the foot, so they have a nerve component as well.  You can see the

10   prior medications included, interestingly enough, oxycodones, again, at

11   certain rates, and then this included from what I could gather here Soma

12   350s.

13           And Soma is an interesting muscle relaxant.  I just want to say a few

14   words about it here that's of note, is that Soma was introduced in 1951 as a

15   muscle relaxant.  In fact I personally had it when I was in my teens.

16   Studying for an exam, my back got tight, and I took it, and it loosened it up

17   quite nicely, and that was that.  But since then we've learned that it has a

18   metabolite that patients can become dependent on, and therefore this

19   medication is now thought to have some degree of addiction.  Some experts

20   say that it doesn't do much muscle relaxation.  I'm a little biased in that I

21   took it and it worked for me, so I can't necessarily go down that pathway,

22   but I can say that that's what's been recognized.  And it's only been

23   recognized recently.  So what's very fascinating is, the FDA puts a

24   medication on the market for an indication, we as docs start to use it, and

25   all of a sudden we bump into all these issues many years later.

-856-

1    So Dr. Azmat leapt on that.  He eliminated the Soma, he eliminated

2    the Xanax, he moves into just adding in now – because we've got the

3    radiating leg pain, that's kind of nerve-related pain with tingles and jingles

4    down the leg, very unpleasant sensations, like when you bump your funny

5    bone – he adds in the Neurontin.  That's to calm that pain down.  And then

6    you're dealing with the usual degenerative disc cascade in the back that he

7    adds in the oxycodone to deal with that long-term pain.

8    Q    And again, Dr. Simopoulos, were those medications consistent with

9    the usual course of professional practice?

10   A    Yes.  He's trying to – the patients that can become dependent upon,

11   minimize those, and attack the pain problem by analyzing the history and

12   adding in the adjuvants or additives that he needs to optimize this patient's

13   care.

14   Q    And with respect to Ms. Nancy Binion, based upon your review of the

15   records, were the medications that were prescribed for a legitimate medical

16   purpose?

17   A    You can see here in this patient, this is a almost 268 pound lady who's

18   only mid-height, 5'5", again, a very heavyset patient.  And in general,

19   heavyset patients can be a very big treatment challenge for us in the pain

20   world.  You can see quite high blood pressure in this patient, too.  That's

21   going to be hard to control in many scenarios.  So as a pain doc you kind of

22   say, well, if I can at least help the pain, maybe that'll help at least a bit the

23   blood pressure, because the patient is also tense and tight, might be able to

24   walk a little more and function a little more.  So you want to try to help this

25   patient, that's how you feel when you're looking at the vitals, you're looking

1  at her complaints, you're synthesizing this history. You can see that she

2  reports here, I do get some decent relief from opioids, it drops my pain

3  from severe down to moderate. And the pain is set off by any type of

4  activity, so if you can keep down her pain, maybe you can help her a bit

5  with her pressure. Of course, that's also driven by her weight and age, and

6  probably genetics as well. And you can see here a prior regimen consists of

7  also Valium in addition to oxycodone. Examination is carried out as usual,

8  ensuring that she's neurologically at least reasonable, and decreased range

9  of motion is what's documented again. You move into the chronic low back

10  pain now with radiculopathy, is the radiating-like pain, that's what we call

11  it, radiculopathy, or as patients say, a ridiculopathy, or it's ridiculous, as

12  they say. And that's the nerve pain, just so for your own – when you hear

13  this term. And that's added in, the gabapentin. You've got an anti-

14  inflammatory added in there for the back, coupled with the opioid

15  medications. A reasonable comprehensive pain regimen to deal with the

16  problem, eliminating the dependence for the Valium as well, which as we

17  discussed the issues with that medication.

18  Q    And were those medications issued within the course of the usual

19  professional practice, Dr. Simopoulos?

20  A    Yes.

21  Q    And then finally, John Koenig. Based upon your review of that chart,

22  Dr. Simopoulos, were the medications administered by Dr. Azmat within

23  the course of legitimate medical purpose?

24  A    Yes. A heavyset person now, again, and a couple of motor vehicle

25  accidents. 284 pounds, 6' tall. Seems to report good relief in the past with

-858-

1    medication such as oxy in the past.  Again, exacerbated by virtually any

2    kind of activity he tries to do.  Not at all unexpected in these folks.  We move

3    down, he documents again the decreased range of motion in this individual.

4    You have chronic low back pain due to disc degeneration.  He again sets in

5    here, reducing their pills to dependence on oxy and Percocet by adding in

6    Naprosyn in there to try to help with the pain in an alternative way.  And he

7    eliminates the Xanax up front.

8         So I think you see a standard approach of attacking the pain in a

9    variety of fashions and eliminating benzodiazepine dependence.

10   Q    And Doctor, were those prescriptions in your professional opinion

11   within the usual course of professional practice?

12   A    Yes.

13   Q    And Doctor, just a last series of questions.  Based upon your review of

14   all of those charts and records, were Dr. Azmat's prescriptions and

15   treatment within – with a legitimate medical purpose?

16   A    Yes.  We cannot – I couldn't find a reason other than based on the

17   history – the synthesis of the history, the complaints, the reported relief of

18   the patients, the way he eliminates certain medications, added certain

19   medications together, where all seem to be with the intent of treating that

20   patient's pain.  Remember that patients can fake physicians, that can

21   happen, and we'd only know that in time.  But at least the regimens and the

22   approach was used to try to treat patients, take their complaints seriously

23   and try to help them.

24   Q    And Doctor, based upon your review of all of those records, were the

25   medications and the treatment rendered within the usual course of

-859-

1    professional practice?

2    A    Yes, they were.

3              MR. WITHERS: Thank you. No further questions, thank you,

4    Your Honor.

5              THE COURT: Members of the jury, we've been here a little over

6    two hours since we started with this witness, so we're going to take a ten-

7    minute recess at this time.

8              [NOTE: The jury is excused to the jury room.]

9              THE COURT: Doctor, during this recess, don't discuss your

10   testimony with anyone – not with any of the lawyers here or anyone else

11   during this recess.

12             WITNESS: Yes.

13             [NOTE: A brief recess is taken, after which the proceedings are

14   continued in the presence of the jury as follows:]

15             THE COURT: All right, counsel, you may proceed.

16             MR. GILLULY: Thank you, Judge.

17                          CROSS-EXAMINATION BY

18   MR. GILLULY:

19   Q    Is it Dr. Simopoulos?

20   A    That is correct.

21   Q    Excellent, okay, sir.  Would you agree with me that pain medicine

22   incorporates different means of practice besides simply prescribing pills?

23   A    Yes.

24   Q    And to practice pain management one does not necessarily have to be

25   board certified.

-860-

1   A   That is correct.

2   Q   In fact there are pain management doctors in pretty much every state

3   in the United States, most of whom are not board certified; is that correct?

4   A   That is correct.

5   Q   There are pain management doctors in Kentucky?

6   A   Yes.

7   Q   Tennessee?

8   A   Yes.

9   Q   Ohio?

10  A   Yes.

11  Q   Florida?

12  A   Yes.

13  Q   South Carolina?

14  A   Yes.

15  Q   In fact pain management doctors don't even have to have hospital

16  privileges; is that right?

17  A   That is correct.

18  Q   And you've reviewed records in this case.  Do you know whether Dr.

19  Azmat was board certified or not?

20  A   I don't think he was.

21  Q   Okay, and he did not have hospital privileges either.

22  A   That I don't know, if he had those.

23  Q   Do you know whether he had medical malpractice insurance?

24  A   I don't know that offhand.

25  Q   Okay.  Dr. Azmat, do you know where he graduated from medical

-861-

1    school?

2    A    I don't recall offhand.

3    Q    Okay.  Pakistan?  Does that ring a bell?

4    A    Yes, it does.  I can't recall the name of the university.

5    Q    Yes, sir, but you are familiar with the – you're not familiar with the

6    courses he took while he was in Pakistan; that's fair to say.

7    A    That is correct, yes.

8    Q    And you would agree with me that whether board certified or not,

9    when a physician practices pain management, it is important to know the

10   prevailing standards in the area in which they practice.

11   A    Yes.

12   Q    For instance, a doctor practicing in Georgia should know the

13   prevailing standards in Georgia.

14   A    Yes.

15   Q    And that includes laws from The Georgia Medical Board – or rules

16   from The Georgia Medical Board?

17   A    Yes.

18   Q    And it also includes the prevailing laws of the United States.

19   A    Yes.

20   Q    And federal regulations in the Code of Federal Regulations.

21   A    Yes.

22   Q    And these include – well, scratch that actually.  Regardless of what

23   kind of practice a physician practices, you would agree with me it is

24   important for the physician to act like a physician.

25   A    Yes, absolutely.

-862-

1    Q    And one of the fundamental principles of being a doctor, one of the

2    fundamental principles is to do no harm.

3    A    Yes.

4    Q    And you're taught that, and that's something that makes you sleep well

5    at night, because what you do is to help; would you agree?

6    A    Yes, but I would comment that none of us intend to, but some of these

7    treatments – many treatments come with risk, and they can harm.

8    Q    Agreed.  But the Hippocratic Oath, that oath to do no harm, is taught

9    in medical school; right?

10   A    Yes.

11   Q    Or it's talked about at least.

12   A    It's discussed.

13   Q    It's discussed in residency programs.

14   A    Yes.

15   Q    It's discussed among doctors, even.

16   A    Yes.

17   Q    And how long is medical school typically?

18   A    Four years.

19   Q    And in fact in medical school students are taught on some of the

20   fundamental principles of pain management; is that correct?

21   A    The actual education of pain management in medical schools has been

22   recently assessed and is in its infancy.  Across the country it's more or less,

23   what we would label it still today as poor, the majority of us.  A few medical

24   schools have actual good formal programs in pain management.  They're in

25   their infancy.

-863-

1    Q    Okay, but regardless, I mean, there are principles of pain management

2    taught in medical school.

3    A    Not to any – not to a reasonable level, and there's not a good

4    consensus across the country.  Recently that's been polled in a recent

5    journal article that I was reading and privy to since we do teach medical

6    students, and that's an ongoing problem.

7    Q    But there's teaching about pain in medical school, but in your opinion

8    it's not sufficient; is that correct?

9    A    In the literature it's not sufficient –

10   Q    Yes, sir, yes, sir.

11   A    – It's not my opinion, it's what's known to be the case.

12   Q    In fact you teach students at your place of employment.

13   A    Correct.

14   Q    And it's Beth Israel ...

15   A    Deaconess, yeah.  It's a merger of two hospitals –

16   Q    – Do you mind if I call it just Beth Israel?

17   A    That's perfectly fine.

18   Q    And it's affiliated with Harvard Medical School.

19   A    That is correct.

20   Q    And in fact you've been affiliated with Beth Israel for years.

21   A    That is correct.

22   Q    You were a trainee there.

23   A    That's correct.

24   Q    You did your fellowship there.

25   A    That is correct.

-864-

1   Q   You were a resident there.

2   A   I was a resident at Brigham and Women's, but I was a fellow at Beth

3   Israel Deaconess.

4   Q   Yes, sir, and in fact you served as an associate in anesthesiology there.

5   A   That is correct, yes.

6   Q   You served as a director of acute post-operative pain services at Beth

7   Israel.

8   A   I did, yes.

9   Q   And director of interventional pain service at Beth Israel.

10   A   That is correct.

11   Q   Among other things; correct?

12   A   Yes.

13   Q   And how large is that facility?

14   A   I think about a hundred operations a day.  They have about 400-some-

15   odd beds.

16   Q   And it's a facility that contains medical equipment that is used to

17   diagnose and treat pain.

18   A   That is correct, yes.

19   Q   And in fact there are X-ray machines?

20   A   Yes.

21   Q   MRI machines?

22   A   Yes.

23   Q   Equipment used to review X-rays?

24   A   Yes.

25   Q   And there's also even physical therapy-related exercise; correct?

-865-

1   A    There is a physical therapy department within the hospital, that is

2   correct.

3   Q    And not to sound silly, but Beth Israel does not advertise by going into

4   other states and marketing other pain clinics; is that fair to say?

5   A    I'm sorry, if you could –

6   Q    – You guys don't advertise by going to rival pain clinics and passing

7   out flyers in parking lots; do you?

