IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF GEORGIA

SAVANNAH  DIVISION


UNITED STATES OF AMERICA    *

v.    *  CASE NUMBER CR413-28

NAJAM AZMAT    *

---

Transcript of Evidence and Proceedings Adduced in the Jury Trial held

January 13-17, 2014 before The HONORABLE WILLIAM T. MOORE, JR.,

Judge Presiding, reported by Marie Cowart, Official Court Reporter.

---

VOLUME 5 - 1/17/2014

PP. 933 - 987

APPEARANCES:

For the Government          KARL I. KNOCHE, AUSA
                  GREGORY E. GILLULY, JR., AUSA

For the Defendant          THOMAS A. WITHERS, ESQ.

*Proceedings recorded by shorthand with back-up recording; transcript produced from note reading in conjunction with transcription of back−up recording.*

<u>I N D E X</u>

<u>VOLUME 1A - 1/13/2014</u>

(*Voir Dire* and Jury Selection)

<u>PP. 1 - 56</u>

PRELIMINARIES AND INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . .  13

JURY PANEL SEATED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

*VOIR DIRE* EXAMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

      Juror Biographicals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

SILENT STRIKING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  54

JURY SEATED AND SWORN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  55

CERTIFICATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  56

<u>VOLUME 1 - 1/13/2014</u>

<u>PP. 57 - 201</u>

PRELIMINARIES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  57

COURT'S RULINGS ON EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  58

OPENING STATEMENTS

    By Mr. Knoche  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  62

    By Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  74

Government's Presentation of Evidence

MARY KAY ROSS

    Direct Examination by Mr. Knoche  . . . . . . . . . . . . . . . . . . . . . . . . . .  82

    Cross-Examination by Mr. Withers  . . . . . . . . . . . . . . . . . . . . . . . . . .  90

    Redirect Examination by Mr. Knoche  . . . . . . . . . . . . . . . . . . . . . . . .  93

    Recross Examination by Mr. Withers  . . . . . . . . . . . . . . . . . . . . . . . .  94

DAVID HATMAKER

    Direct Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . . .  95

    Cross-Examination by Mr. Withers  . . . . . . . . . . . . . . . . . . . . . . . . .  103

    Redirect Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . .  107

CHARLES SIKES

Direct Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . . . 107

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . . 150

Redirect Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . .  181

Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . 188


CHARGE CONFERENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193


CERTIFICATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201

VOLUME 2 - 1/14/2014

PP. 202 - 456

PRELIMINARIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202


ADELARD LeFRANCOIS

Direct Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . . 202

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . .  251

Redirect Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . 277

Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . 284


FRANCIS J. BARBUSCIA

Direct Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . . 286

Cross Examination by Mr. Withers ......................... 301

Redirect Examination by Mr. Gilluly ..................... 310

Recross Examination by Mr. Withers ....................... 311


NANCY BINION

Direct Examination by Mr. Knoche ......................... 312

Cross Examination by Mr. Withers ......................... 329

Redirect Examination by Mr. Knoche ....................... 333


PATRICIA ROHRER

Direct Examination by Mr. Knoche ......................... 334

Cross-Examination by Mr. Withers ......................... 344

Redirect Examination by Mr. Knoche ....................... 350

Recross Examination by Mr. Withers ....................... 351


KONSTANTINO AFTHINOS

Direct Examination by Mr. Gilluly ........................ 352

Cross-Examination by Mr. Withers ......................... 369

Redirect Examination by Mr. Gilluly ..................... 378

Recross Examination by Mr. Withers ....................... 381

SEAN CLARK

Direct Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 383

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . . . . 392

Redirect Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . 401

Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 402


JOSEPH TRAVIS BRADLEY

Direct Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 403

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . . . . 415

Redirect Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . 431


LATINA SIMPSON

Direct Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . . . . 434

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . . . . 445

Redirect Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . 452


CERTIFICATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 456


VOLUME 3 - 1/15/2014

PP. 457 - 734

PRELIMINARIES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  457


GERALD SMITH

   Direct Examination by Mr. Knoche  . . . . . . . . . . . . . . . . . . . . . . . . .  457

   Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . .  469


JAMES GABLE

   Direct Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . . 480

   Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . . 488

   Redirect Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . 494

   Recross Examination by Mr. Withers  . . . . . . . . . . . . . . . . . . . . . . . 496


BILL LETNER

   Direct Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . . 496

   Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . . 507

   Redirect Examination by Mr. Gilluly  . . . . . . . . . . . . . . . . . . . . . . . . 512

   Recross Examination by Mr. Withers  . . . . . . . . . . . . . . . . . . . . . . . 513


KIMBERLY LETNER

   Direct Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . . 516

   Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . . 524

Redirect Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . 534

Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 537


KEN GOSSETT

Direct Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . 537

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 546

Redirect Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . 563

Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 567


DANIEL WISE

Direct Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . 569

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 586

Redirect Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . 605

Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 608


MICHAEL PALMER

Direct Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . 609


GENE SCOTT KENNEDY, M.D.

Direct Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . 611

Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . 673

COURT'S INSTRUCTION TO COUNSEL . . . . . . . . . . . . . . . . . . . . . . . . . . . 726

COURT'S INSTRUCTION TO DR. KENNEDY . . . . . . . . . . . . . . . . . . . . . . 728

COURT'S RULING ON APPROPRIATE STANDARD
       FOR GOOD-FAITH DEFENSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 728

CERTIFICATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 734

<u>VOLUME 4 - 1/16/2014</u>

<u>PP. 735 - 932</u>

PRELIMINARIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 735

GENE SCOTT KENNEDY, M.D.

     Continued Cross-Examination by Mr. Withers . . . . . . . . . . . . . . . . 735

     Redirect Examination by Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . 761

     Recross Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . 775

COURT'S RULINGS ON EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 777

GOVERNMENT RESTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 777

DEFENSE RULE 29 MOTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 778

RESPONSE OF GOVERNMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 780

COURT DEFERS RULING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 780

Defendant's Presentation of Evidence

THOMAS SIMOPOULOS, M.D.

     Direct Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . . 783

     Cross-Examination by Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . 859

     Redirect Examination by Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . 917

DEFENSE RESTS AND CLOSES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 918

COURT'S RULINGS ON EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . 919

CHARGE CONFERENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 922

DEFENSE RENEWS RULE 29 MOTION . . . . . . . . . . . . . . . . . . . . . . . . 930

DEFENDANT WAIVES RIGHT TO TESTIFY . . . . . . . . . . . . . . . . . . . . . . . 931

CERTIFICATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 932

VOLUME 5 - 1/17/2014

PP. 933 - 987

PRELIMINARIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 933

CLOSING ARGUMENTS

By Mr. Knoche . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 933

By Mr. Withers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 946

REBUTTAL ARGUMENT

By Mr. Gilluly . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 964

COURT'S RULING ON DEFENSE RULE 29 MOTION . . . . . . . . . . . . . . 973

DEFENSE EXCEPTIONS TO CHARGE . . . . . . . . . . . . . . . . . . . . . . . . . 975

JURY QUESTIONS 1 AND 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 976

-12-

RECEIPT OF VERDICT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 977

JURY POLLED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 980

POST-CONVICTION RIGHTS ADVISED . . . . . . . . . . . . . . . . . . . . . . . . . . 980

JURY INSTRUCTED REGARDING FORFEITURE . . . . . . . . . . . . . . . . . 982

DETENTION  HEARING  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 982

COURT'S RULING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 986

CERTIFICATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 987

-933-

1    [NOTE: Court is opened on 1/17/2014.  The proceedings are

2    continued in the presence of the jury as follows:]

3    THE COURT: Good morning, ladies and gentlemen.  I hope

4    that you members of the jury had a restful evening last night, and we're

5    ready to proceed.

6    You may begin, Mr. Knoche.

7    <u>CLOSING ARGUMENT BY</u>

8    <u>MR. KNOCHE</u>:

9    May it please the Court, ladies and gentlemen, for four days of

10   evidence, today the last stage of the presentation of the case is the

11   argument of counsel, then you will retire to deliberate, and this matter will

12   be in your hands.  And as you deliberate over this case, I suggest to you that

13   you always keep in mind, keep at the forefront, the big picture concerning

14   the East Health Center.  And there are several things I would like you to

15   remember.

16   Keep in mind the background and training of the individuals

17   who started and ran this clinic.  You heard from Mr. LeFrancois; you heard

18   from Mr. Sean Clark; you've heard from Dan Wise; you heard from Frankie

19   Barbuscia.  None of these individuals, any legitimate medical training or

20   experience.  Their background was, they had experience running pill mills

21   similar to the East Health Center down in south Florida.

22   Keep in the forefront of your minds the reasons why these

23   individuals chose to open East Health Center in Garden City, Georgia.

24   Keep in mind that it was – had the advantage of being at the

25   intersection of two major interstates; that the laws of Georgia were more

-934-

1    favorable to the operation of the clinic than the laws in Florida where they

2    had had their previous experience.

3                    Keep in mind how they marketed East Health Center.  You've

4    seen the posters that were used, and ask yourselves, is this how you find

5    your doctors.  Is that how you find a doctor?  They were not looking for

6    legitimate patients, they were looking for drug addicted patients.  They

7    were looking for the sort of patients that they had catered to and had

8    experience fleecing the money from,  pill addicted people from all over the

9    southeastern United States.  They had done that in Florida.  They intended

10   to do it here.  They had their signs.  They had their recruiters, and they

11   went after that client base so that on day one when East Health Center

12   opens, ready-made clientele.  Dr. Azmat must have thought that he'd come

13   to work at the Mayo Clinic.  I mean, people coming from all over the

14   country to see him?

15                   Keep in mind how the doctors, and Dr. Azmat in particular, was

16   recruited to come to East Health Center.

17                   Dean, put up 30-4.

18                   A Craigslist ad.  Now, you may have had – some of you may

19   have had experience with Craigslist.  Maybe you've looked for a used car on

20   Craigslist.  Maybe you've looked for used electronics.  I will bet that none of

21   you have looked for your doctor on Craigslist.  Salary, fifteen hundred

22   dollars-to-$2,000 per day, full or part-time.  We are going to specialize in

23   pain management.  Now, ask yourselves what kind of physician is perusing

24   Craigslist for his next job.  Pain management, weight loss, and

25   rejuvenation.   You can see how all those things go together, can't you?

1    The weight loss, the rejuvenation, the talk of primary care

2    facility, as you recall from Mr. LeFrancois, that was all to bundle into the

3    pain management, which was the real reason they were doing this was to

4    make it look legitimate.  Remember, people aren't going to travel from

5    Ohio, Kentucky and spend $300 for the privilege of seeing a doctor on top

6    of the expense of traveling to get into a weight loss program.  Not going to

7    happen.  And that's not why they opened East Health Center.

8    30-4-2.

9    Now, looking for MDs or DOs, do not have to be board certified

10   in pain management.  Once again, we're going to specialize in pain

11   management, weight loss, and rejuvenation.  Those are the ads which

12   enticed Dr. Azmat; and may I suggest, he wasn't enticed by the notion of

13   doing pain management, weight loss, and rejuvenation. That's not what

14   enticed him.  It's the other part of that Craigslist ad.  It's the fifteen

15   hundred dollars to $2,000 per day.  That's what enticed him.

