[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-13703

_____

D.C. Docket No. 4:13-cr-00028-WTM-GRS-4


UNITED STATES OF AMERICA,

                                                        Plaintiff-Appellee,

versus

NAJAM AZMAT,
a.k.a. Dr. Hazmat,

                                                        Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(November 10, 2015)

Before TJOFLAT and HULL, Circuit Judges, and BARTLE,[*] District Judge.

HULL, Circuit Judge:

After a jury trial, Dr. Najam Azmat was convicted of 1 count of conspiracy

to dispense controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), (b)(2),

and 846; 49 counts of unlawful dispensation of controlled substances, in violation

of 21 U.S.C. § 841(a)(1), (b)(1)(C), (b)(1)(E), and (b)(2); and 1 count of

conspiracy to launder monetary instruments, in violation of 18 U.S.C. § 1956(h).

After review and oral argument, we affirm Dr. Azmat's convictions and total 133-

month sentence.

## I. BACKGROUND

On August 7, 2013, a superseding indictment ("the indictment") charged

Dr. Azmat with conspiracy to dispense controlled substances and conspiracy to

launder monetary instruments.  The indictment alleged that Dr. Azmat conspired

with Sean Clark, Adelaid Lizama, Daniel Wise, Candace Carreras, Shelly Morford,

and other persons both known and unknown.  The indictment further charged that,

during February and March 2011, Dr. Azmat unlawfully dispensed 49

prescriptions for oxycodone, hydrocodone, and alprazolam to 25 people.  All of the

alleged activities arose from Dr. Azmat and the codefendants' participation in a

---

[*]Honorable Harvey Bartle III, United States District Judge for the Eastern District of
Pennsylvania, sitting by designation.

2

pill-mill scheme in Garden City, Georgia.  The codefendants' pill mill[1] was called East Health Center.

Following a 5-day trial in January 2014,[2] a jury found Dr. Azmat guilty of the 51-charged crimes.  On August 6, 2014, the district court sentenced him to 133 months' imprisonment, which was below his advisory guidelines range.  This appeal follows.

## II. CONVICTION ISSUES

In this appeal, Dr. Azmat challenges his convictions on multiple grounds, arguing, inter alia, that: (1) even if he wrote prescriptions for illegal purposes, he did not "dispense" controlled substances or conspire to "dispense" controlled substances, as provided in § 841(a)(1); (2) the trial evidence was insufficient to support his convictions; (3) the district court abused its discretion by admitting Dr. Gene Kennedy's expert testimony; (4) prosecutorial misconduct occurred during trial; and (5) cumulative error warrants reversal.  We first review the trial evidence.

---

[1] The indictment defined "pill mill" as "a nominal pain management facility which dispenses or distributes controlled substances outside the usual course of professional practice and without legitimate medical purpose."

[2] Dr. Azmat was tried separately from his codefendants, who all accepted plea agreements.

3

## III.  TRIAL EVIDENCE

**A.**    **Establishing East Health Center**

Adelard LeFrancois testified that he began working at a pain management company–Palm Beach Pain and Rejuvenation, in Boca Raton, Florida–in the fall of 2009.  Patients would travel to Palm Beach Pain and Rejuvenation from out-of-state, present a recent magnetic resonance image ("MRI"), and then receive a basic physical examination followed by prescriptions for oxycodone, Percocet, Xanax, and/or Valium.  Palm Beach Pain and Rejuvenation had only basic medical supplies and did not accept insurance.  It did nothing other than dispense controlled substances.

LeFrancois stated that, until October 2010, clinics in Florida could dispense 28 days' worth of medication at one time.  In October 2010, Florida changed its laws so that medical providers could not dispense more than 72 hours' worth of medication unless they had medical malpractice insurance.  Because Palm Beach Pain and Rejuvenation did not carry insurance, it started losing business, as it could no longer attract out-of-state patients who did not want to travel for only 72 hours' worth of pills.  Accordingly, LeFrancois decided that he would open his own clinic in Georgia, where the laws were less restrictive.

LeFrancois recruited several of his Florida coworkers, including Lizama, Carreras, Wise, Clark, Morford, Frankie Barbuscia, and Konstantinos Afthinos, to

4

come with him to open a new pain management clinic in Georgia. Some of the employees–Wise, Morford, and Afthinos–rented a house together in Georgia. LeFrancois then established East Health Center in Garden City, Georgia, and placed an advertisement on Craigslist to recruit a doctor.

## B.    Recruiting Physicians

Dr. Mary Kay Ross testified that, in February 2011, she responded to the advertisement recruiting physicians to work part time at East Health Center. Dr. Ross set up a lunch meeting with Clark and LeFrancois, who told her that doctors working at the clinic would dispense pain medication to patients in, what she felt, were "very, very large amounts." They explained that the clinic already had out-of-state patients waiting for appointments, and the patients knew what medicines they would be prescribed. Dr. Ross asked about medical malpractice insurance, and Clark and LeFrancois stated that they had no need for it. Dr. Ross also observed that neither Clark nor LeFrancois had medical backgrounds, yet they owned a clinic and were well versed in pain medication.

After lunch, Dr. Ross contacted a law enforcement official because she thought it was odd that the clinic would dispense 150 to 190 pills at a time and that patients would come from out-of-state for pain management. Dr. Ross stated that she was sensitive to "drug seekers" based on her previous experiences working in an emergency room. However, Dr. Ross admitted that she was not board certified

5

in pain management and that her perspective may be affected by the fact that emergency rooms provide for patients' short term needs, while primary care physicians and specialists provide long term care.

A narcotics officer suggested that Dr. Ross look at the clinic and "see what else there was going on." Dr. Ross agreed and visited East Health Center, which she found to be "inadequate." It was small, did not have many medical supplies beyond a scale and a blood pressure cuff, there was a safe from which medications could be dispensed, and there was no laboratory for processing tests.

Dr. David Hatmaker, an emergency room doctor who was not certified in pain management, testified that he also responded to East Health Center's advertisement. After electronically communicating with LeFrancois, Dr. Hatmaker visited the clinic, which he stated "did not meet [his] expectations." Dr. Hatmaker described the facility as a "lower scale" clinic in a "less-than-attractive community." There were no nurses and only basic medical equipment–nothing to read an x-ray or an MRI.

Dr. Hatmaker met with LeFrancois at the clinic, and LeFrancois explained that East Health Center did not take insurance, accepted cash and credit card payments only, and would pay Dr. Hatmaker $2,000 per day in cash for his services. LeFrancois also stated that there was no need for medical malpractice insurance. The clinic's primary purpose was "treatment with narcotics."

6

LeFrancois stated that they did not advertise and wanted to keep a "low profile." Finally, he asked Dr. Hatmaker to move his Drug Enforcement Administration ("DEA") number to the clinic so that he could bring narcotics to the facility and dispense them directly to the patients.

Dr. Hatmaker also testified that he met Dr. Azmat during his tour of the clinic. Dr. Hatmaker watched Dr. Azmat examine a patient in a cursory fashion and then prescribe four narcotic prescriptions. Dr. Azmat told him that some patients came from out-of-state to visit East Health Center. After this meeting, Dr. Hatmaker called a friend at the DEA to suggest that law enforcement look into the clinic because it did not appear to be legitimate. On cross-examination, Dr. Hatmaker stated that the clinic was not directly dispensing medication at the time of his visit.

Thus, Dr. Azmat began working at East Health Center at some point prior to Dr. Hatmaker's interview. LeFrancois testified that he and Dr. Azmat communicated about the open position by phone and email. LeFrancois told Dr. Azmat that he would be paid $2,000 in cash each day for pain management services. LeFrancois explained that the patients would be from out-of-state and would be expecting oxycodone. LeFrancois also mentioned his experience at the Florida pill mill and stated that East Health Center would be the same type of operation. Dr. Azmat told LeFrancois that he had experience in a pain

7

management facility, held multiple DEA licenses, and would be able to "take care of everything."

**C.     East Health Center's Operation**

1.     General Practices

East Health Center opened its doors on February 21, 2011. LeFrancois testified that patients paid $250 to $300 to see a doctor and receive a prescription. Patients had to present a recent MRI in order to see a doctor, so that there could be documentation of a chronic-pain injury warranting medication. In order to obtain an oxycodone prescription, patients also had to provide a urine sample to establish that they already had oxycodone in their systems. They could not be seen by a doctor unless they passed the urine test.

Barbuscia and Afthinos testified that they were "marketers" for East Health Center. In this capacity, they attempted to recruit clients by intercepting people as they were visiting other pain clinics, talking to people at gas stations and low-scale hotels, and looking for "raggedy" out-of-state cars. Barbuscia would hand out fliers advertising "incentives" at the clinic. Barbuscia agreed that clients he was targeting looked like "zombies" or "addicts."

LeFrancois wanted to keep a low profile, so he limited the number of patients that could visit the clinic each day and encouraged patients to park in alternative parking lots so that their out-of-state license plates would not attract

8

attention. LeFrancois stocked East Health Center with limited medical supplies and some health-related posters. There were security cameras to deter patients from stealing from the clinic. The clinic never dispensed medication on site.

East Health Center employees audited the cash each day. The clinic used patients' cash payments to pay the doctors' salaries, purchase lunch, pay for the employees' rental house, pay the clinic's lease, and cover any expenses such as electrical work and cable. The remaining cash was deposited at a bank at the end of each day.

