# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF GEORGIA
# SAVANNAH DIVISION

| | |
|---|---|
| NAJAM AZMAT, ) | |
| ) | |
| Movant, ) | |
| ) | |
| v. ) | CV417-086 |
| ) | CR413-028 |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Respondent. ) | |

## REPORT AND RECOMMENDATION

Convicted by a jury for conspiracy to distribute and unlawful distribution of controlled substances and conspiracy to launder money, Najam Azmat was sentenced to 133 months' imprisonment. Docs. 320[1] (jury verdict), 367 (judgment). That sentence was affirmed on appeal. Docs. 392 & 393 (opinion and mandate of Eleventh Circuit affirming judgment); *see also United States v. Azmat*, 805 F.3d 1018, 1025 (11th Cir. 2015); *Azmat v. United States*, 136 S. Ct. 2012 (2016) (denying writ of *certiorari*). Azmat now moves to vacate his sentence under 28 U.S.C.

---

[1] The Court is citing to the criminal docket in CR413-028 unless otherwise noted, and all page numbers are those imprinted by the Court's docketing software.

§ 2255, arguing that trial counsel was deficient. Docs. 401 & 403.[2] The Government moves to dismiss his motion, arguing that it is without merit. Doc. 406. Azmat has not opposed the Government's motion to dismiss, though the Court denied his motion to stay the briefing schedule in its order permitting counsel's withdrawal and allowing Azmat to proceed *pro se*. Doc. 423 at 2. The motion to dismiss is thus ripe for review.

## I.    BACKGROUND

Indicted on 51 crimes stemming from his participation in a "pill mill," Azmat was represented by retained counsel at trial. The evidence mounted against him was substantial. Azmat's codefendants, having operated a successful "pill mill" in Florida until their activities were stymied by Florida state legislation restricting dispensation of narcotics (*see* Trial Transcript[3] at 202-21, 291, 389), decided to open a facility in Georgia. They called it the East Health Center, and opened a space in a strip mall in Garden City, Georgia. TT at 214-15, 217, 219, 298, 387, 572. The Center operated the same way the Florida facility had, solely selling

---

[2]   The Court reviews Azmat's amended motion to vacate his sentence, doc. 403, as did the Government.
[3]   The complete Trial Transcript is accessible on the docket. Docs. 384-89.

controlled substances and not engaging in any legitimate medical activity. TT at 216, 219, 230, 298. The Center did not carry malpractice insurance, had forms identical to the Florida facility, and had only the most basic of equipment and supplies that went largely unused. TT at 227-32.

Azmat's codefendants, in search of a local physician to complete the ruse, placed an advertisement on Craig's List in January 2011. TT at 217. The first applicant, Dr. Mary Kay Ross, declined the job and reported the Center to law enforcement. She was suspicious of the $2,000 cash-per-day pay for the pain management clinic, largely out-of-state clientele, and articulated expectation she would prescribe 150-to-190 pills per-patient, per-visit. A second applicant, Dr. David Hatmaker, followed suit. TT at 84-89, 95-103. Azmat, expressing no such misgivings, accepted the job. TT at 226, 246. The Center opened for business on February 20, 2011, and recruited and accepted patients from all over the country. TT at 220, 290, 293-96, 298, 574.

Azmat, speaking with a DEA agent, called his patients "customers" and acknowledged that most came from out of state, came from other pill mills, and were addicted to oxycodone. He admitted that he refused to

see "customers" who required legitimate primary care, and offered no alternative forms of treatment.  TT at 147-49; *see also* TT at 224 (noting that the Center turned away patients seeking treatment for legitimate sickness because it lacked malpractice insurance).  The Center kept records of each customer, including the date of visit, name, date of birth, a record of a recent MRI (which the Center required as a prerequisite to a visit), and the types and quantities of drugs Azmat prescribed for the customer.  TT at 133-36.  238 customers signed into the Center during Azmat's brief tenure (from February 21 through March 18, 2011).  Of those, 196 received prescriptions from Azmat, and 96% of those patients received a prescription for oxycodone.[4]  Only 4% of the customers comprising those 49 counts were from Georgia or received their prerequisite MRI in Georgia.  The Government thus charged Azmat with 49 counts of illegal dispensation of controlled substances.  TT at 142-43.