8   A    No.

9   Q    Of course, I mean, it's a silly question.

10          MR. GILLULY: May I approach, Judge, the exhibits?

11          THE COURT: Yes, sir.

12   Q    I hand up Exhibit 35.  You guys don't have signs like this; is that fair to

13   say?

14   A    No.  A lot of our patients are – they were in the medical center, it

15   attracts a lot of patients, and then various doctors in the medical facility

16   refer those patients.  So it's a big institution, so itself is a draw for a lot of

17   patients.  We don't – we don't have such advertisements.

18   Q    Yes, sir.  And obviously you don't have people who go to hotels to pass

19   out flyers that advertise that their doctor writes well; would you agree?

20   A    I agree, yeah, we do not.

21   Q    Does Beth Israel have people who work in the office who have training

22   in the medical field?

23   A    Yes.

24   Q    And for instance, the people who conduct triage, or test blood

25   pressure, or measure pulse, these are people who have medical training.

-866-

1    A    Yes.  Either medical assistant or a nurse.

2    Q    People who know what it means when they get a blood pressure result.

3    A    Yeah, they will draw your attention.  So often they'll note an

4    abnormality and draw your attention, circle it, so that you review it with the

5    patient.

6    Q    And they're expected, obviously, to document files properly.

7    A    Yes.

8    Q    And does Beth Israel – you guys probably don't hire convicted felons;

9    is that fair to say?

10    A    I'm not in the human resources division, but I don't – I'm not certain.

11    Q    As far as you know, you don't have anyone working for you who's

12    robbed drug dealers in the past –

13    A    – No, I – no, we – no, not in our unit.

14    Q    And is Beth Israel run and owned by people who have medical

15    experience?

16    A    The CEO is presently a physician.  Prior – the CEO prior was not a

17    physician, was a layperson.  Many people on the board of trustees are lay

18    people.

19    Q    Yes, sir.

20    A    So a mixture.

21    Q    And how are you paid?  Are you paid by check, cash, weekly, biweekly?

22    A    It's biweekly check.

23    Q    Okay, and as far as you know Beth Israel doesn't pay its doctors cash

24    at the end of every day?

25    A    Yeah, no, it's – we're actually employed through what's called Harvard

-867-

1    Medical Faculty, so I'm not an employee of the hospital.  But it's a certain

2    gamut of physicians that go to the various Harvard hospitals, and I happen

3    to be at Beth Israel, which is one of them, and that's how we're paid.

4    Q    Are you aware of any doctor getting paid cash at – with where you

5    work?  At the end of the day?

6    A    Again, we're not a cash-based facility because of the way

7    Massachusetts has been set up in terms of pushing through insurance so –

8    but there are cash – again, cash is an option in the community.  It's a lot

9    easier to set up in a smaller officer, in a smaller facility where, say, I wanted

10   medical treatment that's not covered by insurance, and I'm willing to pay

11   cash –

12   Q    No, no, no.

13   A    – many of these places set that up.  But we do not have that.

14   Q    No, I meant like you getting paid, like at the end of the day after seeing

15   a bunch of patients, you don't get a wad of cash.

16   A    No, no, I do not.

17   Q    Okay.  That's what I was getting at.

18   A    I'm sorry.

19   Q    But Beth Israel, it's fair to say, among – does accept insurance.

20   A    Yes.

21   Q    And can someone simply walk into Beth Israel on the first time with

22   an MRI, and walk out with multiple prescriptions of oxycodone?

23   A    If they come in with an MRI, complaints, et cetera, yes.

24   Q    They can?

25   A    Yes, and usually that – where that usually happens more commonly is,

-868-

1    is they have an MRI, they come in, they get, as we saw, prescriptions, as we

2    saw, of this combination.  It's more commonly done in the primary care

3    since they first encounter the patient.

4    Q     Certainly.  In fact most – I mean, isn't it correct that 99 – I'd say 99

5    percent of the people at Beth Israel who are being seen for pain

6    management issues are from referrals?

7    A     Yes.

8    Q     Or is it a hundred percent?

9    A     There are some self-referrals, but most of them are referrals from

10   various specialties, most commonly things that would hurt, orthopedic,

11   orthopedists ...

12                    [NOTE: Due to an equipment power failure, there is a brief

13   interruption in the proceedings.]

14                    THE COURT: Ladies and gentlemen, if you want to stand up

15   and stretch while we address this problem you may certainly do so.

16                    MR. WITHERS: Judge, while we're waiting, could we have a

17   side bar, please?

18                    THE COURT: Yes, sir.

19                    [NOTE: Side bar conference on the record during the

20   interruption of proceedings:]

21                    MR. WITHERS: I want to make a motion for a mistrial.  Mr.

22   Gilluly inserted the issue of my client's nationality into this case, and that is

23   done for one purpose, and only one purpose.  It is shocking to me that an

24   Assistant United States Attorney in this district would do something like

25   that.  That was done for no other purpose but to –

-869-

1        MR. GILLULY:  – Absolutely not, Judge.  I certainly didn't

2   mean anything beyond asking if he knew where he went to medical school.

3   It had nothing to do with –

4        MR. WITHERS:  – He asked the question in such a way, did he

5   know he went to medical school in Pakistan and –

6        MR. GILLULY:  – There is nothing wrong with him being from

7   Pakistan, Your Honor –

8        THE COURT:  – Wait, let's stop – stop.  I was surprised that

9   you didn't object at the time, but I thought, well, he's asking this witness

10   what he knows about the experience and background of the defendant,

11   whose files he reviewed to make a determination in this case, so then I let it

12   go.  And your motion for mistrial is DENIED, but I agree that it was a low

13   blow, but it doesn't rise to the level of granting a mistrial.

14        [NOTE: Side bar conference concluded.  Thereafter the

15   electrical problem is corrected, and the proceedings are continued in the

16   presence of the jury as follows:]

17        THE COURT: I'm sorry for this inconvenience.  I tried cases as

18   a lawyer for 30 years.  I've been on this bench a long time.  I can tell you in

19   the past we never had these problems.  Every time equipment is updated,

20   every time a new program is put in, it just creates more and new problems.

21   But that's the world that we live in today, ladies and gentlemen.  So

22   hopefully we won't have any more of those problems.

23        And you may continue, counsel.

24   Q     (By Mr. Gilluly) Dr. Simopoulos, with regard to patients who are

25   coming to your facility, they actually receive thorough evaluations, and

-870-

1    those evaluations include a review of medical history; correct?

2    A    That is correct.

3    Q    And physical examinations.

4    A    Yes.

5    Q    In fact, after the evaluation and treatment, the team and the doctor

6    talks to the patient about the suggested next steps to take; is that right?

7    A    We outline a treatment plan.

8    Q    And in some cases the doctor may order additional tests.

9    A    If we don't have the test or we deem we need another test, we'll order

10   another test.

11   Q    Or you may decide on other diagnostic procedures even prior to

12   developing a treatment plan.

13   A    Yes.

14   Q    It's difficult, would you agree – in fact it's impossible to develop an

15   appropriate treatment plan without having first meeting (sic) the patient.

16   A    Yes.  I mean, you have to meet the patient.

17   Q    Of course.  In fact treatment plans are developed for each patient

18   uniquely; right?

19   A    Yes, to try to –

20   Q    – Again, standard approach, but unique.

21   A    Standard approach, but we try to take into it a patient's unique

22   characteristics.

23   Q    And therefore every patient, for instance, does not receive the same

24   treatment plan; you would agree?

25   A    Yes.

-871-

1    Q    In fact Beth Israel does not prescribe long-term narcotics for pain

2    management.

3    A    Well, the primary cares do.  I have patients in my practice, but

4    because, you know, I've had 14 years, I'm one provider, there's so many

5    things I do for pain, it's hard for me to take on many new patients just

6    solely for the purpose of medications.  That said, sometimes when I reach

7    patients at a treatment end of everything I can possibly do, in combination

8    sometimes it's not uncommon that I do end up taking over their

9    medications.  But, you're right.  On our website we don't just primarily take

10   patients over.  We just don't have the capacity anymore –

11   Q    – Yes, sir, in fact –

12   A    – because their needs are just so great.

13   Q    And on the website it talks about how, if it is decided that narcotic

14   medication is the appropriate way to manage pain, your office will send the

15   patient back to their primary care physician; right?

16   A    Right, because they're often already placed on them by the primary

17   care physicians –

18   Q    Certainly.

19   A    – so we just endorse it and they go on.

20   Q    And you're not an addiction specialist.

21   A    That is correct, I'm not –

22   Q    – In fact to become an addiction specialist who treats people with

23   addictions, you have to be separately registered with the DEA; is that

24   correct?

25   A    That is correct.

-872-

1    Q    And you are not separately registered.

2    A    I am not.

3    Q    And to your knowledge Dr. Azmat is not separately registered.

4    A    To my knowledge, you're correct.

5    Q    So he's not an addiction specialist.

6    A    That is correct.

7    Q    And it would therefore be improper for one to practice pain medicine

8    – or excuse me.  It would be improper for one to practice addiction

9    medicine under the heading of pain medicine; correct?

10   A    I'm just trying to put that together, addiction medicine under the

11   heading of pain – well, you're either a – some people – because some

12   people specialize a little into both, because they kind of may overlap to

13   some degree.  Some people do treat addiction and the pain together in

14   some complicated patients with a history of substance abuse.

15   Q    But if you –

16   A    – It's not a common – we'd like to see more of it, but it's very difficult.

17   We do not have, for instance, a person of such in our medical center, but

18   would be useful if we did.

19   Q    I mean, in fact, if you're treating addicted people with opiates the law

20   requires an addiction specialist certification from the DEA.

21   A    Right, because of the types of medications that are prescribed for

22   addiction and the way they're prescribed one – they're two medications,

23   basically.  One is soboxone.  It, again, requires it being an addictionologist;

24   and two is methadone, and if you prescribe methadone in a certain way, it,

25   too, you have to have specialization in addiction.

-873-

Q    Yes, sir.  In fact it's very clear at your office that if a patient is addicted to pain medications, and requires an addiction specialist, or if a patient is in need for a short-term or long-term detoxification program, you guys instruct the patient to talk to a different doctor.

A    That is correct.

Q    One that is not associated with your office.

A    That is correct.

Q    For instance, a primary care physician, or an addiction specialist; right?

A    Right, we do not have an addiction specialist.  We would like one, but we do not have one, no.  For that part, we need one in the whole medical center.  We do not meet that need.

Q    Yes, sir.  Your website has a big warning there that medication abuse is inappropriate use of medicine; would you agree with that?

A    Yes.

Q    And talking about addiction, would you agree with me that there are – well, that there are doctors, sadly, who practice outside the balance of legitimate medical practice.

A    Yes.

Q    There are doctors who prescribe medications for drugs for no legitimate reason.

A    Sadly, it could – yes.  There's a bad egg everywhere, yes.

Q    Yeah, and they're pill mills.  You're familiar with that word?

A    Yes.

Q    And that's – there are also patients who doctor shop.

-874-

1   A   Yes.

2   Q   And by doctor shop, I mean that's when the patient travels to a

3   particular doctor for specific reasons to get drugs.

4   A   Yes.

5   Q   In fact sometimes addicts will talk among other addicts and the word

6   will spread on who pill billies, or people who are doctor shopping, can go to

7   get what they need to get their fix.

8   A   Right.  There are – it's the kind of name you may put out there.

9   Q   Yeah.  I mean, and the sad reality is that addicts may seek out doctors

10   who prescribe freely.

11   A   Right.  Sometimes they seek out from people that don't prescribe

12   freely.  They'll – you know, once again, it's a compulsive behavior, so you're

13   desperate in that situation and you'll try whatever it takes.  But right, you'll

14   hit the easy targets first.

15   Q   Sure.  And to an extent, because of dirty doctors and because of doctor

16   shoppers, some people who may be in legitimate pain may not even receive

17   proper treatment.