16   Keep in mind how Dr. Azmat was paid at East Health Center.

17   He was paid in cash at the end of the day.  When he was paid by check,

18   which Mr. Wise testified happened from time to time, he was not happy

19   with that.  He wanted his cash.  Ask yourselves, is that the usual, ordinary

20   course of a professional practice.  Doc gets paid with the cash proceeds that

21   the patients are paying at the end of each day.  Is that usual?  The

22   government will suggest, that is not usual.

23   Keep in mind the rules and regulations of the East Health

24   Center.  Have you ever gone to your doctor's office and –

25   MR. WITHERS:  – Your Honor, objection.  Mr. Knoche – and I

-936-

1    apologize for interrupting the closing – but continues to violate the golden

2    rule by talking about the individual jurors' experience.  That is completely

3    improper in closing argument.

4            THE COURT: Go ahead, Mr. Knoche.

5            MR. KNOCHE: And you must – your decisions must be

6    informed by your common sense, so don't leave your common sense in the

7    jury box when you retire to deliberate this matter.  The government doesn't

8    want that.  The government suggests your decision would be a better one if

9    you take your common sense and experience into the deliberation room.

10           Keep in mind the rules and regulations of the clinic.  Do not

11   congregate.  Do not smoke, and if you're going to smoke, smoke out back.

12   Watch how you park your car, and particularly if you have out-of-state

13   license plates, don't let that be visible to passersby.  Park with the license

14   plate so that it's concealed, because we don't want to draw attention to our

15   clinic.

16           Keep in mind where the customers – and, you know, we can call

17   them patients or customers, but this is – these are customers.  They are

18   coming not for legitimate medical treatment.  They're coming for one

19   reason, they're coming to get their prescriptions for oxycodone and Xanax

20   and Percocets.  Keep in mind where they came from.  Keep in mind how

21   much of their time, money and lives were wasted chasing drugs to fuel their

22   drug addictions.

23           31-1.

24           This chart has been admitted into evidence.  This is a profile of

25   patients by state for all of the patients of Dr. Azmat.  And you can see that

-937-

1    the majority of those patients who presented at East Health Center were

2    from outside of the state of Georgia.  In fact, 31-7 gives you another nice

3    graphic view of where these patients came from.  We have patients from

4    Ohio, 14 from Ohio, coming to humble East Health Center in Garden City,

5    Georgia.  Ask yourselves why.  Forty-eight patients from the

6    Commonwealth of Kentucky.  May I suggest that after hearing the evidence

7    in this case, from now on when you are traversing the interstate highways,

8    such as 95, and see Kentucky license plates, you may have some

9    recollection of your experience in this case.

10             Thirty-six patients from the state of Florida.  Dr. Simopoulos

11    was asked yesterday, surely there must be pain management clinics in

12    those states, in Ohio, in Kentucky, in Florida, legitimate pain management

13    clinics.  Yes.  Why wouldn't those patients, who have such extreme levels of

14    pain, elect to be treated by a physician that's not 4, 5, 600 miles from

15    home?  Why?  And why would not Dr. Azmat pay attention to that?  Never

16    asked, day one, I see you're from Frenchburg, Kentucky.  What brings you

17    here?  Maybe one patient passes your notice, but patient after patient after

18    patient?  And you don't get the notion that something is wrong with this?

19             Keep in mind the testimony of the customers who gave or sold

20    their drugs to others, who diverted their drugs.  Where did those drugs end

21    up?

22             If you do these things, ladies and gentlemen, if you keep these

23    things, the big picture, foremost in your minds, your path to a righteous

24    verdict will be illuminated by the evidence and by truth.

25             I would also like to suggest to you that this case should not be

-938-

1     determined on the basis of any particular scribble that Najam Azmat made

2     in any particular patient's file.  This, I submit, was the mistake of Dr.

3     Simopoulos, the expert from Boston.  Take for example, a patient coming to

4     East Health Center, says he had a motor vehicle accident nine years ago,

5     and it hurts a lot.  Matter of fact, my ten-year-old accident is causing me a

6     pain level of 10 on a scale of 10.  Now, Dr. Simopoulos came here all the

7     way from Boston to tell you in his exquisite manner that this indeed might

8     hurt.  Well, no kidding.

9           The government has no doubt that Dr. Simopoulos is a fine

10    doctor, and any of us here would likely be fortunate to be treated by him if

11    we had legitimate reason to be treated.  But regrettably, Dr. Simopoulos did

12    something which the government's hoping you members of the jury don't –

13    or the jury don't do; and that is, leave your common sense at those

14    swinging doors when you leave this courtroom today.  Dr. Simopoulos, we

15    submit, did that.  He was interested in looking at particular scribbles in the

16    patient files of Dr. Azmat.  Did you notice during the course of his

17    examination, and particularly his cross-examination, that his demeanor

18    changed?  Did you notice that?  His lengthy and protracted answers

19    became much less so as he was confronted by the details and circumstances

20    of particular patient files.

21          He was asked, are there – would you expect there are pain

22    clinics in Ohio and Kentucky?  Wouldn't these patients traveling to Georgia

23    pass numerous clinics on their way here?  Yes, they would, he said.  Does

24    this raise questions in your mind?  Yes, it would.  Would you ask, would

25    you at least ask the patient about this?  Yes, he would.

-939-

1    And how about the MRIs from the same cluster of facilities in

2    Florida which are being presented by the patients from Ohio and

3    Kentucky?  Would this raise questions, Dr. Simopoulos?  Yes, they would.

4    And how about those MRI reports which were written up,

5    signed by the doctor at a time before the examination was even conducted?

6    Would that suggest that MRI is bogus?  Yes, it would.

7    How about the numerous examples of patients with high and

8    sometimes extremely high blood pressure?  Would not a legitimate medical

9    doctor at least address this, say something in the record, refer the patient

10   immediately?  One patient had a blood pressure, as I recall, of 196/116.

11   That person is ready to explode.  Nothing said.  Is that legitimate?  Is that

12   what you would expect a legitimate doctor to do?

13   I'll suggest that the dawn of regret crossed the good doctor's

14   face while he was being confronted with these facts from the patient files as

15   he left the stand yesterday.  And I will also suggest that from Dr.

16   Simopoulos' testimony, that the patients that you've heard from, and the

17   patient files that you've reviewed, that these individuals would not have

18   received the prescriptions for oxycodone and Xanax that they got from Dr.

19   Azmat.

20   Now, the government's expert, Dr. Kennedy, he's from St.

21   Simons Island, here in our district.  He's the sort of doctor that you would

22   likely be treated by in your hometown if you had long-term pain issues.  It's

23   true he is not on the faculty at Harvard Med School, and he didn't travel

24   hundreds of miles to come here and tell you his opinion.  But he is a

25   reliable expert.  His expertise is frequently relied upon by the Georgia

-940-

1    Medical Board.

2              William F. Buckley, a famed author and founder of a magazine,

3    once said, I'd rather entrust the government of the United States to the first

4    400 people listed in the Boston telephone directory than to the faculty of

5    Harvard University.

6              Most of all, what Dr. Kennedy didn't do, he did not make the

7    mistake of Dr. Simopoulos.  He considered the patient files in context.  He

8    got the whole picture, which is what I submit you members of the jury

9    should do.  He looked at the patient's overall condition at the clinic.  He

10   considered things which were evident to anyone who cared to notice.  He

11   concluded that the prescriptions charge in Counts 2 through 50 were

12   written for no legitimate medical purpose, outside of the usual course of

13   professional practice.  I will submit to you that that is the most obvious

14   conclusion that one could draw.  I will submit to you, that is the only

15   conclusion that one could draw.

16             As I said at the beginning of this case back on Monday, East

17   Health Center did not open because of any real or perceived need for such a

18   clinic in the Savannah area.  This is an area which is blessed to be served

19   with a number of very fine medical institutions. We've got  Memorial

20   Hospital, St. Joseph-Candler, number of doctors that are very capable, and

21   we are well served.  They didn't come here because there was a void in the

22   pain management area.  They came here for two reasons: number one,

23   there is big money to be made from pill mills; and number two, the laws in

24   Florida where pill mills are in abundance, which you may think of as the

25   pill mill capital of the United States, the laws have become less hospitable.

-941-

1    And these organizers were searching for greener pastures, and so they

2    came, and they tried to plant their flag in our backyard, in our

3    neighborhood, in our city.

4           Now, these patients, I would like to point out one or two

5    additional things about them.  You saw the chart showing where all of the

6    patients of Dr. Azmat came from.  Those are, that is a breakdown of the

7    patients –

8           – 31-2, I believe.

9    That is a breakdown of where the patients came from just for the patients

10   pertaining to Counts 2 through 50 of the indictment.  And you can see in

11   this breakdown 52 percent of the patients came from Kentucky, 32 percent

12   from Florida, 4 percent from Georgia, and a smattering from Ohio and

13   South Carolina.

14          That evidence, you know, you can glean easily, if you choose,

15   from government's exhibits 1 through 25.  Each of the files contain the

16   biographical data of the patient, and you can see that, very obvious that the

17   patients in those counts were from well outside of the Savannah area.

18          31-4.

19          For the patients – the MRIs supporting the patients for whom

20   Dr. Azmat is charged in Counts 2 through 50, 72 percent of the MRIs came

21   from the state of Florida, 16 percent from Kentucky.  Dr. Azmat worked in

22   East Health Center for a month and would have you believe that he did not

23   notice what is – which the evidence screams and proclaims at every turn.

24   He didn't notice in the course of a month what you jurors should have

25   noticed within the first hour of evidence in this case.

-942-

1          Dr. Simopoulos indicated that  pain is sometimes under-

2    treated, and that is likely so.  And the government is not saying that people

3    with legitimate pain issues should not be treated for that pain.  We're not

4    saying that – you know, that oxycodone shouldn't be given in legitimate

5    circumstances.  Not saying that.  We're saying oxycodone should not be

6    given for illegitimate medical purposes, and that is what Dr. Azmat did.  It

7    is not compassionate to prescribe oxycodone to drug addicts.  That is not

8    compassionate.  It is not compassionate to prescribe oxycodone to drug

9    abusers.  It is not compassionate to prescribe oxycodone to people who are

10   going to divert that drug, or are going to sell it to others on the street at a

11   dollar a milligram.  So an oxy 30 pill would catch $30 on the street.  That is

12   not compassionate, and that is not healthy, and that is not good, and that is

13   not lawful.

14          And this is not a victimless crime.  Patricia Rohrer, she was a –

15   I believe she was a 57- or 58-year-old woman from Kentucky, the one with

16   the neck issue.  She ran through, according to her testimony, $36,000 over

17   a two-year period feeding her oxycodone addiction.  That is not

18   compassionate.  She now treats her neck issue with over-the-counter pain

19   relievers and a heating pad.  She says she still has pain.  We should accept

20   that.  She does not need oxycodone.  Wouldn't she have liked to have been

21   turned away at some point before she had run through her $36,000?  She's

22   not a woman of means.