An agent from the Chatham-Savannah Counter Narcotics Team visited the clinic during the first two days of its operation. The agent advised LeFrancois that he needed more medical supplies to meet minimum requirements. LeFrancois went shopping and purchased the necessary equipment, which he agreed functioned as "prop[s]."

2.     Dr. Azmat's Role

Dr. Azmat was the only doctor working at the clinic at its inception. He began on February 21, 2011, and was terminated on March 18, 2011. According to Wise, the office manager at East Health Center, Dr. Azmat was aware of the clinic's marketing techniques because they were openly discussed within the office. Dr. Azmat knew that patients paid in cash and saw them congregating in

9

front of the clinic. Wise paid Dr. Azmat in cash each day "[f]rom the daily take of whatever came in."

Furthermore, according to Wise, while Dr. Azmat may have been unaware of the terminology or the particulars of the financial arrangements, Dr. Azmat knew that "sponsors" would bring groups of patients to the clinic. Wise explained that "sponsors" were pill seekers who would pay for patients' appointments in exchange for a portion of the pills prescribed during the visit. Wise had entered a guilty plea related to his involvement in the clinic.

LeFrancois testified that he fired Dr. Azmat primarily because Dr. Azmat did not give patients what they expected to be prescribed, and pharmacies were refusing to fill his prescriptions. Wise confronted Dr. Azmat about why he was reducing prescriptions, and, according to Wise:

> Dr. Azmat would get frustrated and explain that it was his license on the line, that he wasn't going to do what they wanted him to do, and he would increase the patients' prescription on their next visit. He wanted to show that they weren't starting off at a high amount. He wanted to show that they were getting less than what they were getting at a previous clinic.

Barbuscia similarly testified that patients were angry that Dr. Azmat was not writing heavy enough prescriptions.

Aside from issues with the prescriptions, LeFrancois was also upset that Dr. Azmat was refusing to treat patients seeking primary care because he did not have the proper medical malpractice insurance. Afthinos added that the clinic

10

directors were angry that Dr. Azmat was spending 15 to 20 minutes with each patient, which was too long. The negative feelings against Dr. Azmat were compounded by the fact that he was an outsider to the group who had previously worked together in Florida.

3.    Dr. Gossett's Tenure

After the clinic fired Dr. Azmat, Dr. Ken Gossett took his place. Dr. Gossett testified that he understood that the patients paid in cash for his services and were seeking oxycodone. The only time that he did not prescribe a patient oxycodone was when he could not find a justification for doing so based on the patient's medical records or complaints. When this happened, the patient would get a refund.

Dr. Gossett also testified that he recognized that it would be odd for patients experiencing intense pain to travel hours from home to see a doctor. When asked whether it was apparent that many of his patients were drug abusers, Dr. Gossett responded: "It seemed that they acquired a lot of pain medicine, yes." Finally, Dr. Gossett clarified that, as a doctor, he had a license to prescribe medicine, not a license to dispense medicine.

**D.    Investigation**

DEA Diversion Investigator Charles Sikes stated that the government initiated an investigation of East Health Center after receiving Dr. Ross's

complaint. The agency conducted surveillance and discovered cars with out-of-state licenses in the clinic's parking lot and patients' files in the trash. It appeared that people arrived in groups from locations outside of Georgia. Agents spoke with pharmacists and learned that East Health Center was primarily prescribing oxycodone. An agent inspected the interior of the clinic and saw that there was a scale, a blood pressure cuff, band aids, gauze, and cotton balls, which were meant to "give the appearance of a medical facility."

After obtaining a warrant in May 2011, DEA agents seized patient files, business records, patient sign-in sheets, and a camera system. There were boxes of empty pill bottles in the reception area and a safe for cash. A ledger showed that almost all of the patients paid in cash. From the gathered evidence, Investigator Sikes was able to determine which patients Dr. Azmat treated and access the relevant patients' medical files.

Sikes testified that he examined all 238 of Dr. Azmat's patients' records and created a summary of the information. Sikes stated that, out of the 238 patients treated by Dr. Azmat, 196 received medication. Out of the 196 patients who received prescriptions, 64 percent were from out-of-state, and 96 percent received oxycodone.

Sikes further stated that Dr. Azmat consented to a non-custodial interview on September 19, 2012. According to Sikes, Dr. Azmat stated that when

LeFrancois offered him the job, he understood that he would be working as a pain management physician. Dr. Azmat stated that he knew Wise, Lizama, Konstantinos, Morford, and Clark. He explained that East Health Center was "[a] pill mill or pain management clinic," and it turned away primary care patients who came in wanting a physical or treatment for flulike symptoms.

Dr. Azmat stated that most of the patients had been to other pain management clinics and were addicted to oxycodone. He was aware that many of the patients lived outside of Georgia. In order to be seen, patients had to bring an MRI, but did not need to present any other medical records. He would typically spend 30-to-40 minutes with each patient and then prescribe them narcotics. While Dr. Azmat claimed that he referred patients to specialists, Investigator Sikes testified that referrals were not noted in the patient charts. Dr. Azmat believed that the clinic only accepted payment in cash.

According to Sikes's investigation, Dr. Azmat was typically paid in cash at the end of each day, but received checks on three or four occasions. Investigator Sikes also testified that, throughout the interview, Dr. Azmat "constantly referred to [the patients] as customers."

On cross-examination, Sikes explained that, after the clinic was informed that it lacked the proper medical equipment, Dr. Azmat called a government office

to ask what the clinic needed to obtain to be in compliance. Dr. Azmat also
expressed that he believed that what he was doing was legitimate.

Furthermore, Investigator Sikes admitted that Dr. Azmat discontinued or
decreased some peoples' oxycodone and/or Xanax prescriptions when they came
to the clinic. Sikes explained that Xanax and oxycodone can be dangerous when
combined, and it appeared that Dr. Azmat was attempting to prevent harmful drug
interactions. Furthermore, many of the patients who received oxycodone tested
positive for oxycodone at the time of their examination. Dr. Azmat refused to
prescribe narcotics to at least one patient who had a negative urine test, and he also
decreased prescriptions for drugs other than Xanax and oxycodone.

On redirect, Sikes explained that Dr. Azmat did not have medical records for
most of the patients at the time of their visits. Therefore, when the patients self-
reported the amount of narcotics their previous doctors had prescribed, there was
no way for Dr. Azmat to confirm that they were telling the truth. Moreover, some
of the patients obtained MRIs without a doctor's referral and crossed state borders
in order to access walk-in MRI facilities. One patient's MRI documentation even
stated that the MRI was "read" before the time that it was taken. Finally, Sikes
summarized that out of the 42 patients that Dr. Azmat did not medicate, 20 patients
did not have documents in their medical files, 9 lacked MRIs, 6 tested positive for

illegal or un-prescribed drugs and were told to return at a later date, and the rest were denied medications for miscellaneous or unspecified reasons.

Internal Revenue Service ("IRS") Agent Michael Palmer provided brief testimony about Dr. Azmat's tax returns. Agent Palmer stated that Dr. Azmat did not file a federal income tax return for 2011, and he presented a copy of a certificate showing the "lack of record" (2011 tax return).

**E.    Patient Experiences**

Eight of Dr. Azmat's patients testified about their experiences at East Health Center. Seven described themselves as prescription pill addicts. The remaining patient–who was not addicted to pills–testified that the people she observed in the waiting room looked like drug addicts. Another patient observed that the people in the waiting room were noticeably medicated and "nodding out" in their seats.

As to their meetings with Dr. Azmat, seven of the patients stated that their exams were cursory or lasted no more than ten minutes. Three patients testified that Dr. Azmat never touched them during the physical examination. He simply asked them about their pain or prescription history before writing them a new script. Dr. Azmat generally did not review the forms that the patients filled out before their exams or provide any warnings about the addictive nature of the prescribed medications. Dr. Azmat did not discuss treatment options other than narcotics.

While two patients stated that Dr. Azmat failed to treat their high blood pressure or discuss any medical issues beyond their chronic pain, another patient testified that Dr. Azmat diagnosed a heart murmur and advised him to see a cardiologist. All but one of the patients had a legitimate injury, typically from a car accident or workplace accident that occurred years prior to the visit. After visiting East Health Center, one of the patients sought out a more reputable clinic and his new physician has continued to prescribe him oxycodone.

## F.    Government's Expert

Dr. Gene Kennedy testified as the government's expert witness on pain management. Dr. Kennedy stated that it is "impossible" to diagnose a "chronic patient" without (1) reviewing the patient's medical history and treatment records, and (2) conducting a physical examination. After making the appropriate findings, doctors should create treatment plans for their patients. For patients experiencing pain, a treatment plan may include a referral for physical therapy, occupational therapy, or neurosurgery, in addition to other measures. If prescribing a controlled substance is necessary, the physician must discuss with the patient the risks and benefits of the drug.

Dr. Kennedy reviewed the patient files that were relevant to the indictment and concluded that, in each instance, Dr. Azmat did not prescribe the controlled substances for a legitimate medical purpose or in the usual course of professional

16

practice. Based on his review of the records, Dr. Kennedy explained that
Dr. Azmat prescribed medication when: (1) patients did not already have
controlled substances in their system, which suggested that the patients were lying
when they reported that other doctors had prescribed them controlled substances;
(2) patients did not present medical records from their previous physicians to
verify their injuries and prescription history; (3) patients' MRIs and physical
exams were unremarkable; (4) patients were from out-of-state or obtained their
MRIs out-of-state, when patients in extreme pain typically are not capable of
traveling great distances; (5) patients self-reported for MRIs, rather than being
referred by a doctor; (6) patients were reporting high levels of pain but did not
appear to be in distress, further suggesting dishonesty; and (7) patients had state
identification cards, rather than drivers' licenses, which suggested that they had
been caught driving under the influence of drugs or alcohol. All of these factors
are red flags for doctors, and Dr. Azmat should have been suspicious that the
patients were seeking pills.