Eight customers testified at trial.  TT at 312-51, 403-52, 457-537.  They testified that they were addicted to oxycodone at the time they went to the Center and described Azmat's brief examinations as entirely

---

[4]  The 42 that did not receive a prescription were, variously, either disqualified by positive drug tests (and asked to come back three days later), lacked the requisite MRI (and thus referred out to get one), or did not see Azmat.  Tr. 182-83.

4

cursory and done without any discussion of prior treatment or alternative therapies: the point was to prescribe opioids, not to treat. TT at 404, 408, 411-12, 459, 466, 468, 481, 484, 487, 499, 502, 504-506, 518, 520-21. The Government's expert on pain management testified that Azmat's prescriptions were in each case outside the usual course of professional practice and without legitimate medical purpose. TT at 619, *see id.* at 624-71 & 672. The customers testified, and the Government's expert found in each of their files, that they had signed a receipt of information and consent to opioid medication therapy form suggesting they filled it out before seeing Azmat, presupposing a narcotic prescription. TT at 408, 484, 499, 502, 520, 637-40.

Azmat encountered some difficulties with his prescriptions. Pharmacies would call the Center and question his prescriptions or refuse to fill their prescriptions and customers would complain he failed to prescribe them enough drugs. The Government's witnesses testified that Azmat sought to protect himself, explaining that his medical license was on the line, by showing that he was prescribing fewer pills than his customers had previously received at some other pill mill, but promising to increase the amount on the customer's next visit. TT at 300, 308, 391,

413, 468, 584-85.

At trial, Azmat called only one witness, an expert on pain management and pain medicine, to testify that he issued all prescriptions in the usual course of professional practice and with legitimate medical purpose. TT at 783-918. The jury disagreed, and unanimously found Azmat guilty on all counts after deliberating for less than three hours (including lunch). TT at 973, 977. At sentencing, the Court found that Azmat's criminal history category of I and total offense level of 36 yielded a Guidelines range of 188 to 235 months' imprisonment. Doc. 381 at 21. He was sentenced below-Guidelines, to serve on 133 months in prison, with the downward variance predicated on Azmat's poor health and an anticipated amendment to the Guidelines that would lower the base offense level for drug crimes. *Id.* at 86-88.

On appeal, the Eleventh Circuit found "overwhelming evidence" supported Azmat's convictions for the controlled-substance conspiracy, all 49 counts of illegal dispensation of controlled substances, and the money-laundering conspiracy. *Azmat*, 805 F.3d at 1035, 1037-39. It further held that the Court did not abuse its discretion in admitting the Government's expert witness' testimony. *Id.* at 1043.

## II. ANALYSIS

Azmat now seeks to unwind his conviction, arguing that trial counsel failed to effectively mount a defense that he acted in good faith. Doc. 403 at 7. With the benefit of hindsight, Azmat argues that trial counsel ought to have (1) advised him to testify, (2) introduced evidence that some unnamed individual sought to solicit a bribe from Azmat, (3) objected that the Government's expert impermissibly opined to his mental state, and (4) appealed the Court's refusal to instruct the jury on good faith. *Id.*

"To prevail on a claim of ineffective assistance of counsel, a prisoner must prove that his counsel rendered deficient performance and that he was prejudiced by the deficient performance." *Castillo v. United States*, 816 F.3d 1300, 1303 (11th Cir. 2016) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "For performance to be deficient, it must be established that, in light of all the circumstances, counsel's performance was outside the wide range of professional competence." *Putman v. Head*, 268 F.3d 1223, 1243 (11th Cir. 2001). To demonstrate prejudice, the prisoner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." *Strickland*, 466 U.S. at 694; *Matire v. Wainwright*, 811 F.2d 1430, 1434 (11th Cir. 1987) (same); *see also Butcher v. United States*, 368 F.3d 1290, 1293 (11th Cir. 2004) ("[A]ttorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial. That the errors had some *conceivable* effect on the outcome of the proceeding is insufficient to show prejudice."). In other words, mere dissatisfaction with counsel's performance is not enough. Dissatisfaction, however, is all Azmat has alleged.