18   A   Yes.

19   Q   And addiction is a real problem when dealing with pain management.

20   A   Yes, it is.

21   Q   Addiction affects people in many ways.

22   A   That is correct.

23   Q   It affects the person physically.

24   A   Yes.

25   Q   It affects the person mentally.

-875-

1   A   Yes.

2   Q   And it affects, obviously, the person socially.

3   A   Yes, absolutely.

4   Q   And it affects the family and the others around them.

5   A   It's a disease that affects every dimension of the patients' lives.

6   Q   Family, kids.

7   A   Everything.

8   Q   Society.

9   A   Yes.

10  Q   Sometimes crimes are fueled by addiction.

11  A   Yes, absolutely.

12  Q   People sell drugs to maintain their habit.

13  A   Uh-huh.  Agreed.

14  Q   People commit crimes to maintain their habit.

15  A   Absolutely.

16  Q   People rob to maintain their habit.

17  A   They do.

18  Q   People burglarize people's homes to maintain their habit.

19  A   Homes, pharmacies ...

20  Q   Yeah.  Addiction is marked by an out-of-control need and a craving

21  that affects relationships, social obligations, work, and school.

22  A   That is correct.

23  Q   And addiction can literally physically alter one's pathways to their

24  brains for life.

25  A   Yes.  Long-term treatment with opioids can make alterations in the

-876-

1    body that we've only recently started to appreciate in these patients, that it

2    changes you biochemically for life.  But, once again, that is not known by

3    most physicians, and it's something that's recently come to light as we've

4    acquired more information and we've cared to study these patients.

5    Because, once again, they're not – addicted patients are – again, all those

6    reasons that you just described aren't your most pleasant folks –

7    Q    – Sure, in fact, I mean –

8    A    – and there are –

9    Q    – I'm sorry.

10    A    Go ahead, no, no, go ahead.

11    Q    Well, the whole concept of addiction, that's not a new trend in pain

12    management.  I mean, that's been around – that's been around a long time,

13    but what is new may be the scientific development about how it affects

14    one's pathways to the brain; right?

15    A    Well, you know, to be real honest, I think the past decade that we went

16    through was a decade of more liberal use of opioids to treat pain.  And

17    though we were attacking, as you said, legitimate patients with pain, you

18    also saw the escalation in addiction and addicts and access.  So that was not

19    – had we known that, I think that we might have been more – much more

20    conservative.

21    Q    Yes, sir.  In fact addiction can cause people to travel hundreds of miles

22    to get their fix.

23    A    Yes.  When you're willing to commit a crime you'll travel miles to get

24    your fix.

25    Q    Sure.  Ohio to Garden City, Georgia.

-877-

1    A    Uh-huh.

2    Q    Right?

3    A    Yes.

4    Q    Florida to Garden City, Georgia.

5    A    Yes, you'll travel –

6    Q    Kentucky.

7    A    – great distances.  Yes.

8    Q    Maine.

9    A    Maine.

10   Q    And they'll do what they can do to get their fix; is that a fair

11   statement?

12   A    Yes, that's a tough drive, though.

13   Q    Absolutely.  And there are certain prescription drugs that are

14   commonly abused because they are more likely to prompt addiction.

15   A    Yes, though all of them – or all Schedule II or opioid-type medications

16   have that propensity.

17   Q    In fact oxycodone is one of Schedule II and highly addictive.

18   A    Absolutely, all of them are highly addictive.

19   Q    Benzodiazepines are addictive –

20   A    They're addictive as well.

21   Q    – even though it's a Schedule IV.

22   A    Yeah, they're very addictive as well.

23   Q    And oxycodone is a opioid, which I believe you testified earlier, an

24   opioid is one that is – what's the difference between an opioid and an

25   opiate?

-878-

1    A    An opiate is more of – I mean, it's found in nature in a plant.

2    Q    Sure.

3    A    Opioids are just, chemists have modified morphine in a different

4    chemical form so – but in the end they work the same.

5    Q    And heroin is a type of opiate.  Heroin is opiate; right?

6    A    Right.  Well, it's, again, been modified by chemists to penetrate into

7    the brain in a more rapid fashion.  So that's why it's highly addictive.  It's

8    morphine that's chemically altered to penetrate into the brain faster.

9    Q    Sure.  And in addition to addicts being physically altered, even proper

10   use of opioid medicines can alter pathways to the brain.

11   A    We've become much more aware of this.  It is now a more recognized

12   risk of opioid therapy.  It took us a long time to figure this out.  When I got

13   started it was simply, patients needed pain control, opioids was a way,

14   increase the dose until you get them comfortable.  We've recognized that

15   you've got to watch this in a lot more cautious – for the reason you just

16   mentioned.

17   Q    Sure.  In fact, I mean, by recent you're talking, there were studies done

18   in 2009, so we're talking still around 2009, not last week; right?

19   A    Right.

20   Q    And we know it's still emerging; would you agree?

21   A    It's still emerging, yes.

22   Q    In fact the pathways that are influenced, it influences a sense of one's

23   reward or well-being, which obviously can lead to addiction.

24   A    Correct.

25   Q    Correct?

-879-

1   A   Yes, absolutely.

2   Q   Because opioids produce a quick, intense feeling of pleasure, followed

3   by a sense of well being and calm drowsiness.

4   A   Yes, yes.

5   Q   When opioids are used repeatedly, the brain is likely to become

6   dependent on them, and, again, one of the reasons they're highly addictive.

7   A   Yes.

8   Q   And a doctor should be aware of the risks of prescribing opioids.

9   A   Yes.

10  Q   Whether in Georgia or in Boston; right?

11  A   That is correct.

12  Q   And a patient should be aware of the consequences of taking opioids;

13  would you agree?

14  A   Yes.

15  Q   And you teach this to your students.

16  A   That is correct.

17  Q   There are a number of factors that may play a role in opioid addiction;

18  would you agree with me?

19  A   Yes.

20  Q   In fact it's important to know the genetic factors, a person's family

21  history, for instance.

22  A   Yes.

23  Q   Personality traits?

24  A   Personality is an issue.  It's become more recognized that certain

25  personality types may link you more to opioid addiction.  Again, an

-880-

1    evolving area that's ...

2    Q    As recent as –

3    A    – To the more – it's not unreasonable sometimes – once again,

4    understanding personality takes time.  If you look at my pain psychologist,

5    for instance, he'll often defer that diagnosis, and it's something that's

6    established over time of multiple repeated visits with the patient.  Even

7    with the psychologist.  So they often hesitate on this.  So you're absolutely

8    right, but there's often a delay in that diagnosis, and you might often end

9    up treating before you've made that diagnosis.  Now, you've got to

10   backpaddle a little bit.  So you're right –

11   Q    – But you'd agree –

12   A    – You're right, but we end up in – we end up in a little bit of a – we end

13   up caught there sometimes –

14   Q    – Sure, but –

15   A    – if you understand what I mean.

16   Q    And that's why you take protective measures.  I mean like, that's why

17   Beth Israel has questionnaires, and it talks about whether a person smokes,

18   for instance.  Because if a person smokes or has a history of alcohol abuse,

19   and has addictive personality traits, they may be more likely to become

20   addicted to opiates.

21   A    He's absolutely right.  He's going down a pathway where if you're

22   addicted to a substance of any type, you are more likely.  And the estimates

23   range in the literature from five-to-seven times more likely to become

24   addicted to another substance.  So you have to watch these patients very

25   carefully if you choose to use such a substance –

-881-

Q    – Yes, sir, that –

A    – to treat the patient.

Q    It's something you need to look out for at the front end if possible, and that can be done, would you agree, by thorough questionnaires.

A    Questionnaires is an interesting topic.  Questionnaires have been developed in the recent decade.  And he brings out a very valid point, that people are trying to predict based on personality, based on history, based on your psychiatric profile, smoking was brought up, whether you have a propensity to become addicted to opioids some time in the future if I choose to treat you.

Q    In fact in addition to those personality traits, even being under the age of 30 and being a man you're more likely to become addicted to opioid treatments.

A    Right.  Patients that are less than 60 years old that range between their 20s to 60s are at higher risk, so a young age is.  Because we discussed a little bit about the way the nervous system is more likely to change in younger folks than in elderly folks.

Q    And in fact in the initial interviews with clients, it's important for doctors to learn as much about the patient as possible to determine if opioid addiction (sic) is the right course of treatment.

A    If they're treating opioid addiction, then, yes, you need to figure out if they're addicted.

Q    Well, even if they're considering opioid treatment as a means of pain management, I mean, it's best to learn as much about the patient as you can before you make that decision and treatment plan.

-882-

1    A    True, true.

2    Q    And that is one reason it's important to know whether the person has

3    a history of abuse.  It also is important to know if they have a history of

4    being addicted to other controlled substances; right?

5    A    That is correct.

6    Q    Whether the person has a family history that includes addiction

7    problems; right?

8    A    Yes.  Addiction has, in part, a genetic basis.  It's not complete genetic-

9    basis, but there is a – you know, you might have heard the father, for

10   instance, is an alcoholic, then the son does, and so on and so forth.  So we

11   once again think that genetics plays a role.  It's not the whole story, but it is

12   part of the story.

13   Q    Would you agree with the statement that one of the best ways to

14   prevent addiction is to never use opioids?  Have you ever made that

15   statement?

16   A    You know, that's a very –

17   Q    – Have you made –

18   A    – tough statement.  I haven't –

19   Q    – Have you made it?

20   A    I haven't –

21          MR. WITHERS:  – Objection to counsel interrupting him –

22   A    – I have not –

23          THE COURT:  – Let me see you over here, Mr. Gilluly.

24          [NOTE: Side bar conference on the record.]

25          THE COURT: I guess you've got some sort of script that you're

-883-

1    going from here about addiction and the danger of addiction.  But this far

2    exceeds the scope of any direct examination in this case and, in the Court's

3    opinion, far exceeds the question of whether or not this doctor prescribed

4    to patients for a non-legitimate medical reason.  And so I'm going to ask

5    you to refrain from doing it.  And you're not asking questions, you're

6    making statements instead of asking questions.  And you need to just ask a

7    question and allow the witness to answer the question, okay.

8            MR. GILLULY: Yes, sir.

9            THE COURT: And we need to get back on, you know, the trail

10   here of whether or not this doctor did anything wrong in this case.

11           MR. GILLULY: And I will, I'll move forward.  The point – one

12   of the things, Judge, the reason, just so you know why I'm doing it, is

13   because in the questionnaire it asks questions about family history,

14   smoking, and many of these forms that he's rendered opinions on it's blank

15   there.  And I'm trying to demonstrate –

16           THE COURT:  – Well, just ask him that –

17           MR. GILLULY:  – Yes, sir, I will.  I will, Judge –

18           THE COURT:  – Just say, is there nothing on this form?  Is

19   there nothing on this form?  Just ask the question.

20           MR. GILLULY: I will.

21           THE COURT: And don't give us a speech about it.

22           MR. GILLULY: Yes, sir.

23           [NOTE: Side bar conference concluded.]

24           THE COURT: Go ahead.

25           MR. GILLULY: Thank you, sir.

-884-

1    Q    (By Mr. Gilluly) You know, first of all, your office, would you agree –

2    or is this true, that your office does not cater to drug addicts, and if you find

3    out someone is a drug addict, you refer them to a specialist.

4    A    Yes, that would be appropriate since we don't have an addiction

5    specialist.

6    Q    Certainly.  Can people, for instance, who have been taking Xanax for

7    serious – a long time, if they're just cut cold, I mean, can there be

8    consequences from just cutting a patient from taking Xanax?

9    A    If they're taking it – it's a very short-acting benzodiazepine, so it

10   comes on quickly and goes off quickly, as opposed to the Valium, which is

11   longer acting.  In the cases reviewed they at most twice a day.  I don't think

12   there is – again, I'm not a common Xanax prescriber, but just based on the

13   pharmacology I can see it as, is that, you know, because it's short-acting it's

14   used only once or twice a day, as opposed to four times a day which is, you

15   know, the higher amount that it's always in the patient's body all the time.

16   Q    As part of your job as a teacher and doctor, I mean, do you review

17   literature related to pain management?

18   A    Yes.

19   Q    And you write peer review articles; is that right?

20   A    Yes.

21   Q    Some of the guidance doctors receive is through continuing medical

22   education, journals, books, and those articles that you write; correct?

23   A    Yes.

24   Q    And the FDA, Food and Drug Administration, provides information

25   about drugs as well.

-885-

1    A    That is correct, yes.

2    Q    And the DEA provides information about prescribing narcotics; right?

3    Are you aware?

4    A    Yes, well ...

5    Q    And local and state medical boards.

6    A    Yes.

7    Q    And in fact studies are also done that may be helpful to doctors.

8    A    Yes.

9    Q    Were you involved in the study at Beth Israel where your office looked

10   at the records of 23,918 doctors regarding simple back pain between 1999

11   and 2010?