23          And she's typical. $300 for a patient visit, plus all of the other

24   money spent traveling, lodging, and then filling the prescriptions.  You ask

25   yourselves, how do they afford it?  It's not affordable.  They're ruining

-943-

1    themselves.  They're breaking into houses.  They're doing these things to

2    gather the money to fuel their addiction, and where does that money end

3    up?  It ends up in the pockets of Al LeFrancois, Dan Wise, Frankie

4    Barbuscia, Sean Clark, and it ends up in the pockets of the defendant, Dr.

5    Najam Azmat.  Is that right?  Is that compassionate?

6              Joseph Bradley, the young man from Florida, the blonde hair

7    and the tattoos, a young man whose life is engulfed in a raging inferno of

8    drug addiction.  He testified that he was abusing oxycodone intravenously.

9    He said, as I recall, he was taking 30 or 40 such pills a day.  Is it

10   compassionate to give that man, that young man, prescriptions for

11   oxycodone?  Of course, the answer is no.  And of course, it was an

12   illegitimate – it's the doctor's duty – oh, he argues, or will argue that, oh,

13   the patient lied.  It would take 30 seconds to get through those lies.  It's a

14   front.  They don't want to get through those lies.  Bring your MRI and all is

15   well.

16             Gerald Smith, another young man from the Brunswick area,

17   came here with a sponsor and the sponsor's girlfriend.  They're all treated

18   at East Health Center.  Brian Smith said he gave his – you know, some of

19   his drugs to Brian Smith, his sponsor, as payment for the doctor's fee.

20   Those files are in evidence.  Brian Smith is the one – and he's the subject of

21   one of our counts – he's the one who tested positive for meth, whatever that

22   was.  We don't know if it was methamphetamine, methadone.  Nobody

23   asked.  Dr. Azmat didn't ask.  They gave him a prescription.

24             Nancy Binion, 41 year-old woman.  41 years old she is.  That's

25   all.  Traveling from Kentucky because she had a sponsor.  She was

1    supposed to get paid, remember, to give her prescriptions to her sponsor, a

2    fellow named David Henderson.

3         Day one the clinic's open, Latina Simpson, she's one of the

4    substantive of counts in the indictment.  Jim Brooks and Latina Simpson's

5    husband, Michael Brooks, they all show up at the clinic from Frenchburg,

6    Kentucky.  And were they asked, wow, three patients on day one from

7    Frenchburg, Kentucky.  Why is this?  Dr. Azmat must have been in too big a

8    hurry to collect his $2,000 and skedaddle back to Waycross or the motel to

9    ask those questions.

10        James Gable, another man battling the demon of drug

11   addiction to this day.  He told you, he's ridden the pill mill circuit for years,

12   knows what to say.  It's expected.  You walk into the clinic.  I'm an 8, 9, or a

13   10 in pain.  This makes it worse.  Here's my money.  Here's my MRI, bingo.

14   He says everybody knows that.  Everybody knows it but Dr. Azmat.  Strains

15   credulity to the breaking point, beyond the breaking point.

16        Azmat came to East Health Center for one reason, and that was

17   not to minister to people's pain.  He is every bit as cynical and ruthless as

18   Al LeFrancois, Sean Clark, Frankie Barbuscia, all those wannabe wise guys

19   from south Florida.  He's no different.  He's no better.

20        He answered the Craigslist ad.  You can understand the

21   temptation, $2,000 a day.  The temptation.  We understand that, but you

22   can't succumb to that temptation.  He knew they were addicts.  He told that

23   to Investigator Sikes.  You've heard his testimony about the interview of Dr.

24   Azmat, which occurred after the clinic was closed down.  He knew they

25   were addicts.  Knew they came from out of state.  Knew they paid in cash.

-945-

1   Knew their MRIs came from the same cluster of firms.  And remember Dan

2   Wise, his testimony, he knew about the sponsors.  He said, I don't want

3   them waiting in the lobby, have them wait out back.

4         He knew everything.  He did his part.  Oh, and the cherry on

5   top of the dessert.  Did he think his job was legitimate?

6         Could we see 32?

7   Remember, he's being paid in cash, okay.  Would you say that's another

8   word for being paid under the table?  He didn't declare it on his income tax.

9   He didn't file income tax, because he knew the income was not legitimate.

10  No wonder he wanted to be paid by cash and not check.  There is no paper

11  trail with cash.

12        The organizers, in conclusion, they believed the state of Georgia

13  was a soft target.  They came here for that reason.  Savannah is known as

14  the hostess city.  It's a tourist town.  It's a welcoming town.  But not

15  everyone should be welcomed – not everyone.  They planted their flag.

16  They opened their pill mill.  I'm sure they did not expect the sort of push

17  back they received almost from day one.  And shouldn't we be thankful to

18  investigators like Mr. Sikes here?  Soft spoken, deliberative, doesn't

19  exaggerate.  For his colleagues, Agent Kahn you've heard about from the

20  DEA, CNT agents who visited this clinic and had a talk with the employees

21  almost from day one.  And what did they do after that talk?  Went and got

22  more props.  They bought some Band-Aids.  They put a Band-Aid on it,

23  literally.  Here's a Band-Aid.  I'm sure if somebody's going to walk into East

24  Health Center, I have a cut on my finger, do you have a Band-Aid?  I mean,

25  they weren't taking blood at the clinic, had no need for those things.  They

-946-

1    were props, like everything about East Health Center was a prop.

2            Be thankful for our local doctors like Dr. Mary Kay Ross.  She

3    took the measure of this operation over the course of lunch with Mr.

4    LeFrancois and Mr. Clark.  The course of a lunchtime, she walks out and

5    she calls the CNT.  It was that obvious.  It was that obvious.

6            This case is not about mistakes that were made.  It's about

7    choices that were made, choices made by Dr. Azmat and his fellow

8    conspirators.  The government typically in cases, like the criminal cases, we

9    don't choose our witnesses.  The defendant chooses his witnesses.  Al

10   LeFrancois, he chose Al LeFrancois as a witness.  Now he wants to say Mr.

11   LeFrancois has been convicted of felony offenses in Florida.  Yes.  Sean

12   Clark has.  Frankie Barbuscia, strong-arm robbery.  These were the people

13   he picked, that he associated with.

14           He made the decision, in spite of knowing all those things, to be

15   the missing gear, to be the warhead on the missile, if you will.  Without

16   him, it doesn't happen.  He knew what he was doing, and he knowingly and

17   intentionally joined this conspiracy.  He knowingly and intentionally wrote

18   the prescriptions charged in Counts 2 through 50.  He knowingly and

19   intelligently conspired with LeFrancois and Wise and the others to launder

20   money.  Every dollar generated at that clinic was a dollar from the

21   illegitimate and unlawful dispensation of controlled substances.

22           I submit to you, you should find him guilty of each count in

23   which he's charged.

24           THE COURT:  Mr. Withers?

25                   CLOSING ARGUMENT BY

-947-

1   MR. WITHERS:

2           May it please the Court, counsel, ladies and gentlemen, good

3   morning.  First I want to thank you for your service here.  We know what an

4   imposition it is to walk away from your daily work, your daily lives and to

5   come in here.  And I wanted to sincerely thank you for the sacrifice of your

6   time and for your diligence as well, as Judge Moore has noted.

7           You know, I believe with all my soul, ladies and gentlemen, that

8   jury service is one of the most important things that we can do in this

9   country, and that's because it is the jury that stands between the

10  government and an individual.

11          I also want to thank Robin Jenkins.  I have seen six, seven,

12  eight federal, state agents come in and out of this courthouse or out of this

13  courtroom during the course of this case.  And Robin Jenkins, for the

14  written record, has done the work countering the work of those agents, and

15  I wanted to thank her for her devotion to duty, and the steadfast work that

16  she's performed.

17          It's my privilege to represent Dr. Azmat, and it's been a

18  privilege to get to know his wife and his family.  Dr. Azmat sits here today

19  as he did Monday morning, and that is, with the presumption of innocence

20  attached to him.  And not only, as Judge Moore told you Monday morning,

21  does the government have the burden of proof, but they have to have that

22  burden of proof beyond a reasonable doubt.

23          Dr. Azmat doesn't have to prove anything.  The defendant in a

24  criminal case in our nation doesn't have to do anything.  And when you

25  were here on Monday during jury selection, that entire purpose, as you

-948-

1    heard on several occasions, and as you took your oath, was so that you

2    would be fair and impartial in applying the facts and the law to this case.

3    Dr. Azmat has trusted you with that duty, despite the most trying times you

4    can imagine.

5            As I told you on Monday morning, there's only one question for

6    you folks, and that question is whether Dr. Azmat was acting as a physician

7    or as a drug dealer.  It's not whether he was negligent, not whether he was a

8    bad doctor.  The question is, did he act as a physician or a drug dealer.  And

9    I told you on Monday morning, folks, that the facts, facts, are stubborn

10   things.  And here are a few of those stubborn facts.

11           Dr. Azmat worked at East Health Clinic for 19 days – 19 days.

12   He never once saw a patient more than once.  He never increased the

13   medication of a single patient.  You know, the government has introduced

14   all of these patient files.  I think there are 190 – 238 of them, 196 seen by

15   Dr. Azmat.  Not once, not once in those 196 patient files did he increase the

16   medication for anybody.

17           In the counts of the indictment, 22 of the 25 counts, he

18   discontinued Xanax.  And on each occasion with respects to the Valium, he

19   discontinued the Valium.  Now, what did every doctor that came through

20   these doors tell you folks? And there's that drug cocktail that people seek

21   who are dependent on these drugs, oxycodone, Xanax, Soma, Valium.  And

22   what did Dr. Azmat do on each occasion?  He discontinued that Xanax, that

23   Soma, that Valium.  And even the government's expert said, yes, when you

24   eliminate one of the drugs as part of that cocktail, that's a good thing.  And

25   that, ladies and gentlemen, is providing medical care.

-949-

1      Now, the government has stood up here and talked to you

2  about, oh, let's look at the big picture.  Let's look at the big picture.  And

3  that's because they don't want you to look at the facts.  Mr. Knoche has

4  mentioned the scribble of the doctor.  I think all doctors scribble.  But you'll

5  see in those notes of the doctor his treatment of these patients.

6      You know, I think Agent Sikes is a fine young man, and I think

7  he is a good agent, but when the government puts up their pretty charts,

8  their summary exhibits Monday afternoon, they tried to overwhelm you

9  with, goodness gracious, look at all of this.  They tried to overwhelm you.

10  They don't want you to look at the individual facts or the individual

11  patients.  And why is that?  Because when we start looking at the patient

12  files, the government's theory unravels.  It falls apart.  You know, and one

13  thing, Agent Sikes was on that witness stand for a long time.  And I

14  apologize, folks, if I went on too long.  My wife says, droned on too long.  I

15  apologize, but hold that against me.  Do not hold that against Dr. Azmat,

16  because this stuff is important.