Dr. Kennedy also discussed additional issues with Dr. Azmat's medical
practices. He believed that Dr. Azmat was prescribing too many pills; failed to
note or treat obvious problems, such as patients' alarmingly high blood pressures;
and failed to prepare treatment plans. Furthermore, Dr. Kennedy thought it was
strange that patients signed a form before seeing Dr. Azmat, stating that they

consented to opioid treatment.  He believed that the practice suggested that it was a
foregone conclusion that opioids would be prescribed.

On cross-examination, Dr. Kennedy admitted that doctors do not deny
addicts pain medication simply because they are addicts.  Addicts who are
suffering pain are still entitled to be treated with medications.  Dr. Kennedy further
conceded that there was no evidence that East Health Center dispensed
medications on site.

## G.    Dr. Azmat's Expert

Dr. Thomas Simopoulos testified as Dr. Azmat's expert witness in pain
management.  After reviewing the patient files maintained by Dr. Azmat,
Dr. Simopoulos concluded that Dr. Azmat obtained suitable medical histories,
conducted appropriate physical exams, obtained patients' prescription histories,
and created suitable treatment plans.  He stated that, in his opinion, Dr. Azmat
prescribed controlled substances in each case for a legitimate medical purpose and
in the regular course of medical treatment.

Dr. Simopoulos explained that there was no standard measure for how much
pain medication a doctor should prescribe, and Dr. Azmat appeared to be
exercising clinical judgment when he provided patients with strong opioids in large
supply.  Dr. Simopoulos stated that there was no evidence of addictive patient
behavior in Dr. Azmat's medical records.  Furthermore, it did not seem that

18

Dr. Azmat was acting like a drug dealer because he was examining patients and decreasing their medications, rather than simply handing them prescriptions upon arrival. The fact that Dr. Azmat prescribed all of his patients oxycodone was not unusual because oxycodone is one of the most commonly prescribed opioids.

Speaking generally about pain management, Dr. Simopoulos stated that a typical patient examination includes a discussion of the patient's medical history and a physical exam. The physical should include looking at the patient's body, testing the range of motion, and assessing any weakness. A physician should assess whether patients are accurately describing their level of pain, but there is no way for the physician to be sure whether the patient is telling the truth. It is common for patients to try to fool doctors in order to obtain medication. It is also typical that patients seeking pain management physicians are already medicated, and it may be necessary to keep providing such patients with high dosages of medications because they have built up drug tolerances from sustained use. Finally, Dr. Simopoulos stated that many small medical clinics deal in cash, and it is not unusual for a doctor to prescribe medication based on a complaint of pain together with an MRI showing an injury.

On the other hand, Dr. Simopoulos stated that, when a patient travels a great distance to visit a pain clinic, or claims that he is already taking a medication but that medication does not show up in a urine sample because (1) the patient is not

19

taking the pills as prescribed and has run out or (2) the patient is diverting the pills
to another person, the treating doctor should be cautious of addiction.  Similarly,
while requiring patients to sign opioid agreements is a standard practice, requiring
the patient to sign the agreement before seeing a doctor implies that opioid
treatment is part of the clinic's "treatment protocol."  Dr. Simopoulos also
described several approaches, other than medication, that pain management doctors
use to treat chronic pain patients.  In his medical practice, when he encounters a
patient with an addiction, he refers the patient to an addiction specialist.

Having reviewed the trial evidence, we turn to the issues on appeal.

## IV.  UNLAWFUL DISPENSATION OF CONTROLLED SUBSTANCES

As a threshold issue, Dr. Azmat advances a statutory interpretation
argument, contending that his writing prescriptions, even if for illegal purposes,
did not constitute "dispensing" them under 21 U.S.C. § 841(a)(1).  Thus,
Dr. Azmat argues that, as a matter of law, he is not guilty of (1) unlawfully
dispensing controlled substances, in violation of § 841(a)(1), or (2) conspiring to
illegally dispense controlled substances, in violation of §§ 841(a)(1) and 846.  We
review the statute and then our relevant case law.

## A.    21 U.S.C. §§ 802 and 841(a)(1)

Except as authorized by the Controlled Substances Act ("CSA"), it is
"unlawful for any person knowingly or intentionally to manufacture, distribute, or

dispense . . . a controlled substance." 21 U.S.C. § 841(a)(1). The CSA contains

definitions in § 802 and defines "dispense" as follows:

> The term "dispense" means <u>to deliver a controlled substance</u> to an
> ultimate user or research subject by, or pursuant to the lawful order of,
> a practitioner, <u>including</u> the prescribing and administering of a
> controlled substance and the packaging, labeling, or compounding
> necessary to prepare the substance for such delivery.

<u>Id.</u> § 802(10) (emphasis added). "The terms 'deliver' or 'delivery' mean the

actual, <u>constructive</u>, or attempted transfer of a controlled substance." <u>Id.</u> § 802(8)

(emphasis added). Thus "dispense" means constructive transfer of a controlled

substance to a user by prescribing it.

　　　In contrast, "'administer' refers to the direct application of a controlled

substance to the body of a patient or research subject by (A) a practitioner (or, in

his presence, an authorized agent), or (B) the patient or research subject at the

direction and in the presence of the practitioner." <u>Id.</u> § 802(2). Finally,

"'distribute' means to deliver (other than by administering or dispensing) a

controlled substance." <u>Id.</u> § 802(11).

**B.　Dr. Azmat's Arguments**

　　　Dr. Azmat advances two interpretations of § 841(a)(1) and its attendant

definitions in § 802. He first claims that a doctor who writes a prescription for an

illegitimate purpose is guilty of unlawful "distribution" of a controlled substance,

not unlawful "dispensation." Dr. Azmat argues that, in order to "dispense" a

21

controlled substance, under the definition stated in § 802(10), the "practitioner" must "deliver" the controlled substance to the user.  According to Dr. Azmat, "delivery" occurs only when a practitioner (1) prescribes and administers the controlled substance, and/or (2) packages, labels, or compounds the controlled substance.  Dr. Azmat contends that writing a prescription does not complete the physical exchange of medication, and thus a prescription does not "dispense" it.

Next, Dr. Azmat argues that a physician can never be guilty of unlawfully "dispensing" a controlled substance because § 802(10) presupposes that "delivery" occurs by means of a "lawful order."  If the order is not lawful, the offense is "distribution."

## C.    Circuit Precedent

Dr. Azmat's arguments wholly fail in light of our prior decisions.  In United States v. Leigh, the former Fifth Circuit held for the first time that "a doctor who administers or prescribes a controlled substance is, for the purposes of the statute, dispensing it . . . ."[3]  487 F.2d 206, 208 (5th Cir. 1973) (emphasis added).  Our subsequent decisions have followed this precedent, and this Court has consistently affirmed defendants' convictions for unlawfully "dispensing" controlled substances–by virtue of writing prescriptions–on the ground that "prescribing"

---

[3] We have adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

constitutes "dispensing." See, e.g., United States v. Joseph, 709 F.3d 1082, 1088,
1098, 1105 (11th Cir. 2013) (upholding a physician's convictions for unlawfully
dispensing and distributing controlled substances by means of writing
prescriptions); United States v. Ignasiak, 667 F.3d 1217, 1219, 1227-29 (11th Cir.
2012) (upholding the sufficiency of the evidence for a physician's convictions for
unlawfully dispensing controlled substances by virtue of writing prescriptions);
United States v. Thompson, 624 F.2d 740, 741-42 (5th Cir. 1980) (stating that a
doctor is properly indicted for unlawful dispensation when he prescribes a
controlled substance outside of the usual course of professional practice and not for
a legitimate medical purpose).  Moreover, this Court has explicitly rejected
Dr. Azmat's theory that "dispensing" is always a lawful activity.  See Joseph, 709
F.3d at 1098 ("We reject the argument that, under the Act, all acts to dispense
prescriptions are lawful and all acts to distribute prescriptions are unlawful.").

　　Notably, other circuits agree that issuing written prescriptions to patients that
enable them to obtain controlled substances constitutes "dispensing" under
§ 841(a)(1).  United States v. Roya, 574 F.2d 386, 393 (7th Cir. 1978) ("Thus,
'dispense' includes constructive transfers which encompass Roya's actions of
issuing written prescriptions to patients entitling them to purchase the substances
from a pharmacy"); United States v. Tighe, 551 F.2d 18, 21 (3d Cir. 1977) ("[W]e
hold that by placing a prescription for a controlled substance, issued outside of the

23

usual course of medical practice, in the hands of an ultimate user a physician completes the offense of dispensing under 21 U.S.C. § 841(a)(1)."). These circuits rely on a constructive-delivery theory. See Roya, 574 F.2d at 393; Tighe, 551 F.2d at 21 ("[A] prescription is the written representation of the drug and enables its possessor to claim physical custody and control over the drug prescribed.").