### A.   Testify at Trial

Azmat argues that counsel deficiently prevented him from testifying in his own defense. He explains that "the one and only defense available to [him] was that his actions were made in good faith." Doc. 403 at 8. He had no criminal record, is "articulate and very presentable," and "had an excellent memory and knowledge of the facts of his case." *Id*. He was further "willing to waive his Fifth Amendment right to remain testify in his own defense, but was advised not to do so by his counsel." *Id*. Azmat speculates that, had he testified after all, "the outcome of the proceeding would have been" different. *Id*. at 8-9.

8

Counsel argued in closing that Azmat had acted in good faith and reminded the jury that good faith was a defense to the charges against him. TT at 961. He also emphasized that, to convict, the jury had to find that "the conduct charged in the indictment was not done in good faith" "beyond a reasonable doubt." *Id.* The jury convicted Azmat on all counts. They did so because of an insurmountable mountain of evidence that Azmat willingly and knowingly committed the crimes alleged. *See Azmat*, 805 F.3d at 1035 (finding, on appeal, "overwhelming evidence" supporting Azmat's convictions for conspiracy and dispensation of controlled substances), *id.* at 1037-38 (listing exhaustive evidence supporting Azmat's guilt in the money-laundering conspiracy).

The evidence adduced at trial demonstrated that Azmat wrote hundreds of prescriptions for controlled substances "outside the usual course of professional practice and without legitimate medical purpose." Nothing he could have said in his own defense would have overcome that showing. And the mere fact that Azmat can imagine a different outcome — without offering even a hint about what specific testimony he might have presented to combat the Government's showing — does not demonstrate any prejudice flowing from counsel's decision not to allow

9

him to testify. *Harrington v. Richter*, 562 U.S. 86, 112 (2011) ("The likelihood of a different result must be substantial, not just conceivable."); *Strickland*, 466 U.S. at 694 (a reasonable probability of a different result "is a probability sufficient to undermine confidence in the outcome."). A movant is not entitled to habeas relief "when his claims are merely conclusory allegations unsupported by specifics or contentions that in the face of the record are wholly incredible." *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991). In the face of this record, Azmat's conclusory contention that counsel performed deficiently by failing to put him on the stand is meritless.

Indeed, trial counsel's advice was reasonable. Rather than exposing himself to an additional perjury charge or losing the 55-month downward variance he received at sentencing, Azmat benefitted from counsel's caution. *See, e.g., Pericles v. United States*, 567 F. App'x 776, 783 (11th Cir. 2014) (attorney not deficient for advising client not to testify because "he might have: (1) not received the 24-month downward variance the district court imposed; or (2) might have been prosecuted for perjury."). And Azmat levels no allegation that he protested trial counsel's strategic choice or expressed his desire to testify at that time.

"[C]ounsel's performance was not constitutionally deficient" where Azmat "was advised of his right to testify, was advised that he should not exercise the right, and did not protest." *United States v. Teague*, 953 F.2d 1525, 1535 (11th Cir. 1992) (requiring a defendant to show that his "will [to testify in his own defense] was 'overborne' by his counsel" to support an ineffective assistance of counsel claim).

## B. Evidence of the Bribe

Azmat also faults counsel for failing to introduce evidence that — after being fired from the Center, when he went to work at a pain clinic in Kentucky — the Government (allegedly) attempted to solicit a bribe from him. Doc. 403 at 9. An unnamed, unidentified individual holding himself out as a DEA representative apparently "stated that if Dr. Azmat paid him [a sum of money] that the investigation would go away and the case would be closed." *Id*. Azmat refused, and the DEA representative lowered his demand. *Id*. Azmat again refused, and then "surreptitiously record[ed]" the DEA representative. *Id*. He attempted to report the bribe to law enforcement, without result, and then sought to have evidence of the bribe introduced at trial to support his good faith belief in the legitimacy of his actions. *Id*. at 9-10. Trial counsel, he protests,

inexplicably refused, despite having at least one witness available to support his argument. *Id.*

As the Government notes, however, evidence of a defendant's good conduct in one instance is not admissible to negate his criminal intent in another. Doc. 406 at 34-35 (citing, *inter alia*, *United States v. Grimm*, 568 F.2d 1136, 1137-38 (5th Cir. 1978) ("[e]vidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant."); *United States v. Camejo*, 929 F.2d 610, 612 (11th Cir. 1991) (excluding proffered testimony as an impermissible "attempt to portray [defendant] as a good character through the use of prior 'good acts'" because "[e]vidence of good conduct is not admissible to negate criminal intent"); *United States v. Marrero*, 904 F.2d 251, 260 (5th Cir. 190) ("The fact that [defendant] did not [commit the crime] in every instance in which she had an opportunity to do so is not relevant to whether she, in fact, [committed the crime] as alleged in the indictment.")). In other words, even assuming that the "DEA representative" both existed and that witnesses could be found to support Azmat's telling, the evidence of his single "good act" would not have been admissible. And counsel cannot be deficient for failing to explore that rabbit hole. *Diaz-Boyzo v.*