12   A    Yes.

13   Q    And that study determined that the use of opioids to treat lower back

14   pain was not good practice; would you agree?

15   A    Well, it's – it's, again – it was a correlate that patients with chronic

16   opioid therapy with back pain may not have as good outcomes as people

17   who don't.  And there could be many suggested reasons as to why that

18   could be the case.

19   Q    But, Doctor, do you know John Mafi?

20   A    Yeah.

21   Q    Dr. John Mafi is the chief medical resident at your office; right?

22   A    He's in the hospital, not at my office in particular.

23   Q    And are you – did he participate in that study that you participated in?

24   A    That was his study.

25   Q    He was the lead on it?

-886-

A    Yeah.  I'm aware of it.  It was part of our medical center, not in my
office.

Q    And is it fair to say that the study showed that opioids helped only
slightly with acute back pain, and opioids were worthless for long-term
treatment of lower chronic back pain.

A    Well, once again, chronic opioid therapy is a debatable therapy, and
I'm not going to say that it's a proven therapy.  Well, start from the get go,
and it told you up to six months is the most the study suggests favorable
responses.  There have been new emerging studies that are now going back
and forth in terms of patients not doing as well.  If you put patients on
opioids, for instance, they might be more likely to have surgery, they might
be more likely to have hospital admissions.  So there's been some negative
emerging data with regards to chronic opioid therapy.

Q    From your own office.

A    From our hospital, from other medical centers, from recent reviews
that are coming out recently.  Whereas if you look at the trend in the
previous decade, or certainly when I got started, it seems like, well, gee, we
have been under treating patients with opioids.  So we're getting a
pendulum swing, is what's occurring now in the literature, slowly as we're
amassing experience with them.

Q    And as part of the pendulum swing, we're talking about the decade of
1999 to 2010.  During this pendulum swing, 43 percent of the patients that
were taking opioids for chronic back pain had substance abuse disorders.

A    There's been more and more recognition of coexisting substance abuse
or misuse or abuse with patients on chronic opioid therapy that was

-887-

1    underappreciated.  When I got started, basically in that early part of the

2    decade, and I received a lot of my training, when you get a lot of training,

3    that goes with the mental imprints you have in your head is, is that we were

4    told that opioid misuse and abuse was minuscule in patients with chronic

5    pain, and that you needed to treat them.  But obviously studies are now

6    suggesting quite the opposite, you've really got to start watching these

7    patients and being very cautious with what you're doing.

8         So, yes, the pendulum is swinging in our understanding of these

9    patients.

10   Q    Yes, sir.  In fact in 2008, according to your study, almost 15,000

11   people died from overdose prescription –

12        MR. WITHERS:  – Judge, objection to this, Your Honor, in

13   terms of being beyond the scope of direct, number one; and irrelevant,

14   number two.

15        MR. GILLULY: Well, if I –

16        THE COURT:  – The objection is sustained.  It is beyond –

17   there's no testimony in this case that any of these people died.  There's no

18   testimony in this case – the testimony is that when the tests were given that

19   there was only one person that showed up positive for marijuana, and that

20   the mother then substituted her urine test for that urine test.  And so we're

21   going way beyond what this doctor testified about.  So let's get on message.

22        MR. GILLULY: Yes, sir, yes, sir.

23   Q    (By Mr. Gilluly) Would you agree with me that safe and successful

24   treatment with opioids requires a standard approach that includes a

25   comprehensive history, physical examination, and close followups.

-888-

1    A    To the best that we can tell, yes.  Once again, that's still being

2    evaluated.  There's still, can this really be pulled off, is a big question, and I

3    wrote an editorial just as recently as this year.  But we think so.  I will

4    answer it yes, in the standard practice that's what we believe.

5    Q    And in that standard practice, do you agree that physicians must have

6    documentation of the failure of alternative treatments?

7    A    Before ...

8    Q    Before putting a patient on opioid treatment.

9    A    Well, if you – in the guidelines, you can start chronic opioid therapy as

10   initial therapy.  Most – if you look at 2009 guidelines, many will say, yeah,

11   it's okay if you think that's the right thing to do.  So a physician can exert

12   their judgment, as long as you yourself and the patient you're establishing a

13   relationship feel that that is an option, a reasonable option, you're both

14   willing to entertain it, follow it, and carefully monitor the progress.

15       So it can be done.

16   Q    Do you remember making the statement in the article that you wrote

17   for – and the article is entitled "Opioids for Chronic Pain."  Do you

18   remember making the statement that physicians must have documentation

19   of the failure of alternative non- opioid treatments?

20             MR. WITHERS: Objection to foundation, Your Honor.  He

21   needs to tell him when, where and who that was published through.

22             THE COURT: He asked him about a prior statement –

23             MR. GILLULY: Yes, Judge.

24             THE COURT:  – if he wants to see it –

25             MR. GILLULY: Sure.

-889-

1          THE COURT:  – he can see it.

2          MR. GILLULY: May I publish – put it on the overhead.

3          THE COURT: Well, if he asks to see it.  If he doesn't ask to see it

4     ...

5     Q    (By Mr. Gilluly) Would you like to see the statement, sir?

6     A    Sure.

7          THE COURT: Show it to him.

8          MR. GILLULY: Yes.  Yes, Your Honor.  May I approach?

9          THE COURT: Yes, sir.

10    Q    Do you see the statement I'm referring to?

11    A    Right.

12    Q    And did you make that statement?

13    A    Right.  In our review – this was an earlier review, and we had acquired

14    a more rapid experience with opioids earlier than, I'd say, others, because

15    after all, we're a pain treatment center, that we'd like to see that other

16    options are exhausted.  And the reason is, is that it's hard work when you

17    put a patient on opioids.  And I'll be honest with you, the reason is, is you

18    have to see the patient on a monthly basis, you have to follow them

19    carefully, you have to monitor them carefully in order to ensure the safety

20    and long-term effectiveness of this therapy.  So that – it was more

21    convenient and easier and perhaps safer if you did other things first.  But

22    obviously if that's the option that you judge is in the best interest of this

23    patient, then a physician can exert that independent thought.

24    Q    Did you make that statement?

25    A    I did make that statement, yes.

-890-

Q    Okay, thank you.

A    Yeah, it's right there in front of you so ...

Q    In reviewing Georgia literature and national literature regarding prescribing practices, you would agree with me that one of the cardinal rules is that there's no single treatment that is appropriate for everyone.

A    Correct.

Q    And practitioners should conduct comprehensive background investigations.

A    I don't recall if I saw that in the guidelines.

Q    Well, let me ask you this: do you teach doctors of things that they should look for to determine drug aberrant behavior?

A    There are a variety of now published lists for monitoring drug – what we mean by drug aberrant behavior is, is that patients' behaviors that violate the opioid agreement that you have with them.  So remember that with all the initials, and all those, I will do and I will not do.  Well, patients suddenly fall off that and aren't doing that.  That's what aberrant behavior – so we – and certain aberrant behaviors are riskier than others, and when a patient does do aberrant behavior, once again, you need to kind of just follow up on that aberrant behavior.  If that aberrant behavior is something that resulted in a near-death experience, then you might have to cease opioid therapy.  If that was something, well, I got a clot in my leg, all of a sudden I had a painful leg and I took an extra oxycodone and now I'm out, that's an aberrant behavior, but less of a concern than the person who presented, say, obtunded because they took extra pills because they were upset.

-891-

1    So aberrant behaviors are just a wide range.  And, yes, we do teach

2    them, and we do try to sort them out the best we can over –

3    Q    – You try to sort them out even sometimes before you begin the

4    treatment program; right?

5    A    Often before, but more often I find them ongoing.

6    Q    But do you also – I mean, is a factor you may consider is whether or

7    not one traveling long distances to get medicines, I mean, could that be a

8    factor you consider?

9    A    Yes, it –

10   Q    – When there are other pain clinics in their very city.

11   A    Right.  There could be one of two reasons, right, is that the patient

12   could have been let go because of aberrant behaviors and isn't forthcoming

13   for that for a patient center; or that pain center closed because they weren't

14   prescribing correctly; or that patient got into an argument with that

15   physician for other unclear reasons and now is in your office.  I'd agree that

16   you can treat that patient.  It is not to say that you can't but they, again,

17   require very careful monitoring over time.

18   Q    And it would at least –

19   A    You've got to keep them on a short leash.

20   Q    – be important to ask why they traveled so far; correct?

21   A    Yes, I'd ask them.

22   Q    History of – we talked about drug addictions and things in that regard.

23   What about drug screens, are those tools that can be used to help identify

24   whether or not a person more likely to be seeking a drug for inappropriate

25   reasons?

-892-

A      Urine drug testing can sometimes yield something that you didn't expect.  So for instance, you are prescribing oxycodone for pain, you do a urine tox, it shows, yes, they're taking it.  In their urine you can see that there's oxycodone in their system, but they also suddenly show up for cocaine.

Q      Sure –

A      – So it can give you a completely unexpected response.  Now you say to yourself, well, what do you do with that result?  That result in and of itself right now in the country is a debated what-to-do phenomenon.  You'd think it would be clear-cut, cease therapy, the patient's an addict, they've got clear issues.  Recent study even this summer showed that physicians vary dramatically in what they're going to do with that result, with that one result.

Q      But your office, of course, if you learn of that, you would refer them to an addiction-type person, or their primary care physician.

A      My personal beliefs is, is that that's a high-risk behavior.  I wouldn't feel comfortable prescribing oxycodone, but that isn't to say that another person wouldn't.

Q      And with regard to drug screens, if people claimed on their questionnaire that they're taking oxycodone and Xanax, and they're tested and neither product is in their system, is that a flag that maybe this person is seeking drugs for the wrong reason; for instance, to sell them.

A      You have to – that's a very carefully monitored situation.  You have to find out exactly when they took their last pill before I do the urine test.  I try to, at least, as best as I can.  Right, if they took – if they ran out of pills

-893-

1    five days before, the metabolite may not show up in their urine, that's the

2    reason why it's negative.  You have to make sure that's the situation or not

3    the situation but –

4    Q    – Very important to ask the question –

5            MR. WITHERS:  – Objection to Mr. Gilluly repeatedly

6    interrupting the witness, Your Honor.

7            MR. GILLULY: I thought he was over, Judge.

8    A    I'm sorry –

9    Q    – Are you – continue, sir.

10   A    No, no, go ahead, go ahead.

11   Q    I certainly didn't mean to ...  Surely go on if you had more to say.

12   A    Oh.  Well, it's simply that I – once again, it's a difficult scenario

13   because you – it makes you concerned, why isn't the medication in their

14   system.  Say they did say, I took it within 24 hours, doctor, we should see

15   that medication in the urine and now it's not in there, really raises concern.

16   Because my biggest concern is, now the patient is not telling me the truth,

17   and then it raises, what are they doing with their medications.  I can't make

18   a confirmatory diagnosis as to what they're doing with their medication,

19   but it does raise concern going forward because they're not using it as

20   prescribed, and that makes me very concerned.

21            Once again, what I do in my practice is, is – might be very different

22   than what another doctor may do.  They might give them a second chance,

23   or a third chance, or a fourth chance.  That also depends on the relationship

24   you have with patients. So if I'm treating you, for instance, for several

25   months and your urine toxicologies show up negative right away, well, I'm

-894-

1    pretty concerned.  Whereas if I've done urine toxicologies for ten years, and

2    now ten years later all of a sudden I do a urine tox and it doesn't show it, I

3    might be a little more lenient and get a second one, you see what I'm

4    saying, or a third one.

5          So once again, how a doctor's going to react to these tests is going to

6    vary pretty dramatically from doctor to doctor, and from scenario to

7    scenario, and we haven't worked out how you should best react to ensure

8    the safety of the patient.  And I know that's what you're getting to, to ensure

9    that we don't have diversion or addiction.

10   Q    And that would be a concern –

11   A    Yes.

12   Q    – diversion.

13   A    Yes.

14   Q    And another – for instance, would you agree that contradictions

15   contained within the medical questionnaires – for instance, if the patient

16   tells the doctor he had had a pain for a long time, but then tells an MRI

17   place he had it for only a short time, that could be another indication of

18   misrepresentation.