17      And when we were going over those files with the agent, lo and

18  behold, every one of those, I went through every one of those.  And I know

19  you had to be dying Monday afternoon as I was doing that, and I apologize,

20  but every one of those, this guy is disabled on social security, oxycodone 30

21  milligrams, 150 is reduced to 90.  The Xanax is discontinued, and he adds

22  in Motrin.  And we went on and on with this.  Michael Emmet, he comes in

23  and the oxycodone 30 is reduced, and the goal, wean off narcotics

24  progressively.  You know, what drug dealer is going to write that?  They

25  want you to say he's a drug dealer.  Oh, look at the big picture, he's a drug

-950-

1    dealer.  But what drug dealer writes that, you know, his goal is to wean the

2    patient off of narcotics?  Isn't that exactly what a drug dealer wouldn't do?

3              Facts, facts.  Same thing here with this particular fellow,

4    oxycodone reduced – or excuse me, discontinued, Xanax discontinued.

5    This is Bruce Kennedy.  And look what happens with respect to Mr.

6    Kennedy.  Destroy.  Physician needs to call pharmacy to destroy

7    prescriptions.  Destroy.  The government wants you to think that that man

8    is acting as a drug dealer when he's calling a pharmacy saying, destroy that

9    patient's medication.

10             Craig Rogers.  He comes in not on any medication, previous

11   medication zero.  Dr. Azmat gives him Motrin, and look what Dr. Gossett,

12   though, does.  When the patient comes back, he puts him on oxycodone 30,

13   60 oxy – on 15/ 60, and it looks like he continued the Motrin.  That is the

14   government's own summary witness who had to admit all of that.

15             Now, 238 patients walked through the doors of East Health

16   Clinic according to the agent's testimony.  196 were seen.  That means 42

17   were turned away.  Now, it is true, if that patient was on oxycodone, that

18   patient in all but four percent of the cases received oxycodone, but in a

19   reduced amount.  196 patients, by the way, ladies and gentlemen, 19 days,

20   because – I think it's February 23, that first Wednesday, one patient was

21   seen.  I'm not sure what happened with respect to whether they were open

22   or not.  196 patients, 19 days, that's 10 patients a day.  And the government

23   wants to talk to you about, oh, people waiting outside, people filling up the

24   lobby area, but it's 10 patients a day.

25             You know, everything that Dr. Azmat did was contrary to what a

-951-

1    drug dealer would do.  And you know what?  We do want you to use your

2    common sense, because your common sense will tell you that a physician

3    who is acting as a drug dealer doesn't try to wean the patient off of the

4    narcotics.  What drug dealer reduces the amount of prescription

5    medications for the patient?

6           Agent Sikes even told you, a drug dealer wants to sell more

7    drugs.  A drug dealer wants to make more money.  But what does Dr.

8    Azmat do?  What does this man do when he's seeing those patients?  He

9    cuts back the oxycodone.  He discontinues the Xanax.  He discontinues the

10   Valium.  Some of the patients went home unhappy.  They told the front

11   desk about that.  There was even a dispute between Mr. Wise and Dr.

12   Azmat about that.  And what did Dr. Azmat say about it?  It's my license.

13   It's my license.  He's not taking directions from anybody.  He's doing what

14   he thinks is best.

15          You know, and I agree wholeheartedly with Mr. Knoche, there

16   was something afoot here, no doubt about it.  They have proved, and those

17   folks pled guilty to, hatching a conspiracy down in Florida because the laws

18   changed and what-have-you.  And they came up here, and they had a

19   conspiracy.  But this fellow here wasn't a part of that conspiracy.  Why?

20   Because he was the outsider.

21          Now, Judge Moore is going to tell you in his instructions to you

22   – and he already talked about this with you on Monday morning – but

23   you're the sole judges of the credibility of the witnesses.  And we talked

24   about that a little bit, because that's something that we do every day.  Every

25   day we judge the credibility of folks we're talking to.  We may not do it

-952-

1   consciously, but we're doing it, you know.  Does that guy seem to be telling

2   me the truth?  You know, does he have a reason to lie to me?  Does he

3   seem to be candid?  Does he have a good memory?

4               In making the determination of the credibility of that group of

5   witnesses, what the government has done is, they have traded the gold coin

6   of freedom for their testimony, because they have the key that literally

7   unlocks the jailhouse door for them.  And you saw that from that fellow

8   from Brunswick who came in here.

9               Now, Dan Wise, Sean Clark, they had over 50 counts of the

10  indictment dismissed against them – dismissed.  They were facing dozens

11  and dozens of years in prison, federal prison, and it goes down to five years.

12  So for that type of witness, Judge Moore is going to tell you, you have to

13  watch their testimony.  You have to judge their testimony a little more

14  closely.

15              And what do they do?  They do that marketing down in

16  Jacksonville for a couple of weeks.  Dr. Azmat's not down there.  Dr.

17  Azmat's not part of that group.  He's not doing that weird stuff of running

18  into folks as they come out of a pain clinic and handing them a card.  He's

19  not doing that stuff of going around to the motels at 5:30, 4:30 in the

20  morning.

21              You know, and maybe I just ask bad questions, but, you know,

22  wasn't it awfully difficult to get those guys to admit that Dr. Azmat wasn't

23  down in Florida?  He didn't know those people.  He wasn't a part of that

24  group, and he wasn't part of their conspiracy.  And again, let's look at those

25  folks briefly.

-953-

1    Mr. LeFrancois. He didn't have the same conversation with Dr.

2    Azmat that he had with Dr. Ross because he had learned what not to say

3    after his conversation with Dr. Ross. But what did he ultimately tell you?

4    This is right at the end of his testimony. He ultimately told you that it

5    wasn't his job to tell Dr. Azmat what to do or how to do it. And the most

6    important thing he said – and thank goodness it was in the grand jury,

7    because he would never have admitted it otherwise – that the first day at

8    work, the first day of Dr. Azmat at work – and remember he's the outsider

9    – the first day was the beginning of the end. And what did he eventually

10   do? He fires him.

11   Ladies and gentlemen, again, we do want you to use your

12   common sense. It's the only thing that you need in this case. Judge Moore

13   told you that on Monday. You don't fire a coconspirator. You fire

14   somebody when they're not playing on your team. You fire somebody when

15   they're not playing by your rules.

16   Mr. Afthinos. He said Dr. Azmat was a disaster. And  he said

17   he was taking 15-to-20 minutes per patient. And, you know, there's been a

18   lot of talk about, was the examination 5, 10, or 15 minutes. Well, it was

19   within that time frame, we know that.

20   And Mr. Wise, one of the last witnesses the government puts

21   up from that group. Again, when you start peeling away the layers of the

22   onion, you see what the truth is. Mr. Wise said he was mad at Dr. Azmat

23   for taking too long with patients. Why is he taking too long with patients?

24   Because he's treating patients. He was mad at Dr. Azmat for not writing

25   enough prescriptions. Why is he doing that? Because he's treating

-954-

1    patients.  He said Dr. Azmat was a disaster.

2              And what did the government do in cross-examining Dr.

3    Simopoulos?  They misrepresent to him what the facts are about this

4    marketing issue.  The testimony from Dan Wise was, one time in Savannah

5    – of course, we know he's only here a week and a half after he starts

6    testifying – one time in Savannah he's headed out the door and says, I'm

7    going to do marketing.  There was no evidence that Dr. Azmat knew

8    anything about what these guys were doing in Jacksonville.

9              Mr. Barbuscia.  Colorful character,  Frankie B., interesting

10   witness, but he didn't know anything about Dr. Azmat, except he thought

11   his name was Hazmat, so the government puts that on the witness stand

12   and puts that in the indictment.  I wonder why.

13             And what is the truth about these folks?  I mentioned earlier,

14   Dr. Azmat was the outsider, literally the odd man out.  And isn't it funny –

15   isn't it funny that the odd man out ends up being the one man standing?

16   Isn't that funny?  Dr. Azmat didn't know them.  He didn't socialize with

17   them.  He didn't go to dinner with them, and he never went to their house

18   in Pooler.  Dr. Azmat saw patients and he went home.  He saw patients and

19   went to the hotel.

20             And on one occasion, Mr. Wise says, oh, well, you know, he

21   was getting complaints from Al down in Florida, and so he talks to Dr.

22   Azmat.  And again, Dr. Azmat says, it's my license.  I'm going to do what I

23   need to do.  Now, the most that the government could mount from Mr.

24   Wise to try and bring Dr. Azmat into the conspiracy was, Wednesday

25   afternoon he comes in here and he testifies that when he talked to Dr.

-955-

1    Azmat about the need to increase the medications, that Dr. Azmat said, oh,

2    yeah, well, I'll do that later.  You know what?  That's because the proof is

3    that Dr. Azmat decreased the medications, and he knew that, and they

4    knew that.  And so what does he do?  He comes in, you know, this future

5    thing is going to happen, which is contrary to common sense.

6           Now, Judge Moore is also going to tell you to watch the

7    testimony closely of the folks who were taking drugs at the time because

8    their memories can be impaired.  You know, when government puts a

9    three-time convicted felon on the witness stand for the purpose of saying

10   one thing, that Dr. Azmat backdated my prescription – remember it was

11   dated 3/10/11, that's the date of the prescription – and he says, no, no, I

12   was in there several days earlier.  But what do we have?  On 3/10/11, thank

13   goodness, we have the new patient log which shows that Mr. Gerald Smith

14   actually was in there on 3/10 of '11, and that's the date of his prescription.

15   That's a fellow, by the way, ladies and gentlemen, who is out – you will

16   remember he's the one manufacturing meth.  He's the one meeting up

17   with Mexicans with his buddy and doing 25 pound methamphetamine

18   deals.  But look at the facts.  He came up here for one purpose, and that's

19   to say, Dr. Azmat backdated my prescription.  But again, when you start

20   looking at the facts, it is just not true.

21          Now, Patricia Rohrer, Mr. Knoche mentioned her.  She told

22   you that she had a real injury, real pain, and that she got relief from the

23   pain, from the oxycodone, and that she is still waiting to get into a

24   treatment program in Kentucky.

25          Latina Simpson – and again, thank goodness there's the grand

-956-

1    jury testimony from a year ago – she says in that grand jury testimony,

2    which you can credit, that she came here because she had real pain.  And

3    other than that, she couldn't remember hardly anything.

4         Billy Letner.  You know, occasionally in trials, ladies and

5    gentlemen – and I believe that trials are the great levelers in our society, I

6    really do – and occasionally in trials, you have these moments of truth that

7    come out.  And what did Billy Letner tell Mr. Knoche in answer to the

8    question about, why did you put down a level 10? And he said, because if

9    he didn't he wouldn't get no pills.  That was the government's witness.

10   And he really did have a logging accident, and fell 15 feet out of a tree, and

11   really did get relief from the medication.

12        Kim Letner.  Look what Dr. Azmat did with Kim Letner.  He

13   cuts her medications to a third and then notes, wean off of narcotics.