This Court has implicitly relied on this constructive-delivery reasoning in our prior decisions and we expressly do so now: When a physician writes a patient a prescription for a controlled substance, the physician is constructively transferring the controlled substance to the patient, thereby accomplishing the delivery required for dispensation under § 802(10). See 21 U.S.C. § 802(8) (stating that the statutory term "delivery" includes the constructive transfer of a controlled substance).[4]

**D.    Statutory Interpretation Anew**

Alternatively, even viewing Dr. Azmat's interpretations on a clean slate, we would conclude that they are unsupported by the CSA's language. The more natural reading of § 802(10) is that "dispensing" occurs when a practitioner

---

[4] But see United States v. Black, 512 F.2d 864, 866 (9th Cir. 1975) (holding that a physician who wrote unlawful prescriptions was guilty of "distributing" controlled substances–as opposed to "dispensing"–because the term "'dispense' expressly contemplates a 'lawful order,'" meaning that a "'practitioner' who dispenses does not violate the Act"); United States v. Badia, 490 F.2d 296, 297-99 (1st Cir. 1973) (holding that a doctor was properly convicted of "distributing" controlled substances–based on his act of selling prescriptions–because "distribution" is the "[d]elivery of controlled substances outside the course of professional practice or research," whereas "dispensation" is limited to the delivery of a controlled substance "by a physician who is acting in the course of professional practice or research").

"delivers" a controlled substance to a user. See id. § 802(10). In turn, the

"delivery" may be a constructive transfer and may be carried out by various

methods including (1) prescribing the medication, (2) administering the

medication, (3) packaging, labeling, or compounding the medication as necessary

to prepare it for delivery, or (4) other methods not listed in the § 802(10) statute.

See id.; Stansell v. Revolutionary Armed Forces of Colom., 704 F.3d 910, 915

(11th Cir. 2013) (noting that the term "'include' is merely illustrative").

    In addition to the fact that Dr. Azmat's reading of § 802(10) twists the

statute's plain language, his argument falls on its own sword. Dr. Azmat asserts

that prescribing a medication does not complete the "delivery" required by

§ 802(10). Dr. Azmat then claims that because a prescription does not "deliver" a

controlled substance, a doctor who writes a prescription does not dispense a

"controlled substance"–rather, the doctor "distributes" the controlled substance.

    One obvious flaw in this argument is that the term "deliver" also appears in

the definition of "distribution." See 21 U.S.C. § 802(11). As there is a

presumption that a "term is used to mean the same thing throughout a statute,"

Barber v. Thomas, 560 U.S. 474, 483-84, 130 S. Ct. 2499, 2506 (2010) (quotation

marks omitted), Dr. Azmat's interpretation would compel us to conclude that

"delivery," as used in the offense of unlawful "distribution," does not include

writing a prescription, either. Therefore, contrary to Dr. Azmat's assertion, under

his own framework, the act of prescribing a controlled substance without a legitimate medical purpose can never be criminal under § 841(a)(1). As we are hard pressed to decide that Congress did not intend to criminalize this act, we have further reason to reject Dr. Azmat's arguments.

## V. SUFFICIENCY OF EVIDENCE OF UNLAWFUL DISPENSATION

Having reaffirmed that prescribing a controlled substance is "dispensing," we turn to the sufficiency of the evidence as to Dr. Azmat's convictions for unlawfully dispensing controlled substances and conspiring to unlawfully dispense controlled substances. Having outlined the trial evidence above, we readily conclude that the evidence supported the jury's verdict on these charges.

## A.    Standard of Review

We review the sufficiency of the evidence <u>de novo</u> when, as here, the defendant has preserved his claim by moving for a judgment of acquittal. <u>United States v. Jiminez</u>, 564 F.3d 1280, 1284 (11th Cir. 2009). We examine "whether the evidence, when viewed in the light most favorable to the government, and accepting reasonable inferences and credibility choices by the fact-finder, would enable the trier of fact to find the defendant guilty beyond a reasonable doubt." <u>United States v. Monroe</u>, 866 F.2d 1357, 1365 (11th Cir. 1989). A conviction must be affirmed unless there is "no reasonable construction of the evidence" from

which the jury could have found the defendant guilty beyond a reasonable doubt. <u>United States v. Garcia</u>, 405 F.3d 1260, 1269 (11th Cir. 2005).

In order to secure a conviction for unlawful dispensation under § 841(a)(1), the government must prove that the defendant "dispensed controlled substances for other than legitimate medical purposes in the usual course of professional practice, and that he did so knowingly and intentionally." <u>Ignasiak,</u> 667 F.3d at 1227.

To establish a conspiracy in violation of § 846,[5] the government must prove beyond a reasonable doubt that: (1) there was an agreement between two or more people to commit a crime (in this case, unlawfully dispensing controlled substances in violation of § 841(a)(1)); (2) the defendant knew about the agreement; and (3) the defendant voluntarily joined the agreement. <u>Monroe,</u> 866 F.2d at 1365. The existence of an agreement may "be proved by inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." <u>United States v. Mateos,</u> 623 F.3d 1350, 1362 (11th Cir. 2010) (quotation marks omitted). A conspiracy conviction will be upheld if "the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious that knowledge of its character can fairly be attributed to him." <u>United States v. Figueroa,</u> 720 F.2d 1239, 1246 (11th Cir. 1983).

---

[5] Section 846 provides that "[a]ny person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 21 U.S.C. § 846.

B.    **Analysis**

Simply put, there was overwhelming evidence that Dr. Azmat knowingly

and voluntarily joined an agreement to unlawfully dispense controlled substances.

See Monroe, 866 F.2d at 1365.  First, from the testimony concerning Dr. Azmat's

conduct, the jury reasonably could infer that Dr. Azmat was participating in the

conspiracy.  See Mateos, 623 F.3d at 1362.  Before Dr. Azmat accepted the

position, LeFrancois told Dr. Azmat that he had previous experience in a Florida

pill mill and East Health Center would be the same kind of operation.  LeFrancois

also explained that patients would be expecting oxycodone.  Dr. Azmat's response

to LeFrancois was that he had experience in pain management and could "take care

of everything."  As noted earlier, Dr. Azmat also admitted to Investigator Sikes

that many of the people who he saw were addicted to oxycodone, and he

consistently referred to them as "customers" instead of "patients."

Moreover, Dr. Azmat's interactions with the patients suggested that he was

involved in the conspiracy.  Investigator Sikes testified that Dr. Azmat prescribed

196 out of his 238 patients medications, and that 96 percent of the prescriptions

were for oxycodone.  The eight testifying patients generally reported that

Dr. Azmat's examinations were brief and sometimes involved no physical

component.  They described themselves as addicts during their testimony, and they

stated that Dr. Azmat did not review their patient history forms before prescribing

28

medications and appeared to ignore medical concerns–like high blood pressure—
that could not justify prescribing opioids.  Dr. Kennedy concluded that
Dr. Azmat's decision to prescribe controlled substances to each of the 25 patients
included in the indictment was illegitimate.

All of the witnesses with medical backgrounds also testified that there was
an abundance of red flags that should have tipped off any doctor that his patients
were seeking pills.  These signs included the facts that: patients were traveling
from out-of-state; patients appeared to be lying about whether they were already
taking controlled substances; patients' MRIs were unremarkable and obtained
without a doctor's referral; patients appeared to be inflating their pain levels; and
patients consented to opioid treatment before coming into the examination room.
Indeed, upon learning some of this information about East Health Center's
clientele, Drs. Ross and Hatmaker both declined employment and contacted law
enforcement officials because they were suspicious of the clinic's activities.

In addition, the jury could reasonably have concluded that Dr. Azmat had
knowledge of the conspiracy due to his presence at East Health Center.  See
Figueroa, 720 F.2d at 1246.  Many witnesses testified that the clinic did not look
like a legitimate medical office.  It had minimal medical supplies and the patients
looked like addicts or "zombies."  Dr. Azmat also had some awareness of the
clinic's unusual marketing tactics, believed that the patients paid in cash, knew that

he did not have the proper medical malpractice insurance, and accepted his salary in daily cash installments.

Finally, both expert witnesses testified that Dr. Azmat's records showed that he prescribed each patient listed in the indictment oxycodone, hydrocodone, and/or alprazolam.  Dr. Kennedy concluded that the prescriptions in each case were not dispensed for a legitimate medical purpose or in the usual course of professional practice.  We do not disturb the fact-finder's reasonable credibility determinations, and here, the jury credited Dr. Kennedy's professional opinions over Dr. Simopoulos's conclusion that Dr. Azmat was acting appropriately under medical standards.  See Monroe, 866 F.2d at 1365.

The totality of this evidence was more than sufficient for the jury to determine that Dr. Azmat was aware that East Health Center was a pill mill and knowingly entered the conspiracy to dispense controlled substances, as evidenced by his unprofessional interactions with the patients and unwarranted prescriptions for opioids.  Of course, there was countervailing testimony suggesting that Dr. Azmat's patients had real injuries, that he was attempting to wean them off narcotics and was not overprescribing pills, that he was following medical guidelines but was simply fooled by people who lied about their prescription needs, and that he was attempting to bring East Health Center into compliance with

official requirements.[6] However, the jury made a reasonable choice in finding that Dr. Azmat's motives were not altruistic, and that Dr. Azmat knew that East Health Center was not a legitimate medical clinic and that the customers were addicts coming for opioids, not for medical purposes. See id. There was voluminous evidence supporting the jury's conspiracy conviction, and we will not set it aside.

For the same reasons, the 49 counts of conviction for substantive illegal dispensation to individual patients were supported by overwhelming evidence. The evidence was uncontroverted that Dr. Azmat dispensed controlled substances, and the jury reasonably concluded that Dr. Azmat knowingly and intentionally did so outside of the usual course of professional practice and for other than a legitimate medical purpose. See Ignasiak, 667 F.3d at 1227; Garcia, 405 F.3d at 1269.