*United States*, 294 F. App'x 558, 560 (11th Cir. 2008) (counsel is not ineffective for failing to pursue a "nonmeritorious issue"); *United States v. Winfield*, 960 F.2d 970, 974 (11th Cir. 1992) (same).

### 3. The Government's Expert

Azmat also argues that the Government's expert, Dr. Gene Kennedy, violated Fed. R. Crim. P. 704(b) by "present[ing] ultimate opinion testimony which if not expressly then by necessary implication concluded that [ ] Azmat's practice was not done in good faith." Doc. 403 at 10-11. Rule 704(b) prohibits experts from opining about a defendant's "mental state or condition that constitutes an element of the crime charged or a defense." Azmat, however, does not specify any particular trial testimony in which Kennedy so opined. *See* doc. 403. That is, the Government responds, because Kennedy only ever opined that Azmat did not issue *any* of the prescriptions "for a legitimate medical purpose or in the course of professional practice." Doc. 406 (citing TT at 672). Such testimony is routinely accepted by courts in similar cases. *Id.* (collecting cases). Azmat has not even hinted at how trial counsel's refusal to tilt at windmills was either deficient or prejudiced his case. *Diaz-Boyzo*, 294 F. App'x at 560; *Winfield*, 960 F.2d at 974 (11th Cir. 1992).

13

## D. Good Faith Jury Instruction

Azmat lastly contends that counsel failed to appeal the Court's denial of his proposed good faith jury instructions, despite objecting to that denial to preserve the issue. Doc. 403 at 11-12. Appellate counsel, of course, does not have a duty to raise on appeal every nonfrivolous issue requested by the client. *See Jones v. Barnes*, 463 U.S. 745, 751-54 (1983). Further, to demonstrate ineffectiveness, movant must show some "actual prejudice" flowing from counsel's decision not to appeal an error in jury instructions. *See United States v. Frady*, 456 U.S. 152, 169 (1982).

"Actual prejudice" is a high threshold. It asks "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process,' not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.'" *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)), reaffirmed with approval by *Frady*, 456 U.S. at 169. Put differently, "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp*, 414 U.S. at 146. That context includes "testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by

the judge. Thus not only is the challenged instruction but one of many such instructions, but the process of instruction itself is but one of several components of the trial which may result in the judgment of conviction." *Id.* at 147. Here, Azmat concludes without explication that the failure to appeal his denied good faith jury instructions caused him irreparable harm on appeal. Doc. 403 at 11-12. He offers no support for that conclusion, and does not couch his argument in the context of the "overwhelming evidence" the Government had adduced until that point or evaluate the Court's final instructions to the jury. *See id.*

### 1. *Proposed Jury Instruction No. 20*

Azmat first sought to instruct the jury that the issue of whether a prescription was for a "legitimate medical purpose" is determined by a subjective standard, such that a doctor's good faith must be evaluated. Doc. 284 at 34-35 (Defendant's Proposed Jury Instruction No. 20). It is not, and defendant's own citation contradicts him: "a jury must determine from an *objective* standpoint whether a prescription is made in the 'usual course of professional practice" and defendants are "not entitled to an instruction that even *refer[s]* to good faith." *United States v. Tobin*, 676 F.3d 1264, 1283 (11th Cir. 2012) (second emphasis added),

cited in doc. 284 at 34-35.  Of course, counsel had no cause to appeal the denial of a jury instruction contrary to established law, and his failure to so appeal cannot comprise ineffective assistance.

Azmat further sought to instruct that Georgia standards of practice are utilized to determine whether a prescription was "within the usual course of professional practice."  Doc. 284 at 35.  The substance of that request was fully accommodated in the Court's instructions.  Doc. 319 at 17 (instructing the jury that the Government had to prove that Azmat had acted "other than in good faith in the usual course of professional practice" and that he could "not be convicted if he merely made an honest effort to treat his patients in accordance with a standard of medical practice generally recognized and accepted in the State of Georgia.").