19   A    Right.  You – that's an important point.  You need to watch

20   inconsistencies in the history and in their physical exam up front.  And in

21   times – over time, sometimes you can figure these out over time, and then

22   you raise your index of suspicion, and once again, monitor that patient

23   very, very closely with urine drug testing, watch out for phone calls for early

24   refills, see if they keep – if they do request for escalating doses of

25   medication.  Again, you're going to figure these things out as time goes on

-895-

1    in most scenarios.

2    Q    And it would be good to try to figure these things out, even at the

3    initial visit before you put someone on an opioid treatment plan; would you

4    agree?

5    A    If you can.  It's often very difficult to do that in the initial visit.  You're,

6    once again, up front with a patient who you're just getting to know, and

7    you're trying to treat, and trying to help, so you've kind of got a little fine

8    line you're walking between being altruistic, being compassionate, trying to

9    help the patient, stabilize them with their condition, and at the same time

10   watch out for these other little things that come to bite you, such as future

11   addiction, or ongoing addiction that you may have missed, fakery that you

12   just described with inconsistence in history.  It's well documented, for

13   instance, that patients can fake out doctors.  It's been well studied dating

14   back to 2007.  So we know we're amenable to being fooled, so we've got to

15   watch that.

16        And many times I find myself that when I – you know, when

17   somebody's not so obvious, I figure that out in the going forward rather

18   than the initial visit.

19   Q    But with – are you finished?

20   A    Go ahead, yeah.

21   Q    But with regard to finding it out, if there are a number of things,

22   number of indications – for instance, people travel long distances, they

23   have MRIs from other states, they claim they're taking oxycodone but it

24   shows negative on a drug screen, they have inconsistencies in their

25   questionnaire, I mean, a combination of these factors aggravates the

-896-

1    suspicion on whether that's an appropriate person to put on opioid;

2    agreed?

3    A    You're going to be very cautious, and if you do select to select that

4    patient to treat them, you're, again, going to have to be on really strict hard

5    monitoring with that patient.

6    Q    And that treatment plan should be specialized to address the

7    contradictions, it should be – the patient should be monitored closely.

8    A    Yes, that's the key in the long run.

9    Q    And questioned about the contradictions during the initial interview;

10   right?

11   A    Yes.  That's – that's a really – that's a tough thing to do, because you're

12   trying to establish a rapport and a relationship with that patient, and now

13   you come across kind of almost accusatory to the patient when you kind of

14   bring these things – you're absolutely right in the concerns of that.  I mean,

15   nobody's going to deny that as a physician you're kind of trying to form a

16   partnership and a relationship with the patient.  If I'm already starting to

17   accuse you of things, it's already dissolving that relationship, so you're

18   already throwing that up.  So you're kind of walking this tight line, so you're

19   kind of saying, well, you know, the MRI that I have, I know it's from

20   another state, but it definitely has some findings here.  Your story makes

21   reasonable sense.  You do have some inconsistencies.  These are definitely

22   very much concerns.  I'm going to follow this over time.  But, again, you can

23   treat that person, you just – it needs follow through.  And just watch out, as

24   you pointed out.  You pointed that out very clearly, I think.

25   Q    It would help to have documentation, including previous medical files.

-897-

1    If all you have is a suspect MRI and those indications we just talked about,

2    I mean, you would agree with me that you should – you shouldn't just put

3    someone on a standard opioid treatment plan without looking or

4    addressing those concerns; right?  And without setting true goals in the

5    treatment plan.

6           MR. WITHERS: Objection to the compound question, Your

7    Honor.

8           THE COURT: Just ask him one question at a time.  Ask him the

9    first question and let him answer that, and then ask him the second

10   question.

11   Q    With all of these indications of contradictions, would you agree that it

12   would be important to question and address those with the patient?

13   A    Yes.  It would be nice to recognize that you might have a rocky course

14   with that patient.

15   Q    Because am I correct, in Georgia – in fact in Georgia are you aware

16   that prescribing controlled substances to people who are addicts violates

17   The Georgia Board standards of practice?

18   A    Correct, if it's not for legitimately trying to treat their problems.

19   Q    And they may be lying to you, would you agree, in order to get pills to

20   feed their addictiveness rather than their pain?

21   A    Certainly.  Patients can divert their – can fool you for other purposes.

22   Q    And it's good to not solely take the word of a patient, but to use the

23   skills you learned as a doctor; right?

24   A    You didn't – how should I say this.  You gather these skills over time of

25   being – of people fooling you and deceiving you, and we all have various

-898-

1    deceptions that we've occurred, and we've been in certain scenarios where a

2    patient has fooled you.  So you may or may not have been yet as a doctor in

3    those scenarios.  So you could be fooled, you might not be.  It's, again,

4    based on your – I hate to say it – for lack of a better word, how street smart

5    you are when you're faced with these scenarios.

6         So – but you're right, you always have to have an index of suspicion,

7    and sometimes, I can be honest with you, I've treated patients where I

8    thought everything was perfect, everything was legit, the age was good, the

9    risk factors were low, and call me up on the phone and tell me, I'm

10   addicted.  And I – I said (audible gesture).  You know, where can I go for

11   my addiction?  I'm like, my God, I missed – you know, you missed the boat.

12   I missed the boat completely.  So ...

13   Q    With regard to indexes of suspicion, would you agree that another

14   index of suspicion would be a whole family going to you complaining of the

15   same complaint seeking the same kind of medications.

16   A    Right.  You know, genetics covers both degenerative processes as well

17   as addiction.  So it could be one, it could be both, it could be a combination

18   of both.  They could be addicted, have chronic pain.  They could be just

19   addicted, or aberrant behaviors, or they could all have some degree of pain

20   because back problems run in families.  So you ...

21   Q    Let's look at some of the patients.

22        MR. GILLULY: Will you pull up 1-002.

23   Q    This is Jim Brooks.  Can you see where Jim Brooks is from?

24   A    Kentucky.

25        MR. GILLULY: Okay, and 1-003.

-899-

1   Q      And do you see what previous medicines – first of all, his complaint is

2   lower back; is that right?

3   A      Correct.

4   Q      It's at the top.  Briefly describe your main problem/complaint, lower

5   back.  Do you see that?

6   A      Yes.

7   Q      Okay.  You also see, how long have you had this problem?  Over 20

8   years.

9   A      Yes.

10  Q      And degree of pain, 9?

11  A      Yes.

12  Q      And it radiates beyond where it starts; right?

13  A      Right.

14  Q      Now, with regard to pain radiating, would you agree with me that with

15  back injuries or with neck injuries that sometimes – and with numbness,

16  too, that if the nerves are being pinched to the extent that there's numbness

17  in the legs or extremities, that could ultimately result in severe nerve

18  damage that can never be corrected.

19  A      Right.  If something's been going on for 20 years of numbness and

20  tingling and pain down the leg, you're right.  It's not going – it's unlikely to

21  be corrected.

22  Q      And the person's been taking opioids for a significant period of time.

23  Those opioids may be shielding the damage that's being done to the

24  person; right?

25  A      It's very – you know, you bring up a very important issue.  Where do

-900-

1   you balance pain control and pushing people beyond their normal limits of

2   what they should be doing.  And that's not very commonly discussed in the

3   medical literature, to be very honest with you.  The main interest was, is

4   treating the pain, but I see your point's well taken, but, again, not

5   thoroughly evaluated.  I have a concern with any pain management

6   modality that might push somebody more than what they should be doing

7   once you mask this.  But we have to also take in the part that some of that

8   pain might just now be pathologic in nature and no longer serving a

9   warning purpose 20 years out.  It's ...  But you bring up a valid point.

10  Q    Might be a need to consider an alternative form of treatment if they've

11  been taking opioids for 20 years and they still have a level of pain of 9.

12  Would you agree it may be time to consider an alternative form?

13  A    I don't know.  It just says the pain is 9.  I don't know if that's on

14  opioids here or not.

15        MR. GILLULY: Okay, let's scroll down, Dean.

16  Q    [Reading]: Please list any medications that you have been prescribed

17  for your problem.  Can you read that?  It's oxycodone 30, Xanax 1,

18  oxycodone 15; correct?

19  A    Yes.

20  Q    When you reviewed this file, you did not see any supporting medical

21  files from other physicians; would you agree with me?

22  A    Yes.

23        MR. GILLULY: Page 1-004.

24  Q    The patient does not indicate any other previous treatments that he's

25  ever undergone; would you agree that's blank?

-901-

1    A    He did not fill it in, that is correct.

2    Q    And that would be something you would be interested in asking the

3    patient; do you agree with me?  Especially in developing a treatment plan –

4    A    – Well, the question's there, yes.  So it is of interest, and it is a

5    standard question, yes.

6         MR. GILLULY: 1-009.  If you'll highlight the bottom there, I,

7    Jim Brooks.

8    Q    It says [reading]: I, Jim Brooks, having read the above information or

9    it has been read to me, and all my questions regarding the treatment of

10   pain with opioids have been answered to my satisfaction, and I hereby give

11   my consent to participate in the opioid medication therapy and

12   acknowledge receipt of this document.

13        If I were to tell you that that document is signed before the person

14   ever even saw a doctor – I mean, you would agree that's not a legitimate

15   treatment plan if it's never even been – he's never even been seen by the

16   doctor at this point.

17   A    Well, he signed a consent that says the risk-benefits of opioid therapy.

18   The next thing is, is he hasn't received a prescription yet.

19   Q    But it also says everything's been read to him and all questions have

20   been answered, and [reading]: I hereby give my consent to participate in

21   the opioid medication therapy.

22        I mean, if that's filled out with every patient in this case prior to even

23   seeing a doctor, you would agree that that is – that is not a good thing.

24   A    Well, I don't know exactly what a good thing means –

25   Q    – Well, it's certainly not an individualized treatment plan.

-902-

1    A    It would function that the usual course of treatment is, you'd assess

2    the patient and then usually do the opioid contract in my scenario.

3    Q    So this contract –

4    A    – Once again –

5    Q    I'm sorry.

6    A    – this is a little – I haven't seen it in this order but, again, it's

7    something that if you were doing this, you'd have to decide in your final

8    treatment plan if you're really going to prescribe or not prescribe.  You still

9    have that option.  The patient has undergone – so in this consent form, just

10   to recall, they undergo the risk, they sign to the risks of opioid therapy, and

11   they sign to their agreement of what they need to do to stay safe of this

12   therapy.  And that's what they've signed.  They haven't received anything as

13   of yet.

14   Q    But it's predetermined what their therapy will be.

15             MR. WITHERS: Objection, argumentative, Your Honor.

16             MR. GILLULY: It's a question.

17             MR. WITHERS: No.

18             THE COURT: Well, ask it in the nature of a question.  Does it.

19   Q    Does it appear to be predetermined that they will be receiving opioid

20   medication therapy?

21   A    It implies that opioids will be part of their treatment protocol.

22   Q    Thank you.

23             MR. GILLULY: If you'd go to 1-013.  If you'll highlight the blood

24   pressure.

25   Q    Is that a high blood pressure?

-903-

1    A    Yes, it is.

2    Q    Do you see any note anywhere in –

3             MR. GILLULY: If you'll expand.

4    Q    – anywhere in this evaluation where the doctor talks about high blood

5    pressure or references it?

6    A    I do not.

7             MR. GILLULY: If you'll go to 1-014.

8    Q    And this patient, as I stated earlier, was from Kentucky, and the MRI

9    is from POM MRI.  Those are two factors that could cause an index of

10   suspicion; would you agree?

11   A    The out-of-state part where the patient travels is something to be

12   thinking about.  Could they have gotten in a – fallen out of place with their

13   opioid agreement, so we did discuss that .  I'm not so sure about the out-of-

14   state MRI.  I – that, I don't know on lists.  You know, out-of-state patients,

15   you have to monitor.  Remember, our prescription monitoring programs

16   don't cross across borders, so you have to be very careful when you

17   prescribe in the monitoring.  I'm not so sure about the MRI, I just don't – I

18   just don't have a comment there –

19            MR. GILLULY: – 1-016.

20   Q    This patient was ultimately prescribed oxy 30s, oxy 15s and Flexeril;

21   correct?

22   A    Correct.

23   Q    And this patient indicated –

24            MR. GILLULY: – I guess we probably should go back to 1-013,

25   I'm sorry.

-904-

1    Q    This patient indicated to the doctor that he was taking oxy 30s, oxy 15s

2    and Xanax; is that right?

3    A    That is right.

4            MR. GILLULY: And if you'll go to 1-019.

5    Q    Negative for all drugs.  Another index of suspicion?

6    A    Right.  Once again, he may have run out of medications, or didn't have

7    access to medications for a period of time.

8    Q    Yes, sir.

9            MR. GILLULY: Let's go to 2-002, please.

10   Q    George Hunter.  Same date as Jim Brooks, the one we just saw.  From

11   Frenchburg, Kentucky, arriving on the same date as Jim Brooks from

12   Frenchburg, Kentucky.

13           MR. GILLULY: And if we could go to 2-003.

14   Q    Claims lower back pain.  Had the problem ten years.  Degree of pain a

15   9; would you agree with me?

16   A    Yes.

17           MR. GILLULY: 2-009.  Yeah, if you'll highlight there.

18   Q    Patient treatment plan signed prior to seeing the doctor; agreed?

19   A    Yes.

20           MR. GILLULY: 2-011.

21   Q    Blood pressure high?

22   A    Yes, it is.

23           MR. GILLULY: If you'll zoom out.

24   Q    And do you see anything indicated on that diagnosis where the doctor

25   addresses the blood pressure?

-905-

1   A   No.

2       MR. GILLULY: 2-011, we're on it.  If you could highlight the

3   medicines he told the doctor, or purportedly told the doctor he was taking.

4   Q   Oxy, oxy and Xanax; correct?

5   A   Yes.

6       MR. GILLULY: 2-015.

7   Q   Negative on all.  Another index of suspicion?

8   A   Potentially.  Once again, he needs monitoring.

9   Q   In fact every patient that saw Dr. Azmat received prescriptions for

10  oxycodone; is that correct?

11  A   Yes –

12  Q   – In every one of the files you reviewed.

13  A   The files that I reviewed, that is correct.

14  Q   Yes, sir.  Let's go to Billy Letner.

15      MR. GILLULY: 3, please.

16  Q   2/21/11, from Kissimmee, Florida; correct?

17  A   Yes.

18      MR. GILLULY: If we could go to 3-002, please.

19  Q   Again, pain in lower back, ten years.  Degree of pain 9; right?

20  A   Yes.

21      MR. GILLULY: 3-003.

22  Q   Questions regarding substance abuse not answered.  Would you agree

23  that would be something that's important to ask the patient?

24  A   It's on the protocol.  It should have been filled in.

25  Q   Yes, sir.

-906-

1          MR. GILLULY: 3-008.

2    Q    Patient treatment plan signed before seeing the doctor; correct?

3    A    Yes.

4          MR. GILLULY: 3-011.

5    Q    Blood pressure.  Is that high?

6    A    Yes.

7    Q    Do you see any indication where the doctor talks about the blood

8    pressure?

9    A    No.

10         MR. GILLULY: 3-012.

11   Q    Another POM MRI.

12   A    That is correct.

13   Q    Let's go to Kim Letner.  Same day.

14         MR. GILLULY: Number 4.

15   Q    Came from Florida the same day.

16         MR. GILLULY: And if you could go to 4-002.

17   Q    Complaint, lower back pain, 11 years.  Pain 8 or 9; is that correct?

18   A    Yes.

19         MR. GILLULY: 4-003.

20   Q    No indication regarding prior treatments; right?

21   A    (No audible response.)

22   Q    No questions answered regarding prior substance abuse; correct?

23   A    That is correct.

24   Q    No family history; correct?

25   A    That is correct, other than grandfather.

-907-

1          MR. GILLULY: 4-008.

2     Q    Opioid treatment plan signed before seeing the doctor; correct?

3     A    That is correct.

4          MR. GILLULY: 4-012.

5     Q    POM MRI.

6          MR. GILLULY: 4-011.

7     Q    Claimed taking Xanax; correct?  And oxys?

8     A    Yes.

9          MR. GILLULY: 4-014.

10    Q    Negative for all; correct?

11    A    Yes.

12         MR. GILLULY: 4-14.  4-013.

13    Q    Prescriptions for oxycodone.

14    A    Yes.

15         MR. GILLULY: Let's go to Number 5, please.  Actually let's go

16    to 5-002.

17    Q    David Letner.  Same last name as Kim Letner.  Same last name as Billy

18    Letner.  All from Florida the same day.

19         MR. GILLULY: If you would please go –

20         THE COURT:  – Mr. Gilluly, is there a question in here

21    somewhere?  You know, you're not asking him any questions.  You're just

22    going through documents and having them put documents up there.  The

23    purpose of the cross-examination is to ask him questions.  All of those

24    documents are in evidence.

25         MR. GILLULY: Yes, sir

-908-

1    THE COURT: You've been over them many times.

2    MR. GILLULY: Yes, sir, and these are the documents that he

3  relied on –

4    THE COURT:  – If you're going to do it, then ask him questions.

5  If you're not going to ask him any questions about them, there's no point in

6  us engaging in this exercise.

7    MR. GILLULY: Yes, sir, yes, sir.

8  Q    (By Mr. Gilluly) Does it appear where this gentleman is from, sir?

9  A    Yes, from Florida.

10  Q    Do you know how far away Davenport, Florida is to Garden City?

11  A    I don't know the exact mileage.

12    MR. GILLULY: Okay. 5-003.

13  Q    Doctor, will you tell us what the complaint was?

14  A    Again, low back pain for a duration of five years.

15  Q    What pain level?

16  A    Nine.

17    MR. GILLULY: If you would go to 5-004.

18  Q    Were there any alternative treatments noted?

19  A    None were documented.

20    MR. GILLULY: 5-004.

21  Q    Regarding family history, did he outline anything about his family

22  history, other than the fact that they were alive?

23  A    No.

24    MR. GILLULY: 5-009.

25  Q    Is this, again, a opioid therapy treatment plan that was signed prior to

-909-

1   seeing the doctor?

2   A    Yes.

3          MR. GILLULY: If you'll go to 5-003.  If you could highlight

4   what medicines he claimed he was taking.

5   Q    What medicines does he claim he's taking?

6   A    Oxycodone, he's using 240 tablets per month, 180 oxycodone; 60 of

7   Xanax.

8          MR. GILLULY: Okay, and if you could go to 5-020.

9   Q    And it shows positive for oxy; is that right?

10  A    That is correct.

11  Q    Do you remember if there were any drug tests that indicate whether he

12  tested positive for Xanax?

13  A    I didn't recall seeing any.

14  Q    Pardon me?

15  A    No, I didn't recall seeing any.

16         MR. GILLULY: If you'll go to 6-002, please.

17  Q    And what's the date there?

18  A    February 21, 2011.

19  Q    And what city and state did this patient claim to be –

20  A    – Kentucky, Frenchburg.

21         MR. GILLULY: If you'll go to 6-003.  And highlight what drugs

22  this patient claimed they were taking.

23  A    Xanax 2 milligrams, oxycodone 30 milligrams, oxycodone 15

24  milligrams, hydrocodone 10 milligrams, and sometimes muscle relaxers.

25         MR. GILLULY: If you'll go to 6-018, please.

-910-

1    Q    And these are the prescriptions that were issued; is that right?

2    A    Yes.

3    Q    Xanax and oxycodone 30s and 15s; is that correct?

4    A    Yes.

5              [NOTE: Mr. Gilluly confers with Mr. Knoche off the record.]

6              MR. GILLULY: If you'll go to 6-019.

7    Q    Shows positive for OxyContin; is that correct?

8    A    For oxy, yes.  Oxycodone.

9              MR. GILLULY: Yes. 6-020.

10   Q    Negative for all others?

11   A    Yes.

12             MR. GILLULY: Go to 6-013, please.

13   Q    Now, is that blood pressure normal?

14   A    It's elevated as well.

15   Q    Is there any mention in the chart of the doctor referencing the elevated

16   blood pressure?

17   A    No.

18             MR. GILLULY: If you would call up 6-014, please.

19   Q    MRI from the same clinic; correct?

20   A    Correct.

21   Q    Or POM MRI.

22   A    Yes.

23   Q    And I'm not going to do this with every patient, sir, but I do want to

24   point out that some of your testimony, would you agree with me, in direct

25   you said that the doctor was weaning patients off of Xanax, et cetera.  But it

-911-

1   is true that many of the patients who claimed they were taking Xanax were

2   negative in their drug screens.

3   A     Yes.

4   Q     Do you remember when you were reviewing these MRIs that there

5   were MRI centers – I mean, there's just the same ones over and over again.

6   Did you notice that?

7   A     Yes.

8            MR. GILLULY: If you'll go to – please, if you'll go to 10-003.

9   Q     And this document, again, there's no answer regarding previous

10  treatments; is that right, sir?

11  A     That is correct.

12  Q     And let's look at his MRI.

13           MR. GILLULY: 10-012.  And if you could highlight the top.

14  Q     That MRI, it appears to be Professional Diagnostic Reading; is that

15  correct?

16  A     That's correct.

17  Q     Can you read the date and time of this exam analysis.

18  A     It's November 2, 2010.

19  Q     At 10:59;correct?

20  A     Yes.

21           MR. GILLULY: Dean, if we could go to the next page.

22  Q     Can you please read for the jury when this MRI was reviewed by the

23  MRI person?

24  A     November 2, 2010, 10:57.

25  Q     So that would mean that the review came before the test.

-912-

1    A    Yes.

2         MR. GILLULY: 10-011.  If you could highlight the drugs that

3    this – go down a little bit.  Highlight the drugs this person claimed he got.

4    Q    Did he get oxy – claim he got oxy 30s, 15s and Xanax?

5    A    That is correct.

6         MR. GILLULY: If you'll go to 10-015.

7    Q    Negative drug result?

8    A    That is correct.

9         MR. GILLULY: 10-016.

10   Q    Negative drug result.

11        MR. GILLULY: 10-014.

12   Q    Prescriptions for oxycodone.  Would you agree that these negative

13   screens and this MRI are two more factors that are important to address

14   before putting a patient on an opioid treatment plan.

15   A    I think the MRI, the first thing is, is to kind of – you might miss that,

16   even as a doc, that when the read was done was off.  So if you did pick it up

17   – hopefully you did – you'd probably have to call over to the MRI center

18   and find out if they didn't send you – if this is real, if it's not, and

19   investigate.

20   Q    Do you see anything in the record regarding any investigation or

21   request for medical records regarding this individual?

22   A    We don't know if it was caught.  I don't know if they caught it, if they

23   didn't.  We don't know – we don't know the clear story on that.  It would be

24   nice to, but don't.  But certainly if I did see it or – you know, it would be

25   something that you'd definitely want to look into for sure, as you point out.

-913-

1    But once again, we have to have that we caught it.

2         With respect to the negative urine toxicologies that patients can have,

3    once again, you'd want to have that pre-test time.  When did they last take

4    their medications.  That would cinch the story for me.  Because then that

5    would give me an idea of, number one, were they being truthful to me; and

6    number two is, when were they last prescribed.  You need this information.

7    In the absence of that, I can't draw conclusions.  If we did have that

8    documented, say they last took it a week ago and it was negative, good, we

9    expect it to be negative.  But if they took it 24 hours ago and it's negative,

10   well, then, there might – there's issues with being truthful with your

11   physician.  So –

12   Q    – But you didn't see any notes in the file where Dr. Azmat even asked

13   the questions about those issues to the patients.

14   A    We have no documentation that we can – to my knowledge.

15        MR. GILLULY: If we could go to 21-017.

16   Q    This MRI, same place, I believe, does it have a referring doctor

17   mentioned?

18   A    It says, NPP.  I'm not sure if that's a nurse practitioner or who that

19   would be or ...

20   Q    It certainly could be no one referred this person to get an MRI; would

21   you agree?

22   A    That'd be quite a task to pull off, but I guess, yes.

23   Q    Sure.  It might be quite a task to pull off by someone who's seeking

24   drugs and knows that he needed an MRI within two years to get the drugs;

25   would you agree?

-914-

1    A    If that's a criterion used in that clinic.  Anything – yes, it is possible.

2    Q    And Doctor, you were paid to testify.  Was there an hourly rate?

3    A    Yes.

4    Q    In fact $700 an hour?

5    A    Yes.

6    Q    And you have also had a retainer of, what, $10,000?

7    A    Yes.

8    Q    Would your opinion change regarding Dr. Azmat if you learned that he

9    was paid cash at the end of each day?

10   A    No.  I mean, it's – once again, if it's a – I don't know the situations of

11   the cash payment.

12   Q    Okay.  Would your opinion change regarding Dr. Azmat if you learned

13   that patients were being solicited from other pill mills, and he knew that.

14   A    It's once again, I don't know the nature of the solicitation, I don't have

15   any details of that so ...

16   Q    Well, hypothetically, if there was evidence that Dr. Azmat knew

17   patients were being singled out and marketed from other pill mills –

18              MR. WITHERS:  – Objection, Your Honor.  I don't think that's

19   an accurate summary with respect to what the testimony is, and it's not a

20   proper question asking to comment about what a witness would say.

21              MR. GILLULY: Certainly I'm asking a hypo –

22              THE COURT:  – I'm not sure where the evidence was that Dr.

23   Azmat knew about the marketing.  The testimony of all these people that

24   were doing all this marketing was that he was never there, and he never

25   attended any meetings, and he wasn't present with any of them when this

-915-

1    happened.

2              MR. GILLULY: Judge, there was testimony from Dan Wise

3    yesterday that indicated he had conversations with Dr. Azmat regarding

4    marketing practices.

5              MR. WITHERS: Your Honor, that is just a misrepresentation of

6    what Mr. Wise's testimony was about.  Mr. Wise talked about saying, I'm

7    headed out to do marketing when he was here in Savannah for the week

8    and a half that he worked with Dr. Azmat, and not –

9              THE COURT:  – He didn't say what that was.  He didn't say that

10   he had any discussions with Dr. Azmat about what they were doing or how

11   they were doing it, Mr. Gilluly.  So the questions need to be based upon –

12   even a hypothetical needs to be based upon some fact that's in evidence.

13             MR. GILLULY: Okay.  May I proceed?

14             THE COURT: Yes, sir.

15   Q    (By Mr. Gilluly) Doctor, would your opinion change if you learned that

16   Dr. Azmat knew that sponsors were bringing loads of people to get

17   prescriptions for oxycodone?

18             MR. WITHERS: I object.  I don't think that's a fair

19   characterization either, Your Honor.

20             MR. GILLULY: And I'd submit it was, Judge.  Dan Wise again,

21   and we can –

22             THE COURT:  – Well, you add too much to the question.

23   Would it change if Dr. Azmat knew that people who were not patients were

24   bringing patients to the clinic.  That's what some of the testimony was.

25   There's no testimony that these people were ever referred to him as

-916-

1    sponsors, that they were ever introduced to him as sponsors.  So just make

2    it conform to the facts in evidence.

3              MR. GILLULY: Yes, Your Honor.

4    Q    (By Mr. Gilluly) Would it change your opinion, sir, if you knew that

5    people who were not patients were bringing customers to the clinic to see

6    Dr. Azmat?

7    A    So if I can understand that, it is that non-patients were bringing

8    patients who have pain, or recommending that patients who have pain seek

9    out Dr. Azmat.  I'm just trying to understand the ...

10   Q    Non-patients who were repeatedly bringing customers to see Dr.

11   Azmat for prescriptions.

12   A    I'm not so sure about the term customers.  Are they people with

13   ailments?  I mean, once again, if they are people with – it would change my

14   opinion if they were people who did not have ailments at all, and had no

15   documentation of any kind, then yes.  But as long as – if people were

16   brought and then they were appropriately worked up and found to have

17   problems, and he treated those patients, then we've got to be okay with

18   that.

19   Q    Does it change your – would it change your opinion if you knew that

20   every patient in the charts that you reviewed had the same patient plan for

21   opioid treatment?

22   A    They all were treated with opioids.

23   Q    And that the treatment plans were decided after the patient paid cash,

24   but before they ever saw the doctor?  Would that change your opinion?

25   A    No, the patient – well, whether you pay cash or insurance pays for it,

-917-

1    they pay it at the door.  So it's the same thing.  We already know that – I

2    suspect, and I don't know for sure, that given these patients' backgrounds,

3    the ones that I reviewed, a lot of them probably didn't even have insurance.

4    So what happens with a lot of these folks is, you just – you just have a

5    problem, and you pay for it because insurance just costs so much money.

6    Q    Is there evidence in the files related to insurance?

7    A    I can't find anything.  I'm not – I didn't find anything about the cash

8    dollar they paid or the insurance – versus insurance.

9                    MR. GILLULY: If I may have a second, Judge.

10                   [NOTE: Mr. Gilluly confers with Mr. Knoche off the record.]

11                   MR. GILLULY: That's all I have, Judge.

12                   THE COURT: Anything else of this witness, Mr. Withers?

13                   MR. WITHERS: Just one thing.

14                   <u>REDIRECT EXAMINATION BY</u>

15   <u>MR. WITHERS:</u>

16   Q    Dr. Simopoulos, you have agreed to cap your compensation in this

17   case.

18   A    That is correct.

19   Q    And that cap was $10,000 for the pretrial review; right?

20   A    Yes.

21   Q    And fourteen hundred dollars for coming here to testify.

22   A    Yes, that's correct.

23   Q    You spent an awful lot more time and effort than you anticipated when

24   we started this venture.

25   A    As what usually happens with cases, that's true.

-918-

1        MR. WITHERS: Doctor, thank you for coming here.

2        WITNESS: You're welcome.

3        MR. WITHERS: Nothing further, Your Honor.

4        THE COURT: Can this witness be excused?

5        MR. WITHERS: I would ask that he be thanked and excused,

6    Your Honor.

7        THE COURT: Any questions?

8        MR. GILLULY: No further questions.

9        THE COURT: All right, Doctor, you're excused.  You may come

10    down.

11        [Witness Excused]

12        MR. WITHERS: Your Honor, with that, the defense would rest.

13    Subject to tendering my exhibits.

14        THE COURT: Members of the jury, let me ask you to step out in

15    the jury room a minute, please.

16        [NOTE: The jury is excused to the jury room.  The proceedings

17    are continued outside of the presence of the jury as follows:]

18        THE COURT: Does the government wish to call any rebuttal

19    witnesses, Mr. Knoche?

20        MR. KNOCHE: No, Your Honor.

21        THE COURT: Does the government close its case?

22        MR. KNOCHE: Yes, Your Honor.

23        THE COURT: Do you want to check on your exhibits, Mr.

24    Withers?

25        MR. WITHERS: Yes, Your Honor.

-919-

1    [NOTE: Counsel confer with Clerk off the record.]

2    MR. KNOCHE: Judge, I am going to object to these exhibits.

3    THE COURT: Tell me what your objection is.

4    MR. KNOCHE: Your Honor, the government's objection is that,

5    number one, the documents are hearsay.  These are the expert reports

6    which were turned over to counsel in the discovery process.  I mean, they're

7    not inconsistent with what Dr. Kennedy's testimony was.  There's no

8    foundation that's been laid for their admissibility, so they're hearsay.  And

9    the documents have been annotated in several places by counsel, which is –

10   MR. WITHERS:  – Your Honor, I'll make it easy for everybody.

11   I don't need these in.

12   THE COURT: Okay, so they're withdrawn?

13   MR. WITHERS: They're withdrawn.  But we do have a certain

14   number that Ms. Bodaford has.

15   CLERK: Those you've asked to be admitted.

16   MR. KNOCHE: I don't think we had any objection to these.

17   THE COURT: What are those numbers?

18   CLERK: They're numbers 171, 178 – do you want to see them?

19   THE COURT: No, just let's get them for the record.

20   CLERK: 213 and 261.

21   THE COURT: Any objections to those, Mr. Knoche?

22   MR. KNOCHE: No, Your Honor.  Those four exhibits, no.

23   THE COURT: All right, those documents are admitted without

24   objection.

25   MR. KNOCHE: These exhibits are in evidence, but I hope we'll

-920-

1    not have an objection to counsel – they've been admitted as part of the

2    government's evidence, so I guess I have no –

3              THE COURT:  – Well, he may want them in there with his

4    exhibit number on them.

5              MR. WITHERS: Yes –

6              MR. KNOCHE:  – No objection.

7              THE COURT: The government's are voluminous, as you know.

8              MR. KNOCHE: Yes, sir, no objection.

9              MR. WITHERS: Do you want me to run through the numbers?

10             THE COURT: I want you to go through the numbers.

11             MR. WITHERS: Defendants 27, 31, 32, 36, 41, 61, 78, 79, 85, 91,

12   107, 140, 144, 146, 255, 72, 43, 53, 24, 11, and 25.

13             THE COURT: Those are admitted without objection.  All right,

14   are you satisfied, Mr. Knoche, that the government's documents have been

15   identified and are in the record?

16             MR. KNOCHE: Yes, Your Honor.

17             THE COURT: Are you satisfied, Mr. Withers, that the

18   defendant's exhibits have been identified and are in the record?

19             MR. WITHERS: I am, Your Honor.

20             THE COURT: Let me ask you about one matter concerning the

21   indictment.  Because this is – the first count of the indictment against the

22   doctor is a conspiracy count, I see no reason to redact anything from the

23   indictment before it goes to the jury, with the possible exception of Count

24   51, the distribution of controlled substance by Daniel Wise, which is not

25   anything that's been a part of this case in any way.  So I assume that we

-921-

1    would just make a copy of that page of the indictment where that Count 51

2    is taken out of there, and rest of the indictment would then go to the jury.

3                   MR. WITHERS: I think that's accurate, Your Honor, with the

4    exception of the forfeiture allegation.

5                   MR. KNOCHE: That's right, I agree with that.

6                   THE COURT: We're keeping all the forfeiture stuff out, but as

7    we've said at side bar, in the event of guilty verdict in this case, then we'll

8    deal with that again at a later time with this jury.  So we will take out

9    everything – we would take out Page 20 of the indictment, Page 21 of the

10   indictment, Page 22 of the indictment.  We would leave in Page 23, which is

11   the true bill of the grand jury signed by the grand jury foreman, but we

12   would take out count 51, which is on Page 15.  We agree with that?

13                  MR. WITHERS: Yes, Your Honor.

14                  MR. KNOCHE: Yes, Your Honor.

15                  THE COURT: This seems to be the original indictment.  Do you

16   have the original, or is this one you gave me the original?

17                  CLERK: I should have the original in the file here.

18                  THE COURT: Let me see it.

19                  [NOTE: Indictment tendered to the Court.]

20                  THE COURT: Ask my secretary to come in here, please.

21                  [NOTE: Court instructs secretary regarding redactions of the

22   indictment.]

23                  THE COURT: While she's doing that, how much time are you

24   requesting in your closing arguments – in both arguments, Mr. Knoche?

25                  MR. KNOCHE: Your Honor, we would like to split our time, so

-922-

1    the government would like an hour.

2              THE COURT: And you want to split it between you and – how

3    much you want on the front end, and how much do you want on the back

4    end?

5              MR. KNOCHE: I'll take up to 35 on the ...

6              THE COURT: So you want 35, and then the rest you want –

7              MR. KNOCHE: For rebuttal.

8              THE COURT:  – on the back end, okay.  How much time are

9    you requesting, Mr. Withers?

10             MR. WITHERS: Your Honor, I would think about 50-55

11   minutes.

12             THE COURT: So in effect the government's requesting 60

13   minutes, and you're requesting 55 minutes.

14             MR. WITHERS: Yes, sir, Your Honor.

15             THE COURT: So I'll give each of you 60 minutes, and then the

16   government can split theirs up 35 minutes-25 minutes, is that agreeable?

17             MR. KNOCHE: Yes, sir.

18             THE COURT: Now, I need to discuss the final charges with you.

19   Y'all can have a seat.

20             Look at the second draft where the defendant does not testify.

21             MR. KNOCHE: Could you give me just a moment?

22             THE COURT: Yes, sir.

23        [Pause]

24             MR. KNOCHE: Judge, it's been misplaced in the jumble on my

25   table, I regret to say.

-923-

1      THE COURT: Do you have another one of those, other than the

2  one I have?

3      LAW CLERK: I can run get one.

4      THE COURT: While he's getting that for you, Ms. Bodaford, I

5  want you to substitute this Page 15, and I want you to take out the forfeiture

6  beginning on Page 20, but leave in the last page.  So if you'll do that at your

7  desk right now for me so everybody can then look at it and make sure it's

8  okay.

9      CLERK: Yes, sir.

10     [Pause]

11     THE COURT: Y'all come up and look at what we've done and

12  make sure you're satisfied, please.

13     [NOTE: Counsel confer with Clerk regarding redacted

14  indictment.]

15     MR. KNOCHE: Looks correct to the government, Your Honor.

16     MR. WITHERS: Same with defense, Your Honor.

17     THE COURT: All right, that's the one that will go back to the

18  jury.

19     CLERK: Yes, sir.

20     [NOTE: Law Clerk brings in a copy of draft charge for Mr.

21  Knoche.]

22     THE COURT: All right, if you'll look at the  – on Page 5 of the

23  second draft where it starts – and of course we understand that the final

24  draft that the highlights of every paragraph will be taken out.  Like where it

25  says Basic 6.2, that sort of stuff, that will be taken out.  But if you'll look at

-924-

1    Page 5, it says [reading]: For example, a witness may testify about events

2    that occurred during the time when the witness was on addictive drugs and

3    may have an impaired memory.

4               I don't recall any testimony about that, and I don't recall any

5    testimony about paid informants.  We talked about all the various deals,

6    and especially deals that had taken place in Florida.  I can't remember

7    whether any of these witnesses testified that they had been promised

8    immunity from prosecution.  I think some of them testified that offenses

9    that took place that they had not been prosecuted for, but I don't recall any

10   testimony about any witness – or from any witness that said that they'd

11   been promised immunity from prosecution, and you can correct me if I'm

12   wrong.

13               MR. WITHERS: I think you're accurate.

14               MR. KNOCHE: Agreed.

15               THE COURT: So that paragraph – or that statement where it

16   says [reading]: Witness who had been promised immunity or witness who

17   had hoped to gain more favorable treatment in their own case may have a

18   reason to make a statement in order to strike a good bargain – I think that

19   we should leave in, Witness who hoped to gain more favorable treatment,

20   but the remainder of that about informants or promises of immunity, or

21   about addicted to drugs, should come out.  Do we agree with that?

22               MR. KNOCHE: Government agrees.

23               MR. WITHERS: Your Honor, just with respect to the addictive

24   drug issue, I think that some of those patients that testified did testify that

25   they were under the influence of opioids.  I don't know about the – well, I

-925-

1    guess that would qualify as an addictive drug, and so I would ask that that

2    remain in there.

3              THE COURT: Well, I think a couple of the women on cross-

4    examination, maybe one of the men, may have said that they were – well,

5    in their opinion they said they were addicted, a couple of women, so I guess

6    I need to stand corrected about that.  So I guess that would need to stay in

7    where it says [reading]: For example, a witness may testify about events

8    that occurred during a time when the witness was using addictive drugs

9    and so they may have an impaired memory.  I guess that should stay in, but

10   the part about informants, witnesses who have been promised immunity

11   from prosecution should come out.  We agree with that?

12             MR. KNOCHE: Yes, sir.

13             MR. WITHERS: Yes, sir.

14             THE COURT: Let me ask you about the bottom of Page 6 about

15   a confession or statement of a single defendant after being arrested or

16   detained.  I don't recall any evidence in this case that a statement was made

17   by anyone after they had been arrested or detained.  Some of these people

18   were interviewed and they made statements, but I don't recall anything

19   about being arrested or detained.

20             MR. KNOCHE: No, Your Honor.  There was evidence that Dr.

21   Azmat had made a statement to Sikes, but he had not been arrested at that

22   time –

23             THE COURT:  – He went over to his house and interviewed him

24   –

25             MR. KNOCHE: That's correct.

-926-

1          THE COURT:  – as I understand.

2          MR. KNOCHE: Yes, sir.

3          THE COURT: So that should come out on the bottom of Page 6.

4    And then up at the top of Page 7, which refers to that, that should come out.

5    Identification testimony, as silly as it sounds, that's still the pattern charge

6    and needs to stay in.

7          On Page 8, summaries and other materials not admitted into

8    evidence, that should come out because the only summary is the bottom

9    one about summaries that were admitted into evidence.  Do we agree on

10   that?

11         MR. KNOCHE: Yes, summaries were admitted so that would be

12   correct.

13         THE COURT: Right.

14         MR. WITHERS: Yes, Your Honor.

15         THE COURT: So that would stay in.  I don't recall any similar

16   acts evidence that a defendant – that Dr. Azmat was charged with any

17   similar act in this case.  That deals with a defendant not with – I mean,

18   some of the people with plea agreements and some of the government

19   witnesses testified about similar acts that they were involved in, but they're

20   not defendants in this case at this time, and so I don't see where that

21   similar acts should come in.  Do you agree with that?

22         MR. KNOCHE: Yes, sir.

23         MR. WITHERS: Agreed.

24         THE COURT: So that Special 4 regarding similar acts will come

25   out.  The rest of 9 will stay in.  Looks like all of Page 10 will stay in.  All of

-927-

1    Page 11 will stay in.  All of 12 would stay in.  All of 13 would stay in.  On

2    Page 14, the money laundering would stay in.  All of 15 would stay in.  All of

3    16 would stay in.  All of 17 would stay in.  All of 18 would stay in.  There was

4    no character evidence offered in this case, so Special 12 on Page 19 would

5    come out.  We agree on that?

6                    MR. KNOCHE: Yes, Your Honor.

7                    MR. WITHERS: Yes, Your Honor.

8                    THE COURT: The good faith instruction would stay in.  All of

9    20 would stay in.  All of 21 would stay in.  All of 22 would stay in.  All of 23

10   would stay in.  What page is the instruction on about the defendant not

11   testifying?  Mr. Lake?

12                   LAW CLERK: I believe that's 2 Basic ...

13                   MR. KNOCHE: I think it's the first page.  Is it the first page?

14                   MR. WITHERS: Judge, at the top of Page 2, first full paragraph.

15                   THE COURT: Okay, I just want to make sure I look at that.  All

16   right, I'm satisfied with that.

17                   All right, well then, do we agree with what I've stated about

18   what comes out?

19                   MR. KNOCHE: Yes, sir.

20                   MR. WITHERS: Yes, sir.

21                   THE COURT: Okay.  Now, it is quarter to 5:00.  It would be

22   cruel and unusual punishment for me to keep this jury here for two hours

23   of arguments tonight.  Do we agree with that?

24                   MR. KNOCHE: Yes, sir.

25                   MR. WITHERS: Yes, sir.

-928-

1          THE COURT: And I know the lawyers certainly don't want to

2    have overnight to prepare their arguments, that you'd rather do them right

3    away, but I'm not going to listen to you in that regard.  I'm going to go

4    ahead and send this jury home for the evening.  So when we come back,

5    we'll come back in the morning at nine.  We'll do the arguments.  That'll

6    take us up to approximately eleven o'clock.  It will probably take 20

7    minutes to charge the jury.  That will take us up to probably 11:30 or

8    thereabouts.  I intend to have the Marshal's Service bring lunch in, not to

9    send them out for lunch, but have the Marshal's Service order lunch, and to

10   have them deliberate through lunch.

11          So that's the intended schedule tomorrow.  Do you have any

12   problem with that, Mr. Knoche?

13          MR. KNOCHE: None, Your Honor.

14          THE COURT: Any problem with that, Mr. Withers?

15          MR. WITHERS: No, Your Honor.

16          THE COURT: All right, I'm going to bring the jury back in and

17   I'm going to discharge them for the evening, and then I'll talk to you after

18   they leave.

19          All right, bring the jury back in, please.

20          [NOTE: The jury is seated in the jury box.  The proceedings are

21   continued as follows:]

22          THE COURT: Members of the jury, we've reached the point in

23   this case where both the government and the defendant have closed their

24   case.  That means we're through with the evidence in this case.  What

25   remains to be done is the closing argument of counsel for the government

-929-

1    and counsel for the defendant, and for me to then give you your final

2    instructions on the law in this case.  So I'm not going to keep you here

3    tonight for several hours while we do that.  I'm going to send you home for

4    the evening in just a few minutes.

5           We will begin promptly at nine o'clock in the morning with

6    these arguments, and you have been very diligent.  Every jury isn't as

7    diligent as you have been.  You've been here on time every morning, you've

8    come back from your lunch break on time every day, and so now you need

9    to do that one more time.  You need to be sure that you get here in order for

10   us to be able to begin promptly at nine o'clock in the morning.

11          Now, at this stage of the case, the case is not over with.  You

12   haven't heard the arguments of counsel, and you haven't heard my

13   instructions to you about the rules of law that you should apply.  So don't

14   begin now to start forming any opinions.  Leave your mind open until the

15   very end.  It's very important now that you not discuss this case with

16   anyone – not among yourselves, not any family members or friends when

17   you go home.

18          And again, I hate to sound like a parrot, but don't attempt to

19   learn anything about this case from any source whatsoever.  If anything

20   should appear in the media, don't read it, don't watch it, don't look at it.

21   Don't look in any dictionaries or encyclopedias.  Don't research things on

22   the computer.  Don't get on your smartphones or anything else and try to

23   communicate with anybody in any way about this case, or learn anything

24   that you think might be – or try to learn anything that you think might be

25   helpful to you.  Because, as I've told you so many times, to do so would be a

-930-

1    violation of your oath.  It would subject you being held in contempt of

2    court, it would end up with a mistrial, and it would end up with this effort

3    having to be done all over again.  And I'm sure none of us want those things

4    to happen.

5              So leave your notepads and pencils here.  When you come in in

6    the morning there will be some refreshments for you.  And again just try to

7    go home and forget about this and don't think about this case until you

8    start driving in to the courthouse in the morning.

9              So with those instructions you're excused for the evening.

10             [NOTE: The jury is excused for the day.  The proceedings are

11   continued outside of the presence of the jury as follows:]

12             THE COURT: You know what the charge is going to be now,

13   counsel, and we'll be working on cleaning them up and getting them in the

14   final form tonight.  And when you come in in the morning, those charges

15   will be on your desks before you begin your closing argument, but you

16   already know what's going to be in there.

17             Anything else that we need to discuss before we adjourn for the

18   evening, Mr. Knoche?

19             MR. KNOCHE: Nothing from the government, Your Honor.

20             MR. WITHERS: If I can just step ...

21             [NOTE: Mr. Withers and Mr. Knoche confer off the record.]

22             MR. WITHERS: Your Honor, two things.  One, I'm not certain

23   it's necessary, but if the Court would permit me to renew and adopt by

24   reference the arguments I made on the Rule 29 motion for verdict of

25   acquittal, I would do so now.

-931-

1    THE COURT: Right.  And I remind you as an old federal

2    prosecutor that that is now called motion for judgment as a matter of law.

3    Motions for acquittal still take place in state court, but motions for

4    judgment as a matter of law take place over here.

5    MR. WITHERS: And secondly, Your Honor, I'm not sure what

6    the Court's practice is, but Dr. Azmat is prepared to waive on the record his

7    right to testify, and I didn't know whether the Court wanted to address that

8    or not.

9    THE COURT: Yes, I do want to address that with him.  Dr.

10   Azmat, you've heard your counsel, Mr. Withers', statement that it is your

11   desire not to testify in this case.  Is that correct?

12   DR. AZMAT: That is correct, Your Honor.

13   THE COURT: Do you understand that even if your counsel

14   advises you otherwise, that you still have an absolute right to testify on your

15   behalf if you wish to do so.

16   DR. AZMAT: Yes, Your Honor, I've been informed of that.

17   THE COURT: And it is your desire not to testify in this case.

18   DR. AZMAT: That is correct, Your Honor.

19   THE COURT: All right, sir, thank you.  All right, anything else,

20   Mr. Withers?

21   MR. WITHERS: No, Your Honor.

22   THE COURT: We will adjourn, then, until nine o'clock in the

23   morning.

24   [NOTE: Whereupon the proceedings are adjourned.]

-932-

STATE OF GEORGIA

CHATHAM COUNTY.

CERTIFICATE OF REPORTER

I, Marie Cowart, do hereby certify that the above and foregoing pages of typewritten material is a true, correct and complete transcript of the evidence and proceedings adduced in the Jury Trial stated in the captioned matter, this being Volume 4 of Volumes 1A, and 1 through 5.

This 18th day of September, 2014.

/s/ *Marie Cowart*

Marie Cowart, CCR B-237
United States Court Reporter
Southern District of Georgia
Savannah Division

P. O. Box 9572
Savannah, GA 31412
(912) 650- 4066