14   Again, you know, it's easy to get up here and say, look at the big picture.

15   It's easy to get up here and say, oh, there's, you know, bad things going on.

16   But look what Dr. Azmat did when he's treating those patients.  Wean off

17   of narcotics.

18        You know, I'll talk a little bit more about Dr. Simopoulos in a

19   bit, but what did Dr. Simopoulos tell you about, that he really reviewed

20   each and every chart, that Dr. Azmat was engaged in a legitimate practice

21   of medicine.

22        And what did Ms. Letner tell you about her son, by the way?

23   That he really was on 240 30 milligram tablets of oxycodone.  And even

24   Nancy Binion said this to you folks, that when you go to the doctor, you lie

25   and lie, and she learned what to say from the fellow that brought her here,

-957-

1    David Henderson.

2              You know, so with some of these patients, they had real

3    problems, they obtained real relief.  And with others, what did they admit

4    to you?  That they intended to deceive Dr. Azmat.

5              Let me tell you about a fear I have, folks.  You know, they put

6    Dr. Gossett on the stand.  He didn't work there when Dr. Azmat was there.

7    He didn't know Dr. Azmat, has never seen Dr. Azmat.  And what the

8    government wants you to think is that, oh, well, Dr. Gossett pled guilty. I

9    wonder, must be that Dr. Azmat is guilty.  But Judge Moore is going to tell

10   you that you judge each individual, and this individual, based on these

11   facts.  And that because somebody has pled guilty doesn't mean anything

12   with respect to this case.

13             But looking at what Dr. Gossett did is instructive, because he

14   comes in here October 31, 2012, enters a guilty plea to doing all these bad

15   things with respect to the practice of medicine.  And what does he do?  He

16   goes back to north Georgia, crosses the state line into Alabama, and keeps

17   practicing over there.  Two months later he renews his Alabama medical

18   license, and he lies on that; number one, about whether he'd been

19   convicted of a felony, and number two, about whether he had done all of

20   his continuing medical education credits.

21             So judge this case based on these facts, not Dr. Gossett.

22             And remember, the government wants you to believe, folks,

23   that Dr. Azmat started into this conspiracy his first day of work.  Never

24   met these folks, never laid eyes on them.  2/21 of '11 and the government

25   has got him charged, I think, with 14 counts on that one day.  And Judge

-958-

1    Moore is going to tell you that a conspiracy is an agreement for an

2    unlawful purpose.  Dr. Azmat hadn't had any conversations – meaningful

3    conversations with those folks.  Again, that doesn't make sense, and we

4    want you to use your common sense.  And when Judge Moore talks to you

5    about the law, he's going to tell you that merely associating with folks

6    doesn't establish a conspiracy.  What he's going to tell you – and I believe

7    you'll have these jury instructions along with you – that a person who

8    doesn't know about a conspiracy but happens to act in a way that advances

9    some purpose doesn't automatically become a member of the conspiracy.

10           Now, I'm want to talk to you very briefly about some of these

11   folks that were in the indictment that were treated by Dr. Azmat.

12           Barry Hinkle.  3/9, motor vehicle accident three years ago, hurt

13   back, then got run over by a car walking a year and a half ago.  Now, what

14   does Dr. Kennedy say?  Well, he says, no, well, that wouldn't account for

15   the complaint of pain.  That wouldn't account for the complaint of pain,

16   being run over by a car?  You know, and this case is vitally important.  This

17   is a federal criminal case.  And Dr. Kennedy comes in here –  and isn't this

18   backwards, the government calls somebody who's not a specialist in the

19   field, and we call as a witness one of the leaders in the field.  He's not

20   board certified.  He couldn't take the boards in pain medicine.  He couldn't

21   treat and can't treat a patient in any hospital in this nation.  But what does

22   he do?  He takes a two-hour, 120-question test, no training, and miracle,

23   voilà, now he's a diplomat in pain medicine, pain management.  That's a

24   sham.  And that's the government's expert.

25           And look what the medical societies think of him.  You know,

-959-

1    the medical society ethics rules are, unless you are specially trained in that

2    discipline, don't testify, both The American Medical Association and his

3    Family Practice Association.  And, you know this is frightening.  Look at

4    the Letner – the last two Letner charges, Kim and David Letner.  Dr.

5    Kennedy doesn't do his report on them until March of 2013, but this man

6    is indicted, called into the docks for being a criminal, and Dr. Kennedy

7    hasn't even done his report yet.  Now, Dr. Kennedy is on the witness stand,

8    and I'm asking him questions, and he's using answers like, possibly, it

9    depends.  And you know, it's your recollection that will govern, folks, but

10   the government has tried to hang their hat on an expert that's going to

11   have changing testimony over time.

12          Wednesday afternoon Dr. Kennedy freely admitted that it is

13   not a standard of care in Georgia or anywhere else to have to get a medical

14   record.  You know, and we have talked about med – this is the lynchpin of

15   the government's case, the foundation of their case.  He never got any

16   other medical records, therefore he violated the standards, and he's a

17   criminal.  And the court reporter was kind enough to transcribe this this

18   morning.  The afternoon I asked the question: Turning back briefly, the

19   issue of medical record, even though you talked about it on virtually all 25

20   occasions, there is no professional requirement that a doctor obtain

21   medical records before treating a patient, is there?  Answer, no.  And the

22   standard of care, even in a civil standard, when you're talking about

23   whether a doctor has done something negligent or not, doesn't require

24   even that that physician obtain prior medical records.  Answer, no.

25          He comes in Thursday morning, and it was like that hadn't

-960-

1    even happened.  He gets up here Thursday morning, yesterday morning,

2    and tells you, oh, no, that's a requirement, and he violated it.  But

3    fortunately, and you will remember, I had his testimony from a couple of

4    years ago where that same question had asked – been asked.  There is no

5    professional requirement that doctor obtain medical records before

6    treating a patient.  That's true, he said.  And he had to acknowledge that.

7            You know, we spent hours and hours listening to the fact that

8    there are no prior medical records in these files.  That's a fact, but there is

9    no requirement anywhere that you have to obtain the physician's prior

10   medical records to treat a patient.

11           You know what?  It's troubling to me when a witness says

12   something one afternoon and directly contradicts it the following morning.

13   This is a federal criminal case.  There's a lot at stake.  And the truth doesn't

14   change between afternoon, evening, and morning.

15           Dr. Simopoulos.  Again, Judge Moore has told you throughout

16   this case that a defendant doesn't have to prove anything, but we brought

17   one of the leaders in the field down here to talk to you.  He reviewed every

18   one of those files with you.  He told you his thought process.  He knew that

19   these folks had come from out of town.  He knew they had come from

20   Kentucky.  And what did he say when asked?  Well, that's a factor.  It

21   would raise my index of suspicion, but I would treat that patient and follow

22   that patient along.  That is what his testimony was.  I would treat that

23   patient and follow the patient along.

24           You know, and he is board certified, and I don't think that this

25   is a laughing matter, but we went out and found somebody, fortunately,

-961-

1    who gave of his time and his professionalism to come into this court.  He

2    has put his livelihood and reputation on the line to tell you that that man is

3    not a criminal.  He's board certified in anesthesia.  He's board certified in

4    pain management.  He teaches Harvard – he was trained through the

5    Harvard residency program and fellowship.  He runs the pain

6    management clinic at a big hospital in Boston.  He teaches, he lectures, he

7    writes he's a specialist.  He is an expert.

8            And you know what?  You could see, both on direct

9    examination and cross-examination, you could see that this is his calling,

10   that this is what his life work is.  And he has come in here and told you that

11   Dr. Azmat is not a criminal.  In his professional judgment, Dr. Azmat was

12   issuing prescriptions in the legitimate practice of medicine.

13           Now, Judge Moore is also going to tell you that good faith is a

14   defense in this case.  And what he's going to tell you in part is, that

15   negligence, carelessness, foolishness does not equal criminal intent.  And

16   he's going to tell you that unless you find beyond a reasonable doubt that

17   the conduct charged in the indictment was not done in good faith – in

18   other words, they have to prove an absence of good faith – then you must

19   acquit the defendant.  The defendant cannot be convicted if he merely

20   made an honest effort – and these are the Judge's instructions to you – an

21   honest effort to treat his patients in accordance with the standard of

22   medical practice generally recognized and accepted in the state of Georgia.

23   Good faith.

24           While I'm talking about Dr. Simopoulos, let me mention one

25   thing, and that's all I'm going to say about it.  He's down here from Boston.

-962-

1    He's a leader in the field.  And what did you hear the prosecutor ask him?

2    He didn't lay a hand on, a glove on, Dr. Simopoulos, but what did you hear

3    the prosecutor ask him?  Do you know where he went to medical school?  I

4    want you to say to yourself – I want you to say to yourself, why did he do

5    that?  I wonder why.  And the message should be, we're better than that.

6         Now, Dr. Simopoulos told you that every patient that came into

7    that facility completed the same form.  And that's just the way that they do

8    it.  You know what?  And the government spent hours, again, on this,

9    about the forms were completed before the treatment.  Well, that's the way

10   it works when you go to the doctor's office.  You complete the forms when

11   you sit down, not after.  And every patient that left that office had a

12   reduction in their medications.

13        You know, it's interesting, this is the first time Dr. Simopoulos

14   has ever appeared as a witness in a criminal case, and I'll tell you, I was

15   nervous about whether he was going to get here in time yesterday.  But

16   what he told you is that he went through every file, that Dr. Azmat treated

17   these patients with a legitimate medical purpose, prescribed those

18   medications with a legitimate purpose.  This issue of blood pressure, by

19   the way, Dr. Simopoulos must have said four or five times, well, you know,

20   your blood pressure gets elevated when you're in pain, so you prescribe the

21   oxycodone and you expect the blood pressure to come back down.  And Dr.

22   Simopoulos told you that in his opinion, his professional opinion, that Dr.

23   Azmat treated these people, treated these patients in the usual course of

24   professional practice.

25        Now, this is a kitchen sink indictment.  There are 51 counts in

-963-

1    the indictment, because the government hopes that you're going to find

2    Dr. Azmat guilty of one count, two counts, three counts.  But it's like a

3    machine gun with 51 bullets.  All they are doing is hoping that they're

4    going to hit him with one of those bullets.  And Judge Moore is going to

5    tell you very close to the conclusion of your – of the instructions, do not

6    give up your honest belief.  So if you believe that Dr. Azmat is not guilty, do

7    not surrender that honest belief, thinking that, oh, well, you know, we're

8    going to find him not guilty on 45 counts or 40 counts, and that way he's a

9    winner.  You come back here with one count of conviction, and you're

10   going to see the biggest smile from these folks on this side.

11        Mr. Gilluly will speak to you now.  And I ask you to say, while

12   he is speaking, what would Mr. Withers say in response to that?  Because

13   this is the last time I get to speak with you.  And soon the torch will be

14   passed.  It'll be passed from everybody here in the courtroom to you.

15   There are very few times, ladies and gentlemen, very few times in our lives

16   when we can directly affect the life, the liberty of one of our citizens, and

17   this is one of those times.  And I ask you to free Dr. Azmat from these

18   charges and return a verdict of not guilty on every count in that

19   indictment.  Thank you.

20        THE COURT: Thank you Mr. Withers.  Members of the jury,

21   we'll take a five-minute recess, and then we will hear the final argument

22   from the government in this case.

23        [NOTE: A brief recess is taken after which the proceedings are

24   continued in the presence of the jury.]

25        THE COURT: All right, Mr. Gilluly, you may proceed.

-964-

1          MR. GILLULY: Thank you, Judge.

2                    REBUTTAL ARGUMENT BY

3     MR. GILLULY:

4          Around 20 days, tens of thousands of units of oxycodone

5     prescribed.  $2,000 a day, around $40,000 cash not reported to the IRS.

6     People coming from Kentucky, Tennessee, South Carolina, North Carolina,

7     Florida, Georgia, Connecticut, coming here into our community to get pills

8     to feed their habit, and so that they could re-up or get drugs from a source

9     of supply so that they could distribute them in our community.  That is

10    why we are here, because that man made a choice to betray his profession.

11    He made a choice to betray his oath to do no harm, because Dr. Azmat

12    chose – he chose to write prescriptions outside the course of legitimate

13    medical standards and for no legitimate medical purpose.

14          That is why we are here, because every defendant – every

15    defendant in a case like this has a right to a trial.  That's why we're in this

16    courtroom.  Every defendant in a case like this has a right to a jury trial,

17    and that's why you are here.  They have the right to have the government's

18    evidence tested, and Mr. Withers tested the evidence of the government

19    and did a good job.

20          But the reality is, truth dictates and justice demands, and the

21    reality is that Dr. Azmat put one hand over his eyes and the other hand

22    out.  He ignored the philosophy, the fundamental principle of medicine to

23    do no harm, and his choices have consequences.  And you heard about the

24    consequences.  You heard about people traveling hundreds of miles to feed

25    their addiction.  You heard from their own expert that addiction affects not

-965-

1    only the person physically and mentally, it affects their families, it affects

2    their children, it affects the community.  And that is why we are here,

3    because he ignored the fundamental duty of being a doctor.

4            He put his hand over his eyes, and he held out his hand 19 days

5    in a row to accept cash for writing prescriptions for oxycodone.  You see

6    the chart.  It's on the – the pie chart, looks like – something like a Pac Man

7    figure – with every single person that doctor saw got a prescription for

8    oxycodone.  And while we're talking about this, Mr. Withers started his

9    closing argument by saying that the doctor never gave anyone drugs who

10   had not received them previously, and that's just wrong.

11           And if I could see the overhead.

12           And I'm going to show you a file, and you'll have it, and I want

13   you to look at ever one of these files, because every one of these files, this

14   medical file, every one, is this size or smaller, is how this man justified

15   distributing poison for all of these people in our community.  We look at

16   this file of Tina Greer.  And we look, please list any medications that you

17   have been prescribed for your problems.  And there is no answer.

18           And you look at the doctor's notes where it talks about prior

19   medication, never been to a pain clinic before.  No mention of medicine.

20   And then you look at the prescriptions that were prescribed.  Maybe it was

21   an accident, or maybe it was an intentional misstatement, but that defense

22   lawyer misrepresented facts to you.

23           Do no harm. $2,000 a day, cash preferred.  Dr. Azmat was

24   hired to do a job, and his job was to write prescriptions, and that's what he

25   did.

1        The defense attacks our witnesses and complains that our

2   witnesses should not be believed, that our witnesses are exaggerating to

3   get deals from the government, that our witnesses are lying to essentially

4   frame the defendant, including Charles Sikes.  He must have exaggerated

5   when he said Dr. Azmat admitted that he knew he was prescribing drugs to

6   addicts.  And when you look at our witnesses, let me – there's no doubt,

7   some are scumbags.  You got, Frankie B, a man with violent felonies trying

8   to rob drug dealers.  You got Al LeFrancois, convicted felon; Dan Wise, a

9   felon.  Thugs.  You look at the patients.  People who lie.  People who lie and

10  travel around and drag their kids with them.  People who go from pill mill

11  to pill mill to feed their clinic (sic), dishonest people.  Those are our

12  witnesses.  Those are some of our witnesses.

13        And like Karl Knoche said, Dr. Azmat chose those witnesses.

14  He chose those witnesses when he joined the conspiracy, when he agreed

15  to work at that pill mill clinic.  When he chose after day one to write script

16  after script after script, and day two script after script, three, four, five, 19

17  days of continuing writing prescriptions to people from out of state for

18  oxycodone.  That is why those witnesses were called.  There is no better

19  way to pierce a conspiracy, by hearing from the very conspirators who

20  conspired with the defendant.  And that's why you heard from them.  And

21  everything the conspirators testified was corroborated.  It was

22  corroborated by testimony.  It was corroborated by testimony of

23  customers.  It was corroborated by documents and files, and you have all

24  of that to look at.  So absolutely look at their testimony with scrutiny, but

25  use your common sense and look beyond their testimony at the evidence

1    that corroborated what they said.

2    You've heard of the word pill mill, and you heard of the word –

3    I mean, and you heard discussions regarding pill mills and drug aberrant

4    behavior and things like that, and you learn that pill mill people do lie, or

5    pill billies, people who are going to pill mills to get drugs, they lie.  Their

6    expert talked about that.  They will exaggerate their pain symptoms.  They

7    will say what they need to say to get the drugs that they can get.  They may

8    say that they were taking Xanax, and yet the drug screen reveals that they

9    weren't.  But the defendant, regardless, at times either did or did not

10   prescribe drugs.  But just about every time, he prescribed oxycodone,

11   based on their word alone.  And the irony here is, the defense is saying,

12   you can't believe our witnesses.  You can't believe those customers who got

13   up here and testified.  And on the other hand, they argue that Dr. Azmat is

14   entitled to believe them on their word and then issue prescriptions on their

15   word.

16   But this isn't about just the customers or the coconspirators.

17   There's no doubt these people, the conspirators and the customers, are not

18   the kind of people that you would want to have over for dinner.  And the

19   reality is, there's not many swans in the sewer.  Those are the people this

20   defendant chose to supply drugs to and to work with.  Covered his eyes,

21   and he held out his hand, $2,000 a day.  When interviewed by Charles

22   Sikes, he lied.  He lied because he knew he was doing wrong.  He said he

23   was paid weekly by check.  Not true.  He called these people customers.

24   Oops.

25   And to believe that all of these people are involved in a grand

-968-

1   conspiracy to frame this defendant, don't you think that Frankie B.

2   would've maybe hyped up his story a little bit more.  Why not go ahead?  If

3   he's trying to lie to get a benefit, why not say, yeah, Azmat was out there

4   with us handing out flyers before we opened?  They didn't exaggerate, and

5   that demonstrates a ring of truth.  They didn't exaggerate.  But when you

6   listen to some of the testimony, Dan Wise for instance, on that stand under

7   oath, and you heard him say it.  You judged his credibility.  You heard him

8   say about how Dr. Azmat was confronted about not writing enough, and

9   Dr. Azmat said, it's my license, just like the defense lawyer brought up.

10  But the next sentence is, I'll give them more the next time.  Dr. Azmat was

11  fired, true.  And you heard testimony that he was fired for a multitude of

12  reasons, including the fact that no one would fill his prescriptions.  Dr.

13  Azmat closed his eyes that pharmacies weren't filling his prescriptions.  All

14  he cared about was that money that he got at the end of the day.  So the

15  pharmacists, too, involved in the conspiracy – or Dr. Ross, who from day

16  one knew the place was a sham.  Or Dr. Hatmaker knew within minutes

17  the place was a sham.  Yet this defendant didn't know?  Didn't know?

18          Common sense, deliberate ignorance, willful blindness, putting

19  your hand over your eyes, that's what the defendant was doing.  And to say

20  he was exercising good faith, is that reasonable?  Was Dr. Azmat exercising

21  good faith by not asking questions, by filling out – or having patients fill

22  out treatment plans before he ever met them?  Is that good faith?  Is it

23  good faith for Dr. Azmat to turn around legitimately sick people and not

24  treat them?  Is it good faith to ignore high blood pressure time and time

25  and time again?  Is it good faith to never refer someone to a specialist,

-969-

1    people who had numbing going down their leg, and it had been going on

2    for ten years, purportedly?  To not say, you might want to get this checked

3    out by somebody before you have permanent nerve damage?  Not a note in

4    the file about any referrals to specialists.  Is that good faith?  I would

5    suggest it's closing your eyes.  It's deliberate ignorance.

6              Reasonable doubt, the defense argues.  Reasonable doubt.  Is it

7    reasonable that all these people, Charles Sikes, pharmacists, Dr. Ross, Dr.

8    Hatmaker, all these people exaggerated to frame this man?  Is that really

9    reasonable?  It is reasonable that all of these people, some families,

10   traveling up from a multitude of states with MRIs from other states, bogus

11   MRIs at times, that he didn't question anything about that?  Is that really

12   reasonable?  Or is it reasonable that he covered his eyes because he

13   wanted the money?  You talk about good faith.  That's not good faith,

14   ladies and gentlemen.  He knew the drill.  He knew the drill, and he's

15   exactly the kind of doctor that they were looking for, one with no medical

16   malpractice insurance, not from any kind of fancy medical school.  And to

17   imply that by asking which school he went to is somehow wrong, is it

18   reasonable that it might be relevant that he's not some Harvard-educated

19   pain specialist, and yet people are coming from all over the country?  It's a

20   guy who doesn't even have medical malpractice insurance that went to

21   some law school that's not even – no one's heard of?  Is that reasonable?

22   Is it reasonable that a man pockets almost 40 grand in cash and then hides

23   it from the IRS, or does that show consciousness of guilt?

24             The patients knew the drill.  Three rules: you bring your

25   money, you bring an MRI, you say the magic words.  They know what to

-970-

1      write in the forms to get what they want because they've been to pill mills.

2      They knew the drill.  You heard how they exaggerated pain.  You heard it

3      from them.  You heard how they said that they got lots of meds previously

4      so that this doctor would give them lots of meds.  There were no real

5      examinations.  And there were props.  You saw the props.  I mean 28-5A.

6      Boom.  Look at Rule Number 2.  I mean, that's ridiculous.  I understand

7      this office does not prescribe OxyContin (sic).  Every single person just

8      about got that drug.  It's a prop.

9              16-010.  If you'll highlight the signature.

10             Y'all have seen it.  I've highlighted this so many times, I'm sure

11     you're sick of seeing it, but I ask you to read it, because the decision to

12     describe and to put people on opioid therapy was made before the doctor

13     even saw them.  These are props.  They're props.  And in fact, I would

14     submit that Dr. Azmat knew that, and he thought he could cover himself

15     by being deliberately ignorant.  He thought he could cover himself by

16     closing his eyes.  He thought he could cover himself because he had all

17     these props. There are signs.  There is documents in a file, and there is an

18     MRI, but these props is all they were.  And we know they're props because,

19     I mean, you've seen the MRIs.  You saw the MRIs that demonstrated that

20     some were even reviewed before the tests is even given.

21             And common sense.  I mean, you saw the place.  Does it look

22     like a real doctor's office?  You saw the place.  How many security guards

23     have you seen at your doctor's office?  I mean, security guard right there.

24     You saw the place.  Pain management facility with folding chairs, clearly

25     not catering to those harmed.  Lines of people waiting at the door.

1        29-5A-5.

2            People traveling in packs.  Nobody in excruciating pain.  Dr.

3    Azmat walking around like this (gesturing), ignoring the obvious signs,

4    ignoring his oath, because he wanted the money.

5            You're going to have jury instructions.  There are certain things

6    we don't have to prove.  We don't have to prove that the defendant knew

7    all the conspirators or all the roles of the conspiracies.  We don't have to

8    prove – in fact, in a conspiracy we don't have to prove every overt act, but

9    I'd submit we.  We don't even have to prove an overt act was committed,

10   even though we've proved it.  The agreement to write the scripts was the

11   conspiracy, and that agreement doesn't have to be in writing.  The

12   agreement can be inferred.  It can be inferred by the fact that when he got

13   there on day one, this crowd of people rushed in, all from a multitude of

14   states, and without question he did his job.  He wrote the scripts, and he

15   put his hand out at the end of the day.  He was a member of the

16   conspiracy, and it went on day after day.

17           Doses.  We've heard a lot of talk about him reducing –

18   purportedly reducing doses.  Well, whether or not he lowered doses or not,

19   assuming he did, which I'd submit he didn't.  When you look at the files,

20   you look at the drug screens, people were exaggerating the drugs they say

21   they were taking so that maybe he would prescribe them.  You look at the

22   drug screens, they were testing negative for Xanax.

23           But regardless, it's the money that he accepted, is why we are

24   here.  It's the choices he made is why we are here.  It's the prescriptions

25   that he did write, is why we are here, not what he didn't do.

-972-

1    This isn't a case against pain doctors.  It's not a case against

2    getting treated for pain.  It's not about sickle cell patients who really hurt,

3    or pseudo addicts.  Let there be no confusion.  There is no dispute that

4    there is a legitimate need for controlled substances in our society ,and for

5    patients to receive treatment for pain.  There is a legitimate need for

6    Xanax and for oxycodone, but there is a way to do it.  Doctors have a duty

7    to doctor, and simply writing what you see in an MRI, not doing any kind

8    of test, not doing any examination, but simply writing prescriptions is not

9    doctoring.  Doctoring requires using your knowledge that you learned in

10   medical school.  If it was so easy to be a doctor, why go through all those

11   years of school, if all you've got to do is write down what you see on an

12   MRI?  Physicians have a duty to do no harm and to doctor.

13   Common sense.  There is no doubt your memories collectively

14   are so much better than my memory individually.  And these files, these

15   exhibits, the testimony, the collective genius of your brains exceeds mine

16   and any one of us.  But I ask you to use your common sense.  I mean, let's

17   be real.  Be real.  And this whole notion of we don't want you to convict

18   him except for one count, let me assure you, we ask you to find him guilty

19   of every single count, because he committed every single count.

20   And we talk about choices.  You're about to go back in the back,

21   and you'll be faced with decisions to make.  And in these decisions, I'd ask

22   you to use your common sense.  You use the law that the judge is going to

23   instruct, and you look at this evidence.  And you will be asked, did Dr.

24   Azmat really act like a doctor?  Did Dr. Azmat step outside the bounds of

25   professional practice?  And common sense dictates, truth dictates, it

-973-

1   demands a finding of guilty.  Thank you.

2                THE COURT: Thank you, Mr. Gilluly.  Would you hand out the

3   charges to the jury please.

4                CLERK: Yes, Your Honor.

5                [NOTE: Written copies of jury charge are given to jurors. The

6   proceedings are continued with the Court's charge to the jury, which is not

7   a part of this record.]

8                THE COURT: Now, in just a few moments you will begin your

9   deliberations, and you will have a copy of these charges to take with you.

10  And shortly after you get into the jury room, the Clerk will send out to you

11  the exhibits that have been admitted during this trial.

12               [NOTE: Alternates are identified and seated.]

13               THE COURT: Now, ladies and gentlemen, the remainder of

14  you should take your notepads and a copy of the charges and follow my

15  instructions by going to the jury room and first selecting one of your

16  members to serve as your foreperson.  And very shortly the exhibits will be

17  sent out to you.  So I'll ask you to retire to the jury room at this time.

18               [NOTE: The jury retires to the jury room to begin deliberations

19  at 11:38 a.m.  The proceedings are continued outside of the presence of the

20  jury as follows:]

21               THE COURT: Counsel, for the record, the defendant's Rule 29

22  motion for judgment of acquittal has been considered by this Court, and

23  that motion is DENIED.  I'll place that on the record at this time.

24               It is my practice, as you know, that if the jury should send out

25  any message or any note, that before I answer that question that I have

-974-

1    counsel come in and I discuss with you the message and the answer that

2    the Court is preparing to send to the jury.  And if at all possible I'm going

3    to send out a response in writing.

4              Now, in the event that this jury sends out a message or a note,

5    you need to be available; you need to be available to get here quickly so

6    that I can discuss it with you before responding to the jury.  So if you're not

7    going to be right here, you need to give Ms. Bodaford a telephone number

8    where you can be reached, and you need to be prepared to be here very

9    promptly after that message in the event that we get any message.

10             As I told you yesterday, I'm going to have the Marshal take an

11   order from this jury for lunch and have lunch brought in, and have them

12   deliberate during lunch.

13             Now, you're going to be on your own at lunch, and I don't want

14   to keep you captive here, but I never know.  You know, sometimes I've had

15   a jury send out a message ten minutes after they go back, and sometimes

16   it'll be hours before they'll send out a message.  But since we're taking

17   lunch orders and bringing in lunch to these jurors, I would think that you

18   ought to be excused for at least, at a minimum, about 40 minutes, I would

19   think.  So you won't be required, even if they send out a message, to get

20   here before that time.  But as I've said, be readily available as quickly as

21   possible.

22             So we will soon adjourn.

23             [NOTE: The Court now instructs alternate jurors and excuses

24   them.  The proceedings are continued as follows:]

25             THE COURT: All right, counsel, we'll be in recess.  As I've said,

-975-

1    you'll have at least 40 minutes where you won't have to answer – yes, Mr.

2    Withers?

3                    MR. WITHERS: Your Honor, can I briefly put my exceptions to

4    the charge – objections to the charge on the record?

5                    THE COURT: Yes, sir, you may.

6                    MR. WITHERS: With respect to the definition of dispensing

7    found at Page 11 of the charge, we would object that – to the definition

8    included, and that that definition rather should be the one that's found at

9    21 U.S.C. 802, Paragraph 10.

10                   And would also object to the Court's failure to give our –

11   defense good-faith instruction, that's defendant's proposed instruction

12   Number 20; the failure to give the defendant's proposed instruction

13   Number 21, uncertainty of the law regarding standard of care; and then

14   the failure to give the defendant's proposed instruction Number 22, which

15   is the difference between civil malpractice and criminal conduct.

16                   And to be specific, back to the dispensing objection, Your

17   Honor, at Page 11 of the Court's instructions, the definition found at 21

18   U.S.C. 802, Subparagraph 10, is actually found in the superseding

19   indictment at Paragraph 11.

20                   Those are my objections.  Thank you.

21                   THE COURT: All right, those objections are noted for the

22   record.  Anything else, counsel, before we adjourn?

23                   MR. KNOCHE: Not from the government, Your Honor.

24                   MR. WITHERS: Nothing from the defendant, Your Honor.

25                   [NOTE: Whereupon the proceedings are recessed pending jury

-976-

1    deliberations.  At 1:12 p.m. the Court is notified of jury questions, and the

2    proceedings are continued outside of the presence of the jury as follows:]

3              THE COURT: All right, we've got what I call Jury Questions 1

4    and 2, and I will have the Clerk, Ms. Bodaford, mark them as Jury

5    Questions 1 and 2.

6              Jury Question 1 [reading]: Is there a Count 51?

7              The Court's answer will be no.

8              Jury Question 2 [reading]: Re: Count 52, top of Page 14.

9    Defendant is not charged ... in violation of 18 United States Code, Section

10   1956(a)(1).  Rather he is charged with conspiracy to launder money, in

11   violation of 18 United States Code, Section 1956(h).

12             [Reading]: Below: – this is their writing –

13             [Reading]: First: two or more people ... Section 1956(a)(1)...

14             We have a question regarding 1956(a)(1) and 1956(a) and how

15   they relate to Charge 52.

16             The Court's answer [reading]: 18 United States Code, Section

17   1956(a)(1) makes it a federal crime to launder money.  18 United States

18   Code, Section 1956(h) makes it a federal crime to conspire to launder

19   money as defined in 18 United States Code, Section 1956(a)(1).

20             Now, that's the proposed way to answer those questions.  Do

21   you have any problem with those answers, Mr. Knoche?

22             MR. KNOCHE: No, sir.

23             THE COURT: Mr. Withers?

24             MR. WITHERS: No, Your Honor.

25             THE COURT: All right, send the answer back, please.

-977-

1        [NOTE: The Court's answers to the jury questions are taken to

2    the jury room.]

3        THE COURT:  And here is a copy for each counsel, and if you

4    request the Clerk will make a copy of the actual notes and give them to

5    you.  Go back there, Jennifer, and make a copy of those actual notes.  Just

6    put them on one sheet of paper and give them to counsel for the

7    government and counsel for the defendant.  And the originals will go in the

8    record.

9        CLERK: Yes, Your Honor.

10       [NOTE: The proceedings are again recessed pending jury

11   deliberations.  At 2:26 p.m. the Court is notified that a verdict has been

12   reached, and the proceedings are continued in the presence of the jury as

13   follows:]

14       THE COURT: Mr. Vetter, you're the foreperson of the jury?

15       MR. VETTER: Yes, Your Honor.

16       THE COURT: Has the jury reached a unanimous verdict?

17       MR. VETTER: Yes, we have.

18       THE COURT: Would you hand it to the officer, please.

19       [NOTE: Verdict is tendered to the Court.]

20       THE COURT: Would you publish the verdict, please.

21       CLERK: Yes, Your Honor.  In the United States District Court

22   for the Southern District of Georgia, Savannah Division.  In the case of

23   United States of America versus Najam Azmat, Case Number CR413-28.

24   Verdict Form.  We, the jury, find the defendant, Najam Azmat

25       GUILTY as to Count 1.

1          GUILTY as to Count 2.

2          GUILTY as to Count 3.

3          GUILTY as to Count 4.

4          GUILTY as to Count 5.

5          GUILTY as to Count 6.

6          GUILTY as to Count 7.

7          GUILTY as to Count 8.

8          GUILTY as to Count 9.

9          GUILTY as to Count 10.

10         GUILTY as to Count 11.

11         GUILTY as to Count 12.

12         GUILTY as to Count 13.

13         GUILTY as to Count 14.

14         GUILTY as to Count 15.

15         GUILTY as to Count 16.

16         GUILTY as to Count 17.

17         GUILTY as to Count 18.

18         GUILTY as to Count 19.

19         GUILTY as to Count 20.

20         GUILTY as to Count 21.

21         GUILTY as to Count 22.

22         GUILTY as to Count 23.

23         GUILTY as to Count 24.

24         GUILTY as to Count 25.

25         GUILTY as to Count 26.

1          GUILTY as to Count 27.

2          GUILTY as to Count 28.

3          GUILTY as to Count 29.

4          GUILTY as to Count 30.

5          GUILTY as to Count 31.

6          GUILTY as to Count 32.

7          GUILTY as to Count 33.

8          GUILTY as to Count 34.

9          GUILTY as to Count 35.

10         GUILTY as to Count 36.

11         GUILTY as to Count 37.

12         GUILTY as to Count 38.

13         GUILTY as to Count 39.

14         GUILTY as to Count 40.

15         GUILTY as to Count 41.

16         GUILTY as to Count 42.

17         GUILTY as to Count 43.

18         GUILTY as to Count 44.

19         GUILTY as to Count 45.

20         GUILTY as to Count 46.

21         GUILTY as to Count 47.

22         GUILTY as to Count 48.

23         GUILTY as to Count 49.

24         GUILTY as to Count 50.

25         GUILTY as to Count 52.

-980-

1    So say we all.  Signed by the foreperson, this January 17, 2014.

2    THE COURT: Does counsel wish the jury to be polled?

3    MR. WITHERS: Yes, Your Honor.

4    THE COURT: Would you poll the jury, please.

5    [NOTE: The jury is polled.  The proceedings are continued in

6    the presence of the jury as follows:]

7    THE COURT: Mr. Withers, if you and Dr. Azmat would come

8    to the lectern, please.

9    [NOTE: Counsel and defendant approach the lectern.]

10   THE COURT: Dr. Najam Azmat, based upon the verdict of the

11   jury finding you guilty of the offenses charged in the indictment filed

12   against you in Criminal Case Number CR413-28-4, the Court does hereby

13   accept the verdict of the jury and adjudges you GUILTY of the offenses

14   charged therein.

15   You are advised, Doctor, both you and your counsel, that you

16   will have 14 days within which time to file a motion for a new trial; and 14

17   days from the date of sentencing in this case in which to file a notice of

18   appeal.

19   Before you are sentenced for this conviction, the United States

20   Probation Office will conduct a presentence investigation, and upon

21   completion they will file a report, and a copy of that report will be made

22   available to you and your counsel, and counsel for the government.

23   If there are any inaccuracies in the report or any genuine issues

24   that cannot be resolved with the probation office, then the Court will

25   resolve those issues at the time of sentencing.

-981-

1    The Court now also advises you that you're entitled to

2  assistance of counsel in taking an appeal, and if unable to afford a lawyer

3  one will be provided for you.

4    If you so request, the Clerk of Court will prepare and file a

5  notice of appeal on your behalf.

6    In the event of an appeal, it will be the obligation and

7  responsibility of your counsel to continue representation on appeal, unless

8  and until order of the United States Court of Appeals.

9    In addition thereto, if you're unable to pay the cost of an

10  appeal, then you have a right to apply for leave to appeal *in forma*

11  *pauperis* without further authorization, unless it shall be found that the

12  appeal is not taken in good faith, or that you are otherwise not entitled to

13  proceed.

14    Based upon the verdict of the jury finding you guilty, the Court,

15  after the jury has been dismissed, will discuss with you and your counsel

16  and counsel for the government the situation of any bond pending

17  sentencing in this Court.  And as I've said, the sentencing will be scheduled

18  after the Court has received the presentence investigation.

19    You may have a seat now, counsel.

20    [NOTE: The Court excuses the jury with the thanks of the

21  Court.]

22    THE COURT: Ask them to come back in here a minute, I forgot

23  to tell them something, I'm sorry.

24    [NOTE: The jury is brought back to the jury box and the

25  proceedings are continued as follows:]

-982-

1    THE COURT: Please have a seat.  I neglected to discuss with

2    you the fact that in this indictment is a forfeiture allegation regarding any

3    money or funds that may have been involved in this matter.  That

4    forfeiture allegation is a separate matter that was separated from the issue

5    that you decided today.  It may be that in the next couple of weeks that you

6    may be asked to come back here and decide the forfeiture issue.  So that

7    may happen, it may not happen.  But in the event that it does happen, you

8    should not discuss this matter with anyone, and don't try to find out

9    anything else about this case other than what you've learned in this

10   courtroom until you are notified by this Court as to whether or not you will

11   have to determine any issues of forfeiture or not.

12   Now, do you understand what I'm telling you about that?

13   [NOTE: All jurors indicate affirmatively.]

14   THE COURT:  Do you have any questions about that?

15   [NOTE: All jurors indicate negatively.]

16   THE COURT:  Well, we will let you know just as soon as

17   possible whether or not you will be required to return here about any

18   forfeiture issues.  You're excused at this time, thank you.

19   [NOTE: Whereupon the jury is excused.  The proceedings are

20   continued as follows:]

21   THE COURT: Have a seat, please.  Mr. Withers, I can't recall

22   because it's been so long ago – I can't recall what the situation is as far as

23   the bond that your client is on, and perhaps you can enlighten me about

24   that.

25   MR. WITHERS: Your Honor, I'm not positive, but I think it

-983-

1    was $100,000 with $10,000 secured, but I'm not positive.  Honestly, I

2    don't recall either, and I did not look.

3              THE COURT: Is the probation officer here?

4              PROBATION OFFICER: Yes, Your Honor.

5              THE COURT: Come ...

6              PROBATION OFFICER: Dr. Azmat was –

7              THE COURT:  – Excuse me.  Come on up to the lectern, please.

8              [NOTE: Probation Officer approaches lectern.

9              THE COURT:  All right, yes, ma'am.

10             PROBATION OFFICER: Dr. Azmat was released to pretrial

11   supervision on May 13, 2013 on a $100,000 bond secured by five percent.

12             THE COURT: Secured by five percent?

13             PROBATION OFFICER: Yes, sir.

14             THE COURT: Okay, and that was on May 13?

15             PROBATION OFFICER: May 13th –

16             THE COURT: – Of '13.

17             PROBATION OFFICER: 2013.

18             THE COURT: Thank you.  I thought there were some other

19   restrictions.  I thought that there were restrictions about surrendering

20   passports and other restrictions that were on that bond.

21             MR. WITHERS: If I'm correct, I think Dr. Azmat surrendered

22   his passport, his wife, his mother and his mother-in-law.

23             THE COURT: As I recall – I don't know who-all, but I believe

24   Dr. Azmat surrendered his passport, his wife surrendered her passport, his

25   mother, his mother-in-law, and those passports are still surrendered.

-984-

1    MR. WITHERS: I think that's accurate, yes, sir.

2    THE COURT: Thank you, Mr. Withers.  What is the position of

3    the government, Mr. Knoche, as far as Dr. Azmat remaining on bond

4    pending sentencing in this case?

5    MR. KNOCHE: Your Honor, under the Bail Reform Act, the

6    government feels compelled to ask the Court to detain Dr. Azmat, given

7    the statutory penalty and nature of the offenses of which he's just been

8    convicted.  I would also suggest that – I think many cases it would likely be

9    beneficial to the defendant to have some time to reflect upon this and, you

10   know, gather his thoughts about his future condition before just being

11   released back.  This is, I'm sure, a shocking event in his life, and the

12   government would have some concerns along those lines, as well as the

13   requirements of the Bail Reform Act.

14   THE COURT: Thank you, Mr. Knoche.  Mr. Withers, what do

15   you want to say about the situation of bond?

16   MR. WITHERS: Your Honor, I would ask that he be continued

17   on bond.  Your Honor actually heard the bond hearing back in May.  I

18   think that the probation officer can confirm that Dr. Azmat has been

19   compliant with all of the issues with respect to his bond, and we would ask

20   that he continue on that bond.

21   THE COURT: You have to – you know, I deal with a lot of

22   people and I don't have instant recall of all of them.  As I understand, Dr.

23   Azmat is a naturalized U.S. citizen.

24   MR. WITHERS: That's correct.

25   THE COURT: And how about the rest of his family.  As far as

-985-

1    his wife, his mother and other people that I made surrender their

2    passports?

3                    MR. WITHERS: They are all naturalized U.S. citizens.

4                    THE COURT: And Dr. Azmat is still living in Waycross,

5    Georgia?

6                    MR. WITHERS: That's correct, Your Honor.

7                    THE COURT: And he's still living there with his wife and

8    family?

9                    MR. WITHERS: He is living there with his family.  I think that

10   his wife over the last few months has been assisting a sister-in-law in her

11   business in Atlanta so that they can make ends meet.  But he is the

12   caretaker of the children, the three children, in Waycross right now.

13                   THE COURT: All right, thank you.   What is the probation

14   officer's estimate as to the time that the presentence investigation would

15   be completed in this case?

16                   PROBATION OFFICER: Your Honor, we could deliver the final

17   presentence investigation report to you in approximately three months.

18                   THE COURT: Thank you.  Does the probation office – and

19   don't just parrot what the government said that their statutory obligation

20   is – does the probation office have any position regarding the bond in this

21   case?

22                   PROBATION OFFICER: Your Honor, Dr. Azmat has complied

23   with the pretrial conditions.  However, based on the offense of conviction,

24   there is a presumption of detention, and that would be our

25   recommendation.

-986-

1          THE COURT: Thank you.  Based upon the presumption

2   because of the conviction in this case, and the position of the government

3   taken at this hearing today, and the position of the probation office, then

4   the – and based upon the conviction in this case, the Court does hereby

5   remand the defendant to the custody of the United States Marshal pending

6   the sentencing in this case.

7          Anything else from the government, Mr. Knoche?

8          MR. KNOCHE: Not at this time.

9          THE COURT: Anything else from the defendant, Mr. Withers?

10          MR. WITHERS: No, Your Honor.

11          THE COURT: All right, we'll be in recess.

12          [NOTE: Whereupon the proceedings are concluded.]

-987-

STATE OF GEORGIA

CHATHAM COUNTY.


CERTIFICATE OF REPORTER


I, Marie Cowart, do hereby certify that the above and foregoing pages of typewritten material is a true, correct and complete transcript of the evidence and proceedings adduced in the Jury Trial stated in the captioned matter, this being Volume 5 of Volumes 1A, 1 through 5.

This 18th day of September, 2014.


/s/ *Marie Cowart*

Marie Cowart, CCR B-237
United States Court Reporter
Southern District of Georgia
Savannah Division


P. O. Box 9572
Savannah, GA 31412
(912) 650- 4066