## VI. SUFFICIENCY OF EVIDENCE OF CONSPIRACY TO LAUNDER MONETARY INSTRUMENTS

The jury also found Dr. Azmat guilty of conspiracy to commit promotional money laundering under 18 U.S.C. § 1956(a)(1)(A)(i), which is a violation of § 1956(h). See 18 U.S.C. § 1956(h) (making it illegal to conspire to commit any money laundering offense described in § 1956). Promotional money laundering is

---

[6] This testimony was also susceptible to an interpretation that Dr. Azmat was a sophisticated actor who attempted to give his actions an air of legitimacy in case the state investigated the clinic.

using funds from an unlawful activity to promote the carrying out of said unlawful activity. United States v. Esquenazi, 752 F.3d 912, 935 (11th Cir.), cert. denied, 135 S. Ct. 293 (2014). Specifically, the indictment charged Dr. Azmat with conspiring to use the proceeds from unlawfully dispensing controlled substances to promote the pill mill's illegal activities.

In order to obtain a conviction for conspiracy to commit promotional money laundering, the government must prove beyond a reasonable doubt that (1) two or more persons agreed to promotionally launder money; and (2) the defendant, knowing the unlawful plan, voluntarily joined the conspiracy. United States v. Johnson, 440 F.3d 1286, 1294 (11th Cir. 2006). "The existence of an agreement may be proven by circumstantial evidence, including inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme. Indeed, the government may establish knowledge of an illegal agreement by showing that the defendant knew the essential object of the conspiracy." United States v. Silvestri, 409 F.3d 1311, 1328 (11th Cir. 2005).

## A.    Evidence of Agreement

We are unpersuaded by Dr. Azmat's argument that the government failed to prove beyond a reasonable doubt that he knowingly agreed with any of his codefendants to launder money. The trial testimony showed that several of his codefendants agreed to dispense controlled substances in exchange for cash and

then use the cash paid by patients to pay for the clinic's lease, pay salaries, rent a

house in which employees would live, pay for additional overhead costs (such as

maintenance and cable), and open a bank account. By spending profits on these

activities, the scheme participants reinvested the money earned from unlawfully

dispensing drugs into the activities of East Health Center. This enabled them to

continue seeing pill-seeking patients and enrich themselves by dispending

controlled substances in exchange for money.

        While Dr. Azmat may not have been aware of all of the uses of the clinic's

proceeds, it was reasonable for the jury to infer that he knew that the cash was used

to pay salaries and cover the clinic's operating costs. See Monroe, 866 F.2d at

1365. Dr. Azmat reported to the office each day, where he could see that there

were amenities like cable television, and he received a cash salary. Dr. Azmat also

witnessed Wise counting cash at the end of the day and knew that the patients paid

in cash.

        From this evidence, the jury could have readily concluded that Dr. Azmat

knew that the patients' money–which they paid for illegal prescriptions–was used

to pay his salary and the salaries of those around him, in addition to supplying the

clinic and paying the lease. See id. Likewise, the jury easily could have concluded

that, having already agreed with LeFrancois to dispense medications outside the

course of his usual professional practice to patients paying money to the clinic, and

33

by continuing to work and generate profits, Dr. Azmat had knowingly joined a
conspiracy to launder money, in which illegal proceeds were used to "promote"
East Health Center's drug-dispensing activities. See id.

**B.    Separate Offense**

Dr. Azmat also claims that he could not be convicted of conspiring to
launder money because he did nothing other than receive the cash proceeds of the
underlying criminal activity. Dr. Azmat maintains that his convictions for
unlawfully distributing controlled substances encompass his acts of receiving
money in exchange for writing prescriptions, and that his receipt of daily cash
payments was not a separate money laundering offense. In other words, Dr. Azmat
contends that his receipt of cash payments merged with his crime of unlawfully
dispensing controlled substances, and to convict him of conspiracy to
promotionally launder money would be punishing him twice for the same conduct.

Dr. Azmat's argument misses the mark, however, as he was not convicted of
substantive money laundering. His conviction was for joining a conspiracy to
launder money, in which his co-conspirators used the proceeds from his crime of
illegally dispensing controlled substances to maintain East Health Center's
operations, in order to continue reaching more patients and enriching themselves
from additional pill-for-cash exchanges. The government did not have to prove
that Dr. Azmat personally reinvested the illegal proceeds into the clinic's criminal

activities.  See Whitfield v. United States, 543 U.S. 209, 214, 125 S. Ct. 687, 691 (2005) ("Because the text of § 1956(h) does not expressly make the commission of an overt act an element of the conspiracy offense, the Government need not prove an overt act to obtain a conviction."); Silvestri, 409 F.3d at 1328.  It was enough that he knowingly entered an agreement in which his co-conspirators did, or planned to do, the reinvesting.  See Johnson, 440 F.3d at 1294.

## C.    Underlying Funds Were Illegally Generated

Dr. Azmat further argues that his conviction for conspiracy to illegally launder the proceeds from dispensing controlled substances cannot stand because East Health Center did not violate the law by "dispensing" controlled substances, as stated in the indictment.  However, as discussed above, the activities undertaken at East Health Center constituted unlawful dispensation of controlled substances.  Thus, the funds were illegal proceeds from those crimes and the funds were used to promote the pill mill.  Dr. Azmat has shown no reversible error as to his conviction for conspiracy to commit promotional money laundering.

## VII.  EXPERT TESTIMONY

Next, Dr. Azmat argues that the district court abused its discretion by admitting Dr. Kennedy's expert testimony.  To place this issue in context, we review the district court's pretrial rulings and what happened at trial.

35

## A.    Pretrial Rulings

At the start of the process, Dr. Kennedy reviewed East Health Center's

patient files and completed expert worksheets for each patient.  The worksheets all

followed the same format.  Dr. Kennedy provided a paragraph description of each

patient's symptoms, diagnosis, and treatment.  He then checked boxes indicating

whether the diagnosis, treatment, and records were "below minimum standards" or

"within minimum standards."  Dr. Kennedy explained his opinion on each of those

three topics after checking one of the boxes.  Each worksheet ended with an

"overall summary" paragraph.  Dr. Kennedy wrote, as the last sentence of each

"overall summary," that the "patient's management was not medically legitimate,

[fell] below a reasonable standard of care, and may represent a significant danger

to the patient's safety."  Dr. Kennedy did not cite any medical guidelines or texts in

the worksheets.

Pursuant to Fed. R. Crim. P. 16(a)(1)(G), the government provided

Dr. Azmat with a copy of Dr. Kennedy's opinions and filed a motion disclosing to

the district court the expert testimony that it planned to present during its case-in-

chief.  In the motion, the government stated that Dr. Kennedy would testify as an

expert in medicine and pain management.  Dr. Kennedy was expected to testify

that Dr. Azmat "routinely prescribed controlled substances outside the usual course

of professional practice . . . and without legitimate purpose relating to the practice

36

of medicine." The government explained that Dr. Kennedy based the opinions expressed in the worksheets on his training and experience, and may have considered "standard reference materials," including The Physicians' Desk Reference and The Merck Manual.

Dr. Azmat then filed a Daubert[7] motion to exclude Dr. Kennedy's expert testimony and requested an evidentiary hearing on the motion. Dr. Azmat argued that Dr. Kennedy failed to "list [in his expert worksheets] any peer reviewed articles, treatises, or other objective standards" used in assessing Dr. Azmat's patient files, and did not specify what standard of care or "scope of legitimate medical practice" he applied. According to Dr. Azmat, Dr. Kennedy's opinions could not be tested and were not based on any objective standard and, consequently, failed Daubert's reliability requirement. Put differently, Dr. Kennedy was doing no more than making unverifiable conclusions based on his own experiences and practices.

After the government filed a brief response and Dr. Azmat replied, the district court determined that Dr. Kennedy's proposed testimony was currently unreliable under Daubert. The district court stated that it would give the government an opportunity to cure the deficiencies by outlining the standards of care that Dr. Kennedy applied and explaining how he determined those standards.

---

[7] Daubert v. Merrell Dow Pharms., 509 U.S. 579, 113 S. Ct. 2786 (1993).

The court ordered the government to file a supplemental response addressing these Daubert issues, so that it could meaningfully evaluate Dr. Kennedy's methodology.

In the supplemental response, the government explained that, for the applicable standard of care, Dr. Kennedy relied on: the Georgia Composite Medical Board's regulation addressing unprofessional conduct, Ga. Comp. R. & Regs. R. 360.3-.02, and the Board's "Guidelines for the Use of Controlled Substances for the Treatment of Pain: Ten Steps;" warnings and labels promulgated by the Federal Drug Administration; literature from the American Academy of Pain Management and the American Academy of Addiction; the Federation of State Medical Boards' model policies on the treatment of opioid addiction and the use of opioids in the treatment of chronic pain; medical textbooks; published journal articles; and the Hippocratic Oath. The government also described in detail Dr. Kennedy's expected testimony and stated that Dr. Kennedy's methodology involved reviewing patient files, considering the above sources, and exercising his judgment as an experienced practitioner.

After reviewing the government's supplemental response, the district court entered a written order denying Dr. Azmat's Daubert motion. The court expressly found that the government "met its burden with regard to [ ] Dr. Kennedy," and that Dr. Kennedy's proposed testimony was "the product of a reliable methodology."

38

As to Dr. Kennedy's methodology, the district court wrote that "Dr. Kennedy determined the appropriate standards of care for a pain management practice by relying on his nine years of practice in pain management, a review of academic and professional medical literature relating to pain management and prescription drug treatment, and the criteria outlined in professional practice and professional guidelines used for the state of Georgia." The district court also observed that Dr. Kennedy reviewed Dr. Azmat's patient files and evaluated the files based on the "standards produced by the methodology stated above." The district court ultimately concluded that it was satisfied that Dr. Kennedy's opinions were reliable.

## B.    Trial Testimony

At trial, the government questioned Dr. Kennedy concerning his education, clinical experience, membership in professional organizations, and service to the Georgia State Medical Board. It also asked Dr. Kennedy if he was familiar with the Georgia Composite State Medical Board's standards and guidelines on the prescription of controlled substances for the treatment of pain, the Federation of State Medical Boards' model policy, The Physician's Desk Reference, The Merck Manual, and pain and pain management textbooks. Dr. Kennedy indicated that he was familiar with those authorities, considers the standards articulated therein in

39

his own medical practice, and considers the standards when rendering expert

opinion testimony on the prescribing practices of other physicians.

After hearing from defense counsel, the court admitted Dr. Kennedy as an

expert.  Dr. Kennedy then testified to the facts described in the previous section.

Dr. Kennedy generally analyzed six factors in addressing whether Dr. Azmat met

the standard of care: (1) whether Dr. Azmat obtained the patient's prior medical

records and/or pharmacy records before issuing a prescription; (2) whether

Dr. Azmat conducted a physical examination of the patient; (3) whether Dr. Azmat

considered non-drug treatment options; (4) whether Dr. Azmat discussed the risks

and benefits of opioid treatment; (5) whether Dr. Azmat created a treatment plan;

and (6) whether Dr. Azmat regularly monitored the patients after their first visit.

Dr. Kennedy frequently opined that Dr. Azmat's course of treatment was "not

medically legitimate," but ultimately stated, at the end of his direct testimony, that–

under either national or state medical standards–Dr. Azmat's prescriptions were

not issued for a legitimate medical purpose or in the usual course of professional

medical practice.

## C.     Standard of Review

We review a district court's decision to admit or exclude expert testimony

for an abuse of discretion.  United States v. Paul, 175 F.3d 906, 909 (11th Cir.

1999).  A district court abuses its discretion when it "applies an incorrect legal

standard or makes findings of fact that are clearly erroneous." United States v.
Wilk, 572 F.3d 1229, 1234 (11th Cir. 2009). Moreover, "[a]n erroneous
evidentiary ruling will result in reversal only if the resulting error was not
harmless." United States v. Hands, 184 F.3d 1322, 1329 (11th Cir. 1999). [8]

## D.    Federal Rule of Evidence 702

On appeal, Dr. Azmat contends that the district court abused its discretion by
allowing the jury to hear and consider Dr. Kennedy's expert testimony. We review
Rule 702 and related case law first.

The admissibility of an expert's testimony is controlled by Fed. R. Evid.
702. Fed. R. Evid. 702. We have explained that district courts must analyze three
factors in determining the admissibility of expert testimony under Rule 702: the
expert's qualifications, the reliability of the testimony, and the extent to which the
testimony will be helpful to the trier of fact. United States v. Frazier, 387 F.3d
1244, 1260 (11th Cir. 2004). By applying these requirements, the district court
acts as a gatekeeper with respect to the admissibility of expert testimony. Id.

---

[8] The parties dispute whether defense counsel made adequate objections at trial or invited
any error in admitting Dr. Kennedy's testimony. The parties also debate Fed. R. Evid. 103(b),
which provides: "Once the court rules definitively on the record–either before or at trial–a party
need not renew an objection or offer of proof to preserve a claim of error for appeal." Fed. R.
Evid. 103(b). There is also a question of the scope of the district court's pretrial ruling and
whether defense counsel needed to move to strike or at least object to certain parts of
Dr. Kennedy's testimony to preserve the issue on appeal.
    We need not reach or decide any of these questions because, in any event, we conclude
that the district court did not abuse its discretion in admitting Dr. Kennedy's testimony, and
alternatively, any alleged error was harmless.

This Court has explained that, in addressing the reliability prong, the district court must consider whether "the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert." Id. Factors that inform the inquiry include: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." Id. at 1262. Not all of these factors will apply in every case, and sometimes other factors will be equally important in assessing reliability. Id.

A district court cannot simply accept that an opinion is reliable because the expert says that his methodology is sound. Hughes v. Kia Motors Corp., 766 F.3d 1317, 1331 (11th Cir. 2014), cert. denied, 135 S. Ct. 1423 (2015). "If admissibility could be established merely by the ipse dixit of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong." Frazier, 387 F.3d at 1261.

**E.    Analysis**

Contrary to Dr. Azmat's arguments, the district court's pretrial denial of Dr. Azmat's Daubert motion easily passes scrutiny. The government filed a memorandum describing the numerous sources that Dr. Kennedy relied on in

42

reaching the conclusions presented in his expert worksheets. These sources included federal and state medical guidelines, literature from national organizations, published journal articles, and textbooks. In addition, the government explained Dr. Kennedy's method of reviewing patient files, which involved Dr. Kennedy weighing Dr. Azmat's decisions against the standards articulated in the above medical texts and Dr. Kennedy exercising his judgment as an experienced medical practitioner to reach conclusions concerning the legitimacy of Dr. Azmat's courses of treatment.

Accordingly, Dr. Kennedy relied on published sources generally accepted by the medical community in defining the applicable standard of care. See id. at 1262. Dr. Kennedy did not rely exclusively on his own experiences in reaching his conclusions, and the district court was able to fulfil its gatekeeping function by undertaking a Daubert analysis and assessing the reliability of his methodology based on the cited sources. See id. at 1260-61. The district court did not apply an incorrect legal standard or make a clear error of judgment in denying Dr. Azmat's motion to exclude Dr. Kennedy's testimony. See Wilk, 572 F.3d at 1234.

At trial, the district court also did not abuse its discretion in admitting Dr. Kennedy's testimony. On appeal, Dr. Azmat argues that Dr. Kennedy (1) did not actually testify to the opinions that the government described in its pretrial motions, (2) did not deliver the promised testimony regarding whether Dr. Azmat's

conduct fell "outside the usual course of practice generally recognized and accepted in the United States," and (3) did not discuss whether Dr. Azmat failed to comply with the Federation of State Medical Boards or Georgia Composite State Board of Medical Examiners, or failed to comply with any federal or state regulations. According to Dr. Azmat, Dr. Kennedy did not offer any reliable standards or explain the bases for his opinions; instead, he testified based only on his "say-so."

This argument lacks merit. Before the district court qualified Dr. Kennedy as an expert, Dr. Kennedy testified that, when providing expert opinion on the prescribing practices of other physicians, he relies on The Physicians' Desk Reference, The Merck Manual, textbooks on pain and pain management, and federal and state standards. Dr. Kennedy then consulted and summarized his expert worksheets, testifying that, under the medical guidelines and standards of care for both Georgia and the United States, Dr. Azmat's care fell outside of the usual course of professional practice and lacked a legitimate medical purpose.

Accordingly, Dr. Kennedy grounded his opinions in medical texts–both those named during his testimony and the number of sources described pretrial as the basis for what he wrote in the worksheets from which he testified—and Dr. Azmat has not made any argument that the medical community does not accept those authorities. See Frazier, 387 F.3d at 1260. Dr. Kennedy described standards

of care drawn from these texts, analyzed Dr. Azmat's conduct under those standards, and testified consistently with the expert worksheets that the district court analyzed and deemed admissible prior to trial. The district court did not make a clear error in judgment or apply the wrong legal standard when it allowed the jury to consider Dr. Kennedy's testimony, which was sufficiently reliable, in fact and methodology, and more than ipse dixit. See Wilk, 572 F.3d at 1234; Frazier, 387 F.3d at 1261.

We also reject Dr. Azmat's other miscellaneous arguments about Dr. Kennedy's testimony. For example, Dr. Azmat asserts that Dr. Kennedy gave inconsistent opinions about whether it is acceptable for a physician to prescribe pain medication on the basis of an MRI alone, and contends that the inconsistency highlights Dr. Kennedy's unreliability. However, Dr. Azmat misconstrues the record in making this assertion.

During cross-examination, the government stated: "A physician is never going to just [use] an MRI and say, boom, that patient needs to get oxycodone; is he? You're never going to do that. You're going to rely on your clinical judgment; right." Dr. Kennedy responded, "You would hope so." It therefore appears that Dr. Kennedy was agreeing that a doctor has to exercise his clinical judgment, in conjunction with the MRI, in order to reach a sound decision about prescribing narcotics. Dr. Kennedy, then, did not testify that it would always be

45

inappropriate to prescribe pain medication when an MRI is the only objective measure of a patient's pain.

Furthermore, this testimony was not inconsistent with Dr. Kennedy's later statement that, when a patient has an MRI and a history of spinal surgery (or an MRI revealing spinal surgeries), for example, it may be appropriate to initiate narcotics. Even if Dr. Kennedy had previously testified that an MRI alone would never support the initiation of prescription pain pills, his second statement was that an MRI–in addition to knowledge of the patient's medical history–could support the decision.

Lastly, Dr. Azmat contends that Dr. Kennedy's admission that there is no recommended "unit dosage" for oxycodone also shows that Dr. Kennedy's testimony about Dr. Azmat's prescribing practices was based on his own judgment, instead of reliable and testable standards. While Dr. Azmat is correct in asserting that Dr. Kennedy conceded that the unit dosage is up to the clinical judgment of the physician, the district court's inability to test Dr. Kennedy's conclusions on this narrow issue does not represent reversible error because Dr. Simopoulos also testified about Dr. Azmat's prescribing practices. See Hands, 184 F.3d at 1329.

Dr. Simopoulos agreed that there is no consensus on the proper dosage of pain medications. Dr. Simopoulos stated that physicians rely on their knowledge, experience, and assessment of the patient's condition to determine what to

46

prescribe. However, Dr. Simopoulos still testified that, in his opinion, Dr. Azmat was exercising appropriate clinical judgment when he adjusted a patient's dose. Accordingly, both Dr. Azmat's and the government's expert witness testified on the subject of whether Dr. Azmat was prescribing too many opioids. The district court permitted the jury to weigh both opinions, and both experts were subject to cross-examination. In light of this, Dr. Azmat has not shown that he was prejudiced by the district court's allowance of Dr. Kennedy's testimony. See id.

In sum, we see no basis for reversal in Dr. Kennedy's testimony or the district court's evidentiary rulings. The district court did not abuse its discretion in admitting Dr. Kennedy's expert testimony. See Wilk, 572 F.3d at 1234. Alternatively, any allegedly objectionable portion of Dr. Kennedy's conclusions did not prejudice Dr. Azmat and was harmless error. See Hands, 184 F.3d at 1329.

## VIII. PROSECUTORIAL MISCONDUCT

### A.   Pakistani Medical Education

When the prosecutor was cross-examining Dr. Simopoulos, he asked whether Dr. Simopoulos knew where Dr. Azmat went to medical school. Dr. Simopoulos stated that he could not recall. The prosecutor responded: "Pakistan? Does that ring a bell?" Dr. Simopoulos stated it did ring a bell, but he could not recall the name of Dr. Azmat's university. Dr. Simopoulos indicated he

was not familiar with the courses that Dr. Azmat would have taken in a Pakistani medical school.

Defense counsel moved for a mistrial, arguing that the prosecutor improperly inserted comments about Dr. Azmat's nationality in order to influence the jury. The district court overruled the motion, finding that the comment was a "low blow" but that it did not warrant a mistrial because it was relevant to what the expert knew about Dr. Azmat's background and experience when he was evaluating Dr. Azmat's medical files.

Because defense counsel timely objected, we review this allegation of prosecutorial misconduct de novo. United States v. Duran, 596 F.3d 1283, 1299 (11th Cir. 2010). In determining whether there was prosecutorial misconduct, we examine whether the prosecutor's remarks were (1) improper and (2) prejudicially affected the defendant's substantial rights. United States v. Lopez, 590 F.3d 1238, 1256 (11th Cir. 2009). A prosecutor's remarks, suggestions, insinuations, and assertions are improper when they are calculated to mislead or inflame the jury's passions. United States v. Rodriguez, 765 F.2d 1546, 1560 (11th Cir. 1985).

A defendant is prejudiced by a prosecutor's remarks when there is a reasonable probability that, but for the improper comments, the result of the trial would have been different. Lopez, 590 F.3d at 1256. We consider whether a

defendant's substantial rights were prejudiced "in the context of the entire trial, along with any curative instruction." Id.

We agree that the prosecutor's line of questioning, while distasteful, was not improper. See id. We must so conclude because, taken in context, the prosecutor was asking questions to show that Dr. Azmat may have been unfamiliar with the standard of care in Georgia or the United States, supporting the government's contention that he was writing prescriptions outside of the usual course of professional practice. The prosecutor's questions during this portion of the trial also tended to show that Dr. Simopoulos reviewed Dr. Azmat's files without familiarizing himself with Dr. Azmat's background and qualifications.

As cross-examination requires probing a witness's credibility, and Dr. Simopoulos's perceived unfamiliarity with the case had the potential to undercut his direct testimony, the prosecutor's questions were relevant and were not calculated to inflame the jury. See Rodriguez, 765 F.2d at 1560. Furthermore, even if the questions were improper, there was overwhelming evidence of Dr. Azmat's guilt on all counts, and there is not a reasonable probability that Dr. Azmat would have been acquitted if the jury had never learned that he went to school in Pakistan. See Lopez, 590 F.3d at 1256.

**B.     South Florida "Wise Guys"**

During closing argument, the prosecutor commented that "Azmat came to East Health Center for one reason, and that was not to minister to people's pain. He is every bit as cynical and ruthless as Al LeFrancois, Sean Clark, Frankie Barbuscia, all those wannabe wise guys from [S]outh Florida. He's no different. He's no better." Dr. Azmat argues that this comment was unsupported by the evidence, and, in conjunction with the prosecutor frequently noting that his codefendants were from South Florida, was meant to connect him to organized crime. Dr. Azmat's counsel did not object to the prosecutor's closing arguments or use of the phrase "South Florida" during questioning.

When the defendant does not object to the propriety of the prosecutor's statement, we review for plain error only. United States v. Flanders, 752 F.3d 1317, 1332-33 (11th Cir. 2014), cert. denied, 135 S. Ct. 1757 (2015). In that case, "the defendant must show that (1) an error occurred; (2) the error was plain; (3) it affected his substantial rights; and (4) it seriously affected the fairness of the judicial proceedings." Id.

As to the "wise guys" comment, we conclude that there was no error, much less that it was plain. See id. First, the comments concerning Dr. Azmat's impure motives and similarities with LeFrancois, Clark, and Barbuscia, who all previously worked in South Florida, were based on the record evidence. See United States v.

50

Reeves, 742 F.3d 487, 505 (11th Cir. 2014). LeFrancois, Clark, and Barbuscia came to Georgia from southern Florida, and it was uncontroverted that Dr. Azmat joined them in working at East Health Center. The evidence also suggested that Dr. Azmat, like his codefendants, did not have his patients' health and safety in mind when he prescribed them controlled substances. It appeared that he was writing them prescriptions in exchange for money. The prosecutor was merely drawing these conclusions from the record when he discussed Dr. Azmat's motives. See id.; United States v. Windom, 510 F.2d 989, 994 (5th Cir. 1975) (stating that "unflattering characterizations of a defendant will not provoke a reversal when such descriptions are supported by the evidence").

Second, the prosecutor's use of the term "wise guys" in association with men from southern Florida was not improper. We have held much more inflammatory phrases to be insufficient to warrant reversal. See, e.g., United States v. Tisdale, 817 F.2d 1552, 1555 (11th Cir. 1987) (refusing to reverse when the prosecutor called the defendant a "dirty, low-life criminal" (quotation marks omitted)); United States v. Taylor, 792 F.2d 1019, 1027 (11th Cir. 1986) (upholding a conviction when the prosecutor referred to the defendant as a "hit man"). Once again, though, even if the prosecutor's comments were improper, there was no prejudice in light of the entire record, because the "South Florida"

51

language was fleeting and there was ample evidence of Dr. Azmat's guilt. See
Lopez, 590 F.3d at 1526.

## IX.  CUMULATIVE ERROR

Under the cumulative-error doctrine, we will reverse a conviction if the
cumulative effect of the errors is prejudicial, even if the prejudice caused by each
individual error was harmless. See United States v. Capers, 708 F.3d 1286, 1299
(11th Cir. 2013).  Having already concluded that Dr. Azmat failed to establish the
existence of any errors during his trial, there are no errors to accumulate.
Dr. Azmat's final claim necessarily fails, as there can be no cumulative error where
there are no individual errors. See id.

## X.  CHALLENGES TO SENTENCE

The Presentence Report ("PSR") gave Dr. Azmat an offense level of 36 and
a criminal history category of I, yielding an advisory guidelines range of 188 to
235 months.[9]  Later Dr. Azmat and the government jointly agreed to give
Dr. Azmat the benefit of an anticipated amendment to the drug quantity table and
that the government would not object to a two-level downward variance that would
reduce his offense level to 34.  This yielded an advisory guidelines range of 151 to

---

[9] The PSR reported that Dr. Azmat prescribed 643,050 milligrams of oxycodone, 1800
units of hydrocodone, and 164 units of Xanax.  Using the drug equivalency tables in U.S.S.G.
§ 2D1.1, the PSR converted the drugs to 4,310,245 kilograms of marijuana.  This resulted in a
base offense level of 34 under U.S.S.G. § 2D1.1(c)(3).  The PSR added a 2-level increase under
U.S.S.G. § 3B1.3 for abuse of trust or use of a special skill because Dr. Azmat was a licensed
medical doctor authorized to issue prescriptions for controlled substances, resulting in a total
offense level of 36.

188 months. Even though the amendment was not yet effective, the government

agreed to the two-level reduction as a downward variance.

At sentencing, the government then requested a sentence of 188 months, the

top end of that range. After hearing from defense counsel, the district court

granted a further downward variance to 133 months on the conviction for

conspiring to launder money and certain other counts based on the 18 U.S.C.

§ 3553(a) factors, including Dr. Azmat's history, age, and health problems.

More specifically, the district court sentenced Dr. Azmat to (1) 133 months'

imprisonment for his convictions for conspiracy to launder monetary instruments

and for the unlawful dispensation of oxycodone, a Schedule II controlled

substance; (2) 120 months' imprisonment for each count of unlawfully dispensing

hydrocodone, a Schedule III controlled substance; and (3) 60 months'

imprisonment for conspiring to unlawfully dispense controlled substances and for

unlawfully dispensing alprazolam, a Schedule IV controlled substance. The court

ordered all of Dr. Azmat's sentences to run concurrently, resulting in a total

sentence of 133 months' imprisonment.

On appeal, Dr. Azmat challenges his sentences on three grounds: (1) the

district court clearly erred in calculating the drug quantity attributable to him;

(2) his sentence was substantively unreasonable because it was higher than his

codefendants' sentences; and (3) the court erred in sentencing him more severely

for exercising his Sixth Amendment right to a jury trial.

## A.    Drug Quantity

We review for clear error a district court's determination of the drug

quantity attributable to a defendant. United States v. Almedina, 686 F.3d 1312,

1315 (11th Cir. 2012).  "For a finding to be clearly erroneous, this Court must be

left with a definite and firm conviction that a mistake has been committed." Id.

(quotation marks omitted).  The government bears the burden of establishing drug

quantity by a preponderance of the evidence. Id.

"Where there is no drug seizure . . . the court shall approximate the quantity

of the controlled substance.  In making this determination, the [district] court may

consider, for example, . . . financial or other records . . . ." U.S.S.G. § 2D1.1,

comment. (n.5).  A court's approximation of drug quantity "may be based on fair,

accurate, and conservative estimates of the quantity of drugs attributable to a

defendant, [but it] cannot be based on calculations of drug quantities that are

merely speculative." Almedina, 686 F.3d at 1316 (alteration in original) (quotation

marks omitted).

Based on the drug amounts prescribed by Dr. Azmat in East Health Center's

records, the district court held Dr. Azmat accountable for all of the hydrocodone,

oxycodone, and Xanax that he personally prescribed while he was at the Center.[10] We easily conclude that the district court did not clearly err in its drug quantity determination.

Dr. Azmat's primary argument—that there was no "reliable evidence as to what portion of the relevant prescriptions were legitimately used to treat pain"— finds no support in the record. The trial evidence showed that East Health Center was a pill mill that did not serve a legitimate medical purpose. Indeed, it was a cash-based pill mill for pill-seeking addicts, mostly from out-of-state. Abundant evidence showed that Dr. Azmat was aware of its illegitimacy. The fact that Dr. Azmat reduced some patients' prescriptions does not establish that he was treating those patients for medical purposes, particularly when his own statements supported an inference that he reduced the prescriptions to protect himself from legal scrutiny, should the clinic become the subject of an investigation. Indeed, after reviewing the individual patients' records, Dr. Kennedy also testified that Dr. Azmat did not prescribe any of the pills for a legitimate medical purpose or in the usual course of professional practice. In light of all of the powerful trial evidence, we are not left with "a definite and firm conviction" that the district court erred by including all of Dr. Azmat's prescriptions in the drug quantity calculation. See id. at 1315.

---

[10] On occasion, Dr. Azmat also prescribed Lorcet and Percocet.

Additionally, we are equally as confident that the district court relied on "reliable and specific" evidence of the drug quantities. See id. ("The district court must ensure that the Government carries its burden by presenting reliable and specific evidence." (citation omitted)). The district court admitted Dr. Azmat's patient files into evidence, and Investigator Sikes prepared a summary spreadsheet of the amount of medication prescribed to each patient. Therefore, even though there was no drug seizure, the district court had Dr. Azmat's prescription records and was able to make an accurate assessment of the drug quantities involved in the crimes. See U.S.S.G. § 2D1.1, comment. (n.5); Almedina, 686 F.3d at 1316. The quantities were not speculative, and the district court properly attributed all of the prescribed medications to Dr. Azmat for sentencing purposes. See Almedina, 686 F.3d at 1315.

**B.   Substantive Reasonableness**

As to Dr. Azmat's other claims, we review the reasonableness of a sentence under a deferential abuse-of-discretion standard of review. Gall v. United States, 552 U.S. 38, 41, 128 S. Ct. 586, 591 (2007).

The district court must impose a sentence "sufficient, but not greater than necessary to comply with the purposes" listed in § 3553(a)(2), including the need to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, deter criminal conduct, and protect the public from the

defendant's future criminal conduct.  See 18 U.S.C. § 3553(a)(2).  In imposing a

particular sentence, the court must also consider the nature and circumstances of

the offense, the history and characteristics of the defendant, the kinds of sentences

available, the applicable guidelines range, the pertinent policy statements of the

Sentencing Commission, the need to avoid unwarranted sentencing disparities, and

the need to provide restitution to victim.  Id. § 3553(a)(1), (3)-(7).  The defendant

bears the burden of showing that the sentence is unreasonable.  United States v.

Tome, 611 F.3d 1371, 1374 (11th Cir. 2010).

Dr. Azmat's primary argument as to the substantive reasonableness of his

sentence is that the district court failed to consider the need to avoid unwarranted

sentencing disparities.  He claims that his sentence, even with the downward

variances, is more than two to ten times as long as the sentences that his co-

conspirators received, which is a particularly egregious disparity because he

worked at East Health Center for just 19 days and was not involved with

organizing or operating the Center.[11]

Dr. Azmat's argument, however, fails to appreciate that there can be no

"unwarranted" sentencing disparities among codefendants who are not similarly

_____

[11] Dr. Azmat's 5 codefendants received these sentences: (1) Daniel Wise, 42 months;
(2) Sean Clark, 40 months; (3) Candace Carreras, 24 months; (4) Adelaid Lizama, 18 months;
and (5) Shelly Morford, 13 months.  Although they were not codefendants in the indictment
before us, Adelard LeFrancois received a 52-month sentence, Dr. Ken Gosset received a 42-
month sentence, Frankie Barbuscia received a 42-month sentence, and Konstantinos Afthinos
received a 15-month sentence.

situated. See United States v. Docampo, 573 F.3d 1091, 1101 (11th Cir. 2009).

Here, Dr. Azmat was not similarly situated to his co-conspirators, as he wrote the

prescriptions, did the dispensing, and was facing a significantly higher statutory

maximum sentence. Each of his five codefendants pled guilty to conspiracy to

unlawfully dispense controlled substances, and, in exchange, the government

dismissed the remaining counts of the indictment against them. The statutory

maximum penalty for the conspiracy charge was 5 years' imprisonment, whereas

the statutory maximum for dispensing a Schedule II controlled substance was 20

years' imprisonment. See 21 U.S.C. § 841(b)(1)(C), (b)(2). Therefore,

Dr. Azmat's five codefendants could not have received a sentence similar in length

to that of Dr. Azmat. See id. In addition, Dr. Azmat was convicted of more crimes

than his codefendants. Defendants convicted of more crimes or more serious

offenses naturally receive longer prison sentences than those who pled guilty to

fewer or lesser crimes.

In any event, "there is no unwarranted disparity when a cooperating

defendant pleads guilty and receives a lesser sentence than a defendant who

proceeds to trial." United States v. Langston, 590 F.3d 1226, 1237 (11th Cir.

2009). Dr. Azmat's codefendants accepted responsibility for their crimes, pled

guilty to offenses that carried lower penalties, and cooperated with the prosecution.

It is not enough for a defendant to simply compare the sentences of other

defendants in the conspiracy to his own; there must be comparable underlying factual circumstances. One needs to have more than the crime of conviction and the total length of the sentences to evaluate alleged disparities. The underlying facts of the crime and all of the individual characteristics are relevant. Dr. Azmat has not carried his burden to show specific facts establishing that any codefendants are similarly situated.

**C.    Sixth Amendment Claim**

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ." U.S. Const. amend. VI. The former Fifth Circuit has held that "[a]n accused cannot be punished by a more severe sentence because he unsuccessfully exercised his constitutional right to stand trial rather than plead guilty." Baker v. United States, 412 F.2d 1069, 1073 (5th Cir. 1969).

While Dr. Azmat contends that the district court violated the Sixth Amendment by basing his sentence on the fact that he went to trial rather than pleading guilty, like his codefendants, he has wholly failed to establish a constitutional violation. First, the district court rejected the government's request for a 188-month sentence, which the government argued was proper because Dr. Azmat stood "alone and apart from his codefendants" for his refusal to cooperate. The district court, instead of accepting the government's

recommendation, sentenced Dr. Azmat to a lower sentence; the district court even varied below the advisory guidelines range of 151 to 188 months.  This shows that the court was not seeking to punish Dr. Azmat more severely for his choice to exercise his trial rights.

We also note again that Dr. Azmat was facing a higher statutory sentence than his codefendants.  In that sense, his exercise of his Sixth Amendment rights resulted in a higher sentence only indirectly, as it led to the jury convicting him of 51 offenses–more serious offenses that carried more serious penalties.  There is no evidence in the record that the district court punished Dr. Azmat for holding the government to its burden of proof before a jury.  See id.

## XI. CONCLUSION

For the foregoing reasons, we affirm Dr. Azmat's convictions and sentences.

**AFFIRMED.**

60

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

Amy C. Nerenberg
Acting Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

November 10, 2015

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  14-13703-EE
Case Style:  USA v. Najam Azmat
District Court Docket No:  4:13-cr-00028-WTM-GRS-4

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the CRIMINAL JUSTICE ACT must file a CJA voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for a writ of certiorari (whichever is later).

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Sandra Brasselmon, EE at (404) 335-6181.

Sincerely,

AMY C. NERENBERG, Acting Clerk of Court

Reply to: Djuanna Clark
Phone #: 404-335-6161

OPIN-1 Ntc of Issuance of Opinion