The remainder of the proposed instruction defined "good faith," explained that Azmat was not guilty if he acted in good faith, and instructed that Azmat did not have the burden of proving good faith. Doc. 284 at 34-35.  That definition was given, verbatim, to the jury. Doc. 319 at 16-17 (instructing the jury that "Good faith in this context means good intentions and the honest exercise of good professional judgment as to a patient's medical needs," that the Government had the

16

burden to prove Azmat did not act in good faith, and that the jury must acquit if the Government failed to meet its burden). Because the Court fully incorporated these requests in its final instructions to the jury, counsel had no cause to appeal their denial and Azmat cannot show any prejudice flowing from counsel's strategic decision not to raise a moot point on appeal.

### 2.   *Proposed Jury Instruction No. 21*

Azmat also requested a jury instruction that, if the jury found the governing medical standards to be vague or highly debatable, it had to acquit.  Doc. 284 at 36 (Defendant's Proposed Jury Instruction No. 21). No evidence was introduced, however, to raise the issue of vagueness for any factfinder.  Azmat's sole witness, an expert on pain management, testified only that Azmat's prescriptions were within the usual course of professional practice and made for a legitimate purpose.  *See* TT at 809-58.  He referred to the Georgia Composite Board's guidelines for use of controlled substances, but made no suggestion that the standards were vague or even debatable.  TT. at 809-15.  Counsel could not be deficient for failing to raise a nonexistent claim on appeal.

### 3.   *Proposed Jury Instruction No. 22*

Azmat finally requested a jury instruction setting forth the difference between civil medical malpractice and criminal conduct outside the bounds of professional medical practice. Doc. 284 at 37 (Defendant's Proposed Jury Instruction No. 22). Given that civil medical malpractice was a nonissue, and the Court fully instructed the jury as to the elements of the charged crimes, there was no cause for counsel to appeal the denial of the proposed instruction and no possible prejudice flowing from counsel's strategic decision not to raise a nonmeritorious issue on appeal.

In sum, Azmat's proposed instructions were either contrary to law, otherwise encompassed in the Court's final jury instructions, or completely irrelevant to the case. Counsel cannot be deficient for failing to pursue such nonmeritorious arguments on appeal. *Diaz-Boyzo*, 294 F. App'x at 560; *Winfield*, 960 F.2d at 974 (11th Cir. 1992).

### III. CONCLUSION

Accordingly, the Government's motion to dismiss Najam Azmat's § 2255 motion (doc. 406) should be **GRANTED**, and Azmat's motion

(docs. 401 & 403) should be **DENIED**.[5]  For the reasons set forth above, it is plain that he raises no substantial claim of deprivation of a constitutional right.  Accordingly, no certificate of appealability should issue.  28 U.S.C. § 2253; Fed. R. App. P. 22(b); Rule 11(a) of the Rules Governing Habeas Corpus Cases Under 28 U.S.C. § 2255 ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.").  Any motion for leave to appeal *in forma pauperis* therefore is moot.

This Report and Recommendation (R&R) is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72.3.  Within 14 days of service, any party may file written objections to this R&R with the Court and serve a copy on all parties.  The document should be captioned "Objections to Magistrate Judge's Report and Recommendations."  Any request for additional time to file objections should be filed with the Clerk for consideration by the assigned district judge.

---

[5] Because his motion is entirely without merit and his contentions are unambiguously contradicted by the record, an evidentiary hearing is not warranted.  *Lynn v. United States*, 365 F.3d 1225, 1239 (11th Cir. 2004) (where the motion "amount[ed] to nothing more than mere conclusory allegations, the district court was not required to hold an evidentiary hearing on the issues and correctly denied [movant]'s § 2255 motion.").

After the objections period has ended, the Clerk shall submit this R&R together with any objections to the assigned district judge. The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to timely file objections will result in the waiver of rights on appeal. 11th Cir. R. 3-1; *see Symonett v. V.A. Leasing Corp.*, 648 F. App'x 787, 790 (11th Cir. 2016); *Mitchell v. U.S.*, 612 F. App'x 542, 545 (11th Cir. 2015).

**SO REPORTED AND RECOMMENDED,** this  11th  day of June, 2019.

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA